**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | Chapter 15 |
| Pride Group Holdings Inc., *et al.*[1] | Case No. 24-10632 (CTG) |
| Debtors in Foreign Proceedings. | (Joint Administration Requested) |

**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN
MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Randall Benson, solely in his capacity as the duly authorized foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors"), in the Canadian proceedings (the "CCAA Proceedings") commenced under the Companies' Creditors Arrangement Act (the "CCAA"), pending before the Ontario Superior Court of Justice (Commercial List) in Ontario, Canada, Court File No. CV-24-00717340-00CL (the "Canadian Court"), respectfully submits this verified petition (together with the form petitions (the "Petitions") filed concurrently herewith, the "Verified Petition") for recognition of the CCAA Proceedings with respect to each of the Debtors as "foreign main proceedings," recognition of the Foreign Representative, and certain related relief pursuant to sections 105(a), 1507, 1510, 1515, 1517, and 1521 of Title 11 of the United States Code (the "Bankruptcy Code").

In support of the Verified Petition, the Foreign Representative respectfully refers the Court to and incorporate the following herein by reference: the (a) *Declaration of Randall Benson in Support of the (A) Debtors' Verified Petition for (I) Recognition of Foreign Main Proceedings,*

---

[1] The last four digits of Debtor Pride Group Holdings Inc.'s Canadian business number are 6399. Due to the large number of debtors in these chapter 15 cases, a complete list of the debtor entities and the last four digits of their unique identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing agent at https://dm.epiq11.com/pridegroup. The Debtors' service address for the purposes of these chapter 15 cases is 1450 Meyerside, Suite 401, Mississauga, Ontario, L5T 2N5, Canada.

*(II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code and (B) Motion for Provisional Relief* (the "<u>Benson Declaration</u>"); and (b) *Declaration of Rachel Nicholson as Canadian Counsel to the Debtors in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "<u>Nicholson Declaration</u>").

## PRELIMINARY STATEMENT[2]

1.     The Debtors operate a trucking and logistics conglomerate based in Canada with operations in Canada and the United States that is collectively the largest used truck seller in North America.  The Debtors' businesses are managed centrally from their headquarters in Mississauga, Ontario, and they maintain facilities and operations in Canada and the United States.  The Debtors' businesses consist of new and used truck and trailer sales, truck leasing and financing, logistics, equipment maintenance and parts sales, rescue, and owning and operating real properties with dealerships and service centers in Canada and the United States, and they are a dominant or important player in each of these industries and markets.  The Debtors' ability to offer a "one-stop shop" solution for truck drivers is a unique competitive advantage that sets them apart from many other industry players.  In particular, the Debtors' services are attractive to trucking "owner-operators," which are a class of entrepreneurs that own and operate between one and five commercial trucks.

2.     Despite being profitable and growing until very recently, the Debtors' trajectory was disrupted by the onset of the COVID-19 pandemic in 2020, ultimately leading to the company's

---

[2]     Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to them elsewhere in this Verified Petition.

current financial crisis.  Initially, the pandemic was a boon to the North American trucking and logistics industries as freight rates soared in Canada and across the world.  The Debtors seized on those opportunities and experienced rapid growth by significantly expanding its North American fleet and footprint and expanding into new business lines that helped its client base.  However, as the effects of the COVID-19 pandemic began to subside, so too did its beneficial effects on the North American trucking industry.  As demand for trucking services waned and diesel prices soared, there was suddenly an overabundance of trucks and truck drivers in North America, negatively impacting every part of the industry.  The industry's overall downturn had a particularly severe impact on smaller-scale trucking operations such as owner-operators, which typically operate at the margins of the industry and have less financial wherewithal to sustain themselves through more challenging times.

3.      To address this downturn, the Debtors took a number of important steps, including refinancing a significant amount of their assets, reducing their workforce, and winding down several of their less profitable business lines beginning in late 2022.  More recently, the Debtors made the decision to suspend payments to certain of their lenders in an effort to continue operating as a going concern.  Despite these efforts, the downturn has continued, and the lenders under the Syndicated Facility[3] informed the Debtors that they would begin to enforce their rights and remedies if formal insolvency proceedings were not initiated by March 31, 2024.

---

[3]    That certain Third Amended and Restated Credit Agreement dated as of November 4, 2022 (the "Syndicated Facility"), by and among: TPine Truck Rental Inc., Tpine Leasing Capital Corporation, Pride Truck Sales Ltd., 2076401 Ontario Inc., Tpine Leasing Capital L.P., PGED Holding, Corp., High Prairie Texas Holding Corp, 131 Industrial Blvd Holding Corp, 59th Ave Phoenix Holding Corp., Di Miller Drive Bakersfield Holding Corp. and 1450 Meyerside Holding Inc., as borrower (the "Borrower Parties"); various guarantors including each of the Borrower Parties and Pride Truck Sales L.P., TPine Rental USA, Inc., Coastline Holdings, Corp., Pride Group Holdings Inc., Pride Group Logistics Ltd., 2043002 Ontario Inc., Pride Fleet Solutions Inc., and Frontage Road Holding Corp.; Royal Bank of Canada, as administrative agent, and the lenders from time to time party thereto.

4.      Accordingly, and after thoroughly evaluating all other available options, the Debtors commenced the CCAA Proceedings and, shortly thereafter, these chapter 15 cases (collectively, the "Chapter 15 Cases").  Recognition of the CCAA Proceedings is imperative to the success of the CCAA Proceedings because it is aimed at protecting the Debtors and their non-Debtor affiliates (collectively, the "Pride Group") and their assets within the United States from creditor and any other actions, and it will complement the stay of proceedings imposed under the CCAA within Canada so as to give the Pride Group the necessary breathing room to negotiate and formulate a restructuring plan.

5.      Recognition, if granted, will serve chapter 15's purpose—to provide a forum for coordination between the Canadian Court and this Court that will enable the fair and efficient centralized administration of the Debtors' assets and protect the Pride Group's creditors and other interested parties in Canada and the United States, while enabling the Pride Group to formulate a path forward that will maximize the value of the Debtors' assets.  Without this Court's recognition of the CCAA Proceedings, the Pride Group's operations in the United States (and the value of its assets) may be jeopardized by creditors and other parties taking piecemeal enforcement actions, which would have a devastating effect on the Pride Group, the CCAA Proceedings, and the overall prospects of a successful restructuring.

