## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>Pride Group Holdings., *et al.*[1]<br><br>    Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 24-10632 (CTG)<br><br>(Joint Administration Requested) |

**DECLARATION OF RANDALL BENSON IN SUPPORT OF
(A) THE DEBTORS' VERIFIED PETITION FOR (I) RECOGNITION
OF FOREIGN MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN
REPRESENTATIVE AND (III) RELATED RELIEF UNDER CHAPTER 15
OF THE BANKRUPTCY CODE AND (B) MOTION FOR PROVISIONAL RELIEF**

I, Randall Benson, pursuant to 28 U.S.C. § 1746, hereby declare (this "<u>Declaration</u>") under penalty of perjury under the laws of the United States, as follows:

1.    I am the founder of RC Benson Consulting Inc, which was engaged on February 26, 2024 as the Chief Restructuring Officer (the "<u>CRO</u>") of the Pride Group (the "<u>Pride Group</u>"), a group of related companies comprising a trucking and logistics conglomerate that operates in Canada and the United States headquartered in Mississauga, Ontario, Canada. I have over 20 years of experience managing complex restructuring situations. The Pride Group includes Pride Group Holdings Inc. and its affiliates that are debtors (the "<u>Debtors</u>") in these chapter 15 cases (the "<u>Chapter 15 Cases</u>"). The Debtors are the subject of proceedings (the "<u>CCAA Proceedings</u>") under the Companies' Creditors Arrangement Act (the "<u>CCAA</u>"), pending before the Ontario Superior Court of Justice (Commercial List) in Ontario, Canada, Court File No. CV-24-00717340-00CL (the "<u>Canadian Court</u>"). I was appointed as the foreign representative of the Debtors (the "<u>Foreign</u>

---

[1]    The last four digits of Debtor Pride Group Holdings Inc.'s Canadian business number are 6399. Due to the large number of debtors in these chapter 15 cases, a complete list of the debtor entities and the last four digits of their unique identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing agent at https://dm.epiq11.com/pridegroup. The Debtors' service address for the purposes of these chapter 15 cases is 1450 Meyerside, Suite 401, Mississauga, Ontario, L5T 2N5, Canada.

Representative") by the Canadian Court pursuant to the preliminary initial order entered on March 28, 2024 (the "Initial Order"), and I am authorized to commence these Chapter 15 Cases in respect of the Debtors.

2.      Since my engagement on February 26, 2024, I have become familiar with the Debtors' business, history, operations, and financial affairs, and I am ultimately responsible for the Debtors' restructuring, including the CCAA Proceedings and these Chapter 15 Cases.  I am an individual over the age of 18 and, if called upon, could and would testify to the facts set forth in this Declaration.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by members of the Debtors' management and professionals or learned from my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' industry, operations, and financial condition that I have acquired since my engagement.

3.      I submit this Declaration in support of the: (i) Debtors' *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition"), and (ii) *Motion of the Foreign Representative for Entry of an Order Granting Provisional Relief Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code* (the "Provisional Relief Motion").

## GENERAL BACKGROUND

### A.  Overview of the Debtors' Businesses

4.      The Pride Group was founded by Sulakhan Johal and his brother Jasvir Johal in 2010 as a used truck dealership operating from the back of a single tractor trailer in Mississauga, Ontario, Canada.  Under their direction and supervision over the past 14 years, the Pride Group experienced rapid growth and success, quickly becoming a leading cross-border trucking and logistics

conglomerate operating from more than 50 leased and owned locations across Canada and the United States.  The Pride Group is responsible for the management of, or logistics in respect of, over 20,000 trucks on roads across Canada and the continental United States, as well as on the Pride Group's dealership lots and service centers across more than a dozen Canadian provinces and U.S. states.

5.      The Pride Group's businesses consist of, among other things, (i) new and used truck and trailer sales; (ii) truck leasing and financing to individuals or corporate owners; (iii) trucks servicing and truck parts sales; (iv) logistics; and (v) owning and operating real estate properties across Canada and the United States as dealerships, truck stops, and service centers.  The Pride Group is a dominant or important player in each of these industries, and its ability to offer a "one-stop shop" solution for truck drivers is a unique competitive advantage that sets it apart from many other industry players.  In particular, the Pride Group's services are attractive to entrepreneurial "owner-operators" in the trucking community who utilize the Pride Group's infrastructure and businesses across Canada and the United States and benefit from its competitive pricing achieved through economies of scale.

6.      Until very recently, the Pride Group was profitable and growing.  However, the onset of the COVID-19 pandemic in 2020 disrupted the company's historical trajectory, ultimately leading to the company's current financial crisis.

7.      Initially, the COVID-19 pandemic was a boon to the North American trucking and logistics industries as freight rates soared in Canada and across the world.  Amidst a labor shortage, lower diesel prices and negligible (or negative) truck and trailer depreciation, the Pride Group's services became especially attractive to owner-operators, who flocked to the industry and to the Pride Group in particular to buy, finance, lease and service their trucks.  The company seized on

the opportunity and experienced rapid growth by significantly expanding its North American fleet and footprint, and expanding into new business lines that helped its entrepreneurial client base, along with the acquisition of several real estate properties in Canada and the United States.

8.      However, as the effects of the COVID-19 pandemic began to subside, so too did its beneficial effects on the North American trucking industry.  As demand for trucking services waned, diesel prices soared, and interest rates rose, there was suddenly an overabundance of trucks and truck drivers in North America, negatively impacting every part of the industry.  The industry's overall downturn had a particularly severe impact on smaller-scale trucking operations such as owner-operators, who typically operate at the margins of the industry and have less financial wherewithal to sustain them through more challenging times.  In the past few years, there have been an unprecedented number of insolvencies among small trucking operations and owner-operators across North America.

