**<u>Exhibit D</u>**

**Protocols Order**

Court File No. CV-24-00717340-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE | ) | FRIDAY, THE 5TH |
| | ) | |
| JUSTICE OSBORNE | ) | DAY OF APRIL, 2024 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those Applicants listed on Schedule "A" hereto (each, an "**Applicant**", and collectively, the "**Applicants**")

**PROTOCOLS ORDER**

**THIS MOTION**, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") was heard this day at 330 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of Sulakhan Johal sworn March 26, 2024 and the Exhibits thereto, the affidavit of Randy Benson sworn April 2, 2024 and the Exhibits thereto, the pre-filing report of the proposed monitor, Ernst & Young Inc., dated March 26, 2024, the first report of Ernst & Young Inc., in its capacity as court-appointed monitor (the "**Monitor**") dated April 4, 2024 (the "**First Report**"), and the Initial Order dated March 27, 2024 (as amended and restated from time to time, the "**Initial Order**") and on hearing the submissions of counsel for the Applicants and the limited partnerships listed in Schedule "A" hereto (collectively with the Applicants, the "**Pride Entities**"), the Monitor, Royal Bank of Canada (the "**DIP Agent**") as administrative agent for the lenders under the DIP Term Sheet and such other counsel that were present, and no one else appearing although duly served as appears from the affidavit of service of Puya Fesharaki sworn April 2, 2024 and the affidavit of service of Nancy Thompson sworn April 4, 2024,

**SERVICE**

1.       **THIS COURT ORDERS** that the time for service of the Notice of Motion, Motion Record, and the First Report is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

**DEFINED TERMS**

2.       **THIS COURT ORDERS** that capitalized terms used in this Order and not otherwise defined herein have the meaning ascribed to them in the Initial Order.

**PROTOCOLS**

3.       **THIS COURT ORDERS** that each of (i) the Governance Protocol set out in Schedule "B" hereto; (ii) the Real Estate Monetization Plan set out in Schedule "C" hereto; and (iii) the Intercompany and Unsecured Claims Preservation Protocol set out in Schedule "D" hereto (collectively, the "**Protocols**") be and are hereby approved and the Pride Entities and those Additional Stay Parties listed on Schedule "A" hereto, together with the Monitor and CRO are hereby authorized and directed to act in accordance with the Protocols.

4.       **THIS COURT ORDERS** that each of the Protocols may be amended from time to time pursuant to a further order of the Court. Notwithstanding the foregoing, the Pride Entities, with the prior written consent of the CRO, Monitor and DIP Agent, and on notice to the Service List, may make minor amendments as they deem appropriate to give effect to the provisions of any or all of the Protocols.

5.       **THIS COURT ORDERS** that the CRO and Monitor shall have all of the protections afforded to them under the CCAA, the Initial Order, or any further Order of this Court, in exercising their duties and obligations under this Order and the Protocols and shall not incur any liability or obligations in exercising their duties under this Order and the Protocols, save and except for any gross negligence or wilful misconduct on its part.

**GOVERNANCE PROTOCOL HEARING**

6.      **THIS COURT ORDERS** that any proposed revisions to the Governance Protocol will be the subject of a motion to be heard on notice to the Service List on April __, 2024, or as soon after that date as the motion may be heard.

**GENERAL**

7.      **THIS COURT ORDERS** that each of the Pride Entities, the Monitor or the CRO may, from time to time, apply to this Court for advice and directions in the discharge of its powers and duties under this Order or the Protocols.

8.      **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States, to give effect to this Order and to assist the Pride Entities, the CRO, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Pride Entities, the CRO and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the CRO or Monitor in any foreign proceeding, or to assist the Pride Entities, the CRO and the Monitor and their respective agents in carrying out the terms of this Order.

9.      **THIS COURT ORDERS** that each of the Pride Entities, the CRO and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the CRO is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

10.     **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. (Eastern Time) on the date of this Order without the need for entry or filing.



2024.04.09
17:24:01
-04'00'

## SCHEDULE "A"

### A. APPLICANTS

**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

## Other Holding Companies
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

## B. LIMITED PARTNERSHIPS

*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

## C. ADDITIONAL STAY PARTIES

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PERGOLA HOLDINGS, CORP.
- PRIDE GLOBAL INSURANCE COMPANY LTD.

