**<u>Exhibit B</u>**

**Sale Agreement**

# PURCHASE AND SALE AGREEMENT

## 225 WEST SOUTH FRONTAGE ROAD, BOLINGBROOK, IL

### ARTICLE 1:  PROPERTY/PURCHASE PRICE

1.1.    Certain Basic Terms.

(a) Seller and Notice Address:
Frontage Road Holding Corp.
C/o Pride Group Enterprises
1450 Meyerside Drive – Suite 401
Mississauga, Ontario, Canada  L5T2N5
Attn: Property Notice
Telephone: (416) 858-3051
Email: Sam@pridegroupenterprises.com

With a copy to:
Pride Group Enterprises
Attn: Frederick Gareri, Director of Legal Operations
1450 Meyerside Drive – Suite 401
Mississauga, Ontario, Canada  L5T2N5
Telephone:  (437) 429-6710
Email: fgareri@pridegroupenterprises.com

(b) Purchaser and Notice Address:

Hardik Patel
7220 122nd Avenue
Kenosha, Wisconsin 53142
Telephone: 412-818-5952
E-Mail:  hdpatel0122@gmail.com

With a copy to:

Mack Law Group
1363 Shermer Rd., Suite 210
Northbrook, IL 60062
Attention:        Charles Mack
Telephone:        847.239.7212
E-Mail:        charles@mlgcounsel.net

(c) Title Company:
First American Title Insurance Company
Attn:  Jim McIntosh
200 West Madison Street, Suite 800
Chicago, IL 60606
Telephone:  (312) 917.7220
Facsimile:  (312) 553-0480

(d) Escrow Agent:
First American Title Insurance Company
Attn:  Jim McIntosh
200 West Madison Street, Suite 800
Chicago, IL 60606
Telephone:  (312) 917.7220
Facsimile:   (312) 553-0480

| | | |
|---|---|---|
| (e) | Date of this Agreement: | The latest date of execution by the Seller, the Purchaser and Escrow Agent as indicated on the signature page. |
| (f) | Purchase Price: | Six Million Three Hundred Thousand and No/100 Dollars ($6,300,000.00) |
| (g) | Earnest Money: | Five Hundred Thousand and No/100 Dollars ($500,000.00), including interest thereon. |
| (h) | Reclassification Period: | The period ending forty-five (45) days after the date of this Agreement. |
| (i) | Closing Date: | Sixty (60) days after the Date of this Agreement |
| (J) | Closing Date Extension: | Purchaser may extend the Closing Date for up to three (3) additional periods of fifteen (15) days each, subject to section 6.1 (b). |

1.2     Property.  Subject to the terms of this Purchase and Sale Agreement (this "Agreement"), Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, all of Seller's right, title and interest in and to the following property (the "Property"):

(a)     The "Real Property," being the land described in Exhibit A attached hereto, commonly known as 225 West South Frontage Road, Bolingbrook, Illinois, consisting of approximately 2.64 acres of land, together with (i) all building and structures, paving, lighting and fencing improvements located thereon ("Improvements"), (ii) all and singular the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereon or in any way appertaining to such real property, and (iii) without warranty, all right, title, and interest of Seller in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such real property.; and

(b)     The "Personal Property," being all Seller's rights and interests in (i) items of tangible personal property consisting of all furniture, fixtures, equipment, machinery, and other tangible personal property located at the Hotel, including all in-use or stock of linens and terry (1.5 turns), china, glassware, silver, uniforms, and towels, paper goods, stationery, soaps, cleaning supplies and the like with respect to the Hotel on hand as of the Closing Date (5 day supply) (the "Inventory"), and (ii) Intangible Personal Property (collectively, the "Personal Property"). "Intangible Personal Property" shall mean, to the extent assignable at no cost or expense to Seller, Seller's right, title and interest in and to all intangible personal property owned or possessed by Seller and used exclusively in connection with the ownership or operation of the Hotel, including, without limitation, (1) trade names and general intangibles pertaining to the Real Property and the Personal Property related to the Hotel, (2) all licenses, permits, concessions and approvals required by any Governmental Authority, as defined in Section 7.1(c), or otherwise appropriate with respect to the construction, ownership, operation, leasing, maintenance, or use of the Property or any part thereof (the "Authorizations), (3) all websites, domain names, social media accounts and similar items and (4) any warranties and guaranties relating to the Improvements and Personal Property.

1.3     Earnest Money.  The Earnest Money, in immediately accessible funds, evidencing Purchaser's good faith to perform Purchaser's obligations under this Agreement, shall be deposited by Purchaser with the Escrow Agent not later than three (3) business days after the execution of this Agreement.  Should the Purchaser fail to timely deposit the Earnest Money with the Escrow Agent, this Agreement shall be of no force and effect.  At Closing, the Earnest Money shall be applied to the Purchase Price.  Otherwise, the Earnest Money shall be delivered to the party entitled to receive the Earnest Money in accordance with the terms and conditions of this Agreement.

ARTICLE 2:  INSPECTIONS

2.1     Property Information.  Within five (5) days following the date of this Agreement, Seller shall deliver or cause to be delivered to Purchaser, at Seller's sole cost and expense, copies of all of the items described on Exhibit C attached hereto and incorporated herein by this reference for all purposes (the "Property Information") which is in Seller's possession or control.  Seller makes no representations or warranties as to the accuracy or completeness of the Property Information, except as related to the operating income statements.  The Property Information and all other information, other than matters of public record, furnished to, or obtained through inspection of the Property by, Purchaser, the Purchaser Related Parties (as defined herein) or Purchaser's lender, will be treated by Purchaser, the Purchaser Related Parties and Purchaser's lender as confidential, and will not be disclosed to anyone other than on a need-to-know basis to Purchaser's employees and consultants who agree to maintain the confidentiality of such information, and will be returned to Seller by Purchaser if the Closing does not occur.  This provision shall survive the Closing or any termination of this Agreement.

2.2     Inspections.  Subject to the provisions of Paragraph 2.3 below, during the Reclassification Period, Purchaser shall be permitted to make a complete review, inspection, and investigation of all matters of interest to Seller, including but not limited to the physical, legal, and environmental condition of the Property, including, without limitation, soil condition, asbestos, PCB, hazardous waste, toxic substance or other environmental matters, compliance with building, health, safety, land use and zoning laws, regulations and orders, plans and specifications, traffic patterns, and all other information pertaining to the Property.

2.3     Conduct of Inspections.

(a)    <u>Inspections in General</u>.  During the Reclassification Period, Purchaser, its agents, and employees shall have the right to enter upon the Property for the purpose of making non-invasive inspections at Purchaser's sole risk, cost and expense.  Before any such entry, Purchaser shall provide Seller with a certificate of insurance naming Seller as an additional insured and with an insurer and insurance limits (minimum $1 million) and coverage reasonably satisfactory to Seller.  All of such entries upon the Property shall be at reasonable times during normal business hours and after at least 24 hours prior notice to Seller or Seller's agent, and Seller or Seller's agent shall have the right to accompany Purchaser during any inspection activities performed by Purchaser on the Property. If any inspection or test damages the Property, Purchaser will restore the Property to the same condition as existed before the inspection or test.  Purchaser shall indemnify, defend and hold harmless Seller and Seller's partners and their respective shareholders, directors, officers, affiliates, tenants, agents, contractors, employees, successors and assigns ("<u>Seller Related Parties</u>") from and against any and all losses, costs, damages, claims, or liabilities (collectively "<u>Losses</u>") arising out of or in connection with any entry or inspections performed by Purchaser, its agents or representatives, provided that Purchaser shall not indemnify Seller Related Parties from and against any Losses arising based on information disclosed by or actions required of the owner of the Property as a result of any inspection or test of the Property permitted by this Agreement.  This indemnity shall survive the Closing or any termination of this Agreement.

(b)    <u>Environmental Inspections</u>.  The inspections permitted under <u>Paragraph 2.2</u> may include a non-invasive Phase I environmental inspection of the Property, but no Phase II environmental inspection or other invasive inspection or sampling of soil, groundwater,  or other materials shall be performed without the prior written consent of Seller, which shall not be unreasonably withheld or delayed, and if consented to by Seller, the proposed scope of work and the party who will perform the work shall be subject to Seller's review and reasonable approval. Upon Seller's request, Purchaser shall deliver to Seller copies of any Phase I, Phase II or other environmental report to which Seller consents as provided above.

