## EXHIBIT 2

**Redline**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 15 |
| Pride Group Holdings Inc., *et al.*[1] | Case No. ~~24 _____~~ 24-10632 (CTG) |
| Debtors in Foreign Proceedings. | ~~(Joint Administration Requested)~~ Jointly Administered |

## AMENDED VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

Randall Benson, solely in his capacity as the duly authorized foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors"),[2] in the Canadian proceedings (the "CCAA Proceedings") commenced under the Companies' Creditors Arrangement Act (the "CCAA"), pending before the Ontario Superior Court of Justice (Commercial List) in Ontario, Canada, Court File No. CV-24-00717340-00CL (the "Canadian Court"), respectfully submits this amended verified petition (together with the form petitions for each of the Debtors (the "Petitions") ~~filed concurrently herewith~~, the "Amended Verified Petition") for recognition of the CCAA Proceedings with respect to each of the Debtors as "foreign main proceedings," recognition of the Foreign Representative, and certain related relief

---

[1]    The last four digits of Debtor Pride Group Holdings Inc.'s Canadian business number are 6399. Due to the large number of debtors in these chapter 15 cases, a complete list of the debtor entities and the last four digits of their unique identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing agent at https://dm.epiq11.com/pridegroup. The Debtors' service address for the purposes of these chapter 15 cases is 1450 Meyerside, Suite 401, Mississauga, Ontario, L5T 2N5, Canada.

[2]    A list of the Debtors is set forth on Exhibit B hereto. As described in greater detail herein, although 1000089137 Ontario Inc., DVP Holdings, Corp., Parker Global Enterprises, Inc., Parker Transport Co., and Arnold Transportation Services, Inc. (collectively, the "Arnold Entities") are currently Debtors in these Chapter 15 Cases, the Arnold Entities are exploring all available options including potentially filing for bankruptcy assignment in Canada and/or chapter 7 in the United States. The Foreign Representative no longer seeks recognition or any other relief with respect to those entities in these Chapter 15 Cases. Accordingly, the term "Debtors" as used herein does not include the Arnold Entities.

pursuant to sections 105(a), 1507, 1510, 1515, 1517, and 1521 of Title 11 of the United States Code (the "Bankruptcy Code").

In support of the Amended Verified Petition, the Foreign Representative respectfully refers the Court to and incorporate the following herein by reference: the (a) *Amended Declaration of Randall Benson in Support of the ~~(A)~~ Debtors' Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code ~~and (B) Motion for Provisional Relief~~* (the "Amended Benson Declaration"), filed contemporaneously herewith; and (b) *Declaration of Rachel Nicholson as Canadian Counsel to the Debtors in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 4] (the "Nicholson Declaration").

## PRELIMINARY STATEMENT[3]

1.    The Debtors operate a trucking and logistics conglomerate based in Canada with operations in Canada and the United States that is collectively the largest used truck seller in North America.  The Debtors' businesses are managed centrally from their headquarters in Mississauga, Ontario, and they maintain facilities and operations in Canada and the United States.  The Debtors' businesses consist of new and used truck and trailer sales, truck leasing and financing, logistics, equipment maintenance and parts sales, rescue, and owning and operating real properties with dealerships and service centers in Canada and the United States, and they are a dominant or important player in each of these industries and markets.  The Debtors' ability to offer a "one-stop shop" solution for truck drivers is a unique competitive advantage that sets

---

[3]    Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to them elsewhere in this Amended Verified Petition.

them apart from many other industry players.  In particular, the Debtors' services are attractive to trucking "owner-operators," which are a class of entrepreneurs that own and operate between one and five commercial trucks.

2.     Despite being profitable and growing until very recently, the Debtors' trajectory was disrupted by the onset of the COVID-19 pandemic in 2020, ultimately leading to the company's current financial crisis.  Initially, the pandemic was a boon to the North American trucking and logistics industries as freight rates soared in Canada and across the world.  The Debtors seized on those opportunities and experienced rapid growth by significantly expanding ~~its~~their North American fleet and footprint and expanding into new business lines that helped ~~its~~their client base.  However, as the effects of the COVID-19 pandemic began to subside, so too did its beneficial effects on the North American trucking industry.  As demand for trucking services waned and diesel prices soared, there was suddenly an overabundance of trucks and truck drivers in North America, negatively impacting every part of the industry.  The industry's overall downturn had a particularly severe impact on smaller-scale trucking operations such as owner-operators, which typically operate at the margins of the industry and have less financial wherewithal to sustain ~~themselves~~them through more challenging times.

3.     To address this downturn, the Debtors took a number of important steps, including refinancing a significant amount of their assets, reducing their workforce, and winding down several of their less profitable business lines beginning in late 2022.  More recently, the Debtors made the decision to suspend payments to certain of their lenders in an effort to continue operating as a going concern.  Despite these efforts, the downturn has continued, and the lenders

under the Syndicated Facility[24] informed the Debtors that they would begin to enforce their rights and remedies if formal insolvency proceedings were not initiated by March 31, 2024.

4. Accordingly, and after thoroughly evaluating all other available options, the Debtors commenced the CCAA Proceedings and, shortly thereafter, these chapter 15 cases (collectively, the "Chapter 15 Cases"). Recognition of the CCAA Proceedings is imperative to the success of the CCAA Proceedings because it is aimed at protecting the Debtors and their non-Debtor affiliates (collectively, the "Pride Group")[5] and their assets within the United States from creditor and any other actions, and it will complement the stay of proceedings imposed under the CCAA within Canada so as to give the Pride Group the necessary breathing room to negotiate and formulate a restructuring plan.

---

[24] That certain Third Amended and Restated Credit Agreement dated as of November 4, 2022 (the "Syndicated Facility"), by and among: TPine Truck Rental Inc., Tpine Leasing Capital Corporation, Pride Truck Sales Ltd., 2076401 Ontario Inc., Tpine Leasing Capital L.P., PGED Holding, Corp., High Prairie Texas Holding Corp, 131 Industrial Blvd Holding Corp, 59th Ave Phoenix Holding Corp., Di Miller Drive Bakersfield Holding Corp. and 1450 Meyerside Holding Inc., as borrower (the "Borrower Parties"); various guarantors including each of the Borrower Parties and Pride Truck Sales L.P., TPine Rental USA, Inc., Coastline Holdings, Corp., Pride Group Holdings Inc., Pride Group Logistics Ltd., 2043002 Ontario Inc., Pride Fleet Solutions Inc., and Frontage Road Holding Corp.; Royal Bank of Canada, as administrative agent, and the lenders from time to time party thereto.

[5] As used herein, "Pride Group" includes: (i) each of the Debtors; (ii) Pride Truck Sales L.P., TPine Leasing Capital L.P., and Sweet Home Hospitality L.P. (the "LPs") ((i) and (ii) together, the "Pride Entities"); and (iii) Block 6 Holding Inc., 2500819 Ontario Inc., Pergola Holdings, Corp., and Pride Global Insurance Company Ltd. (the "Additional Stay Parties"). The LPs are limited partnerships and therefore not eligible to become applicants in the CCAA Proceedings due to their corporate structure. However, the controlling general partners of these limited partnerships are applicants in the CCAA Proceedings and Debtors in these Chapter 15 Cases.

"Pride Group" does not include (i) the following affiliated special-purpose securitization vehicles that do not engage in any business or activity other than acting as purchasers of securitized assets or issuers of asset-backed obligations under various securitization agreements: TPine USA Funding I LLC, TPine USA Funding II LLC, TPine USA Funding III LLC, TPine USA Funding IV LLC, TPine Canada Securitization L.P., and TPine Canada GP L.P. (collectively, the "Securitization SPVs"), which are not applicants in the CCAA Proceedings, are not Debtors in these Chapter 15 Cases, and no relief is sought with respect to these entities; or (ii) the Arnold Entities, given that the Foreign Representative is no longer seeking relief with respect to the Arnold Entities.

5.      Recognition, if granted, will serve chapter 15's purpose—to provide a forum for coordination between the Canadian Court and this Court that will enable the fair and efficient centralized administration of the Debtors' assets and protect the Pride Group's creditors and other interested parties in Canada and the United States, while enabling the Pride Group to formulate a path forward that will maximize the value of the Debtors' assets.  Without this Court's recognition of the CCAA Proceedings, the Pride Group's operations in the United States (and the value of its assets) may be jeopardized by creditors and other parties taking piecemeal enforcement actions, which would have a devastating effect on the Pride Group, the CCAA Proceedings, and the overall prospects of a successful restructuring.

6.      The relief sought by the Foreign Representative in these Chapter 15 Cases will ensure that these Chapter 15 Cases and the CCAA Proceedings are conducted in a fair, efficient, uninterrupted, and centralized manner with the goal of maximizing the value of the Debtors' assets for the benefit of all stakeholders, preserving jobs, and ensuring uninterrupted service to the Debtors' customers.

## **BACKGROUND**

### A.      **Overview of the Debtors and the Pride Group**

7.      There is no ultimate parent company for the Debtors.  The ultimate beneficial owners of the Pride Group are two individuals (along with certain other members of their family via various family trusts)—Sulakhan Johal and Jasvir Johal—who together started these businesses in 2010 after immigrating to Canada.  All management decisions for the Pride Group are made from its global headquarters located at 1450 Meyerside Dr., Suite 401, Mississauga, Ontario, Canada.  The Debtors, all of which are applicants in the CCAA Proceedings, consist of the Pride Group's Canadian and U.S. operating companies,[3] ~~as well as~~ certain other holding

---

[3]   ~~Two U.S. operating companies, Pride Truck Sales L.P. and TPine Leasing Capital L.P., are limited partnerships and therefore not eligible to become applicants in the CCAA Proceedings due to their corporate structure.~~

companies in Canada and the United States that are borrowers or guarantors under the Pride Group's credit facilities. ~~The~~ that filed chapter 15 cases on April 1, 2024 (the "Initial Debtors ~~do not include the Pride Group's numerous single asset~~"), as well as its Canadian and U.S. real estate holding companies, ~~which are applicants in the CCAA Proceedings~~ that filed chapter 15 cases on April 15, 2024 (the "Additional Debtors").

8.      The Pride Group is engaged in a number of business lines across the North American trucking and logistics industries, including logistics and brokering; used and new truck sales, leasing, and financing; servicing, rescue, and parts sales; securitization and securitization financing; and other ancillary business lines (some of which have been recently wound down) such as factoring, operating truck stops, and installing electric truck charging stations.  As of the ~~date hereof (the "~~Initial Petition Date~~")~~, and excluding the Arnold Entities, the Pride Group employed 669 employees and 405 independent contractors, the majority of whom are based in Canada.

9.      The Pride Group is obligated on a number of pre-petition secured facilities, including (i) the Syndicated Facility consisting of CA$22 million and US$80 million in non-revolving term loans, and CA$390 million and US$250 million in revolving loans; (ii) various floor plan facilities secured against truck collateral totaling CA$175 million and US$100 million; (iii) various wholesale leaseline facilities totaling CA$341 million and up to US$405 million; (iv) various lease facilities secured against truck collateral totaling CA$300 million; (v) various securitization facilities totaling more than CA$1 billion and US$400 million; (vi) various

---

~~and therefore not eligible to become applicants in the CCAA Proceedings due to their corporate structure.  However, the controlling general partners of these limited partnerships are applicants in the CCAA Proceedings and Debtors in these Chapter 15 Cases.~~

real estate mortgages totaling more than CA$230 million and US$80 million;  and (vii) certain other credit facilities totaling CA$130 million.

