**<u>Exhibit A</u>**

**Second Monitor Report**

Court File No. CV-24-00717340-00CL

***ONTARIO***

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those Applicants listed on **Schedule "A"** hereto

**SECOND REPORT OF THE MONITOR**

**DATED April 24, 2024**

# TABLE OF CONTENTS

**INTRODUCTION**........................................................................................................... 1

**PURPOSE** ....................................................................................................................... 2

**TERMS OF REFERENCE** .......................................................................................... 3

**OPERATIONAL UPDATES FOR THE PRIDE GROUP** ........................................ 4

**CHAPTER 15 PROCEEDINGS**.................................................................................... 5

**THE MONITOR'S ACTIVITIES SINCE THE FIRST REPORT** ........................... 7

**REVISED GOVERNANCE PROTOCOL** .................................................................. 9

**ARNOLD GROUP**.......................................................................................................... 20

**SECURITY AND SECURITIZATION REVIEWS** ................................................... 23

**UPDATED THIRTEEN WEEK CASH FLOW FORECAST** ................................... 27

**OTHER RELEVANT MATTERS AND UPDATES**.................................................... 28

**CONCLUSIONS AND RECOMMENDATIONS**........................................................ 32

**Appendices**

| **Appendix** | **Tab** |
|---|---|

Pre-Filing Report dated March 27, 2024 (without appendices)............................A

First Report dated April 4, 2024 (without appendices).........................................B

Monitor's Counsel's E-mail message to the Service List dated April 10, 2024 .....C

Revised Governance Protocol, with explanatory footnotes ..................................D

Clean copy of Revised Governance Protocol ........................................................E

Blackline of Revised Governance Protocol ........................................................ F

Cash Flow Forecast for the 13-week period from ................................................G
April 8, 2024 to the week ending July 7, 2024

Court File No. CV-24-00717340-00CL

***ONTARIO***

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**SECOND REPORT OF THE MONITOR**

**DATED April 24, 2024**

**INTRODUCTION**

1.　On March 27, 2024, Pride Group Holdings Inc. and those entities listed as "Applicants" in **Schedule "A"** hereto (each an "**Applicant**" and, collectively, the "**Applicants**") brought an application (the "**CCAA Application**") before the Ontario Superior Court of Justice (Commercial List) (the "**Court**") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") to, among other things, obtain a stay of proceedings to allow them an opportunity to restructure their business and affairs.

2.　On the same day, the Court granted an initial order (the "**Initial Order**") in these CCAA proceedings (the "**CCAA Proceedings**") that, among other things, appointed Ernst & Young Inc. as Monitor (in such capacity, the "**Monitor**"). The Monitor filed a Pre-Filing Report dated March 27, 2024 (the "**Pre-Filing Report**") in connection with the CCAA Application, a copy of which is attached hereto (without Appendices) as **Appendix "A"**.

3.　In addition to the Applicants, the entities listed as "Limited Partnerships" and "Additional Stay Parties" in **Schedule "A"** hereto also obtained the benefit of the stay of proceedings until and including April 6, 2024, which stay expired the next business day, April 8, 2024 (the "**Stay Period**"). The Applicants together with the Limited Partnerships are referred herein as the "**Pride Entities**" (and together with the Additional Stay Parties, the "**Pride Group**").

4.      The comeback hearing was heard on Friday, April 5, 2024 (the "**Comeback Hearing**"), where the Pride Entities sought and obtained an amended and restated initial order (the "**ARIO**"), which among other things extended the Stay Period to June 30, 2024, and approved the DIP Term Sheet (as defined in the ARIO) and other relief as further described in the First Report. The Court also granted an order approving the Governance Protocol (as defined in the First Report), the Real Estate Protocol (as defined in the First Report), and the Preservation Protocol (as defined in the First Report, with such order being the "**Protocols Order**"). The Governance Protocol was approved subject to parties returning to Court on a without prejudice basis on April 19, 2024 for the approval of a revised Governance Protocol (discussed in detail below). This April 19, 2024 hearing date was adjourned to April 25, 2024 on consent, in order to give the Monitor, the Pride Group, the CRO (as defined in the ARIO) additional time to negotiate the Revised Governance Protocol (as defined below) with affected stakeholders.

5.      The Monitor filed its First Report to Court, dated April 4, 2024 (the "**First Report**") in connection with the Comeback Hearing, a copy of which is attached hereto (without Appendices) as **Appendix "B"**.

6.      This report (the "**Second Report**") should be read in conjunction with the Pre-Filing Report, the First Report, the affidavit of Sulakhan Johal sworn March 26, 2024 (the "**Johal Affidavit**"), the affidavit of Randall Benson sworn April 2, 2024, and the affidavit of Randall Benson sworn April 23, 2024 (the ("**Second Benson Affidavit**") for additional background and financial information with respect to the Pride Group.

**PURPOSE**

7.      The purpose of this Second Report is to provide information to the Court in respect of:

(a)      Operational updates for the Pride Group;

(b)      Update on the Chapter 15 Proceedings (as defined herein);

(c)      The Applicants' motion for:

(i)     The approval of a Revised Governance Protocol;

(ii)    Certain relief in respect of the Arnold Group (defined below);

(d)    The Monitor's activities since the date of the First Report, including:

(i)     The status and ongoing work on lender security reviews; and

(ii)    The status and ongoing work on securitization facility reviews;

(e)    The updated thirteen-week cash flow forecast on a consolidated basis for the Pride Entities (the "**Cash Flow Forecast**");

(f)    Other relevant updates on these CCAA Proceedings:

(i)     Status of stakeholder outreach and inbound inquiries;

(ii)    Status of the DIP Credit Agreement (defined below);

(iii)   Status of the Entitlement Protocol (defined below); and

(iv)    Status of real estate monetization efforts.

**TERMS OF REFERENCE**

8.     In preparing this Second Report and making the comments herein, the Monitor has been provided with, and has relied upon, unaudited financial information, books and records prepared by the Applicants, discussions with management of the Applicants ("**Management**"), and information from other third-party sources (collectively, the "**Information**"). Except as described in this Second Report in respect of the Cash Flow Forecast:

(a)    the Monitor has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Monitor has not audited or otherwise attempted to verify the accuracy or completeness of such Information in a manner that would wholly or partially comply with Canadian

- 4 -

Auditing Standards ("**CAS**") pursuant to the Chartered Professional Accountants Canada Handbook and, accordingly, the Monitor expresses no opinion or other form of assurance contemplated under CAS in respect of the Information; and

(b)      some of the information referred to in this Second Report consists of forecasts and projections. An examination or review of the financial forecast and projections, as outlined in the Chartered Professional Accountants Canada Handbook, has not been performed.

9.      Future-oriented financial information referred to in this Second Report was prepared based on Management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that are not ascertainable, the actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

10.     Unless otherwise indicated, the Monitor's understanding of factual matters expressed in this Second Report concerning the Pride Group, and their business is based on the Information, and not independent factual determinations made by the Monitor.

11.     Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## OPERATIONAL UPDATES FOR THE PRIDE GROUP

*Operational Updates*

12.     Since the date of the First Report (April 4, 2024), the Pride Group has maintained their existing operations without material disruptions, other than the Arnold Group (as discussed in detail below).

13.     The Pride Group continues to assess their business operations and considering restructuring options, including continuing to work with the CRO and the Monitor in developing strategies surrounding the sale of inventory and working with lenders on monetizing assets to pay down debt.

14.     The Pride Entities have also adhered to the terms under the Governance Protocol approved by the Protocols Order, as described further below.

*DIP Borrowings Update*

15.     As at the date of this Second Report, the Pride Entities have requested the first advance as allowed under the DIP Term Sheet of $6.5 million.  This advance directs the DIP Lenders (as defined in the ARIO) to use $200,000 for the payment of the commitment fee.

16.     As discussed in the Second Benson Affidavit, the DIP Agent has advised the Pride Group that the Syndicate Lenders (as defined in the First Report) require updated "know your client" disclosure for regulatory compliance, as a condition of making the requested DIP advance. The Pride Group, the Monitor and the DIP Agent are diligently working to satisfy these requirements.

**CHAPTER 15 PROCEEDINGS**

17.     On April 1, 2024, Mr. Randall Benson, acting as "**Foreign Representative**" of the Pride Group filed an application to commence ancillary recognition proceedings under Chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**"). Within the Pride Group, the "Canadian Operating Entities", "U.S. Operating Entities", "Other Canadian Holding Companies" and "Other U.S. Holding Companies", as listed in **Schedule "A"** hereto, filed as "Debtors" under the Chapter 15 Proceedings (collectively, the "**Chapter 15 Debtors**").

18.     On April 2, 2024, the Foreign Representative obtained an order from the U.S. Bankruptcy Court, amongst other things, recognizing the Initial Order on a provisional basis and granting a stay in the United States that is co-extensive with the stay granted in the CCAA Proceedings (the "**First Provisional Relief Order**").

19.     A further hearing by the U.S. Bankruptcy Court was scheduled for May 2, 2024 to address the Chapter 15 Debtors' motion requesting recognition of the CCAA Proceedings as a "foreign main proceeding" on a final basis, recognition of Randall Benson as "foreign

representative" of the Chapter 15 Debtors, enforcement of the ARIO (including the debtor-in-possession financing contemplated therein (the "**DIP Facility**"), the DIP Lenders' Charge (as defined in the ARIO) and the Intercompany Advances Charge (as defined in the ARIO)), and enforcement of the Protocols Order.

*Provisional Relief Order Hearing*

20.    On April 11, 2024, the U.S. Bankruptcy Court heard a motion (the "**April 11 Motion**") of the Foreign Representative seeking entry of an order granting provisional relief enforcing the ARIO and Protocols Order, including enforcement of the DIP Facility and certain protocols under section 1519 of the United States Bankruptcy Code (the "**Second Provisional Relief Order**"), in the Chapter 15 Proceedings.

21.    At the hearing of the April 11 Motion, Regions Bank ("**Regions**") filed a limited objection and reservation of rights, primarily objecting to the U.S. Bankruptcy Court granting relief with respect to the priority of the DIP Lenders' Charge and its attachment to certain property of TPine Leasing Capital L.P. ("**TLC**"). The basis for this objection was that TLC is an Additional Stay Party, and not an Applicant in the CCAA Proceedings nor a "debtor" in the Chapter 15 Proceedings, and therefore relief under Chapter 15 of the Bankruptcy Code was not appropriate. Triumph Business Capital ("**Triumph**") joined Regions' objection. The United States Trustee (the "**U.S. Trustee**") also raised an issue with the appropriateness of certain marshalling rights permitted by the U.S. Bankruptcy Code being granted in the Second Provisional Relief Order and noted that such relief would ordinarily be reserved for a final order.

22.    In addition to the objections of Regions, Triumph and the U.S. Trustee, PACCAR Financial Corp. ("**PFC**") and Daimler Truck Financial Services USA LLC ("**Daimler U.S.**") reserved rights with respect to the entry of the Second Provisional Relief Order to the extent that it sought approval of a "priming lien" with respect to the Intercompany Advances Charge.

23.    The interested parties were provided with time during the April 11 Motion to amend the language in the Second Provisional Relief Order to deal with the above-mentioned issues.

However, no resolution was accomplished during this time period, and the matter was put over to a hearing on April 16, 2024.

24.     At the return of the hearing for the Second Provisional Relief Order on April 16, 2024, the U.S. Bankruptcy Court was advised that the issues raised by the U.S. Trustee, Daimler U.S. and PFC had been resolved on consent. Counsel for Regions and Triumph maintained their objections. Following the hearing, the U.S. Bankruptcy Court directed the parties to make certain changes to the Second Provisional Relief Order and ultimately entered an order that enforced and gave effect to the ARIO and Protocols Order in the United States, without reference to the provisions of the U.S. Bankruptcy Code that Regions and Triumph took issue with (particularly section 364 of the U.S. Bankruptcy Code).

25.     Additionally, as part of the resolution of the Second Provisional Relief Order, (a) the Chapter 15 Debtors confirmed that TLC would not be an intercompany borrower (such that the Intercompany Advances Charge would not need to attach to its property), and (b) each of the U.S. Real Estate Holdings Companies (as listed in Schedule "A" hereof) filed petitions in the Chapter 15 Proceedings to become Chapter 15 Debtors.

26.     Copies of the filings and related documents under the Chapter 15 Proceedings can be accessed from the following website: https://dm.epiq11.com/case/pridegroup/info. Copies of certain key materials in the Chapter 15 Proceedings have been, and will continue to be, posted on the Monitor's Website (as defined below).

**THE MONITOR'S ACTIVITIES SINCE THE FIRST REPORT**

27.     Since the First Report, the Monitor has been:

(a)     assisting the Pride Group with their communication plan;

(b)     responding to numerous calls and e-mails received from suppliers, employees and independent contractors, and other parties with respect to these CCAA Proceedings;

(c)     participating in extensive consultation with Financiers (as defined in the First Report), lenders and other stakeholders with respect to financed equipment and inventory, pending completion of the security and securitization reviews (discussed in detail below), including the Pride Group's inventory reduction plans and potential restructuring scenarios;

(d)     assisting the Pride Group with numerous inquiries from Financiers as to the location of inventory and arranging site visits;

(e)     reviewing the Pride Entities' receipts and disbursements, including Intercompany Advances (as defined in the First Report);

(f)     engaging in extensive discussions with the Pride Group's brokers and insurance providers in order to maintain appropriate insurance coverage;

(g)     consulting with lenders regarding the Governance Protocol, Revised Governance Protocol and the security and securitization reviews;

(h)     placing soft collections on account of Securitization Party Assets (as defined in the ARIO) into the Monitor's trust account, in accordance with the terms of the Governance Protocol;

(i)     consulting with the Pride Group and the CRO with respect to the marketing and sale of the Pride Entities' real estate;

(j)     advising the Pride Group on the preparation of the cash flow forecasts and variance analysis; and

(k)     performing its duties, and supervising the Pride Group's performance, under the Governance Protocol.

28.    The Monitor established a case website at www.ey.com/ca/pridegroup (the "**Monitor's Website**"). Documents filed in these CCAA Proceedings and certain other documents will be posted on the Monitor's Website. Further, the Monitor has arranged for a toll-free hotline phone number 1-800-207-9506 (fax: 416-943-3300) for calls related to this matter

and an e-mail address: pridegroup.monitor@ca.ey.com for e-mail correspondence with the creditors and other stakeholders of the Pride Group.

**REVISED GOVERNANCE PROTOCOL**

29.   As reported in the First Report, it is clear to the Monitor that the numerous creditors of the Pride Group require a measure of discipline, predictability, flexibility and transparency to be imposed on the operations of the Pride Group throughout these CCAA Proceedings. That discipline, predictability, flexibility and transparency is intended to be accomplished, in part, pursuant to the Governance Protocol, which provides for how cash receipts from vehicle sales, lease payments, Soft Collections (as defined herein), lease enforcements and other vehicle-related revenues will be dealt with.

*Original Governance Protocol and Stakeholder Consultation*

30.   The original Governance Protocol is discussed at length in Paragraphs 55-80 of the First Report, where the Monitor advised stakeholders and the Court that the Governance Protocol was not, and is not, intended to be the final and determinative document on dealing with the Pride Group's revenues. Rather, it is intended to provide short-term stability, predictability and equality-of-treatment for all Financiers, while the Pride Group, the CRO and the Monitor develop and implement longer-term solutions on a Financier-by-Financier basis.

31.   The First Report further advised that the Monitor had engaged, and would continue to engage, in discussions and consultations with affected stakeholders regarding the Governance Protocol, which was expected to undergo revisions as these CCAA Proceedings progress.

32.   Following the issuance of the ARIO and the Protocols Order, on April 10, 2024, the Monitor's counsel provided a word version of the Governance Protocol to the service list in these proceedings (the "**Service List**") and requested a mark-up reflecting any changes that were being sought by affected parties. A copy of the Monitor's counsel's email to the Service List is attached hereto as **Appendix "C"**.

Case 24-10632-CTG    Doc 128-1    Filed 04/25/24    Page 13 of 162
- 10 -

33.     The Monitor received comments and/or a mark up from the following stakeholders: Mitsubishi HC Capital Canada, Inc. and Mitsubishi HC Capital America Inc. (together, "**Mitsubishi**"), Royal Bank of Canada ("**RBC**") (as Securitization Party), Bennington Financial Corp., BNY Trust Company of Canada, in its capacity as trustee of MOVE TRUST and BOAT Capital, National Bank, Regions, LLC, National Bank of Canada, CWB Maxium Financial Inc.,[1] Versafinance US Corp., Aviator Financial Corp., PACCAR Financial Limited, PACCAR Financial Services Ltd., Bank of Montreal, The Bank of Nova Scotia, Daimler (as defined below), and HSBC Bank Canada ("**HSBC**").

34.     Upon receipt of comments, the Monitor worked with the CRO and counsel to the Pride Group to incorporate and consolidate the comments into a version of the Governance Protocol that could be reasonably performed by the Pride Entities, taking into account any potential prejudice to a stakeholder that may result from the amendments. Once an acceptable revised draft was prepared, incorporating as many comments from the parties listed in paragraph 33 as possible, the draft and a blackline against the version of the Governance Protocol attached to the Protocols Order was provided to counsel for the DIP Agent (as defined in the ARIO).

35.     The Governance Protocol is a schedule to the DIP Term Sheet, and the terms of the DIP Term Sheet require compliance with it. Accordingly, the DIP Agent's approval is necessary for any changes to the original Governance Protocol.

36.     Once the DIP Agent's comments were received, the Monitor consulted with the CRO and counsel to the Pride Group to further revise and refine the Governance Protocol to accommodate acceptable comments, including those of the DIP Agent. On April 22, 2024, a subsequent draft of the Governance Protocol was provided to the Financiers who had provided comments, together with a blackline against the version of the Governance

---

[1] The Monitor notes that consolidated comments were provided by counsel to: Mitsubishi, RBC (as Securitization Party), Bennington Financial Corp., BNY Trust Company of Canada, in its capacity as trustee of MOVE TRUST and BOAT Capital, National Bank, Regions, LLC, National Bank of Canada, CWB Maxium Financial Inc. The Monitor thanks counsel for coordinating their comments into a single mark-up.

Protocol attached to the Protocols Order, and a blackline against any mark-ups provided by such Financiers.

37.    The Monitor and its counsel, together with the Pride Group and the CRO, will continue to work with Financiers to further refine the Governance Protocol, to the extent possible, before the return of the Pride Group's motion for approval of same.

*The Revised Governance Protocol*

38.    As a result of the consultation described above, the Monitor, CRO and Pride Group have developed a revised version of the Governance Protocol (the "**Revised Governance Protocol**"). A copy of the Revised Governance Protocol, which includes explanatory footnotes, is attached hereto as **Appendix "D"**. A clean version of the Revised Governance Protocol is attached hereto as **Appendix "E"**. A blackline of the Revised Governance Protocol marked against the version of the Governance Protocol that is attached to the Protocols Order is attached hereto as **Appendix "F"**.

39.    As illustrated by the blackline attached as Appendix "F", the revisions to the original Governance Protocol that resulted in the Revised Governance Protocol are extensive, reflecting the volume of comments received from numerous Financers with different practical and economic interests in the Pride Group's inventory. The following chart summarizes the revisions. The Monitor notes that parties should refer to the terms of the Revised Governance Protocol as the definitive statement of its functioning; the following chart is provided for summary and illustrative purposes only.

| Key Topic[2] | Original Governance Protocol | Revised Governance Protocol |
|---|---|---|
| Modifications as applicable with particular Financier(s) | • Silent. | • Governance Protocol may be modified with a particular Financier, subject to the written approval of the Monitor, Pride Entities and affected Financier(s). |

---

[2] Capitalized terms not otherwise defined herein have the meaning ascribed thereto in the Governance Protocol or Revised Governance Protocol, as applicable.

| Key Topic[2] | Original Governance Protocol | Revised Governance Protocol |
|---|---|---|
| [Original GP: N/A Revised GP: Preamble, Para 2] | | |
| Governance Protocol is not binding on the entitlements of any Financier<br><br>[Original GP: N/A Revised GP: Preamble – Last Paragraph] | • Silent. | • For greater certainty, the Governance Protocol shall not be determinative of the validity, effectiveness, enforceability or priority of any entitlement asserted by any Financier. |
| Securitization Party Assets: separation of lease payments and soft collections received by the Pride Entities<br><br>[Original GP: N/A Revised GP: Para 2] | • Silent. | • Such amounts will be (a) paid over to the Monitor (as soon as practicable upon receipt); (b) kept separate and apart from the Property of the Pride Entities (not to be comingled or subject to the Cash Management System); and (c) held in trust by the Monitor until distributed in accordance with the Governance Protocol |
| Consent for Vehicle Sales: Vehicles that are not Multiple Collateral Vehicles<br><br>[Original GP: N/A Revised GP: Para 3] | • Silent. | • No sale of Securitization Party Assets or financed Vehicle Property without the prior consent of the respective Financier. |
| Consent for Vehicle Sales: Multiple Collateral Vehicles<br><br>[Original GP: N/A Revised GP: Para 3A] | • Silent. | • No sale of Multiple Collateral Vehicles without the consent of the Monitor.<br><br>• Vehicle Proceeds for Multiple Collateral Vehicles will be held in trust by the Monitor. |

| Key Topic[2] | Original Governance Protocol | Revised Governance Protocol |
|---|---|---|
| Instructions from Securitization Parties: Replacement Servicers and Soft Collections<br><br>[Original GP: N/A Revised GP: Para 3B] | • Silent. | • Any Securitization Party can instruct the Pride Entities to cease all soft collection efforts related to their Securitization Party Assets. |
| Process for identifying Multiple Collateral Vehicles<br><br>[Original GP: N/A Revised GP: Para 4] | • Silent. | • Upon request, the Pride Entities shall provide a listing of Securitization Party Assets or financed Vehicle Property as it pertains to the requesting Financier. This listing will be based on the Books and Records and include a preliminary list of Multiple Collateral Vehicles.<br><br>• The applicable Financier(s) shall provide comments to identify differences or inconsistencies and Multiple Collateral Vehicles based on its own books and records. No Financier(s) shall be prejudiced or bound by their comments.<br><br>• The Monitor will review any inconsistencies that may be identified. |
| Commission for Vehicle Sales: Vehicles that are not Multiple Collateral Vehicles<br><br>[Original GP: Para 1(a) Revised GP: Para 7(a)] | • Commissions on vehicle sales would be disclosed in the Weekly Vehicle Sales Report, without reference to a specific commission structure. | • The following addition was made:<br><br>Commissions will be calculated based on 12% of the gross purchase price or such other amounts as may be agreed upon between each individual Financier and the Pride Entities or the CRO. |
| Commission for Vehicle Sales: Multiple Collateral Vehicles<br><br>[Original GP: Para 1(a) Revised GP: Para 7(b)] | • Consistent with the description above. | • The following addition was made:<br><br>Commissions will be calculated based on 12% of the gross purchase price. |

| Key Topic[2] | Original Governance Protocol | Revised Governance Protocol |
|---|---|---|
| Treatment of Vehicle Proceeds: Vehicles that are not Multiple Collateral Vehicles<br><br>[Original GP: Para 2(a) Revised GP: Para 8(a)] | • The Monitor will review entitlement to vehicle proceeds based on the Books and Records and otherwise review the proposed disbursements to the Financier(s) identified in the Weekly Vehicle Sales Report as having the entitlement (without requiring a legal opinion on the priorities).<br><br>• Subject to the Monitor's review and approval of payment, the lesser of the following amount will be disbursed to the applicable Financier(s):<br><br>(i) the amount outstanding to the relevant Financier(s) in respect of the relevant vehicle by VIN (based on the Books and Records); and<br><br>(ii) the vehicle proceeds. | • The following additions were made:<br><br>1. Consent is required from the applicable Financier(s) prior to vehicle sales; and<br><br>2. If the Monitor becomes aware of any competing claims or inconsistencies not otherwise identified in the Books and Records, the Monitor will inform the affected Financier(s) and hold the applicable Vehicle Proceeds in trust, pending resolution. |
| Reporting Vehicle Equity (if any)<br><br>[Original GP: N/A Revised GP: Para 8(a)] | • Silent. | • Vehicle Proceeds remaining after distributions to Financier(s) in accordance with the Revised Governance Protocol, if any, shall be retained by the Pride Entities after each disbursement. |
| Treatment of Vehicle Proceeds: Multiple Collateral Vehicles<br><br>[Original GP: Para 2(b) Revised GP: Para 8(b)] | • The vehicle proceeds (which is net of sale commissions) will be transferred and held in trust by the Monitor pending determination of entitlement. | • No substantive changes. |
| Vehicle Repossession Report | • Silent. | • On a monthly basis starting on May 6, 2024, a listing of all vehicles that have been repossessed |

| Key Topic[2] | Original Governance Protocol | Revised Governance Protocol |
|---|---|---|
| [Original GP: N/A<br><br>Revised GP: Para 9] | | by the Pride Entities shall be provided by the Pride Entities to the Monitor. |
| Amount of disbursements for Lease Payments: Leases to vehicles that are not Multiple Collateral Vehicles<br><br>[Original GP: Para 6<br>Revised GP: Para 15(a)] | • The Monitor will review the lease payment report for payments made by the top five customers to confirm (i) the proposed amounts to be disbursed to the respective Financier(s); and (ii) the applicable Financier(s) entitled to receive lease payments (based on the Books and Records).<br><br>• The Monitor is not required to obtain a legal opinion on the priorities of the proposed disbursements. | • The following changes were made:<br><br>1. The Monitor will review the entitlement of the identified Financier(s) to the corresponding Lease Payments to the extent the Monitor considers appropriate based on the Books and Records.<br><br>2. The proposed distribution to five randomly selected Lease Payments will also be reviewed.<br><br>• The Monitor is not required to obtain a legal opinion on the priorities of the proposed disbursements.<br><br>• The following additions were made:<br><br>1. Subject to the Monitor's review and approval of payment, the lesser of the following amount will be disbursed to the applicable Financier(s):<br><br>    (i) the monthly amount outstanding to the relevant Financier(s) in respect of the relevant vehicle by VIN (based on the Books and Records); and<br><br>    (ii) the Net Lease Payment.<br><br>2. If the Monitor becomes aware of any competing claims or inconsistencies not otherwise identified in the Books and Records, the Monitor will inform the affected Financier(s) and hold the applicable Net Lease Payments in trust, pending resolution. |
| Treatment of Lease Payments: Multiple Collateral Vehicles<br><br>[Original GP: Para 7<br>Revised GP: Para 15(e)] | • Lease Payments in respect of Multiple Collateral Vehicles will be transferred and held in trust. | • The following additions were made regarding applicable sales taxes:<br><br>1. Non-Securitization Parties: Lease Payment(s) net of applicable sales taxes will be transferred to the Monitor and held in trust.<br><br>2. Securitization Parties: Lease Payment(s) will be transferred to the Monitor and held in trust. |

| Key Topic[2] | Original Governance Protocol | Revised Governance Protocol |
|---|---|---|
| Soft Collections: Securitization Parties<br><br>[Original GP: Paras 5, 10<br>Revised GP: Para 15(f)] | • All Soft Collections related to a securitization lease will be transferred to the Monitor and held in trust.<br><br>• Commissions on Soft Collections would be disclosed in the Soft Collections report, without reference to a specific commission structure. | • The following addition was added:<br><br>Soft Collection Fees in connection with all Securitization Party Assets (20% commission on Soft Collections) will be charged and also held in trust. |
| Soft Collections: Multiple Collateral Vehicles<br><br>[Original GP: Para 10<br>Revised GP: Para 15(f)] | • Soft Collections with respect to leases of Multiple Collateral Vehicles will be transferred and held in trust, pending determination of entitlement. | • Soft Collections net of the Soft Collection Fees, with respect to leases of Multiple Collateral Vehicles will be transferred and held in trust, pending determination of entitlement. |
| Other Soft Collections<br><br>[Original GP: Para 9<br>Revised GP: Para 14] | • The Monitor will review the Soft Collections report for payments made by the top five customers to confirm (i) the proposed amounts to be disbursed to the respective Financier(s); and (ii) the applicable Financier(s) entitled to receive lease payments (based on the Books and Records).<br><br>• The Monitor is not required to obtain a legal opinion on the priorities of the proposed disbursements. | • The following changes were made:<br><br>1. The Monitor will review the entitlement of the identified Financier(s) to the corresponding Soft Collections to the extent the Monitor considers appropriate based on the Books and Records.<br><br>2. The proposed distributions to five randomly selected Soft Collections will also be reviewed.<br><br>• The Monitor is not required to obtain a legal opinion on the priorities of the proposed disbursements.<br><br>• The following additions were made:<br><br>1. For leaseline Financier(s), the proposed amounts to be distributed will be based on the proportion of payment from Soft Collections that each leaseline Financier(s) would have normally received from each Lease Payment.<br><br>For example, if the leaseline Financier normally receives 80% of each Lease Payment from the Pride Entities, such Financier shall receive 80% of the Soft Collection amount. No additional |

| Key Topic[2] | Original Governance Protocol | Revised Governance Protocol |
|---|---|---|
| | | fees are charged on Soft Collections to non-Securitization Party Financiers.<br><br>2. If the Monitor becomes aware of any competing claims or inconsistencies, the Monitor will inform the affected Financier(s) and hold the applicable Soft Collections in trust, pending resolution. |
| Reports to Financier(s)<br><br>[Original GP: Paras 3 & 12<br><br>Revised GP: Paras 12 & 17] | • A copy of each Weekly Vehicle Sales Report and the Bi-Weekly Vehicle Lease Collections Report will be made available to the Financier(s) | • The following change was made:<br><br>Information from the Weekly Vehicle Sales Report, Vehicle Repossession Report, and the Bi-Weekly Lease Collection Report, as it pertains to each affected Financier(s), will be provided to the applicable Financier. |
| Reconciliations<br><br>[Original GP: Para 14<br><br>Revised GP: Paras 15 & 18] | • Vehicle Proceeds and lease payments related disbursements will be reconciled to the Pride Entities' actual cash flow statements. | • The following change was made:<br><br>Lease Payments and Soft Collections and related disbursements will be reconciled:<br><br>(i) to the Pride Entities' actual cash flow statements; and<br><br>(ii) to amounts that were received or collected, which could not be reconciled at the time of the applicable Bi-Weekly Lease Collection Report.<br><br>• Vehicle Proceeds will not be included in reconciliation, as such reconciliations are cost prohibitive. |
| Compliance with the Governance Protocol<br><br>[Original GP: N/A<br><br>Revised GP: Para 21] | • Silent. | • The Monitor and CRO shall provide the Court with regular updates on the compliance of the Pride Entities of the Governance Protocol.<br><br>Such updates shall be included in the Monitor's ordinary-course reports to this Court. |
| Direction of the Court<br>[Original GP: Para 16<br>Revised GP: Para 23] | • The Monitor shall be entitled to seek the advice and direction of this Court in respect of the Governance Protocol. | • The following addition was made:<br><br>Any affected Financier shall also be entitled to seek advice and direction of this Court in respect of the Governance Protocol. |

| Key Topic[2] | Original Governance Protocol | Revised Governance Protocol |
|---|---|---|
| Monitor's discretion to refuse disbursements<br><br>[Original GP: Para 16<br>Revised GP: Para 24] | • The Monitor may decline to provide consent to any distributions by the Pride Entities, in its sole discretion, subject to the direction of this Court. | • The following addition was made for greater certainty:<br><br>Without limiting the Monitor's sole discretion to refuse distributions, the Monitor may refuse distributions if it becomes aware of conflicting entitlements, competing claims or inconsistencies to entitlements, or inconsistencies between the Books and Records and its own information and analysis. |
| Use of Books and Records<br><br>[Throughout] | • As a starting point, information will be based on the Books and Records. | • The following change was made:<br><br>The Monitor will review the Books and Records to the extent that (a) the Monitor discovers conflicting information in the context of performing a review of entitlements (where applicable in the Governance Protocol); or (b) has been advised by any other party that there is a dispute over entitlement to property or proceeds that is not evident in the Books and Records. |

40.   The Monitor, the Pride Group and the CRO have spent a considerable amount of time developing the Revised Governance Protocol, and have attempted to accommodate as many requests and comments as possible from the affected Financiers and the DIP Agent.

41.   Accordingly, the Monitor recommends that the Court approve the Revised Governance Protocol, subject to any further revisions that the Monitor may advise the Court are acceptable following the service of this Second Report on the Service List.

**Pride Group Performance of Governance Protocol**

42.   The Governance Protocol requires the applicable Pride Entities to provide three (3) reports to the Monitor on a weekly or bi-weekly basis: the Weekly Vehicle Sales Report, the Lease Payments Report and the Soft Collections Report (each as defined in the Governance Protocol). As at the date of this Second Report, four Weekly Vehicle Sales Reports, and

one of each of a Lease Payments Report and a Soft Collections Report have been delivered and reviewed, or are presently under review, by the Monitor.

*Weekly Vehicle Sales Report*

43.    On Monday April 1, 2024, Monday April 8, 2024, Monday April 15, 2024, and Monday April 22, 2024 the applicable Pride Entities provided the Monitor with the Weekly Vehicle Sales Reports, relating to the sold vehicles and vehicle buyouts between March 27 and March 31, 2024, April 1 and April 7, 2024, April 8 and April 14, 2024 and April 15 through April 21, 2024, respectively.

44.    None of the vehicles sold from this Weekly Vehicle Sales Report were with respect to Multiple Collateral Vehicles (Leases) (as defined in the Governance Protocol), however, there was one (1) early buyout which was a Multiple Collateral Vehicle (as defined in the Revised Governance Protocol) and the funds are in the process of being remitted to the Monitor's trust account.

45.    Even though the Weekly Vehicle Sales Report is a summary of the previous week's activities, the Monitor performs the underlying review on a daily basis.

46.    Since the Filing Date:

(a)    The Pride Group has completed sales of approximately 92 vehicles, and received end of term buyouts and insurance proceeds for five (5) vehicles;

(b)    The Pride Group has received approximately $7.2M in cash from customers (excluding taxes) and has paid or is in the process of paying approximately $6.4M to respective Financiers.

*Lease Payment Report and the Soft Collections Report*

47.    The Monitor is finalizing its review of the Lease Payments (as defined in the Governance Protocol) and Soft Collections Reports for the period of March 27, to April 8, 2024 that was delivered by the Pride Entities on April 15, 2024.

48.     The Monitor has performed its sample testing of top 5 Lease Payments and top 5 Soft Collections, in accordance with the Governance Protocol, with no noted concerns.

49.     The Monitor anticipates sharing the Lease Payment Report and Soft Collections Report with applicable Financiers by April 24, 2024, with corresponding disbursements of the Lease Payments and Soft Collections by April 26, 2024.

50.     Lease collections for Securitization Parties (as defined in the ARIO) will remain in their respective blocked accounts. The Monitor has set up trust accounts for Soft Collections on account of leases that it believes to be Securitization Party Assets.  As at the date of this Second Report, the Pride Entities have transferred C$512,000 and US$456,000 to such trust accounts. The Pride Entities will continue to transfer Soft Collections on account of Securitization Party Assets on a weekly basis.

51.     The Monitor has set up a trust account with respect to the Multiple Collateral Vehicles (Leases). As at the date of this Second Report, no funds have been transferred, however, the Monitor anticipates funds to be transferred by April 26, 2024 as Multiple Collateral Vehicles (Leases) were identified in the Lease Payment and Soft Collections Report.

