**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | Chapter 15 |
| Pride Group Holdings Inc., *et al.* | Case No. 24-10632 (CTG) |
| Debtors in Foreign Proceedings. | (Jointly Administered) |
|  | **Hearing Date:   September 12, 2024 @10:00 a.m. Eastern** |
|  | **Obj. Deadline:   September 5, 2024 @4:00 p.m. Eastern** |

**MOTION OF PACCAR FINANCIAL CORP. FOR AN ORDER
GRANTING (I) RELIEF FROM THE AUTOMATIC STAY PURSUANT TO
11 U.S.C. § 362(d) AND (II) RELATED RELIEF**

PACCAR FINANCIAL CORP ("PFC"), through its undersigned counsel, respectfully submits this motion (the "Motion") for entry of an order in the above-captioned chapter 15 cases (these "Chapter 15 Cases") of Pride Group Holdings Inc. and its affiliated debtors (collectively, the "Debtors"),[1] substantially in the form attached hereto (the "Proposed Order"), pursuant to sections 105(a) and 362(d) of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):  (i) granting PFC relief from the automatic stay to pursue its *in rem* rights and remedies, including those under

---

[1] The last four digits of Debtor Pride Group Holdings Inc.'s Canadian business number are 6399. Due to the large number of debtors in these chapter 15 cases, a complete list of the debtor entities and the last four digits of their unique identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing agent at https://dm.epiq11.com/pridegroup. The Debtors' service address for the purposes of these chapter 15 cases is 1450 Meyerside, Suite 401, Mississauga, Ontario, L5T 2N5, Canada.  The Debtors are also Applicants in the Canadian proceedings (the "CCAA Proceedings") commenced under the Companies' Creditors Arrangement Act (the "CCAA"), pending before the Ontario Superior Court of Justice (Commercial List) in Ontario, Canada, Court File No. CV-24-00717340-00CL (the "Canadian Court").

Article 9 of the Uniform Commercial Code with respect to its U.S. Trucks (defined below) under its agreements with TPine Leasing Capital LP, a non-debtor U.S. limited partnership that is an "Additional Stay Party" under the Initial Order (defined below) entered by the Canadian Court on March 27, 2024, as amended, and under this Court's Recognition Order (defined below); (ii) waiving the 14-day stay provided for in Bankruptcy Rule 4001(a)(3); and (iii) granting such further relief as is deemed just and appropriate.   In support of the Motion, PFC has filed contemporaneously herewith the *Declaration of Tina N. Moss, Esq*., sworn August 29, 2024 (the "Moss Declaration") (see **Exhibit A** hereto), the *Affidavit of James Schenk, sworn July 23, 2024 (*the "Schenk Affidavit") (see **Exhibit B** hereto), and the *Supplementary Affidavit of James Schenk, sworn August 26, 2024* (the "Supplemental Schenk Affidavit") (see **Exhibit C** hereto), each of which are incorporated herein by reference, and respectfully states as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Chapter 15 Cases under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is and other proceedings under chapter 15 of the Bankruptcy Code are core matters within the meaning of 28 U.S.C. § 157(b)(2)(P).

2.      Pursuant to Local Rule 9013-1(f), PFC consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue of these Chapter 15 Cases is proper in the Court pursuant to 28 U.S.C. § 1410.

4.      The statutory predicates for the relief requested in this Motion are sections 362(d)

and 1520 of the Bankruptcy Code. The requested relief is warranted under Bankruptcy Rule 4001(a) and Local Rule 4001-1.

5. Simply put, PFC lacks adequate protection of its liens in the U.S. Trucks. The Debtors are not providing adequate protection to PFC by any means. Thus, stay relief is required.

## PROCEDURAL BACKGROUND

6. On March 27, 2024, the Debtors commenced the CCAA Proceedings in the Canadian Court, which thereafter issued an initial order (the "Initial Order") authorizing (among other things) Randall Benson (the "Foreign Representative") to act as the foreign representative for the Debtors and file these Chapter 15 Cases.

7. On April 1, 2024, the Foreign Representative commenced chapter 15 cases for 26 Canadian and U.S. operating companies and non-real estate holding companies by filing petitions for relief under chapter 15 of the Bankruptcy Code. That same day, the Foreign Representative filed the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Dkt. No. 2] (the "Verified Petition") seeking recognition of the CCAA Proceedings as "foreign main proceedings" under Bankruptcy Code section 1517 and related relief.

