**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re <br><br> Pride Group Holdings Inc., *et al.* <br><br> Debtors in Foreign Proceedings. | Chapter 15 <br><br> Case No. 24-10632 (CTG) <br><br> (Jointly Administered) <br> **Hearing Date: September 12, 2024 at 10:00 a.m.** <br> **Obj. Deadline: September 5, 2024 at 4:00 p.m.** |

**MOTION OF DAIMLER TRUCK FINANCIAL SERVICES USA LLC, FOR AN ORDER (I) GRANTING RELIEF FROM THE INJUNCTION AND STAY IMPOSED UNDER 11 U.S.C. §§ 1519, 1520 AND 1521 BY CERTAIN ORDERS OF THIS COURT AS TO NON-APPLICANT AND NON-DEBTOR THIRD PARTY TPINE LEASING CAPITAL LP, (II) GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d) TO THE EXTENT OF ITS APPLICATION TO NON-APPLICANTAND  NON-DEBTOR THIRD PARTY TPINE LEASING CAPITAL LP AND (III) FOR RELATED RELIEF WITH RESPECT TO FIVE HUNDRED AND FOUR (504) TRUCKS ALL OF WHICH ARE THE PROPERTY OF NON-APPLICANT AND NON-DEBTOR THIRD PARTY TPINE LEASING CAPITAL LP AND WHICH WERE FINANCED AND ARE LOCATED IN THE CONTINENTAL UNITED STATES**

Movant, Daimler Truck Financial Services USA LLC ("DTFS"), respectfully submits this motion (the "Motion") for an order in the above-captioned chapter 15 cases (the "Chapter 15 Cases") of Pride Group Holdings Inc. and its affiliated debtors (collectively, "Debtors")[1] substantially in the form attached hereto as **Exhibit 1** (the "Proposed Order") pursuant to sections 105(a) and 362(d) of the United States Bankruptcy Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

---

[1] The last four digits of Debtor Pride Group Holdings Inc.'s Canadian business number are 6399. Due to the large number of debtors in these chapter 15 cases, a complete list of the debtor entities and the last four digits of their unique identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing agent at https://dm.epiq11.com/pridegroup. Debtors' service address for the purposes of these Chapter 15 Cases is 1450 Meyerside, Suite 401, Mississauga, Ontario, L5T 2N5, Canada.

# I.

# RELIEF REQUESTED

1.      DTFS seeks an Order granting it relief from the injunction and stay imposed upon it under certain below-described orders of this Court (docket numbers 49 and 152) made pursuant to 11 U.S.C. §§ 1519(a)(1), 1520 and 1521(a)(1)-(3) with respect to five hundred and four (504) Freightliner trucks (the "Vehicles")[2] owned by non-Debtor, third party TPine Leasing Capital LP ("TPine").[3] The Vehicles are all physically located in the United States. DTFS also seeks relief from the automatic stay of 11 U.S.C. §362 to the extent it applies to TPine and the Vehicles, if at all. In the alternative, DTFS requests that it be provided weekly adequate protection payments of $352,560.00 each to compensate it for the diminution in the value of its collateral as a condition to the maintenance of the injunction and stay.

2.      As a threshold matter, it is critical to note that the Vehicles are not the Debtors' property. Instead, each Vehicle is owned by DTFS's borrower, TPine. TPine is not a Debtor in this case. TPine is not an Applicant in Debtors' Companies' Creditors Arrangement Act ("CCAA") proceedings in Canada. In fact, since TPine is organized as a Delaware limited partnership, it is ineligible to be an Applicant in the CCAA proceedings. The Vehicles are not physically located in Canada. The Vehicles are all physically located in the United States and were purchased under contracts executed in the United States.

3.      However, DTFS has been enjoined and stayed by certain below-described orders of this Court from taking steps to enforce its security interests in the Vehicles. But for that injunction

---

[2] A true and correct list of the Vehicles by year, make, model and vehicle identification number ("VIN") is attached to the Declaration of Korneljia Marinkovik-Shivers in support of this Motion (the "Declaration") as **Exhibit "2"** and is incorporated herein by this reference. DTFS is the assignee of certain TPine Notes and Security Agreements assigned by Mercedes-Benz Financial Services USA LLC ("MBFS") as part of the "demerger" of DTFS from MBFS.

[3] TPine did not acquire the Vehicles for its own use.  TPine is a leasing company in the business of leasing trucks and trailers to end users. The Vehicles subject of this Motion serve as DTFS's collateral for repayment of TPine's indebtedness to DTFS, as does the stream of lease payments TPine receives from the lease of those Vehicles.

and stay—and the automatic stay to the extent it applies to TPine and its property—DTFS could and would have long ago enforced its security interests in the Vehicles. The continued maintenance of the injunction and stay is causing DTFS extreme, immediate and irreparable injury through the ongoing loss in the value of its collateral, a loss that is not being compensated for by TPine or Debtors. DTFS requests that the injunction and stay be dissolved and that the automatic stay be lifted to allow DTFS to exercise its contractual remedies under applicable non-bankruptcy law.

## II.

## SUMMARY OF ARGUMENT

4.     Cause exists to dissolve the injunction and stay created by the below-described orders of this Court and to grant DTFS relief from the automatic stay with respect to the Vehicles.

5.     TPine's indebtedness to DTFS with respect to the Vehicles is currently $57,573,264.47. This amount does not take into account the deficiency balances incurred as the result of sales of vehicles previously surrendered by TPine and sold by DTFS. When those deficiency balances are fully liquidated, the above indebtedness will be greater than $57,573,264.47.

6.     The amount owed to DTFS by TPine is approximately $10 million more than the Vehicles' retail book value of $47,014,000.00 and approximately $22 million more than the Vehicles' wholesale book value of $35,629,500.00. There is no equity in the Vehicles for TPine's benefit or for the benefit of any other party. A sale of the Vehicles by TPine could not generate any return in excess of the secured amount owed to DTFS.

7.     Presuming for the sake of argument Debtors would have the right to sell TPine's property, that sale would also generate nothing for the benefit of TPine or for Debtors' Canadian estates given the degree to which the Vehicles are over-encumbered. The sale would result only in the unnecessary incurrence of administrative costs and expenses. In fact, TPine's continued possession of the Vehicles is, at this time, contributing to Debtors' administrative costs. Debtors'

estates are presently incurring ongoing costs to insure the Vehicles and to store and safeguard those Vehicles that have been turned back in by, or repossessed from, TPine's lessees.

8.      The accumulation of administrative costs negatively affects and erodes the positions of Debtors' unsecured creditors. Incurring a large administrative liability in attempting to sell the Vehicles would do nothing but push unsecured creditors even further off the table than they are at present. Since certain of the Debtors have executed guarantees of TPine's debt to DTFS, sale of the Vehicles at a loss after more time passes and more value is lost would increase the size of DTFS's unsecured claim and dilute the share of recovery other unsecured creditors could hope to receive in the CCAA proceedings.

9.      DTFS is in, by far, the best position to minimize its losses and to obtain maximum value for the Vehicles. DTFS is an expert at the repossession and sale of its collateral and has access to a nationwide network of heavy truck dealers who routinely bid on vehicles sold at online auctions conducted by DTFS. The sale of truck collateral is a major aspect of DTFS's routine operations. By way of example, TPine voluntarily surrendered 137 vehicles to DTFS prior to the filing of Debtors' CCAA proceedings. On July 2, 2024, this Court entered an Agreed Order dissolving the Court's injunction and stay as to those 137 vehicles. Since July 2, 2024, DTFS has already sold and been paid for 101 of those vehicles.

10.     By contrast, TPine and Debtors are not experts at the repossession and sale of vehicle collateral as exemplified by their efforts to date. TPine has provided DTFS with a Lease Receivables Aging Report (the "Receivables Report") which shows that TPine's lessees of 30 of DTFS's collateral Vehicles are between 90 and 120 days past due in making lease payments to TPine for a total delinquency of $4,782,186.10.   The Receivables Report also shows that lease payments due from TPine's lessees on an additional 71 DTFS collateral Vehicles are more than 120 days past due for a total additional delinquency of $14,490,675.24. In total, TPine's lessees are more than 90 days past

due under their leases of 101 of DTFS's collateral Vehicles in the aggregate amount of $19,272,861.34.[4]

11.     Despite the massive and long-standing delinquencies described above, TPine has not repossessed the Vehicles from its delinquent lessees more than 90 days in default much less liquidated those Vehicles, thus raising serious questions whether TPine has the resources to pay for taking possession of the Vehicles.

