**<u>Exhibit B</u>**

Twelfth Report

Court File No. CV-24-00717340-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**TWELFTH REPORT OF THE MONITOR**

**DATED August 6, 2024**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

TERMS OF REFERENCE .................................................................................................. 6

PURPOSE............................................................................................................................. 6

PGL ....................................................................................................................................... 8

FACTORING TRANSACTION ........................................................................................ 23

CORNWALL PROPERTY TRANSACTION ................................................................. 24

ABBOTSFORD PROPERTY TRANSACTION .............................................................. 30

CONCLUSIONS AND RECOMMENDATIONS............................................................. 34

**Appendices**                                                               **Tab**

Summary of PGL Equipment Financier Lift-Stay Motions……………………….A

August 2, 2024 Email Chain with PGL Equipment Financiers...…………………B

July 15, 2024 Endorsement of Mr. Justice Osborne………………………………C

Cornwall Property Payout Statement…………………………….…………………D

Abbotsford Propety Payout Statement…………….………………………………E

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those Applicants listed on **Schedule "A"** hereto

**TWELFTH REPORT OF THE MONITOR**

**DATED August 6, 2024**

**INTRODUCTION**

1.      On March 27, 2024, Pride Group Holdings Inc. and those entities listed as "Applicants" in **Schedule "A"** hereto (each an "**Applicant**" and, collectively, the "**Applicants**") brought an application (the "**CCAA Application**") before the Ontario Superior Court of Justice (Commercial List) (the "**Court**") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") to, among other things, obtain a stay of proceedings to allow them an opportunity to restructure their business and affairs.

2.      On the same day, the Court granted an initial order in these CCAA proceedings (the "**CCAA Proceedings**") that, among other things, (i) appointed Ernst & Young Inc. as Monitor (in such capacity, the "**Monitor**"), and (ii) appointed RC Benson Consulting Inc. as Chief Restructuring Officer of the Pride Entities (in such capacity, the "**CRO**"). The Monitor filed a Pre-Filing Report dated March 27, 2024 in connection with the CCAA Application.

3.      In addition to the Applicants, the entities listed as "Limited Partnerships" and "Additional Stay Parties" in **Schedule "A"** hereto also obtained the benefit of the stay of proceedings until and including April 6, 2024, which stay expired the next business day, April 8, 2024 (the "**Stay Period**"). The Applicants together with the Limited Partnerships are referred to

herein as the "**Pride Entities**" (and together with the Additional Stay Parties, the "**Pride Group**").

4.    The comeback hearing was heard on Friday, April 5, 2024 (the "**Comeback Hearing**"), where the Pride Entities sought and obtained an amended and restated initial order (the "**ARIO**"). The Monitor filed its First Report to Court, dated April 4, 2024 (the "**First Report**") in connection with the Comeback Hearing. The ARIO, among other things, extended the Stay Period to June 30, 2024, approved the DIP Term Sheet and granted other relief as further described in the First Report.

5.    At the Comeback Hearing, the Court also granted an order approving certain protocols, including the Governance Protocol (as defined in the First Report). The Governance Protocol was approved subject to parties returning to Court on a without prejudice basis on April 19, 2024, for the approval of a revised Governance Protocol (the "**Revised Governance Protocol**"), which was subsequently adjourned to April 25, 2024, on consent. The Monitor filed its Second Report to Court, dated April 24, 2024 (the "**Second Report**") in connection with this April 19, 2024 return date, which was further adjourned to May 15, 2024, on consent, to give the Monitor, the Pride Entities, and the CRO additional time to negotiate the Revised Governance Protocol with affected stakeholders.

6.    The Monitor filed its Supplement to the Second Report to Court on May 6, 2024, to provide information to the Court in respect of ongoing negotiations and terms of the Revised Governance Protocol from the date of the Second Report.

7.    On May 6, 2024, the Pride Entities brought a motion for an approval and vesting order in respect of the sale of certain real property in Bolingbrook, Illinois (the "**Bolingbrook Property**") and to amend and restate the ARIO. The Monitor filed its Third Report to Court, dated May 2, 2024, in connection with such motion. The Court granted orders approving the sale of the Bolingbrook Property and amending and restating the ARIO (the "**Second ARIO**").

8.    On May 5, 2024, the Pride Entities brought a motion, seeking, among other things, (i) an order approving a sale and marketing process for the business, operations, and assets

("**PGL Sale Process**") of Pride Group Logistics Ltd. ("**PGL**"), Pride Group Logistics USA, Co., Pride Global Insurance Company Ltd.[1] (collectively, the "**PGL Entities**"), and (ii) an approval and vesting order in respect of the sale of certain property in Chehalis, Washington (the "**Chehalis Property**"). The Monitor filed its Fourth Report to Court, dated May 10, 2024, in connection with same.

9.      On May 13, 2024, the Monitor filed its Fifth Report to Court (the "**Fifth Report**"), which provided the Court and stakeholders with an update on the status and ongoing work with respect to: (i) secured facility reviews, (ii) securitization facility reviews, and (iii) the entitlement claims process. On May 15, 2024, the Court granted orders approving, among other things, the PGL Sale Process (the "**PGL Sale Process Order**"), the sale of the Chehalis Property, and the Amended and Restated Protocols Order, dated May 15, 2024 (the "**Amended and Restated Protocols Order**"), which included the Revised Governance Protocol.

10.     On June 14, 2024, the Pride Entities brought a motion seeking approval of the entitlement claims process (the "**Entitlement Claims Process**", with such Order being the "**Entitlement Claims Process Order**"). The Monitor filed its Sixth Report to Court, dated June 13, 2024 (the "**Sixth Report**"), in connection with same. On June 14, 2024, the Court granted the Entitlement Claims Process Order.

11.     On June 27, 2024, the Pride Entities brought motions seeking (i) the extension of the Stay Period (as defined in the Second ARIO) to and including September 30, 2024, (ii) the entry of a consent order authorizing Regions Equipment Finance Corporation ("**REFCO**") and Regions Commercial Equipment Finance, LLC ("**RCEF**", and together with REFCO, "**Regions Equipment Finance**") to sell certain vehicles surrendered to Regions Equipment Finance pre-filing, and (iii) the entry of a consent order authorizing Daimler Truck Financial Services Canada Corporation ("**DTF Canada**") and Daimler Truck Financial Services USA LLC ("**DTF US**", and together with DTF Canada, "**Daimler**") to sell certain vehicles surrendered to Daimler pre-filing. The Monitor filed its Seventh Report to Court,

---

[1] Pride Global Insurance Company Ltd. is not an Applicant in these proceedings and is an Additional Stay Party as listed in Schedule "A" to the Second ARIO.

dated June 26, 2024 in connection with these motions. On June 27, 2024, the Court granted the order extending the Stay Period as well as the consent orders referred to above.

12.     On July 3, 2024, the Pride Entities brought a motion seeking (i) an order approving the amendment and extension of the Fourth Amended and Restated Credit Agreement executed on May 10, 2024, and (ii) the entry of a consent order authorizing VFS Canada Inc. ("**VFS Canada**") and VFS U.S. LLC ("**VFS US**", and together with VFS Canada, "**VFS**") to sell certain vehicles surrendered to VFS pre-filing. The Monitor filed its Eighth Report to Court, dated July 2, 2024 (the "**Eighth Report**") in connection with this motion. On July 3, 2024, the Court granted the orders referred to above.

13.     On July 16, 2024, the Pride Entities brought a motion seeking, among other things, (i) entry of an order in respect of certain unreturned collateral financed by Regions Equipment Finance, (ii) an order approving the distribution of net proceeds of sale of the Chehalis Property to Roynat Inc. ("**Roynat**"), and (iii) an order approving a transaction contemplated by a factoring portfolio purchase agreement (the "**Factoring Transaction**") between TPine Financial Services Inc. ("**TPine Financial**"), as vendor, and J D Factors Corporation / Corporation D'affacturage J D (the "**Factoring Purchaser**"), as purchaser. The Monitor filed its Ninth Report to Court, dated July 13, 2024, in connection with same. Separately, the Monitor filed a Supplement to the Ninth Report of the Monitor on July 15, 2024 (the "**Supplement to the Ninth Report**"), which Supplement to the Ninth Report included an update on the Monitor's review of the securitization facilities. On July 16, 2024, the Court granted the orders referred to in points (i) and (ii) above. The motion seeking the approval of the Factoring Transaction was adjourned until August 7, 2024.

14.     On July 21, 2024, the Pride Entities brought a motion seeking, among other things, (i) an order respecting the transition and relinquishment of servicing and other duties under certain Securitization Programs where the outcome of the Monitor's proprietary interest assessment with respect to an applicable Securitization Party's ownership entitlement to such assets is favourable, and (ii) set out the terms and conditions upon which such turn-over may occur.  The Monitor filed its Tenth Report to Court, dated July 21, 2024 (the "**Tenth Report**"), in connection with same, which Tenth Report included the Monitor's view with respect to certain of the Securitization Programs.

15.     The Monitor filed its Supplement to Tenth Report on August 1, 2024 ("**Supplement to Tenth Report**"), which provided a proposed methodology for consideration by the stakeholders and the Court for the allocation of the direct legal fees and disbursements of the Securitization Program review undertaken by the Monitor's Canadian counsel, Blake, Cassels & Graydon LLP ("**Canadian Counsel**"), and U.S. counsel, McDermott, Will & Emery LLP ("**U.S. Counsel**") on a fair and equitable basis as a necessary cost of transitioning, as well as an Estimate to Turnover (as defined therein), among the Subject Assets subject to the Reviewed Programs (as such terms are defined in the Supplement to the Tenth Report).

16.     The Monitor filed its Eleventh Report to Court on August 2, 2024 ("**Eleventh Report**"), which provided the Court with information pertaining to the Monitor's security review of the security interests asserted by Secured Creditors (as defined therein), including, but not limited to, the Monitor's view as to whether each Secured Creditor has provided sufficient evidence of a perfected and priority interest in specific vehicles identified and tracked by vehicle identification numbers which are owned by the Pride Entities (with the exception of MCVs, which are subject to the Entitlement Claims Process).

17.     This report (the "**Twelfth Report**") should be read in conjunction with the affidavit of Randall Benson sworn July 9, 2024 (the "**Benson Factoring Affidavit**"), the Ninth Report, the affidavit of Randall Benson, dealing with the PGL Sale Process and Lift-Stay Motions (defined below), to be sworn (the "**Benson PGL Affidavit**"), and the affidavit of Randall Benson, dealing with the Abbotsford Property and the Cornwall Property (each as defined below), to be sworn (the "**Benson Real Estate Affidavit**") and for additional background and information with respect to the relief sought at the motions scheduled for August 7, 2024, discussed in further detail below.

18.     This Twelfth Report should also be read in conjunction with the Tenth Report, which speaks to the turn-over motions of the Securitization Parties (as defined in the ARIO), which are also scheduled to be heard on August 7, 2024.

