**<u>Exhibit C</u>**

Fourteenth Report

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**THIRD SUPPLEMENT TO FOURTEENTH REPORT OF THE MONITOR**

**DATED September 23, 2024**

**TABLE OF CONTENTS**

**INTRODUCTION** ............................................................................................................... **2**

**PURPOSE**............................................................................................................................ **2**

**TERMS OF REFERENCE** ................................................................................................ **2**

**PGL REQUESTED RELIEF UPDATE** ........................................................................... **3**

*ACCESS TO INFORMATION* ............................................................................................ **3**

*MEDIATION UPDATE*......................................................................................................... **4**

*AMENDMENTS REFLECTED IN THE A&R PGL SALE AGREEMENT* ......................... **4**

**RECOMMENDATIONS**..................................................................................................... **14**

**Appendices**                                                                                                          **Tab**

Amended and Restated PGL Sale Agreement, dated September 22, 2024……… A

Blackline of Amended and Restated PGL Sale Agreement, dated September 23, 2024, marked against PGL Sale Agreement dated August 26, 2024…………… B

Form of Approval and Vesting Order…………………………………………… C

Blackline of of Approval and Vesting Order marked against version attached to First Supplement to the Fourteenth Report……………………………………… D

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**THIRD SUPPLEMENT TO FOURTEENTH REPORT OF THE MONITOR**

**DATED September 23, 2024**

**INTRODUCTION**

1.      The background on these CCAA proceedings is summarized in paragraphs 1-24 of the
Fourteenth Report, which paragraphs are hereby incorporated by reference. All capitalized
terms used herein and not otherwise defined shall have the meanings given to them in the
Fourteenth Report.

**PURPOSE**

2.      This third supplement to the Fourteenth Report (the "**Third Supplemental Report**") is to
provide information and updates to the Court with respect to the Pride Entities' motion for
the approval of the PGL Going Concern Transaction contemplated by the PGL Sale
Agreement, as amended pursuant to the amendments discussed herein the "**A&R PGL
Sale Agreement**", and vesting in the Purchaser (as defined in the A&R PGL Sale
Agreement) of the Purchased Assets (as defined in the A&R PGL Sale Agreement), and
the Monitor's recommendation in respect to same.

**TERMS OF REFERENCE**

3.      The Terms of Reference set out in paragraphs 25 through 27 of the Fourteenth Report are
incorporated herein by reference.  All references are to CDN $.

**PGL TRANSACTION UPDATE**

*Access to Information*

4.    At the September 3, 2024 hearing in these CCAA Proceedings, Financiers of PGL raised concerns regarding information provided to them in respect of the PGL Entities.

5.    Immediately following this hearing, the Monitor: (i) contacted each of the Financiers of PGL and Fuller Landau to indicate that they could have access to the dataroom created by Ernst & Young's corporate finance group in connection with the PGL Sale Process (the "**PGL Dataroom**"), which would provide them with substantially all of the relevant information pertaining to the PGL Entities to which the Monitor has access, and (ii) circulated a form of non-disclosure agreement ("**NDA**") to be reviewed and executed by each of the Financiers of PGL and Fuller Landau to gain access to the PGL Dataroom.

6.    The Monitor received two executed NDAs, from RBC (in its capacity as bilateral lender) and Daimler, and provided access to the PGL Dataroom accordingly.

7.    As discussed in the Supplement to the Fourteenth Report of the Monitor, dated September 2, 2024 (the "**First Supplemental Report**"), the Monitor's counsel previously communicated to Financiers of PGL concerns relating to confidentiality of information requested to be shared with Fuller Landau, but offered to meet with the applicable Financiers and their financial advisors, including Fuller Landau, to understand the information requests and whether or how they could be accommodated. Additionally, the Monitor has offered a meeting with Fuller Landau to respond to any reasonable information requests of Fuller Landau in respect of the PGL Entities, but the Monitor has not received a response from Fuller Landau to this offer as of the date hereof.

*Mediation Update*

8.     The Endorsement of Mr. Justice Osborne, dated September 3, 2024, directed, among other things, "the secured creditors of PGL" to attend at a mediation (the "**Mediation**") before retired Commercial List Team Lead Mr. Thomas McEwen (the "**Mediator**"). The intend of the Mediation was to resolve, or at least narrow, the outstanding issues in these CCAA Proceedings, including any issues in respect of the PGL Going Concern Transaction.

9.     As discussed in the Second Supplement to Fourteenth Report to Court, dated September 19, 2024, the Monitor and its counsel, counsel to the Pride Entities, and the CRO attended the Mediation on September 9 and 10, 2024, along with Financier representatives, counsel, and/or financial advisers from all but three Financiers of PGL (the "**PGL Mediation Parties**"), among other stakeholders of the Pride Entities. To facilitate further negotiation and discussion, the Monitor and its counsel, the CRO and the PGL Mediation Parties attended on a series of calls with the Mediator on September 13, 2024.

10.    The Monitor commends the PGL Mediation Parties for their participation in the Mediation, including two full days of attendance, and participation in the September 13 phone calls. In the Monitor's view, while all of the issues surrounding the PGL Going Concern Transaction could not be resolved, substantial progress was made and the terms of the PGL Going Concern Transaction have been materially improved.

11.    The Mediation resulted in a number of amendments to the PGL Sale Agreement, which were agreed to between the Purchaser and the Vendors (acting through the CRO and the Monitor) in order to address as many of the concerns raised by the Financiers of PGL as could be accommodated. These amendments resulted in the A&R PGL Sale Agreement, a copy of which is attached hereto as **Appendix "A"**. Attached hereto as **Appendix "B"** is a blackline of the A&R PGL Sale Agreement marked against the executed version of the PGL Sale Agreement that was attached to the Fourteenth Report as Appendix "D".

*Amendments Reflected in the A&R PGL Sale Agreement*

12.    As illustrated in the blackline attached as Appendix "B", the amendments to the PGL Sale Agreement that have resulted in the A&R PGL Sale Agreement are set out below.

Capitalized terms used but not defined in this section have the definitions given to them in the A&R PGL Sale Agreement.

*Purchase Price Increase*

13.    The Purchase Price has been increased by $2 million, all of which has been allocated to Vehicles, which are listed in Schedule "G" of the A&R PGL Sale Agreement. As no new Purchased Assets have been added to the A&R PGL Sale Agreement, the net effect of this Purchase Price increase is that PGL's equipment Financiers will each recover more under the A&R PGL Sale Agreement than they would have recovered under the PGL Sale Agreement.

14.    The Monitor is in the process of updating the lender-by-lender allocation analyses, and will be providing revised allocation analyses to each lender shortly. A number of lenders have requested the allocation analyses of other lenders, however this request has been declined by the Monitor. If the PGL Financiers wish to share their respective allocation analyses with other lenders, the Monitor has no objection to them doing so.

15.    In the Monitor's view, the increased Purchase Price represents a material improvement to the PGL Sale Agreement, from the perspective of lender recoveries. As discussed in the Twelfth and Fourteenth Reports, based on the Monitor's analysis of the allocation of the Purchase Price, and the costs and logistics of a wind-down alternative to a going concern sale, PGL's Financiers would do better in the aggregate under the going concern scenario than they would under a wind-down scenario; with the addition of $2 million to the Purchase Price, that recovery is even better than it would have been under the PGL Sale Agreement.

*Real Estate Option and Approved Lease Terms*

16.    Financiers with an interest in the real property that is subject to the Real Estate Option and/or the real property to be leased to the Purchaser under the terms of the PGL Sale Agreement communicated concerns to the Monitor about the ways in which the Real Estate Option and leases may prejudice their interests, in particular their desire to see the charged property sold as expeditiously as possible.

- 6 -

17.     While it has not been possible to include all of the mortgagee's requested revisions into the A&R PGL Sale Agreement, the following changes have been made:

   (a)     Scope of Real Property Option

18.     The Real Property Option, as drafted in the PGL Sale Agreement, provided that the Purchaser could exercise an option to buy three parcels of land owed by Pride Entities, which were historically used by PGL to store vehicles not currently on customer delivery, and mortgaged to National Bank of Canada ("**NBC**"), being property in Dorval, Quebec (the "**Dorval Property**"), Pierrefonds Quebec, and Halton, Ontario (collectively, the "**Option Properties**").[1] The Real Property Option was (and continues to be) subject to the consent of the Monitor, the applicable mortgagee on the Option Property (being NBC), and RBC as syndication agent (the "**Agent**").

19.     The Real Property Option has been amended to provide that the option can be exercised in respect of any one or more of the Option Properties, rather than all of them together. This would permit the Purchaser to buy fewer than all three Option Properties, and/or permit NBC and the Agent to grant or decline to grant consent to individual Option Properties.

   (b)     Approved Lease Terms

21.     The PGL Sale Agreement included a Purchaser's condition of closing that required leases to be entered into between the Purchaser, as tenant, and the relevant Pride Entity property owner, as landlord, for the Dorval Property,[2] the Milton Property[3] and the Fort Erie Property[4] (collectively, the "**Leased Pride Properties**"), as well as assignments to the Purchaser of the leases of the Dixie Road Property and the Cornwall Property, which are owned by third-parties (the "**Leased Third Party Properties**", and together with the Leased Pride Properties, the "**Lease Properties**").[5]

---

[1] The Option Properties are described in further detail in Paragraph 54 of the Fourteenth Report.
[2] Being the property municipally known as 1943 & 1945 55e Avenue, Dorval, Quebec.
[3] Being the property municipally known as 10862 Steeles Ave E., Milton, Ontario.
[4] Being the property municipally known as 933 Helena Street, Fort Erie, Ontario.
[5] The Lease Properties are discussed in further detail in Paragraphs 59-63 of the Fourteenth Report.

22.    In respect of the Leased Pride Properties, the PGL Sale Agreement required that the lease terms be:

> not less favourable than the terms of any existing lease agreements or other existing arrangements, as necessary to allow the Purchaser or its nominee to continue to use the real property currently owned by [the Pride Entity owner of the Leased Pride Properties] for a period of twelve (12) months at fair market value rents, with an option to extend such lease for an additional twelve months on consent of [the Pride Entity owner of the Leased Pride Properties] and the Purchaser, and an at-will termination provision in favour of the landlord of not more than 60 days notice.

23.    The mortgagee of the Lease Pride Properties raised concerns that these prescribed lease terms could interfere with the sale of the real properties, by imposing a tenant on the property that a purchaser may not want. In the Monitor's view, this is a fair concern, and the Monitor shares the mortgagee's desire to maintain the Lease Pride Properties for sale as soon as possible.

24.    In response to these concerns, the A&R PGL Sale Agreement now includes the defined term "Approved Lease Terms", which prescribes the terms on which the Leased Pride Properties must be leased by the Purchaser. These Approved Lease Terms require that the leases have the following terms:

(a)    an initial 60 day term, with a series of 60 day renewal terms, renewable with the consent of the landlord, any mortgagee with an interest registered on title to the real property, and the Royal Bank of Canada (in its capacity as administrative agent and collateral agent), which consent is not to be unreasonably withheld unless: (A) the lease is in default and any applicable cure periods have expired, (B) a binding offer is accepted by the landlord for the purchase of the applicable real property, or (C) the leased property has been vacated of substantially all trucks and trailers not owned by the Purchaser, at which point the lease or agreement may be (x) terminated by the landlord on 60 days notice to the tenant, or (y) renewed if requested by the tenant for a further term, with the consent of the landlord, any mortgagee or other secured creditor with an interest in the leased property, and the purchaser of the real property;

- 8 -

(b)    fair market value rent, as determined by the Monitor in its sole discretion;

(c)    terms that are not less favourable to the landlord than the terms of any existing lease, access or parking agreements in respect of the real property;

(d)    an at-will, without-cause, termination right, exercisable by either the landlord or the tenant on 60 days notice; and

(e)    prior to its execution, each lease for Leased Pride Properties shall be provided to any mortgagee or other secured creditor with an interest in the property to be leased, and the Monitor, CRO and Purchaser shall consult with such creditors on the terms of such lease.

25.    The amendments related to the Approved Lease Terms also include a new provision in Section 4.6 to provide that the Pride Entity owners of the Leased Pride Properties (defined as the "Related Party Landlords") shall, after Closing, be subject to the exclusive governance and control of the CRO and the Monitor, and shall not be bankrupt, dissolved or otherwise wound up without further order of the Court. This provision is to ensure that the landlord remains an extant corporation for the duration of the leases of the Leased Pride Properties. This provision is also required by the A&R PGL Sale Agreement to be included in the Approval and Vesting Order. A copy of the revised proposed Approval and Vesting Order is attached hereto as **Appendix "C"**, and a blackline of the updated proposed Approval and Vesting Order, marked against the version attached as Appendix "A" to the First Supplemental Report, is attached hereto as **Appendix "D"**.

26.    In the Monitor's view, the foregoing amendments substantially address the concerns of mortgagees that the leases contemplated by the A&R Sale Agreement could interfere with the sale of the Leased Pride Properties. Each of the Leased Pride Properties is presently listed for sale, and the Monitor and CRO are working to sell them as soon as possible, consistent with the larger wind-down plan of the Pride Entities generally. However, any sale for the Leased Pride Properties cannot close until the property has been vacated of Pride Entity vehicles. The Monitor projects that the Dorval Property and Fort Erie Property will be vacant by mid-October, and the Milton Property by the end of the year. In the

interim, offers can be solicited, terms of sale can be negotiated, sale agreements can be executed, and transactions can be brought before the Court for approval – it's only the closing that cannot occur until the properties are vacant of Pride Entity vehicles.

27. If an offer for any of the Leased Pride Properties that was acceptable to the applicable mortgagee was received, that offer could be accepted immediately. However, in the Monitor's experience with selling other Pride Entity real property, a transaction could not be negotiated, documented, court-approved and closed in a 60 day period. Accordingly, the 60 day terms and termination rights set out in the Approved Lease Terms would allow the CRO to deliver vacant possession to any purchaser of a Leased Pride Property who did not want the Purchaser as a tenant, on a commercially reasonable timeline.

28. In short, in the Monitor's view, the revisions to the PGL Sale Agreement represented by the Approved Lease Terms address the potential prejudice to mortgagees that has been raised. The Monitor understands and acknowledges that the mortgagees would prefer a consent right over the leases themselves, however such a consent right (a) was not acceptable to the Purchaser, and (b) would introduce a third-party consent condition to the Transaction that could jeopardize Closing (such third-party consent rights are discussed further below).

29. The Leased Third Party Properties are discussed below, under the heading "Critical Required Contracts".

*Permit Assignment*

30. Section 6.2(a) of the PGL Sale Agreement required that, as a Purchaser's condition of closing, all "Permits" be in good standing and transferred or assigned to the Purchaser on Closing. This closing condition created a third-party consent right that was out of the Monitor's and the Purchaser's control, and thus was a Closing risk that the Monitor understands was justifiably of concern to PGL Financiers.

31. The Purchaser has advised the Monitor that it will agree to close without the Permits being assigned, provided the PGL entities that hold the Permits (defined as "**Permit Vendors**" in the A&R PGL Sale Agreement) remain as corporations in good standing post-Closing,

and enter into a transition services agreement that will allow the Purchaser to take the benefit of the Permits until they can be assigned to the Purchaser (with the consent of the issuing regulator), or new permits can be obtained by the Purchaser.

32.     The PGL Sale Agreement has accordingly been amended to (a) delete the Permit condition in Section 6.2(a), and (b) include in Sections 2.1 and 4.6 new language to ensure that the Permit Vendors remain in good standing, under the exclusive control of the Monitor and CRO, until such time as the transition services agreement is no longer required.

33.     The Monitor considers the revised treatment of Permits to be positive, as it reduces Closing risk, and does not impose any new costs or obligations on the Vendors. There is no change in the Purchase Price or other consideration to accommodate the revised treatment of Permits, because it is fundamentally an administrative change: the Purchaser is still buying the Permits, it is just agreeing to a work-around in the event that they cannot be conveyed on the Closing Date, so that the assignment of the Permits does not delay closing.

34.     The amendments to the treatment of the Permits and Permit Vendors also requires an addition to the proposed Approval and Vesting Order, to address the treatment of the Permit Vendors post-Closing, similar to that of the Related Party Landlords.

### *Critical Required Contracts*

35.     The PGL Sale Agreement included five "Critical Required Contracts", the assignment of which to the Purchaser (whether on consent or pursuant to the Assignment Order) was a condition of Closing. Like the Permit condition discussed above, the condition attached to these Critical Required Contracts presented a third-party consent right that could delay Closing.

36.     In order to mitigate the Closing risk, the Purchaser has agreed to reduce the number of Critical Required Contracts from five to three, with the remaining Critical Required Contracts being: (a) the lease of the Dixie Road Property, (b) the lease of the Cornwall Property, and (c) the Finloc Leases.

37.    The Purchaser, the Monitor and the CRO have engaged in discussions with the landlord of the Dixie Road Property, which discussions have been constructive. The landlord of the Cornwall Property is subject to a lease option in favour of PGL, with prescribed terms that have already been agreed to by the Cornwall Property landlord, and the Purchaser has commenced discussions with the landlord, which likewise have been constructive. Finally, the Finloc Leases are, in the Monitor's view, "true leases", which are expected to be current as of the Closing Date.

38.    In the Monitor's view, the reduction of the Critical Required Contracts to just the two real property leases and the Finloc Leases is a positive step towards reducing Closing risk, and based on discussions to date, the Monitor is optimistic that consents to assignment of each will be obtained (obviating the need for an Assignment Order).

*Outside Date*

39.    The Monitor understands that the PGL Financiers are acutely concerned with the certainty of Closing of the Transaction, and with such Closing happening as soon as possible. The Monitor shares this concern.

40.    The A&R PGL Sale Agreement includes an "Outside Date" of "October 16, 2024, or such later date that is two Business Days after the date on which the Approval and Vesting Order and, if applicable, the Assignment Order, become Final Orders, or such later date and time as the Vendors, with the consent of the Monitor, and the Purchaser may agree in writing, or as the Court may direct."

41.    The Monitor is focussed on Closing on October 16, and the revised treatment of Permits and reduced number of Critical Required Contracts will make this timing more achievable. However, the Monitor understands that the Purchaser cannot close without the Approval and Vesting Order being a Final Order (particularly given the significant degree of opposition to the PGL Going Concern Transaction that has been raised), and given the complexity of the Transaction (and the volume of mobile Purchased Assets), the Closing Date could, without the fault of any person, slip beyond October 16.

42.  The revisions to the definition of "Outside Date" in the A&R PGL Sale Agreement are designed to provide some discretion to the Monitor to extend Closing if reasonable and prudent to do so under the prevailing circumstances on October 16, while also providing recourse to the Court for the Monitor and the PGL Financers in the event that Closing cannot be completed. In the Monitor's view, it would be commercially unreasonable to agree to an October 16 Outside Date that did not have any flexibility whatsoever, however this does not mean that the Monitor would support the Closing Date being extended indefinitely.

43.  It bears repeating that the Monitor is acutely aware of the importance to the PGL Financers of the October 16 Closing Date, and intends to work with the Purchaser and any necessary third parties to ensure that this Closing Date is met.

*Purchased LCs and LC Purchase Price*

44.  The PGL Sale Agreement allocated $4 million of the aggregate Purchase Price to the "Purchased LCs", being the existing letters of credit maintained by PGL entities in the course of their business. However, this "LC Purchase Price" was not payable to the Vendors or the Monitor on Closing, rather, it was payable to the issuer(s) of the Purchased LCs, to be used as cash collateral to maintain the letters of credit in good standing.

45.  In the context of amending the PGL Sale Agreement, the Monitor and the Purchaser have agreed to delete the Purchased LCs and the LC Purchase Price from the A&R PGL Sale Agreement. The Purchaser will apply the former LC Purchase Price, and deal with the necessary letters of credit, separately from the Transaction.

46.  In the Monitor's view, this change is neutral: since the LC Purchase Price was never payable to the Vendors or the Monitor, and never constituted proceeds of the sale to be distributed to creditors, its deletion does not change the mechanics or economics of the PGL Going Concern Transaction.

*Monitor's Continued Support for the PGL Going Concern Transaction*

47.   The Monitor supported the PGL Going Concern Transaction evidenced by the PGL Sale Agreement for the reasons set out in the Fourteenth Report, summarized in Paragraph 71 thereof. In the Monitor's view, the A&R PGL Sale Agreement includes a number of improvements to the PGL Sale Agreement, and the Monitor's support for the Transaction thereunder continues.

48.   As set out in the Fourteenth Report, the support of the Monitor for the PGL Going Concern Transaction is based on the following factors:

   (a)   it provides a higher recovery than a forced liquidation, which recoveries have been improved by the $2 million increase to the Purchase Price;

   (b)   it provides for the purchase of substantially all the PGL Entities' assets, including trucks, trailers, inventory, and accounts receivable (other than accounts receivable owing by non-acquired Pride Entities), on an as-is, where-is basis;

   (c)   the Purchase Price was the result of a thorough and comprehensive sale process, on Court-approved terms and conditions;

   (d)   the sale contemplates the assumption of substantially all employees, independent contractors and customer contracts;

   (e)   the closing and post-closing adjustments regarding assumed liabilities and other assets are limited and rational;

   (f)   the Real Estate Option appropriately balances the Purchaser's need for real property to conduct the PGL business with the mortgagee's rights to consent to a sale of such real property pursuant to existing Court orders, which mortgagee's rights and interests have been improved from prior deal by the addition of the Approved Lease Terms; and

   (g)   the alternative to the PGL Going Concern Transaction will be expensive, time consuming, destructive to value,  logistically very difficult to implement, and will result in the loss of over 500 jobs.

**RECOMMENDATIONS**

49.   For the reasons set out in this Third Supplemental Report, the Monitor recommends this Court approve the PGL Going Concern Transaction.

All of which is respectfully submitted this 23rd day of September 2024.

**ERNST & YOUNG INC.**,
solely in its role as Court-appointed Monitor of Pride Group Holdings Inc. and certain affiliates and not in its personal or corporate capacity

**per:**

**Alex Morrison, CPA, CA, LIT, CIRP**
**Senior Vice President**

**SCHEDULE "A"**

**A. APPLICANTS**
**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

## Other Holding Companies
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

## B. LIMITED PARTNERSHIPS

*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

## C. ADDITIONAL STAY PARTIES

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.

# Appendix "A"

## AMENDED & RESTATED PURCHASE AGREEMENT

This Amended & Restated Purchase Agreement dated as of the 22nd day of September, 2024 among:

Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation
(collectively, the "**Vendors**")

– and –

1000927605 Ontario Inc.
(the "**Purchaser**")

**WHEREAS** pursuant to the Order of the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") granted on March 27, 2024 (the "**CCAA Filing Date**") (as amended or amended and restated from time to time, the "**Initial Order**"), the Vendors and certain of their affiliated entities/businesses (as defined collectively in the Initial Order, the "**Pride Entities**") were granted creditor protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36, as amended (the "**CCAA**"). Ernst & Young Inc. was appointed as the monitor of the Pride Entities (in such capacity, the "**Monitor**"), and RC Benson Consulting Inc. was appointed as the Pride Entities' chief restructuring officer (in such capacity, the "**CRO**");

**AND WHEREAS** the proceedings initiated by the Initial Order (the "**CCAA Proceedings**") were recognized pursuant to an Order of the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**" and together with the Canadian Court, the "**Courts**") under Chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**");

**AND WHEREAS** in connection with the CCAA Proceedings, on May 15, 2024, the Pride Entities sought and obtained approval from the Canadian Court of a sale solicitation process (as it may be amended from time to time in accordance with its terms, the "**Sale Process**"), to be conducted by the Monitor, with the assistance of its advisors, the CRO, and the Vendors, intended to solicit interest in, and opportunities for, the purchase of all or part of the business, operations and assets of all or any of the Vendors;

**AND WHEREAS** pursuant to the Sale Process, the Monitor, in consultation with the Vendors, has reviewed and evaluated all qualified bids received, and identified the Purchaser's bid for the Purchased Assets (defined herein) as a Successful Bid;

**AND WHEREAS** on the terms set out in the purchase agreement among the Vendors and the Purchaser dated August 26, 2024 (the "**Original APA**"), the Vendors agreed to sell and transfer to the Purchaser, and the Purchaser agreed to purchase from the Vendors, all of the Vendors' right, title and interest in and to the Purchased Assets, which includes substantially all of PGL's assets, subject to and in accordance with the terms and conditions set forth in this Agreement;

**AND WHEREAS** following the execution of the Original APA, certain additional transaction terms were negotiated between the Vendors and the Purchaser, which additional terms are set out in this Agreement;

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby irrevocably acknowledged, the parties hereto (collectively, the "**Parties**", and each, a "**Party**") hereby acknowledge and agree as follows:

– 2 –

## ARTICLE 1
## INTERPRETATION

**1.1    Definitions**

Unless something in the subject matter or context is inconsistent therewith, the terms defined herein shall have the following meanings:

"**129 Canada**" means 12944154 Canada Inc.

"**129 Shares**" means all of the outstanding shares of 129 Canada.

"**131 Canada**" means 13184633 Canada Inc.

"**207 Ontario**" means 2076401 Ontario Inc.

"**283 Ontario**" means 2837229 Ontario Inc.

"**933 Helena**" means 933 Helena Holdings Inc.

"**Accounts Receivable**" means, with respect to the PGL Vendors and without duplication, all accounts receivable, trade receivables, bills receivable, trade accounts, book debts, notes receivables, rebates, refunds and other receivables of the PGL Vendors whether current or overdue and determined in accordance with GAAP, arising prior to, including, and after the Closing Date, together with all interest accrued on such items, but for greater certainty, excluding any amounts owing by any the Pride Entity that is not a PGL Vendor or PGL Insurance.

"**Acquired AR Amount**" has the meaning ascribed thereto in section 3.2.

"**Affiliate**" has the meaning given to the term "affiliate" in the *Business Corporations Act* (Ontario).

"**Agreement**" means this amended & restated purchase agreement, as may be further amended and restated from time to time in accordance with the terms hereof, with the consent of the Monitor, and "Article" and "Section" mean and refer to the specified article, section and subsection of this Agreement.

"**Applicable Law**" means, in respect of any Person, property, transaction or event, any (i) domestic or foreign statute, law (including the common law), ordinance, rule, regulation, treaty, restriction, regulatory policy, standard, code or guideline, by-law or order, (ii) judicial, arbitral, administrative, ministerial, departmental or regulatory judgments, orders, decisions, rulings, instruments or awards of any Governmental Authority, and (iii) policies, practices, standards, guidelines and protocols having the force of law, that applies in whole or in part to such Person, property, transaction or event.

"**Approval and Vesting Order**" means an order by the Canadian Court, in form and substance satisfactory to the Purchaser, acting reasonably, among other things, approving and authorizing the Transaction and vesting in the Purchaser (or as it may direct) all the right, title and interest of the Vendors in and to the Purchased Assets, free and clear from any Encumbrances.

"**Approved Lease Terms**" mean terms in a real property lease, access agreement or parking agreement that provide for: (i) an initial 60 day term, with a series of 60 day renewal terms, renewable with the consent of the landlord, any mortgagee with an interest registered on title to the real property, and the Royal Bank of Canada (in its capacity as administrative agent and collateral

agent), which consent is not to be unreasonably withheld unless (A) the lease is in default and any applicable cure periods have expired, (B) a binding offer is accepted by the landlord for the purchase of the applicable real property, or (C) the leased property has been vacated of substantially all trucks and trailers not owned by the Purchaser, at which point the lease or agreement may be (x) terminated by the landlord on 60 days notice to the tenant, or (y) renewed if requested by the tenant for a further term, with the consent of the landlord, any mortgagee or other secured creditor with an interest in the leased property, and the purchaser of the real property; (ii) fair market value rent, as determined by the Monitor in its sole discretion; (iii) terms that are not less favourable to the landlord than the terms of any existing lease, access or parking agreements in respect of the real property; and (iv) an at-will, without-cause, termination right, exercisable by either the landlord or the tenant on 60 days notice. Without limiting any of the foregoing, the Purchaser and the Vendors agree that any lease entered into subject to the Approved Lease Terms shall be provided in draft to any mortgagee or other secured creditor with an interest in the property to be leased, prior to it being entered into, and the Monitor, CRO and Purchaser shall consult with such creditors on the terms of such lease.

"**Assignment Order**" means an order or orders of the Canadian Court pursuant to section 11.3 of the CCAA and other applicable provisions of the CCAA, in form and substance satisfactory to the Purchaser and the Monitor on behalf of the PGL Vendors, each acting reasonably, authorizing and approving (i) the assignment of any Critical Required Contract for which a consent, approval or waiver necessary for the assignment of such Critical Required Contract has not been obtained, (ii) the prevention of any counterparty to such Critical Required Contracts from exercising any right or remedy under such Critical Required Contracts by reason of any defaults arising from the CCAA Proceedings or the insolvency of the PGL Vendors and deeming any such defaults to have been cured (iii) the vesting in the Purchaser (or as directed by the Purchaser) of all right, title and interest of the PGL Vendors in such Critical Required Contracts, including without limitation any and all rights to purchase the Finloc Leased Vehicles in accordance with the Finloc Leases.

"**Assumed Liabilities**" means any of the following: (i) liabilities of PGL Insurance accruing from and after the Closing Date; (ii) any Unpaid Post CCAA Filing Accruals that remain unpaid by the Vendors on Closing; (iii) liabilities for accrued vacation pay of the Transferring Employees; (iv) liabilities of any PGL Vendor owing to any other PGL Vendor or PGL Insurance, whether incurred or owing prior or subsequent to the CCAA Filing Date; and (v) if the Real Property Option is exercised, the real property mortgages and accrued property taxes and utilities associated with the Optional Assets.

"**Authorization**" means any authorization, approval, consent, concession, exemption, license, lease, grant, permit, franchise, right, privilege or no-action letter from any Governmental Authority having jurisdiction with respect to any specified Person, property, transaction or event, or with respect to any of such Person's property or business and affairs (including any zoning approval or building permit) or from any Person in connection with any easements, contractual rights or other matters.

"**Books and Records**" means, in respect of the PGL Vendors, LeaseCo and PGL Insurance and, if applicable, the Optional Vendors: (i) all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise), including Tax and accounting books and records, and (ii) all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise), including Tax and accounting books and records used or intended for use by, or in the possession of such entities, including, without limitation, information, documents and records relating to the Purchased Contracts, customer lists, customer information and account records, sales records, computer files, data processing records, employment and personnel records, sales literature,

advertising and marketing data and records, cost and pricing information, production reports and records, equipment logs, operating guides and manuals, credit records, records relating to present and former suppliers and contractors, plans and projections and all other records, data and information stored electronically, digitally or on computer-related media.

"**Business**" means the transportation and logistics business conducted by the PGL Vendors across Canada and the United States, as applicable.

"**Business Day**" means a day on which banks are open for business in Toronto, Ontario, but does not include a Saturday, Sunday or statutory holiday in the Province of Ontario.

"**Canadian Court**" has the meaning ascribed thereto in the recitals.

"**Cash and Cash Equivalents**" means all cash on hand, cash equivalents and bank accounts of the PGL Vendors.

"**Cash Purchase Price**" has the meaning ascribed thereto in Section 3.4(b).

"**CCAA**" has the meaning ascribed thereto in the recitals.

"**CCAA Filing Date**" has the meaning ascribed thereto in the recitals.

"**CCAA Proceedings**" has the meaning ascribed thereto in the recitals.

"**Change of Control Consents**" has the meaning ascribed thereto in Section 5.2(c).

"**Claims**" means any civil, criminal, administrative, regulatory, arbitral or investigative inquiry, action, suit, investigation or proceeding and any claim of any nature or kind (including any cross-claim or counterclaim), demand, investigation, audit, chose in or cause of action, suit, default, assessment, litigation, prosecution, third party action, arbitral proceeding or proceeding, complaint or allegation, by or before any Person.

"**Closing**" means the completion of the purchase and sale of the Purchased Assets in accordance with the provisions of this Agreement.

"**Closing Date**" means, subject to the terms hereof, the date on which the Monitor's Certificate is released from escrow to the Purchaser in accordance with Section 9.15, which date shall (unless otherwise agreed to by the Purchaser and the Monitor, on behalf of the Vendors) be no later than the Outside Date.

"**Closing Time**" means 12:01 a.m. (Toronto time) on the Closing Date or such other time on the Closing Date as the Parties agree in writing that the Closing Time shall take place.

"**Contracts**" means all pending and executory contracts, agreements, leases, understandings and arrangements (whether oral or written) to which the PGL Vendors are a party or by which the PGL Vendors are bound or in which the PGL Vendors have, or will at Closing have, any rights or by which any of their property or assets are or may be affected, including any Contracts in respect of Employees.

"**Courts**" has the meaning ascribed thereto in the recitals hereto.

"**Critical Required Contract**" means the Contracts set forth in Schedule "I", which Schedule "I" may be amended by the Purchaser up until 5 calendar days prior to the hearing of the motion for

the Approval and Vesting Order, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "I" is amended.

"**Cure Costs**" means, in respect of any Purchased Contract, Critical Required Contract or Change of Control Consent, all monetary amounts, if any, required to be paid pursuant to section 11.3(4) of the CCAA in order to obtain the assignment to the Purchaser of such Purchased Contract, Critical Required Contract or in order for the Purchaser to obtain any Change of Control Consent, or such lesser amount as may be negotiated by the Purchaser or the Monitor with the applicable counterparty.

"**Deposit**" has the meaning ascribed thereto in Section 3.5 hereof.

"**Discharge**" means, in relation to any Encumbrance against any Person or upon any asset, undertaking or property, the full, final, irrevocable, complete and permanent waiver, release, discharge, cancellation, termination and extinguishment of such Encumbrance against such Person or upon such asset, undertaking or property and all proceeds thereof.

"**Effective Date**" means August 26, 2024, the "Effective Date" of the Original APA.

"**Employee**" means any individual who is employed by the PGL Vendors as of the Closing Date, whether on a full-time or a part-time basis and includes an employee on short term or long-term disability leave, but for certainty excludes any employee whose employment is terminated by the PGL Vendors prior to the Closing Date.

"**Encumbrance**" means any security interest, lien, Claim, charge, right of retention, deemed trust, judgement, writ of seizure, writ of execution, notice of seizure, notice of execution, notice of sale, hypothec, reservation of ownership, pledge, encumbrance, mortgage or right of a third party (including any contractual rights such as purchase options, rights of first refusal, rights of first offer or any other pre-emptive contractual right) or encumbrance of any nature or kind whatsoever and any agreement, option or privilege (whether by law, contract or otherwise) capable of becoming any of the foregoing, (including any conditional sale or title retention agreement, or any capital or financing lease).

"**Equipment**" means all Tangible Property and Vehicles.

"**Excluded Assets**" means the assets of the PGL Vendors listed in Schedule "B", the Excluded Contracts, and all claims by the PGL Vendors against or in respect of any Related Party other than the PGL Vendors and PGL Insurance, which Schedule "B" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "B" is amended.

"**Excluded Contracts**" means the Contracts listed in Schedule "E", which Schedule "E" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "E" is amended.

"**Excluded Liabilities**" means all Liabilities of the PGL Vendors of any kind or nature whatsoever, other than Assumed Liabilities.

"**Exercise Notice**" has the meaning ascribed in Section 2.2 hereof.

"**Final Adjustment Statement**" has the meaning ascribed thereto in Section 3.10(a)

"**Final AR Adjustment**" has the meaning ascribed thereto in Section 3.3.

"**Final Order**" means a final, non-interlocutory order issued by a court of competent jurisdiction that has not been stayed, set aside, or vacated and no application, motion or other proceeding has been commenced seeking the same, in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably, and all appeal periods in respect of such order have expired.

"**Finloc Leased Vehicles**" means such of the trailers owned by Finloc 2000 Inc. or its affiliates subject to the Finloc Leases that the Purchaser agrees to assume the leases in respect of, as are set out in Schedule "J" to this Agreement, which Schedule may be amended by the Purchaser no later than 5 calendar days prior to the hearing of the motion for the Approval and Vesting Order.

"**Finloc Leases**" means, collectively, the Master Leasing Agreement No. A900271 PRI 6055 dated November 5, 2019 between PGL and Finloc 2000 Inc., and each of the following leasing agreements entered into thereunder: A900271-10854, A900271-10885 (as amended), A900271-10891, A900271-10905, A900271-10949, A900271-10990, A900271-11125, A900271-11138.

"**Fuel Inventory Adjustment**" has the meaning ascribed thereto in Section 3.3(e).

"**GAAP**" means Canadian Accounting Standards for Private Enterprises as defined in the CPA Canada Handbook—Accounting, Part II, as applicable, from time to time applied on a consistent basis and determined in accordance with past practices of PGL Vendors.

"**Governmental Authority**" means any domestic or foreign government, whether federal, provincial, state, territorial or municipal; and any governmental agency, ministry, department, court (including the Courts), tribunal, commission, stock exchange, bureau, board or other instrumentality exercising or purporting to exercise legislative, judicial, regulatory or administrative functions of, or pertaining to, government or securities market regulation.

"**GST/HST**" has the meaning ascribed thereto in Section 7.2(i).

"**Ineligible Equipment**" means any Vehicles of any PGL Vendor or TPine that is included in Schedule "G" hereof, but that prior to the Closing Date becomes unavailable for sale or otherwise cannot be conveyed to the Purchaser, including because the Vehicles have (a) been sold to a party other than the Purchaser, (b) been delivered to a secured creditor, or (c) become Wrecked Equipment.

"**Initial AR Adjustment**" has the meaning ascribed thereto in Section 3.3.

"**Initial Order**" has the meaning ascribed thereto in the recitals hereto.

"**Intangible Property**" means all of the following which is used in connection with the Business and/or the Purchased Assets, whether or not registered, anywhere in the world: (a) all trade or brand names, business names, trademarks, service marks, copyrights to any original works of authorship, patents, licences, sublicenses, industrial designs, trade secrets, and other industrial or intellectual property of any nature in any form whatsoever recognized in any jurisdiction throughout the world; (b) inventions, discoveries, developments, concepts, ideas, improvements, processes and methods, know-how, trade secrets, confidential information, systems, procedures, computer software, source code; and (c) all goodwill, customer and supplier lists, confidential and proprietary information;

"**Intercompany Receivables**" means (i) any Accounts Receivable owing to any PGL Vendor by PGL Insurance, and (ii) if the Real Property Option is exercised by way of a share purchase transaction, any Accounts Receivable owing to any PGL Vendor by any of the Optional Vendors.

"**Interim Adjustment Statement**" has the meaning ascribed thereto in section 3.4(c).

"**Interim Period**" means the period beginning on the Effective Date and ending at the Closing Time.

"**Inventory**" means, collectively, all (i) shop supplies, including, motor oil, fluids, filters and other service supplies used in connection with the Business and/or the Purchased Assets, and (ii) diesel and fuel inventory.

"**ITA**" means the *Income Tax Act* (Canada).

"**LeaseCo**" means 2029909 Ontario Inc.

"**Lenders**" has the meaning ascribed thereto in Section 2.2.

"**Liability**" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"**Monitor**" has the meaning ascribed thereto in the recitals hereto.

"**Monitor's Certificate**" has the meaning ascribed thereto in Section 9.15.

"**Offers of Employment**" has the meaning ascribed thereto in Section 9.1(a).

"**Optional Assets**" means all rights, titles and interests in and to the real property held by the Optional Vendors.

"**Optional Vendors**" means, collectively, 129 Canada, 131 Canada and 283 Ontario.

"**Original APA**" has the meaning ascribed thereto in the recitals hereto.

"**Organizational Documents**" means any trust document, charter, certificate or articles of incorporation or amalgamation, articles of amendment, articles of association, articles of organization, articles of continuance, bylaws, as amended, partnership agreement or similar formation or governing documents of a Person (excluding individuals).

"**Outside Date**" means 11:59PM (Toronto time) on October 16, 2024, or such later date that is two Business Days after the date on which the Approval and Vesting Order and, if applicable, the Assignment Order, become Final Orders, or such later date and time as the Vendors, with the consent of the Monitor, and the Purchaser may agree in writing, or as the Court may direct.

"**Parties**" has the meaning ascribed thereto in the recitals hereto.

"**Party**" has the meaning ascribed thereto in the recitals hereto.

"**Permit Vendor**" has the meaning ascribed thereto in Section 4.6.

"**Permits**" means, in respect of the PGL Vendors, all permits, licences, certificates, licence plates, approvals, authorizations, and registrations, or any item with a similar effect, issued or granted by

any Governmental Authority that are listed in Schedule "H", which Schedule "H" may be amended no later than 5 calendar days prior to the hearing of the motion for the Approval and Vesting Order, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "H" is amended.

"**Permitted Assignee**" has the meaning ascribed thereto in Section 9.11

"**Permitted Encumbrances**" means such Encumbrances, if any, that the Purchaser agrees will continue to attach to and be enforceable against the Purchased Assets following Closing, a list of which are attached hereto as Schedule "C", which Schedule "C" may be amended by the Purchaser up until the Closing Date, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "C" is amended.

"**Person**" is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity.

"**PFS**" means Pride Fleet Solutions Inc.

"**PFS USA**" means Pride Fleet Solutions USA Inc.

"**PGL**" means Pride Group Logistics Ltd.

"**PGL Entities**" means PGL, PGL USA, PGL Insurance, PGL International, 12944154 Canada Inc. and 933 Helena Holdings Inc.

"**PGL Group**" means the PGL Vendors and their subsidiaries.

"**PGL Insurance**" means Pride Global Insurance Company Ltd.

"**PGL Insurance Financial Instruments**" means, collectively, all letters of credit, cash, cash equivalents, securities and investments held directly or indirectly by PGL Insurance.

"**PGL Insurance Shares**" means all of the outstanding shares of PGL Insurance.

"**PGL International**" means Pride Group Logistics International Ltd.

"**PGL USA**" means Pride Group Logistics USA, Co.

"**PGL Vendors**" means, collectively, PGL, PGL International, PGL USA, PFS, PFS USA, and LeaseCo.

"**Post-Closing Cash**" has the meaning ascribed thereto in Section 3.7.

"**Pride Entities**" has the meaning ascribed to it in the recitals.

"**Prepaid Expenses**" means all prepaid expenses of LeaseCo in respect of prepaid rents under the lease for 6050 Dixie Road, Mississauga, ON.

"**Purchase Price**" has the meaning ascribed thereto in Section 3.1.

"**Purchased Assets**" means the following tangible and intangible assets, undertakings and properties owned by the PGL Vendors, Optional Vendors and Real Property Vendor, related to the Business, wherever located, as of the Closing Date, but excluding the Excluded Assets:

(i)      all Cash and Cash Equivalents of PGL, PGL International, and PGL USA;

(ii)     all Accounts Receivable (including the Intercompany Receivables);

(iii)    all Purchased Contracts;

(iv)    all Prepaid Expenses;

(v)     all Permits;

(vi)    all Equipment;

(vii)   all Inventory;

(viii)  all PGL Insurance Shares;

(ix)    all PGL Insurance Financial Instruments;

(x)     the Intangible Property;

(xi)    all Books and Records;

(xii)   all rights under non-disclosure and confidentiality, non-compete, or non-solicitation agreements with Employees and agents of the PGL Vendors or with third parties to the extent related to the Business and/or the Purchased Assets, excluding any such agreements signed in connection with the Sale Process;

(xiii)  all rights of the PGL Vendors under or pursuant to all warranties, representations and guarantees to the extent relating to products sold, or services provided, to the PGL Vendors or to the extent affecting any Purchased Assets;

(xiv)  if the Real Property Option is exercised, the Optional Assets;

(xv)    all Vehicles listed on Schedule "G" hereof;

and the following tangible assets owned by TPine:

(xvi)   all Vehicles listed on Schedule "G" that are owned by TPine.

"**Purchased Contracts**" means all Contracts of the PGL Vendors, including the Finloc Leases, except for the Excluded Contracts.

"**QST**" has the meaning ascribed thereto in Section 7.2(i).

"**Real Property Option**" has the meaning ascribed thereto in Section 2.2.

"**Real Property Vendor**" means 2043002 Ontario Inc., being the entity that holds all outstanding shares of 283 Ontario, 129 Canada, 131 Canada and LeaseCo.

"**Related Party**" means any Person (i) that is an affiliate or associate of any of the Pride Entities; (ii) that is an officer or director of any of the Pride Entities, (iii) that is an affiliate or associate of any such responsible officer or director, or (iv) that does not deal at arm's length (within the meaning of the ITA) with any of the Pride Entities or any responsible officer or director of any of the Pride Entities.

"**Related Party Landlord**" means any Related Party that becomes a landlord under a lease, access agreement or parking agreement referred to in Section 6.2(f).

"**Sanctions**" has the meaning ascribed thereto in Section 7.2(g).

"**Sale Process**" has the meaning ascribed thereto in the recitals hereto.

"**Specific Conveyances**" means all conveyances, bills of sale, assignments, powers of attorney, transfers, registrable transfers of land and other documents or instruments that are reasonably required or desirable to convey, assign and transfer the Vendors' respective title to and/or interest in and to the Purchased Assets to the Purchaser;

"**Tangible Property**" means all tangible personal property of the PGL Vendors other than the Vehicles.

"**Taxes**" means, with respect to any Person, all national, federal, provincial, local or other taxes, including income taxes, capital gains taxes, value added taxes, severance taxes, ad valorem taxes, property taxes, capital taxes, net worth taxes, production taxes, sales taxes, use taxes, license taxes, lease excise taxes, environmental taxes, transfer taxes, withholding or similar taxes, payroll taxes, employment taxes, employer health taxes, pension plan premiums and contributions, workers' compensation premiums, employment insurance or compensation premiums, stamp taxes, occupation taxes, premium taxes, alternative or add-on minimum taxes, GST/HST, customs duties or other taxes of any kind whatsoever imposed or charged by any Governmental Authority, together with any interest, penalties, or additions with respect thereto and any interest in respect of such additions or penalties and any Liability for the payment of any amounts of the type described in this paragraph as a result any express or implied obligation to indemnify any other Person or as a result of being a transferee or successor in interest to any Person.

"**TPine**" means TPine Leasing Capital Corporation.

"**Transaction**" means all of the transactions contemplated by this Agreement, including the purchase and sale transaction whereby the Purchaser will acquire the Purchased Assets.

"**Transfer Taxes**" has the meaning ascribed in section 3.11 hereof.

"**Transferring Employees**" means the Employees who accept or are deemed to accept offers of employment from the Purchaser or an affiliate thereof in accordance with the terms hereof.

"**Transition Services Agreement**" means an agreement between the Purchaser and each Permit Vendor, in form and substance acceptable to the Purchaser, Vendors and Monitor, that provides for the Purchaser to have the use and benefit of the Permits post-Closing, to the extent that the Permits are not transferred or assigned to the Purchaser on Closing.

"**U.S. Approval Order**" means an Order of the U.S. Court approving the Transaction solely with respect to the sale to the Purchaser of the Purchased Assets and Business located within the territorial jurisdiction of the United States.

"**Vehicles**" means all of the trucks, trailers and other vehicles of the PGL Vendors and TPine listed in Schedule "G", which schedule cannot be amended except for as provided for herein, and includes all accessories, fuel, equipment and parts thereof, therein or affixed thereto.

"**Vendors**" means, collectively, the PGL Vendors, TPine the Optional Vendors and the Real Property Vendor.

"**Wrecked Equipment**" has the meaning ascribed in section 7.4 hereof.

## 1.2    Interpretation Not Affected by Headings, etc.

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

## 1.3    General Construction

The terms "this Agreement", "hereof", "herein" and "hereunder" and similar expressions refer to this Agreement and not to any particular section hereof. The expression "Section" or reference to another subdivision followed by a number mean and refer to the specified Section or other subdivision of this Agreement. The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

## 1.4    Extended Meanings

Words importing the singular include the plural and vice versa and words importing gender include all genders. The term "including" means "including, without limitation," and such terms as "includes" have similar meanings and the term "third party" means any other Person other than the Vendors or the Purchaser, or any Affiliates thereof.

## 1.5    Currency

All references in this Agreement to dollars, monetary amounts, or to $, are expressed in Canadian currency unless otherwise specifically indicated.

## 1.6    Statutes

Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules, regulations and interpretations made under it, as it or they may have been or may from time to time be modified, amended or re-enacted.

## 1.7    Schedules & Amendments to Schedules

The following exhibits and schedules are attached hereto and incorporated in and form part of this Agreement:

### SCHEDULES

Schedule "A"    -    Form of Approval and Vesting Order

Schedule "B"    -    Excluded Assets

Schedule "C"    -    Permitted Encumbrances

Schedule "D"    -    [Intentionally Omitted]

Schedule "E"    -    Excluded Contracts

Schedule "F"    -    Allocation Statement

Schedule "G"    -    Vehicles

Schedule "H"    -    Permits

Schedule "I"    -    Critical Required Contracts

Schedule "J"    -    Finloc Leased Equipment

Unless the context otherwise requires, words and expressions defined in this Agreement will have the same meanings in the Schedules and the interpretation provisions set out in this Agreement will apply to the Schedules. Unless the context otherwise requires, or a contrary intention appears, references in the Schedules to a designated Article, Section, or other subdivision refer to the Article, Section, or other subdivision, respectively, of this Agreement.

**1.8    Interpretation if Closing Does Not Occur**

If Closing does not occur, each provision of this Agreement which presumes that the Purchaser has acquired the Purchased Assets shall be construed as having been contingent upon Closing having occurred.

**1.9    Amendment and Restatement**

The Vendors and the Purchaser agree that effective as of the date hereof, this Agreement is an amendment and restatement of the Original APA and not a novation of the Original APA. As a consequence, the obligations, liabilities, covenants, representations and warranties under the Original APA shall constitute obligations, liabilities, covenants, representations and warranties hereunder governed by the terms hereof. Such obligations, liabilities, covenants, representations and warranties shall be continuing in all respects, and this Agreement shall not be deemed to evidence or result in a novation of such obligations, liabilities, covenants, representations and warranties. The Original APA has been amended and restated solely for the purposes of reflecting amendments to the Original APA which the Vendors and Purchaser have agreed upon.

**ARTICLE 2**
**PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES**

**2.1    Purchase and Sale of the Purchased Assets**

Subject to the terms and conditions of this Agreement, effective as of the Closing Time, the Vendors shall sell, assign and transfer the Purchased Assets to the Purchaser, and the Purchaser shall purchase, accept, assume and receive from the Vendors, all of the Vendors' title to and interest in and to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to the Approval and Vesting Order. For greater certainty, the Purchased Assets do not include the Excluded Assets.

Notwithstanding the foregoing paragraph, the Permits shall only be transferred and assigned to the Purchaser by the Vendors on Closing to the extent that such transfer and assignment is consented to or approved by the applicable issuers of the Permits, and the Parties hereto acknowledge that if such transfer or assignment of the Permits cannot be accomplished on Closing, the Purchaser shall still be required to close the Transaction on the Closing Date as long as the Transition Services Agreement is delivered in

accordance with Section 5.2(e). If the Permits are not transferred and assigned to the Purchaser on Closing because the necessary consents have not been obtained, then the Permits shall transfer and assign to the Purchaser following Closing effective immediately upon the delivery of the necessary consents from the issuer of the Permit(s), without any further steps or formalities by the Vendors and the Purchaser.

Provided that Closing occurs, and subject to the terms and conditions of this Agreement, possession, risk, legal and beneficial ownership of, rights in, and responsibility for, the Purchased Assets shall transfer from the Vendors to the Purchaser effective as of the Closing Time, all subject to the Approval and Vesting Order.

## 2.2    Option to Acquire Additional Assets

From the Effective Date until the date that is no less than ten (10) Business Days prior to the Closing Date, the Purchaser shall have the option (but not the obligation) to acquire any of the Optional Assets held by any of the Optional Vendors (the "**Real Property Option**"). If the Real Property Option is exercised, in whole or in part, the acquisition by the Purchaser of any of Optional Assets shall be free and clear of any Encumbrances and Liabilities, other than the Assumed Liabilities. In the event that the Real Property Option is exercised, in whole or in part, the Optional Assets subject to the exercise of the Real Property Option shall be deemed to be included in the definition of Purchased Assets. Notwithstanding anything to the contrary provided in this Agreement, the exercise of the Real Property Option will be subject to (i) the approval of the Monitor, and (ii) the Purchaser obtaining written consent from (A) the mortgage lenders to each of the mortgaged real property owned by the applicable Optional Vendors (the "**Lenders**") to the assignment of the existing mortgages to the Purchaser, and (B) the Royal Bank of Canada (in its capacity as administrative agent and collateral agent). The Purchaser may exercise the Real Property Option at its sole discretion by delivering to the Vendors and the Monitor written notice of its intention to exercise the Real Property Option (the "**Exercise Notice**") on or before the date that is ten (10) Business Days prior to the Closing Date. Such Exercise Notice shall, among other things, specify the Optional Assets the Purchaser wishes to acquire. After receiving the Exercise Notice, the Monitor shall advise the Purchaser within five (5) Business Days as to whether or not the Monitor consents to the exercise of the Real Property Option. If the Real Property Option is exercised, the Purchase Price shall be increased by $1.00 and concordant adjustments will be made to the Allocation Statement in Schedule "F".

If the Real Property Option is exercised, the Purchaser and Vendors may elect to complete the transaction as either an asset purchase or a share purchase transaction, and shall be subject to Court approval, which may be sought at the hearing for the Approval and Vesting Order, or at a subsequent hearing in the event that the Exercise Notice is not exercised, and the required consents are not obtained, prior to the motion for the Approval and Vesting Order being served.

In the event that (a) the Purchaser declines to exercise the Real Property Option, (b) the Lenders do not consent to the sale of any of the Optional Assets, or (c) the Monitor does not provide its consent to the exercise of the Real Property Option, then in each such case there shall be no right of termination on the part of the Purchaser or the Vendors based solely upon such event, and the Purchaser's obligations, entitlements or other rights under this agreement shall not be impaired, waived or diminished, including the obligation to proceed with the Transaction, excluding the Optional Assets, in accordance with the terms of this Agreement.

## ARTICLE 3
## PURCHASE PRICE AND RELATED MATTERS

**3.1** **Purchase Price**

(a)    The aggregate cash consideration payable by the Purchaser for the Purchased Assets based upon the Purchased Assets existing as at the date of this Agreement and subject to adjustment as set out below shall be as set out below (the "**Purchase Price**").

Purchase Price Allocation Summary:

| | |
|---|---|
| Vehicles (Schedule "G") | $43,098,837[1] |
| Acquired AR Amount (including Intercompany Receivables at nil consideration) | $9,000,000.00[2] |
| Tangible Property (Computers, office furniture, IT, mechanics tools, etc.) | $160,000.00 |
| Intangibles (IP, licenses, software, goodwill, Permits, license plates, Purchased Contracts, etc.) (Schedule "F") | $50,000.00 |
| PGL Insurance Shares | $1.00 |
| Inventory[3] | $100,000 |
| Prepaid Expenses | $50,000 |
| **TOTAL** | $52,458,838 |

(b)    The Purchase Price shall be satisfied in accordance with Section 3.3 and shall not be subject to any claim for set off, reduction or adjustment or any similar claim or mechanism of any kind whatsoever, other than as described herein. For the avoidance of doubt, any Cash or Cash Equivalents indirectly acquired by the Purchaser from the PGL Vendors pursuant to this Agreement will be acquired on a dollar for dollar basis and such amount of Cash or Cash Equivalents acquired hereunder shall be added to the Purchase Price after payment and deduction of any unpaid amounts owing by any of the PGL Vendors in respect of unpaid wages, source deductions, taxes and unpaid HST accruing up to the Closing Date (the "**Unpaid Post CCAA Filing Accruals**"). In the event that the Cash or Cash Equivalents are not sufficient to satisfy the Unpaid Post CCAA Filing Accruals or there are any liabilities that cannot be vested out and released as against the PGL Vendors and their directors and officers pursuant to the Approval and Vesting Order, the Purchase Price shall be reduced on a dollar for dollar basis to the extent that such Unpaid Post CCAA Filing Accruals and any such undischarged liabilities are greater than the Cash or Cash

---

1 Subject to further adjustment in accordance with s. 3.3(c).

2 Subject to further adjustment in accordance with s. 3.3(b).

3 Subject to further adjustment in accordance with s. 3.3(e).

Equivalents as at the Closing Date. For the avoidance of doubt, Unpaid Post CCAA Filing Accruals shall not be Excluded Liabilities. Subject to the filing of the elections referred to in Section 3.12 hereof, the Purchase Price shall be net of all applicable Transfer Taxes, which shall be paid in accordance with Section 3.12(a) hereof.

(c)     [Intentionally Omitted].

(d)     In addition, as set forth in Section 2.4 hereof, the Purchaser shall have the option to acquire the Optional Assets for a purchase price of $1.00 or such other amount as may be agreed to by the Monitor and Purchaser (and, for greater certainty, no other adjustment to the Purchase Price) and indirectly assume certain liabilities associated with the Optional Assets so acquired, including the mortgages and accrued property taxes and utilities associated with such Optional Assets.

## 3.2     Assumption of Liabilities

In addition to the Purchase Price, the Purchaser shall assume the Assumed Liabilities, which are estimated by the Purchaser to be equal to approximately $4 million based upon post-Closing obligations under the Purchased Contracts and the accrued vacation pay liabilities of the Employees. For the avoidance of doubt, the Purchaser shall assume all liabilities of PGL Insurance, by virtue of purchasing the shares of PGL Insurance.

## 3.3     Allocation

(a)     <u>Allocation Statement</u>. The Purchaser has delivered to the Monitor, on behalf of the Vendors, a statement (the "**Allocation Statement**"), as set out in Schedule "F", allocating, in sufficient detail, the Purchase Price and in respect thereof, (a) the allocation of the respective Purchase Price on an asset-by-asset basis, together with (b) the Purchase Price aggregated and allocated among each category of Purchased Assets of the Vendors.

(b)     <u>AR Adjustments</u>. In respect of Accounts Receivable, the Allocation Statement shall include a value to be allocated to the Accounts Receivable, which value shall be equal to 70% of the face amount of such Accounts Receivable other than Intercompany Receivables (the "**Acquired AR Amount**"), it being acknowledged and agreed by all Parties hereto that (a) the Acquired AR Amount shall remain at all times an amount equal to 70% of the full amount of the Accounts Receivable (other than Intercompany Receivables), as determined by the Monitor, and (b) the full amount of Accounts Receivable as estimated on the Allocation Statement shall be subject to adjustments based on the full amount of the Accounts Receivable, as determined by the Monitor, on (i) the Closing Date under the Interim Adjustment Statement in accordance with Section 3.4(c) (the "**Initial AR Adjustment**"), and (ii) the date that is sixty (60) days following the Closing Date, as determined in accordance with Section 3.10(a) hereof (the "**Final AR Adjustment**"). Notwithstanding the foregoing, no value shall be allocated to Intercompany Receivables, which shall be assigned to the Purchaser for no additional consideration.

(c)     <u>Vehicles Adjustment</u>. In respect of Vehicles, the Allocation Statement includes a value allocated to the Vehicles being acquired (the "**Acquired Vehicles Amount**"), it being acknowledged and agreed by all Parties hereto that (a) the Acquired Vehicles Amount shall not be amended or adjusted, other than removal of any Ineligible Equipment, and (b) the Purchase Price allocated to Equipment in the Allocation Statement shall be reduced to omit any Ineligible Equipment, in an amount equal to value attributed to such Ineligible Equipment on the Allocation Statement (such reduction, the "**Vehicle Adjustment**").

(d)  <u>Adjustments to Allocation Statement</u>. The Parties hereto shall make appropriate adjustments to the Allocation Statement to reflect any changes in the Purchase Price as of the Closing Time.  The Parties hereto agree for all Tax reporting purposes to report the Transaction in accordance with the Allocation Statement, as adjusted pursuant to the preceding sentence, and to not take any position during the course of any audit or other action inconsistent with such schedule unless required by a determination of the applicable Governmental Authority that is final.

(e)  <u>Fuel Inventory Adjustment</u>.  An amount of $50,000 of the Purchase Price has been allocated as the estimated fuel in the gas station fuel tanks as part of the "Inventory" in the Allocation Statement.  On the Closing Date, the Vendors shall provide an updated measurement of actual fuel in the gas station fuel tanks and the Purchase Price shall be adjusted by X-$50,000 where X is the cost basis of the actual fuel in the gas station fuel tanks on the Closing Date. (the "**Fuel Inventory Adjustment**").

**3.4  Satisfaction of Purchase Price**

The Purchaser shall satisfy the Purchase Price, at the Closing Time, in accordance with the following:

(a)  <u>Deposit.</u> The Parties acknowledge that the Purchaser has paid a deposit in the amount of $3,000,000 being approximately 5% of the Purchase Price (the "**Deposit**"), which Deposit is being held by the Monitor, in trust, in accordance with the terms of the Sale Process and shall be credited against the Purchase Price at Closing.

(b)  <u>Cash Purchase Price.</u> An amount shall be paid to the Monitor (the "**Cash Purchase Price**"), for the benefit of the Vendors, at the Closing Time, in immediately available funds equal to the Purchase Price (i) *minus* the Deposit, (ii) *plus* or *minus* the Initial AR Adjustment (if any), (iii) *plus* or *minus* the Vehicle Adjustment (if any), and (iv) *plus* or *minus* the Fuel Inventory Adjustment (if any).

(c)  <u>Initial AR Adjustment.</u> The PGL Vendors, in consultation with the Monitor, shall carry out a physical accounting and adjustment and prepare and deliver to Purchaser no less than five (5) Business Days before the Closing a statement (the "**Interim Adjustment Statement**") setting out the PGL Vendors' good faith estimate of any difference between the Acquired AR Amount as set out in the Allocation Statement and the full value of the acquired accounts receivable on the Closing Date. The Interim Adjustment Statement shall be used to calculate any adjustments to the Cash Purchase Price required by Section 3.3.

(d)  <u>Vehicle Adjustment.</u> The PGL Vendors and TPine, in consultation with the Monitor, shall carry out a physical accounting and adjustment and prepare and deliver to Purchaser no less than five (5) Business Days before the Closing an updated schedule of Vehicles (the "**Vehicle Adjustment Statement**") setting out any Ineligible Equipment by VIN. The Vehicle Adjustment Statement shall be used to calculate the Vehicle Adjustment required by Section 3.3.

**3.5  Deposit**

(a)  If Closing occurs in accordance with the terms and conditions of this Agreement, the Deposit shall be credited against the Purchase Price, in partial satisfaction of the Purchaser's obligation to pay the Purchase Price at Closing.

(b)  If this Agreement is terminated:

(i)     due to breach by the Purchaser as a result of events or circumstances entirely under the Purchaser's control that are not cured or waived and result in this Agreement not closing, then the Monitor on behalf of the Vendors shall be entitled to retain the Deposit and the full amount of the Deposit shall be forfeited to the Vendors; or

(ii)    for any other reason, including, for the avoidance of doubt, the failure of the Vendors to satisfy any of its obligations or meet any of its conditions in this Agreement or any of the Purchaser's conditions set forth under Section 6.2 not being satisfied, the Deposit shall be returned to the Purchaser within three (3) Business Days of the termination of the Agreement; and

each Party shall be released from all obligations and liabilities under or in connection with this Agreement. In the event of termination of this Agreement under Section 6.3 pursuant to which the Vendors shall be entitled to retain the Deposit, the Parties agree that the amount of the Deposit constitutes a genuine pre-estimate of liquidated damages representing the Vendors' Losses and Liabilities as a result of Closing not occurring and agree that the Vendors shall not be entitled to recover from the Purchaser any amounts that are in excess of the Deposit as a result of Closing not occurring. The Purchaser hereby waives any claim or defence that the amount of the Deposit is a penalty or is otherwise not a genuine pre-estimate of the Vendors' damages.

## 3.6     Assignment of Critical Required Contracts

In the event that there are any Critical Required Contracts which are not assignable in whole or in part without the consent, approval or waiver of another Person and such consents, approvals or waivers have not yet been obtained as of the Closing Date, then:

(a)     nothing in this Agreement will be construed as an assignment of any Critical Required Contract and, without limiting the foregoing, the Purchaser does not assume and has no obligation to discharge any liability or obligation under or in respect of any such Critical Required Contract, until (i) an Assignment Order is obtained in accordance with 3.6(c), or (ii) such consent, approval or waiver is obtained in respect of such Critical Required Contract on terms satisfactory to the Purchaser, in either case following which the value of and rights of the applicable PGL Vendor under such Critical Required Contract shall enure to the applicable Purchaser;

(b)     the PGL Vendors shall use their commercially reasonable efforts to obtain any such consent, approval or waiver, and the Purchaser shall provide reasonable cooperation to assist the PGL Vendors in obtaining any such consent, approval or waiver;

(c)     if any consent, approval or waiver is not obtained for any Critical Required Contract prior to Closing, the Purchaser may request that the PGL Vendors bring a motion to the Court for issuance of an Assignment Order with respect to such Critical Required Contract prior to Closing;

(d)     once the consent, approval or waiver to the assignment of a Critical Required Contract is obtained, or the assignment of such Contract has been ordered by the Court pursuant to an Assignment Order, such Critical Required Contract shall be deemed to be assigned to the Purchaser on Closing;

(e)     the PGL Vendors shall preserve the Critical Required Contracts for the benefit of the Purchasers and shall not terminate, amend, modify, assign, convey or otherwise transfer all or any part of such Critical Required Contracts until such time as the required consent,

approval or waiver or an Assignment Order is obtained, to enable the Purchasers to obtain the benefit of the Critical Required Contracts; and

(f)     the PGL Vendors, with the consent of the Purchaser, shall have the right to disclaim any Critical Required Contract in accordance with the CCAA, and in the event of disclaimer, such Critical Required Contract shall be considered an Excluded Contract for all purposes under this Agreement.

With respect to each Critical Required Contract, subject to Closing and to either (i) the consent, approval or waiver of the other parties thereto to the assignment thereof, or (ii) in the absence of such consent, approval or waiver, the obtaining of an Assignment Order, in addition to its other obligations under this Agreement, the Purchaser shall pay the applicable Cure Costs related to such Critical Required Contract on Closing.

## 3.7     Change of Control Consents

(a)     The Vendors shall as promptly as practicable submit requests for the Change of Control Consents to the applicable party related to the purchase of PGL Insurance and, if applicable, the Optional Assets (provided that Change of Control Consents in respect of the Optional Assets shall not be sought until the Exercise Notice has been delivered by the Purchaser). The Vendors shall, and they shall cause the PGL Insurance and, if applicable, the Lenders associated with the Optional Assets, to obtain or cause to be obtained prior to Closing the Change of Control Consents on such terms as are acceptable to the Purchaser, acting reasonably. The Purchaser shall co-operate in obtaining the Change of Control Consents.

(b)     PGL and the Real Property Vendor shall, and PGL and the Real Property Vendor shall cause PGL Insurance and, if applicable, the Lenders associated with the Optional Assets to provide, or cause to be provided, all notices that are required to be provided in connection with the Transactions.

## 3.8     Post-Closing Cash

If, after the Closing Date, the PGL Vendors come into possession of any Cash or Cash Equivalents that are proceeds of Accounts Receivable purchased by the Purchaser (the **"Post-Closing Cash"**), the Monitor, on behalf of the PGL Vendors, shall hold all such amounts in trust for the Purchaser and shall forthwith wire or otherwise transfer any Post-Closing Cash to an account designated by the Purchaser in writing.

## 3.9     Good Faith Dealings

(a)     The Parties shall co-operate fully in good faith with each other and their respective legal advisors, accountants and other representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, including making or causing to be made, all filings and submissions, as applicable, required under any Applicable Law to effect the Closing.

(b)     The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing on or before the Outside Date.

(c)     The Parties acknowledge, agree and confirm that the Agreement was negotiated, proposed and entered into by the Vendors and the Purchaser in good faith, without collusion, and from arm's-length bargaining positions and that the Purchaser is a good faith purchaser

within the meaning of section 363(m) of the United States Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

**3.10    Post-Closing Adjustments**

In the event that any prorations, apportionments, computations, statements of Purchased Assets or amounts made hereunder shall require final adjustment, then the Parties shall use good faith and diligent efforts to make the appropriate adjustments promptly when accurate information becomes available and either Party shall be entitled to an adjustment to correct the same provided that, it makes written demand on the one from whom it is entitled to such adjustment within 90 days of the Closing Date (or prior to the end of any applicable tax period).

Notwithstanding the foregoing, the Parties hereto agree to work together in good faith, and in consultation with the Monitor and CRO, to make any necessary post-Closing adjustments to the Purchase Price as follows:

(a)     On the date that is sixty (60) days following the Closing Date, the Purchaser shall deliver to the Vendors and the Monitor a statement (the "**Final Adjustment Statement**"), together with any supporting accounting and other information, that sets out as at such date (A) the full amount of the purchased Accounts Receivable compared to the value of the Acquired AR Amount set out in the Allocation Statement; (B) the Vehicles actually received by the Purchaser, compared to the listing of the purchased Vehicles on Schedule "G" (as amended prior to the Closing Date to omit any Ineligible Equipment) and (C) the actual amount of the Prepaid Expenses as at the Closing Date in respect of which the Purchaser receives the actual benefit of on Closing, compared to the value of the Prepaid Expenses set out in the Allocation Statement. The Final Adjustment Statement shall be in a form acceptable to the Vendors, in consultation with the Monitor;

(b)     On or before the date that is ninety (90) days following the Closing Date, the Vendors, in consultation with the Monitor, may provide changes and comments on the Final Adjustment Statement to the Purchaser in writing, and the Purchaser and Vendors, in consultation with the Monitor, shall negotiate in good faith to finalize the Final Adjustment Statement, failing which either Party may direct the Monitor to engage an independent third-party accountant to resolve any discrepancies regarding the Final Adjustment Statement on such terms and standards as the Parties may agree in good faith in consultation with the Monitor;

(c)     Subject to the Final Adjustment Statement being resolved pursuant to (b) above, the Parties agree to the following post-Closing adjustments to the Purchase Price, to be paid in readily available cash as the Parties may determine in good faith:

(i)     an adjustment in favour of the Purchaser or the Vendors, as the case may be, in the amount of the applicable Final AR Adjustment as between the Closing Date and the date that is sixty (60) days following the Closing Date; and

(ii)     an adjustment in favour of the Purchaser in the amount of any Purchased Assets that the Vendor was incapable of delivering unto the Purchaser for any reason despite making its best efforts to do so, provided that the aggregate value of such Purchased Assets that cannot be delivered to the Purchaser is equal to or greater than two percent (2%) of the Purchase Price, failing which there shall not be any adjustment under this subheading.

**3.11**     **Withholding**

The Purchaser (or any affiliate thereof) shall be permitted to deduct or withhold from any amounts payable under this Agreement any amounts required to be deducted or withheld pursuant to Applicable Law in respect of Taxes, provided that it shall remit or cause to be remitted, such withheld amounts to the appropriate Governmental Authority in accordance with Applicable Law. To the extent that a Party becomes aware that any consideration payable under this Agreement may be subject to withholding Taxes, it shall promptly notify the other Party and the Parties shall cooperate in good faith to minimize or eliminate the amount of such withholding Taxes (including seeking relief from the Court, if applicable). To the extent that any amounts are so deducted or withheld and timely paid over to the applicable Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

**3.12**     **Payment of Sales Taxes and Tax Elections**

(a)     <u>Transfer Taxes</u>.  The Purchaser shall be liable for and shall pay all federal and provincial sales, goods and services, harmonized sales, value added, use, transfer, property or land transfer and similar Taxes ("**Transfer Taxes**") properly payable upon and in connection with the sale, assignment and transfer of the Purchased Assets from the Vendors to the Purchaser, which for greater certainty exclude any Taxes payable on the Vendors' net income, profits or gains. Subject to Section 3.12(b), where the Transfer Taxes are collectable by the Vendors, the Purchaser shall pay such Transfer Taxes directly and promptly to the Vendors upon the delivery of such documentation as may be prescribed under applicable Laws indicating the applicable Transfer Taxes and the Vendors' relevant Transfer Tax registration number(s) and any other information required for the Purchaser to obtain any applicable input tax credits or similar amounts in respect of such Transfer Taxes (or alternatively, in the context of any property or land transfer tax or other Tax required to be paid directly by the Purchaser to a Governmental Authority, the Purchaser shall pay such tax directly to the applicable Governmental Authority). The Vendors shall remit any such Transfer Taxes received from the Purchaser directly to the relevant taxation authority.  For Transfer Taxes that are payable directly by the Purchaser to the relevant Governmental Authority (including, for greater certainty, GST/HST to be self-assessed on the acquisition of real property), the Purchaser will be responsible for, and shall indemnify and hold harmless the Vendors from, such Transfer Taxes, plus any applicable penalties and interest.  For purposes of calculating the Transfer Taxes collectable by the Vendors, the provincial place of supply for the Purchased Assets physically situated in Canada will be determined by the Vendor one (1) day prior to Closing.

(b)     <u>GST/HST Election</u>.  PGL and the Purchaser shall jointly make the election provided for under section 167 of the *Excise Tax Act* (Canada) and under section 75 of *an Act respecting the Quebec sales tax* that no tax be payable pursuant to that legislation in respect of the purchase and sale of the Purchased Assets to be sold by PGL as contemplated by this Agreement.  The Purchaser and PGL, in consultation with the Monitor, shall jointly complete the election form(s) (including more particularly the form described as form GST-44 and Form FP-2044) in respect of such election and the Purchaser shall file the said election form(s) no later than the due date for the Purchaser's GST/HST and QST returns for the first reporting period in which GST/HST, would, in the absence of such election, become payable in connection with the transactions contemplated by this Agreement (or within the timelines otherwise required under applicable provincial law), and will provide evidence of such filings to the Vendors and the Monitor. Notwithstanding the foregoing, the Purchaser shall, on demand, indemnify and hold harmless the Vendors and their

directors, shareholders, employees, and successors of any Taxes (including interest and penalties) resulting from (i) the Purchaser's failure to timely file any election form (including the GST-44 and F P-2044) required to be filed pursuant to this paragraph, or (ii) any assessment, reassessment or imposition of GST/HST, QST assessed or imposed by any Governmental Authority as a result of or as a consequence of a rejection or denial of the GST/HST and QST elections made by the parties pursuant to this paragraph. The Purchaser does not assume and shall not be liable for any other Taxes which may be or become payable by the Vendors other than Transfer Taxes in connection with the purchase and sale of the Purchased Assets pursuant to this Agreement.

(c)     <u>Income Tax Election – Section 22 of the ITA</u>.    The Purchaser and the Vendors, in consultation with the Monitor, agree to make and file, in a timely manner, a joint election under section 22 of the ITA and any other equivalent or corresponding provision under applicable provincial or territorial tax legislation with respect to the sale, assignment, transfer and conveyance of the Accounts Receivable and shall designate therein that portion of the Purchase Price allocated to the Accounts Receivable in accordance with the procedures set out in Section 3.2 and 3.10 of this Agreement. The Purchaser and the Vendors, in consultation with the Monitor shall each file such elections, along with any documentation necessary or desirable to give effect to such elections, within the prescribed time limitations and will also prepare and file all of their respective Tax Returns in a manner consistent with such allocation.

## ARTICLE 4
## COVENANTS

**4.1     Closing Date**

(a)     The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing.

(b)     Each of the Parties shall, as promptly as possible, make, or cause to be made, all filings and submissions, as applicable, required under any Applicable Law to effect the Closing.

**4.2     Motion for Approval and Vesting Order and Assignment Order**

As soon as practicable after the date of this Agreement, the Vendors shall serve and file with the Canadian Court a motion for the issuance of the Approval and Vesting Order, seeking relief that will, *inter alia*, approve this Agreement and the Transaction and the Assignment Order. The Vendors shall use their best efforts to seek the issuance and entry of the Approval and Vesting Order and the Purchaser shall cooperate with the Vendors in their efforts to obtain the issuance and entry of the Approval and Vesting Order and the Assignment Order.

To the extent required to give full effect to, and implement, the Transaction, Randall Benson, in his capacity as the foreign representative of the Vendors, shall seek U.S. Court approval of the Transaction solely with respect to Purchased Assets located within the territorial jurisdiction of the United States in the form and manner required by the order approving the sales procedures motion to be filed in the Chapter 15 Proceedings set forth in the Order (i) Approving the Sale Procedures and Sale Notice, (ii) Authorizing the Sale of the Debtors' U.S. Assets Free and Clear and Liens, Claims, Encumbrances and Other Interests, and (iii) Granting Related Relief.

**4.3        Interim Period**

During the Interim Period, the Vendors shall ensure that all of the Purchased Assets remain insured and the Vendors shall use commercially reasonable efforts to continue to maintain the Purchased Assets and the Business in substantially the same manner as on the Effective Date, *provided that* the Purchaser hereby acknowledges that payments to equipment financers of the Vendors have not been made during the pendency of the CCAA Proceedings to date.

**4.4        Access During Interim Period**

During the Interim Period, the Monitor, on behalf of the Vendors, shall give, or cause to be given, to the Purchaser, and its representatives, reasonable access during normal business hours to the Books and Records, to conduct such investigations, inspections, surveys or tests thereof and of the financial and legal condition of the Business and Assets as the Purchaser reasonably deems necessary or desirable to further familiarize themselves with the Business and/or Assets. Without limiting the generality of the foregoing: (a) the Purchaser and its representatives shall be permitted reasonable access during normal business hours to all documents relating to information scheduled or required to be disclosed under this Agreement and to the Employees; and (b) the Purchaser and its Representatives shall be permitted to contact and discuss the Transactions contemplated herein with Governmental Authorities and the Vendors' customers and contractual counterparties. Such investigations, inspections, surveys and tests shall be carried out at the Purchaser's sole and exclusive risk and cost, during normal business hours, and without undue interference with the Vendors' operations and the Vendors shall co-operate reasonably in facilitating such investigations, inspections, surveys and tests and shall furnish copies of all such documents and materials relating to such matters as may be reasonably requested by or on behalf of the Purchaser. For the avoidance of doubt, nothing in this section 4.4 shall constitute a due diligence condition, and nothing discovered or learned by the Purchaser during the Interim Period shall entitle the Purchaser to terminate this Agreement or adjust the Purchase Price.

**4.5        Insurance Matters**

Until Closing, the Vendors shall keep in full force and effect all existing insurance policies relating to the Purchased Assets or the Business, and give any notice or present any claim under any such insurance policies consistent with past practice of the Vendors in the ordinary course of business. Any insurance proceeds received shall be applied to repair or remedy any damage caused by fire, theft, vandalism, collision or other calamity to any Equipment or other property being purchased by the Purchaser pursuant to this Agreement. For the avoidance of any doubt, in the event that insurance proceeds are paid or payable in respect of any Wrecked Equipment that is excluded from Schedule "G" in accordance with the terms hereof, the Purchaser shall in no case be entitled to any portion of such proceeds, and such proceeds constitute Excluded Assets hereunder.

**4.6        Post-Closing Matters**

Following Closing, each Vendor that holds, or is a direct or indirect beneficiary of, any Permit (each, a "**Permit Vendor**") and each Related Party Landlord shall continue as a corporation in good standing, in the CCAA Proceedings, and the Purchaser and Vendors agree that the Approval and Vesting Order shall provide that (a) the Permit Vendors and Related Party Landlords shall be subject to the exclusive governance and control of the CRO and/or the Monitor, (b) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Permit Vendor shall be bankrupt, dissolved or otherwise wound-up prior to the earlier of (i) the date that all Permits are irrevocably transferred to the Purchaser, (ii) the date that the Purchaser advises the CRO and the Monitor in writing that it does not require the irrevocable transfer of the Permits to the Purchaser, and (iii) March 31, 2025, and (c) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Related Party Landlord

shall be bankrupt, dissolved or otherwise wound-up prior to the date that the lease, access agreement or parking agreement to which the Related Party Landlord is terminated.

**ARTICLE 5**
**CLOSING ARRANGEMENTS**

**5.1     Closing**

Closing shall take place on the Closing Date effective as of the Closing Time electronically (or as otherwise determined by mutual agreement of the Parties in writing), by the exchange of deliverables (in counterparts or otherwise) by electronic transmission in PDF format.

**5.2     Vendors' Closing Deliveries**

At or before the Closing Time, the Vendors shall deliver or cause to be delivered to the Purchaser the following:

(a)     any Specific Conveyances required in respect of the transfer of the Purchased Assets from the Vendors to the Purchaser, including, if applicable, the transfer of the Optional Assets;

(b)     a true copy of the Approval and Vesting Order, as signed by the Canadian Court;

(c)     all required consents or approval orders, in form and substance satisfactory to the Purchaser, providing for the assignment and transfer of the Critical Required Contracts;

(d)     all required consents, in form and substance satisfactory to the Purchaser, to the change of control of PGL Insurance, which shall be provided by the Purchaser to the Vendors for execution (the "**Change of Control Consents**");

(e)     consents to the assignment of the Permits effective on the Closing date, or a duly executed copy of the Transition Services Agreement;

(f)     any tax elections contemplated by Section 3.11 duly executed by the applicable Vendors;

(g)     evidence that all necessary corporate actions have been taken on or prior to the Closing to permit good title to the PGL Insurance Shares to be duly and validly transferred and assigned to the Purchaser at the Closing;

(h)     share certificates representing all issued and outstanding shares of PGL Insurance accompanied with duly executed share transfer forms in the name of the Purchaser or its nominee or evidence of cancellation of all existing outstanding shares and issuance of new share certificates to the Purchaser or its nominee, in either case, together with security registers evidencing that the Purchaser or its nominee is the sole holder of PGL Insurance;

(i)     the Books and Records of the Vendors, PGL Insurance, LeaseCo and, if applicable, any Optional Vendors;

(j)     a true copy of the U.S. Approval Order as entered by the U.S. Court;

(k)     a certificate of an officer of the Vendors dated as of the Closing Date confirming that all of the representations and warranties of the Vendors contained in this Agreement are true in all material respects as of the Closing Time, with the same effect as though made at and

as of the Closing Time, and that the Vendors have performed in all material respects the covenants to be performed by them prior to the Closing Time; and

(l)     such other agreements, documents and instruments as may be reasonably required by the Purchaser to complete the Transaction, all of which shall be in form and substance satisfactory to the Parties, acting reasonably.

**5.3     Purchaser's Closing Deliveries**

At or before the Closing, the Purchaser shall deliver or cause to be delivered to the Vendors (or to the Monitor, as applicable), the following:

(a)     the Cash Purchase Price;

(b)     all Transfer Taxes payable in accordance with Section 3.12(a);

(c)     evidence that all Offers of Employment have been provided to the Employees prior to Closing in accordance with Section 9.1(a);

(d)     duly executed assignment and assumption agreements, in form and substance satisfactory to the Vendors, evidencing the assumption by the Purchaser of the Purchased Contracts and Assumed Liabilities;

(e)     any Specific Conveyances required in respect of the transfer of the Purchased Assets from the Vendors to the Purchaser;

(f)     any tax elections contemplated by Section 3.12 duly executed by the Purchaser;

(g)     a certificate of an officer of the Purchaser dated as of the Closing Date confirming that all of the representations and warranties of the Purchaser contained in this Agreement are true in all material respects as of the Closing Time, with the same effect as though made at and as of the Closing Time, and that the Purchaser has performed in all material respects the covenants to be performed by it prior to the Closing Time; and

(h)     such other agreements, documents and instruments as may be reasonably required by the Monitor on behalf of the Vendors to complete the Transaction, all of which shall be in form and substance satisfactory to the Monitor and the Purchaser, acting reasonably.

**5.4     Post-Closing Deliveries**

(a)     Following Closing, as soon as practicable after receiving a written direction to do so by the Purchaser, PGL, PGL USA, PGL International, PFS and PFS USA shall file articles of amendment to change their name to another name or numbered company and shall deliver to the Purchaser evidence of the filing of such articles of amendment and change of name and shall consent to the Purchaser changing its name to "Pride Group Logistics Ltd.", it being acknowledged by the Vendors that the Purchaser is purchasing all goodwill and intellectual property associated with the "Pride Group Logistics" name and that the change of the name of the Purchaser to Pride Group Logistics Ltd. may facilitate the assignment and continuation of Permits currently held by the Vendors, provided however that the Purchaser may defer delivering the direction referred to herein in respect of any Permit Vendors that are required to maintain their current name in order to maintain any Permits in good standing, in which case such Permit Vendors shall maintain their current names until such time as the Purchaser advises the Monitor and the CRO, in writing, that the

– 25 –

applicable Permits are no longer required to be maintained by the Permit Vendors pursuant to Section 4.6, and the Purchaser shall contemporaneously with such advise to the Monitor and CRO delivery the direction contemplated hereby, at which point the applicable Permit Vendors shall promptly change their names in accordance with this Section 5.4.

(b)     Immediately following the receipt of the documents set out in Section 5.4(a) above, or as soon as practicable thereafter, the Purchaser and each of its Permitted Assignees shall be entitled to file articles of amendment, articles of incorporation or otherwise effect a change of name in their applicable jurisdiction of incorporation to utilize one or more of the names of the Vendors set out in Section 5.4(a) above, and shall, upon doing so, provide the Monitor with evidence of the filing of such articles of amendment, articles of incorporation or other documents evidencing such change of name.

**ARTICLE 6**
**CONDITIONS OF CLOSING**

**6.1     Conditions Precedent in Favour of the Parties**

The obligation of the Parties to complete the Transaction is subject to the following joint conditions being satisfied, fulfilled or performed on or prior to the Closing Date:

(a)     <u>Approval and Vesting Order and Assignment Order.</u> The Canadian Court shall have issued and entered the Approval and Vesting Order on or before September 25, 2024 (or such later date as may be agreed by the Purchaser, Vendors and Monitor) and the Assignment Order on or before October 7, 2024 (or such later date as may be agreed by the Purchaser, Vendors and Monitor) in form and substance satisfactory to the parties, or as soon thereafter subject to availability of the Canadian Court, which Approval and Vesting Order and, if applicable, Assignment Order, have become Final Orders.

(b)     <u>US Approval Order.</u>  The U.S. Approval Order shall have been entered by the U.S. Court.

(c)     <u>No Order</u>. No Applicable Law and no judgment, injunction, order or decree shall have been issued by a Governmental Authority or otherwise in effect that restrains or prohibits the completion of the Transaction;

(d)     <u>No Restraint.</u> No motion, action or proceedings shall be pending by or before a Governmental Authority to restrain or prohibit the completion of the Transaction contemplated by this Agreement; and

The foregoing conditions are for the mutual benefit of the Parties. If any condition set out in this Section 6.1 is not satisfied, performed or mutually waived on or prior to the Closing Date, any Party may elect on written notice to the other Parties to terminate this Agreement.

**6.2     Conditions Precedent in Favour of the Purchaser**

The obligation of the Purchaser to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)     <u>Change of Control Consents; Critical Required Contracts</u>: The assignment of all Critical Required Contracts to the Purchaser shall have been completed either pursuant to the Change of Control Consents or the Assignment Order, provided that this condition shall not apply to any Change of Control Consents or Critical Required Contracts that are not in

good standing, transferred or assigned solely as a result of the Purchaser's failure to pay the applicable Cure Costs.

(b)   <u>Vendors' Deliverables.</u> The Vendors shall have executed and delivered or caused to have been executed and delivered to the Purchaser at the Closing all the documents contemplated in Section 5.2.

(c)   <u>No Breach of Representations and Warranties</u>. Except as such representations and warranties may be affected by the occurrence of events or transactions specifically contemplated by this Agreement, each of the representations and warranties contained in Section 7.1 shall be true and correct in all material respects: (i) as of the Closing Date as if made on and as of such date; or (ii) if made as of a date specified therein, as of such date.

(d)   <u>No Breach of Covenants.</u> The Vendors shall have performed, in all material respects, all covenants, obligations and agreements contained in this Agreement required to be performed by the Vendors on or before the Closing Date.

(e)   <u>Monitor's Certificate.</u> The Monitor shall have provided an executed certificate of the Monitor substantially in the form attached to the Approval and Vesting Order (the "**Monitor's Certificate**") confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Vendors.

(f)   <u>Real Property.</u>

   (i)   In the event that the Purchaser (A) exercises the Real Property Option with respect to the purchase of the 129 Shares, and the Purchaser is unable to obtain the required consents and approvals from the applicable Lenders or the Monitor to acquire the real property currently owned by 129 Canada, or (B) advises the Vendors and the Monitor in writing that it does not intend to exercise the Real Property Option with respect to the 129 Shares, then the Purchaser or its nominee shall have entered into a lease agreement or such other form of arrangement, consistent with the Approved Lease Terms, for the property municipally known as 1943 & 1945 55e Avenue, Dorval, Quebec.

   (ii)   The Purchaser or its nominee shall have entered into an access or parking agreement with 207 Ontario for the use by the Purchaser of the real property municipally known as 10862 Steeles Ave E., Milton, Ontario, currently held by 207 Ontario in a manner consistent with the existing use of such property by the Vendors, consistent with the Approved Lease Terms;

   (iii)   The Purchaser or its nominee shall have entered into a lease with 933 Helena for the continued use of the real property municipally known as 933 Helena Street, Fort Erie, Ontario, currently held by 933 Helena, consistent with the Approved Lease Terms.

   (iv)   Without limiting Section 6.2(a), the Purchaser shall be entitled to the continued use of the real property municipally known as 6050 Dixie Road, Mississauga, Ontario, currently used by the PGL Vendors, on existing lease terms for the duration of the existing lease, and the Vendors shall have obtained a Change of Control Consent from the 6050 Dixie Road landlord, or Assignment Order in respect thereof.

(v)     Without limiting Section 6.2(a), the Purchaser shall be entitled to the continued use of the real property municipally known as 6253 Boundary Road, Cornwall, ON, currently used by the PGL Vendors, on existing lease terms for the duration of the existing lease, and the Vendors shall have obtained a Change of Control Consent from the 6253 Boundary Road landlord, or Assignment Order in respect thereof.

The foregoing conditions are for the exclusive benefit of the Purchaser. Any condition in this Section 6.2 may be waived by the Purchaser in whole or in part, without prejudice to any of its rights of termination in the event of non-fulfillment of any other condition in whole or in part. Any such waiver shall be binding on the Purchaser only if made in writing. If any condition set out in this Section 6.2 is not satisfied or performed by the Closing Date, the Purchaser may elect on written notice to the Vendors to terminate this Agreement.

### 6.3     Conditions Precedent in Favour of the Vendors

The obligation of the Vendors to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)     <u>Purchaser's Deliverables</u>. The Purchaser shall have executed and delivered or caused to have been executed and delivered to the Vendors at the Closing all the documents and payments contemplated in Section 5.3.

(b)     <u>No Breach of Representations and Warranties</u>. Each of the representations and warranties contained in Section 7.2 shall be true and correct in all material respects (i) as of the Closing Date as if made on and as of such date, or (ii) if made as of a date specified therein, as of such date.

(c)     <u>No Breach of Covenants.</u> The Purchaser shall have performed in all material respects all covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(d)     <u>Monitor's Certificate.</u> The Monitor shall have provided an executed copy of the Monitor's Certificate confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Vendors.

The foregoing conditions are for the exclusive benefit of the Vendors. Any condition in this Section 6.3 may be waived by the Vendors in whole or in part, without prejudice to any of their rights of termination in the event of non-fulfilment of any other condition in whole or in part. Any such waiver shall be binding on the Vendors only if made in writing. If any condition set forth in this Section 6.3 is not satisfied or performed by the Closing Date, the Vendors may elect on written notice to the Purchaser to terminate the Agreement.

### ARTICLE 7
### REPRESENTATIONS AND WARRANTIES

### 7.1     Representations and Warranties of the Vendors

The Vendors hereby jointly and severally represent and warrant as of the Effective Date and as of the Closing Time as follows, and acknowledge that the Purchaser is relying on such representations and warranties in connection with entering into this Agreement and performing its obligations hereunder:

(a)   <u>Incorporation and Status.</u> The Vendors are corporations incorporated and existing under the *Business Corporations Act* (Ontario), are in good standing under such act and have the power and authority to enter into, deliver and perform their obligations under this Agreement.

(b)   <u>Corporate Authorization.</u> The execution, delivery and, subject to obtaining the Approval and Vesting Order and Assignment Order in respect of the matters to be approved therein, performance by the Vendors of this Agreement has been authorized by all necessary corporate action on the part of the Vendors.

(c)   <u>Execution and Binding Obligation.</u> This Agreement has been duly executed and delivered by the Vendors and constitutes a legal, valid and binding obligation of the Vendors, enforceable against them in accordance with its terms, subject only to obtaining the Approval and Vesting Order, the Assignment Order, and the U.S. Approval Order.

(d)   <u>Proceedings.</u> There are no proceedings pending against the Vendors, or any of them, or, to the knowledge of the Vendors, threatened, with respect to, or in any manner affecting, title to the Purchased Assets, which would reasonably be expected to enjoin, delay, restrict or prohibit the transfer of all or any part of the Purchased Assets as contemplated by this Agreement or which would reasonably be expected to delay, restrict or prevent the Vendors from fulfilling any of their obligations set forth in this Agreement, provided that the Approval and Vesting Order is granted.

(e)   <u>No Consents or Authorizations.</u> Subject only to obtaining the Approval and Vesting Order, the Assignment Order and, to the extent applicable, the U.S. Approval Order, the Vendors do not require any consent, approval, waiver or other Authorization from any Governmental Authority as a condition to the lawful completion of the Transaction.

(f)   <u>Residency.</u> None of the Vendors (other than PGL USA and PFS USA) is a non-resident of Canada for purposes of the ITA.

(g)   <u>No Other Agreements to Purchase.</u> Except for the Purchaser's rights under this Agreement, no Person has any contractual right, option or privilege for the purchase or acquisition from the Vendors of any of the Purchased Assets.

## 7.2   Representations and Warranties of the Purchaser

The Purchaser hereby represents and warrants to and in favour of the Vendors as of the Effective Date and as of the Closing Time, and acknowledges that, the Vendors are relying on such representations and warranties in connection with entering into this Agreement and performing their obligations hereunder:

(a)   <u>Incorporation and Status.</u> The Purchaser is a corporation incorporated and existing under the laws of the Province of Ontario as of the date hereof, is in good standing under such act and has the power and authority to enter into, deliver and perform their obligations under this Agreement.

(b)   <u>Corporate Authorization.</u> The execution, delivery and performance by the Purchaser of this Agreement has been authorized by all necessary corporate action on the part of the Purchaser.

(c)   <u>No Conflict.</u> The execution, delivery and performance by the Purchaser of this Agreement do not (or would not with the giving of notice, the lapse of time, or both, or the happening of any other event or condition) result in a breach or a violation of, or conflict with, or

allow any other Person to exercise any rights under, any terms or provisions of the Organizational Documents of the Purchaser.

(d)     Execution and Binding Obligation. This Agreement has been duly executed and delivered by the Purchaser and constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms subject only to the Approval and Vesting Order, the Assignment Order and, to the extent applicable, the U.S. Approval Order.

(e)     Proceedings. There are no proceedings pending, or to the knowledge of the Purchaser, threatened, against the Purchaser before any Governmental Authority, which prohibit or seek to enjoin delay, restrict or prohibit the Closing of the Transaction, as contemplated by this Agreement, or which would reasonably be expected to delay, restrict or prevent the Purchaser from fulfilling any of its obligations set forth in this Agreement.

(f)     Residency. The Purchaser is not a non resident of Canada within the meaning of section 116 of the ITA.

(g)     Sanctions Not Applicable. None of the Purchaser, any of its subsidiaries or, to the knowledge of the Purchaser, any director, officer, agent, employee, Affiliate or representative of the Purchaser or any of its subsidiaries is, or is controlled or 50% or more owned by or is acting on behalf of, an individual or entity ("**Person**") currently the subject of applicable economic sanctions including those administered or enforced by the government of Canada, the United States of America (collectively, "**Sanctions**"). None of the Purchaser or any of its subsidiaries is located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions. To the Purchaser's knowledge, neither it nor any of its subsidiaries has engaged in any dealings or transactions with or for the benefit of a Person subject to Sanctions. The Purchaser has procedures and policies in place designed to ensure compliance with Sanctions.

(h)     Equity Financing. The Purchaser has obtained not less than $5,000,000 in equity financing.

(i)     GST/HST Registration. The Purchaser is registered for goods and services tax/harmonized sales tax (GST/HST) purposes under Part IX of the *Excise Tax Act* (Canada), and its registration number is 766551022. The Purchaser will be registered effective on the Closing Date for Quebec sales tax (QST) purposes under Title I of *an Act respecting the Quebec sales tax.*

### 7.3    Transfer of Title; Conveyance of Assets

Subject to the conditions relating to leases set out in Section 6.2 above, the Purchaser is responsible for transferring any physical Purchased Assets (including specifically, any Equipment owned by the Vendors) as soon as practicable following Closing situated on any real properties owned or leased by the Vendors that are not acquired by the Purchaser pursuant to the Transaction.

### 7.4    "As is, Where is"

(1)     The Purchaser acknowledges and agrees that it is purchasing the Purchased Assets on an "as is, where is" basis, and without representations or warranties of any kind, nature, or description by the Monitor, the CRO, the Vendors or any of their respective agents, advisors or estates, and on the basis that the Purchaser has conducted to its satisfaction an independent inspection, investigation and verification of the Purchased Assets (including a review of title), and all other relevant matters and has determined to proceed with the transaction contemplated herein and will accept the same at the Closing Time in their then current state, condition, location, and amounts, provided, however, that the Purchaser shall not be required to accept

any Equipment or other property that has been lost, damaged or destroyed due to theft, fire, collision, vandalism or other calamity and for which insurance proceeds are not available to repair or replace such Equipment (the "**Wrecked Equipment**"), in which case such Wrecked Equipment will be deemed not to have been received by the Purchaser and the Purchaser shall be entitled to a reduction of the Purchase Price in accordance with Section 3.10.

(2)     No representation, warranty or condition whether statutory (including under the *Sale of Goods Act* (Ontario), the International Sale of Goods *Contracts Convention Act* (Canada) and the *International Sale of Goods Act* (Ontario) or any international equivalent act which may be applicable to the subject matter pursuant to the provisions of this Agreement, including but not limited to the United Nations Convention on Contracts for the International Sale of Goods), or express or implied, oral or written, legal, equitable, conventional, collateral, arising by custom or usage of trade, or otherwise is or will be given by the Vendors or the Monitor including as to title, outstanding liens or encumbrances, description, fitness for purpose, merchantability, merchantable quality, quantity, condition (including physical and environmental condition), suitability, durability, assignability, or marketability thereof or any other matter or thing whatsoever, and all of the same are expressly excluded and disclaimed and any rights pursuant to such statutes have been waived by the Purchaser.  The Purchaser acknowledges and agrees that it has relied entirely and solely on its own investigations as to the matters set out above and in determining to purchase the Purchased Assets pursuant to this Agreement.

(3)     The description of the Purchased Assets contained herein is for the purpose of identification only and the inclusion of any item in such description does not confirm the existence of any such items or that any such item is owned by the Vendors.  No representation, warranty or condition has been given by the Vendors, CRO or the Monitor concerning the completeness or accuracy of such descriptions and the Purchaser acknowledges and agrees that any other representation, warranty, statements of any kind or nature, express or implied, (including any relating to the future or historical financial condition, results of operations, prospects, assets or liabilities of the Vendors or the quality, quantity or condition of the Purchased Assets) are specifically disclaimed by the Vendors.

(4)     Any documents, materials and information provided by the Vendors, CRO or Monitor to the Purchaser with respect to the Purchased Assets (including any confidential information memorandums, management presentations, or material made available in the electronic data room) have been provided to the Purchaser solely to assist the Purchaser in undertaking its own due diligence, and the Vendors, CRO and/or Monitor have not made and are not making any representations or warranties, implied or otherwise, to or for the benefit of the Purchaser as to the accuracy and completeness of any such documents, materials or information or the achievability of any valuations, estimates or projections.  The Purchaser acknowledges that it has not and will not rely upon any such documents, materials or information in any manner, whether as a substitute for or supplementary to its own due diligence, searches, inspections and evaluations.  The Vendors, CRO and/or Monitor and their respective Affiliates, directors, officers, employees, agents and advisors shall not be liable for any inaccuracy, incompleteness or subsequent changes to any such documents, materials or information. The Purchaser further acknowledges that the use of the documents may not be possible without the Purchaser obtaining reliance or other assurances from the author of such documents directly and further that the documents may be subject to copyright or other property rights which may preclude their use by the Purchaser in whole or in part.

## ARTICLE 8
## TERMINATION

**8.1     Grounds for Termination**

This Agreement may be terminated on or prior to the Closing Date:

(a)     by the mutual written agreement of the Vendors (with the consent of the Monitor) and the Purchaser;

(b)     pursuant to Sections 6.1, 6.2 and 6.3, as applicable; or

(c)     by the Vendors (with the consent of the Monitor) or the Purchaser upon written notice to the other Parties if: (i) the Closing has not occurred by the Outside Date; or (ii) this Agreement is not approved or the Approval and Vesting Order is not granted by the Canadian Court; provided in each case that the failure to close or obtain such order, as applicable, by such deadline is not caused by any act or omission or breach of this Agreement by the Party proposing to terminate the Agreement.

**8.2     Effect of Termination.**

If this Agreement is terminated pursuant to Section 8.1, all further obligations of the Parties under this Agreement will terminate and no Party will have any Liability or further obligations hereunder; except for the provisions of Sections 9.4 (Public Announcements) and 9.10 (Governing Law).

**ARTICLE 9**
**GENERAL**

**9.1     Employment Matters**

(a)     The Purchaser or an affiliate thereof shall offer employment, effective on the Closing Date, to all Employees on terms and conditions which are substantially similar to the terms and conditions that each Employee had with the Vendors, conditional on the Closing occurring and effective on the Closing Date. Purchaser shall have provided the Vendors with copies of all offers of employment for the Employees for the purposes of confirming that the proposed terms and conditions of such offers comply with this section (collectively, the "**Offers of Employment**"). Each Offer of Employment shall expressly provide that the Purchaser recognizes all employment service with the Vendors and if applicable, the Vendors' predecessors, for all purposes. Each Offer of Employment will be delivered by the Purchaser to each Employee such number of days prior to the Closing Date as Purchaser and Vendors may reasonably agree, and shall provide that the Offer of Employment will be deemed to have been accepted if it is not rejected in writing by the applicable employee no less than two (2) business days prior to the Closing Date. The Purchaser shall have advised the Vendors prior to the Closing Date of each Employee who has rejected an Offer of Employment. In the event an Employee rejects an Offer of Employment such Employee shall not be considered a Transferring Employee and the applicable Vendor shall provide written notice of termination to such Employee prior to the Closing Date, which notice shall be in form and substance satisfactory to the Monitor, acting reasonably. The Vendors shall not attempt to discourage Employees from accepting the Offers of Employment.

(b)     If the Purchaser satisfies its obligations under the section immediately above, it shall only assume and be liable for the Employee-related obligations of the Transferring Employees.

(c)     The Purchaser will establish replacement plans for the Transferring Employees that are substantially similar to the Employee benefit plans existing on the Closing Date. The Purchaser shall cause each replacement plan to recognize all employment service with the Vendors, as applicable, and if applicable, the Vendors' predecessors, of each Transferring Employee for purposes of eligibility for participating, vesting, benefit accrual and entitlement to benefits under such replacement plans.

**9.2      Access to Books and Records**

For a period of six years from the Closing Date or for such longer period as may be reasonably required for the Vendors (or any trustee in bankruptcy of the estate of any of the Vendors) to comply with Applicable Law, the Purchaser will retain all original Books and Records that are transferred to the Purchaser under this Agreement, but the Purchaser is not responsible or liable for any accidental loss or destruction of, or damage to, any such Books and Records. So long as any such Books and Records are retained by the Purchaser pursuant to this Agreement, the Vendors (and any representative, agent, former director or officer or trustee in bankruptcy of the estate of any of the Vendors, including the Monitor) has the right to inspect and to make copies (at their own expense) of them at any time upon reasonable request during normal business hours and upon reasonable notice for any proper purpose and without undue interference to the business operations of the Purchaser.

**9.3      Notice**

Any notice or other communication under this Agreement shall be in writing and may be delivered by read-receipted email, addressed:

(a)      in the case of the Purchaser, as follows:

**1000927605 Ontario Inc.**
100 King Street West, Suite 3400
Toronto, Ontario, M5X 1A4

Attention: Aman Johal
Email: aman@pridegroupenterprises.com

with a copy to:

**Bennett Jones LLP**
100 King Street West, Suite 3400
Toronto, Ontario, M5X 1A4

Attention: Raj Sahni and Jesse Mighton
Email: SahniR@bennettjones.com / mightonj@bennettjones.com

(b)      in the case of the Vendors, as follows to the CRO:

Attention:      Randall Benson
Email:            r.benson@rcbensonconsulting.com

with a copy to:

**Thornton Grout Finnigan LLP**
Suite 3200, 100 Wellington Street West
P. O. Box 329, Toronto-Dominion Centre
Toronto, ON  M5K 1K7

Attention:      Leanne Williams, Rachel Nicholson, Puya Fesharaki
Email:            lwilliams@tgf.ca, rnicholson@tgf.ca, pfesharaki@tgf.ca

(c)  in each case, with a further copy to the Monitor as follows:

**Ernst & Young Inc.**
EY Tower, 100 Adelaide Street West,
Toronto , ON M5H 0B3

Attention:  Alex Morrison, Simone Carvalho, Michael Hayes, Ross Johnson
Email:  alex.f.morrison@parthenon.ey.com; simone.carvalho@parthenon.ey.com;
Michael.Hayes@parthenon.ey.com;  ross.johnson@ca.ey.com

with a copy to:

**Blake, Cassels & Graydon LLP**
199 Bay Street, Suite 4000,
Toronto ON M5L 1A9

Attention:  Pam Huff, Kelly Bourassa, Chris Bur,
Email:  pam.huff@blakes.com; kelly.bourassa@blakes.com
chris.burr@blakes.com;

Any such notice or other communication, if transmitted by email before 5:00 p.m. (Toronto time) on a Business Day, will be deemed to have been given on such Business Day, and if transmitted by email after 5:00 p.m. (Toronto time) on a Business Day, will be deemed to have been given on the Business Day after the date of the transmission. In the case of a communication by email or other electronic means, if an autoreply is received indicating that the email is no longer monitored or in use, delivery must be followed by the dispatch of a copy of such communication pursuant to one of the other methods described above; provided however that any communication originally delivered by electronic means shall be deemed to have been given on the date stipulated above for electronic delivery.

Sending a copy of a notice or other communication to a Party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the notice or other communication to that Party. The failure to send a copy of a notice or other communication to legal counsel does not invalidate delivery of that notice or other communication to a Party. A Person may change its address for service by notice given in accordance with the foregoing and any subsequent communication must be sent to such Person at its changed address.

**9.4  Public Announcements**

The Vendors shall be entitled to disclose this Agreement to the Courts and parties in interest in the CCAA Proceedings, other than any information which the Purchaser advises the Vendors in writing as being confidential, acting reasonably, and this Agreement may be posted on the Monitor's website maintained in connection with the CCAA Proceedings at URL: http://www.ey.com/ca/pridegroup. Other than as provided in the preceding sentence or statements made in the Courts (or in pleadings filed therein) or where required to meet timely disclosure obligations of the Vendors or any of their Affiliates under Applicable Laws, the Vendors shall not issue (prior to or after the Closing) any press release or make any public statement or public communication with respect to this Agreement or the Transactions contemplated hereby without the prior consent of the other Parties, which shall not be unreasonably withheld or delayed.

**9.5  Time**

Time shall, in all respects, be of the essence hereof, provided that the time for doing or completing any matter provided for herein may be extended or abridged by an agreement in writing signed by the Parties.

**9.6    Survival**

The representations and warranties of the Parties contained in this Agreement shall not merge on Closing and the representations, warranties and covenants of the Parties contained herein to be performed after the Closing shall survive Closing and remain in full force and effect.

**9.7    Benefit of Agreement**

This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

**9.8    Entire Agreement**

This Agreement and the attached Schedules hereto constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior negotiations, understandings and agreements. This Agreement may not be amended or modified in any respect unless agreed to in writing by the Parties.

**9.9    Paramountcy**

In the event of any conflict or inconsistency between the provisions of this Agreement, and any other agreement, document or instrument executed or delivered in connection with this Transaction or this Agreement, the provisions of this Agreement shall prevail to the extent of such conflict or inconsistency.

**9.10    Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and each of the Parties irrevocably attorn to the exclusive jurisdiction of the Canadian Court, and any appellate courts of the Province of Ontario therefrom.

**9.11    Assignment**

The Purchaser cannot assign any of its rights or obligations under this Agreement without the prior written consent of the Vendors and the Monitor. Notwithstanding the foregoing, this Agreement may be assigned by the Purchaser prior to the issuance of the Approval and Vesting Order, in whole or in part (and, for greater certainty, the Purchaser may assign to one or more Permitted Assignees (as defined below) the right to purchase, in consideration for the allocable portion of the Consideration, all or any portion of the Purchased Assets hereunder), without the prior written consent of the Vendors or the Monitor, provided that: (i) such assignee is a Related Party or subsidiary of the Purchaser (a "**Permitted Assignee**"); (ii) the Purchaser provides prior notice of such assignment to the Vendors and the Monitor; and (iii) such assignee agrees in writing to be bound by the terms of this Agreement to the extent of the assignment and a copy of such assumption agreement is delivered to the Vendors and the Monitor forthwith after having been entered into; provided, however, that any such assignment shall not relieve the Purchaser of its obligations hereunder.

**9.12    Further Assurances**

Each of the Parties shall, at the request and expense of the requesting Party, take or cause to be taken such action and execute and deliver or cause to be executed and delivered to the other such conveyances, transfers, documents and further assurances as may be reasonably necessary or desirable to give effect to this Agreement.

**9.13    Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement. Transmission by e-mail of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

**9.14    Severability**

Notwithstanding any provision herein, if a condition to complete the Transaction, or a covenant or an agreement herein is prohibited or unenforceable pursuant to Applicable Law, then such condition, covenant or agreement shall be ineffective to the extent of such prohibition or unenforceability without invalidating the other provisions hereof.

**9.15    Monitor's Certificate**

The Parties acknowledge and agree that the Monitor shall be entitled to deliver to the Purchaser, and file with the Canadian Court, the executed Monitor's Certificate without independent investigation, upon receiving written confirmation from both Parties (or the applicable Party's counsel) that all conditions of Closing in favour of such Party have been satisfied or waived, and the Monitor shall have no Liability to the Parties in connection therewith. The Parties further acknowledge and agree that upon written confirmation from both Parties that all conditions of Closing in favour of such Party have been satisfied or waived, the Monitor may deliver the executed Monitor's Certificate to the Purchaser's counsel in escrow, with the sole condition of its release from escrow being the Monitor's written confirmation that all such funds have been received, the Monitor's Certificate will be released from escrow to the Purchaser, and the Closing shall be deemed to have occurred.

**9.16    Monitor's Capacity**

In addition to all of the protections granted to the Monitor under the CCAA or any order of the Court in this CCAA Proceeding, the Vendors and the Purchaser acknowledge and agree that the Monitor, acting in its capacity as Monitor and not in their personal capacity, will have no Liability, in its personal capacity or otherwise, in connection with this Agreement or the Transaction contemplated herein whatsoever as Monitor.

*[Signature Page Follows]*

IN WITNESS WHEREOF the Parties have executed this Agreement as of the day and year first above written.

**1000927605 ONTARIO INC**.

By: *Sulakhan Johal*

       Name:    Sulakhan Johal

       Title:     Director

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS LTD.**

By: *RC Benson*

       Name:    Randy Benson

       Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS USA, CO.**

By: *RC Benson*

       Name:    Randy Benson

       Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS INTERNATIONAL LTD.**

By *RC Benson*

       Name:    Randy Benson

       Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE FLEET SOLUTIONS INC.**

By: 

        Name:    Randy Benson

        Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**PRIDE FLEET SOLUTIONS USA INC.**

By: 

        Name:    Randy Benson

        Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**2029909 ONTARIO INC.**

By: 

        Name:    Randy Benson

        Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**12944154 CANADA INC.**

By: 

        Name:    Randy Benson

        Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**13184633 CANADA INC.**

By _R.C. Benson_____
        Name:   Randy Benson

        Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**2837229 ONTARIO INC.**

By: _R.C. Benson_____
        Name:   Randy Benson

        Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**2043002 ONTARIO INC.**

By _R.C. Benson_____
        Name:   Randy Benson

        Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**TPINE LEASING CAPITAL CORPORATION**

By _R.C. Benson_____
        Name:   Randy Benson

        Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**SCHEDULE "A"**
**FORM OF APPROVAL AND VESTING ORDER**

**[To be finalized and appended prior to Approval and Vesting Order motion]**

**SCHEDULE "B"**
**EXCLUDED ASSETS**

1.      Non-material assets sold in the Interim Period.

2.      Excluded Contracts.

3.      Accounts Receivable owed to any PGL Vendor or its subsidiaries by any member of the Pride Entities that is not a PGL Vendor.

4.      Any Cash or Cash Equivalents of PFS and PFS USA.

5.      All truck and trailer parts inventory owned by PFS [**or PFS USA**], save and except for motor oil and other fluids and shop supplies used by PFS [**or PFS USA**] in servicing trucks and trailers and diesel exhaust fluid and diesel fuel and gasoline held in storage tanks or containers at the gas stations.

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

**SCHEDULE "C"**
**PERMITTED ENCUMBRANCES**

**[Note: Balance of schedule to be completed prior to Closing.]**

Docusign Envelope ID: 127CBCE5-42D7-49B6-8FCD-D693BA41DF50

**SCHEDULE "D"**

**[INTENTIONALLY OMITTED]**

**SCHEDULE "E"**
**EXCLUDED CONTRACTS**

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

**SCHEDULE F**
**ALLOCATION STATEMENT**

| | |
|---|---|
| Vehicles (Schedule "G") | $ 43,098,837[4] |
| Acquired AR Amount (including Intercompany Receivables at nil consideration) | $9,000,000.00[5] |
| Tangible Property (Computers, office furniture, IT, mechanics tools, etc.) | $160,000.00 |
| Intangibles (IP, licenses, software, goodwill, Permits, license plates, Purchased Contracts, etc.) (Schedule "F") | $50,000.00 |
| PGL Insurance Shares | $1.00 |
| Inventory[6] | $100,000 |
| Prepaid Expenses | $50,000 |
| **TOTAL** | $52,458,838 |

**[Note: This Allocation Statement is subject to adjustment in accordance with Section 3.3 of the Purchase Agreement. The details with respect to Vehicles being purchased are set out in Schedule "G".]**

---

4 Subject to further adjustment in accordance with s. 3.3(c).

5 Subject to further adjustment in accordance with s. 3.3(b).

6 Subject to further adjustment in accordance with s. 3.3(e).

# SCHEDULE "G"

# VEHICLES

## TPine Assets

| Make | Model | Year | VIN |
|------|-------|------|-----|
| FREIGHTLINER | CSC | 2018 | 3AKJGBDV6JDJV5185 |
| FREIGHTLINER | PEI | 2019 | 1FUJHTDV1KLKA1156 |
| FREIGHTLINER | PE1 | 2019 | 1FUJHTDV3KLKA1160 |
| FREIGHTLINER | FM2 | 2019 | 1FUJHTDV6KLKA1170 |
| FREIGHTLINER | FM2 | 2019 | 1FUJHTDV5KLKA1161 |
| UTILITY | VS2 | 2020 | 1UYVS2533L7143908 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7143909 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7143912 |
| UTILITY | VS2 | 2020 | 1UYVS2530L7143915 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143917 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143921 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143925 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143926 |
| VOLVO | VVN | 2022 | 4V4NC9EHXNN305472 |
| VOLVO | VVN | 2022 | 4V4NC9EH5NN305475 |
| VOLVO | VVN | 2022 | 4V4NC9EH9NN305477 |
| VOLVO | VVN | 2022 | 4V4NC9EH8NN305499 |
| VOLVO | VVN | 2022 | 4V4NC9EH2NN305501 |
| VOLVO | VVN | 2022 | 4V4NC9EH4NN320372 |
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR2KSKM7362 |
| WABASH | ZGP | 2019 | 1DW1A5331KBA14563 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14564 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14565 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14566 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14567 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14568 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14569 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14570 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14571 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14572 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14573 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14574 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14575 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14576 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14577 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14578 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14579 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14580 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14581 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14582 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14583 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14584 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14585 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14586 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14587 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14588 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14589 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14590 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14591 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14592 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14593 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14594 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14595 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14596 |

| | | | |
|---|---|---|---|
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14597 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14598 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14599 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14600 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14602 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14603 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14604 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14605 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14606 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14607 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14608 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14609 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14610 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14611 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14612 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17904 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17905 |
| STOUGHTON | COM | 2019 | 1DW1A5330KEA17906 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17907 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17908 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17909 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17910 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17911 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17912 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17913 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17914 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17915 |
| STOUGHTON | COM | 2019 | 1DW1A5333KEA17916 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17917 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17918 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17919 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17920 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17921 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17922 |
| STOUGHTON | COM | 2019 | 1DW1A5330KEA17923 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17924 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17925 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17926 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17927 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17928 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17929 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17930 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17931 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17932 |
| STOUGHTON | COM | 2019 | 1DW1A5333KEA17933 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17934 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17935 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903018 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903020 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903021 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903022 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903023 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903024 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903025 |
| VANGUARD | VXP | 2019 | 5V8VC53B6KM903026 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903027 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903028 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903029 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903030 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903031 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903032 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903033 |

| | | | |
|---|---|---|---|
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903034 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903035 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903037 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903038 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903039 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903040 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903041 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903042 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903049 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903050 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903051 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903052 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903056 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903058 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903059 |
| VANGUARD | VXP | 2019 | 5V8VC53B6KM903060 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903061 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903062 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903063 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903064 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903065 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903066 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903067 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30640 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30641 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30642 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30643 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30644 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30645 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30646 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30647 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30648 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30649 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30650 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30651 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30652 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30653 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30654 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30655 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30656 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30657 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30660 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30661 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30662 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30663 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30664 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30665 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30666 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30667 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30668 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30669 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30670 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30671 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30672 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30673 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30674 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30675 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30676 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30677 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30678 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30679 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30680 |

| | | | |
|---|---|---|---|
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30681 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30682 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30683 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30684 |
| GREAT DANE | ETL | 2015 | 1GRAA062XFB700007 |
| UTILITY | VS2 | 2018 | 1UYVS2532GM381420 |
| UTILITY | N/A | 2019 | 1UYVS2535K6740918 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14836 |
| WANC | RFA | 2014 | 1JJV532B1HL008360 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6884720 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6840805 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6840806 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6840808 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6915027 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6915028 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6915029 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6840831 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6840842 |
| UTILITY | N/A | 2020 | 1UYVS253L6914929 |
| UTILITY | N/A | 2020 | 1UYVS2537L6914943 |
| UTILITY | N/A | 2020 | 1UYVS2532L6914946 |
| UTILITY | N/A | 2020 | 1UYVS2534L6914947 |
| UTILITY | N/A | 2020 | 1UYVS2534L6914950 |
| UTILITY | VS2 | 2019 | 1UYVS253XK6538527 |
| UTILITY | UTIL | 2019 | 1UYVS2532K6538523 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6258505 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6914935 |
| UTILITY | N/A | 2019 | 1UYVS2535L7837015 |
| STRI | S75 | 2018 | 1S12E9532JE536500 |
| STRI | S75 | 2018 | 1S12E9534JE536482 |
| EAST | S75 | 2018 | 1S12E9537JE536489 |
| STRI | S75 | 2018 | 1S12E9531JE536486 |
| DIMN | FV | 2018 | 2DM421A45JB157402 |
| UTILITY | S75 | 2018 | 1S12E9536JE536483 |
| UTILITY | N/A | 2020 | 1UYVS2531L7143910 |
| UTILITY | N/A | 2020 | 1UYVS2532L7143916 |
| CIMC | N/A | 2018 | 527SR5320JM012662 |
| CIMC | N/A | 2018 | 527SR5324JM012597 |
| CIMC | N/A | 2018 | 527SR5326JM012598 |
| CIMC | N/A | 2018 | 527SR5326JM012665 |
| CIMC | N/A | 2018 | 527SR5322JM012663 |
| UTILITY | VS3 | 2020 | 1UYVS3536L6884601 |
| UTILITY | VS3 | 2020 | 1UYVS3538L6884602 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884604 |
| UTILITY | VS3 | 2020 | 1UYVS3533L6884605 |
| UTILITY | VS3 | 2020 | 1UYVS3535L6884606 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884607 |
| UTILITY | VS3 | 2020 | 1UYVS3539L6884608 |
| UTILITY | VS3 | 2020 | 1UYVS3530L6884609 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884610 |
| UTILITY | 2020 | 2020 | 1UYVS3539L6884611 |
| UTILITY | VS3 | 2020 | 1UYVS3530L6884612 |
| UTILITY | VS3 | 2020 | 1UYVS3532L6884613 |
| UTILITY | VS3 | 2020 | 1UYVS3534L6884614 |
| UTILITY | VS3 | 2020 | 1UYVS3538L6884616 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884617 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884618 |
| UTILITY | VS3 | 2020 | 1UYVS3533L6884619 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884621 |
| UTILITY | VS3 | 2020 | 1UYVS3535L6884623 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884624 |
| UTILITY | VS3 | 2020 | 1UYVS3539L6884625 |

| | | | |
|---|---|---|---|
| UTILITY | VS3 | 2020 | 1UYVS353XL6884620 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884603 |
| UTILITY | VS3 | 2020 | 1UYVS3536L6884615 |
| UTILITY | VS2 | 2014 | 1UYVS2535EM774258 |
| STOU | N/A | 2017 | 1DW1A532XHB699224 |
| STOUGHTON | STOU | 2016 | 1DW1A53246B703721 |
| WABASH | N/A | 2023 | 1JJV532D1PL328715 |
| UTILITY | VS2 | 2020 | 1UYVS2538L7143919 |
| UTILITY | VS2 | 2020 | 1UYVS2537L7143913 |
| UTILITY | N/A | 2014 | 1UYVS2531EM774533 |
| UTILITY | N/A | 2014 | 1UYVS253XEM774515 |
| UTILITY | VS2 | 2014 | 1UYVS2535EU772851 |
| UTILITY | VS2 | 2014 | 1UYVS2530EU772708 |
| UTILITY | VS2 | 2014 | 1UYVS2537EU772821 |
| UTILITY | VS2 | 2014 | 1UYVS2535EM774521 |
| GREAT DANE | TT | 2011 | 1GRAA0623BW702135 |
| GREAT DANE | TT | 2011 | 1GRAA0629BW702110 |
| UTILITY | VS2 | 2012 | 1UYVS2539CM470007 |
| UTILITY | VS2 | 2015 | 1UYVS2531FM078109 |
| UTILITY | VS2 | 2014 | 1UYVS535EM773949 |
| UTILITY | VS2 | 2011 | 1UYVS2538CU468846 |
| UTILITY | VS2 | 2014 | 1UYVS2537CM469910 |
| HYUNDAI | N/A | 2012 | 3H3V533C3CT298004 |
| UTILITY | TL | 2020 | 1UYVS2531L7143924 |
| UTILITY | VS2 | 2020 | 1UYVS2533L7143911 |
| UTILITY | N/A | 2019 | 1UYVS2538K7533319 |
| UTILITY | VS2 | 2020 | 1UYVS2536L7143904 |
| UTILITY | VS2 | 2020 | 1UYVS2539L7143914 |
| UTILITY | VS2 | 2020 | 1UYVS2536L7143918 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143920 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143922 |

## PGL Assets

| Make | Model | Year | VIN |
|---|---|---|---|
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F70RPUX9509 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F70RPUX9512 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F71RPNP1888 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F72RPUX9513 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F75RPUX9506 |
| FREIGHTLINER | ECASCADIA | 2024 | 1FUJH4F76RPUX9515 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F77RPUX9507 |
| FREIGHTLINER | ECASCADIA | 2024 | 1FUJH4F78RPUX9516 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR1LLLA0402 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR1NLMW8595 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR2LLLA0408 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR2NLMW8590 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR3NLMW8596 |
| FREIGHTLINER | FRHT | 2022 | 1FUJHHDR3NLMW8890 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR4NLMW8591 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHHDR5MLML4450 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR5NLMW8597 |

| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR6NLMW8589 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR6NLMW8592 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR7LLLA0405 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR7NLMW8598 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR8LLLA0400 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR8NLMW8593 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR9LLLA0406 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDRXNLMW8594 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR0LLKU7313 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR0LLKU7375 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR2LLKU7300 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR2LLKU7314 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR2MLMM2136 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7301 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7377 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7380 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR4MLMM2137 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR5LLKU7310 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR5MLMA7585 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7302 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7378 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7381 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR7LLKU7311 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR7MLMA7586 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR8LLKU7303 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR8LLKU7379 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR9LLKU7312 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR9MLMA7587 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDRXLLKU7304 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV0MLMA7667 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV3MLML4446 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV5MLMA7664 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV5MLML4447 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV7MLMA7665 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV9MLMA7666 |
| KENWORTH | CON | 2020 | 1XKZD49X1LJ960840 |
| KENWORTH | CON | 2020 | 1XKZD49X3LJ960841 |
| KENWORTH | CON | 2020 | 1XKZD49X5LJ960839 |
| KENWORTH | CON | 2020 | 1XKZD49X5LJ960842 |
| KENWORTH | CON | 2020 | 1XKZD49X7LJ960843 |
| PETERBILT | 579 | 2023 | 1XPBAL9X0PD793437 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR0PSUP5013 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR0PSUP5027 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSUU3259 |

| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSUU3262 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR0RSVA3178 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR0RSVA3181 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSVG7513 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR1PSUP5019 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR1PSUP5022 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR1RSUU3383 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR1RSVA3240 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5000 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5014 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5028 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5031 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR2RSVA3179 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR2RSVA3182 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR2RSVG7514 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR3PSUP5006 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR3PSUP5023 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSUU3384 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSVA3238 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSVA3241 |
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR4KSKM7301 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP4995 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5001 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5015 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5029 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR4RSUU3376 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR4RSVG7515 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP4990 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR5PSUP5007 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP5010 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP5024 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSUU3385 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSVA3239 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSVA3242 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR6PSUP4996 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR6PSUP5002 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR6RSUU3220 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR6RSUU3377 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR6RSUU3380 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR6RSVG7516 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR7PSUP5008 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR7PSUP5011 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR7RSUU3257 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR7RSUU3260 |

| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR8KSKM7303 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR8PSUP4997 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR8PSUP5003 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR8PSUP5020 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3218 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3221 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3378 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3381 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR8RSVG7517 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR9PSUP4992 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5009 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5012 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5026 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSUU3258 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSUU3261 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR9RSVA3180 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSVG7512 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP4998 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5004 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5018 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5021 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3253 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3379 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3382 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDRXRSVG7518 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR0MSMA7580 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR1MSMA7605 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR2MSMA7581 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR3MSMA7606 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR4MSMA7579 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR4MSMA7582 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR5MSMA7607 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR6MSMA7583 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR7MSMA7608 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR8MSMA7584 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR8MSMA7603 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDRXMSMA7604 |
| FREIGHTLINER | CASC | 2019 | 3AKJHTDV5KSKA1178 |
| FREIGHTLINER | 116 | 2019 | 3AKJHTDV7KSKA1179 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPA1PN527730 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPA4PN527771 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR0PN526008 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR1PN557610 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN121888 |

| | | | |
|---|---|---|---|
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN443561 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN527766 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR4PN580704 |
| INTERNATIONAL | LT | 2023 | 3HSDZAPR5PN492650 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPR5PN527767 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR5PN557612 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPR5PN563622 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR6PN527731 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR6PN580705 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR7PN443580 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN121109 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN121885 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN527729 |
| INTERNATIONAL | LT6 | 2023 | 3HSDZAPR8PN580706 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN443581 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN492635 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN527769 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN527772 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN563624 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN569133 |
| VOLVO | VNL | 2022 | 4V4NC9EH0NN305476 |
| VOLVO | VVN | 2021 | 4V4NC9EH4MN272886 |
| VOLVO | VVN | 2021 | 4V4NC9EH6MN272887 |
| VOLVO | VVN | 2022 | 4V4NC9EH9NN320383 |
| VOLVO | ARO | 2021 | 4V4WC9EG0MN281824 |
| VOLVO | ARO | 2021 | 4V4WC9EG2MN281825 |
| VOLVO | ARO | 2021 | 4V4WC9EG4MN281826 |
| VOLVO | ARO | 2021 | 4V4WC9EG7MN281822 |
| VOLVO | ARO | 2021 | 4V4WC9EG9MN281823 |
| VOLVO | ARO | 2019 | 4V4WC9EH0KN192955 |
| VOLVO | ARO | 2022 | 4V4WC9EH0NN292686 |
| VOLVO | ARO | 2019 | 4V4WC9EH2KN192956 |
| VOLVO | ARO | 2022 | 4V4WC9EH2NN292673 |
| VOLVO | ARO | 2022 | 4V4WC9EH2NN292687 |
| VOLVO | ARO | 2019 | 4V4WC9EH4KN192957 |
| VOLVO | ARO | 2022 | 4V4WC9EH4NN292688 |
| VOLVO | ARO | 2022 | 4V4WC9EH6NN292689 |
| VOLVO | ARO | 2019 | 4V4WC9EH7KN192953 |
| VOLVO | ARO | 2022 | 4V4WC9EH7NN292670 |
| VOLVO | ARO | 2019 | 4V4WC9EH8KN192962 |
| VOLVO | ARO | 2022 | 4V4WC9EH9NN292671 |
| VOLVO | ARO | 2022 | 4V4WC9EH9NN292685 |
| UTILITY | N/A | 2019 | 1UYVS2539K7562215 |
| WANC | VS2 | 2020 | 1UYVS2537L7876432 |

| | | | |
|---|---|---|---|
| WANC | DVC | 2023 | 1JJV532DXPL361129 |
| WANC | WANC | 2023 | 1JJV532D6PL361130 |
| WANC | DVC | 2023 | 1JJV532D8PL361131 |
| UTILITY | VS2 | 2023 | 1JJV532DXPL361132 |
| WANC | DVC | 2023 | 1JJV532D1PL361133 |
| WANC | DVC | 2023 | 1JJV532D3PL361134 |
| WANC | DVC | 2023 | 1JJV532D5PL361135 |
| WANC | DVC | 2023 | 1JJV532D7PL361136 |
| WANC | DVC | 2023 | 1JJV532D9PL361137 |
| WANC | DVC | 2023 | 1JJV532D0PL361138 |
| WANC | DVC | 2023 | 1JJV532D2PL361139 |
| WANC | DVC | 2023 | 1JJV532D9PL361140 |
| WANC | DVC | 2023 | 1JJV532D0PL361141 |
| WANC | DVC | 2023 | 1JJV532D2PL361142 |
| WANC | DVC | 2023 | 1JJV532D4PL361143 |
| WANC | DVC | 2023 | 1JJV532D6PL361144 |
| WANC | DVC | 2023 | 1JJV532D8PL361145 |
| WANC | DVC | 2023 | 1JJV532DXPL361146 |
| WANC | DVC | 2023 | 1JJV532D1PL361147 |
| WANC | DVC | 2023 | 1JJV532D3PL361148 |
| WANC | DVC | 2023 | 1JJV532D5PL361149 |
| WANC | DVC | 2023 | 1JJV532D1PL361150 |
| WANC | DVC | 2023 | 1JJV532D3PL361151 |
| WANC | DVC | 2023 | 1JJV532D5PL361152 |
| WANC | DVC | 2023 | 1JJV532D7PL361153 |
| WANC | DVC | 2023 | 1JJV532D9PL361154 |
| WANC | DVC | 2023 | 1JJV532D0PL361155 |
| WANC | DVC | 2023 | 1JJV532D2PL361156 |
| WANC | DVC | 2023 | 1JJV532D4PL361157 |
| WANC | DVC | 2023 | 1JJV532D6PL361158 |
| WANC | DVC | 2023 | 1JJV532D8PL361159 |
| WANC | DVC | 2023 | 1JJV532D4PL361160 |
| WANC | DVC | 2023 | 1JJV532D6PL361161 |
| WANC | DVC | 2023 | 1JJV532D8PL361162 |
| WANC | DVC | 2023 | 1JJV532DXPL361163 |
| WANC | DVC | 2023 | 1JJV532D1PL361164 |
| WANC | DVC | 2023 | 1JJV532D3PL361165 |
| WANC | DVC | 2023 | 1JJV532D5PL361166 |
| WANC | DVC | 2023 | 1JJV532D7PL361167 |
| WANC | DVC | 2023 | 1JJV532D9PL361168 |
| MANAC | 942 | 2023 | 2M5921610P1215253 |
| MANAC | 942 | 2023 | 2M5921612P1215254 |
| MANAC | 942 | 2023 | 2M5921614P1215255 |
| MANAC | 942 | 2023 | 2M5921616P1215256 |

| MANAC | 942 | 2023 | 2M5921618P1215257 |
| MANAC | 942 | 2023 | 2M592161XP1215258 |
| MANAC | 942 | 2023 | 2M5921611P1215259 |
| MANAC | 942 | 2023 | 2M5921618P1215260 |
| MANAC | 942 | 2023 | 2M592161XP1215261 |
| MANAC | 942 | 2023 | 2M592161XP1215262 |
| MANAC | 942 | 2023 | 2M5921613P1215263 |
| MANAC | 942 | 2023 | 2M5921615P1215264 |
| MANAC | 942 | 2023 | 2M5921617P1215265 |
| MANAC | 942 | 2023 | 2M5921619P1215266 |
| MANAC | 942 | 2023 | 2M5921610P1215267 |
| MANAC | 942 | 2023 | 2M5921612P1215268 |
| MANAC | 942 | 2023 | 2M5921614P1215269 |
| MANAC | 942 | 2023 | 2M5921610P1215270 |
| MANAC | 942 | 2023 | 2M5921612P1215271 |
| MANAC | 942 | 2023 | 2M5921614P1215272 |
| STOUGHTON | AVW | 2017 | 1DW1A5337HS699304 |
| STOUGHTON | AVW | 2017 | 1DW1A5332HS699307 |
| STOUGHTON | AVW | 2017 | 1DW1A5330HS699306 |
| STOUGHTON | AVW | 2017 | 1DW1A5335HS699303 |
| STOUGHTON | AVW | 2017 | 1DW1A5332HS699310 |
| STOUGHTON | AVW | 2017 | 1DW1A5336HS699309 |
| STOUGHTON | AVW | 2017 | 1DW1A5334HS699311 |
| STOUGHTON | AVW | 2017 | 1DW1A5334HS699308 |
| STOUGHTON | AVW | 2017 | 1DW1A5339HS699305 |
| MANAC | 94353A321 | 2017 | 2M5931615H1163715 |
| MANAC | 94353A321 | 2017 | 2M593161XH1163712 |
| MANAC | 94353A321 | 2017 | 2M5931618H1163711 |
| MANAC | N/A | 2017 | 2M5931613H1163714 |
| STOUGHTON | AVW | 2017 | 1DW1A5333HS699302 |
| MANAC | N/A | 2017 | 2M5931611H1163713 |
| GREAT DANE | CS1 | 2016 | 1GRAA0635GB705741 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705744 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705743 |
| GREAT DANE | CS1 | 2016 | 1GRAA0637GB705742 |
| MANAC | 943 | 2017 | 2M5931614H1161812 |
| MANAC | 943 | 2017 | 2M5931612H1161811 |
| MANAC | 943 | 2017 | 2M5931618H1161814 |
| MANAC | 943 | 2017 | 2M593161XH1161815 |
| MANAC | 943 | 2017 | 2M5931611H1161816 |
| MANAC | 943 | 2017 | 2M5931616H1161813 |
| MANAC | 943 | 2017 | 2M5931613H1161817 |
| GREAT DANE | CS1 | 2016 | 1GRAA063XGB705752 |
| GREAT DANE | CS1 | 2016 | 1GRAA063XGB705749 |

| | | | |
|---|---|---|---|
| GREAT DANE | CS1 | 2016 | 1GRAA0637GB705756 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705750 |
| GREAT DANE | CS1 | 2016 | 1GRAA0635GB705755 |
| GREAT DANE | CS1 | 2016 | 1GRAA0633GB705754 |
| GREAT DANE | CS1 | 2016 | 1GRAA0638GB705751 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705747 |
| GREAT DANE | CS1 | 2016 | 1GRAA0632GB705759 |
| GREAT DANE | CS1 | 2016 | 1GRAA0633GB705746 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705757 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705760 |
| GREAT DANE | CSE | 2016 | 1GRAA0638GB705748 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705758 |
| GREAT DANE | CS1 | 2016 | 1GRAA0631GB705753 |
| GREAT DANE | CS1 | 2016 | 1GRAA0634GB705763 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705764 |
| GREAT DANE | CS1 | 2016 | 1GRAA0638GB705765 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705761 |
| GREAT DANE | CS1 | 2016 | 1GRAA0632GB705762 |
| STOUGHTON | ZGP | 2018 | 1DW1A5338JS773108 |
| STOUGHTON | ZGP | 2018 | 1DW1A533XJS773109 |
| STOUGHTON | ZGP | 2018 | 1DW1A5337JS773102 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335JS773101 |
| GREAT DANE | CS1 | 2018 | 1GRAA0637JB700872 |
| STOUGHTON | ZGP | 2018 | 1DW1A5331JS773113 |
| STOUGHTON | ZGP | 2018 | 1DW1A533XJS773112 |
| GREAT DANE | CS1 | 2018 | 1GRAA0635JB700871 |
| STOUGHTON | ZGP | 2018 | 1DW1A5330JS773104 |
| STOUGHTON | ZGP | 2018 | 1DW1A5339JS773103 |
| STOUGHTON | ZGP | 2018 | 1DW1A5333JS773114 |
| STOUGHTON | ZGP | 2018 | 1DW1A5334JS773106 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335JS773115 |
| STOUGHTON | ZGP | 2018 | 1DW1A5336JS773110 |
| STOUGHTON | ZGP | 2018 | 1DW1A5338JS773111 |
| STOUGHTON | ZGP | 2018 | 1DW1A5336JS773107 |
| UTILITY | VS3 | 2017 | 1UYVS3534HG835611 |
| UTILITY | VS3 | 2017 | 1UYVS3531HG835601 |
| UTILITY | VS2 | 2017 | 1UYVS3533HG835602 |
| UTILITY | VS3 | 2017 | 1UYVS3536HG835612 |
| UTILITY | VS3 | 2017 | 1UYVS3538HG835613 |
| UTILITY | VS3 | 2017 | 1UYVS353XHG835614 |
| UTILITY | VS3 | 2017 | 1UYVS3531HG835615 |
| UTILITY | VS3 | 2017 | 1UYVS3535HG835603 |
| VANGUARD | VXP | 2018 | 5V8VC53B2JM806498 |
| VANGUARD | VXP | 2018 | 5V8VC53B4JM806499 |

| | | | |
|---|---|---|---|
| VANGUARD | VXP | 2018 | 5V8VC53B9JM806501 |
| VANGUARD | VXP | 2018 | 5V8VC53B0JM806502 |
| VANGUARD | VXP | 2018 | 5V8VC53B2JM806503 |
| VANGUARD | VXP | 2018 | 5V8VC53B4JM806504 |
| VANGUARD | VXP | 2018 | 5V8VC53B6JM806505 |
| VANGUARD | VXP | 2018 | 5V8VC53B8JM806506 |
| VANGUARD | VXP | 2018 | 5V8VC53BXJM806507 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335KBA14601 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903019 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30635 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30636 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30637 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30638 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30639 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30658 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30659 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30809 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30811 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30812 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30813 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30814 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30816 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30817 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30820 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30821 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30823 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30824 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30825 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30826 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30827 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30828 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30829 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30830 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30831 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30832 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30833 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30834 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30835 |
| STOUGHTON | COM | 2020 | 1DW1A5330LBA30836 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30837 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30838 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30839 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30840 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30841 |

| STOUGHTON | COM | 2020 | 1DW1A5336LBA30842 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30843 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30844 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30845 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30846 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30847 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30848 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30849 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30850 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30851 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30852 |
| STOUGHTON | COM | 2020 | 1DW1A5330LBA30853 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30854 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30855 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30856 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30857 |
| STOUGHTON | COM | 2020 | 1DW1A5333LEA31171 |
| STOUGHTON | COM | 2020 | 1DW1A5335LEA31172 |
| STOUGHTON | COM | 2020 | 1DW1A5337LEA31173 |
| STOUGHTON | COM | 2020 | 1DW1A5339LEA31174 |
| STOUGHTON | COM | 2020 | 1DW1A5330LEA31175 |
| STOUGHTON | COM | 2020 | 1DW1A5332LEA31176 |
| STOUGHTON | COM | 2021 | 1DW1A5339MSA49712 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49713 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49714 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49715 |
| STOUGHTON | COM | 2021 | 1DW1A5336MSA49716 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49717 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49718 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49719 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49720 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49721 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49722 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49723 |
| STOUGHTON | COM | 2021 | 1DW1A5335MSA49724 |
| STOUGHTON | COM | 2021 | 1DW1A5337MSA49725 |
| STOUGHTON | COM | 2021 | 1DW1A5339MSA49726 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49727 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49728 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49729 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49730 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49731 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49732 |
| STOUGHTON | COM | 2021 | 1DW1A5336MSA49733 |

| STOUGHTON | COM | 2021 | 1DW1A5338MSA49734 |
|-----------|-----|------|-------------------|
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49735 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49736 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49737 |
| STOUGHTON | COM | 2021 | 1DW1A5335MSA49738 |
| STOUGHTON | COM | 2021 | 1DW1A5337MSA49739 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49740 |
| MANAC | 944 | 2017 | 2M5941615H1157801 |
| MANAC | 944 | 2017 | 2M5941617H1157802 |
| MANAC | 944 | 2017 | 2M5941613H1157800 |
| MANAC | 944 | 2017 | 2M5941610H1157799 |
| MANAC | VAN | 2017 | 2M5941610H1165692 |
| MANAC | VAN | 2017 | 2M5941616H1165695 |
| MANAC | VAN | 2017 | 2M5941614H1165694 |
| MANAC | VAN | 2017 | 2M5941612H1165693 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA31360 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA31368 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA31369 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA31371 |
| STOUGHTON | N/A | 2020 | 1DW1R5328LEA31375 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA31382 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA31359 |
| STOUGHTON | N/A | 2020 | 1DW1R5320LEA31385 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA31363 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA31372 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA40962 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31364 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31378 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA31373 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA31379 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA31374 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA31383 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA31358 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA31370 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA31384 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6884737 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6914910 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914911 |
| UTILITY | N/A | 2020 | 1UYVS2539L6914913 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6914916 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914919 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6914920 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6914921 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914922 |

| | | | |
|---|---|---|---|
| UTILITY | VS2 | 2020 | 1UYVS2531L6914923 |
| UTILITY | N/A | 2020 | 1UYVS2531L6884743 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6884744 |
| UTILITY | VS2 | 2020 | 1UYVS25306L884748 |
| UTILITY | N/A | 2020 | 1UYVS2539L6884750 |
| WABASH | RFA | 2016 | 1JJV532B2GL887138 |
| WABASH | RFA | 2016 | 1JJV532B3GL920311 |
| WABASH | RFA | 2016 | 1JJV532B5GL920312 |
| GREAT DANE | ESS | 2016 | 1GRAA0620GW700575 |
| VANGUARD | COO | 2016 | 527SR5326GM006535 |
| GREAT DANE | ESS | 2016 | 1GRAA0623GW703289 |
| WABASH | RFA | 2017 | 1JJV532B1HL008326 |
| WABASH | RFA | 2017 | 1JJV532B1HL008357 |
| WABASH | RFA | 2017 | 1JJV532B1HL008410 |
| UTILITY | VS2 | 2012 | 1UYVS2533CM469922 |
| WABASH | RFA | 2017 | 1JJV532BXHL008342 |
| WABASH | RFA | 2017 | 1JJV532B7HL008220 |
| UTILITY | VS2 | 2016 | 1UYVS2536GM381422 |
| UTILITY | VS2 | 2018 | 1UYVS2539J6258502 |
| WABASH | RFA | 2017 | 1JJV52B2HL008237 |
| WABASH | RFA | 2017 | 1JJV532B4HL008367 |
| WABASH | RFA | 2017 | f31971JJV532B1HL008181 |
| UTILITY | VS2 | 2018 | 1UYVS2536J6258506 |
| UTILITY | VS2 | 2018 | 1UYVS2539J6258516 |
| UTILITY | VS2 | 2018 | 1UYVS2530J6258517 |
| UTILITY | VS2 | 2018 | 1UYVS2533J6258513 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6258512 |
| UTILITY | VS2 | 2018 | 1UYVS2532J6258518 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6258509 |
| UTILITY | VS2 | 2018 | 1UYVS2538J6258507 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6258508 |
| UTILITY | VS2 | 2018 | 1UYVS2538J6258510 |
| UTILITY | VS2 | 2018 | 1UYVS2530J6258520 |
| UTILITY | VS2 | 2018 | 1UYVS2535J6258514 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6258519 |
| UTILITY | VS3 | 2018 | 1UYVS2530J6270201 |
| UTILITY | VS3 | 2018 | 1UYVS2538J6270205 |
| UTILITY | VS2 | 2018 | 1UYVS2537J6258515 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6258511 |
| UTILITY | VS2 | 2018 | 1UYVS2532J6270202 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6270203 |
| UTILITY | VS2 | 2018 | 1UYVS2536J6270204 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6270206 |
| UTILITY | VS2 | 2018 | 1UYVS2535J6270209 |

| UTILITY | VS2 | 2018 | 1UYVS2531J6270210 |
|---------|-----|------|-------------------|
| UTILITY | VS2 | 2018 | 1UYVS2531J6270207 |
| UTILITY | VS2 | 2018 | 1UYVS2533J6270208 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14796 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14797 |
| STOUGHTON | REF | 2019 | 1DW1R5327KEA14811 |
| STOUGHTON | REF | 2019 | 1DW1R5329KEA14812 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14813 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14814 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14816 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14817 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14819 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14820 |
| STOUGHTON | REF | 2019 | 1DW1R532XKEA14821 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14822 |
| STOUGHTON | REF | 2019 | 1DW1R5323KEA14823 |
| STOUGHTON | REF | 2019 | 1DW1R5325KEA14824 |
| STOUGHTON | REF | 2019 | 1DW1R5327KEA14825 |
| STOUGHTON | REF | 2019 | 1DW1R5329KEA14826 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14827 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14828 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14829 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14830 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14831 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14832 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14833 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14834 |
| VANGUARD | CR8 | 2019 | 527SR5322KM017007 |
| VANGUARD | CR8 | 2019 | 527SR5324KM017008 |
| VANGUARD | CR8 | 2019 | 527SR5326KM017009 |
| VANGUARD | CR8 | 2019 | 527SR5322KM017010 |
| VANGUARD | CR8 | 2019 | 527SR5324KM017011 |
| VANGUARD | CR8 | 2019 | 527SR5328KM017013 |
| VANGUARD | CR8 | 2019 | 527SR532XKM017014 |
| VANGUARD | CR8 | 2019 | 527SR5321KM017015 |
| UTILITY | N/A | 2019 | 1UYVS2535K6740904 |
| UTILITY | N/A | 2019 | 1UYV52537K6740905 |
| UTILITY | N/A | 2019 | 1UYVS2532K6740911 |
| UTILITY | N/A | 2019 | 1UYV52534K6740912 |
| UTILITY | N/A | 2019 | 1UYVS2536K6740913 |
| UTILITY | N/A | 2019 | 1UYVS2538K6740914 |
| UTILITY | N/A | 2019 | 1UYVS253XK6740915 |
| UTILITY | N/A | 2019 | 1UYVS2531K6740916 |
| UTILITY | N/A | 2019 | 1UYVS2537K6740919 |

| UTILITY | N/A | 2019 | 1UYVS2533K6740920 |
|---------|-----|------|-------------------|
| UTILITY | VS2 | 2019 | 1UYVS2533K6740903 |
| WABASH | N/A | 2016 | 1JJV532B3GL887147 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6114202 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6914930 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6914931 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6914932 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6914933 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914939 |
| UTILITY | VS2 | 2020 | 1UYVS2531L6914940 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6914941 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914942 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6914944 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6914945 |
| UTILITY | N/A | 2020 | 1UYVS2533L6914938 |
| UTILITY | N/A | 2020 | 1UYVS2536L6914934 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914936 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA41949 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA41950 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA41951 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA41952 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA41955 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA41956 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA41957 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA41958 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42375 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA42376 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42377 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA41945 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA42379 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42380 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA42381 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA42382 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA42384 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA42385 |
| STOUGHTON | REF | 2021 | 1DW1R5329LEA41946 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA42387 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA42388 |
| STOUGHTON | RSV | 2019 | 1DW1R5325KEA14791 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6915562 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6915563 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6915565 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6915567 |
| STOUGHTON | REF | 2021 | 1DW1R5321LEA41939 |

| | | | |
|---|---|---|---|
| STOUGHTON | REF | 2021 | 1DW1R5325LEA42396 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA42399 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42389 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA42393 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA42395 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6712107 |
| UTILITY | VS2 | 2022 | 1UYVS2538N6712101 |
| UTILITY | VS2 | 2022 | 1UYVS253XN6712102 |
| UTILITY | VS2 | 2022 | 1UYVS2531N6712103 |
| UTILITY | VS2 | 2022 | 1UYVS2533N6712104 |
| UTILITY | VS2 | 2022 | 1UYVS2535N6712105 |
| UTILITY | VS2 | 2022 | 1UYVS2537N6712106 |
| UTILITY | VS2 | 2022 | 1UYVS2530N6712108 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6712110 |
| UTILITY | VS2 | 2022 | 1UYVS253ON6712111 |
| UTILITY | VS2 | 2022 | 1UYVS2532N6712112 |
| UTILITY | VS2 | 2022 | 1UYVS2534N6712113 |
| UTILITY | VS2 | 2022 | 1UYVS2536N6712114 |
| UTILITY | VS2 | 2022 | 1UYVS2538N6712115 |
| UTILITY | VS2 | 2022 | 1UYVS2532N6712109 |
| CIMC | COO | 2023 | 527SR5328PM034319 |
| CIMC | REE | 2023 | 527SR532XPL033355 |
| CIMC | REE | 2023 | 527SR5326PL033367 |
| CIMC | REE | 2023 | 527SR5322PL030398 |
| CIMC | REE | 2023 | 527SR5327PL030400 |
| CIMC | REE | 2023 | 527SR5320PL030416 |
| CIMC | REE | 2023 | 527SR5326PL030419 |
| CIMC | REE | 2023 | 527SR5322PL030420 |
| VANGUARD | REE | 2023 | 527SR5323PL030474 |
| CIMC | REE | 2023 | 527SR5325PL030475 |
| CIMC | COO | 2023 | 527SR5326PL030422 |
| CIMC | COO | 2023 | 527SR5320PM034296 |
| CIMC | COO | 2023 | 527SR5329PM034295 |
| UTILITY | VS2 | 2021 | 1UYVS2539M6393225 |
| CIMC | CR8 | 2023 | 2SHSR5328PS001426 |
| VANGUARD | CIMC | 2024 | 527SR532XRM037015 |
| CIMC | COO | 2024 | 527SR5321RM037016 |
| CIMC | COO | 2024 | 527SR5323RM037017 |
| CIMC | COO | 2024 | 527SR5325RM037018 |
| CIMC | COO | 2024 | 527SR5327RM037019 |
| CIMC | COO | 2024 | 527SR5323RM037020 |
| CIMC | COO | 2024 | 527SR5325RM037021 |
| CIMC | COO | 2024 | 527SR5327RM037022 |
| CIMC | COO | 2024 | 527SR5329RM037023 |

| | | | |
|---|---|---|---|
| CIMC | COO | 2024 | 527SR5320RM037024 |
| CIMC | COO | 2024 | 527SR5322RM037025 |
| CIMC | COO | 2024 | 527SR5324RM037026 |
| CIMC | COO | 2024 | 527SR5326RM037027 |
| CIMC | COO | 2024 | 527SR5328RM037028 |
| CIMC | COO | 2024 | 527SR532XRM037029 |
| CIMC | COO | 2024 | 527SR5326RM037030 |
| CIMC | COO | 2024 | 527SR5328RM037031 |
| CIMC | COO | 2024 | 527SR532XRM037032 |
| CIMC | COO | 2024 | 527SR5321RM037033 |
| CIMC | COO | 2024 | 527SR5323RM037034 |
| CIMC | COO | 2024 | 527SR5325RM037035 |
| CIMC | COO | 2024 | 527SR5327RM037036 |
| CIMC | COO | 2024 | 527SR5329RM037037 |
| CIMC | COO | 2024 | 527SR5320RM037038 |
| CIMC | COO | 2024 | 527SR5322RM037039 |
| CIMC | COO | 2024 | 527SR5322PL033365 |
| CIMC | REE | 2023 | 527SR5322PL033348 |
| CIMC | N/A | 2023 | 527SR532XPM031227 |
| CIMC | N/A | 2023 | 527SR5324PM033989 |
| CIMC | N/A | 2023 | 527SR5322PM033988 |
| CIMC | N/A | 2023 | 527SR5323PM034034 |
| UTILITY | VS2 | 2021 | 1UYVS2537M6393224 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6461945 |
| CIMC | COO | 2023 | 527SR5322PM034297 |
| UTILITY | RFA | 2022 | 1UYVS2536N6712128 |
| CIMC | REE | 2023 | 527SR5324PL033352 |
| CIMC | COO | 2023 | 527SR5327PM034294 |
| CIMC | REE | 2023 | 527SR5320PL030478 |
| CIMC | VS2 | 2022 | 1UYVS2533N6461925 |
| CIMC | REE | 2023 | 527SR5329PL030477 |
| CIMC | REE | 2023 | 527SR5329PL030401 |
| CIMC | REE | 2023 | 527SR5320PL033350 |
| CIMC | REE | 2023 | 527SR5327PL030431 |
| CIMC | COO | 2023 | 527SR5320PM034329 |
| HYUNDAI | N/A | 2016 | 3H3V532C2GT498007 |
| HYUNDAI | HHY | 2016 | 3H3V532CXGT498014 |
| HYUNDAI | N/A | 2016 | 3H3V532C1GT498015 |
| UTILITY | VS2 | 2015 | 1UYVS2533FG298608 |
| STRI | S75 | 2019 | 1S12E9533KE539102 |
| UTILITY | N/A | 2020 | 1UYVS2534L7143923 |
| MANAC | 942 | 2023 | 2M592161P1217644 |
| MANAC | 942 | 2023 | 2M5921615P1217645 |
| MANAC | 942 | 2023 | 2M5921617P1217646 |

| MANAC | 942 | 2023 | 2M5921619P1217647 |
| MANAC | 942 | 2023 | 2M5921610P1217648 |
| MANAC | 942 | 2023 | 2M5921612P1217649 |
| MANAC | 942 | 2023 | 2M5921619P1217650 |
| MANAC | 942 | 2023 | 2M5921617P1217016 |
| MANAC | 942 | 2023 | 2M5921619P1217017 |
| MANAC | 942 | 2023 | 2M5921610P1217018 |
| MANAC | 942 | 2023 | 2M5921612P1217019 |
| MANAC | 942 | 2023 | 2M5921619P1217020 |
| MANAC | 942 | 2023 | 2M5921610P1217021 |
| MANAC | 942 | 2023 | 2M5921612P1217022 |
| MANAC | 942 | 2023 | 2M5921614P1217023 |
| MANAC | 942 | 2023 | 2M5921616P1217024 |
| MANAC | 942 | 2023 | 2M5921618P1217025 |
| MANAC | 94253A311 | 2023 | 2M592161XP1217026 |
| MANAC | 942 | 2023 | 2M5921611P1217027 |
| MANAC | 94253A311 | 2023 | 2M5921613P1217028 |
| MANAC | 942 | 2023 | 2M5921615P1217029 |
| MANAC | 942 | 2023 | 2M5921611P1217030 |
| MANAC | 94253A311 | 2023 | 2M5921613P1217031 |
| MANAC | 942 | 2023 | 2M5921615P1217032 |
| MANAC | 942 | 2023 | 2M5921617P1217033 |
| MANAC | 942 | 2023 | 2M5921619P1217034 |
| MANAC | 942 | 2023 | 2M5921610P1217035 |
| MANAC | 942 | 2023 | 2M5921612P1217036 |
| MANAC | 942 | 2023 | 2M5921614P1217037 |
| MANAC | 942 | 2023 | 2M5921616P1217038 |
| MANAC | MANAC | 2023 | 2M5921618P1217039 |
| MANAC | 942 | 2023 | 2M5921614P1217040 |
| MANAC | 942 | 2023 | 2M5921616P1217041 |
| MANAC | 942 | 2023 | 2M5921618P1217042 |
| MANAC | 942 | 2023 | 2M592161XP1217043 |
| MANAC | 942 | 2023 | 2M5921611P1217044 |
| MANAC | 942 | 2023 | 2M5921613P1217045 |
| MANAC | 94253A311 | 2023 | 2M5921615P1217046 |
| MANAC | 94253A311 | 2023 | 2M5921617P1217047 |
| MANAC | 94253A311 | 2023 | 2M5921619P1217048 |
| MANAC | 94253A311 | 2023 | 2M5921610P1217049 |
| MANAC | 94253A311 | 2023 | 2M5921617P1217050 |
| MANAC | 94253A311 | 2023 | 2M5921619P1217051 |
| MANAC | 94253A311 | 2023 | 2M5921610P1217052 |
| MANAC | 94253A311 | 2023 | 2M5921612P1217053 |
| MANAC | 94253A311 | 2023 | 2M5921614P1217054 |
| MANAC | 94253A311 | 2023 | 2M5921616P1217055 |

| | | | |
|---|---|---|---|
| MANAC | 942 | 2023 | 2M5921618P1217641 |
| MANAC | 942 | 2023 | 2M592161XP1217642 |
| MANAC | 942 | 2023 | 2M5921611P1217643 |
| MANAC | 942 | 2022 | 2M5921614N1208884 |
| MANAC | 942 | 2022 | 2M5921616N1208885 |
| MANAC | N/A | 2022 | 2M5921618N1208886 |
| MANAC | 942 | 2022 | 2M592161XN1208887 |
| MANAC | 942 | 2022 | 2M5921611N1208888 |
| STOUGHTON | 942 | 2022 | 2M5921613N1208889 |
| MANAC | 942 | 2022 | 2M592161XN1208890 |
| MANAC | N/A | 2022 | 2M5921611N1208891 |
| MANAC | N/A | 2022 | 2M5921613N1208892 |
| MANAC | 942 | 2022 | 2M5921615N1208893 |
| MANAC | 942 | 2021 | 2M592161XM1202294 |
| MANAC | 942 | 2021 | 2M5921611M1202295 |
| MANAC | 942 | 2021 | 2M5921613M1202296 |
| MANAC | 942 | 2021 | 2M5921615M1202297 |
| MANAC | 942 | 2021 | 2M5921617M1202298 |
| MANAC | 942 | 2021 | 2M5921619M1202299 |
| MANAC | 942 | 2021 | 2M5921611M1202300 |
| MANAC | 942 | 2021 | 2M5921613M1202301 |
| MANAC | 942 | 2021 | 2M5921615M1202302 |
| MANAC | 942 | 2021 | 2M5921617M1202303 |
| MANAC | 942 | 2021 | 2M5921619M1202304 |
| MANAC | 942 | 2021 | 2M5921610M1202305 |
| MANAC | 942 | 2021 | 2M5921612M1202306 |
| MANAC | 942 | 2021 | 2M5921614M1202307 |
| MANAC | 942 | 2021 | 2M5921616M1202308 |
| MANAC | 942 | 2021 | 2M5921618M1202309 |
| MANAC | 942 | 2021 | 2M5921614M1202310 |
| MANAC | 942 | 2021 | 2M5921616M1202311 |
| MANAC | 942 | 2021 | 2M5921618M1202312 |
| MANAC | 942 | 2021 | 2M592161XM1202313 |
| CIMC | NDW136*0AF0 | 2018 | 527SR5329JM012594 |
| CIMC | VS2 | 2023 | 527SR5327PM031170 |
| CIMC | VS2 | 2022 | 527SR5329PM031171 |
| CIMC | N/A | 2023 | 527SR5320PM031172 |
| CIMC | VS2 | 2022 | 527SR5322PM031173 |
| CIMC | N/A | 2023 | 527SR5324PM031174 |
| CIMC | VS2 | 2022 | 527SR5326PM031175 |
| CIMC | N/A | 2023 | 527SR5328PM031176 |
| CIMC | VS2 | 2023 | 527SR532XPM031177 |
| CIMC | N/A | 2022 | 527SR5321PM031178 |
| CIMC | N/A | 2022 | 527SR5323PM031179 |

| CIMC | N/A | 2023 | 527SR532XPM031180 |
|------|-----|------|-------------------|
| CIMC | N/A | 2023 | 527SR5323PM031215 |
| CIMC | N/A | 2023 | 527SR5327PM031217 |
| CIMC | N/A | 2023 | 527SR5325PM031183 |
| CIMC | N/A | 2023 | 527SR5327PM031184 |
| CIMC | N/A | 2022 | 527SR5329PM031185 |
| CIMC | N/A | 2023 | 527SR5329PM031218 |
| CIMC | VS2 | 2022 | 527SR5324PM031188 |
| CIMC | VS2 | 2023 | 527SR5329PM031221 |
| CIMC | N/A | 2023 | 527SR5329PM031222 |
| CIMC | N/A | 2023 | 527SR5325PM031197 |
| CIMC | N/A | 2023 | 527SR5320PM031219 |
| CIMC | N/A | 2022 | 527SR5325PM031216 |
| CIMC | VS2 | 2023 | 527SR5321PM031200 |
| CIMC | N/A | 2023 | 527SR5327PM031220 |
| CIMC | THERMO | 2023 | 527SR5328PM031226 |
| CIMC | VS2 | 2023 | 527SR5322PM031206 |
| CIMC | N/A | 2023 | 527SR5324PM031224 |
| CIMC | REF | 2023 | 527SR5326PM031208 |
| CIMC | RFA | 2023 | 527SR5324PM031210 |
| CIMC | COO | 2023 | 527SR5328PM031212 |
| CIMC | N/A | 2023 | 527SR532XPM031213 |
| CIMC | VS2 | 2022 | 527SR5321PM031214 |
| CIMC | VS2 | 2023 | 527SR537PM031198 |
| CIMC | N/A | 2023 | 527SR5326PM034318 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31381 |
| | | | |
| UTILITY | N/A | 2020 | 1UYVS2537L6914912 |
| WANC | RFA | 2022 | 1JJV532B2NL315354 |
| WANC | RFA | 2022 | 1JJV532B2NL315355 |
| WANC | RFA | 2022 | 1JJV532B6NL315356 |
| WANC | RFA | 2022 | 1JJV532B2NL315357 |
| WANC | RFA | 2022 | 1JJV532B2NL315358 |
| WANC | RFA | 2022 | 1JJV532B2NL315359 |
| WANC | RFA | 2022 | 1JJV532B2NL315360 |
| WANC | RFA | 2022 | 1JJV532B2NL315361 |
| WANC | RFA | 2022 | 1JJV532B2NL315362 |
| WANC | RFA | 2022 | 1JJV532B3NL315363 |
| WANC | RFA | 2022 | 1JJV532B5NL315364 |
| WANC | RFA | 2022 | 1JJV532B7NL315365 |
| WANC | RFA | 2022 | 1JJV532B9NL315366 |
| WANC | RFA | 2022 | 1JJV532B0NL315367 |
| WANC | RFA | 2022 | 1JJV532B2NL315368 |
| WANC | RFA | 2022 | 1JJV532B4NL315369 |

| WANC | RFA | 2022 | 1JJV532B0NL315370 |
| WANC | RFA | 2022 | 1JJV532B2NL315371 |
| WANC | RFA | 2022 | 1JJV532B4NL315372 |
| WANC | RFA | 2022 | 1JJV532B6NL315373 |
| WANC | RFA | 2022 | 1JJV532B8NL315374 |
| WANC | RFA | 2022 | 1JJV532BXNL315375 |
| WANC | RFA | 2022 | 1JJV532B1NL315376 |
| WANC | RFA | 2022 | 1JJV532B3NL315377 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315378 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315379 |
| WABASH | 7500 | 2023 | 1JJV532BXPL315380 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315381 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315382 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315383 |
| WABASH | 7500 | 2023 | 1JJV532B7PL315384 |
| WABASH | 7500 | 2023 | 1JJV532B9PL315385 |
| WABASH | 7500 | 2023 | 1JJV532B0PL315386 |
| WABASH | 7500 | 2023 | 1JJV532B2PL315387 |
| WABASH | 7500 | 2023 | 1JJV532B4PL315388 |
| WABASH | 7500 | 2023 | 1JJV532B6PL315389 |
| WABASH | 7500 | 2023 | 1JJV532B2PL315390 |
| WABASH | 7500 | 2023 | 1JJV532B4PL315391 |
| WABASH | 7500 | 2023 | 1JJV532B8PL315393 |
| WABASH | 7500 | 2023 | 1JJV532BXPL315394 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315395 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315396 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315397 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315398 |
| WABASH | 7500 | 2023 | 1JJV532B9PL315399 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315400 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315401 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315402 |
| WABASH | 7500 | 2023 | 1JJV532B7PL315403 |
| CIMC | REE | 2022 | 2SHSR5328NS000452 |
| WABASH | 7500 | 2023 | 1JJV532B6PL315392 |
| MANAC | 943 | 2022 | 2M5931614N1204475 |
| MANAC | 943 | 2022 | 2M5931616N1204476 |
| MANAC | 943 | 2022 | 2M5931618N1204477 |
| MANAC | 943 | 2022 | 2M593161XN1204478 |
| MANAC | 943 | 2022 | 2M5931611N1204479 |
| MANAC | 943 | 2022 | 2M5931618N1204480 |
| MANAC | 943 | 2022 | 2M593161XN1204481 |
| MANAC | 943 | 2022 | 2M5931611N1204482 |

| MANAC | 943 | 2022 | 2M5931613N1204483 |
|-------|-----|------|-------------------|
| MANAC | 943 | 2022 | 2M5931615N1204484 |
| MANAC | 943 | 2022 | 2M5931617N1204485 |
| MANAC | 943 | 2022 | 2M5931619N1204486 |
| MANAC | 943 | 2022 | 2M5931610N1204487 |
| MANAC | 943 | 2022 | 2M5931612N1204488 |
| MANAC | 943 | 2022 | 2M5931614N1204489 |
| MANAC | 943 | 2022 | 2M5931610N1204490 |
| MANAC | 943 | 2022 | 2M5931612N1204491 |
| MANAC | 943 | 2022 | 2M5931614N1204492 |
| MANAC | 943 | 2022 | 2M5931616N1204493 |
| MANAC | 943 | 2022 | 2M5931618N1204494 |
| MANAC | 943 | 2022 | 2M593161XN1204495 |
| MANAC | 943 | 2022 | 2M5931611N1204496 |
| MANAC | 943 | 2022 | 2M5931613N1204497 |
| MANAC | 943 | 2022 | 2M5931615N1204498 |
| MANAC | 943 | 2022 | 2M5931617N1204499 |
| MANAC | 943 | 2022 | 2M5931615N1204517 |
| MANAC | 943 | 2022 | 2M5931617N1204518 |
| MANAC | 943 | 2022 | 2M5931619N1204519 |
| MANAC | 943 | 2022 | 2M5931615N1204520 |
| MANAC | 943 | 2022 | 2M5931617N1204521 |
| MANAC | 943 | 2022 | 2M5931619N1204522 |
| MANAC | 943 | 2022 | 2M5931610N1204523 |
| MANAC | 943 | 2022 | 2M5931612N1204524 |
| MANAC | 943 | 2022 | 2M5931614N1204525 |
| MANAC | 943 | 2022 | 2M5931616N1204526 |
| MANAC | 943 | 2022 | 2M5931618N1204527 |
| MANAC | 943 | 2022 | 2M593161XN1204528 |
| MANAC | 943 | 2022 | 2M5931611N1204529 |
| MANAC | 943 | 2022 | 2M5931618N1204530 |
| MANAC | 943 | 2022 | 2M593161XN1204531 |
| MANAC | 943 | 2022 | 2M5931611N1204532 |
| MANAC | 943 | 2022 | 2M5931613N1204533 |
| MANAC | 943 | 2022 | 2M5931615N1204534 |
| MANAC | 943 | 2022 | 2M5931617N1204535 |
| MANAC | 943 | 2022 | 2M5931619N1204536 |
| MANAC | 943 | 2022 | 2M5931610N1204537 |
| MANAC | 943 | 2022 | 2M5931612N1204538 |
| MANAC | 943 | 2022 | 2M5931614N1204539 |
| MANAC | 943 | 2022 | 2M5931610N1204540 |
| MANAC | 943 | 2022 | 2M5931612N1204541 |
| UTILITY | TRA | 2018 | 1UYVS3530J6060316 |

| GREAT DANE | ESS | 2016 | 1GRAA0636GW701027 |
| GREAT DANE | ESS | 2016 | 1GRAA0638GW701028 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6060317 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6060319 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6060318 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6060320 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6258401 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6258406 |
| UTILITY | VS3 | 2015 | 1UYVS3537J6258407 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6258402 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6258409 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6258410 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6258405 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6258408 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6258404 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6258413 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6258415 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6258414 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6258416 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6258412 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6258420 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6258417 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6258418 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6258419 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6269901 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6269902 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6269903 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6269904 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6269905 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6269906 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6269907 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6269908 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6269909 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6269910 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6269911 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6269912 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6269913 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6269914 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6269915 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6269916 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6269917 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6269919 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6270001 |

| UTILITY | VS3 | 2018 | 1UYVS3538J6270002 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6270003 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6270004 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6270005 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6270006 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6270007 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6270008 |
| WABASH | RFA | 2022 | IJJV533B7NL339891 |
| WABASH | RFA | 2022 | 1JJV533B9NL339892 |
| WABASH | RFA | 2022 | 1JJV533B0NL339893 |
| WABASH | RFA | 2022 | 1JJV533B2NL339894 |
| WABASH | RFA | 2022 | 1JJV533B4NL339895 |
| EAST | PLA | 2022 | 1E1H5Z581NR074864 |
| EAST | PLA | 2022 | 1E1H5Z583NR074865 |
| EAST | PLA | 2022 | 1E1H5Z585NR074866 |
| EAST | PLA | 2022 | 1E1H5Z682NR074869 |
| EAST | PLA | 2022 | 1E1H5Z689NR074870 |
| WABASH | RFA | 2016 | 1JJV532B7GL887149 |
| WABASH | RFA | 2016 | 1JJV532B2GL887141 |
| WABASH | RFA | 2016 | 1JJV532B7GL887145 |
| WABASH | RFA | 2016 | 1JJV532B6GL920299 |
| WABASH | RFA | 2016 | 1JJV532B1GL920310 |
| WABASH | RFA | 2016 | 1JJV532B8GL920305 |
| WABASH | RFA | 2016 | 1JJV532BXGL920306 |
| GREAT DANE | ESS | 2016 | 1GRAA0626GW700578 |
| GREAT DANE | ESS | 2016 | 1GRAA0622GW700576 |
| GREAT DANE | ESS | 2016 | 1GRAA0624GW700577 |
| WABASH | RFA | 2016 | 1JJV532B2GL920316 |
| WABASH | RFA | 2016 | 1JJV532B0GL920329 |
| HYUNDAI | VC2 | 2016 | 3H3V532C5GT498020 |
| STRI | S75 | 2018 | 1S12E953XJE536499 |
| MANAC | 712 | 2022 | 2M5720416N1208230 |
| MANAC | 712 | 2021 | 2M5720418M1202542 |
| MANAC | N/A | 2023 | 2M5720413P1212318 |
| MANAC | N/A | 2023 | 2M5720411P1212317 |
| MANAC | N/A | 2023 | 2M5720415P1212319 |
| MANAC | N/A | 2023 | 2M5720411P1212320 |
| MANAC | N/A | 2023 | 2M5720413P1212321 |
| MANAC | N/A | 2023 | 2M5720419P1212307 |
| MANAC | N/A | 2019 | 1GR5R1623PK439837 |
| GREAT DANE | N/A | 2019 | 1GR5R1625PK439838 |
| MANAC | 712 | 2023 | 2M5720419P1218916 |
| MANAC | 712 | 2023 | 2M5720412P1218918 |

| MANAC | 712 | 2023 | 2M5720410P1218920 |
| UTILITY | VS2 | 2020 | 1UYVS2537L6884701 |
| CIMC | VS2 | 2022 | 527SR5320PM031186 |
| CIMC | COO | 2023 | 527SR5328PM031209 |
| GREAT DANE | CCC | 2016 | 1GRAP0628GD461688 |
| STOUGHTON | COM | 2016 | 1DW1A5321GB647821 |
| STOU | COM | 2016 | 1DW1A532XGB647817 |
| STOUGHTON | 7GP | 2017 | 1DW1A532XHB753511 |
| STOUGHTON | ZGP | 2017 | 1DW1A5322HB753521 |
| STOUGHTON | ZGP | 2018 | 1DW1A5320JBA00210 |
| STOUGHTON | ZGP | 2018 | 1DW1A5320JBA00191 |
| STOUGHTON | WHI | 2017 | 1DW1A5320HB753520 |
| STOUGHTON | ZGP | 2017 | 1DW1A5327HB753532 |
| STOUGHTON | WHI | 2018 | 1DW1A5320JBA00188 |
| STOUGHTON | ZGP | 2018 | 1DW1A5328JBA00195 |
| STOUGHTON | ZGP | 2017 | 1DW1A5329HB753533 |
| STOUGHTON | ZGP | 2017 | 1DW1A5320HB753534 |
| STOUGHTON | ZGP | 2017 | 1DW1A5329HB753502 |
| STOUGHTON | ZGP | 2017 | 1DW1A5324HB753519 |
| STOUGHTON | ZGP | 2017 | 1DW1A5323HB753527 |
| STOUGHTON | ZGP | 2017 | 1DW1A5325HB753514 |
| STOUGHTON | ZGP | 2017 | 1DW1A532XHB753539 |
| WABASH | N/A | 2023 | 1JJV532D6PL328709 |
| WABASH | N/A | 2023 | 1JJV532D2PL328710 |
| WABASH | N/A | 2023 | 1JJV532D4PL328711 |
| WABASH | N/A | 2023 | 1JJV532D3PL328716 |
| WABASH | N/A | 2023 | 1JJV532D7PL328718 |
| WABASH | N/A | 2023 | 1JJV532D9PL328719 |
| WABASH | N/A | 2023 | 1JJV532D5PL328720 |
| STOUGHTON | ZGP | 2018 | 1DW1A5322JBA00189 |
| STOUGHTON | ZGP | 2017 | 1DW1A532XHB753508 |

| STOUGHTON | ZGP | 2018 | 1DW1A5321JBA00197 |
| STOUGHTON | WHI | 2018 | 1DW1A5328JBA00214 |
| STOUGHTON | ZGP | 2018 | 1DW1A5327JBA00186 |
| STOUGHTON | N/A | 2018 | 1DW1A5327JBA00205 |
| STOUGHTON | WHI | 2017 | 1DW1A5324HB753522 |
| STOUGHTON | ZGP | 2017 | 1DW1A5326HB753540 |
| STOUGHTON | ZGP | 2018 | 1DW1A5321JBA00202 |
| STOUGHTON | ZGP | 2017 | 1DW1A5320HB753503 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7876428 |
| UTILITY | VS2 | 2020 | 1UYVS2530K7760908 |
| STOUGHTON | ALU | 2020 | 1DW1R5326LEA41936 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA41944 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA42386 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA42397 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA42398 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA42390 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42392 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA42391 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42394 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA41947 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7876431 |
| GREAT DANE | N/A | 2016 | 1GRAP0626GD461687 |
| UTILITY | VS2 | 2012 | 1UYVS2535CM470005 |

**SCHEDULE "H"**

**PERMITS**

- Commercial Vehicle Operating Licences

- United States Department of Transportation Licences

- Long Combination Vehicle Licence

- New York State Heavy Haul Permit

**[Note: Balance of schedule to be completed no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order.]**

## SCHEDULE "I"

## CRITICAL REQUIRED CONTRACTS

1. The lease dated as of November 24, 2015 in respect of the property located at 6050 Dixie Road, Mississauga, between 6050 Dixie Road Investments Limited as Landlord, 2029909 Ontario Inc. as Tenant and Sam Johal as Indemnifier

2. Lease agreement in respect of 6253 Boundary Road, Cornwall, ON, with Globocam (Montreal) Inc., provided that such lease is in force on the Closing Date.

3. The Finloc Leases


**[Note: Balance of schedule to be completed no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order.]**

## SCHEDULE "J"

## FINLOC LEASED VEHICLES

| Make | Model | Year | VIN |
|------|-------|------|-----|
| MANAC | 712 | 2020 | 2M5720419L1190805 |
| MANAC | 712 | 2020 | 2M5720410L1190806 |
| MANAC | 712 | 2020 | 2M5720417L1186817 |
| MANAC | 712 | 2020 | 2M5720417L1190804 |
| MANAC | 712 | 2020 | 2M5720415L1190803 |
| MANAC | 942 | 2021 | 2M5921613M1202282 |
| MANAC | N/A | 2019 | 2M593161XL1197805 |
| MANAC | 942 | 2021 | 2M5921611M1202264 |
| MANAC | 942 | 2021 | 2M5921613M1202265 |
| MANAC | 942 | 2021 | 2M5921615M1202266 |
| MANAC | 942 | 2021 | 2M5921617M1202267 |
| MANAC | 942 | 2021 | 2M5921619M1202268 |
| MANAC | 942 | 2021 | 2M5921610M1202269 |
| MANAC | 942 | 2021 | 2M5921617M1202270 |
| MANAC | 942 | 2021 | 2M5921619M1202271 |
| MANAC | 942 | 2021 | 2M5921610M1202272 |
| MANAC | 942 | 2021 | 2M5921612M1202273 |
| MANAC | 942 | 2021 | 2M5921614M1202274 |
| MANAC | 942 | 2021 | 2M5921616M1202275 |
| MANAC | 942 | 2021 | 2M5921618M1202276 |
| MANAC | 942 | 2021 | 2M592161XM1202277 |
| MANAC | 942 | 2021 | 2M5921611M1202278 |
| MANAC | 942 | 2021 | 2M5921613M1202279 |
| MANAC | 942 | 2021 | 2M592161XM1202280 |
| MANAC | 942 | 2021 | 2M5921611M1202281 |
| MANAC | 942 | 2021 | 2M5921615M1202283 |
| MANAC | 942 | 2021 | 2M5921617M1202284 |
| MANAC | 942 | 2021 | 2M5921619M1202285 |
| MANAC | 942 | 2021 | 2M5921610M1202286 |
| MANAC | 942 | 2021 | 2M5921612M1202287 |
| MANAC | 942 | 2021 | 2M5921614M1202288 |
| MANAC | 942 | 2021 | 2M5921616M1202289 |
| MANAC | 342 | 2021 | 2M5921612M1202290 |
| MANAC | 942 | 2021 | 2M5921614M1202291 |
| MANAC | 942 | 2021 | 2M5921616M1202292 |
| MANAC | 942 | 2021 | 2M5921618M1202293 |
| MANAC | 943 | 2020 | 2M5931611L1197790 |
| MANAC | 943 | 2020 | 2M5931613L1197791 |
| MANAC | 943 | 2020 | 2M5931615L1197792 |
| MANAC | 943 | 2020 | 2M5931617L1197793 |
| MANAC | 943 | 2020 | 2M5931619L1197794 |
| MANAC | 943 | 2020 | 2M5931610L1197795 |
| MANAC | N/A | 2020 | 2M5931612L1197796 |
| MANAC | N/A | 2020 | 2M5931614L1197797 |
| MANAC | N/A | 2020 | 2M5931618L1197799 |
| MANAC | N/A | 2020 | 2M5931610L1197800 |
| MANAC | N/A | 2020 | 2M5931612L1197801 |
| MANAC | N/A | 2020 | 2M5931614L1197802 |
| MANAC | N/A | 2020 | 2M5931616L1197803 |
| MANAC | N/A | 2020 | 2M5931618L1197804 |
| MANAC | N/A | 2020 | 2M5931611L1197806 |
| MANAC | N/A | 2020 | 2M5931613L1197807 |
| MANAC | N/A | 2020 | 2M5931615L1197808 |
| MANAC | N/A | 2020 | 2M5931617L1197809 |
| MANAC | N/A | 2020 | 2M5931613L1197810 |

```
MANAC   N/A    2020   2M5931615L1197811
MANAC   N/A    2020   2M5931617L1197812
MANAC   N/A    2020   2M5931619L1197813
MANAC   N/A    2020   2M5931610L1197814
MANAC   N/A    2020   2M5931612L1197815
MANAC   N/A    2020   2M5931614L1197816
MANAC   N/A    2020   2M5931616L1197817
MANAC   N/A    2020   2M5931618L1197818
MANAC   N/A    2020   2M593161XL1197819
MANAC   N/A    2020   2M5931614M1197820
MANAC   N/A    2020   2M5931616M1197821
MANAC   N/A    2020   2M5931618M1197822
MANAC   N/A    2020   2M593161XM1197823
MANAC   N/A    2020   2M5931611M1197824
MANAC   943    2020   2M5931613M1197825
MANAC   943    2020   2M5931615M1197826
MANAC   943    2021   2M5931617M1197827
MANAC   943    2021   2M5931619M1197828
MANAC   943    2021   2M5931610M1197829
MANAC   943    2021   2M5931617M1197830
MANAC   943    2021   2M5931619M1197831
MANAC   943    2021   2M5931610M1197832
MANAC   943    2021   2M5931612M1197833
MANAC   943    2021   2M5931614M1197834
MANAC   943    2021   2M5931616M1197835
MANAC   943    2021   2M5931618M1197836
MANAC   943    2021   2M593161XM1197837
MANAC   943    2021   2M5931611M1197838
MANAC   943    2021   2M5931613M1197839
```

# Appendix "B"

~~EXECUTION COPY~~Execution Copy

**AMENDED & RESTATED PURCHASE AGREEMENT**

This Amended & Restated Purchase Agreement dated as of the ~~26th~~22nd day of ~~August~~September, 2024 ~~(the "**Effective Date**")~~ among:

Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation
(collectively, the "**Vendors**")

– and –

1000927605 Ontario Inc.
(the "**Purchaser**")

**WHEREAS** pursuant to the Order of the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") granted on March 27, 2024 (the "**CCAA Filing Date**") (as amended or amended and restated from time to time, the "**Initial Order**"), the Vendors and certain of their affiliated entities/businesses (as defined collectively in the Initial Order, the "**Pride Entities**") were granted creditor protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36, as amended (the "**CCAA**"). Ernst & Young Inc. was appointed as the monitor of the Pride Entities (in such capacity, the "**Monitor**"), and RC Benson Consulting Inc. was appointed as the Pride Entities' chief restructuring officer (in such capacity, the "**CRO**");

**AND WHEREAS** the proceedings initiated by the Initial Order (the "**CCAA Proceedings**") were recognized pursuant to an Order of the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**" and together with the Canadian Court, the "**Courts**") under Chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**");

**AND WHEREAS** in connection with the CCAA Proceedings, on May 15, 2024, the Pride Entities sought and obtained approval from the Canadian Court of a sale solicitation process (as it may be amended from time to time in accordance with its terms, the "**Sale Process**"), to be conducted by the Monitor, with the assistance of its advisors, the CRO, and the Vendors, intended to solicit interest in, and opportunities for, the purchase of all or part of the business, operations and assets of all or any of the Vendors;

**AND WHEREAS** pursuant to the Sale Process, the Monitor, in consultation with the Vendors, has reviewed and evaluated all qualified bids received, and ~~has~~ identified the Purchaser's bid for the Purchased Assets (defined herein) as a Successful Bid ~~on the terms set out in this Agreement~~;

**AND WHEREAS** on the terms set out ~~herein~~in the purchase agreement among the Vendors and the Purchaser dated August 26, 2024 (the "**Original APA**"), the Vendors ~~have~~ agreed to sell and transfer to the Purchaser, and the Purchaser ~~has~~ agreed to purchase from the Vendors, all of the Vendors' right, title and interest in and to the Purchased Assets, which includes substantially all of PGL's assets, subject to and in accordance with the terms and conditions set forth in this Agreement;

**AND WHEREAS** following the execution of the Original APA, certain additional transaction terms were negotiated between the Vendors and the Purchaser, which additional terms are set out in this Agreement;

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby

– 2 –

irrevocably acknowledged, the parties hereto (collectively, the "**Parties**", and each, a "**Party**") hereby acknowledge and agree as follows:

**ARTICLE 1**
**INTERPRETATION**

**1.1    Definitions**

Unless something in the subject matter or context is inconsistent therewith, the terms defined herein shall have the following meanings:

"**129 Canada**" means 12944154 Canada Inc.

"**129 Shares**" means all of the outstanding shares of 129 Canada.

"**131 Canada**" means 13184633 Canada Inc.

"**207 Ontario**" means 2076401 Ontario Inc.

"**283 Ontario**" means 2837229 Ontario Inc.

"**933 Helena**" means 933 Helena Holdings Inc.

"**Accounts Receivable**" means, with respect to the PGL Vendors and without duplication, all accounts receivable, trade receivables, bills receivable, trade accounts, book debts, notes receivables, rebates, refunds and other receivables of the PGL Vendors whether current or overdue and determined in accordance with GAAP, arising prior to, including, and after the Closing Date, together with all interest accrued on such items, but for greater certainty, <u>excluding</u> any amounts owing by any the Pride Entity that is not a PGL Vendor or PGL Insurance.

"**Acquired AR Amount**" has the meaning ascribed thereto in section 3.2.

"**Affiliate**" has the meaning given to the term "affiliate" in the *Business Corporations Act* (Ontario).

"**Agreement**" means this amended & restated purchase agreement, as may be further amended and restated from time to time in accordance with the terms hereof, with the consent of the Monitor, and "Article" and "Section" mean and refer to the specified article, section and subsection of this Agreement.

"**Applicable Law**" means, in respect of any Person, property, transaction or event, any (i) domestic or foreign statute, law (including the common law), ordinance, rule, regulation, treaty, restriction, regulatory policy, standard, code or guideline, by-law or order, (ii) judicial, arbitral, administrative, ministerial, departmental or regulatory judgments, orders, decisions, rulings, instruments or awards of any Governmental Authority, and (iii) policies, practices, standards, guidelines and protocols having the force of law, that applies in whole or in part to such Person, property, transaction or event.

"**Approval and Vesting Order**" means an order by the Canadian Court, in form and substance satisfactory to the Purchaser, acting reasonably, among other things, approving and authorizing the Transaction and vesting in the Purchaser (or as it may direct) all the right, title and interest of the Vendors in and to the Purchased Assets, free and clear from any Encumbrances.

"**Approved Lease Terms**" mean terms in a real property lease, access agreement or parking agreement that provide for: (i) an initial 60 day term, with a series of 60 day renewal terms, renewable with the consent of the landlord, any mortgagee with an interest registered on title to the real property, and the Royal Bank of Canada (in its capacity as administrative agent and collateral agent), which consent is not to be unreasonably withheld unless (A) the lease is in default and any applicable cure periods have expired, (B) a binding offer is accepted by the landlord for the purchase of the applicable real property, or (C) the leased property has been vacated of substantially all trucks and trailers not owned by the Purchaser, at which point the lease or agreement may be (x) terminated by the landlord on 60 days notice to the tenant, or (y) renewed if requested by the tenant for a further term, with the consent of the landlord, any mortgagee or other secured creditor with an interest in the leased property, and the purchaser of the real property; (ii) fair market value rent, as determined by the Monitor in its sole discretion; (iii) terms that are not less favourable to the landlord than the terms of any existing lease, access or parking agreements in respect of the real property; and (iv) an at-will, without-cause, termination right, exercisable by either the landlord or the tenant on 60 days notice. Without limiting any of the foregoing, the Purchaser and the Vendors agree that any lease entered into subject to the Approved Lease Terms shall be provided in draft to any mortgagee or other secured creditor with an interest in the property to be leased, prior to it being entered into, and the Monitor, CRO and Purchaser shall consult with such creditors on the terms of such lease.

"**Assignment Order**" means an order or orders of the Canadian Court pursuant to section 11.3 of the CCAA and other applicable provisions of the CCAA, in form and substance satisfactory to the Purchaser and the Monitor on behalf of the PGL Vendors, each acting reasonably, authorizing and approving (i) the assignment of any Critical Required Contract for which a consent, approval or waiver necessary for the assignment of such Critical Required Contract has not been obtained, (ii) the prevention of any counterparty to such Critical Required Contracts from exercising any right or remedy under such Critical Required Contracts by reason of any defaults arising from the CCAA Proceedings or the insolvency of the PGL Vendors and deeming any such defaults to have been cured (iii) the vesting in the Purchaser (or as directed by the Purchaser) of all right, title and interest of the PGL Vendors in such Critical Required Contracts, including without limitation any and all rights to purchase the Finloc Leased Vehicles in accordance with the Finloc Leases.

"**Assumed Liabilities**" means any of the following: (i) liabilities of PGL Insurance accruing from and after the Closing Date; (ii) any Unpaid Post CCAA Filing Accruals that remain unpaid by the Vendors on Closing; (iii) liabilities for accrued vacation pay of the Transferring Employees; (iv) liabilities of any PGL Vendor owing to any other PGL Vendor or PGL Insurance, whether incurred or owing prior or subsequent to the CCAA Filing Date; and (v) if the Real Property Option is exercised, the real property mortgages and accrued property taxes and utilities associated with the Optional Assets.

"**Authorization**" means any authorization, approval, consent, concession, exemption, license, lease, grant, permit, franchise, right, privilege or no-action letter from any Governmental Authority having jurisdiction with respect to any specified Person, property, transaction or event, or with respect to any of such Person's property or business and affairs (including any zoning approval or building permit) or from any Person in connection with any easements, contractual rights or other matters.

"**Books and Records**" means, in respect of the PGL Vendors, LeaseCo and PGL Insurance and, if applicable, the Optional Vendors: (i) all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise), including Tax and accounting books and records, and (ii) all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic

format or otherwise), including Tax and accounting books and records used or intended for use by, or in the possession of such entities, including, without limitation, information, documents and records relating to the Purchased Contracts, customer lists, customer information and account records, sales records, computer files, data processing records, employment and personnel records, sales literature, advertising and marketing data and records, cost and pricing information, production reports and records, equipment logs, operating guides and manuals, credit records, records relating to present and former suppliers and contractors, plans and projections and all other records, data and information stored electronically, digitally or on computer-related media.

"**Business**" means the transportation and logistics business conducted by the PGL Vendors across Canada and the United States, as applicable.

"**Business Day**" means a day on which banks are open for business in Toronto, Ontario, but does not include a Saturday, Sunday or statutory holiday in the Province of Ontario.

"**Canadian Court**" has the meaning ascribed thereto in the recitals.

"**Cash and Cash Equivalents**" means all cash on hand, cash equivalents and bank accounts of the PGL Vendors.

"**Cash Purchase Price**" has the meaning ascribed thereto in Section 3.4(b).

"**CCAA**" has the meaning ascribed thereto in the recitals.

"**CCAA Filing Date**" has the meaning ascribed thereto in the recitals.

"**CCAA Proceedings**" has the meaning ascribed thereto in the recitals.

"**Change of Control Consents**" has the meaning ascribed thereto in Section 5.2(c).

"**Claims**" means any civil, criminal, administrative, regulatory, arbitral or investigative inquiry, action, suit, investigation or proceeding and any claim of any nature or kind (including any cross-claim or counterclaim), demand, investigation, audit, chose in or cause of action, suit, default, assessment, litigation, prosecution, third party action, arbitral proceeding or proceeding, complaint or allegation, by or before any Person.

"**Closing**" means the completion of the purchase and sale of the Purchased Assets in accordance with the provisions of this Agreement.

"**Closing Date**" means, subject to the terms hereof, the date on which the Monitor's Certificate is released from escrow to the Purchaser in accordance with Section 9.15, which date shall (unless otherwise agreed to by the Purchaser and the Monitor, on behalf of the Vendors) be no later than ~~ten (10) days after the date on which the Approval and Vesting Order is granted by the Canadian Court and, if applicable, the U.S. Approval Order is granted by the U.S. Court~~the Outside Date.

"**Closing Time**" means 12:01 a.m. (Toronto time) on the Closing Date or such other time on the Closing Date as the Parties agree in writing that the Closing Time shall take place.

"**Contracts**" means all pending and executory contracts, agreements, leases, understandings and arrangements (whether oral or written) to which the PGL Vendors are a party or by which the PGL Vendors are bound or in which the PGL Vendors have, or will at Closing have, any rights

or by which any of their property or assets are or may be affected, including any Contracts in respect of Employees.

"**Courts**" has the meaning ascribed thereto in the recitals hereto.

"**Critical Required Contract**" means the Contracts set forth in Schedule "I", which Schedule "I" may be amended by the Purchaser up until 85 calendar days prior to the hearing of the motion for the Approval and Vesting Order, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "I" is amended.

"**Cure Costs**" means, in respect of any Purchased Contract, Critical Required Contract or Change of Control Consent, all monetary amounts, if any, required to be paid pursuant to section 11.3(4) of the CCAA in order to obtain the assignment to the Purchaser of such Purchased Contract, Critical Required Contract or in order for the Purchaser to obtain any Change of Control Consent, or such lesser amount as may be negotiated by the Purchaser or the Monitor with the applicable counterparty.

"**Deposit**" has the meaning ascribed thereto in Section 3.5 hereof.

"**Discharge**" means, in relation to any Encumbrance against any Person or upon any asset, undertaking or property, the full, final, irrevocable, complete and permanent waiver, release, discharge, cancellation, termination and extinguishment of such Encumbrance against such Person or upon such asset, undertaking or property and all proceeds thereof.

"**Effective Date**" has the meaning ascribed thereto in the preamble hereto means August 26, 2024, the "Effective Date" of the Original APA.

"**Employee**" means any individual who is employed by the PGL Vendors as of the Closing Date, whether on a full-time or a part-time basis and includes an employee on short term or long-term disability leave, but for certainty excludes any employee whose employment is terminated by the PGL Vendors prior to the Closing Date.

"**Encumbrance**" means any security interest, lien, Claim, charge, right of retention, deemed trust, judgement, writ of seizure, writ of execution, notice of seizure, notice of execution, notice of sale, hypothec, reservation of ownership, pledge, encumbrance, mortgage or right of a third party (including any contractual rights such as purchase options, rights of first refusal, rights of first offer or any other pre-emptive contractual right) or encumbrance of any nature or kind whatsoever and any agreement, option or privilege (whether by law, contract or otherwise) capable of becoming any of the foregoing, (including any conditional sale or title retention agreement, or any capital or financing lease).

"**Equipment**" means all Tangible Property and Vehicles.

"**Excluded Assets**" means the assets of the PGL Vendors listed in Schedule "B", the Excluded Contracts, and all claims by the PGL Vendors against or in respect of any Related Party other than the PGL Vendors and PGL Insurance, which Schedule "B" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "B" is amended.

"**Excluded Contracts**" means the Contracts listed in Schedule "E", which Schedule "E" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "E" is amended.

"**Excluded Liabilities**" means all Liabilities of the PGL Vendors of any kind or nature whatsoever, other than Assumed Liabilities.

"**Exercise Notice**" has the meaning ascribed in Section 2.2 hereof.

"**Final Adjustment Statement**" has the meaning ascribed thereto in Section 3.10(a)

"**Final AR Adjustment**" has the meaning ascribed thereto in Section 3.3.

"**Final Order**" means a final, non-interlocutory order issued by a court of competent jurisdiction that has not been stayed, set aside, or vacated and no application, motion or other proceeding has been commenced seeking the same, in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably, and all appeal periods in respect of such order have expired.

"**Finloc Leased Vehicles**" means such of the trailers owned by Finloc 2000 Inc. or its affiliates subject to the Finloc Leases that the Purchaser agrees to assume the leases in respect of, as are set out in Schedule "J" to this Agreement, which Schedule may be amended by the Purchaser no later than 85 calendar days prior to the hearing of the motion for the Approval and Vesting Order.

"**Finloc Leases**" means, collectively, the Master Leasing Agreement No. A900271 PRI 6055 dated November 5, 2019 between PGL and Finloc 2000 Inc., and each of the following leasing agreements entered into thereunder: A900271-10854, A900271-10885 (as amended), A900271-10891, A900271-10905, A900271-10949, A900271-10990, A900271-11125, A900271-11138.

"**Fuel Inventory Adjustment**" has the meaning ascribed thereto in Section 3.3(e).

"**GAAP**" means Canadian Accounting Standards for Private Enterprises as defined in the CPA Canada Handbook—Accounting, Part II, as applicable, from time to time applied on a consistent basis and determined in accordance with past practices of PGL Vendors.

"**Governmental Authority**" means any domestic or foreign government, whether federal, provincial, state, territorial or municipal; and any governmental agency, ministry, department, court (including the Courts), tribunal, commission, stock exchange, bureau, board or other instrumentality exercising or purporting to exercise legislative, judicial, regulatory or administrative functions of, or pertaining to, government or securities market regulation.

"**GST/HST**" has the meaning ascribed thereto in Section 7.2(i).

"**Ineligible Equipment**" means any Vehicles of any PGL Vendor or TPine that is included in Schedule "G" hereof, but that prior to the Closing Date becomes unavailable for sale or otherwise cannot be conveyed to the Purchaser, including because the Vehicles have (a) been sold to a party other than the Purchaser, (b) been delivered to a secured creditor, or (c) become Wrecked Equipment.

"**Initial AR Adjustment**" has the meaning ascribed thereto in Section 3.3.

"**Initial Order**" has the meaning ascribed thereto in the recitals hereto.

"**Intangible Property**" means all of the following which is used in connection with the Business and/or the Purchased Assets, whether or not registered, anywhere in the world: (a) all trade or

brand names, business names, trademarks, service marks, copyrights to any original works of authorship, patents, licences, sublicenses, industrial designs, trade secrets, and other industrial or intellectual property of any nature in any form whatsoever recognized in any jurisdiction throughout the world; (b) inventions, discoveries, developments, concepts, ideas, improvements, processes and methods, know-how, trade secrets, confidential information, systems, procedures, computer software, source code; and (c) all goodwill, customer and supplier lists, confidential and proprietary information;

"**Intercompany Receivables**" means (i) any Accounts Receivable owing to any PGL Vendor by PGL Insurance, and (ii) if the Real Property Option is exercised by way of a share purchase transaction, any Accounts Receivable owing to any PGL Vendor by any of the Optional Vendors.

"**Interim Adjustment Statement**" has the meaning ascribed thereto in section 3.4(c).

"**Interim Period**" means the period beginning on the Effective Date and ending at the Closing Time.

"**Inventory**" means, collectively, all (i) shop supplies, including, motor oil, fluids, filters and other service supplies used in connection with the Business and/or the Purchased Assets, and (ii) diesel and fuel inventory.

"**ITA**" means the *Income Tax Act* (Canada).

"**LeaseCo**" means 2029909 Ontario Inc.

"~~**LC Purchase Price**" has the meaning ascribed thereto in Section 3.1.~~

"**Lenders**" has the meaning ascribed thereto in Section 2.2.

"**Liability**" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"**Monitor**" has the meaning ascribed thereto in the recitals hereto.

"**Monitor's Certificate**" has the meaning ascribed thereto in Section 9.15.

"**Offers of Employment**" has the meaning ascribed thereto in Section 9.1(a).

"**Optional Assets**" means all rights, titles and interests in and to the real property held by the Optional Vendors.

"**Optional Vendors**" means, collectively, 129 Canada, 131 Canada and 283 Ontario.

"**Original APA**" has the meaning ascribed thereto in the recitals hereto.

"**Organizational Documents**" means any trust document, charter, certificate or articles of incorporation or amalgamation, articles of amendment, articles of association, articles of

organization, articles of continuance, bylaws, as amended, partnership agreement or similar formation or governing documents of a Person (excluding individuals).

"**Outside Date**" means 11:59PM (Toronto time) on ~~September 30~~October 16, 2024, or such later date that is two Business Days after the date on which the Approval and Vesting Order and, if applicable, the Assignment Order, become Final Orders, or such later date and time as the Vendors, with the consent of the Monitor, and the Purchaser may agree in writing, or as the Court may direct.

"**Parties**" has the meaning ascribed thereto in the recitals hereto.

"**Party**" has the meaning ascribed thereto in the recitals hereto.

"**Permit Vendor**" has the meaning ascribed thereto in Section 4.6.

"**Permits**" means, in respect of the PGL Vendors, all permits, licences, certificates, licence plates, approvals, authorizations, and registrations, or any item with a similar effect, issued or granted by any Governmental Authority that are listed in Schedule "H", which Schedule "H" may be amended no later than ~~8~~5 calendar days prior to the hearing of the motion for the Approval and Vesting Order, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "H" is amended.

"**Permitted Assignee**" has the meaning ascribed thereto in Section 9.11

"**Permitted Encumbrances**" means such Encumbrances, if any, that the Purchaser agrees will continue to attach to and be enforceable against the Purchased Assets following Closing, a list of which are attached hereto as Schedule "C", which Schedule "C" may be amended by the Purchaser up until the Closing Date, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "C" is amended.

"**Person**" is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity.

"**PFS**" means Pride Fleet Solutions Inc.

"**PFS USA**" means Pride Fleet Solutions USA Inc.

"**PGL**" means Pride Group Logistics Ltd.

"**PGL Entities**" means PGL, PGL USA, PGL Insurance, PGL International, 12944154 Canada Inc. and 933 Helena Holdings Inc.

"**PGL Group**" means the PGL Vendors and their subsidiaries.

"**PGL Insurance**" means Pride Global Insurance Company Ltd.

"**PGL Insurance Financial Instruments**" means, collectively, all letters of credit, cash, cash equivalents, securities and investments held directly or indirectly by PGL Insurance.

"**PGL Insurance Shares**" means all of the outstanding shares of PGL Insurance.

"**PGL International**" means Pride Group Logistics International Ltd.

"**PGL USA**" means Pride Group Logistics USA, Co.

"**PGL Vendors**" means, collectively, PGL, PGL International, PGL USA, PFS, PFS USA, and LeaseCo**.**

"**Post-Closing Cash**" has the meaning ascribed thereto in Section 3.7.

"**Pride Entities**" has the meaning ascribed to it in the recitals.

"**Prepaid Expenses**" means all prepaid expenses ~~(a) of the PGL Vendors in respect of Permits, and (b)~~ of LeaseCo in respect of prepaid rents under the lease for 6050 Dixie Road, Mississauga, ON.

"**Purchase Price**" has the meaning ascribed thereto in Section 3.1.

"**Purchased Assets**" means the following tangible and intangible assets, undertakings and properties owned by the PGL Vendors, Optional Vendors and Real Property Vendor, related to the Business, wherever located, as of the Closing Date, but excluding the Excluded Assets:

    (i)        all Cash and Cash Equivalents of PGL, PGL International, and PGL USA;

    (ii)       all Accounts Receivable (including the Intercompany Receivables);

    (iii)      all Purchased Contracts;

    (iv)      all Prepaid Expenses;

    (v)       all Permits;

    (vi)      all Equipment;

    (vii)     all Inventory;

    (viii)    all PGL Insurance Shares;

    (ix)      all PGL Insurance Financial Instruments;

    (x)       the Intangible Property;

    (xi)      all Books and Records;

    (xii)     all rights under non-disclosure and confidentiality, non-compete, or non-solicitation agreements with Employees and agents of the PGL Vendors or with third parties to the extent related to the Business and/or the Purchased Assets, excluding any such agreements signed in connection with the Sale Process;

    (xiii)    all rights of the PGL Vendors under or pursuant to all warranties, representations and guarantees to the extent relating to products sold, or services provided, to the PGL Vendors or to the extent affecting any Purchased Assets;

(xiv)    if the Real Property Option is exercised, the Optional Assets;

(xv)    all Vehicles listed on Schedule "G" hereof;

and the following tangible assets owned by TPine:

(xvi)    all Vehicles listed on Schedule "G" that are owned by TPine.

"**Purchased Contracts**" means all Contracts of the PGL Vendors, including ~~the Purchased LCs set out in Schedule "D" and~~ the Finloc Leases, except for the Excluded Contracts~~, which Schedule "D" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "D" is amended.~~

~~"**Purchased LCs**" means the letters of credit set out in Schedule "D", which Schedule "D" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "D" is amended~~.

"**QST**" has the meaning ascribed thereto in Section 7.2(i).

"**Real Property Option**" has the meaning ascribed thereto in Section 2.2.

"**Real Property Vendor**" means 2043002 Ontario Inc., being the entity that holds all outstanding shares of 283 Ontario, 129 Canada, 131 Canada and LeaseCo.

"**Related Party**" means any Person (i) that is an affiliate or associate of any of the Pride Entities; (ii) that is an officer or director of any of the Pride Entities, (iii) that is an affiliate or associate of any such responsible officer or director, or (iv) that does not deal at arm's length (within the meaning of the ITA) with any of the Pride Entities or any responsible officer or director of any of the Pride Entities.

"**Related Party Landlord**" means any Related Party that becomes a landlord under a lease, access agreement or parking agreement referred to in Section 6.2(f).

"**Sanctions**" has the meaning ascribed thereto in Section 7.2(g).

"**Sale Process**" has the meaning ascribed thereto in the recitals hereto.

"**Specific Conveyances**" means all conveyances, bills of sale, assignments, powers of attorney, transfers, registrable transfers of land and other documents or instruments that are reasonably required or desirable to convey, assign and transfer the Vendors' respective title to and/or interest in and to the Purchased Assets to the Purchaser;

"**Tangible Property**" means all tangible personal property of the PGL Vendors other than the Vehicles.

"**Taxes**" means, with respect to any Person, all national, federal, provincial, local or other taxes, including income taxes, capital gains taxes, value added taxes, severance taxes, ad valorem taxes, property taxes, capital taxes, net worth taxes, production taxes, sales taxes, use taxes, license taxes, lease excise taxes, environmental taxes, transfer taxes, withholding or similar taxes, payroll taxes, employment taxes, employer health taxes, pension plan premiums and contributions, workers' compensation premiums, employment insurance or compensation premiums, stamp taxes, occupation taxes, premium taxes, alternative or add-on minimum taxes,

– 11 –

GST/HST, customs duties or other taxes of any kind whatsoever imposed or charged by any Governmental Authority, together with any interest, penalties, or additions with respect thereto and any interest in respect of such additions or penalties and any Liability for the payment of any amounts of the type described in this paragraph as a result any express or implied obligation to indemnify any other Person or as a result of being a transferee or successor in interest to any Person.

"**TPine**" means TPine Leasing Capital Corporation.

"**Transaction**" means all of the transactions contemplated by this Agreement, including the purchase and sale transaction whereby the Purchaser will acquire the Purchased Assets.

"**Transfer Taxes**" has the meaning ascribed in section 3.11 hereof.

"**Transferring Employees**" means the Employees who accept or are deemed to accept offers of employment from the Purchaser or an affiliate thereof in accordance with the terms hereof.

"**Transaction**" means all of the transactions contemplated by this Agreement, including the purchase and sale transaction whereby the Purchaser will acquire the Purchased Assets**Transition Services Agreement**" means an agreement between the Purchaser and each Permit Vendor, in form and substance acceptable to the Purchaser, Vendors and Monitor, that provides for the Purchaser to have the use and benefit of the Permits post-Closing, to the extent that the Permits are not transferred or assigned to the Purchaser on Closing.

"**U.S. Approval Order**" means an Order of the U.S. Court approving the Transaction solely with respect to the sale to the Purchaser of the Purchased Assets and Business located within the territorial jurisdiction of the United States.

"**Vehicles**" means all of the trucks, trailers and other vehicles of the PGL Vendors and TPine listed in Schedule "G", which schedule cannot be amended except for as provided for herein, and includes all accessories, fuel, equipment and parts thereof, therein or affixed thereto.

"**Vendors**" means, collectively, the PGL Vendors, TPine the Optional Vendors and the Real Property Vendor.

"**Wrecked Equipment**" has the meaning ascribed in section 7.4 hereof.

## 1.2    Interpretation Not Affected by Headings, etc.

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

## 1.3    General Construction

The terms "this Agreement", "hereof", "herein" and "hereunder" and similar expressions refer to this Agreement and not to any particular section hereof. The expression "Section" or reference to another subdivision followed by a number mean and refer to the specified Section or other subdivision of this Agreement. The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

– 12 –

**1.4    Extended Meanings**

Words importing the singular include the plural and vice versa and words importing gender include all genders. The term "including" means "including, without limitation," and such terms as "includes" have similar meanings and the term "third party" means any other Person other than the Vendors or the Purchaser, or any Affiliates thereof.

**1.5    Currency**

All references in this Agreement to dollars, monetary amounts, or to $, are expressed in Canadian currency unless otherwise specifically indicated.

**1.6    Statutes**

Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules, regulations and interpretations made under it, as it or they may have been or may from time to time be modified, amended or re-enacted.

**1.7    Schedules & Amendments to Schedules**

The following exhibits and schedules are attached hereto and incorporated in and form part of this Agreement:

<u>**SCHEDULES**</u>

| | | |
|---|---|---|
| Schedule "A" | - | Form of Approval and Vesting Order |
| Schedule "B" | - | Excluded Assets |
| Schedule "C" | - | Permitted Encumbrances |
| Schedule "D" | - | ~~Purchased Contracts~~[Intentionally Omitted] |
| Schedule "E" | - | Excluded Contracts |
| Schedule "F" | - | Allocation Statement |
| Schedule "G" | - | Vehicles |
| Schedule "H" | - | Permits |
| Schedule "I" | - | Critical Required Contracts |
| Schedule "J" | - | Finloc Leased Equipment |

Unless the context otherwise requires, words and expressions defined in this Agreement will have the same meanings in the Schedules and the interpretation provisions set out in this Agreement will apply to the Schedules. Unless the context otherwise requires, or a contrary intention appears, references in the Schedules to a designated Article, Section, or other subdivision refer to the Article, Section, or other subdivision, respectively, of this Agreement.

– 13 –

## 1.8    Interpretation if Closing Does Not Occur

If Closing does not occur, each provision of this Agreement which presumes that the Purchaser has acquired the Purchased Assets shall be construed as having been contingent upon Closing having occurred.

## 1.9    Amendment and Restatement

The Vendors and the Purchaser agree that effective as of the date hereof, this Agreement is an amendment and restatement of the Original APA and not a novation of the Original APA. As a consequence, the obligations, liabilities, covenants, representations and warranties under the Original APA shall constitute obligations, liabilities, covenants, representations and warranties hereunder governed by the terms hereof. Such obligations, liabilities, covenants, representations and warranties shall be continuing in all respects, and this Agreement shall not be deemed to evidence or result in a novation of such obligations, liabilities, covenants, representations and warranties. The Original APA has been amended and restated solely for the purposes of reflecting amendments to the Original APA which the Vendors and Purchaser have agreed upon.

## ARTICLE 2
## PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES

## 2.1    Purchase and Sale of the Purchased Assets

Subject to the terms and conditions of this Agreement, effective as of the Closing Time, the Vendors shall sell, assign and transfer the Purchased Assets to the Purchaser, and the Purchaser shall purchase, accept, assume and receive from the Vendors, all of the Vendors' title to and interest in and to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to the Approval and Vesting Order. For greater certainty, the Purchased Assets do not include the Excluded Assets.

Notwithstanding the foregoing paragraph, the Permits shall only be transferred and assigned to the Purchaser by the Vendors on Closing to the extent that such transfer and assignment is consented to or approved by the applicable issuers of the Permits, and the Parties hereto acknowledge that if such transfer or assignment of the Permits cannot be accomplished on Closing, the Purchaser shall still be required to close the Transaction on the Closing Date as long as the Transition Services Agreement is delivered in accordance with Section 5.2(e). If the Permits are not transferred and assigned to the Purchaser on Closing because the necessary consents have not been obtained, then the Permits shall transfer and assign to the Purchaser following Closing effective immediately upon the delivery of the necessary consents from the issuer of the Permit(s), without any further steps or formalities by the Vendors and the Purchaser.

Provided that Closing occurs, and subject to the terms and conditions of this Agreement, possession, risk, legal and beneficial ownership of, rights in, and responsibility for, the Purchased Assets shall transfer from the Vendors to the Purchaser effective as of the Closing Time, all subject to the Approval and Vesting Order.

## 2.2    Option to Acquire Additional Assets

From the Effective Date until the date that is no less than ten (10) Business Days prior to the Closing Date, the Purchaser shall have the option (but not the obligation) to acquire allany of the Optional Assets held by any of the Optional Vendors (the "**Real Property Option**"). If the Real Property Option is exercised, in whole or in part, the acquisition by the Purchaser of any of Optional Assets shall be free and clear of any Encumbrances and Liabilities, other than the Assumed Liabilities. In the event that the Real

Property Option is exercised, in whole or in part, the Optional Assets subject to the exercise of the Real Property Option shall be deemed to be included in the definition of Purchased Assets. Notwithstanding anything to the contrary provided in this Agreement, the exercise of the Real Property Option will be subject to (i) the approval of the Monitor, and (ii) the Purchaser obtaining written consent from (A) the mortgage lenders to each of the mortgaged real property owned by the applicable Optional Vendors (the "**Lenders**") to the assignment of the existing mortgages to the Purchaser, and (B) the Royal Bank of Canada (in its capacity as administrative agent and collateral agent). The Purchaser may exercise the Real Property Option at its sole discretion by delivering to the Vendors and the Monitor written notice of its intention to exercise the Real Property Option (the "**Exercise Notice**") on or before the date that is ten (10) Business Days prior to the Closing Date. Such Exercise Notice shall, among other things, specify the Optional Assets the Purchaser wishes to acquire. After receiving the Exercise Notice, the Monitor shall advise the Purchaser within five (5) Business Days as to whether or not the Monitor consents to the exercise of the Real Property Option.  If the Real Property Option is exercised, the Purchase Price shall be increased by $1.00 and concordant adjustments will be made to the Allocation Statement in Schedule "F".

If the Real Property Option is exercised, the Purchaser and Vendors may elect to complete the transaction as either an asset purchase or a share purchase transaction, and shall be subject to Court approval, which may be sought at the hearing for the Approval and Vesting Order, or at a subsequent hearing in the event that the Exercise Notice is not exercised, and the required consents are not obtained, prior to the motion for the Approval and Vesting Order being served.

In the event that (a) the Purchaser declines to exercise the Real Property Option, (b) the Lenders do not consent to the sale of any of the Optional Assets, or (c) the Monitor does not provide its consent to the exercise of the Real Property Option, then in each such case there shall be no right of termination on the part of the Purchaser or the Vendors based solely upon such event, and the Purchaser's obligations, entitlements or other rights under this agreement shall not be impaired, waived or diminished, including the obligation to proceed with the Transaction, excluding the Optional Assets, in accordance with the terms of this Agreement.

### ARTICLE 3
### PURCHASE PRICE AND RELATED MATTERS

**3.1    Purchase Price**

(a)    The aggregate cash consideration payable by the Purchaser for the Purchased Assets based upon the Purchased Assets existing as at the date of this Agreement and subject to adjustment as set out below shall be as set out below (the "**Purchase Price**").

Purchase Price Allocation Summary:

| | |
|---|---|
| Vehicles (Schedule "G") | $ ~~41,098,837~~43,098,837[1] |
| Acquired AR Amount (including Intercompany Receivables at nil consideration) | $9,000,000.00[2] |
| ~~Purchased LCs~~ | ~~$4,000,000.00[3]~~ |

---

[1] Subject to further adjustment in accordance with s. 3.3(c).

[2] Subject to further adjustment in accordance with s. 3.3(b).

[3] ~~Subject to further adjustment in accordance with s. 3.1(c).~~

| | |
|---|---|
| Tangible Property (Computers, office furniture, IT, mechanics tools, etc.) | $160,000.00 |
| Intangibles (IP, licenses, software, goodwill, Permits, license plates, Purchased Contracts, etc.) (Schedule "F") | $50,000.00 |
| PGL Insurance Shares | $1.00 |
| Inventory[43] | $100,000 |
| Prepaid Expenses | $50,000 |
| **TOTAL** | $~~54,458,838~~52,458,838 |

(b)    The Purchase Price shall be satisfied in accordance with Section 3.3 and shall not be subject to any claim for set off, reduction or adjustment or any similar claim or mechanism of any kind whatsoever, other than as described herein. For the avoidance of doubt, any Cash or Cash Equivalents indirectly acquired by the Purchaser from the PGL Vendors pursuant to this Agreement will be acquired on a dollar for dollar basis and such amount of Cash or Cash Equivalents acquired hereunder shall be added to the Purchase Price after payment and deduction of any unpaid amounts owing by any of the PGL Vendors in respect of unpaid wages, source deductions, taxes and unpaid HST accruing up to the Closing Date (the "**Unpaid Post CCAA Filing Accruals**"). In the event that the Cash or Cash Equivalents are not sufficient to satisfy the Unpaid Post CCAA Filing Accruals or there are any liabilities that cannot be vested out and released as against the PGL Vendors and their directors and officers pursuant to the Approval and Vesting Order, the Purchase Price shall be reduced on a dollar for dollar basis to the extent that such Unpaid Post CCAA Filing Accruals and any such undischarged liabilities are greater than the Cash or Cash Equivalents as at the Closing Date. For the avoidance of doubt, Unpaid Post CCAA Filing Accruals shall not be Excluded Liabilities. Subject to the filing of the elections referred to in Section 3.12 hereof, the Purchase Price shall be net of all applicable Transfer Taxes, which shall be paid in accordance with Section 3.12(a) hereof.

(c)    ~~As the Purchased LCs are not currently cash collateralized, the Purchase Price allocated to the Purchased LCs (the "**LC Purchase Price**") shall be paid directly to the issuer or issuers of the Purchased LCs to be held by such issuers as cash collateral for the Purchased LCs, shall not be paid to the Vendors or the Monitor, and shall not form a part of the Cash Purchase Price. Further, in the event that the issuer of any Purchased LC wishes to terminate any Purchased LC prior to or concurrently with Closing, an amount of the LC Purchase Price corresponding to the terminated Purchased LC shall be used solely to secure replacement letters of credit or other security in form and substance satisfactory to the applicable insurance companies who are the beneficiaries of the terminated Purchased LC~~[Intentionally Omitted].

---

[43] Subject to further adjustment in accordance with s. 3.3(e).

– 16 –

(d) In addition, as set forth in Section 2.4 hereof, the Purchaser shall have the option to acquire the Optional Assets for a purchase price of $1.00 or such other amount as may be agreed to by the Monitor and Purchaser (and, for greater certainty, no other adjustment to the Purchase Price) and indirectly assume certain liabilities associated with the Optional Assets so acquired, including the mortgages and accrued property taxes and utilities associated with such Optional Assets.

**3.2 Assumption of Liabilities**

In addition to the Purchase Price, the Purchaser shall assume the Assumed Liabilities, which are estimated by the Purchaser to be equal to approximately $4 million based upon post-Closing obligations under the Purchased Contracts and the accrued vacation pay liabilities of the Employees. For the avoidance of doubt, the Purchaser shall assume all liabilities of PGL Insurance, by virtue of purchasing the shares of PGL Insurance.

**3.3 Allocation**

(a) <u>Allocation Statement</u>. The Purchaser has delivered to the Monitor, on behalf of the Vendors, a statement (the "**Allocation Statement**"), as set out in Schedule "F", allocating, in sufficient detail, the Purchase Price and in respect thereof, (a) the allocation of the respective Purchase Price on an asset-by-asset basis, together with (b) the Purchase Price aggregated and allocated among each category of Purchased Assets of the Vendors.

(b) <u>AR Adjustments</u>. In respect of Accounts Receivable, the Allocation Statement shall include a value to be allocated to the Accounts Receivable, which value shall be equal to 70% of the face amount of such Accounts Receivable other than Intercompany Receivables (the "**Acquired AR Amount**"), it being acknowledged and agreed by all Parties hereto that (a) the Acquired AR Amount shall remain at all times an amount equal to 70% of the full amount of the Accounts Receivable (other than Intercompany Receivables), as determined by the Monitor, and (b) the full amount of Accounts Receivable as estimated on the Allocation Statement shall be subject to adjustments based on the full amount of the Accounts Receivable, as determined by the Monitor, on (i) the Closing Date under the Interim Adjustment Statement in accordance with Section 3.4(c) (the "**Initial AR Adjustment**"), and (ii) the date that is sixty (60) days following the Closing Date, as determined in accordance with Section 3.10(a) hereof (the "**Final AR Adjustment**"). Notwithstanding the foregoing, no value shall be allocated to Intercompany Receivables, which shall be assigned to the Purchaser for no additional consideration.

(c) <u>Vehicles Adjustment</u>. In respect of Vehicles, the Allocation Statement includes a value allocated to the Vehicles being acquired (the "**Acquired Vehicles Amount**"), it being acknowledged and agreed by all Parties hereto that (a) the Acquired Vehicles Amount shall not be amended or adjusted, other than removal of any Ineligible Equipment, and (b) the Purchase Price allocated to Equipment in the Allocation Statement shall be reduced to omit any Ineligible Equipment, in an amount equal to value attributed to such Ineligible Equipment on the Allocation Statement (such reduction, the "**Vehicle Adjustment**").

(d) <u>Adjustments to Allocation Statement</u>. The Parties hereto shall make appropriate adjustments to the Allocation Statement to reflect any changes in the Purchase Price as of the Closing Time. The Parties hereto agree for all Tax reporting purposes to report the Transaction in accordance with the Allocation Statement, as adjusted pursuant to the

preceding sentence, and to not take any position during the course of any audit or other action inconsistent with such schedule unless required by a determination of the applicable Governmental Authority that is final.

(e) <u>Fuel Inventory Adjustment</u>.  An amount of $50,000 of the Purchase Price has been allocated as the estimated fuel in the gas station fuel tanks as part of the "Inventory" in the Allocation Statement.  On the Closing Date, the Vendors shall provide an updated measurement of actual fuel in the gas station fuel tanks and the Purchase Price shall be adjusted by X-$50,000 where X is the cost basis of the actual fuel in the gas station fuel tanks on the Closing Date. (the "**Fuel Inventory Adjustment**").

## 3.4    Satisfaction of Purchase Price

The Purchaser shall satisfy the Purchase Price, at the Closing Time, in accordance with the following:

(a) <u>Deposit.</u> The Parties acknowledge that the Purchaser has paid a deposit in the amount of $3,000,000 being approximately 5% of the Purchase Price (the "**Deposit**"), which Deposit is being held by the Monitor, in trust, in accordance with the terms of the Sale Process and shall be credited against the Purchase Price at Closing.

(b) <u>Cash Purchase Price.</u> An amount shall be paid to the Monitor (the "**Cash Purchase Price**"), for the benefit of the Vendors, at the Closing Time, in immediately available funds equal to the Purchase Price (i) *minus* the Deposit, (ii) *minus* the LC Purchase Price, (iii) *plus* or *minus* the Initial AR Adjustment (if any), (iviii) *plus* or *minus* the Vehicle Adjustment (if any), and (viv) *plus* or *minus* the Fuel Inventory Adjustment (if any).

(c) <u>Initial AR Adjustment.</u> The PGL Vendors, in consultation with the Monitor, shall carry out a physical accounting and adjustment and prepare and deliver to Purchaser no less than five (5) Business Days before the Closing a statement (the "**Interim Adjustment Statement**") setting out the PGL Vendors' good faith estimate of any difference between the Acquired AR Amount as set out in the Allocation Statement and the full value of the acquired accounts receivable on the Closing Date. The Interim Adjustment Statement shall be used to calculate any adjustments to the Cash Purchase Price required by Section 3.3.

(d) <u>Vehicle Adjustment.</u> The PGL Vendors and TPine, in consultation with the Monitor, shall carry out a physical accounting and adjustment and prepare and deliver to Purchaser no less than five (5) Business Days before the Closing an updated schedule of Vehicles (the "**Vehicle Adjustment Statement**") setting out any Ineligible Equipment by VIN. The Vehicle Adjustment Statement shall be used to calculate the Vehicle Adjustment required by Section 3.3.

## 3.5    Deposit

(a) If Closing occurs in accordance with the terms and conditions of this Agreement, the Deposit shall be credited against the Purchase Price, in partial satisfaction of the Purchaser's obligation to pay the Purchase Price at Closing.

(b) If this Agreement is terminated:

(i) due to breach by the Purchaser as a result of events or circumstances entirely under the Purchaser's control that are not cured or waived and result in this Agreement not closing, then the Monitor on behalf of the Vendors shall be

entitled to retain the Deposit and the full amount of the Deposit shall be forfeited to the Vendors; or

(ii)    for any other reason, including, for the avoidance of doubt, the failure of the Vendors to satisfy any of its obligations or meet any of its conditions in this Agreement or any of the Purchaser's conditions set forth under Section 6.2 not being satisfied, the Deposit shall be returned to the Purchaser within three (3) Business Days of the termination of the Agreement; and

each Party shall be released from all obligations and liabilities under or in connection with this Agreement. In the event of termination of this Agreement under Section 6.3 pursuant to which the Vendors shall be entitled to retain the Deposit, the Parties agree that the amount of the Deposit constitutes a genuine pre-estimate of liquidated damages representing the Vendors' Losses and Liabilities as a result of Closing not occurring and agree that the Vendors shall not be entitled to recover from the Purchaser any amounts that are in excess of the Deposit as a result of Closing not occurring. The Purchaser hereby waives any claim or defence that the amount of the Deposit is a penalty or is otherwise not a genuine pre-estimate of the Vendors' damages.

**3.6    Assignment of Critical Required Contracts**

In the event that there are any Critical Required Contracts which are not assignable in whole or in part without the consent, approval or waiver of another Person and such consents, approvals or waivers have not yet been obtained as of the Closing Date, then:

(a)    nothing in this Agreement will be construed as an assignment of any Critical Required Contract and, without limiting the foregoing, the Purchaser does not assume and has no obligation to discharge any liability or obligation under or in respect of any such Critical Required Contract, until (i) an Assignment Order is obtained in accordance with ~~3.5~~3.6(c), or (ii) such consent, approval or waiver is obtained in respect of such Critical Required Contract on terms satisfactory to the Purchaser, in either case following which the value of and rights of the applicable PGL Vendor under such Critical Required Contract shall enure to the applicable Purchaser;

(b)    the PGL Vendors shall use their commercially reasonable efforts to obtain any such consent, approval or waiver, and the ~~Purchasers~~Purchaser shall provide reasonable cooperation to assist the PGL Vendors in obtaining any such consent, approval or waiver;

(c)    if any consent, approval or waiver is not obtained for any Critical Required Contract prior to Closing, the Purchaser may request that the PGL Vendors bring a motion to the Court for issuance of an Assignment Order with respect to such Critical Required Contract prior to Closing;

(d)    once the consent, approval or waiver to the assignment of a Critical Required Contract is obtained, or the assignment of such Contract has been ordered by the Court pursuant to an Assignment Order, such Critical Required Contract shall be deemed to be assigned to the Purchaser on Closing;

(e)    the PGL Vendors shall preserve the Critical Required Contracts for the benefit of the Purchasers and shall not terminate, amend, modify, assign, convey or otherwise transfer all or any part of such Critical Required Contracts until such time as the required

– 19 –

consent, approval or waiver or an Assignment Order is obtained, to enable the Purchasers to obtain the benefit of the Critical Required Contracts; and

(f)     the PGL Vendors, with the consent of the Purchaser, shall have the right to disclaim any Critical Required Contract in accordance with the CCAA, and in the event of disclaimer, such Critical Required Contract shall be considered an Excluded Contract for all purposes under this Agreement.

With respect to each Critical Required Contract, subject to Closing and to either (i) the consent, approval or waiver of the other parties thereto to the assignment thereof, or (ii) in the absence of such consent, approval or waiver, the obtaining of an Assignment Order, in addition to its other obligations under this Agreement, the Purchaser shall pay the applicable Cure Costs related to such Critical Required Contract on Closing.

**3.7     Change of Control Consents**

(a)     The Vendors shall as promptly as practicable, ~~but in any event within five (5) days, after the execution of this Agreement,~~ submit requests for the Change of Control Consents to the applicable party related to the purchase of PGL Insurance and, if applicable, the Optional Assets (provided that Change of Control Consents in respect of the Optional Assets shall not be sought until the Exercise Notice has been delivered by the Purchaser). The Vendors shall, and they shall cause the PGL Insurance and, if applicable, the Lenders associated with the Optional Assets, to obtain or cause to be obtained prior to Closing the Change of Control Consents on such terms as are acceptable to the Purchaser, acting reasonably. The Purchaser shall co-operate in obtaining the Change of Control Consents.

(b)     PGL and the Real Property Vendor shall, and PGL and the Real Property Vendor shall cause PGL Insurance and, if applicable, the Lenders associated with the Optional Assets to provide, or cause to be provided, all notices that are required to be provided in connection with the Transactions.

**3.8     Post-Closing Cash**

If, after the Closing Date, the PGL Vendors come into possession of any Cash or Cash Equivalents that are proceeds of Accounts Receivable purchased by the Purchaser (the **"Post-Closing Cash"**), the Monitor, on behalf of the PGL Vendors, shall hold all such amounts in trust for the Purchaser and shall forthwith wire or otherwise transfer any Post-Closing Cash to an account designated by the Purchaser in writing.

**3.9     Good Faith Dealings**

(a)     The Parties shall co-operate fully in good faith with each other and their respective legal advisors, accountants and other representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, including making or causing to be made, all filings and submissions, as applicable, required under any Applicable Law to effect the Closing.

(b)     The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing on or before the Outside Date.

(c)     The Parties acknowledge, agree and confirm that the Agreement was negotiated, proposed and entered into by the Vendors and the Purchaser in good faith, without

– 20 –

collusion, and from arm's-length bargaining positions and that the Purchaser is a good faith purchaser within the meaning of section 363(m) of the United States Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

**3.10    Post-Closing Adjustments**

In the event that any prorations, apportionments, computations, statements of Purchased Assets or amounts made hereunder shall require final adjustment, then the Parties shall use good faith and diligent efforts to make the appropriate adjustments promptly when accurate information becomes available and either Party shall be entitled to an adjustment to correct the same provided that, it makes written demand on the one from whom it is entitled to such adjustment within 90 days of the Closing Date (or prior to the end of any applicable tax period).

Notwithstanding the foregoing, the Parties hereto agree to work together in good faith, and in consultation with the Monitor and CRO, to make any necessary post-Closing adjustments to the Purchase Price as follows:

(a)    On the date that is sixty (60) days following the Closing Date, the Purchaser shall deliver to the Vendors and the Monitor a statement (the "**Final Adjustment Statement**"), together with any supporting accounting and other information, that sets out as at such date (A) the full amount of the purchased Accounts Receivable compared to the value of the Acquired AR Amount set out in the Allocation Statement; (B) the Vehicles actually received by the Purchaser, compared to the listing of the purchased Vehicles on Schedule "G" (as amended prior to the Closing Date to omit any Ineligible Equipment) and (C) the actual amount of the Prepaid Expenses as at the Closing Date in respect of which the Purchaser receives the actual benefit of on Closing, compared to the value of the Prepaid Expenses set out in the Allocation Statement. The Final Adjustment Statement shall be in a form acceptable to the Vendors, in consultation with the Monitor;

(b)    On or before the date that is ninety (90) days following the Closing Date, the Vendors, in consultation with the Monitor, may provide changes and comments on the Final Adjustment Statement to the Purchaser in writing, and the Purchaser and Vendors, in consultation with the Monitor, shall negotiate in good faith to finalize the Final Adjustment Statement, failing which either Party may direct the Monitor to engage an independent third-party accountant to resolve any discrepancies regarding the Final Adjustment Statement on such terms and standards as the Parties may agree in good faith in consultation with the Monitor;

(c)    Subject to the Final Adjustment Statement being resolved pursuant to (b) above, the Parties agree to the following post-Closing adjustments to the Purchase Price, to be paid in readily available cash as the Parties may determine in good faith:

(i)    an adjustment in favour of the Purchaser or the Vendors, as the case may be, in the amount of the applicable Final AR Adjustment as between the Closing Date and the date that is sixty (60) days following the Closing Date; and

(ii)    an adjustment in favour of the Purchaser in the amount of any Purchased Assets that the Vendor was incapable of delivering unto the Purchaser for any reason despite making its best efforts to do so, provided that the aggregate value of such Purchased Assets that cannot be delivered to the Purchaser is equal to or greater than two percent (2%) of the Purchase Price, failing which there shall not be any adjustment under this subheading.

3.11    **Withholding**

The Purchaser (or any affiliate thereof) shall be permitted to deduct or withhold from any amounts payable under this Agreement any amounts required to be deducted or withheld pursuant to Applicable Law in respect of Taxes, provided that it shall remit or cause to be remitted, such withheld amounts to the appropriate Governmental Authority in accordance with Applicable Law. To the extent that a Party becomes aware that any consideration payable under this Agreement may be subject to withholding Taxes, it shall promptly notify the other Party and the Parties shall cooperate in good faith to minimize or eliminate the amount of such withholding Taxes (including seeking relief from the Court, if applicable). To the extent that any amounts are so deducted or withheld and timely paid over to the applicable Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

3.12    **Payment of Sales Taxes and Tax Elections**

(a)    <u>Transfer Taxes</u>.    The Purchaser shall be liable for and shall pay all federal and provincial sales, goods and services, harmonized sales, value added, use, transfer, property or land transfer and similar Taxes ("**Transfer Taxes**") properly payable upon and in connection with the sale, assignment and transfer of the Purchased Assets from the Vendors to the Purchaser, which for greater certainty exclude any Taxes payable on the Vendors' net income, profits or gains. Subject to Section 3.12(b), where the Transfer Taxes are collectable by the Vendors, the Purchaser shall pay such Transfer Taxes directly and promptly to the Vendors upon the delivery of such documentation as may be prescribed under applicable Laws indicating the applicable Transfer Taxes and the Vendors' relevant Transfer Tax registration number(s) and any other information required for the Purchaser to obtain any applicable input tax credits or similar amounts in respect of such Transfer Taxes (or alternatively, in the context of any property or land transfer tax or other Tax required to be paid directly by the Purchaser to a Governmental Authority, the Purchaser shall pay such tax directly to the applicable Governmental Authority). The Vendors shall remit any such Transfer Taxes received from the Purchaser directly to the relevant taxation authority. For Transfer Taxes that are payable directly by the Purchaser to the relevant Governmental Authority (including, for greater certainty, GST/HST to be self-assessed on the acquisition of real property), the Purchaser will be responsible for, and shall indemnify and hold harmless the Vendors from, such Transfer Taxes, plus any applicable penalties and interest. For purposes of calculating the Transfer Taxes collectable by the Vendors, the provincial place of supply for the Purchased Assets physically situated in Canada will be determined by the Vendor one (1) day prior to Closing.

(b)    <u>GST/HST Election</u>. PGL and the Purchaser shall jointly make the election provided for under section 167 of the *Excise Tax Act* (Canada) and under section 75 of *an Act respecting the Quebec sales tax* that no tax be payable pursuant to that legislation in respect of the purchase and sale of the Purchased Assets to be sold by PGL as contemplated by this Agreement. The Purchaser and PGL, in consultation with the Monitor, shall jointly complete the election form(s) (including more particularly the form described as form GST-44 and Form FP-2044) in respect of such election and the Purchaser shall file the said election form(s) no later than the due date for the Purchaser's GST/HST and QST returns for the first reporting period in which GST/HST, would, in the absence of such election, become payable in connection with the transactions contemplated by this Agreement (or within the timelines otherwise required under applicable provincial law), and will provide evidence of such filings to the Vendors and the Monitor. Notwithstanding the foregoing, the Purchaser shall, on

demand, indemnify and hold harmless the Vendors and their directors, shareholders, employees, and successors of any Taxes (including interest and penalties) resulting from (i) the Purchaser's failure to timely file any election form (including the GST-44 and F P-2044) required to be filed pursuant to this paragraph, or (ii) any assessment, reassessment or imposition of GST/HST, QST assessed or imposed by any Governmental Authority as a result of or as a consequence of a rejection or denial of the GST/HST and QST elections made by the parties pursuant to this paragraph. The Purchaser does not assume and shall not be liable for any other Taxes which may be or become payable by the Vendors other than Transfer Taxes in connection with the purchase and sale of the Purchased Assets pursuant to this Agreement.

(c)     <u>Income Tax Election – Section 22 of the ITA</u>.     The Purchaser and the Vendors, in consultation with the Monitor, agree to make and file, in a timely manner, a joint election under section 22 of the ITA and any other equivalent or corresponding provision under applicable provincial or territorial tax legislation with respect to the sale, assignment, transfer and conveyance of the Accounts Receivable and shall designate therein that portion of the Purchase Price allocated to the Accounts Receivable in accordance with the procedures set out in Section 3.2 and 3.10 of this Agreement. The Purchaser and the Vendors, in consultation with the Monitor shall each file such elections, along with any documentation necessary or desirable to give effect to such elections, within the prescribed time limitations and will also prepare and file all of their respective Tax Returns in a manner consistent with such allocation.

## ARTICLE 4
## COVENANTS

### 4.1     Closing Date

(a)     The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing.

(b)     Each of the Parties shall, as promptly as possible, make, or cause to be made, all filings and submissions, as applicable, required under any Applicable Law to effect the Closing.

### 4.2     Motion for Approval and Vesting Order and Assignment Order

As soon as practicable after the date of this Agreement, the Vendors shall serve and file with the Canadian Court a motion for the issuance of the Approval and Vesting Order, seeking relief that will, *inter alia*, approve this Agreement and the Transaction and the Assignment Order. The Vendors shall use their best efforts to seek the issuance and entry of the Approval and Vesting Order and the Purchaser shall cooperate with the Vendors in their efforts to obtain the issuance and entry of the Approval and Vesting Order and the Assignment Order.

To the extent required to give full effect to, and implement, the Transaction, Randall Benson, in his capacity as the foreign representative of the Vendors, shall seek U.S. Court approval of the Transaction solely with respect to Purchased Assets located within the territorial jurisdiction of the United States in the form and manner required by the order approving the sales procedures motion to be filed in the Chapter 15 Proceedings set forth in the Order (i) Approving the Sale Procedures and Sale Notice, (ii) Authorizing the Sale of the Debtors' U.S. Assets Free and Clear and Liens, Claims, Encumbrances and Other Interests, and (iii) Granting Related Relief.

**4.3      Interim Period**

During the Interim Period, the Vendors shall ensure that all of the Purchased Assets remain insured and the Vendors shall use commercially reasonable efforts to continue to maintain the Purchased Assets and the Business in substantially the same manner as on the Effective Date, *provided that* the Purchaser hereby acknowledges that payments to equipment financers of the Vendors have not been made during the pendency of the CCAA Proceedings to date.

**4.4      Access During Interim Period**

During the Interim Period, the Monitor, on behalf of the Vendors, shall give, or cause to be given, to the Purchaser, and its representatives, reasonable access during normal business hours to the Books and Records, to conduct such investigations, inspections, surveys or tests thereof and of the financial and legal condition of the Business and Assets as the Purchaser reasonably deems necessary or desirable to further familiarize themselves with the Business and/or Assets. Without limiting the generality of the foregoing: (a) the Purchaser and its representatives shall be permitted reasonable access during normal business hours to all documents relating to information scheduled or required to be disclosed under this Agreement and to the Employees; and (b) the Purchaser and its Representatives shall be permitted to contact and discuss the Transactions contemplated herein with Governmental Authorities and the Vendors' customers and contractual counterparties. Such investigations, inspections, surveys and tests shall be carried out at the Purchaser's sole and exclusive risk and cost, during normal business hours, and without undue interference with the Vendors' operations and the Vendors shall co-operate reasonably in facilitating such investigations, inspections, surveys and tests and shall furnish copies of all such documents and materials relating to such matters as may be reasonably requested by or on behalf of the Purchaser. For the avoidance of doubt, nothing in this section 4.4 shall constitute a due diligence condition, and nothing discovered or learned by the Purchaser during the Interim Period shall entitle the Purchaser to terminate this Agreement or adjust the Purchase Price.

**4.5      Insurance Matters**

Until Closing, the Vendors shall keep in full force and effect all existing insurance policies relating to the Purchased Assets or the Business, and give any notice or present any claim under any such insurance policies consistent with past practice of the Vendors in the ordinary course of business. Any insurance proceeds received shall be applied to repair or remedy any damage caused by fire, theft, vandalism, collision or other calamity to any Equipment or other property being purchased by the Purchaser pursuant to this Agreement. For the avoidance of any doubt, in the event that insurance proceeds are paid or payable in respect of any Wrecked Equipment that is excluded from Schedule "G" in accordance with the terms hereof, the Purchaser shall in no case be entitled to any portion of such proceeds, and such proceeds constitute Excluded Assets hereunder.

**4.6      Post-Closing Matters**

Following Closing, each Vendor that holds, or is a direct or indirect beneficiary of, any Permit (each, a "**Permit Vendor**") and each Related Party Landlord shall continue as a corporation in good standing, in the CCAA Proceedings, and the Purchaser and Vendors agree that the Approval and Vesting Order shall provide that (a) the Permit Vendors and Related Party Landlords shall be subject to the exclusive governance and control of the CRO and/or the Monitor, (b) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Permit Vendor shall be bankrupt, dissolved or otherwise wound-up prior to the earlier of (i) the date that all Permits are irrevocably transferred to the Purchaser, (ii) the date that the Purchaser advises the CRO and the Monitor in writing that it does not require the irrevocable transfer of the Permits to the Purchaser, and (iii) March 31, 2025, and (c) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Related Party

– 24 –

Landlord shall be bankrupt, dissolved or otherwise wound-up prior to the date that the lease, access agreement or parking agreement to which the Related Party Landlord is terminated.

**ARTICLE 5**
**CLOSING ARRANGEMENTS**

**5.1      Closing**

Closing shall take place on the Closing Date effective as of the Closing Time electronically (or as otherwise determined by mutual agreement of the Parties in writing), by the exchange of deliverables (in counterparts or otherwise) by electronic transmission in PDF format.

**5.2      Vendors' Closing Deliveries**

At or before the Closing Time, the Vendors shall deliver or cause to be delivered to the Purchaser the following:

(a)      any Specific Conveyances required in respect of the transfer of the Purchased Assets from the Vendors to the Purchaser, including, if applicable, the transfer of the Optional Assets;

(b)      a true copy of the Approval and Vesting Order, as signed by the Canadian Court;

(c)      all required consents or approval orders, in form and substance satisfactory to the Purchaser, providing for the assignment and transfer of the Critical Required Contracts;

(d)      all required consents, in form and substance satisfactory to the Purchaser, to the change of control of PGL Insurance, which shall be provided by the Purchaser to the Vendors for execution (the "**Change of Control Consents**");

(e)      all required consents, in form and substance satisfactory to the Purchaser, to the assignment of the Permits effective on the Closing date, or a duly executed copy of the Transition Services Agreement;

(f)      any tax elections contemplated by Section 3.11 duly executed by the applicable Vendors;

(g)      evidence that all necessary corporate actions have been taken on or prior to the Closing to permit good title to the PGL Insurance Shares to be duly and validly transferred and assigned to the Purchaser at the Closing;

(h)      share certificates representing all issued and outstanding shares of PGL Insurance accompanied with duly executed share transfer forms in the name of the Purchaser or its nominee or evidence of cancellation of all existing outstanding shares and issuance of new share certificates to the Purchaser or its nominee, in either case, together with security registers evidencing that the Purchaser or its nominee is the sole holder of PGL Insurance;

(i)      the Books and Records of the Vendors, PGL Insurance, LeaseCo and, if applicable, any Optional Vendors;

(j)      a true copy of the U.S. Approval Order, if applicable, as entered by the U.S. Court;

– 25 –

(k)     a certificate of an officer of the Vendors dated as of the Closing Date confirming that all of the representations and warranties of the Vendors contained in this Agreement are true in all material respects as of the Closing Time, with the same effect as though made at and as of the Closing Time, and that the Vendors have performed in all material respects the covenants to be performed by them prior to the Closing Time; and

(l)     such other agreements, documents and instruments as may be reasonably required by the Purchaser to complete the Transaction, all of which shall be in form and substance satisfactory to the Parties, acting reasonably.

**5.3     Purchaser's Closing Deliveries**

At or before the Closing, the Purchaser shall deliver or cause to be delivered to the Vendors (or to the Monitor, as applicable), the following:

(a)     the Cash Purchase Price;

(b)     all Transfer Taxes payable in accordance with Section 3.12(a);

(c)     evidence that all Offers of Employment have been provided to the Employees prior to Closing in accordance with Section 9.1(a);

(d)     duly executed assignment and assumption agreements, in form and substance satisfactory to the Vendors, evidencing the assumption by the Purchaser of the Purchased Contracts and Assumed Liabilities;

(e)     any Specific Conveyances required in respect of the transfer of the Purchased Assets from the Vendors to the Purchaser;

(f)     any tax elections contemplated by Section 3.12 duly executed by the Purchaser;

(g)     a certificate of an officer of the Purchaser dated as of the Closing Date confirming that all of the representations and warranties of the Purchaser contained in this Agreement are true in all material respects as of the Closing Time, with the same effect as though made at and as of the Closing Time, and that the Purchaser has performed in all material respects the covenants to be performed by it prior to the Closing Time; and

(h)     such other agreements, documents and instruments as may be reasonably required by the Monitor on behalf of the Vendors to complete the Transaction, all of which shall be in form and substance satisfactory to the Monitor and the Purchaser, acting reasonably.

**5.4     Post-Closing Deliveries**

(a)     ~~Immediately following~~Following Closing~~ or,~~ as soon as practicable ~~thereafter~~after receiving a written direction to do so by the Purchaser, PGL, PGL USA, PGL International, PFS and PFS USA shall file articles of amendment to change their name to another name or numbered company and shall deliver to the Purchaser evidence of the filing of such articles of amendment and change of name and shall consent to the Purchaser changing its name to "Pride Group Logistics Ltd.", it being acknowledged by the Vendors that the Purchaser is purchasing all goodwill and intellectual property associated with the "Pride Group Logistics" name and that the change of the name of the Purchaser to Pride Group Logistics Ltd. may facilitate the assignment and continuation of Permits currently held by the Vendors, provided however that the Purchaser may defer

– 26 –

delivering the direction referred to herein in respect of any Permit Vendors that are required to maintain their current name in order to maintain any Permits in good standing, in which case such Permit Vendors shall maintain their current names until such time as the Purchaser advises the Monitor and the CRO, in writing, that the applicable Permits are no longer required to be maintained by the Permit Vendors pursuant to Section 4.6, and the Purchaser shall contemporaneously with such advise to the Monitor and CRO delivery the direction contemplated hereby, at which point the applicable Permit Vendors shall promptly change their names in accordance with this Section 5.4.

(b)    Immediately following the receipt of the documents set out in Section 5.4(a) above, or as soon as practicable thereafter, the Purchaser and each of its Permitted Assignees shall be entitled to file articles of amendment, articles of incorporation or otherwise effect a change of name in their applicable jurisdiction of incorporation to utilize one or more of the names of the Vendors set out in Section 5.4(a) above, and shall, upon doing so, provide the Monitor with evidence of the filing of such articles of amendment, articles of incorporation or other documents evidencing such change of name.

## ARTICLE 6
## CONDITIONS OF CLOSING

**6.1    Conditions Precedent in Favour of the Parties**

The obligation of the Parties to complete the Transaction is subject to the following joint conditions being satisfied, fulfilled or performed on or prior to the Closing Date:

(a)    <u>Approval and Vesting Order and Assignment Order.</u> The Canadian Court shall have issued and entered the Approval and Vesting Order on or before September 25, 2024 (or such later date as may be agreed by the Purchaser, Vendors and Monitor) and the Assignment Order on or before ~~September 15~~October 7, 2024 (or such later date as may be agreed by the Purchaser, Vendors and Monitor) in form and substance satisfactory to the parties, or as soon thereafter subject to availability of the Canadian Court, which Approval and Vesting Order and, if applicable, Assignment Order ~~shall not,~~ have ~~been stayed, set aside, or vacated and no application, motion or other proceeding shall have been commenced seeking the same, in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably~~become Final Orders.

(b)    <u>US Approval Order</u>.  ~~If determined to be necessary, the~~The U.S. Approval Order shall have been entered by the U.S. Court.

(c)    <u>No Order</u>. No Applicable Law and no judgment, injunction, order or decree shall have been issued by a Governmental Authority or otherwise in effect that restrains or prohibits the completion of the Transaction;

(d)    <u>No Restraint.</u> No motion, action or proceedings shall be pending by or before a Governmental Authority to restrain or prohibit the completion of the Transaction contemplated by this Agreement; and

The foregoing conditions are for the mutual benefit of the Parties. If any condition set out in this Section 6.1 is not satisfied, performed or mutually waived on or prior to the Closing Date, any Party may elect on written notice to the other Parties to terminate this Agreement.

**6.2    Conditions Precedent in Favour of the Purchaser**

The obligation of the Purchaser to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)    ~~Good Standing of Permits;~~ Change of Control Consents; Critical Required Contracts: ~~All Permits shall have been transferred to the Purchaser in good standing and the Vendors shall have obtained all consents required by regulatory authorities in order to allow for the transfer of such Permits to the Purchaser.~~ The assignment of all Critical Required Contracts to the Purchaser shall have been completed ~~and~~either pursuant to the Change of Control Consents ~~shall have been obtained~~or the Assignment Order, provided that this condition shall not apply to any ~~Permits,~~ Change of Control Consents or Critical Required Contracts that are not in good standing, transferred or assigned solely as a result of the Purchaser's failure to pay the applicable Cure Costs.

(b)    Vendors' Deliverables. The Vendors shall have executed and delivered or caused to have been executed and delivered to the Purchaser at the Closing all the documents contemplated in Section 5.2.

(c)    No Breach of Representations and Warranties. Except as such representations and warranties may be affected by the occurrence of events or transactions specifically contemplated by this Agreement, each of the representations and warranties contained in Section 7.1 shall be true and correct in all material respects: (i) as of the Closing Date as if made on and as of such date; or (ii) if made as of a date specified therein, as of such date.

(d)    No Breach of Covenants. The Vendors shall have performed, in all material respects, all covenants, obligations and agreements contained in this Agreement required to be performed by the Vendors on or before the Closing Date.

(e)    Monitor's Certificate. The Monitor shall have provided an executed certificate of the Monitor substantially in the form attached to the Approval and Vesting Order (the "**Monitor's Certificate**") confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Vendors.

(f)    Real Property.

(i)    In the event that the Purchaser (A) exercises the Real Property Option with respect to the purchase of the 129 Shares, and the Purchaser is unable to obtain the required consents and approvals from the applicable Lenders or the Monitor to acquire the real property currently owned by 129 Canada, or (B) advises the Vendors and the Monitor in writing that it does not intend to exercise the Real Property Option with respect to the 129 Shares, then the Purchaser or its nominee shall have entered into a lease agreement or such other form of arrangement, ~~on terms that are not less favorable than the terms of any existing lease agreements or other existing arrangements, as is necessary to allow the~~consistent with the Approved Lease Terms, for the property municipally known as 1943 & 1945 55e Avenue, Dorval, Quebec.

(ii)    The Purchaser or its nominee ~~to continue to use~~shall have entered into an access or parking agreement with 207 Ontario for the use by the Purchaser of the real property municipally known as 10862 Steeles Ave E., Milton, Ontario, currently ~~owned~~held by ~~129 Canada for a period of twelve (12) months at fair market~~

~~value rents, with an option to extend such lease for an additional twelve months on consent of 129 Canada and the Purchaser, and an at will termination provision in favour of the landlord of not more than 60 days notice. In addition, the~~207 Ontario in a manner consistent with the existing use of such property by the Vendors, consistent with the Approved Lease Terms;

(iii)    The Purchaser or its nominee shall have entered into a lease with ~~each of 207 Ontario and~~ 933 Helena for the continued use of the real property municipally known as 933 Helena Street, Fort Erie, Ontario, currently held by ~~each of them for a period of twelve (12) months at fair market value rents, with an option to extend such lease for an additional twelve months on consent of 207 Ontario and 933 Helena, respectively~~933 Helena, consistent with the Approved Lease Terms.

(iv)    Without limiting Section 6.2(a), ~~and~~ the Purchaser~~, and an at will termination provision in favour of~~ shall be entitled to the continued use of the real property municipally known as 6050 Dixie Road, Mississauga, Ontario, currently used by the PGL Vendors, on existing lease terms for the duration of the existing lease, and the Vendors shall have obtained a Change of Control Consent from the 6050 Dixie Road landlord ~~of not more than 60 days notice. In addition,~~ or Assignment Order in respect thereof.

(v)    Without limiting Section 6.2(a), the Purchaser shall be entitled to the continued use of the real property municipally known as 6253 Boundary Road, Cornwall, ON, currently used by the PGL Vendors ~~at 6050 Dixie Road, Mississauga, ON~~, on existing lease terms for the duration of the existing lease, and the Vendors shall have obtained a Change of Control Consent from the ~~Landlord~~6253 Boundary Road landlord, or Assignment Order in respect thereof.

The foregoing conditions are for the exclusive benefit of the Purchaser. Any condition in this Section 6.2 may be waived by the Purchaser in whole or in part, without prejudice to any of its rights of termination in the event of non-fulfillment of any other condition in whole or in part. Any such waiver shall be binding on the Purchaser only if made in writing. If any condition set out in this Section 6.2 is not satisfied or performed by the Closing Date, the Purchaser may elect on written notice to the Vendors to terminate this Agreement.

**6.3    Conditions Precedent in Favour of the Vendors**

The obligation of the Vendors to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)    Purchaser's Deliverables. The Purchaser shall have executed and delivered or caused to have been executed and delivered to the Vendors at the Closing all the documents and payments contemplated in Section 5.3.

(b)    No Breach of Representations and Warranties. Each of the representations and warranties contained in Section 7.2 shall be true and correct in all material respects (i) as of the Closing Date as if made on and as of such date, or (ii) if made as of a date specified therein, as of such date.

– 29 –

(c)    <u>No Breach of Covenants.</u> The Purchaser shall have performed in all material respects all covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(d)    <u>Monitor's Certificate.</u> The Monitor shall have provided an executed copy of the Monitor's Certificate confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Vendors.

The foregoing conditions are for the exclusive benefit of the Vendors. Any condition in this Section 6.3 may be waived by the Vendors in whole or in part, without prejudice to any of their rights of termination in the event of non-fulfilment of any other condition in whole or in part. Any such waiver shall be binding on the Vendors only if made in writing. If any condition set forth in this Section 6.3 is not satisfied or performed by the Closing Date, the Vendors may elect on written notice to the Purchaser to terminate the Agreement.

**ARTICLE 7**
**REPRESENTATIONS AND WARRANTIES**

**7.1**    **Representations and Warranties of the Vendors**

The Vendors hereby jointly and severally represent and warrant as of the ~~date hereof~~<u>Effective Date</u> and as of the Closing Time as follows, and acknowledge that the Purchaser is relying on such representations and warranties in connection with entering into this Agreement and performing its obligations hereunder:

(a)    <u>Incorporation and Status.</u> The Vendors are corporations incorporated and existing under the *Business Corporations Act* (Ontario), are in good standing under such act and have the power and authority to enter into, deliver and perform their obligations under this Agreement.

(b)    <u>Corporate Authorization.</u> The execution, delivery and, subject to obtaining the Approval and Vesting Order and Assignment Order in respect of the matters to be approved therein, performance by the Vendors of this Agreement has been authorized by all necessary corporate action on the part of the Vendors.

(c)    <u>Execution and Binding Obligation.</u> This Agreement has been duly executed and delivered by the Vendors and constitutes a legal, valid and binding obligation of the Vendors, enforceable against them in accordance with its terms, subject only to obtaining the Approval and Vesting Order, the Assignment Order, ~~[and~~~~, if applicable,~~ the U.S. Approval Order~~]~~.

(d)    <u>Proceedings.</u> There are no proceedings pending against the Vendors, or any of them, or, to the knowledge of the Vendors, threatened, with respect to, or in any manner affecting, title to the Purchased Assets, which would reasonably be expected to enjoin, delay, restrict or prohibit the transfer of all or any part of the Purchased Assets as contemplated by this Agreement or which would reasonably be expected to delay, restrict or prevent the Vendors from fulfilling any of their obligations set forth in this Agreement, provided that the Approval and Vesting Order is granted.

(e)    <u>No Consents or Authorizations.</u> Subject only to obtaining the Approval and Vesting Order, the Assignment Order and, to the extent applicable, the U.S. Approval Order, the Vendors do not require any consent, approval, waiver or other Authorization from any Governmental Authority as a condition to the lawful completion of the Transaction.

(f)     <u>Residency.</u> None of the Vendors (other than PGL USA and PFS USA) is a non-resident of Canada for purposes of the ITA.

(g)     <u>No Other Agreements to Purchase</u>. Except for the Purchaser's rights under this Agreement, no Person has any contractual right, option or privilege for the purchase or acquisition from the Vendors of any of the Purchased Assets.

**7.2     Representations and Warranties of the Purchaser**

The Purchaser hereby represents and warrants to and in favour of the Vendors as of the ~~date hereof~~<u>Effective Date</u> and as of the Closing Time, and acknowledges that, the Vendors are relying on such representations and warranties in connection with entering into this Agreement and performing their obligations hereunder:

(a)     <u>Incorporation and Status</u>. The Purchaser is a corporation incorporated and existing under the laws of the Province of Ontario as of the date hereof, is in good standing under such act and has the power and authority to enter into, deliver and perform their obligations under this Agreement.

(b)     <u>Corporate Authorization.</u> The execution, delivery and performance by the Purchaser of this Agreement has been authorized by all necessary corporate action on the part of the Purchaser.

(c)     <u>No Conflict</u>. The execution, delivery and performance by the Purchaser of this Agreement do not (or would not with the giving of notice, the lapse of time, or both, or the happening of any other event or condition) result in a breach or a violation of, or conflict with, or allow any other Person to exercise any rights under, any terms or provisions of the Organizational Documents of the Purchaser.

(d)     <u>Execution and Binding Obligation</u>. This Agreement has been duly executed and delivered by the Purchaser and constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms subject only to the Approval and Vesting Order, the Assignment Order and, to the extent applicable, the U.S. Approval Order.

(e)     <u>Proceedings.</u> There are no proceedings pending, or to the knowledge of the Purchaser, threatened, against the Purchaser before any Governmental Authority, which prohibit or seek to enjoin delay, restrict or prohibit the Closing of the Transaction, as contemplated by this Agreement, or which would reasonably be expected to delay, restrict or prevent the Purchaser from fulfilling any of its obligations set forth in this Agreement.

(f)     <u>Residency.</u> The Purchaser is not a non resident of Canada within the meaning of section 116 of the ITA.

(g)     <u>Sanctions Not Applicable.</u> None of the Purchaser, any of its subsidiaries or, to the knowledge of the Purchaser, any director, officer, agent, employee, Affiliate or representative of the Purchaser or any of its subsidiaries is, or is controlled or 50% or more owned by or is acting on behalf of, an individual or entity ("**Person**") currently the subject of  applicable economic sanctions including those administered or enforced by the government of Canada, the United States of America (collectively, "**Sanctions**"). None of the Purchaser or any of its subsidiaries is located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions.  To the Purchaser's knowledge, neither it nor any of its subsidiaries has engaged in any dealings

or transactions with or for the benefit of a Person subject to Sanctions. The Purchaser has procedures and policies in place designed to ensure compliance with Sanctions.

(h)     <u>Equity Financing.</u> The Purchaser has obtained not less than $5,000,000 in equity financing.

(i)     <u>GST/HST Registration</u>.    The Purchaser is registered for goods and services tax/harmonized sales tax (GST/HST) purposes under Part IX of the *Excise Tax Act* (Canada), and its registration number is 766551022. The Purchaser will be registered effective on the Closing Date for Quebec sales tax (QST) purposes under Title I of *an Act respecting the Quebec sales tax.*

## 7.3     Transfer of Title; Conveyance of Assets

Subject to the conditions relating to leases set out in Section 6.2 above, the Purchaser is responsible for transferring any physical Purchased Assets (including specifically, any Equipment owned by the Vendors) as soon as practicable following Closing situated on any real properties owned or leased by the Vendors that are not acquired by the Purchaser pursuant to the Transaction.

## 7.4     "As is, Where is"

(1)     The Purchaser acknowledges and agrees that it is purchasing the Purchased Assets on an "as is, where is" basis, and without representations or warranties of any kind, nature, or description by the Monitor, the CRO, the Vendors or any of their respective agents, advisors or estates, and on the basis that the Purchaser has conducted to its satisfaction an independent inspection, investigation and verification of the Purchased Assets (including a review of title), and all other relevant matters and has determined to proceed with the transaction contemplated herein and will accept the same at the Closing Time in their then current state, condition, location, and amounts, provided, however, that the Purchaser shall not be required to accept any Equipment or other property that has been lost, damaged or destroyed due to theft, fire, collision, vandalism or other calamity <u>and</u> for which insurance proceeds are not available to repair or replace such Equipment (the "**Wrecked Equipment**"), in which case such Wrecked Equipment will be deemed not to have been received by the Purchaser and the Purchaser shall be entitled to a reduction of the Purchase Price in accordance with Section 3.10.

(2)     No representation, warranty or condition whether statutory (including under the *Sale of Goods Act* (Ontario), the International Sale of Goods *Contracts Convention Act* (Canada) and the *International Sale of Goods Act* (Ontario) or any international equivalent act which may be applicable to the subject matter pursuant to the provisions of this Agreement, including but not limited to the United Nations Convention on Contracts for the International Sale of Goods), or express or implied, oral or written, legal, equitable, conventional, collateral, arising by custom or usage of trade, or otherwise is or will be given by the Vendors or the Monitor including as to title, outstanding liens or encumbrances, description, fitness for purpose, merchantability, merchantable quality, quantity, condition (including physical and environmental condition), suitability, durability, assignability, or marketability thereof or any other matter or thing whatsoever, and all of the same are expressly excluded and disclaimed and any rights pursuant to such statutes have been waived by the Purchaser.  The Purchaser acknowledges and agrees that it has relied entirely and solely on its own investigations as to the matters set out above and in determining to purchase the Purchased Assets pursuant to this Agreement.

(3)     The description of the Purchased Assets contained herein is for the purpose of identification only and the inclusion of any item in such description does not confirm the existence of any such items or that any such item is owned by the Vendors.  No representation, warranty or condition has been given by the Vendors, CRO or the Monitor concerning the completeness or accuracy of such descriptions and the Purchaser acknowledges and agrees that any other representation, warranty, statements of any kind or

nature, express or implied, (including any relating to the future or historical financial condition, results of operations, prospects, assets or liabilities of the Vendors or the quality, quantity or condition of the Purchased Assets) are specifically disclaimed by the Vendors.

(4)    Any documents, materials and information provided by the Vendors, CRO or Monitor to the Purchaser with respect to the Purchased Assets (including any confidential information memorandums, management presentations, or material made available in the electronic data room) have been provided to the Purchaser solely to assist the Purchaser in undertaking its own due diligence, and the Vendors, CRO and/or Monitor have not made and are not making any representations or warranties, implied or otherwise, to or for the benefit of the Purchaser as to the accuracy and completeness of any such documents, materials or information or the achievability of any valuations, estimates or projections. The Purchaser acknowledges that it has not and will not rely upon any such documents, materials or information in any manner, whether as a substitute for or supplementary to its own due diligence, searches, inspections and evaluations. The Vendors, CRO and/or Monitor and their respective Affiliates, directors, officers, employees, agents and advisors shall not be liable for any inaccuracy, incompleteness or subsequent changes to any such documents, materials or information. The Purchaser further acknowledges that the use of the documents may not be possible without the Purchaser obtaining reliance or other assurances from the author of such documents directly and further that the documents may be subject to copyright or other property rights which may preclude their use by the Purchaser in whole or in part.

## ARTICLE 8
## TERMINATION

**8.1    Grounds for Termination**

This Agreement may be terminated on or prior to the Closing Date:

      (a)    by the mutual written agreement of the Vendors (with the consent of the Monitor) and the Purchaser;

      (b)    pursuant to Sections 6.1, 6.2 and 6.3, as applicable; or

      (c)    by the Vendors (with the consent of the Monitor) or the Purchaser upon written notice to the other Parties if: (i) the Closing has not occurred by the Outside Date; or (ii) this Agreement is not approved or the Approval and Vesting Order is not granted by the Canadian Court; provided in each case that the failure to close or obtain such order, as applicable, by such deadline is not caused by any act or omission or breach of this Agreement by the Party proposing to terminate the Agreement.

**8.2    Effect of Termination.**

If this Agreement is terminated pursuant to Section 8.1, all further obligations of the Parties under this Agreement will terminate and no Party will have any Liability or further obligations hereunder; except for the provisions of Sections 9.4 (Public Announcements) and 9.10 (Governing Law).

## ARTICLE 9
## GENERAL

**9.1    Employment Matters**

      (a)    The Purchaser or an affiliate thereof shall offer employment, effective on the Closing Date, to all Employees on terms and conditions which are substantially similar to the

terms and conditions that each Employee had with the Vendors, conditional on the Closing occurring and effective on the Closing Date. Purchaser shall have provided the Vendors with copies of all offers of employment for the Employees for the purposes of confirming that the proposed terms and conditions of such offers comply with this section (collectively, the "**Offers of Employment**"). Each Offer of Employment shall expressly provide that the Purchaser recognizes all employment service with the Vendors and if applicable, the Vendors' predecessors, for all purposes. Each Offer of Employment will be delivered by the Purchaser to each Employee such number of days prior to the Closing Date as Purchaser and Vendors may reasonably agree, and shall provide that the Offer of Employment will be deemed to have been accepted if it is not rejected in writing by the applicable employee no less than two (2) business days prior to the Closing Date. The Purchaser shall have advised the Vendors prior to the Closing Date of each Employee who has rejected an Offer of Employment. In the event an Employee rejects an Offer of Employment such Employee shall not be considered a Transferring Employee and the applicable Vendor shall provide written notice of termination to such Employee prior to the Closing Date, which notice shall be in form and substance satisfactory to the Monitor, acting reasonably. The Vendors shall not attempt to discourage Employees from accepting the Offers of Employment.

(b)     If the Purchaser satisfies its obligations under the section immediately above, it shall only assume and be liable for the Employee-related obligations of the Transferring Employees.

(c)     The Purchaser will establish replacement plans for the Transferring Employees that are substantially similar to the Employee benefit plans existing on the Closing Date. The Purchaser shall cause each replacement plan to recognize all employment service with the Vendors, as applicable, and if applicable, the Vendors' predecessors, of each Transferring Employee for purposes of eligibility for participating, vesting, benefit accrual and entitlement to benefits under such replacement plans.

**9.2     Access to Books and Records**

For a period of six years from the Closing Date or for such longer period as may be reasonably required for the Vendors (or any trustee in bankruptcy of the estate of any of the Vendors) to comply with Applicable Law, the Purchaser will retain all original Books and Records that are transferred to the Purchaser under this Agreement, but the Purchaser is not responsible or liable for any accidental loss or destruction of, or damage to, any such Books and Records. So long as any such Books and Records are retained by the Purchaser pursuant to this Agreement, the Vendors (and any representative, agent, former director or officer or trustee in bankruptcy of the estate of any of the Vendors, including the Monitor) has the right to inspect and to make copies (at their own expense) of them at any time upon reasonable request during normal business hours and upon reasonable notice for any proper purpose and without undue interference to the business operations of the Purchaser.

**9.3     Notice**

Any notice or other communication under this Agreement shall be in writing and may be delivered by read-receipted email, addressed:

(a)     in the case of the Purchaser, as follows:

**1000927605                           Ontario                           Inc.**
100        King        Street        West,        Suite        3400
Toronto,            Ontario,            M5X            1A4

Attention: Aman Johal
Email: aman@pridegroupenterprises.com

with a copy to:

**Bennett Jones LLP**
100 King Street West, Suite 3400
Toronto, Ontario, M5X 1A4

Attention: Raj Sahni and Jesse Mighton
Email: SahniR@bennettjones.com / mightonj@bennettjones.com

(b)     in the case of the Vendors, as follows to the CRO:

Attention: Randall Benson
Email: r.benson@rcbensonconsulting.com

with a copy to:

**Thornton Grout Finnigan LLP**
Suite 3200, 100 Wellington Street West
P. O. Box 329, Toronto-Dominion Centre
Toronto, ON M5K 1K7

Attention: Leanne Williams, Rachel Nicholson, Puya Fesharaki
Email: lwilliams@tgf.ca, rnicholson@tgf.ca, pfesharaki@tgf.ca

(c)     in each case, with a further copy to the Monitor as follows:

**Ernst & Young Inc.**
EY Tower, 100 Adelaide Street West,
Toronto , ON M5H 0B3

Attention: Alex Morrison, Simone Carvalho, Michael Hayes, Ross Johnson
Email: alex.f.morrison@parthenon.ey.com; simone.carvalho@parthenon.ey.com;
Michael.Hayes@parthenon.ey.com; ross.johnson@ca.ey.com

with a copy to:

**Blake, Cassels & Graydon LLP**
199 Bay Street, Suite 4000,
Toronto ON M5L 1A9

Attention: Pam Huff, Kelly Bourassa, Chris Bur,
Email: pam.huff@blakes.com; kelly.bourassa@blakes.com
chris.burr@blakes.com;

Any such notice or other communication, if transmitted by email before 5:00 p.m. (Toronto time) on a Business Day, will be deemed to have been given on such Business Day, and if transmitted by email after 5:00 p.m. (Toronto time) on a Business Day, will be deemed to have been given on the Business Day

after the date of the transmission. In the case of a communication by email or other electronic means, if an autoreply is received indicating that the email is no longer monitored or in use, delivery must be followed by the dispatch of a copy of such communication pursuant to one of the other methods described above; provided however that any communication originally delivered by electronic means shall be deemed to have been given on the date stipulated above for electronic delivery.

Sending a copy of a notice or other communication to a Party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the notice or other communication to that Party. The failure to send a copy of a notice or other communication to legal counsel does not invalidate delivery of that notice or other communication to a Party. A Person may change its address for service by notice given in accordance with the foregoing and any subsequent communication must be sent to such Person at its changed address.

**9.4      Public Announcements**

The Vendors shall be entitled to disclose this Agreement to the Courts and parties in interest in the CCAA Proceedings, other than any information which the Purchaser advises the Vendors in writing as being confidential, acting reasonably, and this Agreement may be posted on the Monitor's website maintained in connection with the CCAA Proceedings at URL: http://www.ey.com/ca/pridegroup. Other than as provided in the preceding sentence or statements made in the Courts (or in pleadings filed therein) or where required to meet timely disclosure obligations of the Vendors or any of their Affiliates under Applicable Laws, the Vendors shall not issue (prior to or after the Closing) any press release or make any public statement or public communication with respect to this Agreement or the Transactions contemplated hereby without the prior consent of the other Parties, which shall not be unreasonably withheld or delayed.

**9.5      Time**

Time shall, in all respects, be of the essence hereof, provided that the time for doing or completing any matter provided for herein may be extended or abridged by an agreement in writing signed by the Parties.

**9.6      Survival**

The representations and warranties of the Parties contained in this Agreement shall not merge on Closing and the representations, warranties and covenants of the Parties contained herein to be performed after the Closing shall survive Closing and remain in full force and effect.

**9.7      Benefit of Agreement**

This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

**9.8      Entire Agreement**

This Agreement and the attached Schedules hereto constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior negotiations, understandings and agreements. This Agreement may not be amended or modified in any respect unless agreed to in writing by the Parties.

– 36 –

**9.9    Paramountcy**

In the event of any conflict or inconsistency between the provisions of this Agreement, and any other agreement, document or instrument executed or delivered in connection with this Transaction or this Agreement, the provisions of this Agreement shall prevail to the extent of such conflict or inconsistency.

**9.10    Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and each of the Parties irrevocably attorn to the exclusive jurisdiction of the Canadian Court, and any appellate courts of the Province of Ontario therefrom.

**9.11    Assignment**

The Purchaser cannot assign any of its rights or obligations under this Agreement without the prior written consent of the Vendors and the Monitor. Notwithstanding the foregoing, this Agreement may be assigned by the Purchaser prior to the issuance of the Approval and Vesting Order, in whole or in part (and, for greater certainty, the Purchaser may assign to one or more Permitted Assignees (as defined below) the right to purchase, in consideration for the allocable portion of the Consideration, all or any portion of the Purchased Assets hereunder), without the prior written consent of the Vendors or the Monitor, provided that: (i) such assignee is a Related Party or subsidiary of the Purchaser (a "**Permitted Assignee**"); (ii) the Purchaser provides prior notice of such assignment to the Vendors and the Monitor; and (iii) such assignee agrees in writing to be bound by the terms of this Agreement to the extent of the assignment and a copy of such assumption agreement is delivered to the Vendors and the Monitor forthwith after having been entered into; provided, however, that any such assignment shall not relieve the Purchaser of its obligations hereunder.

**9.12    Further Assurances**

Each of the Parties shall, at the request and expense of the requesting Party, take or cause to be taken such action and execute and deliver or cause to be executed and delivered to the other such conveyances, transfers, documents and further assurances as may be reasonably necessary or desirable to give effect to this Agreement.

**9.13    Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement. Transmission by e-mail of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

**9.14    Severability**

Notwithstanding any provision herein, if a condition to complete the Transaction, or a covenant or an agreement herein is prohibited or unenforceable pursuant to Applicable Law, then such condition, covenant or agreement shall be ineffective to the extent of such prohibition or unenforceability without invalidating the other provisions hereof.

**9.15    Monitor's Certificate**

The Parties acknowledge and agree that the Monitor shall be entitled to deliver to the Purchaser, and file with the Canadian Court, the executed Monitor's Certificate without independent investigation, upon

receiving written confirmation from both Parties (or the applicable Party's counsel) that all conditions of Closing in favour of such Party have been satisfied or waived, and the Monitor shall have no Liability to the Parties in connection therewith. The Parties further acknowledge and agree that upon written confirmation from both Parties that all conditions of Closing in favour of such Party have been satisfied or waived, the Monitor may deliver the executed Monitor's Certificate to the Purchaser's counsel in escrow, with the sole condition of its release from escrow being the Monitor's written confirmation that all such funds have been received, the Monitor's Certificate will be released from escrow to the Purchaser, and the Closing shall be deemed to have occurred.

**9.16    Monitor's Capacity**

In addition to all of the protections granted to the Monitor under the CCAA or any order of the Court in this CCAA Proceeding, the Vendors and the Purchaser acknowledge and agree that the Monitor, acting in its capacity as Monitor and not in their personal capacity, will have no Liability, in its personal capacity or otherwise, in connection with this Agreement or the Transaction contemplated herein whatsoever as Monitor.

*[Signature Page Follows]*

IN WITNESS WHEREOF the Parties have executed this Agreement as of the day and year first above written.

**1000927605 ONTARIO INC**.

By: _____

      Name:    Sulakhan Johal

      Title:    Director

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS LTD.**

By: _____

      Name:    Randy Benson

      Title:    Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS USA, CO.**

By: _____

      Name:    Randy Benson

      Title:    Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS INTERNATIONAL LTD.**

By: _____

      Name:    Randy Benson

      Title:    Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE FLEET SOLUTIONS INC.**

By: _____

      Name:     Randy Benson

      Title:      Chief Restructuring Officer

I have authority to bind the Corporation.


**PRIDE FLEET SOLUTIONS USA INC.**


By: _____

      Name:     Randy Benson

      Title:      Chief Restructuring Officer

I have authority to bind the Corporation.


**2029909 ONTARIO INC.**


By: _____

      Name:     Randy Benson

      Title:      Chief Restructuring Officer

I have authority to bind the Corporation.


**12944154 CANADA INC.**


By: _____

      Name:     Randy Benson

      Title:      Chief Restructuring Officer

I have authority to bind the Corporation.


**13184633 CANADA INC.**


By: _____

      Name:     Randy Benson

      Title:      Chief Restructuring Officer

I have authority to bind the Corporation.

**2837229 ONTARIO INC.**

By: _____

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**2043002 ONTARIO INC.**

By: _____

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**TPINE LEASING CAPITAL CORPORATION**

By: _____

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**SCHEDULE "A"**
**FORM OF APPROVAL AND VESTING ORDER**

**[To be finalized and appended prior to Approval and Vesting Order motion]**

**SCHEDULE "B"**
**EXCLUDED ASSETS**

1.      Non-material assets sold in the Interim Period.

2.      Excluded Contracts.

3.      Accounts Receivable owed to any PGL Vendor or its subsidiaries by any member of the Pride Entities that is not a PGL Vendor.

4.      Any Cash or Cash Equivalents of PFS and PFS USA.

5.      All truck and trailer parts inventory owned by PFS **[or PFS USA]**, save and except for motor oil and other fluids and shop supplies used by PFS **[or PFS USA]** in servicing trucks and trailers and diesel exhaust fluid and diesel fuel and gasoline held in storage tanks or containers at the gas stations.

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

**SCHEDULE "C"**
**PERMITTED ENCUMBRANCES**

**[Note: Balance of schedule to be completed prior to Closing.]**

SCHEDULE "D"

PURCHASED LETTERS OF CREDIT

The following is a list of Purchased LCs:

[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]

Letters of Credit

| Applicant | Beneficiary | Issue Date | Cur | Amount |
|---|---|---|---|---|
| PRIDE GROUP LOGISTICS LTD. | RBC INVESTOR SERVICES TRUST IN (ZURICH) | Feb/25/2022 | CAD | 1,400,000.00 |
| PRIDE GROUP LOGISTICS LTD. | LIQUOR CONTROL BOARD OF ONTARIO | Mar/31/2022 | CAD | 135,000.00 |
| PRIDE GROUP LOGISTICS LTD. | SOCIETE DES ALCOOLS DU QUEBEC | Jan/31/2023 | CAD | 137,410.00 |
| PRIDE GROUP LOGISTICS LTD. | RBC INVESTOR SERVICES TRUST IN (ZURICH) | Feb/14/2023 | CAD | 922,726.00 |
| PRIDE GROUP LOGISTICS LTD. | RBC INVESTOR SERVICES TRUST IN (ZURICH) | Feb/14/2023 | CAD | 1,467,245.00 |

[INTENTIONALLY OMITTED]

**SCHEDULE "E"**
**EXCLUDED CONTRACTS**

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

**SCHEDULE F**
**ALLOCATION STATEMENT**

| | |
|---|---|
| Vehicles (Schedule "G") | $ ~~41,098,837⁵~~43,098,837⁴ |
| Acquired AR Amount (including Intercompany Receivables at nil consideration) | $9,000,000.00⁶⁵ |
| ~~Purchased LCs~~ | ~~$4,000,000.00⁷~~ |
| Tangible Property (Computers, office furniture, IT, mechanics tools, etc.) | $160,000.00 |
| Intangibles (IP, licenses, software, goodwill, Permits, license plates, Purchased Contracts, etc.) (Schedule "F") | $50,000.00 |
| PGL Insurance Shares | $1.00 |
| Inventory⁸⁶ | $100,000 |
| Prepaid Expenses | $50,000 |
| **TOTAL** | $~~54,458,838~~52,458,838 |

**[Note: This Allocation Statement is subject to adjustment in accordance with Section 3.3 of the Purchase Agreement.  The details with respect to Vehicles being purchased are set out in Schedule "G".]**

---

⁵ ~~Subject to further adjustment in accordance with s. 3.3(e).~~

⁴ Subject to further adjustment in accordance with s. 3.3(c).

⁶⁵ Subject to further adjustment in accordance with s. 3.3(b).

⁷ ~~Subject to further adjustment in accordance with s. 3.1(e).~~

⁸⁶ Subject to further adjustment in accordance with s. 3.3(e).

## SCHEDULE "G"

## VEHICLES

**TPine Assets**

| Make | Model | Year | VIN |
|------|-------|------|-----|
| FREIGHTLINER | CSC | 2018 | 3AKJGBDV6JDJV5185 |
| FREIGHTLINER | PEI | 2019 | 1FUJHTDV1KLKA1156 |
| FREIGHTLINER | PE1 | 2019 | 1FUJHTDV3KLKA1160 |
| FREIGHTLINER | FM2 | 2019 | 1FUJHTDV6KLKA1170 |
| FREIGHTLINER | FM2 | 2019 | 1FUJHTDV5KLKA1161 |
| UTILITY | VS2 | 2020 | 1UYVS2533L7143908 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7143909 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7143912 |
| UTILITY | VS2 | 2020 | 1UYVS2530L7143915 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143917 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143921 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143925 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143926 |
| VOLVO | VVN | 2022 | 4V4NC9EHXNN305472 |
| VOLVO | VVN | 2022 | 4V4NC9EH5NN305475 |
| VOLVO | VVN | 2022 | 4V4NC9EH9NN305477 |
| VOLVO | VVN | 2022 | 4V4NC9EH8NN305499 |
| VOLVO | VVN | 2022 | 4V4NC9EH2NN305501 |
| VOLVO | VVN | 2022 | 4V4NC9EH4NN320372 |
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR2KSKM7362 |
| WABASH | ZGP | 2019 | 1DW1A5331KBA14563 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14564 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14565 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14566 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14567 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14568 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14569 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14570 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14571 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14572 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14573 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14574 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14575 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14576 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14577 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14578 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14579 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14580 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14581 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14582 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14583 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14584 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14585 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14586 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14587 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14588 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14589 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14590 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14591 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14592 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14593 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14594 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14595 |

| | | | |
|---|---|---|---|
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14596 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14597 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14598 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14599 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14600 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14602 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14603 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14604 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14605 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14606 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14607 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14608 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14609 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14610 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14611 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14612 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17904 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17905 |
| STOUGHTON | COM | 2019 | 1DW1A5330KEA17906 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17907 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17908 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17909 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17910 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17911 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17912 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17913 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17914 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17915 |
| STOUGHTON | COM | 2019 | 1DW1A5333KEA17916 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17917 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17918 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17919 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17920 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17921 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17922 |
| STOUGHTON | COM | 2019 | 1DW1A5330KEA17923 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17924 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17925 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17926 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17927 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17928 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17929 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17930 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17931 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17932 |
| STOUGHTON | COM | 2019 | 1DW1A5333KEA17933 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17934 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17935 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903018 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903020 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903021 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903022 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903023 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903024 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903025 |
| VANGUARD | VXP | 2019 | 5V8VC53B6KM903026 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903027 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903028 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903029 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903030 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903031 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903032 |

| | | | |
|---|---|---|---|
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903033 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903034 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903035 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903037 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903038 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903039 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903040 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903041 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903042 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903049 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903050 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903051 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903052 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903056 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903058 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903059 |
| VANGUARD | VXP | 2019 | 5V8VC53B6KM903060 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903061 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903062 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903063 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903064 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903065 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903066 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903067 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30640 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30641 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30642 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30643 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30644 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30645 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30646 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30647 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30648 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30649 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30650 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30651 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30652 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30653 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30654 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30655 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30656 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30657 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30660 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30661 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30662 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30663 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30664 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30665 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30666 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30667 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30668 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30669 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30670 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30671 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30672 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30673 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30674 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30675 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30676 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30677 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30678 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30679 |

| STOUGHTON | COM | 2019 | 1DW1A5338KBA30680 |
|-----------|-----|------|-------------------|
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30681 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30682 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30683 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30684 |
| GREAT DANE | ETL | 2015 | 1GRAA062XFB700007 |
| UTILITY | VS2 | 2018 | 1UYVS2532GM381420 |
| UTILITY | N/A | 2019 | 1UYVS2535K6740918 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14836 |
| WANC | RFA | 2014 | 1JJV532B1HL008360 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6884720 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6840805 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6840806 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6840808 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6915027 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6915028 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6915029 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6840831 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6840842 |
| UTILITY | N/A | 2020 | 1UYVS253L6914929 |
| UTILITY | N/A | 2020 | 1UYVS2537L6914943 |
| UTILITY | N/A | 2020 | 1UYVS2532L6914946 |
| UTILITY | N/A | 2020 | 1UYVS2534L6914947 |
| UTILITY | N/A | 2020 | 1UYVS2534L6914950 |
| UTILITY | VS2 | 2019 | 1UYVS253XK6538527 |
| UTILITY | UTIL | 2019 | 1UYVS2532K6538523 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6258505 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6914935 |
| UTILITY | N/A | 2019 | 1UYVS2535L7837015 |
| STRI | S75 | 2018 | 1S12E9532JE536500 |
| STRI | S75 | 2018 | 1S12E9534JE536482 |
| EAST | S75 | 2018 | 1S12E9537JE536489 |
| STRI | S75 | 2018 | 1S12E9531JE536486 |
| DIMN | FV | 2018 | 2DM421A45JB157402 |
| UTILITY | S75 | 2018 | 1S12E9536JE536483 |
| UTILITY | N/A | 2020 | 1UYVS2531L7143910 |
| UTILITY | N/A | 2020 | 1UYVS2532L7143916 |
| CIMC | N/A | 2018 | 527SR5320JM012662 |
| CIMC | N/A | 2018 | 527SR5324JM012597 |
| CIMC | N/A | 2018 | 527SR5326JM012598 |
| CIMC | N/A | 2018 | 527SR5326JM012665 |
| CIMC | N/A | 2018 | 527SR5322JM012663 |
| UTILITY | VS3 | 2020 | 1UYVS3536L6884601 |
| UTILITY | VS3 | 2020 | 1UYVS3538L6884602 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884604 |
| UTILITY | VS3 | 2020 | 1UYVS3533L6884605 |
| UTILITY | VS3 | 2020 | 1UYVS3535L6884606 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884607 |
| UTILITY | VS3 | 2020 | 1UYVS3539L6884608 |
| UTILITY | VS3 | 2020 | 1UYVS3530L6884609 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884610 |
| UTILITY | 2020 | 2020 | 1UYVS3539L6884611 |
| UTILITY | VS3 | 2020 | 1UYVS3530L6884612 |
| UTILITY | VS3 | 2020 | 1UYVS3532L6884613 |
| UTILITY | VS3 | 2020 | 1UYVS3534L6884614 |
| UTILITY | VS3 | 2020 | 1UYVS3538L6884616 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884617 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884618 |
| UTILITY | VS3 | 2020 | 1UYVS3533L6884619 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884621 |
| UTILITY | VS3 | 2020 | 1UYVS3535L6884623 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884624 |

| UTILITY | VS3 | 2020 | 1UYVS3539L6884625 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884620 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884603 |
| UTILITY | VS3 | 2020 | 1UYVS3536L6884615 |
| UTILITY | VS2 | 2014 | 1UYVS2535EM774258 |
| STOU | N/A | 2017 | 1DW1A532XHB699224 |
| STOUGHTON | STOU | 2016 | 1DW1A53246B703721 |
| WABASH | N/A | 2023 | 1JJV532D1PL328715 |
| UTILITY | VS2 | 2020 | 1UYVS2538L7143919 |
| UTILITY | VS2 | 2020 | 1UYVS2537L7143913 |
| UTILITY | N/A | 2014 | 1UYVS2531EM774533 |
| UTILITY | N/A | 2014 | 1UYVS253XEM774515 |
| UTILITY | VS2 | 2014 | 1UYVS2535EU772851 |
| UTILITY | VS2 | 2014 | 1UYVS2530EU772708 |
| UTILITY | VS2 | 2014 | 1UYVS2537EU772821 |
| UTILITY | VS2 | 2014 | 1UYVS2535EM774521 |
| GREAT DANE | TT | 2011 | 1GRAA0623BW702135 |
| GREAT DANE | TT | 2011 | 1GRAA0629BW702110 |
| UTILITY | VS2 | 2012 | 1UYVS2539CM470007 |
| UTILITY | VS2 | 2015 | 1UYVS2531FM078109 |
| UTILITY | VS2 | 2014 | 1UYVS535EM773949 |
| UTILITY | VS2 | 2011 | 1UYVS2538CU468846 |
| UTILITY | VS2 | 2014 | 1UYVS2537CM469910 |
| HYUNDAI | N/A | 2012 | 3H3V533C3CT298004 |
| UTILITY | TL | 2020 | 1UYVS2531L7143924 |
| UTILITY | VS2 | 2020 | 1UYVS2533L7143911 |
| UTILITY | N/A | 2019 | 1UYVS2538K7533319 |
| UTILITY | VS2 | 2020 | 1UYVS2536L7143904 |
| UTILITY | VS2 | 2020 | 1UYVS2539L7143914 |
| UTILITY | VS2 | 2020 | 1UYVS2536L7143918 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143920 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143922 |

## PGL Assets

| Make | Model | Year | VIN |
| --- | --- | --- | --- |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F70RPUX9509 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F70RPUX9512 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F71RPNP1888 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F72RPUX9513 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F75RPUX9506 |
| FREIGHTLINER | ECASCADIA | 2024 | 1FUJH4F76RPUX9515 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F77RPUX9507 |
| FREIGHTLINER | ECASCADIA | 2024 | 1FUJH4F78RPUX9516 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR1LLLA0402 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR1NLMW8595 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR2LLLA0408 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR2NLMW8590 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR3NLMW8596 |
| FREIGHTLINER | FRHT | 2022 | 1FUJHHDR3NLMW8890 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR4NLMW8591 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHHDR5MLML4450 |

| | | | |
|---|---|---|---|
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR5NLMW8597 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR6NLMW8589 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR6NLMW8592 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR7LLLA0405 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR7NLMW8598 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR8LLLA0400 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR8NLMW8593 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR9LLLA0406 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDRXNLMW8594 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR0LLKU7313 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR0LLKU7375 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR2LLKU7300 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR2LLKU7314 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR2MLMM2136 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7301 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7377 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7380 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR4MLMM2137 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR5LLKU7310 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR5MLMA7585 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7302 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7378 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7381 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR7LLKU7311 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR7MLMA7586 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR8LLKU7303 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR8LLKU7379 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR9LLKU7312 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR9MLMA7587 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDRXLLKU7304 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV0MLMA7667 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV3MLML4446 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV5MLMA7664 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV5MLML4447 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV7MLMA7665 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV9MLMA7666 |
| KENWORTH | CON | 2020 | 1XKZD49X1LJ960840 |
| KENWORTH | CON | 2020 | 1XKZD49X3LJ960841 |
| KENWORTH | CON | 2020 | 1XKZD49X5LJ960839 |
| KENWORTH | CON | 2020 | 1XKZD49X5LJ960842 |
| KENWORTH | CON | 2020 | 1XKZD49X7LJ960843 |
| PETERBILT | 579 | 2023 | 1XPBAL9X0PD793437 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR0PSUP5013 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR0PSUP5027 |

| | | | |
|---|---|---|---|
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSUU3259 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSUU3262 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR0RSVA3178 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR0RSVA3181 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSVG7513 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR1PSUP5019 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR1PSUP5022 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR1RSUU3383 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR1RSVA3240 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5000 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5014 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5028 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5031 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR2RSVA3179 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR2RSVA3182 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR2RSVG7514 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR3PSUP5006 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR3PSUP5023 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSUU3384 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSVA3238 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSVA3241 |
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR4KSKM7301 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP4995 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5001 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5015 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5029 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR4RSUU3376 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR4RSVG7515 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP4990 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR5PSUP5007 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP5010 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP5024 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSUU3385 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSVA3239 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSVA3242 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR6PSUP4996 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR6PSUP5002 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR6RSUU3220 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR6RSUU3377 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR6RSUU3380 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR6RSVG7516 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR7PSUP5008 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR7PSUP5011 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR7RSUU3257 |

| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR7RSUU3260 |
|---|---|---|---|
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR8KSKM7303 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR8PSUP4997 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR8PSUP5003 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR8PSUP5020 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3218 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3221 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3378 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3381 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR8RSVG7517 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR9PSUP4992 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5009 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5012 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5026 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSUU3258 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSUU3261 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR9RSVA3180 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSVG7512 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP4998 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5004 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5018 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5021 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3253 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3379 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3382 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDRXRSVG7518 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR0MSMA7580 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR1MSMA7605 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR2MSMA7581 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR3MSMA7606 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR4MSMA7579 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR4MSMA7582 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR5MSMA7607 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR6MSMA7583 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR7MSMA7608 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR8MSMA7584 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR8MSMA7603 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDRXMSMA7604 |
| FREIGHTLINER | CASC | 2019 | 3AKJHTDV5KSKA1178 |
| FREIGHTLINER | 116 | 2019 | 3AKJHTDV7KSKA1179 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPA1PN527730 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPA4PN527771 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR0PN526008 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR1PN557610 |

| | | | |
|---|---|---|---|
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN121888 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN443561 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN527766 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR4PN580704 |
| INTERNATIONAL | LT | 2023 | 3HSDZAPR5PN492650 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPR5PN527767 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR5PN557612 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPR5PN563622 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR6PN527731 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR6PN580705 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR7PN443580 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN121109 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN121885 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN527729 |
| INTERNATIONAL | LT6 | 2023 | 3HSDZAPR8PN580706 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN443581 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN492635 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN527769 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN527772 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN563624 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN569133 |
| VOLVO | VNL | 2022 | 4V4NC9EH0NN305476 |
| VOLVO | VVN | 2021 | 4V4NC9EH4MN272886 |
| VOLVO | VVN | 2021 | 4V4NC9EH6MN272887 |
| VOLVO | VVN | 2022 | 4V4NC9EH9NN320383 |
| VOLVO | ARO | 2021 | 4V4WC9EG0MN281824 |
| VOLVO | ARO | 2021 | 4V4WC9EG2MN281825 |
| VOLVO | ARO | 2021 | 4V4WC9EG4MN281826 |
| VOLVO | ARO | 2021 | 4V4WC9EG7MN281822 |
| VOLVO | ARO | 2021 | 4V4WC9EG9MN281823 |
| VOLVO | ARO | 2019 | 4V4WC9EH0KN192955 |
| VOLVO | ARO | 2022 | 4V4WC9EH0NN292686 |
| VOLVO | ARO | 2019 | 4V4WC9EH2KN192956 |
| VOLVO | ARO | 2022 | 4V4WC9EH2NN292673 |
| VOLVO | ARO | 2022 | 4V4WC9EH2NN292687 |
| VOLVO | ARO | 2019 | 4V4WC9EH4KN192957 |
| VOLVO | ARO | 2022 | 4V4WC9EH4NN292688 |
| VOLVO | ARO | 2022 | 4V4WC9EH6NN292689 |
| VOLVO | ARO | 2019 | 4V4WC9EH7KN192953 |
| VOLVO | ARO | 2022 | 4V4WC9EH7NN292670 |
| VOLVO | ARO | 2019 | 4V4WC9EH8KN192962 |
| VOLVO | ARO | 2022 | 4V4WC9EH9NN292671 |
| VOLVO | ARO | 2022 | 4V4WC9EH9NN292685 |
| UTILITY | N/A | 2019 | 1UYVS2539K7562215 |

| WANC | VS2 | 2020 | 1UYVS2537L7876432 |
|------|------|------|-------------------|
| WANC | DVC | 2023 | 1JJV532DXPL361129 |
| WANC | WANC | 2023 | 1JJV532D6PL361130 |
| WANC | DVC | 2023 | 1JJV532D8PL361131 |
| UTILITY | VS2 | 2023 | 1JJV532DXPL361132 |
| WANC | DVC | 2023 | 1JJV532D1PL361133 |
| WANC | DVC | 2023 | 1JJV532D3PL361134 |
| WANC | DVC | 2023 | 1JJV532D5PL361135 |
| WANC | DVC | 2023 | 1JJV532D7PL361136 |
| WANC | DVC | 2023 | 1JJV532D9PL361137 |
| WANC | DVC | 2023 | 1JJV532D0PL361138 |
| WANC | DVC | 2023 | 1JJV532D2PL361139 |
| WANC | DVC | 2023 | 1JJV532D9PL361140 |
| WANC | DVC | 2023 | 1JJV532D0PL361141 |
| WANC | DVC | 2023 | 1JJV532D2PL361142 |
| WANC | DVC | 2023 | 1JJV532D4PL361143 |
| WANC | DVC | 2023 | 1JJV532D6PL361144 |
| WANC | DVC | 2023 | 1JJV532D8PL361145 |
| WANC | DVC | 2023 | 1JJV532DXPL361146 |
| WANC | DVC | 2023 | 1JJV532D1PL361147 |
| WANC | DVC | 2023 | 1JJV532D3PL361148 |
| WANC | DVC | 2023 | 1JJV532D5PL361149 |
| WANC | DVC | 2023 | 1JJV532D1PL361150 |
| WANC | DVC | 2023 | 1JJV532D3PL361151 |
| WANC | DVC | 2023 | 1JJV532D5PL361152 |
| WANC | DVC | 2023 | 1JJV532D7PL361153 |
| WANC | DVC | 2023 | 1JJV532D9PL361154 |
| WANC | DVC | 2023 | 1JJV532D0PL361155 |
| WANC | DVC | 2023 | 1JJV532D2PL361156 |
| WANC | DVC | 2023 | 1JJV532D4PL361157 |
| WANC | DVC | 2023 | 1JJV532D6PL361158 |
| WANC | DVC | 2023 | 1JJV532D8PL361159 |
| WANC | DVC | 2023 | 1JJV532D4PL361160 |
| WANC | DVC | 2023 | 1JJV532D6PL361161 |
| WANC | DVC | 2023 | 1JJV532D8PL361162 |
| WANC | DVC | 2023 | 1JJV532DXPL361163 |
| WANC | DVC | 2023 | 1JJV532D1PL361164 |
| WANC | DVC | 2023 | 1JJV532D3PL361165 |
| WANC | DVC | 2023 | 1JJV532D5PL361166 |
| WANC | DVC | 2023 | 1JJV532D7PL361167 |
| WANC | DVC | 2023 | 1JJV532D9PL361168 |
| MANAC | 942 | 2023 | 2M5921610P1215253 |
| MANAC | 942 | 2023 | 2M5921612P1215254 |
| MANAC | 942 | 2023 | 2M5921614P1215255 |

| | | | |
|---|---|---|---|
| MANAC | 942 | 2023 | 2M5921616P1215256 |
| MANAC | 942 | 2023 | 2M5921618P1215257 |
| MANAC | 942 | 2023 | 2M592161XP1215258 |
| MANAC | 942 | 2023 | 2M5921611P1215259 |
| MANAC | 942 | 2023 | 2M5921618P1215260 |
| MANAC | 942 | 2023 | 2M592161XP1215261 |
| MANAC | 942 | 2023 | 2M592161XP1215262 |
| MANAC | 942 | 2023 | 2M5921613P1215263 |
| MANAC | 942 | 2023 | 2M5921615P1215264 |
| MANAC | 942 | 2023 | 2M5921617P1215265 |
| MANAC | 942 | 2023 | 2M5921619P1215266 |
| MANAC | 942 | 2023 | 2M5921610P1215267 |
| MANAC | 942 | 2023 | 2M5921612P1215268 |
| MANAC | 942 | 2023 | 2M5921614P1215269 |
| MANAC | 942 | 2023 | 2M5921610P1215270 |
| MANAC | 942 | 2023 | 2M5921612P1215271 |
| MANAC | 942 | 2023 | 2M5921614P1215272 |
| STOUGHTON | AVW | 2017 | 1DW1A5337HS699304 |
| STOUGHTON | AVW | 2017 | 1DW1A5332HS699307 |
| STOUGHTON | AVW | 2017 | 1DW1A5330HS699306 |
| STOUGHTON | AVW | 2017 | 1DW1A5335HS699303 |
| STOUGHTON | AVW | 2017 | 1DW1A5332HS699310 |
| STOUGHTON | AVW | 2017 | 1DW1A5336HS699309 |
| STOUGHTON | AVW | 2017 | 1DW1A5334HS699311 |
| STOUGHTON | AVW | 2017 | 1DW1A5334HS699308 |
| STOUGHTON | AVW | 2017 | 1DW1A5339HS699305 |
| MANAC | 94353A321 | 2017 | 2M5931615H1163715 |
| MANAC | 94353A321 | 2017 | 2M593161XH1163712 |
| MANAC | 94353A321 | 2017 | 2M5931618H1163711 |
| MANAC | N/A | 2017 | 2M5931613H1163714 |
| STOUGHTON | AVW | 2017 | 1DW1A5333HS699302 |
| MANAC | N/A | 2017 | 2M5931611H1163713 |
| GREAT DANE | CS1 | 2016 | 1GRAA0635GB705741 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705744 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705743 |
| GREAT DANE | CS1 | 2016 | 1GRAA0637GB705742 |
| MANAC | 943 | 2017 | 2M5931614H1161812 |
| MANAC | 943 | 2017 | 2M5931612H1161811 |
| MANAC | 943 | 2017 | 2M5931618H1161814 |
| MANAC | 943 | 2017 | 2M593161XH1161815 |
| MANAC | 943 | 2017 | 2M5931611H1161816 |
| MANAC | 943 | 2017 | 2M5931616H1161813 |
| MANAC | 943 | 2017 | 2M5931613H1161817 |
| GREAT DANE | CS1 | 2016 | 1GRAA063XGB705752 |

| | | | |
|---|---|---|---|
| GREAT DANE | CS1 | 2016 | 1GRAA063XGB705749 |
| GREAT DANE | CS1 | 2016 | 1GRAA0637GB705756 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705750 |
| GREAT DANE | CS1 | 2016 | 1GRAA0635GB705755 |
| GREAT DANE | CS1 | 2016 | 1GRAA0633GB705754 |
| GREAT DANE | CS1 | 2016 | 1GRAA0638GB705751 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705747 |
| GREAT DANE | CS1 | 2016 | 1GRAA0632GB705759 |
| GREAT DANE | CS1 | 2016 | 1GRAA0633GB705746 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705757 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705760 |
| GREAT DANE | CSE | 2016 | 1GRAA0638GB705748 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705758 |
| GREAT DANE | CS1 | 2016 | 1GRAA0631GB705753 |
| GREAT DANE | CS1 | 2016 | 1GRAA0634GB705763 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705764 |
| GREAT DANE | CS1 | 2016 | 1GRAA0638GB705765 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705761 |
| GREAT DANE | CS1 | 2016 | 1GRAA0632GB705762 |
| STOUGHTON | ZGP | 2018 | 1DW1A5338JS773108 |
| STOUGHTON | ZGP | 2018 | 1DW1A533XJS773109 |
| STOUGHTON | ZGP | 2018 | 1DW1A5337JS773102 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335JS773101 |
| GREAT DANE | CS1 | 2018 | 1GRAA0637JB700872 |
| STOUGHTON | ZGP | 2018 | 1DW1A5331JS773113 |
| STOUGHTON | ZGP | 2018 | 1DW1A533XJS773112 |
| GREAT DANE | CS1 | 2018 | 1GRAA0635JB700871 |
| STOUGHTON | ZGP | 2018 | 1DW1A5330JS773104 |
| STOUGHTON | ZGP | 2018 | 1DW1A5339JS773103 |
| STOUGHTON | ZGP | 2018 | 1DW1A5333JS773114 |
| STOUGHTON | ZGP | 2018 | 1DW1A5334JS773106 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335JS773115 |
| STOUGHTON | ZGP | 2018 | 1DW1A5336JS773110 |
| STOUGHTON | ZGP | 2018 | 1DW1A5338JS773111 |
| STOUGHTON | ZGP | 2018 | 1DW1A5336JS773107 |
| UTILITY | VS3 | 2017 | 1UYVS3534HG835611 |
| UTILITY | VS3 | 2017 | 1UYVS3531HG835601 |
| UTILITY | VS2 | 2017 | 1UYVS3533HG835602 |
| UTILITY | VS3 | 2017 | 1UYVS3536HG835612 |
| UTILITY | VS3 | 2017 | 1UYVS3538HG835613 |
| UTILITY | VS3 | 2017 | 1UYVS353XHG835614 |
| UTILITY | VS3 | 2017 | 1UYVS3531HG835615 |
| UTILITY | VS3 | 2017 | 1UYVS3535HG835603 |
| VANGUARD | VXP | 2018 | 5V8VC53B2JM806498 |

| | | | |
|---|---|---|---|
| VANGUARD | VXP | 2018 | 5V8VC53B4JM806499 |
| VANGUARD | VXP | 2018 | 5V8VC53B9JM806501 |
| VANGUARD | VXP | 2018 | 5V8VC53B0JM806502 |
| VANGUARD | VXP | 2018 | 5V8VC53B2JM806503 |
| VANGUARD | VXP | 2018 | 5V8VC53B4JM806504 |
| VANGUARD | VXP | 2018 | 5V8VC53B6JM806505 |
| VANGUARD | VXP | 2018 | 5V8VC53B8JM806506 |
| VANGUARD | VXP | 2018 | 5V8VC53BXJM806507 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335KBA14601 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903019 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30635 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30636 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30637 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30638 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30639 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30658 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30659 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30809 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30811 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30812 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30813 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30814 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30816 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30817 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30820 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30821 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30823 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30824 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30825 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30826 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30827 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30828 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30829 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30830 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30831 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30832 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30833 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30834 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30835 |
| STOUGHTON | COM | 2020 | 1DW1A5330LBA30836 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30837 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30838 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30839 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30840 |

| STOUGHTON | COM | 2020 | 1DW1A5334LBA30841 |
|-----------|-----|------|-------------------|
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30842 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30843 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30844 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30845 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30846 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30847 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30848 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30849 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30850 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30851 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30852 |
| STOUGHTON | COM | 2020 | 1DW1A5330LBA30853 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30854 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30855 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30856 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30857 |
| STOUGHTON | COM | 2020 | 1DW1A5333LEA31171 |
| STOUGHTON | COM | 2020 | 1DW1A5335LEA31172 |
| STOUGHTON | COM | 2020 | 1DW1A5337LEA31173 |
| STOUGHTON | COM | 2020 | 1DW1A5339LEA31174 |
| STOUGHTON | COM | 2020 | 1DW1A5330LEA31175 |
| STOUGHTON | COM | 2020 | 1DW1A5332LEA31176 |
| STOUGHTON | COM | 2021 | 1DW1A5339MSA49712 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49713 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49714 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49715 |
| STOUGHTON | COM | 2021 | 1DW1A5336MSA49716 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49717 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49718 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49719 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49720 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49721 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49722 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49723 |
| STOUGHTON | COM | 2021 | 1DW1A5335MSA49724 |
| STOUGHTON | COM | 2021 | 1DW1A5337MSA49725 |
| STOUGHTON | COM | 2021 | 1DW1A5339MSA49726 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49727 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49728 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49729 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49730 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49731 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49732 |

| | | | |
|---|---|---|---|
| STOUGHTON | COM | 2021 | 1DW1A5336MSA49733 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49734 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49735 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49736 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49737 |
| STOUGHTON | COM | 2021 | 1DW1A5335MSA49738 |
| STOUGHTON | COM | 2021 | 1DW1A5337MSA49739 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49740 |
| MANAC | 944 | 2017 | 2M5941615H1157801 |
| MANAC | 944 | 2017 | 2M5941617H1157802 |
| MANAC | 944 | 2017 | 2M5941613H1157800 |
| MANAC | 944 | 2017 | 2M5941610H1157799 |
| MANAC | VAN | 2017 | 2M5941610H1165692 |
| MANAC | VAN | 2017 | 2M5941616H1165695 |
| MANAC | VAN | 2017 | 2M5941614H1165694 |
| MANAC | VAN | 2017 | 2M5941612H1165693 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA31360 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA31368 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA31369 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA31371 |
| STOUGHTON | N/A | 2020 | 1DW1R5328LEA31375 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA31382 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA31359 |
| STOUGHTON | N/A | 2020 | 1DW1R5320LEA31385 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA31363 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA31372 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA40962 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31364 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31378 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA31373 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA31379 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA31374 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA31383 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA31358 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA31370 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA31384 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6884737 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6914910 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914911 |
| UTILITY | N/A | 2020 | 1UYVS2539L6914913 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6914916 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914919 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6914920 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6914921 |

| UTILITY | VS2 | 2020 | 1UYVS253XL6914922 |
|---------|-----|------|-------------------|
| UTILITY | VS2 | 2020 | 1UYVS2531L6914923 |
| UTILITY | N/A | 2020 | 1UYVS2531L6884743 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6884744 |
| UTILITY | VS2 | 2020 | 1UYVS25306L884748 |
| UTILITY | N/A | 2020 | 1UYVS2539L6884750 |
| WABASH | RFA | 2016 | 1JJV532B2GL887138 |
| WABASH | RFA | 2016 | 1JJV532B3GL920311 |
| WABASH | RFA | 2016 | 1JJV532B5GL920312 |
| GREAT DANE | ESS | 2016 | 1GRAA0620GW700575 |
| VANGUARD | COO | 2016 | 527SR5326GM006535 |
| GREAT DANE | ESS | 2016 | 1GRAA0623GW703289 |
| WABASH | RFA | 2017 | 1JJV532B1HL008326 |
| WABASH | RFA | 2017 | 1JJV532B1HL008357 |
| WABASH | RFA | 2017 | 1JJV532B1HL008410 |
| UTILITY | VS2 | 2012 | 1UYVS2533CM469922 |
| WABASH | RFA | 2017 | 1JJV532BXHL008342 |
| WABASH | RFA | 2017 | 1JJV532B7HL008220 |
| UTILITY | VS2 | 2016 | 1UYVS2536GM381422 |
| UTILITY | VS2 | 2018 | 1UYVS2539J6258502 |
| WABASH | RFA | 2017 | 1JJV52B2HL008237 |
| WABASH | RFA | 2017 | 1JJV532B4HL008367 |
| WABASH | RFA | 2017 | f31971JJV532B1HL008181 |
| UTILITY | VS2 | 2018 | 1UYVS2536J6258506 |
| UTILITY | VS2 | 2018 | 1UYVS2539J6258516 |
| UTILITY | VS2 | 2018 | 1UYVS2530J6258517 |
| UTILITY | VS2 | 2018 | 1UYVS2533J6258513 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6258512 |
| UTILITY | VS2 | 2018 | 1UYVS2532J6258518 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6258509 |
| UTILITY | VS2 | 2018 | 1UYVS2538J6258507 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6258508 |
| UTILITY | VS2 | 2018 | 1UYVS2538J6258510 |
| UTILITY | VS2 | 2018 | 1UYVS2530J6258520 |
| UTILITY | VS2 | 2018 | 1UYVS2535J6258514 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6258519 |
| UTILITY | VS3 | 2018 | 1UYVS2530J6270201 |
| UTILITY | VS3 | 2018 | 1UYVS2538J6270205 |
| UTILITY | VS2 | 2018 | 1UYVS2537J6258515 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6258511 |
| UTILITY | VS2 | 2018 | 1UYVS2532J6270202 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6270203 |
| UTILITY | VS2 | 2018 | 1UYVS2536J6270204 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6270206 |

| | | | |
|---|---|---|---|
| UTILITY | VS2 | 2018 | 1UYVS2535J6270209 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6270210 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6270207 |
| UTILITY | VS2 | 2018 | 1UYVS2533J6270208 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14796 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14797 |
| STOUGHTON | REF | 2019 | 1DW1R5327KEA14811 |
| STOUGHTON | REF | 2019 | 1DW1R5329KEA14812 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14813 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14814 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14816 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14817 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14819 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14820 |
| STOUGHTON | REF | 2019 | 1DW1R532XKEA14821 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14822 |
| STOUGHTON | REF | 2019 | 1DW1R5323KEA14823 |
| STOUGHTON | REF | 2019 | 1DW1R5325KEA14824 |
| STOUGHTON | REF | 2019 | 1DW1R5327KEA14825 |
| STOUGHTON | REF | 2019 | 1DW1R5329KEA14826 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14827 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14828 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14829 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14830 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14831 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14832 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14833 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14834 |
| VANGUARD | CR8 | 2019 | 527SR5322KM017007 |
| VANGUARD | CR8 | 2019 | 527SR5324KM017008 |
| VANGUARD | CR8 | 2019 | 527SR5326KM017009 |
| VANGUARD | CR8 | 2019 | 527SR5322KM017010 |
| VANGUARD | CR8 | 2019 | 527SR5324KM017011 |
| VANGUARD | CR8 | 2019 | 527SR5328KM017013 |
| VANGUARD | CR8 | 2019 | 527SR532XKM017014 |
| VANGUARD | CR8 | 2019 | 527SR5321KM017015 |
| UTILITY | N/A | 2019 | 1UYVS2535K6740904 |
| UTILITY | N/A | 2019 | 1UYV52537K6740905 |
| UTILITY | N/A | 2019 | 1UYVS2532K6740911 |
| UTILITY | N/A | 2019 | 1UYV52534K6740912 |
| UTILITY | N/A | 2019 | 1UYVS2536K6740913 |
| UTILITY | N/A | 2019 | 1UYVS2538K6740914 |
| UTILITY | N/A | 2019 | 1UYVS253XK6740915 |
| UTILITY | N/A | 2019 | 1UYVS2531K6740916 |

| UTILITY | N/A | 2019 | 1UYVS2537K6740919 |
| UTILITY | N/A | 2019 | 1UYVS2533K6740920 |
| UTILITY | VS2 | 2019 | 1UYVS2533K6740903 |
| WABASH | N/A | 2016 | 1JJV532B3GL887147 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6114202 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6914930 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6914931 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6914932 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6914933 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914939 |
| UTILITY | VS2 | 2020 | 1UYVS2531L6914940 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6914941 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914942 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6914944 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6914945 |
| UTILITY | N/A | 2020 | 1UYVS2533L6914938 |
| UTILITY | N/A | 2020 | 1UYVS2536L6914934 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914936 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA41949 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA41950 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA41951 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA41952 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA41955 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA41956 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA41957 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA41958 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42375 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA42376 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42377 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA41945 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA42379 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42380 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA42381 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA42382 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA42384 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA42385 |
| STOUGHTON | REF | 2021 | 1DW1R5329LEA41946 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA42387 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA42388 |
| STOUGHTON | RSV | 2019 | 1DW1R5325KEA14791 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6915562 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6915563 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6915565 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6915567 |

| | | | |
|---|---|---|---|
| STOUGHTON | REF | 2021 | 1DW1R5321LEA41939 |
| STOUGHTON | REF | 2021 | 1DW1R5325LEA42396 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA42399 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42389 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA42393 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA42395 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6712107 |
| UTILITY | VS2 | 2022 | 1UYVS2538N6712101 |
| UTILITY | VS2 | 2022 | 1UYVS253XN6712102 |
| UTILITY | VS2 | 2022 | 1UYVS2531N6712103 |
| UTILITY | VS2 | 2022 | 1UYVS2533N6712104 |
| UTILITY | VS2 | 2022 | 1UYVS2535N6712105 |
| UTILITY | VS2 | 2022 | 1UYVS2537N6712106 |
| UTILITY | VS2 | 2022 | 1UYVS2530N6712108 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6712110 |
| UTILITY | VS2 | 2022 | 1UYVS253ON6712111 |
| UTILITY | VS2 | 2022 | 1UYVS2532N6712112 |
| UTILITY | VS2 | 2022 | 1UYVS2534N6712113 |
| UTILITY | VS2 | 2022 | 1UYVS2536N6712114 |
| UTILITY | VS2 | 2022 | 1UYVS2538N6712115 |
| UTILITY | VS2 | 2022 | 1UYVS2532N6712109 |
| CIMC | COO | 2023 | 527SR5328PM034319 |
| CIMC | REE | 2023 | 527SR532XPL033355 |
| CIMC | REE | 2023 | 527SR5326PL033367 |
| CIMC | REE | 2023 | 527SR5322PL030398 |
| CIMC | REE | 2023 | 527SR5327PL030400 |
| CIMC | REE | 2023 | 527SR5320PL030416 |
| CIMC | REE | 2023 | 527SR5326PL030419 |
| CIMC | REE | 2023 | 527SR5322PL030420 |
| VANGUARD | REE | 2023 | 527SR5323PL030474 |
| CIMC | REE | 2023 | 527SR5325PL030475 |
| CIMC | COO | 2023 | 527SR5326PL030422 |
| CIMC | COO | 2023 | 527SR5320PM034296 |
| CIMC | COO | 2023 | 527SR5329PM034295 |
| UTILITY | VS2 | 2021 | 1UYVS2539M6393225 |
| CIMC | CR8 | 2023 | 2SHSR5328PS001426 |
| VANGUARD | CIMC | 2024 | 527SR532XRM037015 |
| CIMC | COO | 2024 | 527SR5321RM037016 |
| CIMC | COO | 2024 | 527SR5323RM037017 |
| CIMC | COO | 2024 | 527SR5325RM037018 |
| CIMC | COO | 2024 | 527SR5327RM037019 |
| CIMC | COO | 2024 | 527SR5323RM037020 |
| CIMC | COO | 2024 | 527SR5325RM037021 |
| CIMC | COO | 2024 | 527SR5327RM037022 |

| | | | |
|---|---|---|---|
| CIMC | COO | 2024 | 527SR5329RM037023 |
| CIMC | COO | 2024 | 527SR5320RM037024 |
| CIMC | COO | 2024 | 527SR5322RM037025 |
| CIMC | COO | 2024 | 527SR5324RM037026 |
| CIMC | COO | 2024 | 527SR5326RM037027 |
| CIMC | COO | 2024 | 527SR5328RM037028 |
| CIMC | COO | 2024 | 527SR532XRM037029 |
| CIMC | COO | 2024 | 527SR5326RM037030 |
| CIMC | COO | 2024 | 527SR5328RM037031 |
| CIMC | COO | 2024 | 527SR532XRM037032 |
| CIMC | COO | 2024 | 527SR5321RM037033 |
| CIMC | COO | 2024 | 527SR5323RM037034 |
| CIMC | COO | 2024 | 527SR5325RM037035 |
| CIMC | COO | 2024 | 527SR5327RM037036 |
| CIMC | COO | 2024 | 527SR5329RM037037 |
| CIMC | COO | 2024 | 527SR5320RM037038 |
| CIMC | COO | 2024 | 527SR5322RM037039 |
| CIMC | COO | 2024 | 527SR5322PL033365 |
| CIMC | REE | 2023 | 527SR5322PL033348 |
| CIMC | N/A | 2023 | 527SR532XPM031227 |
| CIMC | N/A | 2023 | 527SR5324PM033989 |
| CIMC | N/A | 2023 | 527SR5322PM033988 |
| CIMC | N/A | 2023 | 527SR5323PM034034 |
| UTILITY | VS2 | 2021 | 1UYVS2537M6393224 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6461945 |
| CIMC | COO | 2023 | 527SR5322PM034297 |
| UTILITY | RFA | 2022 | 1UYVS2536N6712128 |
| CIMC | REE | 2023 | 527SR5324PL033352 |
| CIMC | COO | 2023 | 527SR5327PM034294 |
| CIMC | REE | 2023 | 527SR5320PL030478 |
| CIMC | VS2 | 2022 | 1UYVS2533N6461925 |
| CIMC | REE | 2023 | 527SR5329PL030477 |
| CIMC | REE | 2023 | 527SR5329PL030401 |
| CIMC | REE | 2023 | 527SR5320PL033350 |
| CIMC | REE | 2023 | 527SR5327PL030431 |
| CIMC | COO | 2023 | 527SR5320PM034329 |
| HYUNDAI | N/A | 2016 | 3H3V532C2GT498007 |
| HYUNDAI | HHY | 2016 | 3H3V532CXGT498014 |
| HYUNDAI | N/A | 2016 | 3H3V532C1GT498015 |
| UTILITY | VS2 | 2015 | 1UYVS2533FG298608 |
| STRI | S75 | 2019 | 1S12E9533KE539102 |
| UTILITY | N/A | 2020 | 1UYVS2534L7143923 |
| MANAC | 942 | 2023 | 2M592161P1217644 |
| MANAC | 942 | 2023 | 2M5921615P1217645 |

| | | | |
|---|---|---|---|
| MANAC | 942 | 2023 | 2M5921617P1217646 |
| MANAC | 942 | 2023 | 2M5921619P1217647 |
| MANAC | 942 | 2023 | 2M5921610P1217648 |
| MANAC | 942 | 2023 | 2M5921612P1217649 |
| MANAC | 942 | 2023 | 2M5921619P1217650 |
| MANAC | 942 | 2023 | 2M5921617P1217016 |
| MANAC | 942 | 2023 | 2M5921619P1217017 |
| MANAC | 942 | 2023 | 2M5921610P1217018 |
| MANAC | 942 | 2023 | 2M5921612P1217019 |
| MANAC | 942 | 2023 | 2M5921619P1217020 |
| MANAC | 942 | 2023 | 2M5921610P1217021 |
| MANAC | 942 | 2023 | 2M5921612P1217022 |
| MANAC | 942 | 2023 | 2M5921614P1217023 |
| MANAC | 942 | 2023 | 2M5921616P1217024 |
| MANAC | 942 | 2023 | 2M5921618P1217025 |
| MANAC | 94253A311 | 2023 | 2M592161XP1217026 |
| MANAC | 942 | 2023 | 2M5921611P1217027 |
| MANAC | 94253A311 | 2023 | 2M5921613P1217028 |
| MANAC | 942 | 2023 | 2M5921615P1217029 |
| MANAC | 942 | 2023 | 2M5921611P1217030 |
| MANAC | 94253A311 | 2023 | 2M5921613P1217031 |
| MANAC | 942 | 2023 | 2M5921615P1217032 |
| MANAC | 942 | 2023 | 2M5921617P1217033 |
| MANAC | 942 | 2023 | 2M5921619P1217034 |
| MANAC | 942 | 2023 | 2M5921610P1217035 |
| MANAC | 942 | 2023 | 2M5921612P1217036 |
| MANAC | 942 | 2023 | 2M5921614P1217037 |
| MANAC | 942 | 2023 | 2M5921616P1217038 |
| MANAC | MANAC | 2023 | 2M5921618P1217039 |
| MANAC | 942 | 2023 | 2M5921614P1217040 |
| MANAC | 942 | 2023 | 2M5921616P1217041 |
| MANAC | 942 | 2023 | 2M5921618P1217042 |
| MANAC | 942 | 2023 | 2M592161XP1217043 |
| MANAC | 942 | 2023 | 2M5921611P1217044 |
| MANAC | 942 | 2023 | 2M5921613P1217045 |
| MANAC | 94253A311 | 2023 | 2M5921615P1217046 |
| MANAC | 94253A311 | 2023 | 2M5921617P1217047 |
| MANAC | 94253A311 | 2023 | 2M5921619P1217048 |
| MANAC | 94253A311 | 2023 | 2M5921610P1217049 |
| MANAC | 94253A311 | 2023 | 2M5921617P1217050 |
| MANAC | 94253A311 | 2023 | 2M5921619P1217051 |
| MANAC | 94253A311 | 2023 | 2M5921610P1217052 |
| MANAC | 94253A311 | 2023 | 2M5921612P1217053 |
| MANAC | 94253A311 | 2023 | 2M5921614P1217054 |

| MANAC | 94253A311 | 2023 | 2M5921616P1217055 |
|---|---|---|---|
| MANAC | 942 | 2023 | 2M5921618P1217641 |
| MANAC | 942 | 2023 | 2M592161XP1217642 |
| MANAC | 942 | 2023 | 2M5921611P1217643 |
| MANAC | 942 | 2022 | 2M5921614N1208884 |
| MANAC | 942 | 2022 | 2M5921616N1208885 |
| MANAC | N/A | 2022 | 2M5921618N1208886 |
| MANAC | 942 | 2022 | 2M592161XN1208887 |
| MANAC | 942 | 2022 | 2M5921611N1208888 |
| STOUGHTON | 942 | 2022 | 2M5921613N1208889 |
| MANAC | 942 | 2022 | 2M592161XN1208890 |
| MANAC | N/A | 2022 | 2M5921611N1208891 |
| MANAC | N/A | 2022 | 2M5921613N1208892 |
| MANAC | 942 | 2022 | 2M5921615N1208893 |
| MANAC | 942 | 2021 | 2M592161XM1202294 |
| MANAC | 942 | 2021 | 2M5921611M1202295 |
| MANAC | 942 | 2021 | 2M5921613M1202296 |
| MANAC | 942 | 2021 | 2M5921615M1202297 |
| MANAC | 942 | 2021 | 2M5921617M1202298 |
| MANAC | 942 | 2021 | 2M5921619M1202299 |
| MANAC | 942 | 2021 | 2M5921611M1202300 |
| MANAC | 942 | 2021 | 2M5921613M1202301 |
| MANAC | 942 | 2021 | 2M5921615M1202302 |
| MANAC | 942 | 2021 | 2M5921617M1202303 |
| MANAC | 942 | 2021 | 2M5921619M1202304 |
| MANAC | 942 | 2021 | 2M5921610M1202305 |
| MANAC | 942 | 2021 | 2M5921612M1202306 |
| MANAC | 942 | 2021 | 2M5921614M1202307 |
| MANAC | 942 | 2021 | 2M5921616M1202308 |
| MANAC | 942 | 2021 | 2M5921618M1202309 |
| MANAC | 942 | 2021 | 2M5921614M1202310 |
| MANAC | 942 | 2021 | 2M5921616M1202311 |
| MANAC | 942 | 2021 | 2M5921618M1202312 |
| MANAC | 942 | 2021 | 2M592161XM1202313 |
| CIMC | NDW136*0AF0 | 2018 | 527SR5329JM012594 |
| CIMC | VS2 | 2023 | 527SR5327PM031170 |
| CIMC | VS2 | 2022 | 527SR5329PM031171 |
| CIMC | N/A | 2023 | 527SR5320PM031172 |
| CIMC | VS2 | 2022 | 527SR5322PM031173 |
| CIMC | N/A | 2023 | 527SR5324PM031174 |
| CIMC | VS2 | 2022 | 527SR5326PM031175 |
| CIMC | N/A | 2023 | 527SR5328PM031176 |
| CIMC | VS2 | 2023 | 527SR532XPM031177 |
| CIMC | N/A | 2022 | 527SR5321PM031178 |

| | | | |
|---|---|---|---|
| CIMC | N/A | 2022 | 527SR5323PM031179 |
| CIMC | N/A | 2023 | 527SR532XPM031180 |
| CIMC | N/A | 2023 | 527SR5323PM031215 |
| CIMC | N/A | 2023 | 527SR5327PM031217 |
| CIMC | N/A | 2023 | 527SR5325PM031183 |
| CIMC | N/A | 2023 | 527SR5327PM031184 |
| CIMC | N/A | 2022 | 527SR5329PM031185 |
| CIMC | N/A | 2023 | 527SR5329PM031218 |
| CIMC | VS2 | 2022 | 527SR5324PM031188 |
| CIMC | VS2 | 2023 | 527SR5329PM031221 |
| CIMC | N/A | 2023 | 527SR5329PM031222 |
| CIMC | N/A | 2023 | 527SR5325PM031197 |
| CIMC | N/A | 2023 | 527SR5320PM031219 |
| CIMC | N/A | 2022 | 527SR5325PM031216 |
| CIMC | VS2 | 2023 | 527SR5321PM031200 |
| CIMC | N/A | 2023 | 527SR5327PM031220 |
| CIMC | THERMO | 2023 | 527SR5328PM031226 |
| CIMC | VS2 | 2023 | 527SR5322PM031206 |
| CIMC | N/A | 2023 | 527SR5324PM031224 |
| CIMC | REF | 2023 | 527SR5326PM031208 |
| CIMC | RFA | 2023 | 527SR5324PM031210 |
| CIMC | COO | 2023 | 527SR5328PM031212 |
| CIMC | N/A | 2023 | 527SR532XPM031213 |
| CIMC | VS2 | 2022 | 527SR5321PM031214 |
| CIMC | VS2 | 2023 | 527SR537PM031198 |
| CIMC | N/A | 2023 | 527SR5326PM034318 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31381 |
| UTILITY | N/A | 2020 | 1UYVS2537L6914912 |
| WANC | RFA | 2022 | 1JJV532B2NL315354 |
| WANC | RFA | 2022 | 1JJV532B2NL315355 |
| WANC | RFA | 2022 | 1JJV532B6NL315356 |
| WANC | RFA | 2022 | 1JJV532B2NL315357 |
| WANC | RFA | 2022 | 1JJV532B2NL315358 |
| WANC | RFA | 2022 | 1JJV532B2NL315359 |
| WANC | RFA | 2022 | 1JJV532B2NL315360 |
| WANC | RFA | 2022 | 1JJV532B2NL315361 |
| WANC | RFA | 2022 | 1JJV532B2NL315362 |
| WANC | RFA | 2022 | 1JJV532B3NL315363 |
| WANC | RFA | 2022 | 1JJV532B5NL315364 |
| WANC | RFA | 2022 | 1JJV532B7NL315365 |
| WANC | RFA | 2022 | 1JJV532B9NL315366 |
| WANC | RFA | 2022 | 1JJV532B0NL315367 |
| WANC | RFA | 2022 | 1JJV532B2NL315368 |
| WANC | RFA | 2022 | 1JJV532B4NL315369 |

| WANC | RFA | 2022 | 1JJV532B0NL315370 |
|------|-----|------|-------------------|
| WANC | RFA | 2022 | 1JJV532B2NL315371 |
| WANC | RFA | 2022 | 1JJV532B4NL315372 |
| WANC | RFA | 2022 | 1JJV532B6NL315373 |
| WANC | RFA | 2022 | 1JJV532B8NL315374 |
| WANC | RFA | 2022 | 1JJV532BXNL315375 |
| WANC | RFA | 2022 | 1JJV532B1NL315376 |
| WANC | RFA | 2022 | 1JJV532B3NL315377 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315378 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315379 |
| WABASH | 7500 | 2023 | 1JJV532BXPL315380 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315381 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315382 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315383 |
| WABASH | 7500 | 2023 | 1JJV532B7PL315384 |
| WABASH | 7500 | 2023 | 1JJV532B9PL315385 |
| WABASH | 7500 | 2023 | 1JJV532B0PL315386 |
| WABASH | 7500 | 2023 | 1JJV532B2PL315387 |
| WABASH | 7500 | 2023 | 1JJV532B4PL315388 |
| WABASH | 7500 | 2023 | 1JJV532B6PL315389 |
| WABASH | 7500 | 2023 | 1JJV532B2PL315390 |
| WABASH | 7500 | 2023 | 1JJV532B4PL315391 |
| WABASH | 7500 | 2023 | 1JJV532B8PL315393 |
| WABASH | 7500 | 2023 | 1JJV532BXPL315394 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315395 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315396 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315397 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315398 |
| WABASH | 7500 | 2023 | 1JJV532B9PL315399 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315400 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315401 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315402 |
| WABASH | 7500 | 2023 | 1JJV532B7PL315403 |
| CIMC | REE | 2022 | 2SHSR5328NS000452 |
| WABASH | 7500 | 2023 | 1JJV532B6PL315392 |
| MANAC | 943 | 2022 | 2M5931614N1204475 |
| MANAC | 943 | 2022 | 2M5931616N1204476 |
| MANAC | 943 | 2022 | 2M5931618N1204477 |
| MANAC | 943 | 2022 | 2M593161XN1204478 |
| MANAC | 943 | 2022 | 2M5931611N1204479 |
| MANAC | 943 | 2022 | 2M5931618N1204480 |
| MANAC | 943 | 2022 | 2M593161XN1204481 |
| MANAC | 943 | 2022 | 2M5931611N1204482 |
| MANAC | 943 | 2022 | 2M5931613N1204483 |

| | | | |
|---|---|---|---|
| MANAC | 943 | 2022 | 2M5931615N1204484 |
| MANAC | 943 | 2022 | 2M5931617N1204485 |
| MANAC | 943 | 2022 | 2M5931619N1204486 |
| MANAC | 943 | 2022 | 2M5931610N1204487 |
| MANAC | 943 | 2022 | 2M5931612N1204488 |
| MANAC | 943 | 2022 | 2M5931614N1204489 |
| MANAC | 943 | 2022 | 2M5931610N1204490 |
| MANAC | 943 | 2022 | 2M5931612N1204491 |
| MANAC | 943 | 2022 | 2M5931614N1204492 |
| MANAC | 943 | 2022 | 2M5931616N1204493 |
| MANAC | 943 | 2022 | 2M5931618N1204494 |
| MANAC | 943 | 2022 | 2M593161XN1204495 |
| MANAC | 943 | 2022 | 2M5931611N1204496 |
| MANAC | 943 | 2022 | 2M5931613N1204497 |
| MANAC | 943 | 2022 | 2M5931615N1204498 |
| MANAC | 943 | 2022 | 2M5931617N1204499 |
| MANAC | 943 | 2022 | 2M5931615N1204517 |
| MANAC | 943 | 2022 | 2M5931617N1204518 |
| MANAC | 943 | 2022 | 2M5931619N1204519 |
| MANAC | 943 | 2022 | 2M5931615N1204520 |
| MANAC | 943 | 2022 | 2M5931617N1204521 |
| MANAC | 943 | 2022 | 2M5931619N1204522 |
| MANAC | 943 | 2022 | 2M5931610N1204523 |
| MANAC | 943 | 2022 | 2M5931612N1204524 |
| MANAC | 943 | 2022 | 2M5931614N1204525 |
| MANAC | 943 | 2022 | 2M5931616N1204526 |
| MANAC | 943 | 2022 | 2M5931618N1204527 |
| MANAC | 943 | 2022 | 2M593161XN1204528 |
| MANAC | 943 | 2022 | 2M5931611N1204529 |
| MANAC | 943 | 2022 | 2M5931618N1204530 |
| MANAC | 943 | 2022 | 2M593161XN1204531 |
| MANAC | 943 | 2022 | 2M5931611N1204532 |
| MANAC | 943 | 2022 | 2M5931613N1204533 |
| MANAC | 943 | 2022 | 2M5931615N1204534 |
| MANAC | 943 | 2022 | 2M5931617N1204535 |
| MANAC | 943 | 2022 | 2M5931619N1204536 |
| MANAC | 943 | 2022 | 2M5931610N1204537 |
| MANAC | 943 | 2022 | 2M5931612N1204538 |
| MANAC | 943 | 2022 | 2M5931614N1204539 |
| MANAC | 943 | 2022 | 2M5931610N1204540 |
| MANAC | 943 | 2022 | 2M5931612N1204541 |
| UTILITY | TRA | 2018 | 1UYVS3530J6060316 |
| GREAT DANE | ESS | 2016 | 1GRAA0636GW701027 |
| GREAT DANE | ESS | 2016 | 1GRAA0638GW701028 |

| | | | |
|---|---|---|---|
| UTILITY | VS3 | 2018 | 1UYVS3532J6060317 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6060319 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6060318 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6060320 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6258401 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6258406 |
| UTILITY | VS3 | 2015 | 1UYVS3537J6258407 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6258402 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6258409 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6258410 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6258405 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6258408 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6258404 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6258413 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6258415 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6258414 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6258416 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6258412 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6258420 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6258417 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6258418 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6258419 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6269901 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6269902 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6269903 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6269904 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6269905 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6269906 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6269907 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6269908 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6269909 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6269910 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6269911 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6269912 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6269913 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6269914 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6269915 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6269916 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6269917 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6269919 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6270001 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6270002 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6270003 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6270004 |

| UTILITY | VS3 | 2018 | 1UYVS3533J6270005 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6270006 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6270007 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6270008 |
| WABASH | RFA | 2022 | IJJV533B7NL339891 |
| WABASH | RFA | 2022 | 1JJV533B9NL339892 |
| WABASH | RFA | 2022 | 1JJV533B0NL339893 |
| WABASH | RFA | 2022 | 1JJV533B2NL339894 |
| WABASH | RFA | 2022 | 1JJV533B4NL339895 |
| EAST | PLA | 2022 | 1E1H5Z581NR074864 |
| EAST | PLA | 2022 | 1E1H5Z583NR074865 |
| EAST | PLA | 2022 | 1E1H5Z585NR074866 |
| EAST | PLA | 2022 | 1E1H5Z682NR074869 |
| EAST | PLA | 2022 | 1E1H5Z689NR074870 |
| WABASH | RFA | 2016 | 1JJV532B7GL887149 |
| WABASH | RFA | 2016 | 1JJV532B2GL887141 |
| WABASH | RFA | 2016 | 1JJV532B7GL887145 |
| WABASH | RFA | 2016 | 1JJV532B6GL920299 |
| WABASH | RFA | 2016 | 1JJV532B1GL920310 |
| WABASH | RFA | 2016 | 1JJV532B8GL920305 |
| WABASH | RFA | 2016 | 1JJV532BXGL920306 |
| GREAT DANE | ESS | 2016 | 1GRAA0626GW700578 |
| GREAT DANE | ESS | 2016 | 1GRAA0622GW700576 |
| GREAT DANE | ESS | 2016 | 1GRAA0624GW700577 |
| WABASH | RFA | 2016 | 1JJV532B2GL920316 |
| WABASH | RFA | 2016 | 1JJV532B0GL920329 |
| HYUNDAI | VC2 | 2016 | 3H3V532C5GT498020 |
| STRI | S75 | 2018 | 1S12E953XJE536499 |
| MANAC | 712 | 2022 | 2M5720416N1208230 |
| MANAC | 712 | 2021 | 2M5720418M1202542 |
| MANAC | N/A | 2023 | 2M5720413P1212318 |
| MANAC | N/A | 2023 | 2M5720411P1212317 |
| MANAC | N/A | 2023 | 2M5720415P1212319 |
| MANAC | N/A | 2023 | 2M5720411P1212320 |
| MANAC | N/A | 2023 | 2M5720413P1212321 |
| MANAC | N/A | 2023 | 2M5720419P1212307 |
| MANAC | N/A | 2019 | 1GR5R1623PK439837 |
| GREAT DANE | N/A | 2019 | 1GR5R1625PK439838 |
| MANAC | 712 | 2023 | 2M5720419P1218916 |
| MANAC | 712 | 2023 | 2M5720412P1218918 |
| MANAC | 712 | 2023 | 2M5720410P1218920 |
| UTILITY | VS2 | 2020 | 1UYVS2537L6884701 |
| CIMC | VS2 | 2022 | 527SR5320PM031186 |
| CIMC | COO | 2023 | 527SR5328PM031209 |

| GREAT DANE | CCC | 2016 | 1GRAP0628GD461688 |
| STOUGHTON | COM | 2016 | 1DW1A5321GB647821 |
| STOU | COM | 2016 | 1DW1A532XGB647817 |
| STOUGHTON | 7GP | 2017 | 1DW1A532XHB753511 |
| STOUGHTON | ZGP | 2017 | 1DW1A5322HB753521 |
| STOUGHTON | ZGP | 2018 | 1DW1A5320JBA00210 |
| STOUGHTON | ZGP | 2018 | 1DW1A5320JBA00191 |
| STOUGHTON | WHI | 2017 | 1DW1A5320HB753520 |
| STOUGHTON | ZGP | 2017 | 1DW1A5327HB753532 |
| STOUGHTON | WHI | 2018 | 1DW1A5320JBA00188 |
| STOUGHTON | ZGP | 2018 | 1DW1A5328JBA00195 |
| STOUGHTON | ZGP | 2017 | 1DW1A5329HB753533 |
| STOUGHTON | ZGP | 2017 | 1DW1A5320HB753534 |
| STOUGHTON | ZGP | 2017 | 1DW1A5329HB753502 |
| STOUGHTON | ZGP | 2017 | 1DW1A5324HB753519 |
| STOUGHTON | ZGP | 2017 | 1DW1A5323HB753527 |
| STOUGHTON | ZGP | 2017 | 1DW1A5325HB753514 |
| STOUGHTON | ZGP | 2017 | 1DW1A532XHB753539 |
| WABASH | N/A | 2023 | 1JJV532D6PL328709 |
| WABASH | N/A | 2023 | 1JJV532D2PL328710 |
| WABASH | N/A | 2023 | 1JJV532D4PL328711 |
| WABASH | N/A | 2023 | 1JJV532D3PL328716 |
| WABASH | N/A | 2023 | 1JJV532D7PL328718 |
| WABASH | N/A | 2023 | 1JJV532D9PL328719 |
| WABASH | N/A | 2023 | 1JJV532D5PL328720 |
| STOUGHTON | ZGP | 2018 | 1DW1A5322JBA00189 |
| STOUGHTON | ZGP | 2017 | 1DW1A532XHB753508 |

| STOUGHTON | ZGP | 2018 | 1DW1A5321JBA00197 |
| STOUGHTON | WHI | 2018 | 1DW1A5328JBA00214 |
| STOUGHTON | ZGP | 2018 | 1DW1A5327JBA00186 |
| STOUGHTON | N/A | 2018 | 1DW1A5327JBA00205 |
| STOUGHTON | WHI | 2017 | 1DW1A5324HB753522 |
| STOUGHTON | ZGP | 2017 | 1DW1A5326HB753540 |
| STOUGHTON | ZGP | 2018 | 1DW1A5321JBA00202 |
| STOUGHTON | ZGP | 2017 | 1DW1A5320HB753503 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7876428 |
| UTILITY | VS2 | 2020 | 1UYVS2530K7760908 |
| STOUGHTON | ALU | 2020 | 1DW1R5326LEA41936 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA41944 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA42386 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA42397 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA42398 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA42390 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42392 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA42391 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42394 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA41947 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7876431 |
| GREAT DANE | N/A | 2016 | 1GRAP0626GD461687 |
| UTILITY | VS2 | 2012 | 1UYVS2535CM470005 |

**SCHEDULE "H"**

**PERMITS**

- Commercial Vehicle Operating Licences

- United States Department of Transportation Licences

- Long Combination Vehicle Licence

- New York State Heavy Haul Permit

**[Note: Balance of schedule to be completed no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order.]**

**SCHEDULE "I"**

**CRITICAL REQUIRED CONTRACTS**

1. ~~DEF contract dated as of August 29, 2023 between Shell Flying J and Pride Diesel Inc.~~

1. ~~2.~~ The lease dated as of November 24, 2015 in respect of the property located at 6050 Dixie Road, Mississauga, between 6050 Dixie Road Investments Limited as Landlord, 2029909 Ontario Inc. as Tenant and Sam Johal as Indemnifier

3. ~~Fuel contract dated as of June 19, 2023 between Shell Flying J and Pride Diesel Inc.~~

4. ~~Branded Dealer Agreement (Esso) dated as of October 25, 2019 between Husky Oil Marketing Company, a division of Husky Oil Operations Limited and 2076401 Ontario Inc.~~

2. ~~5.~~ Lease agreement in respect of 6253 Boundary Road, Cornwall, ON, with Globocam (Montreal) Inc., provided that such lease is in force on the Closing Date.

3. ~~6.~~ The Finloc Leases

**[Note: Balance of schedule to be completed no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order.]**

# SCHEDULE "J"

## FINLOC LEASED VEHICLES

| Make | Model | Year | VIN |
|------|-------|------|-----|
| MANAC | 712 | 2020 | 2M5720419L1190805 |
| MANAC | 712 | 2020 | 2M5720410L1190806 |
| MANAC | 712 | 2020 | 2M5720417L1186817 |
| MANAC | 712 | 2020 | 2M5720417L1190804 |
| MANAC | 712 | 2020 | 2M5720415L1190803 |
| MANAC | 942 | 2021 | 2M5921613M1202282 |
| MANAC | N/A | 2019 | 2M593161XL1197805 |
| MANAC | 942 | 2021 | 2M5921611M1202264 |
| MANAC | 942 | 2021 | 2M5921613M1202265 |
| MANAC | 942 | 2021 | 2M5921615M1202266 |
| MANAC | 942 | 2021 | 2M5921617M1202267 |
| MANAC | 942 | 2021 | 2M5921619M1202268 |
| MANAC | 942 | 2021 | 2M5921610M1202269 |
| MANAC | 942 | 2021 | 2M5921617M1202270 |
| MANAC | 942 | 2021 | 2M5921619M1202271 |
| MANAC | 942 | 2021 | 2M5921610M1202272 |
| MANAC | 942 | 2021 | 2M5921612M1202273 |
| MANAC | 942 | 2021 | 2M5921614M1202274 |
| MANAC | 942 | 2021 | 2M5921616M1202275 |
| MANAC | 942 | 2021 | 2M5921618M1202276 |
| MANAC | 942 | 2021 | 2M592161XM1202277 |
| MANAC | 942 | 2021 | 2M5921611M1202278 |
| MANAC | 942 | 2021 | 2M5921613M1202279 |
| MANAC | 942 | 2021 | 2M592161XM1202280 |
| MANAC | 942 | 2021 | 2M5921611M1202281 |
| MANAC | 942 | 2021 | 2M5921615M1202283 |
| MANAC | 942 | 2021 | 2M5921617M1202284 |
| MANAC | 942 | 2021 | 2M5921619M1202285 |
| MANAC | 942 | 2021 | 2M5921610M1202286 |
| MANAC | 942 | 2021 | 2M5921612M1202287 |
| MANAC | 942 | 2021 | 2M5921614M1202288 |
| MANAC | 942 | 2021 | 2M5921616M1202289 |
| MANAC | 342 | 2021 | 2M5921612M1202290 |
| MANAC | 942 | 2021 | 2M5921614M1202291 |
| MANAC | 942 | 2021 | 2M5921616M1202292 |
| MANAC | 942 | 2021 | 2M5921618M1202293 |
| MANAC | 943 | 2020 | 2M5931611L1197790 |
| MANAC | 943 | 2020 | 2M5931613L1197791 |
| MANAC | 943 | 2020 | 2M5931615L1197792 |
| MANAC | 943 | 2020 | 2M5931617L1197793 |
| MANAC | 943 | 2020 | 2M5931619L1197794 |
| MANAC | 943 | 2020 | 2M5931610L1197795 |
| MANAC | N/A | 2020 | 2M5931612L1197796 |
| MANAC | N/A | 2020 | 2M5931614L1197797 |
| MANAC | N/A | 2020 | 2M5931618L1197799 |
| MANAC | N/A | 2020 | 2M5931610L1197800 |
| MANAC | N/A | 2020 | 2M5931612L1197801 |
| MANAC | N/A | 2020 | 2M5931614L1197802 |
| MANAC | N/A | 2020 | 2M5931616L1197803 |
| MANAC | N/A | 2020 | 2M5931618L1197804 |
| MANAC | N/A | 2020 | 2M5931611L1197806 |
| MANAC | N/A | 2020 | 2M5931613L1197807 |
| MANAC | N/A | 2020 | 2M5931615L1197808 |
| MANAC | N/A | 2020 | 2M5931617L1197809 |

```
MANAC   N/A    2020   2M5931613L1197810
MANAC   N/A    2020   2M5931615L1197811
MANAC   N/A    2020   2M5931617L1197812
MANAC   N/A    2020   2M5931619L1197813
MANAC   N/A    2020   2M5931610L1197814
MANAC   N/A    2020   2M5931612L1197815
MANAC   N/A    2020   2M5931614L1197816
MANAC   N/A    2020   2M5931616L1197817
MANAC   N/A    2020   2M5931618L1197818
MANAC   N/A    2020   2M593161XL1197819
MANAC   N/A    2020   2M5931614M1197820
MANAC   N/A    2020   2M5931616M1197821
MANAC   N/A    2020   2M5931618M1197822
MANAC   N/A    2020   2M593161XM1197823
MANAC   N/A    2020   2M5931611M1197824
MANAC   943    2020   2M5931613M1197825
MANAC   943    2020   2M5931615M1197826
MANAC   943    2021   2M5931617M1197827
MANAC   943    2021   2M5931619M1197828
MANAC   943    2021   2M5931610M1197829
MANAC   943    2021   2M5931617M1197830
MANAC   943    2021   2M5931619M1197831
MANAC   943    2021   2M5931610M1197832
MANAC   943    2021   2M5931612M1197833
MANAC   943    2021   2M5931614M1197834
MANAC   943    2021   2M5931616M1197835
MANAC   943    2021   2M5931618M1197836
MANAC   943    2021   2M593161XM1197837
MANAC   943    2021   2M5931611M1197838
MANAC   943    2021   2M5931613M1197839
```

Document comparison by Workshare Compare on Monday, September 23, 2024
4:06:48 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\BUR\AppData\Local\Temp\1\Workshare\wmtemp1450\Purchase Agreement - August 26 2024 - Execution Copy73.DOCX |
| Description | Purchase Agreement - August 26 2024 - Execution Copy73 |
| Document 2 ID | netdocuments://1408-7051-1119/2 |
| Description | EY - Pride - Amended and Restated PGL Purchase Agreement (Final) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 105 |
| Deletions | 125 |
| Moved from | 4 |
| Moved to | 4 |
| Style changes | 0 |
| Format changes | 0 |

| Total changes | 238 |

# Appendix "C"

Court File No.: CV-24-00717340-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | TUESDAY, THE 24th |
| | ) | |
| JUSTICE OSBORNE | ) | DAY OF SEPTEMBER, 2024 |

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT**
**OF PRIDE GROUP HOLDINGS INC. AND THOSE APPLICANTS LISTED ON**
**SCHEDULE "A" HERETO (each, an "Applicant", and collectively, the**
**"Applicants")**

**ORDER**
**(Approval and Vesting - PGL)**

**THIS MOTION**, made by Applicants pursuant to the *Companies Creditors' Arrangement Act*, R.S.C. 1985, c. c-36, as amended (the "**CCAA**") for an order, among other things, approving the sale transaction (the "**Transaction**")[1] contemplated by an Amended and Restated Purchase Agreement dated as of September 23, 2024 (the "**Purchase Agreement**") between Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation, as vendors (collectively, the "**Vendors**"), and 1000927605 Ontario Inc., as purchaser (the "**Purchaser**"), attached to the Third Supplement to the Fourteenth Report of the Monitor, dated September 23, 2024 (the "**Third Supplementary Report**") as Appendix "D",  and vesting in the Purchaser all of the Vendors' right, title

---

[1] For greater certainty, "Transaction" shall not include any transaction(s) contemplated by the Real Property Option (as defined in the Sale Agreement) which option and the exercise of same remain open in accordance with and subject to the terms of the Sale Agreement and which transaction(s) remain subject to Court approval.

- 2 -

and interest in and to the Purchased Assets (as defined in the Purchase Agreement), was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of Randal Benson sworn August 27, 2024 and the Exhibits thereto (the "**Benson Affidavit**"), the Fourteenth Report of Ernst & Young Inc. dated August 28, 2024 (the "**Fourteenth Report**"), the Supplement to the Fourteenth Report of Ernst & Young Inc., dated September 2, 2024, and the Third Supplementary Report, each issued by Ernst & Young Inc. in its capacity as court-appointed monitor (in such capacity, the "**Monitor**"), and on hearing the submissions of counsel for the Applicants and the limited partnerships listed in **Schedule "A"** hereto (collectively with the Applicants, the "**Pride Entities**"), the Monitor and the Purchaser, and such other counsel as listed on the Participant Information Form, with no one else appearing although properly served as appears from the affidavit of service, filed,

## DEFINITIONS

1. **THIS COURT ORDERS** that capitalized terms used but not defined in this Order shall have the meanings given to them in the Purchase Agreement or the Fourteenth Report, as the case may be.

## APPROVAL OF TRANSACTION

2. **THIS COURT ORDERS AND DECLARES** that the Transaction is hereby approved, and the execution of the Purchase Agreement by the Vendors is hereby authorized and approved, with such minor amendments as the Vendors and the Purchaser, with the consent of the Monitor, may deem necessary or as the Purchase Agreement may permit in accordance with its terms. The Vendors and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Purchased Assets to the Purchaser.

3.      **THIS COURT ORDERS AND DECLARES** that this Order shall constitute the only authorization required by the Monitor and Vendors to proceed with the Transaction and that no shareholder, partner, or other approvals shall be required in connection therewith.

4.      **THIS COURT ORDERS AND DECLARES** that upon the delivery of a certificate by the Monitor to the Vendors and the Purchaser or their respective counsel substantially in the form attached as **Schedule "B"** hereto (the "**Monitor's Certificate**"), all of the Vendors' right, title and interest in and to the Purchased Assets (which for greater certainty shall not include the Excluded Assets listed on Schedule "B" to the Purchase Agreement or the Excluded Contracts listed on Schedule "E" to the Purchase Agreement) shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts, or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, rights of distraint, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "**Claims**") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Second ARIO or any other Order made in these CCAA Proceedings, including, without limitation, the Administration Charge, Intercompany Advances Charge, DIP Lenders' Charge and the Directors' Charge (as each of those terms are defined in the Second ARIO); (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system in Canada or the United States and all Encumbrances (as defined in the Purchase Agreement) (all of which are collectively referred to as the "**Encumbrances**", which term shall not include the Permitted Encumbrances listed on Schedule "C" to the Purchase Agreement) and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

- 4 -

5.     **THIS COURT ORDERS** that upon the issuance of the Monitor's Certificate, any of the Vendors, the Purchaser or the Monitor, shall be authorized to take all such steps as may be necessary to effect the discharge of all Encumbrances registered against the Purchased Assets (including by filing such financing change statements in the Ontario Personal Property Registry (or any analogous legislation as may be necessary) provided that the Vendors, the Purchaser and the Monitor shall not be authorized to effect any discharge that would have the effect of releasing any Encumbrances against any property other than the Purchased Assets.

6.     **THIS COURT ORDERS AND DIRECTS** that the Cash Purchase Price (as adjusted pursuant to the Purchase Agreement) shall be paid to the Monitor on Closing, and held in trust by the Monitor pending further order of the Court.

7.     **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Purchased Assets shall stand in the place and stead of the Purchased Assets, in accordance with and based on the allocations set out in the Allocation Statement, without prejudice to a subsequent determination by the Court as to the quantum of any claims, distributions and priority in respect of proceeds, and that from and after the delivery of the Monitor's Certificate, all Claims and Encumbrances shall attach to the net proceeds from the sale of the Purchased Assets with the same priority as they had with respect to the Purchased Assets immediately prior to the sale, as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

8.     **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

- 5 -

9.      **THIS COURT ORDERS** that the Monitor may rely on written notice from the Vendors and the Purchaser or their respective counsel regarding fulfillment of the conditions to Closing under the Purchase Agreement and shall incur no liability with respect to the delivery of the Monitor's Certificate.

10.      **THIS COURT ORDERS** that upon the issuance of the Monitor's Certificate, (a) each Permit Vendor and each Related Party Landlord shall be subject to the exclusive governance and control of the CRO and/or the Monitor, (b) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Permit Vendor shall be bankrupt, dissolved or otherwise wound-up prior to the earlier of (i) the date that all Permits are irrevocably transferred to the Purchaser, (ii) the date that the Purchaser advises the CRO and the Monitor in writing that it does not require the irrevocable transfer of the Permits to the Purchaser, and (iii) March 31, 2025, and (c) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Related Party Landlord shall be bankrupt, dissolved or otherwise wound-up prior to the date that the lease, access agreement or parking agreement to which the Related Party Landlord is a party is terminated.

11.      **THIS COURT ORDERS** that nothing in this Order, and nothing done by the Monitor or the CRO in carrying out their control of the Permit Vendors and Related Party Landlords as prescribed in Paragraph 10 hereof, shall result in, or be deemed to result in, the Monitor or CRO being an employer, successor employer, responsible person, operator, officer, director, employee, receiver, trustee, assignee, liquidator, administrator, legal representative, receiver-manager or agent of any Permit Vendor or Related Party Landlord, in each case, within the meaning of any statute, regulation or rule of law, or equity, for any purpose whatsoever.

12.      **THIS COURT ORDERS** that, without limiting Paragraph 11 hereof, the Monitor and CRO shall not, as a result of this Order, or anything done pursuant to Paragraph 10 hereof, be deemed to occupy or to take control, care, charge, possession or management of any of the property of any Permit Vendor or Related

Party Landlord that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination; provided however, if the Monitor or CRO is nevertheless found to be in possession of any property of any Permit Vendor or Related Party Landlord, then the Monitor and CRO, as applicable, shall be deemed to be a person who has been lawfully appointed to take, or has lawfully taken, possession or control of such property for the purposes of section 14.06(1.1)(c) of the BIA, and shall be entitled to the benefits and protections in relation to the applicable Permit Vendor or Related Party Landlord and such property, as provided by section 14.06(2) of the BIA to a "trustee" in relation to an insolvent person and its property.

13.     **THIS COURT ORDERS** that, in addition to the rights and protections afforded to the Monitor and CRO under the CCAA, any order granted in these CCAA proceedings, as an officer of this Court or otherwise at law, the Monitor, CRO and their respective legal counsel shall continue to have the benefit of all of the indemnities, charges, protections and priorities as set out in the Second ARIO and any other Order of this Court and all such indemnities, charges, protections and priorities shall apply and extend to the Monitor and CRO in the fulfillment of their duties, carrying out the provisions of this Order and exercising any powers granted to them hereunder. Nothing in this Order shall derogate from the powers of the Monitor as provided in the CCAA, the Second ARIO and the other Orders of this Court in the CCAA proceedings. Without limiting the generality of the foregoing, in exercising any powers granted to it hereunder: (a) the Monitor and CRO shall be entitled to rely on the Permit Vendors' and Related Party Landlords' books and records without independent investigation; and (b) the Monitor and CRO shall incur no liability or obligation as a result of exercising the powers granted to it under Paragraph 10 hereof, save and except for any gross negligence or wilful misconduct on their part, and the Monitor and CRO shall not have any liability with respect to any losses, claims, damages or liabilities, of any nature or kind in relation to the exercise of their powers under Paragraph 10 hereof, to any person from and after the date of this Order,

save and except to the extent such losses, claims, damages or liabilities result from gross negligence or wilful misconduct on their part.

14.    **THIS COURT ORDERS** that, notwithstanding:

(a)    the pendency of these CCAA Proceedings;

(b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "**BIA**") in respect of any of the Vendors and any bankruptcy order issued pursuant to any such applications; and

(c)    any assignment in bankruptcy made in respect of any of the Vendors;

the vesting of the Purchased Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of the Vendors and shall not be void or voidable by creditors of the Vendors, nor shall it constitute nor be deemed to be a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

**SELLER NAME CHANGE AND TITLE OF PROCEEDINGS**

15.    **THIS COURT ORDERS AND DIRECTS** that, following the issuance of the Monitor's Certificate, each of the Vendors and Purchaser are authorized and directed to take any and all steps prescribed by Section 5.4 of the Purchase Agreement, pursuant to the terms thereof (the "**Name Change**").

16.    **THIS COURT ORDERS** that following the Name Change, the name of the Vendors in the within title of proceedings shall be deleted and replaced with the new legal name of the Vendors, and any document filed in these CCAA Proceedings shall be filed using such revised title of proceedings.

**DISCLOSURE OF PERSONAL INFORMATION**

17.     **THIS COURT ORDERS** that, pursuant to clause 7(3)(c) of the *Personal Information Protection and Electronic Documents Act* (Canada), the Vendors and the Monitor are authorized and permitted to disclose and transfer to the Purchaser all human resources and payroll information in the Vendors' records pertaining to the Vendors' past and current employees. The Purchaser shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Vendors.

**GENERAL**

18.     **THIS COURT ORDERS AND DECLARES** that this Order shall have full force and effect in all provinces and territories in Canada.

19.     **THIS COURT ORDERS** that the Vendors, the Monitor or the Purchaser may apply to the Court as necessary to seek further orders and directions to give effect to this Order.

20.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States to give effect to this Order and to assist the Pride Entities, the CRO, the Monitor and their agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Pride Entities, the CRO, and the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Pride Entities, the CRO, the Monitor and their agents in carrying out the terms of this Order.

21.     **THIS COURT ORDERS** that each of the Pride Entities, the CRO, the Monitor, and the Purchaser be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

- 9 -

22.    **THIS COURT ORDERS** that this Order is effective from the date that it is made and is enforceable without any need for entry and filing.

_____

## SCHEDULE "A"

**A. APPLICANTS**

**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.

- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PERGOLA HOLDINGS, CORP.
- PRIDE GLOBAL INSURANCE COMPANY LTD.

**SCHEDULE "B"**

**Form of Monitor's Certificate**

Court File No.: CV-24-00717340-00CL

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. AND THOSE APPLICANTS LISTED ON SCHEDULE "A" HERETO (each, an "Applicant", and collectively, the "Applicants")**

Applicants

**MONITOR'S CERTIFICATE**

**RECITALS**

A.      Pursuant to an Order of the Court dated September 24, 2024 (the "**Approval and Vesting Order**"), the Court approved an Amended and Restated Purchase Agreement dated as of September 22, 2024 (the "**Purchase Agreement**") between Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation, as vendors (collectively, the "**Vendors**"), and 1000927605 Ontario Inc., as purchaser (the "**Purchaser**"), and provided for the vesting in the Purchaser of the Vendor's right, title and interest in and to the Purchased Assets (the "**Transaction**"), which vesting is to be effective with respect to the Purchased Assets upon the Monitor's delivery to the Purchaser of a certificate confirming the Transaction has been completed to the satisfaction of the Monitor.

B.      Pursuant to the Approval and Vesting Order, the Monitor may rely on written notice from the Vendors and the Purchaser regarding fulfillment and/or waiver of conditions to closing under the Purchase Agreement.

C.      Capitalized terms used herein and not otherwise defined have the meanings given to such terms in the Approval and Vesting Order or the Purchase Agreement, as the case may be.

- 2 -

**THE MONITOR CERTIFIES** the following:

1.      The Purchaser has paid the Purchase Price for the Purchased Assets pursuant to the Purchase Agreement.

2.      The Vendors and the Purchaser have each delivered written notice to the Monitor that the conditions to Closing under the Purchase Agreement have been satisfied and/or waived, as applicable.

3.      The Transaction has been completed to the satisfaction of the Monitor.

4.      This Certificate was delivered by the Monitor at _____ **[TIME]** on _____ **[DATE]**.

**ERNST & YOUNG INC., solely in its capacity as Court-appointed Monitor of the Pride Entities and not in its personal capacity**

Per: _____

       Name:

       Title:

Court File No.: CV-24-00717340-00CL

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. ET AL. (each, an "Applicant", and collectively, the "Applicants")**

| | |
|---|---|
| | **ONTARIO**<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>PROCEEDING COMMENCED AT TORONTO |
| | **ORDER**<br>**(Approval and Vesting)** |
| | **THORNTON GROUT FINNIGAN LLP**<br>TD West Tower, Toronto-Dominion Centre<br>100 Wellington Street West, Suite 3200<br>Toronto, ON  M5K 1K7<br><br>**Leanne Williams (LSO #41877E)**<br>Tel:  (416) 304-0060 / Email:  lwilliams@tgf.ca<br><br>**Rachel Nicholson (LSO #68348V)**<br>Tel:  (416) 304-1153 / Email:  rnicholson@tgf.ca<br><br>**Puya Fesharaki (LSO #70588L)**<br>Tel:  (416) 304-7979 / Email:  pfesharaki@tgf.ca<br><br>**Ines Ferreira (LSO #81472A)**<br>Tel:  (416) 304-0461 / Email: iferreira@tgf.ca<br><br>Lawyers for the Applicants |

# Appendix "D"

Court File No.: CV-24-00717340-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE ●MR. | ) | ●DAYTUESDAY, THE ●24th |
| | ) | |
| JUSTICE ●OSBORNE | ) | DAY OF ●SEPTEMBER, 2024 |

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT**
**OF PRIDE GROUP HOLDINGS INC. AND THOSE APPLICANTS LISTED ON**
**SCHEDULE "A" HERETO (each, an "Applicant", and collectively, the**
**"Applicants")**

**ORDER**
**(Approval and Vesting - PGL)**

**THIS MOTION**, made by Applicants pursuant to the *Companies Creditors' Arrangement Act*, R.S.C. 1985, c. c-36, as amended (the "**CCAA**") for an order, among other things, approving the sale transaction (the "**Transaction**")[1] contemplated by a̶an Amended and Restated Purchase Agreement dated as of August 26September 22, 2024 (the "**Purchase Agreement**") between Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation, as vendors (collectively, the "**Vendors**"), and 1000927605 Ontario Inc., as purchaser (the "**Purchaser**"), attached to the Third Supplement to the Fourteenth Report (as defined belowof the Monitor, dated September 23, 2024 (the "**Third Supplementary Report**") as Appendix "D",  and vesting in the Purchaser all of the

---

[1] For greater certainty, "Transaction" shall not include any transaction(s) contemplated by the Real Property Option (as defined in the Sale Agreement) which option and the exercise of same remain open in accordance with and subject to the terms of the Sale Agreement and which transaction(s) remain subject to Court approval.

Vendors' right, title and interest in and to the Purchased Assets (as defined in the Purchase Agreement), was heard this day at 330 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of Randal Benson sworn August 27, 2024 and the Exhibits thereto (the "**Benson Affidavit**"), the Fourteenth Report of Ernst & Young Inc. dated August 28, 2024 (the "**Fourteenth Report**") ~~and~~ **,** the Supplement to the Fourteenth Report of Ernst & Young Inc., dated ~~August [31]~~September 2, 2024, and the Third Supplementary Report, each issued by Ernst & Young Inc. in its capacity as court-appointed monitor (in such capacity, the "**Monitor**"), and on hearing the submissions of counsel for the Applicants and the limited partnerships listed in **Schedule "A"** hereto (collectively with the Applicants, the "**Pride Entities**"), the Monitor and the Purchaser, and such other counsel as listed on the Participant Information Form, with no one else appearing although properly served as appears from the affidavit of service, filed,

**DEFINITIONS**

1.      **THIS COURT ORDERS** that capitalized terms used but not defined in this Order shall have the meanings given to them in the Purchase Agreement or the Fourteenth Report, as the case may be.

**APPROVAL OF TRANSACTION**

2.      **THIS COURT ORDERS AND DECLARES** that the Transaction is hereby approved, and the execution of the Purchase Agreement by the Vendors is hereby authorized and approved, with such minor amendments as the Vendors and the Purchaser, with the consent of the Monitor, may deem necessary or as the Purchase Agreement may permit in accordance with its terms. The Vendors and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Purchased Assets to the Purchaser.

- 3 -

3.      **THIS COURT ORDERS AND DECLARES** that this Order shall constitute the only authorization required by the Monitor and Vendors to proceed with the Transaction and that no shareholder, partner, or other approvals shall be required in connection therewith.

4.      **THIS COURT ORDERS AND DECLARES** that upon the delivery of a certificate by the Monitor to the Vendors and the Purchaser or their respective counsel substantially in the form attached as **Schedule "B"** hereto (the "**Monitor's Certificate**"), all of the Vendors' right, title and interest in and to the Purchased Assets (which for greater certainty shall not include the Excluded Assets listed on Schedule "B" to the Purchase Agreement or the Excluded Contracts listed on Schedule "E" to the Purchase Agreement) shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts, or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, rights of distraint, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "**Claims**") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Second ARIO or any other Order made in these CCAA Proceedings, including, without limitation, the Administration Charge, Intercompany Advances Charge, DIP Lenders' Charge and the Directors' Charge (as each of those terms are defined in the Second ARIO); (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system in Canada or the United States and all Encumbrances (as defined in the Purchase Agreement) (all of which are collectively referred to as the "**Encumbrances**", which term shall not include the Permitted Encumbrances listed on Schedule "C" to the Purchase Agreement) and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

- 4 -

5.      **THIS COURT ORDERS** that upon the issuance of the Monitor's Certificate, any of the Vendors, the Purchaser or the Monitor, shall be authorized to take all such steps as may be necessary to effect the discharge of all Encumbrances registered against the Purchased Assets (including by filing such financing change statements in the Ontario Personal Property Registry (or any analogous legislation as may be necessary) provided that the Vendors, the Purchaser and the Monitor shall not be authorized to effect any discharge that would have the effect of releasing any Encumbrances against any property other than the Purchased Assets.

~~6.      **THIS COURT ORDERS AND DIRECTS** that the Purchaser shall pay the LC Purchase directly to the issuers of the Purchased LCs (the "**LC Issuers**"), which amount shall be held by the LC Issuers as cash collateral for the LCs, or as cash collateral for letters of credit issued to replace the Purchased LCs (the "**Replacement LCs**"), and applied or disbursed in accordance with the terms of the documentation governing the Purchased LCs or Replacement LCs, as applicable.~~

6.      ~~7.~~ **THIS COURT ORDERS AND DIRECTS** that the Cash Purchase Price (as adjusted pursuant to the Purchase Agreement~~, and, for the avoidance of doubt, net of the LC Purchase Price~~) shall be paid to the Monitor on Closing, and held in trust by the Monitor pending further order of the Court.

7.      ~~8.~~ **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Purchased Assets ~~(other than the LC Purchase Price)~~ shall stand in the place and stead of the Purchased Assets, in accordance with and based on the allocations set out in the Allocation Statement, without prejudice to a subsequent determination by the Court as to the quantum of any claims, distributions and priority in respect of proceeds, and that from and after the delivery of the Monitor's Certificate, all Claims and Encumbrances shall attach to the net proceeds from the sale of the Purchased Assets with the same priority as they had with respect to the Purchased Assets

immediately prior to the sale, as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

8.    9. **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

9.    10. **THIS COURT ORDERS** that the Monitor may rely on written notice from the Vendors and the Purchaser or their respective counsel regarding fulfillment of the conditions to Closing under the Purchase Agreement and shall incur no liability with respect to the delivery of the Monitor's Certificate.

10.    **THIS COURT ORDERS** that upon the issuance of the Monitor's Certificate, (a) each Permit Vendor and each Related Party Landlord shall be subject to the exclusive governance and control of the CRO and/or the Monitor, (b) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Permit Vendor shall be bankrupt, dissolved or otherwise wound-up prior to the earlier of (i) the date that all Permits are irrevocably transferred to the Purchaser, (ii) the date that the Purchaser advises the CRO and the Monitor in writing that it does not require the irrevocable transfer of the Permits to the Purchaser, and (iii) March 31, 2025, and (c) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Related Party Landlord shall be bankrupt, dissolved or otherwise wound-up prior to the date that the lease, access agreement or parking agreement to which the Related Party Landlord is a party is terminated.

11.    **THIS COURT ORDERS** that nothing in this Order, and nothing done by the Monitor or the CRO in carrying out their control of the Permit Vendors and Related Party Landlords as prescribed in Paragraph 10 hereof, shall result in, or be deemed to result in, the Monitor or CRO being an employer, successor employer, responsible person, operator, officer, director, employee, receiver, trustee, assignee, liquidator, administrator, legal representative, receiver-manager or agent of any Permit Vendor or

Related Party Landlord, in each case, within the meaning of any statute, regulation or rule of law, or equity, for any purpose whatsoever.

12.    **THIS COURT ORDERS** that, without limiting Paragraph 11 hereof, the Monitor and CRO shall not, as a result of this Order, or anything done pursuant to Paragraph 10 hereof, be deemed to occupy or to take control, care, charge, possession or management of any of the property of any Permit Vendor or Related Party Landlord that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination; provided however, if the Monitor or CRO is nevertheless found to be in possession of any property of any Permit Vendor or Related Party Landlord, then the Monitor and CRO, as applicable, shall be deemed to be a person who has been lawfully appointed to take, or has lawfully taken, possession or control of such property for the purposes of section 14.06(1.1)(c) of the BIA, and shall be entitled  to the benefits and protections in relation to the applicable Permit Vendor or Related Party Landlord and such property, as provided by section 14.06(2) of the BIA to a "trustee" in relation to an insolvent person and its property.

13.    **THIS COURT ORDERS** that, in addition to the rights and protections afforded to the Monitor and CRO under the CCAA, any order granted in these CCAA proceedings, as an officer of this Court or otherwise at law, the Monitor, CRO and their respective legal counsel shall continue to have the benefit of all of the indemnities, charges, protections and priorities as set out in the Second ARIO and any other Order of this Court and all such indemnities, charges, protections and priorities shall apply and extend to the Monitor and CRO in the fulfillment of their duties, carrying out the provisions of this Order and exercising any powers granted to them hereunder. Nothing in this Order shall derogate from the powers of the Monitor as provided in the CCAA, the Second ARIO and the other Orders of this Court in the CCAA proceedings. Without limiting the generality of the foregoing, in exercising any powers granted to

it hereunder: (a) the Monitor and CRO shall be entitled to rely on the Permit Vendors' and Related Party Landlords' books and records without independent investigation; and (b) the Monitor and CRO shall incur no liability or obligation as a result of exercising the powers granted to it under Paragraph 10 hereof, save and except for any gross negligence or wilful misconduct on their part, and the Monitor and CRO shall not have any liability with respect to any losses, claims, damages or liabilities, of any nature or kind in relation to the exercise of their powers under Paragraph 10 hereof, to any person from and after the date of this Order, save and except to the extent such losses, claims, damages or liabilities result from gross negligence or wilful misconduct on their part.

14.    11. **THIS COURT ORDERS** that, notwithstanding:

(a)    the pendency of these CCAA Proceedings;

(b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "**BIA**") in respect of any of the Vendors and any bankruptcy order issued pursuant to any such applications; and

(c)    any assignment in bankruptcy made in respect of any of the Vendors;

the vesting of the Purchased Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of the Vendors and shall not be void or voidable by creditors of the Vendors, nor shall it constitute nor be deemed to be a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

**SELLER NAME CHANGE AND TITLE OF PROCEEDINGS**

15.    12. **THIS COURT ORDERS AND DIRECTS** that, ~~immediately~~ following ~~Closing~~the issuance of the Monitor's Certificate, each of the Vendors and Purchaser are authorized and directed to take any and all steps prescribed by Section 5.4 of the Purchase Agreement, pursuant to the terms thereof (the "**Name Change**").

16.    13. **THIS COURT ORDERS** that following the Name Change, the name of the Vendors in the within title of proceedings shall be deleted and replaced with the new legal name of the Vendors, and any document filed in these CCAA Proceedings shall be filed using such revised title of proceedings.

**DISCLOSURE OF PERSONAL INFORMATION**

17.    14. **THIS COURT ORDERS** that, pursuant to clause 7(3)(c) of the *Personal Information Protection and Electronic Documents Act* (Canada), the Vendors and the Monitor are authorized and permitted to disclose and transfer to the Purchaser all human resources and payroll information in the Vendors' records pertaining to the Vendors' past and current employees. The Purchaser shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Vendors.

**GENERAL**

18.    15. **THIS COURT ORDERS AND DECLARES** that this Order shall have full force and effect in all provinces and territories in Canada.

19.    16. **THIS COURT ORDERS** that the Vendors, the Monitor or the Purchaser may apply to the Court as necessary to seek further orders and directions to give effect to this Order.

- 9 -

20.   17.  **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States to give effect to this Order and to assist the Pride Entities, the CRO, the Monitor and their agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Pride Entities, the CRO, and the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Pride Entities, the CRO, the Monitor and their agents in carrying out the terms of this Order.

21.   18.  **THIS COURT ORDERS** that each of the Pride Entities, the CRO, the Monitor, and the Purchaser be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

22.   19.  **THIS COURT ORDERS** that this Order is effective from the date that it is made and is enforceable without any need for entry and filing.

_____

# SCHEDULE "A"

## A.  APPLICANTS

**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*

- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

## C.  ADDITIONAL STAY PARTIES

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PERGOLA HOLDINGS, CORP.
- PRIDE GLOBAL INSURANCE COMPANY LTD.

**SCHEDULE "B"**

**Form of Monitor's Certificate**

Court File No.: CV-24-00717340-00CL

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. AND THOSE APPLICANTS LISTED ON SCHEDULE "A" HERETO (each, an "Applicant", and collectively, the "Applicants")**

Applicants

**MONITOR'S CERTIFICATE**

**RECITALS**

A.      Pursuant to an Order of the Court dated September ~~3~~24, 2024 (the "**Approval and Vesting Order**"), the Court approved ~~a~~an Amended and Restated Purchase Agreement dated as of ~~August 26~~September 22, 2024 (the "**Purchase Agreement**") between Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation, as vendors (collectively, the "**Vendors**"), and 1000927605 Ontario Inc., as purchaser (the "**Purchaser**"), and provided for the vesting in the Purchaser of the Vendor's right, title and interest in and to the Purchased Assets (the "**Transaction**"), which vesting is to be effective with respect to the Purchased Assets upon the Monitor's delivery to the Purchaser of a certificate confirming the Transaction has been completed to the satisfaction of the Monitor.

B.      Pursuant to the Approval and Vesting Order, the Monitor may rely on written notice from the Vendors and the Purchaser regarding fulfillment and/or waiver of conditions to closing under the Purchase Agreement.

- 2 -

C.      Capitalized terms used herein and not otherwise defined have the meanings given to such terms in the Approval and Vesting Order or the Purchase Agreement, as the case may be.

**THE MONITOR CERTIFIES** the following:

1.      The Purchaser has paid the Purchase Price for the Purchased Assets pursuant to the Purchase Agreement.

2.      The Vendors and the Purchaser have each delivered written notice to the Monitor that the conditions to Closing under the Purchase Agreement have been satisfied and/or waived, as applicable.

3.      The Transaction has been completed to the satisfaction of the Monitor.

4.      This Certificate was delivered by the Monitor at _____ **[TIME]** on _____ **[DATE]**.

**ERNST & YOUNG INC.,** ~~soley~~solely **in its capacity as Court-appointed Monitor of the Pride Entities and not in its personal capacity**

Per: _____
　　　　　Name:
　　　　　Title:

- 3 -

Court File No.: CV-24-00717340-00CL

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. ET AL. (each, an "Applicant", and collectively, the "Applicants")**

| | |
|---|---|
| | **ONTARIO**<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>PROCEEDING COMMENCED AT TORONTO |
| | **ORDER**<br>**(Approval and Vesting)** |
| | **THORNTON GROUT FINNIGAN LLP**<br>TD West Tower, Toronto-Dominion Centre<br>100 Wellington Street West, Suite 3200<br>Toronto, ON  M5K 1K7<br><br>**Leanne Williams (LSO #41877E)**<br>Tel:  (416) 304-0060 / Email:  lwilliams@tgf.ca<br><br>**Rachel Nicholson (LSO #68348V)**<br>Tel:  (416) 304-1153 / Email:  rnicholson@tgf.ca<br><br>**Puya Fesharaki (LSO #70588L)**<br>Tel:  (416) 304-7979 / Email:  pfesharaki@tgf.ca<br><br>**Ines Ferreira (LSO #81472A)**<br>Tel:  (416) 304-0461 / Email: iferreira@tgf.ca<br><br>Lawyers for the Applicants |

Document comparison by Workshare Compare on Monday, September 23, 2024 4:49:02 PM

| Input: | |
|---|---|
| Document 1 ID | netdocuments://1415-2696-3471/2 |
| Description | EY - Pride - PGL Approval and Vesting Order (Blakes Comments) |
| Document 2 ID | netdocuments://1415-2696-3471/4 |
| Description | EY - Pride - PGL Approval and Vesting Order (Blakes Comments) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|

|  | Count |
|---|---|
| Insertions | 41 |
| Deletions | 33 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 74 |

Court File No.:  CV-24-00717340-00CL

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC., et al.**

| | |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding Commenced at Toronto |
| | **THIRD SUPPLEMENT TO FOURTEENTH**<br>**REPORT OF THE MONITOR**<br>**Dated September 23, 2024** |
| | **BLAKE, CASSELS & GRAYDON LLP**<br>Barristers and Solicitors<br>199 Bay Street<br>Suite 4000, Commerce Court West<br>Toronto, Ontario M5L 1A9<br><br>**Pamela Huff**, LSO #27344V<br>Tel:      416-863-2958<br>Email:    pamela.huff@blakes.com<br><br>**Chris Burr**, LSO #55172H<br>Tel:      416-863-3261<br>Email:    chris.burr@blakes.com<br><br>**Kelly Bourassa**, LSO #43062R<br>Tel:      416-863-2421<br>Email:    kelly.bourassa@blakes.com<br><br>**Daniel Loberto**, LSO #79632Q<br>Tel:      416-863-2937<br>Email:    daniel.loberto@blakes.com<br><br>Lawyers for the Monitor |