# **Exhibit D**

PGL Sale Endorsement



SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

# ENDORSEMENT

**COURT FILE NO.: CV-24-00717340-00CL**                    **DATE: September 24, 2024**

**NO. ON LIST: 3/4**

**TITLE OF PROCEEDING:**

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC et al.**

**BEFORE:    JUSTICE OSBORNE**

## PARTICIPANT INFORMATION

**For Applicants:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Rachel Nicholson<br>Leanne Williams<br>Puya Fesharaki<br>Ines Ferreira | Counsel for the Applicants | rnicholson@tgf.ca<br>lwilliams@tgf.ca<br>pfeshraki@tgf.ca<br>iferreira@tgf.ca |
| Raj Sahni | Counsel for the Directors and Officers | sahnir@bennettjones.com |

**For Respondents:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
|  |  |  |

| Jeffrey Levine<br>Adam Maerov | Counsel for The Bank of Nova Scotia | Jeffrey.levine@mcmillan.ca<br>Adam.maerov@mcmillan.ca |
|---|---|---|
| Stuart Brotman<br>Daniel Richer | Counsel for The Lending Syndicate | sbrotman@fasken.com<br>dricher@fasken.com |

| Shaun Parsons | Counsel for TD Equipment Finance Canada | sparsons@airdberlis.com |
|---|---|---|
| Pam Huff<br>Kelly Bourassa<br>Chris Burr | Counsel for the Court-appointed Monitor | Chris.burr@blakes.com<br>Kelly.bourassa@blakes.com<br>Pam.huff@blakes.com |
| John Salmas | Counsel for Bank of Montreal | john.salmas@dentons.com |
| Blair McRadu<br>Harvey Chaiton | Counsel for Mitsubishi HC Capital | bmcradu@osler.com<br>harvey@chaitons.com |
| Lee Nicholson | Counsel for MOVETRUST and Boat Capital LP | leenicholson@stikeman.com |
| Elaine Gray<br>Mark Freake | Counsel for Daimler Truck Financial Services Canada Corporation and Daimler Truck Financial Services USA LLC | Elaine.gray@dentons.com<br>mark.freake@dentons.com |
| Tracy Sandler<br>Shawn Irving | Counsel for RBC as Financial Service Agent | tsandler@osler.com<br>sirving@osler.com |
| Caroline Descours | Counsel for Regions Bank Regions Equipment Finance Corporation and Regions Commercial Equipment Finance LLC | cdescours@goodmans.ca |
| Heather Meredith | Counsel for National Bank of Canada | hmeredith@mccarthy.ca |
| Caitlin Fell | Counsel for Versa Finance and Aviator Financial | cfell@reconllp.com |
| Alex MacFarlane<br>Nick Hollard | Counsel for RBC – formerly HSBC Bank Canada (Bilateral Lender) | amacfarlane@blg.com<br>NHollard@blg.com |
| Andrew Hatnay | Counsel for Certain Employees | ahatnay@kmlaw.ca |
| John Russo | Counsel for Meridian OneCap Credit Corp | jrusso@pallettvalo.com |
| Graham Phoenix | Counsel for Finloc 2000 Inc | gphoenix@ln.law |
| Trevor Courtis | Counsel for Bennington Financial Corp. | tcourtis@mccarthy.ca |
| Stewart Thom | Counsel for M&T Capital and Leasing Corporation and Webster Capital Finance, Inc., | sthom@torkinmanes.com |
| Monique Sassi | Counsel for Flagstar | msassi@cassels.com |
| Craig Colraine | Counsel for Paccar | mariane@bslsc.com |

**ENDORSEMENT OF JUSTICE OSBORNE:**

[1]   The Applicants seek approval of the PGL Going Concern Transaction. Given that the proposed purchasers include principals of the Applicants, the negotiation of the Transaction and proposed agreement, and carriage of this motion, was undertaken by the Court-appointed Monitor. I heard the motion yesterday.

[2]   Given the necessity for a decision on this motion immediately since it affects various next steps in this proceeding, this Endorsement is more summary in nature than it would otherwise be. Defined terms in this

Endorsement have the meaning given to them in the motion materials and in the Reports of the Court-appointed Monitor, unless otherwise stated.

