# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>Pride Group Holdings Inc., *et al.*[1]<br><br>Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 24-10632 (CTG)<br><br>(Jointly Administered)<br><br>**Hearing Date:**<br>November 12, 2024 at 1:00 p.m. (ET)<br><br>**Objection Deadline:**<br>November 5, 2024 at 4:00 p.m. (ET) |

## MOTION OF THE FOREIGN REPRESENTATIVE
## FOR ENTRY OF AN ORDER (I) ENFORCING THE
## WIND-DOWN ORDERS AND (II) GRANTING RELATED RELIEF

Randall Benson, solely in his capacity as the duly authorized foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors"),[2] in the Canadian proceedings (the "CCAA Proceedings") commenced under the Companies' Creditors Arrangement Act (the "CCAA"), pending before the Ontario Superior Court of Justice (Commercial List) in Ontario, Canada, Court File No. CV-24-00717340-00CL (the "Canadian Court"), respectfully submits this motion (the "Motion") for entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A**, granting relief under section 1521(a)(7) of Title 11 of the United States Code (the "Bankruptcy Code").

---

[1] The last four digits of Debtor Pride Group Holdings Inc.'s Canadian business number are 6399. Due to the large number of debtors in these chapter 15 cases, a complete list of the debtor entities and the last four digits of their unique identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing agent at https://dm.epiq11.com/pridegroup. The Debtors' service address for the purposes of these chapter 15 cases is 1450 Meyerside, Suite 401, Mississauga, Ontario, L5T 2N5, Canada.

[2] The term "Debtors" does not include: 1000089137 Ontario Inc., DVP Holdings, Corp., Parker Global Enterprises, Inc., Parker Transport Co., and Arnold Transportation Services, Inc. (collectively, the "Arnold Entities").

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

2. Venue is proper in this Court and this District pursuant to 28 U.S.C. § 1410.

3. The Foreign Representative, in his capacity as authorized foreign representative, has properly commenced these chapter 15 cases pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code and rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4. The statutory predicates for the relief requested herein are section 105(a) and 1521 of the Bankruptcy Code.

## BACKGROUND

**I.    Commencement of the CCAA Proceedings and the Chapter 15 Cases**

5. The Debtors and certain of their non-Debtor affiliates (collectively, the "Pride Group")[3] operate a trucking and logistics conglomerate based in Canada with operations in Canada and the United States. The Pride Group's businesses are managed from their headquarters in Mississauga, Ontario, and they maintain facilities and operations in both Canada and the United States. The Pride Group owns substantial assets located within the territorial jurisdiction of the

---

[3] As used herein, "Pride Group" includes: (i) each of the "Applicants" listed in Schedule "A" to the PGL Vesting Order (as defined below); (ii) Pride Truck Sales L.P., TPine Leasing Capital L.P., and Sweet Home Hospitality L.P. ((i) and (ii) together, the "Pride Entities"); and (iii) Block 6 Holding Inc., 2500819 Ontario Inc., Pergola Holdings, Corp., and Pride Global Insurance Company Ltd. Further, as noted in the Recognition Order (as defined below), the Foreign Representative is not seeking relief with respect to the Arnold Entities. As a result, the terms "Pride Group" and "Pride Entities" do not include the Arnold Entities.

United States, including, among other things, real estate properties, bank accounts, equipment, and trucks.

6. On March 27, 2024, the Debtors commenced the CCAA Proceedings in the Canadian Court, and the Canadian Court issued the initial order on the following day (the "Initial Order") authorizing, among other things, Randall Benson of RC Benson Consulting Inc. to act as the Foreign Representative and file these chapter 15 cases (collectively, the "Chapter 15 Cases").

7. On April 1, 2024 (the "Petition Date"), and on April 15, 2024, the Foreign Representative filed petitions for the Pride Group's Canadian and U.S. operating companies, single-asset real estate holding companies, and non-real estate holding companies (the "Petitions"), thereby commencing the Debtors' Chapter 15 Cases. Also on the Petition Date, the Foreign Representative filed the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 2] (the "Verified Petition") seeking, among other things, recognition of the CCAA Proceedings as "foreign main proceedings" under section 1517 of the Bankruptcy Code and certain related relief.