6.      The relief sought by the Foreign Representative in these Chapter 15 Cases will ensure that these Chapter 15 Cases and the CCAA Proceedings are conducted in a fair, efficient, uninterrupted, and centralized manner with the goal of maximizing the value of the Debtors' assets for the benefit of all stakeholders, preserving jobs, and ensuring uninterrupted service to the Debtors' customers.

## **BACKGROUND**

A. <u>**Overview of the Debtors and the Pride Group**</u>

7.     There is no ultimate parent company for the Debtors.  The ultimate beneficial owners of the Pride Group are two individuals (along with certain other members of their family via various family trusts)—Sulakhan Johal and Jasvir Johal—who together started these businesses in 2010 after immigrating to Canada.  All management decisions for the Pride Group are made from its global headquarters located at 1450 Meyerside Dr., Suite 401, Mississauga, Ontario, Canada.  The Debtors, all of which are applicants in the CCAA Proceedings, consist of the Pride Group's Canadian and U.S. operating companies,[4] as well as certain other holding companies in Canada and the United States that are borrowers or guarantors under the Pride Group's credit facilities.  The Debtors do not include the Pride Group's numerous single-asset real estate holding companies, which are applicants in the CCAA Proceedings.

8.     The Pride Group is engaged in a number of business lines across the North American trucking and logistics industries, including logistics and brokering; used and new truck sales, leasing, and financing; servicing, rescue, and parts sales; securitization and securitization financing; and other ancillary business lines (some of which have been recently wound down) such as factoring, operating truck stops, and installing electric truck charging stations.  As of the date hereof (the "<u>Petition Date</u>"), the Pride Group employed 669 employees and 405 independent contractors, the majority of whom are based in Canada.

9.     The Pride Group is obligated on a number of pre-petition secured facilities, including (i) the Syndicated Facility consisting of CA$22 million and US$80 million in non-

---

[4]    Two U.S. operating companies, Pride Truck Sales L.P. and TPine Leasing Capital L.P., are limited partnerships and therefore not eligible to become applicants in the CCAA Proceedings due to their corporate structure. However, the controlling general partners of these limited partnerships are applicants in the CCAA Proceedings and Debtors in these Chapter 15 Cases.

revolving term loans, and CA$390 million and US$250 million in revolving loans; (ii) various floor plan facilities secured against truck collateral totaling CA$175 million and US$100 million; (iii) various wholesale leaseline facilities totaling CA$341 million and up to US$405 million; (iv) various lease facilities secured against truck collateral totaling CA$300 million; (v) various securitization facilities totaling more than CA$1 billion and US$400 million; (vi) various real estate mortgages totaling more than CA$230 million and US$80 million;  and (vii) certain other credit facilities totaling CA$130 million.

###### B.  Circumstances Leading to the Restructuring

10.    As noted above, the North American trucking and logistics industry is facing a prolonged downturn in the wake of the COVID-19 pandemic.  The situation is made worse by the increased number of trucks that were brought to market during the immediate aftermath of the COVID-19 pandemic, many of which are currently sitting unused.  These effects have been disproportionately borne by smaller trucking and logistics companies and owner-operators, which comprise a significant proportion of the Debtors' customers.  As these customers become delinquent in making financing and lease payments for their trucks, they also stop utilizing the Pride Group's other business lines, such as truck servicing, fuel sales, factoring, and rescue operations, culminating in a perfect storm of events that have all contributed to the Debtors' current financial position.

11.    In addition to the above, the Debtors have also been made aware that more than one lender claims a security interest in certain trucks due to a lapse in the timely tracking and correction of security registration (in part driven by the overall business downturn and strain on human resources).  The Debtors have been working with their financial advisor and Canadian Court-appointed monitor, Ernst & Young Inc. (in such capacity, the "Monitor"), and their chief

restructuring officer, RC Benson Consulting Inc. (in such capacity, the "CRO"), to address that issue.  The Debtors have, with the CRO and Monitor's assistance, implemented internal governance programs and controls to ensure that security interests in trucks would be properly tracked and corrected.  However, certain lenders have refused to permit their truck collateral from being transferred or sold, which further exacerbates the Debtors' financial position as they are unable to conduct a core part of their business—selling and leasing trucks.  While the CCAA Proceedings and these Chapter 15 Cases proceed, the Debtors, with the CRO and Monitor's assistance and oversight, intend to strictly implement governance protocols designed by the Monitor to ensure that no lenders receive any benefits from their collateral at the expense of any other parties in interest, including by placing any proceeds of the trucks subject to multiple security interests into a trust account held by the Monitor to be distributed in accordance with the CCAA Proceedings.

12.    The Monitor and CRO, with the Debtors' assistance, have also identified certain other instances where assets or credit facilities were recorded differently than they ought to have been.  In each such case, the Debtors, the Monitor, and the CRO have implemented practices and protocols to prevent these situations from occurring in the future, and such practices and protocols have been disclosed to certain of the Debtors' lenders.

C.    **The CCAA Proceedings and These Chapter 15 Cases**

13.    As a result of the foregoing, and after exhausting all other available options, the Debtors commenced the CCAA Proceedings on March 27, 2024 in the Canadian Court.  The Canadian Court signed the preliminary initial order on the following day (the "Initial Order"), granting certain relief in connection with the CCAA Proceedings.  The Initial Order, among other things, (i) appoints Randall Benson as the Foreign Representative for the Debtors and authorizes

him to file these Chapter 15 Cases; and (ii) stays the commencement or continuation of any proceeding or enforcement process in any court or tribunal against the Debtors, their non-Debtor affiliates, certain of their directors and officers, and any of their property through and including April 6, 2024 or such later date as the Court may order (the "Stay Period").