9.      All of these realities have directly affected the Pride Group, which is currently contending with an unprecedented number of delinquencies from truck purchasers and lessors. The same synergies that contributed to the Pride Group's exceptional growth have exacerbated its present financial situation.  As the businesses of owner-operators falter, they become delinquent in making financing and lease payments for their trucks.  They also stop utilizing the various other services provided by the Pride Group such as maintenance, factoring, rescue, and fuel sales, resulting in a ripple effect across multiple business lines.  In essence, the Pride Group's fate has been uniquely tied to the fate of the currently struggling owner-operators.  Set forth below are tables illustrating the sharp rise in lease payment delinquencies for the Pride Group in Canada and the United States:

***Lease payment delinquencies – Canada (percentage of total leases):***



***Lease payment delinquencies – United States (percentage of total leases):***



10.    To address this downturn, the Pride Group took a number of important steps.  In 2022, the Pride Group refinanced a significant amount of its assets, reduced its workforce, and wound down several of its less profitable business lines in an effort to shore up its finances.  And in late 2023, the Pride Group suspended payment to certain of its lenders in an effort to continue operating as a going concern.  Despite these efforts, the downturn has continued, the Pride Group can no longer sustain the *status quo*, and the lenders under the Syndicated Facility[2] informed the

---

[2]    That certain Third Amended and Restated Credit Agreement dated as of November 4, 2022 (the "Syndicated Facility"), by and among: TPine Truck Rental Inc., Tpine Leasing Capital Corporation, Pride Truck Sales Ltd., 2076401 Ontario Inc., Tpine Leasing Capital L.P., PGED Holding, Corp., High Prairie Texas Holding Corp, 131 Industrial Blvd Holding Corp, 59th Ave Phoenix Holding Corp., Di Miller Drive Bakersfield Holding Corp. and 1450 Meyerside Holding Inc., as borrower (the "Borrower Parties"); various guarantors including each of the Borrower Parties and Pride Truck Sales L.P., TPine Rental USA, Inc., Coastline Holdings, Corp., Pride Group

Pride Group that they would begin to enforce their rights and remedies if formal insolvency proceedings were not initiated by March 31, 2024.

11.     Since the end of December 2023, the Pride Group has received over 40 default notices from its various secured lenders, including more than 10 demands and notices of intent to enforce security under the Canadian *Bankruptcy and Insolvency Act*.   Accordingly, and after thoroughly evaluating all other available options, the Debtors commenced the CCAA Proceedings and, shortly thereafter, these Chapter 15 Cases, in an effort to maintain the stability and integrity of its enterprise, and to protect its customers and other stakeholders.

**B.  The Debtors' Corporate Structure**

12.     There is no ultimate parent company for the Debtors.  Sulakhan Johal, his brother Jasvir Johal, and other members of their family (through various family trusts) are the ultimate beneficial owners of the Pride Group.  All management decisions for the Pride Group as a whole are made from its global headquarters located at 1450 Meyerside Dr., Suite 401, Mississauga, Ontario, Canada.  Corporate organizational charts for Canada and the United States showing the structure of the Pride Group are attached hereto as **Exhibit A**.

13.     The Debtors, all of which are applicants in the CCAA Proceedings, consist of the Pride Group's Canadian and U.S. operating companies (with the exception of two U.S. limited partnerships which I understand are not eligible to become applicants in the CCAA Proceedings due to their corporate structure),[3] as well as certain holding companies that are borrowers or guarantors under the Pride Group's credit facilities.  The Debtors do not include the Pride Group's

---

Holdings Inc., Pride Group Logistics Ltd., 2043002 Ontario Inc., Pride Fleet Solutions Inc., and Frontage Road Holding Corp.; Royal Bank of Canada, as administrative agent, and the lenders from time to time party thereto.

[3]     These two U.S. operating companies are Pride Truck Sales L.P. and TPine Leasing Capital L.P.  However, the controlling general partners of these limited partnerships are applicants in the CCAA Proceedings and Debtors in these Chapter 15 Cases.

numerous single-asset real estate holding companies, which are applicants in the CCAA Proceedings.

14.    Many of the Pride Group's business lines are organized to include a Canadian company and a U.S. counterpart, and each business line is centrally managed by the Pride Group's senior management team from Ontario, Canada.  For example, Debtor Pride Truck Sales Ltd., a Canadian company, oversees used truck sales in Canada, while non-Debtor Pride Truck Sales L.P., a Delaware limited partnership, performs the corresponding function in the United States.

15.    The Pride Group entities that are Debtors in these Chapter 15 Cases consist of the following entities:

### Canadian and U.S Operating Companies (16 entities):

a.    Pride Truck Sales Ltd., a Canadian entity that oversees used truck and tractor trailer sales in Canada that is a wholly-owned subsidiary of Pride Group Holdings Inc.[4]

b.    TPine Truck Rental Inc., a Canadian entity that principally sells and rents new trucks and tractor trailers in Canada; and its U.S. equivalent, TPine Rental USA, Inc.

c.    Pride Group Logistics Ltd., a Canadian entity that provides logistics, brokering and delivery services in Canada; and its U.S. equivalents, Pride Group Logistics USA, Co., and Arnold Transportation Services, Inc.

d.    Pride Group Logistics International Ltd., a Canadian entity that is the freight broker for Pride Group Logistics Ltd., Pride Group Logistics USA Ltd., and Arnold Transportation Services.

e.    TPine Leasing Capital Corporation, a Canadian entity that oversees truck leasing in Canada.[5]

f.    Dixie Truck Parts Inc., a Canadian entity that sells and is a supplier of truck parts in Canada; and its U.S. equivalent, Dixie Truck Parts US Inc., which has

---

[4]    Pride Truck Sales Ltd.'s U.S. equivalent is Pride Truck Sales L.P., which is not applicant in the CCAA Proceedings for the reasons discussed above and therefore not a Debtor in these Chapter 15 Cases.