**SCHEDULE "B"**

**Governance Protocol**

## Governance Protocol

Pursuant to the Initial Order dated March 27, 2024 (as may be amended or restated from time to time), (i) Ernst & Young Inc. was appointed as Monitor (in such capacity, the "**Monitor**") of the Pride Entities[1] and (ii) RC Benson Consulting Inc. was appointed as Chief Restructuring Officer (in such capacity, the "**CRO**") of the Pride Entities.

The Pride Entities shall comply with this Governance Protocol set forth herein and shall cooperate with and assist the Monitor and the CRO in fulfilling their duties and obligations herein.

Pursuant to the duties and obligations set forth herein, the Monitor and CRO, in consultation with the Pride Entities, will review receipts, disbursements and other items of the Pride Entities.

In performing their duties and obligations herein, the Monitor, its counsel, and the CRO, shall consult with the Pride Entities, their counsel, and/or any relevant lender(s) or securitization party(ies) (together "**Financier(s)**"), or their counsel, as needed or appropriate.

### Vehicle Sales and Buyouts Reporting and Disbursements

1. On Monday of each week (or, if such Monday falls on a holiday, the next business day), the Pride Entities shall provide the Monitor and CRO with written reports (the "**Weekly Vehicle Sales Report**") listing:

   a) vehicles sold in the prior week, with the following information in respect of each sold vehicle: (i) the accompanying vehicle identification number ("**VIN**"), (ii) lease number, (iii) amount of funds received net of fees, costs, commissions and sales taxes (such amounts, the "**Vehicle Sale Proceeds**"), (iv) the applicable Financier(s) that had a registered security or other interest in such VIN or, based on the books and records of the Pride Entities (the "**Books and Records**"), have an entitlement to the Vehicle Sale Proceeds in priority to any other Financier(s), and (v) based on the Books and Records, the amounts owing to such priority Financier(s) in respect of such VIN; and

   b) vehicle buyouts in the prior week, with the following information in respect of each vehicle: (i) the accompanying VIN; (ii) lease number, (iii) amount of funds received net of fees, costs, commissions and sales taxes (such amounts, the "**Vehicle Buyout Proceeds**"), (iv) the applicable Financier(s) that had a registered security or other interest in such VIN and/or, based on the Books and Records, have an entitlement to the Vehicle Buyout Proceeds in priority to any other Financier(s); and (iv) based on the Books and Records, the amount owing to such priority Financier(s) in respect of such VIN.

---

[1] As defined in the Initial Order.

2. Prior to any disbursements being made by the Pride Entities in respect of the Vehicle Sale Proceeds and Vehicle Buyout Proceeds (together, "**Vehicle Proceeds**") to the applicable Financier(s) identified by the Pride Entities as entitled to same in the Weekly Vehicle Sales Report:

   a) the Monitor, together with its counsel, and in consultation with the CRO, will review the entitlement of the identified Financier(s) to the Vehicle Proceeds based on the Books and Records and otherwise review such proposed distribution of Vehicle Proceeds to the Financier(s) identified in the Vehicle Sales Report as having the entitlement (but, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement) and, subject to (b) below, approve the payment of such amounts to the respective Financier(s), up to the lesser of (i) the amount outstanding to the relevant Financier(s) in respect of the relevant VIN (based on the Books and Records, as reviewed by the Monitor), or (ii) the amount of the respective Vehicle Proceeds; and

   b) in the event a VIN listed in the Weekly Vehicle Sales Report was, based on (i) the Books and Records, and/or (ii) applicable VIN security searches, and/or (iii) claims or demands made in writing by any Financier as reviewed by the Monitor, pledged as collateral security, leased, assigned or an interest was otherwise granted or transferred to or for the benefit of two or more Financier(s) (a "**Multiple Collateral Vehicle (Sale)**"), the corresponding Vehicle Proceeds will be transferred to a bank account established by the Monitor to be held in trust (the "**Monitor's Trust Account**") pending determination of entitlement to such Vehicle Proceeds. The determination of entitlement to the Vehicle Proceeds of a Multiple Collateral Vehicle (Sale) will be conducted by the Pride Entities, in consultation with the Monitor, their respective counsel, and the CRO, in accordance with a protocol to be established by future order of the Court, which shall be developed in consultation with affected parties (the "**Entitlement Protocol**") or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected Financier(s).