(c)    <u>Authorization for Inquiries</u>.  Notwithstanding any term of this Agreement to the contrary, Seller consents to and authorizes Purchaser to make all inquiries of all appropriate governmental authorities; and appropriate providers of utility and other services with respect to the Property, as Purchaser deems necessary to confirm: (i) the compliance of the Property with all legal requirements applicable to the Property; (ii) to satisfy itself as to the compliance of the Property with the requirements of such governmental authorities for the ownership and operation of the Property; (iii) to confirm the present and future availability of all utility services reasonably required by Purchaser for the ownership and operation of the Property; and (iv) to confirm compliance of the Property with all requirements, rules and regulations of such utility providers to the Property.

(d)    <u>Zoning Approval</u>.  As soon as practical after the Date of this Agreement, Seller shall, at its cost and expense, apply for a reclassification of the zoning of the Property to permit use of the Property as a hotel and vacate the variance for a truck dealership ("Zoning Approval").  Seller will continuously and diligently pursue the zoning reclassification.  Seller will keep Purchaser apprised of the status of the zoning reclassification and provide Purchaser with advance notice of any meetings reclassification of the zoning.  Purchaser may attend any meeting or public hearing. Upon receipt of the Zoning Approval, seller shall provide a copy of such approval as certified by the Village of Bolingbrook by no later than forty-five (45) days after the execution of this Agreement.

If Seller is unable to obtain Zoning Approval within forty-five (45) days of the Date of his Agreement (the "Reclassification Period"), Purchaser may terminate this Agreement by delivering written notice of termination to Seller by no later than 5 p.m. CST time on the 3rd day following the expiry of the Reclassification Period, and thereafter the Earnest Money shall be returned to Purchaser, and Seller and Purchaser shall have no further rights, obligations or liabilities hereunder, other than (x) payment of any fee owing to Escrow Agent and (y) those which by their terms expressly survive termination of this Agreement. If Purchaser does not timely deliver to Seller said written termination notice, Purchaser shall have no further right to terminate this Agreement except as expressly provided otherwise elsewhere in this Agreement.

(e)    <u>Items to be in Good Working Order on Closing</u>.

(i)    Seller represents and warrants that the fire alarm system, sprinkler system and the plumbing and water heaters, shall be in good working order, and free of any liens or encumbrances upon completion of this transaction.

2.4 **PURCHASER'S RELIANCE ON ITS INVESTIGATIONS. PURCHASER ACKNOWLEDGES AND AGREES THAT (A) THE PROPERTY IS BEING SOLD, AND PURCHASER ACCEPTS POSSESSION OF THE PROPERTY ON THE DATE OF CLOSING, "AS IS, WHERE IS, WITH ALL FAULTS," WITH NO RIGHT OF SETOFF OR REDUCTION IN THE PURCHASE PRICE; (B) EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES IN PARAGRAPH 8.1 ("SELLER'S WARRANTIES"), NEITHER SELLER NOR ANY SELLER RELATED PARTY HAS OR SHALL BE DEEMED TO HAVE MADE ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES, PROMISES OR GUARANTEES (WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE) TO PURCHASER WITH RESPECT TO THE PROPERTY, ANY MATTER SET FORTH, CONTAINED OR ADDRESSED IN THE DOCUMENTS DELIVERED TO PURCHASER IN CONNECTION WITH THE PROPERTY (INCLUDING, BUT NOT LIMITED TO, THE ACCURACY AND COMPLETENESS THEREOF) OR THE RESULTS OF PURCHASER'S DUE DILIGENCE; AND (C) PURCHASER HAS CONFIRMED INDEPENDENTLY ALL INFORMATION THAT IT CONSIDERS MATERIAL TO ITS PURCHASE OF THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREBY. PURCHASER SPECIFICALLY ACKNOWLEDGES THAT, EXCEPT FOR SELLER'S WARRANTIES, PURCHASER IS NOT RELYING ON (AND SELLER, FOR ITSELF AND ON BEHALF OF THE SELLER RELATED PARTIES, DOES HEREBY DISCLAIM AND RENOUNCE) ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE WHATSOEVER, WHETHER ORAL OR WRITTEN, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, AS TO (IF AND TO THE EXTENT APPLICABLE): (1) THE OPERATION OF THE PROPERTY OR THE INCOME POTENTIAL, USES, OR THE MERCHANTABILITY, HABITABILITY OR FITNESS OF ANY PORTION OF THE PROPERTY FOR A PARTICULAR PURPOSE; (2) THE PHYSICAL CONDITION OF THE PROPERTY OR THE CONDITION OR SAFETY OF THE PROPERTY OR ANY COMPONENT THEREOF, INCLUDING, BUT NOT LIMITED TO, SOILS AND GEOLOGY, INCLUDING HAZARDOUS MATERIALS, LOT SIZE, OR SUITABILITY OF THE PROPERTY OR ANY COMPONENT THEREOF FOR A PARTICULAR PURPOSE; (3) THE PRESENCE OR ABSENCE, LOCATION OR SCOPE OF ANY HAZARDOUS MATERIALS IN, AT, ABOUT OR UNDER THE PROPERTY; (4) WHETHER ANY IMPROVEMENTS ARE STRUCTURALLY SOUND, IN GOOD CONDITION, OR IN COMPLIANCE WITH APPLICABLE LAWS; (5) THE ACCURACY OF ANY STATEMENTS, CALCULATIONS OR CONDITIONS STATED OR SET FORTH IN SELLER'S OR THE SELLER RELATED PARTIES' MATERIALS CONCERNING THE PROPERTY OR SET FORTH IN ANY OFFERING MATERIALS WITH RESPECT TO THE PROPERTY; (6) THE DIMENSIONS OF THE PROPERTY OR THE ACCURACY OF ANY OTHER MATERIALS RELATED TO THE PROPERTY; (7) THE ECONOMIC STATUS AND/OR CAPACITY OF THE PROPERTY; (8) THE ABILITY OF PURCHASER TO OBTAIN ANY AND ALL NECESSARY GOVERNMENTAL APPROVALS OR PERMITS FOR PURCHASER'S INTENDED USE AND DEVELOPMENT OF THE PROPERTY; (9) SELLER'S OWNERSHIP OF ANY PORTION OF THE PROPERTY; AND (10) ANY OTHER MATTER PERTAINING TO THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR SELLER'S WARRANTIES, SELLER IS UNDER NO DUTY TO MAKE ANY AFFIRMATIVE DISCLOSURES OR INQUIRY REGARDING ANY MATTER WHICH MAY OR MAY NOT BE KNOWN TO SELLER OR THE SELLER RELATED PARTIES, AND PURCHASER, FOR ITSELF AND FOR ITS SUCCESSORS AND ASSIGNS, HEREBY SPECIFICALLY WAIVES AND RELEASES SELLER AND EACH SELLER RELATED PARTY FROM ANY SUCH DUTY THAT OTHERWISE MIGHT EXIST.**

**EXCEPT FOR THE SELLER'S WARRANTIES, PURCHASER, FOR ITSELF AND ITS PARTNERS, MEMBERS, SHAREHOLDERS, DIRECTORS, OFFICERS, AFFILIATES, AGENTS, CONTRACTORS, EMPLOYEES, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS ("PURCHASER RELATED PARTIES"), HEREBY RELEASES SELLER AND EACH SELLER RELATED PARTY FROM, AND WAIVES ALL CLAIMS AND LIABILITY AGAINST SELLER AND EACH SELLER RELATED PARTY FOR OR ATTRIBUTABLE TO, THE FOLLOWING: (A) ANY AND ALL STATEMENTS OR OPINIONS HERETOFORE OR HEREAFTER MADE, OR INFORMATION FURNISHED, BY THE SELLER OR SELLER RELATED PARTIES TO PURCHASER OR ANY OF THE PURCHASER RELATED PARTIES; AND (B) ANY AND ALL LOSSES, COSTS, CLAIMS, LIABILITIES, EXPENSES, DEMANDS OR OBLIGATIONS OF ANY KIND OR NATURE WHATSOEVER ATTRIBUTABLE TO THE PROPERTY, WHETHER ARISING OR ACCRUING BEFORE, ON OR AFTER THE DATE HEREOF AND WHETHER ATTRIBUTABLE TO EVENTS OR CIRCUMSTANCES WHICH**