**B.  Circumstances Leading to the Restructuring**

10.    As noted above, the North American trucking and logistics industry is facing a prolonged downturn in the wake of the COVID-19 pandemic.  The situation is made worse by the increased number of trucks that were brought to market during the immediate aftermath of the COVID-19 pandemic, many of which are currently sitting unused.  These effects have been disproportionately borne by smaller trucking and logistics companies and owner-operators, which comprise a significant proportion of the Debtors' customers.  As these customers become delinquent in making financing and lease payments for their trucks, they also stop utilizing the Pride Group's other business lines, such as truck servicing, fuel sales, factoring, and rescue operations, culminating in a perfect storm of events that have all contributed to the Debtors' current financial position.

11.    In addition to the above, the Debtors have also been made aware that more than one lender claims a security interest in certain trucks due to a lapse in the timely tracking and correction of security registration (in part driven by the overall business downturn and strain on human resources).  The Debtors have been working with their financial advisor and Canadian Court-appointed monitor, Ernst & Young Inc. (in such capacity, the "Monitor"), and their chief restructuring officer, RC Benson Consulting Inc. (in such capacity, the "CRO"), to address that issue.  The Debtors have, with the CRO and Monitor's assistance, implemented internal governance programs and controls to ensure that security interests in trucks would be properly tracked and corrected.  However, certain lenders have refused to permit their truck collateral

from being transferred or sold, which further exacerbates the Debtors' financial position as they are unable to conduct a core part of their business—selling and leasing trucks. ~~While~~

12.    To address this issue, since the commencement of the CCAA Proceedings and these Chapter 15 Cases ~~proceed~~, the ~~Debtors, with the CRO and Monitor's assistance and oversight, intend to strictly implement~~ Canadian Court has approved governance protocols designed by the Monitor to ensure that no lenders receive any benefits from their collateral at the expense of any other parties in interest, including by placing any proceeds of the trucks subject to multiple security interests into a trust account held by the Monitor to be distributed in accordance with the CCAA Proceedings.  Negotiations regarding these protocols are continuing, and the Debtors intend to seek Canadian Court approval of revised governance protocols on April 25, 2024.

13.    ~~12.~~ The Monitor and CRO, with the Debtors' assistance, have also identified certain other instances where assets or credit facilities were recorded differently than they ought to have been.  In each such case, the Debtors, the Monitor, and the CRO have implemented practices and protocols to prevent these situations from occurring in the future, and such practices and protocols have been disclosed to certain of the Debtors' lenders.

**C.    The CCAA Proceedings and These Chapter 15 Cases**

14.    ~~13.~~ As a result of the foregoing, and after exhausting all other available options, the Debtors commenced the CCAA Proceedings on March 27, 2024 in the Canadian Court.  The Canadian Court signed the preliminary initial order on the following day (the "Initial Order"), granting certain relief in connection with the CCAA Proceedings.  The Initial Order, among other things, (i) appoints Randall Benson as the Foreign Representative ~~for~~ in respect of the ~~Debtors~~ CCAA Proceedings and authorizes him to file these Chapter 15 Cases; and (ii) stays the

commencement or continuation of any proceeding or enforcement process in any court or tribunal against the Debtors, their non-Debtor affiliates, certain of their directors and officers, and any of their property through and including April 6, 2024 or such later date as the Court may order (the "Stay Period").

15. 14. On April 1, 2024 (the "Initial Petition Date"), the Foreign Representative commenced these Chapter 15 Cases. Concurrently with the filing of this by filing Petitions for the Initial Debtors, along with the *Verified Petition, the for (I) Recognition of Foreign Main Proceedings, (II) Recognition of* Foreign Representative has requested joint administration of these*, and (III) Related Relief Under* Chapter 15 Cases pursuant to*of the* Bankruptcy Rule 1015(b)*Code* [D.I. 2] (the "Initial Verified Petition"). The Court granted joint administration with respect to the chapter 15 cases of the Initial Debtors on April 2, 2024. Also on the Initial Petition Date, the Foreign Representative filed the *Motion of the Foreign Representative for Entry of an Order Granting Provisional Relief Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code* (the "First Provisional Relief Motion") seeking entry of an order (the "requesting, among other things, enforcement of the Initial Order in the United States on a provisional basis. On April 3, 2024, the Court entered the *Order Granting Motion of the Foreign Representative for* Provisional Relief Order") granting certain provisional relief under section 1519(a)*Pursuant to Sections 105(a) and 1519* of the Bankruptcy Code, including relief available pursuant to sections 362, 364 and 365 of the Bankruptcy Code with respect to the Pride Group and its property located within the territorial jurisdiction of the United States. [D.I. 49] approving the First Provisional Relief Motion.

16. Following entry of the Initial Order, certain entities in the Pride Group entered into that certain debtor-in-possession facility term sheet, dated as of April 1, 2024 (the "DIP Term Sheet") with its prepetition lenders under the Syndicated Facility (in such capacities, the "DIP

Lenders") and Royal Bank of Canada, as administrative agent (in such capacity, the "DIP Agent"). Pursuant to the terms of the DIP Term Sheet, the DIP Lenders have agreed to make available to the Pride Entities a new term loan facility in aggregate principal amount not to exceed CA$30 million.

17. On April 5, 2024, the Canadian Court held a further hearing and granted an Amended and Restated Initial Order (as may be further amended from time to time, the "A&R Initial Order"). Among other things, the A&R Initial Order (i) authorizes the Pride Entities to obtain and borrow under the DIP Facility in accordance with the terms of the DIP Term Sheet to finance their ordinary working capital and other general corporate purposes; (ii) grants a superpriority charge (the "DIP Charge") to the DIP Agent for and on behalf of the DIP Lenders on the property of the Pride Entities; (iii) grants a superpriority charge (the "Intercompany Advances Charge") to secure intercompany advances made from one Pride Entity to another Pride Entity after the entry of the Initial Order; (iv) extends the Stay Period through June 30, 2024 (or such later time as the Canadian Court may order); and (v) increases the superpriority charges over the property of the Pride Entities previously granted pursuant to the Initial Order (x) as security for the fees and disbursements of certain professionals (the "Administration Charge") and (y) in favor of their directors and officers for additional liability insurance and certain obligations (the "Directors' Charge").[6]

---

[6] As among the charges created by the Initial Order and A&R Initial Order, the relative priority is as follows: (1) the Administration Charge; (2) the Intercompany Advances Charge; (3) the DIP Charge; and (4) the Directors' Charge (collectively, the "Charges").

Pursuant to paragraph 61 of the A&R Initial Order, the DIP Charge and Directors' Charge are subordinate to: (i) any validly perfected and enforceable security interest of third party financers in specific vehicle and lease collateral and such proceeds of collateral which, as of the date of the A&R Initial Order, ranks in priority to the security under the Syndicated Facility (the "Leases"); (ii) any valid and enforceable mortgage in favor of a third party mortgagee which, as of the date of this Order, is duly registered on title to real properties of the Pride Entities as of the date of the A&R Initial Order, ranks in priority to the security under the Syndicated Facility (the "Mortgages"); and (iii) until and including April 25, 2024 which may be extended upon further order of the

18.    On the same day, the Canadian Court signed the Protocols Order (as may be further amended from time to time, the "Protocols Order").  The Protocols Order approves (i) governance protocols (the "Governance Protocol"), which provide the Monitor and CRO with reasonable control and oversight over the cash proceeds generated from asset sales and other dispositions, as well as distributions and remittances of the Pride Entities; (ii) a real estate monetization plan, which is intended to bring structure, oversight, and transparency to the monetization of the Pride Entities' real estate (the "Real Estate Monetization Plan"); and (iii) an intercompany and unsecured claims preservation protocol to govern the disbursements of proceeds from real estate sales (the "Intercompany and Unsecured Claims Preservation Protocol").

19.    Following the Canadian Court's signing of the A&R Initial Order and Protocols Order, the Foreign Representative filed the *Motion of the Foreign Representative for Entry of an Order Granting Provisional Relief in Connection with Debtors-In-Possession Financing and Certain Protocols Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code* (the "Second Provisional Relief Motion") on April 9, 2024 requesting, among other things, enforcement of the A&R Initial Order and Protocols Order in the United States on a provisional basis.

20.    On April 15, 2024, the Foreign Representative filed Petitions for the Additional Debtors.  The Additional Debtors include 17 Canadian real estate holding companies and 28 U.S. real estate holding companies.

---

Canadian Court, any validly perfected and enforceable security interest of Triumph Financial Services LLC in the Property of Arnold Transportation Services, Inc. in the maximum amount of CA$3 million (the "Triumph Interests").

The Debtors also intend to request authority from the Canadian Court to subordinate the Arnold Intercompany Advances (defined below) to the Leases and Mortgages.

21.    On April 17, 2024, the Court entered the *Order Granting Provisional Relief in Connection with Debtors-In-Possession Financing and Certain Protocols Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code* (the "Second Provisional Relief Order"). The Second Provisional Relief Order, among other things, enforces on a provisional basis pursuant to section 1519 of the Bankruptcy Code and principles of comity, the Charges approved pursuant to the A&R Initial Order over the property of the Pride Entities located in the United States.

22.    Since the filing of the CCAA Proceedings and these Chapter 15 Cases, the Pride Group, with the oversight of the Monitor and CRO, has been engaging in negotiations with its various creditor groups and identifying opportunities for asset sales or other avenues of value maximization. For instance, on April 19, 2024, the Foreign Representative filed *the Motion of the Foreign Representative for Entry of an Order (I) Authorizing the Sale of Property of Debtor Frontage Road Holding Corp. Free and Clear of Liens, Claims, Encumbrances and Other Interests and (II) Granting Related Relief* [D.I. 115] (the "Frontage Sale Motion") seeking Court approval to sell certain real estate owned by Debtor Frontage Road Holding Corp. The Monitor has also been continuing its comprehensive securitization and security reviews, which are well underway.

23.    15. As described in detail in the Amended Benson Declaration, the primary purpose of the CCAA Proceedings is to give the Debtors breathing room to stabilize their business and develop a plan to restructure their affairs and indebtedness for the benefit of their stakeholders. Additional factual background regarding the Debtors, including their history and business operations, their capital structure, and the events leading to the filing of the CCAA Proceedings and these Chapter 15 Cases, is set forth in detail in the Amended Benson Declaration. Details regarding the CCAA Proceedings and the CCAA process are set forth in the Nicholson Declaration.

**D.    The Arnold Entities**

24.    Although the Arnold Entities filed chapter 15 cases on the Initial Petition Date, the Foreign Representative is no longer seeking recognition as to their CCAA Proceedings or any other relief with respect to them by this Amended Verified Petition.  Since the Initial Petition Date, it has become apparent to the CRO and other advisors that the Arnold Entities, which were acquired by the Pride Group in 2022, had never been fully integrated into the Pride Group's operational structure as had been previously explained to the CRO.  Instead, the Arnold Entities were operationally independent from the Pride Group, and had their own management team and infrastructure located in Texas (although their fleet of trucks is primarily leased from TPine Leasing Capital L.P.).  As a result, it was determined that certain statements set forth in the original *Declaration of Randall Benson in Support of the (A) Debtors' Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code and (B) Motion for Provisional Relief* [D.I. 2] regarding the COMI of the Pride Group were inaccurate as to the Arnold Entities.