**ARNOLD GROUP**

52.     Arnold Transportation Services, Inc. ("**Arnold**") and its affiliates 1000089137 Ontario Inc., DVP Holdings, Corp., Parker Global Enterprises, Inc., and Parker Transport Co. (collectively, the "**Arnold Group**") are each Applicants and Chapter 15 Debtors. The Arnold Group makes up a trucking and logistics business in the United States that was purchased by the Pride Group in 2022, whose fleet of trucks is leased from another Pride Group entity.

53.     The Arnold Group has not been profitable since its acquisition by the Pride Group in 2022 and, prior to the commencement of the CCAA Proceedings, was financed with intercompany loans and factoring provided by Triumph Financial Services LLC ("**Triumph**"). As a result of the CCAA Proceedings and Chapter 15 Proceedings, the Triumph financing has ceased to be available to the Arnold Group. Without this Triumph

financing, the Arnold Group's only source of liquidity would be intercompany advances or DIP Facility borrowings.

54.     However, the Arnold Group entities are not obligors under the Syndicate Agreement (as defined in the First Report), but they are "DIP Availment Borrowers" under the DIP Term Sheet. In order to make them eligible to borrow under the DIP Term Sheet, the Syndicate Lenders require that "know your client" information be provided; the Arnold Group entities have begun the process to provide this information, but it will not be completed in time for advances under the DIP Facility to be provided to them to fund critical near-term obligations.

55.     The ARIO includes at paragraph 61 a provision that makes the Directors' Charge (as defined in the ARIO) and the DIP Lenders' Charge subordinate to any validly perfected and enforceable security interest of Triumph in the property of Arnold, to the maximum amount of CDN$3mm, until April 19, 2024. This subordination expiry was extended to April 25, 2024, to coincide with the return of the motion to approve the Revised Governance Protocol.

56.     Arnold was required to fund payroll in the amount of approximately US$160,000 and US$300,000 on April 10 and April 17, 2024, respectively. Without access to the DIP Facility, its only recourse was to intercompany loans. As of April 22, 2024, the Arnold Group has received intercompany advances during the CCAA Proceedings totalling approximately US$800,000 which were advanced by Pride Truck Sales LP in order to fund fuel costs and meet obligations to employees for wages and benefits. To the extent that the Arnold Group relies on intercompany financing, the Intercompany Advances Charge (as defined in the ARIO) would attach to its property to secure the funding. Pursuant to the terms of the ARIO, the Intercompany Advances Charge is subordinate only to the Administration Charge (as defined in the ARIO).

57.     Triumph raised concerns about being primed by the Intercompany Advances Charge, including because this charge has a higher priority than the DIP Lenders' Charge and does not include the subordinations that qualify the DIP Lenders' Charge (being (a) validly

perfected and enforceable security interests of third party financiers in specific vehicle and lease collateral, and (b) valid and enforceable mortgages).

58.    In order to resolve the issues with Triumph, the Pride Group, in consultation with the Monitor and on notice to the DIP Agent, are seeking an order with respect to the Arnold Group providing that the Intercompany Advances Charge with respect to intercompany advances to the Arnold Group (the "**Arnold Intercompany Advances**") will have the same qualifications as the DIP Lenders' Charge (ie: that the Arnold Intercompany Advances are subordinate to valid security interests in vehicles and valid mortgages).

59.    If the requested order is made, it will (a) permit the Arnold Group to continue to rely on intercompany advances until such time as Arnold can make draw requests under the DIP facility, (b) enable the funding Pride Group entity to get the benefit of a corresponding Intercompany Advances Charge (which charge is necessary to protect the interests of the funding entity's creditors), and (c) make the priority of the Intercompany Advances Charge for the Arnold Intercompany Advances on the Arnold Group's assets the same as the DIP Lenders' Charge. In other words, the requested relief will replicate the priority of the DIP Lenders' Charge vis a vis the Arnold Group's creditors, as if it had received such amounts as a DIP Availment Borrower.

60.    Using intercompany advances to fund the Arnold Group's immediate liquidity needs is only a temporary solution. The Monitor understands that the Arnold Group is in discussions with certain parties with respect to a potential sale of its assets. In the event that a sale cannot be consummated in short order, the Arnold Group will have no choice but to cease operations and liquidate. Accordingly, the Pride Group is seeking an order authorizing (but not directing) the Pride Group to commence bankruptcy proceedings under the *Bankruptcy and Insolvency Act* or Chapter 7 of the U.S. Bankruptcy Code in respect of the Arnold Group. Bankruptcy proceedings are considered to be a last resort for the Arnold Group, but such proceedings may become necessary in the short term if a sale transaction cannot be negotiated.

61.    The Monitor supports the Pride Group's request for the Intercompany Advances Charge subordination and authorization to bankrupt the Arnold Group. The optionality that such

authorization provides will maintain the ability of the Pride Group to attempt to consummate a going concern sale in short order, failing which the Arnold Group would be wound down and liquidated.

## SECURITY AND SECURITIZATION REVIEWS

62.     One of the major factors that has resulted in the Pride Group's financial difficulties was an excess of inventory levels due to slow market conditions for selling vehicles, which was exacerbated by increased levels of repossession of collateral on defaulted leases.

63.     As has been reported or stated elsewhere in these proceedings, the Pride Group must continue selling vehicle inventory in the ordinary course through these CCAA Proceedings in order to maintain cashflow. With the assistance of the CRO and the Monitor, the Pride Group is working to determine which vehicles are best positioned to be sold to (a) maximize proceeds for the Securitization Parties and other Financiers, and (b) vacate the Pride Entities' real property parcels so that the properties can be marketed and sold. In accordance with the Governance Protocol, inventory has been sold in the ordinary course, and proceeds have been distributed to Financiers, as discussed further below.

64.     In addition to the Pride Group's steps to monetize inventory, they are also receiving requests from certain Financiers for the return of certain collateral to those Financiers.

65.     In order to properly and efficiently liquidate or return certain vehicle inventory, it is necessary to formally understand the rights and entitlements of secured creditors in and to that inventory.

66.     Taking into account the foregoing, the Monitor has prioritized a review of the conventional personal property security of lenders, and the securitization facilities of the securitization funders, in order to allow the Pride Group to consult with the Financiers as to how to deal with inventory as expeditiously as possible. This review is proceeding in parallel tracks, with separate legal teams in both Canada and the United States: (a) a security review, and (b) a securitization facility review.

67.     The Monitor will provide a detailed update and description of the process, the factors to be considered in both the security review and the securitization review, and the status of same in its next report to Court, including an expected timeline for completion. A high-level status update is included in the following two subsections of this Second Report.

**Security Review**

68.     The Pride Group has a fleet of approximately 25,000 trucks, the majority of which are inventory leased to customers (and in many cases those leases are subject to securitization facilities). Many of the trucks are used by the Pride Group as equipment in their logistics business. At any given time, these vehicles are located all across Canada and the United States, and the majority of the fleet is constantly in transit. The Monitor understands that the Pride Entities currently hold approximately 3,500 trucks and trailers as inventory or idle vehicles, which have been financed by lenders, and an additional approximately 1,000 repossessed trucks and trailers that appear to be Securitization Party Assets, that are located all across Canada and the United States. This inventory is proposed to be sold in a strategic and efficient manner in accordance with the Revised Governance Protocol.

69.     Immediately following its appointment, the Monitor instructed its Canadian counsel (Blakes) to begin the security review of Canadian assets and other property subject to Canadian law security documents. The Monitor has engaged McDermott, Will & Emery LLP ("**McDermott**") as U.S. counsel to review the U.S. assets and other property subject to U.S. law security documents.

70.     To date, all *Personal Property Security Act* and *Uniform Commercial Code* searches have been conducted in the numerous jurisdictions in which the Pride Entities do business, with a number of *Uniform Commercial Code* searches pending. In Canada, this resulted in approximately 17,500 pages of raw search results, disclosing approximately 1,300 individual registrations across various provinces by approximately 169 different iterations of secured creditor names. In the U.S., the *Uniform Commercial Code* searches received to date have resulted in approximately 650 pages of raw search results, disclosing approximately 120 individual filings by approximately 20 different secured creditors. *Personal Property Security Act* searches include automated summaries that can be

reviewed electronically, and the data digitally organized and consolidated; *Uniform Commercial Code* searches must be reviewed manually.

71.     Rather than rely on what may be incomplete records of the Pride Group, the Monitor's counsel has requested debt and security documents directly from many secured creditors that it has been in contact with since the commencement of the CCAA Proceedings, and the response rate has been good. The Monitor has additionally obtained copies of security documents provided to Pride Group's counsel by secured creditors.

72.     Given the sheer volume of search results and the number of secured creditors, the Monitor has devised a systemic approach to reviewing entitlements, including creating a database which summarizes all registered interests by VIN. For context, this database contains over 130,000 line items, as many secured creditors filed duplicative registrations against various Pride Entities across various provinces. While this database of registered interests does not provide for a definitive view on entitlements (which will require a review of the underlying security documents as well), it identifies which parties have registered interests in vehicles and identifies vehicles where there may be more than one potential interest (either through a specific registration or a registration against all present and after-acquired property).

73.     As discussed in the First Report, the DIP Term Sheet requires that a security review of the Syndicate Lenders' (as defined in the First Report) pre-filing security must be delivered on or before April 29, 2024, and accordingly the Monitor and its counsel have prioritized this review. The Monitor expects that this review will be complete on or before the April 29, 2024 deadline.

74.     Further updates on the security review will be provided in the next report to Court.

**Securitization Facilities**

75.     The Monitor and its counsel have been in frequent contact with the Securitization Parties regarding their respective securitization facilities, and has received requests from many of them to start the process to replace the applicable Pride Group entity as servicer under these facilities.

- 26 -

76.     Paragraph 14 of the ARIO provides:

> **THIS COURT ORDERS** that each of the applicable Pride Entities shall, with the approval of the Monitor and the CRO and upon notice to the DIP Agent, have the right to transition and relinquish servicing and other duties in respect of Securitization Party Assets (including relinquishing possession of any vehicles or equipment that are Securitization Party Assets and/or Property where Securitization Parties have a first-ranking security interest) pursuant to arrangements satisfactory to the Pride Entities and the applicable Securitization Party, or further order of the Court.

77.     In order for the Monitor and CRO to be in a position to determine the terms of any approval of the transfer of servicers, the Monitor is undertaking a review of the documentation underlying each Securitization Party's facility and claim to a property interest in Securitization Party Assets. Because the structure of each facility is different, the nature and scope of the review must be tailored to each.

78.     On April 17, 2024, the Monitor's counsel sent a letter to counsel of record for each Securitization Party with Canadian law governed facilities, outlining the documentation the Monitor requires for its review. To facilitate and expedite the review, the Monitor's counsel also requested any internal analysis regarding the structure of the facilities from the Securitization Parties, including the basis for their claim to Securitization Party Assets.

79.     Requests to Securitization Parties with U.S. law governed facilities are being finalized in consultation with McDermott, and will be sent as soon as possible.

80.     Counsel for most of the Securitization Parties have indicated that a response to the Monitor's request for information is being prepared, however the Monitor has not yet received any of the documentation requested from most Securitization Parties, and has not yet received all of the documentation requested from any Securitization Parties. This delay is understandable, given the extensive scope of documentation, and the complexity of the relevant securitization facilities.

81.     The Monitor is working with the Pride Group and the CRO, in consultation with the DIP Agent, to determine the terms and parameters on which securitization facilities should be reviewed. A full and complete review is a complicated exercise, and would require the

Monitor's counsel to review all of the applicable securitization facility documents, all bills of sale or conveyancing documents for each tranche of each facility, the post-closing treatment of each vehicle (including, for example, whether any vehicle was sold back to the Pride Group after originally being sold to a Securitization Party or associated special purpose vehicle ("**SPV**")), the flow of funds with respect to each of the foregoing, and other structural and post-closing factual matters.

82.     Given the significant time and expense that would be required for this full review, the Monitor is considering what reasonable assumptions can be made to expedite the review, as well as whether it may be reasonable and prudent to "spot check" a certain proportion of vehicles in any given securitization facility. Any such assumptions or spot checks will need to be supported by the DIP Agent and any other Financier with a potential interest in the underlying assets (if any), and discussions with the DIP Agent in this regard have been started.

83.     The Monitor expects to provide the Court and stakeholders with a further update on the status and parameters of the securitization review and any potential interim solutions to permit replacement servicers to be appointed as more documentary and factual support is provided to it, and as its consultations with stakeholders progress.

**UPDATED THIRTEEN WEEK CASH FLOW FORECAST**

84.     The Pride Entities, with the assistance of the Monitor, have prepared the Cash Flow Forecast for the 13-week period from April 8, 2024 to the week ending July 7, 2024 (the "**Forecast Period**") for the purpose of projecting the Pride Entities' estimated liquidity needs during the Forecast Period. A copy of the Cash Flow Forecast is attached as **Appendix "G"** to this Second Report.

85.     The Cash Flow Forecast is presented on a weekly basis during the Forecast Period and represents the estimates of Management of the projected cash flow during the Forecast Period. The Cash Flow Forecast has been prepared by the Pride Entities using probable and hypothetical assumptions set out in the notes to the Cash Flow Forecast.

86.     The Cash Flow Forecast shows that during the Forecast Period, the Pride Entities project $92.3 million in receipts, and project estimated total combined disbursements of approximately $77.8 million in operating disbursements and $39.0 million in non-operating disbursements to Financiers, and approximately $6.4 million placed into trust for Multiple Collateral Vehicles (Leases). The Cash Flow Forecast estimates that the Pride Entities will require a total draw on the DIP facility during the Forecast Period, including interest and fees, of approximately $26.4 million, with an ending cash balance of $11.9 million for the borrowers under the Syndicate Agreement and $2.1 million for the other Applicants.

## OTHER RELEVANT MATTERS AND UPDATES

### Status of Stakeholder Outreach, Inbound Inquiries and Near-Term Tasks

87.     Since the granting of the Initial Order, the Monitor and its counsel have received requests for calls or consultation from numerous stakeholders, most particularly Financiers whose interests are affected by the Governance Protocol, equipment lessors and secured parties. The Monitor and its counsel, in many cases together with representatives of the Applicants and the CRO, have had numerous discussions with stakeholders, including providing detailed information on inventory reduction options, and have taken note of concerns and proposals that have been made.

88.     The Monitor provides the following update on a number of ongoing discussions with, and issues raised by, stakeholders. The following list is not an exhaustive list of stakeholder outreach and communications.

### DIP Credit Agreement & Advances

89.     The DIP Term Sheet requires a stand-alone credit agreement, supplemental to and an amendment and restatement of the Syndicate Agreement (the "**DIP Credit Agreement**") to be fully executed and delivered by the DIP Borrowers on or before April 19, 2024.

90.     The DIP Borrowers, the CRO and the Monitor have been working diligently with the DIP Agent to finalize the DIP Credit Agreement. The deadline to do so has been extended on

the consent of the parties to April 24, 2024, and the Monitor understands that the parties expect to have finalized and executed the DIP Credit Agreement by that time.

**Entitlement Protocol**

91.    Affirmative Covenant (d) in the DIP Term Sheet requires that the DIP Borrowers consult with the DIP Agent on the development of an "Entitlement Protocol", and make best efforts to obtain Court approval of the Entitlement Protocol by no later than May 1, 2024.

92.    The Entitlement Protocol is prescribed by the Governance Protocol (and the Revised Governance Protocol), and is intended to be essentially a claims process for resolving competing claims against Multiple Collateral Vehicles, and the proceeds thereof that are held in trust by the Monitor pursuant to the terms of the Governance Protocol (and the Revised Governance Protocol).

93.    Given the significant issues, Court hearings in Canada and the U.S., inbound inquiries and requests and other urgent matters in these CCAA Proceedings, the Monitor believes that the Pride Entities will require additional time beyond May 1, 2024 to develop the Entitlement Protocol and obtain its approval at a fully briefed motion on notice to the Service List. The parties are expected to seek an extension of time to complete the Entitlement Protocol from the DIP Agent.

94.    The Monitor will keep stakeholders and the Court updated on the status of the Entitlement Protocol.

**Equipment Lessors**

95.    The Monitor has received inquiries from equipment lessors regarding the treatment of vehicles, trailers and other equipment that is leased by Pride Group Logistics Ltd. ("**Pride Logistics**") as equipment (ie: as opposed to leased or financed as inventory to be sold or leased to end users). These include, without limitation, HSBC and Roynat.

96.    The equipment lessors have been informed that the ARIO does not permit Pride Logistics (or any of the Pride Entities) to sell any equipment that is leased as such, and as a result any sales of such equipment would be subject to approval of the Court.

97.    Equipment lessors have also been told that lease payments are provided for in the DIP budget, and that such payments are expected to be made post-filing to the extent that Pride Logistics is generating sufficient cashflow from operations, and has sufficient availability under the DIP Facility to fully fund such lease payments. The Monitor is prepared to assist with any lease reviews that are necessary to determine whether the leases are true leases (in respect of which post-filing payments are required to be made) or financing leases (in respect of which post-filing payments are stayed).

**Intercompany Advances Charge**

98.    The ARIO creates, among other things, the Intercompany Advances Charge, in order to secure the payment obligations of one Pride Group entity to another Pride Group entity following an intercompany loan. The Intercompany Advances Charge is subordinate only to the Administration Charge.

99.    The Monitor has been contacted by a number of stakeholders with obligations owing to them by Applicant TPine Leasing Capital L.P. and TPine Leasing Capital Corporation (collectively, "**TPine**"). These stakehoders have expressed concern that any intercompany loans to TPine by another Pride Group entity would give rise to a corresponding Intercompany Advances Charge in favour of the advancing Pride Group entity, and in particular concern that this Intercompany Advances Charge would prime their interests in a way that the DIP Lenders' Charge would not, if the funding into TPine was made under the DIP Term Sheet (because the DIP Lenders' Charge is subordinate to, among other things, validly perfected and enforceable security interests of third party financiers in specific vehicle or lease collateral).

100.    Based on the Cash Flow Forecast, it is not expected that any TPine entity would be a borrower in an intercompany financing arrangement, and accordingly no Intercompany Advances Charge is expected to attach to any TPine entity's property. While this financial

situation is dynamic, especially because the timing of advances under the DIP Term Sheet is not presently known, the Monitor has been informed by the CRO that TPine will not borrow money from any other Pride Group entities without at least 7 clear days of advanced written notice to the Service List as to quantum and purpose.

**Termination of National Bank ISDA Agreements**

101.    On April 11, 2024, counsel for National Bank of Canada ("**NBC**") provided three notices of events of default and designation of early termination date to the Pride Group and Monitor, giving notice of termination of three ISDA Master Agreements to which Applicants 2837229 Ontario Inc.,12944154 Canada Inc. and 13184633 Canada Inc. are party (the "**NBC ISDAs**").

102.    The Monitor understands that the three Pride Group entities that are party to the NBC ISDAs are "in the money" on the swap facilities, and has been advised by counsel to NBC that these amounts would be treated as off-sets against indebtedness owing to NBC. The Monitor followed up with counsel to NBC on April 23, 2024 for a reconciliation of debt amounts, which it will review and consider, and is awaiting a response.

103.    It appears to the Pride Group and the Monitor that the NBC ISDAs are eligible financial contracts, as defined in the CCAA, and therefore the proposed termination by NBC is not prohibited by the stay of proceedings. The Monitor will continue to work with the Pride Group and NBC on this matter, and update the Court as appropriate.

**Real Estate Monetization Efforts**

104.    As prefaced in the Pre-Filing Report, Block 6 Holding Inc., with the assistance of the Pride Entities, completed the sale of certain real estate property in Milton, Ontario (the "**Block 6 Transaction**").    The proceeds of the Block 6 Transaction are being held in trust by the Pride Group's counsel pending the determination of entitlement of distributions.

105.    In addition to the Block 6 Transaction, the Pride Group, CRO and Monitor are working with purchasers of properties in Bolingbrook, Illinois, Chehalis, Washington, and Cornwall, Ontario, which are expected to close in May, 2024.

- 32 -

106.    The Pride Entities, with direction from the CRO and in consultation with the Monitor, continue to work towards listing all of their properties by May 1, 2024, as required by the Real Estate Protocol. The Pride Group, CRO and Monitor have been in contact with mortgagees to keep them appraised of the real estate monetization process.

**CONCLUSIONS AND RECOMMENDATIONS**

107.    For the reasons set out in this Second Report, the Monitor is of the view that the Revised Governance Protocol reasonably incorporates the concerns raised by stakeholders, while balancing the Applicants' need to continue to monetize excess assets and continue restructuring efforts. In the Monitor's view, the Revised Governance Protocol should be approved, and the relief requested in respect of the Arnold Group should be granted.

All of which is respectfully submitted this 24th day of April, 2024.

**ERNST & YOUNG INC.**

**Solely in its role as Court-appointed Monitor of Pride Group Holdings Inc. and certain affiliates and not in its personal or corporate capacity**

**per:**

**Alex Morrison, CPA, CA, LIT, CIRP**
**Senior Vice President**

**Karen Fung, CPA, CA, LIT, CIRP**
**Senior Vice President**

## SCHEDULE "A"

**A. APPLICANTS**
**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

- 2 -

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

## B. LIMITED PARTNERSHIPS
*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

## C. ADDITIONAL STAY PARTIES
*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.

**APPENDIX "A"**

**Pre-Filing Report dated March 27, 2024**
**(without appendices)**

Court File No.

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those entities listed in **Schedule "A"** hereto

**REPORT OF THE PROPOSED MONITOR**

**March 27, 2024**

**INTRODUCTION**

1.      Ernst & Young Inc. ("**EY**" or the "**Proposed Monitor**") understands that Pride Group Holdings Inc. and those entities listed as "Applicants" in Schedule "A" hereto (each an "**Applicant**" and, collectively, the "**Applicants**") have brought an application (the "**CCAA Application**") before this Court returnable on March 27, 2024 seeking an initial order (the "**Initial Order**") pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") to, among other things, obtain a stay of proceedings to allow them an opportunity to restructure their business and affairs. The Applicants propose that EY be appointed as Monitor of the Applicants (in such capacity, the "**Monitor**") in these proceedings under the CCAA (the "**CCAA Proceedings**").

2.      This report (the "**Report**") has been prepared by the Proposed Monitor prior to its appointment as Monitor, should this Court grant the Initial Order, to provide information to this Court for its consideration in respect of the CCAA Application and the relief sought in the Initial Order.

3.      The Proposed Monitor further understands that the Applicants will be seeking an order (the "**Amended and Restated Initial Order**") at a subsequent hearing, to be scheduled with the supervising judge prior to the expiry of the initial 10-day stay period (the "**Initial Stay Period**"), granting certain broader relief. If appointed, the Monitor intends to file a further

report in advance of that hearing to provide information on the relief sought in the Amended and Restated Initial Order.

**PURPOSE**

4.      The purpose of this Report is to provide information to the Court on:

   (a)      EY's qualifications to act as Monitor;

   (b)      an overview of the Applicants, Limited Partnerships and the Additional Stay Parties (as each term is defined herein);

   (c)      a summary of the circumstances leading to the Applicants' decision to commence the CCAA Proceedings;

   (d)      proposed Governance Protocol (as defined below);

   (e)      an overview of the Applicants' fifteen-week cash flow forecast on a consolidated basis for all the Applicants (the "**Cash Flow Forecast**") and the Proposed Monitor's comments regarding the reasonableness thereof; and

   (f)      certain relevant matters about the relief sought in the Initial Order.

**TERMS OF REFERENCE**

5.      In preparing this Report and making the comments herein, the Proposed Monitor has been provided with, and has relied upon, unaudited financial information, books and records prepared by the Applicants, discussions with management of the Applicants ("**Management**"), and information from other third-party sources (collectively, the "**Information**"). Except as described in this Report in respect of the Cash Flow Forecast:

   (a)      the Proposed Monitor has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Proposed Monitor has not audited or otherwise attempted to verify the accuracy or completeness of such Information in a manner that would wholly or partially comply with Canadian Auditing Standards ("**CAS**") pursuant to the Chartered

Professional Accountants Canada Handbook and, accordingly, the Proposed Monitor expresses no opinion or other form of assurance contemplated under CAS in respect of the Information; and

(b)      some of the information referred to in this Report consists of forecasts and projections. An examination or review of the financial forecast and projections, as outlined in the Chartered Professional Accountants Canada Handbook, has not been performed.

6.      Future-oriented financial information referred to in this Report was prepared based on Management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that are not ascertainable, the actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

7.      Unless otherwise indicated, the Proposed Monitor's understanding of factual matters expressed in this Report concerning the Applicants, the Additional Stay Parties, and their business is based on the Information, and not independent factual determinations made by the Proposed Monitor.

8.      Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

**EY'S QUALIFICATION TO ACT AS MONITOR**

9.      EY is a licensed insolvency trustee within the meaning of section 2 of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3. EY is not subject to any of the restrictions set out in section 11.7(2) of the CCAA on who may be appointed as Monitor.

10.    At no point has EY been the auditor of the Applicants.

11.    EY has previously provided advisory services ("**FA**") to the Applicants to assist the Applicants to develop cash flow projections and to respond to queries from their various lenders with respect to liquidity issues and restructuring efforts.

12.     EY has an understanding of the Applicants' operations and cash flow and will be able to quickly and seamlessly perform its responsibilities as Monitor, if appointed.

13.     The Proposed Monitor has retained Blake, Cassels & Graydon LLP to act as its counsel.

## OVERVIEW OF THE APPLICANTS

### Background

14.     This Report should be read in conjunction with the affidavit of Sulakhan Johal sworn March 26, 2024 (the "**Johal Affidavit**") for additional background and financial information with respect to the Applicants, Limited Partnerships and the Additional Stay Parties.  The Applicants together with the Limited Partnerships and Additional Stay Parties are referred herein as the "**Pride Group**".

15.     The Pride Group is a privately held, cross-border operation which has historically maintained the following business lines:

(a)     sale and lease of new and used trucks and trailers;

(b)     trucking and logistics services;

(c)     vehicle repair, maintenance and rescue services; and

(d)     other ancillary services, such as maintaining truck stops, offering fuel car services and factoring driver invoices, all to provide a 'one-stop shop' for its customers.

16.     The Pride Group was founded by Sulakhan "Sam" Johal in 2010 with his brother as a used truck dealership and now has expanded to operate out of approximately 50 owned and leased locations across Canada and the U.S. with a fleet of approximately 20,000 trucks and tractor trailers that are owned, leased, contracted for service, serviced or securitized.

17.     The Pride Group hires individuals through direct employment as well as through subcontractor agreements (either directly or through staffing agencies) for some of its drivers, mechanics, sales team and overseas office staff. The table below highlights the geographical distribution of approximately 1,074 of the Pride Group's employees and subcontractors:

| Region | Number of Employees | Number of Subcontractors |
|:---:|:---:|:---:|
| **Canada** | 369 | 384 |
| **United States** | 100 | 21 |
| **India** | 200 | - |
| *Total* | **669** | **405** |

18.     Many of the Pride Group's customers and drivers are from the Southeast Asian community, a community that is well represented in the North American trucking and logistics industry. The Pride Group's business is focused on providing vehicle assets and services needed to support the entrepreneurial owner-operators within this community. Mr. Johal is also a member of the Southeast Asian community, to which the Pride Group also markets, and hires from.

**Pride Group Structure and Businesses**

19.     As illustrated by the organizational charts described below, the Pride Group does not have an ultimate, single parent company and has a significant number of entities within the overall corporate structure. Many of these entities have a singular purpose or a singular business function. This Report will summarize the entities that are the Applicants, Limited Partnerships and Additional Stay Parties.  A copy of the company structure is attached as **Appendix "A"** for the Canadian entities, **Appendix "B"** for the U.S. entities, and **Appendix "C"** for the Arnold (defined herein) corporate structure.

20.     The Applicants (comprising Canadian and U.S. incorporated operating and holding companies), the insolvent Limited Partnerships to which the CCAA does not apply and Additional Stay Parties (comprising solvent affiliates of the Applicants that require the benefit of the stay of proceedings) are discussed in detail in the Johal Affidavit, and are summarized in Schedule "B" hereof, based on information provided to the Proposed Monitor by the Applicants.

**Overview of the Sale and Leasing Business and Related Financing**

21.     In the ordinary course, the Proposed Monitor understands that Pride Group vehicle inventory was purchased either with Pride Group's cash on hand, financed by the vehicle manufacturer's (each an "original equipment manufacturer", or "**OEM**") own equipment financing program ("**OEM Financing**"), or through financing facilities entered into by certain Pride Group entities as borrowers for the specific purpose of acquiring vehicle inventory for the dealerships ("**Floorplan Financing**").

22.     Once acquired by the applicable Pride Group entity, the vehicle inventory was either sold to end-users, or leased to customers.

*Vehicle Sales*

23.     New vehicles are sold through Tpine Truck Rental (Canada)[1] in Canada, and Tpine Truck Rental (USA) in the U.S. via the Pride Group's dealer network across North America. Used vehicles are sold through Pride Truck Sales (Canada) in Canada, and Pride Truck Sales (USA) in the U.S. through the dealer network.

24.     Pride Group customers purchase vehicles from the dealerships either with cash or their own third-party financing. Where a vehicle was purchased with cash, the proceeds are used to re-pay a corresponding amount owed under the applicable  OEM Financing or Floorplan Financing facility. After the corresponding amounts are repaid, the Pride Group would keep a margin on each transaction if there was any.

*Vehicle Leasing*

25.     The Pride Group also offered lease-financing options through Tpine Leasing (Canada) or Tpine Leasing (USA), the leasing arms of the Pride Group in Canada and the U.S., respectively. When a customer signs a lease with Tpine Leasing (Canada) or Tpine Leasing (USA), they become an "**Obligor**" and often have to provide a down payment against the vehicle or trailer. The remainder of the amount is financed by way of lease over a 3 to 5-

---

[1] Please note that the full legal entity names referred to in this section can be found in Schedule "B".

year period.  Tpine Leasing (Canada) or Tpine Leasing (USA) would often grant its Obligors a grace period before the first lease payment would begin or allow for payments in instalments. The Proposed Monitor understands that, historically, the vast majority of the Pride Group's customer transactions are done through leasing structures, not sales.

26.     For vehicles that are leased by an Obligor, the applicable Pride Group entity would typically draw down on one of several wholesale lease financing facilities ("**Leaseline Financing**").  The funds that were drawn from the Leaseline Financing facility were used to re-pay a corresponding amount owed under the applicable OEM Financing or Floorplan Financing facility.

*Securitization*

27.     Another financing mechanism used by the Pride Group, after a vehicle has been acquired with OEM Financing or Floorplan Financing and after the vehicle has been transferred to the Leaseline Financing, was to sell a tranche of lease receivables and related assets to or for the benefit of a securitization funder ("**Securitization**").

28.     While the Proposed Monitor has not yet reviewed the Securitization documentation in any detail, and is advised that each Securitization facility differs in structure, it understands that as a general matter the financer in a Securitization financing (a "**Securitization Funder**") will have paid to the applicable Pride Group entity a specified percentage of the forecast amounts payable under the unexpired term of the bundled leases, as consideration for the Securitization Funder acquiring the proprietary interest in these lease receivables and related assets. The obligations of the Obligors under the securitized leases to pay the Securitization Funder would then be backed by either a security interest or a proprietary interest in the underlying leased vehicle (where the Securitization Funder obtains a security interest in the underlying leased vehicle, the applicable entity in the Pride Group would continue to own that vehicle, subject to the rights of the Obligor and the Securitization Funder).

29.     In the ordinary course, funds received from Securitization Funders were used to pay the existing financing corresponding to the leased vehicles (i.e., the Floorplan Financing or

Leaseline Financing). The Proposed Monitor understands that some Securitization funding was paid directly by the Securitization Funder to the previous financier, and that some was paid by the Securitization Funder to Pride Group entities.

30.     As is common in securitization structures, the Proposed Monitor understands that the Pride Group facilitated some of its Securitizations through special purposes vehicles, or "**SPVs**", which SPVs are not Applicants or Additional Stay Parties in the Pride Group's proposed CCAA Proceedings.

31.     The Proposed Monitor understands that as part of most of the Securitization structures, Tpine Leasing (Canada) and Tpine Leasing (USA) would continue to be obligated to see to the collection of the lease payments from the Obligor on behalf of the Securitization Funders (or intermediary SPVs), and in all situations, Tpine Leasing (Canada) and Tpine Leasing (USA) would otherwise be responsible for servicing the underlying obligations, which typically included collecting on arrears, repossessing the physical assets and finding new Obligors or purchasers of the repossessed asset.

32.     If an Obligor defaults on its lease, the Pride Group would attempt to work with the Obligor to collect arrears. Where consensual resolution to lease defaults is not possible, the Pride Group would arrange to repossess the leased vehicle from the Obligor.

33.     Once repossessed, the Pride Group would typically re-sell or re-lease the vehicle through its sale and leasing entities. The Proposed Monitor understands that upon repossession, the vehicle would be transferred back to the Floorplan Financing, the applicable Floorplan Financing lender would advance funds to the applicable Pride Group entity, and those funds would then be paid to the applicable Securitization funder.  However, as discussed below in the context of Multiple Financed Leases (defined below), the Proposed Monitor understands that this did not happen in all cases. The Proposed Monitor is in the process of reconciling the treatment and proceeds of repossessed vehicles with Multiple Financed Leases that were re-sold or re-leased, and will continue to do so if appointed as Monitor.

**Overview of Indebtedness in connection to the Sale, Leasing and Securitization Structure**

34.    Below is a summary of the approximate debt, by secured lender, as per the books and records of the Applicants as at March 22, 2024, which totals to approximately $1.69 billion and US$637.1 million:

| Floorplan Lenders | Outstanding Amount $(000,000) |
|---|---|
| BMO Harris Bank, N.A. ("**BMO**") | USD 33.8 |
| Mitsubishi HC Capital Canada, Inc.  ("**Mitsubishi**") | 88.3 |
| Mitsubishi – EV Equipment | 4.7 |
| Syndicate Lenders | 108.4 |
| **Total Floorplan Indebtedness** | **CAD 201.4**<br>**USD   33.8** |

| Wholesale Leaseline Lenders | |
|---|---|
| Syndicate Lenders – Canada | 213.0 |
| Syndicate Lenders - USA | USD 62.0 |
| First America Equipment | USD   5.0 |
| **Total Leaseline Indebtedness** | **CAD 213.0**<br>**USD   67.0** |

| OEM Lenders | |
|---|---|
| Daimler Truck Financial ("**Daimler**") - Canada | 193.0 |
| Daimler – EV CAD | 3.3 |
| Daimler – EV | USD  7.6 |
| Daimler - USA | USD 69.7 |
| Paccar Financial Corp ("**Paccar**")- Canada and USA | 46.9 |
| Volvo Financial Services ("**VFS**")– Canada | 9.8 |
| VFS - USA | USD  16.0 |
| **Total** | **CAD 253.0**<br>**USD   93.3** |

| Securitization Funders | |
|---|---|
| BNY Trust Company of Canada | 218.0 |
| Bodkin, a division of Bennington Financial Corp | 162.0 |
| Canadian Western Bank | 40.0 |
| ENGS Commercial Finance Co. | USD   36.0 |
| Mitsubishi | 255.0 |
| Mitsubishi – USA | USD   20.0 |

| National Bank of Canada ("**NBC**") | USD 160.0 |
| Regions – Arnold | USD 0.04 |
| Regions | USD  160.0 |
| Royal Bank of Canada ("**RBC**") | 346.0 |
| Versa Bank | USD    67.0 |
| **Total** | **CAD 1,021.0** **USD    443.0** |

**Overview of Multiple Finance Leases and Collateral Form and Substance Differences**

35.   As further detailed in the Johal Affidavit, and as previewed above, there were situations where the financing and the settlement of financing did not accord with the base-case structure and flow of funds summarized above.