8. On April 5, 2024, the Canadian Court signed an amended and restated version of the Initial Order (the "A&R Initial Order") and an order regarding protocols for real estate sale transactions *(*the "Canadian Protocols Order"). The Foreign Representative thereafter sought and obtained enforcement of such orders in the United States on a provisional basis pursuant to this Court's *Order Granting Provisional Relief in Connection with Debtors-In-Possession Financing and Certain Protocols Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code* [Dkt. No.

110].

9.     On April 15, 2024, the Foreign Representative commenced chapter 15 cases for the 45 Canadian and U.S. single-asset real estate holding companies by filing additional petitions for relief under chapter 15 of the Bankruptcy Code.

10.     On April 23, 2024, the Debtors filed an amended version of the Verified Petition [Dkt. No. 121] seeking recognition of the CCAA Proceedings as "foreign main proceedings" under Bankruptcy Code section 1517 and related relief.

11.     On May 2, 2024, the Court entered an order [Dkt. No. 152] (the "Recognition Order") granting recognition of the CCAA Proceedings, enforcement of the A&R Initial Order and Canadian Protocols Order in the United States on a final basis, and related relief.

12.     Paragraph 9 of the Recognition Order provides that PFC, as an Adequate Protection Party "[is] entitled to receive Adequate Protection of [its] interest in [its] applicable collateral under [its] respective credit or other agreements . . . on a dollar-for-dollar basis from any Diminution in Value resulting from the Priming, the imposition or enforcement of the stay in these Chapter 15 Cases or the CCAA proceedings, or the use, sale or lease, or proposed use, sale or lease, of [its] interests in such collateral by the Pride Group."  Paragraph 17 of the Recognition Order provides that nothing therein "shall affect the rights of any secured party to request adequate protection to the Bankruptcy Code in addition to any adequate protection granted under [the Recognition Order] … and all such rights are expressly preserved."

13.     On May 6, 2024, the Canadian Court entered the Second Amended and Restated Initial Order (the "Second A&R Initial Order") authorizing the Debtors (subject to the Canadian Protocols Order) to list for sale all their vehicles, trailers, equipment, and other personal property. *See* Second A&R Initial Order ¶ 13.

13.     On July 12, 2024, PACCAR Financial Ltd., PACCAR Financial Services Ltd., and Paccar Financial Corp. filed a Motion to Lift Stay and Recover Assets in the CCAA Proceedings (the "CCAA Stay Relief Motion").  The Schenk Affidavit and the Supplemental Schenk Affidavit were filed in the Canadian Proceedings in support of the CCAA Stay Relief Motion.  The CCAA Stay Relief Motion is scheduled to be heard by the Canadian Court on September 3, 2024.

14.     The Debtors failed to meet certain milestones under their DIP Facility provided by certain syndicate lenders in the CCAA Proceedings, and the DIP Facility matured on July 31, 2024 without renewal or extension, leaving the Debtors without access to a lending facility.

15.     Following the maturity of the DIP Facility, the Debtors filed the *Motion to Amend Governance Protocol; Approve Indicative Term Sheet* (the "Term Sheet Motion") on August 7, 2024, with a hearing proposed on August 9, 2024 at 2:00 p.m. (Eastern).  The Term Sheet Motion sought (a) authority to apply any Lease Payments and Soft Collections (as both terms are defined in the Term Sheet Motion) to "pay their ordinary course working capital needs and for other general cooperate purposes…."; and (b) an order "approving the Pride Entities' execution of the non-binding indicative term sheet … to facilitate a proposed interim financing facility."

16.     In the Term Sheet Motion, the Debtors admitted they cannot continue as a going concern and that their "intention is to effect an orderly and centralized wind-down of their operations…."  The Debtors sought authority to "finance the orderly wind-down" with a potential $50 million senior secured revolving loan that would be secured by a first ranking charge on the assets to be sold.

17.     A number of stakeholders, including PACCAR, did not oppose but did not consent to the use of the Lease Payments and Soft Collections for the short period of time to September 3, 2024 proposed by the Debtors and Monitor.  The Canadian Court ultimately

permitted this plan to move forward temporarily to September 3, 2024.  The Debtors and the

Monitor have now informed the case parties that they intend to seek the continued use of the

Lease Payments and Soft Collections through September 30, 2024.  *See* Moss Decl., Ex. 2.

PACCAR (along with certain OEMs) has advised the Monitor and the Debtors of its objection to

the continued use of the Lease Payments and Soft Collections beyond September 3, 2024, and of

its intention to proceed with prosecuting the CCAA Stay Relief Motion on that date.  *See* Moss

Decl., Ex. 3.