12.     TPine's Receivables Report also shows that TPine's lessees in the United States are delinquent in making lease payments to TPine at a staggeringly high rate of 38.32%. By contrast, the delinquency rate of DTFS's small business loan and lease portfolio, company-wide, is only 5.8% and decreasing. It is apparent from TPine's Receivables Report that TPine is not particularly adept at collecting its delinquent lease receivables or taking possession of Vehicles under leases that are in serious default.

13.     DTFS has every incentive to obtain the highest and best values from the sale of its collateral Vehicles before it suffers from further depreciation, as DTFS has very little confidence there will be a meaningful recovery on any unsecured claim it may have in Debtors' CCAA proceeding.

14.     In addition to there being no equity in the Vehicles, the Vehicles are also not necessary to TPine's—or Debtors'—effective reorganization. TPine is not an Applicant in the CCAA proceedings and is not a Debtor in this case. It is simply an entity in whose favor a Court ordered injunction and stay flows. No reorganization of TPine is underway or is in prospect. Since TPine is neither a Debtor in this case nor an Applicant in the CCAA proceeding, TPine's reorganization is not legally possible in either matter.

---

[4] The Receivables Report contains no bucket for receivables aged beyond "120 +" days.  As such, the true age of the lease receivables in the "120+ day" bucket of the Receivables Report is knowable only by TPine.

15.     The Vehicles are not necessary to Debtors' reorganization in prospect either.  Debtors' CCAA proceedings in Canada are no longer in a reorganization posture.  After expending nearly $36 million in DIP financing since filing the CCAA proceedings on March 27, 2024 without producing a viable reorganization plan, Debtors' DIP facility expired on July 31, 2024, and has not been renewed. At the present time, Debtors have no source of DIP financing and are surviving only because they are diverting the cash collateral of their secured lenders to pay their operating expenses.

16.     In its Thirteenth Report to the Canadian Court dated August 8, 2024, Debtors' court-appointed Monitor in the CCAA proceedings, Ernst & Young, Inc. (the "Monitor"), concluded (1) Debtors lacked sufficient liquidity to satisfy their working capital requirements and other needs going forward, and (2) Debtors would be unable to satisfy their payroll, operating expenses and professional fees through September 8, 2024 unless Debtors were allowed to apply lease payments and soft collections—that is, the secured creditors' cash collateral—to Debtors' working capital needs.  The collapse of Debtors' CCAA proceedings has been delayed only by the Canadian Court's grant of Debtors' request to divert lease payments and soft collections that are the cash collateral of Debtors' secured lenders to Debtor's use as working capital through September 8, 2024.

17.     In its Thirteenth Report to the Canadian Court, the Monitor also admitted that as of August 8, 2024: "Given the feedback it has received to date, the Monitor no longer views a going-concern Restructuring Plan as a feasible option given the lack of stakeholder support for it. Accordingly, the [Debtors] and the CRO, in consultation with the Monitor, intend to continue to move forward with a centralized, coordinated and controlled disposition and wind-up of the remaining [Debtors'] assets…and the CRO, in consultation with the Monitor and subject to direction from the Court intends to continue to move forward with a going concern sale or wind-down of the PGL Entities." (Emphasis added.)

18.     On August 9, 2024, the Canadian Court overseeing the Debtors' CCAA proceedings issued an order amending the Debtors' Revised Governance Protocol and stated in the Endorsement Slip thereto, "…I direct that the Chief Restructuring Officer and the [Debtors], in consultation with the Monitor, <u>shall immediately engage with the [Debtors'] significant financiers in an effort to develop an orderly wind-down proposal</u> in respect of the [Debtors], including the funding required in respect to such proposal and completion of the CCAA proceedings." (Emphasis added.)

19.     Despite the Canadian Court's August 9, 2024 Order and the overtures made since that time by Debtor's major equipment lenders to engage in discussions concerning Debtors' wind-down, neither Debtors, Debtors' Chief Restructuring Officer nor the Monitor have taken any meaningful substantive steps to engage with DTFS or the other of Debtors' equipment lenders regarding Debtors' wind-down.  In response to correspondence sent on August 21, 2024 on behalf of Debtors' major equipment lenders (1) noting Debtors' failure to engage regarding the wind-down, (2)  requesting the return of over-encumbered collateral, and (3) requesting a meeting with Debtors and Debtors' court-appointed Monitor to discuss a wind-down process, Debtors' Monitor advised Debtors' equipment lenders that it intends to submit a unilateral wind-down proposal to the Canadian Court without obtaining any input from Debtors' equipment lenders.

20.     The CCAA proceedings are no longer reorganization proceedings. They are liquidation proceedings. The Vehicles, which are hopelessly over-encumbered, are not necessary to any reorganization in prospect, and certainly no reorganization of TPine. For that matter, they are of no benefit to any liquidation process. DTFS has more and better resources than the Debtors or TPine to take possession of and liquidate the Vehicles so as to achieve the highest and best value for them. At this point, Debtors have run out of the funds necessary to simply take possession of the Vehicles.

21.     Other cause exists to dissolve the injunction and terminate the stay because DTFS's interests are not adequately protected under 11 U.S.C. § 361 or sufficiently protected under 11 U.S.C.

§ 1522(a). The Vehicles are depreciating assets. Between April 1 and July 31, 2024, the Vehicles have been depreciating, in the aggregate, at a rate of between 2.5% to 3% of retail replacement value per month.  Based on the JD Power (formerly NADA) online Market Guide, the retail replacement value of the Vehicles is $47,014,000.00 and the Vehicles depreciate at between $1,175,350.00 and $1,410,420.00 per month. DTFS has been offered nothing to offset this depreciation.

22.     As noted above, the stream of lease payments TPine receives from the lease of the Vehicles serves as additional collateral for repayment of TPine's debt to DTFS. For some period of time during the pendency of the CCAA proceedings and this case, DTFS was receiving a portion of those lease payments as a minimal hedge against the depreciation of its Vehicle collateral.  However, after the termination of Debtors' DIP facility in the CCAA proceedings, those lease payments have now all been diverted to the Debtors' use to pay the Debtors' operating expenses. DTFS is presently receiving nothing in the way of adequate protection or other compensation to offset the diminution of the value of its Vehicle collateral. The lease payments are DTFS's cash collateral which is being diverted to the Debtors' use without DTFS's permission.

23.      Neither TPine nor any other any entity has offered any form of adequate protection or compensation to DTFS for the diminution in the value of DTFS's Vehicle collateral or the use of its cash collateral. Since Debtors and TPine have no current source of working capital financing, it is evident neither TPine nor Debtors have any realistic ability to compensate DTFS for that loss of value.

24.     TPine, a non-debtor, has had the benefit of the injunctions and stays ordered by this Court long enough. DTFS is prepared to take possession of and to begin the process of liquidating the Vehicles. DTFS submits that the Court should dissolve all of the injunctions and stays affecting the Vehicles and terminate the automatic stay, to the extent it applies to non-Debtor TPine, to allow

DTFS to take possession of and liquidate the Vehicles.[5]  Alternatively, as a condition to maintenance of the injunction and any stay, TPine should be ordered to make payments to DTFS in the amount of $352,650.00 per week retroactive to the date of this Motion to compensate it for the depreciation of its Vehicle collateral.

## III.

## JURISDICTION AND VENUE

25.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Chapter 15 Cases under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is and other proceedings under chapter 15 of the Bankruptcy Code are core matters within the meaning of 28 U.S.C. § 157(b)(2)(P).

26.     Pursuant to Local Rule 9013-1(f), DTFS consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

27.     Venue of these Chapter 15 Cases is proper in the Court pursuant to 28 U.S.C. § 1410.

28.     The statutory predicates for the relief requested in this Motion are sections 362(d), 1520, and 1522 of the Bankruptcy Code. The requested relief is warranted under Bankruptcy Rule 4001(a) and Local Rule 4001-1.

---

[5] The Court should grant DTFS relief from the court-ordered injunction and the automatic stay independent of any decision regarding the third-party injunction in the CCAA Proceedings. The orders creating the injunction provide for the right to seek the dissolution of the injunction for cause and give DTFS the right to pursue stay relief in this Court regardless of any relief granted in the CCAA Proceedings.

**IV.**

**FACTS**

29.     Prior to the commencement of this case and Debtors' Canadian CCAA proceedings, DTFS entered into 92 Notes and Security Agreements (the "Contracts") with TPine to finance the purchase by TPine of 650 Freightliner trucks of various models and model years. (See, Declaration, ¶ 3.) TPine granted DTFS a cross-collateralized, cross-defaulted security interest in all 650 trucks to secure repayment under the Contracts. (See, Declaration, ¶ 3.) TPine is in default of each of the Contracts for purchase of the Vehicles by its failure to make multiple monthly payments coming due under those Contracts. (See, Declaration, ¶ 3.)