**TERMS OF REFERENCE**

19.    In preparing this Twelfth Report and making the comments herein, the Monitor has been provided with, and has relied upon, unaudited financial information, books and records prepared by the Applicants, discussions with management of the Applicants ("**Management**"), and information from other third-party sources, including Financiers and personal property security registries (collectively, the "**Information**"). In its preparation of this Twelfth Report the Monitor has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Monitor has not audited or otherwise attempted to verify the accuracy or completeness of such Information in a manner that would wholly or partially comply with Canadian Auditing Standards ("**CAS**") pursuant to the Chartered Professional Accountants Canada Handbook and, accordingly, the Monitor expresses no opinion or other form of assurance contemplated under CAS in respect of the Information.

20.    Unless otherwise indicated, the Monitor's understanding of factual matters expressed in this Twelfth Report concerning the Pride Group and their business is based on the Information, and not independent factual determinations made by the Monitor.

**PURPOSE**

21.    The purpose of this Twelfth Report is to provide information to the Court with respect to:

(a)    an update on the PGL Sale Process, including the status of the developing going-concern purchase offer for the PGL Entities' business and a wind-down analysis of the business, and the Applicants' request for an adjournment of motions with respect to PGL for a period of time to pursue same;

(b)    an update on the proposed transaction between the Applicant, Tpine Financial and the Factoring Purchaser, as purchaser, pursuant to which the Factoring Purchaser has agreed to buy substantially all of the accounts receivable of Tpine Financial (defined above as the "Factoring Transaction"), and the Monitor's recommendations with respect to the Pride Entities motion for approval of the sale;

(c)     the Pride Entities' motion for the following relief (the "**Requested Relief**"):

      (i)     approving a transaction contemplated by an agreement of purchase and sale dated July 31, 2024 (the "**Abbotsford APS**") between the Applicant, 30530 Matsqui Abbotsford Holdings Inc., as vendor ("**Abbotsford Holdings**") and Fort Garry Industries Ltd., as purchaser (the "**Abbotsford Purchaser**"), and vesting in the Purchaser all of Abbotsford Holdings' right, title and interest in and to the real property municipally known as 30530 Matsqui Place, Abbotsford, British Columbia (the "**Abbotsford Property**") and the other assets described in the Abbotsford APS;

      (ii)     approving a distribution of the net proceeds of sale from the Abbotsford Property to Roynat as a permanent paydown of Roynat's direct indebtedness with respect to the Cornwall Property, with any surplus to be held by the Monitor in trust pending further Order of the Court;

      (iii)     approving a transaction contemplated by an agreement of purchase and sale dated July 7, 2024 (the "**Cornwall APS**") between the Applicant, 2863283 Ontario Inc., as vendor ("**286 Co.**") and Globocam (Montreal) Inc., as purchaser (the " **Cornwall Purchaser**"), and vesting in the Purchaser all of 286 Co's right, title and interest in and to the real property municipally known as 6251 and 6253 Boundary Rd., Cornwall, Ontario (the "**Cornwall Property**") and the other assets described in the Cornwall APS;

      (iv)     approving a distribution of the net proceeds of sale from the Cornwall Property to Roynat, as a permanent paydown of Roynat's direct indebtedness with respect to the Cornwall Property, with any surplus to be held by the Monitor in trust pending further Order of the Court; and

(d)     the Monitor's views on the Relief Requested.

**PGL**

*Overview of PGL's Business and Operations*

22.     As described in detail in the Fourth Report, one of the Pride Group's business lines provides logistic, brokerage and delivery services to customers including certain blue-chip customers through the PGL Entities.

23.     PGL's fleet consists of approximately 1,459 trucks and trailers (of which approximately 1,383 are owned directly by PGL). Approximately 50 trucks and 377 trailers are idle at a customer or Pride yard, with the remaining approximately 1,068 assets in active transit with loads at any given time. Approximately 85% of such loads include perishable products.

24.     PGL employs approximately 110 office staff (including subcontractors) to manage its logistics operations and approximately 95 drivers.  Further, PGL's operations also include approximately 120 driver subcontractors through agencies, approximately 140 owner operator drivers and approximately 75 drivers through four partner carriers.  Overall PGL's business operations include over 500 individuals as office staff or drivers.

*PGL Sale Process & Results[2]*

25.     As discussed in the Eighth Report and the Ninth Report, on May 15, 2024, the Court granted the PGL Sale Process Order approving the PGL Sale Process.  The Monitor, in consultation with the CRO, was authorized to conduct the PGL Sale Process. The Fourth Report described the PGL Sale Process in detail and the key dates related to the PGL Sale Process are summarized therein as follows:

| Milestone | Deadline |
|---|---|
| Deliver Teaser Letter and non-disclosure agreement ("**NDA**") to Known Potential Bidders, and set up electronic dataroom | Two calendar days from the issuance of the Sale Process Order |
| Site Visits and Management Presentation | Ongoing until five calendar days prior to bid deadline |

---

[2] Capitalized terms not otherwise defined in this section have the meanings given to them in the PGL Sale Process.

| Bid Deadline | June 19, 2024 |
|---|---|
| Select Qualified Bidders and, if applicable, provide Additional Confidential Information | Within two calendar days of the Bid Deadline |
| Qualified Bidders to confirm Bids | If applicable, Qualified Bidders must confirm Bid within five calendar days of receipt of Additional Confidential Information |
| Select Successful Bid and (if applicable) Back-up Bid | June 28, 2024 |
| Approval Motion | Week of July 22, 2024 (or as soon as the Court has availability) |
| Outside Closing Date | July 31, 2024 |

*Marketing Efforts*

26.     The marketing efforts were conducted by EY's Corporate Finance Group in consultation with the CRO.  Interested parties were categorized in three categories.  The first category was Tier 1 Canadian parties.  These were parties who were assessed as the most logical potential purchasers with the financial capacity for a transaction of this size. The second category, Tier 2 buyers, were comprised of potential Canadian buyers and US buyers who were assessed as having the potential to transact, but were determined to be less likely to proceed with a transaction than the Tier 1 parties, based on  a number of factors, including the relative size of the PGL business and assessed strategic priorities.

27.     Pursuant to the PGL Sale Process Order, the EY Corporate Finance Group conducted the PGL Sale Process as follows:

(a)     on May 14 and May 15, contacted 20 tier 1 Canadian parties to gauge market interest in the PGL opportunity. These parties were provided with information on the proposed PGL Sale Process milestones and a description of the PGL opportunity with a copy of the NDA;

(b)     on May 16, contacted and distributed the Teaser and NDA to the remaining parties and distributed the Teaser to the initial 20 parties.  In total 71 parties were contacted;

(c)     on May 17, opened the virtual dataroom and provided access to all counterparties who had signed an NDA. Parties who executed the NDA thereafter were subsequently added to the dataroom and the EY Corporate Finance Group followed up with all Tier 1 Canadian parties who had not executed the NDA;

(d)     on May 23, distributed a confidential information memorandum (the "**CIM**") to all parties who had executed the NDA. The CIM was distributed subsequently to parties who executed the NDAs thereafter;

(e)     on May 28 and June 5, followed up with all parties who had not signed the NDA at that time;

(f)     on June 3, June 10 and June 12, followed up with all parties who had executed the NDA and had access to the CIM / dataroom, to schedule a call with the EY Corporate Finance Group, to see if there were any questions from their review of the information provided and to notify such parties that the opportunity to meet Management was available;

(g)     held calls, discussions and email exchanges with various parties who expressed interest in holding discussions; and

(h)     hosted one management presentation and on site / asset visit.

28.     The following table summarizes the parties contacted and the outcome of the PGL Sale Process:

| Outreach Summary | Canada | | US | Total |
|---|---|---|---|---|
| | Tier 1 | Tier 2 | Tier 1 | |
| Parties Contacted | 21 | 25 | 25 | 71 |
| Declined Pre-NDA | 7 | 3 | 11 | 21 |
| No Response | 4 | 11 | 11 | 26 |
| NDA Signed & Info Received | 10 | 11 | 3 | 24 |
| Management Meeting / Site Visit | 1 | - | 1 | 2 |
| Declined Post-NDA | 8 | 4 | 2 | 14 |
| Offers Submitted | 1 | 2 | - | 3 |
| No Bid but No Formal Decline | 1 | 5 | 1 | 7 |

29.    The Monitor notes that at the commencement of the PGL Sale Process, the Johal family members expressed an interest in participating in the PGL Sale Process.  As a result, a wall was put up and the Applicants and Applicants' counsel had no visibility into the conduct of the PGL Sale Process. The PGL Sale Process was conducted independently by the Monitor and CRO with the assistance of certain operational management for factual information only.

*Offers Received*

30.    As a result of the marketing efforts, as set out in the table above, three offers were received for PGL's assets and business, including the going concern offer from 1000927605 Ontario Inc. (the "**Proposed Purchaser**"), the principals of which are Johal family members.

31.    The PGL Sale Process provides that the Monitor, in consultation with the CRO, may at any time and from time to time, modify, amend, vary, or supplement the PGL Sale Process, without the need for obtaining an order of the Court. The PGL Sale Process also specifically provides that the Monitor, in consultation with the CRO, may extend any milestone date.

32.    On June 20, 2024, the Monitor advised all parties who had submitted a Bid by the Bid Deadline that the Monitor was in receipt of such Bids and in the process of reviewing same to determine whether it may be designated a Qualified Bid.  In connection with that review, the Monitor, in consultation with the CRO, determined to extend the two (2) day deadline to select Qualified Bidders and asked Bidders to respond to certain clarifying questions in relation to their Bids.

33.    Of the three Bids received, one of the Bids was for the purchase of certain trailers and a pool of certain customers.  A second Bid was for PGL's business operations as a going concern, but significantly lower in value to the third Bid which is from the Proposed Purchaser.

34.    The Proposed Purchaser is a company owned and controlled by certain members of the Johal family, who are the direct and indirect owners of the Pride Entities generally, and the Proposed Purchaser's Bid is primarily financed by third parties. After several further

discussions and clarifications over several weeks, with respect to the Proposed Purchaser's Bid, such Bid was selected as the Successful Bid.

35.     Because the Proposed Purchaser is a related party of the Pride Entities, the negotiations and discussions with the Proposed Purchaser and its counsel have been conducted by the Monitor, the EY Corporate Finance Group, the CRO and the Monitor's counsel, without the involvement of the Pride Group's counsel. Similarly, pursuant to paragraph 4 of the PGL Sale Process, no direct or indirect shareholder, Johal family member or senior management of the Pride Group was given access to, or information about, any Sale Proposals or Bids submitted in the PGL Sale Process.

*The Proposed Purchaser's Bid*

36.     As described above, the going concern Bid of the Proposed Purchaser was selected as the Successful Bid.  For the past few weeks, the Monitor has been working extensively with the Proposed Purchaser and its counsel to negotiate a sale agreement (the "**PGL Sale Agreement**"). Due to the complications with respect to the nature of the logistics business and the transfer of licences to a potential purchaser, negotiating and finalizing the terms of the PGL Sale Agreement have been difficult and time consuming.