[3] Pride Group Logistics ("PGL") is one of the business lines of the Pride Entities. It is operationally separate and distinct from the balance of the business of the Pride Entities. PGL provides logistics, brokerage and delivery services to customers through the PGL Entities. The fleet of PGL consists of approximately 1459 trucks and trailers of which approximately 1383 are owned directly by PGL. Approximately 1000 of those trucks are in active transit with customer orders at any given time. Approximately 85% of such loads include perishable products.

[4] The business of PGL is carried out by approximately 110 office staff (including subcontractors) to manage the logistics operations, and approximately 95 drivers. Its operations further include approximately 120 driver subcontractors through agencies, approximate 140 owner-operator drivers, and approximately 75 drivers through four partner carriers. In the aggregate, over 500 individuals earn their livelihood through PGL as office staff or drivers.

[5] By motion originally returnable on September 3, 2024, the Applicants sought an order approving the PGL Going Concern Transaction or, in the alternative, advice and directions with respect to the PGL Wind-Down Plan, including a mediation to be facilitated by The Honourable Thomas J. McEwen, in the event of a lack of consensus among the affected parties.

[6] For the reasons set out in my Endorsement of September 3, 2024, I directed the affected parties to participate in a mediation conducted by Mr. McEwen. That took place, with the good faith and active participation of the affected parties, on September 9 and 10, 2024. The parties advised me that while certain issues were narrowed, all matters separating the affected parties were not resolved. Of particular relevance is the fact that the parties were not in agreement with respect to PGL and the proposed Transaction, with the result that I heard the approval motion yesterday on a contested basis.

[7] Approval of the Transaction is recommended by the Monitor, and the CRO, and supported by the Applicants, the directors and officers of the Applicants (some of whom, to be clear, include principals of the proposed purchaser entities), the Employees and as further discussed below, certain financiers and lenders, including Daimler, Mitsubishi and Finloc.

[8] Approval of the Transaction is opposed by certain secured lenders to PGL, including TD, BNS and RBC as well as the Syndicate (DIP Lender).

[9] For the reasons that follow, the PGL Going Concern Transaction is approved.

[10] The law is well settled with respect to how a CCAA court should approach a requested sale. Section 36(3) of the *CCAA* grants to the Court express statutory jurisdiction to authorize and approve the sale or disposition of assets outside the ordinary course of business. It sets out six non-exhaustive factors that a Court must consider on a sale approval motion:

   a. whether the process leading to the proposed sale or disposition was reasonable in the circumstances;

   b. whether the monitor approved the process leading to the proposed sale or disposition;

    c. whether the monitor filed with the Court a report stating that in their opinion the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy;

    d. the extent to which the creditors were consulted;

    e. the effects of the proposed sale or disposition on the creditors and other interested parties; and

    f. whether the consideration to be received for the assets is reasonable and fair, taking into account their market value.

[11] Section 36 also provides that where the proposed sale or disposition is to a person who is related to the company, the court may, after considering the above factors, grant the approval only of two additional factors are satisfied:

    a. good faith efforts were made to sell or otherwise dispose of the assets to persons who are not related to the company; and

    b. the consideration to be received is superior to the consideration that would be received under any other offer made in accordance with the process leading to the proposed sale or disposition.

[12] Not surprisingly, these factors overlap to a very significant extent with the principles set out prior to the enactment of section 36(3) by the Court of Appeal for Ontario in *Royal Bank v. Soundair Corp.*, 1991, 4 OR (3d) 1 (ONCA), as observed by Pepall, J. in *Re CanWest Global Communications Corp.,* 2010 ONSC 2870 at para. 13. The *Soundair Principles*, as they are colloquially referred to, have been held to apply equally to a sale approval in a *CCAA* (as well as a receivership). They are:

    a. whether the receiver has made a sufficient effort to get the best price and has not acted improvidently;

    b. the interests of all parties;

    c. the efficacy and integrity of the process by which offers were obtained; and

    d. whether there has been unfairness in the working out of the process.

[13] The Supreme Court of Canada has been clear that in considering a sale approval, the Court should consider the appropriateness of the sale as against the overall purpose of the *CCAA*. In *Ted Leroy Trucking [Sentry Services] Ltd., Re,* the Supreme Court stated at para. 70:

> Appropriateness under the CCAA is assessed by incorporating whether the order sought advances the policy objectives underlying the CCAA. The question is whether the order will usefully further efforts to achieve the remedial purpose of the CCAA - avoiding the social and economic losses resulting from liquidation of an insolvent company.