8. On April 23, 2024, the Debtors filed an amended Verified Petition [D.I. 121] (the "Amended Verified Petition, and together with the Petitions, the "Chapter 15 Petitions") seeking, among other things, recognition of the CCAA Proceedings as "foreign main proceedings" under section 1517 of the Bankruptcy Code, enforcement of the A&R Initial Order in the United States on a final basis, and related relief.

9. On April 30, 2024, the Arnold Entities (except for 1000089137 Ontario Inc.) filed cases under chapter 7 of the Bankruptcy Code pending in the United States Bankruptcy Court for

the District of Delaware.[4] As described in the Amended Verified Petition, the Foreign Representative is not seeking further relief with respect to the Arnold Entities in these Chapter 15 Cases.

10. On May 2, 2024, the Court entered an order [D.I. 152] (the "Recognition Order") granting recognition of the CCAA Proceedings and the related relief sought in the Chapter 15 Petitions, including, among other things, extending the relief granted in the Court's *Order Granting Provisional Relief in Connection with Debtor in Possession Financing and Certain Protocols Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code* [D.I. 110] (the "Second Provisional Relief Order") on a final basis.

## II. Global Wind Down of the Pride Entities' Operations

11. As set forth in the (i) Fourteenth Report of the Monitor (including the supplements thereto), dated August 28, 2024, (ii) Fifteenth Report of the Monitor, dated September 22, 2024, and (iii) Sixteenth Report of the Monitor, dated October 9, 2024 (collectively, the "Monitor's Reports"), which are attached hereto as **Exhibits B-D**, a going concern restructuring plan for the Pride Entities is no longer a feasible option, other than the going concern sale of the PGL Entities,[5] given the lack of support from the Pride Entities' stakeholders. Accordingly, Ernst & Young Inc., the Debtors'

---

[4] *See In re Arnold Transportation Services, Inc.*, Case No. 24-10928 (CTG) (Bankr. D. Del. 2024); *In re DVP Holdings Corp.*, Case No. 24-10931 (CTG) (Bankr. D. Del. 2024); *In re Parker Global Enterprises, Inc.*, Case No. 24-10929 (CTG) (Bankr. D. Del. 2024); *In re Parker Transport Co.*, Case No. 24-10930 (CTG) (Bankr. D. Del. 2024).

[5] As used herein, the "PGL Entities" include Debtors Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., 12944154 Canada Inc. and 933 Helena Holdings Inc., and non-Debtor Pride Group Insurance Company Ltd. On October 3, 2024, the Canadian Court granted an order (the "PGL Vesting Order") approving the sale of the PGL Entities' business as a going concern to 1000927605 Ontario Inc (the "PGL Sale"). This Court subsequently entered an order on October 10, 2024 (the "PGL Enforcement Order") [D.I. 276] enforcing the PGL Vesting Order in the territorial jurisdiction of the United States. Further, the Foreign Representative filed a notice of the PGL Sale [D.I. 272] in compliance with the Court-approved sale procedures [D.I. 197] and, having received no objections thereto by the applicable deadline, the Debtors are authorized to consummate the PGL Sale without further order from this Court. The PGL Sale has not yet closed as of the date of this Motion.

Canadian Court-appointed monitor (in such capacity, the "Monitor") and the Debtors' chief restructuring officer (the "CRO") have directed their efforts towards developing a centralized, coordinated, and controlled wind-down of the Pride Entities' remaining businesses and assets.

12. The CRO, in consultation with the Monitor, has engaged extensively with the Pride Entities' key stakeholders to develop a centralized wind-down plan for the Pride Entities, and obtain the funding required to complete the CCAA proceedings and these Chapter 15 Cases.