14.     On the Petition Date, the Foreign Representative commenced these Chapter 15 Cases. Concurrently with the filing of this Verified Petition, the Foreign Representative has requested joint administration of these Chapter 15 Cases pursuant to Bankruptcy Rule 1015(b).  Also on the Petition Date, the Foreign Representative filed the *Motion of the Foreign Representative for Entry of an Order Granting Provisional Relief Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code* (the "Provisional Relief Motion") seeking entry of an order (the "Provisional Relief Order") granting certain provisional relief under section 1519(a) of the Bankruptcy Code, including relief available pursuant to sections 362, 364 and 365 of the Bankruptcy Code with respect to the Pride Group and its property located within the territorial jurisdiction of the United States.

15.     As described in detail in the Benson Declaration, the primary purpose of the CCAA Proceedings is to give the Debtors breathing room to stabilize their business and develop a plan to restructure their affairs and indebtedness for the benefit of their stakeholders.  Additional factual background regarding the Debtors, including their history and business operations, their capital structure, and the events leading to the filing of the CCAA Proceedings and these Chapter 15 Cases, is set forth in detail in the Benson Declaration.  Details regarding the CCAA Proceedings and the CCAA process are set forth in the Nicholson Declaration.

### JURISDICTION AND VENUE

16.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

*Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

17.     Recognition of a foreign proceeding and other matters under chapter 15 of the Bankruptcy Code are core matters under 28 U.S.C. § 157(b)(2)(P).

18.     These Chapter 15 Cases have been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of the Verified Petition in accordance with section 1515 of the Bankruptcy Code.

19.     The Foreign Representative confirms his consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of final orders or judgments by the Court to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

20.     Venue in this district is proper under 28 U.S.C. § 1410 because the Debtors have their principal assets in the United States located in Delaware.  The Debtors have property in Delaware through their indirect ownership in the equity of Delaware entities, and each debtor has an interest in a retainer on deposit with the Delaware office of Morris, Nichols, Arsht & Tunnell LLP in which the Debtors have a continuing ownership interest. These funds are held in an account at a Wilmington, Delaware branch of M&T Bank in accordance with Delaware Rule of Professional Responsibility 1.5.

21.     The statutory predicates for the relief requested in this Verified Petition are sections 101(23)-(24), 105(a), 306, 1502, 1504, 1507, 1509, 1510, 1512, 1515, 1516, 1517, 1520, 1521, 1522, and 1524 of the Bankruptcy Code.

**RELIEF REQUESTED**

22.     The Foreign Representative has commenced these Chapter 15 Cases as ancillary proceedings to the CCAA Proceedings and respectfully files this Verified Petition contemporaneously with the accompanying documentation required by sections 1504 and 1515 of the Bankruptcy Code.

23.     The Foreign Representative respectfully requests that this Court enter an order, substantially in the form of the Proposed Order attached hereto as **Exhibit A**, pursuant to sections 105(a), 1504, 1507, 1509, 1510, 1515, 1517, 1520, and 1521 of the Bankruptcy Code that:

    a.  recognizes the CCAA Proceedings as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code, or in the alternative as foreign nonmain proceedings pursuant to section 1517(b)(2) of the Bankruptcy Code;

    b.  recognizes the Foreign Representative as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the CCAA Proceedings;

    c.  gives full force and effect in the United States to the Initial Order, including any and all extensions or amendments thereof authorized by the Canadian Court and extending the protections of the Initial Order to the Debtors (and their non-Debtor affiliates, as applicable) on a final basis;

    d.  grants the Debtors all of the relief afforded pursuant to section 1520 of the Bankruptcy Code, including but not limited to the "automatic stay" under section 362 of the Bankruptcy Code, which shall apply with respect to the Debtors, their non-Debtor affiliates, certain directors and officers, and any of their property that is now or in the future located within the territorial jurisdiction of the United States;

    e.  extends on a final basis (pursuant to section 1521(a)(6) of the Bankruptcy Code) the relief granted under the Provisional Relief Order and grants such further additional relief requested herein and as otherwise authorized by sections 1507 and 1521 of the Bankruptcy Code, as applicable, as the Court deems necessary; including a permanent injunction enjoining all parties from commencing or continuing any action or proceeding in the United States against the Debtors, their non-Debtor affiliates, certain directors and officers, or any of their assets located within the territorial jurisdiction of the United States that is inconsistent with the Initial Order (the "Injunction"); and

    f.  provides such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

24.     Chapter 15 of the Bankruptcy Code is designed to promote cooperation and comity between courts in the United States and foreign courts, to protect and maximize the value of a debtor's assets and to facilitate the rehabilitation and reorganization of businesses.  11 U.S.C. 1501. The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's restructuring in its home country.

25.     Consistent with these principles, the Foreign Representative commenced ancillary proceedings for the Debtors under chapter 15 of the Bankruptcy Code to obtain recognition of the CCAA Proceedings and certain related relief.  The Foreign Representative believes that these Chapter 15 Cases will complement the Debtors' primary proceedings in Canada to ensure the effective and economic administration of the Debtors' restructuring efforts and prevent adverse actions from being brought by disgruntled creditors against the Pride Group in the United States that would derail the Pride Group's restructuring efforts.

### A.     The Debtors are Eligible for Chapter 15 Relief

26.     Section 109(a) of the Bankruptcy Code provides that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title."  Courts have applied section 109(a) of the Bankruptcy Code to chapter 15 eligibility.  *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir. 2013) (holding that section 109(a) applies to chapter 15 debtors).  Decisions interpreting section 109(a) of the Bankruptcy Code as applied to foreign debtors under other chapters of the Bankruptcy Code unanimously hold that a debtor satisfies the section 109 requirement even when it only has a nominal amount of property in the United States.  *See GMAM Inv. Funds Trust I v. Globo Comunicacoes e Partipacoes S.A. (In re Globo Comunicacoes e Partipacoes S.A.),* 317 B.R. 253,

249 (S.D.N.Y. 2004) (stating that courts have repeatedly found that there is "'virtually no formal barrier' to having federal courts adjudicate foreign debtors' bankruptcy proceedings") (citing *In re Aerovias Nacionales de* Colombia S.A. (In re Avianca), 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003); *In re Berau Capital Res. Pte. Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015) (holding that section 109(a) neither requires a specific quantum of property in the United States, nor states when or for how long that property must be located within the United States); *see also In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 38-39 (Bankr. D. Del. 2000) (holding that approximately $10,000 in a bank account and the unearned portions of retainers provided to local counsel constituted a sufficient property interest for chapter 11 purposes).