[5]    TPine Leasing Capital Corporation's U.S. equivalent is TPine Leasing Capital L.P., which is not an applicant in the CCAA Proceedings for the reasons discussed above and therefore not a Debtor in these Chapter 15 Cases.

no operations of its own and is used to facilitate the payment of U.S.-based vendors of Dixie Truck Parts Inc.

g.  Pride Fleet Solutions Inc., a Canadian entity that is the fuel wholesaler and repair and maintenance services provider to external customers and to other members of the Pride Group; and its U.S. equivalent, Pride Fleet Solutions USA Inc.

h.  TPine Financial Services Inc., a Canadian entity that provides factoring and other financial services to Pride Group customers in Canada; and its U.S. equivalent, TPine Financial Services Corp.

i.  Parker Transport Co., a U.S. entity that oversees equipment leases in the United States.

j.  Pride Group EV Sales Ltd., a Canadian entity that sells electric vehicle chargers to customers of the Pride Group.

***Canadian and U.S. Holding Companies (10 entities):***

a.  Pride Group Holdings Inc., a Canadian entity that is the intermediate management holding company for certain entities of the Pride Group.  This entity is directly owned by members of Sulakhan Johal's family or family trusts.

b.  Coastline Holdings Corporation, a Delaware corporation that is a minority holding company for certain U.S. operating companies.

c.  Pride Group Real Estate Holdings Inc., a Canadian entity that holds the shares of certain Canadian real estate holding companies.

d.  1000089137 Ontario Inc., a Canadian holding company.

e.  DVP Holdings, Corp., a U.S. holding company.

f.  Parker Global Enterprises, Inc., a U.S. holding company that holds the shares of Parker Transport Co.

g.  2692293 Ontario Ltd., a Canadian holding company that is the ultimate shareholder of all of the U.S. Pride Group entities.

h.  2043002 Ontario Inc., a Canadian entity that acts as the real estate holding company for the Pride Group in Canada.

i.  2554193 Ontario Inc., a Canadian holding company that holds the shares of certain other real estate holding companies.

j.  2554194 Ontario Inc., a Canadian holding company that holds the shares of certain other real estate holding companies.

16.     As noted above, the Pride Group's 47 Canadian and U.S single-asset real estate holding companies are applicants in the CCAA Proceedings but do not intend to file chapter 15 cases at this time.[6]  However, given that these real estate holding companies hold real estate on which the Debtors operate their various businesses, I understand the Pride Group requires the benefit of the stay under the CCAA Proceedings and the Chapter 15 Cases to extend to these entities to preserve the *status quo* and to avoid potential disruption to the restructuring process that would ensue if creditors or litigants attempt to directly pursue claims against those entities.

17.     Also as noted above, the Pride Group's U.S. limited partnerships, including Pride Truck Sales L.P., TPine Leasing Capital L.P., and Sweet Home Hospitality L.P., are not eligible to be applicants in the CCAA Proceedings and are therefore not Debtors in these Chapter 15 Cases. Further, Canadian entity Block 6 Holding Inc. (a single-asset real estate company), Bermudan entity Pride Global Insurance Company Ltd. (which acts as the captive insurance company formed to provide risk mitigation services to Pride Group Logistics Ltd.), Canadian entity 2500819 Ontario Inc. (which holds insurance policies for all passenger vehicles driven by Pride Group employees in Canada), and Delaware Corporation Pergola Holdings, Corp. (which holds the shares of all of the U.S. real estate holding companies) are not applicants in the CCAA Proceedings and are therefore not Debtors in these Chapter 15 Cases (collectively, the "Non-Applicant Stay Entities").  However, given that the Non-Applicant Stay Entities continue to provide important services to the Pride Group, I understand that the Pride Group has obtained an extension of the stay under the CCAA Proceedings over these entities, and require the stay under the Chapter 15 Cases to extend to these entities to preserve the *status quo*.

---

[6]     The Pride Group reserves the right to commence chapter 15 cases in respect of these entities after the Petition Date.

18.     Finally, the Pride Group includes certain entities that are special-purpose securitization vehicles that do not engage in any business or activity other than acting as purchasers of securitized assets or issuers of asset-backed obligations under various securitization agreements (the "Securitization SPVs").[7]     The Securitization SPVs are not applicants in the CCAA Proceedings and are not Debtors in these Chapter 15 Cases.

### C.  The Debtors' Business Operations

19.     The Pride Group is engaged in a number of business lines that focus on the North American trucking and logistics industries that collectively form a "one-stop shop" solution for truck drivers across Canada and the United States.

20.     *Logistics*.  As noted above, Pride Group Logistics Ltd. and Pride Group Logistics USA, Co. are the Canadian and U.S. logistics and brokering arm of the Pride Group, respectively. These entities serve a large and growing roster of blue-chip customers, including in the grocery and food and beverage industries.

21.     *Used Truck Sales*.  The Pride Group started as a seller of used trucks and tractor trailers and continues to focus on this business segment today.  Used trucks are sold at a lower price point as compared to new trucks and allow the Pride Group to target a broader group of customers as well as to provide a way to monetize trucks that have been traded in by customers. The Pride Group sells and services trucks from various manufacturers.

22.     *New Truck Sales and Leases*.  The Pride Group sells and leases new trucks and tractor trailers from various manufacturers.  Given the relatively high price of new trucks, customers typically lease trucks, including on a "lease to own" or operating lease basis.

---

[7]     These entities include U.S. entities TPine USA Funding I LLC, TPine USA Funding II LLC, TPine USA Funding III LLC, and TPine USA Funding IV LLC and Canadian entity TPine Canada Securitization L.P, with its general partner, TPine Canada GP L.P.

Additionally, the Pride Group offers customers a purchase package that includes servicing, repair, and 24/7 rescue services across North America, which allows it to draw on its relationships with local suppliers as well as synergies between its various business lines. As of the date hereof, the Pride Group has over 18,500 trucks leased to customers throughout Canada and the United States, and over 4,500 trucks in inventory at its various facilities across Canada and the United States.