3. The Monitor shall make available to Financier(s) a copy of each Weekly Vehicle Sales Report as and when received from the Pride Entities and, as soon as practical following completion of the review contemplated in paragraph 2, a report on the amount of Vehicle Proceeds disbursed to Financiers and transferred to the Monitor's Trust Account correlated to the relevant VINs.

**Lease Payments and Soft Collections Reporting**

4. On the Monday of every second week (or, if such Monday falls on a holiday, the next business day) commencing April 15, 2024, the Pride Entities shall provide the Monitor and CRO with a report (the "**Lease Payments Report**") listing the itemized amounts that the Pride Entities have received through pre-authorized payments (including as servicer under securitizations or otherwise on behalf of third parties, but excluding collections that are to be reported upon pursuant to paragraph 5) from customers pursuant to leases (individually

a "**Lease Payment**" and collectively, the "**Lease Payments**"), along with: (i) the accompanying VIN, (ii)   lease number(s) to which each Lease Payment relates; (iii) name of lessee; (iv) applicable Financier(s) entitled to receipt of each Lease Payment (based on the Books and Records); and (v) proposed amounts to be distributed to the respective Financier(s).[2]

5.  On the Monday of every second week (or, if such Monday falls on a holiday, the next business day) commencing April 15, 2024, the Pride Entities shall provide the Monitor and CRO with a report (the "**Soft Collections Report**", and together with the Lease Payments Report, the "**Bi-Weekly Vehicle Lease Collections Report**") listing the itemized amounts that the Pride Entities have collected (including as servicer under securitizations or otherwise on behalf of third parties) from customers pursuant to leases other than those pre-authorized payments made to segregated trust accounts (each a "**Soft Collection**" and collectively, the "**Soft Collections**"), along with: (i) the accompanying VIN, (ii) lease number(s) to which each Soft Collection relates; (iii) name of lessee; (iv) applicable Financier(s) entitled to receipt of each Soft Collection (based on the Books and Records, as reviewed by the Monitor); and (v) proposed amounts to be paid to the respective Financier(s) (net of any fees, costs, commissions, and sales taxes).

**Lease Payment Disbursements**

6.  Prior to any disbursements being made by the Pride Entities from the Lease Payments to those Financier(s) and in the amounts identified in the Lease Payments Report, the Monitor (who, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement) will review the payments made by the top five customers (in total dollar amount of payments received) in the Lease Payments Report to confirm (i) the proposed amounts to be disbursed to such respective Financier(s); and (ii) the applicable Financier(s) entitled to receipt of such Lease Payments (based on the Books and Records, as reviewed by the Monitor), and such payments in the Lease Payments Report may be made with the Monitor's prior approval, subject to paragraphs 7 and 8 herein.

7.  In the event that the VIN pursuant to a lease listed in the Lease Payments Report was, based on the Books and Records, and/or applicable VIN security searches and/or claims or demands made in writing by any Financier, pledged as collateral security to two or more Financiers (a "**Multiple Collateral Vehicle (Lease)**"), then the corresponding Lease Payment(s) will be transferred to the Monitor's Trust Account pending determination of entitlement to such Lease Payment(s). In the event that a portion of the Lease Payments are received from a lessee who has made payments, without attribution to a particular VIN and who is indebted to the Pride Entities in respect of more than one Financier and with respect to more than one lender (an "**Unallocated Lease Payment**"), then the

---

[2] For certainty, Lease Payments received from pre-authorized payment shall not be included in a Lease Payments Report until five days have passed since the pre-authorized payment date.

corresponding Lease Payment(s) will be allocated to all such Financier(s) on a pro-rata basis based on the total amount outstanding due to each Financer(s).

8. The determination of entitlement to the Lease Payments in respect of a Multiple Collateral Vehicle (Lease) will be conducted by the Pride Entities, in consultation with the Monitor, their respective counsel, and the CRO, in accordance with the Entitlement Protocol, or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected Financier(s).