**HAVE HERETOFORE OR MAY HEREAFTER OCCUR, INCLUDING, WITHOUT LIMITATION, (I) ALL LOSSES, COSTS, CLAIMS, LIABILITIES, EXPENSES, DEMANDS AND OBLIGATIONS WITH RESPECT TO THE STRUCTURAL, PHYSICAL, OR ENVIRONMENTAL CONDITION OF THE PROPERTY; (II) ALL LOSSES, COSTS, CLAIMS, LIABILITIES, EXPENSES, DEMANDS AND OBLIGATIONS RELATING TO THE RELEASE OF OR THE PRESENCE, DISCOVERY OR REMOVAL OF ANY HAZARDOUS MATERIALS IN, AT, ABOUT OR UNDER THE PROPERTY, OR FOR, CONNECTED WITH OR ARISING OUT OF ANY AND ALL CLAIMS OR CAUSES OF ACTION BASED UPON CERCLA (COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980, 42 U.S.C. §§9601 ET SEQ., AS AMENDED BY SARA (SUPERFUND AMENDMENT AND REAUTHORIZATION ACT OF 1986) AND AS MAY BE FURTHER AMENDED FROM TIME TO TIME), THE RESOURCE CONSERVATION AND RECOVERY ACT OF 1976, 42 U.S.C. §§6901 ET SEQ., OR ANY RELATED CLAIMS OR CAUSES OF ACTION OR ANY OTHER FEDERAL, STATE OR MUNICIPAL BASED STATUTORY OR REGULATORY CAUSES OF ACTION FOR ENVIRONMENTAL CONTAMINATION AT, IN, ABOUT OR UNDER THE PROPERTY; AND (III) ANY TORT CLAIMS MADE OR BROUGHT WITH RESPECT TO THE PROPERTY OR THE USE OR OPERATION THEREOF.**

The provisions of this Paragraph 2.4 shall survive indefinitely the Closing or termination of this Agreement and shall not be merged closing documents.

2.5     Allocation of Purchase Price.  Prior to the completion of the transaction contemplated by this Agreement, Purchaser and Seller shall, acting reasonably and in good faith, attempt to agree on an allocation of the Purchase Price among the real estate, personal property and intangible property described herein and related to the Property.  In the event Purchaser and Seller do not agree, each party shall be free to allocate the Purchase Price to such items as they deem appropriate, subject to and in accordance with applicable laws.

## ARTICLE 3:  TITLE AND SURVEY REVIEW

3.1     Title Commitment.  Within ten (10) days following the Effective Date of this Agreement Purchaser shall cause the Title Company to provide to Purchaser: (a) a current Commitment for an Owner's Policy of Title Insurance (hereinafter referred to as the "Title Commitment") issued by the Title Company, whereby said Title Company commits to issue an Owner's Policy of Title Insurance ("Owner's Policy") without standard exceptions (other than the so called "survey exception", unless Purchaser provides an acceptable survey to the Title Company to delete such exception), in at least the amount of the Purchase Price written in accordance with this Agreement; and (b) copies of all instruments shown as exceptions on the Title Commitment (the "Exception Documents").  The Title Commitment shall: describe the Property; list Purchaser as the prospective named insured; show as the policy amount the Purchase Price; contain the commitment of the Title Company to insure Purchaser's fee simple interest in the Property upon the Closing; and show the status of the title of the Property and all exceptions which would appear in an Owner's Policy, if issued.

3.2     Removal of Liens; Affidavits.  Seller shall have no obligation to remove any exceptions to title other than those pertaining to real estate taxes lawfully assessed and owed by Seller, and mortgages of record made or assumed by Seller.  Seller shall have no obligation to execute any affidavits or indemnifications in connection with the issuance of Purchaser's title insurance policy, excepting only affidavts in form satisfactory to Seller as to Seller's authority, the rights of tenants in occupancy and the status of mechanics' liens.

3.3     Survey.  At Purchaser's option, and at Purchaser's sole cost and expense, a current ALTA land title boundary and improvements survey of the Land (the "Survey").  Seller shall provide Purchaser, as part of the Property Information, with Seller's most recent survey in its possession for the Land, and shall cooperate with Purchaser in attempting to have Seller's survey updated by the land surveyor who completed the survey included in the Property Information

3.4     Objections.  Purchaser shall have until the twenty-fifth (25th) day after the Effective Date (the "Title Objection Period") to review the Survey, the Title Commitment and Exception Documents and deliver to Seller, in writing, such objections as Purchaser may have to anything contained or set forth in the Survey, Title Commitment

and Exception Documents ("Title Objections").  Any items to which Purchaser does not object to within the Title Objection Period shall be deemed to be approved by Purchaser and shall be deemed to be Permitted Exceptions (hereinafter defined) for purposes of this Agreement.  Notwithstanding the foregoing or anything to the contrary herein, the items set forth as normal and standard requirements of Seller in the Title Commitment (such as, resolutions, certified governmental documentation, owner's affidavit, delivery of deed, etc.), and all other items the Title Company identifies to be released upon Closing including but not limited to Monetary Liens, shall be deemed Title Objections made by Purchaser.  If Title Objections are timely delivered to Seller by Purchaser, Seller shall have five (5) business days after receipt of Purchaser's Title Objections to give Purchaser and Title Company, with respect to each Title Objection, either: (i) evidence satisfactory to Purchaser of the removal of the Title Objection or that the Title Objection will be removed or cured on or before the Closing (in which event such cure or removal shall be a condition precedent to Purchaser's obligation to proceed with the Closing); (ii) written notice that Seller elects not to remove or cure such Title Objection; or (iii) make arrangements with the title insurance company to insure over such Title Objection. Seller's failure to timely respond to Purchaser's Title Objections shall be deemed an election by Seller not to remove, cure or insure over such Title Objections.  If Seller notifies Purchaser of its election (or deemed election) not to remove, cure or insure over any Title Objection, Purchaser shall, on or prior to the date the Reclassification Period expires, either: (a) waive such Title Objection and proceed with the transaction contemplated by this Agreement, subject to the terms and conditions of this Agreement; or (b) terminate this Agreement by written notice to Seller and receive a refund of the Earnest Money, except for those provisions which expressly survive the termination of this Agreement which shall include Seller's indemnification under Paragraph 2.3(a) and the provisions of Paragraph 2.1, all of which shall survive.  If Purchaser provides a Notice to Proceed on or before the expiration of the Reclassification Period (as the same may be extended), then Purchaser shall be deemed to have elected to waive the Title Objection and proceed with the transaction contemplated by this Agreement, subject to the terms and conditions of this Agreement.  All title exceptions which are approved or deemed approved by Purchaser shall constitute Permitted Exceptions for purposes hereof.  Notwithstanding the foregoing, Seller agrees to provide executed resolutions, organizational documents, and an owner's affidavit (all in forms reasonably acceptable to Seller) as well as evidence that Seller is in good standing in the State of Illinois to Title Company and to satisfy Monetary Liens in accordance with and subject to Section 3.2 of this Agreement at or prior to Closing, and, as a result such matters shall not constitute Permitted Exceptions for purposes hereof.

3.5    Additional Exceptions.  In the event that at any time following delivery of the Title Commitment, Exception Documents or Survey described above, but prior to Closing, any changes (other than the deletion or elimination of any item as to which Purchaser has made an objection) shall occur in the Title Commitment, Exception Documents or Survey, in addition to other remedies permitted pursuant to this Agreement, Purchaser shall have the right to review and approve or disapprove of any such matters, and to terminate this Agreement  and obtain a refund of the Earnest Money in the event that any such exceptions are not acceptable to Purchaser.

ARTICLE 4:  OPERATIONS AND RISK OF LOSS

4.1    Ongoing Operations.  During the pendency of this Agreement, Seller shall operate, repair, maintain and carry on its business and activities relating to the Property substantially in the same manner as Seller did before the date of this Agreement, and shall permit no wasting of the Property.  Seller shall not operate the Property as a hotel.  Seller shall maintain the current insurance policies carried by Seller on the Property.  Seller shall not transfer any of the Property, create any lien or encumbrance thereon, or grant any easements or rights of way, and enter into any contract or other agreement affecting the Property which is not cancelable upon thirty (30) days' notice without cause and without any termination or penalty fee without Purchaser's prior written consent, in each such instance; provided, however that Seller may enter into or extend or renew Operating Agreements (as hereinafter defined) prior to the expiration of the Reclassification Period in the ordinary course of business and with prior notice to Purchaser, in which event the parties shall amend Schedule 2 attached to this Agreement to reflect such new or amended Operating Agreement.

4.2    Lease.  At Closing, Seller shall terminate any lease, license, or similar arrangement for the use of the Property.  At Closing, the Property shall be vacant and free of tenant and tenant's property.