25.    Since the commencement of the CCAA Proceedings, the liquidity position of the Arnold Entities has been deteriorating rapidly due to the fact that: (i) the primary source of liquidity for the Arnold Entities, a factoring relationship with Triumph Financial Services LLC, has been discontinued following the commencement of the CCAA Proceedings, and (ii) certain large customers have ceased doing business with the Arnold Entities.  The Arnold Entities have taken measures to reduce cash burn, including shutting down business lines and not taking certain new delivery orders.  Further, on April 19, 2024, the Arnold Entities terminated their group medical and prescription drug plan, in accordance with its terms.  Nevertheless, the Arnold Entities required continued funding to maintain payments for fuel and employee wages and

benefits, which have been in the form of intercompany advances from the Pride Group (the "Arnold Intercompany Advances") totaling approximately US$800,000 (as of April 22, 2024) since the commencement of the CCAA Proceedings.

26.    As a result of the foregoing, the CRO concluded that an asset sale for the Arnold Entities was the best—and only—option to pursue.  The CRO, the Monitor, and the Arnold Entities' management team solicited bids from potential purchasers that may be interested in the Arnold Entities' assets to determine if a sale could be accomplished quickly.  Although certain bidders expressed interest in the Arnold Entities' assets, including one that was a particularly strong potential candidate, no bidder has yet emerged with a viable offer that could be consummated quickly.  The CRO also recently discovered that the Arnold Entities were not current on, and failed to satisfy, significant obligations that directly impacted their ability to continue to operate their business.  As a result, the Arnold Entities are exploring all available options and are seeking authority from the Canadian Court to file for bankruptcy in Canada and/or chapter 7 in the United States.  As such, the Foreign Representative is no longer seeking recognition of the CCAA Proceedings in the United States under chapter 15 solely as to the Arnold Entities.

## JURISDICTION AND VENUE

27.    ~~16.~~ The United States Bankruptcy Court for the District of Delaware (the "Court") has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

28. ~~17.~~ Recognition of a foreign proceeding and other matters under chapter 15 of the Bankruptcy Code are core matters under 28 U.S.C. § 157(b)(2)(P).

29. ~~18.~~ These Chapter 15 Cases have been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of the Initial Verified Petition and this Amended Verified Petition in accordance with section 1515 of the Bankruptcy Code.

30. ~~19.~~ The Foreign Representative confirms his consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of final orders or judgments by the Court to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

31. ~~20.~~ Venue in this district is proper under 28 U.S.C. § 1410 because the Debtors have their principal assets in the United States located in Delaware.  The Debtors have property in Delaware through their indirect ownership in the equity of Delaware entities, and each ~~debtor~~Debtor has an interest in a retainer on deposit with the Delaware office of Morris, Nichols, Arsht & Tunnell LLP in which the Debtors have a continuing ownership interest. These funds are held in an account at a Wilmington, Delaware branch of M&T Bank in accordance with Delaware Rule of Professional Responsibility 1.5.

32. ~~21.~~ The statutory predicates for the relief requested in this Amended Verified Petition are sections 101(23)-(24), 105(a), 306, 1502, 1504, 1507, 1509, 1510, 1512, 1515, 1516, 1517, 1520, 1521, 1522, and 1524 of the Bankruptcy Code.

**RELIEF REQUESTED**

33.    22. The Foreign Representative has commenced these Chapter 15 Cases as ancillary proceedings to the CCAA Proceedings and respectfully files this Amended Verified Petition contemporaneously with the accompanying documentation required by sections 1504 and 1515 of the Bankruptcy Code.

34.    23. The Foreign Representative respectfully requests that this Court enter an order, substantially in the form of the Proposed Order attached hereto as **Exhibit A**, pursuant to sections 105(a), 1504, 1507, 1509, 1510, 1515, 1517, 1520, and 1521 of the Bankruptcy Code that:

    a.  recognizes the CCAA Proceedings as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code, or in the alternative as foreign nonmain proceedings pursuant to section 1517(b)(2) of the Bankruptcy Code;

    b.  recognizes the Foreign Representative as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the CCAA Proceedings;

    c.  gives full force and effect in the United States to the Initial Order, the A&R Initial Order, and the Protocols Order (collectively, the "Canadian Orders") including any and all extensions or amendments thereof authorized by the Canadian Court and extending the protections of the Initial OrderCanadian Orders to the Debtors (and theircertain non-Debtor affiliates and directors and officers, as applicable) on a final basis;

    d.  grants the Debtors all of the relief afforded pursuant to section 1520 of the Bankruptcy Code, including but not limited to the "automatic stay" under section 362 of the Bankruptcy Code, which shall apply with respect to the Debtors, their non-Debtor affiliates, certain directors and officers, and any of their property that is now or in the future located within the territorial jurisdiction of the United States;

    e.  approves the Charges in the amount and priorities as set forth in the A&R Initial Order pursuant to section 364 of the Bankruptcy Code with respect to the assets, undertakings, and properties of the Pride Entities located within the territorial jurisdiction of the United States on a final basis;

    f.  approves, as adequate protection for lenders under the Syndicated Facility and certain other secured creditors for diminution in value resulting from the priming of their liens by the Charges and the imposition or enforcement of the stay in these Chapter 15 Cases or the CCAA Proceedings, certain replacement security interests and liens upon the property of the Pride Entities that are immediately junior to the Charges, which shall attach to the property of the

Pride Entities located in the United States to the same extent and priority as existed immediately prior to the Initial Petition Date;

g.   ~~e.~~ extends on a final basis (pursuant to section 1521(a)(6) of the Bankruptcy Code) the relief granted under the First Provisional Relief Order and Second Provisional Relief Order and grants such further additional relief requested herein and as otherwise authorized by sections 1507 and 1521 of the Bankruptcy Code, as applicable, as the Court deems necessary; including a permanent injunction enjoining all parties from commencing or continuing any action or proceeding in the United States against the Debtors, their non-Debtor affiliates, certain directors and officers, or any of their assets located within the territorial jurisdiction of the United States that is inconsistent with the ~~Initial Order~~Canadian Orders (the "Injunction"); and

h.   ~~f.~~ provides such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

35.   ~~24.~~ Chapter 15 of the Bankruptcy Code is designed to promote cooperation and comity between courts in the United States and foreign courts, to protect and maximize the value of a debtor's assets and to facilitate the rehabilitation and reorganization of businesses.  11 U.S.C. § 1501.  The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's restructuring in its home country.

36.   ~~25.~~ Consistent with these principles, the Foreign Representative commenced ancillary proceedings for the Debtors under chapter 15 of the Bankruptcy Code to obtain recognition of the CCAA Proceedings and certain related relief.  The Foreign Representative believes that these Chapter 15 Cases will complement the Debtors' primary proceedings in Canada to ensure the effective and economic administration of the Debtors' restructuring efforts and prevent adverse actions from being brought by disgruntled creditors against the Pride Group in the United States that would derail the Pride Group's restructuring efforts.

### A.    The Debtors are Eligible for Chapter 15 Relief

37. 26. Section 109(a) of the Bankruptcy Code provides that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title."  Courts have applied section 109(a) of the Bankruptcy Code to chapter 15 eligibility.  *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir. 2013) (holding that section 109(a) applies to chapter 15 debtors).  Decisions interpreting section 109(a) of the Bankruptcy Code as applied to foreign debtors under other chapters of the Bankruptcy Code unanimously hold that a debtor satisfies the section 109 requirement even when it only has a nominal amount of property in the United States.  *See GMAM Inv. Funds Trust I v. Globo Comunicacoes e Partipacoes S.A. (In re Globo Comunicacoes e Partipacoes S.A.),* 317 B.R. 253, 249 (S.D.N.Y. 2004) (stating that courts have repeatedly found that there is "'virtually no formal barrier' to having federal courts adjudicate foreign debtors' bankruptcy proceedings") (citing *In re Aerovias Nacionales de* Colombia S.A. (In re Avianca), 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003); *In re Berau Capital Res. Pte. Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015) (holding that section 109(a) neither requires a specific quantum of property in the United States, nor states when or for how long that property must be located within the United States); *see also In re Global Ocean Carriers Ltd*., 251 B.R. 31, 38-39 (Bankr. D. Del. 2000) (holding that approximately $10,000 in a bank account and the unearned portions of retainers provided to local counsel constituted a sufficient property interest for chapter 11 purposes).

38. 27. Each of the Debtors is eligible to be a debtor under section 109(a) of the Bankruptcy Code because it either is incorporated in the United States or has property in the United States.  Specifically, each of the Debtors incorporated in the United States (the "U.S. Debtors") is

incorporated in the United States and each of the Debtors incorporated in Canada (the "Canadian Debtors") has property located in Delaware consisting of a retainer deposited with Delaware counsel to the Foreign Representative that is being held in a Delaware bank account for the benefit of all of the Debtors.  For these reasons, each of the Debtors satisfies the requirements under section 109(a) of the Bankruptcy Code.

**B.    The CCAA Proceedings Should Be Recognized as Foreign Main Proceedings**

39.    28. Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (a) such foreign proceeding is a foreign main proceeding within the meaning of section 1502(4) and 1517(b)(1) of the Bankruptcy Code, (b) the foreign representative applying for recognition is a person or body, and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517.  As explained below, the CCAA Proceedings, the Foreign Representative, and the Petitions satisfy all of the foregoing requirements.

**C.    The CCAA Proceedings are Foreign Proceedings**

40.    29. Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

41.    30. Courts have held that a "foreign proceeding" is one:

   a.  in which "acts and formalities [are] set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;"

   b.  that has either a judicial or an administrative character;

   c.  that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

      d.   that is located in a foreign country;

      e.   that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

      f.   in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

      g.   which proceeding is for the purpose of reorganization or liquidation.

*See In re Ashapura Minechem Ltd.,* 480 B.R. 129, 136 (S.D.N.Y. 2012) (citing *In re Betcorp Ltd.,* 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re Overnight and Control Comm 'n of Avćmzit, S.A.,* 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors). As set forth in the Amended Benson Declaration and Nicholson Declaration, the CCAA Proceedings satisfy such requirements and, therefore, qualify as "foreign proceedings" for purposes of section 101(23) of the Bankruptcy Code.

42.    ~~31.~~ *First,* the CCAA Proceedings are proceedings commenced pursuant to the CCAA, a Canadian law that governs corporate reorganizations and provides for an arrangement of a company's financial obligations. *See* CCAA § 44(a—e). *See* Nicholson Decl. at ¶ 9. For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets." *Betcorp*, 400 B.R. at 278. Because the CCAA Proceedings operate under such statutory framework, they satisfy the first factor of section 101(23) of the Bankruptcy Code.

43.    ~~32.~~ *Second*, the CCAA Proceedings are judicial in character. A reorganization proceeding is judicial in character whenever a "court exercises its supervisory powers." *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010). In the CCAA Proceedings, the Canadian Court has jurisdiction over the Debtors' assets and affairs and has entered the

Initial Order, which, among other things, has imposed the Stay Period until April 6, 2024 precluding parties from exercising any potential rights with respect to the Pride Group and its assets.[7]  *See* Nicholson Decl. at ¶ 18.