36.   There are several scenarios which have resulted in multiple lenders and Securitization Funders taking the position that they have a priority security interest in the same vehicle collateral ("**Multiple Financed Leases**").

37.   For example, the Proposed Monitor understands that there are cases where (a) a vehicle was leased, (b) the lease was securitized with the first Securitization Funder, referred to as "Securitization Funder A", (c) the underlying Obligor defaulted, (d) the Pride Group entity acting as servicer under the securitization repossessed the leased vehicle, (e) the repossessed vehicle was re-leased, (f) the new lease was put into a new securitization tranche and sold to a subsequent Securitization Funder, referred to as "Securitization Funder B", and (g) the Securitization proceeds from Securitization Funder B were not remitted to Securitization Funder A, or the lenders under a Leaseline Financing facility. In such cases, each of Securitization Funder A, Securitization Funder B and the applicable Leaseline Financing lender may each claim a priority security interest in the underlying vehicle.

38.   These Multiple Financed Leases impact various forms of financing, in both Canada and in the U.S.: Leaseline Financing, OEM Financing, and Securitizations.

39.     The Proposed Monitor is also aware of scenarios in which the underlying collateral securing a financing was not, or is no longer, in the form intended by the parties ("**Collateral Form and Substance Differences**").  For example, a vehicle that has been leased to an Obligor should be collateral for obligations under a Leaseline Financing facility, however, there are instances where it was not transferred to the Leaseline Financing facility from the original Floorplan Financing facility.

40.     As discussed above, the Proposed Monitor (in its capacity as FA) has been working with the Applicants and Randall Benson of RC Benson Consulting Inc., as Chief Restructuring Officer (the "**CRO**", with the engagement of the CRO further described below) to identify Multiple Financed Leases and Collateral Form and Substance Differences.  As at the date of this Report, the Applicants have been able to identify specific assets that could potentially fit into either of these scenarios, however, at this time has not made any assessment as to the competing claims and priority of the multiple liabilities underlying the Multiple Financed Leases. If appointed as Monitor, the Proposed Monitor will continue to work with the Applicants, and with applicable legal counsel, to make recommendations to address these priority disputes.

41.     In addition, the Pride Group will need to work with the various lenders and Securitization Funders as to the method of flowing funds related to Collateral Form and Substance Differences.

42.     The treatment of the funds received from the sale or lease of assets subject to Multiple Financed Leases and Collateral Form and Substance Differences are further discussed in connection with the Governance Protocol described below.

**Overview of the Mortgages and Real Estate**

43.     Several different lenders have provided financing to specific real estate holding companies in respect of specific real estate properties. Below is a summary of the lenders and approximate secured debt outstanding as at December 31, 2023:

| Mortgage Lenders | Number of Properties | $(000,000) |
|---|---|---|
| Bank of Montreal | 7 | 29.5 USD 12.7 |
| Daimler Truck Financial Services Canada Corporation | 1 | 17.8 |
| National Bank of Canada | 4 | 54.0 |
| Royal Bank of Canada, as Agent | 7 | 80.5 USD 43.6 |
| Roynat Capital | 21 | 50.0 USD 32.4 |
| **Total** | **40** | **CAD 231.8 USD   88.7** |

**Overview of Other Financing**

44.    Pride Logistics (Canada) has the following credit facilities:

(a)    a $25 million revolving term equipment financing facility with Bank of Nova Scotia;

(b)    a $30 million revolving term equipment financing facility with HSBC Bank Canada;

(c)    a $20 million revolving term equipment financing facility with Canadian Western Bank; and

(d)    a $30 million revolving term equipment financing facility with TD Bank.

45.    In addition to the Floorplan Financing and Leaseline Financing facilities provided to some of the Applicants, the "**Syndicate Lenders**" (as defined in the Johal Affidavit) also provided (a) a $22 million Non-Revolving Term Loan Facility; and (b) a US$80 million Non-Revolving Term Loan Facility.

## CIRCUMSTANCES LEADING TO THE DECISION TO COMMENCE INSOLVENCY PROCEEDINGS

46.    As further detailed in the Johal Affidavit, the circumstances leading to the Applicants' decision to commence the CCAA Application was a culmination of several external factors which impacted the liquidity of the Pride Group. The Proposed Monitor has reviewed and considered these factors in the context of the Pride Group's operations and financial statements, and shares the Applicants' view that such factors combined to create a "perfect storm" of financial and operational hardship. The factors include:

(a)    Increased spot freight prices, and low diesel prices and interest rates during the COVID-19 pandemic led to an increase in trucking and logistics supply. This ultimately resulted in an oversupply of trucking and logistic services which resulted in declining the spot freight prices at the same time that diesel prices and interest rates went back up. This simultaneous reduction in pricing and increase in costs negatively impacted the Pride Group's revenue, while also decreasing the demand for truck sales, because the industry was no longer viewed as a good investment for the new owner-operators that form the foundation of the Pride Group's customer base;

(b)    With the increase in trucking and logistics supply and the economic downturn in the industry, smaller trucking and logistics companies, and sole-proprietor owner-operators in particular, began defaulting on their leases or allowing their vehicle to be repossessed. With the rise of delinquent leases by Obligors, the Applicants had to utilize more of their cash resources to settle outstanding balances under either the OEM Financing, Leaseline Financing or Securitizations; and

(c)    The Applicants' inventory of used vehicles increased dramatically with the increase of vehicle repossessions. As new customer demand for vehicles decreased, the prices being offered to new customers also decreased, and in many cases the proceeds of sale were not sufficient, after accounting for costs to repossess and bring the vehicle to a saleable state, to cover the underlying outstanding balance on

the financing of the vehicle under the Floorplan Financing, Leaseline Financing and OEM Financing facilities.

47.    The foregoing headwinds combined to put tremendous pressure on the Applicants' business, which had grown exponentially due to the demand during the COVID-19 pandemic, when the Applicants began purchasing new assets to support their various businesses as well as purchase of new vehicles to match the demand. Consequently, as the operations became less profitable and inventory levels rose significantly, the Applicants began taking several measures, as described in the Johal Affidavit, to improve its financial position. However, even with restructuring efforts, the liquidity was not sufficient to pay outstanding obligations.

48.    By December, 2023, the Proposed Monitor understands that many of the lenders either cut-off availability under their facilities or the facilities maxed out, which hindered the Applicants' ability to fund new inventory and lease sales.  As a result, Applicants had nominal cash sales and no new lease sales in January 2024.  Without the ability for the Applicants to provide leasing options to customers (because of the frozen Leaseline Financing facilities), sales have fallen substantially and liquidity has been severely impacted.

49.    In addition, certain of the lenders advised the Applicants that they objected to the sale of any vehicles that were subject to a Multiple Financed Leases. This decreased the pool of available vehicles for sale by the Pride Group and has increased the surplus of idle inventory.

50.    In January 2024, the Applicants ceased to pay its obligations under the Floorplan Financing facilities, Leaseline Financing facilities, Securitization facilities, mortgages, and equipment financing to maintain cash for operations, including payroll. As a result, the Applicants have received notices of default and demand letters from many of their lenders.

51.    With the assistance of the FA and the CRO, the Pride Group has attempted to negotiate a standstill letter or other forbearance arrangements with a number of its lenders to afford it the opportunity to develop a restructuring plan. Unfortunately, despite good faith efforts

by all parties, and in particular taking into account the number of lenders with various (and in some cases conflicting) interests in the Pride Group's assets, no agreement has been reached.

52.     The proposed CCAA Proceedings would provide the Applicants with the breathing room and time, under the supervision of the Court, the CRO and the Monitor (if appointed), to develop and execute a restructuring plan in consultation with its key stakeholders, maintain the operations of key businesses to generate cashflow, and preserve stakeholder rights via the implementation of the Governance Protocol (as discussed further herein). The proposed CCAA Proceedings are intended to restore lender confidence in the Applicants, thereby allowing the Applicants to resume selling and leasing vehicles in the ordinary course of business. The Proposed Monitor believes that this process is the Applicants' only chance to preserve service and supply relationships, maintain employment of the Applicants' employees, and subcontractors, and create the stability needed for the benefit of all the Applicants' stakeholders and the trucking industry in North America.

53.     In the Proposed Monitor's view, the only alternative to the proposed CCAA Proceedings would be an uncoordinated free-for-all enforcement by lenders (given that the negotiation of an out-of-court solution has failed), in many cases in respect of assets that are subject to multiple first-priority claims. The Proposed Monitor believes that this alternative option would materially impair recoveries for lenders and stakeholder interests, including due to (a) the administrative costs and delays of multiple inter-creditor disputes playing out in disparate proceedings, (b) the cessation of any future operations by the Pride Group, and (c) the flooding of the market with thousands of trucks and trailers.

**GOVERNANCE PROTOCOL**

54.     The proposed Initial Order authorizes the "Pride Entities" (as defined in the Initial Order to include the Applicants and Limited Partnerships) to remit certain amounts to creditors in respect of proceeds of sold inventory, lease payments and collections by the Pride Entities on account of leases in default, in each case without specific additional Court authorization. Such remittances are reasonable and appropriate, given the nature of the Pride Entities' business and its financing structure, which as described above requires that

certain payments be made to lenders or funders under Floorplan Financing, Leaseline Financing and Securitizations. The proposed Initial Order will also authorize the Pride Entities to sell vehicles and trailers in the ordinary course of business, for the same reason.

55.     In order to impose sufficient oversight and scrutiny on these disbursements authorized by the proposed Initial Order, certain terms of the Initial Order are to be subject to the terms of a governance protocol (the "**Governance Protocol**"), which is intended to create a process that will govern how the Proposed Monitor, if appointed, will work with Pride Entities to monitor the collection, treatment and remittance of proceeds of inventory sales, lease payments and collections from enforcement in the case of delinquent or defaulted lease agreements with Obligors.

56.     The Governance Protocol has been prepared by the Proposed Monitor, in consultation with the Pride Entities and preliminary comments from the Syndicate Lenders. In the Proposed Monitor's view, it provides for reasonable controls and oversight over cash proceeds, and provides scrutiny that distributions or remittances are made in accordance with the rights of Pride Entities' creditors.

57.     The Governance Protocol is attached hereto as **Appendix** "**D**", and the Proposed Monitor encourages interested parties to review the document in detail. The key components of the Governance Protocol are summarized as follows:[2]

(a)     Disclosure and Reporting: Applicable Pride Entities will provide the Proposed Monitor with (i) weekly reports regarding vehicle sales and buyouts, and (ii) bi-weekly reports regarding lease payments made to the Pride Entities on account of leases in good standing ("**Lease Payments Report**"), and collections made by applicable Pride Entities in respect of enforcement steps taken with respect to leases that are in default (referred to as "**Soft Collections**", with the report being the "**Soft Collections Report**"). Such reporting will include itemized amounts received or collected by the applicable Pride Entity, together with details in respect of receipts, including vehicles sold, leases paid or collected on, the Pride Entities' analysis of

---

[2] Capitalized terms not otherwise defined in this section have the meanings attributed to them in the Governance Protocol.

which lenders or Securitization Funders (collectively, the "**Financiers**") have entitlements to the funds, and Pride Entities' proposed distribution of such funds to those Financiers.

(b)     <u>Stakeholder Disclosure</u>: The Proposed Monitor will make the weekly and bi-weekly reporting available to affected Financiers.

(c)     <u>Scrutiny of Proposed Distributions</u>:

   (i)     In the case of vehicle sale and buyout proceeds ("**Vehicle Proceeds**"), the Proposed Monitor will review which Financiers are entitled to the funds and approve proposed distributions up to the lesser of (x) the amounts outstanding to such Financiers in respect of the relevant vehicle, and (y) the amount of the Vehicle Proceeds.

   (ii)    The Proposed Monitor will review the payments made by the top five customers (in total dollar amount of payments received) in respect of lease payments and Soft Collections in each bi-weekly reporting period and approve the distribution of collections or payments contained in the Soft Collections Report and Lease Payments Report (as applicable) to the Financiers entitled thereto, subject to the terms of paragraph 57(d) herein.

   (iii)   All Soft Collections related to a securitized lease, discussed in a Soft Collections Report, will be held by the Proposed Monitor in trust pending entitlement to such proceeds.

   (iv)    In the event that a portion of the Lease Payments are received from a lessee who has made payments, without attribution to a particular VIN and who is indebted to the Pride Entities in respect of more than one lease and with respect to more than one lender, then the corresponding Lease Payment(s) will be allocated to all such Financiers on a pro-rata basis based on the total amount outstanding due to each Financer.

- 18 -

(v) In the event that a portion of the Soft Collections are collected from a lessee without attribution to a particular VIN and who is indebted to the Pride Entities, Tpine USA Funding I LLC, Tpine USA Funding II LLC, Tpine USA Funding III LLC, Tpine USA Funding V LLC, or Tpine Canada Securitization LP in respect of more than one lease and with respect to more than one securitization funder, then the corresponding Soft Collection(s) will be allocated to all such Financiers on a pro-rata basis based on total amount outstanding due to each Financer.

(d) <u>Proceeds Related to Multiple Financed Leases</u>: In the case of Vehicle Proceeds, Lease Payments or Soft Collections received or recovered in respect of vehicles subject to Multiple Financed Leases, all proceeds shall be remitted to the Proposed Monitor, to be held in trust, pending the settlement or adjudication of entitlement to such proceeds, in accordance with an entitlement protocol to be approved by the Court, or as otherwise agreed to between the Pride Entities, Proposed Monitor, CRO and affected Financiers.

(e) <u>General Disbursement Oversight</u>: With respect to any payment in excess of $100,000, and all payments outside of the business operations in the ordinary course, such disbursements shall only be made with the prior consent of the Proposed Monitor and CRO.

(f) <u>Advice and Directions</u>: The Proposed Monitor shall be entitled to seek the advice and direction of the Court in respect of any disbursement, for any reason, and the Proposed Monitor reserves the right to refuse to provide its consent to such disbursement pending the direction of the Court.

(g) <u>Limitation of Liability</u>: The CRO, the Proposed Monitor, and their respective employees, advisors and other representatives acting in such capacities shall not incur any liability or obligation as a result of the CRO and/or Proposed Monitor carrying out the provisions of the Governance Protocol, save and except for any gross negligence or wilful misconduct on their part. The Monitor shall have all of

- 19 -

the protections under the CCAA in carrying out its duties and obligations hereunder.

**OVERVIEW OF PRIDE GROUP'S FIFTEEN WEEK CASH FLOW FORECAST**

58.    The Pride Group, with the assistance of the Proposed Monitor, has prepared the Cash Flow Forecast for the 13-week period from March 18, 2024 to the week ending June 30, 2024 (the "**Forecast Period**") for the purpose of projecting the Pride Group's estimated liquidity needs during the Forecast Period.   A copy of the Cash Flow Forecast is attached as **Appendix** "**E**" to this Report.

59.    The Cash Flow Forecast is presented on a weekly basis during the Forecast Period and represents the estimates of Management of the projected cash flow during the Forecast Period.  The Cash Flow Forecast has been prepared by the Pride Group using probable and hypothetical assumptions (the "**Assumptions**") set out in the notes to the Cash Flow Forecast.

60.    The Proposed Monitor has reviewed the Cash Flow Forecast through inquiries, analytical procedures and discussions, and review of documents related to the Information supplied to it by certain key members of Management and employees of the Pride Group. Based on the Proposed Monitor's review, nothing has come to its attention that causes it to believe, in all material respects, that:

(a)    the Assumptions are not consistent with the purpose of the Cash Flow Forecast;

(b)    as at the date of this Report, the Assumptions are not suitably supported and consistent with the plans of the Applicants or do not provide a reasonable basis for the Cash Flow Forecast, given the probable and hypothetical assumptions; or

(c)    the Cash Flow Forecast does not reflect the Assumptions.

61.    The Pride Group maintained 95 bank accounts in total, with Royal Bank of Canada, Bank of Montreal and National Bank of Canada, BMO Harris Bank and Bank of America.  The

- 20 -

Applicants also maintain a dormant account with CIBC.  The Pride Group has no bank credit or overdraft facilities, aside from credit cards.

62. The Cash Flow Forecast shows that during the Forecast Period, the Pride Group projects $106.2 million in receipts and project estimated total combined disbursements of approximately $88.7 million in operating disbursements and $43.3 million in non-operating disbursements. The Cash Flow Forecast assumes that a DIP facility is finalized and is available to the Pride Group after the Applicants' comeback hearing, to be scheduled. In the interim, the Pride Group will hold lease collections from customers to Leaseline Financing and OEM Financing facilities without remitting same to the applicable lenders.

## SELECT RELEVANT MATTERS ADDRESSED IN THE PROPOSED INITIAL ORDER

### Stay of Proceeding of Additional Affiliated Parties and Personal Guarantors

63. Pride Truck Sales (USA), Tpine Leasing (USA) and Sweet Home Hospitality LP are limited partnerships (collectively, the "**Limited Partnerships**") and therefore cannot be an applicant in a CCAA proceeding, however, their operations are inextricably connected with the operations of the Applicants, and many have provided cross-guarantees of the Applicants various obligations, meaning that defaults by the Applicants will trigger defaults by the Limited Partnerships. The costs and distractions to the Applicants that would be suffered by having to respond, on behalf of the Limited Partnerships are expected to be significant and would undermine the efficacy of these CCAA Proceedings. Therefore, the Pride Group is seeking an order extending the stay and other benefits and protections in the proposed Initial Order and CCAA to the Limited Partnerships.

64. As summarized in Schedule "B", the following are solvent entities that are part of the Pride Group for which the Applicants are seeking relief to extend the stay of proceedings (the "**Additional Stay Parties**")

    (a)    2500819 Ontario Inc. is a non-operating company that holds the insurance policies for all passenger vehicles driven by Pride Group employees in Canada. Premiums

are paid out of Pride Truck Sales (Canada). Any interference with the insurance coverage of the Pride Group operations would be catastrophic from a financial, operational and regulatory perspective, and accordingly 2500819 Ontario Inc. requires the benefit of the stay of proceedings in these CCAA Proceedings in order for such proceedings to be effectively undertaken;

(b)    Pride Global Insurance Company Ltd. is a captive insurance company formed to provide risk mitigation services to Pride Group Logistics (Canada);

(c)    Pergola Holdings, Corp ("**Pergola**") holds the shares of all of the U.S. real estate holding companies with the exception of those held by Pride Group Real Estate Holdings Inc. Pergola is also a guarantor of the debt to one of the OEM lenders but that may not render it insolvent. As a result, it is proposed to be an Additional Stay Party; and

(d)    Block 6 Holding Inc., which the Monitor understands is a single-purpose holding company, has entered into an agreement with a third party, to sell certain real estate property in Milton, Ontario (the "**Block 6 Transaction**"), which is expected to close in early April. Daimler Truck Financial Services Canada Corporation has security over the property subject to the Block 6 Transaction and has consented to this transaction. The Pride Group has advised the Proposed Monitor that it is in the best interest of Block 6 and the Pride Group generally to proceed with the Block 6 Transaction outside of the CCAA Proceedings, however, Pride Group proposes that the net proceeds be held by the Monitor, if appointed, subject to the rights and remedies of the creditors of Block 6, if any. As a result, Block 6 is proposed to be an Additional Stay Party so that it (and the proceeds of the Block 6 Transaction) will have the benefit of the protection of the stay of proceedings and a forum for distribution of the proceeds of sale.

65.    The Proposed Monitor agrees that such protection to the Additional Stay Parties would be in the best interests of the Pride Group stakeholders.

66.　The Proposed Monitor is of the view that the stay of proceedings in the CCAA Proceedings should be extended to the Additional Stay Parties so that there is no risk to disruption to their businesses or assets as a result of the Pride Group's defaults, the cross-guarantees or the commencement of the CCAA Proceedings.

67.　In addition to the Applicants, Limited Partnerships and Additional Stay Parties, the proposed Initial Order provides that the stay of proceedings will be extended to Mr. Johal, Jasvir Johal and Amrinder Johal (collectively, the "**Personal Guarantors**"), each of whom are personal guarantors of certain obligations of the Applicants. The proposed stay would provide that no claim or proceeding may be commenced or continued against the Personal Guarantors or their assets with respect to any guarantee, contribution or indemnity obligation, liability or claim in respect to any obligation of the Pride Group.

68.　The Personal Guarantors are key members of the Pride Group management, whose attention will be critical to the successful conduct of the CCAA Proceedings. In the Proposed Monitor's view, the significant cost and distraction that would be created by claims against the Personal Guarantors on account of their guaranteed obligations would be detrimental to the CCAA Proceedings, and by extension detrimental to the Pride Group's stakeholders. Moreover, the obligations guaranteed by the Personal Guarantors may be materially reduced or otherwise satisfied as part of the CCAA Proceedings. The proposed application of the stay of proceedings to the Personal Guarantors is also generally consistent with the rationale for staying claims against directors and officers, which is routinely granted in CCAA proceedings.

69.　Accordingly, the Proposed Monitor believes that it is reasonable and appropriate for the stay of proceedings to be extended to the Personal Guarantors.

**Priority of Charges**

70.　The proposed Initial Order provides for two priority charges (collectively, the "**Charges**") on the current and future assets, undertakings and properties of the Applicants, wherever located, including all proceeds thereof that rank in the following order:

(a)    first, the Administration Charge (as that term is defined below); and

(b)    second, Directors' Charge (as that term is defined below).

71.    The Proposed Monitor understands that, if the proposed Initial Order is granted, the Applicants will provide notice of the Initial Order and the scheduled "comeback" motion to registered secured creditors of the Applicants, together with any parties who serve a "Notice of Appearance" in the CCAA Proceedings, in advance of the comeback motion. Approval of a DIP Term Sheet and Governance Protocol is expected to be sought at the hearing for the "comeback" motion.

72.    The Proposed Monitor expects that at least two additional charges will be sought by the Applicants at the comeback hearing: a DIP Lenders' Charge, securing the obligations of the applicable Pride Group borrowers' under a DIP facility to be approved by the Court, and an Intercompany Charge, securing obligations of Pride Group entities to other Pride Group entities on account of post-filing intercompany transfers. The Monitor, if appointed, will provide a further report to the Court in respect of these anticipated charges, if they are sought by the Applicants.

**Administration Charge**

73.    The proposed Initial Order provides for a charge up to a maximum amount of $2,000,000 (the "**Administration Charge**") in favour of Canadian and U.S. counsel to the Applicants, the Proposed Monitor and its counsel, and Canadian counsel to the Directors and Officers, and the CRO, as security for the professional fees and disbursements incurred prior to and after the commencement of the CCAA Proceedings.

74.    The proposed Administration Charge in the proposed Initial Order is based on the forecast fees of the above-listed professionals to the week ended April 6, 2024. The Proposed Monitor reviewed the calculation of the Administration Charge that was prepared by the Applicants and is of the view that the proposed Administration Charge is required and reasonable in the circumstances. The Proposed Monitor believes the quantum of the Administration Charge is limited to the amount necessary for the Initial Stay Period based

on its review and assessment of the anticipated professional costs to be incurred during this matter.

75.     The Proposed Monitor understands that the Applicants will be seeking an increase of the Administration Charge to $3,000,000 on the comeback motion. The Proposed Monitor, if appointed, will provide additional commentary on this increase to the Administration Charge in a subsequent report to the Court.

**Directors' Charge**

76.     The proposed Initial Order provides for a charge in an amount not to exceed $4,100,000 (the "**Directors' Charge**") to secure an indemnity in favour of the current directors and officers of the Applicants (the "**Directors and Officers**") against obligations and liabilities that they may incur as directors or officers of the Applicants after the commencement of these CCAA Proceedings, except to the extent that the obligation or liability is incurred as a result of such director's or officer's gross negligence or willful misconduct.

77.     The Directors and Officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent such coverage is insufficient to pay an indemnified amount as described above.

78.     The proposed Directors' Charge in the proposed Initial Order is based on approximately 1.2 weeks of payroll, current accrued vacation pay and current unremitted source deductions. In addition, it includes HST in Canada and sale and use taxes, state income taxes, payroll taxes in the U.S that directors' and officers' are liable in the jurisdictions that they operate. The Proposed Monitor reviewed the calculation of the Directors' Charge that was prepared by the Applicants and is of the view that the proposed Directors' Charge is required and reasonable in the circumstances and believes the quantum of the Directors' Charge is limited to the amount necessary for the Initial Stay Period, based upon a review and assessment of the anticipated payroll, other employee costs and taxes to be incurred during this matter.

79.     The Proposed Monitor understands that the Applicants will be seeking an increase of the Directors' Charge to $7,400,000 to incorporate other employee amounts that are expected to be payable during the course of these CCAA Proceedings. The Proposed Monitor, if appointed, will provide additional commentary on this increase to the Directors' Charge in a subsequent report to the Court.

**MATTERS IN CONNECTION TO THE CRO ENGAGEMENT LETTER**

80.     The Pride Group formally engaged the CRO pursuant to an engagement letter dated February 24, 2024 (the "**CRO Engagement Letter**"). A copy of the CRO Engagement Letter, redacted to protect commercially sensitive information, is attached to the Johal Affidavit as Exhibit "L". An unredacted copy of the CRO Engagement Letter is attached hereto as **Confidential Appendix "A".** The Proposed Monitor understands that the Pride Group will be seeking a sealing order of this Court, sealing **Confidential Appendix "A".**

**CONCLUSIONS AND RECOMMENDATIONS**

81.     The Proposed Monitor has reviewed the Applicants' CCAA Application materials and has consented to act as the Monitor of the Applicants should this Court grant the proposed Initial Order.

82.     For the reasons stated herein, the Proposed Monitor believes it is appropriate for the Applicants to be granted protection under the CCAA, for the Limited Partnerships and Additional Stay Parties to obtain the benefit of the stay of proceedings, and for the Court to grant the proposed Initial Order.

All of which is respectfully submitted this 27th day of March, 2024.

**ERNST & YOUNG INC.**

**Solely in its role as proposed Court-appointed Monitor of Pride Group Holdings Inc. and certain affiliates and not in its personal or corporate capacity**

**per:**

**Alex Morrison, CPA, CA, LIT, CIRP**
**Senior Vice President**

**Karen Fung, CPA, CA, LIT, CIRP**
**Senior Vice President**

**APPENDIX "B"**

**First Report dated April 4, 2024**
**(without appendices)**

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those Applicants listed on **Schedule "A"** hereto

**FIRST REPORT OF THE MONITOR**

**DATED April 4, 2024**

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................... 1

PURPOSE ................................................................................................................................ 2

TERMS OF REFERENCE ...................................................................................................... 3

OPERATIONAL UPDATES FOR THE PRIDE ENTITIES .................................................... 4

CHAPTER 15 PROCEEDINGS.............................................................................................. 5

THE MONITOR'S ACTIVITIES SINCE ITS APPOINTMENT ........................................... 6

DIP FINANCING.................................................................................................................... 7

PROPOSED AMENDED AND RESTATED INITIAL ORDER........................................... 12

PROPOSED PROTOCOLS ORDER .................................................................................... 18

UPDATED FIFTEEN WEEK CASH FLOW FORECAST ................................................... 32

OTHER RELEVANT MATTERS AND UPDATES.............................................................. 33

CONCLUSIONS AND RECOMMENDATIONS.................................................................. 38

**Appendices**

| Appendix | Tab |
|---|---|
| Pre-Filing Report dated March 27, 2024 ................................................................ | A |
| Debtor-In-Possession Facility Term Sheet dated April 1, 2024 .............................. | B |
| Preservation Protocol - Illustrative ....................................................................... | C |
| Updated Cash Flow Forecast ................................................................................ | D |

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**FIRST REPORT OF THE MONITOR**

**DATED April 4, 2024**

## INTRODUCTION

1.   On March 27, 2024, Pride Group Holdings Inc. and those entities listed as "Applicants" in **Schedule "A"** hereto (each an "**Applicant**" and, collectively, the "**Applicants**") brought an application (the "**CCAA Application**") before the Ontario Superior Court of Justice (Commercial List) (the "**Court**") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") to, among other things, obtain a stay of proceedings to allow them an opportunity to restructure their business and affairs.

2.   On the same day, the Court granted an initial order (the "**Initial Order**") in these CCAA proceedings (the "**CCAA Proceedings**") that, among other things, appointed Ernst & Young Inc. as Monitor (in such capacity, the "**Monitor**"). In addition to the Applicants, the entities listed as Limited Partnerships and Additional Stay Parties in **Schedule "A"** hereto also obtained the benefit of the stay of proceedings until and including April 6, 2024, which stay expires the next business day, April 8, 2024 (the "**Stay Period**"). The Applicants together with the Limited Partnerships are referred herein as the "**Pride Entities**" (and together with the Additional Stay Parties, the "**Pride Group**").

3.   The Monitor filed a Pre-Filing Report dated March 27, 2024 (the "**Pre-Filing Report**") in connection with the CCAA Application. This First Report of the Monitor (the "**First Report**") supplements the information contained in the Pre-Filing Report for the purposes

of the comeback motion scheduled to be heard on April 5, 2024, at 2pm (ET) (the **"Comeback Hearing"**). A copy of the Pre-Filing Report (with schedules) is attached hereto as **Appendix "A"**.

4.      This First Report should be read in conjunction with the Pre-Filing Report, the affidavit of Sulakhan Johal sworn March 26, 2024 (the **"Johal Affidavit"**) and the affidavit of Randall Benson sworn April 2, 2024 (the **"Benson Affidavit"**) for additional background and financial information with respect to the Pride Group. Capitalized terms not otherwise defined herein have the meanings attributed to them in the Pre-Filing Report or Initial Order, as applicable.

**PURPOSE**

5.      The purpose of this First Report is to provide information to the Court in respect of:

(a)      Operational updates for the Pride Group;

(b)      Commencement of the Chapter 15 Proceedings (as defined herein);

(c)      The Monitor's activities since its appointment;

(d)      The proposed debtor-in-possession financing facility;

(e)      The Applicants' motion for:

(i)      an amended and restated Initial Order (the **"ARIO"**), substantially in the form attached to the Pride Group's motion record dated April 2, 2024, including, among other things, the following relief:

(1)      elevating the priority of the Administration Charge and the Directors' Charge;

(2)      increasing the quantum of the Administration Charge and Directors' Charge;

(3)      granting the Intercompany Advances Charge (as defined below);

(4)  approving the proposed DIP Term Sheet (as defined below);

(5)  granting the DIP Lenders' Charge; and

(6)  authorizing certain payments of pre-filing obligations;

(ii)  the "**Protocols Order**" approving, among other things, (i) the Governance Protocol; (ii) the Real Estate Protocol; and (iii) the Preservation Protocol (together with the Real Estate Protocol and Governance Protocol, each as defined below and collectively, the "**Protocols**"), substantially in the form attached to the Pride Group's motion record dated April 2, 2024;

(f)  The updated fifteen-week cash flow forecast on a consolidated basis for the Applicants and the Additional Stay Parties (the "**Cash Flow Forecast**");

(g)  Other relevant updates on these CCAA Proceedings:

(i)  Status of stakeholder outreach and inbound inquiries;

(ii)  Activation Notice for Blocked Accounts from Mitsubishi HC Capital Canada, Inc. ("**Mitsubishi**");

(iii)  Role of External Accountants in the Financial Reporting Process; and

(iv)  Pride Group Logistics Trucks; and

(h)  Extending the Stay Period until and including June 30, 2024.

**TERMS OF REFERENCE**

6.  In preparing this First Report and making the comments herein, the Monitor has been provided with, and has relied upon, unaudited financial information, books and records prepared by the Applicants, discussions with management of the Applicants ("**Management**"), and information from other third-party sources (collectively, the "**Information**"). Except as described in this First Report in respect of the Cash Flow Forecast:

- 4 -

(a)     the Monitor has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Monitor has not audited or otherwise attempted to verify the accuracy or completeness of such Information in a manner that would wholly or partially comply with Canadian Auditing Standards ("**CAS**") pursuant to the Chartered Professional Accountants Canada Handbook and, accordingly, the Monitor expresses no opinion or other form of assurance contemplated under CAS in respect of the Information; and

(b)     some of the information referred to in this First Report consists of forecasts and projections. An examination or review of the financial forecast and projections, as outlined in the Chartered Professional Accountants Canada Handbook, has not been performed.

7.     Future-oriented financial information referred to in this First Report was prepared based on Management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that are not ascertainable, the actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

8.     Unless otherwise indicated, the Monitor's understanding of factual matters expressed in this First Report concerning the Pride Group, and their business is based on the Information, and not independent factual determinations made by the Monitor.

9.     Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

**OPERATIONAL UPDATES FOR THE PRIDE ENTITIES**

10.     Since the date of the Initial Order, the Pride Entities have maintained their existing operations without material disruptions. The Pride Entities prepared and executed a communications plan to each of its key stakeholders to provide information on the CCAA Proceedings, which included, with the assistance of the Monitor:

- 5 -

(a)      holding a virtual town hall meeting on March 27, 2024 with employees and independent contractors in the US and Canada to discuss the strategic direction of the Pride Entities' operations and, provide information regarding the CCAA process;

(b)      contacting key customers directly by telephone and email;

(c)      contacting certain key suppliers and stakeholders;

(d)      organizing calls with certain secured lenders and financiers;

(e)      sending mail and email communication on or around March 28, 2024 to:

    (i)      sales and service customers;

    (ii)      leasing customers;

    (iii)      truck and logistics customers;

    (iv)      employees and independent contractors;

    (v)      suppliers and service providers; and

(f)      issuing a press release with respect to the CCAA Proceedings on March 28, 2024.

11.      The Pride Entities have also adhered to the terms under the Governance Protocol approved by the Initial Order.

**CHAPTER 15 PROCEEDINGS**

12.      On April 1, 2024, Mr. Randall Benson, acting as "Foreign Representative" of the Pride Group filed an application to commence ancillary insolvency proceedings under Chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**"). Within the Pride Group, the "Canadian Operating Entities", "U.S. Operating Entities", "Other Canadian Holding Companies" and "Other U.S. Holding Companies", as listed in **Schedule "A"** hereto, filed as "Debtors" under the Chapter 15 Proceedings (collectively, the "**Chapter 15 Debtors**").

13.    On or about April 2, 2024, the Foreign Representative obtained orders from the U.S. Bankruptcy Court, amongst other things, recognizing the Initial Order on a provisional basis (the "**Provisional Relief Order**") and granting recognition of Randall Benson as "Foreign Representative". A further hearing by the U.S. Bankruptcy Court has been scheduled for May 2, 2024 to address the Chapter 15 Debtors' motion requesting recognition of the CCAA Proceedings as a "foreign main proceeding" on a final basis. While the relief obtained on April 2, 2024 was on an *ex parte* basis, a number of parties reserved rights to make objections on May 2, 2024. The Monitor will continue to monitor the Chapter 15 Proceedings.

14.    Copies of the filings and related documents under the Chapter 15 Proceedings can be accessed from the following website: https://dm.epiq11.com/case/pridegroup/info. Copies of certain key materials in the Chapter 15 Proceedings have been, and will continue to be, posted on the Monitor's Website (as defined below).