## FACTUAL BACKGROUND

18.    PFC respectfully refers the Court to the Schenk Affidavit ("Schenk Aff.") and the

Supplemental Schenk Affidavit ("Supp. Schenk Aff.") for a detailed history of PFC's relationship

with the TPine Entities, the nature of its contractual and security arrangements, its vehicles in the

Debtors' possession, and the prejudice it is currently suffering as a result of the Debtors' refusal

to return PFC's vehicles.

19.    By way of summary, PFC is incorporated under the laws of the state of

Washington and facilitates the lease, conditional sale, and sale in the United States of the trucks

and related products manufactured by its affiliate, PACCAR Inc., and related corporations in

Canada. *See* Schenk Aff., p. 2 at ¶ 4.

20.    PACCAR Inc. is a global technology leader in the design, manufacture, and

customer support of premium light, medium, and heavy-duty trucks. The PACCAR group's

history traces back to 1905 (collectively referred to herein as "PACCAR").  PACCAR entered

the heavy-duty truck market in 1945. The PACCAR companies have considerable resources and

experience in the trucking industry.  PACCAR's group of companies has established a dealer and

aftermarket parts network spanning over 2,200 locations globally selling their products in more

than 100 countries.  *See id.* ¶ 6.

21.    PACCAR Inc. designs and manufactures advanced diesel engines, provides financial services through subsidiary corporations, develops information technology, and distributes aftermarket truck parts related to its principal business.  *See id.* ¶ 7.

22.    PACCAR's dealer network is represented in all states in the United States and in all provinces in Canada. There are approximately 70 dealer groups across over 600 locations in the United States and approximately 21 dealer groups across approximately 100 locations in Canada. *See id.* ¶ 8.

23.    PFC also owns four retail used truck centers used for the purposes of remarketing lease returns and repossessed vehicles. *See id.* ¶ 9.

24.    In addition to PACCAR's own sizeable presence in the trucking industry, many of PACCAR's dealers are major companies. PACCAR's largest dealer in the United States, Rush Enterprises Inc., is listed on the NYSE and generated total revenues of over $7.9 billion in 2023. *See id.* at 2-3, ¶ 10.

25.    The sales and servicing teams employed by PACCAR's dealers are experts in marketing, selling, and servicing PACCAR's trucks and are able to rely on the resources and expertise of PACCAR Inc. for assistance in doing so.  The dealer groups which have agreements with PACCAR Inc are licensed to use the "Kenworth", "Peterbilt", and "DAF" trademarked names to sell and service the trucks manufactured by PACCAR Inc. (and related corporations), and to repair and service those trucks. *See id.* at 3, ¶ 11.

26.    TPine Leasing Capital Corporation ("TLCC") and TPine Leasing Capital L.P. ("TLCL") (TLCC and TLCL are hereinafter collectively referred to as "TPine Entities"), procured leaseline facilities from PFL in Canada and from PFC in the United States on a secured

credit basis in the initial principal amount of approximately $50 million. *See id.* ¶ 13. The TPine

Entities used those facilities to purchase on credit trucks manufactured by PACCAR Inc. under

the "Kenworth" and "Peterbilt" trademarks. *See id.* ¶ 12.

27.    In connection therewith, the TPine Entities entered into security agreements with

PACCAR (hereinafter individually referred to as a "Security Agreement", and collectively as

"Security Agreements") in Canada and the United States. *See id.* ¶ 14.

28.    The Security Agreements grant PFC first-ranking security interests in collateral

(trucks bought on credit through the Security Agreements, including all accessories, attachments,

accessions, and replacements thereto) and the proceeds of such collateral. Attached to the Schenk

Affidavit as Exhibits "A" and "B" are samples of the security agreements entered into between

TLCC and PACCAR, and between TLCL and PACCAR, dated October 27, 2023 and July 6,

2022, respectively. These forms of agreement were used with respect to the acquisition by the

TPine Entities of the PACCAR trucks in Canada and the United States which remain in

possession of the TPine Entities following the filing of the CCAA Proceedings. *See id.* at 3-4, ¶

15. It is indisputable the TPine Entities are in default of their obligations under numerous

provisions of the Security Agreements. *See, e.g.*, *id.* at Ex. B, pp. 3-4 at ¶ 10 (Default).