30.     TPine is not a Debtor in this case. In addition, TPine is not an Applicant in Debtors' Canadian CCAA proceedings. (See, Declaration, ¶ 4.) TPine is organized as a Delaware limited partnership. (See, Declaration, ¶ 4.) Since it is a limited partnership, TPine is ineligible under Canadian law to be an Applicant in a CCAA proceeding. (See, Declaration, ¶ 4.)

31.     This Motion concerns a portion of DTFS' collateral, specifically, 504 Vehicles purchased pre-petition by non-Debtor TPine. (See, Declaration, ¶ 5 and **Exhibit "2"** thereto.) The Vehicles are not Debtors' property. The Vehicles are owned by non-Debtor TPine. (See, Declaration, ¶ 5.) The Vehicles are not physically located in Canada. (See, Declaration, ¶ 5.) The Vehicles are all physically located in the United States and were purchased under Contracts executed in the United States. (See, Declaration, ¶ 5.)

32.     DTFS properly perfected its security interests in the Vehicles by the notation of its liens on the Vehicles' title certificates. (See, Declaration, ¶ 6.) During the course of the Debtors' CCAA proceedings, Debtors engaged a third-party auditor to determine whether any of the liens of Debtors' equipment lenders were unperfected. (See, Declaration, ¶ 6.) That audit determined that Debtors were in possession of documents to confirm DTFS had properly perfected its security

interest pre-petition in each of DTFS's 650 collateral Vehicles with the exception of one vehicle. (See, Declaration, ¶ 6 and **Exhibit "3"** thereto at p. 11 and Exhibit 25A thereto.) That vehicle is not the subject of this Motion.

33.      The results of Debtors' securitization audit with respect to DTFS's collateral are set forth at paragraph 29 of the 11th Report of Debtor's Monitor to the Canadian Court dated August 2, 2024 filed in the CCAA proceedings and in the Exhibit 25A thereto. A true and correct copy of the 11th Report of Debtor's Monitor with the described exhibit is attached to the Declaration as **Exhibit "3"** and is incorporated herein by this reference.

34.      The Contracts are substantially the same but for the description of the Vehicles subject of each Contract.  (See, Declaration, ¶ 8.) As such, a true and correct copy of an exemplar copy of one of the Contracts setting forth the terms thereof is attached to the Declaration as **Exhibit "4"** and is incorporated herein by this reference.

35.      Each of the Contracts contains an unnumbered paragraph on the first page of the same entitled "Security Agreement." That paragraph provides, in pertinent part:

> "In order to secure the prompt and punctual payment and satisfaction of my Indebtedness (as defined herein), I am granting Lender a security interest in the Equipment … and in all leases and chattel paper of the Equipment, and in all lease payments, rentals, and rights thereto, and in all proceeds derived from the Equipment…I also agree that, to the extent permitted by applicable law, collateral securing other loans, credit sales and leases that I may have with Lender or any affiliate of Lender, whether now or in the future, additionally will secure my Indebtedness under this Note. The Equipment, all leases and chattel paper of the Equipment, all lease payments, rentals, and rights thereto, proceeds, and my additional collateral securing other loans, credit sales, and leases with Lender or any affiliate of Lender, are individually, collectively and interchangeably referred to under this Note as my 'Collateral'." (See,

Declaration, ¶ 9 and **Exhibit "4"** thereto.)

36.     That same unnumbered paragraph defines "Indebtedness" as:

"For purposes of this Note, the term "Indebtedness" means: (1) my indebtedness under this Note for payment of principal, interest, late charges, returned check fees, liquidated damages and any other amounts due hereunder; (2) … my indebtedness under any other loans, leases or other obligations that I may now and in the future owe to Lender or any affiliate of Lender …"(See, Declaration, ¶ 10 and **Exhibit "4"** thereto.)

37.     As such, to secure TPine's indebtedness to DTFS TPine granted DTFS a first priority security interest not only in the vehicle or vehicles subject of any specific Contract, but also in all other vehicles securing any other loans, credit sales and leases TPine may have entered into with DTFS, whether then existing or in the future, and in all proceeds of those vehicles. (See, Declaration, ¶ 11.)

38.     On March 27, 2024, the Debtors commenced the Canadian CCAA Proceedings. (See, Declaration, ¶ 12.) In connection therewith, Randall Benson was authorized to act as the foreign representative for the Debtors and to file these Chapter 15 Cases. (See, Declaration, ¶ 12.) These Chapter 15 Cases were filed on April 1, 2024. (See, Declaration, ¶ 12.)

39.     On April 3, 2024, this Court entered that certain Order Granting Motion of the Foreign Representative for Provisional Relief Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code as docket number 49 (the "Provisional Order"). (See, Declaration, ¶ 13.) A true and correct copy of the Provisional Order is attached as **Exhibit "5"** to the Declaration and is incorporated herein by this reference.

40.     Pursuant to Paragraph 1.b. of the Provisional Order, DTFS was enjoined and stayed pursuant to 11 U.S.C. §1519(a)(1) from, among other things, taking any action to enforce its security interests in its collateral vehicles in possession of TPine including, but not limited to, any action to enforce its security interests in the Vehicles subject of this Motion. (See, Declaration, ¶

14 and **Exhibit "5"** thereto at p. 5.) Paragraph 1.b. of the Provisional Order expressly authorizes DTFS to seek relief from the injunction and stay created by the Provisional Order "in accordance with Section 362 of the Bankruptcy Code and the Bankruptcy Rules." (See, Declaration, ¶ 14 and **Exhibit "5"** thereto at p. 5.) Paragraph 12 of the Provisional Order provides for the Court's retention of jurisdiction with respect to any party's request for relief from the Provisional Order for "cause shown." (See, Declaration, ¶ 14 and **Exhibit "5"** thereto at pp. 8-9.)

41.     On May 2, 2024, the Court entered that certain Order Granting Amended Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code as docket number 110 (the "<u>Recognition Order</u>"). (See, Declaration, ¶ 15.) A true and correct copy of the Recognition Order is attached as **Exhibit "6"** to the Declaration and is incorporated herein by this reference.

42.     Pursuant to Paragraph 6 of the Recognition Order, the Court enjoined DTFS pursuant to 11 U.S.C. §1521(a)(1)-(3) from, among other things, taking any action to enforce its security interests in its collateral in TPine's possession, including the Vehicles subject of this Motion, to the extent not already stayed by 11 U.S.C. §1520.  (See, Declaration, ¶ 16 and **Exhibit "6"** thereto at pp. 7-8.) Under paragraph 7 of the Recognition Order, the Court extended and continued in effect the prior relief granted under the Provisional Order. (See, Declaration, ¶ 16 and **Exhibit "6"** thereto at p. 8.) Under Paragraph 12 of the Recognition Order, the Court preserved DTFS' right to seek relief from the injunction and stay as per the Provisional Order notwithstanding any other term of the Recognition Order. (See, Declaration, ¶ 16 and **Exhibit "6"** thereto at p. 11.)

43.     As such, under the Provisional Order and the Recognition Order DTFS may seek relief from the injunction and stay protecting TPine upon a showing of its entitlement to relief from stay under 11 U.S.C. §362(d) for "cause shown." (See, Declaration, ¶ 17.)

44.     There is no equity in the Vehicles for the benefit of TPine or any other party. (See, Declaration, ¶ 18.) TPine's indebtedness to DTFS with respect to the Vehicles is $57,573,264.47. (See, Declaration, ¶ 18.) This amount does not take into account the deficiency balances incurred as the result of sales of vehicles previously surrendered by TPine and sold by DTFS. (See, Declaration, ¶ 18.)  When those deficiency balances are fully liquidated, the above indebtedness will be greater than $57,573,264.47. (See, Declaration, ¶ 18.)

45.     According to the JD Power (formerly NADA) online Market Guide, the Vehicles have a retail value book value, in the aggregate, of $47,014,000.00 and a wholesale value, in the aggregate, of $35,629,500.00. (See, Declaration, ¶ 19 **and Exhibit "7"** thereto.) The amount owed to DTFS is approximately $10 million more than the Vehicles' retail book value and approximately $22 million more than the Vehicles' wholesale book value. (See, Declaration, ¶ 19.)  Given that the Vehicles are so dramatically over-encumbered, a sale of the Vehicles by TPine would generate no return over and above the secured amount owed to DTFS. (See, Declaration, ¶ 19.)  A true and correct Spreadsheet of the values of the Vehicles on a per VIN basis, as well as true and correct copies of the relevant pages from the JD Power online Market Guide concerning the retail and wholesale values of the Vehicles, are attached to the Declaration as **Exhibit "7"** and are incorporated herein by this reference.