37.     As of the date of this Twelfth Report, the PGL Sale Agreement is in a significantly advanced state, however the parties will require additional time to (a) finalize the document into a form that is suitable to be executed and brought forward to the Court for approval, (b) confirm committed financing for the transaction, and (c) consult with the PGL Equipment Financiers regarding the terms of the PGL Sale Agreement, and the alternatives to proceeding with a going concern sale (discussed further below).

38.     Although the PGL Sale Agreement is not final, given the significant concerns of the PGL Equipment Financiers, the outstanding Lift-Stay Motions (defined and discussed below), and the timeline imposed by the Court for the resolution of PGL issues on August 7 (also discussed below), the Monitor believes that it is constructive at this point to report on the key transaction details, which are set out in this subsection of this Twelfth Report.

39.     The PGL Sale Agreement is expected to provide for the below allocation of the proposed purchase price (the "**Purchase Price Allocation**"), which remains under discussion and remains subject to further adjustment based upon the actual equipment and accounts receivable delivered to the Proposed Purchaser on closing. The PGL Entities have been selling trucks and trailers during the pendency of these CCAA Proceedings where the proceeds are being held in trust for the ultimate distribution to the entitled financier who holds first collateral security on each individual truck, including as recently as last week, and so the final determination of the Purchase Price Allocation has been a dynamic issue. The following is the Purchase Price Allocation at this point in time; however it is subject to an adjustment for trucks and trailers sold until the closing of the transaction, and accounts receivable at the closing of the transaction:

| Allocation of Purchase Price | Purchase Price |
| --- | --- |
| Trucks and Trailers (subject to final adjustment on closing) | 42,922,652.50 |
| Accounts Receivable (subject to change based on 70% of actual at close) | 9,000,000.00 |
| Letters of Credit | 4,000,000.00 |
| Other Equipment (Computers, office furniture, IT, etc..) | 160,000.00 |
| Assumed Contracts | 20,000.00 |
| Intangibles (IP, licenses, software, goodwill, etc.) | 50,000.00 |
| **TOTAL** | **56,152,652.50** |

40.     Based on the above, the allocation to trucks and trailers is approximately $42.9 million. Most of these assets are financed by the PGL Equipment Financiers, as discussed in further detail below. The allocation to the remainder of the assets is approximately $13.3 million (subject to a downward adjustment to reflect obligations under letters of credit, estimated to be $4.0 million).

41.     The additional details of the PGL Sale Agreement continue to be finalized, but at a high level, the PGL Sale Agreement is expected to provide for:

(a)     the purchase of substantially all of the PGL Entities' assets, including trucks, trailers, inventory, and accounts receivable (other than accounts receivable owing by non-acquired Pride Entities), on an as-is, where-is basis;

(b)      the assumption of substantially all employees, independent contractors and customer contracts (to be scheduled to the PGL Sale Agreement);

(c)      a closing by way of a reverse vesting order, or "RVO", to facilitate the expeditious, indirect assumption by the Proposed Purchaser of numerous critical permits and licences held by the PGL Entities;

(d)      a cash purchase price, payable to the Monitor in trust on closing, subject to limited post-closing adjustments regarding assumed liabilities; and

(e)      customary conditions to closing for a CCAA transaction pursuant to an RVO, with no financing or diligence conditions.

42.     The Monitor notes that, while the PGL Sale Agreement is not expected to include a financing condition, the Monitor has required that the Proposed Purchaser provide evidence of its ability to finance the purchase price, in accordance with paragraph 18(e) of the PGL Sale Process.  The Monitor understands that the Potential Purchaser has been working diligently to obtain an unconditional financing commitment and is close to doing so, and the Monitor has been provided with regular detailed updates on the process, but as of the date of this Twelfth Report, the Monitor has not yet been provided with confirmation sufficient to satisfy Paragraph 18(e) of the PGL Sale Process.

*Wind-up of PGL's Business Operations, if No Going Concern Sale*

43.     As described above, at any point of time, PGL has approximately 1,068 active trucks and trailers with loads of which approximately 80% include perishable products.  Further, most idle units are booked for ongoing loads on a regular basis. Therefore, in the event the going concern sale does not proceed, the Monitor and the CRO propose an orderly wind-up of PGL's business operations to be coordinated by the Monitor and CRO, with the assistance of a third party, in the best interests of the stakeholders, including employees and customers, and to avoid a chaotic situation where trucks and trailers are in transit and no funding or coordination is in place to ensure they are returned after completing customer deliveries in a safe and organized manner.

44.     On August 1, 2024, the Monitor provided notice (the "**DIP Maturity Notice**") to the Service List that the Applicants' DIP Facility (as defined in the First Report) of $36.3 million had matured on July 31, 2024, and that the maximum amount available under the DIP Facility was fully drawn prior to its maturity.  As a result, the Applicants, including PGL, will need financing to (i) complete deliveries of loads that are in progress, (ii) continue to pay certain operating costs; and (iii) locate, marshal and decommission trucks and trailers, all in an orderly and coordinated manner.  As further described in the DIP Maturity Notice, the Applicants and CRO are in advanced discussions with another potential DIP lender. The Monitor will file a report with further information of the potential new DIP financing.

45.     In the potential absence of a going concern solution, the CRO and the Monitor considered it prudent to assess the process to wind down PGL's operations, in an orderly manner. The CRO and Monitor are in discussions with Hilco Global (**Hilco**") who has significant experience in such wind-downs.  On or about July 31, 2024, Hilco presented a proposal to the PGL Entities to operate the wind-down of the PGL Entities and monetize its truck and trailer assets (the "**PGL Wind-Down Plan**") if a going concern sale does not proceed. The PGL Entities (and the Johal family) have not been provided with the PGL Wind-Down Plan, and were not involved with its solicitation or preparation other than to the limited extent they assisted with the data accumulation. A copy of the PGL Wind-Down Plan has been provided to the PGL Entities' counsel.

46.     Details of the PGL Wind-Down Plan are expected to be described in the Benson PGL Affidavit.

47.     The Monitor has reviewed the PGL Wind-Down Plan and is of the view that the PGL Wind-Down Plan provides for the wind-down of PGL's business operations in an orderly and efficient manner by an experienced operator. Given the complexities of an un-coordinated liquidation of the PGL business if the PGL Equipment Financiers take separate enforcement proceedings, in the Monitor's view, the only reasonable options for PGL are (a) a going concern sale, with the Proposed Purchaser, or (b) executing the PGL Wind-Down Plan. This view is discussed in further detail below, and the Monitor and CRO intend to engage with each PGL Equipment Financier to consider same.

*PGL Equipment Financiers & Lift Stay Motions*

48.     As discussed in the Third Report and the Fourth Report, certain of PGL's trucks and trailers are financed by various lenders including Bank of Montreal, BMO Bank N.A., FINLOC 2000 Inc., Bank of Nova Scotia ("**BNS**"), Royal Bank of Canada (in its capacity as bilateral lender and not Syndicate Agent) ("**RBC**"), TD Equipment Finance Canada ("**TDEF**"), and Daimler Truck Financial Services Canada Corporation (collectively, the "**PGL Equipment Financiers**").

49.     The Monitor's counsel has completed its review of the security of the PGL Equipment Financiers, and its conclusions are set out in the Eleventh Report beginning at Paragraph 42.  As discussed further below, while the issues identified by the Monitor's counsel with respect to the PGL Equipment Financiers' security interests in PGL vehicles are limited, the Monitor's counsel has identified issues with respect to a total of 64 VINs, and identified multiple collateral vehicles, or "**MCVs**", subject to the claims of the PGL Equipment Financiers.

50.     Each of the PGL Equipment Financiers have brought motions seeking a lifting of the stay of proceedings to enable the PGL Equipment Financiers to exercise remedies against PGL property to which their security attaches (collectively, the "**Lift-Stay Motions**"). While the relief requested in the Lift-Stay Motions varies by PGL Equipment Financier, generally it involves each lender being authorized to either take direct possession of its collateral, or the appointment of a receiver (in the case of RBC and BNS) to do so.  The Lift-Stay Motions also each provided for different treatment of Multiple Collateral Vehicles, or "**MCVs**", but generally defer to the Entitlement Claims Process Order for the determination of entitlement to MCVs. A chart summary of the Lift-Stay Motions is attached hereto as **Appendix "A"**. In each case, the Lift-Stay Motions seek time and considerable assistance from the PGL Entities and the Monitor to access the collateral claimed.

51.     The logistics, timing, and costs of the PGL Entities, the Monitor and their respective counsel that would be required to implement the relief requested in the Lift-Stay Motions

present a complicated problem that would need to be coordinated and for which there is currently no funding available.  For example:

(a)     PGL's trucks and trailers are spread across North America, many in the possession of employees and contract drivers, and PGL's participation would be required to locate, store and turn-over possession of these vehicles.

(b)     Many of the PGL trucks and trailers are actively engaged in transportation contracts with customers, including significant blue-chip retailers and other businesses, in respect of which the Monitor understands customer cargo is currently in the possession of PGL.  A hard shut-down of the PGL business would mean that these contracts could not be completed, and would create considerable issues with returning customer property.

(c)     The PGL Equipment Financiers are secured against the PGL trucks and trailers to which their security attaches, and the proceeds thereof, but not the accounts of PGL. A hard shut-down of the PGL business would have deleterious effects on receivables, to the prejudice of PGL and the Syndicate Lenders.

(d)     As a result of the maturity of the DIP Facility, PGL can only fund its expenses from its customer receivables in the absence of an alternative DIP being provided.

(e)     The relief requested in each Lift-Stay Motion is slightly different, and if the Lift-Stay Motions are to be granted, it would be prudent to harmonize the relief across all PGL Equipment Financiers to ensure efficient implementation.

(f)     While each of the Lift-Stay Motions generally propose to deal with MCVs in a manner that is consistent with the Entitlement Claims Process, the Monitor has identified issues with the security of a number of the PGL Equipment Financiers, as outlined in the Eleventh Report. Specifically, the Monitor has identified issues with 24 of BNS's non-MCV PGL VINs, 14 of RBC's non-MCV PGL VINs,[3] and 26 of TDEF's non-MCV PGL VINs, and concluded that to the extent that any of these VINs are not subject to

---

[3] RBC is referred to in the Eleventh Report as HSBC, as HSBC is the predecessor entity to RBC.

perfected and priority security interest of another lender, then the security of the "**DIP Agent**" (as defined in the First Report) and RBC in its capacity as administrative agent (the "**Syndicate Agent**") would have priority. The treatment of these 64 VINs will need to be coordinated with PGL, the Monitor and the affected PGL Equipment Financiers.