[14] Where the s. 36 factors and the *Soundair Principles* have been met, the Court should uphold the business judgment of the Monitor as to the result of the sales process and should not lightly interfere with the exercise

the commercial and business judgment [of the Monitor] so long as the sale process was fair, reasonable, transparent and efficient: *Eddie Bauer of Canada Inc., (Re),* (2009) 57 CBR 95th) 241 at para. 22, *Sanjel Corp., Re*, 2016 ABQB 257 at para. 57 and *National Bank of Canada v. Global Fasteners & Clamps Ltd.*, 24 CBR (4th) 288 (ONSC) at para. 19. See also *Regal Constellation Hotel Ltd., Re*, 2004 CanLII 206 (ONCA) at para. 23.

[15]   Earlier in this proceeding, I granted the PGL Sale Process Order, pursuant to which the PGL Sale Process was conducted by the Monitor, and the Corporate Finance Group of EY, in consultation with the CRO. That is fully set out in the Affidavit of the CRO, Randall Benson, sworn August 6, 2024 and the 12th Report of the Monitor of the same date.[1] The objective of the PGL Sale Process Order was exactly what has now come about: the generation of an offer for PGL to continue as a going concern.

[16]   I pause to observe that none of the parties who object to the Transaction approval today opposed the PGL Sale Process Order, and nor did any party seek leave to appeal. On the contrary, they requested, and I ordered, the Monitor to consult with the key stakeholders of the PGL Entities (the PGL Equipment Financiers) and while there is not complete agreement today about the exact level of engagement and discussion, I am satisfied that the Monitor did consult with the key stakeholders as I directed.[2]

[17]   As described in the August 6, 2024 Benson affidavit, members of the Johal family expressed an interest in participating in the PGL Sale Process at the time it was commenced, with the result that (pursuant to paragraph four of the PGL Sale Process), no direct or indirect shareholder, Johal family member or senior management of the Pride Group was granted access to any of the Sale Proposals or Bids submitted.

[18]   In addition, a wall was established, such that the Pride Entities and their counsel did not have visibility or input into the conduct of the PGL Sale Process to ensure that it was independently conducted by the Monitor and the EY Corporate Finance Group with consultation with the CRO.

[19]   Only three bids were received. Following review, a bid submitted by 1000927605 Ontario Inc. for the purchase of substantially all of the assets of the PGL Entities to continue the business as a going concern for a total purchase price of $56,152,652.50 (subject to certain limited adjustments), was determined to be the successful bid and was reflected in the PGL Sale Agreement.[3]

[20]   The successful bid was the only viable going concern bid received. In the view of the Monitor, it represents the only path to a possible going concern outcome, the alternative to which is a wind-down of the business and a cessation of all operations.

[21]   It is also important to note that the full PGL Sale Agreement has been made available publicly and to all stakeholders (Appendix "D" to the 14th Report). To be clear, there have been no redactions whatsoever, in order to provide maximum transparency to all stakeholders. The key terms were also fully set out and commented on by the Monitor in the 14th Report (see, for example, paragraph 47). The Transaction is necessarily complex, given the nature of the logistics business and the circumstances. It includes, among many other terms, a Real Property Option, Lease Conditions, and Critical Required Contracts.

---

[1] The PGL Sale Process, its objective, the conduct of the Sale Process and the results are further discussed in the Eighth and Ninth Reports of the Monitor as well as the 12th report (particularly at paragraphs 25 – 35).

[2] See the 14th Report at paragraph 67 and the 12th Report at paragraphs 55 - 61.

[3] The Sale Process and the successful bidder are described in the Affidavit of the CRO, Randall Benson, sworn August 27, 2024 and the 14th Report of the Monitor dated August 28, 2024.

[22] The principal reasons for the Monitor's strong support of the PGL Going Concern Transaction are set out in the 14th Report and include these:

  a. it provides a higher recovery than a forced liquidation;

  b. it provides for the purchase of substantially all of the PGL Entities' assets, including trucks, trailers, inventory and accounts receivable (other than as are owing by non-acquired Pride Entities) on an as-is, where-is basis;

  c. the Purchase Price was the result of a thorough and comprehensive sales process, on Court-approved terms and conditions;

  d. the sale contemplates the assumption of substantially all employees, independent contractors and customer contracts;

  e. the closing and post-closing adjustments regarding assumed liabilities and other assets are limited and rational;

  f. the Real Estate Option appropriately balances the Purchaser's need for real property to conduct the PGL business, with the mortgagee's rights to consent to a sale of such real property pursuant to existing Court orders; and

  g. the alternative to the PGL Going Concern Transaction will be expensive, time-consuming, destructive to value and logistically very difficult to implement.