13. As detailed in the Monitor's Reports, the Monitor believes that a centralized wind-down plan is imperative given the disorder that would result from secured creditors pursuing piecemeal enforcement actions against the vast number of vehicles in the Pride Entities' fleet across North America, as well as thousands of leased vehicles (most of which are constantly in transit). Any form of wind down would also require interim cash to fund the necessary payroll, transition costs, transfer of assets to the applicable secured parties, and administration costs. Without this funding, employees would be immediately terminated, customers would be stranded, committed and in-progress sales would be abandoned, leases would not be serviced, delinquency rates would increase, and many vehicles would be abandoned without the critical infrastructure needed to support their retrieval or to determine competing claims against the assets of the Pride Entities. This would make it challenging, if not impossible, to turn-over the Pride Entities' assets to their secured creditors in an orderly fashion.

14. As further described in the Monitor's Reports, the DIP Facility (as defined in Monitor's Reports) matured and was fully drawn as of July 31, 2024, and the Pride Entities have been unable to obtain alternative financing from external sources. To address ordinary course working capital and other general corporate needs, the Pride Entities sought and obtained orders from the Canadian Court authorizing the Pride Entities to retain and use amounts that the Pride

Entities received through lease payments or pursuant to enforcement steps taken with respect to defaulted leases (the "Deferred Payments") from and after July 15, 2024 until September 30, 2024. The Pride Entities' use of the Deferred Payments had been their only source of working capital and operational funding between August 1, 2024 through September 30, 2024, while the parties worked to develop a centralized wind-down plan.

15. The Pride Entities initially filed a motion in the CCAA Proceedings on September 24, 2024, seeking an order approving a proposed wind-down plan and funding and allocation of the Liquidity Requirement (as defined below) by and among the Pride Entities' secured creditors (as proposed, the "Initial Wind-Down and Funding Order"). Following a contested hearing before the Canadian Court on September 26, 2024, at which several affected parties appeared and asserted objections, the Canadian Court issued an Endorsement on September 30, 2024, which is attached hereto as **Exhibit E** (the "September 30 Endorsement"), setting forth its reasons for declining to approve that Initial Wind Down and Funding Order, including that the Canadian Court did not have jurisdiction to compel certain of the Pride Entities' securitization creditors to advance new money to fund the wind-down plan without their consent. The Canadian Court noted in the September 30 Endorsement that the Pride Entities' continued engagement with their stakeholders culminated in a consensual resolution that the Pride Entities (other than the PGL Entities) need to be wound-down and that approximately CAD$40 million (the "Liquidity Requirement") is necessary to fund the wind-down of their operations.

16. Following receipt of the September 30 Endorsement, the Pride Entities, in consultation with the Monitor and the CRO, continued to engage with their key stakeholders to develop a workable wind-down plan. The parties' efforts ultimately culminated in obtaining the Wind-Down and Turn-Over Order (defined below) from the Canadian Court, which provides a

mechanism for an orderly wind-down of the Pride Entities' operations, the turnover of the Pride Entities' remaining assets to their secured creditors, and funding for the foregoing.

## III. The Wind-Down and Turn-Over Order[6]

17. On September 24, 2024, the Pride Entities filed the Motion Approving Wind-Down Funding Contribution, Turn-Over, Stay Extension and KERP (the "<u>Wind-Down and Turn-Over Motion</u>") in the CCAA Proceedings seeking an order (the "<u>Wind-Down and Turn-Over Order</u>") approving the implementation of a centralized, coordinated, and controlled wind-down of the Pride Entities' remaining assets, other than in respect of the PGL Entities, including, among other things: (i) authorizing the sale of Inventory to fund the cost of the Pride Entities' wind-down plan (the "<u>Wind-Down Plan</u>"), except where a Recourse Lender has (a) satisfied its Liquidity Contribution (as defined below) in accordance with the terms of the Wind-Down and Turn-Over Order, if it elects to do so, and (b) retrieved its Inventory by the applicable Turn-Over Outside Dates; and (ii) terminating the Governance Protocol in respect of Remaining Assets turned over to Recourse Lenders. On October 10, 2024, the Canadian Court granted the Wind-Down and Turn-Over Order, which is attached hereto as **Exhibit F**.