27.    Each of the Debtors is eligible to be a debtor under section 109(a) of the Bankruptcy Code because it either is incorporated in the United States or has property in the United States. Specifically, each of the Debtors incorporated in the United States (the "U.S. Debtors") is incorporated in the United States and each of the Debtors incorporated in Canada (the "Canadian Debtors") has property located in Delaware consisting of a retainer deposited with Delaware counsel to the Foreign Representative that is being held in a Delaware bank account for the benefit of all of the Debtors.  For these reasons, each of the Debtors satisfies the requirements under section 109(a) of the Bankruptcy Code.

### B.    The CCAA Proceedings Should Be Recognized as Foreign Main Proceedings

28.    Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (a) such foreign proceeding is a foreign main proceeding within the meaning of section 1502(4) and 1517(b)(1) of the Bankruptcy Code, (b) the foreign representative applying for recognition is a person or body, and (c) the petition meets the requirements of section 1515 of the Bankruptcy

Code. *See* 11 U.S.C. § 1517.   As explained below, the CCAA Proceedings, the Foreign

Representative, and the Petitions satisfy all of the foregoing requirements.

### C.    The CCAA Proceedings are Foreign Proceedings

29.    Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets and
> affairs of the debtor are subject to control or supervision by a foreign
> court, for the purpose of reorganization or liquidation.

30.    Courts have held that a "foreign proceeding" is one:

a.   in which "acts and formalities [are] set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;"

b.   that has either a judicial or an administrative character;

c.   that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

d.   that is located in a foreign country;

e.   that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

f.   in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

g.   which proceeding is for the purpose of reorganization or liquidation.

*See In re Ashapura Minechem Ltd.,* 480 B.R. 129, 136 (S.D.N.Y. 2012) (citing *In re Betcorp Ltd.,*

400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re Overnight and Control Comm 'n of*

*Avćmzit, S.A.,* 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors). As set forth in the

Benson Declaration and Nicholson Declaration, the CCAA Proceedings satisfy such requirements

and, therefore, qualify as "foreign proceedings" for purposes of section 101(23) of the Bankruptcy

Code.

31.      *First*, the CCAA Proceedings are proceedings commenced pursuant to the CCAA, a Canadian law that governs corporate reorganizations and provides for an arrangement of a company's financial obligations.  *See* CCAA § 44(a—e).  *See* Nicholson Decl. at ¶ 9.  For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets."  *Betcorp*, 400 B.R. at 278.  Because the CCAA Proceedings operate under such statutory framework, they satisfy the first factor of section 101(23) of the Bankruptcy Code.

32.      *Second*, the CCAA Proceedings are judicial in character.   A reorganization proceeding is judicial in character whenever a "court exercises its supervisory powers."  *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010).   In the CCAA Proceedings, the Canadian Court has jurisdiction over the Debtors' assets and affairs and has entered the Initial Order, which, among other things, has imposed the Stay Period until April 6, 2024 precluding parties from exercising any potential rights with respect to the Pride Group and its assets.  *See* Nicholson Decl. at ¶ 18.

33.      *Third*, the CCAA Proceedings are collective in nature in that all affected creditors are allowed to participate.  *See* Nicholson Decl. at ¶ 21.   In *Betcorp*, for instance, the bankruptcy court discussed the contrasts between a true collective proceeding, where such proceeding "considers the rights and obligations of all creditors" and a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor."  *See* 400 B.R. at 281.  Here, the Debtors have commenced the CCAA Proceedings to negotiate, formulate and propose a restructuring plan to their stakeholders.  The Initial Order protects due process rights of the various stakeholders of the Debtors, as evidenced by the Canadian Court's discussion regarding certain rights held by interested parties, the temporary nature of the Stay

Period, and the notice requirements in the Initial Order.  All creditors and other parties will have a full and fair opportunity to participate in the CCAA Proceedings, including by submitting claims, retaining counsel and appearing, raising objections, and voting on a restructuring plan (if one is proposed).  *See* Nicholson Decl. at ¶ 20.

34.     ***Fourth***, the CCAA Proceedings, including the Canadian Court, are located in a foreign country, namely Canada.

35.     ***Fifth***, as described above, the CCAA, which governs the CCAA Proceedings, relates to the adjustment of debt.  *See id.* at ¶ 21.

36.     ***Sixth***, the CCAA Proceedings subject the Debtors' assets and affairs to the supervision of the Canadian Court during the pendency of the proceedings.  *See id*.

37.     ***Seventh***, the objective of the CCAA Proceedings is the reorganization of the Debtors.  The Debtors require immediate CCAA protection to ensure that they can continue as a going concern, service their significant customer base of small business owners and operators, maintain gainful employment for over a thousand employees and independent contractors, and preserve enterprise value for the benefit of all stakeholders.  The Debtors intend to evaluate and pursue during the pendency of CCAA Proceedings, as appropriate, the recapitalization of their business through a plan of arrangement and/or a sale of assets under court supervision for the benefit of creditors.   Therefore, the Foreign Representative submits that the Debtors have commenced the CCAA Proceedings for the purpose of reorganization, as required by section 101(23) of the Bankruptcy Code.

38.     Since the CCAA Proceedings satisfy all of the criteria required by section 101(23) of the Bankruptcy Code, they are foreign proceedings. United States courts have recognized collective proceedings similar to the CCAA Proceedings as "foreign proceedings" on numerous

occasions.  *See, e.g., In re SimEx Inc.*, No 24-10083 (TMH) (Bankr. D. Del. Feb. 20, 2024) (recognizing a Canadian arrangement as a foreign proceeding); *In re Nexii Building Solutions Inc.*, No. 24-10026 (JKS) (Bankr. D. Del. Feb. 9, 2024) (same); *In re Lighthouse Immersive Inc.*, No. 23-11021 (LSS) (Bankr. D. Del. Aug. 28, 2023) (same); *In re Nextpoint Financial Inc.*, No. 23-10983 (TMH) (Bankr. D. Del. Aug. 16, 2023) (same); *In re IMV Inc.,* No. 23-10589 (KBO) (Bankr. D. Del. June 2, 2023) (same); *In re Tervita Corp.*, No. 16-12920 (MEW) (Bankr. S.D.N.Y. Dec. 2, 2016) (same); *In re Essar Steel Algoma*, No. 14-11730 (KJC) (Bankr. D. Del. Jul. 21, 2014) (same); *In re Mega Brands Inc.*, No. 10-10485 (CSS) (Bankr. D. Del. Mar. 23, 2010) (same).