23. ***Servicing and 24/7 Rescue.*** A critical component of most Pride Truck purchase packages is a servicing and 24/7 rescue package that provides peace-of-mind to customers, particularly smaller scale owner-operators. The price of the service is typically included as part of the single monthly price charged to customers. Commercial trucks and tractor-trailers have significant servicing needs due to their size, complexity, and intensive use. The Pride Group offers directly, or through service agreements with local companies, professional 24/7 rescue and repair services as well as replacement trucks to its customers.

24. ***Truck Parts Sales.*** The Pride Group also sells truck and tractor trailer part and components through its Dixie Truck Parts Inc. (Canada) and Dixie Truck Parts Inc. (US) businesses. These entities operate several big-box store parts businesses at Pride Group-owned properties across North America.

25. ***Securitization and Securitization-Servicing.*** Certain Pride Group entities, including Canadian Debtor TPine Leasing Capital Corporation and U.S. non-Debtor TPine Leasing Capital L.P., are party to certain securitization and servicing agreements with various funders (collectively, the "Securitization Agreements") which are used to generate funding that it can redeploy to grow its business. The Securitization Agreements generally provide that packages of leases and lease receivables are sold to special purpose vehicles or directly to securitization funders. The Securitization Agreements generally require that the Pride Group continue to

administer or "service" the leases on behalf of the third-party funders, including by collecting payments and repossessing trucks in case of lease defaults.

26.    ***Other Business Lines.***  The Pride Group also operates additional business lines, including (i) offering its customers wholesale fuel cards that allow truck drivers to purchase fuel from major fuel retailers at reduced cost; (ii) offering factoring services whereby the Pride Group purchases customer invoices at a discounted amount, then leverages its administrative and billing teams to bill and collect the outstanding amounts; (iii) operating truck stops at various locations across Canada and the United States; and (iv) installing electric truck charging stations at several of its real estate properties across North America.  Several of these business lines have been wound down or are in the process of being wound down.

### D.  **The Debtors' Customers, Suppliers, Employees, and Cash Management**

27.    The Pride Group's customers include both large blue-chip businesses as well as smaller-scale owner-operators.  Given the number of business lines operated by the Pride Group, it utilizes a large number of suppliers, but the most significant suppliers are original equipment manufacturers that manufacture and sell trucks to the Pride Group and provide related financing solutions, including Daimler, Navicar, Volvo, and Paccar Trucks.

28.    The Pride Group employs 669 employees, the majority of which are based in Ontario, Canada, with the remainder in limited-service centers in the United States and India. Certain full-time employees are entitled to participate in the Pride Group's registered retirement savings plan for Canadian resident employees maintained by the Pride Group.  The Pride Group's employees are all non-unionized.

29.    The Pride Group contracts with 405 independent contractors.  While these individuals are hired as independent contractors, they rely solely on the Pride Group for their

income.  Independent contractors consist of back-office support, salespersons, mechanics, drivers, and owner-operators that support Pride Group entities.  These independent contractors are integral to the operations of the Pride Group, and the continuation of their relationship with the Pride Group is critical to its ongoing operations.  Set forth below is a table with respect to the Pride Group's employees and independent contractors:

| Location | Employees | Contractors |
|----------|-----------|-------------|
| Canada | 369 | 384 |
| United States | 100 | 21 |
| India | 200 | 0 |
| **Total** | **669** | **405** |

30.     The Pride Group maintains a centralized cash management system to consolidate and track funds generated by the operations of its various business lines.  Canadian bank accounts are maintained with Royal Bank of Canada, Bank of Montreal, and National Bank of Canada, while a small number of bank accounts are maintained in the United States with BMO Harris Bank N.A. ("BMO Harris") and Bank of America.

31.     Certain Pride Group entities that use BMO Harris accounts have an arrangement where their deposit only accounts are used to settle disbursement operating accounts on a nightly basis.  The remainder of the BMO Harris accounts are standalone.

**E.    The Debtors' Liabilities and Capital Structure**

32.     The Pride Group has loan and credit facilities with more than 20 lenders and securitization agreements with more than six securitization funders.  Based on the books and records of the Pride Group as of March 22, 2024, the aggregate amount outstanding on these loan and credit facilities exceeds CA$1.6 billion and US$600 million.  The various facilities on which Pride Group entities are obligated are described in greater detail below.

33. ***Syndicated Facility***. Many of the Debtors are borrowers and guarantors under the Syndicated Facility, which provides the following facilities to the borrowers: (i) a CA$125 million Revolving Omnibus Floor Plan Facility; (ii) a CA$22 million Non-Revolving Term Loan Facility; (iii) a US$80 million Non-Revolving Term Loan Facility; (iv) a CA$265 million Revolving Wholesale Lease Line; and (v) a US$250 million Revolving Whole Lease Line. As of March 26, 2024, the total amount outstanding under the Syndicated Facility was CA$403 million. The obligations under the Syndicated Facility are secured by general security agreements and other security documentation.

34. ***Floor Plan Facilities***. Several Pride Group entities are parties to various floor plan facilities (the "Floor Plan Facilities"), the proceeds of which are used for the acquisition of trucks which are subsequently made available for sale on Pride Group lots across Canada and the United States. The Floor Plan Facilities are guaranteed by various Pride Group entities and are secured by general security agreements granted by the borrowers, and include the following:

    a. The Syndicated Facility, which includes a CA$125 million Revolving Omnibus Floor Plan Facility.

    b. The floor plan facilities in an initial principal amount of US$100 million provided by Hitachi Capital Canada and Hitachi Capital America (which facilities have since been acquired by Mitsubishi HC Capital Canada, Inc. ("Mitsubishi")) in favor of Debtor Pride Truck Sales Ltd. and non-Debtor affiliate Pride Truck Sales L.P. (the "Mitsubishi Facility"). In addition to guarantees provided by various Canadian and U.S. Pride Group entities, the Mitsubishi Facility is guaranteed by me personally. As of March 26, 2024, the amount outstanding under the Mitsubishi Facility was approximately CA$93 million, plus interest and costs.

    c. The floor plan facilities in an initial principal amount of CA$50 million provided by BMO Harris in favor of Debtor TPine Rental USA Inc. (the "BMO Facility"). As of March 26, 2024, the amount outstanding under the BMO Facility was approximately CA$33.8 million, plus interest and costs.