**Soft Collections Disbursements**

9. Prior to any disbursements being made by the Pride Entities from the Soft Collections to Financiers identified in the Soft Collections Report as entitled to same, the Monitor (who, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement) will review the payments made by the top five customers (in total dollar amount of payments received) in the Soft Collections Report to confirm (i) the proposed amounts to be disbursed to such Financier(s); and (ii) the applicable Financier(s) entitled to receipt of such Soft Collections based on the Books and Records (as reviewed by the Monitor), and such payments in the Soft Collections Report may be made with the Monitor's prior approval, subject to paragraphs 10 and 11 herein.

10. In the event that the vehicle pursuant to a lease listed in the Soft Collections Report was, based on the Books and Records and/or applicable VIN security searches and/or claims or demands made in writing by any Financier, a Multiple Collateral Vehicle (Lease), then the corresponding Soft Collection(s) will be transferred to the Monitor's Trust Account pending determination of entitlement to such Soft Collections. Additionally, all Soft Collections in the Soft Collections Report related to a securitized lease will be held by the Monitor in trust pending entitlement to such proceeds. In the event that a portion of the Soft Collections are collected from a lessee without attribution to a particular VIN and who is indebted to Pride Entities, Tpine USA Funding I LLC, Tpine USA Funding II LLC, Tpine USA Funding III LLC, Tpine USA Funding V LLC, or TPine Canada Securitization LP in respect of more than one lease and with respect to more than one Financier (an "**Unallocated Soft Collection**"), then the corresponding Soft Collection(s) will be allocated to all such Financier(s) on a pro-rata basis based on total amount outstanding due to each Financer(s).

11. The determination of entitlement to the Soft Collections in respect of a Multiple Collateral Vehicle (Lease) will be conducted by the Pride Entities, in consultation with the Monitor, their respective counsel, and the CRO, in accordance with the Entitlement Protocol, or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected Financier(s).

**General**

12. The Monitor shall make available to Financier(s) a copy of each Bi-Weekly Vehicle Lease Collections Report as and when received from the Pride Entities and, as soon as practical following completion of the review contemplated in paragraph 3, a report on the amount of Lease Payments disbursed to Financier(s) and transferred to the Monitor's Trust Account correlated to the relevant leases.

13. The Pride Entities shall be entitled but not required to pay all reasonable expenses incurred by the Pride Entities in carrying on their business lines in the ordinary course. With respect to any such payment in excess of $100,000, and all payments outside of the business operations in the ordinary course, such disbursements shall only be made with the prior consent of the Monitor and CRO.

14. Commencing as soon as practical following issuance of the Initial Order and thereafter, on a biweekly basis, the Pride Entities shall provide to the Monitor and CRO together with each Weekly Vehicle Sales Report a written reconciliation of (i) Vehicle Proceeds and Lease Payments and related disbursements in the prior week, to (ii) the Pride Entities' actual cash flow statements.

15. Following issuance of the Initial Order, the Pride Entities, in consultation with the CRO and Monitor, shall track vehicle deposits and downpayments received by the Pride Entities in respect of any vehicle, along with the return of such deposits or downpayments in the event that such vehicle is not ultimately sold or leased to such customer.

16. The Monitor shall be entitled to seek the advice and direction of the Court in respect of its obligations hereunder, and may decline to provide consent to any disbursement by the Pride Entities, in its sole discretion, subject to the direction of the Court.

17. The CRO, the Monitor, and their respective employees, advisors and other representatives acting in such capacities shall not incur any liability or obligation as a result of the CRO and/or Monitor carrying out the provisions of this Governance Protocol, save and except for any gross negligence or wilful misconduct on their part. The Monitor shall have all of the protections under the CCAA in carrying out its duties and obligations hereunder.

**SCHEDULE "C"**

**Real Estate Monetization Plan**

**REAL ESTATE MONETIZATION PLAN**

Each DIP Borrower[1] shall list for sale all of its real property (each such property, a "**Listed Property**") by no later than May 1, 2024, or such later date as the Administrative Agent and relevant third party mortgagees of each Listed Property (a "**Third Party Mortgagee**") may in writing agree. The listing and sale of each Listed Property (each, a "**Listing**") will be directed by RC Benson Consulting Inc. in its capacity as Chief Restructuring Officer (the "**CRO**") in consultation with the Monitor and the relevant Third Party Mortgagee (provided such Third Party Mortgagee has indicated it will not submit a bid in respect of the applicable Listing).