4.3    New Contracts.  During the pendency of this Agreement, Seller will not enter into any contract that will be an obligation affecting the Property subsequent to the Closing (except contracts entered into in the ordinary

course of business that are terminable without cause on not more than 30-days' notice) without the prior consent of the Purchaser, which shall not be unreasonably withheld, conditioned or delayed.

      4.4      <u>Existing Contracts</u>.  Attached hereto as <u>Schedule 2</u> is a list of all the current management, leasing, service, equipment, supply, security, maintenance pest control, utility, waste disposal, advertising, vending machine, and other agreements related to the Property, if any, (the "<u>Operating Agreements</u>").  On or prior to the expiration of the Reclassification Period, Purchaser shall notify Seller which Operating Agreements that Buyer elects to assume at Closing (collectively, the "<u>Surviving Operating Agreements</u>").  Seller agrees to prepare, execute and deliver at Closing notices of termination for those Operating Agreements which Purchaser has elected not to assume by written notice to Seller on or before the end of the Reclassification Period.  At Closing the Surviving Operating Agreements shall be assigned by Seller to Purchaser by an instrument substantially the same as the assignment and assumption of leases set forth on <u>Exhibit F</u>, and Seller shall terminate and pay off all Operating Agreements that are not Surviving Operating Agreements.  Seller shall use commercially reasonable efforts (at no material out of pocket cost to Seller) to obtain all consents necessary, if any, to allow it to so assign the Surviving Operating Agreements to Purchaser.  After the expiration of the Reclassification Period, Seller shall not enter into any new Operating Agreements or extend or renew any existing Operating Agreement, that would be binding upon Purchaser after Closing without Seller's prior written approval.  If there is an outstanding default under any Surviving Operating Agreement as of the Closing, Seller agrees to be responsible for all such liability associated with such default, to the extent the default occurred prior to Closing.  Moreover, if any Surviving Operating Agreement is in default, at or prior to Closing, Purchaser may also request that Seller terminate such Operating Agreement at Seller's sole cost and expense, in which event the same shall not be assigned to Purchaser at Closing.

      4.5      <u>Damage or Condemnation</u>.  Risk of loss resulting from any condemnation or eminent domain proceeding which is commenced or has been threatened before the Closing and risk of loss to the Property due to fire, flood or any other cause before the Closing, shall remain with Seller. If before the Closing the Property shall be damaged, and such damage exceeds Fifty Thousand and No/100ths Dollars ($50,000.00) (the "<u>Materiality Threshold</u>"), if the damage has a material adverse effect upon the access to the property, structure, improvements thereon, which cannot be repaired within thirty (30) days, or if the Property or any portion thereof shall be subjected to a bona fide threat of condemnation or shall become the subject of any proceedings, judicial, administrative or otherwise, with respect to the taking by eminent domain or condemnation, then Purchaser, as Purchaser's sole and exclusive remedy, may: (i) terminate this Agreement by written notice to Seller given within ten (10) days after Purchaser receives written notice from Seller of the damage or taking, in which event the Earnest Money shall be returned to Purchaser and neither party shall have any further obligations under this Agreement except for those obligations which, by the express terms of this Agreement, survive the Closing or earlier termination hereunder (the "<u>Surviving Obligations</u>"); or (ii) elect to proceed with the transaction contemplated by this Agreement, subject to the terms and conditions of this Agreement.  If the Closing Date is within the aforesaid ten (10) day period, then the Closing shall be extended to the next Business Day following the end of said ten (10) day period.  In the event of any bona fide threat of condemnation or any proceedings with respect to a taking by eminent domain or condemnation, and Purchaser elects to proceed with the transaction contemplated by this Agreement, then this Agreement shall remain in full force and effect and the purchase contemplated herein, less any interest taken by eminent domain or condemnation, shall be effected with no further adjustment, and upon the Closing of this purchase, Seller shall assign, transfer and set over to Purchaser all of the right, title and interest of Seller in and to any awards that have been or that may thereafter be made for such taking.  In the event the Property shall be damaged in an amount that exceeds the Materiality Threshold, and within ten (10) days after Purchaser receives notice from Seller of the damage, Purchaser elects, by notice to Seller, to proceed with the transaction contemplated by this Agreement, then this Agreement shall remain in full force and effect, and at Closing Seller shall assign, transfer and set over to Purchaser any insurance proceeds, and Purchaser shall receive a credit against the Purchase Price for the deductible.  If Purchaser does not send a notice of its election to proceed within such ten (10) day period, then Purchaser shall be deemed to have elected not to proceed, in which case the Earnest Money, shall be returned to Purchaser and neither party shall have any further obligations under this Agreement except for the Surviving Obligations.  In the event of a casualty which is equal to or less than the Materiality Threshold, Purchaser may elect within ten (10) days after receiving Purchaser's written notice of the damage to: (i) have Seller assign, transfer and set over to Purchaser any insurance proceeds not applied to the repair of the Property prior to Closing that may thereafter be made for such damage or destruction, together with all rights that Seller may have to negotiate with the insurance company with regards to the amount of such insurance claim, and Purchaser shall receive a credit against the Purchase Price in the amount of the deductible.  Further, if Purchaser elects to acquire the Property, the Purchase Price shall be reduced by the total amount of any insurance

proceeds actually received by Seller on or before the Closing Date attributable to the casualty damage (but not business interruption, rent loss or other similar insurance proceeds allocable to periods prior to the Closing Date) and not expended by Seller prior to Closing for the repair or restoration of the Property. The provisions of this Paragraph 4.4 supersede the provisions of any applicable laws with respect to the subject matter of this Paragraph 4.4. Seller shall provide written notice to Purchaser of any damage to the Property promptly upon Seller's Actual Knowledge of same.

4.6     Notices. During the pendency of this Agreement, Seller shall promptly deliver to the Purchaser a copy of any notice issued or received by Seller (including, without limitation, a notice of default) under any mortgage or any Lease or License; copies of any notices provided to Seller from any governmental authority pertaining to the Property or Seller; as well as any notices related to actions, suits, claims and other proceedings affecting the Property, or the use, possession or occupancy thereof or of any proposed condemnation or of any violations of any environmental or other laws.

## ARTICLE 5: CONDITIONS PRECEDENT

5.1     Purchaser's Conditions. Notwithstanding anything in this Agreement to the contrary, Purchaser's obligation to purchase the Property shall be subject to and contingent upon the satisfaction (or waiver by Purchaser in its sole and absolute discretion) of the following conditions precedent:

(a)     Seller shall have performed and observed, in all material respects, all of the covenants and agreements of this Agreement to be performed and observed by Seller prior to or on the Closing Date, subject to Seller's right to cure any failure to observe and perform all of the covenants and agreements of this Agreement to be performed and observed by Seller pursuant to Section 9.2 of this Agreement, in which event of such cure Seller shall be deemed to have performed and observed, in all material respects, all of the covenants and agreements of this Agreement to be performed and observed by Seller. In addition, to the extent that Seller is in default of this Agreement at Closing but Purchaser proceeds to Closing notwithstanding such default, then Purchaser shall be deemed to have waived such default.

(b)     All of Seller's representations and warranties shall be true and correct in all material respects as of the Effective Date and as of the Closing Date;

(c)     The Title Company shall be irrevocably and unconditionally committed to issue the Owner's Policy in accordance with Paragraph 3.7; and

(d)     the Property shall be vacant and free of tenant and tenant's property.

5.2     Seller's Conditions. Notwithstanding anything in this Agreement to the contrary, Seller's obligation to sell the Property shall be subject to and contingent upon the satisfaction (or waiver by Seller in its sole and absolute discretion) of the following conditions precedent:

(a)     Purchaser shall have performed and observed, in all material respects, all of the covenants and agreements of this Agreement to be observed and performed by Purchaser prior to or on the Closing Date, subject to Purchaser's right to cure any failure to observe and perform all of the covenants and agreements of this Agreement to be performed and observed by Purchaser pursuant to Section 9.1 of this Agreement, in which event of such cure Purchaser shall be deemed to have performed and observed, in all material respects, all of the covenants and agreements of this Agreement to be performed and observed by Purchaser; and

(b)     All of Purchaser's representations and warranties shall be true and correct in all material respects as of the Effective Date and as of the Closing Date.