44.  ~~33.~~ *Third*, the CCAA Proceedings are collective in nature in that all affected creditors are allowed to participate.  *See* Nicholson Decl. at ¶ 21.   In *Betcorp*, for instance, the bankruptcy court discussed the contrasts between a true collective proceeding, where such proceeding "considers the rights and obligations of all creditors" and a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor." *See* 400 B.R. at 281.  Here, the Debtors have commenced the CCAA Proceedings to negotiate, formulate and propose a restructuring plan to their stakeholders.  The ~~Initial Order protects~~Canadian Orders protect the due process rights of the various stakeholders of the Debtors, as evidenced by the Canadian Court's discussion regarding certain rights held by interested parties, the temporary nature of the Stay Period, and the notice requirements in the Initial Order and A&R Initial Order.  All creditors and other parties ~~will~~have had and continue to have a full and fair opportunity to participate in the CCAA Proceedings, including by submitting claims, retaining counsel and appearing, raising objections, and voting on a restructuring plan (if one is proposed).  *See* Nicholson Decl. at ¶ 20.

45.  ~~34.~~ *Fourth*, the CCAA Proceedings, including the Canadian Court, are located in a foreign country, namely Canada.

46.  ~~35.~~ *Fifth*, as described above, the CCAA, which governs the CCAA Proceedings, relates to the adjustment of debt.  *See id.* at ¶ 21.

---

[7]    The Stay Period was extended to June 30, 2024 pursuant to the A&R Initial Order.

47. ~~36.~~ *Sixth*, the CCAA Proceedings subject the Debtors' assets and affairs to the supervision of the Canadian Court during the pendency of the proceedings. *See id.*

48. ~~37.~~ *Seventh*, the objective of the CCAA Proceedings is the reorganization of the Debtors. The Debtors require immediate CCAA protection to ensure that they can continue as a going concern, service their significant customer base of small business owners and operators, maintain gainful employment for over a thousand employees and independent contractors, and preserve enterprise value for the benefit of all stakeholders. The Debtors intend to evaluate and pursue during the pendency of CCAA Proceedings, as appropriate, the recapitalization of their business through a plan of arrangement and/or a sale of assets under court supervision for the benefit of creditors. Therefore, the Foreign Representative submits that the Debtors have commenced the CCAA Proceedings for the purpose of reorganization, as required by section 101(23) of the Bankruptcy Code.

49. ~~38.~~ Since the CCAA Proceedings satisfy all of the criteria required by section 101(23) of the Bankruptcy Code, they are foreign proceedings. United States courts have recognized collective proceedings similar to the CCAA Proceedings as "foreign proceedings" on numerous occasions. *See, e.g., In re SimEx Inc.*, No 24-10083 (TMH) (Bankr. D. Del. Feb. 20, 2024) (recognizing a Canadian arrangement as a foreign proceeding); *In re Nexii Building Solutions Inc.*, No. 24-10026 (JKS) (Bankr. D. Del. Feb. 9, 2024) (same); *In re Lighthouse Immersive Inc.*, No. 23-11021 (LSS) (Bankr. D. Del. Aug. 28, 2023) (same); *In re Nextpoint Financial Inc.*, No. 23-10983 (TMH) (Bankr. D. Del. Aug. 16, 2023) (same); *In re IMV Inc.,* No. 23-10589 (KBO) (Bankr. D. Del. June 2, 2023) (same); *In re Tervita Corp.*, No. 16-12920 (MEW) (Bankr. S.D.N.Y. Dec. 2, 2016) (same); *In re Essar Steel Algoma*, No. 14-11730 (KJC)

(Bankr. D. Del. Jul. 21, 2014) (same); *In re Mega Brands Inc.*, No. 10-10485 (CSS) (Bankr. D. Del. Mar. 23, 2010) (same).

### D.    The CCAA Proceedings are Foreign Main Proceedings

50. 39. The CCAA Proceedings should be recognized as "foreign main proceedings" as defined in section 1502(4) of the Bankruptcy Code.  A foreign proceeding must be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of its main interests. 11 U.S.C. § 1517(b).  The term "center of main interests" ("COMI") is not defined in the Bankruptcy Code.  COMI, however, has been equated to a debtor's principal place of business.  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (S.D.N.Y. 2008).

51. 40. While section 1516 of the Bankruptcy Code creates a presumption that a debtor's registered office (place of incorporation) is its COMI, that presumption may be rebutted by contrary evidence.  *See In re Tri-Continental Exch.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006); § 1516(c).  Section 1516(c) "creates no more than a rebuttable evidentiary presumption, which may be rebutted notwithstanding a lack of party opposition."  *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 335 (S.D.N.Y. 2008). Each of the Debtors that is incorporated in Canada (the "Canadian Debtors") has its COMI in Canada because it is incorporated in Canada.  Notwithstanding that the remaining Debtors are incorporated in the United States (the "U.S. Debtors"), the facts set forth herein and in the Amended Benson Declaration rebut the presumption of COMI in the United States.  *See* Amended Benson Declaration ¶¶ 60-63 62-66.

52. 41. Courts consider a variety of factors when assessing COMI including, "the location of the debtor's headquarters; the location of those who actually manage the debtor […]

the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *In re Modern Land (China) Co.*, 641 B.R at 782 (Bankr. S.D.N.Y. 2022) (quoting *In re SphinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)). In *Modern Land*, the court noted that "consideration of these specific factors is neither required nor dispositive." *Id.* Further, in *SphinX*, the court explained that these factors should not be applied "mechanically" and "[i]nstead, they should be viewed in light of Chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value." *SphinX, Ltd.*, 351 B.R. at 117. Here, under all the relevant criteria, Canada is the Debtors' COMI.

### E. The COMI of Each of the Debtors is Canada

#### i. Location of the Debtors' Headquarters

53. 42. Although the U.S. Debtors are incorporated under the laws of various U.S. states, they are all centrally managed from the Pride Group's global headquarters located at 1450 Meyerside Dr. Suite 401, Mississauga, Ontario, Canada.[48] *See* Amended Benson Declaration ¶ 6062. Additionally, all of the Debtors incorporated in the United States are ultimately directly or indirectly owned by 2692293 Ontario Ltd., a Canadian Debtor that is personally owned by Sulakhan Johal and his brother Jasvir Johal, who exclusively reside in, and manage the Pride Group's operations from, Ontario, Canada. *See Id*.

54. Accordingly, the facts of this case support the conclusion that all of the Debtors' headquarters are located in Canada.

---

[48] While the Debtors maintain an office in Dallas, Texas that serves as the Pride Group's U.S. head office, all management decisions as a whole are made from the Pride Group's global headquarters in Ontario, Canada, and all of the most senior executives of the Pride Group live and work in Ontario, Canada.

#### ii.    Location of Those Who Actually Manage the Debtors

55.    43.  For each of the U.S Debtors other than the Arnold Entities, Sulakhan Johal, and his brother, Jasvir Johal and/or his son, Navraj Johal, are the only members of the board of directors, and each of them lives and works in Ontario, Canada.  *See* *id*Id. ¶ 62.  And, since the Pride Group's founding in 2010, all of the Debtors have physically held board meetings (or otherwise conducted board business) in Ontario, Canada.  *See* *Id*.  Additionally: (i) all of the Debtors' strategic and key operating and policy decisions are made by, or are subject to approval from, the Debtors' senior management team located in Ontario, Canada;[59] (ii) substantially all key human resources decisions pertaining to payroll and employees are made by the Debtors' senior management located in Ontario, Canada; (iii) substantially all of the Debtors' key accounting decisions and all plans, budgets and financial projections are made by the Debtors' senior management located in Ontario, Canada; (iv) all of the Debtors' operations as a whole are overseen by, and report to, the senior management team (including Sulakhan Johal and members of his family) at the Debtors' global headquarters in Ontario, Canada; (v) substantially all of the Debtors' planning, budgeting, management of taxes, cash management and preparation of financial projections is done from Ontario, Canada; (vi) substantially all material and/or long-term contracts and expenses are subject to the approval of the Debtors' senior management located in Ontario, Canada; (vii) substantially all marketing and business development initiatives are overseen from Ontario, Canada; and (viii) substantially all corporate governance and regulatory compliance for the Debtors is overseen from itstheir management team located in

---

[59]    While there are a few members of the management team that live and work in the United States, all management decisions as a whole are made from the Pride Group's headquarters in Ontario, Canada, and all of the most senior executives of the Pride Group live and work in Ontario, Canada.

Ontario, Canada. *See Id*. Accordingly, the facts support a finding that those who actually manage the Debtors are located in Canada.

### iii. Location of the Debtors' Primary Assets

56. ~~44.~~ The primary assets of the Debtors as a whole, including ~~its~~their accounts receivables, office headquarters, other real estate, and trucks, are located in Canada. *See ~~id~~Id*. at ¶ ~~60~~63. While the Debtors maintain certain real estate held by various real estate holding companies (comprised of, among other things truck stops, parking lots, and dealerships) and certain trucks in the United States, those assets are part of the overall operations of the Pride Group, which is headquartered in, and managed from, Canada. *See Id*. Further, all of the directors of the U.S. Debtors are located in Canada, which means that all decisions with respect to the property of those Debtors are made in Canada (for example, as set forth in the Frontage Sale Motion, Sulakhan Johal executed the sale agreement to sell property owned by U.S. Debtor Frontage Road Holding Corp., and the sale was negotiated by a Pride Group executive located in Canada). *See Id*. Accordingly, the Debtors' primary assets are located in Canada.

### iv. Location of a Majority of the Debtors' Creditors

57. ~~45.~~ The majority of the Debtors' creditors affected by the CCAA Proceedings are located in, or have connections to, Canada. *See ~~id~~Id*. at ¶ ~~62~~64. The advisors engaged by those creditors in connection with the CCAA Proceedings are also primarily located in Canada. *See Id*. For example, the lenders under the Syndicated Facility are all Canadian banks or subsidiaries of Canadian banks, and more than 50% (by value) of the Debtors' creditors are located in Canada. *See Id*. Further, the mortgagees on each of the Debtors' U.S. real estate holding companies that are subject to mortgages are Canadian banks or subsidiaries or affiliates of

Canadian banks.  *See Id*.  Accordingly, a majority of affected creditors and their advisors are located in Canada.

### v.    Jurisdiction Whose Law Would Apply to Most Disputes

58.    46. While some of the Debtors' credit facilities are governed under U.S. law, the majority of them are governed by Canadian law, including the Syndicated Facility which is the largest credit facility on which the Debtors are obligated.  *See idId*. at ¶ 6365.  Additionally, the CCAA Proceedings were initiated in Ontario, Canada, and are being prosecuted there, and the Canadian Court is overseeing the CCAA Proceedings.  Therefore, many, if not most, disputes with the Debtors would have a nexus to Canada and will therefore be subject to Canadian law. *See Id*.

59.    47. Consequently, there are no facts to rebut the presumption that the Canadian Debtors' COMI is in Canada, and the facts set forth herein and in the Amended Benson Declaration provide sufficient contrary evidence to rebut the presumption that the U.S. Debtors' COMI is in the United States.

### F.    The Ascertainability of the Debtors' COMI in Canada

60.    48. Certain other factors also support a finding that the Debtors' COMI is located in Canada.  For instance, the outward appearance of the Debtors' COMI is an important consideration.  All of the Debtors' activities in the Debtors' global headquarters in Ontario, Canada, particularly during the negotiations with their various lenders and other restructuring activities, were conducted and ascertainable as being in Canada.  Accordingly, Canada would be reasonably ascertainable by the Debtors' creditors and other stakeholders as the Debtors' COMI.