**THE MONITOR'S ACTIVITIES SINCE ITS APPOINTMENT**

15.    Since the commencement of the CCAA Proceedings, the Monitor has been:

(a)    assisting the Pride Entities with their communication plan;

(b)    responding to calls and e-mails received from suppliers, employees and independent contractors, and other parties with respect to these CCAA Proceedings;

(c)    reviewing the Pride Entities' receipts and disbursements, including Intercompany Advances (as defined below);

(d)    advising the Pride Entities on the preparation of the cash flow forecasts and variance analysis; and

(e)    performing its duties, and supervising the Pride Group's performance, under the Governance Protocol.

16.    The Monitor established a case website at www.ey.com/ca/pridegroup (the "**Monitor's Website**"). Documents filed in these CCAA Proceedings and certain other documents will be posted on the Monitor's Website. Further, the Monitor has arranged for a toll-free hotline phone number 1-800-207-9506 (fax: 416-943-3300) for calls related to this matter and an e-mail address: pridegroup.monitor@ca.ey.com for e-mail correspondence with the creditors and other stakeholders of the Pride Entities.

17.    Pursuant to the Initial Order, the following notices have been posted on the Monitor's Website and/or sent to the Applicants' stakeholders since the date of the Initial Order:

(a)    on or around March 28, 2024, the Monitor posted a copy of the CCAA Application, the Pre-Filing Report, the Initial Order, and the service list, as at that date on the Monitor's Website;

(b)    on March 28, 2024, the Monitor sent a notice, which included information about the CCAA Proceedings, the toll-free telephone number and the Monitor's email address (the "**Notice to Creditors**") to all known creditors, based on the contact information of such known creditors who are owed funds by the Pride Entities greater than $1,000, provided by the Pride Entities (the "**Known Creditors**"), by prepaid ordinary mail to all Known Creditors where such information was available. A copy of the Notice to Creditors was also posted on the Monitor's Website;

(c)    on April 1, 2024, the Monitor posted on the Monitor's Website a list showing the names of the Known Creditors and amounts owing according to the Applicants' books and records; and

(d)    the Monitor has arranged to publish a notice to creditors in the Globe and Mail (National Edition) on April 5, 2024.

**DIP FINANCING**

18.    As illustrated and described in the cash flow forecast attached as Appendix "E" to the Pre-Filing Report, and as reported in the Updated Cash Flow Forecast (defined below), the

- 8 -

Pride Group will require financing during the CCAA Proceedings to address their urgent liquidity needs and fund the costs of the CCAA Proceedings.

19.     The Pride Group, in consultation with the Monitor, has been actively negotiating a debtor-in-possession financing facility (the "**DIP Facility**") with certain of its existing senior lenders to obtain access to such liquidity, which DIP Facility has been established in the Debtor-In-Possession Facility Term Sheet dated April 1, 2024 (the "**DIP Term Sheet**"). An un-signed copy of the DIP Term Sheet is attached as Exhibit "D" to the Benson Affidavit. A fully executed copy of the DIP Term Sheet is attached hereto as **Appendix "B"**.

20.     Key terms and components of the DIP Facility include the following[1]:

| **DIP Facility**<br>(Capitalized terms not otherwise defined herein have the meaning ascribed thereto in this First Report or the DIP Term Sheet, as applicable) | |
| --- | --- |
| DIP Borrowers | • The Applicants and "Limited Partnerships" listed in **Schedule "A"** hereto (collectively, the "**DIP Borrowers**" and each a "**DIP Borrower**"). |
| DIP Availment Borrowers | • The DIP Borrowers other than Coastline Holdings, Corp., Pride Group Holdings Inc., and Frontage Road Holding Corp. (the "**DIP Availment Borrowers**"). |
| Lender Parties | • Royal Bank of Canada, as administrative agent (the "**DIP Agent**"), and the lenders (including Royal Bank of Canada, the Toronto-Dominion Bank, the Bank of Nova Scotia, Bank of Montreal and other banks and financial institutions who may from time to time become a lender) under the Third Amended and Restated Credit Agreement dated as of November 4, 2022 (the "**Syndicate Agreement**") as "**DIP Lenders**". |
| Commitment | • Up to a principal amount of $30 million on a non-revolving basis.<br><br>• Funding shall be by way of multiple advances which will require written notice by the applicable DIP Borrower to the DIP Agent, with such notice approved by the Monitor and executed by a senior officer of such DIP Borrower. |

---

[1] The following summary of the DIP Term Sheet is provided for convenience only. Parties should refer to the DIP Term Sheet itself for a definitive account of its terms and conditions.

| | |
|---|---|
| Entities Entitled to Request an Advance | • Only the DIP Availment Borrowers are permitted to submit a written notice for an advance under the DIP Facility, unless the DIP Agent provides its written consent to other DIP Borrowers. |
| Use of Proceeds | The proceeds of the DIP Facility are to be used to:<br><br>• fund the ordinary course working capital and other general corporate purposes of the DIP Borrowers; and<br><br>• pay all costs and expenses of the DIP Agent, Finance Parties, Lenders' Counsel, and Lender Financial Advisor incurred including in connection with the DIP Facility, the preparation of the DIP Term Sheet, and such other Permitted Fees and Expenses as fully described in the DIP Term Sheet. |
| Interest | • Canadian Prime Rate plus 250 basis points per annum (i.e. 9.70% as of the date of this First Report). |
| Mandatory Prepayments (DIP Facility) | Mandatory prepayments of the DIP Facility include:<br><br>• all receipts of any DIP Borrowers outside of the ordinary course of business, which are not disclosed or accounted for in the DIP Budget and which exceed $1 million individually or in the aggregate; and<br><br>• subject to and except as provided in the Governance Protocol and the priorities as set out in the ARIO, all proceeds from the sale of Secured Assets (as defined in the Syndicate Agreement) which proceeds are not contemplated in the DIP Budget and are not subject to a security interest in favour of a third party financier ranking in priority to the security interest of the Administrative Agent as of the Filing Date. Such proceeds are required to be remitted when the aggregate amount thereof reaches $250,000. |
| Mandatory Prepayments (Pre-Filing Facility) | • Certain amounts to be applied against the Pre-Filing Secured Obligations of the Syndicate Lenders, including (i) all amounts received by any DIP Borrower in repayment of Pre-Filing intercompany advances to other DIP Borrowers outstanding, and (ii) all amounts paid in accordance with the Real Property Monetization Plan and Governance Protocol.<br><br>• In each case, funds contemplated to be paid to the Administrative Agent and applied against Pre-Filing Obligations as aforesaid shall be held in trust by the Monitor and not released to the Administrative Agent until the Monitor has confirmed, based upon legal opinions obtained, that it has no objection to such payments being made to the Administrative Agent for application against Pre-Filing Obligations, or further Court Order. |

| Maturity | The earlier of: <br><br> • June 30, 2024 (12:00 pm Toronto time) (the "**Outside Maturity Date**"); and <br><br> • The occurrence of an Event of Default of which the DIP Agent has elected, in its sole discretion to accelerate the DIP Obligations. <br><br> • The Outside Maturity Date can be extended to September 30, 2024 if the DIP Borrowers satisfy certain conditions. |
|---|---|
| Fees and Expenses | • Commitment fee of $200,000 payable to the DIP Agent (the "**Commitment Fee**"). <br><br> • The DIP Borrowers shall be responsible for the Permitted Fees and Expenses. |
| Security | • To be secured by the "Security" as defined under the Syndicate Agreement, together with the DIP Lenders' Charge (as discussed further herein). |

21.     The DIP Term Sheet was negotiated and settled under significant time pressure. As discussed in the Johal Affidavit, the Applicants were advised by the lenders under the Syndicate Agreement (the "**Syndicate Lenders**") in March that they would enforce their rights and remedies if no formal insolvency proceeding was commenced by March 31, 2024, which not only precipitated the present CCAA Proceedings, but also left the Pride Group with very little time to secure interim financing.

22.     Given the sheer volume of lenders with security interests in the Pride Group's assets (who would be expected to object to a priming charge securing interim financing), the state of the Pride Group's operations and books and records (which would create significant impediments to meaningful due diligence by any third-party lender), the significant involvement of the Syndicate Lenders in the discussions leading up to the CCAA filing (including their retainer of a financial advisor and its engagement in the process), and the Syndicate Lenders' willingness to provide interim financing, it was not apparent to the Pride Group that there were any viable alternatives to the Syndicate Lenders for a DIP Facility. The DIP Facility negotiations included the establishment of governance protocols. The Pride Group, with the assistance of the CRO and EY, had discussions regarding

obtaining DIP financing from lenders other than the Syndicate Lenders, and such discussions continued until it was recently determined that no such alternatives would be possible under the circumstances and time pressures that the Pride Group was facing.

23.    The Monitor is of the view that the DIP Facility provides the financing necessary to allow the Pride Entities to maintain their ongoing operations, and does so pursuant to terms that are as favourable as the Pride Group can expect to get. The Monitor considers the terms of the DIP Facility to be reasonable under the circumstances, including for the following reasons:

(a)    Commitment Fee and Interest Rate: The DIP Facility includes a Commitment Fee of $200,000 (which represents less than 1% of the DIP Facility commitments) and charges an interest rate of Canadian Prime Rate plus 250 basis points per annum. In the Monitor's view, the Commitment Fee is reasonable and the interest rate competitive, having regards to the pricing of comparable debtor-in-possession facilities approved by this Court in comparable CCAA proceedings in Ontario.

(b)    Priority: The DIP Facility is being advanced by the Syndicate Lenders, who already have a significant amount of indebtedness secured by the DIP Borrowers' property.[2] As discussed below, the proposed DIP Lenders' Charge is subordinate to (a) any validly perfected and enforceable security interest of third party financers in specific vehicle and lease collateral which, as of the date of the Initial Order, ranks in priority to the security under the Syndicate Agreement; and (b) any valid and enforceable mortgages duly registered on title to the real property of the DIP Borrowers, as of the date of the Initial Order.

(c)    Absence of Alternatives. As discussed above, given the circumstances and time pressures of the Pride Group, the Monitor does not believe that alternative interim financing would have been available on acceptable terms.

---

[2] The Monitor has not yet received independent confirmation regarding the validity or enforceability of the Syndicate Lenders' security and makes no conclusion herein regarding same. The Monitor has instructed its counsel to undertake a security review of, among other creditors, the security of the Syndicate Lenders.

24.     The Monitor notes that Event of Default (p) in the DIP Term Sheet prescribes that it is a default if the Monitor does not obtain opinions from its legal counsel on usual and customary terms, assumptions and qualifications with respect to the validity and enforceability of the Syndicate Lenders' pre-filing Security, in both Canada and the United States, by April 29, 2024, or such later date as reasonably required by such legal counsel exercising best efforts to complete such review in a timely manner. The Monitor has instructed its Canadian counsel to begin this security review, and is in the process of retaining US counsel to assist with the US law review.[3]

25.     The Monitor also notes that the June 30, 2024 Outside Maturity Date of the DIP Facility will only be extended to September 30, 2024 if, by June 1, 2024, the DIP Borrowers have provided to the DIP Agent the detailed principal terms of a restructuring plan in respect of the DIP Borrowers which is supported by the Monitor with appropriate financial analysis (a "**Restructuring Plan**"), which Restructuring Plan shall also contemplate the path for repayment in full of  the DIP Obligations by no later than September 30, 2024, and the Lenders shall have provided their approval to such Restructuring Plan by June 15, 2024. The Monitor expects to consult with not just the DIP Lenders, but other material stakeholders in developing such Restructuring Plan.

26.     Accordingly, the Monitor recommends that this Court approve the DIP Facility and authorize the DIP Borrowers execution of the DIP Term Sheet.

**PROPOSED AMENDED AND RESTATED INITIAL ORDER**

27.     The Monitor has reviewed the following aspects of the proposed ARIO:

**Elevation of Priority of Charges**

28.     Under the Initial Order, the Administration Charge and Directors' Charge did not rank in priority to all other security interests, trusts, lien, charges and encumbrances, claims of

---

[3] As discussed further below, the Monitor has instructed its counsel to review the security of all of the Pride Entities' lenders, and the Monitor's counsel has started this process. In the Monitor's view, the numerous Pride Group stakeholders, and the Court, will require an independent analysis of the security entitlements of the various creditors in these CCAA Proceedings before any long-term steps can be implemented.

secured creditors, statutory or otherwise in favour of any parties (with such parties, the "**Charge Notice Parties**"). The proposed ARIO now seeks to (a) elevate the Administration Charge and the Directors' Charge, and (b) create the Intercompany Advances Charge and the DIP Lenders' Charge, in each case in priority over the interests of the Charge Notice Parties served with the motion for this Comeback Hearing (subject to certain carve-outs described below).

29.     The proposed ARIO provides for four priority charges (collectively, the "**Charges**") on the current and future assets, undertakings and properties of the Pride Entities, wherever located, including all proceeds thereof, that rank in the following order:

(a)      first, the Administration Charge;

(b)      second, the Intercompany Advances Charge;

(c)      third, the DIP Lenders' Charge; and

(d)      fourth, Directors' Charge.

30.     Each of these Charges are discussed in further detail below.

**Increase to the Administration Charge**

31.     Pursuant to the Initial Order, this Court granted an Administration Charge up to a maximum amount of $2,000,000 in favour of the Monitor, counsel to the Monitor, counsel to the Pride Entities, the CRO and Canadian counsel to the boards of directors (collectively, the "**Restructuring Professionals**"), as security for the professional fees and disbursements incurred prior to and after the commencement of the CCAA Proceedings.

32.     The Applicants seek to increase the quantum of the Administration Charge from $2,000,000 to $3,000,000 under the proposed ARIO. This increase in quantum reflects the estimated financial exposure of the Restructuring Professionals during the proposed extended Stay Period.

33.     The increased quantum of the Administration Charge has been established based on the Pride Entities' estimated payment cycles and the Monitor's experience with restructurings of similar scope and complexity. The Monitor believes that such an increase to the Administration Charge is required and reasonable in the circumstances.

**Intercompany Advances Charge**

34.     As described in the Johal Affidavit and the Benson Affidavit, certain operations of one DIP Borrower (the "**Lending Entity**") may need to fund the operations of another DIP Borrower (each, a "**Recipient Entity**"). These intercompany funding requirements are consistent with the historical practice of the Pride Group.

35.     The proposed ARIO contemplates that, subject to the Protocols and the DIP Facility being approved, the Pride Entities shall be entitled to continue to utilize their centralized cash management system currently in place, including intercompany transfers. This will include the authority for a Lending Entity to make a loan to a Recipient Entity, and for a Recipient Entity to borrow from a Lending Entity the amounts advanced to fund the Recipient Entity's ongoing operations (the "**Intercompany Advances**").

36.     The proposed ARIO also provides that to the extent that a Lending Entity after the date of the ARIO, makes any payment to any Recipient Entity, such Lending Entity is granted a charge (the "**Intercompany Advances Charge**") on all of the Property (as that term is defined in the Initial Order) of the Recipient Entity in the amount of such payment or obligation or transfer.

37.     The Monitor is of the view that the request for approval of the Intercompany Advances and the Intercompany Advances Charge is reasonable under the circumstances and will ensure that the stakeholders of each Lending Entity will not be prejudiced by Intercompany Advances that are required to be made to facilitate the Pride Entities' operations during these CCAA Proceedings.

38.     The Monitor will work with the Pride Entities to review, approve and track all Intercompany Advances and will periodically report thereon to the Court.

**DIP Lenders' Charge**

39.     The proposed ARIO provides for a charge on the DIP Borrowers' current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof, as security for the outstanding obligations of the DIP Borrowers under the DIP Facility (the "**DIP Lenders' Charge**").

40.     As set out above, the DIP Lenders' Charge would be subordinate to the Administration Charge and the Intercompany Advances Charge, and also subordinate to (a) any validly perfected and enforceable security interest of third party financers in specific vehicle and lease collateral which, as of the date of the Initial Order, ranks in priority to the security under the Syndicate Agreement; and (b) any valid and enforceable mortgages duly registered on title to the real property of the DIP Borrowers, as of the date of the Initial Order.

41.     In the Monitor's view, the proposed terms and priority of the DIP Lenders' Charge is reasonable and appropriate in the circumstances.

**Increase to the Directors' Charge**

42.     Pursuant to the Initial Order, this Court granted a Director's Charge not to exceed the amount of $4,100,000 to secure an indemnity in favour of the directors and officers of the Pride Entities (the "**Directors and Officers**") against obligations and liabilities that they may incur as directors or officers of the Pride Entities after the commencement of these CCAA Proceedings, except to the extent that the obligation or liability is incurred as a result of such director's or officer's gross negligence or willful misconduct.

43.     Subject to the priority of Charges described above, the Directors' Charge shall be subordinate to the same pre-filing interests as the DIP Lenders' Charge, being: (a) any validly perfected and enforceable security interest of third party financers in specific vehicle and lease collateral; and (b) any valid and enforceable mortgage in favour of a third party mortgagee, in each case including, for greater certainty, such interests in favour of

- 16 -

the Administrative Agent and Lenders (each as defined in the Syndicate Agreement) under the Security.

44.    The quantum of the Directors' Charge in the Initial Order was based on approximately 1.2 weeks of payroll, current accrued vacation pay and current unremitted source deductions. In addition, it included Canadian sales taxes, U.S. state sales and use taxes, U.S. state income taxes, U.S. payroll taxes that directors' and officers' are liable in the jurisdictions that they operate until and including April 6, 2024.

45.    The Applicants seek to increase the quantum of the Directors' Charge from $4,100,000 to $7,400,000 under the proposed ARIO. This increase reflects (a) approximately two weeks (instead of 1.2 weeks) of payroll, (b) a month's worth (instead of 10-days) of Canadian sales taxes, and (c) a month's worth (instead of 10-days) of U.S. state sales and use taxes, U.S. state income taxes, and payroll taxes that directors and officers are liable for in the jurisdictions that they operate during the proposed extended Stay Period to June 30, 2024, in addition to the current accrued vacation pay and current unremitted source deductions.

46.    The Monitor reviewed the calculation of the increased Directors' Charge that was prepared by the Applicants, and is of the view that the proposed increase is required and reasonable in the circumstances. The Monitor believes the quantum of the Directors' Charge is limited to the amount necessary for the proposed extended Stay Period.

**Restrictions on Set-off**

47.    The proposed ARIO includes explicit restrictions on "pre- against post-filing set-off". In the Monitor's view, this restriction on pre- against post- filing set-off is important for the efficient conduct of the CCAA Proceedings and agrees with the Applicants in the Benson Affidavit where Mr. Benson states that the proposed language in the ARIO is merely a description of the current *status quo* as established by the Courts (including the Supreme Court of Canada).

48.    As such, the proposed language in the ARIO related to set-off is appropriate as a statement of the *status quo*, but should not be prejudicial to (or otherwise effect the rights of) any stakeholder.

**Payment of pre-filing insurance premiums**

49.    Pursuant to paragraph 6 of the Initial Order, the Pride Entities are entitled to pay reasonable expenses incurred by them in carrying on their businesses in the ordinary course after the date of the Initial Order. This specifically includes the payment on account of insurance, including directors' and officers' insurance. Since the date of the Initial Order, the Monitor became aware that certain pre-filing premiums are outstanding in respect of certain insurance policies with respect to the directors and officers.

50.    Accordingly, the Pride Entities, with approval from the Monitor and the CRO, seek the authority to pay such amounts in order to bring such insurance policies current. Given that the Directors' Charge only applies in respect of obligations after the date of the Initial Order, the directors and officers require the protection available to them under the existing insurance policies, and the Monitor supports the payment of such amounts.

**Payment of Pre-filing Trade Payables**

51.    The Monitor has also become aware that certain suppliers of goods and services, and certain transportation route tolls, are unpaid and constitute pre-filing claims. The Pride Group will require the ongoing supply of goods and services from certain of these unpaid suppliers, and will require its trucks to be able to access routes in respect of which tolls are outstanding. To the extent that payment of the pre-filing amounts are necessary in order to preserve the value of the Property and the Business by assuring continued supply or access to routes, the Pride Group is seeking the Court's authorization to make such payments, with the consent of the Monitor and the CRO.

52.    Given that the payment of pre-filing amounts is required by the terms of the proposed ARIO to be (a) necessary to preserve the value of the Property and the Business, or to facilitate the Restructuring (as defined in the ARIO), and (b) approved by the Monitor and

CRO, the Monitor is satisfied that this relief is reasonable and necessary. The Monitor supports the relief sought by the Pride Group in this regard.

## PROPOSED PROTOCOLS ORDER

53. It is clear to the Monitor that the numerous creditors of the Pride Group require a measure of discipline, predictability, flexibility and transparency to be imposed on the operations of the Pride Group throughout these CCAA Proceedings. That discipline, predictability, flexibility and transparency is intended to be accomplished, in part, pursuant to the Protocols that the Pride Group will be required to operate under, with the supervision and participation of the Monitor. Such Protocols are a requirement of the DIP Facility, but protect all stakeholders.

54. Accordingly, the Applicants are seeking approval of the Protocols Order, which shall, among other things, approve the Governance Protocol, the Real Estate Protocol, and the Preservation Protocol. Each of these Protocols are further described below.

## Governance Protocol[4]

55. As part of its consultation with stakeholders prior to its appointment as Monitor, EY (together with the CRO and the Pride Group) identified the treatment of proceeds of sale, lease payments and recoveries on leases in default as key sensitivities of creditors.

56. Given the several scenarios which have resulted in multiple lenders and/or securitization funders (collectively, "**Financiers**") asserting a priority security interest in the same vehicle collateral ("**Multiple Collateral Vehicles (Leases)**"), creating a process by which revenue from sales, leasing and enforcement would be analyzed and distributed became a clear priority in preparing for these CCAA Proceedings, and one that the DIP Lenders identified as a core requirement as well. These considerations resulted in the Governance Protocol that was attached to the Pre-Filing Report as Appendix "D" and that is attached to the DIP Term Sheet as Schedule "B" (the "**Governance Protocol**").

---

[4] Capitalized terms used in this section of the First Report which are not defined herein shall have the meanings given to such terms in the Governance Protocol.

57.     The Governance Protocol was not, and is not, intended to be the final and determinative document on dealing with the Pride Group's revenues. Rather, it is intended to provide short-term stability, predictability and equality-of-treatment for all Financiers, while the Pride Group, the CRO and the Monitor develop and implement longer-term solutions on a Financier-by-Financier basis. As discussed below, the CRO expects to initiate discussions with Financiers on bespoke solutions to their individual situations shortly after the Comeback Hearing (each, an "**Inventory Monetization Plan**") – until that time, the Governance Protocol is intended to govern.

*The Governance Protocol*

58.     The Initial Order authorizes the Pride Entities to, among other things, and in each case subject to the terms of the Governance Protocol:

(a)     carry on business in a manner consistent with the preservation of their business;

(b)     utilize the central cash management system currently in place or replace it with another substantially similar central cash management system;

(c)     remit:

(i)     certain amounts collected by Tpine Leasing Capital Corporation ("**Tpine Leasing (Canada)**") or Tpine Leasing Capital LP ("**Tpine Leasing (USA)**") in respect of those vehicles leased to third party customers (including, with respect to securitized leases, as applicable), in the ordinary course of their business, and

(ii)     certain amounts collected by any of the Pride Entities with respect to the sale of vehicles or trailers in the ordinary course of their business; and

(d)     sell vehicles or trailers in the ordinary course of their business.

59.     As discussed in the Pre-Filing Report, the Governance Protocol was prepared by the Monitor in consultation with the Pride Entities, reflecting preliminary comments from the Syndicate Lenders in their capacity as proposed DIP Lenders. The Governance Protocol

provided for reasonable control and oversight of, among other things, remittance of proceeds of sold inventory, lease payments and collections by the Pride Entities on account of leases in default. However, the Governance Protocol was not intended to be a fixed document, and the Monitor intended to further develop its terms in consultation with affected stakeholders once they had an opportunity to review. Since its appointment, the Monitor has had numerous discussions with affected parties about the Governance Protocol, as discussed further below.

60.    The Governance Protocol addresses how funds received on account of sales, leases or enforcement are dealt with by the Pride Group, with the Monitor's supervision. With respect to sales, an important preliminary step, which occurs before any inventory is sold, is assumed but not explained in the Governance Protocol. In the ordinary course of business, the Pride Entities sell vehicles with the consent of the Financiers that have a secured interest and/or lien against such vehicles. Once a sale is proposed by a customer, the Pride Entities approach each Financier individually to request authorization to sell their applicable vehicle, which authorization and security discharge is necessary to convey clear title to the purchaser. The request to sell the applicable vehicle will include: (i) the purchase price, (ii) the Pride Group's proposed fees, commissions and costs, and (iii) indicate the proposed net distribution of sale proceeds to the applicable Financier.

61.    The Monitor understands that the Pride Entities have been operating with some omnibus consents from Financiers (pursuant to which sales within a prescribed range of the financed amount are approved without specific additional authorization), and have obtained specific consents to particular sales from applicable Financiers where an omnibus consent has not been provided. However, the Monitor understands that consents have not been obtained in respect of every vehicle sale prior to closing. For the reasons set out below, the Monitor considers this threshold Financier consent to sales to be important, and has taken steps to ensure that going forward, every vehicle sold is subject to either an omnibus or a specific consent.

62.    If the applicable Financier does not consent to the sale, the Pride Group has no way of removing that Financier's security interest from the vehicle. In that case, the sale would

not proceed, and the vehicle would remain Pride Group's inventory. Such inventory is not intended to remain warehoused with the Pride Group indefinitely. To the extent that the prevailing market prices of vehicles, or other factors, cause Financiers to decline to give their consent to sales at the prices achievable by the Pride Group, the Pride Group, together with the CRO and the Monitor, intend to create bespoke, long-term Inventory Monetization Plans.

63.     If the applicable Financier approves the transaction proposed to them, the Pride Entities will complete the sale, and the proceeds of sale will become subject to the Governance Protocol. The following are key terms of the Proceeds remittance process contained in the Governance Protocol:

### *Governance Protocol Terms*

64.     The applicable Pride Entities will provide the Monitor with (i) weekly reports regarding vehicle sales and buyouts ("**Weekly Vehicle Sales Report**"), and (ii) bi-weekly reports regarding lease payments made to the Pride Entities on account of leases in good standing (referred to as "**Lease Payments**", with the report being the "**Lease Payments Report**"), and collections made by applicable Pride Entities in respect of enforcement steps taken with respect to leases that are in default (referred to as "**Soft Collections**", with the report being the "**Soft Collections Report**"). Such reporting will include itemized amounts received or collected by the applicable Pride Entity, together with details in respect of receipts, including vehicles sold, leases paid or collected on, the Pride Entities' analysis of which Financiers have entitlements to the funds, and Pride Entities' proposed distribution of such funds to those Financiers.

### *Fees, Commissions, Costs and Taxes*

65.     The above-mentioned proposed distribution of funds to the respective Financiers will be net of any fees, commissions, costs, and sales taxes. These amounts are broken down as follows:

*Fees and Commissions*

(a)     The Pride Group did not historically charge any fees or commissions in connection with selling vehicles or servicing leases, and as a general matter would cover its overhead in connection with these services from the margin it earned on the original sale or lease. As a result of the market-downturn that has, in part, precipitated these CCAA Proceedings, and Pride's current inability to provide leasing options to customers, the Pride Group would be selling vehicles and servicing leases at a loss, if it did not provide for some kind of compensation.

(b)     The Pride Group cannot operate at a loss in these CCAA Proceedings. If the Pride Group does not recoup its fees and overhead incurred in connection with sales and certain Soft Collections (as discussed in further detail below) done for the benefit of one Financier from the proceeds payable to that Financier, then another creditor is inevitably subsidizing the recoveries of the Financier to which proceeds are due.

(c)     In order to create an even playing field among all Financiers, any fees associated with sales or certain Soft Collections must be recovered from the proceeds of such sales or certain Soft Collections. Moreover, this structure is not being unilaterally imposed on Financiers: as discussed in paragraphs 60 through 62, in the case of sales, if a Financier does not want to have the costs of proceeds taken out of those proceeds, it can refuse to approve the sale, in which case no proceeds will be created, and no fees or commissions earned.

(d)     The Monitor notes that Pride Group will be charging fees on Soft Collections undertaken for the benefit of securitization funders. For securitized leases, all customers remit lease payments through a pre-authorized payment system ("**PAP System**"). When a customer payment is returned "NSF", the PAP System will reverse the transaction and the Pride Group will attempt to collect the NSF payment directly from the customer (a "Soft Collection").  For these NSF payments resulting in Soft Collections on behalf of securitization funders, the Pride Group will charge a fee to offset its costs incurred to service and collect in connection with such leases,

which will be applied against the Soft Collection proceeds eventually remitted to the applicable securitization funder.

(e)     Accordingly, in consultation with the Monitor and CRO, the Pride Group has determined that it requires a commission of approximately 12% on future sales, plus an administrative fee based on 20% of recoverable costs (discussed in (g) below). For Soft Collections on securitized leases, the premium being charged by the Pride Group to service the lease payments is 20% on the amount collected.[5] No premium or commission is charged on payments made on leases in good standing (ie: non-Soft Collections).

(f)     In the view of the Pride Group and the CRO, the fees and commissions that are being imposed on vehicle sales and certain Soft Collections are reasonable, because (a) the Pride Group is providing value (i.e., liquidating inventory or enforcing lease defaults) for the applicable Financier secured against the sold or leased vehicle, (b) the Financiers would incur costs and have to pay commissions in the event that a third party other than the Pride Group was hired to sell the vehicles and service the delinquent leases, and (c) in the case of sales, the applicable Financier has to approve the sale before it can close, and each Financier will be provided with the amount of the proposed commission/fee on the specific sale in connection with the request for consent. The Monitor considers point (c) to be an important threshold control on the fees, commissions and costs charged by the Pride Group.

*Costs*

(g)     Any amounts reasonably incurred by the Pride Group such as direct costs of enforcement, collection, repairs and maintenance, transportation, storage, and bailiff fees, in each case in connection with repossessing, repairing and selling that specific vehicle are passed through to the applicable Financier and taken out of the

---

[5] Some securitization funders have raised concerns with the Monitor about the fee charged on Soft Collections. As discussed above, the Pride Group can only facilitate these Soft Collections if its costs and overhead are recouped. The Monitor will continue to work with each securitization Financier, together with the CRO.

- 24 -

proceeds of sale or Soft Collections. On newer vehicles that do not require material repair or maintenance to prepare them for sale, the costs will be minimal.

*Sales Taxes*

(h)     Harmonized sales tax in the amount of 13% if such vehicle is sold in Ontario, and the equivalent sales tax if such vehicle is sold in different jurisdictions (for example, the province of Quebec imposes 5% GST in addition to the applicable Quebec Sales Tax for the sale of used vehicles).

*Vehicle Proceeds*

66.     In the case of any vehicle sale and/or buyout proceeds ("**Vehicle Proceeds**"), the Governance Protocol requires the Monitor to review which Financiers are entitled to the funds based on the books and records of the Pride Entities[6] without individual legal opinions, and approve proposed distributions up to the lesser of (x) the amounts outstanding to such Financiers in respect of the relevant vehicle, and (y) the amount of the Vehicle Proceeds, subject to paragraph 68 below. To the extent that any vehicle is sold for greater than the financed amount of that particular vehicle, any surplus will be retained by the Pride Entities and used for general corporate purposes.

*Lease Payments and Soft Collections Distribution*

67.     Lease Payment and Soft Collections Distributions are treated by the Governance Protocol as follows:

(a)     The Monitor will review the payments made by the top five customers (in total dollar amount of payments received) in respect of Lease Payments and Soft Collections in each bi-weekly reporting period, and approve the distribution of collections or payments contained in the Soft Collections Report and Lease

---

[6] The Monitor has been made aware of concerns by a number of Financiers regarding the accuracy and reliability of the Pride Group's books and records for the purposes of justifying distributions. The Monitor acknowledges these concerns, and expects that this will be addressed in the revised version of the Governance Protocol (defined below).

- 25 -

Payments Report (as applicable) to the Financiers entitled thereto, subject to paragraphs (c) and 680 below.

(b)     In the event that a portion of the Lease Payments are received from a lessee who has made payments, without attribution to a particular VIN and who is indebted to the Pride Entities in respect of more than one lease and with respect to more than one Financier, then the corresponding Lease Payment(s) will be allocated to all such Financiers on a *pro-rata* basis based on the total amount outstanding due to each Financier.

(c)     In the event that a portion of the Soft Collections are collected from a lessee without attribution to a particular VIN and who is indebted to the Pride Entities, Tpine USA Funding I LLC, Tpine USA Funding II LLC, Tpine USA Funding III LLC, Tpine USA Funding V LLC, or Tpine Canada Securitization LP in respect of more than one lease and with respect to more than one securitization funder, then the corresponding Soft Collection(s) will be allocated to all such Financiers on a pro-rata basis based on total amount outstanding due to each Financier, subject to 67(a) above.

(d)     All Soft Collections in respect of securitized leases will be held by the Monitor in the Monitor's Trust Account pending the Monitor's confirmation of entitlement to such proceeds. This is necessary because Soft Collections on securitized leases represent a pool of cash that must be analyzed and attributed to particular securitization Financiers, taking into account possible amounts received directly by such Financiers through the PAP System that may be attributable to Multiple Collateral Vehicles (Leases) (such amounts received directly through the PAP System but attributable to Multiple Collateral Vehicles (Leases) must be held back from Soft Collections attributable to such securitization Financier, and thus accounted for pursuant to paragraph 68, in order to maintain fairness among Financiers). The determination of entitlement to these Soft Collections therefore creates a delay in distributions, but the Monitor does not intend for the determination of Soft Collections which are not attributable to Multiple Collateral

Vehicles (Leases) to be subject to the Entitlement Protocol (defined below), and therefore expects that the delay will not be material or require Court intervention. This is because Soft Collections which are not attributable to Multiple Collateral Vehicles (Leases) do not have the same entitlement-related issues compared to the Soft Collections which are attributable to Multiple Collateral Vehicles (Leases). The Monitor also notes that the retention of Soft Collections on account of securitized leases has been a concern for several securitization Financiers, and expects that it will be addressed in a subsequent version of the Governance Protocol (discussed below in paragraphs 70 through 74).

*Proceeds Related to Multiple Collateral Vehicles (Leases)*

68. In the case of Vehicle Proceeds, Lease Payments or Soft Collections received or recovered in respect of vehicles subject to Multiple Collateral Vehicles (Leases), net proceeds shall be remitted to the Monitor, to be held in trust, pending the settlement or adjudication of entitlement to such proceeds, in accordance with an entitlement protocol to be approved by the Court, or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected Financiers on a vehicle by vehicle basis (the "**Entitlement Protocol**").

*PAD and Cash Sweeps*

69. Additionally, the Monitor notes that the Governance Protocol is not intended to otherwise alter the Pride Entities' existing cash management system. For instance, no changes are proposed to the structure of those accounts in which Lease Payments are remitted where an applicable Financier(s) has the ability to access and sweep such Lease Payments pursuant to the terms of the applicable financing documents as between Tpine Leasing (Canada) or Tpine Leasing (USA) and the applicable Financier. It is the intention of the Pride Entities to continue operating these accounts in the ordinary course of business, providing such Financier the same rights and remedies in respect of such accounts as existed prior to the date of the Initial Order.