29.    As of March 27, 2024, the TPine Entities had approximately 374 PACCAR trucks

and one charging station in their possession, 287 of which were located in the United States. *See*

Schenk Aff., p. 4 at ¶ 16.  As of August 22, 2024, the TPine Entities are believed to have in their

possession a total 246 trucks in the United States and 72 trucks and one charging station in

Canada. *See* Supp. Schenk Aff., Ex. A.  As of April 1, 2024, for its U.S. Trucks PFC was owed

the principal balance of approximately $27.8 million.  As of August 28, 2024, and accounting for

receipt of certain sale and lease proceeds during the CCAA and bankruptcy proceedings, PFC in

respect of the U.S. Trucks believes it is owed approximately $24.4 million and to date during these cases has sustained losses well in excess of $1 million and mounting in connection therewith.

30.     Out of the total 287 trucks in the possession of the TPine Entities located in the United States as of the date of the filing of the CCAA Proceedings, the Debtors have been able to sell only 43 of those trucks, with PACCAR suffering losses in excess of $880,000 on those sold trucks.

31.     Attached to the Moss Declaration as Exhibit "1" is a spreadsheet listing the trucks currently in the possession of the TPine Entities and located in the United States (the "U.S. Trucks"). *See also* Schenk Aff., Exs. C, G. Many of the U.S. Trucks are idle and are rapidly depreciating in value and will depreciate further as newer model trucks put into production in January 2024 will compete with them in the market.  *See* Schenk Aff., p. 5 ¶ 22.  Some of the U.S. Trucks are in the possession of third-party truck operators who are not making the required lease payments; or are in the possession of the Debtors who are not making the required payments.  *See id.* ¶ 28.  On average, and conservatively, PFC's trucks are depreciating in value by at least 1% to 2% per month, a significant and recurring collective collateral decline.  *See id.* ¶ 21.  Should the U.S. Trucks continue to sit idle on TPine's lots, depreciation could approach 4% to 5% per month.  *See id.* ¶ 22.

32.   On account the Debtors' inability to advance the CCAA Proceedings to a restructuring, the court-appointed Monitor, in conjunction with the Debtors, is now in the process of discussing with the Debtors' stakeholders the terms of a potential winddown of the Pride Group's operations and selling certain of its assets, as well as the potential appointment of a receiver by the syndicate lenders.  Nonetheless, notwithstanding repeated requests, the Monitor

and the Debtors have refused to release any of PACCAR's trucks to PACCAR, including the U.S. Trucks. Based on the analysis below, one is compelled to conclude that the Debtors seek to deplete the value of PACCAR's trucks to fund administrative expense payments to other parties instead of repaying the indebtedness owed to PACCAR.

33. Given their financial difficulties and likely impending winddown, the Debtors are not in a position to market and sell the PACCAR trucks effectively to realize their maximum values. Thus, if the Debtors conduct the marketing and sale of the PACCAR trucks, this will harm PACCAR irreparably. The Debtors will not realize maximum values and the difference between what PACCAR could achieve in marketing and selling the trucks versus what the Debtor is likely to achieve is a pure loss to PACCAR for which there is no adequate protection.

34. Moreover, if the Debtor uses any portion of the sale proceeds to pay any administrative expenses to third parties instead of paying proceeds to PACCAR, this will increase the loss to PACCAR. This will generate a further loss to PACCAR for which it lacks adequate protection.

35. PACCAR is not required to accede to the Debtor's ineffective efforts to manage a sale process they cannot manage effectively. Accordingly, at set forth above, PACCAR intends to prosecute the CCAA Stay Relief Motion at the hearing scheduled before the Canadian Court on September 3, 2024.

36. PACCAR is a global leader in the design, manufacture and distribution of premium light, medium, and heavy-duty trucks and has an extensive worldwide dealer network which will enable it to market and sell its trucks in a timely fashion for maximum recovery. *See id.* at 2, ¶¶ 6, 8. PACCAR is of course incentivised to sell the trucks for maximum values and will not be under pressure to accept "low ball" offers for cash flow purposes and simply to move inventory

or generate revenues to pay administrative expenses of the Debtor's favored payees. *See id.* at 6, ¶ 25.

37.     Accordingly, PFC is suffering and will continue to suffer irreparable harm and prejudice if it is not permitted to recover and sell the U.S. Trucks expeditiously.  *See* Supp. Schenk Aff., p. 3 at ¶ 11.

38.     No party or stakeholder will be prejudiced if PFC is permitted to recover the U.S. Trucks and sell them with net proceeds to be applied against PFC's claims against the TPine Entities.  PFC is undersecured.  Its marketing and sale of the U.S. Trucks will result in it having a lower deficiency claim against the Debtors than will obtain if the Debtors manage the sale process less effectively than PFC can.  A lower PFC deficiency claim benefits all of the Debtors' creditors.