46.     Presuming for the sake of argument Debtors would have the right to sell TPine's property, such a sale would also generate nothing for the benefit of TPine or the Debtors' Canadian estates given the degree to which the Vehicles are over-encumbered. (See, Declaration, ¶ 20.)  The sale would result only in the unnecessary incurrence of administrative costs and expenses in attempting to sell the Vehicles thereby pushing unsecured creditors even further off the table than they are at present. (See, Declaration, ¶ 20.)  TPine's continued possession of the Vehicles is, by itself, contributing to the Debtors' administrative costs.  Debtors' estates are presently incurring the

cost to insure the Vehicles and to store and safeguard those Vehicles that have been turned back in by, or repossessed from, TPine's lessees. (See, Declaration, ¶ 20.)

47.     Certain of the Debtors have executed guarantees of TPine's debt to DTFS. (See, Declaration, ¶ 21.) Any sale of the Vehicles at a loss after more time passes and more value is lost would increase the size of DTFS's unsecured claim and dilute the share of recovery other unsecured creditors could hope to receive in the CCAA proceedings. (See, Declaration, ¶ 21.)

48.     DTFS is in, by far, the best position to minimize its losses and to obtain maximum value for the Vehicles. (See, Declaration, ¶ 22.) DTFS is an expert at the repossession and sale of its collateral and has access to a nationwide network of heavy truck dealers who routinely bid on vehicles sold at online auctions conducted by DTFS. (See, Declaration, ¶ 22.)  The sale of truck collateral is a major aspect of DTFS's routine operations. (See, Declaration, ¶ 22.) By way of example, TPine voluntarily surrendered 137 vehicles to DTFS prior to the filing of the Debtors' CCAA proceedings. (See, Declaration, ¶ 22.) On July 2, 2024, this Court entered an Agreed Order dissolving this Court's injunction and stay as to those 137 vehicles. (See, Declaration, ¶ 22.) DTFS has already sold and been paid for 101 of those vehicles. (See, Declaration, ¶ 22.)

49.     By contrast, TPine and Debtors are not experts at the repossession and sale of vehicle collateral as exemplified by their efforts to date. (See, Declaration, ¶ 23.) On August 8, 2024, Britt Roberts, DTFS's Chief Operating Officer of its Canadian operations, received an email from Rupinder Singh, TPine's Vice President of Sales & Operations. (See, Declaration, ¶ 23 and **Exhibit "8"** thereto.) Attached to that email was a Receivables Report with regard to TPine's leases of the Vehicles to its lessees. (See, Declaration, ¶ 23 and **Exhibit "8"** thereto.) The Receivables Report shows that TPine's lessees of 30 of DTFS's collateral Vehicles are between 90 and 120 days past due in making lease payments to TPine for a total delinquency of $4,782,186.10. (See, Declaration, ¶ 23 and **Exhibit "8"** thereto.)  The Receivables Report also shows that lease payments due from TPine's

lessees on an additional 71 DTFS collateral Vehicles are more than 120 days past due for a total additional delinquency of $14,490,675.24. (See, Declaration, ¶ 23 and **Exhibit "8"** thereto.) In total, TPine's lessees are $19,272,861.34 in default under their leases with TPine as to 101 of DTFS's collateral Vehicles, all of which is 90 days or more past due. (See, Declaration, ¶ 23 and **Exhibit "8"** thereto.) The Receivables Report contains no bucket for receivables aged beyond "120 +" days. As such, the true age of the receivables in the "120 + day" bucket of the Receivables Report is knowable only by TPine. (See, Declaration, ¶ 23 and **Exhibit "8"** thereto.) A true and correct copy of the August 8, 2024 email from Rupinder Singh to Britt Roberts and the attached Receivables Report is attached as **Exhibit "8"** to the Declaration and is incorporated herein by this reference.

50.     Despite the massive and long-standing delinquencies described above, TPine has not repossessed the Vehicles from its delinquent lessees more than 90 days in default much less liquidated those Vehicles. (See, Declaration, ¶ 24.)

51.     TPine's Receivables Report also shows that TPine's lessees in the United States are delinquent in making lease payments to TPine at a staggeringly high rate of 38.32%. (See, Declaration, ¶ 25 and **Exhibit "8"** thereto.) By contrast, the delinquency rate of DTFS's small business loan and lease portfolio, company-wide, is only 5.8% and decreasing. (See, Declaration, ¶ 25.)  It is apparent from TPine's Receivables Report that TPine is not particularly adept at collecting its delinquent lease receivables or taking possession of vehicles under leases that are in serious default. (See, Declaration, ¶ 25 and **Exhibit "8"** thereto.)

52.     DTFS has every incentive to obtain the highest and best values from the sale of its collateral Vehicles before it suffers from further depreciation, as DTFS has very little confidence there will be a meaningful recovery on any unsecured claim it may have in Debtors' CCAA proceeding. (See, Declaration, ¶ 26.)

53.     The Vehicles are also not necessary to TPine's—or Debtors'—effective reorganization. TPine is not an Applicant in the CCAA proceedings and is not a Debtor in this case. (See, Declaration, ¶ 27.) It is simply an entity in whose favor a Court ordered injunction and stay flows. (See, Declaration, ¶ 27.) No reorganization of TPine is underway or is in prospect. (See, Declaration, ¶ 27.) Since TPine is neither a Debtor in this case nor an Applicant in the CCAA proceeding, TPine's reorganization is not legally possible in either matter. (See, Declaration, ¶ 27.)

54.     Debtors' CCAA proceedings in Canada are no longer in a reorganization posture. (See, Declaration, ¶ 28.) After expending nearly $36 million in DIP financing since the filing of the CCAA proceedings on March 27, 2024 without producing a viable reorganization plan, Debtors' DIP facility expired on July 31, 2024 and has not been renewed. (See, Declaration, ¶ 28.) At the present time, Debtors have no source of DIP financing and are surviving only because they are diverting cash collateral of their secured lenders to pay their operating expenses. (See, Declaration, ¶ 28.)

55.     In its Thirteenth Report to the Canadian Court dated August 8, 2024, the Monitor concluded (1) the Debtors lacked sufficient liquidity to satisfy their working capital requirements and other needs going forward, and (2) Debtors would be unable to satisfy their payroll, operating expenses and professional fees through September 8, 2024 unless Debtors were allowed to apply lease payments and soft collections—that is, the secured creditors' cash collateral—to Debtors' working capital needs. (See, Declaration, ¶ 29 and **Exhibit "9"** thereto at ¶¶ 57-58, pp. 19-20.) The collapse of Debtors' CCAA proceedings has been delayed only by the Canadian Court's grant of Debtors' request to divert lease payments and soft collections that are the cash collateral of Debtors' secured lenders to Debtor's use as working capital through September 8, 2024. (See, Declaration, ¶ 29.) A true and correct copy of the Monitor's Thirteenth Report to the Canadian Court dated August 8, 2024 is attached as **Exhibit "9"** to the Declaration and is incorporated herein by this reference.

56.     In its Thirteenth Report to the Canadian Court, the Monitor also admitted that as of August 8, 2024: "Given the feedback it has received to date, the Monitor no longer views a going-concern Restructuring Plan as a feasible option given the lack of stakeholder support for it. Accordingly, the [Debtors] and the CRO, in consultation with the Monitor, intend to continue to move forward with a centralized, coordinated and controlled disposition and wind-up of the remaining [Debtors] assets…and the CRO, in consultation with the Monitor and subject to direction from the Court intends to continue to move forward with a going concern sale or wind-down of the PGL Entities." (Emphasis added.) (See, Declaration, ¶ 30 and **Exhibit "9"** thereto at ¶ 44, pp. 13-14.)

57.     On August 9, 2024, the Canadian Court issued an order amending Debtors' Revised Governance Protocol and stated in the Endorsement Slip thereto, "…I direct that the Chief Restructuring Officer and the [Debtors], in consultation with the Monitor, shall immediately engage with the [Debtors'] significant financiers in an effort to develop an orderly wind-down proposal in respect of the [Debtors], including the funding required in respect to such proposal and completion of the CCAA proceedings." (Emphasis added.) (See, Declaration, ¶ 31 and **Exhibit "10"** thereto, Endorsement Slip ¶ 5.) A true and correct copy of the Canadian Court's August 9, 2024 Order and attached Endorsement Slip is attached as **Exhibit "10"** to the Declaration and is incorporated herein by this reference.