(g)     The PGL Equipment Financiers do not represent the totality of secured creditors of the PGL Entities. As set out in the Eleventh Report, Coast Capital Equipment Finance Ltd. (and Travellers Leasing Ltd.) (12 VINs), Concentra Bank (12 VINs), Canadian Western Bank (20 VINs), and De Lage Landen Financial Services Canada Inc. (23 VINs) have proven an interest in vehicles of the PGL Entities, and Meridian OneCap Credit Corp. also claims an interest in certain PGL assets (and has filed a lift-stay motion).  A hard shut-down of the PGL business would leave the assets financed by the non-PGL Equipment Financiers stranded.

(h)     The relief requested in the Lift-Stay Motions would directly or indirectly lead to the elimination of over 500 jobs.

52.    The significant complications and necessary advanced planning required to implement the relief requested in the Lift-Stay Motions appears to be understood by the PGL Equipment Financiers. On Friday, August 2, 2024, counsel for one of the PGL Equipment Financiers contacted the Monitor, its counsel and counsel to the PGL Entities, on behalf of a sub-set of the PGL Equipment Financiers, raising some of the above logistical concerns, and seeking the Monitor's views on how they ought to be addressed.

53.    The Monitor appreciates this outreach, and agrees that these issues need to be dealt with in a coordinated way if a going concern solution is not available, including available funding. However, due to the complexity of the PGL business and the significant urgent developments regarding the Pride Entities generally (discussed in this Twelfth Report and elsewhere), the Monitor has not had an opportunity to work with the PGL Equipment Financiers to develop it.

54.      A copy of the August 2, 2024 email referred to above, together with the Monitor's
counsel's response, is attached hereto as **Appendix "B"**. Subsequent emails were
exchanged in this email chain between counsel to the Applicants, Monitor and the PGL
Equipment Financiers, but are not attached.

*PGL Equipment Financier Consultation*

55.      The PGL Sale Process provides that the Monitor, in consultation with the CRO, shall
consult with secured creditors of PGL, to the extent that such creditors are directly affected,
throughout the PGL Sale Process upon such assurances as to confidentiality as the Monitor
may require.

56.      Virtual meetings were conducted by the Monitor and the CRO on July 3 separately with
each of the DIP Agent and the PGL Equipment Financiers, except for one equipment
financier who was not available (the Monitor subsequently had a meeting with this party
of July 8, 2024).   At the meetings, the Monitor and the CRO provided a status update of
the PGL Sale Process, and a summary of the Bids received on a confidential basis.   Since
July 3, the Monitor and CRO had individual meetings with the DIP Agent and most of the
PGL Equipment Financiers to receive feedback. The Monitor notes that during these July
consultations, some of the PGL Equipment Financiers were not supportive of the going
concern option, others indicated that they might support a sale transaction subject to
receiving further details, and others took no position.

57.      A case conference was held on July 15, 2024 at the request of the PGL Equipment Financier
TDEF (the "**July Case Conference**"), following an affidavit sworn on June 27, 2024 being
filed by TDEF (the "**TDEF Affidavit**") in connection with the Pride Entities stay extension
motion on June 27, 2024.   The TDEF Affidavit indicated that "without further information
that satisfies TDEF about the value associated with the Sale Process, TDEF intends to bring
a motion to have all of the [TDEF] Collateral returned to it for monetization subject to
allocation as agreed with the Applicants and the Monitor or as ordered by the Court."[4]

---

[4] TDEF's formal Lift-Stay Motion was subsequently served and filed on July 31, 2024.

58.     The purpose of the July Case Conference was to speak to scheduling a motion to be brought by TDEF to lift the stay of proceedings and enable TDEF to enforce security rights against certain PGL equipment. The July Case Conference was also attended by representatives of the PGL Entities, the Monitor, the Applicants' Directors and Officers, the Syndicate Agent, Mitsubishi, the Royal Bank of Canada (in its capacity as Financial Services Agent[5]), Paccar Financial Ltd., and each of the PGL Equipment Financiers other than RBC (in its capacity as PGL Equipment Financier).

59.     At the conclusion of the July Case Conference, Mr. Justice Osborne issued an endorsement (the "**July Endorsement**") that provided, among other things: "…the motion of TD Equipment Finance and the motions or potential motions of others similarly situated in respect of PGL vehicles, should be heard at the same time as a PGL sale approval motion, if indeed, that proceeds.  All of those motions will be heard on August 7, 2024, together with other matters already scheduled, for one full day in person at the Courthouse." A copy of the July Endorsement is attached hereto as **Appendix "C"**.

60.     The Monitor has worked diligently to advance the PGL Sale Agreement, noting the timetable set out in the July Endorsement, however for the reasons set out herein has not been able to progress the PGL Sale Agreement to a point that it is suitable to bring forward for approval.  Given that the PGL Sale Agreement is not final, that the purchase price allocation was only provisionally settled a few days ago, and that the PGL Wind-Down Plan was only finalized by Hilco last week, the PGL Equipment Financiers have not been consulted on the details of a going concern sale to the Proposed Purchaser or the alternative PGL Wind-Down Plan.

61.     The Monitor considers this consultation to be essential to the process and believes that it must happen expeditiously now that the financial terms are substantially confirmed. Counsel for the PGL Entities has contacted representatives of a number of the PGL Equipment Financers to schedule preliminary calls in advance of the August 7, 2024 hearing in these proceedings, and the Monitor understands that a call has been scheduled for 10:30am on August 6 (which the Monitor will attend).  However additional time after

---

[5] This RBC entity is a Securitization Party (as defined in the ARIO).

August 6, 2024 will be required for the PGL Equipment Financiers to meaningfully consider and respond to the options.

*Monitor's Analysis of Recoveries to Stakeholders*

62.  The Monitor has conducted an analysis of illustrative recoveries to stakeholders under the two scenarios described earlier herein: (i) the PGL Sale Agreement that described the going concern sale transaction; and (ii) if such going concern sale does not proceed, the wind-up of PGL's business operations as described in the PGL Wind-Down Plan.

63.  As described herein, there are two categories of stakeholders that would be expected to receive recoveries under the two above scenarios: (i) the PGL Equipment Financiers who receive recoveries from the sale of the trucks and trailers financed by the PGL Equipment Financiers; and (ii) the Syndicate Lenders, who receive any surplus and recoveries from the sale of the remaining assets of PGL.

64.  The Monitor is in the process of finalizing an illustrative recovery analysis, to be provided to individual PGL Equipment Financiers and the non-PGL Equipment Financiers with a security interest in the PGL Entities' assets (including the Syndicate Lenders) in the next day or two.

65.  Based on the illustrative analysis, it appears that on a combined basis, the PGL Equipment Financiers and non-PGL Equipment Financiers with a security interest in the PGL Entities' assets (including the Syndicate Lenders) would have a higher recovery under a going concern sale scenario as compared to a wind-down scenario.

*The Monitor's Conclusions Regarding PGL*

66.  The Monitor understands and appreciates the concerns of the PGL Equipment Financiers. The circumstances of the PGL Sale Process and the complexity of the PGL business have rendered it exceptionally difficult to progress the PGL Sale Agreement on a timeline expected by the PGL Equipment Financiers and as initially contemplated by the PGL Sale Process. Similarly, the Monitor has been unable to advance the details of a going concern sale, wind-down or coordinated liquidation by the PGL Equipment Financiers on a timeline

that would have permitted meaningful consultation with the PGL Equipment Financiers until now.  As discussed above, the Monitor considers this consultation to be critical, and is now in a position to do so, provided the Court authorizes some additional time.

67.    In the Monitor's view, the course of action that will be most beneficial to the PGL Entities' stakeholders, including especially the PGL Equipment Financiers, is for additional time to be granted to permit the Monitor to (a) finalize the PGL Sale Agreement (and corresponding Purchase Price Allocation), (b) meet with the PGL Equipment Financers and Syndicate Agent to explain the economics, timing, logistics, costs and risks of a going concern sale and, alternatively, the implementation of the PGL Wind-Down Plan (c) in the alternative to (a) and (b), develop a plan for, and consult with the PGL Equipment Financiers regarding the timing, logistics, costs and risks of, a coordinated liquidation by the PGL Equipment Financiers in accordance with the relief requested in the Lift-Stay Motions, and (d) following the completion (or advancement) of (a) – (c), return to Court to have a proposed treatment of the PGL business approved (collectively, the "**Monitor's PGL Recommendation**").

68.    The Monitor believes that an additional 10 business days would be sufficient to advance the Monitor's PGL Recommendation. Accordingly, the Monitor supports the Applicants' request that the Lift-Stay Motions be adjourned, without prejudice to any arguments or positions of any parties, to a return date that will enable the Monitor to advance the elements of the Monitor's PGL Recommendations.

69.    Accordingly, regardless of how the PGL Entities assets are ultimately dealt with, be that conveyed in a going concern sale, monetized as part of the PGL Wind-Down Plan, or liquidated by individual PGL Equipment Financiers in accordance with the Lift-Stay Motions, additional time is necessary to ensure that any of these the processes: (a) are orderly, with sufficient funding in place, (b) are fair to all stakeholders, (c) maximize recoveries and, to the extent possible, preserve enterprise value, customer contracts and in excess of 500 jobs, and (d) avoid the significant disorder, disruption and corresponding costs that would follow from a hard-shut-down of the PGL business.

**FACTORING TRANSACTION**

70.     As described in the Benson Factoring Affidavit and the Ninth Report, TPine Financial provides factoring and other financial services to the Pride Entities' customers. Since the Pride Entities commenced these CCAA Proceedings, the book value of TPine Financial's factoring portfolio has diminished as customers make routine payments and no new customers have been onboarded.  At the same time, TPine Financial's costs to administer the factoring portfolio remain static.   Accordingly, TPine Financial has agreed to consummate the Factoring Transaction, to monetize its factoring portfolio, and eliminate the costs incurred in connection with a business that is winding down.

71.     The Monitor has provided background on the Factoring Transaction in the Ninth Report, including a summary of the transaction, the Monitor's view that the transaction is beneficial to the Pride Entities and its stakeholders, and the Monitor's view that the transaction ought to be approved. Readers are encouraged to refer to the Ninth Report in this regard.

72.     TPine Financial brought forward a motion on July 16, 2024 (the "**July Factoring Approval Motion**"), seeking an order (a) approving the Factoring Transaction, and (b) directing the proceeds of the Factoring Transaction to be held by the Monitor subject to a further order of the Court regarding distribution thereof and entitlement thereto.

73.     The July Factoring Approval Motion was opposed by Mitsubishi HC Capital Canada, Inc. ("**Mitsubishi**"), and adjourned to August 7, 2024, in order to give Mitsubishi additional time to prepare and file materials.

74.     The Monitor was advised on August 1, 2024 by Mitsubishi's counsel that Mitsubishi will not oppose TPine Financial's motion for an approval and vesting order in connection with the Factoring Transaction, provided that paragraph 6 of the proposed order provides for the "Blocked Account Amounts" (as defined in the draft order) to be paid to the Monitor in trust, rather than "in such manner and at such time(s) as the Monitor determines appropriate" (as provided for in the version of the order served by TPine Financial). The Monitor understands that Mitsubishi intends to file materials and take a position on the

subsequent distribution/entitlement motion with respect to the proceeds of the Factoring Transaction and the "Blocked Account Amounts".