[23] To evaluate that alternative, and as fully set out in the 12th Report, the Monitor, in consultation with the CRO, engaged Hilco Global, who has significant experience in such wind-downs, to assist.

[24] On July 31, Hilco presented a proposal to coordinate the wind-down of the PGL Entities and monetize its truck and trailer assets if a going concern sale did not proceed. Neither the PGL Entities, nor the Johal family were involved with the preparation of that, save to the extent to which they provided necessary information or data. That initial Hilco plan was shared with PGL, Financiers and other significant creditors of the Pride Entities. I reference this fact as part of the engagement by the Monitor with those stakeholders, recognizing as I do at those stakeholders were not supportive of that initial wind-down plan.

[25] Following those discussions, a revised wind-down proposal was prepared by Hilco working with the Monitor and the CRO, together with a budget that provides for the liquidity requirements to execute an orderly wind-down and turnover of collateral. The Financiers were not supportive of the revised plan either. A summary of its key components is set out at paragraph 77 of the 14th Report. A comparison of that to the PGL Going Concern Transaction is also set out in the 14th Report beginning at paragraph 78.

[26] The relevant chronology leading to the motion heard yesterday did not end there, as is set out in the Third Supplement to the 14th Report dated September 23, 2024. Following the September 3, 2024 hearing, and given the concerns raised by the PGL Financiers at that hearing regarding the information provided to them in respect of the PGL Entities, the Monitor contacted each of them (and the professional services firm they had proposed to be involved) to provide access to the PGL virtual data room upon the signing of a non-disclosure agreement. That would provide them with substantially all of the relevant information to which

the Monitor had access. Two of those Financiers, RBC and Daimler, executed the NDAs and were immediately provided access.

[27] As set out in the Third Supplement to the 14th Report, the mediation referred to above resulted in a number of Financiers and other stakeholders expressing concerns with the proposed PGL Sale Agreement. While the without-prejudice positions of all parties remain confidential and appropriately so, they resulted in a number of amendments to the PGL Sale Agreement in order to address those concerns. Those were captured in the A&R PGL Sale Agreement.[4]

[28] Those amendments include:

    a. an increase in the Purchase Price by $2 million, all of which has been allocated the Vehicles. To be clear, no new Purchased Assets have been added, with the result that the net effect of the increase in the Purchase Price is a net increase in recovery to the equipment Financiers of PGL. In the view of the Monitor, this represents a material improvement to the PGL Sale Agreement from the perspective of lender recoveries;

    b. changes to the Real Estate Option and Approved Lease Terms (as defined in the materials). Financiers with an interest in the real property that is subject to the Option and/or the real property to be leased to the Purchaser expressed to the Monitor concerns about the possible prejudice to their interests and in particular, their concern that the option and/or lease might prejudice their desire to have the property sold as soon as possible.

    I recognize that not all of the amendments requested by the mortgagees were accepted, but a number of them were, as fully set out in the Third Supplement at paragraphs 17 – 25. The Monitor submits that the amendments made now substantially address the concerns of the mortgagees directed towards the possible interference with the sale of the affected properties, each of which is presently listed for sale, consistent with the larger wind-down plan of the Pride Entities generally. There are practical concerns, including the fact that any property sold must be vacated of Pride Entity Vehicles;

    c. the PGL Sale Agreement required as a condition of closing in favour of the Purchaser that all permits be transferred or assigned to the Purchaser. The permits are largely issued through the Ministry of Transportation, such that satisfaction of the condition was a closing risk outside the control of the parties.