18. A summary of the key terms of the relief granted in the Wind-Down and Turn-Over Order is as follows:

| Key Terms of the Wind-Down and Turn-Over Order | |
|---|---|
| **Wind-Down Cash Flow Forecast and Wind-Down Plan** | • The Wind-Down Cash Forecast and the Wind-Down Plan, each as detailed in the Monitor's Reports, are approved, subject to such amendments as the Pride Entities, as directed by the CRO in consultation with the Monitor, may deem necessary. |
| **Mechanics of the Liquidity Contribution Alternative** | • Each Recourse Lender shall be permitted three business days from the date of the Wind-Down and |

---

[6] Capitalized terms used in this section but not otherwise defined herein have the meanings ascribed to them in the Wind-Down and Turn-Over Order.

| | |
|---|---|
| | Turn-Over Order, or such later date agreed among the applicable Recourse Lender, the CRO and the Monitor (the "<u>Liquidity Contribution Deadline</u>"), to elect to satisfy its proportionate share of the Liquidity Requirement (its "<u>Liquidity Contribution</u>") in full to the Monitor (subject to applicable set-offs).  Upon receipt of such payment, each Recourse Lender shall be entitled to receive all of the Remaining Assets in respect of which it asserts an interest. |
| **Mechanics of Inventory Sales and Transfer of Leasebooks** | • The Pride Entities are permitted to sell Inventory through their agent, Nations Capital, LLC ("<u>NCI</u>"), including Multiple Collateral Vehicles (which only includes those Multiple Collateral Vehicles in which a Recourse Lender and not any Securitization Party has asserted an interest) other than (i) Inventory in respect of which the Monitor has received a Liquidity Contribution by the Liquidity Contribution Deadline, and (ii) Inventory which has been retrieved by the Recourse Lender by the applicable Turn Over Outside Date.<br><br>• NCI will conduct sales through an orderly sale process utilizing its existing sale channels and relationships through private treaty sales. Any net sale proceeds will first be applied to any unpaid portion of the Liquidity Contribution by the applicable Recourse Lender, with any excess to be distributed to the applicable Recourse Lender entitled to such amounts.<br><br>• All Leasebooks shall be transferred to the Recourse Lenders following payment of the Liquidity Contribution by the applicable Turn-Over Outside Date. In the case of Recourse Lenders that have not elected to pay their Liquidity Contribution, the Pride Entities shall be permitted to apply the Leasebooks against the applicable Recourse Lenders' Liquidity Contribution, as well as the sale of Inventory. |
| **Multiple Collateral Vehicles and Priority Collateral Vehicles** | • Recourse Lenders will be permitted to reach a settlement with any other Recourse Lender in respect of any Multiple Collateral Vehicles by the MCV Resolution Outside Date, and the Recourse Lender that has been determined by such settlement to have an interest in such vehicle may take possession of same by the relevant Turn-Over Outside Date, |

|  | provided it has satisfied its Liquidity Contribution by the applicable deadline. |
|---|---|
|  | • Each Recourse Lender that has satisfied its Liquidity Contribution by the Liquidity Contribution Deadline may take possession of all PCVs in which such Recourse Lender has asserted an interest, subject to the future determination of entitlement to the PCVs. |
|  | • The Pride Entities will be permitted to monetize, through NCI, any and all other Multiple Collateral Vehicles and PCVs. |

### IV. KERP Order[7]

19. Given the contemplated wind-down of the Pride Entities' operations, the CCAA proceedings and these Chapter 15 Cases, there is significantly reduced incentive for certain key employees of the Pride Entities (the "Key Personnel") to remain employed by the Pride Entities. The CRO and the Monitor require the continued aid and contribution of the Key Personnel because their knowledge and skillsets are imperative to complete the next steps in the Wind-Down Plan, including the complicated proposed turn-over of assets. The Key Personnel have significant experience and specialized expertise that cannot be easily replicated or replaced. Retaining these Key Personnel would also be difficult because they will likely have more certain employment opportunities and will be faced with a significantly increased workload during the remainder of the CCAA Proceedings and these Chapter 15 Cases.