### D.    The CCAA Proceedings are Foreign Main Proceedings

39.    The CCAA Proceedings should be recognized as "foreign main proceedings" as defined in section 1502(4) of the Bankruptcy Code.  A foreign proceeding must be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of its main interests. 11 U.S.C. § 1517(b).  The term "center of main interests" ("COMI") is not defined in the Bankruptcy Code.  COMI, however, has been equated to a debtor's principal place of business.  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (S.D.N.Y. 2008).

40.    While section 1516 of the Bankruptcy Code creates a presumption that a debtor's registered office (place of incorporation) is its COMI, that presumption may be rebutted by contrary evidence.  *See In re Tri-Continental Exch.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006); § 1516(c).  Section 1516(c) "creates no more than a rebuttable evidentiary presumption, which may be rebutted notwithstanding a lack of party opposition." *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 335 (S.D.N.Y. 2008).  Each of the Debtors that is incorporated in Canada (the "Canadian Debtors") has its COMI in Canada because it is

incorporated in Canada.  Notwithstanding that the remaining Debtors are incorporated in the United States (the "U.S. Debtors"), the facts set forth herein and in the Benson Declaration rebut the presumption of COMI in the United States.  *See* Benson Declaration ¶¶ 60-63.

41.     Courts consider a variety of factors when assessing COMI including, "the location of the debtor's headquarters; the location of those who actually manage the debtor […] the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes."  *In re Modern Land (China) Co.*, 641 B.R at 782 (Bankr. S.D.N.Y. 2022) (quoting *In re SphinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)).  In *Modern Land*, the court noted that "consideration of these specific factors is neither required nor dispositive."  *Id.* Further, in *SphinX*, the court explained that these factors should not be applied "mechanically" and "[i]nstead, they should be viewed in light of Chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value."  *SphinX, Ltd.*, 351 B.R. at 117.  Here, under all the relevant criteria, Canada is the Debtors' COMI.

**E.      The COMI of Each of the Debtors is Canada**

**i.     Location of the Debtors' Headquarters**

42.     Although the U.S. Debtors are incorporated under the laws of various U.S. states, they are all centrally managed from the Pride Group's global headquarters located at 1450 Meyerside Dr. Suite 401, Mississauga, Ontario, Canada.[5]  *See* Benson Declaration ¶ 60. Additionally, all of the Debtors incorporated in the United States are directly or indirectly owned

---

[5]     While the Debtors maintain an office in Dallas, Texas that serves as the Pride Group's U.S. head office, all management decisions as a whole are made from the Pride Group's global headquarters in Ontario, Canada, and all of the most senior executives of the Pride Group live and work in Ontario, Canada.

by 2692293 Ontario Ltd., a Canadian Debtor that is personally owned by Sulakhan Johal and his brother Jasvir Johal, who exclusively reside in, and manage the Pride Group's operations from, Ontario, Canada. *See Id*. Accordingly, the facts of this case support the conclusion that all of the Debtors' headquarters are located in Canada.

### ii.   <u>Location of Those Who Actually Manage the Debtors</u>

43.    For each of the U.S Debtors, Sulakhan Johal, his brother, Jasvir Johal, and/or his son, Navraj Johal, are the only members of the board of directors, and each of them lives and works in Ontario, Canada. *See id*. And, since the Pride Group's founding in 2010, all of the Debtors have physically held board meetings (or otherwise conducted board business) in Ontario, Canada. *Id*. Additionally: (i) all of the Debtors' strategic and key operating and policy decisions are made by, or are subject to approval from, the Debtors' senior management team located in Ontario, Canada;[6] (ii) substantially all key human resources decisions pertaining to payroll and employees are made by the Debtors' senior management located in Ontario, Canada; (iii) substantially all of the Debtors' key accounting decisions and all plans, budgets and financial projections are made by the Debtors' senior management located in Ontario, Canada; (iv) all of the Debtors' operations are overseen by, and report to, the senior management team (including Sulakhan Johal) at the Debtors' global headquarters in Ontario, Canada; (v) substantially all of the Debtors' planning, budgeting, management of taxes, cash management and preparation of financial projections is done from Ontario, Canada; (vi) substantially all material and/or long-term contracts and expenses are subject to the approval of the Debtors' senior management located in Ontario, Canada; (vii) substantially all marketing and business development initiatives are overseen from Ontario,

---

[6]    While there are a few members of the management team that live and work in the United States, all management decisions as a whole are made from the Pride Group's headquarters in Ontario, Canada, and all of the most senior executives of the Pride Group live and work in Ontario, Canada.

Canada; and (viii) substantially all corporate governance and regulatory compliance for the Debtors is overseen from its management team located in Ontario, Canada. *Id*. Accordingly, the facts support a finding that those who actually manage the Debtors are located in Canada.

### iii.  **Location of the Debtors' Primary Assets**

44.     The primary assets of the Debtors, including its accounts receivables, office headquarters, other real estate, and trucks, are located in Canada. *See id*. at ¶ 60. While the Debtors maintain certain real estate (comprised of truck stops, parking lots, and dealerships) and certain trucks in the United States, those assets are part of the overall operations of the Pride Group, which is headquartered in, and managed from, Canada. *Id*. Accordingly, the Debtors' primary assets are located in Canada.