35. ***OEM Wholesale Leaseline Facilities***. Several Pride Group entities are parties to various OEM ***wholesale*** leaseline facilities (the "OEM Facilities"), the proceeds of which are used

to facilitate the leasing of trucks to end customers.  The OEM Facilities are guaranteed by various Pride Group entities and are secured by general security agreements granted by Debtor TPine Leasing Capital Corporation, and contemplate first-ranking security in specific trucks leased thereunder, and include the following:

*Canadian Leaseline Facilities*

a.   The wholesale leaseline facilities provided by Daimler Truck Financial Services in an initial principal amount of CA$256 million to Debtor TPine Leasing Capital Corporation (the "Daimler Facility").  As of March 26, 2024, the amount outstanding under the Daimler Facility was approximately CA$296 million.

b.   The wholesale leaseline facilities provided by Daimler Truck Financial Service USA LLC to Debtor TPine Leasing Capital L.P. As of March 26, 2024, the principal amount outstanding was approximately US$75 million.

c.   The wholesale leaseline facilities provided by Paccar Financial Corp. in an initial principal amount of CA$50 million to Debtor TPine Leasing Capital Corporation and non-Debtor affiliate TPine Leasing Capital L.P. (the "Paccar Facility").  As of March 26, 2024, the amount outstanding under the Paccar Facility was approximately CA$46.9 million.

d.   The wholesale leaseline facilities provided by Volvo Financial Services in initial principal amount of CA$35 million to Debtor TPine Leasing Capital Corporation (the "Volvo Facility").  As of March 26, 2024, the amount outstanding under the Volvo Facility was approximately CA$30.6 million.

*U.S. Leaseline Facilities*

a.   The wholesale leaseline facilities provided by Daimler Truck Financial Services USA LLC in an initial principal amount of up to US$165 million to non-Debtor TPine Leasing Capital L.P.

b.   The wholesale leaseline facilities provided Paccar Financial Corp. in an initial principal amount of up to US$50 million to non-Debtor TPine Leasing Capital L.P.

c.   The wholesale leaseline facilities provided VFS US LLC in an initial principal amount of up to US$35 million to non-Debtor TPine Leasing Capital L.P.

d.   The wholesale leaseline facilities provided BMO Harris in an initial principal amount of up to US$30 million to non-Debtor TPine Leasing Capital L.P.

e.   The wholesale leaseline facilities provided TBK Bank, SSB in an initial principal amount of up to US$40 million to non-Debtor TPine Leasing Capital L.P.

      f.   The wholesale leaseline facilities provided First American Commercial Bancorp, Inc. in an initial principal amount of up to US$10 million to non-Debtor TPine Leasing Capital L.P.

36.    ***Lease Facilities.***  Debtor TPine Leasing Capital Corporation and non-Debtor affiliate TPine Leasing Capital L.P. are borrowers under several different bilateral leasing facilities (collectively the "Lease Facilities").  As of March 26, 2024, the amount outstanding under the Lease Facilities is approximately CA$300 million.  The Lease Facilities are guaranteed by various Pride Group entities and secured by general security agreements granted by those entities.  The Lease Facilities contemplate a first-ranking security interest in specific trucks leased thereunder. Lenders under the various bilateral Lease Facilities include CWB/Maxium, Royal Bank of Canada, BMO Harris, TBC Bank, First American Equipment Finance, Versa Bank, Regions Bank, ENGS Commercial Finance Co. and Mitsubishi.

37.    ***Securitization Facilities.***  As noted above, Debtor TPine Leasing Capital Corporation and non-Debtor affiliate TPine Leasing Capital L.P. are party to several Securitization Agreements with the following funders: (i) Royal Bank of Canada, (ii) Bodkin, a division of Bennington Financial Corp; (iii) Mitsubishi (formerly through CLE Leasing); (iv) ENGS Commercial Finance Co.; (v) Coast Capital; (vii) National Bank of Canada and National Bank Financial Inc.; (viii) Regions Bank; (ix) VersaFinance US Corp. and Aviator Financial Inc.; (x) CWB/Maxium; and (xi) BDC/BNY Trust Company of Canada in its capacity as trustee of Move Trust.  The Securitization Agreements provide for a first-ranking interest in the specific leased trucks thereunder, and certain other Pride Group entities have also provided guarantees and pledged collateral in respect of the Securitization Agreements.

38.    ***Real Estate and Mortgages.***  Various lenders have provided real estate financing to specific Pride Group real estate holding companies in respect of specific real estate properties (*collectively*, the "Real Estate Financings").  In each case, the principal security is a first-ranking

mortgage in respect of the underlying real estate property.  As of December 31, 2023, the aggregate amount outstanding under the Real Estate Financings is approximately CA$231.8 million and US$88.7 million.

39.     ***Other Credit Facilities***.  The Pride Group has several other credit facilities with other lenders (collectively, the "Other Credit Facilities"), including:

   a.  a CA$25 million revolving term equipment financing facility with Bank of Nova Scotia;

   b.  a CA$30 million revolving term equipment financing facility with HSBC Bank Canada;

   c.  a CA$20 million revolving term equipment financing facility with Canadian Western Bank;

   d.  a CA$30 million revolving term equipment financing facility with TD Bank; and

   e.  a CA$25 million operating facility with Royal Bank of Canada.

40.     Due to the centrally managed nature of the Pride Group's businesses, the Debtors' accounts, management, and operations are heavily intertwined, and assets and funds are routinely transferred between and among Pride Group entities, which are reflected through intercompany invoices and accounts payables/receivables.   For example, the Debtor real estate holding companies have relied on advances from other Debtors to pay their mortgages, and the Floor Plan Facilities and Lease Facilities contemplate the frequent transfer of underlying truck collateral among the applicable Debtor entities.