The CRO shall keep the Administrative Agent and all Third Party Mortgagees apprised of the progress of the Listing, subject to confidentiality agreements (as the Monitor may deem appropriate in consultation with the DIP Borrowers) being entered into, and, provided that such Third Party Mortgagee has indicated it will not submit a bid in respect of the applicable Listing, including by:

(a) promptly following receipt, providing copies of all listing agreements, appraisals, reports from agents or brokers engaged by a DIP Borrower in connection with the Listing, offers for any Listed Property from any source whatsoever, whether or not solicited or obtained in connection with the Listing (each, an "**Offer**"), and all other documents related to any solicitation or interest in the Listed Property or to the Listing;

(b) on a weekly basis, providing to the Administrative Agent and to each Third Party Mortgagee, a written status update in form and substance acceptable to the Administrative Agent and Third Party Mortgagee regarding the status of the Listing, including with respect to listing strategy, pricing, and interest expressed in the Listed Property to date; and

(c) providing such further written and oral updates as the Administrative Agent or any Third Party Mortgagee may request.

No DIP Borrower shall accept an Offer in respect of any Listed Property without the prior written consent of the Administrative Agent and each Third Party Mortgagee of the Listed Property, or approval of the Court on a motion with notice to the Third Party Mortgagee. If one of the Administrative Agent or the Third Party Mortgagee consent to accept an Offer but the other does not and such disagreement is not resolved promptly, then the DIP Borrower shall seek direction of the Court on notice to each of the Administrative Agent and the Third Party Mortgagee.  Upon receipt of any Offer, the DIP Borrowers will provide to the Administrative Agent and any Third Party Mortgagee all present and future definitive documents relating to the transaction contemplated by the Offer and will promptly notify the Administrative Agent of any material changes affecting such transaction (including as to the purchase price or closing date) or its acceptance, implementation or consummation.

The proceeds of sale of any Listed Property shall be dealt with in accordance with the terms of this Real Estate Monetization Plan, the Intercompany and Unsecured Claims Preservation Protocol in

---

[1] Capitalized terms not defined herein have the meanings given to them in the Amended and Restated Initial Order dated as of April 5, 2024.

relation to a Listed Property in which the Third Party Mortgage is one of the "Mortgagees" as defined in the Intercompany and Unsecured Creditor Claims Preservation Protocol, "**BMO and Roynat**")), and relevant Court Orders.

In respect of a Listed Property with a Third Party Mortgagee other than BMO and Roynat,

> (a) No proceeds from the sale of such Listed Property shall be distributed to a Third Party Mortgagee unless and until the Monitor's counsel shall have delivered an opinion satisfactory to the Monitor as to the validity and enforceability of the Third Party Mortgagee's security relating to that Listed Property and the DIP Borrowers shall have obtained an order authorizing such distribution;

> (b) To the extent practical and subject to receipt by the Monitor of the opinions referred to above, the DIP Borrowers shall seek an order authorizing the distribution from the net proceeds of sale of any Property to the relevant Third Party Mortgagee in an amount sufficient to satisfy in full the outstanding amount secured (including, for certainty, cross-collateralized amounts and all interest, fees, costs and other amounts payable to the Third Party Mortgagee) by any valid and enforceable mortgage registered in favour of the Third Party Mortgagee against title to the Property at the same time as the DIP Borrowers seek an order approving the sale of the Property;

The DIP Borrowers, the Monitor, Third Party Mortgagee and the Administrative Agent shall be authorized to apply to the Court for directions in respect of the Real Estate Monetization Plan, including any variations thereto.

# SCHEDULE "D"

**Intercompany and Unsecured Claims Preservation Protocol**

**Intercompany and Unsecured Creditor Claims Preservation Protocol**

**Background[1]:**

- Bank of Montreal ("**BMO**") provided[2] a delayed-draw facility to finance the acquisition by certain of the DIP Borrowers of real estate properties across Canada and the U.S. Each such DIP Borrower granted to BMO a mortgage over the acquired real estate and other security as collateral security for its and certain other of the DIP Borrowers' obligations to BMO under the BMO facility (the "**BMO Mortgage Pool**").