5.3     Failure or Waiver of Conditions Precedent. In the event any of the conditions set forth in Paragraph 5.1 or Paragraph 5.2 are not fulfilled or waived by Purchaser or Seller, as applicable, then Purchaser or Seller, as applicable, may, by written notice to the other party, terminate this Agreement, whereupon, unless such failure also constitutes a default by Purchaser or Seller, as applicable (in which event, for the avoidance of doubt, the terms and

provisions of <u>Paragraphs 9.1</u> or <u>9.2</u>, as applicable, shall govern rather than this <u>Paragraph 5.3</u>), the Earnest Money shall be released to the Purchaser and all rights and obligations hereunder of each party shall be at an end except for the Surviving Obligations. Purchaser or Seller, as applicable, may, at its election, at any time on or before the date specified in this Agreement for the satisfaction of the condition, waive in writing the benefit of any of the conditions set forth in <u>Paragraphs 5.1</u> or <u>5.2</u>, as applicable.

ARTICLE 6:  CLOSING

6.1     <u>Closing</u>.

(a)     The consummation of the transaction contemplated herein ("<u>Closing</u>") shall occur on the Closing Date through the Escrow Agent.

(b)     Purchaser may extend the Closing date for three (3) periods of fifteen (15) days each if Purchaser provides written notice to extend the Closing Date to Seller at least three (3) days prior to the then scheduled closing and deposits as additional earnest money an amount equal to Fifty Thousand and 00/100 Dollars ($50,000.00), for each extension, which amount shall be nonrefundable but applicable to the Purchase Price.

6.2     <u>Seller's Deliveries in Escrow</u>.  On or before the Closing Date (as the same may be extended as provided herein), Seller shall deliver in escrow to the Escrow Agent the following:

(a)     <u>Deed</u>.  Special Warranty Deed, in the form attached hereto as <u>Exhibit E</u>, duly executed and acknowledged by Seller, dated as of the Closing, conveying good and marketable title to the Property to Purchaser, subject only to the Permitted Exceptions ("<u>Deed</u>").

(b)     <u>Assignment of Documents</u> An assignment to Purchaser of all permits, approvals, licenses, and other rights and interests owned or held by Seller in connection with the Property, to the extent that those permits, approvals, licenses, and other rights and interests are assignable.

(c)     <u>Bill of Sale.</u>  A bill of sale for the Personal Property in the form attached hereto as <u>Exhibit F</u>

(d)     <u>State Law Disclosures</u>.  Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property.

(e)     <u>FIRPTA</u>.  Foreign Investment in Real Property Tax Act affidavit executed by Seller.

(f)     <u>Owner's Policy</u> An Owner's Policy covering the Property issued by the Title Company in accordance with the terms of the Title Commitment described in <u>Article 3</u> above, containing no exceptions other than the Permitted Exceptions.

(g)     <u>Additional Documents</u>.  Any additional documents that Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

6.3     <u>Purchaser's Deliveries in Escrow</u>.  On or before the Closing Date, Purchaser shall deliver in escrow to the Escrow Agent the following:

(a)     <u>Purchase Price</u>.  The Purchase Price, less the Earnest Money that is applied to the Purchase Price, plus or minus applicable prorations, deposited by Purchaser with the Escrow Agent in immediate, same-day federal funds wired for credit into the Escrow Agent's escrow account;

(b)     <u>State Law Disclosures</u>.  Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property; and

9

(c)      <u>Additional Documents</u>.  Any additional documents that Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

6.4      <u>Closing Statement</u>.  At the Closing, Seller and Purchaser shall deposit with the Escrow Agent an executed closing statement consistent with this Agreement in the form required by the Escrow Agent.

6.5      <u>Possession</u>.  Seller shall deliver possession of the Property to Purchaser at the Closing.

6.6      <u>Closing Costs</u>.  At Closing, Seller and Purchaser shall pay the costs of closing the transaction contemplated hereby as provided on <u>Schedule 1</u> attached hereto.  Each party shall pay its own attorneys' fees.

<h3 style="text-align:center">ARTICLE 7:  PRORATIONS</h3>

Prorations and adjustments with respect to the Property shall be made as of the Closing Date as set forth in this <u>Article 7</u>.

7.1      <u>Prorations</u>.  If the Purchase Price is received by Seller's depository bank in time to credit to Seller's account on the Closing Date, the day of Closing shall belong to Purchaser and all prorations hereinafter provided to be made as of the Closing shall each be made as of the end of the day before the Closing Date.  If the cash portion of the Purchase Price is not so received by Seller's depository bank on the Closing Date, then the day of Closing shall belong to Seller and such proration shall be made as of the end of the day that is the Closing Date.  In each such proration set forth below, the portion thereof applicable to periods beginning as of Closing shall be credited to Purchaser or charged to Purchaser as applicable and the portion thereof applicable to periods ending as of Closing shall be credited to Seller or charged to Seller as applicable.

(a)      <u>Utilities and Other Applicable Operating Costs</u>.  Utilities, including but not limited to water, sewer, gas, electricity, trash removal and fire protection service, shall be terminated as of the Closing Date and Seller shall be responsible for the payment of any and all amounts due with respect to such utilities for the period prior to the Closing Date and Purchaser shall not be liable therefor.  All other expenses relating to the Property up to the Closing Date and all periods prior thereto including those required by any contract or agreement for any services to the Property by Seller or Seller's agents, including but not limited to cost of maintenance, insurance and administrative expenses, shall be paid for by Seller and Purchaser shall not be liable therefor.  Purchaser shall not be responsible for payment of any part of any fee due to Seller's managing agent, if any, nor for payment of any service, maintenance or supply agreement up to the Closing Date and all periods prior thereto, nor for payment for any personal property, supplies, fixtures or equipment ordered prior to the Closing Date by Seller or Seller's agents and Seller shall hold harmless and indemnify Purchaser from and against payment of all such amounts.  All expenses relating to the Property prior to the Closing Date and all periods prior thereto including those required by any Operating Agreement, contract or agreement for any services to the Property, including but not limited to cost of maintenance performed by Seller, or any of its agents, insurance and administrative expenses incurred by Seller, or any of its agents, shall be paid for by Seller and Purchaser shall not be liable therefor and Seller shall hold harmless and indemnify Purchaser from and against payment of all such amounts.  All expenses relating to the Property upon and after the Closing Date and all periods thereafter including those required by any contract or agreement for any services to the Property (but excluding any contracts entered into by Seller that are not assumed by Purchaser pursuant to the terms hereof), including but not limited to cost of maintenance, insurance and administrative expenses, shall be paid for by Purchaser and Seller shall not be liable therefor, and Purchaser shall hold harmless and indemnify Seller from and against all of such amounts.

(b)      <u>Real Estate Taxes and Assessments</u>.  All state, county and municipal real estate taxes for the Property for the year of Closing shall be prorated as of the close of business on the Closing Date.  Seller shall pay and discharge all general and special assessments that have become a lien on the Property prior to the Closing Date to the extent that the same are due and payable as of the Closing Date; any ongoing general and special assessments, if any, shall be prorated as of the Closing Date with the Closing Date going to Purchaser.  If Closing shall occur before the tax rate is fixed for the then current year, proration of taxes shall be upon the basis of one hundred five percent (105%) of the tax rate for the immediately preceding year and the same shall be adjusted when the rate for the year of Closings is fixed by appropriate payments after Closing.  At closing, Seller shall deposit in escrow with the Escrow Agent an

10

amount equal to five percent (5%) of the real estate taxes which will be subject to disbursement at the time of reproration in accordance with a written escrow agreement. All agreements between Seller and Purchaser set forth in this Agreement relating to the proration and payment of taxes on the Property shall be subject to re-proration among the parties upon receipt of corrected information within twelve (12) months of the Closing Date.

(c)      <u>Final Adjustment After Closing</u>.  If final prorations cannot be made at Closing for any item being prorated under this <u>Paragraph 7.1</u>, then Purchaser and Seller agree to allocate such items on a fair and equitable basis as soon as invoices or bills are available and applicable reconciliations have been completed, with final adjustment to be made as soon as reasonably possible after the Closing but no later than 120 days after the Closing, to the effect that income and expenses are received and paid by the parties on an accrual basis with respect to their period of ownership. Payments in connection with the final adjustment shall be due within 10 days of written notice.  Seller and Purchaser shall have reasonable access to, and the right to inspect and audit, the other's books to confirm the final prorations.

7.2      <u>Utility Deposits</u>.  Purchaser shall be responsible for making any deposits required with utility companies.

7.3      <u>Survival</u>.  The provisions of this <u>Article 7</u> shall survive the Closing.