61.    49. This Court has routinely found that the COMI presumption should be rebutted for U.S. incorporated companies with pending CCAA proceedings that are part of a larger,

centrally managed Canadian enterprise. *See, e.g., In re SimEx Inc*., No 24-10083 (TMH) (D.I. 39) (Bankr. D. Del. Feb. 20, 2024) (holding that the debtors' pending CCAA proceedings are "foreign main proceedings" because debtors' COMI, including for the U.S.-incorporated debtors, is in Canada); *In re Nexii Building Solutions Inc*., No. 24-10026 (JKS) (D.I. 44) (Bankr. D. Del. Feb. 9, 2024) (same); *In re Lighthouse Immersive Inc*., No. 23-11021 (LSS) (D.I. 20) (Bankr. D. Del. Aug. 28, 2023) (same); *In re Nextpoint Financial Inc*., No. 23-10983 (TMH) (D.I. 54) (Bankr. D. Del. Aug. 16, 2023) (same); *In re IMV Inc.,* No. 23-10589 (KBO) (D.I. 29) (Bankr. D. Del. June 2, 2023) (same).[610]

62.    ~~50.~~ Based on all of these facts, each of the Debtors has substantially more ties to Canada than to any other country.  Therefore, each of the Debtors' COMI is Canada and, as such, the CCAA Proceedings should be recognized as foreign main proceedings.

### G.    In the Alternative, Each of the CCAA Proceedings is a "Foreign Nonmain Proceeding"

63.    ~~51.~~ In the event that any of the CCAA Proceedings are held to not be a "foreign main proceeding," this Court should, in the alternative, recognize such CCAA Proceeding as a "foreign nonmain proceeding" as defined in section 1502(5) of the Bankruptcy Code.  11 U.S.C. § 1502(5).   Under Section 1517(b) of the Bankruptcy Code, a foreign proceeding shall be

---

[610] In a recent case where this Court ruled that the COMI presumption was not rebutted for U.S. incorporated companies with pending CCAA proceedings, the Court reasoned that the U.S. entities were independent operations that were acquired and merely held by a Canadian holding company. *See In re Black Press Ltd*., No. 24-10044 (MFW) (Bankr. D. Del. Feb. 14, 2024) [D.I. 73] (holding that the debtors' U.S.-incorporated subsidiaries have their COMI in the United States because they were independent local newspaper each with its own publisher that made key management decisions).  This case is easily distinguishable.  None of the U.S. Debtors operate independently.  Instead, each of the U.S. Debtors is managed directly by Sulakhan Johal and his management team (including members of his family), almost all of whom live and work in Ontario, Canada.  As described in greater detail in the ~~Johal~~Amended Benson Declaration, many of the Debtors' business lines are comprised of both a Canadian company and a U.S. counterpart, and each business line is managed centrally from Ontario, Canada.  For instance, on the main website of the Pride Group,  it is clear that the Pride Group maintains both a Canadian headquarters in Ontario, Canada (which is listed first), and a U.S. headquarters in Dallas, Texas, but that the entire enterprise is managed as a single operation with a single management team.

recognized as a foreign nonmain proceeding if it is pending in a country where the debtor has an "establishment". *See* 11 U.S.C. § 1517(b)(2). Section 1502 of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity." *See* 11 U.S.C. § 1502(2). The "establishment" requirement is satisfied by conducting business locally. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 126-27 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).

64.    52. All of the Debtors, including each of the U.S. Debtors, conduct pertinent economic activity locally (in Canada). As noted above, all of the Debtors, including each of the U.S. Debtors, are centrally managed from the Pride Group's global headquarters in Mississauga, Ontario, Canada, and all senior management decisions are made, and board meetings are held there. In addition, all of the Debtors, including each of the U.S. Debtors, continue to conduct substantial restructuring activities in Canada including negotiating with Canadian lenders and prosecuting the CCAA Proceedings, all of which affect creditors located in, or that have connections to, Canada. Accordingly, to the extent that this Court finds that the CCAA Proceedings are not "foreign main proceedings," the Court should find that the Debtors have an "establishment" in Canada under section 1502(2) of the Bankruptcy Code and recognize the CCAA Proceedings as "foreign nonmain proceedings" as defined in section 1502(5) of the Bankruptcy Code.

**H.    The Chapter 15 Cases Have Been Commenced by a Duly Authorized Foreign Representative**

65.    53. Section 1517 of the Bankruptcy Code provides that a "foreign representative" shall apply for recognition of the foreign proceeding. Section 101(24) of the Bankruptcy Code defines "foreign representative":

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding. 11 U.S.C. § 101(24).

66.    ~~54.~~ Pursuant to the Initial Order and the A&R Initial Order, the Court authorized the appointment of Randall Benson as the Foreign Representative, authorized and empowered him to act as the foreign representative in respect of the CCAA Proceedings, and authorized him to file these Chapter 15 Cases in the United States for the purpose of having the CCAA Proceedings recognized, and the Initial Order, A&R Initial Order, and other orders of the Canadian Court ~~recognized and~~ enforced in the United States. *See* Initial Order, ¶¶ 56-57, A&R Initial Order ¶¶ 70-71.

## I.    The Petitions Satisfy the Requirements under Section 1515 of the Bankruptcy Code

67.    ~~55.~~ These Chapter 15 Cases were duly and properly commenced by filing the Petitions, accompanied by all fees, documents, and information required by the Bankruptcy Code, Bankruptcy Rules and Local Rules, including: (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtors, (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time ~~of the commencement of the Chapter~~ they commenced their chapter 15 ~~Cases~~ cases, and (iii) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all of the Debtors' foreign proceedings that are known to the Foreign Representative; and (d) a certified copy of the Initial Order.

68.    ~~56.~~ Accordingly, because each of the Petitions satisfies section 1517 of the Bankruptcy Code, the Court should recognize the CCAA Proceedings in these Chapter 15 Cases.

Moreover, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code.  Thus, these circumstances satisfy the conditions for recognition of the CCAA Proceedings under section 1517 of the Bankruptcy Code.

### J. Extension of the Automatic Stay to Certain Non-Debtor Affiliates and Certain Directors and Officers is Appropriate

69.    57. As discussed in the First Provisional Relief Motion, the Initial Order also extends the stay of proceedings and other protections provided under the CCAA to (i) the Pride Group[711] as a whole to preserve the *status quo*, given that the businesses and operations of the Debtors are heavily intertwined with that of ~~the~~their non-Debtor ~~entities~~affiliates; and (ii) certain directors and officers of the Pride Group in their capacity as personal guarantors on certain of the Pride Group's credit facilities[812]  (collectively and in such capacities, the "Personal Guarantors"), given that permitting such proceedings to continue would be distracting to management which is operating the Pride Group and pursuing the CCAA Proceedings and these Chapter 15 Cases. The Foreign Representative likewise seeks concomitant recognition and enforcement of the stay granted by the Canadian Court pursuant to the Initial Order with respect to these parties and their assets located within the United States in order to prevent creditors and other parties in interest from taking adverse actions against them during the pendency of the CCAA Proceedings and these Chapter 11 Cases.

---

[711]  As noted ~~in the Provisional Relief Motion~~above, no relief is sought with respect to the ~~Pride Group's affiliated entities that are special purpose securitization vehicles that do not engage in any business or activity other than acting as purchasers of securitized assets or issuers of asset backed obligations under various securitization agreements.  These entities are not applicants in the CCAA Proceedings and are not Debtors in these Chapter 15 Cases~~Securitization SPVs or the Arnold Entities.

[812]  Including the Pride Group's co-founders Sulakhan Johal and Jasvir Johal and Sulakhan's son Amrinder Johal.

70.    58. The Foreign Representative now seeks extension of the relief granted under the

First Provisional Relief Order on a final basis pursuant to section 1521(a)(6) of the Bankruptcy

Code. This Court has regularly entered recognition orders enforcing the scope of stay granted

under CCAA proceedings, including extensions of the stay as to non-debtor affiliates and

directors and officers. *See, e.g., In re SimEx Inc*., No. 24-10083 (TMH) (D.I. 39) (Bankr. D. Del.

Feb. 20, 2024) (Canadian stay extended to directors and officers, which was given full force and

effect by the U.S. bankruptcy court); *In re Black Press Ltd*., No. 24-10044 (MFW) (D.I. 73)

(Bankr. D. Del. Feb. 14, 2024) (Canadian stay extended to four non-debtor affiliate entities and

debtors' directors and officers, which was given full force and effect by the U.S. bankruptcy

court); *In re Nexii Building Solutions Inc*., No. 24-10026 (JKS) (D.I. 44) (Bankr. D. Del. Feb. 9,

2024) (same); *In re Lighthouse Immersive Inc*., No. 23-11021 (LSS) (D.I. 20) (Bankr. D. Del.

Aug. 28, 2023) (Canadian stay extended to directors and officers, which was given full force and

effect by the U.S. bankruptcy court); *In re Nextpoint Financial Inc*., No. 23-10983 (TMH) (D.I.

54) (Bankr. D. Del. Aug. 16, 2023) (same); *In re IMV Inc*., No. 23-10589 (KBO) (D.I. 29)

(Bankr. D. Del. June 2, 2023) (same).

71.    59. Here, absent the requested relief, creditors, litigants, and other parties in interest

could enforce their claims against the assets of the non-Debtor affiliates in the United States,

causing irreparable harm to the Debtors and potentially derailing the orderly process under the

CCAA Proceedings. Indeed, certain lenders have already initiated litigation proceedings against

Debtor entities and non-Debtor affiliates in the United States seeking to litigate breach of

contract claims and the appointment of a receiver with respect to their collateral, and

enforcement of existing settlement agreements. The Debtors have also been made aware that at

least one lender has delivered notices to truck lessees instructing them to make payment on their

lease (which serves as collateral for the lender's loans) to the lender instead of to the applicable non-Debtor Pride Group entity.

72.    60. Similarly, irreparable harm could result to the Debtors if parties in interest were to enforce their claims against the Personal Guarantors. The Personal Guarantors are intimately involved in the management and operations of the Pride Group, and distraction from their duties at this pivotal time could result in business disruption and further decline, leading to worsened outcomes for all stakeholders.[9][13]

73.    61. Accordingly, the Foreign Representative submits that recognition and enforcement of the Initial Order, including extending the stay of proceedings as to the non-Debtor affiliates and the Personal Guarantors is appropriate and in the best interest of the Debtors, their creditors, and other parties in interest.

**K.    Granting the Injunction is Necessary to Enforce the Initial Order and A&R Initial Order**

74.    62. To the extent not otherwise stayed under sections 1520 and 362 of the Bankruptcy Code, the Foreign Representative also seeks the Injunction to prevent any parties from attempting to continue or commence actions or assert claims in the United States against the Pride Group or its, the Personal Guarantors, or their property inconsistent with the Initial Order and A&R Initial Order. The Injunction requested herein is necessary to ensure that no party may take actions adverse to the Pride Group, the Personal Guarantors, or any of their property located within the territorial jurisdiction of the United States in an effort to gain an unfair advantage over other parties in interest subject to the CCAA Proceedings.

---

[9][13] Indeed, one lender has already filed litigation against two of the Personal Guarantors in federal court in the District of Connecticut and Southern District of New York seeking to enforce certain personal guarantees.