*Stakeholder Consultation and Governance Protocol*

70.     Since the granting of the Initial Order, the Monitor and/or the CRO has consulted with several key Financiers in an effort to refine the Governance Protocol to address concerns that such Financiers may have, recognizing that each Financier's position is slightly different than the other, so each will have unique concerns and sensitivities.  Specifically, as of the date of this First Report, the Monitor and/or the CRO has consulted with counsel to the following parties to discuss the Governance Protocol: Royal Bank of Canada, as Administrative Agent,[7] Bank of Montreal, Mitsubishi, BNY Trust Company of Canada, in its capacity as trustee of Move Trust, Bennington Financial Corp., National Bank of Canada, and Daimler.

71.     Given the number of interested Financiers and the significant post-filing matters competing for the Pride Group's, CRO's and Monitor's attention immediately post-filing, it has not been possible to develop a revised Governance Protocol that incorporates all Financier comments and concerns. However, the Monitor's discussions and consultations with affected stakeholders are intended to continue, and the Governance Protocol is expected to undergo revisions as these CCAA Proceedings progress. The Monitor anticipates returning to the Court after the Comeback Hearing to seek approval of a revised Governance Protocol that will reflect its ongoing discussions with the significant number of affected Financiers.[8]

72.     The Monitor notes that the flexibility to amend the Governance Protocol must be measured against the need for stability and predictability. Accordingly, while the Governance Protocol is expected and intended to be revised and further developed in consultation with affected Financiers to create a revised Governance Protocol, any subsequent amendments to the Governance Protocol will not be made without careful consideration and stakeholder input.

---

[7] The Royal Bank of Canada, as Agent, has been involved with the preparation of the Governance Protocol, as the Governance Protocol is a requirement under the DIP Term Sheet.

[8] The Monitor anticipates seeking Court time on or around April 17 for a hearing to approve a revised Governance Protocol, following further consultation with affected Financiers.

73.    Moreover, it is expected that once a revised version of the Governance Protocol is settled, the most efficient and useful next step will be developing the unique Inventory Monetization Plans with each Financier.

74.    The Monitor supports the Governance Protocol, and anticipates that it will result in an orderly distribution of proceeds in accordance with Financier objectives, while maintaining sufficient oversight of funds and prevent distribution of any proceeds from Multiple Collateral Vehicles (Leases) prior to the Monitor considering such distributions in accordance with the Governance Protocol. On that basis, in the Monitor's view, the Protocols Order should be granted, approving the Governance Protocol, subject to future amendment.

**Pride Group Performance of Governance Protocol**

75.    As described above, the applicable Pride Entities are required to provide three (3) reports to the Monitor on a weekly or bi-weekly basis: the Weekly Vehicle Sales Report, the Lease Payment Report and the Soft Collections Report. As at the date of this First Report, the only report that was due was the Weekly Vehicle Sales Report.

*Weekly Vehicle Sales Report*

76.    On Monday April 1, 2024, the applicable Pride Entities provided the Monitor with the Weekly Vehicle Sales Report, relating to the sold vehicles and vehicle buyouts between March 27 and March 29, 2024.

77.    None of the vehicles sold from this Weekly Vehicle Sales Report were with respect to the Multiple Collateral Vehicles (Leases).

78.    Even though the Weekly Vehicle Sales Report is a summary of the previous week's activities, the Monitor performs the underlying review on a daily basis.

*Lease Payment Report and the Soft Collections Report*

79.    At this time, there has not been any disbursements to Financiers with respect to amounts received from Lease Payments and Soft Collections. The first Lease Payment Report and

the Soft Collections Report are expected to be provided on April 15, 2024. The disbursements that will be reflected from such reports will be paid as soon as practically possible, following the Monitor's review and approval in accordance with paragraph 6 of the Governance Protocol.

80.     The Monitor has set up a trust account with respect to the Multiple Collateral Vehicles (Leases) and Soft Collections on account of securitized leases. Since the first Soft Collection Report is still in progress, there have not been any funds deposited as at the date of this First Report.

**Real Estate Monetization Plan**

81.     The Real Estate Monetization Plan (the "**Real Estate Protocol**") requires the Pride Entities to list all their real property for sale by no later than May 1, 2024, or such later date as the DIP Agent may agree to in writing. The listing and sale of each real property will be directed by the CRO in consultation with the Monitor. The CRO has further reporting obligations to the DIP Agent and third-party mortgagees of such real property. Any sale of real property under this Real Estate Protocol must be approved by the DIP Agent and each respective third-party mortgagee, or by this Court. The proceeds from the sale of the real property will be dealt with in accordance with the terms of the DIP Term Sheet, the Preservation Protocol (as described below), and relevant Court orders.

82.     The Monitor has received comments on the Real Estate Protocol from counsel to BMO, one of the Mortgagees (as defined below), and is working with the DIP Agent's counsel to implement corresponding revisions. To the extent that revisions acceptable to the DIP Agent and the Mortgagees are agreed prior to the Comeback Hearing, the Monitor will update the Court.

83.     The Monitor is of the view that the Real Estate Protocol will bring structure, oversight and transparency to an important source of proceeds for the benefit of the stakeholders and supports the approval of the Real Estate Protocol as requested in the Protocols Order.

**Intercompany and Unsecured Claims Preservation Protocol**

84.     Certain DIP Borrowers acquired real property through separate financing facilities provided by Bank of Montreal ("**BMO**") and Roynat Inc. ("**Roynat**", and together with BMO, the "**Mortgagees**"). Subject to review, the Monitor understands that the DIP Borrowers that acquired real property with financing from BMO each granted to BMO a mortgage over such real property and other security as collateral security for its and certain other DIP Borrowers' obligations under the BMO facility. This created a mortgage pool (the "**BMO Mortgage Pool**") of cross-collateralized real property (each, a "**Cross-collateralized Property**"). Subject to review, the Monitor also understands that the DIP Borrowers that acquired real property with financing from Roynat each granted to Roynat a mortgage over such real property and other security as collateral security for its obligations under the Roynat facility, and any of its indirect obligations to Roynat in respect of certain other of the DIP Borrowers' obligations under the Roynat facilities. This created a mortgage pool (the "**Roynat Mortgage Pool**") of Cross-collateralized Properties.

85.     In addition to the obligations under the mortgages and DIP Facility, certain DIP Borrowers that own Cross-collateralized Property are indebted to other DIP Borrowers (the "**Intercompany Creditor**s") and also are or may be indebted to unsecured third parties (the "**Other Creditors**").

86.     As a result of the cross-collateralization, there is a risk that potential inequities may result from the timing of the sale of a Cross-collateralized Property, which would be to the benefit of certain Intercompany Creditors and Other Creditors of one DIP Borrower, and to the detriment of other Intercompany Creditors and Other Creditors of other DIP Borrowers.

87.     The Intercompany and Unsecured Claims Preservation Protocol (the "**Preservation Protocol**") is intended to provide an orderly mechanism to distribute the proceeds from the sale of Cross-collateralized Property in accordance with the following (the "**Objective**"):

    (a)     first, to permit the Mortgagees to be repaid from the proceeds of monetization of a Cross-collateralized Property from their respective Mortgage Pools as and when

they are sold and regardless of the order in which Cross-collateralized Properties are sold; and

(b)     second, subject to the Charges, for the balance of the proceeds to be distributed to the Intercompany Creditors, Other Creditors of the relevant mortgagors and any other persons who may be entitled to the proceeds of a Cross-collateralized Property (collectively, the claims and obligations, the "**Remaining Obligations**") in a manner which, to the extent possible in the circumstances, mimics the realization they would have received had the property not been cross-collateralized.

88.     It is proposed that the monetization of any Cross-collateralized Property shall be subject to the terms of the Real Estate Protocol and the ARIO. No proceeds from the sale of any Cross-collateralized Property shall be distributed to a Mortgagee unless and until the Monitor's counsel delivers a satisfactory opinion as to the validity and enforceability of the Mortgagee's security relating to the applicable Cross-collateralized Property and the DIP Borrowers shall have obtained an order authorizing such distribution.

89.     To the extent that proceeds remain after the applicable Mortgagees' claims are satisfied, those proceeds from the sale of each Cross-collateralized Property will be held by the Monitor in trust under two accounts (each, a "**Proceeds Account**"):

(a)     The "**BMO Proceeds Account**" for the remaining proceeds of all Cross-collateralized Properties sold under the BMO Mortgage Pool; and

(b)     The "**Roynat Proceeds Account**" for the remaining proceeds of all Cross-collateralized Properties sold under the Roynat Mortgage Pool.

90.     The DIP Borrowers, in consultation with the Monitor and the DIP Agent, will seek the Court's approval of a distribution from proceeds of the applicable Proceeds Accounts following the sale of all Cross-collateralized Properties in the respective Mortgage Pool. The amount that each DIP Borrower can seek to distribute, as repayment of its own Remaining Obligations, will be determined in accordance with paragraph (e) of the

Preservation Protocol for the BMO Mortgage Pool and with paragraph (h) of the Preservation Protocol for the Roynat Mortgage Pool.

91.　Attached hereto as **Appendix "C"** is an illustration of the mechanism for distribution under the Preservation Protocol once all mortgaged properties in a mortgage pool are sold in order to achieve the objective. While the example in Appendix "C" uses the mechanism and defined terms for the BMO Mortgage Pool, the example is also illustrative of the mechanism for the Roynat Mortgage Pool. The example set out in Appendix "C" is provided for illustrative purposes only, and parties should review the Preservation Protocol in detail to determine its operation.

92.　The Monitor is of the view that the Preservation Protocol will bring structure, oversight and transparency over the proceeds of the Cross-collateralized Property and achieve the Objective. The Monitor supports the approval of the Preservation Protocol as requested in the Protocols Order.

**UPDATED FIFTEEN WEEK CASH FLOW FORECAST**

93.　The Pride Entities, in consultation with the Monitor, have updated the cash flow forecast as attached in the Pre-Filing Report ("**Initial Cash Flow Forecast**") for the period from March 18, 2024 to the week ending June 30, 2024 (the "**Forecast Period**"). A copy of the updated cash flow forecast (the "**Updated Cash Flow Forecast**") is attached hereto as **Appendix "D"**.

94.　There were no significant changes to the receipts and disbursements in the Updated Cash Flow Forecast in comparison to the Initial Cash Flow Forecast. Changes to the Updated Cash Flow Forecast were generally limited to minor timing adjustments for certain disbursements, updates to non-DIP Facility related schedules, and a removal of bank account balances of entities that are not the DIP Availment Borrowers.

- 33 -

## OTHER RELEVANT MATTERS AND UPDATES

## Status of Stakeholder Outreach and Inbound Inquiries

*Specific Stakeholder Consultation*

95.    Since the granting of the Initial Order, the Monitor and its counsel have received requests for calls or consultation from numerous stakeholders, most particularly Financiers whose interests are affected by the Governance Protocol. The Monitor and its counsel, in many cases together with representatives of the Applicants and the CRO, have had preliminary discussions with stakeholders, and have taken note of concerns and proposals that have been made.

96.    As discussed above, revisions to the Governance Protocol are expected to be made as a result of the valuable consultations with stakeholders, and the Monitor anticipates that this stakeholder consultation will be ongoing.

## Activation Notice for Blocked Accounts

97.    As part of a factoring arrangement with Mitsubishi, the Monitor understands that TPine Financial Services Inc. ("**Tpine Financial (Canada)**") entered into a tripartite blocked accounts agreement ("**Mitsubishi Blocked Accounts Agreement**") with Mitsubishi, and Royal Bank of Canada in its capacity as the bank and service provider (the "**Blocked Account Bank**"). The Mitsubishi Blocked Accounts Agreement is in connection with two of Tpine Financial (Canada)'s bank accounts held by the Blocked Account Bank (the "**RBC Blocked Accounts**"). The Monitor has been advised by TPine Financial (Canada) that as of April 2, 2024, the RBC Blocked Accounts hold approximately $1.7 million of funds.

98.    Prior to the commencement of the CCAA Proceedings, Mitsubishi sought to initiate control over the RBC Blocked Accounts, by delivering an activation notice issued to the Blocked Account Bank on March 26, 2024 (the "**Activation Notice**"), providing for an effective date on which Mitsubishi would obtain control over the RBC Blocked Accounts on April 2, 2024 (the "**Activation Date**"). The Activation Notice included directions to the Blocked

- 34 -

Account Bank to perform cash sweeps of the RBC Blocked Accounts into accounts designated by Mitsubishi starting on April 3, 2024.

99.   The Applicants, by letter dated March 31, 2024, advised each of Mitsubishi and RBC, among other things, that (a) the actions that Mitsubishi directed RBC to perform on the Activation Date are stayed in the Initial Order, and (b) any transfer of funds out of the RBC Blocked Accounts by RBC into accounts directed by Mitsubishi are not permitted under the Initial Order. Counsel to RBC has acknowledged receipt of the Applicants' letter, and confirmed that RBC will abide by the directions therein subject to further direction from the Monitor or Court.

100.   The Monitor has had preliminary but constructive discussions with counsel to Mitsubishi regarding the Activation Notice and the RBC Blocked Accounts, and will work with Mitsubishi, the Pride Group and the CRO to attempt to find a consensual resolution to the claims over the funds. If no such consensual resolution is possible, it is likely that the matter will be brought before the Court for resolution.

**Role of External Accountants in the Financial Reporting Process**

101.   At the hearing of the application for the Initial Order, the Court inquired about the accountants and bookkeepers that were previously engaged by the Pride Group. The Monitor has made inquiries with the Pride Group, and has received the information set out in this section.

102.   Historically, the Pride Group engaged PricewaterhouseCoopers LLP ("**PwC**") and BDO Canada ("**BDO**") to provide various external financial reporting services, with the scope of such services depending on each entity's reporting requirements.

103.   For the financial statements with respect to calendar year ended December 31, 2022:

(a)   PwC provided audit services for consolidated financial statements which included eleven entities within the Pride Group;

(b)   BDO provided review services for five entities within the Pride Group; and

    (c)    BDO or the Pride Group's internal accounting team compiled financial statements for the remaining entities.

104.    As further described in the Johal Affidavit, there is no ultimate parent company of the Pride Group. As a result, the Monitor understands that audited or reviewed consolidated financial statements comprising of all entities within the Pride Group are not available.

**Pride Group Logistics Equipment**

105.    Pride Group Logistics Ltd., as described in the Pre-Filing Report, operates a trucking and logistics business. Currently, the entity has equipment financing arrangements for approximately 1,060 trailers and 245 trucks from various Financiers. Of these, there are 142 trailers and 64 trucks that are leased through Tpine Leasing (Canada). As these are not leased but financed, the payments include a principal repayment which is stayed. The CRO and Tpine Leasing (Canada) are working on a plan that it will take to the affected Financiers with respect to the equipment that is being used, and will come back to Court to seek relief if required.

**Regions Equipment Financing Corp.**

106.    As mentioned in the Johal Affidavit, Regions Equipment Financing Corp. recently filed a complaint for breach of contract and a motion for the appointment of a receiver in respect to Tpine Leasing (USA) in the Northern District of Texas, seeking among other things, the return of its collateral. As a result of the Provisional Relief Order, such litigation is currently stayed.

**Notice of Replacement as Service Provider for Securitization Agreements**

107.    The Pride Entities received several notices over the past few weeks from securitization financiers with respect to replacing Tpine Leasing (Canada) or Tpine Leasing (USA), as the service provider pursuant to their respective agreements.  Tpine Leasing (Canada) is considering the implications of these notices with respect to lease payment collections and dealing with any of the vehicles in inventory. Below is a list of notices received to date:

(a)     On March 13, 2024, Tpine Leasing (USA) received notice of event of termination and appointment of replacement servicer from Mitsubishi, appointing itself (Mitsubishi) as the new servicer of the lease receivables;

(b)     On March 25, 2024, Tpine Leasing (Canada) received a letter from Royal Bank of Canada with respect to its duties as servicer pursuant to its various agreements related to securitization funding.  This notice indicated that a replacement servicer has been appointed; and

(c)     On March 28, 2024, Tpine Leasing (USA) and Tpine USA Funding I LLC received a notice of facility termination date, Default Funding rate, reservation of rights and other matters from National Bank of Canada.

**Extension of Stay Period**

108.    Pursuant to the Initial Order, the Stay Period expires on April 8, 2024 (due to April 6 falling on a weekend). The Applicants are seeking an extension of the Stay Period for the Pride Group until and including June 30, 2024.

109.    The Monitor supports the Applicants' motion to extend the Stay Period for the following reasons:

(a)     it will provide the Pride Group with the stability to continue to operate in the ordinary course;

(b)     the Pride Entities are projected to have sufficient liquidity through the extended Stay Period, provided that the DIP Facility is approved; and

(c)     the Pride Group has acted, and is acting in good faith and with due diligence during the Stay Period.

**ANTICIPATED NEXT STEPS IN CCAA PROCEEDINGS**

110.    This Report has referred to a number of anticipated next steps in these CCAA Proceedings following the Comeback Hearing, which the Court and affected stakeholders may find

useful to have summarized here. In the weeks following the Comeback Hearing, provided the DIP Facility is approved, the Stay Period is extended and the proposed Protocols Order is granted, the Monitor expects the following initiatives to be undertaken by the Pride Group, the CRO and/or the Monitor:

(a)     **Ongoing Stakeholder Consultation**: The Monitor, the CRO and the Pride Group will continue to work with stakeholders to address day-to-day inquiries and issues. The CCAA Proceedings are the only venue in which stakeholders will have access to the Pride Group and a court officer with oversight over all of the Pride Group's assets and operations.

(b)     **Revised Governance Protocol**: As discussed in paragraphs 70 through 74, the Monitor, with the support of the Pride Group and the CRO, intend to consult with affected Financiers to refine and amend the Governance Protocol into a short-term solution for the treatment, analysis and distribution of proceeds of sale, leases and Soft Collections, and to return to Court in April to have a revised Governance Protocol approved.

(c)     **Inventory Monetization Plans**: As discussed in paragraphs 57, 62 and 73, the Pride Entities and the CRO, in consultation with the Monitor, intend to consult with affected Financiers to develop bespoke Inventory Monetization Plans, tailored to each Financiers' particular circumstances. These Inventory Monetization Plans are intended to be medium- or long-term solutions for the treatment of collateral, and the analysis and distribution of proceeds of sale, leases and Soft Collections.

(d)     **Real Estate Monetization**: As discussed in paragraphs 81 through 83, the Pride Group, in consultation with the CRO and the Monitor, intend to list and sell substantially all of its real property assets, in accordance with the Real Estate Protocol.

(e)     **Entitlement Protocol**: As discussed in paragraph 68, the Governance Protocol requires that the Entitlement Protocol be developed and approved by the Court, for

the purposes of determining entitlement to proceeds of vehicle subject to Multiple Collateral Vehicles (Leases).

(f) **<u>Security Reviews</u>**: As discussed in paragraph 24 and elsewhere, the Monitor's counsel is working on security reviews of each Financiers' security and securitization structures. Regardless of the nature of the relief or resolution sought by a Financier (including a liquidation or the recovery of its collateral), a security review will be a necessary precondition of implementation, and the Pride Group will be unable to implement any solution until the security reviews are complete.

(g) **<u>Restructuring Plan</u>**: As discussed in paragraph 25, the DIP Borrowers are required to provide details of a comprehensive Restructuring Plan to the DIP Lenders by June 1, 2024. While the DIP Term Sheet prescribes certain elements of the Restructuring Plan that are applicable to the DIP Lenders, the Monitor does not believe that a meaningful, achievable Restructuring Plan is possible to put forward that does not also address the interests and claims of virtually all of the Pride Group's stakeholders. Accordingly, as a condition of receiving the funding that will be necessary to implement a global Restructuring Plan, the Pride Group will have to develop and articulate the terms of a Restructuring Plan in the next two months.

## CONCLUSIONS AND RECOMMENDATIONS

111. For the reasons set out in this First Report, the Monitor is of the view that the relief requested by the Pride Entities is reasonable in the circumstances and respectfully recommends that the Court grant the Order.

All of which is respectfully submitted this 4th day of April, 2024.

**ERNST & YOUNG INC.**

**Solely in its role as Court-appointed Monitor of Pride Group Holdings Inc. and certain affiliates and not in its personal or corporate capacity**

**per:**

**Alex Morrison, CPA, CA, LIT, CIRP**
**Senior Vice President**

**Karen Fung, CPA, CA, LIT, CIRP**
**Senior Vice President**

**APPENDIX "C"**

**Monitor's Counsel's E-mail message to the Service List**
**Dated April 10, 2024**

**Thompson, Nancy**

| | |
|---|---|
| **From:** | Burr, Chris |
| **Sent:** | Wednesday, April 10, 2024 8:13 AM |
| **To:** | lwilliams@tgf.ca; rnicholson@tgf.ca; pfesharaki@tgf.ca; penelope.jensen@linklaters.com; christopher.hunker@linklaters.com; clark.xue@linklaters.com; dabbott@morrisnichols.com; Alex.F.Morrison@parthenon.ey.com; Karen.K.Fung@parthenon.ey.com; Simone.Carvalho@parthenon.ey.com; Michael.Hayes@parthenon.ey.com; Emily.Masry@parthenon.ey.com; Huff, Pam; Loberto, Daniel; Wu, Kevin; Thompson, Nancy; r.benson@rcbensonconsulting.com; sahnir@bennettjones.com; fosterj@bennettjones.com; dennis.wiebe@dentons.com; robert.kennedy@dentons.com; jonathan.meyer@dentons.com; elaine.gray@dentons.com; john.salmas@dentons.com; bkofman@ksvadvisory.com; jeffrey.levine@mcmillan.ca; Kourtney.rylands@mcmillan.ca; adam.maerov@mcmillan.ca; dsingh@fasken.com; sbrotman@fasken.com; dricher@fasken.com; stetro@chapman.com; benz@chapman.com; jsulliva@chapman.com; yzahoroda@chapman.com; matthew.ward@wbd-us.com; todd.atkinson@wbd-us.com; tsandler@osler.com; jmacdonald@osler.com; bmuller@osler.com; harvey@chaitons.com; mwasserman@osler.com; bmcradu@osler.com; jroach@reedsmith.com; jrusso@pallettvalo.com; mdhaliwal@pallettvalo.com; colraine@bslsc.com; nikita@bslsc.com; kgage@cookseylaw.com; phogue@munsch.com; jtrad@lewisrice.com; pganninger@lewisrice.com; gdemerich@chapman.com; leenicholson@stikeman.com; mmcelheran@stikeman.com; rhammad@stikeman.com; jgage@mccarthy.ca; tcourtis@mccarthy.ca; hmeredith@mccarthy.ca; mnoel@mccarthy.ca; thomas.gertner@gowlingwlg.com; Charlie.Livermon@wbd-us.com; morgan.patterson@wbd-us.com; aiqbal@millerthomson.com; jcarhart@millerthomson.com; mcressatti@millerthomson.com; sgraff@airdberlis.com; sparsons@airdberlis.com; sthom@torkinmanes.com; mtamblyn@torkinmanes.com; edmond.lamek@dlapiper.com; dmourning@tfin.com; cfell@reconllp.com; bbissell@reconllp.com; mclemente@sidley.com; mwerner@sidley.com; insolvency.unit@ontario.ca; AGC-PGC.Toronto-Tax-Fiscal@justice.gc.ca; sandra.tsui@justice.gc.ca; tessania.lawrence@justice.gc.ca; osbccaa-laccbsf@ised-isde.gc.ca; legalwfsc@bdc.ca; nyna.bishop@wellsfargo.com; chris.wuest@faef.com; joseph.franke@regions.com; kyle.shenton@regions.com; STScott@mayerbrown.com; james.cogill@rbccm.com; brad.d.newton@rbc.com; estelle.richmond@bmo.com; hina.latif@mercedes-benz.com; morgan.tyler@finloc.com; kathy.ruhe@cenovus.com; amy.gillespie@cenovus.com; sknapman@haltonhillshydro.com; mattheww@haltonhillshydro.com; htaesq@aol.com; tarnold@arnold-foster.com; Descours, Caroline; STScott@mayerbrown.com; joseph.franke@regions.com; kyle.shenton@regions.com; jtrad@lewisrice.com; pganninger@lewisrice.com; Trip.Nix@hklaw.com |
| **Subject:** | Pride Group Holdings et. al. - Call for Comments on Governance Protocol |
| **Attachments:** | Pride Group Holdings - Governance Protocol - Appendix D to Prefiling Report .docx |

Service List,

As you are aware, the Monitor is working with the Applicants in the Pride Group CCAA Proceedings to revise and update the Governance Protocol, to better reflect the concerns of stakeholders, and to ensure that the near-term treatment of proceeds of sales, leases and soft collections is fair and equitable. The Court has not yet confirmed the return date of a motion to approve the amended Governance Protocols, but the Monitor's counsel is working with the Commercial List Office to secure a date, and will keep the service list advised.

In order to efficiently coordinate comments on the Governance Protocol from the numerous parties that have expressed a desire to have it revised, we are hereby requesting that any interested parties provide a written mark-up of the Governance Protocol by **8 pm on Thursday, April 11**. A word version of the Governance Protocol is attached, to assist with the mark-up. If you have already provided a mark-up of the Governance Protocol to Blakes, there is no need to re-send.

A number of parties have raised questions about the fees and commissions referred to in the Governance Protocol, including in submissions at Friday's Comeback Hearing. While you are encouraged to raise any issues with the Governance Protocol in the requested mark-up, we can advise that Mr. Benson and representatives of the Monitor are scheduling meetings with a number of the creditors over the next several days to review operational and process matters, including any concerns about the fees and commissions.

Once we have reviewed and considered all comments on the Governance Protocol, the Monitor will work with the Applicants and DIP Agent to consolidate acceptable comments into a revised protocol, which will then be recirculated to the service list. Receipt by the Montior of comments on the Governance Protocol by Thursday April 11 will facilitate the efficient review and redistribution of comments. Any comments or mark-ups received after April 11 will still be considered, but may not be included in the subsequent turns of the document if not received on a timely basis.

We are happy to discuss the Governance Protocol with interested parties, however given the number of parties involved, may not be able to set up calls with everyone in the time that is available. Please reach out if you or your client would like a call, and we will accommodate as best as possible. As above, written comments are preferred, and if we have any questions or require any clarifications, we will advise directly.

Thank you,

Chris.


**Chris Burr**
Partner
chris.burr@blakes.com
T. +1-416-863-3261
C. +1-647-201-3789

**APPENDIX "D"**

**Revised Governance Protocol, with explanatory footnotes**

**Governance Protocol**

Pursuant to the Initial Order dated March 27, 2024 (as amended by the Amended and Restated Initial Order dated April 5, 2024, and as may be further amended or restated from time to time, the "**Initial Order**"), (i) Ernst & Young Inc. was appointed as Monitor (in such capacity, the "**Monitor**") of the Pride Entities and (ii) RC Benson Consulting Inc. was appointed as Chief Restructuring Officer (in such capacity, the "**CRO**") of the Pride Entities. Capitalized terms used herein and not otherwise defined have the meanings given to them in the Initial Order.

The Pride Entities shall comply with this Governance Protocol set forth herein and shall cooperate with and assist the Monitor and the CRO in fulfilling their duties and obligations herein. This Governance Protocol may be modified as it applies to the relationship between the Pride Entities and a particular Financier (as defined below), subject to the written approval of the Monitor, Pride Entities, such Financier and any other Financier that would in the determination of the Monitor be affected by such modification.

Pursuant to the duties and obligations set forth herein, the Monitor and CRO, in consultation with the Pride Entities, will review receipts, disbursements and other items of the Pride Entities.

In performing their duties and obligations herein, the Monitor, its counsel, and the CRO, shall consult with the Pride Entities, their counsel, and/or any relevant lender(s) or Securitization Party(ies) (together "**Financier(s)**"), or their counsel, as needed or appropriate.

Throughout this Governance Protocol, references to any alleged entitlement of a Financier, including amounts owing to a Financier, expressly includes proprietary interests in a lease, lease payment and/or underlying vehicle of a Financier pursuant to a securitization and other amounts owing, either directly to the Financier or through a special purpose vehicle to which it provides financing.

Nothing in this Governance Protocol shall be determinative of the validity, effectiveness, enforceability or priority of any entitlement asserted by any Financier, nor shall the validity, effectiveness, enforceability or priority of any entitlement asserted by any Financier be enhanced or new entitlement be created by the provisions of or carrying out of this Governance Protocol. Without limiting the foregoing, no provision in this Governance Protocol which contemplates that any collections, proceeds or other property is to be held separate and apart and/or in trust shall confer on any Financier any entitlement, interest or priority in such collections, proceeds or other property that it would not have had those collections, proceeds or other property not been required to be held or in fact held separate and apart and/or in trust.

1.  [Intentionally Deleted][1]

---

[1] **Explanatory NTD to be deleted**: "[Intentionally Deleted]" is being used in this draft to manage paragraph references; these will be deleted in the final version.

**Securitization Party Assets**

2.  All lease or soft collections[2] received by the Pride Entities in respect of Securitization Party Assets will be:

    (a) paid over to the Monitor, as soon as practicable, upon receipt by the Pride Entities;

    (b) kept separate and apart from, and not commingled with, the Property of the Pride Entities and not subject to the Cash Management System; and

    (c) held in trust by the Monitor for the benefit of the applicable Securitization Parties until distributed in accordance with this Governance Protocol.

*Dealing with Securitization Party Assets and other Vehicle Property*

3.  Subject to Paragraph 3.A, the Pride Entities shall not sell, lease or otherwise dispose of (i) the Securitization Party Assets of a Securitization Party; or (ii) any vehicles, trailers, equipment and other personal property leased to third party customers or customarily sold in the ordinary course of Business ("**Vehicle Property**") which any Financier has financed, as reflected in the books and records of the Pride Entities (the "**Books and Records**", and such Securitization Party Assets or Vehicle Property being the "**Floorplan Assets**"), in either case without the prior consent of the respective Securitization Party or other Financier. Subject to Financier-specific omnibus pre-approved consents for sales that may have been or will be obtained from the applicable Financier (which omnibus consents shall govern, if provided), the request to sell the applicable Securitization Party Asset or Floorplan Asset shall include: (i) the purchaser's name, (ii) the purchase price, (iii) the Pride Entities' proposed amounts retained with respect to commissions, plus out-of-pocket costs as further described below, and (iv) indicate the proposed net distribution of sale proceeds to the applicable Financier.[3]

3.A. The Pride Entities may sell Securitization Party Assets or Vehicle Property that are Multiple Collateral Vehicles[4], with the consent of the Monitor. Any sale of Multiple Collateral Vehicles shall be reported pursuant to Paragraph 7, with such proceeds held in trust pursuant to Paragraph 8.[5]

---

[2] **Explanatory NTD to be deleted:** Some parties have asked that <u>all</u> proceeds be put into the Monitor's trust account, pending distribution under the Governance Protocol. This is impractical and will be very inefficient. Proceeds of sale of Securitization Party Assets, which sale will only occur with the consent of the applicable Securitization Party, will be held by the Company until distributed, with the Monitor's oversight.

[3] **Explanatory NTD to be deleted:** Some parties have asked that the Monitor confirm that any buyer is arms-length to the Pride Entities. This is not economically feasible for each vehicle sale. A vehicle sale (for non-Multiple Collateral Vehicles) will not occur without the blanket consent of the applicable Financier, which will include a price range that is acceptable to the Financier. A Multiple Collateral Vehicle sale will not occur without the consent of the Monitor.

[4] "Multiple Collateral Vehicles" are vehicles or leases of vehicles that are or may be pledged as a collateral security, leased, assigned or otherwise securitized or in which an interest is otherwise granted or transferred to or for the benefit of two or more Financier(s).

[5] **Explanatory NTD to be deleted:** The purpose of this new paragraph is to enable Multiple Collateral Vehicles to be sold in a streamlined manner and to avoid undue costs or delays. This new paragraph does not change the fact that proceeds will be held in trust.

*Other Requests*

3.B. Notwithstanding anything else in this protocol to the contrary, if any Securitization Party instructs the Pride Entities, copying the Monitor and the CRO, to cease all steps in connection with Soft Collections related to any Securitization Party Assets (or any lease that, based on the Books and Records, is reasonably likely to be a Securitization Party Asset), then the Pride Entities shall cease all Soft Collection actions unless and until requested to resume by the Securitization Party who instructed the Pride Entities to cease Soft Collection work. The appointment of any replacement servicer following the delivery of any instruction to cease Soft Collections in accordance with this paragraph shall occur in accordance with the terms of the Initial Order.

4.  Upon request of any Securitization Party or other Financier, the Pride Entities shall provide to the requesting Financier a listing of (i) the Securitization Party Assets or (ii) the Vehicle Property which appears to be owned by, or financed by, the respective Financier or the special purpose vehicle to which they provided financing. The listing will also identify a preliminary list of Multiple Collateral Vehicles. All information from the listing will be based on the Books and Records, which the Monitor will review only to the extent that any inconsistencies have been identified. Upon receiving such listing, each applicable Financier shall provide comments and, as applicable, identify differences or inconsistencies and Multiple Collateral Vehicles with its own books and records as soon as reasonably practicable. No Financier shall be prejudiced or bound by their respective comments that are provided to identify differences or inconsistencies and Multiple Collateral Vehicles. In the event that any Multiple Collateral Vehicles, differences or inconsistencies are identified, each Financier shall have an opportunity to consult with the Monitor and the CRO regarding same. In the event of any dispute, the Financier(s) or the Monitor and the CRO shall be entitled to refer the matter either through the Entitlement Protocol or to the Court for determination.

5.  [Intentionally Deleted]

6.  [Intentionally Deleted]

**Vehicle Related Reporting and Disbursements**

7.  On Monday of each week (or, if such Monday falls on a holiday, the next business day) commencing April 22, 2024, the Pride Entities shall provide the Monitor and CRO with written reports (the "**Weekly Vehicle Sales Report**") listing:

    (a) vehicles that are not Multiple Collateral Vehicles sold in the prior week, with the following information in respect of each sold vehicle, as applicable: (i) the accompanying vehicle identification number ("**VIN**"); (ii) the lease number; (iii) the amount of funds received and separately a breakdown of the associated sale commission of 12% of the vehicle purchase price (or such other amounts as may be negotiated and agreed upon between the individual Financier and Pride Entities or the CRO),[6] plus actual out-of-pocket costs, and applicable sales taxes (collectively, the "**Sale Fees and Taxes**", with the net amount after the applicable sale

---

[6] **Explanatory NTD to be deleted**: 12% is the default commission, and will be subject to any separate agreements with Financiers, as discussed in Paragraph 3.

commission and Sale Fees and Taxes being the "**Vehicle Sale Proceeds**"); (iv) the Vehicle Equity (defined below), if any; (v) all applicable Financier(s) that had an ownership interest, a registered or otherwise perfected security interest in the relevant jurisdiction or other interest in such vehicle and, based on the Books and Records, had an entitlement to the Vehicle Sale Proceeds; and (vi) based on the Books and Records, the amounts owing to such Financier(s) in respect of such vehicle;

(b) Multiple Collateral Vehicles sold in the prior week, with the following information in respect of each sold vehicle, as applicable: (i) the accompanying vehicle identification number ("**VIN**"); (ii) the lease number; (iii) the amount of funds received and separately a breakdown of the associated sale commission of 12% of the vehicle purchase price, plus Sale Fees and Taxes, with the net amount being the Vehicle Sale Proceeds; (iv) the Vehicle Equity, if any; (v) all applicable Financier(s) that may have an ownership interest, a registered or otherwise perfected security interest in the relevant jurisdiction or other interest in such vehicle and, based on the Books and Records, may have an entitlement to the Vehicle Sale Proceeds; and (vi) based on the Books and Records, the amounts owing to such Financier(s) in respect of such vehicle; and

(c) vehicle buyouts and/or insurance proceeds in the prior week, with the following information in respect of each vehicle, as applicable: (i) the accompanying VIN; (ii) the lease number; (iii) the amount of funds received and separately a breakdown of the associated actual out-of-pocket costs, and applicable sales taxes (collectively, the "**Buyout Costs and Taxes**")[7], with the net amount being the "**Vehicle Buyout Proceeds**"; (iv) all applicable Financier(s) that had an ownership interest, a registered or otherwise perfected security interest in the relevant jurisdiction or other interest in such vehicle and, based on the Books and Records, had an entitlement to the Vehicle Buyout Proceeds; and (v) based on the Books and Records, the amount owing to such Financier(s) in respect of such vehicle.