39.     In addition, the U.S. Trucks are not needed by the Debtors for reorganization purposes.  The Debtors have not proposed any formal plan of restructuring—including any plan that would require the use of the unsold idle trucks on their lots. *See* Schenk Aff., p. 6 at ¶ 28. And, in any event, by proposing to sell the U.S. Trucks, the Debtors concede that they do not need the U.S. Trucks for any reorganization.  To the contrary, as set forth above, the CCAA Proceedings are headed toward a winddown and receivership process and the Monitor and the Debtors simply seek to continue to diminish PACCAR's cash collateral to fund the ongoing case operations that in no way benefit PACCAR but rather prejudice its rights as a secured creditor. However, the Debtor cannot deplete PACCAR's cash collateral proceeds from U.S. Truck sales to pay other administrative expenses and then assert that such depletion somehow provides adequate protection to PACCAR.  Accordingly, stay relief is required.

## RELIEF REQUESTED

40.    PFC respectfully requests entry of the Proposed Order: (i) granting PFC relief from the automatic stay to pursue its *in rem* rights and remedies, including those under Article 9 of the Uniform Commercial Code with respect to its U.S. Trucks under its agreements with TPine Leasing Capital LP, a non-debtor U.S. limited partnership that is an Additional Stay Party under the Initial Order entered by the Canadian Court on March 27, 2024, as amended, and under this Court's Recognition Order; (ii) waiving the 14-day stay provided for in Bankruptcy Rule 4001(a)(3); and (iii) granting such further relief as is deemed just and appropriate.

## BASIS FOR REQUESTED RELIEF

41.    The United States Supreme Court has recognized that a lien or a security interest is an interest in property that is protected from government taking or destruction under the Fifth Amendment to the U.S. Constitution. *See Armstrong v. United States*, 364 U.S. 40, 48 (1960).  It is fundamental that the essence of the key right arising from a lien is the right to compel the involuntary transfer of the collateral with the proceeds paid to the secured creditor.  Indeed, "[t]he Supreme Court has recognized, as did the common law, that the secured creditor has two types of rights: the contractual right to obtain repayment of its debt with a fair rate of return in the form of interest payments and the property right the creditor has in the collateral that secures the debt. These two types of rights together constitute the 'bundle of rights' held by the secured creditor." *In re Nichols*, 440 F.3d 850, 854 (6th Cir. 2006).

42.    These rights must likewise be protected in a bankruptcy proceeding. Although bankruptcy laws "have long been construed to authorize the impairment of contractual obligations[,]" the "power of the bankruptcy laws [] is subject to the Fifth Amendment's prohibition against taking property without just compensation."  *Id*. (citing *United States v. Security Indus. Bank*, 459 U.S. 70, 74 (*citing Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188

(1902)). Notwithstanding the inherent "tension between permitting the impairment of contractual obligations while maintaining the integrity of the property rights[,]" the bankruptcy laws may not interfere so as to destroy the value of the property held by a creditor. *Id*. Such a result would violate the Fifth Amendment.

43.     Consistent with this overarching constitutional imperative, the Bankruptcy Code mandates that secured creditors be protected from destruction of the value of their lien interests in property of the estate. Accordingly, Section 362(d)(1) recognizes that lack of adequate protection of a secured creditor's lien interest in debtor property is cause for granting stay relief. Moreover, the fundamental nature of this protection overrides any extra-territorial disregard of a secured creditor's right to adequate protection of its lien interest in property located within the jurisdiction of the United States.

44.     To that end, the Bankruptcy Code applies the secured creditor's right to adequate protection to chapter 15 cases. In a proceeding under chapter 15 of the Bankruptcy Code, the automatic stay provisions of section 362 become applicable upon recognition with respect to the Debtors' property located within the territorial jurisdiction of the United States. 11 U.S.C. § 1520(a)(1); *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 337 (Bankr. D. Del. 2010), *on reconsideration in part*, 445 B.R. 318 (Bankr. D. Del. Jan. 21, 2011), *aff'd* 728 F.3d 301 (3d Cir. 2013); *see also In re Agrokor d.d.*, 591 B.R. 163, 187 (Bankr. S.D.N.Y. 2018) ("Section 1520(a)(1) provides that the automatic stay will apply to all the debtor's property *that is located within the territorial jurisdiction of the United States*. The statute refers specifically to the property of the debtor, as opposed to the property of the estate, since there is no estate in a Chapter 15 case… Despite this difference, the automatic effect of recognition of a foreign main

proceeding under section 1520(a) is an imposition of a stay on any action regarding the debtor's property located in the United States." (emphasis in original) (citations omitted)).