58.     Despite the Canadian Court's August 9, 2024 Order, neither Debtors, Debtors' Chief Restructuring Officer nor Debtors' court-appointed Monitor have taken any meaningful substantive steps to date to engage with DTFS or its other significant equipment lenders regarding a wind-down proposal as ordered. (See, Declaration, ¶ 32.)

59.     Having heard nothing from Debtors regarding a wind-down proposal after August 9, 2024, on August 21, 2024 a correspondence was sent to Debtors' and the Monitor's counsel on behalf of Debtors' major equipment lenders, including DTFS.    (See, Declaration, ¶ 33.) That

correspondence (1) noted that Debtors' equipment lenders had been excluded from the process of formulating a wind-down proposal, (2) requested return of those units of the equipment lenders' vehicle collateral that are not subject to multiple liens, and (3) requested a meeting with the equipment lenders to discuss Debtor's wind-down.[6]  (See, Declaration, ¶ 33 and **Exhibit 11"** thereto.) A true and correct copy of said August 21, 2024 letter is attached as **Exhibit "11"** to the Declaration and is incorporated herein by this reference

60.    In response to the above-described August 21, 2024 correspondence, counsel for the Monitor addressed a correspondence to Debtors' creditors stating:

"It is impossible from a band width and cost perspective for the Applicants, the Monitor and the CRO to respond to each motion [for relief from stay] individually or to negotiate separately with each secured lender. The intention is that there will be a single, coordinated response contained in a report of the Monitor and an affidavit of the CRO, which will outline the recommended path forward: an orderly wind-down of the Pride Entities under the direction and supervision of the CRO and the Monitor, considering the interests of employees, customers, lenders and other stakeholders. The Monitor also anticipates that its report will propose a going concern sale of the PGL business. It is the Monitor's intention to communicate with all PGL lenders in advance of the hearing with respect to the benefits of the going concern sale and alternatives available." (See, Declaration, ¶ 35 and **Exhibit "12"** thereto.)

61.    In addition, the Monitor indicated in its August 21, 2024 correspondence that it intended to request that the Court extend the period during which Debtors could divert secured

---

[6] After the CCAA proceedings were filed, it was discovered that Debtors had pledged at least 1839 trucks as collateral to multiple lenders thus leading to situations where Debtors had, in an enormous number of instances, obtained financing from multiple lenders secured by the same truck. (See, Declaration, ¶ 30 and **Exhibit "3"** thereto.) These vehicles have been referred to in the CCAA proceedings as the MCV Vehicles. See, 11th Report of Debtor's Monitor attached to the Declaration as **Exhibit "3"** at ¶ 29, pp. 9-12. One vehicle financed by DTFS is an MCV vehicle subject to multiple liens. (See, Declaration, ¶ 34.) DTFS is not seeking relief from the injunction and stay as to that Vehicle in this Motion since issues of priority concerning that vehicle have not been resolved.

creditors' cash collateral lease payments and soft collections from September 8, 2024 to September 30, 2024. (See, Declaration, ¶ 36 and **Exhibit 12"** thereto.) The Monitor has now formerly made that request of the Canadian Court.   (See, Declaration, ¶ 36.) A true and correct copy of the Monitor's August 23, 2024 letter is attached as **Exhibit "12"** to the Declaration and is incorporated herein by this reference.

62.     Simply put, on August 9, 2024 the Canadian Court ordered Debtors and Debtors' Chief Restructuring Officer to "immediately engage" with Debtors' significant financiers regarding wind-down of Debtors' operations. (See, Declaration, ¶ 37.) Debtors ignored that Order and did not engage with Debtors' equipment lenders or involve those lenders in the formulation of a wind-down proposal. (See, Declaration, ¶ 37.)  Approximately two weeks after Debtors had been ordered to engage, Debtors' major equipment lenders reached out to Debtors to jump start discussions regarding wind-down. (See, Declaration, ¶ 37.) Two days later, Debtor's court-appointed Monitor made clear that Debtors would not engage with Debtors' equipment lenders, despite the Canadian Court's Order, and would instead present a unilateral wind-down proposal directly to the Canadian Court without the lenders' input. (See, Declaration, ¶ 37.)

63.     TPine did not acquire the Vehicles for its own use. (See, Declaration, ¶ 38.) TPine is a leasing company in the business of leasing trucks and trailers to end users. (See, Declaration, ¶ 38.) The Vehicles serve as DTFS's collateral for repayment of TPine's debt to DTFS, as does the stream of lease payments TPine receives from the lease of the Vehicles. (See, Declaration, ¶ 38.) For some period of time during the pendency of the CCAA proceedings and this case, DTFS was receiving a portion of those lease payments as a minimal hedge against the depreciation of its Vehicle collateral. (See, Declaration, ¶ 38.) However, after termination of Debtor's DIP facility in the CCAA proceedings, those lease payments have now all been diverted to Debtors' use to pay Debtors' operating expenses without DTFS's permission. (See, Declaration, ¶ 38.) DTFS is presently

receiving nothing in the way of adequate protection or other compensation to offset the diminution of the value of its Vehicle collateral or the Debtors' use of its cash collateral lease payments. (See, Declaration, ¶ 38.)

64.    Further, neither TPine nor any other any entity has offered any form of adequate protection or other compensation to DTFS for the diminution of its Vehicle collateral or the use of its cash collateral. (See, Declaration, ¶ 39.) Given that Debtors and TPine have no current source of working capital financing, it is evident neither TPine nor Debtors have any realistic ability to provide adequate protection or other compensation to DTFS. (See, Declaration, ¶ 39.)

65.    The Vehicles are depreciating assets. (See, Declaration, ¶ 40.) Between April 1 and July 31, 2024, the Vehicles have been depreciating, in the aggregate, at a rate of between 2.5% to 3% of retail replacement value per month. (See, Declaration, ¶ 40 and **Exhibit "13"** thereto.)  Based on the JD Power (formerly NADA) online Market Guide, the retail replacement value of the Vehicles is $47,014,000.00. (See, Declaration, ¶ 40 and **Exhibit "13"** thereto.) The Vehicles are depreciating at between $1,175,350.00 and $1,410,240.00 per month. (See, Declaration, ¶ 40 and **Exhibit "13"** thereto.) Again, DTFS has been offered nothing to offset this depreciation. (See, Declaration, ¶ 40.) A true and correct copy of DTFS's historical depreciation analysis along with the JD Power online Market Guide pages on which that analysis is based is attached as **Exhibit "13"** to the Declaration and is incorporated herein by this reference.

66.    TPine, a non-debtor, has had the benefit of the injunction and stay ordered by this Court long enough. (See, Declaration, ¶ 41.) DTFS is prepared to take possession of the Vehicles at its own expense and to begin the process of liquidating the Vehicles. (See, Declaration, ¶ 41.)  DTFS has already demonstrated a proven track record of timely liquidating its collateral vehicles where the Court has previously lifted the injunction and stay. (See, Declaration, ¶ 41.) TPine, on the other hand, is not repossessing Vehicles in instances where its lessees are dramatically past due on lease payments

and is not taking reasonable steps to collect past due receivables as exemplified by its 38.32% lease

delinquency rate. (See, Declaration, ¶ 41.)

## V.

## <u>LEGAL ARGUMENT</u>

67.     On April 3, 2024, this Court entered the above-described Provisional Order which

enjoined and stayed DTFS pursuant to 11 U.S.C. §1519(a)(1) from taking any action to enforce its

security interests in the Vehicles subject of this Motion.  However, Paragraph 1.b. of the Provisional

Order expressly authorized DTFS a to seek relief from that injunction and stay "in accordance with

Section 362 of the Bankruptcy Code and the Bankruptcy Rules."  Paragraph 12 of the Provisional

Order provides for the Court's retention of jurisdiction with respect to DTFS's request for relief

from the Provisional Order for "cause shown."

68.     On May 2, 2024, the Court entered the above-described Recognition Order which

enjoined DTFS pursuant to 11 U.S.C. §1521(a)(1)-(3) from taking any action to enforce its security

interests in the Vehicles. Under paragraph 7 of the Recognition Order, the Court extended and

continued in effect the prior relief granted under the Provisional Order. Under Paragraph 12 of the

Recognition Order, the Court preserved DTFS' right to seek relief from the injunction and stay as

per the Provisional Order.