75.     The Monitor has consulted with TPine Financial personnel, and understands that the revision to the approval and vesting order requested by Mitsubishi can be accommodated. TPine Financial will require a small amount of cash to manage the notices to customers and other transitional issues following the approval and closing of the Factoring Transaction, but the Monitor understands that it has sufficient cash for these expenses and will not need to access the Blocked Account Amounts.

76.     Accordingly, for the reasons set out in the Ninth Report, the Monitor supports the Pride Entities' request for an order approving the Factoring Transaction, on the terms sought by the Pride Entities (subject only to the amendment to the approval order requested by Mitsubishi).

77.     At this time, the Monitor is not taking any position, giving any view or making any recommendation with respect to issues of distribution of, or entitlement to, the proceeds of the Factoring Transaction. The Monitor will provide the Court with its views on proceeds in a subsequent report, at the appropriate time.

**CORNWALL PROPERTY TRANSACTION**

78.     The Monitor understands that the Cornwall Property was acquired by 286 Co. in 2021 for $5,500,000, primarily for the use of PGL, as PGL was already a tenant on the property and had existing operations. A significant portion of the Cornwall Property was also leased to the Cornwall Purchaser, pursuant to a commercial lease agreement dated February 23, 2024, and smaller portions of the property were leased to other arm's length tenants, for truck and vehicle storage.

79.     The Cornwall Property was not considered core to the Pride Group's business and is being sold to monetize its value, subject to the short-term Lease-Back Provision, discussed below. The Cornwall Property is not included as a purchased asset in the PGL Sale Agreement, discussed above.

80.    The Monitor understands that the Pride Entities were introduced in January 2024 to the Cornwall Purchaser, who the Monitor understands to be a Freightliner truck dealer based out of Quebec, and who expressed interest in leasing or purchasing the Cornwall Property. The Monitor understands that the Pride Group entered into a lease of the Cornwall Property with the Cornwall Purchaser in February 2024, which included a purchase option for $7,500,000 (the "**Cornwall Purchase Option**").

81.    The Cornwall Purchase Option was exercised by the Cornwall Purchaser on or about April 8, 2024.

82.    The Monitor has been overseeing the process undertaken by the Pride Group for the Cornwall Property since its appointment. The property was not listed,[6] due to the Cornwall Purchase Option, however the Monitor has scrutinized the $7,500,000 purchase option price, and considers it to be reasonable because:

(a)    The option price is materially greater than the price the Pride Entities paid for the Cornwall Property in 2021;

(b)    The Monitor understands that the Pride Entities consulted with independent real estate agents and appraisers in February 2024 when agreeing to the Cornwall Purchase Option, and the feedback they received indicated that $7,500,000 was above market for that time period;

(c)    The Monitor reviewed the Cornwall Purchaser's offer with a third party CBRE consultant who indicated that the transaction is favourable to stakeholders, given the real estate market is relatively slow and a purchaser can still gain access to vacant land in close proximity to the subject property directly from the City of Cornwall; and

(d)    The Monitor understands that the Cornwall Purchaser is not a related party of the Pride Group.

---

[6] Roynat and DIP Agent consent was obtained to not list the Cornwall Property, in accordance with the Real Estate Monetization Plan (as approved by, and attached to, the Amended and Restated Protocols Order).

83.    The Monitor is of the view that the option price on the Cornwall Purchase Option represents a fair and reasonable price, which may be slightly above market. The Monitor is of the view that any sale or marketing efforts would not be cost beneficial and would be unlikely to result in a materially better offer than the Cornwall Purchaser's offer in the circumstances, particularly considering that the Cornwall Purchaser would be expected to object to any alternative transaction, and seek to enforce the Cornwall Purchase Option.

84.    A copy of the Cornwall APS is expected to be attached to the Benson Real Estate Affidavit as Exhibit "C". The relevant terms are as follows:[7]

| Item | Term |
| --- | --- |
| Purchaser | Globocam (Montreal) Inc. |
| Purchase Price | $7,500,000 |
| Satisfaction of Purchase Price | 1.        assumption by the Cornwall Purchaser of the Assumed Obligations; and<br><br>2.        payment to the Monitor by wire transfer of the Cash Purchase Price (subject to the Adjustments), to an account specified in writing by the Monitor. The Adjustments include:<br><br>(a) 35% of realty taxes;<br><br>(b) Net Rent;<br><br>(c) Security Deposit;<br><br>(d) $2,951.55 and $31,925.98, which constituted expenses incurred by Purchaser on behalf of the Vendor, shall be applied as a credit towards the Cash Purchase Price |
| Purchased Assets | All of 268 Co's right, title and interest in the Real Property and the Leases |
| Lease-Back Provision | The Cornwall Purchaser grants to Pride Group Logistics Ltd. (or an assignee thereof) a right to continue storing commercial vehicles on the Real Property, on the terms set out in Section 3.01 of the Cornwall APS. |

---

[7] The following table summarizing the terms of the Cornwall APS is being provided for illustrative purposes only. Readers should consult the Cornwall APS itself for a definitive statement of its terms. Capitalized terms used in the following chart but not otherwise defined shall have the meanings given to them in the Cornwall APS.

| Other Leases | The Cornwall Purchaser will assume the leases of other arm's length tenants. |
|---|---|
| Material Conditions | - Consent of Roynat and Royal Bank of Canada (in its capacity as administrative agent and collateral agent)<br><br>- Issuance of the Approval and Vesting Order |
| Closing Date | The later of (i) August 6, 2024 (being 120 days following the date the Purchase Notice was provided by the Purchaser to the Landlord) or (ii) the first Business Day that is twenty-two (22) days after the date on which the Approval and Vesting Order is granted by the Court, or such other date as the Parties may agree to writing |

85.    Section 3.01 of the Cornwall APS includes provisions for the post-closing lease of the Cornwall Property to Pride Group Logistics Ltd. ("**PGL**") (or an assignee thereof) until September 30, 2024 for the purposes of PGL storing commercial trucks and trailers on the property (the "**Lease-Back Provision**"). PGL will pay the Cornwall Purchaser $7,500/month (plus GST/HST) as rent for the use of the Cornwall Property. This provision is necessary, as the Pride Group (and PGL in particular) are currently storing approximately 15 trucks and 85 trailers on the Cornwall Property in the ordinary course of their business and does not anticipate being able to remove all of the vehicles prior to September 30, 2024.

86.    The Monitor recommends that the Court approve the Cornwall APS for the following reasons:

(a)    while the Cornwall Property was not marketed through a listing, the Cornwall Purchase Option price appears to be fair and reasonable;

(b)    the Lease-Back Provision will permit the Pride Group with sufficient time to move the trucks and trailers that are currently on the Cornwall Property to other locations, without delaying closing;

(c)    the Cornwall APS represents the highest realization available for the Cornwall Property in the circumstances;

(d)      the first secured mortgagee and the DIP Agent supports the transaction; and

(e)      the terms of the Cornwall APS are commercially reasonable, and the proposed closing date in August 2024 is expected to provide adequate time to close the transaction.

*Roynat Indebtedness and Distribution of Proceeds*

87.      As discussed above, the gross purchase price under the Cornwall APS is $7,500,000 (the "**Cornwall Gross Proceeds**"), which are subject to Adjustments (as defined in the Cornwall APS) and closing costs. The Monitor intends to work closely with the Pride Entities in connection with closing, including to supervise the closing costs, which are anticipated to include real estate fees and commissions, pre-closing municipal taxes (limited to 35%), pre-closing accrued utilities, professional costs and costs required to deliver vacant possession on closing (primarily costs of moving vehicles off the property).

88.      The Cornwall Gross Proceeds, less the Adjustments and closing costs, are referred to herein as the "**Cornwall Net Proceeds**".

89.      The Cornwall Property is subject to a mortgage in favour of Roynat, the Monitor's counsel has reviewed the security granted by 286 Co. to Roynat in respect of the Cornwall Property and issued a security opinion which is summarized below (the "**Cornwall Opinion**"). A copy of the Cornwall Opinion will be made available to the Court and any party with a demonstrated interest in the Cornwall Property (or its proceeds), upon request, subject to the delivery by the requesting party of a non-reliance undertaking in form and substance acceptable to the Monitor.

90.      A copy of the Cornwall Property parcel register (the "**Cornwall Parcel Register**") is expected to be attached to the Benson Real Estate Affidavit as Exhibit "A".

91.      The Cornwall Opinion concludes that, subject to customary assumptions and qualifications, (a) Roynat's mortgage (defined in the Cornwall Opinion as the "Charge") and general assignment of rents (defined in the Cornwall Opinion as the "GAR") constitute legal, valid and binding obligations of 286 Co., enforceable against 286 Co. by Roynat in accordance with their terms, (b) subject to the prior registrations set out in the Cornwall

Parcel Register (which do not include any financial encumbrances), Roynat's mortgage and general assignment of rents (i) are registered as first ranking charges against the Cornwall Property, and (ii) constitute valid legal charges on the Cornwall Property.

92.  Accordingly, based on the Cornwall Opinion and subject to the assumptions and qualifications set out therein, the Monitor understands that Roynat has a first priority interest in the Cornwall Property.

93.  Roynat has provided the Pride Entities and the Monitor with a payout statement, indicating that the total outstanding indebtedness secured against the Cornwall Property as of August 7, 2024 is $4,142,650.94 (plus applicable per diem through the date of closing, the "**Cornwall Secured Indebtedness**"). A copy of the payout statement evidencing the Cornwall Secured Indebtedness is attached hereto as **Appendix "D"**.

94.  The Monitor has consulted with the Pride Entities, and has confirmed that the Cornwall Secured Indebtedness is consistent with the Pride Entities books and records. On that basis, the Monitor supports the Pride Entities' request for an order directing that an amount equal to the Cornwall Secured Indebtedness be distributed to Roynat, in full satisfaction of the amounts secured by Roynat's mortgage against the Cornwall Property.

95.  Should the distribution order in respect of the Cornwall Secured Indebtedness be granted, it will leave material surplus proceeds (the "**Cornwall Surplus Proceeds**").

96.  The treatment of the Cornwall Surplus Proceeds is governed by the Protocols Order, and specifically the Intercompany and Unsecured Claims Preservation Protocol (the "**Preservation Protocol**"), which provides that for any real property subject to a valid mortgage in favour of Roynat, Roynat is entitled to a distribution of the amount secured by the mortgage on the sold property, as well as any surplus amounts to the extent that Roynat's mortgages on all Pride Entity properties are cross-collateralized, net of costs.

97.  Accordingly, the Cornwall Surplus Proceeds ought to be distributed pursuant to the terms of the Preservation Protocol.