    The Purchaser has now advised the Monitor that it will agree to close without the assignment of the permits, in accordance with a work-around arrangement, such that the Permit Vendors enter into a transition services agreement to allow the Purchaser to continue to enjoy the benefit of the permits until they can be formally assigned or new permits can be obtained. Concurrently with all of that, the Purchasers engaged with the provincial government and the office of the Minister of Transportation in particular, with a view to expediting the assignment of the permits. The PGL Sale Agreement has been amended accordingly;

    d. the PGL Sale Agreement originally included five Critical Required Contracts, the assignment of which to the Purchaser was a condition of closing. The Purchaser has now agreed to reduce those from five to three. The Monitor has engaged with the affected parties in respect of each of those

---

[4] A blackline version of the A&R PGL Sale Agreement, marked as against the executed version of the original agreement attached to the 14th Report as Appendix "D" was attached to the Third Supplement as Appendix "A", to assist in a review of the amendments.

      to further address them and reduce closing risk (the lease of the Dixie Road Property, the lease of the Cornwall Property, and the Finloc Leases). Finloc supports approval of the Transaction, and submits that the alternative is, in the submission of counsel, "non-existent" in that, among other things, would have to repossess trailers which it lacks the physical and logistical ability to do.

   e.  to address the concern of the PGL Financiers about closing risk and uncertainty of the Transaction, they understandably want the closing to occur as soon as possible. The A&R PGL Sale Agreement now includes a defined Outside Date of October 16, 2024 or such later date that is two business days after the date on which, and the Purchaser may agree in writing, or as the court may direct.

      The Financiers are still not satisfied with this, since the Monitor and Purchaser may extend the date if they agree. In my view, however, the introduction of the Outside Date is appropriate and reasonable. The Monitor is motivated just as are the Financiers have the Transaction close as soon as possible. However, the Transaction is complex, and it may very well be that events arise that require a modest or very brief extension. In my view, that does not undermine the overall positive attributes and benefits of the Transaction. Moreover, there is an additional "safety valve" in that the agreement provides that the Court may direct an Outside Date and if necessary, advice and directions can be sought and the Court can determine whether any extension then proposed is reasonable and should be granted; and

   f.  in the original PGL Sale Agreement, $4 million of the aggregate Purchase Price was allocated to certain letters of credit (the Purchased LCs). Those letters of credit are existing facilities maintained by the PGL entities in the ordinary course of business. That amount, however, was not payable to the Vendors or Monitor on Closing, but rather was payable to the issuers of the Purchased LCs to be used as Cash Collateral to maintain the letters of credit in good standing.

      The amendments provide that the Purchased LCs and the LC Purchase Price are deleted from the A&R PGL Sale Agreement, and the Purchaser will address the necessary letters of credit separately from the Transaction. There were extensive submissions made at the hearing of the motion about whether and the extent to which this change represented an improvement in the terms at all. I accept the view of the Monitor that the change is neutral since the LC Purchase Price was never payable to the Vendors or the Monitor and never constituted proceeds of sale to be distributed to creditors in any event.

[29]  In the main, I am satisfied that granting the relief sought will preserve enterprise value, customer contracts and approximately 500 jobs for the employees and those independent contractors whose livelihood and work depends upon the PGL Entities. Moreover, it will avoid the significant disorder, disruption that will inevitably be associated with a shutdown of the business of the PGL Entities. As further described below, those increased costs will be borne not only by the lenders who oppose the Transaction on this motion, but by other lenders and stakeholders in the Pride Entities beyond the PGL Entities who will inevitably but materially be prejudiced by an abrupt shutdown of the PGL Entities.

[30]  I am also satisfied that the Sale Process was conducted properly, fairly and transparently, in accordance with the earlier order made. There is no evidence upon which I can conclude that the Sale Process lacked integrity.

[31]  The position of the objecting Financiers can be summarized, bluntly but fundamentally, as this: they submit that they represent, in the aggregate, a clear majority in dollar value of the secured creditors of the PGL Entities, such that they are the most economically affected stakeholders, and they strongly prefer a wind-down of PGL and its operations as opposed to a going concern outcome.

[32] They candidly submit that all of the jobs will be lost as a result, but that the number of individuals who are employees as opposed to independent contractors is much less than 500, and independent contractors accept the risk by agreeing to work as such that they may lose their livelihoods.

[33] The objecting Financiers submit that the allocated recoveries as projected by the Monitor to be realized by them if the PGL Going Concern Transaction is approved (which are certainly less than 100%), are sufficiently unattractive that they would prefer a shutdown and the ability to sell the trucks and trailers themselves.

[34] I have considered all of these points, and others also raised by these parties.