20. Accordingly, the Wind-Down and Turn-Over Motion also sought approval by the Canadian Court of the KERP, in the maximum amount of CAD$1.8 million, to be held by the Monitor in trust, until such time as the Key Personnel (and such other essential employees, who are not Key Personnel, subject to the approval of the CRO and the Monitor) become entitled to

---

[7] Capitalized terms used in this section but not otherwise defined herein have the meanings ascribed to them in the KERP Order.

9

receive their payments, at which time the Monitor will release sufficient funds to the relevant Pride Entity to make such payments in accordance with the terms and conditions of the KERP. The Canadian Court granted the foregoing relief on October 10, 2024 in the order attached hereto as **Exhibit G** (the "KERP Order").

### V. Collateral Management Order and Sale Approval Order[8]

21. On August 2, 2024, the Royal Bank of Canada, in its capacity as administrative agent (the "Administrative Agent") for and on behalf of the Syndicate Lenders under the Syndicated Facility (as defined in the Recognition Order), filed a motion (the "Collateral Management Motion") in the CCAA Proceedings seeking an order (the "Collateral Management Order") for the appointment of Alvarez & Marsal Canada Inc. as manager (in such capacity as an officer of the Canadian Court, the "Manager") of those assets, undertakings and properties of the Pride Entities, including all proceeds thereof, included in the definition of "Management Property" in the Collateral Management Order.

22. The Collateral Management Order provides the Manager with, among other things, the necessary powers to (i) take possession of and exercise control over the Management Property and any and all proceeds, receipts and disbursements arising out of or from the Management Property, and (ii) apply for any vesting order or other orders necessary to convey the Management Property or any part or parts thereof to a purchaser or purchasers thereof, free and clear of any liens or encumbrances affecting such Management Property, provided however, that the Manager may rely on the Wind-Down and Turn-Over Order to convey Management Property free and clear

---

[8] Capitalized terms used in this section but not otherwise defined herein have the meanings ascribed to them in the Collateral Management Order or the Sale Approval Order, as applicable.

of Claims and Encumbrances (as defined in the Wind-Down and Turn-Over Order) as set out therein.

23. Additionally, the Collateral Management Order authorizes the Manager to borrow such monies from time to time as it may consider necessary or desirable, provided that the outstanding principal amount does not exceed CAD$6 million at any time for the purpose of funding the exercise of the powers and duties conferred upon the Manager.  The whole of the Management Property will be charged by way of a fixed and specific charge (the "<u>Manager's Borrowings Charge</u>") as security for the payment of the monies borrowed, together with interest and charges thereon, in priority to all security interests, trusts, liens, charges and encumbrances, statutory or otherwise, in favor of any Person, upon the turn-over of the Management Property in accordance with the Wind-Down and Turn-Over Order.  The Collateral Management Order further provides that the Manager and counsel to the Manager shall be (i) paid their reasonable fees and disbursements from the proceeds of Management Property or the Manager's borrowings, and (ii) granted a charge (the "<u>Manager's Charge</u>") on the Management Property, as security for such fees and disbursements and that the Manager's Charge shall form a first charge on the Management Property in priority to all security interests, trusts, liens, charges and encumbrances, statutory or otherwise, in favor of any Person, upon the turn-over of the Management Property in accordance with the Wind-Down and Turn-Over Order.