### iv.  **Location of a Majority of the Debtors' Creditors**

45.     The majority of the Debtors' creditors affected by the CCAA Proceedings are located in, or have connections to, Canada. *See id*. at ¶ 62. The advisors engaged by those creditors in connection with the CCAA Proceedings are also primarily located in Canada. *Id*. For example, the lenders under the Syndicated Facility are all Canadian banks or subsidiaries of Canadian banks, and more than 50% (by value) of the Debtors' creditors are located in Canada. *Id*. Accordingly, a majority of affected creditors and their advisors are located in Canada.

### v.  **Jurisdiction Whose Law Would Apply to Most Disputes**

46.     While some of the Debtors' credit facilities are governed under U.S. law, the majority of them are governed by Canadian law, including the Syndicated Facility which is the largest credit facility on which the Debtors are obligated. *See id*. at ¶ 63. Additionally, the CCAA Proceedings were initiated in Ontario, Canada, and are being prosecuted there, and the Canadian

Court is overseeing the CCAA Proceedings.  Therefore, many, if not most, disputes with the Debtors would have a nexus to Canada and will therefore be subject to Canadian law.  *Id.*

47.     Consequently, there are no facts to rebut the presumption that the Canadian Debtors' COMI is in Canada, and the facts set forth herein and in the Benson Declaration provide sufficient contrary evidence to rebut the presumption that the U.S. Debtors' COMI is in the United States.

**F.     The Ascertainability of the Debtors' COMI in Canada**

48.     Certain other factors also support a finding that the Debtors' COMI is located in Canada.  For instance, the outward appearance of the Debtors' COMI is an important consideration.  All of the Debtors' activities in the Debtors' global headquarters in Ontario, Canada, particularly during the negotiations with their various lenders and other restructuring activities, were conducted and ascertainable as being in Canada.  Accordingly, Canada would be reasonably ascertainable by the Debtors' creditors and other stakeholders as the Debtors' COMI.

49.     This Court has routinely found that the COMI presumption should be rebutted for U.S. incorporated companies with pending CCAA proceedings that are part of a larger, centrally managed Canadian enterprise. *See, e.g., In re SimEx Inc*., No 24-10083 (TMH) (D.I. 39) (Bankr. D. Del. Feb. 20, 2024) (holding that the debtors' pending CCAA proceedings are "foreign main proceedings" because debtors' COMI, including for the U.S.-incorporated debtors, is in Canada); *In re Nexii Building Solutions Inc*., No. 24-10026 (JKS) (D.I. 44) (Bankr. D. Del. Feb. 9, 2024) (same); *In re Lighthouse Immersive Inc*., No. 23-11021 (LSS) (D.I. 20) (Bankr. D. Del. Aug. 28, 2023) (same); *In re Nextpoint Financial Inc*., No. 23-10983 (TMH) (D.I. 54) (Bankr. D. Del. Aug. 16, 2023) (same); *In re IMV Inc.,* No. 23-10589 (KBO) (D.I. 29) (Bankr. D. Del. June 2, 2023) (same).[7]

---

[7]     In a recent case where this Court ruled that the COMI presumption was not rebutted for U.S. incorporated companies with pending CCAA proceedings, the Court reasoned that the U.S. entities were independent

50.     Based on all of these facts, each of the Debtors has substantially more ties to Canada than to any other country.   Therefore, each of the Debtors' COMI is Canada and, as such, the CCAA Proceedings should be recognized as foreign main proceedings.

### G.     In the Alternative, Each of the CCAA Proceedings is a "Foreign Nonmain Proceeding"

51.     In the event that any of the CCAA Proceedings are held to not be a "foreign main proceeding," this Court should, in the alternative, recognize such CCAA Proceeding as a "foreign nonmain proceeding" as defined in section 1502(5) of the Bankruptcy Code.   11 U.S.C. § 1502(5). Under Section 1517(b) of the Bankruptcy Code, a foreign proceeding shall be recognized as a foreign nonmain proceeding if it is pending in a country where the debtor has an "establishment". *See* 11 U.S.C. § 1517(b)(2).   Section 1502 of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity."   *See* 11 U.S.C. § 1502(2).   The "establishment" requirement is satisfied by conducting business locally. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 126-27 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).

52.     All of the Debtors, including each of the U.S. Debtors, conduct pertinent economic activity locally (in Canada).   As noted above, all of the Debtors, including each of the U.S. Debtors, are centrally managed from the Pride Group's global headquarters in Mississauga, Ontario,

---

operations that were acquired and merely held by a Canadian holding company.   *See In re Black Press Ltd.*, No. 24-10044 (MFW) (Bankr. D. Del. Feb. 14, 2024) [D.I. 73] (holding that the debtors' U.S.-incorporated subsidiaries have their COMI in the United States because they were independent local newspaper each with its own publisher that made key management decisions).   This case is easily distinguishable.   None of the U.S. Debtors operate independently.   Instead, each of the U.S. Debtors is managed directly by Sulakhan Johal and his management team, almost all of whom live and work in Ontario, Canada.   As described in greater detail in the Johal Declaration, many of the Debtors' business lines are comprised of both a Canadian company and a U.S. counterpart, and each business line is managed centrally from Ontario, Canada.   For instance, on the main website of the Pride Group, it is clear that the Pride Group maintains both a Canadian headquarters in Ontario, Canada (which is listed first), and a U.S. headquarters in Dallas, Texas, but that the entire enterprise is managed as a single operation with a single management team.

Canada, and all senior management decisions are made, and board meetings are held there.  In addition, all of the Debtors, including each of the U.S. Debtors, continue to conduct substantial restructuring activities in Canada including negotiating with Canadian lenders and prosecuting the CCAA Proceedings, all of which affect creditors located in, or that have connections to, Canada. Accordingly, to the extent that this Court finds that the CCAA Proceedings are not "foreign main proceedings," the Court should find that the Debtors have an "establishment" in Canada under section 1502(2) of the Bankruptcy Code and recognize the CCAA Proceedings as "foreign nonmain proceedings" as defined in section 1502(5) of the Bankruptcy Code.

**H.**     **The Chapter 15 Cases Have Been Commenced by a Duly Authorized Foreign Representative**

53.     Section 1517 of the Bankruptcy Code provides that a "foreign representative" shall apply for recognition of the foreign proceeding. Section 101(24) of the Bankruptcy Code defines "foreign representative":

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding. 11 U.S.C. § 101(24).