## EVENTS LEADING TO THE COMMENCEMENT OF THE CCAA PROCEEDINGS

### A.  The "Perfect Storm" of Unfortunate Events

41.     The North American trucking and logistics industry is facing a prolonged downturn. While spot freight prices, diesel prices and interest rates trends were all initially favorable for the trucking industry following the COVID-19 pandemic, they have all deteriorated significantly since

that time.  The situation has been exacerbated by the increased number of trucks that were brought to market during the immediate aftermath of the COVID-19 pandemic, many of which are currently sitting unused.

42.     The effects of the foregoing have been disproportionately borne by smaller trucking and logistics companies and owner-operators.  These smaller companies and owner-operators comprise a significant percentage of the Pride Group's customers.  Delinquencies and non-payment by such customers have directly contributed to the Pride Group's current financial position.  In addition, due to the nature of the Pride Group's business lines, the effects of non-payment and delinquencies by customers are multiplied as these customers have also stopped utilizing the Pride Group's other businesses, such as truck servicing, fuel sales, factoring, and rescue operations.  These factors have created a perfect storm of events contributing to the Pride Group's current financial position.

**B.  The Pride Group's Efforts to Improve Financial Performance**

43.     In response to these financial difficulties, the Pride Group instituted a number of measures in an attempt to improve its financial position, including working closely with customers to create payment and other workout plans that maximize recoveries in the event of non-payment and delinquencies.  However, these efforts have been complicated by broader economic trends in Canada and the United States.  For instance, in the past, the Pride Group has attempted to secure its trucks against customers' homes, but stagnating home prices in Canada has made this recourse less effective.

44.     Efforts undertaken by the Pride Group have included efforts to initiate legal and collection proceedings against delinquent lease customers; imposing stricter credit policies on end customers; requiring more frequent payments; conducting layoffs to reduce payroll; selling non-

core assets; and winding down unprofitable business lines, such as the factoring and electric truck charging businesses. These efforts have imposed significant strain on the Pride Group's management team, who have been forced to do more with fewer resources.

### C. Uncertainty Over Priority of Security Against Collateral

45.     As noted above, the Pride Group's business requires the frequent transfer of trucks among different business lines. It is my understanding based on discussions with the Debtors' management that while lenders expect first-ranking security over the trucks that are financed by them, it is not common practice for lenders to register financing statements against the specific trucks that serve as collateral on their loans. Rather, periodic audit checks are performed by lenders to ensure that their collateral is not subject to other parties' interests.

46.     I have been informed that in the ordinary course of a truck's life, it will typically become subject to various liens and security interests. When a truck is first acquired by the Pride Group for sale or lease, that truck is collateral for the Syndicated Facility. When the same truck is leased or financed, it then becomes subject to the lessor or financier's security registration instead. I have been informed that for most of the Pride Group's history, this potential for multiple security interests against the same trucks has always existed. However, starting in late 2022 through 2023, the Pride Group experienced much higher than normal rates of payment default and delinquency on truck leases, resulting in the Pride Group having to repossess an increasing number of trucks. I understand that these repossessed trucks sometimes had existing liens attached to them in favor of lessors or financiers, but they also became collateral under the Syndicated Facility upon their repossession and return to the Pride Group's inventory.

47.     It is my understanding based on discussions with the Debtors' management that due in part to the strains on the Pride Group's team and delays in transferring assets and liabilities

across business lines in recent months, the Pride Group was not able to timely track and correct security registrations, and has inadvertently pledged certain trucks more than once such that more than one lender claims a security interest in those trucks.  This issue was first identified by a lender pursuant to an ordinary course audit of pledged collateral.  I understand that the Pride Group immediately created an internal task force to identify the extent of the issue and to ensure the inadvertent practice stopped.  Since Ernst & Young Inc.'s ("EY") engagement as financial advisor and, more recently, as the Canadian Court-appointed monitor (in such capacity, the "Monitor"), it has been closely involved in assessing and resolving the issue.  With EY's assistance, new internal governance programs and controls (the "Governance Protocols") were implemented to ensure accurate recording and correction of security interest in truck collateral.  The Pride Group has also alerted most lenders that may have been impacted by this issue.  Since my engagement as CRO, I have been assisting the Pride Group and EY with addressing this issue as well.

48.     Upon learning of that there may be multiple security interests in the same collateral, certain Pride Group lenders have, as a precautionary measure, refused to permit their collateral from being transferred or sold.  This has restricted the Pride Group from conducting a core part of its business—selling and leasing trucks.  While the CCAA Proceedings and these Chapter 15 Cases proceed, the Debtors intend to strictly implement the Governance Protocols to ensure that no lenders receive any benefits from their collateral at the expense of any other parties in interest, including by placing any proceeds of the trucks subject to multiple security interests into a trust account held by the Monitor to be distributed in accordance with the CCAA Proceedings.

49.     The Monitor and I, with the Debtors' assistance, have also identified certain other instances where assets or credit facilities were recorded differently than they ought to have been. In each such case, the Debtors, the Monitor, and I have implemented practices and protocols to

prevent these situations from occurring in the future, and such practices and protocols have been disclosed to certain of the Debtors' lenders.

**D.  Negotiations With Creditors**

50.    As noted above, over the past several months, the Debtors have engaged in extensive negotiations with their principal lenders to find a path forward.  These efforts have resulted in informal forbearances from several lenders.  Nevertheless, many of the Debtors' lenders have delivered demands for payment, reservations of rights, and notices of intent to enforce security pursuant to section 244 of the Canadian *Bankruptcy and Insolvency Act*.

51.    Certain lenders and contract counterparties have already initiated a litigation proceeding against Debtors and a non-Debtor affiliate in the United States.  This includes seeking to litigate breach of contract claims and the appointment of a receiver with respect to their collateral and seeking to enforce existing settlement agreements.  Further, the Debtors have also been made aware that at least one lender has delivered notices to truck lessees instructing them to make payment on their lease (which serves as collateral for the lender's loans) to the lender instead of to the applicable non-Debtor Pride Group entity.  Finally, several funders under the Pride Group's Securitization Agreements have indicated that they intend to replace the Pride Group as the "servicer" under those agreements.  The Debtors intend to continue engaging in negotiations with their lenders as they develop their plan of restructuring.