- Roynat Inc. ("**Roynat**", and together with BMO, the "**Mortgagees**") provided[3] financing to certain of the DIP Borrowers to acquire real estate properties across Canada and the U.S. Each such DIP Borrower granted to Roynat a mortgage over the acquired real estate property and other security as collateral security for its obligations under the Roynat facility, and any of its indirect obligations to Roynat in respect of certain other of the DIP Borrowers' obligations under the Roynat facilities (the "**Roynat Mortgage Pool**" and, together with the BMO Mortgage Pool, the "**Mortgage Pools**").

- The real properties subject to mortgages in favour of the Mortgagees and included in the Mortgage Pools are referred to herein as the "**Properties**").

- Certain of the DIP Borrowers in the Mortgage Pools are indebted (the "**Intercompany Indebtedness**") to other DIP Borrowers (the "**Intercompany Creditors**").

- Certain of the DIP Borrowers in the Mortgage Pools are and may become indebted to third parties on an unsecured basis (such third parties being "**Other Creditors**").

- Certain Intercompany Creditors have granted to the Administrative Agent a security interest in all of their present and after-acquired personal property, including the claims of such Intercompany Creditors to the Intercompany Indebtedness.

- The Properties and the claims of all Intercompany Creditors to the Intercompany Indebtedness, among other collateral, are subject to the DIP Charge and the other Charges as set out in the Amended and Restated Initial Order (the "**CCAA Charges**"), with the DIP Charge and the Directors' Charge on the Properties ranking subordinate to the mortgages of the Mortgagees.

- As a result of the cross-collateralization of the Properties within each Mortgage Pool, the order in which the Properties are realized and the value for which they are sold could

---

[1] The background statements made in this protocol shall not be determinative of the quantum, existence, validity, priority or enforceability of any claim or interest of any party.
[2] Pursuant to a BMO Real Estate Line Term Sheet dated June 21, 2022 and a Credit Agreement dated August 29, 2022, together with the loan and security documents delivered together therewith, and including all joinders and amendments thereto.
[3] Pursuant to separate offers of finance made available in respect of specific real estate acquisitions.

materially benefit certain Intercompany Creditors and Other Creditors and materially impair other Intercompany Creditors and Other Creditors.

- The objective of this protocol is to provide a mechanism to permit BMO and Roynat to be repaid from the proceeds of monetization of the Properties in their respective Mortgage Pools as and when they are sold and, subject to the claims of the Administrative Agent against such Properties under the DIP Charge, for the balance of the proceeds to be distributed to the Intercompany Creditors and Other Creditors in a manner which, to the extent possible in the circumstances, mimics the realization that they would have received had the Properties in each Mortgage Pool not been cross-collateralized (the "**Objective**").

**Protocol:**

The DIP Borrowers, the CRO and the Monitor shall implement the following protocol:

(a) The monetization of any Property is subject to the terms of the Real Estate Monetization Plan and the Amended and Restated Initial Order

(b) No proceeds from the sale of any Property shall be distributed to a Mortgagee unless and until the Monitor's counsel shall have delivered an opinion satisfactory to the Monitor as to the validity and enforceability of the Mortgagee's security relating to that Property and the DIP Borrowers shall have obtained an order authorizing such distribution;

(c) To the extent practical and subject to receipt by the Monitor of the opinions referred to above, the DIP Borrowers shall seek an order authorizing the distribution from the net proceeds of sale of any Property to the relevant Mortgagee in an amount sufficient to satisfy in full the outstanding amount secured (including, for certainty, cross-collateralized amounts) by any valid and enforceable mortgage registered in favour of the Mortgagee against title to the Property (a "**Mortgagee Distribution**") at the same time as the DIP Borrowers seek an order approving the sale of the Property;