<u>ARTICLE 8:  REPRESENTATIONS AND WARRANTIES</u>

8.1      <u>Seller's Representations and Warranties</u>.  As a material inducement to Purchaser to execute this Agreement and consummate this transaction, Seller represents and warrants to Purchaser that:

(a)      As used in this Agreement, any and all references to "Seller's knowledge", "Seller's Actual Knowledge" or phrases of similar import shall mean the actual knowledge of Sam Johal.  "Seller's knowledge", "Seller's Actual Knowledge", or phrases of similar import shall not mean implied, imputed or constructive knowledge and shall not require Sam Johal or any other officer, director, member, manager, shareholder, employee or agent of Seller to undertake any investigation whatsoever.  For clarity's sake, for Sam Johal shall have no personal liability pursuant to this Agreement and is referenced solely in his capacity as an officer of Seller.

(b)      Seller has been duly organized and is validly existing as a For Profit Corporation, in good standing and is qualified to do business in the State of Illinois, where the Property is located.  Seller has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby.  This Agreement has been, and all of the documents to be delivered by Seller at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Seller, enforceable in accordance with their terms.

(c)      Except for the "due on sale" provision within any mortgage or loan agreement regarding the Property, there is no agreement to which Seller is a party or binding on Seller which is in conflict with this Agreement. Seller's execution and performance of this Agreement, and the consummation of the transactions by Seller contemplated hereby, will not result in any breach or violation of any of the terms or the provisions of or constitute a default under, any indenture, deeds of trust, mortgage, note, or other agreement or instrument by which Seller is bound. There is no condemnation action or proceeding pending or, to Seller's Actual Knowledge, threatened against Seller or the Property; and Seller has received no written notice threatening any such action, suit or proceeding;

(d)      There are no attachments, executions, assignments for the benefit of creditors, or voluntary or involuntary proceedings in bankruptcy or under other debtor relief laws contemplated by, pending, or, to the Seller's Actual Knowledge, threatened against Seller or the Property. Seller is not presently the subject of any bankruptcy, insolvency or probate proceedings and Seller does not anticipate nor intend to file or cause to be filed any bankruptcy or insolvency proceeding involving Seller or Seller's assets during the pendency of this Agreement;

(e)      There is no agreement to which Seller is a party or, to Seller's Actual Knowledge binding on Seller which is in conflict with this Agreement.  To Seller's Actual Knowledge, there is no action or proceeding pending or

threatened in writing against Seller or the Property, including condemnation proceedings or similar proceedings or special assessments (inclusive of assessments for street widening, repair or improvement).

(f)     Seller has and will convey to Purchaser at Closing, good and marketable title to the Property, free from all liens and encumbrances, and otherwise subject only to the Permitted Exceptions.

(g)     As of the Closing Date, there are no parties in possession of any portion of the Property as lessees, tenants at sufferance or trespassers.

(h)     There is no pending or, to Seller's Actual Knowledge, threatened litigation or administrative proceeding affecting Seller or the Property.

(i)     A complete list of the Operating Agreements is attached hereto as <u>Schedule 3</u> and is made a part hereof by reference.  Seller is not currently in default under any of the Operating Agreements.  Seller has not received any written notice of default, termination, failure to perform, or dispute from any party under any of the Operating Agreements that have not been cured and to Seller's Actual Knowledge, there is not any dispute or any existing and uncured default, any claim of any default, or any existing circumstances which with the passage of time or the giving of notice, or both, would give rise to a default, by either the Seller or by any other counterparty under the Operating Agreements;

(j)     Seller has not utilized the Property as a land fill or dump site, or for the production or disposal of hazardous substances or environmental contaminants, and to Seller's Actual Knowledge, the Property is in compliance with, and not in violation of, any applicable environmental laws.

(k)     To Seller's Actual Knowledge, Seller is not prohibited from consummating the transactions contemplated in this Agreement by any law, regulation, agreement, instrument, restriction, order or judgment.

(l)     Seller has not entered into any outstanding contracts or options to purchase the Property or any portion thereof in favor of any third party.

(m)     Seller is not a "foreign person" as that term is defined in Section 1445 of the Internal Revenue Code, as amended, and any applicable regulations promulgated thereunder;

(n)     Seller: (a) is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, or nation pursuant to any Law that is enforced or administered by the Office of Foreign Assets Control, and is not engaging in this Transaction, directly or indirectly, on behalf of, or instigating or facilitating this Transaction, directly or indirectly, on behalf of, any such person, group, entity or nation; (b) is not engaging in this Transaction, directly or indirectly, in violation of any Laws relating to drug trafficking, money laundering or predicate crimes to money laundering; (c) none of the funds of Seller have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Seller is prohibited by Law or that the Transaction or this Agreement is or will be in violation of Law; and (d) Seller has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to use commercially reasonable efforts to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing;

(o)     <u>Litigation</u>.  As of the Effective Date, Seller has not received written notice of any litigation that is pending or threatened with respect to the Hotel, except (i) litigation that is not reasonably likely to have a material adverse effect on the value of the Property, (ii) litigation covered by insurance policies (subject to customary deductibles) or (iii) litigation set forth in <u>Schedule 8.1(o)</u>;

(p)     Seller has not engaged in or, to Seller's knowledge, permitted any operations or activities upon the Property for the purpose of or in any way involving the handling, manufacture, treatment, storage, use, generation, release, discharge, refining, dumping or disposal of Hazardous Materials in violation of any applicable laws.  Seller

has not received from any governmental authority written notice of any uncured violation of any provision of applicable laws pertaining to Hazardous Materials.  As used herein, "Hazardous Materials" shall mean any chemical substance (i) which is defined as a "hazardous substance," "hazardous waste," "hazardous material," "pollutant," "contaminant," or "toxic," "explosive," "corrosive," "flammable," "infectious," "radioactive," "carcinogenic," or "mutagenic" material under any applicable laws regarding the protection of human health or the environment from such chemical substances; (ii) diesel fuel or other petroleum hydrocarbons; (iii) asbestos or asbestos-containing materials or urea formaldehyde foam insulation; (iv) polychlorinated biphenyls, or (v) radon gas; provided, however that Hazardous Materials shall not include substances of kinds and in amounts ordinarily and customarily used or stored in properties similar to the Property for the purposes of cleaning, dry cleaning and other maintenance or operations and otherwise in compliance with applicable laws.

        8.2     Purchaser's Representations and Warranties.  As a material inducement to Seller to execute this Agreement and consummate this transaction, Purchaser represents and warrants to Seller that:

        (a)     Purchaser has the full right and authority and has obtained any and all consents required to enter into this Agreement and, to consummate the transactions contemplated hereby.  This Agreement has been, and all of the documents to be delivered by Purchaser at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Purchaser, enforceable in accordance with their terms;

        (b)     There are no agreements to which Purchaser is a party or, to Purchaser's knowledge, binding on Purchaser which are in conflict with this Agreement.  There is no action or proceeding pending or, to Purchaser's actual knowledge, threatened in writing against Purchaser which challenges or impairs Purchaser's ability to execute or perform its obligations under this Agreement;

        (c)     Purchaser: (a) is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, or nation pursuant to any Law that is enforced or administered by the Office of Foreign Assets Control, and is not engaging in this Transaction, directly or indirectly, on behalf of, or instigating or facilitating this Transaction, directly or indirectly, on behalf of, any such person, group, entity or nation; (b) is not engaging in this Transaction, directly or indirectly, in violation of any Laws relating to drug trafficking, money laundering or predicate crimes to money laundering; (c) none of the funds of Purchaser have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Purchaser is prohibited by Law or that the Transaction or this Agreement is or will be in violation of Law; and (d) Purchaser has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing; and

        (d)     As used in this Agreement, any and all references to "Purchaser's knowledge", "Purchaser's actual knowledge", or phrases of similar import shall mean the conscious awareness of facts or other relevant information, by H.D. Patel.  "Purchaser's knowledge", "Purchaser's actual knowledge", or phrases of similar import shall not mean implied, imputed or constructive knowledge and shall not require any other officer, director, member, manager, shareholder, employee or agent of Purchaser to undertake any investigation whatsoever.  For clarity's sake, H.D. Patel shall have no personal liability pursuant to this Agreement and is referenced solely in his capacity as an officer of Purchaser.