75. ~~63.~~ This Court has the authority to grant the Injunction in these Chapter 15 Cases. *See, e.g., Canada S. Ry. Co. v. Gebhard, 109 U.S. 527, 539 (1883)*, 109 U.S. 527, 539 (actions brought in the United States by bondholders who did not participate in the Canadian insolvency proceedings of a Canadian railroad could not be maintained, even though the bonds were payable in New York); *In re Metcalfe & Mansfield*, 421 B.R. at 700 (granting permanent injunctive relief in chapter 15 case in respect of Canadian plan); *In re Lehman Bros. Int'l (Europe) (in administration)*, No. 18-11470 (SCC) (Bankr. S.D.N.Y. 2018) (D.I. 15) (permanently enjoining any action inconsistent with UK scheme, including scheme releases); *In re Bibby Offshore Servs. Plc*, No. 17-13588 (MG) (Bankr. S.D.N.Y. 2018) (D.I. 16) (same); *In re YH Ltd.*, No. 16-12262 (SCC) (Bankr. S.D.N.Y. 2016) (D.I. 14) (same).

76. ~~64.~~ The standards, procedures, and limitations applicable to an injunction apply to relief sought under section 1521(a) of the Bankruptcy Code. *See* 11 U.S.C. § 1521(e). Generally, to obtain a permanent injunction, a movant must demonstrate the likelihood of irreparable harm. *See Clarkson v. Coughlin*, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995). Irreparable harm in the chapter 15 context may exist if there is a risk of disruption to the orderly and fair distribution of assets through dissenting creditor actions to the detriment of other creditors. *See, e.g., In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum.") (*quoting* Collier on Bankruptcy ¶ 304.05 (15th ed. Rev. 2003)); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors").

77.    ~~65.~~ The risk of irreparable harm exists here because disgruntled creditors and other parties in interest may seek judgments or take enforcement actions in the United States against the Pride Group, the Personal Guarantors, and their property located in the United States in an effort to circumvent the orderly administration of the Debtors' estates pursuant to the CCAA Proceedings.  As stated above, some of the Pride Group's credit facilities are governed by U.S. law, and are secured by collateral in the United States, and the Pride Group maintains assets in the United States such as real property, trucks, and equipment.  Further, certain of the Pride Group's credit facilities are personally guaranteed by the Personal Guarantors.  Accordingly, there is a risk that parties could file suit or take enforcement actions against the Pride Group, the Personal Guarantors, and ~~its~~ their assets in the United States, as some lenders have already done.

78.    ~~66.~~ Absent permanent injunctive relief, the Debtors' efforts to reorganize through the CCAA Proceedings could be thwarted by the actions of disgruntled creditors or other parties in interest, a result that is inconsistent with the Bankruptcy Code.  The interests of affected parties under the CCAA Proceedings are sufficiently protected under section 1522(a) of the Bankruptcy Code because all similarly situated parties will be treated equally and fairly during the pendency of the CCAA Proceedings.  The Injunction also will not cause undue hardship or prejudice to the rights of any U.S.-based creditors or other parties in interest and is consistent with principles of comity.  Accordingly, the Injunction should be granted.

**L.    Approval of the Charges as Set Forth in the A&R Initial Order is Appropriate**

79.    Upon recognition of a foreign proceeding, Bankruptcy Code section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors."  Such relief may include "granting any additional

relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) of the Bankruptcy Code." 11 U.S.C. § 1521(a)(7). The Court may grant relief under section 1521(a) of the Bankruptcy Code if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

80.     Similarly, section 1507 of the Bankruptcy Code provides that, "if recognition is granted," a court "may provide additional assistance to a foreign representative under this title or under other laws of the United States." 11 U.S.C. § 1507. Finally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

81.     In connection with recognition of the CCAA Proceedings, the Foreign Representative is also seeking certain relief, including application of section 364 of the Bankruptcy Code to the Pride Entities made applicable through section 1521(a)(7) of the Bankruptcy Code with respect to the Charges to the extent and in the priorities set forth in the A&R Initial Order with respect to the Pride Entities' property in the United States.

82.     Pursuant to the Second Provisional Relief Order, the Court enforced the Charges on a provisional basis under section 1519 of the Bankruptcy Code and principles of comity with respect to the Pride Entities and their property located within the territorial jurisdiction of the United States. The Foreign Representative submits that extension on a final basis of the Second Provisional Relief Order, and grant of the Charges under section 364 of the Bankruptcy Code, is appropriate relief that may be granted upon recognition under sections 1519 and 1521 of the Bankruptcy Code. Absent such relief, the Pride Entities will not be able to access the capital necessary to continue operating to the detriment of all stakeholders given that such relief is a condition precedent to the DIP Lenders extending all advances other than the initial advance

under the DIP Facility.  For these reasons, the Foreign Representative requests that the Court, on a final basis, grant the Charges approved by the Canadian Court pursuant to the A&R Initial Order under sections 1519, 1521, and 364 of the Bankruptcy Code.

83.    The Foreign Representative acknowledges that the granting of the Charges under section 364 of the Bankruptcy Code requires that the Foreign Representative provide adequate protection to lenders under the Syndicated Facility as well as other secured creditors of the Pride Entities, given that the Charges are superiority charges that rank ahead of certain existing security interests in the property of the Pride Assets.[14]  Therefore, the Foreign Representative also seeks Court approval of certain replacement security interests in and liens on property of the Pride Entities located within the territorial jurisdiction of the United States pursuant to sections 362(d) and 364(d) of the Bankruptcy Code.  The adequate protection sought herein has been negotiated with and agreed to by the lenders under the Syndicated Facility, and the Foreign Representative submits that such adequate protection will adequately protect all other secured creditors from the diminution in the value of their collateral as a result of the grant of the Charges or the imposition or enforcement of the stay in these Chapter 15 Cases and the CCAA Proceedings (the "Diminution in Value") and is reasonable under the circumstances.

84.    Relief that is similar to the relief requested herein is often granted to debtors in domestic proceedings and, as it relates to the DIP Lenders, similar authority with respect to DIP liens and adequate protection have been granted by the bankruptcy court in this District in other chapter 15 cases. *See, e.g., In re Cinram International Inc.*, Case No. 12-11882 (Bankr. D. Del.

---

[14]    As noted above, pursuant to paragraph 61 of the A&R Initial Order, the DIP Charge and Directors' Charge are subordinate to the Leases, the Mortgages, and the Triumph Interests. Further, the Debtors also intend to request authority from the Canadian Court to subordinate the Arnold Intercompany Advances to the Leases and Mortgages.

June 26, 2012) (granting liens related to DIP financing and related adequate protection); *In re Catalyst Paper Corp.*, Case No. 12-10221 (Bankr. D. Del. March 5, 2012) (same); *In re Arctic Glacier Int'l Inc.*, Case No. 12-10605 (Bankr. D. Del. Feb. 23, 2012) (granting DIP liens and related relief); *In re Destinator Techs. Inc.*, Case No. 08-11003 (Bankr D. Del. May 20, 2008) (same).

   **M.**   **The 506(c), 552(b), and Marshaling Waivers Are Appropriate**

   85.   The Foreign Representative also seeks waivers under sections 506(c), 552(b), and the doctrine of marshaling (collectively, the "Waivers"). Section 506(c) of the Bankruptcy Code permits a debtor to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of," such property. 11 U.S.C. § 506(c). Section 506(c) claims are available to, and are an asset of, the Debtors, not any other creditor or party in interest. *See In re Smart World Techs., LLC*, 423 F.3d 166, 181-82 (2d Cir. 2005) ("Section 506(c) . . . allows only the 'trustee,' or debtor-in-possession, to take advantage of this exception. . . . § 1109(b) does not entitle parties in interest, such as [the debtor]'s creditors, to usurp the debtor-in-possession's role as legal representative of the estate."). Similarly, courts also approve waivers of the "equities of the case" exception under section 552(b) of the Bankruptcy Code where a secured lender subordinates its loans to fund operations and administrative claims. *See In re AbitibiBowater, Inc.*, Case No. 09-11296 (KJC) (Bankr. D. Del. June 4, 2009), ECF No. 463 (finding that such waivers are usually granted "in cases in which it looks like . . . the lenders are doing the right thing in terms of . . . providing for payment of administrative expenses"). Finally, marshalling waivers are often used as a negotiation tool to reach agreement with secured lenders. *See* Transcript of Hearing at 92–92, *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 23, 2014), ECF No. 270 (noting that

marshaling waivers are within the "debtor's right to negotiate or secured creditors' right to insist on").

86.     Here, the DIP Lenders are extending additional credit in the form of the DIP Facility to the Pride Entities to fund their ongoing operations and the costs of their restructuring both in the CCAA Proceedings and these Chapter 15 Cases.  As noted above, the DIP Charge (which secures the DIP Facility) is junior to both the Administration Charge and the Intercompany Advances Charge, and the DIP Agent and DIP Lenders have required the Waivers in order to extend further credit under the DIP Facility.  Thus, the Foreign Representative submits that the Waivers are reasonable in light of the circumstances.

## NOTICE

87.     67.  Notice of this Amended Verified Petition has been provided in accordance with the terms set forth in the *Motion for Entry of an Order Scheduling Hearing on Chapter 15 Petitions for Recognition and Related Relief and Specifying Form and Manner of Service of Notice* [D.I. 56].  The Foreign Representative submits that such notice is proper, and that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Foreign Representative respectfully requests the Court to enter an order, substantially in the form attached as **Exhibit A**, granting the requested relief and such other and further relief as may be just and proper.

Dated:  April ~~1~~23, 2024
      Wilmington, Delaware

                    **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

                    */s/ Derek C. Abbott*
                    Derek C. Abbott (No. ~~3367~~3376)
                    Andrew R. Remming (No. 5120)
                    Austin T. Park (No. 7247)
                    1201 North Market Street
                    P.O. Box 1347
                    Wilmington, DE 19899-1347
                    Telephone: (302) 658-9200
                    Facsimile: (302) 658-3989
                    dabbott@morrisnichols.com
                    aremming@morrisnichols.com
                    apark@morrisnichols.com

                    -and-

                    **LINKLATERS LLP**
                    Penelope J. Jensen
                    Christopher J. Hunker
                    Clark L. Xue
                    1290 Avenue of the Americas
                    New York, NY 10104
                    Telephone: (212) 903-9000
                    Facsimile: (212) 903-9100
                    penelope.jensen@linklaters.com
                    christopher.hunker@linklaters.com
                    clark.xue@linklaters.com

                    *Attorneys for the Foreign Representative*

## VERIFICATION OF PETITION

I, Randall Benson, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America, as follows:

I am the founder of RC Benson Consulting Inc, which was engaged on February 26, 2024 as the Chief Restructuring Officer of the Pride Group (the "Pride Group").  The Pride Group includes Pride Group Holdings Inc. and its affiliates that are debtors (the "Debtors") in these chapter 15 cases.  I am the duly authorized foreign representative for each of the Debtors.  As such, I have full authority to verify the foregoing Amended Verified Petition on behalf of the Debtors.