8.  Prior to any disbursements being made by the Pride Entities in respect of the Vehicle Sale Proceeds and/or Vehicle Buyout Proceeds (together, "**Vehicle Proceeds**") to any applicable Financier(s) as identified by the Pride Entities as entitled to the same in the applicable Weekly Vehicle Sales Report, the Monitor will identify Multiple Collateral Vehicles pursuant to Paragraph 4 and:

(a) For each vehicle that is not a Multiple Collateral Vehicle, the Monitor in consultation with the CRO, will review the entitlement of the identified Financier(s) to the corresponding Vehicle Proceeds based on the Books and Records and otherwise review such proposed distribution of Vehicle Proceeds[8] to the Financier(s) identified in the Weekly Vehicle Sales Report as having the entitlement (but, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement). The Monitor will complete its review as soon as practicable and after such review, the Monitor will approve payment by the Pride

---

[7] **Explanatory NTD to be deleted:** It is not anticipated that there would be fees charged on Buyouts; only potentially out-of-pocket costs and taxes**.**
[8] **Explanatory NTD to be deleted:** The commissions in connection with the sale of Multiple Collateral Vehicles will be retained by the company as it forms part of the cash flow projections. The Sale Fees and Taxes will also be deducted and the remaining proceeds will be held in trust.

Entities of such amounts to the respective Financier(s) who have provided their consent pursuant to Paragraph 3, above, as soon as practicable up to the lesser of (i) the amount outstanding to the relevant Financier(s) in respect of the relevant vehicle by VIN (based on the Books and Records, as reviewed by the Monitor), or (ii) the amount of the respective Vehicle Proceeds. The remaining Vehicle Proceeds, if any, after each disbursement shall be retained by the Pride Entities as "**Vehicle Equity**". If the Monitor becomes aware of any competing claims or inconsistencies with respect to the entitlement to the Vehicle Proceeds, including without limitation as a result of its security review process or as a result of information provided by any Financier, the Monitor will inform the affected Financier(s) and hold the applicable Vehicle Proceeds in trust pending resolution;[9] and

(b) For each vehicle that is a Multiple Collateral Vehicle, the corresponding Vehicle Proceeds will be transferred forthwith to a bank account established by the Monitor to be held in trust (the "**Multiple Collateral Trust Account**") pending determination of the entitlement to such Vehicle Proceeds. The determination of entitlement to the Vehicle Proceeds of a Multiple Collateral Vehicle will be conducted by the Monitor and their counsel, in consultation with the Pride Entities, their counsel and the CRO, in accordance with a protocol to be established by future order of the Court (the "**Entitlement Protocol**") or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected Financier(s).

---

[9] **Explanatory NTD to be deleted:** Numerous stakeholders have asked for some kind of over-ride on the Company's books and records. We have included these overrides in each section where it is appropriate, and also added a global override at the end of the Governance Protocol. In the result, to the extent that any entitlement to any vehicles or proceeds are stated to be subject to the information in the Company's books and records, that will in every instance be subject to the Monitor having either (a) discovered conflicting information in the context of doing a security review or otherwise, or (b) been advised by any other party that there is a dispute over entitlement to a vehicle or proceeds that is not evident in the books and records.

9.  On the first Monday of every month (or, if such Monday falls on a holiday, the next business day) commencing May 6, 2024, the Pride Entities shall use best efforts to provide the Monitor and the CRO with a report (the "**Vehicle Repossession Report")**[10] listing all of the vehicles that have been repossessed by the Pride Entities and the location of such repossessed vehicles, along with: (i) the accompanying VIN; (ii) the lease number(s) to which each repossessed vehicle relates; (iii) the name of the lessee; and (iv) the name(s) of any applicable Financier(s) entitled to receipt of each Lease Payment (based on the Books and Records).

10. On a monthly basis, the Monitor shall make available to each Securitization Party a monthly reconciliation of the sales taxes collected by the Pride Entities and remitted on behalf of the respective Securitization Party together with a copy of the remittance form.

11. [Intentionally Deleted]

12. The Monitor shall make available to each Financier information from each Weekly Vehicle Sales Report and Vehicle Repossession Report as it pertains to the affected Financier, as and when received from the Pride Entities and as soon as practicable following completion of the review contemplated in paragraph 8, in a form which will include the amount of Vehicle Proceeds disbursed to the respective Financier and transferred to the Multiple Collateral Trust Account, including a corresponding account of the applicable sale commission, all Sale Fees and Taxes and Buyout Costs and Taxes, as applicable, correlated to the relevant vehicles (by VINs). Nothing in this Governance Protocol shall prohibit one Financier from disclosing their report to one or more other Financiers.[11]

**Lease Payments and Soft Collections Reporting and Disbursements**

13. On the Monday of every second week (or, if such Monday falls on a holiday, the next business day) commencing April 15, 2024 (each a "**Lease Collections Reporting Date**"), the Pride Entities shall provide the Monitor and CRO with a report (the "**Lease Payments Report**") itemizing amounts that the Pride Entities have collected through pre-authorized payments (less amounts that have been declined due to insufficient funds) to accounts of the Pride Entities (including as servicer under securitizations or otherwise on behalf of third parties, but excluding Soft Collections) from lessees pursuant to leases which are not in default (individually a "**Lease Payment**" and collectively, the "**Lease Payments**"), along with: (i) the accompanying VIN; (ii) the lease number(s) to which each Lease Payment relates; (iii) the name of the lessee; (iv) all applicable Financier(s) entitled to receipt of each Lease Payment (based on the Books and Records); and (v) the proposed amounts to be distributed to the respective Financier(s) less applicable taxes (the "**Net Lease Payment**").[12]

---

[10] **Explanatory NTD to be deleted**: Please note that, unlike other inputs to some of the other weekly or bi-weekly reports, the information on repossessed vehicles cannot be automatically generated. As a result, providing Vehicle Repossession Reports on a bi-weekly basis is not practicable.

[11] **Explanatory NTD to be deleted**: The Monitor will not share the aggregate reports with each Financier, but will prepare a Financier-specific report for each Financier and provide that. If Financiers want to know the information in the report of another Financier, it is open to them to exchange reports.

[12] For certainty, (a) Lease Payments received from pre-authorized payments shall not be included in a Lease Payments Report until five days have passed since the pre-authorized payment date; and (b) other than with the consent of the affected Financier(s), pre-authorized payments of customers pursuant to leases being directed to segregated accounts of the applicable Financier(s) shall continue to be made to such accounts.

14. On each Lease Collections Reporting Date, the Pride Entities shall provide the Monitor and CRO with a report (the "**Soft Collections Report**", and together with the Lease Payments Report, the "**Bi-Weekly Lease Collections Report**") itemizing amounts that the Pride Entities have collected (including as servicer under securitizations or otherwise on behalf of third parties) from lessees or third parties (other than insurers)[13] pursuant to enforcement steps taken with respect to leases that are in default (each a "**Soft Collection**" and collectively, the "**Soft Collections**" and for greater certainty, excludes any Lease Payments), along with, as applicable: (i) the accompanying VIN; (ii) the lease number(s) to which each Soft Collection relates; (iii) the name of the lessee; (iv) the name(s) of any applicable Financier(s) entitled to receipt of each Soft Collection (based on the Books and Records); (v) the proposed amounts to be distributed to the respective Financier(s) net of applicable sales tax for vehicles that are not Securitization Party Assets or net of a 20% commission on Soft Collections where the Pride Entities are servicing a Securitization Party (the "**Soft Collection Fees**"); and (vi) for leaseline Financier(s), the proposed amounts to be distributed from Soft Collections based on the proportion of payment from Soft Collections that such leaseline Financier(s) would have normally received from each Lease Payment.[14]

15. Prior to any disbursements being made by the Pride Entities in respect of the Lease Payments and/or Soft Collections to any applicable Financier(s) identified by the Pride Entities as entitled to the same in the Bi-Weekly Lease Collections Report, the Monitor will identify Multiple Collateral Vehicles pursuant to Paragraph 4 and:

   (a) **Lease Payments:** For each vehicle or lease of a vehicle that is not a Multiple Collateral Vehicle, the Monitor, together with its counsel, and in consultation with the CRO, will review the entitlement of the identified Financier(s) to the corresponding Lease Payments to the extent the Monitor considers appropriate based on the Books and Records, and review such proposed distribution of Lease Payments limited to five randomly selected Lease Payments from each report received by lessees made to the Financier(s) identified in each Bi-Weekly Lease Collections Report[15], as having the entitlement (but, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement). The Monitor will complete its review as soon as practicable and after such review, the Monitor will approve payment by the Pride Entities of such amounts to the

---

**Explanatory NTD to be deleted**: No Pride Entity fees or commissions were contemplated for the collection of payments in this paragraph.

[13] **Explanatory NTD to be deleted**: Insurance proceeds from a vehicle that is damaged and hence the lease or the financing is terminated, will be reflected in the buyout report.

[14] **Explanatory NTD and Illustrative to be deleted:** (i) the monthly Lease Payment from Lessee A for Vehicle X is normally $2,500. (ii) the leaseline Financier is normally owed a monthly payment of $2,000 with respect to Vehicle X. In this circumstance, the proportion that is payable to the leaseline Financier is normally 80% of the full Lease Payment.
   *Scenario 1:* The Soft Collection from Lessee A is $6,000. The leaseline Financier will be paid $4,800 from this Soft Collection.
   *Scenario 2:* The Soft Collection from Lessee A is $1,000, which represents less than one Lease Payment. The leaseline Financier will be paid $800 from this Soft Collection.

[15] **Explanatory NTD to be deleted:** It is cost prohibitive to review the lease payments or soft collections on an item-by-item basis. The parties cannot comply with the DIP budget at this level of review. The Pride Entities and the Monitor introduced this construct in the first instance so that the money (not otherwise in connection with Multiple Collateral Vehicles) will continue to flow. If Financiers require that all Lease Payments be reviewed, the Monitor can do that, however no distributions will flow to Financiers in the interim.

relevant Financier(s) forthwith in accordance with the financing and/or securitization document(s) between the Financier(s) and the Pride Entities applicable to the Lease Payments Report for disbursements that are not subject to reconciliation.[16] The disbursement will be the lesser of the (i) Net Lease Payment and (ii) the monthly amount outstanding to the applicable Financier for a specific vehicle (by VIN).[17] If the Monitor becomes aware of any competing claims or inconsistencies with respect to the entitlement to the Net Lease Payments, including without limitation as a result of its security review process or as a result of information provided by any Financier, the Monitor will inform the affected Financier(s) and hold the applicable Net Lease Payments in trust pending resolution;

(b) **Soft Collections – Non-Securitization Party Assets:** For each vehicle or lease of a vehicle that is not a Multiple Collateral Vehicle and not a Securitization Party Asset,[18] the Monitor, together with its counsel, and in consultation with the CRO, will review the entitlement of the identified Financier(s) to the corresponding Soft Collections to the extent the Monitor considers appropriate based on the Books and Records, and review such proposed distribution of Soft Collections limited to five randomly selected Soft Collections by vehicle (VIN) collected from lessees made to the Financier(s) identified in each Bi-Weekly Lease Collections Report, as having the entitlement (but, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement). The Monitor will complete its review as soon as practicable and after such review, the Monitor will approve payment by the Pride Entities of such amounts to the relevant Financier(s) forthwith in accordance with the financing document(s) between the Financier(s) and the Pride Entities applicable to the Soft Collections Report for disbursements that are not subject to reconciliation. If the Monitor becomes aware of any competing claims or inconsistencies with respect to the entitlement to the Soft Collections, including without limitation as a result of its security review process or as a result of information provided by any Financier, the Monitor will inform the affected Financier(s) and hold the applicable Soft Collections in trust pending resolution;

(c) **Unallocated Lease Payments:** In the event that a portion of the Lease Payments are received from a lessee who has made payments, without attribution to a particular vehicle and who is indebted to the Pride Entities in respect of more than one lease and with respect to more than one Financier (an "**Unallocated Lease Payment**"), then the corresponding Lease Payment(s) will be allocated to all such Financier(s) on a pro-rata basis based on the total amount outstanding due to each Financier. In the instance that a customer returns one of their vehicles or the vehicle has been repossessed by the Pride Entities, such vehicle will be considered a "non-performing asset" and will be excluded for the purposes of calculating the pro-rata share of the Unallocated Lease Payment;

---

[16] As further set out in each Bi-Weekly Lease Collections Report, certain amounts received from lessees cannot be reconciled to a specific Financier account. Reconciliation efforts are on-going and will be disclosed in the Bi-Weekly Lease Collections Report.

[17] **Explanatory NTD to be deleted:** We have updated the definition of Lease Payments to specify that such payments are in connection to leases that are not in default.

[18] **Explanatory NTD to be deleted:** This subparagraph (b) is necessary because Soft Collections related to Securitization Party Assets will be held in trust, pending a resolution on the Soft Collection commission. A commission for Soft Collections is not contemplated for non-Securitization Party Assets.

(d) **Unallocated Soft Collections:** In the event that a portion of the Soft Collections are collected from a lessee who has made payments without attribution to a particular vehicle and who is indebted to the Pride Entities, Tpine USA Funding I LLC, Tpine USA Funding II LLC, Tpine USA Funding III LLC, Tpine USA Funding V LLC, TPine Canada Securitization LP or another Financier in respect of more than one lease and with respect to more than one Financier (an "**Unallocated Soft Collection**"), then the Unallocated Soft Collection(s) will be allocated to all such Financier(s) on a pro-rata basis based on the total amount outstanding due to each Financier. In the instance that a customer returns one of their vehicles or the vehicle has been repossessed by the Pride Entities, such vehicle will be considered a "non-performing asset" and will be excluded for the purposes of calculating the pro-rata share of the Unallocated Soft Collection;[19]

(e) **Lease Payments – Multiple Collateral Vehicles:** For each vehicle that is a Multiple Collateral Vehicle, the corresponding Lease Payment(s) net of applicable sales taxes (only to the extent that the Lease Payment(s) are not with respect to Securitization Party Assets) will be transferred forthwith to the Multiple Collateral Trust Account pending determination of entitlement to such Lease Payment(s);

(f) **Soft Collections – Multiple Collateral Vehicles:** For each vehicle that is a Multiple Collateral Vehicle, the corresponding Soft Collection(s), net of the Soft Collection Fees (which shall be retained by the Pride Entities) and applicable sales taxes, will be transferred forthwith to the Multiple Collateral Trust Account pending determination of entitlement to such Soft Collections. Additionally, all Soft Collections in the Soft Collections Report related to Securitization Party Assets will be held in trust by the Monitor for the benefit of the affected Financier(s) (in a separate account referred to as the "**Soft Collections Trust Account**"), pending a determination of entitlement to such proceeds in accordance with the Entitlement Protocol or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected (as determined by the Monitor) Financier(s); and

(g) **Determination of Entitlement – Multiple Collateral Vehicles:** The determination of entitlement to the Lease Payments and Soft Collections in respect of a Multiple Collateral Vehicle will be conducted by the Monitor and their counsel, in consultation with the Pride Entities, their counsel and the CRO, in accordance with the Entitlement Protocol or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected (as determined by the Monitor) Financier(s).

16. For greater certainty, if a Financier has taken over servicing (or appointed a substitute servicer) of its respective leases, the Pride Entities shall not take any steps to collect Lease Payments or Soft Collections, unless otherwise previously directed by the applicable Financier(s), in respect of such leases. In the event that the Pride Entities receives any Lease Payments or any Soft Collection(s) in respect of such leases, such Lease Payments and/or

---

[19] **Explanatory NTD to be deleted:** We have received a number of requests that lease payments and soft collections from non-Multiple Collateral Vehicles be held in trust. We note that the proceeds referred to in this subsection are **not** with respect to Multiple Collateral Vehicles. Historically, allocations on a pro-rata basis with respect to Unallocated Lease Payment or Unallocated Soft Collections have not been contentious. Please explain what the objective of transferring these payments to the Multiple Collateral Trust Account. We don't think the proposed change advances the interest of any Financier, however if the collective preference of Financiers is that these payments be held in trust, instead of distributed pari passu, the Monitor will consider that request.

Soft Collections will subject to this Governance Protocol be paid over to the respective Financier(s) as soon as practicable upon receipt by the Pride Entities without deduction for any fees, costs, commissions or sales taxes (with the applicable Financier or substitute servicer being solely responsible for any corresponding sales tax remittance obligations).

17. In addition to the applicable information from the Weekly Vehicle Sales Report and the monthly Vehicle Repossession Report, the Monitor shall make available to each Financier information from each Bi-Weekly Lease Collections Report as it pertains to the affected Financier, as and when received from the Pride Entities and, as soon as practicable following completion of the review contemplated in paragraph 15, in a form which will include the amount of Lease Payments disbursed to the respective Financier and transferred to the Multiple Collateral Trust Account correlated to the relevant leases.

## Cooperation and Reporting

18. On each Lease Collections Reporting Date, the Pride Entities shall provide to the Monitor and CRO a written reconciliation of (i) Lease Payments and Soft Collections [20] and related disbursements, to (ii) the Pride Entities' actual cash flow statements.

19. The Pride Entities shall be entitled but not required to pay all reasonable expenses incurred by the Pride Entities in carrying on their business lines in the ordinary course. With respect to any such payment in excess of $100,000, and all payments outside of the business operations in the ordinary course, such disbursements shall only be made with the prior consent of the Monitor and CRO.

20. [Intentionally Deleted][21]

21. The Monitor and CRO shall provide the Court with regular updates on the compliance of the Pride Entities with their cooperation, reporting and other obligations hereunder and such updates shall be included in the Monitor's ordinary-course reports to Court.

## General

22. Following issuance of the Initial Order, the Pride Entities, in consultation with the CRO and Monitor, shall track vehicle deposits and down payments received by the Pride Entities in respect of any vehicle, along with the return of such deposits or down payments in the event that such vehicle is not ultimately sold or leased to such customer.

---

[20] **Explanatory NTD to be deleted:** A number of stakeholders have asked for reconciliations beyond what is set out in this paragraph (for example, Vehicle Sale Proceeds and Vehicle Buyout Proceeds). It is possible for the Monitor to reconcile the Lease Payments and Soft Collections on a bi-weekly basis since the data inputs are automated and can be readily available. As evident throughout this Governance Protocol, the Monitor will be tasked with various other reporting obligations. It will be materially administratively burdensome, and prohibitively costly, to reconcile the vehicle proceeds for the sale of each individual vehicle, and so the Monitor will not do so.

[21] **Explanatory NTD to be deleted:** A number of comments received by the Monitor sought to address replacement servicing in the Governance Protocol. The Governance Protocol is intended only to deal with the calculation and distribution of payments on account of sales, leases and soft collections. Replacement servicing is complicated, facility-specific and will be dealt with separately. The Monitor has already reached out, or will be reaching out, to Securitization Parties individually about requests for replacement servicers shortly.

23. The Monitor and any affected Financier shall be entitled to seek the advice and direction of the Court in respect of this Governance Protocol, including to vary the Governance Protocol as required.

24. Notwithstanding anything to the contrary herein, the Monitor may decline to distribute, or authorize the distribution of, funds held by the Pride Entities or held by the Monitor in trust hereunder, in its sole discretion. Without limiting the Monitor's sole discretion to refuse to distribute or authorize the distribution of funds, the Monitor may make such a refusal in the event that (a) the Monitor becomes aware of conflicting entitlements to Vehicle Proceeds, Lease Payments, or Soft Collections in the course of its ongoing security review, (b) the Monitor is alerted by any Financier(s) of any competing claims or inconsistencies with respect to the entitlement to the Vehicle Proceeds, Lease Payments, or Soft Collections, or (c) the Monitor becomes aware of any inconsistencies between the Books and Records of the Pride Entities and its own information and analysis. To the extent that the Monitor exercises its discretion to refuse to make or authorize a payment in accordance with this Governance Profile, any affected Financier may seek direction of the Court.

25. The CRO, the Monitor, and their respective employees, advisors and other representatives acting in such capacities shall not incur any liability or obligation as a result of the CRO and/or Monitor carrying out the provisions of this Governance Protocol, save and except for any gross negligence or wilful misconduct on their part. The Monitor shall have all of the protections under the CCAA in carrying out its duties and obligations hereunder.

**APPENDIX "E"**

**Clean copy of Revised Governance Protocol**

**Governance Protocol**

Pursuant to the Initial Order dated March 27, 2024 (as amended by the Amended and Restated Initial Order dated April 5, 2024, and as may be further amended or restated from time to time, the "**Initial Order**"), (i) Ernst & Young Inc. was appointed as Monitor (in such capacity, the "**Monitor**") of the Pride Entities and (ii) RC Benson Consulting Inc. was appointed as Chief Restructuring Officer (in such capacity, the "**CRO**") of the Pride Entities. Capitalized terms used herein and not otherwise defined have the meanings given to them in the Initial Order.

The Pride Entities shall comply with this Governance Protocol set forth herein and shall cooperate with and assist the Monitor and the CRO in fulfilling their duties and obligations herein. This Governance Protocol may be modified as it applies to the relationship between the Pride Entities and a particular Financier (as defined below), subject to the written approval of the Monitor, Pride Entities, such Financier and any other Financier that would in the determination of the Monitor be affected by such modification.

Pursuant to the duties and obligations set forth herein, the Monitor and CRO, in consultation with the Pride Entities, will review receipts, disbursements and other items of the Pride Entities.

In performing their duties and obligations herein, the Monitor, its counsel, and the CRO, shall consult with the Pride Entities, their counsel, and/or any relevant lender(s) or Securitization Party(ies) (together "**Financier(s)**"), or their counsel, as needed or appropriate.

Throughout this Governance Protocol, references to any alleged entitlement of a Financier, including amounts owing to a Financier, expressly includes proprietary interests in a lease, lease payment and/or underlying vehicle of a Financier pursuant to a securitization and other amounts owing, either directly to the Financier or through a special purpose vehicle to which it provides financing.

Nothing in this Governance Protocol shall be determinative of the validity, effectiveness, enforceability or priority of any entitlement asserted by any Financier, nor shall the validity, effectiveness, enforceability or priority of any entitlement asserted by any Financier be enhanced or new entitlement be created by the provisions of or carrying out of this Governance Protocol. Without limiting the foregoing, no provision in this Governance Protocol which contemplates that any collections, proceeds or other property is to be held separate and apart and/or in trust shall confer on any Financier any entitlement, interest or priority in such collections, proceeds or other property that it would not have had those collections, proceeds or other property not been required to be held or in fact held separate and apart and/or in trust.

**Securitization Party Assets**

1. All lease or soft collections received by the Pride Entities in respect of Securitization Party Assets will be:

    (a) paid over to the Monitor, as soon as practicable, upon receipt by the Pride Entities;

    (b) kept separate and apart from, and not commingled with, the Property of the Pride Entities and not subject to the Cash Management System; and

    (c) held in trust by the Monitor for the benefit of the applicable Securitization Parties until distributed in accordance with this Governance Protocol.

*Dealing with Securitization Party Assets and other Vehicle Property*

2. Subject to Paragraph 3.A, the Pride Entities shall not sell, lease or otherwise dispose of (i) the Securitization Party Assets of a Securitization Party; or (ii) any vehicles, trailers, equipment and other personal property leased to third party customers or customarily sold in the ordinary course of Business ("**Vehicle Property**") which any Financier has financed, as reflected in the books and records of the Pride Entities (the "**Books and Records**", and such Securitization Party Assets or Vehicle Property being the "**Floorplan Assets**"), in either case without the prior consent of the respective Securitization Party or other Financier. Subject to Financier-specific omnibus pre-approved consents for sales that may have been or will be obtained from the applicable Financier (which omnibus consents shall govern, if provided), the request to sell the applicable Securitization Party Asset or Floorplan Asset shall include: (i) the purchaser's name, (ii) the purchase price, (iii) the Pride Entities' proposed amounts retained with respect to commissions, plus out-of-pocket costs as further described below, and (iv) indicate the proposed net distribution of sale proceeds to the applicable Financier.

3.A. The Pride Entities may sell Securitization Party Assets or Vehicle Property that are Multiple Collateral Vehicles, with the consent of the Monitor. Any sale of Multiple Collateral Vehicles shall be reported pursuant to Paragraph 4, with such proceeds held in trust pursuant to Paragraph 5.

*Other Requests*

3.B. Notwithstanding anything else in this protocol to the contrary, if any Securitization Party instructs the Pride Entities, copying the Monitor and the CRO, to cease all steps in connection with Soft Collections related to any Securitization Party Assets (or any lease that, based on the Books and Records, is reasonably likely to be a Securitization Party Asset), then the Pride Entities shall cease all Soft Collection actions unless and until requested to resume by the Securitization Party who instructed the Pride Entities to cease Soft Collection work. The appointment of any replacement servicer following the delivery of any instruction to cease Soft Collections in accordance with this paragraph shall occur in accordance with the terms of the Initial Order.

3. Upon request of any Securitization Party or other Financier, the Pride Entities shall provide to the requesting Financier a listing of (i) the Securitization Party Assets or (ii) the Vehicle Property which appears to be owned by, or financed by, the respective Financier or the special purpose vehicle to which they provided financing. The listing will also identify a preliminary list of Multiple Collateral Vehicles. All information from the listing will be based on the Books and Records, which the Monitor will review only to the extent that any inconsistencies have been identified. Upon receiving such listing, each applicable Financier shall provide comments and, as applicable, identify differences or inconsistencies and Multiple Collateral Vehicles with its own books and records as soon as reasonably practicable. No Financier shall be prejudiced or bound by their respective comments that are provided to identify differences or inconsistencies and Multiple Collateral Vehicles. In the event that any Multiple Collateral Vehicles, differences or inconsistencies are identified, each Financier shall have an opportunity to consult with the Monitor and the CRO regarding same. In the event of any dispute, the Financier(s) or the Monitor and the CRO shall be entitled to refer the matter either through the Entitlement Protocol or to the Court for determination.

**Vehicle Related Reporting and Disbursements**

4.  On Monday of each week (or, if such Monday falls on a holiday, the next business day) commencing April 22, 2024, the Pride Entities shall provide the Monitor and CRO with written reports (the "**Weekly Vehicle Sales Report**") listing:

   (a) vehicles that are not Multiple Collateral Vehicles sold in the prior week, with the following information in respect of each sold vehicle, as applicable: (i) the accompanying vehicle identification number ("**VIN**"); (ii) the lease number; (iii) the amount of funds received and separately a breakdown of the associated sale commission of 12% of the vehicle purchase price (or such other amounts as may be negotiated and agreed upon between the individual Financier and Pride Entities or the CRO), plus actual out-of-pocket costs, and applicable sales taxes (collectively, the "**Sale Fees and Taxes**", with the net amount after the applicable sale commission and Sale Fees and Taxes being the "**Vehicle Sale Proceeds**"); (iv) the Vehicle Equity (defined below), if any; (v) all applicable Financier(s) that had an ownership interest, a registered or otherwise perfected security interest in the relevant jurisdiction or other interest in such vehicle and, based on the Books and Records, had an entitlement to the Vehicle Sale Proceeds; and (vi) based on the Books and Records, the amounts owing to such Financier(s) in respect of such vehicle;

   (b) Multiple Collateral Vehicles sold in the prior week, with the following information in respect of each sold vehicle, as applicable: (i) the accompanying vehicle identification number ("**VIN**"); (ii) the lease number; (iii) the amount of funds received and separately a breakdown of the associated sale commission of 12% of the vehicle purchase price, plus Sale Fees and Taxes, with the net amount being the Vehicle Sale Proceeds; (iv) the Vehicle Equity, if any; (v) all applicable Financier(s) that may have an ownership interest, a registered or otherwise perfected security interest in the relevant jurisdiction or other interest in such vehicle and, based on the Books and Records, may have an entitlement to the Vehicle Sale Proceeds; and (vi) based on the Books and Records, the amounts owing to such Financier(s) in respect of such vehicle; and

   (c) vehicle buyouts and/or insurance proceeds in the prior week, with the following information in respect of each vehicle, as applicable: (i) the accompanying VIN; (ii) the lease number; (iii) the amount of funds received and separately a breakdown of the associated actual out-of-pocket costs, and applicable sales taxes (collectively, the "**Buyout Costs and Taxes**"), with the net amount being the "**Vehicle Buyout Proceeds**"; (iv) all applicable Financier(s) that had an ownership interest, a registered or otherwise perfected security interest in the relevant jurisdiction or other interest in such vehicle and, based on the Books and Records, had an entitlement to the Vehicle Buyout Proceeds; and (v) based on the Books and Records, the amount owing to such Financier(s) in respect of such vehicle.

5.  Prior to any disbursements being made by the Pride Entities in respect of the Vehicle Sale Proceeds and/or Vehicle Buyout Proceeds (together, "**Vehicle Proceeds**") to any applicable Financier(s) as identified by the Pride Entities as entitled to the same in the applicable Weekly Vehicle Sales Report, the Monitor will identify Multiple Collateral Vehicles pursuant to Paragraph 3 and:

(a) For each vehicle that is not a Multiple Collateral Vehicle, the Monitor in consultation with the CRO, will review the entitlement of the identified Financier(s) to the corresponding Vehicle Proceeds based on the Books and Records and otherwise review such proposed distribution of Vehicle Proceeds to the Financier(s) identified in the Weekly Vehicle Sales Report as having the entitlement (but, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement). The Monitor will complete its review as soon as practicable and after such review, the Monitor will approve payment by the Pride Entities of such amounts to the respective Financier(s) who have provided their consent pursuant to Paragraph 2, above, as soon as practicable up to the lesser of (i) the amount outstanding to the relevant Financier(s) in respect of the relevant vehicle by VIN (based on the Books and Records, as reviewed by the Monitor), or (ii) the amount of the respective Vehicle Proceeds. The remaining Vehicle Proceeds, if any, after each disbursement shall be retained by the Pride Entities as "**Vehicle Equity**". If the Monitor becomes aware of any competing claims or inconsistencies with respect to the entitlement to the Vehicle Proceeds, including without limitation as a result of its security review process or as a result of information provided by any Financier, the Monitor will inform the affected Financier(s) and hold the applicable Vehicle Proceeds in trust pending resolution; and

(b) For each vehicle that is a Multiple Collateral Vehicle, the corresponding Vehicle Proceeds will be transferred forthwith to a bank account established by the Monitor to be held in trust (the "**Multiple Collateral Trust Account**") pending determination of the entitlement to such Vehicle Proceeds. The determination of entitlement to the Vehicle Proceeds of a Multiple Collateral Vehicle will be conducted by the Monitor and their counsel, in consultation with the Pride Entities, their counsel and the CRO, in accordance with a protocol to be established by future order of the Court (the "**Entitlement Protocol**") or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected Financier(s).

6.  On the first Monday of every month (or, if such Monday falls on a holiday, the next business day) commencing May 6, 2024, the Pride Entities shall use best efforts to provide the Monitor and the CRO with a report (the "**Vehicle Repossession Report"**) listing all of the vehicles that have been repossessed by the Pride Entities and the location of such repossessed vehicles, along with: (i) the accompanying VIN; (ii) the lease number(s) to which each repossessed vehicle relates; (iii) the name of the lessee; and (iv) the name(s) of any applicable Financier(s) entitled to receipt of each Lease Payment (based on the Books and Records).

7.  On a monthly basis, the Monitor shall make available to each Securitization Party a monthly reconciliation of the sales taxes collected by the Pride Entities and remitted on behalf of the respective Securitization Party together with a copy of the remittance form.

8.  The Monitor shall make available to each Financier information from each Weekly Vehicle Sales Report and Vehicle Repossession Report as it pertains to the affected Financier, as and when received from the Pride Entities and as soon as practicable following completion of the review contemplated in Paragraph 5, in a form which will include the amount of Vehicle Proceeds disbursed to the respective Financier and transferred to the Multiple Collateral Trust Account, including a corresponding account of the applicable sale commission, all Sale Fees and Taxes and Buyout Costs and Taxes, as applicable, correlated to the relevant vehicles (by VINs). Nothing in this Governance Protocol shall prohibit one Financier from disclosing their report to one or more other Financiers.

**Lease Payments and Soft Collections Reporting and Disbursements**

9.  On the Monday of every second week (or, if such Monday falls on a holiday, the next business day) commencing April 15, 2024 (each a "**Lease Collections Reporting Date**"), the Pride Entities shall provide the Monitor and CRO with a report (the "**Lease Payments Report**") itemizing amounts that the Pride Entities have collected through pre-authorized payments (less amounts that have been declined due to insufficient funds) to accounts of the Pride Entities (including as servicer under securitizations or otherwise on behalf of third parties, but excluding Soft Collections) from lessees pursuant to leases which are not in default (individually a "**Lease Payment**" and collectively, the "**Lease Payments**"), along with: (i) the accompanying VIN; (ii) the lease number(s) to which each Lease Payment relates; (iii) the name of the lessee; (iv) all applicable Financier(s) entitled to receipt of each Lease Payment (based on the Books and Records); and (v) the proposed amounts to be distributed to the respective Financier(s) less applicable taxes (the "**Net Lease Payment**").

10. On each Lease Collections Reporting Date, the Pride Entities shall provide the Monitor and CRO with a report (the "**Soft Collections Report**", and together with the Lease Payments Report, the "**Bi-Weekly Lease Collections Report**") itemizing amounts that the Pride Entities have collected (including as servicer under securitizations or otherwise on behalf of third parties) from lessees or third parties (other than insurers) pursuant to enforcement steps taken with respect to leases that are in default (each a "**Soft Collection**" and collectively, the "**Soft Collections**" and for greater certainty, excludes any Lease Payments), along with, as applicable: (i) the accompanying VIN; (ii) the lease number(s) to which each Soft Collection relates; (iii) the name of the lessee; (iv) the name(s) of any applicable Financier(s) entitled to receipt of each Soft Collection (based on the Books and Records); (v) the proposed amounts to be distributed to the respective Financier(s) net of applicable sales tax for vehicles that are not Securitization Party Assets or net of a 20% commission on Soft Collections where the Pride Entities are servicing a Securitization Party Asset (the "**Soft Collection Fees**"); and (vi) for leaseline Financier(s), the proposed amounts to be distributed from Soft Collections based

on the proportion of payment from Soft Collections that such leaseline Financier(s) would have normally received from each Lease Payment.