45.     "The procedure for obtaining a court order for relief from the U.S. automatic stay under subsections (d) through (g) of § 362 applies in a chapter 15 case." *In re Manley Toys Ltd.*, No. 16-15374 (JNP), 2020 WL 1580244, at *5 (Bankr. D.N.J. Mar. 31, 2020).

46.     Section 362(g) places an initial burden on the moving party to establish its *prima facie* case for relief from the automatic stay which must then be rebutted by the party opposing such relief.  *See Izzarelli v. Rexene (In re Rexene Prods. Co.)*, 141 B.R. 574, 577 (Bankr. D. Del. 1992); *In re Eatman*, 182 B.R. 386, 390 (Bankr. S.D.N.Y. 1995) ("[T]he movant must [] make a *prima facie* showing that it is entitled to the relief that it seeks.").  A *prima facie* case requires a showing by the movant of a factual and legal right to the relief sought.  *See In re Eatman*¸ 182 B.R. at 390.  "After the moving party establishes a *prima facie* case, the burden of producing evidence, as well as the ultimate burden of proof, i.e., risk of non-persuasion, shifts to the debtor." *In re Planned Systems, Inc.*, 78 B.R. 852, 859 (Bankr. S.D. Ohio 1987).

**A. PFC is Entitled to Relief from the Automatic Stay Under Bankruptcy Code Section 362(d)(2) Because Debtors Lack Equity in the U.S. Trucks and Are Not Pursuing a Reorganization.**

47.     Section 362(d)(2) of the Bankruptcy Code provides that relief from stay "shall" be granted where a debtor does not have any equity in the property in question and such property is not necessary to an effective reorganization.  11 U.S.C. § 362(d)(2).

48.     "A secured creditor seeking relief from the stay under section 362(d)(2) must show (1) the amount of its claim; (2) that its claim is secured by a valid, perfected lien in property of the estate; and (3) that the debtor lacks equity in the property."  *In re Kaplan Breslaw Ash, LLC*,

264 B.R. 309, 322 (Bankr. S.D.N.Y. 2001); *see also In re Cont'l Airlines*, 134 B.R. 536, 542 (Bankr. D. Del. 1991).

49.     PFC is a secured creditor with a valid, perfected security interest in the U.S. Trucks, including all accessories, attachments, accessions, and replacements thereto.  As set forth above, the Debtors lack equity in the U.S. Trucks.  Moreover, the value of the U.S. Trucks diminishes with each day they remain in the Debtors' possession, and PFC has already suffered and continues to suffer substantial losses on each U.S. Truck sold by the Debtors.

50.     The Debtors also cannot satisfy their burden of proving that the U.S. Trucks are "essential for an effective reorganization that is in prospect[.]" *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 567 (3d Cir. 1994) (*citing United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375 (1988)); *see also In re Bovino*, 496 B.R. 492, 507 (Bankr. N.D. Ill. 2013) (debtor opposing request for relief from stay under section 362(d)(2) must demonstrate that reorganization is impossible without the property and that it can propose a feasible plan within a reasonable time).  Here, the U.S. Trucks are not needed by the Debtors for reorganization purposes.  The Debtors have not proposed any formal plan of restructuring—including any plan that would require the use of the unsold idle trucks sitting on their lots.  To the contrary, the Debtors are not seeking to reorganize their business, but instead are in the process of discussing with the Debtors' stakeholders the terms of a potential winddown of the Pride Group's operations, and selling certain of its assets, as well as the potential appointment of a receiver by the syndicate lenders. And, in any event, by proposing to sell the U.S. Trucks, the Debtors concede that they do not need the U.S. Trucks for any reorganization.

51.    Because the Debtors lack any equity in the U.S. Trucks and are winding down their operations and selling their assets, the U.S. Trucks are not necessary for an effective reorganization.  Accordingly, PFC is entitled to the requested relief from the automatic stay.

**B.  PFC is Entitled to Relief from the Automatic Stay "For Cause" Under Bankruptcy Code Section 362(d)(1) due to Lack of Adequate Protection.**

52.    Section 362(d)(1) of the Bankruptcy Code authorizes the Court to grant relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest[.]" 11 U.S.C. § 362(d)(1).  In the absence of adequate protection of a secured creditor's interest in its collateral, the court "shall" grant relief from the automatic stay. *See* 11 U.S.C. § 362(d); *In re Phoenix Steel Corp.*, 39 B.R. 218, 234 (D. Del. 1984) (granting relief from automatic stay where there was "no equity cushion or offer of substitute collateral in sufficient amount").