69.     As such, under the Provisional Order and the Recognition Order DTFS may seek

relief from the injunction and stay protecting TPine upon a showing of its entitlement to relief from

stay under 11 U.S.C. §362(d) for "cause shown."

70.     Upon entry of the Recognition Order, the automatic stay of Bankruptcy Code section

362 became applicable in this case with respect to the Debtors' property within the territorial

jurisdiction of the United States. 11 U.S.C. § 1520(a)(1); *In re ABC Learning Centres Ltd.*, 445 B.R.

318, 337 (Bankr. D. Del. 2010), *on reconsideration in part*, 445 B.R. 318 (Bankr. D. Del. Jan. 21,

2011), *aff'd* 728 F.3d 301 (3d Cir. 2013); *see also In re Agrokor d.d.*, 591 B.R. 163, 187 (Bankr.

S.D.N.Y. 2018) ("Section 1520(a)(1) provides that the automatic stay will apply to all the debtor's

property that is located within the territorial jurisdiction of the United States.)

71.    The Vehicles subject of this Motion are not property of the Debtors. The Vehicles

are owned by non-Debtor TPine. While it is likely that the §362 automatic stay does not apply to

TPine or the Vehicles, DTFS nonetheless seeks relief from the automatic stay to the extent it may

apply in this case in addition to relief from the injunction and stay created by the Provisional Order

and the Recognition Order.

72.    "The procedure for obtaining a court order for relief from the U.S. automatic stay

under subsections (d) through (g) of § 362 applies in a chapter 15 case." *In re Manley Toys Ltd.*,

No. 16-15374 (JNP), 2020 Bankr. LEXIS 902, at *5 (Bankr. D.N.J. Mar. 31, 2020).

73.    Section 362(g) places an initial burden on the moving party to establish its *prima*

*facie* case for relief from the automatic stay which must then be rebutted by the party opposing

such relief. *See Izzarelli v. Rexene (In re Rexene Prods. Co.)*, 141 B.R. 574, 577 (Bankr. D. Del.

1992); *In re Eatman*, 182 B.R. 386, 390 (Bankr. S.D.N.Y. 1995) ("[T]he movant must [] make a

prima facie showing that it is entitled to the relief that it seeks."). A *prima facie* case requires a

showing by the movant of a factual and legal right to the relief that it seeks. *In re Eatman*, 182 B.R.

at 390 (citations omitted). "After the moving party establishes a *prima facie* case, the burden of

producing evidence, as well as the ultimate burden of proof, *i.e.*, risk of non-persuasion, shifts to

the debtor." *In re Planned Systems, Inc.*, 78 B.R. 852, 859 (Bankr. S.D. Ohio 1987).

74.    Section 362(d)(2) of the Bankruptcy Code provides that relief from stay "shall" be

granted where a debtor does not have equity in the property in question and such property is not

necessary to the debtor's effective reorganization. 11 U.S.C. § 362(d)(2).

75.     "A secured creditor seeking relief from the stay under section 362(d)(2) must show (1) the amount of its claim; (2) that its claim is secured by a valid, perfected lien in property of the estate; and (3) that the debtor lacks equity in the property." *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 322 (Bankr. S.D.N.Y. 2001); *see also In re Cont'l Airlines*, 134 B.R. 536, 542 (Bankr. D. Del. 1991).

76.     Courts routinely find that industry guides such as the JD Power Market Value Guide (formerly NADA) are appropriate evidence of the value of collateral.  *In re Thayer*, 98 B.R. 748 (Bankr. W.D.Va. 1989).

77.     Section 362(d)(1) of the Bankruptcy Code authorizes the Court to grant relief from the stay "for cause, including the lack of adequate protection of an interest in property of such property in interest[.]" 11 U.S.C. § 362(d)(1). In the absence of adequate protection of a secured creditor's interest in its collateral, the court "shall" grant relief from the automatic stay. *See* 11 U.S.C. § 362(d); *In re Phoenix Steel Corp.*, 39 B.R. 218, 234 (D. Del. 1984) (granting relief from automatic stay where there was "no equity cushion or offer of substitute collateral in sufficient amount").

78.      Debtors have the burden of proving the absence of "cause" for relief from the automatic stay. *See Wilmington Trust Co. v. Aardvark, Inc. (In re Aardvark, Inc.)*, 1997 U.S. Dist. LEXIS 3304 (D. Del. Mar. 4, 1997) (quoting *In re Phoenix Pipe & Tube, L.P.*, 154 B.R. 197, 198 (Bankr. E.D. Pa. 1993)); *Partee v. White (In re White)*, 2004 Bankr. LEXIS 478 (Bankr. D. Colo. Mar. 12, 2004); *see also* 11 U.S.C. § 362(g). Bankruptcy courts evaluate "cause" based on the totality of the circumstances in each particular case. *Baldino v. Wilson (In re Wilson),* 116 F.3d 87, 90 (3d Cir. 1997) *(citing Trident Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co. (In re Trident Assocs. Ltd. P'ship),* 52 F.3d 127, 131 (6th Cir. 1995)).

79.     Under the totality of circumstances standard, courts often consider the hardship or prejudice to the non-debtor in determining whether to lift the automatic stay. *See In re Bock Laundry Mach. Co.*, 37 B.R. 564, 566 (Bankr. N.D. Ohio 1984). The court in *Bock* noted that "[c]ourts have developed a balancing test, whereby the interests of the estate are weighed against the hardships that will be incurred by the creditor-plaintiff." *Id.* at 566; *see also Milne v. Johnson (In re Milne)*, 185 B.R. 280, 283 (N.D. Ill. 1995) (courts should look into whether, *inter alia,* there will be injury to the debtor and other creditors if the stay is modified, injury to the movant if the stay is not modified and weigh the proportionality of harms).

80.     Upon recognition of a foreign main proceeding in a Chapter 15 case, the adequate protection provisions of 11 U.S.C. § 361 apply to the debtor and property of the debtor within the territorial jurisdiction of the United States. 11 U.S.C. § 1520(a)(1).

81.     After recognition of a foreign proceeding, any entity that is affected by relief granted by the Court under 11 U.S.C. §§ 1519 or 1521 upon recognition may move to modify or terminate that relief or the Court may modify or terminate the relief on its own motion. 11 U.S.C. § 1522(c). Relief under §§ 1519 or 1521 may be granted only if the interests of creditors and other interested entities, including the debtor, are sufficiently protected and the Court may modify or terminate such relief if the Court finds that sufficient protections do not exist. 11 U.S.C. § 1522(a).

82.     "The plain language of [§ 1522(c)] affords courts flexibility in granting or modifying relief by allowing courts to modify relief either on its own motion or upon request." *In re Sanjel (USA), Inc.*, 2016 Bankr. LEXIS 2771, *13 (Bankr.W.D.Tx. 2016); See also, *In re Tri-Continental Exch. Ltd.*, 349 B.R. 627, 637 (Bankr. E.D. Cal. 2006) ("If it later appears that conditions should be either imposed or relaxed, §1522(c) authorizes a court, on its own motion or upon request, to modify or terminate any discretionary relief it has granted.").

83.    The legislative history behind §1522 "makes clear that Congress intended to give bankruptcy courts 'broad latitude to mold relief to meet specific circumstances . . . .'" *In re Sanjel (USA), Inc.*, *supra,* 2016 Bankr. LEXIS 2771, *15, quoting and citing H.R. REP. NO. 109-31, at 116. "Chapter 15, like the Model Law, anticipates the provision of particularized protection, as stated in §1522(a)" *Jaffé v. Samsung Elecs. Co. (In re Qimonda)*, 737 F.3d 14, 29 (4th Cir. 2013). In addition,  "courts may give effect to certain orders of a foreign court and not give effect to other orders." *In re Sanjel (USA), Inc.*, *supra,* 2016 Bankr. LEXIS 2771, *15; See also *In re Cozumel Caribe*, 508 B.R. 330, 337-38 (Bankr. S.D.N.Y. 2014) ("Granting comity to orders of a foreign court is not an all or nothing exercise—some orders or judgments in the same case or proceeding may merit comity while others may not.")

84.    The Second Circuit has recognized that secured creditors enjoy special protections under United States law which protections do not disappear in the context of a cross-border insolvency case. *In re Hamilton*, 240 F.3d 148 (2d Cir. 2000) ("[O]ur observation that security interests enjoy constitutional protection supports our conclusion that United States law affords strong protection to secured creditors and treats those protections very seriously, a conclusion that, in turn, amplifies the significance of the difference in the way secured claims are treated under Bahamian law.").