98.     The Monitor is currently finalizing the quantum of closing costs and working with Roynat to determine how the Cornwall Surplus Proceeds should be applied once distributed to Roynat, and expects that an order authorizing the distribution of the net Cornwall Surplus Proceeds will be sought in the near future.

## ABBOTSFORD PROPERTY TRANSACTION

99.     The Monitor understands that the Abbotsford Property was acquired by Abbotsford Holdings in 2022 with the plan to expand the dealership network of Pride Truck Sales into the BC market. Pride Truck Sales has operated its dealership business from this location since it was purchased. The Abbotsford Property is not considered core to the Pride Group's business and is being sold to monetize its value. The Abbotsford Property was already listed for sale when the Pride Entities commenced these CCAA Proceedings.

100.    The Monitor has been following the marketing and sale process undertaken by the Pride Group for the Abbotsford Property since its appointment. The property was listed for sale by CBRE on or about January 30, 2024, which listing generated reasonable interest from the market and resulted in three offers, one of which (being the Abbotsford Purchaser's offer) was accepted by Abbotsford Holdings after several rounds of negotiations.

101.    The Monitor understands that the Abbotsford Purchaser is not a related party of the Pride Group.

102.    The Abbotsford Property was listed in accordance with the Real Estate Monetization Plan (as approved by, and attached to, the Amended and Restated Protocols Order), and the Monitor is of the view that listing the Abbotsford Property sufficiently marketed it to the public, under the circumstances. This view is supported by the multiple offers that were received.   Moreover, the Monitor has been advised by CBRE that the price per acre represented by the Abbotsford Purchaser's offer is a record high for comparable properties (notwithstanding a softened market), and CBRE has told the Monitor that it "highly recommends" that the deal proceed.

103.    The Monitor is of the view that any additional sale or marketing efforts would not be cost beneficial and would be unlikely to result in a materially better offer than the Abbotsford Purchaser's offer in the circumstances.

104.    A copy of the Abbotsford APS is expected to be attached to the Benson Real Estate Affidavit as Exhibit "F". The relevant terms are as follows:[8]

| Item | Term |
| --- | --- |
| Purchaser | Fort Garry Industries Ltd. |
| Purchase Price | $15,500,000, including a deposit of $750,000 |
| Satisfaction of Purchase Price | 1.    assumption by the Cornwall Purchaser of the Assumed Obligations; and<br><br>2.    payment to the Monitor by wire transfer of the Cash Purchase Price (subject to customary Adjustments), to an account specified in writing by the Monitor. |
| Purchased Assets | All of Abbotsford Holdings' right, title and interest in the Real Property |
| Material Conditions | -    Consent of Roynat and Royal Bank of Canada (in its capacity as administrative agent and collateral agent)<br><br>-    Issuance of the Approval and Vesting Order |
| Closing Date | Forty-five (45) days after the date on which the Approval and Vesting Order is granted by the Court, or such other date as the Parties may agree to in writing |

105.    The Monitor recommends that the Court approve the Abbotsford APS for the following reasons:

(a)    the Abbotsford Property was sufficiently marketed through its listing;

---

[8] The following table summarizing the terms of the Abbotsford APS is being provided for illustrative purposes only. Readers should consult the Abbotsford APS itself for a definitive statement of its terms. Capitalized terms used in the following chart but not otherwise defined shall have the meanings given to them in the Abbotsford APS.

(b)     the Abbotsford APS is the result of multiple offers and negotiations with potential purchasers, and represents the highest realization available for the Abbotsford Property in the circumstances; and

(c)     the terms of the Abbotsford APS are commercially reasonable, and the proposed closing date in September 2024 is expected to provide adequate time to close the transaction.

*Roynat Indebtedness and Distribution of Proceeds*

106.    As discussed above, the gross purchase price under the Abbotsford APS is $15,500,000, (the "**Abbotsford Gross Proceeds**"), which are subject to Adjustments (as defined in the Abbotsford APS) and closing costs. The Monitor intends to work closely with the Pride Entities in connection with closing, including to supervise the closing costs, which are anticipated to include real estate fees and commissions, pre-closing municipal taxes, pre-closing accrued utilities, professional costs and costs required to deliver vacant possession on closing (primarily costs of moving vehicles off the property).

107.    The Abbotsford Gross Proceeds, less the Adjustments and closing costs, are referred to herein as the "**Abbotsford Net Proceeds**".

108.    The Abbotsford Property is subject to a mortgage in favour of Roynat, Blakes has reviewed the security granted by Abbotsford Holdings to Roynat in respect of the Abbotsford Property and issued a security opinion which is summarized below (the "**Abbotsford Opinion**"). A copy of the Abbotsford Opinion will be made available to the Court and any party with a demonstrated interest in the Abbotsford Property, upon request, subject to the delivery by the requesting party of a non-reliance undertaking in form and substance acceptable to the Monitor.

109.    A copy of the Abbotsford Property title search (the "**Abbotsford Title**") is expected to be attached to the Benson Real Estate Affidavit as Exhibit "D".

110.    The Abbotsford Opinion concludes that, subject to customary assumptions and qualifications, (a) Roynat's mortgage (defined in the Abbotsford Opinion as the "Mortgage") and general assignment of rents (defined in the Abbotsford Opinion as the

"Assignment of Rents") constitute legal, valid and binding obligations of Abbotsford Holdings, enforceable against Abbotsford Holdings by Roynat in accordance with their terms, (b) subject to the prior registrations set out in the Abbotsford Title (which do not include any financial encumbrances), Roynat's mortgage and general assignment of rents (i) are registered as first ranking charges against the Abbotsford Property, and (ii) constitute valid legal charges on the Abbotsford Property.

111.    Accordingly, based on the Abbotsford Opinion and subject to the assumptions and qualifications set out therein, the Monitor understands that Roynat has a first priority interest in the Abbotsford Property.

112.    Roynat has provided the Pride Entities and the Monitor with a payout statement, indicating that the total outstanding indebtedness secured against the Abbotsford Property as of July 9, 2024 is $13,350,325.98 (plus applicable per diem through the date of closing, the "**Abbotsford Secured Indebtedness**"). A copy of the payout statement evidencing the Abbotsford Secured Indebtedness is attached hereto as **Appendix "E"**.

113.    The Monitor has consulted with the Pride Entities, and has confirmed that the Abbotsford Secured Indebtedness is consistent with the Pride Entities books and records. On that basis, the Monitor supports the Pride Entities' request for an order directing that an amount equal to the Abbotsford Secured Indebtedness be distributed to Roynat, in full satisfaction of the amounts secured by Roynat's mortgage against the Abbotsford Property.

114.    Should the distribution order in respect of the Abbotsford Secured Indebtedness be granted, it will leave material surplus proceeds (the "**Abbotsford Surplus Proceeds**"). The treatment of the Abbotsford Surplus Proceeds is governed by the Protocols Order, and specifically the Preservation Protocol, discussed above.

115.    Accordingly, the Abbotsford Surplus Proceeds should be be distributed pursuant to the terms of the Preservation Protocol.

116.    The Monitor is currently finalizing the quantum of closing costs and working with Roynat to determine how the Abbotsford Surplus Proceeds should be applied once distributed to

Roynat, and expects that an order authorizing the distribution of the net Abbotsford Surplus Proceeds will be sought in the near future.

## CONCLUSIONS AND RECOMMENDATIONS

117.     For the reasons set out in this Twelfth Report, the Monitor recommends this Court grant the Requested Relief, and in respect of the PGL Lift-Stay Motions, grant an adjournment for the reasons described herein.

All of which is respectfully submitted this 6th day of August 2024.

**ERNST & YOUNG INC.**,
solely in its role as Court-appointed Monitor of Pride Group Holdings Inc. and certain affiliates and not in its personal or corporate capacity

**per:**

**Alex Morrison, CPA, CA, LIT, CIRP
Senior Vice President**

**SCHEDULE "A"**

**A. APPLICANTS**

**Operating Entities**

*Canadian Operating Entities*

- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*

- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**

*Canadian Real Estate Holding Companies*

- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

## Other Holding Companies

*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.

Court File No.:  CV-24-00717340-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC., et al.**

|  |
|---|
| ***ONTARIO*** <br> **SUPERIOR COURT OF JUSTICE** <br> **(COMMERCIAL LIST)** <br><br> Proceeding Commenced at Toronto |
| **TWELFTH REPORT OF THE MONITOR** <br> **dated August 6, 2024** |
| **BLAKE, CASSELS & GRAYDON LLP** <br> Barristers and Solicitors <br> 199 Bay Street <br> Suite 4000, Commerce Court West <br> Toronto, Ontario  M5L 1A9 <br><br> **Pamela Huff**, LSO #27344V <br> Tel:        416-863-2958 <br> Email:     pamela.huff@blakes.com <br><br> **Chris Burr**, LSO #55172H <br> Tel:        416-863-3261 <br> Email:     chris.burr@blakes.com <br><br> **Kelly Bourassa**, LSO #43062R <br> Tel:        416-863-2421 <br> Email:     kelly.bourassa@blakes.com <br><br> **Daniel Loberto**, LSO #79632Q <br> Tel:        416-863-2937 <br> Email:     daniel.loberto@blakes.com <br><br> Lawyers for the Monitor |

**Appendix "A"**

**Summary of Lift-Stay Motions**

**Summary of Motions filed by PGL Lenders**

| Party | Relief being Sought[1] |
|---|---|
| Bank of Montreal and BMO Bank N.A. (together, "**BMO Canada**") | Pursuant to the BMO Canada motion record, dated July 29, 2024, BMO Canada is bringing a motion before the Court to request, among other things, the following relief:<br><br>(a) lifting the stay of proceedings in these CCAA proceedings (the "**Stay**") to provide, among other things, that:<br><br>    i.  BMO Canada be permitted to collect and repossess for sale outside of these CCAA proceedings the BMO PGL Collateral that is not identified as a MCV in the Monitor's Database;<br><br>    ii.  for the BMO PGL Collateral identified as a MCV in the Monitor's Database, that BMO Canada be permitted to enter into a collateral release and reimbursement agreement with the Monitor and the CRO upon which BMO Canada shall be entitled to, prior to the Entitlement Finding, immediately repossess and monetize the BMO PGL Collateral through its own processes. BMO Canada acknowledges that it will reimburse and pay to the Monitor the value of the BMO PGL Collateral in the event it is determined that another entity has a prior ranking claim to that of BMO Canada;<br><br>    iii.  in the alternative, for the BMO PGL Collateral identified as a MCV in the Monitor's Database, that BMO Canada be permitted to collect and repossess such BMO PGL Collateral for sale outside of these proceedings immediately after it is determined, pursuant to the Entitlement Claims Process, that BMO Canada has a priority claim in such vehicle;<br><br>(b) directing the Applicants and the Monitor to cooperate with BMO Canada in its efforts to recover possession of the BMO PGL Collateral, including providing the municipal address(es) of the location of the BMO PGL Collateral, together with the contact information of the individual(s) who will facilitate compliance with the order to recover possession of the BMO PGL Collateral;<br><br>(c) if required, granting BMO Canada and/or their duly authorized bailiff(s) and agents the right to enter on any premises of the Applicants or any other person for purposes of taking possession of the BMO PGL Collateral, whether unlocked or locked, for the purposes of recovering possession of the BMO PGL Collateral; and<br><br>(d) permitting BMO Canada to sell or otherwise dispose of the BMO PGL Collateral and waiving any applicable notice requirements, including any |