[35] With respect to the loss of jobs, the submission that some of the affected individuals who will indisputably be put out of work and suffer the loss of their livelihood are independent contractors rather than employees is, in these particular circumstances, a distinction without a difference. The evidence is that at least 73 office staff and 95 drivers are employees, in addition to which PGL has contractual relationships with 37 office staff, 120 driver subcontractors through agencies, 75 drivers through four partner carriers, and 140 owner/operator drivers.[5]

[36] The evidence is also that all of these contractors work solely for the Pride Group upon which they rely for their and their families' income.[6] First, even if I were to accept the submission about the difference between employees and contractors (which I do not, in the circumstances), there are still almost 200 employees. Second, the evidence is also to the effect that a number of employees and contractors work alongside spouses and other relatives at PGL, such that a shutdown and loss of jobs would have a magnified effect on those families and their aggregate income.[7] Third, the maximization of the chances that jobs will be maintained is an important (though by no means exclusive) factor to be considered.

[37] Finally, I accept the submission of the Monitor that it would be recommending approval of the Transaction even if there were no employees, given the attendant chaos and instability in respect of all of the Pride Entities and increased costs that would result from a shutdown of operations.

[38] I also accept the submission of the Financiers that their projected recoveries are limited. Again, however, the proposed Transaction is a result of a Sale Process that yielded only one going concern bid.

[39] While I further accept the submission of the Financiers that they would prefer to "take their chances" that they could realize increased recoveries through implementation of their own proposed wind-down plan, that proposed plan itself, would have significant costs, many of which are undefined. It was provided to the Monitor only the day before this motion was argued. It contemplates significant and continuing work to be undertaken by the Monitor and the CRO.

[40] Moreover, it necessarily requires the continued cooperation and assistance of the very employees and contractors who are currently operating the business and whose jobs will be eliminated. It is challenging to accept the proposition that those individuals will be more incentivized to implement the wind-down of PGL with the consequent loss of their own jobs than they would be to maximize the chances of a going concern outcome to protect those same jobs.

---

[5] Affidavit of Aarush Dua sworn September 23, 2024, para. 6.
[6] Affidavit of Aarush Dua sworn September 23, 2024, para. 6.
[7] Affidavit of Aarush Dua sworn September 23, 2024, para. 8.

[41]  The Bank of Nova Scotia relies in part on an affidavit of Mr. Dan Einwechter affirmed September 22, 2024 which includes as exhibits correspondence from himself and his colleague, Mr. Jim Peeples. They are the Chair and President respectively, of Challenger Motor Freight Inc., a logistics and freight forwarding company in the same business as PGL.

[42]  To the extent that this evidence is admissible as expert opinion evidence at all, it does not change my fundamental conclusion about the factors I have weighed to the best of my ability. Challenger is a direct competitor of PGL. Mr. Einwechter states in his own letter at Exhibit "B" that if PGL does not continue as a going concern, the business will be picked up by others in the industry: "the drivers will be hired, the freight will be moved, and services will continue, hopefully by bona fide carriers". Even leaving aside the inference that PGL is not a bona fide carrier, this statement is really an expression of interest from a direct competitor that it and others will attempt to get the business of PGL. That is a reasonable objective of such a competitor, but particularly absent any commitment for example, to hire any of the PGL employees or contractors (which they obviously are not obligated to do), it is of limited assistance.

[43]  In all, I am not persuaded, based on the record, that this alternative plan is more likely to yield higher recoveries.

[44]  I pause to observe that, as noted above, not all Financiers oppose the approval of the going concern Transaction: National Bank, while initially opposed, now supports approval (but requests certain language in an endorsement), and Daimler, a key and significant Financier along with Mitsubishi, now supports the relief sought.[8]

[45]  Finally in this regard, I accept the submission of the Monitor (supported by the CRO) that a wind-down of the PGL business would have corollary effects on the business of the balance of the Pride Entities, with materially increased costs, instability and uncertainty.

[46]  In particular, the balance of the businesses of the Pride Entities, which are now (regrettably) themselves going to be wound down since there is no viable going concern outcome for those businesses and no funding to support continued operations (the DIP having been effectively fully drawn, and no replacement funding being available), are projected to have a $40 million cost associated with that wind-down. There is general agreement that the costs will be in that order of magnitude. Whatever the exact number, it will certainly be very material, given the complexity of the business and the work involved to shut it down.

[47]  That cost estimate is based on an aggressive timetable to complete the wind-down as quickly as reasonably possible. The Monitor submits, and I accept, that the length of time required to implement a wind-down, and therefore the associated costs, will both increase if there is no going concern outcome for PGL. Approval of the going concern Transaction is a premise upon which the budget and timetable for the wind-down of the other Pride Entities is based.