24. The Canadian Court granted the Collateral Management Order on October 17, 2024.  In accordance with the Collateral Management Order and the Canadian Court's Endorsement dated October 19, 2024, which are attached hereto as **Exhibit H**, Schedule "B" to the Collateral Management Order may be amended by agreement among the Manager, the CRO, and the Monitor, or by further order of the Canadian Court.  The Foreign Representative

understands that additional Recourse Lenders intend to request an amendment to the Collateral Management Order, expanding the definition of Management Property to include vehicles secured in favor of certain additional Recourse Lenders. If the Canadian Court grants such amendment to the Collateral Management Order (an "Amended Collateral Management Order") in advance of the hearing before this Court, the Foreign Representative intends to supplement this Motion by filing the as-granted Amended Collateral Management Order shortly after it is granted by the Canadian Court, along with a redline reflecting any changes.

25. In connection with the Collateral Management Motion, the Canadian Court also granted an order (the "Sale Approval Order," and together with the Wind-Down and Turn-Over Order, the KERP Order, and the Collateral Management Order, the "Wind-Down Orders"): (i) approving the Servicing Agreement between Integrated Financial Technologies Inc. and the Manager, dated August 16, 2024 and the transactions contemplated thereby; (ii) approving the form of dealer and auctioneer agreements attached at Schedule "B" thereto (each, a "Sale Agreement") between the Manager and the dealer or auctioneer counterparties identified by the Manager from time to time (each, a "Dealer") and the transactions contemplated thereby; (iii) authorizing the Manager to enter into the Sale Agreements with such minor amendments as may be required by the Dealers identified by the Manager from time to time; (iv) confirming the Manager's authority to transfer Sold Vehicles free and clear of any claims; and (v) providing related relief. Notwithstanding the delivery of any Management Property to, and disposition of any such Management Property by or on behalf of, the Pride Entities or the Manager or any agent, representative, professional, dealer, auctioneer or other party retained by the Pride Entities or the Manager, the Manager's interests in the Management Property shall maintain the validity,

enforceability and priority over any third-party creditor's interests (if any) as prior to such delivery and disposition.

26. The Canadian Court granted the Sale Approval Order on October 17, 2024, which is attached hereto as **Exhibit I**. It is a condition precedent under the approved form of Sale Agreement attached to the Sale Approval Order that the Foreign Representative obtain an order from this Court enforcing the Sale Approval Order in the territorial jurisdiction of the United States because certain of the assets are located in the United States.

27. As set forth above, the Wind-Down and Turn-Over Order provides a comprehensive mechanism for the turnover of Remaining Assets and imposes certain obligations related thereto on the Pride Entities, the CRO, and the Monitor. This mechanism is designed to treat the Recourse Lenders fairly and equitably with respect to the turnover of the Remaining Assets.

28. The Collateral Management Order and the Sale Approval Order, in turn, are intended to facilitate and operationalize the relief granted in the Wind-Down and the Turn-Over Order and is expressly subject to the terms thereof. Effectively, the Collateral Management Order and Sale Approval Order enable the Manager to manage and realize on the Management Property within the CCAA Proceedings, and transfer to the Syndicate Lenders the cost of such management and realization.

29. In connection with the Wind-Down and Turn-Over Order and the Sale Approval Order, the Foreign Representative is hereby seeking certain additional ancillary relief to ensure that the sale of assets located in the United States is consistent with the intent of those orders. Specifically, the Foreign Representative is hereby requesting a waiver of any requirement that the Pride Entities or the Manager make a filing under the Uniform Commercial Code in connection

with such sales. The Foreign Representative understands that certain state laws may require such filings to protect the Pride Entities' or the Manager's interests in the vehicles to be sold pursuant to the sale agreements. In order to facilitate the sales within the United States without such additional administrative burden, the Foreign Representative is seeking this ancillary relief out of an abundance of caution.

30. The Foreign Representative submits that the relief contemplated by the Wind-Down Orders is necessary and appropriate to effectuate the orderly wind-down of the Pride Entities' operations, turnover the Pride Entities' remaining assets to their secured creditors and bring the CCAA Proceedings and these Chapter 15 Cases to their conclusion. Moreover, to consummate the transactions contemplated by, and approved under, the Sale Approval Order, the Foreign Representative must obtain an order from this Court enforcing the Sale Approval Order in the territorial jurisdiction of the United States. As such, to facilitate the relief obtained in the Wind-Down Orders, the Pride Group urgently requires the relief requested herein.