54.     Pursuant to the Initial Order, the Court authorized the appointment of Randall Benson as the Foreign Representative, authorized and empowered him to act as the foreign representative in respect of the CCAA Proceedings, and authorized him to file these Chapter 15 Cases in the United States for the purpose of having the CCAA Proceedings, the Initial Order, and other orders of the Canadian Court recognized and enforced. *See* Initial Order, ¶¶ 56-57.

**I.**     **The Petitions Satisfy the Requirements under Section 1515 of the Bankruptcy Code**

55.     These Chapter 15 Cases were duly and properly commenced by filing the Petitions, accompanied by all fees, documents, and information required by the Bankruptcy Code,

Bankruptcy Rules and Local Rules, including: (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtors, (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time of the commencement of the Chapter 15 Cases, and (iii) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all of the Debtors' foreign proceedings that are known to the Foreign Representative; and (d) a certified copy of the Initial Order.

56.     Accordingly, because each of the Petitions satisfies section 1517 of the Bankruptcy Code, the Court should recognize the CCAA Proceedings in these Chapter 15 Cases.  Moreover, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code.  Thus, these circumstances satisfy the conditions for recognition of the CCAA Proceedings under section 1517 of the Bankruptcy Code.

**J.      Extension of the Automatic Stay to Certain Non-Debtor Affiliates and Certain Directors and Officers is Appropriate**

57.     As discussed in the Provisional Relief Motion, the Initial Order also extends the stay of proceedings and other protections provided under the CCAA to (i) the Pride Group[8] as a whole to preserve the *status quo*, given that the businesses and operations of the Debtors are heavily intertwined with that of the non-Debtor entities; and (ii) certain directors and officers of the Pride

---

[8]     As noted in the Provisional Relief Motion, no relief is sought with respect to the Pride Group's affiliated entities that are special-purpose securitization vehicles that do not engage in any business or activity other than acting as purchasers of securitized assets or issuers of asset-backed obligations under various securitization agreements. These entities are not applicants in the CCAA Proceedings and are not Debtors in these Chapter 15 Cases.

Group in their capacity as personal guarantors on certain of the Pride Group's credit facilities[9] (collectively and in such capacities, the "Personal Guarantors"), given that permitting such proceedings to continue would be distracting to management which is operating the Pride Group and pursuing the CCAA Proceedings and these Chapter 15 Cases. The Foreign Representative likewise seeks concomitant recognition and enforcement of the stay granted by the Canadian Court pursuant to the Initial Order with respect to these parties and their assets located within the United States in order to prevent creditors and other parties in interest from taking adverse actions against them during the pendency of the CCAA Proceedings and these Chapter 11 Cases.

58.    The Foreign Representative now seeks extension of the relief granted under the Provisional Relief Order on a final basis pursuant to section 1521(a)(6) of the Bankruptcy Code. This Court has regularly entered recognition orders enforcing the scope of stay granted under CCAA proceedings, including extensions of the stay as to non-debtor affiliates and directors and officers. *See, e.g., In re SimEx Inc*., No. 24-10083 (TMH) (D.I. 39) (Bankr. D. Del. Feb. 20, 2024) (Canadian stay extended to directors and officers, which was given full force and effect by the U.S. bankruptcy court); *In re Black Press Ltd*., No. 24-10044 (MFW) (D.I. 73) (Bankr. D. Del. Feb. 14, 2024) (Canadian stay extended to four non-debtor affiliate entities and debtors' directors and officers, which was given full force and effect by the U.S. bankruptcy court); *In re Nexii Building Solutions Inc*., No. 24-10026 (JKS) (D.I. 44) (Bankr. D. Del. Feb. 9, 2024) (same); *In re Lighthouse Immersive Inc*., No. 23-11021 (LSS) (D.I. 20) (Bankr. D. Del. Aug. 28, 2023) (Canadian stay extended to directors and officers, which was given full force and effect by the U.S. bankruptcy court); *In re Nextpoint Financial Inc*., No. 23-10983 (TMH) (D.I. 54) (Bankr. D.

---

[9]    Including the Pride Group's co-founders Sulakhan Johal and Jasvir Johal and Sulakhan's son Amrinder Johal.

Del. Aug. 16, 2023) (same); *In re IMV Inc.*, No. 23-10589 (KBO) (D.I. 29) (Bankr. D. Del. June 2, 2023) (same).

59.     Here, absent the requested relief, creditors, litigants, and other parties in interest could enforce their claims against the assets of the non-Debtor affiliates in the United States, causing irreparable harm to the Debtors and potentially derailing the orderly process under the CCAA Proceedings.  Indeed, certain lenders have already initiated litigation proceedings against Debtor entities and non-Debtor affiliates in the United States seeking to litigate breach of contract claims and the appointment of a receiver with respect to their collateral, and enforcement of existing settlement agreements.  The Debtors have also been made aware that at least one lender has delivered notices to truck lessees instructing them to make payment on their lease (which serves as collateral for the lender's loans) to the lender instead of to the applicable non-Debtor Pride Group entity.

60.     Similarly, irreparable harm could result to the Debtors if parties in interest were to enforce their claims against the Personal Guarantors.  The Personal Guarantors are intimately involved in the management and operations of the Pride Group, and distraction from their duties at this pivotal time could result in business disruption and further decline, leading to worsened outcomes for all stakeholders.[10]

61.     Accordingly, the Foreign Representative submits that recognition and enforcement of the Initial Order extending the stay of proceedings as to the non-Debtor affiliates and the Personal Guarantors is appropriate and in the best interest of the Debtors, their creditors, and other parties in interest.

---

[10]     Indeed, one lender has already filed litigation against two of the Personal Guarantors in federal court in the District of Connecticut and Southern District of New York seeking to enforce certain personal guarantees.

**K.**     <u>**Granting the Injunction is Necessary to Enforce the Initial Order**</u>

62.     To the extent not otherwise stayed under sections 1520 and 362 of the Bankruptcy Code, the Foreign Representative also seeks the Injunction to prevent any parties from attempting to continue or commence actions or assert claims in the United States against the Pride Group or its property inconsistent with the Initial Order.  The Injunction requested herein is necessary to ensure that no party may take actions adverse to the Pride Group, the Personal Guarantors, or any of their property located within the territorial jurisdiction of the United States in an effort to gain an unfair advantage over other parties in interest subject to the CCAA Proceedings.