52.    The Debtors are in urgent need of protection under the CCAA and these Chapter 15 Cases so they can stabilize their business, sell non-core assets, and work towards right sizing their businesses.  The Debtors have commenced the CCAA Proceedings with the ultimate goal of protecting the interests of creditors and other stakeholders, with a view to having the business

emerge from CCAA protection in a stronger form that preserves and maximizes its enterprise value and employment for as many of its employees as is reasonably possible.

## THE CHAPTER 15 FILINGS

### A.  Recognition of the CCAA Proceedings as Foreign Main Proceedings

53.    On the date hereof (the "Petition Date") and in my capacity as the Foreign Representative of the Debtors, I filed petitions under chapter 15 of the Bankruptcy Code for recognition of the CCAA Proceedings, thereby commencing the Debtors' Chapter 15 Cases.

54.    I was authorized pursuant to the Initial Order to act as the Foreign Representative of the CCAA Proceedings and to seek recognition and approval of the CCAA Proceedings as necessary, including as "foreign main proceedings" under the Bankruptcy Code.  In light of the statutory presumption embodied in section 1516(a) of the Bankruptcy Code, the Bankruptcy Code's definition of "foreign representative," and the Initial Order, I understand that I satisfy the requirements to serve as the Foreign Representative of the CCAA Proceedings.

55.    Each of the Debtors either is incorporated in the United States or holds property in the United States (or both).  On that basis, I understand that each of the Debtors is eligible to be a debtor in these Chapter 15 Cases.

56.    I understand that the Bankruptcy Code provides for recognition of foreign proceedings as "foreign main proceedings" if such foreign proceedings are "foreign proceedings" pending in a country where the debtor has "the center of its main interests."

57.    I understand that the CCAA Proceedings are "foreign proceedings" given that they are collective judicial proceedings authorized and supervised by the Canadian Court under the CCAA and pursuant to the Initial Order.  It is my understanding that for these reasons, the CCAA Proceedings qualify as "foreign proceedings" as that term is defined in Section 101(23) of the

Bankruptcy Code. In compliance with Section 1515(b) of the Bankruptcy Code, a copy of the Initial Order, which commenced the CCAA Proceedings, is attached to each of the Debtors' Chapter 15 petitions.

### B. The Debtors' COMI is in Canada

58.    I understand that section 1517(b)(1) of the Bankruptcy Code provides that foreign proceedings shall be recognized as "foreign main proceedings" if the foreign proceedings are pending in the country where the debtor has "the center of its main interests" ("COMI"). I understand that COMI is not defined in Chapter 15, but section 1516(c) of the Bankruptcy Code provides that "[i]n the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests."

59.    I believe that the COMI of each of the Debtors incorporated in Canada is located in Canada. I also believe that, while certain of the Debtors are incorporated and have their registered offices in the United States, all of the Debtors' COMI is Canada for the reasons set forth below:

   a. Although the U.S. Debtors are incorporated under the laws of various U.S. states, they are all centrally managed by the same management team from the Pride Group's global headquarters located at 1450 Meyerside Dr. Suite 401, Mississauga, Ontario, Canada.[8]

   b. All of the U.S. Debtors are owned by 2692293 Ontario Ltd., a Debtor Canadian company which is personally owned by the Pride Group's co-founders, Sulakhan Johal and Jasvir Johal.

   c. 16 of the Debtors are incorporated under the laws of Canada and have their principal place of business in Ontario, Canada.

---

[8]    While the Debtors maintain an office in Dallas, Texas that serves as the Pride Group's U.S. head office, all management decisions as a whole are made from the Pride Group's global headquarters in Ontario, Canada, and all of the most senior executives of the Pride Group live and work in Ontario, Canada.

d.  All of the Debtors' strategic and key operating and policy decisions are made by, or are subject to approval from, the Debtors' senior management located in Ontario, Canada.

e.  All of the Debtors' operations are overseen by the senior management team (including Sulakhan Johal and members of his family) at the Pride Group's global headquarters in Ontario, Canada.

f.  Substantially all of the Debtors' senior management team is located in Ontario, Canada.[9]

g.  Substantially all key human resources decisions pertaining to payroll and employees are made by the Debtors' senior management located in Ontario, Canada.

h.  Substantially all of the Debtors' key accounting decisions and all plans, budgets and financial projections are made by the Debtors' senior management located in Ontario, Canada.

i.  Substantially all of the Debtors' planning, budgeting, management of taxes, cash management and preparation of financial projections is done from Ontario, Canada.

j.  Substantially all material and/or long-term contracts and expenses are subject to the approval of the Debtors' senior management located in Ontario, Canada.

k.  Substantially all marketing and business development initiatives are overseen from Ontario, Canada.

l.  Substantially all corporate governance and regulatory compliance for the Debtors is overseen from its management team located in Ontario, Canada.

m.  For each of the U.S. Debtors, Sulakhan Johal, his brother Jasvir Johal and/or his son Navraj Johal are the only members of the board of directors and each of them live in Ontario, Canada, and, since the Pride Group's founding in 2010, all board meetings for all Pride Group entities have been physically held in Ontario, Canada.

60.    Additionally, the primary assets of the Debtors, including its accounts receivables, trucks, dealerships, real estate, and the Pride Group's global headquarters, are located in Canada.

---

[9]    While there are a few members of the management team that live and work in the United States, all management decisions as a whole are made from the Pride Group's headquarters in Ontario, Canada, and all of the most senior executives of the Pride Group live and work in Ontario, Canada.

While the Debtors maintain certain real estate (comprised of truck stops, parking lots, and dealerships) and certain trucks in the United States, those assets are part of the overall Pride Group which is managed from its headquarters in Canada.