BMO Mortgage Pool

(d) The net proceeds of sale of each Property in the BMO Mortgage Pool (individually a "**BMO Sold Property**" and collectively "**BMO Sold Properties**") after payment of the Mortgagee Distribution to BMO shall be deposited into a single account controlled by the Monitor and designated for receipt of the net proceeds of all BMO Sold Properties and distribution in a manner consistent with the Objective (the "**BMO Proceeds Account**"). The funds in the BMO Proceeds Account (the "**BMO Proceeds Pool**") shall stand in the place and stead of the BMO Sold Properties in respect of the claims of, and shall be held in trust by the Monitor for the benefit of, the Administrative Agent and the Lenders in respect of the DIP Charge, the parties having the benefit of the other CCAA Charges, the Intercompany Creditors, all Other Creditors of the relevant mortgagors and any other persons who may be entitled to the net proceeds (the claims of all such parties being "**BMO Pool Remaining Obligations**"), with the same nature and priority as they had with respect to the BMO Sold Property immediately prior to the sale.

(e) The DIP Borrowers, in consultation with the Monitor and the Administrative Agent, shall seek the Court's approval of a distribution of the BMO Proceeds Pool following the sale

of all Properties in the BMO Mortgage Pool. In order to achieve the Objective, the DIP Borrower shall seek a distribution based on the Monitor's calculation of a distribution in respect of the BMO Pool Remaining Obligations for each BMO Sold Property in accordance with the following:

    a.   If there is a Property Shortfall in respect of one or more BMO Sold Properties then:

        i.   With respect to each BMO Sold Property in respect of which there is a Property Shortfall, there shall be no distributions on account of BMO Pool Remaining Obligations of the relevant mortgagor; and

        ii.   With respect to all other BMO Sold Properties, there shall be distributed on account of BMO Pool Remaining Obligations of each relevant mortgagor of a BMO Sold Property the amount of the Property Surplus Proceeds for such BMO Sold Property less the related Adjustment Amount in order to give effect to the Objective; or

    b.   If there is no Property Shortfall in respect of any BMO Sold Properties then the distribution in each case on account of BMO Remaining Pool Obligations shall be the amount of the Property Surplus Proceeds for each BMO Sold Property.

(f)   Defined Terms:

    a.   **Net Sale Proceeds**: Gross purchase price of each BMO Sold Property, less usual and customary adjustments on the closing of commercial real estate transactions, commissions and direct closing costs.

    b.   **Mortgage Amounts Advanced**: means the direct advances received by the relevant mortgagor from BMO in respect of a BMO Sold Property and interest calculated to the date of distribution to BMO on such direct advances in accordance with the applicable mortgage terms (calculated by the Monitor based on the books and records of the applicable DIP Borrower).

    c.   **Property Surplus Proceeds**: means in respect of each BMO Sold Property for which the Net Sale Proceeds exceeds the Mortgage Amount Advanced, the amount by which the Net Sale Proceeds exceeds the Mortgage Amounts Advanced.

    d.   **Property Shortfall**: means, in respect of each BMO Sold Property for which the Net Sale Proceeds are less than the Mortgage Amount Advanced, the amount by which the Net Sale Proceeds are less than the Mortgage Amounts Advanced.

    e.   **Total Property Surplus Proceeds**: means the sum of all Property Surplus Proceeds.

    f.   **Total Property Shortfall**; means the sum of all Property Shortfalls.

    g.   **Adjustment Amount**: means the Total Property Shortfall multiplied by the Adjustment Percentage.

h. **Adjustment Percentage**: means, in respect of each BMO Sold Property, the Property Surplus Proceeds divided by the Total Property Surplus Proceeds.

Roynat Mortgage Pool

(g) The net proceeds of sale of each Property in the Roynat Mortgage Pool (individually a "**Roynat Sold Property**" and collectively "**Roynat Sold Properties**") after payment of the Mortgagee Distribution to Roynat shall be deposited into a single account controlled by the Monitor and designated for receipt of the net proceeds of all Roynat Sold Properties and distribution in a manner consistent with the Objective (the "**Roynat Proceeds Account**"). The funds in the Roynat Proceeds Account (the "**Roynat Proceeds Pool**") shall stand in the place and stead of the Roynat Sold Properties in respect of the claims of, and shall be held in trust by the Monitor for the benefit of, the Administrative Agent and the Lenders in respect of the DIP Charge, the parties having the benefit of the other CCAA Charges, the Intercompany Creditors, all Other Creditors of the relevant mortgagors and any other persons who may be entitled to the net proceeds (the claims of all such parties being "**Roynat Pool Remaining Obligations**"), with the same nature and priority as they had with respect to the Roynat Sold Property immediately prior to the sale.