        8.3     Notification of Breach or Inaccuracy.  Seller covenants and agrees to promptly notify the Purchaser of any state of facts which would constitute a breach of or render inaccurate any of the foregoing covenants, representations or warranties promptly after becoming aware of such state of facts.  In the event that any of the covenants, representations or warranties were true as of the Effective Date, and became untrue before Closing because of a change in circumstances or occurrence of events not caused by Seller, and such change in circumstances shall have a material adverse effect on Purchaser's proposed ownership, economics (including operating income and expenses) and/or operation of the Property following Closing, then Purchaser may elect as its exclusive remedy for

such breach or inaccuracy to either: (i) accept the same and close; or (ii) terminate this Agreement and receive the Earnest Money provided, however, that if Purchaser does not elect option (ii), then applicable representations shall be deemed to have been updated as of the Closing Date and Purchaser shall have no rights to make any claims in respect to such changes.  If, prior to Closing, Purchaser obtains knowledge of a breach of any representations or warranties made by Seller under this Agreement, and elects to proceed with the Closing, then at the Closing Purchaser shall be deemed to have waived any such known breach of the Seller's representations or warranties under this Agreement, unless the parties agree otherwise.

## ARTICLE 9:  DEFAULT AND DAMAGES

9.1    Default by Purchaser.  If on or prior to the Closing Date, Purchaser shall default in its obligation to close under this Agreement, and such default shall remain uncured for a period of five (5) Business Days (i.e., any day that is not a Saturday, Sunday or other day on which banks are required or authorized by law to be closed a "Business Day") following receipt of written notice thereof from Seller to Purchaser (provided, notwithstanding anything to the contrary contained in this Agreement, Purchaser shall not be entitled to any notice and cure right with respect to Purchaser's failure to consummate Closing on the Closing Date), Purchaser agrees that Seller shall, as its sole and exclusive remedy, have the right to terminate this Agreement (in which case Purchaser shall have no further rights or interests in the Property) and to have the Escrow Agent deliver the Earnest Money to Seller as liquidated damages to recompense Seller for time spent, labor and services performed, and the loss of its bargain, Seller hereby waives and releases any right to and covenants that Seller shall not sue Purchaser: (a) for specific performance of this Agreement; or (b) to recover actual damages in excess of the Earnest Money.  Purchaser and Seller agree that it would be impracticable or extremely difficult to affix damages if Purchaser so defaults, and that the Earnest Money, together with the interest thereon, represents a reasonable estimate of Seller's damages. In no event shall Purchaser be liable to Seller for any direct or indirect punitive, speculative or consequential damages.

9.2    Default by Seller.  In the event Seller defaults under this Agreement, and such default shall remain uncured for a period of five (5) Business Days following receipt of written notice thereof from Purchaser to Seller, then Purchaser shall elect as its exclusive remedy to either: (i) seek to enforce specific performance of Seller's obligations; or (ii) cancel and terminate this Agreement and receive a refund of all Earnest Money and Seller shall reimburse Purchaser for its out-of-pocket third-party expenses incurred in connection with the transaction contemplated by this Agreement, not to exceed Thirty Thousand and 00/100 Dollars ($30,000.00),.

9.3    Limitations.

(a)    The representations and warranties of Seller and/or Purchaser pursuant to this Agreement shall survive Purchaser's purchase of the Property for a period of twelve (12) months after Closing (the "Limitation Period").  The Limitation Period referred to herein shall apply to known as well as unknown breaches of such covenants, indemnities, warranties or representations.  Purchaser specifically acknowledges that such termination of liability represents a material element of the consideration to Seller.  The limitation as to Seller's liability in this Paragraph 9.3 does not apply to Seller's liability with respect to prorations and adjustments under Article 7 of this Agreement, Paragraph 8.1(a) or Seller's and Purchaser's indemnification obligations under this Agreement pursuant to Paragraph 9.4 of this Agreement.

(b)    In the event that Closing shall occur, and subsequently during the Limitation Period, Purchaser discovers that any surviving representations or warranties of Seller ("Surviving Representation") was inaccurate as of the Closing Date, and the inaccuracy of such Surviving Representation was not waived by Purchaser at Closing pursuant to Paragraph 8.3 of this Agreement then Purchaser shall have a remedy against Seller for damages actually incurred by Purchaser as a result of such inaccuracy of such Surviving Representation, provided however and subject in all respects to the following limitations: (i) such Surviving Representation is inaccurate as of the Closing Date; (ii) written notice containing a description of the specific nature of such breach shall have been given by Purchaser to Seller subsequent to the Closing Date and prior to the expiration of the Limitation Period and any action or lawsuit arising from such breach shall be brought not later than thirty (30) days after expiration of the Limitation Period; and (iii) in no event shall the Seller's liability to Purchaser for breach of any Surviving Representation exceed One Million and No/100ths Dollars ($1,000,000.00)  (the "Maximum Loss Amount").  Notwithstanding the foregoing, or anything

14

else in this Agreement which may be to the contrary, in no event shall Purchaser have the right to maintain any action against any Seller for so called "consequential," "punitive" or "special" damages.

## ARTICLE 10:  EARNEST MONEY PROVISIONS

10.1    <u>Investment and Use of Funds</u>.  The Escrow Agent shall invest the Earnest Money in government insured interest-bearing accounts satisfactory to Purchaser and Seller and the interest thereon shall be added to and become a part of the Earnest Money, shall not commingle the Earnest Money with any funds of the Escrow Agent or others, and shall promptly provide Purchaser and Seller with confirmation of the investments made.  If the Closing under this Agreement occurs, the Escrow Agent shall apply the Earnest Money to the Purchase Price on the Closing Date.

10.2    <u>Termination</u>.  Except as otherwise expressly provided herein, Earnest Money shall be non-refundable to Purchaser.

10.3    <u>Interpleader</u>.  Seller and Purchaser mutually agree that, except as otherwise provided in <u>Paragraph 10.2</u> above, in the event of any controversy regarding the Earnest Money, unless mutual written instructions are received by the Escrow Agent directing the Earnest Money's disposition, the Escrow Agent shall not take any action, but instead shall await the disposition of any proceeding relating to the Earnest Money or, at the Escrow Agent's option, the Escrow Agent may interplead all parties and deposit the Earnest Money with a court of competent jurisdiction in which event the Escrow Agent may recover all of its court costs and reasonable attorneys' fees.  Seller or Purchaser, whichever loses in any such interpleader action, shall be solely obligated to pay such costs and fees of the Escrow Agent, as well as the reasonable attorneys' fees of the prevailing party in accordance with the other provisions of this Agreement.

10.4    <u>Liability of Escrow Agent</u>.  The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the parties, and that the Escrow Agent shall not be liable to either of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for Escrow Agent's negligent acts or intentional misconduct and for any loss, cost or expense incurred by Seller or Purchaser resulting from the Escrow Agent's mistake of law respecting the Escrow Agent's scope or nature of its duties.  Seller and Purchaser shall jointly and severally indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or made by the Escrow Agent in bad faith, in disregard of this Agreement or involving negligence or intentional misconduct on the part of the Escrow Agent.

## ARTICLE 11:  MISCELLANEOUS

11.1    <u>Parties Bound</u>.  Purchaser may assign this Agreement to any entity owned or controlled in whole or in part by Purchaser, or under common control with Purchaser's principals or affiliates, without the prior written consent of Seller. If such an assignment is made, the sale made pursuant to this Agreement shall be consummated in the name of such assignee, which shall succeed to all of the rights, obligations and liabilities of the respective party hereunder, provided that upon consummation of the Closing, the original Purchaser shall not be released and relieved of any obligation and liability hereunder but shall remain jointly and severally bound to Seller therefor; provided that any Earnest Money deposited by Purchaser shall not be returned to Purchaser due to any such assignment, but Purchaser's rights, if any, to such Earnest Money may be assigned by Purchaser to such assignee.  Except as otherwise provided in this <u>Paragraph 11.1</u>, Purchaser or Seller must obtain the other party's prior consent for any other assignment.  This Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, permitted assigns, heirs, and devisees of the parties.

11.2    <u>Headings</u>.  The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

11.3    <u>Invalidity and Waiver</u>.  If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative.  The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

11.4    <u>Governing Law</u>.  This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the state in which the Property is located.

11.5    <u>No Third-Party Beneficiary</u>.  This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third party beneficiary, decree, or otherwise.

11.6    <u>Entirety and Amendments</u>.  This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property except for any confidentiality agreement binding on Purchaser, which shall not be superseded by this Agreement.  This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

11.7    <u>Time of the Essence</u>.  Time is of the essence in the performance of this Agreement.

11.8    <u>Attorneys' Fees</u>.  Should either party employ attorneys to enforce any of the provisions hereof, the party against whom any final judgment is entered agrees to pay the prevailing party all reasonable costs, charges, and expenses, including attorneys' fees, expended or incurred in connection therewith.