I have read the foregoing Amended Verified Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 123, 2024
        Toronto, Canada

                                */s/ Randall Benson*
                                Randall Benson

**<u>Exhibit A</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | Chapter 15 |
| Pride Group Holdings Inc., *et al.*[1] | Case No. ~~24-_____~~24-10632 (CTG) |
| Debtors in Foreign Proceedings. | ~~(Joint Administration Requested)~~Jointly Administered |

**ORDER GRANTING AMENDED VERIFIED PETITION
FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDINGS,
(II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III)
RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Upon consideration of the *Amended Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Amended Verified Petition")[2] and the *Chapter 15 Petition for Recognition of a Foreign Proceeding* for each of the Debtors (together with the Amended Verified Petition, the "Petitions"), filed by Randall Benson, solely in his capacity as the duly authorized foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors," and together with their non-Debtor affiliates, the "Pride Group")~~)~~[3]

---

[1]   The last four digits of Debtor Pride Group Holdings Inc.'s Canadian business number are 6399. Due to the large number of debtors in these chapter 15 cases, a complete list of the debtor entities and the last four digits of their unique identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing agent at https://dm.epiq11.com/pridegroup. The Debtors' service address for the purposes of these chapter 15 cases is 1450 Meyerside, Suite 401, Mississauga, Ontario, L5T 2N5, Canada.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Amended Verified Petition.

[3]   As used herein, "Pride Group" includes: (i) each of the Debtors; (ii) Pride Truck Sales L.P., TPine Leasing Capital L.P., and Sweet Home Hospitality L.P. ((i) and (ii) together, the "Pride Entities"); and (iii) Block 6 Holding Inc., 2500819 Ontario Inc., Pergola Holdings, Corp., and Pride Global Insurance Company Ltd. (the "Additional Stay Parties"). "Pride Group" does not include the following affiliated special-purpose securitization vehicles that do not engage in any business or activity other than acting as purchasers of securitized assets or issuers of asset-backed obligations under various securitization agreements: TPine USA Funding I LLC, TPine USA Funding II LLC, TPine USA Funding III LLC, TPine USA Funding IV LLC, TPine Canada Securitization L.P., and TPine Canada GP L.P. (collectively, the "Securitization SPVs"). The

in the Canadian proceedings (the "CCAA Proceedings") commenced under the Companies' Creditors Arrangement Act, pending before the Ontario Superior Court of Justice (Commercial List) in Ontario, Canada, Court File No. CV-24-00717340-00CL (the "Canadian Court"), for entry of an order (this "Order") pursuant to sections 105(a), 1504, 1507, 1509, 1515, 1517, 1520, 1521 and 1522 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"): (i) granting recognition of the CCAA Proceedings as "foreign main proceedings," pursuant to chapter 15 of the Bankruptcy Code; (ii) granting recognition of the Foreign Representative as a "foreign representative" as defined in section 101(24) of the Bankruptcy Code; (iii) recognizing, granting comity to, and giving full force and effect in the United States to the CCAA Proceedings, the ~~Initial Order~~Canadian Orders and all other orders of the Canadian Court; (iv) enjoining parties from taking any action that is otherwise inconsistent with the CCAA Order; and (v) granting such other relief as the Court deems just and proper, all as more fully set forth in the Amended Verified ~~Petitions~~Petition; and upon this Court's review and consideration of the Amended Benson Declaration, Nicholson Declaration, and all other pleadings filed by or on behalf of the Foreign Representative in support of the Petitions; and this Court having held a hearing to consider the relief requested in the Petitions (the "Recognition Hearing"); and due and proper notice of the Petitions and all pleadings in support of the Petitions having been provided and no other or further notice being necessary or required; and no objections or other responses having been filed that have not been overruled, withdrawn, or otherwise resolved; and all interested parties having had an opportunity to be heard at the Recognition Hearing; and after

---

Securitization SPVs are not applicants in the CCAA Proceedings, are not Debtors in these Chapter 15 Cases, and no relief is sought with respect to these entities.  Further, as noted in the Amended Verified Petition, the Foreign Representative also is not seeking relief with respect to the Arnold Entities.  As a result, the Pride Group also does not include the Arnold Entities.

due deliberation and sufficient cause appearing therefor, **THIS COURT HEREBY FINDS AND DETERMINES THAT:**

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.

C.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

D.      Venue is proper in this district pursuant to 28 U.S.C. § 1410.

E.      The Debtors have their domicile, principal place of business, and/or property in the United States, and the Debtors are each eligible to be a debtor in a chapter 15 case pursuant to, as applicable, sections 109 and 1501 of the Bankruptcy Code.

F.      These cases were properly commenced pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code.

G.      The CCAA Proceedings are "foreign proceedings" within the meaning of section 101(23) of the Bankruptcy Code.

H.      The CCAA Proceedings are pending in Canada, which is the country in which each of the Debtors have its center of main interests and, as such, the CCAA Proceedings are "foreign main proceedings" within the meaning of sections 1502(4) and 1517(b)(1) of the

Bankruptcy Code and are entitled to recognition as foreign main proceedings in respect of each of the Debtors.

I.      The Foreign Representative is a "person," as such term is defined in section 101(41) of the Bankruptcy Code, and has been duly appointed by the Canadian Court as authorized to act as the "foreign representative" with respect to the CCAA Proceedings within the meaning of section 101(24) of the Bankruptcy Code.

J.      The Petitions satisfy all of the requirements set forth in section 1515 of the Bankruptcy Code and Bankruptcy Rules 1007(a)(4) and 2002(q).

K.      The CCAA Proceedings are entitled to recognition by the Court pursuant to section 1517(a) of the Bankruptcy Code.

L.      The Debtors and the Foreign Representative are entitled to all of the relief set forth in sections 1507, 1519, 1520 and 1521 of the Bankruptcy Code.

M.      Appropriate notice of the filing of, and the Recognition Hearing on, the Petitions and the pleadings in support of the Petitions was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

N.      The relief granted hereby is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 362, 363, 364, 365, 1507(a), 1509(b)(2)-(3), 1520, 1521, 1522 and 1525 of the Bankruptcy Code, and will not cause hardship to creditors of the Debtors or other parties in interest that is not outweighed by the benefits of granting that relief.

O.      The Foreign Representative has demonstrated that the borrowings under the DIP Facility as authorized by the A&R Initial Order and as approved on a provisional basis pursuant to the Second Provisional Relief Order with respect to the Pride Entities' assets, undertakings,

and properties located within the territorial jurisdiction of the United States are necessary to preserve the value of the Debtors' business.

P.    The agent under the Syndicated Facility (the "Prepetition Syndicated Agent"), for itself and for the benefit of the lenders under the Syndicated Facility (the "Prepetition Syndicated Lenders"), and certain other secured creditors who hold valid, enforceable, properly perfected secured loans as of the date of the Initial Order (collectively, the "Adequate Protection Parties"), are entitled to adequate protection of their interests in the collateral securing their indebtedness pursuant to sections 362(d) and 364(d) of the Bankruptcy Code (the "Adequate Protection") arising from (i) the priming of their existing and validly perfected liens and security interests as a result of the grant of the Charges (the "Priming"): and (ii) Diminution in Value as a result of the imposition or enforcement of the stay in these Chapter 15 Cases or the CCAA Proceedings. Accordingly, the Debtors have agreed in their reasonable business judgment to provide the Adequate Protection as set forth in this Order, which terms and conditions are fair and reasonable.

Q.    O. The relief granted hereby is necessary to effectuate the purposes and objectives of chapter 15 and to protect the Debtors and the interests of their creditors and other parties in interest.

R.    P. Each of the injunctions contained in this Order (i) is within the Court's jurisdiction, (ii) is essential to the success of the CCAA Proceedings, (iii) confers material benefits on, and is in the best interests of, the Debtors, their creditors, and their parties in interest, and other stakeholders, (iv) is critical and integral to the overall objectives of the restructuring, and (v) meets the legal and factual requirements for issuing an injunction.

S.    Q. The relief granted hereby is necessary to effectuate the purposes and objectives of chapter 15 and to protect the Debtors and the interests of its their creditors and other parties in interest (and the Debtors' assets located within the United States), is in the interest of the public and international comity, consistent with the public policy of the United States, and will not cause any hardship to any party in interest that is not outweighed by the benefits of the relief granted.  Absent the requested relief, the efforts of the Debtors, the Canadian Court and the Foreign Representative in conducting the CCAA Proceedings may be frustrated by the actions of individual creditors, a result contrary to the purposes of chapter 15 of the Bankruptcy Code.

T.    R. All creditors and other parties in interest, including the Debtors, are sufficiently protected by the grant of relief ordered hereby in accordance with section 1522(a) of the Bankruptcy Code.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    The Petitions are granted as set forth herein, and any objections thereto are overruled with prejudice.

2.    The CCAA Proceedings are granted recognition with respect to each of the Debtors (other than the Arnold Entities) as foreign main proceedings (as defined in section 1502(4) of the Bankruptcy Code) pursuant to sections 1517(a) and (b)(1) of the Bankruptcy Code.

3.    The Foreign Representative is a duly appointed and authorized "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the CCAA Proceedings, is authorized to act on behalf of the Debtors in these chapter 15 cases and together are is established as the exclusive representatives representative of the Debtors in the United States.

4.      The Foreign Representative is entrusted with the administration of any and all of the Debtors' assets within the territorial jurisdiction of the United States, including prosecution of any causes of action belonging to the Debtors.

5.      The Debtors and the Foreign Representative are granted all of the relief set forth in section 1520 of the Bankruptcy Code including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Pride Group and its property that is now within or in the future is located within the territorial jurisdiction of the United States.

6.      Pursuant to section 152(a)(1)-(3) of the Bankruptcy Code, all persons and entities, other than the Foreign Representative and their representatives and agents, are hereby enjoined (to the extent they have not been stayed under section 1520(a), in each case from:

   a.   executing against the assets of the Pride Group or the Personal Guarantors;

   b.   commencing or continuing, including the issuance or employment of process, any judicial, quasi-judicial, administrative, regulatory, arbitral, or other action or proceeding, or to recover a claim, including, without limitation, any and all unpaid judgments, settlements or otherwise against the Pride Group or the Personal Guarantors, which in either case is in any way related to, or would interfere with, the administration of the Debtors' estates in the CCAA Proceedings;

   c.   taking or continuing any act to create, perfect or enforce a lien or other security interest, setoff or other claim against the Pride Group, the Personal Guarantors or any of their property or proceeds thereof;

   d.   transferring, relinquishing or disposing of any property of the Pride Group or the Personal Guarantors to any person or entity (as that term is defined in section 101(15) of the Bankruptcy Code) other than the Foreign Representative;

   e.   commencing or continuing an individual action or proceeding concerning the assets, rights, obligations or liabilities of the Pride Group or the Personal Guarantors; and

   f.   declaring or considering the filing of the CCAA Proceedings or these chapter 15 cases a default or event of default under any agreement, contract or arrangement.

*provided*, in each case, that such injunctions shall be effective solely within the territorial jurisdiction of the United States; *provided further* that nothing herein shall: (i) prevent any entity from filing any claims against the Debtors in the CCAA Proceedings or (ii) prevent any entity from seeking relief from the Canadian Court in the CCAA Proceedings or this Court in these Chapter 15 Cases, as applicable, for relief from the injunctions contained in the Order.

7.      Pursuant to section 1521(a)(6) of the Bankruptcy Code, all prior relief granted by this Court pursuant to the First Provisional Relief Order and Second Provisional Relief Order shall be extended and shall remain in full force and effect on a final basis:, including a permanent injunction enjoining all parties from commencing or continuing any action or proceeding in the United States against the Pride Group, the Personal Guarantors, or any of their assets located within the territorial jurisdiction of the United States that is inconsistent with the Initial Order.; *provided, however,* that notwithstanding the foregoing or any stay provided in this Order, the First Provisional Relief Order or the Second Provisional Relief Order, the DIP Agent may, in its discretion, file or record this Order, the Second Provisional Relief Order, the A&R Initial Order, or any other order of this Court or any financing statement, mortgage, or other instrument or document in any office or jurisdiction to evidence any liens securing the DIP Facility.