11. Prior to any disbursements being made by the Pride Entities in respect of the Lease Payments and/or Soft Collections to any applicable Financier(s) identified by the Pride Entities as entitled to the same in the Bi-Weekly Lease Collections Report, the Monitor will identify Multiple Collateral Vehicles pursuant to Paragraph 3 and:

   (a) **Lease Payments:** For each vehicle or lease of a vehicle that is not a Multiple Collateral Vehicle, the Monitor, together with its counsel, and in consultation with the CRO, will review the entitlement of the identified Financier(s) to the corresponding Lease Payments to the extent the Monitor considers appropriate based on the Books and Records, and review such proposed distribution of Lease Payments limited to five randomly selected Lease Payments from each report received by lessees made to the Financier(s) identified in each Bi-Weekly Lease Collections Report, as having the entitlement (but, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement). The Monitor will complete its review as soon as practicable and after such review, the Monitor will approve payment by the Pride Entities of such amounts to the relevant Financier(s) forthwith in accordance with the financing and/or securitization document(s) between the Financier(s) and the Pride Entities applicable to the Lease Payments Report for disbursements that are not subject to reconciliation. The disbursement will be the lesser of the (i) Net Lease Payment and (ii) the monthly amount outstanding to the applicable Financier for a specific vehicle (by VIN). If the Monitor becomes aware of any competing claims or inconsistencies with respect to the entitlement to the Net Lease Payments, including without limitation as a result of its security review process or as a result of information provided by any Financier, the Monitor will inform the affected Financier(s) and hold the applicable Net Lease Payments in trust pending resolution;

   (b) **Soft Collections – Non-Securitization Party Assets:** For each vehicle or lease of a vehicle that is not a Multiple Collateral Vehicle and not a Securitization Party Asset, the Monitor, together with its counsel, and in consultation with the CRO, will review the entitlement of the identified Financier(s) to the corresponding Soft Collections to the extent the Monitor considers appropriate based on the Books and Records, and review such proposed distribution of Soft Collections limited to five randomly selected Soft Collections by vehicle (VIN) collected from lessees made to the Financier(s) identified in each Bi-Weekly Lease Collections Report, as having the entitlement (but, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement). The Monitor will complete its review as soon as practicable and after such review, the Monitor will approve payment by the Pride Entities of such amounts to the relevant Financier(s) forthwith in accordance with the financing document(s) between the Financier(s) and the Pride Entities applicable to the Soft Collections Report for disbursements that are not subject to reconciliation. If the Monitor becomes aware of any competing claims or inconsistencies with respect to the entitlement to the Soft Collections, including without limitation as a result of its security review process or as a result of information provided by any Financier, the Monitor will inform the affected Financier(s) and hold the applicable Soft Collections in trust pending resolution;

(c) **Unallocated Lease Payments:** In the event that a portion of the Lease Payments are received from a lessee who has made payments, without attribution to a particular vehicle and who is indebted to the Pride Entities in respect of more than one lease and with respect to more than one Financier (an "**Unallocated Lease Payment**"), then the corresponding Lease Payment(s) will be allocated to all such Financier(s) on a pro-rata basis based on the total amount outstanding due to each Financier. In the instance that a customer returns one of their vehicles or the vehicle has been repossessed by the Pride Entities, such vehicle will be considered a "non-performing asset" and will be excluded for the purposes of calculating the pro-rata share of the Unallocated Lease Payment;

(d) **Unallocated Soft Collections:** In the event that a portion of the Soft Collections are collected from a lessee who has made payments without attribution to a particular vehicle and who is indebted to the Pride Entities, Tpine USA Funding I LLC, Tpine USA Funding II LLC, Tpine USA Funding III LLC, Tpine USA Funding V LLC, TPine Canada Securitization LP or another Financier in respect of more than one lease and with respect to more than one Financier (an "**Unallocated Soft Collection**"), then the Unallocated Soft Collection(s) will be allocated to all such Financier(s) on a pro-rata basis based on the total amount outstanding due to each Financier. In the instance that a customer returns one of their vehicles or the vehicle has been repossessed by the Pride Entities, such vehicle will be considered a "non-performing asset" and will be excluded for the purposes of calculating the pro-rata share of the Unallocated Soft Collection;

(e) **Lease Payments – Multiple Collateral Vehicles:** For each vehicle that is a Multiple Collateral Vehicle, the corresponding Lease Payment(s) net of applicable sales taxes (only to the extent that the Lease Payment(s) are not with respect to Securitization Party Assets) will be transferred forthwith to the Multiple Collateral Trust Account pending determination of entitlement to such Lease Payment(s);

(f) **Soft Collections – Multiple Collateral Vehicles:** For each vehicle that is a Multiple Collateral Vehicle, the corresponding Soft Collection(s), net of the Soft Collection Fees (which shall be retained by the Pride Entities) and applicable sales taxes, will be transferred forthwith to the Multiple Collateral Trust Account pending determination of entitlement to such Soft Collections. Additionally, all Soft Collections in the Soft Collections Report related to Securitization Party Assets will be held in trust by the Monitor for the benefit of the affected Financier(s) (in a separate account referred to as the "**Soft Collections Trust Account**"), pending a determination of entitlement to such proceeds in accordance with the Entitlement Protocol or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected (as determined by the Monitor) Financier(s); and

(g) **Determination of Entitlement – Multiple Collateral Vehicles:** The determination of entitlement to the Lease Payments and Soft Collections in respect of a Multiple Collateral Vehicle will be conducted by the Monitor and their counsel, in consultation with the Pride Entities, their counsel and the CRO, in accordance with the Entitlement Protocol or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected (as determined by the Monitor) Financier(s).

12. For greater certainty, if a Financier has taken over servicing (or appointed a substitute servicer) of its respective leases, the Pride Entities shall not take any steps to collect Lease

Payments or Soft Collections, unless otherwise previously directed by the applicable Financier(s), in respect of such leases. In the event that the Pride Entities receives any Lease Payments or any Soft Collection(s) in respect of such leases, such Lease Payments and/or Soft Collections will subject to this Governance Protocol be paid over to the respective Financier(s) as soon as practicable upon receipt by the Pride Entities without deduction for any fees, costs, commissions or sales taxes (with the applicable Financier or substitute servicer being solely responsible for any corresponding sales tax remittance obligations).

13. In addition to the applicable information from the Weekly Vehicle Sales Report and the monthly Vehicle Repossession Report, the Monitor shall make available to each Financier information from each Bi-Weekly Lease Collections Report as it pertains to the affected Financier, as and when received from the Pride Entities and, as soon as practicable following completion of the review contemplated in Paragraph 11, in a form which will include the amount of Lease Payments disbursed to the respective Financier and transferred to the Multiple Collateral Trust Account correlated to the relevant leases.

**Cooperation and Reporting**

14. On each Lease Collections Reporting Date, the Pride Entities shall provide to the Monitor and CRO a written reconciliation of (i) Lease Payments and Soft Collections and related disbursements, to (ii) the Pride Entities' actual cash flow statements.

15. The Pride Entities shall be entitled but not required to pay all reasonable expenses incurred by the Pride Entities in carrying on their business lines in the ordinary course. With respect to any such payment in excess of $100,000, and all payments outside of the business operations in the ordinary course, such disbursements shall only be made with the prior consent of the Monitor and CRO.

16. The Monitor and CRO shall provide the Court with regular updates on the compliance of the Pride Entities with their cooperation, reporting and other obligations hereunder and such updates shall be included in the Monitor's ordinary-course reports to Court.

**General**

17. Following issuance of the Initial Order, the Pride Entities, in consultation with the CRO and Monitor, shall track vehicle deposits and down payments received by the Pride Entities in respect of any vehicle, along with the return of such deposits or down payments in the event that such vehicle is not ultimately sold or leased to such customer.

18. The Monitor and any affected Financier shall be entitled to seek the advice and direction of the Court in respect of this Governance Protocol, including to vary the Governance Protocol as required.

19. Notwithstanding anything to the contrary herein, the Monitor may decline to distribute, or authorize the distribution of, funds held by the Pride Entities or held by the Monitor in trust hereunder, in its sole discretion. Without limiting the Monitor's sole discretion to refuse to distribute or authorize the distribution of funds, the Monitor may make such a refusal in the event that (a) the Monitor becomes aware of conflicting entitlements to Vehicle Proceeds, Lease Payments, or Soft Collections in the course of its ongoing security review, (b) the Monitor is alerted by any Financier(s) of any competing claims or inconsistencies with respect to the entitlement to the Vehicle Proceeds, Lease Payments, or Soft Collections, or (c) the

Monitor becomes aware of any inconsistencies between the Books and Records of the Pride Entities and its own information and analysis. To the extent that the Monitor exercises its discretion to refuse to make or authorize a payment in accordance with this Governance Profile, any affected Financier may seek direction of the Court.

20. The CRO, the Monitor, and their respective employees, advisors and other representatives acting in such capacities shall not incur any liability or obligation as a result of the CRO and/or Monitor carrying out the provisions of this Governance Protocol, save and except for any gross negligence or wilful misconduct on their part. The Monitor shall have all of the protections under the CCAA in carrying out its duties and obligations hereunder.

**APPENDIX "F"**

**Blackline of Revised Governance Protocol**

**Governance Protocol**

Pursuant to the Initial Order dated March 27, 2024 (as amended by the Amended and Restated Initial Order dated April 5, 2024, and as may be further amended or restated from time to time, the "**Initial Order**"), (i) Ernst & Young Inc. was appointed as Monitor (in such capacity, the "**Monitor**") of the Pride Entities[1] and (ii) RC Benson Consulting Inc. was appointed as Chief Restructuring Officer (in such capacity, the "**CRO**") of the Pride Entities. Capitalized terms used herein and not otherwise defined have the meanings given to them in the Initial Order.

The Pride Entities shall comply with this Governance Protocol set forth herein and shall cooperate with and assist the Monitor and the CRO in fulfilling their duties and obligations herein. This Governance Protocol may be modified as it applies to the relationship between the Pride Entities and a particular Financier (as defined below), subject to the written approval of the Monitor, Pride Entities, such Financier and any other Financier that would in the determination of the Monitor be affected by such modification.

Pursuant to the duties and obligations set forth herein, the Monitor and CRO, in consultation with the Pride Entities, will review receipts, disbursements and other items of the Pride Entities.

In performing their duties and obligations herein, the Monitor, its counsel, and the CRO, shall consult with the Pride Entities, their counsel, and/or any relevant lender(s) or ~~securitization party~~Securitization Party(ies) (together "**Financier(s)**"), or their counsel, as needed or appropriate.

~~**Vehicle Sales and Buyouts**~~
Throughout this Governance Protocol, references to any alleged entitlement of a Financier, including amounts owing to a Financier, expressly includes proprietary interests in a lease, lease payment and/or underlying vehicle of a Financier pursuant to a securitization and other amounts owing, either directly to the Financier or through a special purpose vehicle to which it provides financing.

Nothing in this Governance Protocol shall be determinative of the validity, effectiveness, enforceability or priority of any entitlement asserted by any Financier, nor shall the validity, effectiveness, enforceability or priority of any entitlement asserted by any Financier be enhanced or new entitlement be created by the provisions of or carrying out of this Governance Protocol. Without limiting the foregoing, no provision in this Governance Protocol which contemplates that any collections, proceeds or other property is to be held separate and apart and/or in trust shall confer on any Financier any entitlement, interest or priority in such collections, proceeds or other property that it would not have had those collections, proceeds or other property not been required to be held or in fact held separate and apart and/or in trust.

1.  [Intentionally Deleted][1]

---

[1] ~~As defined in the Initial Order.~~

[1] **Explanatory NTD to be deleted**: "[Intentionally Deleted]" is being used in this draft to manage paragraph references; these will be deleted in the final version.

**Securitization Party Assets**

2.  All lease or soft collections[2] received by the Pride Entities in respect of Securitization Party Assets will be:

    (a) paid over to the Monitor, as soon as practicable, upon receipt by the Pride Entities;

    (b) kept separate and apart from, and not commingled with, the Property of the Pride Entities and not subject to the Cash Management System; and

    (c) held in trust by the Monitor for the benefit of the applicable Securitization Parties until distributed in accordance with this Governance Protocol.

*Dealing with Securitization Party Assets and other Vehicle Property*

3.  Subject to Paragraph 3.A, the Pride Entities shall not sell, lease or otherwise dispose of (i) the Securitization Party Assets of a Securitization Party; or (ii) any vehicles, trailers, equipment and other personal property leased to third party customers or customarily sold in the ordinary course of Business ("**Vehicle Property**") which any Financier has financed, as reflected in the books and records of the Pride Entities (the "**Books and Records**", and such Securitization Party Assets or Vehicle Property being the "**Floorplan Assets**"), in either case without the prior consent of the respective Securitization Party or other Financier. Subject to Financier-specific omnibus pre-approved consents for sales that may have been or will be obtained from the applicable Financier (which omnibus consents shall govern, if provided), the request to sell the applicable Securitization Party Asset or Floorplan Asset shall include: (i) the purchaser's name, (ii) the purchase price, (iii) the Pride Entities' proposed amounts retained with respect to commissions, plus out-of-pocket costs as further described below, and (iv) indicate the proposed net distribution of sale proceeds to the applicable Financier.[3]

3.A. The Pride Entities may sell Securitization Party Assets or Vehicle Property that are Multiple Collateral Vehicles[4], with the consent of the Monitor. Any sale of Multiple Collateral Vehicles

---

[2] **Explanatory NTD to be deleted:** Some parties have asked that all proceeds be put into the Monitor's trust account, pending distribution under the Governance Protocol. This is impractical and will be very inefficient. Proceeds of sale of Securitization Party Assets, which sale will only occur with consent of the applicable Securitization Party, will be held by the Company until distributed, with the Monitor's oversight.

[3] **Explanatory NTD to be deleted:** Some parties have asked that the Monitor confirm that any buyer is arms-length to the Pride Entities. This is not economically feasible for each vehicle sale. A vehicle sale (for non-Multiple Collateral Vehicles) will not occur without the blanket consent of the applicable Financier, which will include a price range that is acceptable to the Financier. A Multiple Collateral Vehicle sale will not occur without the consent of the Monitor.

[4] "Multiple Collateral Vehicles" are vehicles or leases of vehicles that are or may be pledged as a collateral security, leased, assigned or otherwise securitized or in which an interest is otherwise granted or transferred to or for the benefit of two or more Financier(s).

shall be reported pursuant to Paragraph 7, with such proceeds held in trust pursuant to Paragraph 8.[5]

*Other Requests*

3.B. Notwithstanding anything else in this protocol to the contrary, if any Securitization Party instructs the Pride Entities, copying the Monitor and the CRO, to cease all steps in connection with Soft Collections related to any Securitization Party Assets (or any lease that, based on the Books and Records, is reasonably likely to be a Securitization Party Asset), then the Pride Entities shall cease all Soft Collection actions unless and until requested to resume by the Securitization Party who instructed the Pride Entities to cease Soft Collection work. The appointment of any replacement servicer following the delivery of any instruction to cease Soft Collections in accordance with this paragraph shall occur in accordance with the terms of the Initial Order.

4. Upon request of any Securitization Party or other Financier, the Pride Entities shall provide to the requesting Financier a listing of (i) the Securitization Party Assets or (ii) the Vehicle Property which appears to be owned by, or financed by, the respective Financier or the special purpose vehicle to which they provided financing. The listing will also identify a preliminary list of Multiple Collateral Vehicles. All information from the listing will be based on the Books and Records, which the Monitor will review only to the extent that any inconsistencies have been identified. Upon receiving such listing, each applicable Financier shall provide comments and, as applicable, identify differences or inconsistencies and Multiple Collateral Vehicles with its own books and records as soon as reasonably practicable. No Financier shall be prejudiced or bound by their respective comments that are provided to identify differences or inconsistencies and Multiple Collateral Vehicles. In the event that any Multiple Collateral Vehicles, differences or inconsistencies are identified, each Financier shall have an opportunity to consult with the Monitor and the CRO regarding same. In the event of any dispute, the Financier(s) or the Monitor and the CRO shall be entitled to refer the matter either through the Entitlement Protocol or to the Court for determination.

5. [Intentionally Deleted]

6. [Intentionally Deleted]

**Vehicle Related Reporting and Disbursements**

7. ~~1.~~ On Monday of each week (or, if such Monday falls on a holiday, the next business day) commencing April 22, 2024, the Pride Entities shall provide the Monitor and CRO with written reports (the "**Weekly Vehicle Sales Report**") listing:

---

[5] **Explanatory NTD to be deleted:** The purpose of this new paragraph is to enable Multiple Collateral Vehicles to be sold in a streamlined manner and to avoid undue costs or delays. This new paragraph does not change the fact that proceeds will be held in trust.

(a) a) vehicles that are not Multiple Collateral Vehicles sold in the prior week, with the following information in respect of each sold vehicle, as applicable: (i) the accompanying vehicle identification number ("**VIN**")., (ii) the lease number., (iii) the amount of funds received net of fees,and separately a breakdown of the associated sale commission of 12% of the vehicle purchase price (or such other amounts as may be negotiated and agreed upon between the individual Financier and Pride Entities or the CRO),[6] plus actual out-of-pocket costs, commissions and applicable sales taxes (such amounts,collectively, the "**Sale Fees and Taxes**", with the net amount after the applicable sale commission and Sale Fees and Taxes being the "**Vehicle Sale Proceeds**")., (iv) the Vehicle Equity (defined below), if any; (v) all applicable Financier(s) that had an ownership interest, a registered or otherwise perfected security interest in the relevant jurisdiction or other interest in such VIN orvehicle and, based on the Books and Records, had an entitlement to the Vehicle Sale Proceeds; and (vi) based on the Books and Records, the amounts owing to such Financier(s) in respect of such vehicle;

(b) Multiple Collateral Vehicles sold in the prior week, with the following information in respect of each sold vehicle, as applicable: (i) the accompanying vehicle identification number ("**VIN**"); (ii) the lease number; (iii) the amount of funds received and separately a breakdown of the associated sale commission of 12% of the vehicle purchase price, plus Sale Fees and Taxes, with the net amount being the Vehicle Sale Proceeds; (iv) the Vehicle Equity, if any; (v) all applicable Financier(s) that may have an ownership interest, a registered or otherwise perfected security interest in the relevant jurisdiction or other interest in such vehicle and, based on the books and records of the Pride Entities (the "Books and Records")., may have an entitlement to the Vehicle Sale Proceeds in priority to any other Financier(s),; and (vvi) based on the Books and Records, the amounts owing to such priority Financier(s) in respect of such VINvehicle; and

(c) b) vehicle buyouts[7] and/or insurance proceeds in the prior week, with the following information in respect of each vehicle, as applicable: (i) the accompanying VIN; (ii) the lease number., (iii) the amount of funds received net of fees,and separately a breakdown of the associated actual out-of-pocket costs, commissions and applicable sales taxes (such amounts,collectively, the "**Buyout Costs and Taxes**")[8], with the net amount being the "**Vehicle Buyout Proceeds**")., (iv) theall applicable Financier(s) that had an ownership interest, a registered or otherwise perfected security interest in the relevant jurisdiction or other interest in such VINvehicle and/or, based on the Books and Records, havehad an entitlement to the Vehicle Buyout Proceeds in priority to any other Financier(s); and (ivv) based on the Books and Records, the amount owing to such priority Financier(s) in respect of such VINvehicle.

---

[6] **Explanatory NTD to be deleted**: 12% is the default commission, and will be subject to any separate agreements with Financiers, as discussed in Paragraph 3.
[7] NTD to Stakeholders: Please explain what the "vehicle prepayments" are intended to describe; the Monitor is not aware of any prepayments being made.
[8] **Explanatory NTD to be deleted:** It is not anticipated that there would be fees charged on Buyouts; only potentially out-of-pocket costs and taxes.

8. 2. Prior to any disbursements being made by the Pride Entities in respect of the Vehicle Sale Proceeds and/or Vehicle Buyout Proceeds (together, "**Vehicle Proceeds**") to the any applicable Financier(s) as identified by the Pride Entities as entitled to the same in the applicable Weekly Vehicle Sales Report, the Monitor will identify Multiple Collateral Vehicles pursuant to Paragraph 4 and:

    (a) a) For each vehicle that is not a Multiple Collateral Vehicle, the Monitor, together with its counsel, and in consultation with the CRO, will review the entitlement of the identified Financier(s) to the corresponding Vehicle Proceeds based on the Books and Records and otherwise review such proposed distribution of Vehicle Proceeds[9] to the Financier(s) identified in the Weekly Vehicle Sales Report as having the entitlement (but, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement) and, subject to (b) below,. The Monitor will complete its review as soon as practicable and after such review, the Monitor will approve the payment by the Pride Entities of such amounts to the respective Financier(s), who have provided their consent pursuant to Paragraph 3, above, as soon as practicable up to the lesser of (i) the amount outstanding to the relevant Financier(s) in respect of the relevant vehicle by VIN (based on the Books and Records, as reviewed by the Monitor), or (ii) the amount of the respective Vehicle Proceeds. The remaining Vehicle Proceeds, if any, after each disbursement shall be retained by the Pride Entities as "**Vehicle Equity**". If the Monitor becomes aware of any competing claims or inconsistencies with respect to the entitlement to the Vehicle Proceeds, including without limitation as a result of its security review process or as a result of information provided by any Financier, the Monitor will inform the affected Financier(s) and hold the applicable Vehicle Proceeds in trust pending resolution;[10] and

    (b) b) in the event a VIN listed in the Weekly Vehicle Sales Report was, based on (i) the Books and Records, and/or (ii) applicable VIN security searches, and/or (iii) claims or demands made in writing by any Financier as reviewed by the Monitor, pledged as collateral security, leased, assigned or an interest was otherwise granted or transferred to or for the benefit of two or more Financier(s) (a "For each vehicle that is a Multiple Collateral Vehicle **(Sale)**"), the corresponding Vehicle Proceeds will be transferred forthwith to a bank account established by the Monitor to be held in trust (the "**Monitor's****Multiple Collateral** Trust Account") pending determination of the entitlement to such Vehicle Proceeds. The determination of entitlement to the Vehicle Proceeds of a Multiple Collateral Vehicle (Sale) will be conducted by the Pride EntitiesMonitor and their counsel, in consultation with the

---

[9] **Explanatory NTD to be deleted:** The commissions in connection with the sale of Multiple Collateral Vehicles will be retained by the company as it forms part of the cash flow projections. The Sale Fees and Taxes will also be deducted and the remaining proceeds will be held in trust.

[10] **Explanatory NTD to be deleted:** Numerous stakeholders have asked for some kind of over-ride on the Company's books and records. We have included these overrides in each section where it is appropriate, and also added a global override at the end of the Governance Protocol. In the result, to the extent that any entitlement to any vehicles or proceeds are stated to be subject to the information in the Company's books and records, that will in every instance be subject to the Monitor having either (a) discovered conflicting information in the context of doing a security review or otherwise, or (b) been advised by any other party that there is a dispute over entitlement to a vehicle or proceeds that is not evident in the books and records.

~~Monitor~~Pride Entities, their ~~respective~~ counsel~~,~~ and the CRO, in accordance with a protocol to be established by future order of the Court~~, which shall be developed in consultation with affected parties~~ (the "**Entitlement Protocol**") or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected Financier(s).

9. On the first Monday of every month (or, if such Monday falls on a holiday, the next business day) commencing May 6, 2024, the Pride Entities shall use best efforts to provide the Monitor and the CRO with a report (the "**Vehicle Repossession Report")**[11] listing all of the vehicles that have been repossessed by the Pride Entities and the location of such repossessed vehicles, along with: (i) the accompanying VIN; (ii) the lease number(s) to which each repossessed vehicle relates; (iii) the name of the lessee; and (iv) the name(s) of any applicable Financier(s) entitled to receipt of each Lease Payment (based on the Books and Records).

10. On a monthly basis, the Monitor shall make available to each Securitization Party a monthly reconciliation of the sales taxes collected by the Pride Entities and remitted on behalf of the respective Securitization Party together with a copy of the remittance form.

11. [Intentionally Deleted]

12. ~~3.~~ The Monitor shall make available to each Financier~~(s) a copy of~~ information from each Weekly Vehicle Sales Report and Vehicle Repossession Report as it pertains to the affected Financier, as and when received from the Pride Entities and~~,~~ as soon as ~~practical~~practicable following completion of the review contemplated in paragraph ~~2~~8, in a ~~report on~~form which will include the amount of Vehicle Proceeds disbursed to ~~Financiers~~the respective Financier and transferred to the ~~Monitor's~~Multiple Collateral Trust Account, including a corresponding account of the applicable sale commission, all Sale Fees and Taxes and Buyout Costs and Taxes, as applicable, correlated to the relevant vehicles (by VINs). Nothing in this Governance Protocol shall prohibit one Financier from disclosing their report to one or more other Financiers.[12]

**Lease Payments and Soft Collections Reporting and Disbursements**

13. ~~4.~~ On the Monday of every second week (or, if such Monday falls on a holiday, the next business day) commencing April 15, 2024 (each a "**Lease Collections Reporting Date")**, the Pride Entities shall provide the Monitor and CRO with a report (the "**Lease Payments Report**") ~~listing the itemized~~itemizing amounts that the Pride Entities have ~~received~~collected through pre-authorized payments (less amounts that have been declined due to insufficient funds) to accounts of the Pride Entities (including as servicer under securitizations or otherwise on behalf of third parties, but excluding ~~collections that are to be reported upon pursuant to paragraph 5~~Soft Collections) from ~~customers~~lessees pursuant to leases which are not in default (individually a "**Lease Payment**" and collectively, the "**Lease Payments**"), along with: (i) the accompanying VIN~~;,~~; (ii) the lease number(s) to which each Lease

---

[11] **Explanatory NTD to be deleted**: Please note that, unlike other inputs to some of the other weekly or bi-weekly reports, the information on repossessed vehicles cannot be automatically generated. As a result, providing Vehicle Repossession Reports on a bi-weekly basis is not practicable.
[12] **Explanatory NTD to be deleted**: The Monitor will not share the aggregate reports with each Financier, but will prepare a Financier-specific report for each Financier and provide that. If Financiers want to know the information in the report of another Financier, it is open to them to exchange reports.

Payment relates; (iii) ~~the~~ the name of ~~the~~ the lessee; (iv) all applicable Financier(s) entitled to receipt of each Lease Payment (based on the Books and Records); and (v) the proposed amounts to be distributed to the respective Financier(s) less applicable taxes (the "**Net Lease Payment**").[~~2~~13]

14. ~~5.~~ On ~~the Monday of every second week (or, if such Monday falls on a holiday, the next business day) commencing April 15, 2024~~each Lease Collections Reporting Date, the Pride Entities shall provide the Monitor and CRO with a report (the "**Soft Collections Report**", and together with the Lease Payments Report, the "**Bi-Weekly ~~Vehicle~~ Lease Collections Report**") ~~listing the itemized~~itemizing amounts that the Pride Entities have collected (including as servicer under securitizations or otherwise on behalf of third parties) from ~~customers~~lessees or third parties (other than insurers)[14] pursuant to ~~leases other than those pre-authorized payments made to segregated trust accounts~~enforcement steps taken with respect to leases that are in default (each a "**Soft Collection**" and collectively, the "**Soft Collections**" and for greater certainty, excludes any Lease Payments), along with, as applicable: (i) the accompanying VIN~~;~~; (ii) the lease number(s) to which each Soft Collection relates; (iv) the name of the lessee; (iv) the name(s) of any applicable Financier(s) entitled to receipt of each Soft Collection (based on the Books and Records~~, as reviewed by the Monitor); and~~); (v) ~~the~~ proposed amounts to be ~~paid~~distributed to the respective Financier(s) ~~(net of any fees, costs, commissions, and sales taxes)~~.

~~**Lease Payment Disbursements**~~

~~6.    Prior to any disbursements being made by~~applicable sales tax for vehicles that are not Securitization Party Assets or net of a 20% commission on Soft Collections where the Pride Entities ~~from the Lease Payments to those Financier(s) and in the amounts identified in the Lease Payments Report, the Monitor (who, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement) will review the payments made by the top five customers (in total dollar amount of payments received) in the Lease Payments Report to confirm (i) the proposed amounts to be disbursed to such respective Financier(s); and (ii) the applicable Financier(s) entitled to receipt of such Lease Payments (based on the Books and Records, as reviewed by the Monitor), and such payments in the Lease Payments Report may be made with the Monitor's prior approval, subject to paragraphs 7 and 8 herein~~are servicing a Securitization Party (the "**Soft Collection Fees**"); and (vi) for leaseline Financier(s), the proposed amounts to be distributed from Soft Collections based on the proportion of payment from Soft Collections that such leaseline Financier(s) would have normally received from each Lease Payment.[15]

---

[~~2~~13] For certainty, (a) Lease Payments received from pre-authorized ~~payment~~payments shall not be included in a Lease Payments Report until five days have passed since the pre-authorized payment date; and (b) other than with the consent of the affected Financier(s), pre-authorized payments of customers pursuant to leases being directed to segregated accounts of the applicable Financier(s) shall continue to be made to such accounts.
**Explanatory NTD to be deleted**: No Pride Entity fees or commissions were contemplated for the collection of payments in this paragraph.
[14] **Explanatory NTD to be deleted**: Insurance proceeds from a vehicle that is damaged and hence the lease or the financing is terminated, will be reflected in the buyout report.
[15] **Explanatory NTD and Illustrative to be deleted:** (i) the monthly Lease Payment from Lessee A for Vehicle X is normally $2,500. (ii) the leaseline Financier is normally owed a monthly payment of $2,000

15. Prior to any disbursements being made by the Pride Entities in respect of the Lease Payments and/or Soft Collections to any applicable Financier(s) identified by the Pride Entities as entitled to the same in the Bi-Weekly Lease Collections Report, the Monitor will identify Multiple Collateral Vehicles pursuant to Paragraph 4 and:

(a) **Lease Payments:** For each vehicle or lease of a vehicle that is not a Multiple Collateral Vehicle, the Monitor, together with its counsel, and in consultation with the CRO, will review the entitlement of the identified Financier(s) to the corresponding Lease Payments to the extent the Monitor considers appropriate based on the Books and Records, and review such proposed distribution of Lease Payments limited to five randomly selected Lease Payments from each report received by lessees made to the Financier(s) identified in each Bi-Weekly Lease Collections Report[16], as having the entitlement (but, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement). The Monitor will complete its review as soon as practicable and after such review, the Monitor will approve payment by the Pride Entities of such amounts to the relevant Financier(s) forthwith in accordance with the financing and/or securitization document(s) between the Financier(s) and the Pride Entities applicable to the Lease Payments Report for disbursements that are not subject to reconciliation.[17] The disbursement will be the lesser of the (i) Net Lease Payment and (ii) the monthly amount outstanding to the applicable Financier for a specific vehicle (by VIN).[18] If the Monitor becomes aware of any competing claims or inconsistencies with respect to the entitlement to the Net Lease Payments, including without limitation as a result of its security review process or as a result of information provided by any Financier, the Monitor will inform the affected Financier(s) and hold the applicable Net Lease Payments in trust pending resolution;

(b) **Soft Collections – Non-Securitization Party Assets:** For each vehicle or lease of a vehicle that is not a Multiple Collateral Vehicle and not a Securitization Party Asset,[19] the Monitor, together with its counsel, and in consultation with the CRO,

---

with respect to Vehicle X. In this circumstance, the proportion that is payable to the leaseline Financier is normally 80% of the full Lease Payment.

*Scenario 1:* The Soft Collection from Lessee A is $6,000. The leaseline Financier will be paid $4,800 from this Soft Collection.

*Scenario 2:* The Soft Collection from Lessee A is $1,000, which represents less than one Lease Payment. The leaseline Financier will be paid $800 from this Soft Collection.

[16] **Explanatory NTD to be deleted:** It is cost prohibitive to review the lease payments or soft collections on an item-by-item basis. The parties cannot comply with the DIP budget at this level of review. The Pride Entities and the Monitor introduced this construct in the first instance so that the money (not otherwise in connection with Multiple Collateral Vehicles) will continue to flow. If Financiers require that all Lease Payments be reviewed, the Monitor can do that, however no distributions will flow to Financiers in the interim.

[17] As further set out in each Bi-Weekly Lease Collections Report, certain amounts received from lessees cannot be reconciled to a specific Financier account. Reconciliation efforts are on-going and will be disclosed in the Bi-Weekly Lease Collections Report.

[18] **Explanatory NTD to be deleted:** We have updated the definition of Lease Payments to specify that such payments are in connection with leases that are not in default.

[19] **Explanatory NTD to be deleted:** This subparagraph (b) is necessary because Soft Collections related to Securitization Party Assets will be held in trust, pending a resolution on the Soft Collection commission. A commission for Soft Collections is not contemplated for non-Securitization Party Assets.

will review the entitlement of the identified Financier(s) to the corresponding Soft Collections to the extent the Monitor considers appropriate based on the Books and Records, and review such proposed distribution of Soft Collections limited to five randomly selected Soft Collections by vehicle (VIN) collected from lessees made to the Financier(s) identified in each Bi-Weekly Lease Collections Report, as having the entitlement (but, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the proposed disbursement). The Monitor will complete its review as soon as practicable and after such review, the Monitor will approve payment by the Pride Entities of such amounts to the relevant Financier(s) forthwith in accordance with the financing document(s) between the Financier(s) and the Pride Entities applicable to the Soft Collections Report for disbursements which are not subject to reconciliation. If the Monitor becomes aware of any competing claims or inconsistencies with respect to the entitlement to the Soft Collections, including without limitation as a result of its security review process or as a result of information provided by any Financier, the Monitor will inform the affected Financier(s) and hold the applicable Soft Collections in trust pending resolution;

(c) 7. In the event that the VIN pursuant to a lease listed in the**Unallocated Lease Payments** Report was, based on the Books and Records, and/or applicable VIN security searches and/or claims or demands made in writing by any Financier, pledged as collateral security to two or more Financiers (a "**Multiple Collateral Vehicle (Lease)**"), then the corresponding Lease Payment(s) will be transferred to the Monitor's Trust Account pending determination of entitlement to such Lease Payment(s).: In the event that a portion of the Lease Payments are received from a lessee who has made payments, without attribution to a particular VINvehicle and who is indebted to the Pride Entities in respect of more than one Financierlease and with respect to more than one lenderFinancier (an "**Unallocated Lease Payment**"), then the corresponding Lease Payment(s) will be allocated to all such Financier(s) on a pro-rata basis based on the total amount outstanding due to each Financier(s).Financier. In the instance that a customer returns one of their vehicles or the vehicle has been repossessed by the Pride Entities, such vehicle will be considered a "non-performing asset" and will be excluded for the purposes of calculating the pro-rata share of the Unallocated Lease Payment;

8. The determination of entitlement to the Lease Payments in respect of a Multiple Collateral Vehicle (Lease) will be conducted by the Pride Entities, in consultation with the Monitor, their respective counsel, and the CRO, in accordance with the Entitlement Protocol, or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected Financier(s).