53.    The Recognition Order also provides that PFC "[is] entitled to receive Adequate Protection of [its] interest in [its] applicable collateral under [its] respective credit or other agreements . . . on a dollar-for-dollar basis from any Diminution in Value resulting from the Priming, the imposition or enforcement of the stay in these Chapter 15 Cases or the CCAA proceedings, or the use, sale or lease, or proposed use, sale or lease, of [its] interests in such collateral by the Pride Group" and that nothing therein "shall affect the rights of any secured party to request adequate protection under the Bankruptcy Code in addition to any adequate protection granted under [the Recognition Order] and all such rights are expressly preserved." ¶¶ 9, 17.

54.    Debtors have the burden of proving the absence of "cause" for relief from the automatic stay.  *See Wilmington Trust Co. v. Aardvark, Inc. (In re Aardvark, Inc.)*, 1997 WL 129346, at *4 (D. Del. Mar. 4, 1997) (*quoting In re Phoenix Pipe & Tube, L.P.*, 154 B.R. 197,

198 (Bankr. E.D. Pa. 1993)); *see also* 11 U.S.C. § 362(g).  Bankruptcy courts evaluate "cause" based on the totality of the circumstances in each particular case.  *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997) (*citing Trident Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 131 (6th Cir. 1995)).

55.    Under the totality of circumstances standard, courts often consider the hardship or prejudice to the non-debtor in determining whether to lift the automatic stay.  *See In re Bock Laundry Mach. Co.*, 37 B.R. 564, 566 (Bankr. N.D. Ohio 1984).  The court in *Bock* noted that "[c]ourts have developed a balancing test, whereby the interests of the estate are weighed against the hardships that will be incurred by the creditor-plaintiff." *Id.* at 566; *see also Milne v. Johnson (In re Milne)*, 185 B.R. 280, 283 (N.D. Ill. 1995) (court should look into whether, *inter alia*, there will be injury to the debtor and other creditors if the stay is modified, injury to the movant if the stay is not modified and weigh the proportionality of harms).

56.    Any attempt by the Debtors to show the absence of "cause" under these circumstances must necessarily fail because PFC's interest in the U.S. Trucks is not adequately protected and, absent PFC's recovery and sale of the U.S. Trucks, the value of the U.S. Trucks declines with each passing day. *See In re JII Liquidating, Inc.*, 344 B.R. 875, 890 (terminating the automatic stay because the creditor "has not received any adequate protection for its security interest."). As provided above, many of the U.S. Trucks are idle and are rapidly depreciating in value and will depreciate further as newer model trucks put into production in January 2024 will compete with them in the market. On average, and conservatively, PFC's trucks are depreciating in value by at least 1% to 2% per month. PACCAR, at minimum, has already suffered a loss of approximately $650,000 since commencement of the CCAA Proceedings.

57.    PACCAR is undersecured with respect to its liens in the U.S. Trucks as established above.  Further depreciation of the value of the U.S. Trucks increases that under-security.  It is precisely the avoidance of increased under-security that is the heart of adequate protection.  The Debtors may not keep the automatic stay and impose the cost of collateral decline on PACCAR.  If they wish to keep the automatic stay in place, they must provide adequate protection, either in the form of cash payments to compensate for the collateral value decline or in the form of a lien of similar priority on collateral of a value at least equal to the decline in value of the U.S. Trucks.  Because they neither are doing or proposing to do either, they are failing to provide adequate protection.  Under these circumstances, PACCAR faces the real prospect of continuing and additional harm and prejudice as the Debtors and the Monitor seek to retain possession and control of the U.S. Trucks. Relief from stay to retrieve collateral is warranted and appropriate under these circumstances.

58.    PFC is also in a better position than the Debtors to effectively market and sell the U.S. Trucks for their maximum value. Out of the total 287 trucks in the possession of the TPine Entities located in the United States as of the date of the filing of the CCAA Proceedings, the Debtors have been able to sell only 27 of those trucks.

59.    Lifting the stay to permit PFC to recover the U.S. Trucks and sell them with net proceeds to be applied against PFC's claims against the TPine entities not only benefits PFC by allowing it to realize the benefit of its security interest, but also ultimately reduces Debtors' extensive liabilities to PFC, which also benefits the creditor body as a whole.