85.    In determining whether relief granted under §§ 1519 or 1521 should be terminated or modified under § 1522(a), courts have engaged in a balancing test which takes into account the relative hardships to the parties when considering whether the interests of the parties are sufficiently protected. *See Jaffé  v. Samsung Elecs. Co. (In re Qimonda), supra,* 737 F.3d at 27-28 ("The analysis required by § 1522(a) is therefore logically best done by balancing the respective interests based on the relative harms and benefits in light of the circumstances presented, thus inherently calling for application of a balancing test.").

86.     In balancing the hardships under §1522 a court may refuse to recognize specific orders in a foreign proceeding when those orders unjustifiably harm an interested party. *In re Qimonda AG*, 462 B.R. 165, 182-83 (Bankr. E.D.Va. 2011) (aff'd by *Jaffé v. Samsung Elecs. Co.*, *supra,* 737 F.3d at 29 (4th Cir. 2013)).

87.     A United States Bankruptcy Court may properly rule in favor of an insufficiently protected creditor in a Chapter 15 case notwithstanding orders, or even the home forum law, of the foreign proceeding. In *Qimonda*, *supra,* 462 B.R. 165, the Virginia bankruptcy court entered an order which recognized German insolvency proceedings but also granted protection to other interested parties by applying § 365(n), a provision that conflicted with the German Insolvency law. Under a provision of the German Insolvency Code that allows rejection of "cross-license patents" with licensees, the debtor had sent letters of non-performance to licensees, including licensees in U.S. patents. Several of the licensees objected, arguing that § 365(n) protected their licenses to the debtor's U.S. patents. *Id.* at 182-83. The bankruptcy court balanced potential losses in value to the debtor's patent portfolio against the high risk to substantial investments made in reliance on the U.S. license agreements. *Id.* The bankruptcy court determined that, even absent a public policy determination under § 1506, the debtor's U.S. patents should be subject to § 365(n), not German insolvency law. *Id.* The bankruptcy court also made clear that its ruling did not affect the foreign administrator's right to terminate licenses to non-U.S. patents. *Id.* at 185-86. On appeal, the Fourth Circuit Court of Appeals affirmed the bankruptcy court, holding that it properly applied § 1522(a) by weighing the interests of the debtor against the interests of adversely affected parties. *Jaffé*, *supra,* 737 F.3d at 29.

**A.** **DTFS IS ENTITLED TO THE RELIEF IT REQUESTS UNDER 11 U.S.C. §362(d)(2).**

88.    TPine's indebtedness to DTFS with respect to the Vehicles is $57,573,264.47 and growing. According to the JD Power (formerly NADA) online Market Guide, the Vehicles' retail book value is $47,014,000.00 and the wholesale book value is $35,629,500.00. The amount owed to DTFS by TPine is approximately $10 million more than the Vehicles' retail book value and approximately $22 million more than the Vehicles' wholesale book value. There is no equity in the Vehicles for TPine's benefit or for the benefit of any other party.

89.    The Vehicles are not necessary to TPine's—or Debtors'—effective reorganization. TPine is not an Applicant in the CCAA proceedings. As a limited partnership, TPine is ineligible to be an Applicant in the CCAA Proceedings. TPine is not a Debtor in this case. TPine is simply an entity in whose favor a Court ordered injunction and stay flows. Since TPine is not a Debtor in this case, no reorganization of TPine is underway or is in prospect. Since TPine is neither a Debtor in this case nor an Applicant in the CCAA proceeding, TPine's reorganization is not legally possible in either matter.

90.    The Vehicles are also not necessary to the Debtor's reorganization. Debtors' CCAA proceedings in Canada are no longer in a reorganization posture. Debtors' DIP facility was terminated on July 31, 2024 and has not been replaced. Debtors have no source of DIP financing and are surviving on a week-to-week basis because they have been allowed by the Canadian Court to divert DTFS's and Debtors' other secured lenders' cash collateral lease proceeds and soft collections to the payment of Debtor's operating expenses. Debtor's court-appointed Monitor has admitted to the Canadian Court that Debtors are incapable of reorganizing and that the only way forward involves a liquidation of the Debtor's assets and a wind-up of the Debtors operations. Since the Vehicles are dramatically over-encumbered, the Vehicles could not be part of an effective disposition of the

Debtors' assets. The Canadian Court ordered Debtors to cooperate with Debtors' major lenders to formulate a wind-down proposal. Debtors have effectively ignored that Order.

91.     There is no equity in the Vehicles for the benefit of TPine or the Debtors' Canadian estates. TPine is neither an Applicant in the Canadian proceedings nor a Debtor in this case. There is no reorganization of TPine in prospect and there never has been. The Vehicles are not necessary to Debtors' reorganization in prospect as the Debtors are now in liquidation mode. The Vehicles are not beneficial to Debtors liquidation process, over-encumbered as they are, and the Debtors' continued retention of them will lead only to the needless incurrence of administrative expenses. DTFS has met the proof standard under 11 U.S.C. § 362(d)(2) for the termination of all injunctions and stays in this case and those injunctions and stays should be terminated.

**B.   DTFS IS ENTITLED TO THE RELIEF IT REQUESTS UNDER 11 U.S.C. §362(d)(1).**

92.     Cause exists to grant DTFS the relief it requests under 11 U.S.C. § 362(d)(1). TPine is in default of each of the Contracts for purchase of the Vehicles by its failure to make multiple monthly payments coming due under those Contracts.

93.     TPine does not purchase Vehicles for its own use. TPine a leasing company in the business of leasing trucks and trailers to end users. The Vehicles serve as DTFS's collateral for repayment of TPine's debt to DTFS, as does the stream of lease payments TPine receives from the lease of the Vehicles. While DTFS was receiving a portion of those lease payments at one time during the pendency of these cases, those lease payments have now all been diverted to Debtors' use to pay Debtors' operating expenses without DTFS's permission. DTFS is presently receiving nothing to offset the diminution of the value of its Vehicle collateral or the use of its cash collateral lease payments.

94.     Neither TPine nor any other any entity has offered any form of compensation to DTFS for the diminution of its Vehicle collateral or the use of its cash collateral. Given that Debtors and TPine have no current source of working capital financing, neither TPine nor Debtors has any realistic ability to protect DTFS's interests in its collateral.

95.     The Vehicles are depreciating assets. Between April 1 and July 31, 2024, the Vehicles have been depreciating, in the aggregate, at a rate of between 2.5% to 3% of retail replacement value per month.  Based on the JD Power (formerly NADA) online Market Guide, the retail replacement value of the Vehicles is $47,014,000.00. The Vehicles, then, are depreciating at between $1,175,350.00 and $1,410,240.00 per month.  DTFS has been offered nothing to offset this depreciation.

96.     Since the CCAA proceedings and this case were commenced, DTFS's collateral has declined in value and will continue to decline in value. Debtors have flouted an order of the Canadian Court requiring that Debtors cooperate with DTFS and Debtors' lenders to formulate a liquidation plan. Neither TPine nor Debtors can generate proceeds from the sale of the Vehicles in excess of what DTFS is owed.  Yet, TPine and Debtors have resisted requests that possession of the Vehicles be restored to DTFS so it can staunch the flow of losses it suffers everyday while the Vehicles depreciate. TPine and Debtors have no means to protect DTFS from the losses DTFS will incur if it is further prevented from taking possession of the Vehicles and selling them. DTFS has demonstrated that cause exists under 11 U.S.C. § 362(d)(1) to terminate all injunctions and stays in this case which prevent it from taking possession of and liquidating the Vehicles and the injunctions and stays should be terminated.

**C.** **DTFS IS ENTITLED TO THE RELIEF IT REQUESTS UNDER 11 U.S.C. §1522.**

97.     The Vehicles are not owned by the Debtors.  They are owned by non-Debtor, non-Applicant TPine.  Debtors' prospects for reorganizing have passed.  Debtor's Monitor and the Canadian Court have both recognized this reality and the Canadian Court has ordered the Debtor to propose a plan for liquidating Debtors' assets.  The Vehicles subject of this Motion are over-encumbered by at least $10 million and, even if Debtors' had the legal right to sell Vehicles they do not own, there is no possibility that a sale of the Vehicles could generate a surplus in excess of what DTFS is owed by TPine.