---

[1] Capitalized terms used in this summary chart and not otherwise defined herein have the meanings ascribed to them in the corresponding Court materials.

| | |
|---|---|
| | requirements for Notice of Disposition of Collateral pursuant to any applicable provincial equivalent of Section 63 of the *Personal Property Security Act*, R.S.O. 1990, c. P.10 (the "**PPSA**"). |
| The Bank of Nova Scotia ("**BNS**") | Pursuant to the BNS motion record, dated July 31, 2024, BNS is bringing a motion before the Court to request, among other things, lifting the Stay for the purpose of seeking and providing for the appointment of the Receiver, without security, over the Collateral pursuant to Section 101 of the *Courts of Justice Act* (Ontario) and section 243 of the BIA (the "**Receivership Application**").<br><br>The Receivership Application was supported by Royal Bank of Canada pursuant to the Affidavit of Brian Pettit, affirmed July 31, 2024. |
| Daimler Truck Financial Services Canada Corporation ("**DTF Canada**") | Pursuant to the DTF Canada motion record, dated July 30, 2024, DTF Canada is bringing a motion before the Court to request, among other things, the following relief:<br><br>(a) lifting the Stay to permit DTF Canada to collect and repossess for sale outside of these CCAA proceedings all DTF PGL Collateral that is not identified as a MCV in the Monitor's Database;<br><br>(b) for the DTF PGL Collateral identified as a MCV in the Monitor's Database, if any, that DTF Canada be permitted to collect and repossess such DTF PGL Collateral for sale outside of these proceedings immediately after it is determined, pursuant to the Entitlement Claims Process Order, that DTF Canada has a priority claim in such vehicle;<br><br>(c) if required, granting DTF Canada and/or its duly authorized bailiff(s) access to each unit of DTF PGL Collateral, whether locked or unlocked, for the purposes of recovering possession of such units; and<br><br>(d) ordering that DTF Canada shall be at liberty to dispose of the DTF PGL Collateral and waiving any applicable notice requirements, including any requirements for Notice of Disposition of Collateral pursuant to any applicable provincial equivalent of Section 63 of the PPSA. |
| TD Equipment Finance Canada ("**TDEF**") | Pursuant to the TDEF motion record dated July 31, 2024, TDEF is bringing a motion before the Court to request, among other things, the following relief:<br><br>(a) lifting the Stay so that, among other things:<br><br>   i. for each piece of Collateral that TDEF has a security interest in, that is not identified as a MCV in the Monitor's Database following the Monitor's Database Closing Date, that TDEF be permitted forty-five days to retrieve same commencing from the date the Collateral's location is identified and available for retrieval; and<br><br>   ii. for each piece of Collateral that TDEF has a security interest in, that is identified as a MCV in the Monitor's Database following the Monitor's Database Closing Date, that TDEF be permitted forty-five days to retrieve same commencing from the date the Collateral's location is |

| | |
|---|---|
| | identified and available for retrieval, pursuant to the Entitlement Claims Process, that that TDEF has a priority claim in such MCV; |
| | (b) providing that TDEF shall be at liberty to dispose of the Collateral and waiving any applicable notice requirements, including any notice requirements to dispose of the Collateral pursuant to any applicable provincial equivalent of section 63 of the PPSA; and |
| | (c) that the Monitor and PGL shall cooperate in good faith with TDEF regarding the retrieval of the Collateral, including by providing possession of any ownership documents relating to the Collateral to TDEF. |
| FINLOC 2000 Inc. ("**Finloc**") | Pursuant to the Finloc motion record dated July 29, 2024, Finloc is bringing a motion before the Court to request, among other things, the following relief: |
| | (a) lifting the Stay in respect of PGL and all of the Applicants (as necessary) for the purpose of enabling and authorizing Finloc to take any and all necessary steps to repossess the Finloc Trailers; |
| | (b) authorizing and directing PGL and the Applicants to: |
| | i. provide to Finloc the known locations of all of the Finloc Trailers and access to the 'GPS' tracking systems in respect of the same, as well as the details of their Current Route; |
| | ii. recall all the Finloc Trailers from active service, immediately following completion of each Vehicle's Current Route, to PGL's Yard and to advise Finloc (via email to its counsel) as to the arrival of each Vehicle at the Yard; |
| | iii. hold each such recalled Finloc Trailer in the Yard, at no cost and free of any encumbrances, to facilitate the release of the same to Finloc; |
| | iv. provide Finloc with access, from time to time, to the Yard (during regular business hours) to repossess the Finloc Trailers – and to release all the Finloc Trailers to Finloc – as they become available; and |
| | v. provide Finloc, at Finloc's request, with access to all premises, books and record and other documents and information of PGL and the Applicants required by Finloc to locate and repossess any Finloc Trailers which PGL and the Applicants are unable to recall to the Yard. |

**Appendix "B"**

**August 2, 2024 Email Chain with PGL Equipment Financiers**

## Burr, Chris

| | |
|---|---|
| **From:** | Burr, Chris |
| **Sent:** | Friday, August 2, 2024 8:12 PM |
| **To:** | R. Graham Phoenix |
| **Cc:** | Huff, Pam; Bourassa, Kelly; Keliher, Christopher; Loberto, Daniel; Wu, Kevin; Alex.F.Morrison@parthenon.ey.com; Karen.K.Fung@parthenon.ey.com; Simone.Carvalho@parthenon.ey.com; Michael.Hayes@parthenon.ey.com; Alexander.Slovic@parthenon.ey.com; Emily.Masry@parthenon.ey.com; 'lwilliams@tgf.ca'; rnicholson@tgf.ca; Puya J. Fesharaki; iferreira@tgf.ca; Shaun Parsons; Gray, Elaine; Jeffrey Levine; Anthony Labib; Steven L. Graff; Freake, Mark; Salmas, John; sarah.law@dentons.com; John Russo; 'Gary Abrahamson'; 'Adam Erlich'; 'Gary Abrahamson'; Kourtney Rylands; Adam Maerov; Jennifer Stam (jennifer.stam@nortonrosefulbright.com) |
| **Subject:** | RE: Inquiry from PGL Equipment Financiers/Lessors |

Hi Graham,

Thank you for reaching out, and for coordinating comments with the other lender and financier parties with interests in PGL. The Monitor is currently working hard to develop a going concern purchase agreement for the sale of PGL, and expects to finalize that over the weekend. The Monitor believes that the going concern sale will produce the best result for all stakeholders, including the equipment financiers that this group represents. As part of developing the going concern transaction, the Monitor is working to finalize a purchase price allocation, on a lender by lender basis, so that each of your clients can get a clear understanding of what the transaction will mean for them. We will share that with you on a confidential basis as soon as possible.

Separately and in parallel, the Monitor is working with Hilco on a wind-down analysis specifically for PGL. For the reasons you identify below, the uncoordinated turn-over of 1500 vehicles would be impossible to reasonably manage. PGL is a going concern company, the vehicles are spread out across North America and actively engaged in business, and AR continues to be generated and paid to the PGL companies. This is not a factual scenario where the music can simply stop, and all lenders go take possession of their collateral. For that reason, the Monitor believes that the only alternative to a going concern transaction is a coordinated wind-down managed by a single entity (such as Hilco) .These two options – going concern sale and Hilco winddown – exclude the third alternative of each financier taking back its collateral. If I understand your email below correctly, I think the financiers are in agreement that an uncoordinated recovery of collateral is unworkable, and that you are suggesting an alternative to the two options I have raised above: a *coordinated* return of collateral to lenders, via a single order and with Monitor oversight. We agree that if something other than a going concern sale or a Hilco winddown were to proceed, it would need to be coordinated. We would also be happy to work with you to develop that, however in the Monitor's view that's currently premature.

At this stage, the Monitor continues to be focused on the going concern sale. We appreciate that the timelines have been delayed, and that the time for reasonably serving sale approval materials for an August 7 hearing date have passed. The Monitor will not be seeking approval of a PGL deal on August 7. However, because the Monitor believes that the going concern sale is the best option, we intend to continue to try to finalize the sale agreement with the purchaser, finalize the purchase price allocation so that we can clearly communicate to financers what they stand to get in the transaction, and serve a Report over the weekend or on Tuesday that (a) provides an executed APA, (b) provides the Hilco wind-down analysis, and (c) requests that the Court stand down all PGL matters (ie: including the receivership and lift-stay motions) for a few weeks, so that parties can assess the alternatives on a reasonable timeline. Any adjournment on August 7 would of course be without prejudice to the rights of each equipment financier to object to a going concern sale at the subsequent return of the motion.

As you can appreciate, things are extremely dynamic with Pride right now. The Eleventh Report, filed a few minutes ago, provides further context on the complexity of the proceedings, and we expect other motions and Reports to be forthcoming with additional detail. As you know from Pam's letter yesterday, the DIP has expired. In light of the uncertainty, the Monitor believes that the best thing to do here is to take a beat, and provide for a little more time for lenders and other interested parties to properly understand the options for PGL. We appreciate that this is a departure

from the established timeline to resolve PGL issues, but it has not been possible to advance the PGL transaction any faster than what has been done.

The Monitor agrees that a coordinated transition plan is the right approach in the event that a going concern sale or Hilco wind-down is not pursued. However, we believe that it is premature to engage with that now, before the lenders have had an opportunity to understand the going concern and liquidation options.

I can discuss over the weekend if that would be helpful.

Chris.

**Chris Burr**
Partner
chris.burr@blakes.com
T. +1-416-863-3261
C. +1-647-201-3789

---

**From:** R. Graham Phoenix <gphoenix@LN.Law>
**Sent:** Friday, August 2, 2024 4:09 PM
**To:** Burr, Chris <CHRIS.BURR@blakes.com>
**Cc:** Huff, Pam <PAM.HUFF@blakes.com>; Bourassa, Kelly <KELLY.BOURASSA@blakes.com>; Keliher, Christopher <christopher.keliher@blakes.com>; Loberto, Daniel <daniel.loberto@blakes.com>; Wu, Kevin <Kevin.Wu@blakes.com>; Alex.F.Morrison@parthenon.ey.com; Karen.K.Fung@parthenon.ey.com; Simone.Carvalho@parthenon.ey.com; Michael.Hayes@parthenon.ey.com; Alexander.Slovic@parthenon.ey.com; Emily.Masry@parthenon.ey.com; 'lwilliams@tgf.ca' <lwilliams@tgf.ca>; rnicholson@tgf.ca; Puya J. Fesharaki <PFesharaki@tgf.ca>; iferreira@tgf.ca; Shaun Parsons <sparsons@airdberlis.com>; Gray, Elaine <elaine.gray@dentons.com>; Jeffrey Levine <Jeffrey.Levine@mcmillan.ca>; Anthony Labib <anthony.labib@mcmillan.ca>; Steven L. Graff <sgraff@airdberlis.com>; Freake, Mark <mark.freake@dentons.com>; Salmas, John <john.salmas@dentons.com>; sarah.law@dentons.com; John Russo <jrusso@pallettvalo.com>; 'Gary Abrahamson' <gabrahamson@fullerllp.com>; 'Adam Erlich' <AErlich@FullerLLP.com>; 'Gary Abrahamson' <gabrahamson@fullerllp.com>; Kourtney Rylands <Kourtney.Rylands@mcmillan.ca>; Adam Maerov <Adam.Maerov@mcmillan.ca>; Jennifer Stam (jennifer.stam@nortonrosefulbright.com) <jennifer.stam@nortonrosefulbright.com>
**Subject:** Inquiry from PGL Equipment Financiers/Lessors

<span style="color:red">● External Email | Courrier électronique externe ●</span>

Chris et al.