[48]  To be clear, I am satisfied that all of the common law on statutory requirements for the approval of a sale of assets, including those specifically related to the sale to a related person, have been met.

---

[8] National Bank requested that the Monitor be required to remove the trucks by October 31, that any approval be without prejudice to a future possible receivership application, and that a date be fixed now for a lift stay motion and that receivership application. I am not imposing these conditions and therefore do not rely on the support of National Bank in approving the Transaction. I do observe, however, that the Monitor fully appreciates the position of National Bank and will continue to cooperate and liaise with that party (as with all others) to address concerns.

[49] The PGL Sale Process was reasonable. As noted above, it was approved by this Court without objection by the Financiers. I am satisfied that the Sale Process undertaken was completely consistent with the terms of that approval. The Monitor coordinated an extensive marketing process. Over 70 third parties were canvassed about the opportunity, which was well known in the market in any event. The operations of the PGL entities is unique and specialized, with the result that the Monitor is of the view that the number of interested parties canvassed was reasonable in the circumstances.

[50] The Johal family and the Pride Entities with which they are related and affiliated, were specifically and intentionally excluded from the process and the evaluation of bids (other than to provide background data and information, as was appropriate - they were the only source of such information). Counsel to the Applicants were also excluded for the same reasons.

[51] The Monitor has issued its Reports, setting out its reasons for supporting the PGL Going Concern Transaction as the best available option, and the only viable alternative to a wind-down.

[52] The PGL Financiers were consulted. They were given a status update immediately following the bid submission deadline of June 19, 2024 and received a summary of all bids received. Consultation with the Monitor and CRO has continued since that time, including after execution of the PGL Sale Agreement. Again, I recognize that some financiers remain dissatisfied with the level and frequency of those consultations.

[53] However, I am satisfied that they were adequate, and I accept the submission of the Monitor that the consultation was reasonable in the circumstances, taking into account the number of affected lenders (more than 13); the fact that the lenders are by no means a homogeneous group in that many of their interests are, as the Monitor observed, "competing and incompatible"; the complexity of the business of the PGL Group; the number of owned and leased assets that have to be accounted for on a lender-by-lender basis; the extremely limited liquidity of the PGL Group and the Pride Group more generally; and the fact that a number of affected lenders objected to the PGL Going Concern Sale before they were even presented with a recovery analysis by the Monitor.

[54] The last point above is significant in the particular circumstances of this case. Emotions are high, issues are hotly contested (and they are arising literally on a daily basis), and it is clear to this Court that there remains significant animus on the part of many stakeholders towards the principals of the Pride Entities. It is clear to me that many of the objections to the proposed Transaction might not be so vehemently held but for the fact those principals are involved. As noted above, I am very satisfied that the steps the Monitor took, together with the CRO, to ensure the integrity of the process and meet the additional s.36 factors applicable in such circumstances, were appropriate, reasonable, and that they fully addressed any concern arising out of the fact that those principals were involved.

[55] I am also satisfied the good faith efforts were made to sell or otherwise dispose of the PGL assets to persons not related to the company. That is clear from the Sale Process described in the materials and summarized above: the Monitor contacted 71 interested parties, 24 of those executed non-disclosure agreements, and two parties conducted management meetings and site visits.

[56] The Monitor engaged with Hilco (and the CRO) to evaluate the proposed Transaction as against the alternative of a wind-down and concluded that the proposed Transaction represented higher recoveries in the preservation of approximately 500 jobs.

[57]   The significant costs of the alternative – a wind-down - together with the attendant chaos, is all avoided. All of that is consistent with the purpose of the *CCAA* to permit the debtor to continue to carry on business and, where possible, avoid the social and economic costs of liquidating its assets: *Century Services Inc. v. Canada (Attorney General),* 2010 SCC 60 (CanLII), [2010] 3 SCR 379 at para. 15.

[58]   The practical but inevitable reality is that, following a Court-approved open Sale Process, the market has spoken. While far from perfect, the Transaction represents the only going concern option available, and is, by far, a bid that is superior to the others received (of which there were only two), neither of which provided for a going concern outcome. All of this is occurring in real time, in what is conceded by all parties to be a very challenging environment currently in the trucking and logistics businesses.

[59]   The PGL Going Concern Transaction is approved.

[60]   Order to go in accordance with this Endorsement.

*Osborne, J.*