## RELIEF REQUESTED

26. By this Motion, the Foreign Representative seeks entry of the Proposed Order enforcing the Wind-Down Orders in the United States, and granting such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

27. Upon recognition of a foreign proceeding, section 1521(a) of the Bankruptcy Code authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors." Such relief may include "granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) of the Bankruptcy Code." 11 U.S.C. § 1521(a)(7). The Court may grant relief under

section 1521(a) of the Bankruptcy Code if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

28. As noted in the September 30 Endorsement, there is consensus that a going concern restructuring is no longer viable, that the Pride Entities need to be wound-down, and that the Liquidity Requirement is necessary to fund the wind-down. The Monitor is supportive of the Wind-Down Plan as contemplated by the Wind-Down Orders on the basis that it (i) provides for a fair and coordinated effort to liquidate the Pride Entities, (ii) intends to maximize recoveries and preserve the value of secured lenders' collateral, and (iii) downsizes the Pride Entities' workforce to align with the wind-down of the Pride Entities' business operations, while incentivizing the Key Personnel to continue their employment during the wind-down.

29. Moreover, the alternative to the Wind-Down Plan is a hard shut down of the Pride Entities' operations. This would inevitably create a disorderly and disruptive situation that would (i) result in the immediate termination of more than 900 employees and contractors, (ii) abruptly abandon customers, vehicles and in-progress operations, (iii) result in an uncoordinated process of the Pride Entities' secured creditors racing to locate and retrieve their vehicle collateral, (iv) leave the Pride Entities' assets stranded or in the wrong hands, and (v) provide no funding to conclude the CCAA Proceedings and these Chapter 15 Proceedings.

30. Further, the relief sought in the Wind-Down Orders generally comports with U.S. due process standards. On notice to creditors, the Canadian Court reviewed each of the Wind-Down Orders, held hearings, and all creditors and other parties had a full and fair opportunity to participate. By granting the relief requested herein, the Court would enforce the Wind-Down Orders on a coextensive basis in the United States, which will allow the Pride Group to effectuate

the Wind-Down Plan as contemplated by the Wind-Down Orders in accordance with the budget and timetable contemplated therein.

31. Granting the requested relief is also in the public interest because it promotes cooperation between jurisdictions in cross-border insolvencies, which is an express purpose of chapter 15 of the Bankruptcy Code. *See* 11 U.S.C. § 1501(a).

32. For those reasons, the Foreign Representative respectfully submits that the relief requested herein is authorized under section 1521(a) of the Bankruptcy Code and should be approved.

## NOTICE

33. The Foreign Representative has provided notice of this Motion consistent with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). The Foreign Representative submits that such notice is sufficient in view of the facts and circumstances, and no other or further notice need be provided.

## **CONCLUSION**

WHEREFORE, the Foreign Representative respectfully requests that the Court enter an order, substantially in the form attached as **Exhibit A**, granting the requested relief and such other and further relief as may be just and proper.

Dated: October 29, 2024
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Austin T. Park*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Clint M. Carlisle (No. 7313)
Austin T. Park (No. 7247)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: dabbott@morrisnichols.com
          aremming@morrisnichols.com
          ccarlisle@morrisnichols.com
          apark@morrisnichols.com

- and -

**LINKLATERS LLP**

Penelope J. Jensen, Esq. (admitted *pro hac vice*)
Christopher J. Hunker, Esq. (admitted *pro hac vice*)
Clark L. Xue, Esq.
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000
Facsimile: (212) 903-9100
Email: penelope.jensen@linklaters.com
          christopher.hunker@linklaters.com
          clark.xue@linklaters.com

*Attorneys for the Foreign Representative*