63.     This Court has the authority to grant the Injunction in these Chapter 15 Cases.  *See, e.g., Canada S. Ry. Co. v. Gebhard, 109 U.S. 527, 539 (1883)*, 109 U.S. 527, 539 (actions brought in the United States by bondholders who did not participate in the Canadian insolvency proceedings of a Canadian railroad could not be maintained, even though the bonds were payable in New York); *In re Metcalfe & Mansfield*, 421 B.R. at 700 (granting permanent injunctive relief in chapter 15 case in respect of Canadian plan); *In re Lehman Bros. Int'l (Europe) (in administration)*, No. 18-11470 (SCC) (Bankr. S.D.N.Y. 2018) (D.I. 15) (permanently enjoining any action inconsistent with UK scheme, including scheme releases); *In re Bibby Offshore Servs. Plc*, No. 17-13588 (MG) (Bankr. S.D.N.Y. 2018) (D.I. 16) (same); *In re YH Ltd.*, No. 16-12262 (SCC) (Bankr. S.D.N.Y. 2016) (D.I. 14) (same).

64.     The standards, procedures, and limitations applicable to an injunction apply to relief sought under section 1521(a) of the Bankruptcy Code.  *See* 11 U.S.C. § 1521(e).  Generally, to obtain a permanent injunction, a movant must demonstrate the likelihood of irreparable harm.  *See Clarkson v. Coughlin*, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995).  Irreparable harm in the chapter 15 context may exist if there is a risk of disruption to the orderly and fair distribution of assets through dissenting creditor actions to the detriment of other creditors.  *See, e.g., In re Garcia Avila*,

26

296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum.") (*quoting* Collier on Bankruptcy ¶ 304.05 (15th ed. Rev. 2003)); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors").

65.     The risk of irreparable harm exists here because disgruntled creditors and other parties in interest may seek judgments or take enforcement actions in the United States against the Pride Group and their property located in the United States in an effort to circumvent the orderly administration of the Debtors' estates pursuant to the CCAA Proceedings.  As stated above, some of the Pride Group's credit facilities are governed by U.S. law, and are secured by collateral in the United States, and the Pride Group maintains assets in the United States such as real property, trucks, and equipment.  Accordingly, there is a risk that parties could file suit or take enforcement actions against the Pride Group and its assets in the United States, as some lenders have already done.

66.     Absent permanent injunctive relief, the Debtors' efforts to reorganize through the CCAA Proceedings could be thwarted by the actions of disgruntled creditors or other parties in interest, a result that is inconsistent with the Bankruptcy Code.  The interests of affected parties under the CCAA Proceedings are sufficiently protected under section 1522(a) of the Bankruptcy Code because all similarly situated parties will be treated equally and fairly during the pendency of the CCAA Proceedings.  The Injunction also will not cause undue hardship or prejudice to the rights of any U.S.-based creditors or other parties in interest and is consistent with principles of comity.  Accordingly, the Injunction should be granted.

**<u>NOTICE</u>**

67.    Notice of this Verified Petition has been provided in accordance with the terms set forth in the *Motion for Entry of an Order Scheduling Hearing on Chapter 15 Petitions for Recognition and Related Relief and Specifying Form and Manner of Service of Notice*.  The Foreign Representative submits that such notice is proper, and that no other or further notice need be provided.

## **CONCLUSION**

WHEREFORE, the Foreign Representative respectfully requests the Court to enter an order, substantially in the form attached as **Exhibit A**, granting the requested relief and such other and further relief as may be just and proper.

Dated: April 1, 2024
　　　Wilmington, Delaware

　　　　　　　　　　　　　**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

　　　　　　　　　　　　　*/s/ Derek C. Abbott*
　　　　　　　　　　　　　Derek C. Abbott (No. 3376)
　　　　　　　　　　　　　Andrew R. Remming (No. 5120)
　　　　　　　　　　　　　Austin T. Park (No. 7247)
　　　　　　　　　　　　　1201 North Market Street
　　　　　　　　　　　　　P.O. Box 1347
　　　　　　　　　　　　　Wilmington, DE 19899-1347
　　　　　　　　　　　　　Telephone: (302) 658-9200
　　　　　　　　　　　　　Facsimile: (302) 658-3989
　　　　　　　　　　　　　dabbott@morrisnichols.com
　　　　　　　　　　　　　aremming@morrisnichols.com
　　　　　　　　　　　　　apark@morrisnichols.com

　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　**LINKLATERS LLP**
　　　　　　　　　　　　　Penelope J. Jensen
　　　　　　　　　　　　　Christopher J. Hunker
　　　　　　　　　　　　　Clark L. Xue
　　　　　　　　　　　　　1290 Avenue of the Americas
　　　　　　　　　　　　　New York, NY 10104
　　　　　　　　　　　　　Telephone: (212) 903-9000
　　　　　　　　　　　　　Facsimile: (212) 903-9100
　　　　　　　　　　　　　penelope.jensen@linklaters.com
　　　　　　　　　　　　　christopher.hunker@linklaters.com
　　　　　　　　　　　　　clark.xue@linklaters.com

　　　　　　　　　　　　　*Attorneys for the Foreign Representative*

## <u>VERIFICATION OF PETITION</u>

I, Randall Benson, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America, as follows:

I am the founder of RC Benson Consulting Inc, which was engaged on February 26, 2024 as the Chief Restructuring Officer of the Pride Group (the "<u>Pride Group</u>").  The Pride Group includes Pride Group Holdings Inc. and its affiliates that are debtors (the "<u>Debtors</u>") in these chapter 15 cases.  I am the duly authorized foreign representative for each of the Debtors.  As such, I have full authority to verify the foregoing Verified Petition on behalf of the Debtors.

I have read the foregoing Verified Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 1, 2024
      Toronto, Canada

                    */s/ Randall Benson*
                    Randall Benson