61.     Further, the majority of the Debtors' creditors affected by the CCAA Proceedings are located in, or have connections to, Canada.  I understand that the advisors engaged by those creditors in connection with the CCAA Proceedings are also primarily located in Canada.  I also understand that the lenders under the Syndicated Facility are all Canadian banks or subsidiaries of Canadian banks, and more than 50% (by value) of the Debtors' creditors are located in Canada.

62.     Finally, while some of the Debtors' various credit facilities are governed under U.S. law, the majority of them are governed by Canadian law, including the Syndicated Facility which is the largest credit facility on which the Debtors are obligated.  Additionally, the CCAA Proceedings were initiated in Ontario, Canada, and are being prosecuted there, and the Canadian Court is overseeing the CCAA Proceedings.  Therefore, I understand that many, if not most, disputes with the Debtors would have a nexus to Canada and will therefore be subject to Canadian law.

63.     Based on the foregoing facts, I believe that recognition of the CCAA Proceedings as foreign main proceedings is warranted.

64.     I also believe my recognition as the Debtors' "foreign representative" and recognition of the CCAA Proceedings as "foreign main proceedings" are consistent with the purpose of chapter 15 and will allow the Debtors to effectuate a potential restructuring or conduct a court-supervised sales process in the most efficient manner without jeopardizing creditors' rights.

C.   **The Need for Provisional Relief**

65.     In addition to seeking recognition of the CCAA Proceedings, I, in my capacity as the Foreign Representative, have also requested certain provisional relief as set forth in the Provisional Relief Motion.   Specifically, pending recognition of the CCAA Proceedings, the Foreign Representative seeks provisional relief to enjoin collection efforts against the Pride Group,[10] certain directors and officers, and their assets located in the United States.   This relief is necessary to avoid immediate and irreparable harm to the Pride Group and its assets, in order to prevent creditors, litigants, contract counterparties, or other parties in interest in the United States from engaging in a "race to the courthouse" or otherwise exercising self-help remedies resulting in a piecemeal and preferential liquidation and distribution of assets, rather than an orderly distribution of value according to priorities schemes set forth under the CCAA.   Indeed, certain of the Pride Group's lenders have already commenced litigation against certain Pride Group entities and are pursuing their remedies aggressively, which is both distracting to management and will result in unfair and preferential treatment for those lenders who win the "race to the courthouse."

66.     The Foreign Representative also seeks provisional relief under section 365 of the Bankruptcy Code to prohibit contract counterparties and landlords from terminating their contracts and leases with members of the Pride Group as a result of the commencement of the CCAA Proceedings.   This would allow the Debtors to maintain the status quo until the Court rules on the Debtors' Chapter 15 Petitions.

67.     Notably, the Initial Order also extends the stay of proceedings and other protections provided under the CCAA to (i) the Pride Group as a whole to preserve the *status quo*, given that the businesses and operations of the Debtors are heavily intertwined with that of the non-Debtor

---

[10]     As noted above, the Debtors are not seeking any relief with respect to the Securitization SPVs.

entities; and (ii) certain of the Pride Group's directors and officers in their capacity as personal guarantors on certain of the Pride Group's credit facilities, including Sulakhan Johal and members of his immediate family (collectively and in such capacities, the "Personal Guarantors"), given that permitting such proceedings to continue would be distracting at this pivotal time during which they are managing and operating the Pride Group and pursuing the CCAA Proceedings and these Chapter 15 Cases.[11]   The Foreign Representative also seeks, through the Provisional Relief Motion, concomitant recognition and enforcement of the stay granted by the Canadian Court pursuant to the Initial Order with respect to these parties and their assets located within the United States in order to prevent creditors and other parties in interest from taking adverse actions against them during the pendency of the CCAA Proceedings and these Chapter 11 Cases.

68.     I believe that the requested provisional relief is consistent with the Initial Order, and, for the foregoing reasons, I believe that the provisional relief requested is necessary and appropriate and is in the best interests of the Debtors, their creditors, and other parties in interest.

**D.  Joint Administration and Noticing Procedures**

69.     Concurrently with the filing of the Verified Petition, The Foreign Representative has requested joint administration and procedural consolidation of these Chapter 15 Cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are affiliates of each other and each of their cases were filed on the Petition Date in this court (the "Bankruptcy Court").  Accordingly, I believe that joint administration of these Chapter 15 Cases for procedural purposes only, as well as permitting the filing of consolidated lists of the information required by Bankruptcy Rule 1007(a)(4), will be an

---

[11]   I have been informed that one lender has already filed litigation against two of the Personal Guarantors in federal court in the District of Connecticut and Southern District of New York seeking to enforce certain personal guarantees.

administrative convenience for the Bankruptcy Court, the court clerk's office, and all interested parties.

70.     Further, I believe that noticing procedures set forth in the contemporaneously filed Motion for Entry of an Order Scheduling Hearing on Chapter 15 Petitions for Recognition and Related Relief and Specifying Form and Manner of Service of Notice (the "<u>Notice Procedures Motion</u>") are appropriate in light of the number of creditors, potential creditors, and other parties in interest, all of whom need to be provided with, among other things, notice of the entry of the Provisional Relief Order, the deadline to object to recognition of the CCAA Proceedings, and the hearing on the Verified Petition.  The Foreign Representative has prepared a form of notice advising of these and related matters (the "<u>Recognition Hearing Notice</u>"), a copy of which is annexed to the Notice Procedures Motion.  Under the facts and circumstances of the Debtors' Chapter 15 Cases, I submit that service of the Recognition Hearing Notice in the manner proposed in the Notice Procedures Motion will provide those parties identified as the Notice Parties in the Notice Procedures Motion with due and sufficient notice of the relief requested in the Recognition and Relief Motion and associated objection deadline and hearing dates.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 1, 2024
      Toronto, Canada

                    */s/ Randall Benson*
                    Randall Benson