(h) The DIP Borrowers, in consultation with the Monitor and the Administrative Agent, shall seek the Court's approval of a distribution of the Roynat Proceeds Pool following the sale of all Properties in the Roynat Mortgage Pool. In order to achieve the Objective, the DIP Borrower shall seek a distribution based on the Monitor's calculation of a distribution in respect of the Roynat Pool Remaining Obligations for each Roynat Sold Property in accordance with the following:

    a. If there is a Property Shortfall in respect of one or more Roynat Sold Properties then:

        i. With respect to a Roynat Sold Property in respect of which there is a Property Shortfall, there shall be no distributions on account of Roynat Pool Remaining Obligations of the relevant mortgagor; and

        ii. With respect to all other Roynat Sold Properties, there shall be distributed on account of Roynat Pool Remaining Obligations of each relevant mortgagor of a Roynat Sold Property the amount of the Property Surplus Proceeds for such Roynat Sold Property less the related Adjustment Amount in order to give effect to the Objective; or

    b. If there is no Property Shortfall in respect of any Roynat Sold Properties then the distribution in each case on account of Roynat Remaining Pool Obligations shall be the amount of the Property Surplus Proceeds for each Roynat Sold Property.

(i) Defined Terms:

    a. **Net Sale Proceeds**: Gross purchase price of each Roynat Sold Property, less usual and customary adjustments on the closing of commercial real estate transactions, commissions and direct closing costs.

b. **Mortgage Amounts Advanced**: means the advances received by the relevant mortgagor directly or indirectly from Roynat in respect of a Roynat Sold Property and interest calculated to the date of distribution to Roynat on such direct or indirect advances in accordance with the applicable mortgage terms (calculated by the Monitor based on the books and records of the applicable DIP Borrower).

c. **Property Surplus Proceeds**: means in respect of each Roynat Sold Property for which the Net Sale Proceeds exceeds the Mortgage Amount Advanced, the amount by which the Net Sale Proceeds exceeds the Mortgage Amounts Advanced.

d. **Property Shortfall**: means, in respect of each Roynat Sold Property for which the Net Sale Proceeds are less than the Mortgage Amount Advanced, the amount by which the Net Sale Proceeds are less than the Mortgage Amounts Advanced.

e. **Total Property Surplus Proceeds**: means the sum of all Property Surplus Proceeds.

f. **Total Property Shortfall**; means the sum of all Property Shortfalls.

g. **Adjustment Amount**: means the Total Property Shortfall multiplied by the Adjustment Percentage.

h. **Adjustment Percentage**: means, in respect of each Roynat Sold Property, the Property Surplus Proceeds divided by the Total Property Surplus Proceeds.

(j) Any real property owned by any of the DIP Borrowers which is not part of a Mortgage Pool shall be dealt with in the ordinary course in accordance with the terms of the Amended and Restated Initial Order and the Real Estate Monetization Plan.

(k) Nothing in this Protocol shall amend or vary the terms or conditions of the DIP Term Sheet or the Credit Agreement and no distribution shall be proposed hereunder which is inconsistent with such terms and conditions or with any Court Order.

Court File No.: CV-24-00717340-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** ET AL.

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
Proceeding commenced at Toronto

**PROTOCOLS ORDER**

**Thornton Grout Finnigan LLP**
3200 – 100 Wellington Street West
TD West Tower, Toronto-Dominion Centre
Toronto, ON  M5K 1K7

**Leanne Williams (LSO# 41877E)**
Email:  lwilliams@tgf.ca

**Rachel Nicholson (LSO# 68348V)**
Email:  rnicholson@tgf.ca

**Puya Fesharaki (LSO# 70588L)**
Email:  pfesharaki@tgf.ca

Tel:    416-304-1616
Fax:   416-304-1313

Lawyers for the Applicants