11.9    <u>Notices</u>.  All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in <u>Paragraph 1.1</u>.  Any such notices shall be either by (a) certified mail, return receipt requested,  in which case notice shall be deemed delivered upon written confirmation of receipt by the intended recipient (and/or his office), (b) by overnight courier, in which case notice shall be deemed delivered upon written confirmation of receipt by the intended recipient (and/or his office), or (c) sent by personal delivery, in which case notice shall be deemed delivered upon receipt by the intended recipient (and/or his office). A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice.  Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.

11.10    <u>Construction</u>.  The parties acknowledge that the parties and/or their counsel have reviewed and revised this Agreement and that the normal rule of construction — to the effect that any ambiguities are to be resolved against the drafting party — shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

11.11    <u>Calculation of Time Periods</u>.  Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday for national banks in the location where the Property is located, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday.  The last day of any period of time described herein shall be deemed to end at 5:00 p.m., in the time zone in which the Property is located.

11.12    <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement.  To facilitate execution of this Agreement, the parties may execute and exchange by telephone facsimile counterparts of the signature pages.

11.13    <u>Non-Disclosure of Purchase Price</u>.  Neither party will disclose the amount of the purchase price to any third party except as required by law or ordinance of any governmental body having jurisdiction; provided, however, that the parties may disclose the purchase price to third party consultants and lender(s) who agree in writing to maintain such confidentiality.

11.14    <u>Merger</u>.  Except as otherwise expressly provided in this Agreement, any and all rights of action of Purchaser for any breach by Seller of any representation, warranty or covenant contained in this Agreement shall merge with the Deed and other instruments executed at Closing, shall terminate at Closing and shall not survive the Closing.

11.15    <u>**WAIVER OF JURY TRIAL**</u>.  **TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

11.16    <u>Illinois Tax Withholding</u>. Within fifteen (15) days of the Effective Date, Seller shall apply for a certificate issued by the Illinois Department of Revenue stating that no assessed, but unpaid tax, penalties or interest are due in connection with the sale of the Property to Purchaser.  Upon receipt of the certificate, Seller shall deliver a copy of same to Purchaser.  If the certificate is not delivered to Purchaser, or if the certificate is delivered and requires that funds be withheld pursuant to the terms thereof, then Purchaser may, at Closing, deduct and withhold from the proceeds that are due Seller the amount necessary to comply with the withholding required.  Purchaser will deposit the amount so withheld in escrow with the Escrow Agent pursuant to the terms and conditions acceptable to Purchaser and Seller, but in any event complying with such provisions of applicable laws.

11.17    <u>Exclusive</u>.  From the Effective Date to the Closing Date or earlier termination of this Agreement, Seller shall not negotiate or enter into any contract, agreement or option for the sale or lease of all or any part of the Property.

11.18    <u>Further Assurances</u>.  Purchaser and Seller agree, at any time and from time to time after the Closing, to execute, acknowledge, where appropriate, and deliver such further instruments and documents and to take such other action as the other party  (or its affiliates) may reasonably request in order to carry out the intent and purpose of this Agreement. The provisions of this <u>Section</u>  shall survive the Closing

12.    <u>Limitation of Liability</u>.

(a)    Except in the case of fraud, no constituent partner or member in, or agent of Seller, nor any present or future partner, member, manager, trustee, beneficiary, director, officer, shareholder, employee, advisor, affiliate or agent of any partnership, limited liability company, corporation, trust or other entity that has or acquires a direct or indirect interest in Seller or any affiliate of Seller shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Purchaser and its successors and assigns and, without limitation, all other persons and entities, shall look solely to Seller's interest in the Property and the sales proceeds therefrom for the payment of any claim or for any performance, and Purchaser on behalf of itself and its successors and assigns hereby waives any and all such personal liability.  For purposes of this <u>subparagraph (a)</u>, no negative capital account or any contribution or payment obligation of any partner or member in Seller shall constitute an asset of Seller. The limitations of liability contained in this <u>subparagraph (a)</u> shall survive the termination of this Agreement or the Closing Date, as applicable, and are in addition to, and not in limitation of, any limitation on liability applicable to Seller provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument delivered at Closing.

(b)    No constituent partner or member in, or agent of Purchaser, nor any present or future partner, member, manager, trustee, beneficiary, director, officer, shareholder, employee, advisor, affiliate or agent of any partnership, limited liability company, corporation, trust or other entity that has or acquires a direct or indirect interest in Purchaser or any affiliate of Purchaser shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made and entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Seller and its successors and assigns and, without limitation, all other persons and entities, shall look solely to the Earnest Money, the assets of Purchaser, and the proceeds  therefrom for the payment of any claim or for any performance, and Seller on behalf of itself and its successors and assigns hereby waives any and all such personal liability.  The limitations of liability contained in this Section shall survive the termination of this Agreement or the Closing Date, as applicable, and are in addition to, and not in limitation of, any limitation on liability applicable to

Purchaser provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument delivered at Closing.

*[Signature Page Follows]*

SIGNATURE PAGE TO
PURCHASE AND SALE AGREEMENT

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year written below.

**PURCHASER:**

By:

By: _____
Name:  Hardik Patel

Date: 03/11/24

**SELLER:**

FRONTAGE ROAD HOLDING CORP., an Illinois corporation

By: _____
Name: Sulakhan (Sam) Johal
Title:  Director

Date: March 11, 2024

19

# JOINDER OF ESCROW AGENT

Escrow Agent has executed this Agreement in order to confirm that Escrow Agent has received and shall hold the Earnest Money in escrow, and shall disburse the Earnest Money pursuant to the provisions of Article 10 hereof.

FIRST AMERICAN TITLE INSURANCE COMPANY

By:_____

Name: _____

Date: _____        Title: _____

"Escrow Agent"

## RECEIPT OF PURCHASE AND SALE AGREEMENT ACKNOWLEDGMENT

Escrow Agent acknowledges receipt of a fully executed Purchase and Sale Agreement on this \_\_\_\_ day of _____, 2024 (but, for the avoidance of doubt, the Escrow Agent's signature below shall not be required in order for this Agreement to be deemed effective).

**First American Title Insurance Company**

By: _____

Print Name: _____

Title: _____

## RECEIPT OF EARNEST MONEY DEPOSIT ACKNOWLEDGMENT

Escrow Agent acknowledges receipt of the Earnest Money Deposit in the amount of $_____ on this \_\_\_\_ day of _____, 2024.

**First American Title Insurance Company**

By: _____

Print Name: _____

Title: _____

**SCHEDULES**

1 - Closing Costs

2 - List of Operating Agreements

**EXHIBITS**

A - Legal Description

B - Intentionally Omitted

C - Property Information

D - Form of Limited Warranty Deed

E - Bill of Sale

F - Assignment and Assumption of Surviving Operating Agreements

**SCHEDULE 1**

## CLOSING COSTS

| Item: | Responsible Party: |
|---|---|
| Owner's Title Insurance Policy | Seller |
| Extended Coverage Premium<br>Other Endorsements to<br>Owner's Policy | Seller<br>Purchaser |
| Lender Policy and endorsements | Purchaser |
| Documentary Fees | Seller |
| Transfer Taxes | Seller |
| Survey | Purchaser |
| Recording Fees | Seller (for releases)<br>Purchaser (for Deed and Mortgage) |
| Broker Fees/Commissions | Seller |
| Escrow Fees | Split 50:50 between Seller and Purchaser |

**EXHIBIT A**

**<u>LEGAL DESCRIPTION</u>**

**To Be Added**

**EXHIBIT B**

**INTENTIONALLY OMITTED.**

**EXHIBIT C**

**PROPERTY INFORMATION**

1.    Disclosure of any legal matters affecting the Property;
2.    Any notices, correspondence, approvals, permits, and/or licenses or any agreements with, to or from any governmental or quasi-governmental authority having jurisdiction over the Property;
3.    Current survey of the Property;
4.    All third-party environmental studies or reports, zoning reports relating to the Property or any portion thereof;
5.    Any and all tax statements for three calendar years prior to the date of this Agreement; and
6.    All licenses and permits affecting the Property.

# EXHIBIT D

### FORM OF SPECIAL WARRANTY DEED

**To Be Added**

**EXHIBIT E**

**<u>Bill of Sale</u>**

**To Be Added**

**EXHIBIT F**

**Assignment and Assumption of Surviving Operating Agreements**

**To Be Added**