8.      The Initial OrderCanadian Orders, including any and all existing and future extensions, amendments, restatements, and/or supplements authorized by the Canadian Court, are hereby given full force and effect, on a final basis, with respect to (as applicable) the Pride Group, the Personal Guarantors, and their property that now or in the future is located within the territorial jurisdiction of the United States, including, without limitation, the provisions of the Initial Order and other orders of the Canadian CourtOrders (i) staying the commencement or continuation of any actions against the Pride Group, the Personal Guarantors, and their property,

(ii) granting the Administration Charge located within the territorial jurisdiction of the United States; (ii) authorizing and empowering the Pride Entities to obtain credit under the DIP Facility pursuant to the terms of the DIP Term Sheet and DIP Documentation (as defined in the Second Provisional Relief Order) and the Directors' and Officers' Charge (as defined in the Provisional Relief Order), and (iii); (iii) granting the Charges over the assets, undertakings, and properties of the Pride Entities located within the territorial jurisdiction of the United States to the extent and in the priority as set forth in the A&R Initial Order; (iv) authorizing the Debtors Pride Entities to disclaim certain leases and other contractual agreements; and (v) approving the Governance Protocol, Real Estate Monetization Plan, and Intercompany and Unsecured Claims Preservation Protocol (each as may be further amended or supplemented by order of the Canadian Court).

9.     The Adequate Protection Parties are entitled to receive Adequate Protection of their interests in their applicable collateral under their respective credit or other agreements (the "Adequate Protection Party Agreements") on a dollar-for-dollar basis from any Diminution in Value resulting from the Priming and the imposition or enforcement of the stay in these Chapter 15 Cases or the CCAA proceedings.  Accordingly, the Adequate Protection Parties are hereby granted valid, binding, enforceable and perfected liens as of the date of the Initial Order in all applicable collateral under their respective Adequate Protection Party Agreements located within the territorial jurisdiction of the United States to secure an amount of their indebtedness equal to any Diminution in Value, which liens shall be immediately junior to the Charges identified in the A&R Initial Order and attach to the applicable collateral under their respective Adequate Protection Party Agreements located within the territorial jurisdiction of the United States to the same extent and priority as existed immediately prior to the date of the Initial Order.

10.     No action, inaction, or acquiescence by the DIP Agent or the DIP Lenders, or the Prepetition Syndicated Agent or the Prepetition Syndicated Lenders, including, without limitation, funding the Pride Entities' ongoing operations under the Second Provisional Relief Order or this Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Agent or the DIP Lenders or the Prepetition Syndicated Agent or the Prepetition Syndicated Lenders to a charge against the collateral pursuant to sections 506(c), 552(b), or 105(a) of the Bankruptcy Code.  None of the DIP Agent,  the DIP Lenders, the Prepetition Syndicated Agent or the Prepetition Syndicated Lenders shall be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to their collateral.

11.     No person or entity shall be entitled, directly or indirectly, whether by operation of sections 506(c), 552(b), or 105 of the Bankruptcy Code or otherwise, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of any collateral or property by the DIP Agent, the DIP Lenders, the Prepetition Syndicated Agent or the Prepetition Syndicated Lenders after a breach under the DIP Facility, the DIP Documentation, the A&R Initial Order, or the Second Provisional Relief Order or this Order, and in no event shall the "equities of the case" exception of section 552(b) of the Bankruptcy Code apply to the secured claims of the DIP Agent, the DIP Lenders, the Prepetition Syndicated Agent or the Prepetition Syndicated Lenders.

12.     Any advances made to the DIP Borrowers by the DIP Lenders pursuant to this Order, the A&R Initial Order, the DIP Term Sheet or the DIP Documentation shall, pursuant to sections 1507, 1519, 1521 and 105(a) of the Bankruptcy Code, be deemed to have been made by the DIP Lenders in good faith.  Notwithstanding (a) any stay, modification, amendment,

supplement, vacatur, revocation or reversal of this Order, the Second Provisional Relief Order, the DIP Term Sheet, the DIP Documentation or any term hereunder or thereunder, or (b) the dismissal of one or more of the Chapter 15 Cases or the commencement of a case by any of the Debtors under another chapter of the Bankruptcy Code or the conversion of a case of any of the Debtors from a case under one chapter of the Bankruptcy Code to a case under another chapter of the Bankruptcy Code (each, a "Subject Event"), (x) the acts taken by the DIP Agent and the DIP Lenders in accordance with this Order, and (y) the indebtedness incurred or arising prior to the DIP Agent's and the DIP Lenders' actual receipt of written notice from Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Order, and the acts taken by the DIP Agent and the DIP Lenders in accordance with this Order, and the liens granted to the DIP Agent for the benefit of the DIP Lenders, and all other rights, remedies, privileges, and benefits in favor of the DIP Agent and the DIP Lenders pursuant to this Order and the DIP Term Sheet and the DIP Loan Documents shall remain valid and in full force and effect to the extent provided in to section 364(e) of the Bankruptcy Code.  For purposes of this Order, the term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Order by this Court or any other tribunal.

13.    Any obligations secured by a valid, enforceable, and perfected security interest upon or in respect of the property of the Pride Entities pursuant to a security agreement which includes as collateral thereunder any property acquired after the date of the applicable security agreement ("After-Acquired Property"), shall continue to be secured by the applicable property (including After Acquired Property that may be acquired by the applicable Pride Entity after the commencement of these proceedings) notwithstanding the commencement of these proceedings

and notwithstanding anything set forth in section 552(a) of the Bankruptcy Code to the contrary, with the same priority, rights, and collateral as existed as of the date of the Initial Order, but subject to the senior liens, charges, and priorities granted by the A&R Initial Order, including but not limited to the Charges; provided that subject only to and effective upon entry of this Order, each prepetition secured creditor shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.

14.    Notwithstanding anything in this Order to the contrary, this Order shall not grant any relief to any of the Arnold Entities, including, without limitation, with respect to recognition of the CCAA Proceedings or enforcement of the Canadian Orders.

15.    9. The Foreign Representative, the Debtors and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

16.    10. No action taken by the Foreign Representative, the Debtors, or their respective successors, agents, representatives, advisors, or counsel in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the CCAA Proceedings, this order, these chapter 15 cases, or any further proceeding commenced hereunder, shall be deemed to constitute a waiver of the rights or benefits afforded such persons under sections 306 and 1510 of the Bankruptcy Code.

17.    11. Notwithstanding any provision in the Bankruptcy Rules to the contrary, including, but not limited to, Bankruptcy Rules 7062 and 1018, (i) this Order shall be effective immediately and enforceable upon its entry; (ii) the Foreign Representative is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (iii) the Foreign Representative and the Debtors are authorized and empowered, and may in their

discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

18.    ~~12.~~ A copy of this Order shall be served in accordance with *Order ~~(A)~~ Scheduling Hearing on Recognition of Chapter 15 Petitions for Recognition and Related Relief and ~~(B)~~ Specifying Form and Manner of Service of Notice* [D.I. 56].  Such service shall be good and sufficient service and adequate notice for all purposes.

19.    ~~13.~~ The Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any request for additional relief and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of the Court.

20.    ~~14.~~ This Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

Wilmington, Delaware
Dated: _____, 2024


_____

THE HONORABLE CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**List of Debtors**

**Initial Debtors**

***Canadian Operating Entities***

1.  PRIDE TRUCK SALES LTD.
2.  TPINE TRUCK RENTAL INC.
3.  PRIDE GROUP LOGISTICS LTD.
4.  PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
5.  TPINE LEASING CAPITAL CORPORATION
6.  DIXIE TRUCK PARTS INC.
7.  PRIDE FLEET SOLUTIONS INC.
8.  TPINE FINANCIAL SERVICES INC.
9.  PRIDE GROUP EV SALES LTD.

***U.S. Operating Entities***

1.  TPINE RENTAL USA, INC.
2.  PRIDE GROUP LOGISTICS USA, CO.
3.  ARNOLD TRANSPORTATION SERVICES, INC.
4.  DIXIE TRUCK PARTS INC.
5.  TPINE FINANCIAL SERVICES CORP.
6.  PARKER TRANSPORT CO.
7.  PRIDE FLEET SOLUTIONS USA INC.

***Other Canadian Holding Companies***

1.  2692293 ONTARIO LTD.
2.  2043002 ONTARIO INC.
3.  PRIDE GROUP HOLDINGS INC.
4.  2554193 ONTARIO INC.
5.  2554194 ONTARIO INC.
6.  PRIDE GROUP REAL ESTATE HOLDINGS INC.
7.  1000089137 ONTARIO INC.

***Other U.S. Holding Companies***

1.  COASTLINE HOLDINGS, CORP.
2.  PARKER GLOBAL ENTERPRISES, INC.
3.  DVP HOLDINGS, CORP.

**Additional Debtors**

***Canadian Real Estate Holding Companies***

*[Different first page link-to-previous setting changed from off in original to on in modified.].*

1. 2029909 ONTARIO INC.
2. 2076401 ONTARIO INC.
3. 1450 MEYERSIDE HOLDING INC.
4. 933 HELENA HOLDINGS INC.
5. 30530 MATSQUI ABBOTSFORD HOLDING INC.
6. 2863283 ONTARIO INC.
7. 2837229 ONTARIO INC.
8. 2108184 ALBERTA LTD.
9. 12944154 CANADA INC.
10. 13184633 CANADA INC.
11. 13761983 CANADA INC.
12. 102098416 SASKATCHEWAN LTD.
13. 177A STREET SURREY HOLDING INC.
14. 52 STREET EDMONTON HOLDING INC.
15. 84 ST SE CALGARY HOLDINGS INC.
16. 68TH STREET SASKATOON HOLDING INC.
17. 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*

1. PGED HOLDING, CORP.
2. HIGH PRAIRIE TEXAS HOLDING CORP.
3. 131 INDUSTRIAL BLVD HOLDING CORP.
4. 59TH AVE PHOENIX HOLDING CORP.
5. DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
6. FRONTAGE ROAD HOLDING CORP.
7. ALEXIS INVESTMENTS, LLC
8. TERNES DRIVE HOLDING CORP.
9. VALLEY BOULEVARD FONTANA HOLDING CORP.
10. HIGHWAY 46 MCFARLAND HOLDING CORP.
11. TERMINAL ROAD HOLDING, CORP.
12. BISHOP ROAD HOLDING CORP.
13. OLD NATIONAL HIGHWAY HOLDING CORP.
14. 11670 INTERSTATE HOLDING, CORP.
15. 401 SOUTH MERIDIAN OKC HOLDING CORP.
16. 8201 HWY 66 TULSA HOLDING CORP.
17. EASTGATE MISSOURI HOLDING CORP.
18. FRENCH CAMP HOLDING CORP.
19. 87TH AVENUE MEDLEY FL HOLDING CORP.
20. LOOP 820 FORT WORTH HOLDING CORP.
21. 162 ROUTE ROAD TROY HOLDING CORP.
22. CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
23. MANHEIM ROAD HOLDING CORP.
24. 13TH STREET POMPANO BEACH FL HOLDING CORP.
25. EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.

26. CORRINGTON MISSOURI HOLDING CORP.
27. 963 SWEETWATER HOLDING CORP.
28. OAKMONT DRIVE IN HOLDING CORP.