**Soft Collections Disbursements**

9. Prior to any disbursements being made by the Pride Entities from the Soft Collections to Financiers identified in the Soft Collections Report as entitled to same, the Monitor (who, for greater certainty, shall not be required to obtain a legal opinion on the priorities of the

~~proposed disbursement) will review the payments made by the top five customers (in total amount of payments received) in the Soft Collections Report to confirm (i) the proposed amounts to be disbursed to such Financier(s); and (ii) the applicable Financier(s) entitled to receipt of such Soft Collections based on the Books and Records (as reviewed by the Monitor), and such payments in the Soft Collections Report may be made with the Monitor's prior approval, subject to paragraphs 10 and 11 herein.~~

(d) ~~10. In the event that the vehicle pursuant to a lease listed in the~~**Unallocated** Soft Collections ~~Report was, based on the Books and Records and/or applicable VIN security searches and/or claims or demands made in writing by any Financier, a Multiple Collateral Vehicle (Lease), then~~ the corresponding Soft Collection(s) will be transferred to the Monitor's Trust Account pending determination of entitlement to such Soft Collections. Additionally, all Soft Collections in the Soft Collections Report related to a securitized lease will be held by the Monitor in trust pending entitlement to such proceeds.: In the event that a portion of the Soft Collections are collected from a lessee who has made payments without attribution to a particular ~~VIN~~vehicle and who is indebted to the Pride Entities, Tpine USA Funding I LLC, Tpine USA Funding II LLC, Tpine USA Funding III LLC, Tpine USA Funding V LLC, ~~or~~TPine Canada Securitization LP or another Financier in respect of more than one lease and with respect to more than one Financier (an "**Unallocated Soft Collection**"), then the ~~corresponding~~Unallocated Soft Collection(s) will be allocated to all such Financier(s) on a pro-rata basis based on the total amount outstanding due to each ~~Financier(s).~~Financier. In the instance that a customer returns one of their vehicles or the vehicle has been repossessed by the Pride Entities, such vehicle will be considered a "non-performing asset" and will be excluded for the purposes of calculating the pro-rata share of the Unallocated Soft Collection;[20]

(e) **Lease Payments – Multiple Collateral Vehicles:** For each vehicle that is a Multiple Collateral Vehicle, the corresponding Lease Payment(s) net of applicable sales taxes (only to the extent that the Lease Payment(s) are not with respect to Securitization Party Assets) will be transferred forthwith to the Multiple Collateral Trust Account pending determination of entitlement to such Lease Payment(s);

(f) **Soft Collections – Multiple Collateral Vehicles:** For each vehicle that is a Multiple Collateral Vehicle, the corresponding Soft Collection(s), net of the Soft Collection Fees (which shall be retained by the Pride Entities) and applicable sales taxes, will be transferred forthwith to the Multiple Collateral Trust Account pending determination of entitlement to such Soft Collections. Additionally, all Soft Collections in the Soft Collections Report related to Securitization Party Assets

---

[20] **Explanatory NTD to be deleted:** We have received a number of requests that lease payments and soft collections from non-Multiple Collateral Vehicles be held in trust. We note that the proceeds referred to in this subsection are **not** with respect to Multiple Collateral Vehicles. Historically, allocations on a pro-rata basis with respect to Unallocated Lease Payment or Unallocated Soft Collections have not been contentious. Please explain what the objective of transferring these payments to the Multiple Collateral Trust Account. We don't think the proposed change advances the interest of any Financier, however if the collective preference of Financiers is that these payments be held in trust, instead of distributed pari passu, the Monitor will consider that request.

will be held in trust by the Monitor for the benefit of the affected Financier(s) (in a separate account referred to as the "**Soft Collections Trust Account**"), pending a determination of entitlement to such proceeds in accordance with the Entitlement Protocol or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected (as determined by the Monitor) Financier(s); and

(g) 11. **Determination of Entitlement – Multiple Collateral Vehicles:** The determination of entitlement to the Lease Payments and Soft Collections in respect of a Multiple Collateral Vehicle (Lease) will be conducted by the Pride Entities Monitor and their counsel, in consultation with the Monitor Pride Entities, their respective counsel, and the CRO, in accordance with the Entitlement Protocol, or as otherwise agreed to between the Pride Entities, Monitor, CRO and affected (as determined by the Monitor) Financier(s).

**General**

16. For greater certainty, if a Financier has taken over servicing (or appointed a substitute servicer) of its respective leases, the Pride Entities shall not take any steps to collect Lease Payments or Soft Collections, unless otherwise previously directed by the applicable Financier(s), in respect of such leases. In the event that the Pride Entities receives any Lease Payments or any Soft Collection(s) in respect of such leases, such Lease Payments and/or Soft Collections will subject to this Governance Protocol be paid over to the respective Financier(s) as soon as practicable upon receipt by the Pride Entities without deduction for any fees, costs, commissions or sales taxes (with the applicable Financier or substitute servicer being solely responsible for any corresponding sales tax remittance obligations).

17. 12. The In addition to the applicable information from the Weekly Vehicle Sales Report and the monthly Vehicle Repossession Report, the Monitor shall make available to each Financier(s) a copy of information from each Bi-Weekly Vehicle Lease Collections Report as it pertains to the affected Financier, as and when received from the Pride Entities and, as soon as practical practicable following completion of the review contemplated in paragraph 3 15, in a report on form which will include the amount of Lease Payments disbursed to Financier(s) the respective Financier and transferred to the Monitor's Multiple Collateral Trust Account correlated to the relevant leases.

**Cooperation and Reporting**

18. On each Lease Collections Reporting Date, the Pride Entities shall provide to the Monitor and CRO a written reconciliation of (i) Lease Payments and Soft Collections[21] and related disbursements, to (ii) the Pride Entities' actual cash flow statements.

---

[21] **Explanatory NTD to be deleted:** A number of stakeholders have asked for reconciliations beyond what is set out in this paragraph (for example, Vehicle Sale Proceeds and Vehicle Buyout Proceeds). It is possible for the Monitor to reconcile the Lease Payments and Soft Collections on a bi-weekly basis since the data inputs are automated and can be readily available. As evident throughout this Governance Protocol, the Monitor will be tasked with various other reporting obligations. It will be materially administratively burdensome, and prohibitively costly, to reconcile the vehicle proceeds for the sale of each individual vehicle, and so the Monitor will not do so.

19. ~~13.~~ The Pride Entities shall be entitled but not required to pay all reasonable expenses incurred by the Pride Entities in carrying on their business lines in the ordinary course. With respect to any such payment in excess of $100,000, and all payments outside of the business operations in the ordinary course, such disbursements shall only be made with the prior consent of the Monitor and CRO.

~~14. Commencing as soon as practical following issuance of the Initial Order and thereafter, on a biweekly basis, the Pride Entities shall provide to the Monitor and CRO together with each Weekly Vehicle Sales Report a written reconciliation of (i) Vehicle Proceeds and Lease Payments~~ ~~and related disbursements~~ ~~in the prior week, to (ii) the Pride Entities' actual cash flow statements.~~

20. [Intentionally Deleted][22]

21. The Monitor and CRO shall provide the Court with regular updates on the compliance of the Pride Entities with their cooperation, reporting and other obligations hereunder and such updates shall be included in the Monitor's ordinary-course reports to Court.

**General**

22. ~~15.~~ Following issuance of the Initial Order, the Pride Entities, in consultation with the CRO and Monitor, shall track vehicle deposits and ~~downpayments~~down payments received by the Pride Entities in respect of any vehicle, along with the return of such deposits or ~~downpayments~~down payments in the event that such vehicle is not ultimately sold or leased to such customer.

23. ~~16.~~ The Monitor and any affected Financier shall be entitled to seek the advice and direction of the Court in respect of ~~its obligations hereunder, and may decline to provide consent to any disbursement~~this Governance Protocol, including to vary the Governance Protocol as required.

24. Notwithstanding anything to the contrary herein, the Monitor may decline to distribute, or authorize the distribution of, funds held by the Pride Entities or held by the Monitor in trust hereunder, in its sole discretion~~, subject to the~~. Without limiting the Monitor's sole discretion to refuse to distribute or authorize the distribution of funds, the Monitor may make such a refusal in the event that (a) the Monitor becomes aware of conflicting entitlements to Vehicle Proceeds, Lease Payments, or Soft Collections in the course of its ongoing security review, (b) the Monitor is alerted by any Financier(s) of any competing claims or inconsistencies with respect to the entitlement to the Vehicle Proceeds, Lease Payments, or Soft Collections, or (c) the Monitor becomes aware of any inconsistencies between the Books and Records of the Pride Entities and its own information and analysis. To the extent that

---

[22] **Explanatory NTD to be deleted:** A number of comments received by the Monitor sought to address replacement servicing in the Governance Protocol. The Governance Protocol is intended only to deal with the calculation and distribution of payments on account of sales, leases and soft collections. Replacement servicing is complicated, facility-specific and will be dealt with separately. The Monitor has already reached out, or will be reaching out, to Securitization Parties individually about requests for replacement servicers shortly.

the Monitor exercises its discretion to refuse to make or authorize a payment in accordance with this Governance Profile, any affected Financier may seek direction of the Court.

25. 17. The CRO, the Monitor, and their respective employees, advisors and other representatives acting in such capacities shall not incur any liability or obligation as a result of the CRO and/or Monitor carrying out the provisions of this Governance Protocol, save and except for any gross negligence or wilful misconduct on their part. The Monitor shall have all of the protections under the CCAA in carrying out its duties and obligations hereunder.

Document comparison by Workshare Compare on Monday, April 22, 2024 11:08:25 AM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\BUR\AppData\Local\Temp\1\Workshare\wmtemp28ac\(Current) Governance Protocol (Revised)27.docx |
| Description | (Current) Governance Protocol (Revised)27 |
| Document 2 ID | netdocuments://1409-2269-1595/16 |
| Description | Governance Protocol - Updates |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 474 |
| Deletions | 134 |
| Moved from | 11 |
| Moved to | 11 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 630 |

**APPENDIX "G"**

**Cash Flow Forecast for the 13-week period from
April 8, 2024 to the week ending July 7, 2024**

**Pride Group Holdings Inc., other Applicants and Limited Partnerships**
**Cash Flow Forecast for the period from April 08, 2024 to July 07, 2024 (in $000 CAD)**

| | Notes | W1 Forecast | W2 Forecast | W3 Forecast | W4 Forecast | W5 Forecast | W6 Forecast | W7 Forecast | W8 Forecast | W9 Forecast | W10 Forecast | W11 Forecast | W12 Forecast | W13 Forecast | 08-Apr-24 07-Jul-24 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week ending | | 14-Apr | 21-Apr | 28-Apr | 05-May | 12-May | 19-May | 26-May | 02-Jun | 09-Jun | 16-Jun | 23-Jun | 30-Jun | 07-Jul | |
| **Cash Sales** | | | | | | | | | | | | | | | |
| Can Sales | 1 | 837 | 864 | 864 | 864 | 864 | 864 | 864 | 864 | 864 | 864 | 864 | 864 | 864 | 11,205 |
| US Sales | 1 | 2,396 | 2,451 | 2,451 | 2,451 | 2,451 | 2,451 | 2,451 | 2,451 | 2,451 | 2,451 | 2,451 | 2,451 | 2,451 | 31,808 |
| Downpayments and Deposits | 2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales Payments to Financier | 3 | (3,233) | (3,315) | (2,934) | (2,934) | (2,934) | (2,934) | (2,934) | (2,934) | (2,934) | (2,934) | (2,934) | (2,934) | (2,934) | (38,822) |
| Cost Recovery | 4 | 243 | 148 | 148 | 148 | 148 | 148 | 148 | 148 | 148 | 148 | 148 | 148 | 148 | 2,019 |
| Realization Commission | 4 | 381 | 394 | 394 | 394 | 394 | 394 | 394 | 394 | 394 | 394 | 394 | 394 | 394 | 5,109 |
| **Net Cash from Sales** | | 624 | 542 | 923 | 923 | 923 | 923 | 923 | 923 | 923 | 923 | 923 | 923 | 923 | 11,319 |
| **Receipts** | | | | | | | | | | | | | | | |
| Lease Collections | 5 | 584 | 5,867 | 584 | 7,184 | 584 | 5,867 | 584 | 7,184 | 584 | 5,867 | 584 | 584 | 7,184 | 43,241 |
| Lease Buyout | 6 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lease Buyout - Payments to Funder | 6 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Logistics Receipts | 7 | 2,710 | 2,710 | 2,710 | 2,710 | 2,710 | 2,710 | 2,710 | 2,710 | 2,710 | 2,710 | 2,710 | 2,710 | 2,710 | 35,230 |
| Net Fuel Sales | 8 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 182 |
| Securitization Portfolio Fee | 9 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 455 |
| Rental Income | 10 | 14 | 108 | 318 | 168 | 27 | 108 | 181 | 259 | 73 | 108 | 181 | 208 | 110 | 1,863 |
| **Total receipts** | | 3,357 | 8,734 | 3,661 | 10,111 | 3,370 | 8,734 | 3,524 | 10,202 | 3,416 | 8,734 | 3,524 | 3,551 | 10,053 | 80,971 |
| **Cash Sales & Receipts** | | 3,981 | 9,276 | 4,584 | 11,034 | 4,293 | 9,657 | 4,447 | 11,125 | 4,339 | 9,657 | 4,447 | 4,474 | 10,976 | 92,290 |
| **Operating disbursements** | | | | | | | | | | | | | | | |
| Payroll and Benefits | 11 | (1,503) | (2,106) | (1,234) | (2,680) | (1,130) | (2,226) | (1,228) | (2,676) | (1,128) | (2,098) | (1,355) | (1,735) | (2,069) | (23,168) |
| Income taxes payable | 12 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales taxes payable | 13 | - | (1,820) | (100) | - | - | (2,049) | - | - | (100) | (1,904) | - | (100) | - | (6,073) |
| Utilities | 14 | (39) | (39) | (39) | (39) | (39) | (39) | (39) | (39) | (39) | (39) | (39) | (39) | (39) | (507) |
| Operating Fuel | 15 | (539) | (539) | (539) | (539) | (539) | (539) | (539) | (539) | (539) | (539) | (539) | (539) | (539) | (7,007) |
| Repairs and maintenance | 16 | (975) | (504) | (504) | (504) | (504) | (504) | (504) | (504) | (504) | (504) | (504) | (504) | (504) | (7,023) |
| Brokerage costs | 17 | (312) | (312) | (312) | (312) | (312) | (312) | (312) | (312) | (312) | (312) | (312) | (312) | (312) | (4,056) |
| Legal Costs | 18 | (63) | (63) | (63) | (63) | (63) | (63) | (63) | (63) | (63) | (63) | (63) | (63) | (63) | (819) |
| Recovery Costs | 19 | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (286) |
| Occupancy Costs | 20 | (10) | (14) | - | (450) | (10) | (14) | - | (450) | (10) | (14) | - | (450) | (10) | (1,432) |
| Other Costs | 21 | (687) | (307) | (543) | (466) | (187) | (307) | (543) | (230) | (423) | (307) | (107) | (543) | (546) | (5,196) |
| Logistics Equipment Financing | 22 | (343) | (497) | (305) | (1,193) | (145) | (698) | (93) | (1,302) | (198) | (502) | (370) | (602) | (889) | (7,137) |
| Intercompany Borrowings | 23 | (481) | (1,342) | (465) | (302) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (3,328) |
| **Total operating disbursements** | | (4,974) | (7,665) | (4,126) | (6,570) | (3,033) | (6,855) | (3,425) | (6,219) | (3,420) | (6,386) | (3,393) | (4,991) | (5,076) | (66,032) |
| Professional Fees - Restructuring | 24 | (1,561) | (811) | (811) | (1,019) | (811) | (811) | (811) | (1,019) | (811) | (811) | (811) | (906) | (811) | (11,804) |
| **Net operating cash flow** | | (2,554) | 900 | (353) | 3,445 | 449 | 1,991 | 211 | 3,887 | 108 | 2,460 | 243 | (1,423) | 5,090 | 14,454 |
| **Non operating disbursements** | | | | | | | | | | | | | | | |
| Lease Repayments | 25 | - | - | (2,714) | (1,756) | (1,184) | (1,147) | (1,210) | (2,145) | (1,493) | (1,524) | (1,448) | (1,543) | (1,757) | (17,921) |
| Floor Plan Repayments | 26 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Floor Plan Interest | 27 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term Loan Repayments (Mortgages) | 28 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| OEM Lease Repayments | 29 | - | - | (3,755) | (1,611) | (1,851) | (1,566) | (1,500) | (1,462) | (1,639) | (1,647) | (1,028) | (1,760) | (1,546) | (19,365) |
| OEM Interest | 30 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lease Repayments - Other | 31 | - | - | (229) | (268) | (22) | (268) | (22) | (268) | (22) | (268) | (22) | (22) | (268) | (1,679) |
| **Total non-operating disbursements** | | - | - | (6,698) | (3,635) | (3,057) | (2,981) | (2,732) | (3,875) | (3,154) | (3,439) | (2,498) | (3,325) | (3,571) | (38,965) |
| **Available Cash Balance for the Syndicate Borrowing Gro** | 32 | | | | | | | | | | | | | | |
| Opening Bank Balance | | 17,387 | 14,330 | 15,230 | 13,899 | 15,379 | 12,691 | 12,044 | 11,074 | 12,367 | 9,686 | 10,056 | 9,695 | 9,384 | 17,387 |
| Bill and Collect | | (503) | - | - | - | - | - | - | - | - | - | - | - | - | (503) |
| Net operating cash/(disbursements) | | (2,554) | 900 | (353) | 3,445 | 449 | 1,991 | 211 | 3,887 | 108 | 2,460 | 243 | (1,423) | 5,090 | 14,454 |
| Non-operating cash/(disbursements) | | - | - | (6,698) | (3,635) | (3,057) | (2,981) | (2,732) | (3,875) | (3,154) | (3,439) | (2,498) | (3,325) | (3,571) | (38,965) |
| DIP Draws/(repayments) | | - | - | 6,300 | 2,250 | 500 | 923 | 2,131 | 1,861 | 945 | 1,929 | 2,474 | 5,017 | 1,591 | 25,921 |
| Payments to Trust Account | | - | - | (580) | (580) | (580) | (580) | (580) | (580) | (580) | (580) | (580) | (580) | (580) | (6,380) |
| **Closing Bank Balance** | | 14,330 | 15,230 | 13,899 | 15,379 | 12,691 | 12,044 | 11,074 | 12,367 | 9,686 | 10,056 | 9,695 | 9,384 | 11,914 | 11,914 |

**Pride Group Holdings Inc., other Applicants and Limited Partnerships**
**Cash Flow Forecast for the period from April 08, 2024 to July 07, 2024 (In $000 CAD)**

| | | W1 Forecast | W2 Forecast | W3 Forecast | W4 Forecast | W5 Forecast | W6 Forecast | W7 Forecast | W8 Forecast | W9 Forecast | W10 Forecast | W11 Forecast | W12 Forecast | W13 Forecast | 08-Apr-24 07-Jul-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week ending | | 14-Apr | 21-Apr | 28-Apr | 05-May | 12-May | 19-May | 26-May | 02-Jun | 09-Jun | 16-Jun | 23-Jun | 30-Jun | 07-Jul | TOTAL |
| **DIP Financing** | 33 | | | | | | | | | | | | | | |
| Opening DIP balance | | - | - | - | 6,500 | 8,800 | 9,300 | 10,223 | 12,354 | 14,311 | 15,256 | 17,185 | 19,659 | 24,676 | - |
| Draws/(repayments) | | - | - | 6,300 | 2,250 | 500 | 923 | 2,131 | 1,861 | 945 | 1,929 | 2,474 | 5,017 | 1,591 | 25,921 |
| Interest expense | | - | - | - | 50 | - | - | - | 96 | - | - | - | - | 191 | 337 |
| Interest payment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP fees | | - | - | 200 | - | - | - | - | - | - | - | - | - | - | 200 |
| **Ending DIP balance** | | **-** | **-** | **6,500** | **8,800** | **9,300** | **10,223** | **12,354** | **14,311** | **15,256** | **17,185** | **19,659** | **24,676** | **26,458** | **26,458** |
| **Available Cash Balance for Other Applicants** | 34 | | | | | | | | | | | | | | |
| Opening Bank Balance | | 2,160 | 2,160 | 2,160 | 2,160 | 2,160 | 2,160 | 2,160 | 2,160 | 2,160 | 2,160 | 2,160 | 2,160 | 2,160 | 2,160 |
| Intercompany Borrowings | | 481 | 1,342 | 465 | 302 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | - |
| Net operating cash/(disbursements) | | (481) | (1,342) | (465) | (302) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | - |
| **Closing Bank Balance** | | **2,160** | **2,160** | **2,160** | **2,160** | **2,160** | **2,160** | **2,160** | **2,160** | **2,160** | **2,160** | **2,160** | **2,160** | **2,160** | **2,160** |
| **Trust Account** | 35 | | | | | | | | | | | | | | |
| Opening Pooling Balance | | - | 1,000 | 1,000 | 1,581 | 2,162 | 2,744 | 3,327 | 3,910 | 4,494 | 5,078 | 5,663 | 6,249 | 6,835 | - |
| Other Deposits | | 1,000 | | | | | | | | | | | | | 1,000 |
| Floorplan | | - | - | 381 | 381 | 381 | 381 | 381 | 381 | 381 | 381 | 381 | 381 | 381 | 4,191 |
| Leaseline | | - | - | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 2,090 |
| OEM Financing | | - | - | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 99 |
| Interest | | - | - | 1 | 1 | 2 | 3 | 3 | 4 | 4 | 5 | 6 | 6 | 6 | 41 |
| **Closing Pool Balance** | | **1,000** | **1,000** | **1,581** | **2,162** | **2,744** | **3,327** | **3,910** | **4,494** | **5,078** | **5,663** | **6,249** | **6,835** | **7,421** | **7,421** |

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those
Applicants listed on **Schedule "A"** hereto

**Notes to the Unaudited Consolidated Filing Cash Flow Forecast of the
Applicants and Limited Partnerships listed on Schedule "A"
(collectively, the "Pride Entities") for the period from
April 8, 2024 to July 7, 2024 (the "Forecast Period")**

**Disclaimer:**

In preparing this cash flow forecast (the "**Cash Flow Forecast**"), the Applicants with the assistance of their financial advisor and Ernst & Young Inc., in its capacity as Monitor of the Pride Entities (the "**Monitor**"), have relied upon unaudited financial information and the Pride Entities have not attempted to further verify the accuracy or completeness of such information. The Cash Flow Forecast includes estimates concerning the operations of the Pride Entities and additional assumptions discussed below, including assumptions from the management of the Pride Entities ("**Management**"), with respect to the requirements and impact of a *Companies' Creditors Arrangement Act* ("**CCAA**") filing (the "**Probable and Hypothetical Assumptions**" or the "**Assumptions**"). Since the Cash Flow Forecast is based on Assumptions about future events and conditions that are not ascertainable, the actual results achieved during the Cash Flow Forecast period will vary from the Cash Flow Forecast, even if the Assumptions materialize, and such variation may be material. There is no representation, warranty, or other assurance that any of the estimates, forecasts or projections will be realized.

The Monitor has reviewed the Cash Flow Forecast to the standard required of a Court-appointed Monitor pursuant to section 23(1)(b) of the CCAA, which requires a Monitor to review the debtor's cash flow statements as to its reasonableness and to file a report with the Court on the Monitor's findings. Pursuant to this standard, the Monitor's review of the Cash Flow Forecast consisted of inquiries, analytical procedures and discussions related to information supplied to it by certain key members of the Pride Entities and other employees of the Pride Entities. Since the Probable and Hypothetical Assumptions need not be supported, the Monitor's procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the Cash Flow Forecast. The Monitor also reviewed the support provided by the Pride Entities for the Probable and Hypothetical Assumptions and the preparation and presentation of the Cash Flow Forecast. Based on the Monitor's review, nothing has come to the Monitor's attention that causes the Monitor to believe, in any material respect, that:

1

a) The Probable and Hypothetical Assumptions are not consistent with the purpose of the Cash Flow Forecast;

b) As at the date of this report, the Probable and Hypothetical Assumptions are not suitably supported and consistent with the plans of the Pride Entities or do not provide a reasonable basis for the Cash Flow Forecast, given the Probable and Hypothetical Assumptions; or

c) The Cash Flow Forecast does not reflect the Probable and Hypothetical Assumptions.

Receipts and disbursements are denominated in thousands of Canadian dollars. The line-by-line details are based on borrowers and guarantors to the Syndicate Agreement ("**Syndicate Borrowers**"). Receipts and disbursements of other Applicants are represented on a net basis. The Syndicate Borrowers are annotated in Schedule "A" and are a subset of the Pride Entities.

**Assumptions:**

1. **Cash Sales**

   This category includes estimates of revenues generated by the Pride Entities (through PTS, TTR, PTS LP and TTR USA) with respect to cash sales of vehicles. This would also include customers who have sought out third-party lease financing. The estimate of cash sales is based on the historical 4-week trailing average of both the sales and the deposit received, net of funds retained for Cost Recovery and Realization Commission in Note 4.

2. **Downpayment/Deposit**

   This category represents the downpayments/deposit that customers pay for cash sales. However, no amounts are forecast as there is currently no predictability of these amounts. It is assumed that the sale proceeds are inclusive of the deposit.

3. **Sale Payments to Financier**

   Represents the repayment to the floor plans/lease lines from net proceeds. It is assumed that if the sale price is below the outstanding loan value, then the financier is only repaid with the funds received from the sale net of Realization Commission and Cost Recovery (See Note 4). This does not include payments to the floor plans for vehicles that are identified as Multiple Collateral Vehicles (Leases). The net proceeds received from the sale of Multiple Collateral Vehicles (Leases) will be placed into Trust (See Note 35).

4. **Realization Commission and Cost Recovery on Sales**

   This represents the proposed structure of the Pride Entities to recover commission from cash sales to cover a portion of the variable and overhead costs related to selling of vehicles. It is currently proposed at 12% for both Canadian and U.S. sales. The Realization Commissions and Cost Recovery on Sales relates to costs associated with specific vehicle identification numbers ("**VINs**") and the work required to either repossess, repair, or store, in order to bring it to a saleable vehicle. It is assumed that these costs (legal costs and transportation recovery costs, and repairs and

2

maintenance) are approximately 80% of the costs incurred by PTS and PTS USA in these categories. It is also assumed that 20% of these costs will be retained to recover other overhead costs. It is to note, that this would be charged based on actual cost related to a specific VIN and therefore new units would typically have little to no costs recovery on sales, whereas used vehicles would be higher.

5. **Lease Collections**

This category includes the collection of customers payments under their lease obligations and short-term rental obligations. This is based on known pre-authorized payments for the current month, and adjusted based on historical performance, including assumptions for estimated defaults and recovery ("**Soft Collections**").

6. **Lease Buyout**

The buyouts represent payments that customers have made to end a lease agreement in order to take full ownership of the vehicle. This also includes payments from insurance claims with respect to any losses as a result of lease buyouts. When a lease is bought out, the Pride Entities will pay the relevant lease funder. As these amounts are unpredictable, they are not being forecast.

7. **Logistics Receipts**

Represents the collection from customers for the logistics business, which is through PGL, based on known contracts with customers. The projection is based on Management's assumptions.

8. **Net Fuel Sales**

Represents the receipts from customers that have purchased fuel cards (through PFS net against the cost of sale. Customers purchase fuel cards to benefit from a volume discount that PFS has obtained. The net fuel sales are based on a 4-week trailing actual run rate.

9. **Securitization Portfolio Fee**

Represents the proposed structure for recovery of costs associated with managing the lease portfolios of the securitization entities upon CCAA filing with respect to Soft Collections. It is assumed that 20% of Soft Collections would be retained by the Pride Entities. These assumptions were based on historical soft collections. Since Soft Collections are not collected on account of the Pride Entities (as the Pride Entities acts as the servicer), these amounts are not included in the Lease Collections in Note 5, but run through the bill and collect transactions that are a reconciling item in the bank accounts.

10. **Rental Income**

Represents rental income collected from tenants of real estate owned by the Syndicate Borrower. This is based on actual tenant contracts of each property. This will be updated as new tenants are

onboarded or tenant agreements are terminated. Rental income for the other Pride Entities are assumed to be collected within their own bank accounts (see Note 34).

**11. Payroll and Benefits**

Represents wages and salaries, benefits, WSIB and National Auto League insurance (WSIB alternative coverage for the trucking industry). This also includes payment to subcontractors, i.e. truck drivers under contract, mechanics, and office contractors.

It is assumed that the Pride Entities will continue to pay outstanding salaries and vacation pay, and independent contractors (including those contractors and subcontractors that provide office support) and owed in the ordinary course. It is assumed that no payments are made for severance or termination pay because of any headcount reduction.

**12. Income Taxes Payable**

It is assumed that outstanding income tax has been stayed and that the Pride Entities will not be in a taxes payable position during the Forecast Period.

**13. Sales Taxes Payable**

It is assumed that outstanding sales taxes in Canada and US will be stayed. This also includes amounts related to US revenue and sales taxes. The amounts included in the Forecast Period are calculated based on the amounts that would be accrued and due post-filing, and all accrued and payable amounts within the CCAA Proceeding. As the timing for refunds related to pre-filing period will not be received therefore are not forecast.

**14. Utilities**

These are the estimated utility costs for the terminal/dealership operations) PTS pays for PGL's utilities at this time.

**15. Operating Fuel Costs**

Represents the cost of fuel that is used by PGL based on its 4-week trailing averages as the estimated run rates. It is assumed that the payments will be on regular credit terms.

**16. Repairs and Maintenance**

Represents the repairs and maintenance costs (typically incurred by the operating entities). This reflects cost reduction initiatives being implemented by the Syndicate Borrower which are expected to impact the Forecast Period.

**17. Brokerage Fees**

Represents the operating cost for PGL for brokerage fees. This is based on Management's estimate and historical run rate. It is assumed that these will continue to be paid in the normal course.

**18. Legal Costs**

These relate to fees paid to legal teams and other advisors for operations, such as enforcement and recovery of delinquent customer accounts. It is assumed these will continue as these relate to collections and recoveries from customers.

**19. Recovery Costs**

These relate to fees paid to repossess vehicles from delinquent leasing customers.

**20. Occupancy Costs**

Represents rent for leased premises used by Syndicate Borrowers and 2076401 Ontario Inc. ("**207**"). The lease for 207 is then sublet to PTS. It is assumed that these will be paid in the normal course as they are typically paid at the first of the month, or first of the period for which they cover.

**21. Other Costs**

Represents the operating cost for the Pride Entities which include parking, software, tolls, insurance, and other general administrative costs.

**22. Logistics Equipment Financing**

This represents the payments to financers to equipment used for PGL operations. It is assumed that these payments will resume, however at this time these payments are stayed.

**23. Intercompany Borrowings**

This represents intercompany borrowings from Pride Entities outside of the Syndicate Borrowers from the Syndicate Borrowers to support operations of these Pride Entities.

**24. Professional Fees - Restructuring**

This relates to fees of the Applicants' external legal counsel in Canada and US, the Monitor and its counsel, the directors and officers counsel, the Chief Restructuring Officer, the DIP lenders' financial and legal advisors.  It is assumed that the costs of financial and legal advisors to the existing secured lenders will not be paid but be added to the outstanding debt balances.

**Non-Operating Disbursements**

**25. Lease Repayments**

This represents the payments for wholesale leases to the various financiers. These lease payments only relate to income generating leases and therefore excludes any payments associated with delinquent customers, vehicles returned or repossessed, vehicles in inventory, duplicate liabilities, etc.  These payments will be subject to the Governance Protocol.

**26. Floor Plan Repayments**

This represents the curtailment payments under various floor plans (Hitachi, RBC, BMO). The forecast projects that curtailments will be stayed.

**27. Floor Plan Interest**

Represents the interest payment on the floor plans. The forecast reflects that interest will be stayed.

**28. Term Loan Payments**

Represents the term loans that are secured by real estate property that are held by the Pride Entities. These payments are stayed.

**29. OEM Lease Repayments**

This represents payments for wholesale leases to the various OEM financiers. These lease payments only relate to income generating leases and therefore excludes any payments associated with delinquent customers, vehicles returned or repossessed, vehicles in inventory, duplicate liabilities, etc.  These payments will be subject to the Governance Protocol.

**30. OEM Interest**

Represents the interest payment on the vehicles that are in inventory for OEM Financiers. Interest has been stayed.

**31. Lease Repayments - Other**

This represents the payments to non-lease lines financiers for which the vehicle has been leased out to a customer.  These lease payments only relate to income generating leases and therefore excludes any payments associated with delinquent customers, duplicate liabilities, etc., pursuant to the Governance Protocol.

**32. Available Cash Balance for the Syndicate Borrowers**

This represents the bank balances of the Syndicate Borrowers, net of the bank account balances held with respect to lease collections for securitization lenders to project the cash available to the Syndicate Borrowers. The Syndicate Borrowers are required to maintain a minimum cash balance of $10M, therefore if the closing cash balance falls below this minimum balance, the Cash Flow Forecast projects a draw from the DIP financing facility. The Syndicate Borrowers are a subsection of the Pride Entities. The balances of the remaining Pride Entities are shown separately (Note 34).

**33. DIP Financing**

This represents the proposed DIP financing that would be required to fund the operating shortfalls of the Pride Entities. The assumed DIP interest rate is 9.7% and it is assumed that it is capitalized along with the Commission Fee.

**34. Available Cash Balance for the other Pride Entities**

This represents the bank balances of other the other Pride Entities not in the Syndicate Borrower.

**35. Trust Account**

This is the proposed Trust account set up to hold amounts including Cash Proceeds and Lease Collection that are Multiple Collateral Vehicles (Leases) until the priority to such vehicles are determined pursuant to the Governance Protocol.

**Schedule "A"**

**A. APPLICANTS**

**Operating Entities**

*Canadian Operating Entities*

- PRIDE TRUCK SALES LTD. ("**PTS**")*
- TPINE TRUCK RENTAL INC. ("**TTR**")*
- PRIDE GROUP LOGISTICS LTD. ("**PGL**")*
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION*
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC. ("**PFS**")*
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*

- TPINE RENTAL USA, INC. ("**TTR USA**")*
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**

*Canadian Real Estate Holding Companies*

- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.*
- 1450 MEYERSIDE HOLDING INC.*
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*

- PGED HOLDING, CORP.*
- HIGH PRAIRIE TEXAS HOLDING CORP.*
- 131 INDUSTRIAL BLVD HOLDING CORP.*
- 59TH AVE PHOENIX HOLDING CORP.*
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.*
- FRONTAGE ROAD HOLDING CORP.*
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**

*Other Canadian Holding Companies*

- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.*
- PRIDE GROUP HOLDINGS INC.*
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*

- COASTLINE HOLDINGS, CORP.*
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*

- PRIDE TRUCK SALES L.P. ("**PTS LP**")*
- TPINE LEASING CAPITAL L.P.*
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*

- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*

- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.


\* Syndicate Borrowers (borrowers or guarantors under the Syndicate Agreement)

Court File No.:  CV-24-00717340-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC., et al.**

| | |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding Commenced at Toronto |
| | **SECOND REPORT OF THE MONITOR**<br>**dated April 24, 2024** |
| | **BLAKE, CASSELS & GRAYDON LLP**<br>Barristers and Solicitors<br>199 Bay Street<br>Suite 4000, Commerce Court West<br>Toronto, Ontario  M5L 1A9<br><br>**Pamela Huff**, LSO #27344V<br>Tel:    416-863-2958<br>Email:    pamela.huff@blakes.com<br><br>**Chris Burr**, LSO #55172H<br>Tel:    416-863-3261<br>Email:    chris.burr@blakes.com<br><br>**Daniel Loberto**, LSO #79632Q<br>Tel:    416-863-2937<br>Email:    daniel.loberto@blakes.com<br><br>Lawyers for the Monitor |