60.    But time is of the essence here: the U.S. Trucks are depreciating rapidly, and the resale market for these assets is volatile. Any further delay in the release of the U.S. Trucks to

PFC will result in further and otherwise preventable losses by PFC and a corresponding increase in its claims.

**C. PFC is Entitled to Stay Relief in this Court Regardless of the Outcome of the CCAA Stay Relief Motion.**

61.    PFC, in the filing of this Motion and the CCAA Stay Relief Motion, is proceeding on parallel paths in these Chapter 15 Cases and the CCAA Proceedings.  Entry of an order approving the CCAA Stay Relief Motion should be determinative of the outcome of this Motion in PFC's favor.  However, should the Canadian Court decline to grant the CCAA Stay Relief Motion (or further delay any determination), this Court's granting of the relief requested herein is nonetheless warranted.

62.    The Second Circuit has recognized that secured creditors enjoy special protections under U.S. law that still obtain in the context of a cross-border insolvency case.  *In re Hamilton*, 240 F.3d 148, 160 (2d Cir. 2000) ("[O]ur observation that security interests enjoy constitutional protection supports our conclusion that United States law affords strong protection to secured creditors and treats those protections very seriously, a conclusion that, in turn, amplifies the significance of the difference in the way secured claims are treated under Bahamian law.").

63.    Here, the Court's recognition of the CCAA Proceedings as "foreign main proceedings" do not relieve Debtors of their obligations to comply with the requirements of applicable U.S. bankruptcy law.  As the *Hamilton* court recognized, secured creditors have special status under U.S. law.  240 F.3d at 160.  Therefore, secured creditors like PFC are entitled to adequate protection to account for the diminution in value of the collateral securing their interests and, failing that, to relief from the strictures of the automatic stay to pursue their rights and remedies.  Because no similar concept to adequate protection exists under Canadian law, this

Court must have independent jurisdiction to determine whether the adequate protection requirement has been satisfied in the context of these Chapter 15 Cases.

## WAIVER OF BANKRUPTCY RULE 4001(a)(3)

64.     PFC respectfully requests waiver of the 14-day stay provided for under Bankruptcy Rule 4001(a)(3). There is no reason to delay effectiveness of an order granting stay relief because the Debtors will not suffer any significant prejudice from the granting of stay relief. In contrast, PFC would be prejudiced by a delay in the effectiveness of an order granting stay relief as PFC is suffering and will continue to suffer irreparable harm and prejudice if it is not permitted to recover and sell the U.S. Trucks expeditiously.  Accordingly, PFC respectfully requests that this Court grant such relief effective immediately.

## NOTICE

65.     Notice of this Motion will be provided to: (i) the Foreign Representative; (ii) counsel to the Debtors; (iii) the Office of the United States Trustee for the District of Delaware; and (iv) those parties entitled to receive notice pursuant to Bankruptcy Rule 2002. PFC submits that no other or further notice is necessary or required.

## RESERVATION OF RIGHTS

66.     PFC reserves all of its rights to amend, modify, or supplement this Motion in any manner, at any time, and for any purpose, and to assert and file any and all additional claims of whatever kind or nature that it has or may hereafter have against the Debtors, which may be based on the respective rights and obligations arising under the relationship and agreements discussed in this Motion or the same events and circumstances described in this Motion. PFC further reserves the right to bring forth additional documentation supporting all of its claims including,

but not limited to, any documents that may become available after further investigation and discovery.

WHEREFORE, PFC respectfully requests entry of the Proposed Order, substantially in the form attached hereto: (i) granting PFC relief from the automatic stay to pursue its *in rem* rights and remedies, including those under Article 9 of the Uniform Commercial Code with respect to its U.S. Trucks under its agreements with TPine Leasing Capital LP, a non-debtor U.S. limited partnership that is an Additional Stay Party under the Initial Order entered by the Canadian Court on March 27, 2024, as amended, and under this Court's Recognition Order; (ii) waiving the 14-day stay provided for in Bankruptcy Rule 4001(a)(3); and (iii) granting such further relief as is deemed just and appropriate.

Dated: August 29, 2024

Respectfully submitted,

**ASHBY & GEDDES, P.A.**

*/s/ Michael D. DeBaecke*
Michael D. DeBaecke (No. 3186)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
Tel: (302) 654-1888
Email: MDeBaecke@ashbygeddes.com

-and-

**PERKINS COIE LLP**
Tina N. Moss, Esq.
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Tel: (212) 262-6910
Email: TMoss@perkinscoie.com

*Counsel for PACCAR Financial Corp.*