98.     The Vehicles are depreciating at a rate of between $1,175,350.00 and $1,410,240.00 per month.  DTFS is receiving nothing from TPine or the Debtors to offset that loss in value.  The lease proceeds collateral that was being paid to DTFS earlier in the case has now all been diverted to the Debtors' use as it has no DIP facility to fund week-to-week operations. DTFS has no means to recapture the depreciation caused by the injunction and stay protecting TPine or the value of its diverted lease proceeds collateral and it will continue to be harmed by ongoing deprecation of the Vehicles and diversion of its cash collateral going forward if the injunction and stay are not dissolved.

99.     DTFS has the expertise and experience to liquidate the Vehicles expeditiously for the maximum return and has every incentive to obtain the highest and best values for the Vehicles at the auctions it routinely conducts and has shown its capability to do so in connection with vehicles that have been surrendered to it.  TPine and Debtor do not have the expertise—or, apparently, the will—to maximize the value of their assets.  TPine has nearly $20 million in non-performing leases of DTFS's collateral Vehicles where its lessees are more than 90 days delinquent in making lease payments.  Yet TPine is not actively repossessing those Vehicles begging the question whether TPine

31

has the funds to engage repossession contractors for that purpose.  TPine's delinquency rate for its leases in the United States is a staggering 38.32%.

100.     The Debtors have begun the process of liquidating.  However, they are moving at a glacial pace.  The Canadian Court ordered Debtors to "immediately engage" with Debtors' major lenders to formulate a wind-down plan on August 9, 2024. Nearly a month later, there has been no engagement notwithstanding the Canadian Court's Order.  Debtors' Monitor has made it clear in writing that the Debtors and the Monitor will propose a wind-down to the Canadian Court without the input of the Debtors' equipment lenders. While the Debtors dither, DTFS is incurring massive losses occasioned by an injunction which protects a non-debtor third party and prevents it from asserting its rights against that non-debtor.

101.     DTFS has demonstrated its ability to liquidate its collateral when it has been provided access to it.  The injunction and stay were lifted as to 137 DTFS collateral trucks on July 2, 2024. Since that time DTFS has sold and been paid for 101 of those trucks.

102.     If the injunction and stay are not dissolved, DTFS will incur harm in the form of depreciation of the Vehicles and diversion of its cash collateral well in excess of one million dollars per month.  Nothing will bring that loss back. On the other hand, if the injunction and stay are not lifted, TPine and Debtors will be allowed to continue to divert DTFS's lease proceeds collateral to their use without compensation and will eventually be forced to concede that they cannot possibly liquidate the Vehicles at a price in excess of DTFS's secured debt.  The balance of harms weighs heavily in favor of DTFS, and DTFS will suffer extreme, immediate and irreparable harm should the Court not dissolve the injunction and stay.

**D.      DTFS IS ENTITLED TO THE RELIEF IT REQUESTS UNDER PRINCIPLES OF COMMON LAW INJUNCTION LAW.**

103.    The United States Supreme Court has held that a non-debtor third party may not be provided the protections of permanent injunctive relief under a plan of reorganization.  *Harrington v. Purdue Pharm L.P.*, 144 S. Ct. 2071, 219 L. Ed. 2d 721 (2024).

104.    Notwithstanding, it has been held that Bankruptcy Courts have the power to grant non-permanent preliminary injunctive relief in favor of non-debtor third parties. *In re American Film Techs*, 175 B.R. 847, 849 (Bankr. D. Del. 1994).  Before such relief can be granted, the party seeking injunctive relief must satisfy a four-factor test. Under that test, courts should consider: (1) the likelihood that plaintiff will prevail on the merits of the underlying matter; (2) the irreparable injury to be incurred by the plaintiff absent an injunction; (3) the harm that the defendant will suffer by the injunction; and (4) the public interest.  *Id.*

105.    In a recent decision of this Court, an examination was made as to the meaning of the phrase "likelihood of success on the merits" within the context of the four-factor test as applied to a non-debtor in a bankruptcy case.  *In re Parlement Techs., Inc.*, 2024 LEXIS 1627 (Bankr. D.Del. 2024)  The Court observed that injunctive relief is "an extraordinary remedy, which should be granted only in limited circumstances," *Id.,* *13, citing *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014).  Regarding the "success on the merits" prong of the four-factor test, the Court stated:

> "…'success on the merits' cannot be based on the likelihood that the non-debtor would be entitled to a non-consensual third-party release through the plan process. But a preliminary injunction may still be granted if the Court concludes that (a) providing the debtor's management a breathing spell from the distraction of other litigation is necessary to permit the debtor to focus on the reorganization of its business *or* (b) because it believes the parties

> may ultimately be able to negotiate a plan that includes a consensual
> resolution of the claims against the non-debtors. Both of those outcomes
> may be viewed as 'success on the merits' for this purpose."

*Id.,* * 2-3.

106.    he above-stated standard for grant of preliminary injunctive relief in favor of a non-debtor should, likewise, be the standard for determining whether the injunctive relief should be terminated under 11 U.S.C. 1522(a) for lack of sufficient protection.

107.    In this case, there is no remaining reason to maintain the injunction protecting TPine. TPine is not Debtor's management.  It is an affiliate entity with no management control over the Debtors.  Debtors and TPine have had a multi-month breathing spell to focus on Debtors' reorganization.  During that time Debtors were unable to formulate a reorganization plan and, at this point, a reorganization of the Debtors is no longer in prospect.  Since the Debtors are now in the process of formulating their liquidation and wind-down, there will be no plan involving a consensual resolution of DTFS's issues with TPine. By contrast, the injury that DTFS will suffer as the result of the continued maintenance of the injunction is extreme, immediate and irreparable.

108.    If TPine was to move the Court for injunctive relief today, it is very unlikely it would be able to satisfy the four-factor test for issuance of that injunction in light of *Parlement Techs., Inc*. and the facts of this case.  In light of that, there is no reason to maintain the injunction and stay any longer and the injunction and stay should be terminated immediately.

## E.    DTFS IS ENTITLED TO WAIVER OF BANKRUPTCY RULE 4001(a)(3).

109.    DTFS respectfully requests waiver of the 14-day stay of under Bankruptcy Rule 4001(a)(3). Given the enormous losses DTFS is suffering as the result of the injunction and stay, there is no reason to delay effectiveness of an order granting the relief requested in this Motion and no significant prejudice will flow from the granting of stay relief. In contrast, DTFS would be

prejudiced by a delay in the effectiveness of an order granting relief. Accordingly, DTFS respectfully requests that this Court grant relief from the injunction and stay effective immediately.

110.    DTFS further requests that the first hearing on this Motion be treated as a final hearing under 11 U.S.C. § 362(e)(1).

## VI.

## NOTICE

111.    Notice of this Motion will be provided to: (i) the Foreign Representative; (ii) counsel to the Debtors; (iii) the Office of the United States Trustee for the District of Delaware; and (iv) those parties entitled to receive notice pursuant to Bankruptcy Rule 2002. DTFS submits that no other or further notice is necessary or required.

## VII.

## RESERVATION OF RIGHTS

DTFS reserves all of its rights to amend, modify, or supplement this Motion in any manner, at any time, and for any purpose, and to assert and file any and all additional claims of whatever kind or nature that it has or may hereafter have against the Debtors, which may be based on the respective rights and obligations arising under the relationship and agreements discussed in this Motion or the same events and circumstances described in this Motion. DTFS further reserves the right to bring forth additional documentation supporting all of its claims including, but not limited to, any documents that may become available after further investigation and discovery.

## VIII.

## CONCLUSION

Based on the foregoing, cause exists to dissolve the court-ordered injunction and stay under the Provisional Order and the Recognition Order as to the Vehicles and grounds exist to terminate the automatic stay under Sections 362(d)(1) and (2) of the Bankruptcy Code, to the extent it applies

to TPine,  to allow DTFS to take possession of and liquidate the Vehicles and to pursue its rights and remedies under applicable non-bankruptcy law.

As such, DTFS respectfully requests entry of the Proposed Order, substantially in the form attached as **Exhibit 1**.

Dated: August 29, 2024

**GREENBERG TRAURIG, LLP**

By: */s/ Dennis A. Meloro*
Anthony W. Clark (DE Bar No. 2051)
Dennis A. Meloro (DE Bar No. 4435)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801
Telephone: (302) 661-7000
Email: Anthony. Clark@gtlaw.com
        Dennis.Meloro@gtlaw.com

-and-

Kim Gage
Cooksey, Toolen, Gage, Duffy & Woog
535 Anton Boulevard, 10th Floor
Costa Mesa, CA  92626
Telephone: (714) 431-1090
E-mail: kgage@cookseylaw.com

*Counsel to Daimler Truck Financial*
*Services USA LLC*