Counsel for the group of equipment financiers/lessors on PGL (the "**PGL Equipment Parties**") just convened a call to discuss potential outcomes of the various motions to be heard on August 7, 2024. They are copied hereto (along with the receiver and counsel, proposed by on the PGL Equipment Parties). I have been nominated to reach out to the Monitor on counsel's behalf, to start this conversation.

As you are aware, BNS & RBC are seeking the appointment of a receiver; Finloc has proposed an order that would facilitate the release of vehicles following their recall to the PGL yard; and, other parties are seeking lift-stay orders but may have not yet fully formulated their orders.

In the event the PGL Equipment Parties' requested relief is granted, there are significant practical transition issues with the return and release of vehicles that will need to be addressed, so as to manage what would otherwise be a chaotic free-for-all of information requests, premises access demands, vehicle repossessions, etc.

Counsel to the PGL Equipment Parties believe that this transition needs to be coordinated, likely under a single Court order. Thus, counsel has started discussing what that might look like. Counsel also believes that the

Monitor and its counsel are positioned to efficiently facilitate the transaction – if only though the directed sharing of key information and the ability to facilitate physical access across the Pride Group locations.

We all understood from the case conference on July 16th and Justice Osbourne's direction that August 7th was going to be the hearing day for (i) the PGL Equipment Parties' motions and (ii) any sale approval motion. Justice Osbourne also stipulated that PGL materials and the Monitor's report in respect of any sale was to be served well before now.  As those materials have not been served, counsel does not believe there is going to a sale approval motion on the August 7th and, regardless, believes (especially in light of the recent DIP issue) that PGL Equipment Parties' motions will likely be granted.

In view of the above, all counsel to the PGL Equipment Parties is writing to ask the Monitor's input/plan/comment regarding the prospect of any transition.

Everyone on this email appreciates that your office, EY and TGF are burdened right now on this file; however, all would appreciate a response – in the hope that it brings some structure to Court hearing on August 7th.

Best regards,

**R. Graham Phoenix**
Partner | Loopstra Nixon LLP
📞 416.748.4776 |  📱 416.558.4492
✉ gphoenix@LN.Law

*RGP Professional Corporation

📍130 Adelaide Street West, Suite 2800,
Toronto, ON Canada M5H 3P5

www.loopstranixon.com






This email may contain confidential information which may be protected by legal privilege. If you are not the intended recipient, please immediately notify us by reply email or by telephone, delete this email and destroy any copies.

## Appendix "C"

## July 15, 2024 Endorsement of Mr. Justice Osborne



ONTARIO SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

## COUNSEL SLIP/ENDORSEMENT

**COURT FILE NO.:**     **CV-24-00717340-00CL**          **DATE:**          **July 15, 2024**

**NO. ON LIST:**     **7**

**TITLE OF PROCEEDING:**     **PRIDE GROUP HOLDINGS INC.**

**BEFORE JUSTICE:**     **Justice OSBORNE**

---

**PARTICIPANT INFORMATION**

**For Plaintiff, Applicant, Moving Party, Crown:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Steve Graff<br>Shaun Parsons | TD Equipment Finance Canada | sgraff@airdberlis.com<br>sparsons@airdberlis.com |
| Leanne Williams | Counsel for the Applicants | lwilliams@tgf.ca |
| Joshua Foster | Counsel to the Applicants' Directors and Officers | fosterj@bennettjones.com |
| Rachel Nicholson | Counsel for Applicants | rnicholson@tgf.ca |

**For Defendant, Respondent, Responding Party, Defence:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Elaine Gray | Daimler Truck Financial Services Canada Corporation and Daimler Truck Financial Services USA LLC | elaine.gray@dentons.com |
| Daniel Richer<br>Stuart Brotman | Syndicate/DIP Lenders | dricher@fasken.com<br>sbrotman@fasken.com |
| Graham Phoenix | Counsel to Finloc 2000 Inc. | gphoenix@LN.law |
| Craig Colraine | Counsel for Paccar | colraine@bslsc.com |
| Harvey Chaiton | Counsel for Mitsubishi | Harvey@chaitons.com |
| John Salmas | Bank of Montreal and BMO Bank NA | john.salmas@dentons.com |
| Blair McRadu<br>Marc Wasserman | Mitsubishi Capital | bmcradu@osler.com<br>mwasserman@osler.com |
| Jeffrey Levine | Bank of Nova Scotia | Jeffrey.levine@mcmillan.ca |

| Ben Muller | Counsel to Royal Bank of Canada, in its capacity as Financial Services Agent | bmuller@osler.com |
|---|---|---|

**For Other, Self-Represented:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Chris Burr<br>Kelly Bourassa<br>Chris Keliher | Counsel for the Monitor | chris.burr@blakes.com<br>Kelly.bourassa@blakes.com<br>christopher.keliher@blakes.com |

## ENDORSEMENT OF JUSTICE OSBORNE:

[1]  TD Equipment Finance requested this scheduling case conference to schedule a motion for a lift stay order in respect of vehicles owned by PGL in respect of which it has a security interest. These comprise approximately 436 trailers.

[2]  Other lenders, such as FINLOC 2000, BMO and Daimler, are in the same position.

[3]  Other financiers, such as Mitsubishi, have analogous positions in respect of non-PGL vehicles.

[4]  The Applicants, supported by the Court-appointed Monitor, take the position that this motion is premature, and that these trailers are being used by PGL in the ordinary course of what continues to be an operating business. They are not idle vehicles being stored. Moreover, PGL is the subject of an ongoing sale process, within which the Monitor hopes it may generate offers for PGL as a going concern business. That process, and the viability of PGL as a going concern, could obviously be materially affected by efforts of lenders to take possession of assets in respect of which they assert a security interest.

[5]  The Monitor advises that its report on the securitization process generally, and various other matters, will be issued this week. That should significantly inform matters. Moreover, if expected recoveries on vehicles pursuant to a proposed transaction that would be the subject of a sale approval motion are such that such approval would not enjoy the support of the affected creditors, it may not proceed, or may result in revisions to the form and scope of the transaction.

[6]  All of the above persuades me that the motion of TD Equipment Finance and the motions or potential motions of others similarly situated in respect of PGL vehicles, should be heard at the same time as a PGL sale approval motion, if indeed, that proceeds. All of **those motions will be heard on August 7, 2024, together with other matters already scheduled, for one full day in person at the Courthouse**.

[7]  The motions of non-PGL vehicle securitization parties **will be heard, as necessary, for one half day in person on September 3, 2024**.

[8]  All affected parties have confirmed their availability on these dates and the fact that the motions will be properly briefed as necessary.

Osborne, J.

## Appendix "D"

## Cornwall Property Payout Statement

| To: | | From: | |
|---|---|---|---|
| **D.O.:** | | **Date:** | 2024/07/31 |

## RoyNat Capital
## Portfolio Administration
### PAYOUT FIGURES
As at  August 7, 2024

**Client Name :**   **2554194 Ontario Inc. 2554193 Ontario Inc., et al**

| | | |
|---|---|---|
| Account No: | 012467-021 | |
| Interest Rate: | 8.398% | |

| | | |
|---|---|---:|
| Principal Outstanding | (Includes arrears of $ 27,350.00) | $3,915,150.00 |
| Interest in arrears | | $200,326.62 |
| Late Payment Charge in arrears | | $5,067.27 |
| Returned Cheque Fee in arrears | | $300.00 |
| Accrued Interest | (2024/07/15 To 2024/08/06) | $20,573.81 |
| Accrued Late Payment Charge | (2024/07/15 To 2024/08/06) | $1,233.24 |
| **Total** | | **$4,142,650.94** |

| | | |
|---|---|---:|
| Daily accrual valid until: | August 13, 2024 | $948.13 |

Prepared by Arleen Miranda

# Appendix "E"

## Abbotsford Property Payout Statement

**To:**                                                    **From:**

**D.O.:**                                          **Date:**        2024/07/09

## RoyNat Capital
## Portfolio Administration
### PAYOUT FIGURES
As at  July 9, 2024

**Client Name :**        **2554194 Ontario Inc. 2554193 Ontario Inc., et al**

Account No:        012467-019
Interest Rate:        8.560%

| | | |
|---|---|---|
| Principal Outstanding | (Includes arrears of $ 77,550.00) | $12,673,800.00 |
| Interest in arrears | | $559,812.75 |
| Late Payment Charge in arrears | | $11,859.49 |
| Returned Cheque Fee in arrears | | $300.00 |
| Accrued Interest | (2024/06/15 To 2024/07/08) | $70,897.91 |
| Accrued Late Payment Charge | (2024/06/15 To 2024/07/08) | $3,655.83 |
| **Total** | | **$13,320,325.98** |

| | | |
|---|---|---|
| Daily accrual valid until: | July 15, 2024 | $3,106.41 |

Prepared by Arleen Miranda

Court File No.: CV-24-00717340-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC., et al.**

| |
|---|
| ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding Commenced at Toronto |
| **TWELFTH REPORT OF THE MONITOR**<br>**dated August 6, 2024** |
| **BLAKE, CASSELS & GRAYDON LLP**<br>Barristers and Solicitors<br>199 Bay Street<br>Suite 4000, Commerce Court West<br>Toronto, Ontario  M5L 1A9<br><br>**Pamela Huff**, LSO #27344V<br>Tel:       416-863-2958<br>Email:     pamela.huff@blakes.com<br><br>**Chris Burr**, LSO #55172H<br>Tel:       416-863-3261<br>Email:     chris.burr@blakes.com<br><br>**Kelly Bourassa**, LSO #43062R<br>Tel:       416-863-2421<br>Email:     kelly.bourassa@blakes.com<br><br>**Daniel Loberto**, LSO #79632Q<br>Tel:       416-863-2937<br>Email:     daniel.loberto@blakes.com<br><br>Lawyers for the Monitor |