**<u>Exhibit B</u>**

Fourteenth Report

Court File No. CV-24-00717340-00CL

# ONTARIO
# SUPERIOR COURT OF JUSTICE
# (COMMERCIAL LIST)

## IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those Applicants listed on **Schedule "A"** hereto

## FOURTEENTH REPORT OF THE MONITOR

## DATED August 28, 2024

**TABLE OF CONTENTS**

**INTRODUCTION** ........................................................................................................... 1

**TERMS OF REFERENCE** ........................................................................................ 8

**PURPOSE** .................................................................................................................... 9

**OVERVIEW** ................................................................................................................ 9

**PROPOSED MEDIATION** ...................................................................................... 12

**PGL TRANSACTION** .............................................................................................. 13

*OVERVIEW OF PGL SALE PROCESS AND RESULTS* ........................................... 13

*THE PROPOSED PURCHASER'S BID* ..................................................................... 14

*MONITOR'S COMMENTS ON THE PGL SALE AGREEMENT* ............................. 18

*PGL STAKEHOLDER CONSULTATION* ................................................................. 24

*MONITOR'S VIEW OF THE PGL GOING CONCERN TRANSACTION* ................ 25

**ALTERNATIVE PGL WIND-DOWN PLAN** ...................................................... 25

*COMPARATIVE ANALYSIS OF PGL GOING CONCERN TRANSACTION AND PGL WIND-DOWN PLAN* .................................................................................................... 28

*PGL EQUIPMENT FINANCIERS AND LIFT-STAY MOTIONS* ........................... 29

**SECURITIZATION PARTY TURN-OVER UPDATE** ...................................... 33

*TURN-OVER OF SUBJECT ASSETS THAT ARE NOT REPOSSESSED ASSETS* ..... 34

*TURN-OVER OF REPOSSESSED ASSETS* ............................................................. 34

*DIP AGENT'S REQUEST FOR INITIAL REPORTING LETTERS* ........................ 35

*PRESERVATION NOTICE* ....................................................................................... 36

**SECURITY REVIEW UPDATE** ............................................................................ 36

**REAL ESTATE TRANSACTIONS UPDATE** ..................................................... 37

**IDLE UNITS UPDATE** ........................................................................................... 38

**PRIDE ENTITIES' WIND-DOWN PLAN** .......................................................... 39

*LIFT-STAY MOTIONS AND INDIVIDUAL ENFORCEMENT ACTIONS ARE IMPRACTICAL* 43

**UPDATED CASHFLOW FORECAST** .................................................................. 46

**TASKS TO COMPLETION OF CCAA AND CHAPTER 15 PROCEEDINGS** ................ 47

**INCREASE TO ADMINISTRATION CHARGE** ............................................... 50

**MCV MONETIZATION ORDER** .......................................................................... 50

**RECOMMENDATIONS** .......................................................................................... 52

| **Appendices** | **Tab** |
|---|---|
| Completion Task List …………………………………………………… | A |
| August 23 Letter …………………………………………………… | B |
| PGL Equipment Financiers Letter, dated August 26, 2024 ……………………… | C |
| PGL Sale Agreement, executed August 27, 2024………………………………… | D |
| Chart Summarizing Lift-Stay Motions …………………………………… | E |
| Turn-Over Mechanics Notice………………………………………… | F |
| Disclosure Request and Response to Disclosure Letters ……………………… | G |
| Preservation Notice, dated August 19, 2024 ……………………………... | H |
| OEM Letter, dated August 21, 2024 …………………………………… | I |
| Draft Order (PACCAR, Daimler and Volvo) ……………………………… | J |
| Wind-Down Cash Flow Forecast ……………………………………… | K |
| List of the 38 MCVs……...…………………………..……………………… | L |

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**FOURTEENTH REPORT OF THE MONITOR**

**DATED August 28, 2024**

**INTRODUCTION**

1.      On March 27, 2024, Pride Group Holdings Inc. and those entities listed as "Applicants" in
**Schedule "A"** hereto (each an "**Applicant**" and, collectively, the "**Applicants**") brought
an application (the "**CCAA Application**") before the Ontario Superior Court of Justice
(Commercial List) (the "**Court**") under the *Companies' Creditors Arrangement Act*,
R.S.C. 1985, c. C-36 (the "**CCAA**") to, among other things, obtain a stay of proceedings
to allow them an opportunity to restructure their business and affairs.

2.      On the same day, the Court granted an initial order in these CCAA proceedings (the
"**CCAA Proceedings**") that, among other things, (i) appointed Ernst & Young Inc. as
Monitor (in such capacity, the "**Monitor**"), and (ii) appointed RC Benson Consulting Inc.
as Chief Restructuring Officer of the Pride Entities (in such capacity, the "**CRO**"). The
Monitor filed a Pre-Filing Report dated March 27, 2024, in connection with the CCAA
Application.

3.      In addition to the Applicants, the entities listed as "Limited Partnerships" and "Additional
Stay Parties" in **Schedule "A"** hereto also obtained the benefit of the stay of proceedings
until and including April 6, 2024, which stay expired the next business day, April 8, 2024
(the "**Stay Period**"). The Applicants together with the Limited Partnerships are referred to

herein as the "**Pride Entities**" (and together with the Additional Stay Parties, the "**Pride Group**").

4.     The comeback hearing was heard on Friday, April 5, 2024 (the "**Comeback Hearing**"), where the Pride Entities sought and obtained an amended and restated initial order (the "**ARIO**"). The Monitor filed its First Report to Court, dated April 4, 2024 (the "**First Report**") in connection with the Comeback Hearing. The ARIO, among other things, extended the Stay Period to June 30, 2024, approved the term sheet for the DIP Facility and granted other relief as further described in the First Report.

5.     At the Comeback Hearing, the Court also granted an order approving certain protocols (the "**Protocols Order**"), including the Governance Protocol set out in Schedule "B" thereto (the "**Governance Protocol**"). The Governance Protocol was approved subject to parties returning to Court on a without prejudice basis on April 19, 2024, for the approval of proposed revisions to the Governance Protocol ("**Revised Governance Protocol**"), which was subsequently adjourned to April 25, 2024, on consent. The Monitor filed its Second Report to Court, dated April 24, 2024 (the "**Second Report**") in connection with this April 19, 2024 return date, which was further adjourned to May 15, 2024, on consent, to give the Monitor, the Pride Entities, and the CRO additional time to negotiate the Revised Governance Protocol with affected stakeholders.

6.     The Monitor filed its Supplement to the Second Report to Court on May 6, 2024, to provide information to the Court in respect of ongoing negotiations and terms of the Revised Governance Protocol from the date of the Second Report.

7.     On May 6, 2024, the Pride Entities brought a motion for an approval and vesting order in respect of the sale of certain real property in Bolingbrook, Illinois (the "**Bolingbrook Property**") and to amend and restate the ARIO. The Monitor filed its Third Report to Court, dated May 2, 2024, in connection with such motion. The Court granted orders approving the sale of the Bolingbrook Property and amending and restating the ARIO (the "**Second ARIO**").

8.    On May 5, 2024, the Pride Entities brought a motion, seeking, among other things, (i) an order approving a sale and marketing process for the business, operations, and assets ("**PGL Sale Process**") of Pride Group Logistics Ltd. ("**PGL**"), Pride Group Logistics USA, Co., Pride Global Insurance Company Ltd.[1] (collectively, the "**PGL Entities**"), and (ii) an approval and vesting order in respect of the sale of certain property in Chehalis, Washington (the "**Chehalis Property**"). The Monitor filed its Fourth Report to Court, dated May 10, 2024 in connection with same (the "**Fourth Report**").

9.    On May 13, 2024, the Monitor filed its Fifth Report to Court (the "**Fifth Report**"), which provided the Court and stakeholders with an update on the status and ongoing work with respect to: (i) secured facility reviews, (ii) securitization facility reviews, and (iii) the entitlement claims process. On May 15, 2024, the Court granted orders approving, among other things, the PGL Sale Process, the sale of the Chehalis Property, and the Amended and Restated Protocols Order, dated May 15, 2024, which included the Revised Governance Protocol.

10.    On June 14, 2024, the Pride Entities brought a motion seeking approval of the entitlement claims process (the "**Entitlement Claims Process**", with such Order being the "**Entitlement Claims Process Order**"). The Monitor filed its Sixth Report to Court, dated June 13, 2024 (the "**Sixth Report**"), in connection with same. On June 14, 2024, the Court granted the Entitlement Claims Process Order.

11.    On June 27, 2024, the Pride Entities brought motions seeking (i) the extension of the Stay Period (as defined in the Second ARIO) to and including September 30, 2024, (ii) the entry of a consent order authorizing Regions Equipment Finance Corporation ("**REFCO**") and Regions Commercial Equipment Finance, LLC ("**RCEF**", and together with REFCO, "**Regions Equipment Finance**") to sell certain vehicles surrendered to Regions Equipment Finance pre-filing, and (iii) the entry of a consent order authorizing Daimler Truck Financial Services Canada Corporation ("**DTF Canada**") and Daimler Truck Financial Services USA LLC ("**DTF US**", and together with DTF Canada, "**Daimler**") to sell certain vehicles surrendered to Daimler pre-filing. The Monitor filed its Seventh Report to Court,

---

[1] Pride Global Insurance Company Ltd. is not an Applicant in these proceedings and is an Additional Stay Party as listed in Schedule "A" to the Second ARIO.

- 4 -

dated June 26, 2024, in connection with these motions. On June 27, 2024, the Court granted the order extending the Stay Period as well as the consent orders referred to above.

12.     On July 3, 2024, the Pride Entities brought a motion seeking (i) an order approving the amendment and extension of the Fourth Amended and Restated Credit Agreement executed on May 10, 2024 ("**FARCA**"), and (ii) the entry of a consent order authorizing VFS Canada Inc. ("**VFS Canada**") and VFS U.S. LLC ("**VFS US**", and together with VFS Canada, "**VFS**") to sell certain vehicles surrendered to VFS pre-filing. The Monitor filed its Eighth Report to Court, dated July 2, 2024 (the "**Eighth Report**") in connection with this motion. On July 3, 2024, the Court granted the orders referred to above.

13.     On July 16, 2024, the Pride Entities brought a motion seeking, among other things, (i) entry of an order in respect of certain unreturned collateral financed by Regions Equipment Finance, (ii) an order approving the distribution of net proceeds of sale of the Chehalis Property to Roynat Inc. ("**Roynat**"), and (iii) an order approving a transaction contemplated by a factoring portfolio purchase agreement (the "**Factoring Transaction**") between TPine Financial Services Inc., as vendor, and J D Factors Corporation / Corporation D'affacturage J D, as purchaser. The Monitor filed its Ninth Report to Court, dated July 13, 2024, in connection with same. Separately, the Monitor filed a Supplement to the Ninth Report of the Monitor on July 15, 2024 (the "**Supplement to the Ninth Report**"), which Supplement to the Ninth Report included an update on the Monitor's review of the securitization facilities. On July 16, 2024, the Court granted the orders referred to in points (i) and (ii) above. The motion seeking the approval of the Factoring Transaction was adjourned until August 7, 2024. An order granted on that date approved the Factoring Transaction, which is expected to close in phases, with the first phase expected to close on or about September 4, 2024.

14.     On July 21, 2024, the Pride Entities brought a motion seeking, among other things, (i) an order respecting the transition and relinquishment of servicing and other duties under certain Securitization Programs where the outcome of the Monitor's proprietary interest assessment with respect to an applicable Securitization Party's ownership entitlement to such assets is favourable, and (ii) set out the terms and conditions upon which such turn-over may occur.  The Monitor filed its Tenth Report to Court, dated July 21, 2024 (the

"**Tenth Report**"), in connection with same, which Tenth Report included the Monitor's view with respect to certain of the Securitization Programs. On August 8, 2024, the Court granted an order in respect of, among other things, the turn-over of securitized assets (the "**Turn-Over Order**").

15. The Monitor filed its Supplement to the Tenth Report on August 1, 2024 (the "**Supplement to the Tenth Report**"), which provided a proposed methodology for consideration by the stakeholders and the Court for the allocation of the direct legal fees and disbursements of the Securitization Program review undertaken by the Monitor's Canadian counsel, Blake, Cassels & Graydon LLP ("**Canadian Counsel**"), and U.S. counsel, McDermott, Will & Emery LLP ("**U.S. Counsel**") on a fair and equitable basis as a necessary cost of transitioning among the Subject Assets subject to the Reviewed Programs (the "**Validation Mandate Fee Proposal**") (as such terms are defined in the Supplement to the Tenth Report). No hearing date has been set to approve the Validation Mandate Fee Proposal, and the Monitor expects to engage with stakeholders prior to such hearing date.

16. The Monitor filed its Eleventh Report to the Court on August 2, 2024 (the "**Eleventh Report**"), which provided the Court with information pertaining to the Monitor's review of the security interests asserted by Secured Creditors (as defined therein), including, but not limited to, the Monitor's view as to whether each Secured Creditor had, as at July 31, 2024, provided sufficient evidence of a perfected and priority interest in specific vehicles which are owned by the Pride Entities and identified and tracked by vehicle identification numbers (with the exception of Multiple Collateral Vehicles and each, an "**MCV**", which are subject to the Entitlement Claims Process).

17. On August 2, 2024, the DIP Agent (as defined below) brought a motion, on a date to be set by the Court, for the appointment of Alvarez & Marsal Canada Inc. (the "**Proposed Collateral Manager**") as manager, an officer of the Court (in such capacity, the "**Collateral Manager**"), of those assets, undertakings and properties of the Pride Entities/Syndicate Lenders, including all proceeds thereof, included in the definition of "Management Property" in the proposed Syndicate Collateral Management Order and lifting the stay of proceedings granted in these CCAA Proceedings to the extent necessary

- 6 -

to give effect to the appointment of the Proposed Collateral Manager as Collateral Manager and the other relief set out in the Syndicate Collateral Management Order.

18. On August 7, 2024, the Pride Entities brought a motion seeking, among other things, (i) an approval and vesting order in respect of the sale of certain property in Abbotsford, British Columbia and approving the distribution of net proceeds of sale to Roynat, and (ii) an approval and vesting order in respect of the sale of certain property in Cornwall, Ontario and approving the distribution of net proceeds of sale to Roynat. The Monitor filed its Twelfth Report to the Court on August 6, 2024 (the "**Twelfth Report**") in respect of this motion and to provide updates to the Court in respect of the PGL Sale Process and the Factoring Transaction. On August 7, 2024, the Court granted orders approving both real property sales referred to above.

19. On August 9, 2024, the Pride Entities brought a motion, seeking, among other things, an order (i) authorizing and entitling the Pride Entities to apply any Lease Payments and Soft Collections (each as defined in the Affidavit of Randall Benson, sworn August 7, 2024) received from and after July 15, 2024 until September 3, 2024 to pay their ordinary course working capital needs and for other general corporate purposes (the "**Deferred Payments**"), but excluding Lease Payments and Soft Collections (a) in respect of MCVs, (b) in which a Securitization Party has claimed an interest, or (c) in respect of any Subject Asset or MCV Asset (as defined in the Turn-Over Order), provided that the Pride Entities continue to abide by the reporting and record-keeping obligations in respect of such Deferred Payments as set out in the Revised Governance Protocol, and (ii) approving the Pride Entities' execution of a non-binding indicative term sheet (the "**Indicative Term Sheet**") between Nations Capital, LLC, as Agent, 1903P Loan Agent, LLC or is affiliates (the "**Gordon Brothers**") and Pride Group Holdings, Inc, as borrower, to facilitate a proposed interim financing facility (the "**New Interim Financing Facility**"), and seeking the limited approval of the payment of due diligence fees and negotiations of the New Interim Financing Facility and wind-down plan, subject to Court approval.

20. The Monitor filed its Thirteenth Report to the Court on August 8, 2024 (the "**Thirteenth Report**") in respect of the foregoing motion and to provide updates to the Court in respect of the Validation Mandate, the DIP Facility, and the status of the Pride Entities' liquidity.

21.     On August 9, 2024, the Court granted an Order (i) amending the Revised Governance Protocol to permit the Pride Entities to use the Deferred Payments subject to the Monitor's review and oversight, provided that (a) the aggregate amount of the Deferred Payments do not exceed the aggregate amount contemplated in the cash flow forecast (subject to a 10% positive variance), (b) the Pride Entities continue to abide by the reporting and record-keeping obligations in respect of such Deferred Payments, among other things, and (c) the amount of the Deferred Payments will be allocated by further order of the Court; and (ii) adjourning the Pride Entities' motion to approve certain provisions of the Indicative Term Sheet *sine die.*

22.     On August 9, 2024, the Court issued an endorsement which provided that, among other things, the CRO and the Pride Entities, in consultation with the Monitor, shall immediately engage with the Pride Entities' significant Financiers in an effort to develop an orderly wind-down proposal in respect of the Pride Entities, including the funding required in respect of such proposal and completion of the CCAA proceedings.

23.     The Pride Entities have brought a motion returnable on September 3, 2024 seeking, among other things, (i) an order extending the Pride Entities' ability to use Lease Payments and Soft Collections received from and after September 3 until September 30, 2024 to pay their ordinary course working capital needs and for other general corporate purposes (the "**Extended Deferred Payments**" and collectively with the Deferred Payments, the "**Total Deferred Payments**") and authorizing the sale of MCVs not subject to an active lease, (ii) approval of the PGL Sale Agreement (as defined below), and (iii) advice and directions relating to alternate relief in respect of the PGL Entities and a wind-down of the Pride Entities. Advice and directions are sought for an orderly wind-down process, in a collective response to the Lift-Stay Motions (defined below) also returnable on September 3, 2024.

24.     This report (the "**Fourteenth Report**") should be read in conjunction with the prior reports of the Monitor and the Affidavit of Randall Benson, sworn August 27, 2024 (the "**Benson Affidavit**").

**TERMS OF REFERENCE**

25.     In preparing this Fourteenth Report and making the comments herein, the Monitor has been provided with, and has relied upon, unaudited financial information, books and records prepared by the Applicants, discussions with management of the Applicants ("**Management**"), and information from other third-party sources, including Financiers and personal property security registries (collectively, the "**Information**"). In its preparation of this Fourteenth Report the Monitor has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Monitor has not audited or otherwise attempted to verify the accuracy or completeness of such Information in a manner that would wholly or partially comply with Canadian Auditing Standards ("**CAS**") pursuant to the Chartered Professional Accountants Canada Handbook and, accordingly, the Monitor expresses no opinion or other form of assurance contemplated under CAS in respect of the Information. Some of the information referred to in this Fourteenth Report may consist of forecasts and projections. An examination or review of the financial forecast and projections, as outlined in the Chartered Professional Accountants Canada Handbook, has not been performed.

26.     Any future-oriented financial information referred to in this Fourteenth Report was prepared based on Management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that are not ascertainable, the actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

27.     Unless otherwise indicated, the Monitor's understanding of factual matters expressed in this Fourteenth Report concerning the Pride Entities and their business is based on the Information, and not independent factual determinations made by the Monitor.

28.     Capitalized terms not otherwise defined herein have the meaning given to them in the Thirteenth Report, as applicable.

**PURPOSE**

29.     The purpose of this Fourteenth Report is:

(a)     to provide the Court and stakeholders of the Pride Entities with the Monitor's recommendations with respect to a going concern sale of the PGL Entities and approval of the PGL Sale Agreement or, in the alternative, the PGL Wind-Down Plan (as defined below), including mediation to be facilitated by the Honourable Thomas J. McEwen, in the event consensus cannot be achieved among the affected parties (the "**PGL Requested Relief**");

(b)     with respect to the Pride Entities' motion seeking (i) to increase the Administration Charge (as defined in the Second ARIO) from $3 million to $5 million; (ii) to permit the Pride Entities to use Total Deferred Payments to pay their ordinary course working capital needs and for other general corporate purposes; and (iii) to authorize the Pride Entities to sell MCVs not subject to an active lease and to use the proceeds of sale of certain such MCVs[2] for the Pride Entities' ordinary course working capital needs and for other general corporate purposes, subject to later allocation (collectively with the PGL Requested Relief, the "**Requested Relief**"); and

(c)     for the path-forward in these CCAA Proceedings, including the Orderly Wind-Down Plan (as defined below) for an orderly wind-down of the business of the Pride Entities under the direction and supervision of the CRO and Monitor.

**OVERVIEW**

30.     The proposed path-forward considers the interests of employees, customers, lenders, and other stakeholders, and provides for an orderly and controlled conclusion of these CCAA Proceedings and the Chapter 15 Proceedings (as defined below).

---

[2] There are a total of 38 MCVs not subject to a property claim by a Securitization Party where proceeds of sale are proposed to be used by the Pride Entities for liquidity, which MCVs are set out on Appendix "L".

31.     The basic structure of the path-forward is:

(a)     a going concern sale for the PGL Entities or, in the alternative, a co-ordinated wind-down and return of vehicles to the Financiers (as defined in the First Report) of PGL in accordance with their entitlements;

(b)     a co-ordinated wind-down of the Pride Entities' dealership and leasing businesses, with a turn-over of the servicing of lease portfolios and vehicles to Financiers in accordance with their entitlements;

(c)     completion of the turn-over of securitized assets to the Securitization Parties pursuant to the Turn-Over Order;

(d)     completion of the sale of all remaining real estate assets and court approval of the distribution of sale proceeds;

(e)     monetization of the MCVs and resolution of entitlements to proceeds through the Entitlement Claims Process established by the Entitlement Claims Process Order;

(f)     assisting in the interim arrangements for and resolution of intercreditor disputes over leases and vehicles in respect of which the Monitor is of the view that a Financier has not established priority over Royal Bank of Canada, as Administrative Agent under the DIP Credit Agreement (the "**DIP Agent**", with such vehicles referred to as the priority claim vehicles or "**PCVs**");

(g)     managing a fair and orderly reduction of a workforce of more than 900 employees and contractors, including the approximately 500 employees who may be assumed by the going concern purchaser of the PGL Entities, providing incentives for the retention of key staff to complete the necessary tasks for an orderly wind-down, and providing for the processing of Wage Earner Protection Program claims;

(h)     communicating appropriately with customers and contract counterparties in respect of the wind-down and collecting outstanding amounts;

(i)     reconciling collections and allocating the costs of this process fairly among participants in the process including secured lenders and other Financiers; and

(j)     completing the essential tasks expected in an orderly wind-down of these CCAA Proceedings and the Chapter 15 Proceedings as summarized herein and described in further detail in **Appendix "A"** (the "**Completion Task List**").

32.    The path forward relies on the findings of entitlement to vehicles and leases as set out in the Tenth Report and Eleventh Report. The findings in these reports are the cornerstone of recommendations for an orderly turn-over to those entitled and the identification of assets in respect of which the DIP Lenders' Charge (as defined in the Second ARIO) has priority.

33.    Several motions have been brought by Financiers, including the DIP Agent, for immediate return of assets and receivership-like structures within the CCAA Proceedings. None of these motions address the complexity and costs of an orderly turn-over of vehicles, or the necessary steps for the conclusion of these CCAA Proceedings. As described below, there are approximately 600 vehicles located at the Milton lot alone, and approximately 3,400 vehicles at other lots across Canada and the United States in respect of which access and turn-over needs to be organized.[3] That requires employees, drivers, logistical support, co-ordination with individual Financiers, their advisors and agents, and professional assistance to ensure order and safety and the turn-over of responsibility for vehicles (including insuring same as they leave the Pride Entities' lots) to those entitled.

34.    It is impossible, from a bandwidth, cost and consistency perspective, for the Pride Entities, CRO and Monitor to respond to each motion individually or to negotiate separately with each individual Financier, whether they are seeking the return of 10 or 100s of leases/vehicles. Many have sought time with the Monitor in the last couple of weeks to discuss their interests. All such requests could simply not be accommodated in the short time since the August 9 hearing, while at the same time, developing a fair and appropriate path forward for all. The Monitor apprised the Service List with its letter, dated August 23, 2024 (the "**August 23 Letter**"), that, among other things, it was unable to negotiate

---

[3] The above-referenced 4,000 vehicles include vehicles to which Securitization Parties assert an interest.

separately with each secured lender. A copy of the August 23 Letter is attached hereto as **Appendix "B"**.

35.    This Fourteenth Report, in conjunction with the Benson Affidavit, is intended to be a global response to all such motions, regardless of the number of leases/vehicles at issue for any particular Financier, and to provide the Monitor's recommendations on (i) the orderly wind-down of the proceedings, (ii) the funding of the wind-down from the Pride Entities' assets in the absence of a new debtor-in-possession facility, (iii) the payment and allocation of specific costs in a streamlined fashion from the proceeds of assets in respect of which such costs are incurred, and (iv) the fair allocation of general, administrative restructuring costs in these CCAA Proceedings ("**Restructuring Costs**") among Financiers. This path-forward is the Monitor's recommendation in the face of the chaos of an unfunded closure of operations and multitude of proposed individual lender enforcements.

**PROPOSED MEDIATION**

36.    The Monitor is of the view, after meetings and discussions with Financiers of PGL on an individual and collective basis, that there is currently no agreement among the Financiers of PGL on how to proceed with respect to the PGL Entities, including funding the necessary steps to avoid a hard shut-down. There is an appreciation that a hard shut-down with no funding for Pride Entities' staff, the Monitor or professional advisors would result in individual enforcements with no assistance available to arrange for a safe and orderly marshalling and turn-over of collateral. Some Financiers of PGL have requested, on an individual basis, access to the Pride Entities books and records and meetings with Pride personnel to gather information. As noted below, the personnel of the Pride Entities with the requisite knowledge are stretched to the limit and cannot reasonably be expected to be able to accommodate all information requests simultaneously, and yet are criticized for failing to do so.

37.    On August 26, 2024, the PGL Equipment Financiers (as defined below) delivered a letter to the Monitor (the "**PGL Equipment Financiers Letter**"), which, among other things, (i) stated the PGL Equipment Financiers have lost confidence in the Monitor's and the CRO's ability to advance a winddown in a manner that the PGL Equipment Financiers are

prepared to support, (ii) raised concern over the Monitor advancing the PGL Going Concern Transaction, and (iii) asserted that the PGL Equipment Financiers will only bear the costs of the winddown that they propose. A copy of the PGL Equipment Financiers Letter is attached hereto as **Appendix** "**C**".

38.    Given the options available in respect of the PGL Entities and the lack of consensus, the Pride Entities have retained the Honourable Thomas J. McEwen and reserved time before him on September 9 and 10, 2024 to conduct a mediation if so directed by the Court (the "**Mediation**") in respect of the path forward for the PGL Entities, be it the PGL Going Concern Transaction, or the PGL Wind-Down Plan, or alternatives proposed by the PGL Equipment Financiers.

39.    The Monitor recommends that this Court direct the affected parties to participate in the Mediation in order to attempt to come to a consensual resolution or, at a minimum to limit the outstanding issues and the alternatives that may be before the Court on a further hearing in respect of the PGL Entities.

**PGL TRANSACTION[4]**

*Overview of PGL Sale Process and Results*

40.    As described in detail in the Fourth Report, one of the Pride Entities' business lines provides logistic, brokerage and delivery services to customers, including certain blue-chip customers through the PGL Entities.

41.    PGL's fleet consists of approximately 1,459 trucks and trailers (of which approximately 1,383 are owned directly by PGL). At any point in time, approximately 1,000 to 1,100 trucks are in active transit with customer orders. Approximately 85% of such loads include perishable products.

42.    PGL employs approximately 110 office staff (including subcontractors) to manage its logistics operations and approximately 95 drivers.  Further, PGL's operations also include approximately 120 driver subcontractors through agencies, approximately 140 owner

---

[4] Capitalized terms not otherwise defined in this section have the meanings given to them in the Twelfth Report, the PGL Sale Process, or the PGL Sale Agreement as applicable.

operator drivers, and approximately 75 drivers through four partner carriers. Overall PGL's business operations include over 500 individuals as office staff or drivers.

43. As discussed in the Eighth Report and the Ninth Report, on May 15, 2024, the Court granted an Order approving the PGL Sale Process to facilitate a going concern transaction for this business. The Monitor, in consultation with the CRO, was authorized to conduct the PGL Sale Process.

44. The conduct and results of the PGL Sale Process are discussed in the Twelfth Report, in paragraphs 25 through 35, which are hereby incorporated by reference.

*The Proposed Purchaser's Bid*

45. Since being selected as the Successful Bid under the PGL Sale Process, the Monitor has worked with the Proposed Purchaser and its counsel to negotiate a sale agreement, with these negotiations resulting in a final sale agreement (the "**PGL Sale Agreement**", and the transaction contemplated therein being the "**PGL Going Concern Transaction**").  The PGL Going Concern Transaction is, fundamentally, an asset sale that is anticipated to be closed by way of a conventional approval and vesting order, subject to certain specified contracts and licences being assigned to the Proposed Purchaser.

46. A copy the PGL Sale Agreement is attached hereto at **Appendix "D"**. The Monitor has not redacted any details from the PGL Sale Agreement, as the Proposed Purchaser is the only viable going concern bidder, and the only viable alternative to the PGL Going Concern Transaction in the Monitor's view is the wind-down plan discussed below.

- 15 -

47.    The following is a summary of the key terms of the PGL Sale Agreement[5]:

| Item | Term |
|---|---|
| Purchaser | 1000927605 Ontario Inc.[6] |
| Vendors | Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc. (collectively, the "**PGL Vendors**"), 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., (collectively, the "**Optional Vendors**"), 2043002 Ontario Inc. and TPine Leasing Capital Corporation ("**TPine**") |
| Purchase Price | $54,458,838 subject to certain closing adjustments discussed below, including a $3,000,000 deposit |
| Satisfaction of Purchase Price | Purchase Price, subject to closing adjustments, will be paid, in cash, on closing, allocated as follows:<br><br>- Vehicles: $41,098,837<br>- Acquired AR: $9,000,000<br>- Purchased Letters of Credit: $4,000,000[7]<br>- Tangible Property: $160,000<br>- Intangibles: $50,000<br>- PGL Insurance Shares: $1.00<br>- Inventory: $100,000<br>- Prepaid Expenses: $50,000 |
| Purchased Assets | Substantially all of the tangible and intangible assets, undertakings and properties owned by the PGL Vendors, including: (i) all Cash and Cash Equivalents of PGL, PGL International, and PGL USA; (ii) all Accounts Receivable (including the Intercompany Receivables from PGL Vendors); (iii) all Purchased Contracts; (iv) all Prepaid Expenses; (v) all Permits; (vi) all Equipment; (vii) all Inventory; (viii) all PGL Insurance Shares; (ix) all PGL Insurance financial instruments; (x) the Intangible Property; (xi) all Books and Records; (xii) all |

[5] The table summarizing the terms of the PGL Sale Agreement is provided for illustrative purposes only.  Readers should consult the PGL Sale Agreement for a definitive statement of its terms.
[6] As discussed in Paragraph 34 of the Twelfth Report, the Purchaser is a company owned and controlled by certain members of the Johal family, who are the direct and indirect owners of the Pride Entities generally, and the Proposed Purchaser's bid is primarily financed by third party lenders.
[7] Pursuant to Section 3.1(c) of the PGL Sale Agreement, approximately $4 million of the Purchase Price, being the "LC Purchase Price," will not be paid in cash on Closing, but will be paid directly by the Purchaser to the issuer of certain letters of credit necessary for the Pride Global Insurance Company Ltd. business, the shares of which are being acquired as Purchased Assets.

|  | rights of the PGL Vendors under or pursuant to all warranties, representations and guarantees to the extent relating to products sold, or services provided, to the PGL Vendors or to the extent affecting any Purchased Assets; (xiii) if the Real Property Option is exercised (described below), the Optional Assets; (xiv) all Vehicles of the PGL Vendors listed on Schedule "G" of the PGL Sale Agreement; and (xv) all Vehicles of TPine listed on Schedule "G" of the PGL Sale Agreement. |
|---|---|
| Assumed Liabilities | (i) Liabilities of PGL Insurance accruing from and after the Closing Date; (ii) any Unpaid Post CCAA Filing Accruals that remain unpaid by the Vendors on Closing; (iii) liabilities for accrued vacation pay of the Transferring Employees; (iv) liabilities of any PGL Vendor owing to any other PGL Vendor or PGL Insurance, whether incurred or owing prior or subsequent to the CCAA Filing Date; and (v) if the Real Property Option is exercised, the real property mortgages and accrued property taxes and utilities associated with the Optional Assets.<br><br>The Assumed Liabilities are estimated to be valued at approximately $4 million. |
| Real Estate Option | Not later than 10 Business Days prior to the Closing Date, the Purchaser shall have to option to purchase all rights, titles and interests in and to the real property owned by the Optional Vendors (the "**Real Property Option**"), <u>provided that</u> the exercise of the Real Property Option is subject to (i) the approval of the Monitor, and (ii) the consent of (A) the mortgage lenders to each of the mortgaged real property owned by the applicable Optional Vendors to the assignment of the existing mortgages to the Purchaser, and (B) the Royal Bank of Canada (in its capacity as administrative agent and collateral agent) ("**RBC**"). |
| Critical Required Contracts | Closing is conditional on the following "Critical Required Contracts" being assigned to the Purchaser on Closing:<br><br>1. DEF contract dated as of August 29, 2023 between Shell Flying J and Pride Diesel Inc.<br><br>2. The lease dated as of November 24, 2015 in respect of the property located at 6050 Dixie Road, Mississauga, between 6050 Dixie Road Investments Limited as Landlord, 2029909 Ontario Inc. as Tenant and Sam Johal as Indemnifier |

|  | 3. Fuel contract dated as of June 19, 2023 between Shell Flying J and Pride Diesel Inc.<br><br>4. Branded Dealer Agreement (Esso) dated as of October 25, 2019 between Husky Oil Marketing Company, a division of Husky Oil Operations Limited and 2076401 Ontario Inc.<br><br>5. Lease agreement in respect of 6253 Boundary Road, Cornwall, ON, with Globocam (Montreal) Inc., provided that such lease is in force on the Closing Date.<br><br>6. The Finloc Leases. |
|---|---|
| Permits | Closing is conditional on the following Permits being assigned to the Purchaser on Closing:<br><br>1. Commercial Vehicle Operating Licences<br><br>2. United States Department of Transportation Licences<br><br>3. Long Combination Vehicle Licence<br><br>4. New York State Heavy Haul Permit |
| Cure Costs | The Purchaser shall be liable, in addition to the Purchase Price, to pay all monetary amounts, if any, required to be paid pursuant to section 11.3(4) of the CCAA in order to obtain the assignment to the Purchaser of assigned contracts and Permits, or such lesser amount as may be negotiated by the Purchaser with the applicable counterparty. |
| Employees | Offers of employment will be made to all existing Employees of the PGL Vendors, and all such employees will be assumed by the Purchaser unless they explicitly reject the employment offer. |
| Material Conditions in Favour of all Parties | - Court approval in Canada and US<br>- No order or injunction prohibiting Closing |
| Material Conditions in Favour of Vendors | None |
| Material Conditions in Favour of Purchaser | - All Critical Required Contracts and Permits assigned. |

|  | - Real property leases for: the Dorval Property, Dixie Road Property, Milton Property, Fort Erie Property, and Cornwall Property (each as defined below) |
|---|---|
| Closing Date | Contemplated Outside Date of September 30, 2024 |

*Monitor's Comments on the PGL Sale Agreement*

48. Because the Proposed Purchaser is a related party of the Pride Entities, the Monitor and the CRO have negotiated the PGL Sale Agreement on behalf of the PGL Entities and TPine, without disclosure to, input from, or consultation with the Pride Entities or their counsel. In the Monitor's view this measure was necessary to ensure that the transaction was negotiated at arm's length. It has also resulted in the Monitor having extremely detailed familiarity with the document.

49. The Monitor notes the below elements of the PGL Sale Agreement, which are particular to the facts and circumstances of the PGL Entities' business and operations, and the facts and circumstances of these CCAA Proceedings.

<u>Purchase Price Adjustments</u>

50. The Purchase Price and corresponding Purchase Price Allocation is subject to the following adjustments, on the Closing Date:

(a) **Unpaid Post CCAA Filing Accruals**: Cash or Cash Equivalents indirectly acquired by the Purchaser from the PGL Vendors will be acquired on a dollar for dollar basis, and such amount of Cash or Cash Equivalents shall be added to the Purchase Price after payment and deduction of any unpaid amounts owing by any of the PGL Vendors in respect of unpaid wages, source deductions, taxes and unpaid HST accruing up to the Closing Date. In the event that the Cash or Cash Equivalents are not sufficient to satisfy the Unpaid Post CCAA Filing Accruals or there are any liabilities that cannot be vested out and released as against the PGL Vendors and their directors and officers pursuant to the Approval and Vesting Order, the Purchase Price shall be reduced on a dollar for dollar basis to the extent that such Unpaid Post CCAA Filing Accruals and any such

undischarged liabilities are greater than the Cash or Cash Equivalents as at the Closing Date.

(b)    **Transfer Taxes**. Subject to the filing of certain tax elections, the Purchase Price shall be net of all applicable Transfer Taxes, which shall be paid by the Purchaser.

(c)    **Acquired AR Adjustment:** Accounts Receivable shall be purchased at a value equal to 70% of the face amount of such Accounts Receivable other than Intercompany Receivables (which are being acquired at nil value), and therefore the full amount of Accounts Receivable as estimated on the Allocation Statement shall be subject to adjustments based on the full amount of the Accounts Receivable, as determined by the Monitor, on (i) the Closing Date, and (ii) the date that is sixty (60) days following the Closing Date.

(d)    **Acquired Vehicle Adjustment**: The Purchase Price allocated to purchased Vehicles shall be reduced to omit any Ineligible Equipment, in an amount equal to value attributed to such Ineligible Equipment on the Allocation Statement. Ineligible Equipment means Vehicles of any PGL Vendor or TPine that is included in Schedule "G", but that prior to the Closing Date becomes unavailable for sale or otherwise cannot be conveyed to the Purchaser, including because the Vehicles have (a) been sold to a party other than the Purchaser, (b) been delivered to a secured creditor, or (c) been lost, damaged or destroyed due to theft, fire, collision, vandalism or other calamity and for which insurance proceeds are not available to repair or replace such Vehicles.

(e)    **Fuel Inventory Adjustment**. An amount of $50,000 has been allocated as the estimated fuel in the gas station fuel tanks as part of the "Inventory". On the Closing Date, the Vendors shall provide an updated measurement of actual fuel in the gas station fuel tanks and the Purchase Price shall be adjusted by X-$50,000 where X is the cost basis of the actual fuel in the gas station fuel tanks on the Closing Date.

(f)    **Prepaid Expense Adjustment**. An amount of $50,000 has been allocated to Prepaid Expenses, which Prepaid Expenses constitute pre-paid rent on the 6050 Dixie Road, Mississauga, ON property and prepayments in respect of Permits. This allocation will

be adjusted on the Closing Date to reflect the actual value received by the Purchaser on account of the Prepaid Expenses.

### Purchased Vehicles

51.    The PGL Sale Agreement provides for the purchase of substantially all of the PGL Vendors' trucks and trailers, subject only to the adjustment described above for Vehicles listed in Schedule "G" to the PGL Sale Agreement that are sold, returned to creditors or destroyed prior to Closing.

52.    In addition to the PGL Vendors' Vehicles, the Purchaser is buying substantially all of the Vehicles owned by TPine that are presently leased to the PGL Entities, which total approximately 270. Of these 270 TPine Vehicles, approximately 9 are subject to the Turn-Over Order, and will accordingly require the consent of the corresponding Securitization Party to be sold.

53.    In addition, the Purchaser is seeking to assume the leases of approximately 84 trailers (or such fewer trailers as the Purchaser may advise not less than 8 days prior to the hearing of the motion for an approval and vesting order), which are leased to PGL by Finloc 2000 Inc. ("**Finloc**", with such leases referred to as the "**Finloc Leases**"). The Monitor has determined that the Finloc Leases are "true leases", and that the leased Finloc trailers are not owned by PGL. As discussed elsewhere in this Fourteenth Report, the Finloc Leases are Critical Required Contracts.

### Real Estate Option

54.    As summarized in the chart above, the PGL Sale Agreement includes an option for the Purchaser to acquire, by way of an asset purchase or a share purchase, the real property owned by the Optional Vendors. This real property is:

(a)    land in Dorval, Quebec (the "**Dorval Property**"), including a warehouse and gas station, used to service and store idle vehicles, owned by Optional Vendor 129 Canada, and subject to a mortgage in favour of National Bank of Canada ("**NBC**");

(b)     land in Pierrefonds, Quebec, including a warehouse, used to service and store idle vehicles, owned by Optional Vendor 13184633 Canada Inc., and subject to a mortgage in favour of NBC; and

(c)     vacant land in Halton, Ontario, used to store idle vehicles, owned by Optional Vendor 2837229 Ontario Inc. and subject to a mortgage in favour of NBC.

55.     The Real Property Option has been built into the PGL Sale Agreement to balance (a) the Purchaser's need to acquire or have access to certain yards and facilities currently used by the PGL Entities, in order to continue the going-concern operations of PGL, with (b) the rights of the corresponding real property creditors to consent to the sale of real property, under the Real Estate Monetization Plan approved by the Protocols Order of Mr. Justice Osborne, dated April 5, 2024 (the "**Real Estate Monetization Plan**").

56.     The $1.00 exercise price for the Real Estate Option assumes that the market value of the properties are less than the current balance of the NBC mortgages, which the Monitor, NBC and RBC will have to validate if the Real Estate Option is exercised. The Monitor understands that if the Purchaser elects to exercise the Real Estate Option, it would seek to assume the existing NBC mortgages, and that the Purchaser intends to commence discussions with NBC imminently, now that the PGL Sale Agreement has been executed.

57.     If the Real Estate Option is exercised by the Purchaser and the Monitor, NBC and RBC do not consent, the Purchaser is still required to close the PGL Going Concern Transaction, provided that the Purchaser enters into a lease with 129 Canada for the Dorval Property, for a period of twelve (12) months at fair market value rents, with an option to extend such lease for an additional twelve months on consent of 129 Canada and the Purchaser, and an at-will termination provision in favour of the landlord of not more than 60 days notice.

58.     In the Monitor's view, the Real Estate Option strikes an appropriate balance, ensures that NBC and RBC's consent rights are protected, and provides a reasonable opportunity for the Purchaser to acquire real estate that is necessary for the operation of the PGL business. Specifically in respect of the Dorval Property, the Monitor believes that the lease condition that is triggered if the Purchaser cannot obtain NBC's and RBC's consents to acquire such

- 22 -

property is reasonable, and will not create undue harm or prejudice to 129 Canada, as owner of the Dorval Property.

<u>Lease Conditions</u>

59.    As described above, in addition to the lease condition for the Dorval Property (in the event that the Purchaser cannot acquire the Dorval Property), the PGL Going Concern Transaction is also subject to the Purchaser entering into leases with Pride Entities in respect of:

    (a)    land in Milton, Ontario, which includes a truck dealership and trucking terminal, used to service, store and repair vehicles, owed by Pride Entity 2076401 Ontario Inc. (the "**Milton Property**"); and

    (b)    land in Fort Erie, Ontario, which includes an office building and a repair and maintenance shop that is used to service vehicles, owned by Pride Entity 933 Helena Holdings Inc. (the "**Fort Erie Property**").

60.    The PGL Sale Agreement prescribes that the leases for the Milton Property and Fort Erie Property must be on the same terms as described above for the Dorval Property: a period of twelve (12) months at fair market value rents, with an option to extend such lease for an additional twelve months on consent of the property owner and the Purchaser, and an at-will termination provision in favour of the landlord of not more than 60 days notice.

61.    Finally, the Purchaser shall only be required to close if the leases of (a) 6050 Dixie Road, Mississauga, ON (the "**Dixie Road Property**"), and (b) 6253 Boundary Road, Cornwall, ON (the "**Cornwall Property**"), are assigned to it. These are the only pieces of real property where the landlord is not a Pride Entity, and as such this condition constitutes a third-party condition requiring consent of the landlords.

62.    The Monitor understands that the Purchaser will be commencing discussions with the Dixie Road Property landlord imminently.

63.    The lease for the Cornwall Property does not yet exist: the Cornwall Property was recently the subject of an approval and vesting order in these proceedings, authorizing 2863283

Ontario Inc. (a Pride Entity) to sell the Cornwall Property to Globocam (Montreal) Inc. ("**Globocam**"). As discussed in the Twelfth Report, the sale agreement for the Cornwall Property includes a lease-back option in favour of PGL. The sale of the Cornwall Property to Globocam is expected to close on August 29, 2024, following which the PGL lease will be promptly negotiated and settled, in order to satisfy the corresponding condition on the PGL Sale Agreement.

Critical Required Contracts

64.    The PGL Sale Agreement provides that substantially all of the PGL Vendors' Contracts will be assumed by the Purchaser, subject to obtaining the necessary consents or an assignment order, however only 6 Contracts are "Critical Required Contracts", the assignment of which is required as a condition of closing. These Critical Required Contracts are:

(a)    DEF contract dated as of August 29, 2023 between Shell Flying J and Pride Diesel Inc.;

(b)    The Dixie Road Property lease;

(c)    The Cornwall Property lease;

(d)    Fuel contract dated as of June 19, 2023 between Shell Flying J and Pride Diesel Inc,;

(e)    Branded Dealer Agreement (Esso) dated as of October 25, 2019 between Husky Oil Marketing Company, a division of Husky Oil Operations Limited and 2076401 Ontario Inc.;

(f)    Master Leasing Agreement No. A900271 PRI 6055 dated November 5, 2019 between PGL and Finloc 2000 Inc., and each of the following leasing agreements entered into thereunder: A900271-10854, A900271-10885 (as amended), A900271-10891, A900271-10905, A900271-10949, A900271-10990, A900271-11125, A900271-11138 (defined in the PGL Sale Agreement as the "Finloc Leases").

65.    The Monitor understands that the Purchaser will commence discussions with the counterparties to the foregoing Critical Required Contracts (other than Globocam, who

cannot consent to the lease assignment until the Cornwall Property has been conveyed to it at the end of August). The Monitor will assist the Purchaser in its discussions to the extent it can be helpful, and the Vendors (through the CRO) will endeavour to obtain the necessary consents or assignment orders to secure the assignment of the Critical Required Contracts.

66.     As discussed above, the Purchaser is required to fund any Cure Costs associated with the assignment of the Critical Required Contacts, in addition to the Purchase Price.

*PGL Stakeholder Consultation*

67.     The Monitor's engagement with the key stakeholders of the PGL Entities, defined in the Twelfth Report as the "**PGL Equipment Financiers**", is described in paragraphs 55 through 61 of the Twelfth Report.

68.     The PGL Sale Agreement was finalized and executed on August 27, 2024. On the same date, the Monitor:

(a)     provided each of BMO, CWB Maxium Financial Inc., Daimler Truck Financial Services Canada Corporation, HSBC (via Royal Bank of Canada as successor to HSBC), Royal Bank of Canada (in its capacity as bilateral lender), the Bank of Nova Scotia and TD Equipment Finance Canada, with an illustrative analysis of estimated recoveries of such lender, based on the Purchase Price allocation set out in the PGL Sale Agreement; and

(b)     offered to schedule a call with each lender referred to in subparagraph (a), above, to discuss the illustrative recovery analysis.

69.     The Monitor and the Pride Entities' counsel held a call with NBC and its counsel on August 26 to discuss the Real Estate Option and real estate issues generally. The Monitor understands that a follow-up discussion between NBC and the Purchaser's counsel is planned for August 28, 2024.

70.     As of the date of this Fourteenth Report, one Financier of PGL has requested a call with the Monitor, however the Monitor remains available to discuss with other Financiers of PGL.

*Monitor's View of the PGL Going Concern Transaction*

71.     The Monitor supports the PGL Going Concern Transaction for the following reasons:

   (a)     it provides a higher recovery than a forced liquidation;

   (b)     it provides for the purchase of substantially all the PGL Entities' assets, including trucks, trailers, inventory, and accounts receivable (other than accounts receivable owing by non-acquired Pride Entities), on an as-is, where-is basis;

   (c)     the Purchase Price was the result of a thorough and comprehensive sale process, on Court-approved terms and conditions;

   (d)     the sale contemplates the assumption of substantially all employees, independent contractors and customer contracts;

   (e)     the closing and post-closing adjustments regarding assumed liabilities and other assets are limited and rational;

   (f)     the Real Estate Option appropriately balances the Purchaser's need for real property to conduct the PGL business with the mortgagee's rights to consent to a sale of such real property pursuant to existing Court orders; and

   (g)     as discussed in the next following section of this Fourteenth Report, the alternative to the PGL Going Concern Transaction will be expensive, time consuming, destructive to value and logistically very difficult to implement.

**ALTERNATIVE PGL WIND-DOWN PLAN**

72.     As described above, at any point in time, PGL has over 1,000 active trucks and trailers with loads, of which approximately 85% include perishable products.  Further, most inactive units are booked for ongoing loads on a regular basis. In the event the going concern sale

does not proceed, the Monitor and the CRO considered it prudent to assess the process to wind down the PGL Entities' operations in an orderly manner. An orderly wind-down avoids a chaotic situation where trucks and trailers are in transit and no funding or coordination is in place to ensure they are returned after completing customer deliveries in a safe and organized manner, and is in the best interests of stakeholders, including employees and customers. The Monitor and CRO propose an orderly wind-up of PGL's business operations to be coordinated by the Monitor and CRO, with the assistance of a third party, if the going concern sale does not proceed.

73.    The Twelfth Report sets out that the Monitor and the CRO were previously in discussion with Hilco Global ("**Hilco**"), who has significant experience in such wind-downs.

74.    On or about July 31, 2024, Hilco presented a proposal to coordinate the wind-down of the PGL Entities and monetize its truck and trailer assets (the "**Initial PGL Wind-Down Plan**") if a going concern sale does not proceed.  The PGL Entities (and the Johal family) were not involved with the solicitation or preparation of the Initial PGL Wind-Down Plan, other than to the limited extent they assisted with the data accumulation. The Initial PGL Wind-Down Plan was shared with Financiers of PGL as well as certain other significant creditors of the Pride Entities, but the Financiers of PGL were not supportive of the Initial PGL Wind-Down Plan.

75.    The CRO and the Monitor have worked with Hilco since the August 9th hearing to prepare a revised wind-down proposal for PGL (the "**PGL Wind-Down Plan**"). The PGL Wind-Down Plan has been provided to the Financiers of PGL, certain other significant creditors of PGL, and the DIP Agent, together with the budget which provides for the liquidity requirements to execute an orderly wind-down and turn-over of collateral.

76.    The Monitor has reviewed the PGL Wind-Down Plan and is of the view that it provides for the wind-down of PGL's business operations in an orderly and efficient manner by an experienced third-party operator. Given the complexities of an uncoordinated liquidation of the PGL business if the Financiers of PGL take separate enforcement actions, it is the Monitor's view that the only reasonable options for PGL are (i) the PGL Going Concern Transaction, or (ii) the PGL Wind-Down Plan.

- 27 -

77.    The following is a summary of key components of the PGL Wind-Down Plan, which would be supervised by the CRO and the Monitor:

(a)    immediately upon Court approval of the PGL Wind-Down Plan, the CRO and Monitor, with the assistance of the PGL Entities staff, will reach out to all customers with active loads to confirm that existing orders will be satisfied;

(b)    Hilco will use existing company dispatch resources to marshal the PGL Entities' assets to two centralized rented locations, with one such location being in Montreal and the other being in Toronto (the "**Asset Site**s")[8];

(c)    Hilco will use all three driver channels (employee, contractors, and owner operators) for the purpose of this marshalling exercise, but will prioritize using employees to minimize incremental costs;

(d)    Hilco has provided for time in the plan for the completion of existing orders to minimize customer disruption;

(e)    Hilco intends to have the majority of the PGL Entities' tractors and trailers held at the Asset Sites, parked in an organized fashion to facilitate turn-over to Financiers of PGL, within 25 days of commencing the PGL Wind-Down Plan, subject to trailer access[9];

(f)    Financiers of PGL would be permitted to attend the Asset Sites to pick up their respective collateral over a 3-4 week period, subject to the Court's determination as to an appropriate allocation of the costs of the PGL Wind-Down Plan to each affected Financier of PGL; and

(g)    the PGL Wind-Down Plan contains estimated costs of $12,800,000, which are projected to be incurred due to marshalling, parking costs, de-identification (i.e., removal of PGL signage), essential repairs, rent, broker expenses, insurance, software, employee payroll, accrued pay, yardies (i.e., assisting with items in the yards and pick

---

[8] There will not be sufficient available space in existing Pride Entities yards to marshal and store such a large volume of trucks and trailers, so short term parking facilities must be secured.

[9] The Monitor understands that there may be a delay in respect of approximately 5% of the assets caused by (i) customers using trailers for storage purposes, and (ii) non-functioning vehicles and vehicles that cannot be located.

up by Financiers of PGL), India staff support, vacation pay, key employee retention plan, third-party management and oversight, HST, and professional fees.

*Comparative Analysis of PGL Going Concern Transaction and PGL Wind-Down Plan*

78.   The Monitor has conducted an analysis of illustrative recoveries to stakeholders under two scenarios: (i) the PGL Going Concern Transaction; and (ii) if such going concern sale does not proceed, the wind-up of PGL's business operations as described in the Initial PGL Wind-Down Plan.

79.   There are two categories of stakeholders that receive recoveries under these scenarios: (i) Financiers of PGL, who receive recoveries from the sale of the vehicles and trailers financed by such Financiers; and (ii) the Syndicate Lenders (as defined in the First Report), who receive recoveries from the sale of the remaining assets of PGL. The Monitor's counsel has reviewed the security of these stakeholders as described in the Eleventh Report.

80.   The following two tables set out illustrative estimated recoveries to Financiers of PGL and the Syndicate Lenders based on the two scenarios described above:

| Illustrative Estimate of Proceeds (000's of dollars) | Note | PGL Going Concern Transaction | Hilco High (PGL Wind-Down Plan) | Hilco Low (PGL Wind-Down Plan) |
|---|---|---|---|---|
| **Financiers of PGL** | | | | |
| Vehicles and trailers (subject to closing adjustments) | 1 | 41,099 | 66,561 | 43,265 |
| Add (Less): Adjustments to compare the PGL Sale Agreement to Hilco's valuation | | | | |
| Assets to be returned to equipment lenders (included in Hilco) | 2 | 1,349 | - | - |
| Assets approved for sale (included in Hilco) | 2 | 2,144 | - | - |
| Assets sold subsequent to Hilco valuation | 2 | - | (4,305) | (2,798) |
| **Estimated Net Proceeds** | | **44,592** | **62,256** | **40,467** |
| | | | | |
| Less: estimated costs | | | | |
| Auction and sales costs | 3 | - | (12,000) | (12,000) |
| Other direct Sales costs | 4 | - | (8,010) | (8,010) |
| Allocation of indirect wind down costs | 5 | - | (3,233) | (3,233) |
| Professional fees | 6 | (300) | (300) | (375) |
| Operating lease costs | 7 | - | (153) | (153) |
| **Net Illustrative Estimate of Proceeds** | | **44,292** | **38,560** | **16,696** |

Notes:
1. Vehicles and trailers including assets of PGL and certain assets of Tpine. The Hilco high scenario is based on a forced liquidation value and the low scenario assumes 65% of the high scenario.
2. These line items are adjustments to compare the assets in the PGL Going Concern Transaction to the Hilco valuation scenarios.
3. Auction and sales costs are Hilco's estimates of costs to sell assets.
4. Other direct sales costs include costs for marshalling, parking, brokerage and driver costs.
5. Indirect costs include staff costs, rent and software costs.
6. Professional fees is an estimate of costs to sell the business.
7. Operating lease costs are post-filing costs with respect to operating leases.

Case 24-10632-CTG    Doc 280-3    Filed 10/29/24    Page 33 of 481

- 29 -


| Illustrative Estimate of Proceeds (000's of dollars) | Note | PGL Going Concern Transaction | Hilco High (PGL Wind-Down Plan) | Hilco Low (PGL Wind-Down Plan) |
|---|---|---|---|---|
| **Syndicate Lenders** | | | | |
| Accounts receivable (subject to closing adjustments) | 1 | 9,000 | 3,881 | 3,881 |
| Other business assets (excluding vehicles and trailers) | 2 | 360 | 72 | - |
| Estimated cash on closing | 3 | 1,600 | 1,600 | 1,600 |
| Cash consideration for letters of credit | 4 | 4,000 | | - |
| **Estimated Proceeds** | | **14,960** | **5,553** | **5,481** |
| | | | | |
| Less: estimated costs | | | | |
| Accrued liabilities | 5 | (4,252) | (4,252) | (4,252) |
| Letters of credit to be paid to the issuer | 4 | (4,000) | - | - |
| Allocation of indirect wind down costs | 6 | - | (697) | (697) |
| Professional fees and contingent liabilities | 7 | (450) | (450) | (525) |
| **Net Illustrative Estimate of Proceeds** | | **6,258** | **154** | **7** |

Notes:
1. The PGL Going Concern Transaction includes accounts receivable at 70% of the value of such accounts receivable on closing.  Hilco's valuation estimates 30%.
2. Other business assets include tangible and intangible property, prepaid amounts and inventory.
3. Estimated cash on closing is assumed based on the cash balance as of August 26, 2024.
4. Cash for the letters of credit will be paid by the Purchaser directly to the issuer of the letters of credit in order to cash collateralize and transfer them to the Purchaser.
5. Accrued liabilities include costs for accrued wages, fuel, repairs and brokerage costs.
6. Indirect costs include staff costs, rent and software costs.
7. Professional fees is an estimate of costs to sell the business and contingent liabilities.

81.  Based on the above illustrative analysis, it appears that Financiers of PGL and the Syndicate Lenders would receive a higher recovery under the PGL Going Concern Transaction as compared to the Initial PGL Wind-Down Plan.

82.  The Monitor notes that the above illustrative values of the PGL Going Concern Transaction and the Initial PGL Wind-Down Plan are based on the existing Purchase Price Allocation in the PGL Sale Agreement and the Initial PGL Wind-Down Plan, however also notes that the PGL Sale Agreement is subject to certain closing adjustments, as described above, including the sale of certain PGL surplus assets.

83.  The Monitor notes that the illustrative recoveries described above would be different for each individual Financier of PGL. As described above, the Monitor has provided the most significant Financiers of PGL with an analysis of illustrative estimated recoveries related to such Financier.

*PGL Equipment Financiers and Lift-Stay Motions*

84.  The Monitor's recommendation for the approval of the PGL Sale Agreement, and in the alternative, the PGL Wind-Down Plan, is made in the context of several Lift-Stay Motions (as defined below) brought by certain PGL Equipment Financiers, and the PGL Equipment Financiers Letter proposing a receivership of PGL Entities.  The following is a summary of these matters:

(a)     Certain of PGL's trucks and trailers are financed by various lenders, including the PGL Equipment Financiers.

(b)     The Monitor's counsel has completed its review of the security of the Financiers of PGL, and its conclusions are set out in the Eleventh Report beginning at Paragraph 42. While the issues identified by the Monitor's counsel with respect to the Financiers of PGL's security interests in PGL vehicles are limited, the Monitor's counsel has identified issues with respect to a total of 64 VINs, and identified multiple collateral vehicles, or "MCVs", subject to the claims of such Financiers.

(c)     Each of the PGL Equipment Financiers have brought motions seeking a lifting of the stay of proceedings to enable the PGL Equipment Financiers to exercise remedies against PGL property to which their security attaches (collectively, the "**Lift-Stay Motions**"). A chart summarizing the Lift-Stay Motions is attached hereto as **Appendix "E"**.  While the relief requested in the Lift-Stay Motions varies by PGL Equipment Financier, generally it involves each lender being authorized to either take direct possession of its collateral, or the appointment of a receiver to do so. The Lift-Stay Motions also each provide for different treatment of MCVs, but generally defer to the Entitlement Claims Process Order for the determination of entitlement to MCVs. In each case, the Lift-Stay Motions seek time and considerable assistance from the PGL Entities and the Monitor to access the collateral claimed. As noted above, the PGL Equipment Financiers' Letter suggests a receivership of the PGL Entities.

(d)     As referenced in the Ninth Report, virtual meetings were conducted by the Monitor and the CRO on July 3, 2024 with each of the DIP Agent and Financiers of PGL, except for one equipment financier who was not available. At the meetings, the Monitor and the CRO provided a status update of the PGL Sale Process and a summary of the bids received, on a confidential basis. There was a subsequent call held with the one equipment financier who missed the meeting to provide the same presentation. Since July 3, 2024, the Monitor and CRO have had individual meetings with the DIP Agent and the Financiers of PGL to receive feedback and respond.

(e)     On August 7, 2024, the PGL Equipment Financiers were consulted on the details of a going concern sale to the Proposed Purchaser and the PGL Wind-Down Plan. The PGL Equipment Financiers indicated to the Monitor their preference of developing a centralized, coordinated and controlled disposition and wind-down of the remaining PGL assets with counsel to the PGL Entities and the CRO, in consultation with the Monitor. The PGL Equipment Financiers' Lift-Stay Motions were accordingly adjourned to September 3, 2024, to allow the Pride Entities additional time to advance a resolution.

(f)     Counsel to the Pride Entities provided the PGL Wind-Down Plan supporting materials to PGL Equipment Financiers and the DIP Agent on August 20, 2024 and August 21, 2024, respectively.

85.     As set out in the Twelfth Report, the logistics, timing, and costs of the PGL Entities, the CRO, the Monitor and their respective counsel that would be required to implement the relief requested in the Lift-Stay Motions present a complicated problem that would need to be coordinated and for which there is currently no funding available.  For example:

(a)     PGL's trucks and trailers are spread across North America, many in the possession of employees and contract drivers, and PGL's participation would be required to locate, store and turn-over possession of these vehicles.

(b)     Many of the PGL trucks and trailers are actively engaged in transportation contracts with customers, including significant blue-chip retailers and other businesses, in respect of which the Monitor understands customer cargo is currently in the possession of PGL.  A hard shut-down of the PGL business would mean that these contracts could not be completed and would create considerable issues with returning customer property.

(c)     The PGL Equipment Financiers are secured against the PGL trucks and trailers to which their security attaches, and the proceeds thereof, but not the accounts of PGL. A hard shut-down of the PGL business would have deleterious effects on receivables, to the prejudice of PGL, the DIP lenders and the lenders under the FARCA.

- 32 -

(d)     As a result of the maturity of the DIP Facility, PGL can only fund its expenses from its customer receivables in the absence of an alternative source of interim financing being provided.

(e)     The relief requested in each Lift-Stay Motion is slightly different, and if the Lift-Stay Motions are to be granted, it would be prudent to harmonize the relief across all PGL Equipment Financiers to ensure efficient implementation.

(f)     While each of the Lift-Stay Motions generally propose to deal with MCVs in a manner that is consistent with the Entitlement Claims Process, the Monitor has identified issues with the security of a number of the PGL Equipment Financiers, as outlined in the Eleventh Report. Specifically, the Monitor has identified issues with 24 of BNS's non-MCV PGL VINs, 14 of Royal Bank of Canada's non-MCV PGL VINs,[10] and 26 of TD Equipment's non-MCV PGL VINs, and concluded that the security of the DIP Agent and Syndicate Agent (as defined in the Twelfth Report) would have priority. The treatment of these 64 VINs will need to be coordinated with PGL, the Monitor and the affected PGL Equipment Financiers.

(g)     The PGL Equipment Financiers do not represent the totality of secured creditors of the PGL Entities. As set out in the Eleventh Report, Coast Capital Equipment Finance Ltd. (and Travellers Leasing Ltd.) (12 VINs), Concentra Bank (12 VINs), Canadian Western Bank (20 VINs), and De Lage Landen Financial Services Canada Inc. (23 VINs) have proven an interest in vehicles of the PGL Entities, and Meridian OneCap Credit Corp. also claims an interest in certain PGL assets (and has filed a lift-stay motion).  A hard shut-down of the PGL business would leave the assets financed by the non-PGL Equipment Financiers stranded.

(h)     The relief requested in the Lift-Stay Motions would directly or indirectly lead to the sudden elimination of over 500 jobs.

86.     As of the date of this Fourteenth Report, the PGL Entities have trucks and trailers located in Ontario and Quebec, as well as in over 20 states within the United States. The PGL

---

[10] Royal Bank of Canada is referred to in the Eleventh Report as HSBC, as HSBC is the predecessor secured party.

Entities' main driving routes include Toronto to Montreal, U.S. East Coast and U.S. Midwest (Chicago, Nashville, Dallas). Several of the PGL Entities' trucks and trailers are being held by customers that are using such assets for storage purposes, including with respect to perishable items. The location of the majority of the PGL Entities' trucks and trailers are determinable by GPS, however, not all vehicles have the software required to determine location. The vast number of trucks and trailers currently held on Pride lots have caused significant congestion issues on Pride lots and are not segregated by Financier to facilitate turn-over.  Accordingly, given the diverse array of transit routes, locations, and other obstacles to turn-over of the PGL Entities assets, the Monitor views anything except an orderly, coordinated, harmonious, and funded turn-over as an impractical method to wind-down the PGL Entities in the circumstances.

**SECURITIZATION PARTY TURN-OVER UPDATE[11]**

87.     Following the issuance of the Turn-Over Order, the Pride Entities started to coordinate and logistically prepare for an orderly transition and relinquishment of the Subject Assets.

88.     Approximately 8,400 of the Subject Assets that are either active leases or leases in default will be ready for Turn-Over by August 30, 2024. The Securitization Parties or their applicable replacement servicers are expected to be prepared to service approximately 4,400 of these Subject Assets by the same date. As further described below despite substantial lead time, two Securitization Parties have indicated that they will require additional time before their replacement servicers can take over servicing of their Subject Assets. This will result in approximately 4,000 active leases or leases in default to be turned-over in September 2024.

89.     Approximately 630 of the Repossessed Assets, across over 30 locations will be made available for physical retrieval by September 3, 2024, with a scheduled pick-up period through the end of September.

---

[11] Capitalized terms not otherwise defined under this section have the meaning ascribed thereto in the Turn-Over Order.

*Turn-Over of Subject Assets that are not Repossessed Assets*

90.     On August 19, 2024, the Pride Entities issued a notice to counsel of each Securitization Party referred to in Schedule "B" of the Turn-Over Order, setting out the proposed mechanics of the Turn-Over (the "**Turn-Over Mechanics Notice**").  A copy of the Turn-Over Mechanics Notice is attached hereto as **Appendix "F"**.

91.     The Turn-Over Mechanics Notice communicated the Pride Entities' target date of August 30, 2024 for the Turn-Over of Subject Assets that are not Repossessed Assets. These Subject Assets are comprised of active leases or leases in default. The Pride Entities selected August 30, 2024 as the target date based on the progress and status of the knowledge transfer between the Pride Entities and the respective replacement servicers for each Securitization Party.

92.     The Turn-Over Mechanics Notice also reminded each Securitization Party that pre-authorized payments ("**PAPs**") can only be initiated for leases with respect to the Subject Assets listed on the applicable Subject Asset Schedules. To the extent that any PAPs for MCVs are paid into blocked accounts that are controlled by the Securitization Parties or the Securitization Parties are in receipt of any other amounts that are the property of another stakeholder, all such amounts are required to be transferred to the Monitor's trust account as soon as practicable.

93.     As of the date of this Fourteenth Report, the Monitor understands that all but two Securitization Parties are on schedule to complete the transition and Turn-Over of the active leases or leases in default contained in the Subject Asset Schedules by August 30, 2024. Two of the Securitization Parties (representing almost 50% of securitization leases) informed the Pride Entities on the week of August 19, 2024 that their replacement servicers will not be ready to start servicing their Subject Assets until the second week of September and the fourth week of September, respectively.

*Turn-Over of Repossessed Assets*

94.     On August 23, 2024, the Pride Entities provided the applicable Securitization Parties a list containing the status, current as of August 12, 2024, of the Subject Assets referenced on

the Subject Asset Schedules (the "**August 23rd Turn-Over List**").  To the extent that a Securitization Party is entitled to the Turn-Over of Repossessed Assets, the August 23rd Turn-Over List for the applicable Securitization Party also specified the location of the Repossessed Assets.

95.    The Repossessed Assets that are ready for retrieval, current as of August 12, 2024, are located across over 30 sites (each site, a "**Pride Lot**").  The Pride Entities, in consultation with the Monitor, have implemented a set of procedures to facilitate a safe and orderly process for the retrieval of the Repossessed Assets.  As set out in the Turn-Over Mechanics Notice, each Securitization Party is required to schedule a mutually-agreeable pick-up window (the "**Pick-Up Window**") with the Pride Entities and the Monitor.  Once the Pick-Up Windows are scheduled, each Securitization Party is required to deliver a letter to the site supervisor of each applicable Pride Lot, specifying: (a) the VINs of the Repossessed Asset(s), (b) the relevant Pick-Up Window, (c) confirmation that the representatives or agents taking possession of the Repossessed Assets have proper insurance to take possession of same, and (d) the contact particulars of authorized representatives that will be retrieving the Repossessed Assets on behalf of the Securitization Party.

96.    Approximately 630 Repossessed Assets (i.e. physical vehicles) contained in the Subject Asset Schedules will be available for retrieval starting September 3, 2024, unless consent by the Monitor is obtained for an earlier retrieval date.[12] These units are expected to be retrieved over the next four weeks.

*DIP Agent's Request for Initial Reporting Letters*

97.    On August 16, 2024, the DIP Agent's counsel requested the Monitor to share the "Initial Reporting Letters" referred to in the Tenth Report subject to protections that are agreeable by the Monitor and the Monitor's counsel. The Monitor considered the DIP Agent's disclosure request and the Monitor's Canadian Counsel responded to the DIP Agent's

---

[12] Applicable Securitization Parties are permitted to retrieve the five Repossessed Assets located in Houston, Texas as soon as practicable on the basis that the lease to this Pride Lot is being disclaimed effective August 30, 2024.

counsel on August 21, 2024 (the "**Response to Disclosure**").  A copy of each of these letters are attached hereto as **Appendix "G"**.

98.    As set out in the Response to Disclosure, the Monitor is of the view that the disclosure of the Initial Reporting Letters would be inappropriate without first receiving a consent and waiver from the relevant Securitization Parties, their counsel and certain other persons who provided confidential information to the Monitor and/or its counsel.

99.    In the interest of efficiency and recognizing the need for cost control, the Monitor is prepared to (i) provide written responses to the DIP Agent's enquiries on the information and analysis set out in the Tenth Report in lieu of disclosing the Initial Reporting Letters or (ii) help pursue consents and waivers for disclosing the Initial Reporting Letters, provided that:

(a)    the DIP Agent agrees to reimburse the Monitor for its costs;

(b)    the information and analysis provided in response to any enquiries is also disclosed to any affected stakeholder to be even-handed and fair; and

(c)    any legal analysis from the Monitor's counsel is subject to appropriate non-reliance protections.

*Preservation Notice*

100.    On August 19, 2024, the Pride Entities issued a document preservation notice (the "**Preservation Notice**") pursuant to paragraph 16(b) of the Turn-Over Order. The Preservation Notice notified potential custodians of the Turn-Over Order and their obligations to preserve "Relevant Documents" (as defined in the Turn-Over Order) with respect to the Securitization Programs. The Preservation Notice was posted on the Monitor's website and is attached hereto as **Appendix "H"**.

**SECURITY REVIEW UPDATE**

101.    Since July 31, 2024, the Monitor and its Canadian Counsel and U.S. Counsel have received numerous follow up questions and additional information from a multitude of Financiers,

including receiving approximately 194 additional documents and responses to certain MCV claims from 10 Financiers. At this time, the Monitor and its Canadian Counsel and U.S. Counsel have not reviewed or considered any new documentation or information received from any Financier after July 31, 2024 (and have advised each applicable Financier accordingly), as the Pride Entities do not presently have funding to allow this further, inter-creditor, analysis to be completed.

102.    As it relates to certain PCVs, the Monitor has been able to resolve 71 priority claims and, through receiving specific email confirmation from certain Financiers, 6 MCV claims.[13]

## REAL ESTATE TRANSACTIONS UPDATE

103.    The Monitor understands that the Pride Entities intend to close the Cornwall Transaction on August 29, 2024, and the Abbotsford Transaction on September 20, 2024, which will provide for total estimated gross proceeds of $21,000,000 (being the sale price, less agent/legal fees and other closing costs) and an estimated $5,200,000 after payout of mortgages.

104.    Additionally, 11 of the Pride Entities' properties are in either the letter of intent or executed purchase agreement phase of the associated sale process.  Of these 11 properties, one is located in Canada and 10 are located in the United States, with total estimated gross proceeds being $139,000,000 (being the sale price, less agent/legal fees and other closing costs) and an estimated $45,700,000 after payout of mortgages.

105.    Each affected mortgagee has been consulted in the listing and sale agreement negotiation process, as required by the Real Estate Monetization Plan. The progress on real estate monetization has been promising, and the Monitor anticipates numerous motions for sale approvals, vesting orders and distribution orders will be forthcoming in the near term.

---

[13] PCV references include 16 VINs contemplated in Schedule "D" of the Order re Daimler Surrendered Vehicles, dated June 27, 2024, which the Monitor determined subsequent to the issuance of such order were not MCVs.

**IDLE UNITS UPDATE**

106.    On August 21, 2024, counsel to each of PACCAR, VFS Canada, VFS US, and Daimler (the "**OEMs**") delivered a joint letter to the Monitor and Pride Entities (the "**OEM Letter**").

107.    The OEM Letter stated, among other things, that (i) their idle financed and leased trucks (the "**Idle Units**") are being held by the Pride Entities, (ii) the OEMs are concerned that wind-up expenses are going to be extracted from Idle Units for the benefit of other lenders that may require more complex and expensive wind-up procedures, (iii) the OEMs view it as practical for arrangements to be made now to return accessible, Idle Units and to permit the forwarding of notices of assignment to third party lessees so that they can take over servicing of those leases, which the OEMs will do at their expense, and (iv) the Pride Entities and the Monitor's counsel must make themselves available for a meeting with the OEMs to discuss the Idle Units. The OEM Letter additionally attached a draft Order for the consideration of the Monitor and Pride Entities' counsel.  Copies of the OEM Letter and draft order are attached hereto as **Appendices "I"** and **"J"**.

108.    The Monitor notes that notwithstanding the suggestion in the OEM Letter that the Monitor and the CRO have not engaged with the OEMs since the August 9th hearing, the Monitor and the CRO had meetings with representatives of PACCAR and Daimler in the week of August 12, 2024 and have discussed, at a high level, the Orderly Wind-Down Plan, including the "user pay" model and the need for an orderly wind-down and turn-over of collateral.

109.    On August 27, 2024, PACCAR served a supplementary motion record in connection with the September 3 Motion which, among other things, seeks the granting of an order (i) lifting the Stay to permit PACCAR to recover from and/or sell, outside of these CCAA Proceedings, its trucks listed in Schedule "B" thereto (the "**Leased Trucks**") which are subject to leases entered into between the Pride Entities and third-parties (whether performing or non-performing) (the "**Leases**"), (ii) permitting PACCAR to deliver notices of assignment to the affected lessees of all the interests and rights of the Tpine Entities (as defined therein) in the Leases to PACCAR (each an "**Assignment**"), and (iii) requiring the

Tpine Entities and the Monitor to inform each affected lessee of the Leases of the Assignment.

110.    The Monitor is of the view that the return of the Idle Units must be balanced with a fair and consistent process to allocate the Restructuring Costs among all affected Financiers, including those OEMs with a small number of Idle Units. The Monitor intends to return the Idle Units to OEMs, but notes that the OEMs should be allocated their fair share of the Restructuring Costs at the appropriate time in these CCAA Proceedings.

**PRIDE ENTITIES' WIND-DOWN PLAN**

111.    The Monitor confirmed in its Thirteenth Report that it no longer views a going concern restructuring plan for the Pride Entities as a feasible option, other than the going concern sale of the PGL Entities, given the lack of stakeholder support. Accordingly, the CRO and the Monitor have directed their efforts towards developing a centralized, coordinated, and controlled wind-down of the Pride Entities' remaining assets (the "**Orderly Wind-Down Plan**"), other than in respect of the PGL Entities.

112.    The Monitor views the Orderly Wind-Down Plan as imperative, given the vast number of vehicles in the Pride Entities' fleet across North America, in addition to the thousands of leased vehicles (most of which are constantly in transit). The Monitor stated in its Thirteenth Report that any form of wind down would require liquidity to fund the necessary payroll, transition costs, transfer of assets to the applicable Securitization Parties, and administration costs of the Pride Entities. Without this funding, employees would be immediately terminated, customers would be stranded, committed and in-progress sales would be abandoned, leases would not be serviced, delinquency rates would increase, and many vehicles would be abandoned without the critical infrastructure needed to support their retrieval or to determine competing claims against the assets of the Pride Entities.

113.    The CRO and the Monitor considered options to best secure necessary financing to fund the Orderly Wind-Down Plan and other remaining matters in these CCAA Proceedings. Efforts to secure a New Interim Financing Facility to pursue an Orderly Wind-Down Plan resulted in the Pride Entities pursuing the Indicative Term Sheet.

114.    The Monitor advised in its Thirteenth Report that due to the DIP Facility being effectively fully drawn and matured, and given the restrictions on the manner in which the Final Advance could be used by the Pride Entities pursuant to the Payment Procedure Agreement, the Pride Entities would have limited liquidity during the interim period of July 29, 2024 up to and including September 8, 2024 by which point the Pride Entities intended on seeking Court approval of a New Interim Financing Facility. The result of these circumstances was that, without additional funds, the Pride Entities would not be able to satisfy their working capital requirements and other needs over that time period which would jeopardize the value of their assets and fleet. The Pride Entities accordingly required access to the Deferred Payments and sought to temporarily suspend the requirement that they disburse the Deferred Payments for the purpose of using the Deferred Payments for working capital until such time as additional funding under a New Interim Financing Facility became available.

115.    Since the August 9th hearing, the CRO and the Monitor have engaged with certain of the Pride Entities' most significant secured lenders in respect of an Orderly Wind-Down Plan proposal for the entirety of the Pride Entities' estate (as described in further detail below).

116.    In addition to meetings with the PGL Equipment Financiers, Daimler and PACCAR, the CRO and the Monitor have held meetings with the DIP Agent and Mitsubishi, being significant secured lenders to the Pride Entities to discuss and devise a fair and balanced Orderly Wind-Down Plan proposal for Court approval that would be administered by the CRO, with the assistance of the Monitor. The Orderly Wind-Down Plan proposal:

   (a)    obviates the need for multiple lift-stay motions, or the appointment of multiple Court officers;

   (b)    seamlessly transfers vehicles, or proceeds thereof, to entitled Financiers pursuant to the Monitor's security review, as contemplated in the Eleventh Report, and provides a process to resolve entitlement to PCVs, to be developed by the Monitor in consultation with the DIP Agent and affected Financiers;

   (c)    facilitates the delivery of the entire lease portfolio to entitled Financiers;

(d)     monetizes MCVs;

(e)     winds down the remainder of the Pride Entities' estate, including, but not limited to, matters involving employees, customers, and real estate; and

(f)     substantially self-funds the Orderly Wind-Down Plan, as opposed to a new debtor-in-possession funding solution that would subject Financiers to additional interest and fees.

117.    A summary of the Orderly Wind-Down Plan is provided below[14]:

| Orderly Wind-Down Plan | |
|---|---|
| **Employees and Independent Contractors** | 1. The Pride Entities' workforce will be progressively downsized beginning in October, 2024 and concluding around March, 2025 ("**Final Date**") to align with the wind-down of various business operations<br><br>2. The Pride Entities will terminate all contracts of employment with its employees, and disclaim independent contractor arrangements, on or before the Final Date. |
| **Vehicles** | 1. Pride Entities to work with Securitization Parties to turn-over vehicles expected to be complete by end of September.<br><br>2. Pride Entities to work with recourse lenders to turnover inventory through October. |
| **MCVs and PCVs** | 1. MCVs will be monetized and competing claimants' rights to proceeds of such assets will be determined under the Entitlement Claims Process.<br><br>2. The Monitor will carry out the Entitlement Claims Process in respect of MCVs, which process will be funded by the Financiers entitled to such MCV, with Court approval to be sought for the associated cost allocation.<br><br>3. The CRO and the Monitor, in consultation with the DIP Agent and affected Financiers, will develop and seek Court approval for a process to monetize and determine entitlement in respect of PCVs. Such process, which shall facilitate the resolution of |

---

[14] The table summarizing the Orderly Wind-Down Plan contains high level, anticipated terms, and is subject to further refinement in advance of any motion to approve the same.

| | |
|---|---|
| | Financier disputes in relation to PCVs, shall be funded by the Financier(s) entitled to such PCVs. |
| **Lease Portfolios** | 1. The Pride Entities will work with the Securitization Parties and their replacement service provider to transition the lease portfolio to them by August 30, 2024, except where Securitization Parties have requested a later transition.<br><br>2. The Pride Entities will work with the recourse lenders to transition the servicing of their lease portfolio to a replacement provider by the end of September. |
| **Real Estate** | 1. The remaining North American real estate portfolio of the Pride Entities, including approximately 11 properties that are currently in various stages of letter of intent and asset purchase agreement negotiations, will be sold.<br><br>2. The costs associated with administering the real estate portfolio sales will be funded through proceeds of sale of such properties. |
| **Costs of Wind-Down** | 1. The Monitor anticipates that costs will be substantially self-financed, with costs allocated by VIN in accordance with a future order of the Court. |

118.    The Monitor is supportive of the Orderly Wind-Down Plan on the basis that:

(a)      the Orderly Wind-Down Plan (i) provides for a fair and coordinated effort to liquidate the Pride Entities, (ii) combines the input of the CRO, (iii) is intended to maximize recoveries and preserve the value of secured collateral, (iv) appropriately addresses non-Vehicle related matters, such as employees and independent contractors involved in the Pride Entities' business operations, and (v) responds to all outstanding wind-down matters through one clear, coherent process; and

(b)      the alternative to the Orderly Wind-Down Plan, being the granting of numerous lift-stay motions and individual Financier enforcement orders, and instituting a hard shut-down of the Pride Entities' operations, would create a disorderly and disruptive situation that would (i) result in the immediate termination of more than 900 employees and contractors, (ii) abruptly leave customers, vehicles and in-progress operations abandoned, (iii) result in an uncoordinated process of Financiers racing to locate and retrieve their vehicle collateral, (iv) leave Pride Entities' assets stranded, or in the

wrong hands, (v) allow for unharmonized relief that would lead to inefficiency, and (vi) provide no funding to complete the customary tasks to terminate the CCAA Proceedings and Chapter 15 Proceedings, leading to abrupt bankruptcy assignments and individual and potentially disparate enforcement steps.

*Lift-Stay Motions and Individual Enforcement Actions are Impractical*

119.    The Monitor views numerous practical and logistical issues with Financiers undertaking individual enforcement actions to repossess their vehicle and trailer collateral, similar to those issues referenced in paragraph 85 above as it relates to the PGL Entities.

120.    The Monitor understands that (i) the Pride Entities currently have approximately 3,800 vehicles under active leases (following completion of the Turn-Over of Subject Assets to Securitization Parties), and approximately 4,000 vehicles[15] held on lots located across North America (which are not coordinated in any fashion by Financier), (ii) finding and moving trucks and trailers located on the Pride Entities' lots requires significant effort, including, but not limited to, identifying the VIN, matching it to the Monitor's Database and marking the appropriate Financier on the vehicle, testing and replacing batteries, fueling, towing unmovable or damaged vehicles away from the movable vehicles, hiring tow-trucks to move units either within the yard or externally, coordinating with lot supervisors, renting space where none is available, coordinating drivers, transferring insurance coverage, and (iii) finding and retrieving trucks and trailers located off the Pride Entities' lots entails further difficulty, including using GPS location technology, hiring repossession agents, paying for yard fees, paying for any costs needed to move unmovable vehicles and dealing with third-parties holding trucks for payment.

121.    The Pride Entities' primary lots, including in Milton, Ontario (the "**Milton Lot**") and Fontana, California ("**Fontana Lot**"), are congested with trucks and trailers, making it nearly impossible to simply enter the premises and retrieve Financier collateral, while also making it increasingly difficult to maintain public safety if such individual enforcement actions are carried out. The Monitor notes that no additional trucks or trailers can be parked

---

[15] Including vehicles to which Securitization Parties assert an interest.

on the Milton Lot or the Fontana Lot due to public safety and permitting requirements. The following are pictures from the Milton Lot illustrating this substantial congestion:







The following link provides an aerial video of the Milton Lot:
https://ln5.sync.com/dl/0ae7ce5a0/g4sxgswc-9nrenqch-8bhi659f-v68929jk.

Aerial photos and videos of the Fontana Lot are not available.

122.    The CRO and the Monitor are in the best position to supervise the marshalling and return of collateral given the substantial chaos that would ensue upon multiple Financiers attending the Pride Entities' lots (or travelling across Canada and the United States) to locate and repossess their secured collateral.

123.    In anticipation of the various lift-stay motions, the Financiers and their representatives have sought information from the Monitor and the Pride Entities to commence the process of transitioning lease payments to replacement servicers, which has resulted in numerous requests. There is simply no collective bandwidth, between the Monitor and the Pride Entities, to accommodate all such inquiries from multiple Financiers simultaneously, nor can it reasonably be expected.

124.    The Monitor views the existence of MCVs as further complicating individual enforcement actions given the ease of which a Financier may inadvertently retrieve MCVs under the false or mistaken pretense that they are entitled to such vehicle.  Shortly after the Turn-Over Order was granted, the Monitor understands that one of the Securitization Parties attended the Pride Entities' lot located in Fontana, California and retrieved 4 MCVs (the "**Mistaken Retrieval**").  The Securitization Party subsequently returned the MCVs,

without objection, when demanded by the Pride Entities. The Mistaken Retrieval illustrates that expediency of turning-over Financiers' collateral must be balanced with the need for a co-ordinated and harmonious plan for the return of vehicles overseen by the CRO and the Monitor to ensure that no Financiers are prejudiced by this return process.

## UPDATED CASHFLOW FORECAST

125.   The Monitor stated in its Thirteenth Report that due to the DIP Facility being effectively fully drawn and matured, and given the restrictions on the manner in which the Final Advance can be used by the Pride Entities pursuant to the Payment Procedure Agreement (described in greater detail in the Thirteenth Report), the Pride Entities would have limited liquidity during the interim period of July 29, 2024 up to and including September 8, 2024.

126.   The Monitor prepared an interim cash flow forecast for such period, in consultation with counsel to the Pride Entities and the CRO, which illustrated that, without access to further funding, the Pride Entities would have been able to satisfy their payroll, operating expenses and professional fees during that period only if relief was granted to allow the Pride Entities to temporarily retain and utilize Deferred Payments. As referenced above, such relief was granted pursuant to the Deferred Payments Order dated August 9, 2024, which allowed for a temporary period for the Pride Entities to operate while its counsel negotiated an appropriate wind-down plan with affected Financiers.

127.   The Monitor, in consultation with the Pride Entities, the CRO, and respective counsel, has prepared a cash flow forecast (the "**Wind-Down Cash Flow Forecast**") from August 12, 2024, until March 30, 2025 (together with subsequent period to complete final wind-up matters, the "**Wind-Down Period**").  A copy of the Wind-Down Cash Flow Forecast is attached hereto as **Appendix "K"**.

128.   The notes to the Wind-Down Forecast include a Gantt Chart to illustrate timing of various wind-down milestones and the estimated headcount reductions.  Based on the Wind-Down Forecast, it is estimated that there would be net receipts of $34.9 million consisting of commissions from cash sales, lease collections prior to turnover and servicing transition, rental income, and the recovery of costs related to the sale of PGL and various real estate properties. It is estimated that the total disbursements would be approximately $65.8

million.  This includes the costs to completion of the proposed sale of PGL, wind-down costs, professional fees, and repayment of Total Deferred Payments, and amounts payable in connection with the Payment Procedure Agreement. The Orderly Wind-Down Plan is estimated to require funding of $31.2 million (which includes cash on hand).

129.   The Wind-Down Forecast illustrates the need for liquidity and that without any sources of funding, the Pride Entities would not be able to satisfy their payroll, operating expenses and professional fees during that period.  As such, the Pride Entities require additional relief until a funding alternative is obtained.  At this time, the Monitor, in consultation with CRO, views that a proposed funding allocation among the lenders, or an alternative source of funding (such as through NCI) could be achieved by September 30, 2024.  The Monitor believes that the Pride Entities will only be able to bridge their liquidity until September 30, 2024 if additional relief is granted to allow the Pride Entities to (i) defer paying the Total Deferred Payments until a funding allocation has been settled, and (ii) defer making payment under the Payment Procedure Agreement until a funding allocation has been settled.

130.   The Monitor intends to report to Court within the next 30 days setting out its proposal of a fair and appropriate allocation of Restructuring Costs, which will include allocation of the impact of use by the Pride Entities of the Total Deferred Payments. The Cash Flow Forecast provides the sizing of the funding needed for Restructuring Costs but not the source of funding. Allocations to all the Financiers of the funding need would repay the Total Deferred Payments and provide a fair and appropriate cost sharing. Without allocation, the burden of the funding need would fall unfairly on those Financiers with security over the Total Deferred Payments.

## TASKS TO COMPLETION OF CCAA AND CHAPTER 15 PROCEEDINGS

131.   As part of analyzing and developing a controlled and coordinated wind-down of the Pride Entities, the Monitor has created a comprehensive summary of tasks to completion of these CCAA Proceedings and the ancillary recognition proceedings under Chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**") in the United Sates Bankruptcy

- 48 -

Court for the District of Delaware, which is referred to as the Completion Task List and attached hereto as Appendix "A".

132. The Completion Task List contemplates, among other things:

(a) addressing employee matters, including developing and seeking Court approval of a Key Employee Retention Plan, delivering notices to employees and independent contractors regarding wind-down matters, gradually reducing the workforce, transitioning select employees and independent contractors from the head office located at 6050 Dixie Road, Toronto, Ontario (the "**Head Office**") to the satellite office located at 1450 Meyerside Dr., Toronto, Ontario ("**Meyerside Office**"), and completing other necessary employee and independent contractor matters;

(b) when no longer required, vacating the Pride Entities' Head Office and Meyerside Office, closing utilities accounts, cancelling direct costs (e.g., security and janitorial services), retaining necessary data, and securely storing the Pride Entities' books and records (both physical and digital versions);

(c) addressing business operations and corporate matters, including corresponding with customers and suppliers regarding the wind-down, terminating or disclaiming contracts (as needed) and the Pride Entities' fuel program (subject to the PGL Sale Agreement), closing the Pride Entities' business bank accounts, shutting down the Pride Entities' India operations;

(d) facilitating Turn-Overs to the applicable Securitization Parties and transitioning of servicing of Securitization Programs through the month of September;

(e) seeking Court approval for allocations in respect of Total Deferred Payments, MCV Proceeds (as defined below), and proceeds resulting from monetizing PCVs, legal fees and disbursements, and Restructuring Costs;

(f)     seeking Court approval for, and closing, transactions (including the PGL Going Concern Transaction[16]), completing distributions in respect to same, with the Monitor and CRO supervising the real estate monetization process;

(g)     managing ancillary real estate matters, including, but not limited to, finalizing any outstanding construction work, overseeing daily maintenance of the real estate properties prior to the respective closings, considering the wind-up of certain Pride Entities that hold real estate assets, responding to inquiries and requests from third-party tenants, and addressing any outstanding legal matters and/or liens.

(h)     addressing intercreditor disputes, including working with the DIP Agent and affected Financiers to monetize PCVs and oversee a process to determine entitlement to PCVs, and conducting the Entitlement Claims Process (unless an alternative process is approved by the Court);

(i)     administering a claims process in respect of any outstanding liens pursuant to the *Repair and Storage Liens Act*, R.S.O. 1990, c. R.25 or such similar applicable statutes;

(j)     completing tax and insurance matters including applying for a refund of premiums on return of collateral;

(k)     reviewing litigation files managed by the Pride Entities' in-house legal team, and completing associated file transfers;

(l)     establishing a claims process for unpaid post-filing claims (if necessary);

(m)     cash collateralizing and calculating Court-ordered charges, as applicable, and administering a claims process under the Directors' Charge, if applicable given the priority of the Directors' Charge (as defined in the Second ARIO);

(n)     seeking Court approval for CCAA termination-related matters; and

(o)     seeking recognition of the PGL Going Concern Transaction (or PGL Wind-Down Plan) and Orderly Wind-Down Plan (to the extent they are each approved) and the eventual

---

[16] As noted herein, in the alternative, the PGL Wind-Down Plan would be implemented (if approved by the Court).

CCAA termination order in the Chapter 15 Proceedings and concluding the Chapter 15 Proceedings.

133.    In the absence of a co-ordinated and funded wind-down plan, there is no ability to continue employment of essential employees and to obtain the required professional services to accomplish these tasks.

**INCREASE TO ADMINISTRATION CHARGE**

134.    As contemplated in the Wind-Down Cash Flow Forecast, the professional fees of the Monitor, counsel to the Monitor, counsel to the Pride Entities, the CRO, and Canadian counsel to the Pride Entities' boards of directors have been or will shortly be paid up to July 31, 2024, with accruals as at August 26, 2024 totalling $3,302,576.64.

135.    The Pride Entities do not have the available funds necessary to comply with making bi-weekly payments as required pursuant to section 49 of the Second ARIO.

136.    As a component of the Requested Relief, the Pride Entities have sought approval of an increase to the Administration Charge from $3,000,000 to $5,000,000.  The Monitor is supportive of this relief given the foregoing circumstances. With no further debtor-in-possession funding, limited liquidity resulting in delayed payment of professionals, the CRO and Monitor extensively engaged in the supervision of an orderly wind-down, and the magnitude of communications from stakeholders, the existing Administration Charge is inadequate.

**MCV MONETIZATION ORDER**

137.    On August 2, 2024, the Monitor filed its Eleventh Report, which provided the Court with information pertaining to the Monitor's security review of the security interests asserted by Secured Creditors, including, but not limited to, the Monitor's view (based on the information received by July 31, 2024) as to whether each Financier that is a secured creditor has provided sufficient evidence of a perfected and priority interest in specific vehicles (and leases thereof) identified and tracked by VINs which are owned by the Pride Entities (with the exception of MCVs, which are subject to the Entitlement Claims Process). As of the date of the Eleventh Report, the Monitor's Database (as defined in the

Eleventh Report) identified 1,798 VINs that comprised MCVs, with the Eleventh Report appending an MCV list current as of July 31, 2024.

138. Financiers have provided additional information and clarification following the Eleventh Report regarding MCVs in respect of which they no longer claim an interest and as a result, certain VINs are no longer noted as MCVs. As of the date hereof, the Monitor's Database identifies there as being approximately 1,700 VINs that comprise MCVs. Additionally, following the Turn-Over Order, certain Securitization Parties and secured lenders have entered into settlements whereby they have agreed as between them that they will not assert a claim over certain MCVs. With respect to Securitization Parties, the Monitor's counsel is reviewing these on a case-by-case basis to determine whether the relevant schedules of Subject Assets can be updated to allow Turn-Over of these MCVs.

139. As a component of the Requested Relief, the Pride Entities have sought Court approval to begin monetizing MCVs (the "**MCV Monetization Order**"). The MCV Monetization Order authorizes the Pride Entities to (i) sell MCVs not subject to an active lease without seeking consent of those Financiers asserting an interest in same, (ii) use the associated proceeds from sale of those MCVs in which a Securitization Party (in such capacity) does not assert a potential interest (the "**Permitted MCV Sale Proceeds**") to pay ordinary course working capital needs and for other corporate purposes, (iii) providing that all other proceeds will be held in the Monitor's trust account, and (iv) providing that the Permitted MCV Sale Proceeds will be allocated among the secured parties of the Pride Entities (and not the Securitization Parties in connection with property interests, not security interests) by further order of the Court. A list of the 38 MCVs where the disposition of such MCVs will result in Permitted MCV Sale Proceeds, which additionally shows the secured parties asserting an interest, is attached hereto as **Appendix "L"**.

140. The Monitor recommends that this Court approve the MCV Monetization Order given that such sales will (i) cap any further depreciation in value of the MCVs and the associated prejudice to the applicable Financiers, (ii) begin the process to clear space in the Pride Entities' lots for the administration of the Orderly Wind-Down Plan (and in the event that the PGL Sale Agreement is not approved, the PGL Wind-Down Plan), (iii) free up Pride Entities' lots to facilitate real estate closings and provide vacant possession to purchasers,

and (iv) create a fund from which distributions to entitled Financiers can be made once entitlement is determined.

141.    The Monitor notes that, while funding is limited, the Pride Entities intend to bring a motion within the next 30 days for the determination of claims to PCVs. The Monitor will present its findings in respect to PCV priority in a report to the Court, share all supporting documents with affected Financiers, and the affected Financiers will be given an opportunity to submit further evidence and assert arguments in connection with their priority based on the Monitor's evidence, as they may supplement. The Monitor views the determination of PCV priority as an issue that should be addressed expeditiously given that the Monitor has collected and reviewed all necessary documents, and therefore is in position to facilitate the determination of such claims.  Counsel to the Pride Entities, in consultation with the Monitor and the CRO, intends to draft a process for the timely resolution of PCV priority issues and will consult the DIP Agent and affected Financiers accordingly.

**RECOMMENDATIONS**

142.    For the reasons set out in this Fourteenth Report, the Monitor recommends this Court grant the Requested Relief.

All of which is respectfully submitted this 28th day of August 2024.

**ERNST & YOUNG INC.**,
solely in its role as Court-appointed
Monitor of Pride Group Holdings Inc. and
certain affiliates and not in its personal or
corporate capacity

**per:**

**Alex Morrison, CPA, CA, LIT, CIRP**
**Senior Vice President**

**SCHEDULE "A"**

**A. APPLICANTS**

**Operating Entities**

*Canadian Operating Entities*

- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*

- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**

*Canadian Real Estate Holding Companies*

- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.

# APPENDIX "A"

| **Completion Task List** [1] |
|---|
| **Employees and Independent Contractors** |
| Employees and independent contractors to be provided with notice regarding wind-down to be conducted by the Monitor or other advisors as approved by the Court.[2] |
| Workforce to be gradually reduced; employees, when terminated, provided with their records of employment; T4s, and termination notices for independent contractors. |
| Develop and seek Court approval of Key Employee Retention Plan to retain necessary employees/independent contractors to assist during wind-down. |
| Facilitate transition of select employees and independent contractors from Head Office (as defined herein) to Meyerside Office (as defined herein), in order to reduce costs. |
| Seek Court approval for necessary steps to permit *Wage Earner Protection Act* ("**WEPPA**") claims by employees. |
| Monitor to process WEPPA claims.<br>  - Identify each employee who may have a WEPPA claim for eligible wages.<br>  - Calculate each employee's claim.<br>  - Provide a report to Service Canada setting out the WEPPA claims they have calculated.<br>  - Send a claims package to each employee. The contents of the claims package include:<br>    o the date that the employee was determined by the Court to meet the WEPPA requirements;<br>    o a proof of claim form and a statement advising the employee they must complete a proof of claim for wages owing;<br>    o the Monitor's calculation of their eligible WEPPA claim and the information the Monitor provided to Service Canada in that regard (e.g., personal information, job title, WEPPA calculation details, employer's officers, directors and owners and of the person responsible for the employer's payroll); and |

---

[1] Capitalized terms not otherwise defined in this section have the meanings attributed to them in the Fourteenth Report of the Monitor, dated August 28, 2024.

[2] In the case of the PGL Wind-Down Plan, with the assistance of Hilco.

|  |
|---|
| ○    a WEPPA application and information about WEPPA.<br>-    The above information is to be provided to Service Canada and respective employee within 45 days of the date that the court determines that Pride meets the WEPPA criteria.<br>-    Inform Service Canada when the Monitor is discharged. |

| **Offices (6050 Dixie Road and 1450 Meyerside Dr.)** |
|---|
| Lease between 2029909 Ontario Inc. and landlord in respect to head office located at 6050 Dixie Road (the "**Head Office**") to be assigned to Proposed Purchaser as part of PGL Sale Agreement. |
| Pride Entities to provide notice of wind-down, and coordinate wind-down matters, with property management company retained in respect of satellite office located at 1450 Meyerside Dr. ("**Meyerside Office**"), and in accordance with the PGL Sale Agreement. |
| Back-up IT server; retain SAAS products, protective software, access and platforms. |
| Retain necessary web-based platforms, software licenses and products, and security platforms. |
| Close utilities account and cancel any other direct costs (e.g., security, janitorial). |
| Vacate Head Office and Meyerside Office; liquidate furniture and non-core business assets. |

| **Books and Records** |
|---|
| Remove Pride Entities' books and records ("**Books and Records**") from Head Office and Meyerside Office. |
| Store physical Books and Records in secure location, pay associated fee(s), and determine appropriate records retention policy for Books and Records and compliance with Paragraph 16 of the Turn-Over Order dated August 8, 2024; determine documents that will be used for future litigation, if any. |
| Store Books and Records located on IT server and cloud network, and determine appropriate records retention policy, as referenced above; determine documents and/or emails that will be used for future litigation, if any. |

| **Business Operations and Corporate Matters** |
|---|
| Customers and suppliers to be provided with notice detailing wind-down. |
| Disclaim customer and supplier contracts, as needed. |
| Pride Fleet Solutions Inc. and Pride Fleet Solutions USA Inc. to terminate fuel card program, subject to the PGL Sale Agreement. |
| Develop plan to close business bank accounts in Canada (Royal Bank of Canada, Bank of Montreal ("**BMO**"), National Bank of Canada and Canadian Imperial Bank of Commerce) and the U.S. (BMO Harris and Bank of America).[3] |
| Post-filing accounting and reconciliation on the PGL Entities to assess net cash flow for the purpose of determining any repayment to PGL Equipment Financiers. |
| Use GPS tracking (if available) to assist Financiers with locating vehicles. |
| Cancel PGL Entities' letters of credit not assumed as part of PGL Going-Concern Transaction. |
| Shut down India operations. |
| Remove Pride Entities' logos from vehicles[4], and test key components of vehicles (e.g., battery, breaks). |
| Consider bankruptcy proceedings in respect of some Pride Entities, as may be appropriate. |
| **Securitization Parties** |
| Facilitate the transition and relinquishment of servicing and other duties under the securitization program documents by the Pride Entities to, or as directed by, a Securitization Counterparty in respect of the relevant Subject Assets in accordance with the Turn-Over Order. Such matters include, but are not limited, to (i) reconciliation and payout of final soft collections swept to Monitor trust account, |

---

[3] The Pride Entities are party to other bank accounts in connection with securitization arrangements. The relevant securitization agreements provide the applicable securitization funder the ability to access and utilize the funds from these accounts to manage loss provisions within the securitization portfolios and the Pride Entities do not have control over the movement of these accounts. Therefore, securitization parties are best positioned to close/transition these specific accounts.

[4] This will only be completed if there is a liquidation.

| |
|---|
| (ii) reconciliation and recovery of any outstanding service fees from securitization lenders, and (iii) reconciliation of unallocated PAPS and soft collections, including end of term buyouts.[5] |
| Address post-vehicle turn-over questions from stakeholders. |
| **Allocations** |
| Seek Court approval of an allocation of Deferred Payments (pursuant to the Order dated August 9, 2024). |
| Seek Court approval of an allocation of direct legal fees and disbursements of the securitization program review undertaken by the Monitor, as well as the associated estimate to turnover, to the applicable securitization parties, as outlined in the Supplement to the Tenth Report. |
| Seek Court approval of an allocation of direct legal fees and disbursements of the security review undertaken by the Monitor. |
| Seek Court approval of an allocation of the wind-down costs. |
| Seek Court approval of an allocation of MCV Proceeds. |
| **Transactions** |
| Complete the phased closing of the Pride Entities factoring transaction.[6]<br><br>Wind-down remaining factoring receivables and collect on promissory notes or consider if they can be sold at a discount. |
| Seek Court approval of going-concern transaction in respect of PGL Entities ("**PGL Transaction**").<br><br>Closing PGL Transaction in accordance with timing contained in associated asset purchase agreement. |

[5] The matter discussed in (iii) will also need to be completed for non-Securitization Party Financiers as well.

[6] The Factoring Transaction is expected to close in phases, with the first phase expected to close on or about September 4, 2024.

| |
|---|
| In the alternative, seek approval of Hilco managed wind-down plan, with Monitor to oversee administration of same; collect accounts receivable, sell remaining assets, and complete associated distribution to PGL Equipment Financiers. Potential mediation, if directed, with the Honourable Thomas J. McEwen and the PGL Equipment Financiers. |

**Real Estate**

| |
|---|
| Real estate monetization to be supervised and conducted by CRO and Monitor; setting up Monitor trust accounts for each sale, complete trust accounting and manage distributions for each of the separate trust accounts. |
| Close the sale of two properties in respect of which the agreements of purchase and sale have been executed and approved by the Court on August 7, 2024. |
| Facilitate the sale of the Pride Entities' remaining North American real estate portfolio, including approximately 11 properties that are currently in various stages of letter of intent and asset purchase agreement negotiations, and abiding by the Real Estate Monetization Plan by providing the DIP Agent and any third-party mortgagee with the associated definitive documents and material changes to same. |
| Seek Court approval of further real estate portfolio sales and associated distributions<br> - Distribution of proceeds will be in accordance with the Real Estate Monetization Plan and Intercompany and Unsecured Claims Preservation Protocol, being that (i) proceeds would be first distributed to BMO and Roynat, and (ii) the Monitor and CRO, in consultation with the DIP Agent, would seek approval to distribute any remaining proceeds held in the BMO Proceeds Pool and Roynat Proceeds Pool (each as defined in the Intercompany and Unsecured Claims Preservation Protocol) to the other entitled secured creditors in accordance with (e) and (h) of the Intercompany and Unsecured Claims Preservation Protocol. |
| Develop and seek approval of a Claims Process, in the event that the above-referenced real estate transactions result in payment in full of the Pride Entities' obligations owing to the DIP Agent, to distribute surplus proceeds which may require a Claims Process. This Claims Process would be funded by such surplus proceeds. |
| Manage ancillary real estate matters, including, but not limited to, finalizing any outstanding construction work, overseeing daily maintenance of the real estate properties prior to the respective closings, considering wind-up of certain Pride Entities that hold real estate assets, responding to inquiries and requests from third-party tenants, and addressing any outstanding legal matters and/or liens. |

| **Inter-Creditor Disputes** |
|---|
| Seek Court approval to monetize MCVs and PCVs and conduct process to determine entitlement. |
| Unless alternative process approved by the Court, Monitor to conduct the Entitlement Claims Process[7], including:<br>   -   circulating an Entitlement Report (as defined in the Entitlement Claims Process Order), which outlines, among other things:<br>      o   the Monitor's summary of the factual information or scenarios which resulted in the MCVs, and<br>      o   in consultation with its Canadian Counsel and U.S. Counsel, its findings as to which financier appears to have the better claim to the proceeds of the MCV under each scenario.<br>   -   the Monitor delivering its Entitlement Finding (as defined in the Entitlement Claims Process Order) to each respective financier and administering the remainder of the Entitlement Claims Process, such as by referring financiers unable to resolve their priority issues during the Claim Negotiation Period to the Claims Officer (each as defined in the Entitlement Claims Process Order and defined in the Monitor's Sixth Report) and facilitating the respective treatment of the proceeds of the MCV at issue.<br><br>The Monitor will complete additional matters in respect to MCVs, including, but not limited to, managing and reconciling proceeds in connection with MCVs and distributing same. The costs in respect of all MCV priority disputes will be paid from the proceeds or as ordered by the Court or Claims Officer. |
| Distributions in respect of PCVs including ultimate determinations as to priority between DIP Agent and competing creditors.<br><br>The costs in respect of all PCV priority disputes will be paid from the proceeds or as ordered by the Court. |
| To the extent that vehicles and trailers are monetized, seeking Court approval of a distribution of funds to Financiers in accordance with the entitlement findings contained in the Eleventh Report, and RSLA claimants (if applicable), subject to cost allocations. |
| **Lien Claims** |
| Applicants to seek approval of a lien regularization order in respect to Lien Claims, with such claimants eligible to receive a distribution from vehicle proceeds (as noted above). |

---

[7] The Monitor is currently considering alternatives to the Entitlement Claims Process.

| Alternatively, if the applicable vehicles are turned over to Financiers, such vehicles will be turned over subject to the Lien Claims. |
| --- |
| Claims process in respect of any outstanding non-possessory lien pursuant to *Repair and Storage Liens Act*, R.S.O. 1990, c. R.25 ("**RSLA**") or such similar statute (collectively, the "**Lien Claims**"). Monitor to review if claimants have a valid and enforceable Lien Claim and seek Court approval of same.<br><br>Monitor to review Lien Claims against Books and Records. |
| **Tax** |
| Reconcile HST and other tax matters with Securitization Parties. |
| Work with Pride Entities to file all HST returns and post-filing income tax returns in Canada and the US. |
| Complete any applicable tax elections and associated matters. |
| **Insurance** |
| Cancel insurance for vehicles driven by the employees of the Pride Group in Canada[8], when appropriate, and collect any associated insurance refund. |
| Cancel insurance for vehicles used as inventory, when appropriate, and collect any associated insurance refund. |
| **Litigation and Post-Filing Claims** |
| Review litigation files managed by Pride Entities' in-house legal team, and complete associated file transfers. |
| Claims process for unpaid post-filing claims (if necessary). |

---

[8] 2500819 Ontario Inc. holds the insurance policies for all passenger vehicles driven by the employees of the Pride Entities in Canada. The insurance premiums are paid by Pride Truck Sales Ltd.

| **Court-Ordered Charges** |
|---|
| Cash collateralizing the Court-ordered Charges, other than the Directors' Charge unless available proceeds in the applicable waterfall. |
| Determining the intercompany payment amounts vis-à-vis the Pride Entities, and the associated amounts secured by the Intercompany Advances Charge. |
| Claims process under the Directors' Charge (if applicable given priority of Directors' Charge). |

| **Final Order (CCAA Termination Matters)** |
|---|
| Seek Court approval to extend the Stay Period until such date as the Monitor delivers the CCAA Termination Certificate (as defined below). |
| Seeking Court approval of the Monitor's fees and counsel's fees, including filing a Monitor's report and fee affidavits (Monitor and its counsel). |
| Seek Court approval for terminating the CCAA Proceedings and discharging and releasing the Monitor on a date to be determined by the Monitor as evidenced by the filing of the CCAA Termination Certificate (the "**CCAA Termination Order**")<br>- The Monitor will advise the Service List of the completion of remaining matters, and thereafter deliver a certificate confirming such completion to the Service List and to the Court (the "**CCAA Termination Certificate**").<br>- Upon delivery of the CCAA Termination Certificate<br>    o the Stay Period would terminate;<br>    o the CCAA Proceedings would terminate; and<br>    o EY would be discharged from its role as Monitor and released on customary terms. |

| **Chapter 15 Proceedings** |
|---|
| Foreign Representative to seek recognition of Pride Entities wind-down and PGL Going-Concern Transaction, or in the alternative, the PGL Wind-Down Plan, in the Chapter 15 Proceedings. |
| Foreign Representative to file final report, seek recognition of CCAA Termination Order in Chapter 15 Proceedings, and file associated Closure Notice confirming that CCAA Proceedings have concluded. |

Foreign Representative's U.S. Counsel to file Certification of Counsel requesting entry of order closing the cases in order to conclude Chapter 15 Proceedings.

# APPENDIX "B"

*Blakes*

Blake, Cassels & Graydon LLP
Barristers & Solicitors
Patent & Trade-mark Agents
199 Bay Street
Suite 2800, Commerce Court West
Toronto ON  M5L 1A9  Canada
Tel: 416-863-2400  Fax: 416-863-2653

August 23, 2024

**Pamela Huff**
Partner
Dir: 416-863-2958
pamela.huff@blakes.com

Reference: 8431/1367

**VIA E-MAIL**

Pride Group Holdings et al. Service List

**Re:    Motions to be Heard on September 3, 2024**

To the Service List:

We are counsel to Ernst & Young Inc., in its capacity as the Court-appointed Monitor of Pride Group Holdings Ltd., et al.  As you are aware, the Court has scheduled time on September 3, 2024, in this matter to hear various motions, including lift stay motions filed by certain secured lenders. We wanted to advise the parties how the Applicants, the CRO and the Monitor intend to respond to such motions.

It is impossible from a band width and cost perspective for the Applicants, the Monitor and the CRO to respond to each motion individually or to negotiate separately with each secured lender.  The intention is that there will be a single, coordinated response contained in a report of the Monitor and an affidavit of the CRO, which will outline the recommended path forward: an orderly wind-down of the Pride Entities under the direction and supervision of the CRO and the Monitor, considering the interests of employees, customers, lenders and other stakeholders.  The Monitor also anticipates that its report will propose a going concern sale of the PGL business.  It is the Monitor's intention to communicate with all PGL lenders in advance of the hearing with respect to the benefits of the going concern sale and alternatives available.

At the hearing on August 9, 2024, the Court granted an Order permitting the Pride Entities to use proceeds of certain Deferred Payments to fund ordinary course working capital needs and for other general corporate purposes for the period from and after July 15, 2024 until September 3, 2024.  The Applicants will be seeking relief to allow the continued use of proceeds of certain Deferred Payments through to September 30, 2024.



Page 2

The individual motions do not provide for the conclusion of the CCAA proceedings, nor do they appreciate the logistical complexity and costs of an orderly turn-over of leasing portfolios and vehicles to numerous secured lenders and financiers. This will be addressed by the CRO and the Monitor in a single response proposing an orderly turn-over of assets and the required funding to complete the necessary steps to conclude the CCAA proceedings.

Yours truly,

Pamela L.J. Huff

# APPENDIX "C"



Steven L. Graff
Direct: 416.865.7726
E-mail: sgraff@airdberlis.com

August 26, 2024

Pam Huff and Chris Burr
Blake, Cassels & Graydon LLP
199 Bay Street, Suite 4000
Toronto, ON M5L 1A9

Dear Ms. Huff and Mr. Burr:

**Re: In the Matter of a Plan of Compromise or Arrangement of Pride Group Holdings Inc., et al. (Court File No. CV-24-00717340-00CL)**

As you are aware, we are counsel to TD Equipment Finance Canada ("**TDEF**"), as it relates to the CCAA proceedings of, *inter alia*, Pride Group Logistics Ltd. ("**PGL**"). As you are further aware, TDEF is an equipment lessor of several trailers used in PGL's day-to-day operations (the "**Collateral**").

We are writing to follow up on your letter served on the Service List dated August 23, 2024 (the "**Winddown Letter**") which we believe contains some misconceptions.

For greater clarity, the equipment financier group (the "**Financiers**") have all reviewed and agree with the contents of this letter. **We speak as one voice herein.**

Simply stated and with respect, the Financiers have lost confidence in the Monitor's and the CRO's ability to advance a winddown in a manner that the Financiers are prepared to support. This is compounded by concerns over the fact that the Monitor has continued to engage in discussions and efforts to advance a going-concern sale to a related entity, despite seemingly universal creditor opposition. This is the case notwithstanding that it is now over one month following the Outside Closing Date set out in the Court-ordered sale process. In addition, the winddown approach contemplated by the Monitor and the related cost summary that was previously provided to the Financiers, certain details of which were reflected in the presentation provided to Financiers, do not align with the approach that the Financiers wish to take.

Throughout the pendency of these proceedings, the Monitor, the CRO and the Company have gone to great lengths to emphasize the difficulties in restructuring PGL, in large part, due to the Multiple Collateral Vehicles ("**MCVs**"). Whether through carelessness of the Johals, or something more deliberate, the Financiers continue to be told that the existence of MCVs, which was thrust upon the Financiers by a desperate ownership group, is the partial justification for the Monitor's continued pursuit of an insider bid that the Financiers do not support. In addition, it has been said that the resources of PGL are simply too stretched to be available to assist another financial professional identified by the Financiers as its preferred choice of receiver to effect the winddown. In this regard, the Financiers have identified The Fuller Landau Group Inc. ("**Fuller**") as its preferred receiver and we expect to ask the court to implement a winddown plan led by Fuller and to ensure necessary resources and information are made available to Fuller to accomplish its purpose.

August 26, 2024
Page 2

In addition, you have continued to raise the issue of the costs associated with the process. We will, among the Financiers, bear the costs of the winddown we propose and our proposed Receivership Order will consider the need for an accounting and allocation of costs generally

The historic mismanagement of PGL by the Johals cannot continue to bar the Financiers from seeking the relief they have requested for months. The historic mismanagement of PGL by the Johals cannot justify the continued prejudice to the Financiers.

PGL has benefitted from the use of the Collateral without payment for the entirety of the CCAA proceeding, and the Financiers have simply had enough. While PGL and the Monitor have requested that the Financiers agree at the outset to bankroll the winddown process, both have, in our view, refused to entertain the cost minimization measures provided in the Draft Protocol that was previously provided. The Financiers already have lost upwards of eight months in missed lease payments and depreciation of their Collateral. The Financiers are presently getting squeezed in several different ways; through: (i) funding their respective equipment lease and financing agreements; (ii) involuntarily funding the "going concern" business, as payments under their respective contractual obligations are redeployed to fund the business or these proceedings; and (iii) potentially funding a winddown and return of the Collateral estimated to be millions of dollars.

Although the overall CCAA proceedings are complex, the Financier's position is simple: give our clients back their Collateral. We would like this process to start as soon as possible.

There is no longer a need for separate motions from each of the Financiers for the return of the Collateral. The Financiers are unified in that they are seeking to have Fuller appointed as a receiver and manager of the assets of PGL. Further, we expect that the syndicate lenders will be supportive of the appointment of Fuller as receiver over all of PGL's assets.

We trust that the above clarifies the Financiers' position on the Winddown Letter. A draft order that we wish to have issued on consent, addressing these matters and the related implications for the CCAA proceedings, will be delivered early this week with the intent that it be taken up before Justice Osborne during the upcoming week.

Yours truly,

AIRD & BERLIS LLP

Steven L. Graff
Partner

SLG:/mc
cc:
  *Leanne Williams (lwilliams@tgf.ca)*
  *Rachel Nicholson (rnicholson@tgf.ca)*
  *Stuart Brotman (sbrotman@fasken.com)*
  *Daniel Richer (dricher@fasken.com)*
  *Financiers*



# APPENDIX "D"

**EXECUTION COPY**

## PURCHASE AGREEMENT

This Purchase Agreement dated as of the 26th day of August, 2024 (the "**Effective Date**") among:

Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation
(collectively, the "**Vendors**")

– and –

1000927605 Ontario Inc.
(the "**Purchaser**")

**WHEREAS** pursuant to the Order of the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") granted on March 27, 2024 (the "**CCAA Filing Date**") (as amended or amended and restated from time to time, the "**Initial Order**"), the Vendors and certain of their affiliated entities/businesses (as defined collectively in the Initial Order, the "**Pride Entities**") were granted creditor protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36, as amended (the "**CCAA**"). Ernst & Young Inc. was appointed as the monitor of the Pride Entities (in such capacity, the "**Monitor**"), and RC Benson Consulting Inc. was appointed as the Pride Entities' chief restructuring officer (in such capacity, the "**CRO**");

**AND WHEREAS** the proceedings initiated by the Initial Order (the "**CCAA Proceedings**") were recognized pursuant to an Order of the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**" and together with the Canadian Court, the "**Courts**") under Chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**");

**AND WHEREAS** in connection with the CCAA Proceedings, on May 15, 2024, the Pride Entities sought and obtained approval from the Canadian Court of a sale solicitation process (as it may be amended from time to time in accordance with its terms, the "**Sale Process**"), to be conducted by the Monitor, with the assistance of its advisors, the CRO, and the Vendors, intended to solicit interest in, and opportunities for, the purchase of all or part of the business, operations and assets of all or any of the Vendors;

**AND WHEREAS** pursuant to the Sale Process, the Monitor, in consultation with the Vendors, has reviewed and evaluated all qualified bids received, and has identified the Purchaser's bid for the Purchased Assets (defined herein) as a Successful Bid on the terms set out in this Agreement;

**AND WHEREAS** on the terms set out herein, the Vendors have agreed to sell and transfer to the Purchaser, and the Purchaser has agreed to purchase from the Vendors, all of the Vendors' right, title and interest in and to the Purchased Assets, which includes substantially all of PGL's assets, subject to and in accordance with the terms and conditions set forth in this Agreement;

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby irrevocably acknowledged, the parties hereto (collectively, the "**Parties**", and each, a "**Party**") hereby acknowledge and agree as follows:

– 2 –

# ARTICLE 1
# INTERPRETATION

**1.1    Definitions**

Unless something in the subject matter or context is inconsistent therewith, the terms defined herein shall have the following meanings:

"**129 Canada**" means 12944154 Canada Inc.

"**129 Shares**" means all of the outstanding shares of 129 Canada.

"**131 Canada**" means 13184633 Canada Inc.

"**207 Ontario**" means 2076401 Ontario Inc.

"**283 Ontario**" means 2837229 Ontario Inc.

"**933 Helena**" means 933 Helena Holdings Inc.

"**Accounts Receivable**" means, with respect to the PGL Vendors and without duplication, all accounts receivable, trade receivables, bills receivable, trade accounts, book debts, notes receivables, rebates, refunds and other receivables of the PGL Vendors whether current or overdue and determined in accordance with GAAP, arising prior to, including, and after the Closing Date, together with all interest accrued on such items, but for greater certainty, excluding any amounts owing by any the Pride Entity that is not a PGL Vendor or PGL Insurance.

"**Acquired AR Amount**" has the meaning ascribed thereto in section 3.2.

"**Affiliate**" has the meaning given to the term "affiliate" in the *Business Corporations Act* (Ontario).

"**Agreement**" means this purchase agreement, as may be amended and restated from time to time in accordance with the terms hereof, with the consent of the Monitor, and "Article" and "Section" mean and refer to the specified article, section and subsection of this Agreement.

"**Applicable Law**" means, in respect of any Person, property, transaction or event, any (i) domestic or foreign statute, law (including the common law), ordinance, rule, regulation, treaty, restriction, regulatory policy, standard, code or guideline, by-law or order, (ii) judicial, arbitral, administrative, ministerial, departmental or regulatory judgments, orders, decisions, rulings, instruments or awards of any Governmental Authority, and (iii) policies, practices, standards, guidelines and protocols having the force of law, that applies in whole or in part to such Person, property, transaction or event.

"**Approval and Vesting Order**" means an order by the Canadian Court, in form and substance satisfactory to the Purchaser, acting reasonably, among other things, approving and authorizing the Transaction and vesting in the Purchaser (or as it may direct) all the right, title and interest of the Vendors in and to the Purchased Assets, free and clear from any Encumbrances.

"**Assignment Order**" means an order or orders of the Canadian Court pursuant to section 11.3 of the CCAA and other applicable provisions of the CCAA, in form and substance satisfactory to the Purchaser and the Monitor on behalf of the PGL Vendors, each acting reasonably, authorizing and approving (i) the assignment of any Critical Required Contract for which a consent, approval or waiver necessary for the assignment of such Critical Required Contract has not been obtained,

– 3 –

(ii) the prevention of any counterparty to such Critical Required Contracts from exercising any right or remedy under such Critical Required Contracts by reason of any defaults arising from the CCAA Proceedings or the insolvency of the PGL Vendors and deeming any such defaults to have been cured (iii) the vesting in the Purchaser (or as directed by the Purchaser) of all right, title and interest of the PGL Vendors in such Critical Required Contracts, including without limitation any and all rights to purchase the Finloc Leased Vehicles in accordance with the Finloc Leases.

"**Assumed Liabilities**" means any of the following: (i) liabilities of PGL Insurance accruing from and after the Closing Date; (ii) any Unpaid Post CCAA Filing Accruals that remain unpaid by the Vendors on Closing; (iii) liabilities for accrued vacation pay of the Transferring Employees; (iv) liabilities of any PGL Vendor owing to any other PGL Vendor or PGL Insurance, whether incurred or owing prior or subsequent to the CCAA Filing Date; and (v) if the Real Property Option is exercised, the real property mortgages and accrued property taxes and utilities associated with the Optional Assets.

"**Authorization**" means any authorization, approval, consent, concession, exemption, license, lease, grant, permit, franchise, right, privilege or no-action letter from any Governmental Authority having jurisdiction with respect to any specified Person, property, transaction or event, or with respect to any of such Person's property or business and affairs (including any zoning approval or building permit) or from any Person in connection with any easements, contractual rights or other matters.

"**Books and Records**" means, in respect of the PGL Vendors, LeaseCo and PGL Insurance and, if applicable, the Optional Vendors: (i) all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise), including Tax and accounting books and records, and (ii) all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise), including Tax and accounting books and records used or intended for use by, or in the possession of such entities, including, without limitation, information, documents and records relating to the Purchased Contracts, customer lists, customer information and account records, sales records, computer files, data processing records, employment and personnel records, sales literature, advertising and marketing data and records, cost and pricing information, production reports and records, equipment logs, operating guides and manuals, credit records, records relating to present and former suppliers and contractors, plans and projections and all other records, data and information stored electronically, digitally or on computer-related media.

"**Business**" means the transportation and logistics business conducted by the PGL Vendors across Canada and the United States, as applicable.

"**Business Day**" means a day on which banks are open for business in Toronto, Ontario, but does not include a Saturday, Sunday or statutory holiday in the Province of Ontario.

"**Canadian Court**" has the meaning ascribed thereto in the recitals.

"**Cash and Cash Equivalents**" means all cash on hand, cash equivalents and bank accounts of the PGL Vendors.

"**Cash Purchase Price**" has the meaning ascribed thereto in Section 3.4(b).

"**CCAA**" has the meaning ascribed thereto in the recitals.

"**CCAA Filing Date**" has the meaning ascribed thereto in the recitals.

– 4 –

"**CCAA Proceedings**" has the meaning ascribed thereto in the recitals.

"**Change of Control Consents**" has the meaning ascribed thereto in Section 5.2(c).

"**Claims**" means any civil, criminal, administrative, regulatory, arbitral or investigative inquiry, action, suit, investigation or proceeding and any claim of any nature or kind (including any cross-claim or counterclaim), demand, investigation, audit, chose in or cause of action, suit, default, assessment, litigation, prosecution, third party action, arbitral proceeding or proceeding, complaint or allegation, by or before any Person.

"**Closing**" means the completion of the purchase and sale of the Purchased Assets in accordance with the provisions of this Agreement.

"**Closing Date**" means, subject to the terms hereof, the date on which the Monitor's Certificate is released from escrow to the Purchaser in accordance with Section 9.15, which date shall (unless otherwise agreed to by the Purchaser and the Monitor, on behalf of the Vendors) be no later than ten (10) days after the date on which the Approval and Vesting Order is granted by the Canadian Court and, if applicable, the U.S. Approval Order is granted by the U.S. Court.

"**Closing Time**" means 12:01 a.m. (Toronto time) on the Closing Date or such other time on the Closing Date as the Parties agree in writing that the Closing Time shall take place.

"**Contracts**" means all pending and executory contracts, agreements, leases, understandings and arrangements (whether oral or written) to which the PGL Vendors are a party or by which the PGL Vendors are bound or in which the PGL Vendors have, or will at Closing have, any rights or by which any of their property or assets are or may be affected, including any Contracts in respect of Employees.

"**Courts**" has the meaning ascribed thereto in the recitals hereto.

"**Critical Required Contract**" means the Contracts set forth in Schedule "I", which Schedule "I" may be amended by the Purchaser up until 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "I" is amended.

"**Cure Costs**" means, in respect of any Purchased Contract, Critical Required Contract or Change of Control Consent, all monetary amounts, if any, required to be paid pursuant to section 11.3(4) of the CCAA in order to obtain the assignment to the Purchaser of such Purchased Contract, Critical Required Contract or in order for the Purchaser to obtain any Change of Control Consent, or such lesser amount as may be negotiated by the Purchaser with the applicable counterparty.

"**Deposit**" has the meaning ascribed thereto in Section 3.5 hereof.

"**Discharge**" means, in relation to any Encumbrance against any Person or upon any asset, undertaking or property, the full, final, irrevocable, complete and permanent waiver, release, discharge, cancellation, termination and extinguishment of such Encumbrance against such Person or upon such asset, undertaking or property and all proceeds thereof.

"**Effective Date**" has the meaning ascribed thereto in the preamble hereto.

"**Employee**" means any individual who is employed by the PGL Vendors as of the Closing Date, whether on a full-time or a part-time basis and includes an employee on short term or long-term

disability leave, but for certainty excludes any employee whose employment is terminated by the PGL Vendors prior to the Closing Date.

"**Encumbrance**" means any security interest, lien, Claim, charge, right of retention, deemed trust, judgement, writ of seizure, writ of execution, notice of seizure, notice of execution, notice of sale, hypothec, reservation of ownership, pledge, encumbrance, mortgage or right of a third party (including any contractual rights such as purchase options, rights of first refusal, rights of first offer or any other pre-emptive contractual right) or encumbrance of any nature or kind whatsoever and any agreement, option or privilege (whether by law, contract or otherwise) capable of becoming any of the foregoing, (including any conditional sale or title retention agreement, or any capital or financing lease).

"**Equipment**" means all Tangible Property and Vehicles.

"**Excluded Assets**" means the assets of the PGL Vendors listed in Schedule "B", the Excluded Contracts, and all claims by the PGL Vendors against or in respect of any Related Party other than the PGL Vendors and PGL Insurance, which Schedule "B" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "B" is amended.

"**Excluded Contracts**" means the Contracts listed in Schedule "E", which Schedule "E" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "E" is amended.

"**Excluded Liabilities**" means all Liabilities of the PGL Vendors of any kind or nature whatsoever, other than Assumed Liabilities.

"**Exercise Notice**" has the meaning ascribed in Section 2.2 hereof.

"**Final Adjustment Statement**" has the meaning ascribed thereto in Section 3.10(a)

"**Final AR Adjustment**" has the meaning ascribed thereto in Section 3.3.

"**Finloc Leased Vehicles**" means such of the trailers owned by Finloc 2000 Inc. or its affiliates subject to the Finloc Leases that the Purchaser agrees to assume the leases in respect of, as are set out in Schedule "J" to this Agreement, which Schedule may be amended by the Purchaser no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order.

"**Finloc Leases**" means, collectively, the Master Leasing Agreement No. A900271 PRI 6055 dated November 5, 2019 between PGL and Finloc 2000 Inc., and each of the following leasing agreements entered into thereunder: A900271-10854, A900271-10885 (as amended), A900271-10891, A900271-10905, A900271-10949, A900271-10990, A900271-11125, A900271-11138.

"**Fuel Inventory Adjustment**" has the meaning ascribed thereto in Section 3.3(e).

"**GAAP**" means Canadian Accounting Standards for Private Enterprises as defined in the CPA Canada Handbook—Accounting, Part II, as applicable, from time to time applied on a consistent basis and determined in accordance with past practices of PGL Vendors.

"**Governmental Authority**" means any domestic or foreign government, whether federal, provincial, state, territorial or municipal; and any governmental agency, ministry, department, court (including the Courts), tribunal, commission, stock exchange, bureau, board or other

– 6 –

instrumentality exercising or purporting to exercise legislative, judicial, regulatory or administrative functions of, or pertaining to, government or securities market regulation.

"**GST/HST**" has the meaning ascribed thereto in Section 7.2(i).

"**Ineligible Equipment**" means any Vehicles of any PGL Vendor or TPine that is included in Schedule "G" hereof, but that prior to the Closing Date becomes unavailable for sale or otherwise cannot be conveyed to the Purchaser, including because the Vehicles have (a) been sold to a party other than the Purchaser, (b) been delivered to a secured creditor, or (c) become Wrecked Equipment.

"**Initial AR Adjustment**" has the meaning ascribed thereto in Section 3.3.

"**Initial Order**" has the meaning ascribed thereto in the recitals hereto.

"**Intangible Property**" means all of the following which is used in connection with the Business and/or the Purchased Assets, whether or not registered, anywhere in the world: (a) all trade or brand names, business names, trademarks, service marks, copyrights to any original works of authorship, patents, licences, sublicenses, industrial designs, trade secrets, and other industrial or intellectual property of any nature in any form whatsoever recognized in any jurisdiction throughout the world; (b) inventions, discoveries, developments, concepts, ideas, improvements, processes and methods, know-how, trade secrets, confidential information, systems, procedures, computer software, source code; and (c) all goodwill, customer and supplier lists, confidential and proprietary information;

"**Intercompany Receivables**" means (i) any Accounts Receivable owing to any PGL Vendor by PGL Insurance, and (ii) if the Real Property Option is exercised by way of a share purchase transaction, any Accounts Receivable owing to any PGL Vendor by any of the Optional Vendors.

"**Interim Adjustment Statement**" has the meaning ascribed thereto in section 3.4(c).

"**Interim Period**" means the period beginning on the Effective Date and ending at the Closing Time.

"**Inventory**" means, collectively, all (i) shop supplies, including, motor oil, fluids, filters and other service supplies used in connection with the Business and/or the Purchased Assets, and (ii) diesel and fuel inventory.

"**ITA**" means the *Income Tax Act* (Canada).

"**LeaseCo**" means 2029909 Ontario Inc.

"**LC Purchase Price**" has the meaning ascribed thereto in Section 3.1.

"**Lenders**" has the meaning ascribed thereto in Section 2.2.

"**Liability**" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"**Monitor**" has the meaning ascribed thereto in the recitals hereto.

"**Monitor's Certificate**" has the meaning ascribed thereto in Section 9.15.

"**Offers of Employment**" has the meaning ascribed thereto in Section 9.1(a).

"**Optional Assets**" means all rights, titles and interests in and to the real property held by the Optional Vendors.

"**Optional Vendors**" means, collectively, 129 Canada, 131 Canada and 283 Ontario.

"**Organizational Documents**" means any trust document, charter, certificate or articles of incorporation or amalgamation, articles of amendment, articles of association, articles of organization, articles of continuance, bylaws, as amended, partnership agreement or similar formation or governing documents of a Person (excluding individuals).

"**Outside Date**" means 11:59PM (Toronto time) on September 30, 2024, or such later date and time as the Vendors, with the consent of the Monitor, and the Purchaser may agree in writing.

"**Parties**" has the meaning ascribed thereto in the recitals hereto.

"**Party**" has the meaning ascribed thereto in the recitals hereto.

"**Permits**" means, in respect of the PGL Vendors, all permits, licences, certificates, approvals, authorizations, and registrations, or any item with a similar effect, issued or granted by any Governmental Authority that are listed in Schedule "H", which Schedule "H" may be amended no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "H" is amended.

"**Permitted Assignee**" has the meaning ascribed thereto in Section 9.11

"**Permitted Encumbrances**" means such Encumbrances, if any, that the Purchaser agrees will continue to attach to and be enforceable against the Purchased Assets following Closing, a list of which are attached hereto as Schedule "C", which Schedule "C" may be amended by the Purchaser up until the Closing Date, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "C" is amended.

"**Person**" is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity.

"**PFS**" means Pride Fleet Solutions Inc.

"**PFS USA**" means Pride Fleet Solutions USA Inc.

"**PGL**" means Pride Group Logistics Ltd.

"**PGL Entities**" means PGL, PGL USA, PGL Insurance, PGL International, 12944154 Canada Inc. and 933 Helena Holdings Inc.

"**PGL Group**" means the PGL Vendors and their subsidiaries.

"**PGL Insurance**" means Pride Global Insurance Company Ltd.

"**PGL Insurance Financial Instruments**" means, collectively, all letters of credit, cash, cash equivalents, securities and investments held directly or indirectly by PGL Insurance.

"**PGL Insurance Shares**" means all of the outstanding shares of PGL Insurance.

"**PGL International**" means Pride Group Logistics International Ltd.

"**PGL USA**" means Pride Group Logistics USA, Co.

"**PGL Vendors**" means, collectively, PGL, PGL International, PGL USA, PFS, PFS USA, and LeaseCo**.**

"**Post-Closing Cash**" has the meaning ascribed thereto in Section 3.7.

"**Pride Entities**" has the meaning ascribed to it in the recitals.

"**Prepaid Expenses**" means all prepaid expenses (a) of the PGL Vendors in respect of Permits, and (b) of LeaseCo in respect of prepaid rents under the lease for 6050 Dixie Road, Mississauga, ON.

"**Purchase Price**" has the meaning ascribed thereto in Section 3.1.

"**Purchased Assets**" means the following tangible and intangible assets, undertakings and properties owned by the PGL Vendors, Optional Vendors and Real Property Vendor, related to the Business, wherever located, as of the Closing Date, but excluding the Excluded Assets:

    (i)      all Cash and Cash Equivalents of PGL, PGL International, and PGL USA;

    (ii)     all Accounts Receivable (including the Intercompany Receivables);

    (iii)    all Purchased Contracts;

    (iv)    all Prepaid Expenses;

    (v)     all Permits;

    (vi)    all Equipment;

    (vii)   all Inventory;

   (viii)   all PGL Insurance Shares;

    (ix)    all PGL Insurance Financial Instruments;

    (x)     the Intangible Property;

    (xi)    all Books and Records;

    (xii)   all rights under non-disclosure and confidentiality, non-compete, or non-solicitation agreements with Employees and agents of the PGL Vendors or with third parties to the extent related to the Business and/or the Purchased Assets, excluding any such agreements signed in connection with the Sale Process;

Docusign Envelope ID: 88FE5681-D1B3-42DF-ACA5-E74282DC2DB9

– 9 –

(xiii)      all rights of the PGL Vendors under or pursuant to all warranties, representations and guarantees to the extent relating to products sold, or services provided, to the PGL Vendors or to the extent affecting any Purchased Assets;

(xiv)      if the Real Property Option is exercised, the Optional Assets;

(xv)      all Vehicles listed on Schedule "G" hereof;

and the following tangible assets owned by TPine:

(xvi)      all Vehicles listed on Schedule "G" that are owned by TPine.

"**Purchased Contracts**" means all Contracts of the PGL Vendors, including the Purchased LCs set out in Schedule "D" and the Finloc Leases, except for the Excluded Contracts, which Schedule "D" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "D" is amended.

"**Purchased LCs**" means the letters of credit set out in Schedule "D", which Schedule "D" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "D" is amended.

"**QST**" has the meaning ascribed thereto in Section 7.2(i).

"**Real Property Option**" has the meaning ascribed thereto in Section 2.2.

"**Real Property Vendor**" means 2043002 Ontario Inc., being the entity that holds all outstanding shares of 283 Ontario, 129 Canada, 131 Canada and LeaseCo.

"**Related Party**" means any Person (i) that is an affiliate or associate of any of the Pride Entities; (ii) that is an officer or director of any of the Pride Entities, (iii) that is an affiliate or associate of any such responsible officer or director, or (iv) that does not deal at arm's length (within the meaning of the ITA) with any of the Pride Entities or any responsible officer or director of any of the Pride Entities.

"**Sanctions**" has the meaning ascribed thereto in Section 7.2(g).

"**Sale Process**" has the meaning ascribed thereto in the recitals hereto.

"**Specific Conveyances**" means all conveyances, bills of sale, assignments, powers of attorney, transfers, registrable transfers of land and other documents or instruments that are reasonably required or desirable to convey, assign and transfer the Vendors' respective title to and/or interest in and to the Purchased Assets to the Purchaser;

"**Tangible Property**" means all tangible personal property of the PGL Vendors other than the Vehicles.

"**Taxes**" means, with respect to any Person, all national, federal, provincial, local or other taxes, including income taxes, capital gains taxes, value added taxes, severance taxes, ad valorem taxes, property taxes, capital taxes, net worth taxes, production taxes, sales taxes, use taxes, license taxes, lease excise taxes, environmental taxes, transfer taxes, withholding or similar taxes, payroll taxes, employment taxes, employer health taxes, pension plan premiums and contributions, workers' compensation premiums, employment insurance or compensation premiums, stamp taxes, occupation taxes, premium taxes, alternative or add-on minimum taxes, GST/HST, customs duties

or other taxes of any kind whatsoever imposed or charged by any Governmental Authority, together with any interest, penalties, or additions with respect thereto and any interest in respect of such additions or penalties and any Liability for the payment of any amounts of the type described in this paragraph as a result any express or implied obligation to indemnify any other Person or as a result of being a transferee or successor in interest to any Person.

"**TPine**" means TPine Leasing Capital Corporation.

"**Transfer Taxes**" has the meaning ascribed in section 3.11 hereof.

"**Transferring Employees**" means the Employees who accept or are deemed to accept offers of employment from the Purchaser or an affiliate thereof in accordance with the terms hereof.

"**Transaction**" means all of the transactions contemplated by this Agreement, including the purchase and sale transaction whereby the Purchaser will acquire the Purchased Assets.

"**U.S. Approval Order**" means an Order of the U.S. Court approving the Transaction solely with respect to the sale to the Purchaser of the Purchased Assets and Business located within the territorial jurisdiction of the United States.

"**Vehicles**" means all of the trucks, trailers and other vehicles of the PGL Vendors and TPine listed in Schedule "G", which schedule cannot be amended except for as provided for herein, and includes all accessories, fuel, equipment and parts thereof, therein or affixed thereto.

"**Vendors**" means, collectively, the PGL Vendors, TPine the Optional Vendors and the Real Property Vendor.

"**Wrecked Equipment**" has the meaning ascribed in section 7.4 hereof.

## 1.2    Interpretation Not Affected by Headings, etc.

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

## 1.3    General Construction

The terms "this Agreement", "hereof", "herein" and "hereunder" and similar expressions refer to this Agreement and not to any particular section hereof. The expression "Section" or reference to another subdivision followed by a number mean and refer to the specified Section or other subdivision of this Agreement. The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

## 1.4    Extended Meanings

Words importing the singular include the plural and vice versa and words importing gender include all genders. The term "including" means "including, without limitation," and such terms as "includes" have similar meanings and the term "third party" means any other Person other than the Vendors or the Purchaser, or any Affiliates thereof.

## 1.5    Currency

All references in this Agreement to dollars, monetary amounts, or to $, are expressed in Canadian currency unless otherwise specifically indicated.

– 11 –

**1.6    Statutes**

Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules, regulations and interpretations made under it, as it or they may have been or may from time to time be modified, amended or re-enacted.

**1.7    Schedules & Amendments to Schedules**

The following exhibits and schedules are attached hereto and incorporated in and form part of this Agreement:

> **SCHEDULES**
>
> Schedule "A"    -        Form of Approval and Vesting Order
>
> Schedule "B"    -        Excluded Assets
>
> Schedule "C"    -        Permitted Encumbrances
>
> Schedule "D"    -        Purchased Contracts
>
> Schedule "E"    -        Excluded Contracts
>
> Schedule "F"    -        Allocation Statement
>
> Schedule "G"    -        Vehicles
>
> Schedule "H"    -        Permits
>
> Schedule "I"    -        Critical Required Contracts
>
> Schedule "J"    -        Finloc Leased Equipment

Unless the context otherwise requires, words and expressions defined in this Agreement will have the same meanings in the Schedules and the interpretation provisions set out in this Agreement will apply to the Schedules. Unless the context otherwise requires, or a contrary intention appears, references in the Schedules to a designated Article, Section, or other subdivision refer to the Article, Section, or other subdivision, respectively, of this Agreement.

**1.8    Interpretation if Closing Does Not Occur**

If Closing does not occur, each provision of this Agreement which presumes that the Purchaser has acquired the Purchased Assets shall be construed as having been contingent upon Closing having occurred.

**ARTICLE 2**
**PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES**

**2.1    Purchase and Sale of the Purchased Assets**

Subject to the terms and conditions of this Agreement, effective as of the Closing Time, the Vendors shall sell, assign and transfer the Purchased Assets to the Purchaser, and the Purchaser shall purchase, accept, assume and receive from the Vendors, all of the Vendors' title to and interest in and to the Purchased Assets,

– 12 –

free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to the Approval and Vesting Order. For greater certainty, the Purchased Assets do not include the Excluded Assets.

Provided that Closing occurs, and subject to the terms and conditions of this Agreement, possession, risk, legal and beneficial ownership of, rights in, and responsibility for, the Purchased Assets shall transfer from the Vendors to the Purchaser effective as of the Closing Time, all subject to the Approval and Vesting Order.

**2.2    Option to Acquire Additional Assets**

From the Effective Date until the date that is no less than ten (10) Business Days prior to the Closing Date, the Purchaser shall have the option (but not the obligation) to acquire all of the Optional Assets held by any of the Optional Vendors (the "**Real Property Option**"). If the Real Property Option is exercised, in whole or in part, the acquisition by the Purchaser of any of Optional Assets shall be free and clear of any Encumbrances and Liabilities, other than the Assumed Liabilities. In the event that the Real Property Option is exercised, in whole or in part, the Optional Assets subject to the exercise of the Real Property Option shall be deemed to be included in the definition of Purchased Assets. Notwithstanding anything to the contrary provided in this Agreement, the exercise of the Real Property Option will be subject to (i) the approval of the Monitor, and (ii) the Purchaser obtaining written consent from (A) the mortgage lenders to each of the mortgaged real property owned by the applicable Optional Vendors (the "**Lenders**") to the assignment of the existing mortgages to the Purchaser, and (B) the Royal Bank of Canada (in its capacity as administrative agent and collateral agent). The Purchaser may exercise the Real Property Option at its sole discretion by delivering to the Vendors and the Monitor written notice of its intention to exercise the Real Property Option (the "**Exercise Notice**") on or before the date that is ten (10) Business Days prior to the Closing Date. Such Exercise Notice shall, among other things, specify the Optional Assets the Purchaser wishes to acquire. After receiving the Exercise Notice, the Monitor shall advise the Purchaser within five (5) Business Days as to whether or not the Monitor consents to the exercise of the Real Property Option. If the Real Property Option is exercised, the Purchase Price shall be increased by $1.00 and concordant adjustments will be made to the Allocation Statement in Schedule "F".

If the Real Property Option is exercised, the Purchaser and Vendors may elect to complete the transaction as either an asset purchase or a share purchase transaction, and shall be subject to Court approval, which may be sought at the hearing for the Approval and Vesting Order, or at a subsequent hearing in the event that the Exercise Notice is not exercised, and the required consents are not obtained, prior to the motion for the Approval and Vesting Order being served.

In the event that (a) the Purchaser declines to exercise the Real Property Option, (b) the Lenders do not consent to the sale of any of the Optional Assets, or (c) the Monitor does not provide its consent to the exercise of the Real Property Option, then in each such case there shall be no right of termination on the part of the Purchaser or the Vendors based solely upon such event, and the Purchaser's obligations, entitlements or other rights under this agreement shall not be impaired, waived or diminished, including the obligation to proceed with the Transaction, excluding the Optional Assets, in accordance with the terms of this Agreement.

**ARTICLE 3**
**PURCHASE PRICE AND RELATED MATTERS**

**3.1    Purchase Price**

    (a)    The aggregate cash consideration payable by the Purchaser for the Purchased Assets based upon the Purchased Assets existing as at the date of this Agreement and subject to adjustment as set out below shall be as set out below (the "**Purchase Price**").

– 13 –

Purchase Price Allocation Summary:

| | |
|---|---|
| Vehicles (Schedule "G") | $ 41,098,837[1] |
| Acquired AR Amount (including Intercompany Receivables at nil consideration) | $9,000,000.00[2] |
| Purchased LCs | $4,000,000.00[3] |
| Tangible Property (Computers, office furniture, IT, mechanics tools, etc.) | $160,000.00 |
| Intangibles (IP, licenses, software, goodwill, Permits, license plates, Purchased Contracts, etc.) (Schedule "F") | $50,000.00 |
| PGL Insurance Shares | $1.00 |
| Inventory[4] | $100,000 |
| Prepaid Expenses | $50,000 |
| **TOTAL** | $54,458,838 |

(b)     The Purchase Price shall be satisfied in accordance with Section 3.3 and shall not be subject to any claim for set off, reduction or adjustment or any similar claim or mechanism of any kind whatsoever, other than as described herein. For the avoidance of doubt, any Cash or Cash Equivalents indirectly acquired by the Purchaser from the PGL Vendors pursuant to this Agreement will be acquired on a dollar for dollar basis and such amount of Cash or Cash Equivalents acquired hereunder shall be added to the Purchase Price after payment and deduction of any unpaid amounts owing by any of the PGL Vendors in respect of unpaid wages, source deductions, taxes and unpaid HST accruing up to the Closing Date (the "**Unpaid Post CCAA Filing Accruals**"). In the event that the Cash or Cash Equivalents are not sufficient to satisfy the Unpaid Post CCAA Filing Accruals or there are any liabilities that cannot be vested out and released as against the PGL Vendors and their directors and officers pursuant to the Approval and Vesting Order, the Purchase Price shall be reduced on a dollar for dollar basis to the extent that such Unpaid Post CCAA Filing Accruals and any such undischarged liabilities are greater than the Cash or Cash Equivalents as at the Closing Date. For the avoidance of doubt, Unpaid Post CCAA Filing Accruals shall not be Excluded Liabilities. Subject to the filing of the elections referred to in Section 3.12 hereof, the Purchase Price shall be net of all applicable Transfer Taxes, which shall be paid in accordance with Section 3.12(a) hereof.

---

1 Subject to further adjustment in accordance with s. 3.3(c).

2 Subject to further adjustment in accordance with s. 3.3(b).

3 Subject to further adjustment in accordance with s. 3.1(c).

4 Subject to further adjustment in accordance with s. 3.3(e).

– 14 –

(c)    As the Purchased LCs are not currently cash collateralized, the Purchase Price allocated to the Purchased LCs (the "**LC Purchase Price**") shall be paid directly to the issuer or issuers of the Purchased LCs to be held by such issuers as cash collateral for the Purchased LCs, shall not be paid to the Vendors or the Monitor, and shall not form a part of the Cash Purchase Price. Further, in the event that the issuer of any Purchased LC wishes to terminate any Purchased LC prior to or concurrently with Closing, an amount of the LC Purchase Price corresponding to the terminated Purchased LC shall be used solely to secure replacement letters of credit or other security in form and substance satisfactory to the applicable insurance companies who are the beneficiaries of the terminated Purchased LC.

(d)    In addition, as set forth in Section 2.4 hereof, the Purchaser shall have the option to acquire the Optional Assets for a purchase price of $1.00 or such other amount as may be agreed to by the Monitor and Purchaser (and, for greater certainty, no other adjustment to the Purchase Price) and indirectly assume certain liabilities associated with the Optional Assets so acquired, including the mortgages and accrued property taxes and utilities associated with such Optional Assets.

**3.2    Assumption of Liabilities**

In addition to the Purchase Price, the Purchaser shall assume the Assumed Liabilities, which are estimated by the Purchaser to be equal to approximately $4 million based upon post-Closing obligations under the Purchased Contracts and the accrued vacation pay liabilities of the Employees. For the avoidance of doubt, the Purchaser shall assume all liabilities of PGL Insurance, by virtue of purchasing the shares of PGL Insurance.

**3.3    Allocation**

(a)    <u>Allocation Statement</u>. The Purchaser has delivered to the Monitor, on behalf of the Vendors, a statement (the "**Allocation Statement**"), as set out in Schedule "F", allocating, in sufficient detail, the Purchase Price and in respect thereof, (a) the allocation of the respective Purchase Price on an asset-by-asset basis, together with (b) the Purchase Price aggregated and allocated among each category of Purchased Assets of the Vendors.

(b)    <u>AR Adjustments</u>. In respect of Accounts Receivable, the Allocation Statement shall include a value to be allocated to the Accounts Receivable, which value shall be equal to 70% of the face amount of such Accounts Receivable other than Intercompany Receivables (the "**Acquired AR Amount**"), it being acknowledged and agreed by all Parties hereto that (a) the Acquired AR Amount shall remain at all times an amount equal to 70% of the full amount of the Accounts Receivable (other than Intercompany Receivables), as determined by the Monitor, and (b) the full amount of Accounts Receivable as estimated on the Allocation Statement shall be subject to adjustments based on the full amount of the Accounts Receivable, as determined by the Monitor, on (i) the Closing Date under the Interim Adjustment Statement in accordance with Section 3.4(c) (the "**Initial AR Adjustment**"), and (ii) the date that is sixty (60) days following the Closing Date, as determined in accordance with Section 3.10(a) hereof (the "**Final AR Adjustment**"). Notwithstanding the foregoing, no value shall be allocated to Intercompany Receivables, which shall be assigned to the Purchaser for no additional consideration.

(c)    <u>Vehicles Adjustment</u>. In respect of Vehicles, the Allocation Statement includes a value allocated to the Vehicles being acquired (the "**Acquired Vehicles Amount**"), it being acknowledged and agreed by all Parties hereto that (a) the Acquired Vehicles Amount shall not be amended or adjusted, other than removal of any Ineligible Equipment, and (b) the

– 15 –

Purchase Price allocated to Equipment in the Allocation Statement shall be reduced to omit any Ineligible Equipment, in an amount equal to value attributed to such Ineligible Equipment on the Allocation Statement (such reduction, the **"Vehicle Adjustment"**).

(d)     <u>Adjustments to Allocation Statement</u>. The Parties hereto shall make appropriate adjustments to the Allocation Statement to reflect any changes in the Purchase Price as of the Closing Time.  The Parties hereto agree for all Tax reporting purposes to report the Transaction in accordance with the Allocation Statement, as adjusted pursuant to the preceding sentence, and to not take any position during the course of any audit or other action inconsistent with such schedule unless required by a determination of the applicable Governmental Authority that is final.

(e)     <u>Fuel Inventory Adjustment</u>.  An amount of $50,000 of the Purchase Price has been allocated as the estimated fuel in the gas station fuel tanks as part of the "Inventory" in the Allocation Statement.  On the Closing Date, the Vendors shall provide an updated measurement of actual fuel in the gas station fuel tanks and the Purchase Price shall be adjusted by X-$50,000 where X is the cost basis of the actual fuel in the gas station fuel tanks on the Closing Date. (the "**Fuel Inventory Adjustment**")

**3.4     Satisfaction of Purchase Price**

The Purchaser shall satisfy the Purchase Price, at the Closing Time, in accordance with the following:

(a)     <u>Deposit.</u> The Parties acknowledge that the Purchaser has paid a deposit in the amount of $3,000,000 being approximately 5% of the Purchase Price (the "**Deposit**"), which Deposit is being held by the Monitor, in trust, in accordance with the terms of the Sale Process and shall be credited against the Purchase Price at Closing.

(b)     <u>Cash Purchase Price.</u> An amount shall be paid to the Monitor (the "**Cash Purchase Price**"), for the benefit of the Vendors, at the Closing Time, in immediately available funds equal to the Purchase Price (i) *minus* the Deposit, (ii) *minus* the LC Purchase Price, (iii) *plus* or *minus* the Initial AR Adjustment (if any), (iv) *plus* or *minus* the Vehicle Adjustment (if any), and (v) *plus* or *minus* the Fuel Inventory Adjustment (if any).

(c)     <u>Initial AR Adjustment.</u> The PGL Vendors, in consultation with the Monitor, shall carry out a physical accounting and adjustment and prepare and deliver to Purchaser no less than five (5) Business Days before the Closing a statement (the "**Interim Adjustment Statement**") setting out the PGL Vendors' good faith estimate of any difference between the Acquired AR Amount as set out in the Allocation Statement and the full value of the acquired accounts receivable on the Closing Date. The Interim Adjustment Statement shall be used to calculate any adjustments to the Cash Purchase Price required by Section 3.3.

(d)     <u>Vehicle Adjustment.</u> The PGL Vendors and TPine, in consultation with the Monitor, shall carry out a physical accounting and adjustment and prepare and deliver to Purchaser no less than five (5) Business Days before the Closing an updated schedule of Vehicles (the "**Vehicle Adjustment Statement**") setting out any Ineligible Equipment by VIN. The Vehicle Adjustment Statement shall be used to calculate the Vehicle Adjustment required by Section 3.3.

3.5     **Deposit**

(a)     If Closing occurs in accordance with the terms and conditions of this Agreement, the Deposit shall be credited against the Purchase Price, in partial satisfaction of the Purchaser's obligation to pay the Purchase Price at Closing.

(b)     If this Agreement is terminated:

   (i)     due to breach by the Purchaser as a result of events or circumstances entirely under the Purchaser's control that are not cured or waived and result in this Agreement not closing, then the Monitor on behalf of the Vendors shall be entitled to retain the Deposit and the full amount of the Deposit shall be forfeited to the Vendors; or

   (ii)     for any other reason, including, for the avoidance of doubt, the failure of the Vendors to satisfy any of its obligations or meet any of its conditions in this Agreement or any of the Purchaser's conditions set forth under Section 6.2 not being satisfied, the Deposit shall be returned to the Purchaser within three (3) Business Days of the termination of the Agreement; and

each Party shall be released from all obligations and liabilities under or in connection with this Agreement. In the event of termination of this Agreement under Section 6.3 pursuant to which the Vendors shall be entitled to retain the Deposit, the Parties agree that the amount of the Deposit constitutes a genuine pre-estimate of liquidated damages representing the Vendors' Losses and Liabilities as a result of Closing not occurring and agree that the Vendors shall not be entitled to recover from the Purchaser any amounts that are in excess of the Deposit as a result of Closing not occurring. The Purchaser hereby waives any claim or defence that the amount of the Deposit is a penalty or is otherwise not a genuine pre-estimate of the Vendors' damages.

3.6     **Assignment of Critical Required Contracts**

In the event that there are any Critical Required Contracts which are not assignable in whole or in part without the consent, approval or waiver of another Person and such consents, approvals or waivers have not yet been obtained as of the Closing Date, then:

(a)     nothing in this Agreement will be construed as an assignment of any Critical Required Contract and, without limiting the foregoing, the Purchaser does not assume and has no obligation to discharge any liability or obligation under or in respect of any such Critical Required Contract, until (i) an Assignment Order is obtained in accordance with 3.5(c), or (ii) such consent, approval or waiver is obtained in respect of such Critical Required Contract on terms satisfactory to the Purchaser, in either case following which the value of and rights of the applicable PGL Vendor under such Critical Required Contract shall enure to the applicable Purchaser;

(b)     the PGL Vendors shall use their commercially reasonable efforts to obtain any such consent, approval or waiver, and the Purchasers shall provide reasonable cooperation to assist the PGL Vendors in obtaining any such consent, approval or waiver;

(c)     if any consent, approval or waiver is not obtained for any Critical Required Contract prior to Closing, the Purchaser may request that the PGL Vendors bring a motion to the Court for issuance of an Assignment Order with respect to such Critical Required Contract prior to Closing;

– 17 –

(d)      once the consent, approval or waiver to the assignment of a Critical Required Contract is obtained, or the assignment of such Contract has been ordered by the Court pursuant to an Assignment Order, such Critical Required Contract shall be deemed to be assigned to the Purchaser on Closing;

(e)      the PGL Vendors shall preserve the Critical Required Contracts for the benefit of the Purchasers and shall not terminate, amend, modify, assign, convey or otherwise transfer all or any part of such Critical Required Contracts until such time as the required consent, approval or waiver or an Assignment Order is obtained, to enable the Purchasers to obtain the benefit of the Critical Required Contracts; and

(f)      the PGL Vendors, with the consent of the Purchaser, shall have the right to disclaim any Critical Required Contract in accordance with the CCAA, and in the event of disclaimer, such Critical Required Contract shall be considered an Excluded Contract for all purposes under this Agreement.

With respect to each Critical Required Contract, subject to Closing and to either (i) the consent, approval or waiver of the other parties thereto to the assignment thereof, or (ii) in the absence of such consent, approval or waiver, the obtaining of an Assignment Order, in addition to its other obligations under this Agreement, the Purchaser shall pay the applicable Cure Costs related to such Critical Required Contract on Closing.

## 3.7      Change of Control Consents

(a)      The Vendors shall as promptly as practicable, but in any event within five (5) days, after the execution of this Agreement, submit requests for the Change of Control Consents to the applicable party related to the purchase of PGL Insurance and, if applicable, the Optional Assets (provided that Change of Control Consents in respect of the Optional Assets shall not be sought until the Exercise Notice has been delivered by the Purchaser). The Vendors shall, and they shall cause the PGL Insurance and, if applicable, the Lenders associated with the Optional Assets, to obtain or cause to be obtained prior to Closing the Change of Control Consents on such terms as are acceptable to the Purchaser, acting reasonably. The Purchaser shall co-operate in obtaining the Change of Control Consents.

(b)      PGL and the Real Property Vendor shall, and PGL and the Real Property Vendor shall cause PGL Insurance and, if applicable, the Lenders associated with the Optional Assets to provide, or cause to be provided, all notices that are required to be provided in connection with the Transactions.

## 3.8      Post-Closing Cash

If, after the Closing Date, the PGL Vendors come into possession of any Cash or Cash Equivalents that are proceeds of Accounts Receivable purchased by the Purchaser (the **"Post-Closing Cash"**), the Monitor, on behalf of the PGL Vendors, shall hold all such amounts in trust for the Purchaser and shall forthwith wire or otherwise transfer any Post-Closing Cash to an account designated by the Purchaser in writing.

## 3.9      Good Faith Dealings

(a)      The Parties shall co-operate fully in good faith with each other and their respective legal advisors, accountants and other representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, including making or

– 18 –

causing to be made, all filings and submissions, as applicable, required under any Applicable Law to effect the Closing.

(b)     The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing on or before the Outside Date.

(c)     The Parties acknowledge, agree and confirm that the Agreement was negotiated, proposed and entered into by the Vendors and the Purchaser in good faith, without collusion, and from arm's-length bargaining positions and that the Purchaser is a good faith purchaser within the meaning of section 363(m) of the United States Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

**3.10     Post-Closing Adjustments**

In the event that any prorations, apportionments, computations, statements of Purchased Assets or amounts made hereunder shall require final adjustment, then the Parties shall use good faith and diligent efforts to make the appropriate adjustments promptly when accurate information becomes available and either Party shall be entitled to an adjustment to correct the same provided that, it makes written demand on the one from whom it is entitled to such adjustment within 90 days of the Closing Date (or prior to the end of any applicable tax period).

Notwithstanding the foregoing, the Parties hereto agree to work together in good faith, and in consultation with the Monitor and CRO, to make any necessary post-Closing adjustments to the Purchase Price as follows:

(a)     On the date that is sixty (60) days following the Closing Date, the Purchaser shall deliver to the Vendors and the Monitor a statement (the "**Final Adjustment Statement**"), together with any supporting accounting and other information, that sets out as at such date (A) the full amount of the purchased Accounts Receivable compared to the value of the Acquired AR Amount set out in the Allocation Statement; (B) the Vehicles actually received by the Purchaser, compared to the listing of the purchased Vehicles on Schedule "G" (as amended prior to the Closing Date to omit any Ineligible Equipment) and (C) the actual amount of the Prepaid Expenses as at the Closing Date in respect of which the Purchaser receives the actual benefit of on Closing, compared to the value of the Prepaid Expenses set out in the Allocation Statement. The Final Adjustment Statement shall be in a form acceptable to the Vendors, in consultation with the Monitor;

(b)     On or before the date that is ninety (90) days following the Closing Date, the Vendors, in consultation with the Monitor, may provide changes and comments on the Final Adjustment Statement to the Purchaser in writing, and the Purchaser and Vendors, in consultation with the Monitor, shall negotiate in good faith to finalize the Final Adjustment Statement, failing which either Party may direct the Monitor to engage an independent third-party accountant to resolve any discrepancies regarding the Final Adjustment Statement on such terms and standards as the Parties may agree in good faith in consultation with the Monitor;

(c)     Subject to the Final Adjustment Statement being resolved pursuant to (b) above, the Parties agree to the following post-Closing adjustments to the Purchase Price, to be paid in readily available cash as the Parties may determine in good faith:

(i)     an adjustment in favour of the Purchaser or the Vendors, as the case may be, in the amount of the applicable Final AR Adjustment as between the Closing Date and the date that is sixty (60) days following the Closing Date; and

– 19 –

(ii)    an adjustment in favour of the Purchaser in the amount of any Purchased Assets that the Vendor was incapable of delivering unto the Purchaser for any reason despite making its best efforts to do so, provided that the aggregate value of such Purchased Assets that cannot be delivered to the Purchaser is equal to or greater than two percent (2%) of the Purchase Price, failing which there shall not be any adjustment under this subheading.

**3.11    Withholding**

The Purchaser (or any affiliate thereof) shall be permitted to deduct or withhold from any amounts payable under this Agreement any amounts required to be deducted or withheld pursuant to Applicable Law in respect of Taxes, provided that it shall remit or cause to be remitted, such withheld amounts to the appropriate Governmental Authority in accordance with Applicable Law. To the extent that a Party becomes aware that any consideration payable under this Agreement may be subject to withholding Taxes, it shall promptly notify the other Party and the Parties shall cooperate in good faith to minimize or eliminate the amount of such withholding Taxes (including seeking relief from the Court, if applicable). To the extent that any amounts are so deducted or withheld and timely paid over to the applicable Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

**3.12    Payment of Sales Taxes and Tax Elections**

(a)    <u>Transfer Taxes</u>.  The Purchaser shall be liable for and shall pay all federal and provincial sales, goods and services, harmonized sales, value added, use, transfer, property or land transfer and similar Taxes ("**Transfer Taxes**") properly payable upon and in connection with the sale, assignment and transfer of the Purchased Assets from the Vendors to the Purchaser, which for greater certainty exclude any Taxes payable on the Vendors' net income, profits or gains. Subject to Section 3.12(b), where the Transfer Taxes are collectable by the Vendors, the Purchaser shall pay such Transfer Taxes directly and promptly to the Vendors upon the delivery of such documentation as may be prescribed under applicable Laws indicating the applicable Transfer Taxes and the Vendors' relevant Transfer Tax registration number(s) and any other information required for the Purchaser to obtain any applicable input tax credits or similar amounts in respect of such Transfer Taxes (or alternatively, in the context of any property or land transfer tax or other Tax required to be paid directly by the Purchaser to a Governmental Authority, the Purchaser shall pay such tax directly to the applicable Governmental Authority). The Vendors shall remit any such Transfer Taxes received from the Purchaser directly to the relevant taxation authority.  For Transfer Taxes that are payable directly by the Purchaser to the relevant Governmental Authority (including, for greater certainty, GST/HST to be self-assessed on the acquisition of real property), the Purchaser will be responsible for, and shall indemnify and hold harmless the Vendors from, such Transfer Taxes, plus any applicable penalties and interest.  For purposes of calculating the Transfer Taxes collectable by the Vendors, the provincial place of supply for the Purchased Assets physically situated in Canada will be determined by the Vendor one (1) day prior to Closing.

(b)    <u>GST/HST Election</u>.  PGL and the Purchaser shall jointly make the election provided for under section 167 of the *Excise Tax Act* (Canada) and under section 75 of *an Act respecting the Quebec sales tax* that no tax be payable pursuant to that legislation in respect of the purchase and sale of the Purchased Assets to be sold by PGL as contemplated by this Agreement.  The Purchaser and PGL, in consultation with the Monitor, shall jointly complete the election form(s) (including more particularly the form described as form

GST-44 and Form FP-2044) in respect of such election and the Purchaser shall file the said election form(s) no later than the due date for the Purchaser's GST/HST and QST returns for the first reporting period in which GST/HST, would, in the absence of such election, become payable in connection with the transactions contemplated by this Agreement (or within the timelines otherwise required under applicable provincial law), and will provide evidence of such filings to the Vendors and the Monitor. Notwithstanding the foregoing, the Purchaser shall, on demand, indemnify and hold harmless the Vendors and their directors, shareholders, employees, and successors of any Taxes (including interest and penalties) resulting from (i) the Purchaser's failure to timely file any election form (including the GST-44 and F P-2044) required to be filed pursuant to this paragraph, or (ii) any assessment, reassessment or imposition of GST/HST, QST assessed or imposed by any Governmental Authority as a result of or as a consequence of a rejection or denial of the GST/HST and QST elections made by the parties pursuant to this paragraph. The Purchaser does not assume and shall not be liable for any other Taxes which may be or become payable by the Vendors other than Transfer Taxes in connection with the purchase and sale of the Purchased Assets pursuant to this Agreement.

(c)     <u>Income Tax Election – Section 22 of the ITA</u>.    The Purchaser and the Vendors, in consultation with the Monitor, agree to make and file, in a timely manner, a joint election under section 22 of the ITA and any other equivalent or corresponding provision under applicable provincial or territorial tax legislation with respect to the sale, assignment, transfer and conveyance of the Accounts Receivable and shall designate therein that portion of the Purchase Price allocated to the Accounts Receivable in accordance with the procedures set out in Section 3.2 and 3.10 of this Agreement. The Purchaser and the Vendors, in consultation with the Monitor shall each file such elections, along with any documentation necessary or desirable to give effect to such elections, within the prescribed time limitations and will also prepare and file all of their respective Tax Returns in a manner consistent with such allocation.

## ARTICLE 4
## COVENANTS

### 4.1    Closing Date

(a)     The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing.

(b)     Each of the Parties shall, as promptly as possible, make, or cause to be made, all filings and submissions, as applicable, required under any Applicable Law to effect the Closing.

### 4.2    Motion for Approval and Vesting Order and Assignment Order

As soon as practicable after the date of this Agreement, the Vendors shall serve and file with the Canadian Court a motion for the issuance of the Approval and Vesting Order, seeking relief that will, *inter alia*, approve this Agreement and the Transaction and the Assignment Order. The Vendors shall use their best efforts to seek the issuance and entry of the Approval and Vesting Order and the Purchaser shall cooperate with the Vendors in their efforts to obtain the issuance and entry of the Approval and Vesting Order and the Assignment Order.

To the extent required to give full effect to, and implement, the Transaction, Randall Benson, in his capacity as the foreign representative of the Vendors, shall seek U.S. Court approval of the Transaction solely with respect to Purchased Assets located within the territorial jurisdiction of the United States in the form and manner required by the order approving the sales procedures motion to be filed in the Chapter 15

Proceedings set forth in the Order (i) Approving the Sale Procedures and Sale Notice, (ii) Authorizing the Sale of the Debtors' U.S. Assets Free and Clear and Liens, Claims, Encumbrances and Other Interests, and (iii) Granting Related Relief.

## 4.3    Interim Period

During the Interim Period, the Vendors shall ensure that all of the Purchased Assets remain insured and the Vendors shall use commercially reasonable efforts to continue to maintain the Purchased Assets and the Business in substantially the same manner as on the Effective Date, *provided that* the Purchaser hereby acknowledges that payments to equipment financers of the Vendors have not been made during the pendency of the CCAA Proceedings to date.

## 4.4    Access During Interim Period

During the Interim Period, the Monitor, on behalf of the Vendors, shall give, or cause to be given, to the Purchaser, and its representatives, reasonable access during normal business hours to the Books and Records, to conduct such investigations, inspections, surveys or tests thereof and of the financial and legal condition of the Business and Assets as the Purchaser reasonably deems necessary or desirable to further familiarize themselves with the Business and/or Assets. Without limiting the generality of the foregoing: (a) the Purchaser and its representatives shall be permitted reasonable access during normal business hours to all documents relating to information scheduled or required to be disclosed under this Agreement and to the Employees; and (b) the Purchaser and its Representatives shall be permitted to contact and discuss the Transactions contemplated herein with Governmental Authorities and the Vendors' customers and contractual counterparties. Such investigations, inspections, surveys and tests shall be carried out at the Purchaser's sole and exclusive risk and cost, during normal business hours, and without undue interference with the Vendors' operations and the Vendors shall co-operate reasonably in facilitating such investigations, inspections, surveys and tests and shall furnish copies of all such documents and materials relating to such matters as may be reasonably requested by or on behalf of the Purchaser. For the avoidance of doubt, nothing in this section 4.4 shall constitute a due diligence condition, and nothing discovered or learned by the Purchaser during the Interim Period shall entitle the Purchaser to terminate this Agreement or adjust the Purchase Price.

## 4.5    Insurance Matters

Until Closing, the Vendors shall keep in full force and effect all existing insurance policies relating to the Purchased Assets or the Business, and give any notice or present any claim under any such insurance policies consistent with past practice of the Vendors in the ordinary course of business. Any insurance proceeds received shall be applied to repair or remedy any damage caused by fire, theft, vandalism, collision or other calamity to any Equipment or other property being purchased by the Purchaser pursuant to this Agreement. For the avoidance of any doubt, in the event that insurance proceeds are paid or payable in respect of any Wrecked Equipment that is excluded from Schedule "G" in accordance with the terms hereof, the Purchaser shall in no case be entitled to any portion of such proceeds, and such proceeds constitute Excluded Assets hereunder.

## ARTICLE 5
## CLOSING ARRANGEMENTS

## 5.1    Closing

Closing shall take place on the Closing Date effective as of the Closing Time electronically (or as otherwise determined by mutual agreement of the Parties in writing), by the exchange of deliverables (in counterparts or otherwise) by electronic transmission in PDF format.

– 22 –

**5.2      Vendors' Closing Deliveries**

At or before the Closing Time, the Vendors shall deliver or cause to be delivered to the Purchaser the following:

(a)      any Specific Conveyances required in respect of the transfer of the Purchased Assets from the Vendors to the Purchaser, including, if applicable, the transfer of the Optional Assets;

(b)      a true copy of the Approval and Vesting Order, as signed by the Canadian Court;

(c)      all required consents or approval orders, in form and substance satisfactory to the Purchaser, providing for the assignment and transfer of the Critical Required Contracts;

(d)      all required consents, in form and substance satisfactory to the Purchaser, to the change of control of PGL Insurance, which shall be provided by the Purchaser to the Vendors for execution (the "**Change of Control Consents**");

(e)      all required consents, in form and substance satisfactory to the Purchaser, to the assignment of the Permits;

(f)      any tax elections contemplated by Section 3.11 duly executed by the applicable Vendors;

(g)      evidence that all necessary corporate actions have been taken on or prior to the Closing to permit good title to the PGL Insurance Shares to be duly and validly transferred and assigned to the Purchaser at the Closing;

(h)      share certificates representing all issued and outstanding shares of PGL Insurance accompanied with duly executed share transfer forms in the name of the Purchaser or its nominee or evidence of cancellation of all existing outstanding shares and issuance of new share certificates to the Purchaser or its nominee, in either case, together with security registers evidencing that the Purchaser or its nominee is the sole holder of PGL Insurance;

(i)      the Books and Records of the Vendors, PGL Insurance, LeaseCo and, if applicable, any Optional Vendors;

(j)      a true copy of the U.S. Approval Order, if applicable, as entered by the U.S. Court;

(k)      a certificate of an officer of the Vendors dated as of the Closing Date confirming that all of the representations and warranties of the Vendors contained in this Agreement are true in all material respects as of the Closing Time, with the same effect as though made at and as of the Closing Time, and that the Vendors have performed in all material respects the covenants to be performed by them prior to the Closing Time; and

(l)      such other agreements, documents and instruments as may be reasonably required by the Purchaser to complete the Transaction, all of which shall be in form and substance satisfactory to the Parties, acting reasonably.

**5.3      Purchaser's Closing Deliveries**

At or before the Closing, the Purchaser shall deliver or cause to be delivered to the Vendors (or to the Monitor, as applicable), the following:

(a)      the Cash Purchase Price;

– 23 –

(b)     all Transfer Taxes payable in accordance with Section 3.12(a);

(c)     evidence that all Offers of Employment have been provided to the Employees prior to Closing in accordance with Section 9.1(a);

(d)     duly executed assignment and assumption agreements, in form and substance satisfactory to the Vendors, evidencing the assumption by the Purchaser of the Purchased Contracts and Assumed Liabilities;

(e)     any Specific Conveyances required in respect of the transfer of the Purchased Assets from the Vendors to the Purchaser;

(f)     any tax elections contemplated by Section 3.12 duly executed by the Purchaser;

(g)     a certificate of an officer of the Purchaser dated as of the Closing Date confirming that all of the representations and warranties of the Purchaser contained in this Agreement are true in all material respects as of the Closing Time, with the same effect as though made at and as of the Closing Time, and that the Purchaser has performed in all material respects the covenants to be performed by it prior to the Closing Time; and

(h)     such other agreements, documents and instruments as may be reasonably required by the Monitor on behalf of the Vendors to complete the Transaction, all of which shall be in form and substance satisfactory to the Monitor and the Purchaser, acting reasonably.

**5.4     Post-Closing Deliveries**

(a)     Immediately following Closing or as soon as practicable thereafter, PGL, PGL USA, PGL International, PFS and PFS USA shall file articles of amendment to change their name to another name or numbered company and shall deliver to the Purchaser evidence of the filing of such articles of amendment and change of name and shall consent to the Purchaser changing its name to "Pride Group Logistics Ltd.", it being acknowledged by the Vendors that the Purchaser is purchasing all goodwill and intellectual property associated with the "Pride Group Logistics" name and that the change of the name of the Purchaser to Pride Group Logistics Ltd. may facilitate the assignment and continuation of Permits currently held by the Vendors.

(b)     Immediately following the receipt of the documents set out in Section 5.4(a) above, or as soon as practicable thereafter, the Purchaser and each of its Permitted Assignees shall be entitled to file articles of amendment, articles of incorporation or otherwise effect a change of name in their applicable jurisdiction of incorporation to utilize one or more of the names of the Vendors set out in Section 5.4(a) above, and shall, upon doing so, provide the Monitor with evidence of the filing of such articles of amendment, articles of incorporation or other documents evidencing such change of name.

**ARTICLE 6
CONDITIONS OF CLOSING**

**6.1     Conditions Precedent in Favour of the Parties**

The obligation of the Parties to complete the Transaction is subject to the following joint conditions being satisfied, fulfilled or performed on or prior to the Closing Date:

– 24 –

(a) <u>Approval and Vesting Order and Assignment Order.</u> The Canadian Court shall have issued and entered the Approval and Vesting Order and the Assignment Order on or before September 15, 2024 (or such later date as may be agreed by the Purchaser, Vendors and Monitor) in form and substance satisfactory to the parties, or as soon thereafter subject to availability of the Canadian Court, which Approval and Vesting Order and Assignment Order shall not have been stayed, set aside, or vacated and no application, motion or other proceeding shall have been commenced seeking the same, in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably.

(b) <u>US Approval Order.</u>  If determined to be necessary, the U.S. Approval Order shall have been entered by the U.S. Court.

(c) <u>No Order</u>. No Applicable Law and no judgment, injunction, order or decree shall have been issued by a Governmental Authority or otherwise in effect that restrains or prohibits the completion of the Transaction;

(d) <u>No Restraint.</u> No motion, action or proceedings shall be pending by or before a Governmental Authority to restrain or prohibit the completion of the Transaction contemplated by this Agreement; and

The foregoing conditions are for the mutual benefit of the Parties. If any condition set out in this Section 6.1 is not satisfied, performed or mutually waived on or prior to the Closing Date, any Party may elect on written notice to the other Parties to terminate this Agreement.

## 6.2    Conditions Precedent in Favour of the Purchaser

The obligation of the Purchaser to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a) <u>Good Standing of Permits; Change of Control Consents; Critical Required Contracts</u>: All Permits shall have been transferred to the Purchaser in good standing and the Vendors shall have obtained all consents required by regulatory authorities in order to allow for the transfer of such Permits to the Purchaser. The assignment of all Critical Required Contracts to the Purchaser shall have been completed and the Change of Control Consents shall have been obtained, provided that this condition shall not apply to any Permits, Change of Control Consents or Critical Required Contracts that are not in good standing, transferred or assigned solely as a result of the Purchaser's failure to pay the applicable Cure Costs.

(b) <u>Vendors' Deliverables.</u> The Vendors shall have executed and delivered or caused to have been executed and delivered to the Purchaser at the Closing all the documents contemplated in Section 5.2.

(c) <u>No Breach of Representations and Warranties</u>. Except as such representations and warranties may be affected by the occurrence of events or transactions specifically contemplated by this Agreement, each of the representations and warranties contained in Section 7.1 shall be true and correct in all material respects: (i) as of the Closing Date as if made on and as of such date; or (ii) if made as of a date specified therein, as of such date.

(d) <u>No Breach of Covenants.</u> The Vendors shall have performed, in all material respects, all covenants, obligations and agreements contained in this Agreement required to be performed by the Vendors on or before the Closing Date.

– 25 –

(e)     Monitor's Certificate. The Monitor shall have provided an executed certificate of the Monitor substantially in the form attached to the Approval and Vesting Order (the "**Monitor's Certificate**") confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Vendors.

(f)     Real Property. In the event that the Purchaser exercises the Real Property Option with respect to the purchase of the 129 Shares, and the Purchaser is unable to obtain the required consents and approvals from the applicable Lenders or the Monitor to acquire the real property currently owned by 129 Canada, the Purchaser or its nominee shall have entered into a lease agreement or such other form of arrangement, on terms that are not less favorable than the terms of any existing lease agreements or other existing arrangements, as is necessary to allow the Purchaser or its nominee to continue to use the real property currently owned by 129 Canada for a period of twelve (12) months at fair market value rents, with an option to extend such lease for an additional twelve months on consent of 129 Canada and the Purchaser, and an at-will termination provision in favour of the landlord of not more than 60 days notice.  In addition, the Purchaser or its nominee shall have entered into a lease with each of 207 Ontario and 933 Helena for the continued use of the real property currently held by each of them for a period of twelve (12) months at fair market value rents, with an option to extend such lease for an additional twelve months on consent of 207 Ontario and 933 Helena, respectively, and the Purchaser, and an at-will termination provision in favour of the landlord of not more than 60 days notice.  In addition, the Purchaser shall be entitled to the continued use of the real property currently used by the PGL Vendors at 6050 Dixie Road, Mississauga, ON, on existing lease terms for the duration of the existing lease and the Vendors shall have obtained a Change of Control Consent from the Landlord in respect thereof.

The foregoing conditions are for the exclusive benefit of the Purchaser. Any condition in this Section 6.2 may be waived by the Purchaser in whole or in part, without prejudice to any of its rights of termination in the event of non-fulfillment of any other condition in whole or in part. Any such waiver shall be binding on the Purchaser only if made in writing. If any condition set out in this Section 6.2 is not satisfied or performed by the Closing Date, the Purchaser may elect on written notice to the Vendors to terminate this Agreement.

**6.3     Conditions Precedent in Favour of the Vendors**

The obligation of the Vendors to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)     Purchaser's Deliverables. The Purchaser shall have executed and delivered or caused to have been executed and delivered to the Vendors at the Closing all the documents and payments contemplated in Section 5.3.

(b)     No Breach of Representations and Warranties. Each of the representations and warranties contained in Section 7.2 shall be true and correct in all material respects (i) as of the Closing Date as if made on and as of such date, or (ii) if made as of a date specified therein, as of such date.

(c)     No Breach of Covenants. The Purchaser shall have performed in all material respects all covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

– 26 –

(d) Monitor's Certificate. The Monitor shall have provided an executed copy of the Monitor's Certificate confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Vendors.

The foregoing conditions are for the exclusive benefit of the Vendors. Any condition in this Section 6.3 may be waived by the Vendors in whole or in part, without prejudice to any of their rights of termination in the event of non-fulfilment of any other condition in whole or in part. Any such waiver shall be binding on the Vendors only if made in writing. If any condition set forth in this Section 6.3 is not satisfied or performed by the Closing Date, the Vendors may elect on written notice to the Purchaser to terminate the Agreement.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES

**7.1    Representations and Warranties of the Vendors**

The Vendors hereby jointly and severally represent and warrant as of the date hereof and as of the Closing Time as follows, and acknowledge that the Purchaser is relying on such representations and warranties in connection with entering into this Agreement and performing its obligations hereunder:

(a) Incorporation and Status. The Vendors are corporations incorporated and existing under the *Business Corporations Act* (Ontario), are in good standing under such act and have the power and authority to enter into, deliver and perform their obligations under this Agreement.

(b) Corporate Authorization. The execution, delivery and, subject to obtaining the Approval and Vesting Order and Assignment Order in respect of the matters to be approved therein, performance by the Vendors of this Agreement has been authorized by all necessary corporate action on the part of the Vendors.

(c) Execution and Binding Obligation. This Agreement has been duly executed and delivered by the Vendors and constitutes a legal, valid and binding obligation of the Vendors, enforceable against them in accordance with its terms, subject only to obtaining the Approval and Vesting Order, the Assignment Order, and, if applicable, the U.S. Approval Order.

(d) Proceedings. There are no proceedings pending against the Vendors, or any of them, or, to the knowledge of the Vendors, threatened, with respect to, or in any manner affecting, title to the Purchased Assets, which would reasonably be expected to enjoin, delay, restrict or prohibit the transfer of all or any part of the Purchased Assets as contemplated by this Agreement or which would reasonably be expected to delay, restrict or prevent the Vendors from fulfilling any of their obligations set forth in this Agreement, provided that the Approval and Vesting Order is granted.

(e) No Consents or Authorizations. Subject only to obtaining the Approval and Vesting Order, the Assignment Order and, to the extent applicable, the U.S. Approval Order, the Vendors do not require any consent, approval, waiver or other Authorization from any Governmental Authority as a condition to the lawful completion of the Transaction.

(f) Residency. None of the Vendors (other than PGL USA and PFS USA) is a non-resident of Canada for purposes of the ITA.

– 27 –

(g)    <u>No Other Agreements to Purchase</u>. Except for the Purchaser's rights under this Agreement, no Person has any contractual right, option or privilege for the purchase or acquisition from the Vendors of any of the Purchased Assets.

## 7.2    Representations and Warranties of the Purchaser

The Purchaser hereby represents and warrants to and in favour of the Vendors as of the date hereof and as of the Closing Time, and acknowledges that, the Vendors are relying on such representations and warranties in connection with entering into this Agreement and performing their obligations hereunder:

(a)    <u>Incorporation and Status</u>. The Purchaser is a corporation incorporated and existing under the laws of the Province of Ontario as of the date hereof, is in good standing under such act and has the power and authority to enter into, deliver and perform their obligations under this Agreement.

(b)    <u>Corporate Authorization.</u> The execution, delivery and performance by the Purchaser of this Agreement has been authorized by all necessary corporate action on the part of the Purchaser.

(c)    <u>No Conflict</u>. The execution, delivery and performance by the Purchaser of this Agreement do not (or would not with the giving of notice, the lapse of time, or both, or the happening of any other event or condition) result in a breach or a violation of, or conflict with, or allow any other Person to exercise any rights under, any terms or provisions of the Organizational Documents of the Purchaser.

(d)    <u>Execution and Binding Obligation.</u> This Agreement has been duly executed and delivered by the Purchaser and constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms subject only to the Approval and Vesting Order, the Assignment Order and, to the extent applicable, the U.S. Approval Order.

(e)    <u>Proceedings.</u> There are no proceedings pending, or to the knowledge of the Purchaser, threatened, against the Purchaser before any Governmental Authority, which prohibit or seek to enjoin delay, restrict or prohibit the Closing of the Transaction, as contemplated by this Agreement, or which would reasonably be expected to delay, restrict or prevent the Purchaser from fulfilling any of its obligations set forth in this Agreement.

(f)    <u>Residency.</u> The Purchaser is not a non resident of Canada within the meaning of section 116 of the ITA.

(g)    <u>Sanctions Not Applicable.</u> None of the Purchaser, any of its subsidiaries or, to the knowledge of the Purchaser, any director, officer, agent, employee, Affiliate or representative of the Purchaser or any of its subsidiaries is, or is controlled or 50% or more owned by or is acting on behalf of, an individual or entity ("**Person**") currently the subject of applicable economic sanctions including those administered or enforced by the government of Canada, the United States of America (collectively, "**Sanctions**"). None of the Purchaser or any of its subsidiaries is located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions.  To the Purchaser's knowledge, neither it nor any of its subsidiaries has engaged in any dealings or transactions with or for the benefit of a Person subject to Sanctions. The Purchaser has procedures and policies in place designed to ensure compliance with Sanctions.

(h)    <u>Equity Financing.</u> The Purchaser has obtained not less than $5,000,000 in equity financing.

(i)     GST/HST Registration.  The Purchaser is registered for goods and services tax/harmonized sales tax (GST/HST) purposes under Part IX of the *Excise Tax Act* (Canada), and its registration number is 766551022. The Purchaser will be registered effective on the Closing Date for Quebec sales tax (QST) purposes under Title I of *an Act respecting the Quebec sales tax.*

## 7.3     Transfer of Title; Conveyance of Assets

Subject to the conditions relating to leases set out in Section 6.2 above, the Purchaser is responsible for transferring any physical Purchased Assets (including specifically, any Equipment owned by the Vendors) as soon as practicable following Closing situated on any real properties owned or leased by the Vendors that are not acquired by the Purchaser pursuant to the Transaction.

## 7.4     "As is, Where is"

(1)     The Purchaser acknowledges and agrees that it is purchasing the Purchased Assets on an "as is, where is" basis, and without representations or warranties of any kind, nature, or description by the Monitor, the CRO, the Vendors or any of their respective agents, advisors or estates, and on the basis that the Purchaser has conducted to its satisfaction an independent inspection, investigation and verification of the Purchased Assets (including a review of title), and all other relevant matters and has determined to proceed with the transaction contemplated herein and will accept the same at the Closing Time in their then current state, condition, location, and amounts, provided, however, that the Purchaser shall not be required to accept any Equipment or other property that has been lost, damaged or destroyed due to theft, fire, collision, vandalism or other calamity <u>and</u> for which insurance proceeds are not available to repair or replace such Equipment (the "**Wrecked Equipment**"), in which case such Wrecked Equipment will be deemed not to have been received by the Purchaser and the Purchaser shall be entitled to a reduction of the Purchase Price in accordance with Section 3.10.

(2)     No representation, warranty or condition whether statutory (including under the *Sale of Goods Act* (Ontario), the International Sale of Goods *Contracts Convention Act* (Canada) and the *International Sale of Goods Act* (Ontario) or any international equivalent act which may be applicable to the subject matter pursuant to the provisions of this Agreement, including but not limited to the United Nations Convention on Contracts for the International Sale of Goods), or express or implied, oral or written, legal, equitable, conventional, collateral, arising by custom or usage of trade, or otherwise is or will be given by the Vendors or the Monitor including as to title, outstanding liens or encumbrances, description, fitness for purpose, merchantability, merchantable quality, quantity, condition (including physical and environmental condition), suitability, durability, assignability, or marketability thereof or any other matter or thing whatsoever, and all of the same are expressly excluded and disclaimed and any rights pursuant to such statutes have been waived by the Purchaser.  The Purchaser acknowledges and agrees that it has relied entirely and solely on its own investigations as to the matters set out above and in determining to purchase the Purchased Assets pursuant to this Agreement.

(3)     The description of the Purchased Assets contained herein is for the purpose of identification only and the inclusion of any item in such description does not confirm the existence of any such items or that any such item is owned by the Vendors.  No representation, warranty or condition has been given by the Vendors, CRO or the Monitor concerning the completeness or accuracy of such descriptions and the Purchaser acknowledges and agrees that any other representation, warranty, statements of any kind or nature, express or implied, (including any relating to the future or historical financial condition, results of operations, prospects, assets or liabilities of the Vendors or the quality, quantity or condition of the Purchased Assets) are specifically disclaimed by the Vendors.

(4)     Any documents, materials and information provided by the Vendors, CRO or Monitor to the Purchaser with respect to the Purchased Assets (including any confidential information memorandums,

management presentations, or material made available in the electronic data room) have been provided to the Purchaser solely to assist the Purchaser in undertaking its own due diligence, and the Vendors, CRO and/or Monitor have not made and are not making any representations or warranties, implied or otherwise, to or for the benefit of the Purchaser as to the accuracy and completeness of any such documents, materials or information or the achievability of any valuations, estimates or projections. The Purchaser acknowledges that it has not and will not rely upon any such documents, materials or information in any manner, whether as a substitute for or supplementary to its own due diligence, searches, inspections and evaluations. The Vendors, CRO and/or Monitor and their respective Affiliates, directors, officers, employees, agents and advisors shall not be liable for any inaccuracy, incompleteness or subsequent changes to any such documents, materials or information. The Purchaser further acknowledges that the use of the documents may not be possible without the Purchaser obtaining reliance or other assurances from the author of such documents directly and further that the documents may be subject to copyright or other property rights which may preclude their use by the Purchaser in whole or in part.

## ARTICLE 8
## TERMINATION

**8.1    Grounds for Termination**

This Agreement may be terminated on or prior to the Closing Date:

    (a)    by the mutual written agreement of the Vendors (with the consent of the Monitor) and the Purchaser;

    (b)    pursuant to Sections 6.1, 6.2 and 6.3, as applicable; or

    (c)    by the Vendors (with the consent of the Monitor) or the Purchaser upon written notice to the other Parties if: (i) the Closing has not occurred by the Outside Date; or (ii) this Agreement is not approved or the Approval and Vesting Order is not granted by the Canadian Court; provided in each case that the failure to close or obtain such order, as applicable, by such deadline is not caused by any act or omission or breach of this Agreement by the Party proposing to terminate the Agreement.

**8.2    Effect of Termination.**

If this Agreement is terminated pursuant to Section 8.1, all further obligations of the Parties under this Agreement will terminate and no Party will have any Liability or further obligations hereunder; except for the provisions of Sections 9.4 (Public Announcements) and 9.10 (Governing Law).

## ARTICLE 9
## GENERAL

**9.1    Employment Matters**

    (a)    The Purchaser or an affiliate thereof shall offer employment, effective on the Closing Date, to all Employees on terms and conditions which are substantially similar to the terms and conditions that each Employee had with the Vendors, conditional on the Closing occurring and effective on the Closing Date. Purchaser shall have provided the Vendors with copies of all offers of employment for the Employees for the purposes of confirming that the proposed terms and conditions of such offers comply with this section (collectively, the "**Offers of Employment**"). Each Offer of Employment shall expressly provide that the Purchaser recognizes all employment service with the Vendors and if applicable, the Vendors' predecessors, for all purposes. Each Offer of Employment will be delivered by

– 30 –

the Purchaser to each Employee such number of days prior to the Closing Date as Purchaser and Vendors may reasonably agree, and shall provide that the Offer of Employment will be deemed to have been accepted if it is not rejected in writing by the applicable employee no less than two (2) business days prior to the Closing Date. The Purchaser shall have advised the Vendors prior to the Closing Date of each Employee who has rejected an Offer of Employment. In the event an Employee rejects an Offer of Employment such Employee shall not be considered a Transferring Employee and the applicable Vendor shall provide written notice of termination to such Employee prior to the Closing Date, which notice shall be in form and substance satisfactory to the Monitor, acting reasonably. The Vendors shall not attempt to discourage Employees from accepting the Offers of Employment.

(b)      If the Purchaser satisfies its obligations under the section immediately above, it shall only assume and be liable for the Employee-related obligations of the Transferring Employees.

(c)      The Purchaser will establish replacement plans for the Transferring Employees that are substantially similar to the Employee benefit plans existing on the Closing Date. The Purchaser shall cause each replacement plan to recognize all employment service with the Vendors, as applicable, and if applicable, the Vendors' predecessors, of each Transferring Employee for purposes of eligibility for participating, vesting, benefit accrual and entitlement to benefits under such replacement plans.

## 9.2    Access to Books and Records

For a period of six years from the Closing Date or for such longer period as may be reasonably required for the Vendors (or any trustee in bankruptcy of the estate of any of the Vendors) to comply with Applicable Law, the Purchaser will retain all original Books and Records that are transferred to the Purchaser under this Agreement, but the Purchaser is not responsible or liable for any accidental loss or destruction of, or damage to, any such Books and Records. So long as any such Books and Records are retained by the Purchaser pursuant to this Agreement, the Vendors (and any representative, agent, former director or officer or trustee in bankruptcy of the estate of any of the Vendors, including the Monitor) has the right to inspect and to make copies (at their own expense) of them at any time upon reasonable request during normal business hours and upon reasonable notice for any proper purpose and without undue interference to the business operations of the Purchaser.

## 9.3    Notice

Any notice or other communication under this Agreement shall be in writing and may be delivered by read-receipted email, addressed:

(a)      in the case of the Purchaser, as follows:

**1000927605 Ontario Inc.**
100 King Street West, Suite 3400
Toronto, Ontario, M5X 1A4

Attention: Aman Johal
Email: aman@pridegroupenterprises.com

with a copy to:

**Bennett Jones LLP**
100 King Street West, Suite 3400

– 31 –

Toronto, Ontario, M5X 1A4

Attention: Raj Sahni and Jesse Mighton
Email: SahniR@bennettjones.com / mightonj@bennettjones.com

(b)      in the case of the Vendors, as follows to the CRO:


Attention:      Randall Benson
Email:          r.benson@rcbensonconsulting.com

with a copy to:

**Thornton Grout Finnigan LLP**
Suite 3200, 100 Wellington Street West
P. O. Box 329, Toronto-Dominion Centre
Toronto, ON  M5K 1K7


Attention:      Leanne Williams, Rachel Nicholson, Puya Fesharaki
Email:          lwilliams@tgf.ca, rnicholson@tgf.ca, pfesharaki@tgf.ca

(c)      in each case, with a further copy to the Monitor as follows:

**Ernst & Young Inc.**
EY Tower, 100 Adelaide Street West,
Toronto , ON M5H 0B3

Attention:      Alex Morrison, Simone Carvalho, Michael Hayes, Ross Johnson
Email:  alex.f.morrison@parthenon.ey.com; simone.carvalho@parthenon.ey.com;
Michael.Hayes@parthenon.ey.com;  ross.johnson@ca.ey.com

with a copy to:

**Blake, Cassels & Graydon LLP**
199 Bay Street, Suite 4000,
Toronto ON M5L 1A9

Attention:      Pam Huff, Kelly Bourassa, Chris Bur,
Email:          pam.huff@blakes.com; kelly.bourassa@blakes.com
chris.burr@blakes.com;

Any such notice or other communication, if transmitted by email before 5:00 p.m. (Toronto time) on a Business Day, will be deemed to have been given on such Business Day, and if transmitted by email after 5:00 p.m. (Toronto time) on a Business Day, will be deemed to have been given on the Business Day after the date of the transmission. In the case of a communication by email or other electronic means, if an autoreply is received indicating that the email is no longer monitored or in use, delivery must be followed by the dispatch of a copy of such communication pursuant to one of the other methods described above; provided however that any communication originally delivered by electronic means shall be deemed to have been given on the date stipulated above for electronic delivery.

Sending a copy of a notice or other communication to a Party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the notice or other communication to that

– 32 –

Party. The failure to send a copy of a notice or other communication to legal counsel does not invalidate delivery of that notice or other communication to a Party. A Person may change its address for service by notice given in accordance with the foregoing and any subsequent communication must be sent to such Person at its changed address.

**9.4    Public Announcements**

The Vendors shall be entitled to disclose this Agreement to the Courts and parties in interest in the CCAA Proceedings, other than any information which the Purchaser advises the Vendors in writing as being confidential, acting reasonably, and this Agreement may be posted on the Monitor's website maintained in connection with the CCAA Proceedings at URL: http://www.ey.com/ca/pridegroup. Other than as provided in the preceding sentence or statements made in the Courts (or in pleadings filed therein) or where required to meet timely disclosure obligations of the Vendors or any of their Affiliates under Applicable Laws, the Vendors shall not issue (prior to or after the Closing) any press release or make any public statement or public communication with respect to this Agreement or the Transactions contemplated hereby without the prior consent of the other Parties, which shall not be unreasonably withheld or delayed.

**9.5    Time**

Time shall, in all respects, be of the essence hereof, provided that the time for doing or completing any matter provided for herein may be extended or abridged by an agreement in writing signed by the Parties.

**9.6    Survival**

The representations and warranties of the Parties contained in this Agreement shall not merge on Closing and the representations, warranties and covenants of the Parties contained herein to be performed after the Closing shall survive Closing and remain in full force and effect.

**9.7    Benefit of Agreement**

This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

**9.8    Entire Agreement**

This Agreement and the attached Schedules hereto constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior negotiations, understandings and agreements. This Agreement may not be amended or modified in any respect unless agreed to in writing by the Parties.

**9.9    Paramountcy**

In the event of any conflict or inconsistency between the provisions of this Agreement, and any other agreement, document or instrument executed or delivered in connection with this Transaction or this Agreement, the provisions of this Agreement shall prevail to the extent of such conflict or inconsistency.

**9.10    Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and each of the Parties irrevocably attorn to the exclusive jurisdiction of the Canadian Court, and any appellate courts of the Province of Ontario therefrom.

**9.11    Assignment**

The Purchaser cannot assign any of its rights or obligations under this Agreement without the prior written consent of the Vendors and the Monitor. Notwithstanding the foregoing, this Agreement may be assigned by the Purchaser prior to the issuance of the Approval and Vesting Order, in whole or in part (and, for greater certainty, the Purchaser may assign to one or more Permitted Assignees (as defined below) the right to purchase, in consideration for the allocable portion of the Consideration, all or any portion of the Purchased Assets hereunder), without the prior written consent of the Vendors or the Monitor, provided that: (i) such assignee is a Related Party or subsidiary of the Purchaser (a "**Permitted Assignee**"); (ii) the Purchaser provides prior notice of such assignment to the Vendors and the Monitor; and (iii) such assignee agrees in writing to be bound by the terms of this Agreement to the extent of the assignment and a copy of such assumption agreement is delivered to the Vendors and the Monitor forthwith after having been entered into; provided, however, that any such assignment shall not relieve the Purchaser of its obligations hereunder.

**9.12    Further Assurances**

Each of the Parties shall, at the request and expense of the requesting Party, take or cause to be taken such action and execute and deliver or cause to be executed and delivered to the other such conveyances, transfers, documents and further assurances as may be reasonably necessary or desirable to give effect to this Agreement.

**9.13    Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement. Transmission by e-mail of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

**9.14    Severability**

Notwithstanding any provision herein, if a condition to complete the Transaction, or a covenant or an agreement herein is prohibited or unenforceable pursuant to Applicable Law, then such condition, covenant or agreement shall be ineffective to the extent of such prohibition or unenforceability without invalidating the other provisions hereof.

**9.15    Monitor's Certificate**

The Parties acknowledge and agree that the Monitor shall be entitled to deliver to the Purchaser, and file with the Canadian Court, the executed Monitor's Certificate without independent investigation, upon receiving written confirmation from both Parties (or the applicable Party's counsel) that all conditions of Closing in favour of such Party have been satisfied or waived, and the Monitor shall have no Liability to the Parties in connection therewith. The Parties further acknowledge and agree that upon written confirmation from both Parties that all conditions of Closing in favour of such Party have been satisfied or waived, the Monitor may deliver the executed Monitor's Certificate to the Purchaser's counsel in escrow, with the sole condition of its release from escrow being the Monitor's written confirmation that all such funds have been received, the Monitor's Certificate will be released from escrow to the Purchaser, and the Closing shall be deemed to have occurred.

**9.16    Monitor's Capacity**

In addition to all of the protections granted to the Monitor under the CCAA or any order of the Court in this CCAA Proceeding, the Vendors and the Purchaser acknowledge and agree that the Monitor, acting in

Docusign Envelope ID: 88FE5681-D1B3-42DF-A9AC-E74292DG31D9

– 34 –

its capacity as Monitor and not in their personal capacity, will have no Liability, in its personal capacity or otherwise, in connection with this Agreement or the Transaction contemplated herein whatsoever as Monitor.

*[Signature Page Follows]*

IN WITNESS WHEREOF the Parties have executed this Agreement as of the day and year first above written.

**1000927605 ONTARIO INC**.

By:   _Sam Johal_
      E6677F3DDA13463...

Name:   Sulakhan Johal

Title:   Director

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS LTD.**

By:   _RC Benson_
      441B58CA3EBB45C...

Name:   Randy Benson

Title:   Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS USA, CO.**

By:   _RC Benson_
      441B58CA3EBB45C...

Name:   Randy Benson

Title:   Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS INTERNATIONAL LTD.**

By:   _RC Benson_
      441B58CA3EBB45C...

Name:   Randy Benson

Title:   Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE FLEET SOLUTIONS INC.**

By: _____

     Name:    Randy Benson

     Title:    Chief Restructuring Officer

I have authority to bind the Corporation.


**PRIDE FLEET SOLUTIONS USA INC.**

By: _____

     Name:    Randy Benson

     Title:    Chief Restructuring Officer

I have authority to bind the Corporation.


**2029909 ONTARIO INC.**

By: _____

     Name:    Randy Benson

     Title:    Chief Restructuring Officer

I have authority to bind the Corporation.


**12944154 CANADA INC.**

By: _____

     Name:    Randy Benson

     Title:    Chief Restructuring Officer

I have authority to bind the Corporation.

**13184633 CANADA INC.**

By: _____

          Name:    Randy Benson

          Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**2837229 ONTARIO INC.**

By: _____

          Name:    Randy Benson

          Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**2043002 ONTARIO INC.**

By: _____

          Name:    Randy Benson

          Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**TPINE LEASING CAPITAL CORPORATION**

By: _____

          Name:    Randy Benson

          Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**SCHEDULE "A"**
**FORM OF APPROVAL AND VESTING ORDER**

**[To be finalized and appended prior to Approval and Vesting Order motion]**

## SCHEDULE "B"
## EXCLUDED ASSETS

1.      Non-material assets sold in the Interim Period.

2.      Excluded Contracts.

3.      Accounts Receivable owed to any PGL Vendor or its subsidiaries by any member of the Pride Entities that is not a PGL Vendor.

4.      Any Cash or Cash Equivalents of PFS and PFS USA.

5.      All truck and trailer parts inventory owned by PFS [**or PFS USA**], save and except for motor oil and other fluids and shop supplies used by PFS [**or PFS USA**] in servicing trucks and trailers and diesel exhaust fluid and diesel fuel and gasoline held in storage tanks or containers at the gas stations.

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

Docusign Envelope ID: 88FE5681-D1B3-42DE-A9AC-E74202DG31D9

**SCHEDULE "C"**
**PERMITTED ENCUMBRANCES**

**[Note: Balance of schedule to be completed prior to Closing.]**

## SCHEDULE "D"

## PURCHASED LETTERS OF CREDIT

The following is a list of Purchased LCs:

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

### Letters of Credit

| Applicant | Beneficiary | Issue Date | Cur | Amount |
|---|---|---|---|---|
| PRIDE GROUP LOGISTICS LTD. | RBC INVESTOR SERVICES TRUST IN (ZURICH) | Feb/25/2022 | CAD | 1,400,000.00 |
| PRIDE GROUP LOGISTICS LTD. | LIQUOR CONTROL BOARD OF ONTARIO | Mar/31/2022 | CAD | 135,000.00 |
| PRIDE GROUP LOGISTICS LTD. | SOCIETE DES ALCOOLS DU QUEBEC | Jan/31/2023 | CAD | 137,410.00 |
| PRIDE GROUP LOGISTICS LTD. | RBC INVESTOR SERVICES TRUST IN (ZURICH) | Feb/14/2023 | CAD | 922,726.00 |
| PRIDE GROUP LOGISTICS LTD. | RBC INVESTOR SERVICES TRUST IN (ZURICH) | Feb/14/2023 | CAD | 1,467,245.00 |

**SCHEDULE "E"**
**EXCLUDED CONTRACTS**

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

**SCHEDULE F**
**ALLOCATION STATEMENT**

| | |
|---|---|
| Vehicles (Schedule "G") | $ 41,098,837[5] |
| Acquired AR Amount (including Intercompany Receivables at nil consideration) | $9,000,000.00[6] |
| Purchased LCs | $4,000,000.00[7] |
| Tangible Property (Computers, office furniture, IT, mechanics tools, etc.) | $160,000.00 |
| Intangibles (IP, licenses, software, goodwill, Permits, license plates, Purchased Contracts, etc.) (Schedule "F") | $50,000.00 |
| PGL Insurance Shares | $1.00 |
| Inventory[8] | $100,000 |
| Prepaid Expenses | $50,000 |
| **TOTAL** | $54,458,838 |

**[Note: This Allocation Statement is subject to adjustment in accordance with Section 3.3 of the Purchase Agreement.  The details with respect to Vehicles being purchased are set out in Schedule "G".]**

---

5 Subject to further adjustment in accordance with s. 3.3(c).

6 Subject to further adjustment in accordance with s. 3.3(b).

7 Subject to further adjustment in accordance with s. 3.1(c).

8 Subject to further adjustment in accordance with s. 3.3(e).

## SCHEDULE "G"

## VEHICLES

### TPine Assets

| Make | Model | Year | VIN |
|------|-------|------|-----|
| FREIGHTLINER | CSC | 2018 | 3AKJGBDV6JDJV5185 |
| FREIGHTLINER | PEI | 2019 | 1FUJHTDV1KLKA1156 |
| FREIGHTLINER | PE1 | 2019 | 1FUJHTDV3KLKA1160 |
| FREIGHTLINER | FM2 | 2019 | 1FUJHTDV6KLKA1170 |
| FREIGHTLINER | FM2 | 2019 | 1FUJHTDV5KLKA1161 |
| UTILITY | VS2 | 2020 | 1UYVS2533L7143908 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7143909 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7143912 |
| UTILITY | VS2 | 2020 | 1UYVS2530L7143915 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143917 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143921 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143925 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143926 |
| VOLVO | VVN | 2022 | 4V4NC9EHXNN305472 |
| VOLVO | VVN | 2022 | 4V4NC9EH5NN305475 |
| VOLVO | VVN | 2022 | 4V4NC9EH9NN305477 |
| VOLVO | VVN | 2022 | 4V4NC9EH8NN305499 |
| VOLVO | VVN | 2022 | 4V4NC9EH2NN305501 |
| VOLVO | VVN | 2022 | 4V4NC9EH4NN320372 |
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR2KSKM7362 |
| WABASH | ZGP | 2019 | 1DW1A5331KBA14563 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14564 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14565 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14566 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14567 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14568 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14569 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14570 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14571 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14572 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14573 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14574 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14575 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14576 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14577 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14578 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14579 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14580 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14581 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14582 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14583 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14584 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14585 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14586 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14587 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14588 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14589 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14590 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14591 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14592 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14593 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14594 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14595 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14596 |

| | | | |
|---|---|---|---|
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14597 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14598 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14599 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14600 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14602 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14603 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14604 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14605 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14606 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14607 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14608 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14609 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14610 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14611 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14612 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17904 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17905 |
| STOUGHTON | COM | 2019 | 1DW1A5330KEA17906 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17907 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17908 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17909 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17910 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17911 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17912 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17913 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17914 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17915 |
| STOUGHTON | COM | 2019 | 1DW1A5333KEA17916 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17917 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17918 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17919 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17920 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17921 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17922 |
| STOUGHTON | COM | 2019 | 1DW1A5330KEA17923 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17924 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17925 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17926 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17927 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17928 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17929 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17930 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17931 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17932 |
| STOUGHTON | COM | 2019 | 1DW1A5333KEA17933 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17934 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17935 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903018 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903020 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903021 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903022 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903023 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903024 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903025 |
| VANGUARD | VXP | 2019 | 5V8VC53B6KM903026 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903027 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903028 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903029 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903030 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903031 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903032 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903033 |

| | | | |
|---|---|---|---|
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903034 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903035 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903037 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903038 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903039 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903040 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903041 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903042 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903049 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903050 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903051 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903052 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903056 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903058 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903059 |
| VANGUARD | VXP | 2019 | 5V8VC53B6KM903060 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903061 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903062 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903063 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903064 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903065 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903066 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903067 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30640 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30641 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30642 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30643 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30644 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30645 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30646 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30647 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30648 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30649 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30650 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30651 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30652 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30653 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30654 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30655 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30656 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30657 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30660 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30661 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30662 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30663 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30664 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30665 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30666 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30667 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30668 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30669 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30670 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30671 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30672 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30673 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30674 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30675 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30676 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30677 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30678 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30679 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30680 |

| STOUGHTON | COM | 2019 | 1DW1A533XKBA30681 |
|---|---|---|---|
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30682 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30683 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30684 |
| GREAT DANE | ETL | 2015 | 1GRAA062XFB700007 |
| UTILITY | VS2 | 2018 | 1UYVS2532GM381420 |
| UTILITY | N/A | 2019 | 1UYVS2535K6740918 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14836 |
| WANC | RFA | 2014 | 1JJV532B1HL008360 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6884720 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6840805 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6840806 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6840808 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6915027 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6915028 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6915029 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6840831 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6840842 |
| UTILITY | N/A | 2020 | 1UYVS253L6914929 |
| UTILITY | N/A | 2020 | 1UYVS2537L6914943 |
| UTILITY | N/A | 2020 | 1UYVS2532L6914946 |
| UTILITY | N/A | 2020 | 1UYVS2534L6914947 |
| UTILITY | N/A | 2020 | 1UYVS2534L6914950 |
| UTILITY | VS2 | 2019 | 1UYVS253XK6538527 |
| UTILITY | UTIL | 2019 | 1UYVS2532K6538523 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6258505 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6914935 |
| UTILITY | N/A | 2019 | 1UYVS2535L7837015 |
| STRI | S75 | 2018 | 1S12E9532JE536500 |
| STRI | S75 | 2018 | 1S12E9534JE536482 |
| EAST | S75 | 2018 | 1S12E9537JE536489 |
| STRI | S75 | 2018 | 1S12E9531JE536486 |
| DIMN | FV | 2018 | 2DM421A45JB157402 |
| UTILITY | S75 | 2018 | 1S12E9536JE536483 |
| UTILITY | N/A | 2020 | 1UYVS2531L7143910 |
| UTILITY | N/A | 2020 | 1UYVS2532L7143916 |
| CIMC | N/A | 2018 | 527SR5320JM012662 |
| CIMC | N/A | 2018 | 527SR5324JM012597 |
| CIMC | N/A | 2018 | 527SR5326JM012598 |
| CIMC | N/A | 2018 | 527SR5326JM012665 |
| CIMC | N/A | 2018 | 527SR5322JM012663 |
| UTILITY | VS3 | 2020 | 1UYVS3536L6884601 |
| UTILITY | VS3 | 2020 | 1UYVS3538L6884602 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884604 |
| UTILITY | VS3 | 2020 | 1UYVS3533L6884605 |
| UTILITY | VS3 | 2020 | 1UYVS3535L6884606 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884607 |
| UTILITY | VS3 | 2020 | 1UYVS3539L6884608 |
| UTILITY | VS3 | 2020 | 1UYVS3530L6884609 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884610 |
| UTILITY | 2020 | 2020 | 1UYVS3539L6884611 |
| UTILITY | VS3 | 2020 | 1UYVS3530L6884612 |
| UTILITY | VS3 | 2020 | 1UYVS3532L6884613 |
| UTILITY | VS3 | 2020 | 1UYVS3534L6884614 |
| UTILITY | VS3 | 2020 | 1UYVS3538L6884616 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884617 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884618 |
| UTILITY | VS3 | 2020 | 1UYVS3533L6884619 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884621 |
| UTILITY | VS3 | 2020 | 1UYVS3535L6884623 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884624 |
| UTILITY | VS3 | 2020 | 1UYVS3539L6884625 |

| | | | |
|---|---|---|---|
| UTILITY | VS3 | 2020 | 1UYVS353XL6884620 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884603 |
| UTILITY | VS3 | 2020 | 1UYVS3536L6884615 |
| UTILITY | VS2 | 2014 | 1UYVS2535EM774258 |
| STOU | N/A | 2017 | 1DW1A532XHB699224 |
| STOUGHTON | STOU | 2016 | 1DW1A53246B703721 |
| WABASH | N/A | 2023 | 1JJV532D1PL328715 |
| UTILITY | VS2 | 2020 | 1UYVS2538L7143919 |
| UTILITY | VS2 | 2020 | 1UYVS2537L7143913 |
| UTILITY | N/A | 2014 | 1UYVS2531EM774533 |
| UTILITY | N/A | 2014 | 1UYVS253XEM774515 |
| UTILITY | VS2 | 2014 | 1UYVS2535EU772851 |
| UTILITY | VS2 | 2014 | 1UYVS2530EU772708 |
| UTILITY | VS2 | 2014 | 1UYVS2537EU772821 |
| UTILITY | VS2 | 2014 | 1UYVS2535EM774521 |
| GREAT DANE | TT | 2011 | 1GRAA0623BW702135 |
| GREAT DANE | TT | 2011 | 1GRAA0629BW702110 |
| UTILITY | VS2 | 2012 | 1UYVS2539CM470007 |
| UTILITY | VS2 | 2015 | 1UYVS2531FM078109 |
| UTILITY | VS2 | 2014 | 1UYVS535EM773949 |
| UTILITY | VS2 | 2011 | 1UYVS2538CU468846 |
| UTILITY | VS2 | 2014 | 1UYVS2537CM469910 |
| HYUNDAI | N/A | 2012 | 3H3V533C3CT298004 |
| UTILITY | TL | 2020 | 1UYVS2531L7143924 |
| UTILITY | VS2 | 2020 | 1UYVS2533L7143911 |
| UTILITY | N/A | 2019 | 1UYVS2538K7533319 |
| UTILITY | VS2 | 2020 | 1UYVS2536L7143904 |
| UTILITY | VS2 | 2020 | 1UYVS2539L7143914 |
| UTILITY | VS2 | 2020 | 1UYVS2536L7143918 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143920 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143922 |

## PGL Assets

| Make | Model | Year | VIN |
|---|---|---|---|
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F70RPUX9509 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F70RPUX9512 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F71RPNP1888 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F72RPUX9513 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F75RPUX9506 |
| FREIGHTLINER | ECASCADIA | 2024 | 1FUJH4F76RPUX9515 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F77RPUX9507 |
| FREIGHTLINER | ECASCADIA | 2024 | 1FUJH4F78RPUX9516 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR1LLLA0402 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR1NLMW8595 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR2LLLA0408 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR2NLMW8590 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR3NLMW8596 |
| FREIGHTLINER | FRHT | 2022 | 1FUJHHDR3NLMW8890 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR4NLMW8591 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHHDR5MLML4450 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR5NLMW8597 |

| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR6NLMW8589 |
|---|---|---|---|
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR6NLMW8592 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR7LLLA0405 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR7NLMW8598 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR8LLLA0400 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR8NLMW8593 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR9LLLA0406 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDRXNLMW8594 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR0LLKU7313 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR0LLKU7375 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR2LLKU7300 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR2LLKU7314 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR2MLMM2136 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7301 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7377 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7380 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR4MLMM2137 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR5LLKU7310 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR5MLMA7585 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7302 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7378 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7381 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR7LLKU7311 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR7MLMA7586 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR8LLKU7303 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR8LLKU7379 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR9LLKU7312 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR9MLMA7587 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDRXLLKU7304 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV0MLMA7667 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV3MLML4446 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV5MLMA7664 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV5MLML4447 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV7MLMA7665 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV9MLMA7666 |
| KENWORTH | CON | 2020 | 1XKZD49X1LJ960840 |
| KENWORTH | CON | 2020 | 1XKZD49X3LJ960841 |
| KENWORTH | CON | 2020 | 1XKZD49X5LJ960839 |
| KENWORTH | CON | 2020 | 1XKZD49X5LJ960842 |
| KENWORTH | CON | 2020 | 1XKZD49X7LJ960843 |
| PETERBILT | 579 | 2023 | 1XPBAL9X0PD793437 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR0PSUP5013 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR0PSUP5027 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSUU3259 |

| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSUU3262 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR0RSVA3178 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR0RSVA3181 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSVG7513 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR1PSUP5019 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR1PSUP5022 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR1RSUU3383 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR1RSVA3240 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5000 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5014 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5028 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5031 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR2RSVA3179 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR2RSVA3182 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR2RSVG7514 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR3PSUP5006 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR3PSUP5023 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSUU3384 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSVA3238 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSVA3241 |
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR4KSKM7301 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP4995 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5001 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5015 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5029 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR4RSUU3376 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR4RSVG7515 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP4990 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR5PSUP5007 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP5010 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP5024 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSUU3385 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSVA3239 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSVA3242 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR6PSUP4996 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR6PSUP5002 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR6RSUU3220 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR6RSUU3377 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR6RSUU3380 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR6RSVG7516 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR7PSUP5008 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR7PSUP5011 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR7RSUU3257 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR7RSUU3260 |

| | | | |
|---|---|---|---|
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR8KSKM7303 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR8PSUP4997 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR8PSUP5003 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR8PSUP5020 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3218 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3221 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3378 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3381 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR8RSVG7517 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR9PSUP4992 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5009 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5012 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5026 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSUU3258 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSUU3261 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR9RSVA3180 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSVG7512 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP4998 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5004 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5018 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5021 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3253 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3379 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3382 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDRXRSVG7518 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR0MSMA7580 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR1MSMA7605 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR2MSMA7581 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR3MSMA7606 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR4MSMA7579 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR4MSMA7582 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR5MSMA7607 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR6MSMA7583 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR7MSMA7608 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR8MSMA7584 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR8MSMA7603 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDRXMSMA7604 |
| FREIGHTLINER | CASC | 2019 | 3AKJHTDV5KSKA1178 |
| FREIGHTLINER | 116 | 2019 | 3AKJHTDV7KSKA1179 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPA1PN527730 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPA4PN527771 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR0PN526008 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR1PN557610 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN121888 |

| | | | |
|---|---|---|---|
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN443561 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN527766 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR4PN580704 |
| INTERNATIONAL | LT | 2023 | 3HSDZAPR5PN492650 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPR5PN527767 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR5PN557612 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPR5PN563622 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR6PN527731 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR6PN580705 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR7PN443580 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN121109 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN121885 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN527729 |
| INTERNATIONAL | LT6 | 2023 | 3HSDZAPR8PN580706 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN443581 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN492635 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN527769 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN527772 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN563624 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN569133 |
| VOLVO | VNL | 2022 | 4V4NC9EH0NN305476 |
| VOLVO | VVN | 2021 | 4V4NC9EH4MN272886 |
| VOLVO | VVN | 2021 | 4V4NC9EH6MN272887 |
| VOLVO | VVN | 2022 | 4V4NC9EH9NN320383 |
| VOLVO | ARO | 2021 | 4V4WC9EG0MN281824 |
| VOLVO | ARO | 2021 | 4V4WC9EG2MN281825 |
| VOLVO | ARO | 2021 | 4V4WC9EG4MN281826 |
| VOLVO | ARO | 2021 | 4V4WC9EG7MN281822 |
| VOLVO | ARO | 2021 | 4V4WC9EG9MN281823 |
| VOLVO | ARO | 2019 | 4V4WC9EH0KN192955 |
| VOLVO | ARO | 2022 | 4V4WC9EH0NN292686 |
| VOLVO | ARO | 2019 | 4V4WC9EH2KN192956 |
| VOLVO | ARO | 2022 | 4V4WC9EH2NN292673 |
| VOLVO | ARO | 2022 | 4V4WC9EH2NN292687 |
| VOLVO | ARO | 2019 | 4V4WC9EH4KN192957 |
| VOLVO | ARO | 2022 | 4V4WC9EH4NN292688 |
| VOLVO | ARO | 2022 | 4V4WC9EH6NN292689 |
| VOLVO | ARO | 2019 | 4V4WC9EH7KN192953 |
| VOLVO | ARO | 2022 | 4V4WC9EH7NN292670 |
| VOLVO | ARO | 2019 | 4V4WC9EH8KN192962 |
| VOLVO | ARO | 2022 | 4V4WC9EH9NN292671 |
| VOLVO | ARO | 2022 | 4V4WC9EH9NN292685 |
| UTILITY | N/A | 2019 | 1UYVS2539K7562215 |
| WANC | VS2 | 2020 | 1UYVS2537L7876432 |

| WANC | DVC | 2023 | 1JJV532DXPL361129 |
|------|-----|------|-------------------|
| WANC | WANC | 2023 | 1JJV532D6PL361130 |
| WANC | DVC | 2023 | 1JJV532D8PL361131 |
| UTILITY | VS2 | 2023 | 1JJV532DXPL361132 |
| WANC | DVC | 2023 | 1JJV532D1PL361133 |
| WANC | DVC | 2023 | 1JJV532D3PL361134 |
| WANC | DVC | 2023 | 1JJV532D5PL361135 |
| WANC | DVC | 2023 | 1JJV532D7PL361136 |
| WANC | DVC | 2023 | 1JJV532D9PL361137 |
| WANC | DVC | 2023 | 1JJV532D0PL361138 |
| WANC | DVC | 2023 | 1JJV532D2PL361139 |
| WANC | DVC | 2023 | 1JJV532D9PL361140 |
| WANC | DVC | 2023 | 1JJV532D0PL361141 |
| WANC | DVC | 2023 | 1JJV532D2PL361142 |
| WANC | DVC | 2023 | 1JJV532D4PL361143 |
| WANC | DVC | 2023 | 1JJV532D6PL361144 |
| WANC | DVC | 2023 | 1JJV532D8PL361145 |
| WANC | DVC | 2023 | 1JJV532DXPL361146 |
| WANC | DVC | 2023 | 1JJV532D1PL361147 |
| WANC | DVC | 2023 | 1JJV532D3PL361148 |
| WANC | DVC | 2023 | 1JJV532D5PL361149 |
| WANC | DVC | 2023 | 1JJV532D1PL361150 |
| WANC | DVC | 2023 | 1JJV532D3PL361151 |
| WANC | DVC | 2023 | 1JJV532D5PL361152 |
| WANC | DVC | 2023 | 1JJV532D7PL361153 |
| WANC | DVC | 2023 | 1JJV532D9PL361154 |
| WANC | DVC | 2023 | 1JJV532D0PL361155 |
| WANC | DVC | 2023 | 1JJV532D2PL361156 |
| WANC | DVC | 2023 | 1JJV532D4PL361157 |
| WANC | DVC | 2023 | 1JJV532D6PL361158 |
| WANC | DVC | 2023 | 1JJV532D8PL361159 |
| WANC | DVC | 2023 | 1JJV532D4PL361160 |
| WANC | DVC | 2023 | 1JJV532D6PL361161 |
| WANC | DVC | 2023 | 1JJV532D8PL361162 |
| WANC | DVC | 2023 | 1JJV532DXPL361163 |
| WANC | DVC | 2023 | 1JJV532D1PL361164 |
| WANC | DVC | 2023 | 1JJV532D3PL361165 |
| WANC | DVC | 2023 | 1JJV532D5PL361166 |
| WANC | DVC | 2023 | 1JJV532D7PL361167 |
| WANC | DVC | 2023 | 1JJV532D9PL361168 |
| MANAC | 942 | 2023 | 2M5921610P1215253 |
| MANAC | 942 | 2023 | 2M5921612P1215254 |
| MANAC | 942 | 2023 | 2M5921614P1215255 |
| MANAC | 942 | 2023 | 2M5921616P1215256 |

| MANAC | 942 | 2023 | 2M5921618P1215257 |
|---|---|---|---|
| MANAC | 942 | 2023 | 2M592161XP1215258 |
| MANAC | 942 | 2023 | 2M5921611P1215259 |
| MANAC | 942 | 2023 | 2M5921618P1215260 |
| MANAC | 942 | 2023 | 2M592161XP1215261 |
| MANAC | 942 | 2023 | 2M592161XP1215262 |
| MANAC | 942 | 2023 | 2M5921613P1215263 |
| MANAC | 942 | 2023 | 2M5921615P1215264 |
| MANAC | 942 | 2023 | 2M5921617P1215265 |
| MANAC | 942 | 2023 | 2M5921619P1215266 |
| MANAC | 942 | 2023 | 2M5921610P1215267 |
| MANAC | 942 | 2023 | 2M5921612P1215268 |
| MANAC | 942 | 2023 | 2M5921614P1215269 |
| MANAC | 942 | 2023 | 2M5921610P1215270 |
| MANAC | 942 | 2023 | 2M5921612P1215271 |
| MANAC | 942 | 2023 | 2M5921614P1215272 |
| STOUGHTON | AVW | 2017 | 1DW1A5337HS699304 |
| STOUGHTON | AVW | 2017 | 1DW1A5332HS699307 |
| STOUGHTON | AVW | 2017 | 1DW1A5330HS699306 |
| STOUGHTON | AVW | 2017 | 1DW1A5335HS699303 |
| STOUGHTON | AVW | 2017 | 1DW1A5332HS699310 |
| STOUGHTON | AVW | 2017 | 1DW1A5336HS699309 |
| STOUGHTON | AVW | 2017 | 1DW1A5334HS699311 |
| STOUGHTON | AVW | 2017 | 1DW1A5334HS699308 |
| STOUGHTON | AVW | 2017 | 1DW1A5339HS699305 |
| MANAC | 94353A321 | 2017 | 2M5931615H1163715 |
| MANAC | 94353A321 | 2017 | 2M593161XH1163712 |
| MANAC | 94353A321 | 2017 | 2M5931618H1163711 |
| MANAC | N/A | 2017 | 2M5931613H1163714 |
| STOUGHTON | AVW | 2017 | 1DW1A5333HS699302 |
| MANAC | N/A | 2017 | 2M5931611H1163713 |
| GREAT DANE | CS1 | 2016 | 1GRAA0635GB705741 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705744 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705743 |
| GREAT DANE | CS1 | 2016 | 1GRAA0637GB705742 |
| MANAC | 943 | 2017 | 2M5931614H1161812 |
| MANAC | 943 | 2017 | 2M5931612H1161811 |
| MANAC | 943 | 2017 | 2M5931618H1161814 |
| MANAC | 943 | 2017 | 2M593161XH1161815 |
| MANAC | 943 | 2017 | 2M5931611H1161816 |
| MANAC | 943 | 2017 | 2M5931616H1161813 |
| MANAC | 943 | 2017 | 2M5931613H1161817 |
| GREAT DANE | CS1 | 2016 | 1GRAA063XGB705752 |
| GREAT DANE | CS1 | 2016 | 1GRAA063XGB705749 |

| GREAT DANE | CS1 | 2016 | 1GRAA0637GB705756 |
|------------|-----|------|-------------------|
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705750 |
| GREAT DANE | CS1 | 2016 | 1GRAA0635GB705755 |
| GREAT DANE | CS1 | 2016 | 1GRAA0633GB705754 |
| GREAT DANE | CS1 | 2016 | 1GRAA0638GB705751 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705747 |
| GREAT DANE | CS1 | 2016 | 1GRAA0632GB705759 |
| GREAT DANE | CS1 | 2016 | 1GRAA0633GB705746 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705757 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705760 |
| GREAT DANE | CSE | 2016 | 1GRAA0638GB705748 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705758 |
| GREAT DANE | CS1 | 2016 | 1GRAA0631GB705753 |
| GREAT DANE | CS1 | 2016 | 1GRAA0634GB705763 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705764 |
| GREAT DANE | CS1 | 2016 | 1GRAA0638GB705765 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705761 |
| GREAT DANE | CS1 | 2016 | 1GRAA0632GB705762 |
| STOUGHTON | ZGP | 2018 | 1DW1A5338JS773108 |
| STOUGHTON | ZGP | 2018 | 1DW1A533XJS773109 |
| STOUGHTON | ZGP | 2018 | 1DW1A5337JS773102 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335JS773101 |
| GREAT DANE | CS1 | 2018 | 1GRAA0637JB700872 |
| STOUGHTON | ZGP | 2018 | 1DW1A5331JS773113 |
| STOUGHTON | ZGP | 2018 | 1DW1A533XJS773112 |
| GREAT DANE | CS1 | 2018 | 1GRAA0635JB700871 |
| STOUGHTON | ZGP | 2018 | 1DW1A5330JS773104 |
| STOUGHTON | ZGP | 2018 | 1DW1A5339JS773103 |
| STOUGHTON | ZGP | 2018 | 1DW1A5333JS773114 |
| STOUGHTON | ZGP | 2018 | 1DW1A5334JS773106 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335JS773115 |
| STOUGHTON | ZGP | 2018 | 1DW1A5336JS773110 |
| STOUGHTON | ZGP | 2018 | 1DW1A5338JS773111 |
| STOUGHTON | ZGP | 2018 | 1DW1A5336JS773107 |
| UTILITY | VS3 | 2017 | 1UYVS3534HG835611 |
| UTILITY | VS3 | 2017 | 1UYVS3531HG835601 |
| UTILITY | VS2 | 2017 | 1UYVS3533HG835602 |
| UTILITY | VS3 | 2017 | 1UYVS3536HG835612 |
| UTILITY | VS3 | 2017 | 1UYVS3538HG835613 |
| UTILITY | VS3 | 2017 | 1UYVS353XHG835614 |
| UTILITY | VS3 | 2017 | 1UYVS3531HG835615 |
| UTILITY | VS3 | 2017 | 1UYVS3535HG835603 |
| VANGUARD | VXP | 2018 | 5V8VC53B2JM806498 |
| VANGUARD | VXP | 2018 | 5V8VC53B4JM806499 |

| | | | |
|---|---|---|---|
| VANGUARD | VXP | 2018 | 5V8VC53B9JM806501 |
| VANGUARD | VXP | 2018 | 5V8VC53B0JM806502 |
| VANGUARD | VXP | 2018 | 5V8VC53B2JM806503 |
| VANGUARD | VXP | 2018 | 5V8VC53B4JM806504 |
| VANGUARD | VXP | 2018 | 5V8VC53B6JM806505 |
| VANGUARD | VXP | 2018 | 5V8VC53B8JM806506 |
| VANGUARD | VXP | 2018 | 5V8VC53BXJM806507 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335KBA14601 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903019 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30635 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30636 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30637 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30638 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30639 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30658 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30659 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30809 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30811 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30812 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30813 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30814 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30816 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30817 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30820 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30821 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30823 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30824 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30825 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30826 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30827 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30828 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30829 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30830 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30831 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30832 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30833 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30834 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30835 |
| STOUGHTON | COM | 2020 | 1DW1A5330LBA30836 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30837 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30838 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30839 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30840 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30841 |

| | | | |
|---|---|---|---|
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30842 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30843 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30844 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30845 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30846 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30847 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30848 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30849 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30850 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30851 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30852 |
| STOUGHTON | COM | 2020 | 1DW1A5330LBA30853 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30854 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30855 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30856 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30857 |
| STOUGHTON | COM | 2020 | 1DW1A5333LEA31171 |
| STOUGHTON | COM | 2020 | 1DW1A5335LEA31172 |
| STOUGHTON | COM | 2020 | 1DW1A5337LEA31173 |
| STOUGHTON | COM | 2020 | 1DW1A5339LEA31174 |
| STOUGHTON | COM | 2020 | 1DW1A5330LEA31175 |
| STOUGHTON | COM | 2020 | 1DW1A5332LEA31176 |
| STOUGHTON | COM | 2021 | 1DW1A5339MSA49712 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49713 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49714 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49715 |
| STOUGHTON | COM | 2021 | 1DW1A5336MSA49716 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49717 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49718 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49719 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49720 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49721 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49722 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49723 |
| STOUGHTON | COM | 2021 | 1DW1A5335MSA49724 |
| STOUGHTON | COM | 2021 | 1DW1A5337MSA49725 |
| STOUGHTON | COM | 2021 | 1DW1A5339MSA49726 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49727 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49728 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49729 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49730 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49731 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49732 |
| STOUGHTON | COM | 2021 | 1DW1A5336MSA49733 |

| | | | |
|---|---|---|---|
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49734 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49735 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49736 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49737 |
| STOUGHTON | COM | 2021 | 1DW1A5335MSA49738 |
| STOUGHTON | COM | 2021 | 1DW1A5337MSA49739 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49740 |
| MANAC | 944 | 2017 | 2M5941615H1157801 |
| MANAC | 944 | 2017 | 2M5941617H1157802 |
| MANAC | 944 | 2017 | 2M5941613H1157800 |
| MANAC | 944 | 2017 | 2M5941610H1157799 |
| MANAC | VAN | 2017 | 2M5941610H1165692 |
| MANAC | VAN | 2017 | 2M5941616H1165695 |
| MANAC | VAN | 2017 | 2M5941614H1165694 |
| MANAC | VAN | 2017 | 2M5941612H1165693 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA31360 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA31368 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA31369 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA31371 |
| STOUGHTON | N/A | 2020 | 1DW1R5328LEA31375 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA31382 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA31359 |
| STOUGHTON | N/A | 2020 | 1DW1R5320LEA31385 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA31363 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA31372 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA40962 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31364 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31378 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA31373 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA31379 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA31374 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA31383 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA31358 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA31370 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA31384 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6884737 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6914910 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914911 |
| UTILITY | N/A | 2020 | 1UYVS2539L6914913 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6914916 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914919 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6914920 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6914921 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914922 |

| UTILITY | VS2 | 2020 | 1UYVS2531L6914923 |
|---|---|---|---|
| UTILITY | N/A | 2020 | 1UYVS2531L6884743 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6884744 |
| UTILITY | VS2 | 2020 | 1UYVS25306L884748 |
| UTILITY | N/A | 2020 | 1UYVS2539L6884750 |
| WABASH | RFA | 2016 | 1JJV532B2GL887138 |
| WABASH | RFA | 2016 | 1JJV532B3GL920311 |
| WABASH | RFA | 2016 | 1JJV532B5GL920312 |
| GREAT DANE | ESS | 2016 | 1GRAA0620GW700575 |
| VANGUARD | COO | 2016 | 527SR5326GM006535 |
| GREAT DANE | ESS | 2016 | 1GRAA0623GW703289 |
| WABASH | RFA | 2017 | 1JJV532B1HL008326 |
| WABASH | RFA | 2017 | 1JJV532B1HL008357 |
| WABASH | RFA | 2017 | 1JJV532B1HL008410 |
| UTILITY | VS2 | 2012 | 1UYVS2533CM469922 |
| WABASH | RFA | 2017 | 1JJV532BXHL008342 |
| WABASH | RFA | 2017 | 1JJV532B7HL008220 |
| UTILITY | VS2 | 2016 | 1UYVS2536GM381422 |
| UTILITY | VS2 | 2018 | 1UYVS2539J6258502 |
| WABASH | RFA | 2017 | 1JJV52B2HL008237 |
| WABASH | RFA | 2017 | 1JJV532B4HL008367 |
| WABASH | RFA | 2017 | f31971JJV532B1HL008181 |
| UTILITY | VS2 | 2018 | 1UYVS2536J6258506 |
| UTILITY | VS2 | 2018 | 1UYVS2539J6258516 |
| UTILITY | VS2 | 2018 | 1UYVS2530J6258517 |
| UTILITY | VS2 | 2018 | 1UYVS2533J6258513 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6258512 |
| UTILITY | VS2 | 2018 | 1UYVS2532J6258518 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6258509 |
| UTILITY | VS2 | 2018 | 1UYVS2538J6258507 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6258508 |
| UTILITY | VS2 | 2018 | 1UYVS2538J6258510 |
| UTILITY | VS2 | 2018 | 1UYVS2530J6258520 |
| UTILITY | VS2 | 2018 | 1UYVS2535J6258514 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6258519 |
| UTILITY | VS3 | 2018 | 1UYVS2530J6270201 |
| UTILITY | VS3 | 2018 | 1UYVS2538J6270205 |
| UTILITY | VS2 | 2018 | 1UYVS2537J6258515 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6258511 |
| UTILITY | VS2 | 2018 | 1UYVS2532J6270202 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6270203 |
| UTILITY | VS2 | 2018 | 1UYVS2536J6270204 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6270206 |
| UTILITY | VS2 | 2018 | 1UYVS2535J6270209 |

| | | | |
|---|---|---|---|
| UTILITY | VS2 | 2018 | 1UYVS2531J6270210 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6270207 |
| UTILITY | VS2 | 2018 | 1UYVS2533J6270208 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14796 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14797 |
| STOUGHTON | REF | 2019 | 1DW1R5327KEA14811 |
| STOUGHTON | REF | 2019 | 1DW1R5329KEA14812 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14813 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14814 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14816 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14817 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14819 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14820 |
| STOUGHTON | REF | 2019 | 1DW1R532XKEA14821 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14822 |
| STOUGHTON | REF | 2019 | 1DW1R5323KEA14823 |
| STOUGHTON | REF | 2019 | 1DW1R5325KEA14824 |
| STOUGHTON | REF | 2019 | 1DW1R5327KEA14825 |
| STOUGHTON | REF | 2019 | 1DW1R5329KEA14826 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14827 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14828 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14829 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14830 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14831 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14832 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14833 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14834 |
| VANGUARD | CR8 | 2019 | 527SR5322KM017007 |
| VANGUARD | CR8 | 2019 | 527SR5324KM017008 |
| VANGUARD | CR8 | 2019 | 527SR5326KM017009 |
| VANGUARD | CR8 | 2019 | 527SR5322KM017010 |
| VANGUARD | CR8 | 2019 | 527SR5324KM017011 |
| VANGUARD | CR8 | 2019 | 527SR5328KM017013 |
| VANGUARD | CR8 | 2019 | 527SR532XKM017014 |
| VANGUARD | CR8 | 2019 | 527SR5321KM017015 |
| UTILITY | N/A | 2019 | 1UYVS2535K6740904 |
| UTILITY | N/A | 2019 | 1UYV52537K6740905 |
| UTILITY | N/A | 2019 | 1UYVS2532K6740911 |
| UTILITY | N/A | 2019 | 1UYV52534K6740912 |
| UTILITY | N/A | 2019 | 1UYVS2536K6740913 |
| UTILITY | N/A | 2019 | 1UYVS2538K6740914 |
| UTILITY | N/A | 2019 | 1UYVS253XK6740915 |
| UTILITY | N/A | 2019 | 1UYVS2531K6740916 |
| UTILITY | N/A | 2019 | 1UYVS2537K6740919 |

| | | | |
|---|---|---|---|
| UTILITY | N/A | 2019 | 1UYVS2533K6740920 |
| UTILITY | VS2 | 2019 | 1UYVS2533K6740903 |
| WABASH | N/A | 2016 | 1JJV532B3GL887147 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6114202 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6914930 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6914931 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6914932 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6914933 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914939 |
| UTILITY | VS2 | 2020 | 1UYVS2531L6914940 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6914941 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914942 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6914944 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6914945 |
| UTILITY | N/A | 2020 | 1UYVS2533L6914938 |
| UTILITY | N/A | 2020 | 1UYVS2536L6914934 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914936 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA41949 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA41950 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA41951 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA41952 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA41955 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA41956 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA41957 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA41958 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42375 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA42376 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42377 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA41945 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA42379 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42380 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA42381 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA42382 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA42384 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA42385 |
| STOUGHTON | REF | 2021 | 1DW1R5329LEA41946 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA42387 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA42388 |
| STOUGHTON | RSV | 2019 | 1DW1R5325KEA14791 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6915562 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6915563 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6915565 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6915567 |
| STOUGHTON | REF | 2021 | 1DW1R5321LEA41939 |

| | | | |
|---|---|---|---|
| STOUGHTON | REF | 2021 | 1DW1R5325LEA42396 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA42399 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42389 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA42393 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA42395 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6712107 |
| UTILITY | VS2 | 2022 | 1UYVS2538N6712101 |
| UTILITY | VS2 | 2022 | 1UYVS253XN6712102 |
| UTILITY | VS2 | 2022 | 1UYVS2531N6712103 |
| UTILITY | VS2 | 2022 | 1UYVS2533N6712104 |
| UTILITY | VS2 | 2022 | 1UYVS2535N6712105 |
| UTILITY | VS2 | 2022 | 1UYVS2537N6712106 |
| UTILITY | VS2 | 2022 | 1UYVS2530N6712108 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6712110 |
| UTILITY | VS2 | 2022 | 1UYVS253ON6712111 |
| UTILITY | VS2 | 2022 | 1UYVS2532N6712112 |
| UTILITY | VS2 | 2022 | 1UYVS2534N6712113 |
| UTILITY | VS2 | 2022 | 1UYVS2536N6712114 |
| UTILITY | VS2 | 2022 | 1UYVS2538N6712115 |
| UTILITY | VS2 | 2022 | 1UYVS2532N6712109 |
| CIMC | COO | 2023 | 527SR5328PM034319 |
| CIMC | REE | 2023 | 527SR532XPL033355 |
| CIMC | REE | 2023 | 527SR5326PL033367 |
| CIMC | REE | 2023 | 527SR5322PL030398 |
| CIMC | REE | 2023 | 527SR5327PL030400 |
| CIMC | REE | 2023 | 527SR5320PL030416 |
| CIMC | REE | 2023 | 527SR5326PL030419 |
| CIMC | REE | 2023 | 527SR5322PL030420 |
| VANGUARD | REE | 2023 | 527SR5323PL030474 |
| CIMC | REE | 2023 | 527SR5325PL030475 |
| CIMC | COO | 2023 | 527SR5326PL030422 |
| CIMC | COO | 2023 | 527SR5320PM034296 |
| CIMC | COO | 2023 | 527SR5329PM034295 |
| UTILITY | VS2 | 2021 | 1UYVS2539M6393225 |
| CIMC | CR8 | 2023 | 2SHSR5328PS001426 |
| VANGUARD | CIMC | 2024 | 527SR532XRM037015 |
| CIMC | COO | 2024 | 527SR5321RM037016 |
| CIMC | COO | 2024 | 527SR5323RM037017 |
| CIMC | COO | 2024 | 527SR5325RM037018 |
| CIMC | COO | 2024 | 527SR5327RM037019 |
| CIMC | COO | 2024 | 527SR5323RM037020 |
| CIMC | COO | 2024 | 527SR5325RM037021 |
| CIMC | COO | 2024 | 527SR5327RM037022 |
| CIMC | COO | 2024 | 527SR5329RM037023 |

| CIMC | COO | 2024 | 527SR5320RM037024 |
|------|-----|------|-------------------|
| CIMC | COO | 2024 | 527SR5322RM037025 |
| CIMC | COO | 2024 | 527SR5324RM037026 |
| CIMC | COO | 2024 | 527SR5326RM037027 |
| CIMC | COO | 2024 | 527SR5328RM037028 |
| CIMC | COO | 2024 | 527SR532XRM037029 |
| CIMC | COO | 2024 | 527SR5326RM037030 |
| CIMC | COO | 2024 | 527SR5328RM037031 |
| CIMC | COO | 2024 | 527SR532XRM037032 |
| CIMC | COO | 2024 | 527SR5321RM037033 |
| CIMC | COO | 2024 | 527SR5323RM037034 |
| CIMC | COO | 2024 | 527SR5325RM037035 |
| CIMC | COO | 2024 | 527SR5327RM037036 |
| CIMC | COO | 2024 | 527SR5329RM037037 |
| CIMC | COO | 2024 | 527SR5320RM037038 |
| CIMC | COO | 2024 | 527SR5322RM037039 |
| CIMC | COO | 2024 | 527SR5322PL033365 |
| CIMC | REE | 2023 | 527SR5322PL033348 |
| CIMC | N/A | 2023 | 527SR532XPM031227 |
| CIMC | N/A | 2023 | 527SR5324PM033989 |
| CIMC | N/A | 2023 | 527SR5322PM033988 |
| CIMC | N/A | 2023 | 527SR5323PM034034 |
| UTILITY | VS2 | 2021 | 1UYVS2537M6393224 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6461945 |
| CIMC | COO | 2023 | 527SR5322PM034297 |
| UTILITY | RFA | 2022 | 1UYVS2536N6712128 |
| CIMC | REE | 2023 | 527SR5324PL033352 |
| CIMC | COO | 2023 | 527SR5327PM034294 |
| CIMC | REE | 2023 | 527SR5320PL030478 |
| CIMC | VS2 | 2022 | 1UYVS2533N6461925 |
| CIMC | REE | 2023 | 527SR5329PL030477 |
| CIMC | REE | 2023 | 527SR5329PL030401 |
| CIMC | REE | 2023 | 527SR5320PL033350 |
| CIMC | REE | 2023 | 527SR5327PL030431 |
| CIMC | COO | 2023 | 527SR5320PM034329 |
| HYUNDAI | N/A | 2016 | 3H3V532C2GT498007 |
| HYUNDAI | HHY | 2016 | 3H3V532CXGT498014 |
| HYUNDAI | N/A | 2016 | 3H3V532C1GT498015 |
| UTILITY | VS2 | 2015 | 1UYVS2533FG298608 |
| STRI | S75 | 2019 | 1S12E9533KE539102 |
| UTILITY | N/A | 2020 | 1UYVS2534L7143923 |
| MANAC | 942 | 2023 | 2M592161P1217644 |
| MANAC | 942 | 2023 | 2M5921615P1217645 |
| MANAC | 942 | 2023 | 2M5921617P1217646 |

| | | | |
|---|---|---|---|
| MANAC | 942 | 2023 | 2M5921619P1217647 |
| MANAC | 942 | 2023 | 2M5921610P1217648 |
| MANAC | 942 | 2023 | 2M5921612P1217649 |
| MANAC | 942 | 2023 | 2M5921619P1217650 |
| MANAC | 942 | 2023 | 2M5921617P1217016 |
| MANAC | 942 | 2023 | 2M5921619P1217017 |
| MANAC | 942 | 2023 | 2M5921610P1217018 |
| MANAC | 942 | 2023 | 2M5921612P1217019 |
| MANAC | 942 | 2023 | 2M5921619P1217020 |
| MANAC | 942 | 2023 | 2M5921610P1217021 |
| MANAC | 942 | 2023 | 2M5921612P1217022 |
| MANAC | 942 | 2023 | 2M5921614P1217023 |
| MANAC | 942 | 2023 | 2M5921616P1217024 |
| MANAC | 942 | 2023 | 2M5921618P1217025 |
| MANAC | 94253A311 | 2023 | 2M592161XP1217026 |
| MANAC | 942 | 2023 | 2M5921611P1217027 |
| MANAC | 94253A311 | 2023 | 2M5921613P1217028 |
| MANAC | 942 | 2023 | 2M5921615P1217029 |
| MANAC | 942 | 2023 | 2M5921611P1217030 |
| MANAC | 94253A311 | 2023 | 2M5921613P1217031 |
| MANAC | 942 | 2023 | 2M5921615P1217032 |
| MANAC | 942 | 2023 | 2M5921617P1217033 |
| MANAC | 942 | 2023 | 2M5921619P1217034 |
| MANAC | 942 | 2023 | 2M5921610P1217035 |
| MANAC | 942 | 2023 | 2M5921612P1217036 |
| MANAC | 942 | 2023 | 2M5921614P1217037 |
| MANAC | 942 | 2023 | 2M5921616P1217038 |
| MANAC | MANAC | 2023 | 2M5921618P1217039 |
| MANAC | 942 | 2023 | 2M5921614P1217040 |
| MANAC | 942 | 2023 | 2M5921616P1217041 |
| MANAC | 942 | 2023 | 2M5921618P1217042 |
| MANAC | 942 | 2023 | 2M592161XP1217043 |
| MANAC | 942 | 2023 | 2M5921611P1217044 |
| MANAC | 942 | 2023 | 2M5921613P1217045 |
| MANAC | 94253A311 | 2023 | 2M5921615P1217046 |
| MANAC | 94253A311 | 2023 | 2M5921617P1217047 |
| MANAC | 94253A311 | 2023 | 2M5921619P1217048 |
| MANAC | 94253A311 | 2023 | 2M5921610P1217049 |
| MANAC | 94253A311 | 2023 | 2M5921617P1217050 |
| MANAC | 94253A311 | 2023 | 2M5921619P1217051 |
| MANAC | 94253A311 | 2023 | 2M5921610P1217052 |
| MANAC | 94253A311 | 2023 | 2M5921612P1217053 |
| MANAC | 94253A311 | 2023 | 2M5921614P1217054 |
| MANAC | 94253A311 | 2023 | 2M5921616P1217055 |

| | | | |
|---|---|---|---|
| MANAC | 942 | 2023 | 2M5921618P1217641 |
| MANAC | 942 | 2023 | 2M592161XP1217642 |
| MANAC | 942 | 2023 | 2M5921611P1217643 |
| MANAC | 942 | 2022 | 2M5921614N1208884 |
| MANAC | 942 | 2022 | 2M5921616N1208885 |
| MANAC | N/A | 2022 | 2M5921618N1208886 |
| MANAC | 942 | 2022 | 2M592161XN1208887 |
| MANAC | 942 | 2022 | 2M5921611N1208888 |
| STOUGHTON | 942 | 2022 | 2M5921613N1208889 |
| MANAC | 942 | 2022 | 2M592161XN1208890 |
| MANAC | N/A | 2022 | 2M5921611N1208891 |
| MANAC | N/A | 2022 | 2M5921613N1208892 |
| MANAC | 942 | 2022 | 2M5921615N1208893 |
| MANAC | 942 | 2021 | 2M592161XM1202294 |
| MANAC | 942 | 2021 | 2M5921611M1202295 |
| MANAC | 942 | 2021 | 2M5921613M1202296 |
| MANAC | 942 | 2021 | 2M5921615M1202297 |
| MANAC | 942 | 2021 | 2M5921617M1202298 |
| MANAC | 942 | 2021 | 2M5921619M1202299 |
| MANAC | 942 | 2021 | 2M5921611M1202300 |
| MANAC | 942 | 2021 | 2M5921613M1202301 |
| MANAC | 942 | 2021 | 2M5921615M1202302 |
| MANAC | 942 | 2021 | 2M5921617M1202303 |
| MANAC | 942 | 2021 | 2M5921619M1202304 |
| MANAC | 942 | 2021 | 2M5921610M1202305 |
| MANAC | 942 | 2021 | 2M5921612M1202306 |
| MANAC | 942 | 2021 | 2M5921614M1202307 |
| MANAC | 942 | 2021 | 2M5921616M1202308 |
| MANAC | 942 | 2021 | 2M5921618M1202309 |
| MANAC | 942 | 2021 | 2M5921614M1202310 |
| MANAC | 942 | 2021 | 2M5921616M1202311 |
| MANAC | 942 | 2021 | 2M5921618M1202312 |
| MANAC | 942 | 2021 | 2M592161XM1202313 |
| CIMC | NDW136*0AF0 | 2018 | 527SR5329JM012594 |
| CIMC | VS2 | 2023 | 527SR5327PM031170 |
| CIMC | VS2 | 2022 | 527SR5329PM031171 |
| CIMC | N/A | 2023 | 527SR5320PM031172 |
| CIMC | VS2 | 2022 | 527SR5322PM031173 |
| CIMC | N/A | 2023 | 527SR5324PM031174 |
| CIMC | VS2 | 2022 | 527SR5326PM031175 |
| CIMC | N/A | 2023 | 527SR5328PM031176 |
| CIMC | VS2 | 2023 | 527SR532XPM031177 |
| CIMC | N/A | 2022 | 527SR5321PM031178 |
| CIMC | N/A | 2022 | 527SR5323PM031179 |

| | | | |
|---|---|---|---|
| CIMC | N/A | 2023 | 527SR532XPM031180 |
| CIMC | N/A | 2023 | 527SR5323PM031215 |
| CIMC | N/A | 2023 | 527SR5327PM031217 |
| CIMC | N/A | 2023 | 527SR5325PM031183 |
| CIMC | N/A | 2023 | 527SR5327PM031184 |
| CIMC | N/A | 2022 | 527SR5329PM031185 |
| CIMC | N/A | 2023 | 527SR5329PM031218 |
| CIMC | VS2 | 2022 | 527SR5324PM031188 |
| CIMC | VS2 | 2023 | 527SR5329PM031221 |
| CIMC | N/A | 2023 | 527SR5329PM031222 |
| CIMC | N/A | 2023 | 527SR5325PM031197 |
| CIMC | N/A | 2023 | 527SR5320PM031219 |
| CIMC | N/A | 2022 | 527SR5325PM031216 |
| CIMC | VS2 | 2023 | 527SR5321PM031200 |
| CIMC | N/A | 2023 | 527SR5327PM031220 |
| CIMC | THERMO | 2023 | 527SR5328PM031226 |
| CIMC | VS2 | 2023 | 527SR5322PM031206 |
| CIMC | N/A | 2023 | 527SR5324PM031224 |
| CIMC | REF | 2023 | 527SR5326PM031208 |
| CIMC | RFA | 2023 | 527SR5324PM031210 |
| CIMC | COO | 2023 | 527SR5328PM031212 |
| CIMC | N/A | 2023 | 527SR532XPM031213 |
| CIMC | VS2 | 2022 | 527SR5321PM031214 |
| CIMC | VS2 | 2023 | 527SR537PM031198 |
| CIMC | N/A | 2023 | 527SR5326PM034318 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31381 |
| | | | |
| UTILITY | N/A | 2020 | 1UYVS2537L6914912 |
| WANC | RFA | 2022 | 1JJV532B2NL315354 |
| WANC | RFA | 2022 | 1JJV532B2NL315355 |
| WANC | RFA | 2022 | 1JJV532B6NL315356 |
| WANC | RFA | 2022 | 1JJV532B2NL315357 |
| WANC | RFA | 2022 | 1JJV532B2NL315358 |
| WANC | RFA | 2022 | 1JJV532B2NL315359 |
| WANC | RFA | 2022 | 1JJV532B2NL315360 |
| WANC | RFA | 2022 | 1JJV532B2NL315361 |
| WANC | RFA | 2022 | 1JJV532B2NL315362 |
| WANC | RFA | 2022 | 1JJV532B3NL315363 |
| WANC | RFA | 2022 | 1JJV532B5NL315364 |
| WANC | RFA | 2022 | 1JJV532B7NL315365 |
| WANC | RFA | 2022 | 1JJV532B9NL315366 |
| WANC | RFA | 2022 | 1JJV532B0NL315367 |
| WANC | RFA | 2022 | 1JJV532B2NL315368 |
| WANC | RFA | 2022 | 1JJV532B4NL315369 |

| | | | |
|---|---|---|---|
| WANC | RFA | 2022 | 1JJV532B0NL315370 |
| WANC | RFA | 2022 | 1JJV532B2NL315371 |
| WANC | RFA | 2022 | 1JJV532B4NL315372 |
| WANC | RFA | 2022 | 1JJV532B6NL315373 |
| WANC | RFA | 2022 | 1JJV532B8NL315374 |
| WANC | RFA | 2022 | 1JJV532BXNL315375 |
| WANC | RFA | 2022 | 1JJV532B1NL315376 |
| WANC | RFA | 2022 | 1JJV532B3NL315377 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315378 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315379 |
| WABASH | 7500 | 2023 | 1JJV532BXPL315380 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315381 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315382 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315383 |
| WABASH | 7500 | 2023 | 1JJV532B7PL315384 |
| WABASH | 7500 | 2023 | 1JJV532B9PL315385 |
| WABASH | 7500 | 2023 | 1JJV532B0PL315386 |
| WABASH | 7500 | 2023 | 1JJV532B2PL315387 |
| WABASH | 7500 | 2023 | 1JJV532B4PL315388 |
| WABASH | 7500 | 2023 | 1JJV532B6PL315389 |
| WABASH | 7500 | 2023 | 1JJV532B2PL315390 |
| WABASH | 7500 | 2023 | 1JJV532B4PL315391 |
| WABASH | 7500 | 2023 | 1JJV532B8PL315393 |
| WABASH | 7500 | 2023 | 1JJV532BXPL315394 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315395 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315396 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315397 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315398 |
| WABASH | 7500 | 2023 | 1JJV532B9PL315399 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315400 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315401 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315402 |
| WABASH | 7500 | 2023 | 1JJV532B7PL315403 |
| CIMC | REE | 2022 | 2SHSR5328NS000452 |
| WABASH | 7500 | 2023 | 1JJV532B6PL315392 |
| MANAC | 943 | 2022 | 2M5931614N1204475 |
| MANAC | 943 | 2022 | 2M5931616N1204476 |
| MANAC | 943 | 2022 | 2M5931618N1204477 |
| MANAC | 943 | 2022 | 2M593161XN1204478 |
| MANAC | 943 | 2022 | 2M5931611N1204479 |
| MANAC | 943 | 2022 | 2M5931618N1204480 |
| MANAC | 943 | 2022 | 2M593161XN1204481 |
| MANAC | 943 | 2022 | 2M5931611N1204482 |

| MANAC | 943 | 2022 | 2M5931613N1204483 |
|-------|-----|------|-------------------|
| MANAC | 943 | 2022 | 2M5931615N1204484 |
| MANAC | 943 | 2022 | 2M5931617N1204485 |
| MANAC | 943 | 2022 | 2M5931619N1204486 |
| MANAC | 943 | 2022 | 2M5931610N1204487 |
| MANAC | 943 | 2022 | 2M5931612N1204488 |
| MANAC | 943 | 2022 | 2M5931614N1204489 |
| MANAC | 943 | 2022 | 2M5931610N1204490 |
| MANAC | 943 | 2022 | 2M5931612N1204491 |
| MANAC | 943 | 2022 | 2M5931614N1204492 |
| MANAC | 943 | 2022 | 2M5931616N1204493 |
| MANAC | 943 | 2022 | 2M5931618N1204494 |
| MANAC | 943 | 2022 | 2M593161XN1204495 |
| MANAC | 943 | 2022 | 2M5931611N1204496 |
| MANAC | 943 | 2022 | 2M5931613N1204497 |
| MANAC | 943 | 2022 | 2M5931615N1204498 |
| MANAC | 943 | 2022 | 2M5931617N1204499 |
| MANAC | 943 | 2022 | 2M5931615N1204517 |
| MANAC | 943 | 2022 | 2M5931617N1204518 |
| MANAC | 943 | 2022 | 2M5931619N1204519 |
| MANAC | 943 | 2022 | 2M5931615N1204520 |
| MANAC | 943 | 2022 | 2M5931617N1204521 |
| MANAC | 943 | 2022 | 2M5931619N1204522 |
| MANAC | 943 | 2022 | 2M5931610N1204523 |
| MANAC | 943 | 2022 | 2M5931612N1204524 |
| MANAC | 943 | 2022 | 2M5931614N1204525 |
| MANAC | 943 | 2022 | 2M5931616N1204526 |
| MANAC | 943 | 2022 | 2M5931618N1204527 |
| MANAC | 943 | 2022 | 2M593161XN1204528 |
| MANAC | 943 | 2022 | 2M5931611N1204529 |
| MANAC | 943 | 2022 | 2M5931618N1204530 |
| MANAC | 943 | 2022 | 2M593161XN1204531 |
| MANAC | 943 | 2022 | 2M5931611N1204532 |
| MANAC | 943 | 2022 | 2M5931613N1204533 |
| MANAC | 943 | 2022 | 2M5931615N1204534 |
| MANAC | 943 | 2022 | 2M5931617N1204535 |
| MANAC | 943 | 2022 | 2M5931619N1204536 |
| MANAC | 943 | 2022 | 2M5931610N1204537 |
| MANAC | 943 | 2022 | 2M5931612N1204538 |
| MANAC | 943 | 2022 | 2M5931614N1204539 |
| MANAC | 943 | 2022 | 2M5931610N1204540 |
| MANAC | 943 | 2022 | 2M5931612N1204541 |
| UTILITY | TRA | 2018 | 1UYVS3530J6060316 |

| GREAT DANE | ESS | 2016 | 1GRAA0636GW701027 |
| GREAT DANE | ESS | 2016 | 1GRAA0638GW701028 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6060317 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6060319 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6060318 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6060320 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6258401 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6258406 |
| UTILITY | VS3 | 2015 | 1UYVS3537J6258407 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6258402 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6258409 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6258410 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6258405 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6258408 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6258404 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6258413 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6258415 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6258414 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6258416 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6258412 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6258420 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6258417 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6258418 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6258419 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6269901 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6269902 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6269903 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6269904 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6269905 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6269906 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6269907 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6269908 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6269909 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6269910 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6269911 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6269912 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6269913 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6269914 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6269915 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6269916 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6269917 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6269919 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6270001 |

| | | | |
|---|---|---|---|
| UTILITY | VS3 | 2018 | 1UYVS3538J6270002 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6270003 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6270004 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6270005 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6270006 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6270007 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6270008 |
| WABASH | RFA | 2022 | IJJV533B7NL339891 |
| WABASH | RFA | 2022 | 1JJV533B9NL339892 |
| WABASH | RFA | 2022 | 1JJV533B0NL339893 |
| WABASH | RFA | 2022 | 1JJV533B2NL339894 |
| WABASH | RFA | 2022 | 1JJV533B4NL339895 |
| EAST | PLA | 2022 | 1E1H5Z581NR074864 |
| EAST | PLA | 2022 | 1E1H5Z583NR074865 |
| EAST | PLA | 2022 | 1E1H5Z585NR074866 |
| EAST | PLA | 2022 | 1E1H5Z682NR074869 |
| EAST | PLA | 2022 | 1E1H5Z689NR074870 |
| WABASH | RFA | 2016 | 1JJV532B7GL887149 |
| WABASH | RFA | 2016 | 1JJV532B2GL887141 |
| WABASH | RFA | 2016 | 1JJV532B7GL887145 |
| WABASH | RFA | 2016 | 1JJV532B6GL920299 |
| WABASH | RFA | 2016 | 1JJV532B1GL920310 |
| WABASH | RFA | 2016 | 1JJV532B8GL920305 |
| WABASH | RFA | 2016 | 1JJV532BXGL920306 |
| GREAT DANE | ESS | 2016 | 1GRAA0626GW700578 |
| GREAT DANE | ESS | 2016 | 1GRAA0622GW700576 |
| GREAT DANE | ESS | 2016 | 1GRAA0624GW700577 |
| WABASH | RFA | 2016 | 1JJV532B2GL920316 |
| WABASH | RFA | 2016 | 1JJV532B0GL920329 |
| HYUNDAI | VC2 | 2016 | 3H3V532C5GT498020 |
| | | | |
| STRI | S75 | 2018 | 1S12E953XJE536499 |
| MANAC | 712 | 2022 | 2M5720416N1208230 |
| MANAC | 712 | 2021 | 2M5720418M1202542 |
| MANAC | N/A | 2023 | 2M5720413P1212318 |
| MANAC | N/A | 2023 | 2M5720411P1212317 |
| MANAC | N/A | 2023 | 2M5720415P1212319 |
| MANAC | N/A | 2023 | 2M5720411P1212320 |
| MANAC | N/A | 2023 | 2M5720413P1212321 |
| MANAC | N/A | 2023 | 2M5720419P1212307 |
| MANAC | N/A | 2019 | 1GR5R1623PK439837 |
| GREAT DANE | N/A | 2019 | 1GR5R1625PK439838 |
| MANAC | 712 | 2023 | 2M5720419P1218916 |
| MANAC | 712 | 2023 | 2M5720412P1218918 |

| MANAC | 712 | 2023 | 2M5720410P1218920 |
|---|---|---|---|
| UTILITY | VS2 | 2020 | 1UYVS2537L6884701 |
| CIMC | VS2 | 2022 | 527SR5320PM031186 |
| CIMC | COO | 2023 | 527SR5328PM031209 |
| GREAT DANE | CCC | 2016 | 1GRAP0628GD461688 |
| STOUGHTON | COM | 2016 | 1DW1A5321GB647821 |
| STOU | COM | 2016 | 1DW1A532XGB647817 |
| STOUGHTON | 7GP | 2017 | 1DW1A532XHB753511 |
| STOUGHTON | ZGP | 2017 | 1DW1A5322HB753521 |
| STOUGHTON | ZGP | 2018 | 1DW1A5320JBA00210 |
| STOUGHTON | ZGP | 2018 | 1DW1A5320JBA00191 |
| STOUGHTON | WHI | 2017 | 1DW1A5320HB753520 |
| STOUGHTON | ZGP | 2017 | 1DW1A5327HB753532 |
| STOUGHTON | WHI | 2018 | 1DW1A5320JBA00188 |
| STOUGHTON | ZGP | 2018 | 1DW1A5328JBA00195 |
| STOUGHTON | ZGP | 2017 | 1DW1A5329HB753533 |
| STOUGHTON | ZGP | 2017 | 1DW1A5320HB753534 |
| STOUGHTON | ZGP | 2017 | 1DW1A5329HB753502 |
| STOUGHTON | ZGP | 2017 | 1DW1A5324HB753519 |
| STOUGHTON | ZGP | 2017 | 1DW1A5323HB753527 |
| STOUGHTON | ZGP | 2017 | 1DW1A5325HB753514 |
| STOUGHTON | ZGP | 2017 | 1DW1A532XHB753539 |
| WABASH | N/A | 2023 | 1JJV532D6PL328709 |
| WABASH | N/A | 2023 | 1JJV532D2PL328710 |
| WABASH | N/A | 2023 | 1JJV532D4PL328711 |
| WABASH | N/A | 2023 | 1JJV532D3PL328716 |
| WABASH | N/A | 2023 | 1JJV532D7PL328718 |
| WABASH | N/A | 2023 | 1JJV532D9PL328719 |
| WABASH | N/A | 2023 | 1JJV532D5PL328720 |
| STOUGHTON | ZGP | 2018 | 1DW1A5322JBA00189 |
| STOUGHTON | ZGP | 2017 | 1DW1A532XHB753508 |

| | | | |
|---|---|---|---|
| STOUGHTON | ZGP | 2018 | 1DW1A5321JBA00197 |
| STOUGHTON | WHI | 2018 | 1DW1A5328JBA00214 |
| STOUGHTON | ZGP | 2018 | 1DW1A5327JBA00186 |
| STOUGHTON | N/A | 2018 | 1DW1A5327JBA00205 |
| STOUGHTON | WHI | 2017 | 1DW1A5324HB753522 |
| STOUGHTON | ZGP | 2017 | 1DW1A5326HB753540 |
| STOUGHTON | ZGP | 2018 | 1DW1A5321JBA00202 |
| STOUGHTON | ZGP | 2017 | 1DW1A5320HB753503 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7876428 |
| UTILITY | VS2 | 2020 | 1UYVS2530K7760908 |
| STOUGHTON | ALU | 2020 | 1DW1R5326LEA41936 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA41944 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA42386 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA42397 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA42398 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA42390 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42392 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA42391 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42394 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA41947 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7876431 |
| GREAT DANE | N/A | 2016 | 1GRAP0626GD461687 |
| UTILITY | VS2 | 2012 | 1UYVS2535CM470005 |

**SCHEDULE "H"**

**PERMITS**

- Commercial Vehicle Operating Licences

- United States Department of Transportation Licences

- Long Combination Vehicle Licence

- New York State Heavy Haul Permit

**[Note: Balance of schedule to be completed no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order.]**

## SCHEDULE "I"

## CRITICAL REQUIRED CONTRACTS

1.  DEF contract dated as of August 29, 2023 between Shell Flying J and Pride Diesel Inc.

2.  The lease dated as of November 24, 2015 in respect of the property located at 6050 Dixie Road, Mississauga, between 6050 Dixie Road Investments Limited as Landlord, 2029909 Ontario Inc. as Tenant and Sam Johal as Indemnifier

3.  Fuel contract dated as of June 19, 2023 between Shell Flying J and Pride Diesel Inc.

4.  Branded Dealer Agreement (Esso) dated as of October 25, 2019 between Husky Oil Marketing Company, a division of Husky Oil Operations Limited and 2076401 Ontario Inc.

5.  Lease agreement in respect of 6253 Boundary Road, Cornwall, ON, with Globocam (Montreal) Inc., provided that such lease is in force on the Closing Date.

6.  The Finloc Leases

**[Note: Balance of schedule to be completed no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order.]**

## SCHEDULE "J"

## FINLOC LEASED VEHICLES

| Make | Model | Year | VIN |
|------|-------|------|-----|
| MANAC | 712 | 2020 | 2M5720419L1190805 |
| MANAC | 712 | 2020 | 2M5720410L1190806 |
| MANAC | 712 | 2020 | 2M5720417L1186817 |
| MANAC | 712 | 2020 | 2M5720417L1190804 |
| MANAC | 712 | 2020 | 2M5720415L1190803 |
| MANAC | 942 | 2021 | 2M5921613M1202282 |
| MANAC | N/A | 2019 | 2M593161XL1197805 |
| MANAC | 942 | 2021 | 2M5921611M1202264 |
| MANAC | 942 | 2021 | 2M5921613M1202265 |
| MANAC | 942 | 2021 | 2M5921615M1202266 |
| MANAC | 942 | 2021 | 2M5921617M1202267 |
| MANAC | 942 | 2021 | 2M5921619M1202268 |
| MANAC | 942 | 2021 | 2M5921610M1202269 |
| MANAC | 942 | 2021 | 2M5921617M1202270 |
| MANAC | 942 | 2021 | 2M5921619M1202271 |
| MANAC | 942 | 2021 | 2M5921610M1202272 |
| MANAC | 942 | 2021 | 2M5921612M1202273 |
| MANAC | 942 | 2021 | 2M5921614M1202274 |
| MANAC | 942 | 2021 | 2M5921616M1202275 |
| MANAC | 942 | 2021 | 2M5921618M1202276 |
| MANAC | 942 | 2021 | 2M592161XM1202277 |
| MANAC | 942 | 2021 | 2M5921611M1202278 |
| MANAC | 942 | 2021 | 2M5921613M1202279 |
| MANAC | 942 | 2021 | 2M592161XM1202280 |
| MANAC | 942 | 2021 | 2M5921611M1202281 |
| MANAC | 942 | 2021 | 2M5921615M1202283 |
| MANAC | 942 | 2021 | 2M5921617M1202284 |
| MANAC | 942 | 2021 | 2M5921619M1202285 |
| MANAC | 942 | 2021 | 2M5921610M1202286 |
| MANAC | 942 | 2021 | 2M5921612M1202287 |
| MANAC | 942 | 2021 | 2M5921614M1202288 |
| MANAC | 942 | 2021 | 2M5921616M1202289 |
| MANAC | 342 | 2021 | 2M5921612M1202290 |
| MANAC | 942 | 2021 | 2M5921614M1202291 |
| MANAC | 942 | 2021 | 2M5921616M1202292 |
| MANAC | 942 | 2021 | 2M5921618M1202293 |
| MANAC | 943 | 2020 | 2M5931611L1197790 |
| MANAC | 943 | 2020 | 2M5931613L1197791 |
| MANAC | 943 | 2020 | 2M5931615L1197792 |
| MANAC | 943 | 2020 | 2M5931617L1197793 |
| MANAC | 943 | 2020 | 2M5931619L1197794 |
| MANAC | 943 | 2020 | 2M5931610L1197795 |
| MANAC | N/A | 2020 | 2M5931612L1197796 |
| MANAC | N/A | 2020 | 2M5931614L1197797 |
| MANAC | N/A | 2020 | 2M5931618L1197799 |
| MANAC | N/A | 2020 | 2M5931610L1197800 |
| MANAC | N/A | 2020 | 2M5931612L1197801 |
| MANAC | N/A | 2020 | 2M5931614L1197802 |
| MANAC | N/A | 2020 | 2M5931616L1197803 |
| MANAC | N/A | 2020 | 2M5931618L1197804 |
| MANAC | N/A | 2020 | 2M5931611L1197806 |
| MANAC | N/A | 2020 | 2M5931613L1197807 |
| MANAC | N/A | 2020 | 2M5931615L1197808 |
| MANAC | N/A | 2020 | 2M5931617L1197809 |
| MANAC | N/A | 2020 | 2M5931613L1197810 |

| MANAC | N/A | 2020 | 2M5931615L1197811 |
| MANAC | N/A | 2020 | 2M5931617L1197812 |
| MANAC | N/A | 2020 | 2M5931619L1197813 |
| MANAC | N/A | 2020 | 2M5931610L1197814 |
| MANAC | N/A | 2020 | 2M5931612L1197815 |
| MANAC | N/A | 2020 | 2M5931614L1197816 |
| MANAC | N/A | 2020 | 2M5931616L1197817 |
| MANAC | N/A | 2020 | 2M5931618L1197818 |
| MANAC | N/A | 2020 | 2M593161XL1197819 |
| MANAC | N/A | 2020 | 2M5931614M1197820 |
| MANAC | N/A | 2020 | 2M5931616M1197821 |
| MANAC | N/A | 2020 | 2M5931618M1197822 |
| MANAC | N/A | 2020 | 2M593161XM1197823 |
| MANAC | N/A | 2020 | 2M5931611M1197824 |
| MANAC | 943 | 2020 | 2M5931613M1197825 |
| MANAC | 943 | 2020 | 2M5931615M1197826 |
| MANAC | 943 | 2021 | 2M5931617M1197827 |
| MANAC | 943 | 2021 | 2M5931619M1197828 |
| MANAC | 943 | 2021 | 2M5931610M1197829 |
| MANAC | 943 | 2021 | 2M5931617M1197830 |
| MANAC | 943 | 2021 | 2M5931619M1197831 |
| MANAC | 943 | 2021 | 2M5931610M1197832 |
| MANAC | 943 | 2021 | 2M5931612M1197833 |
| MANAC | 943 | 2021 | 2M5931614M1197834 |
| MANAC | 943 | 2021 | 2M5931616M1197835 |
| MANAC | 943 | 2021 | 2M5931618M1197836 |
| MANAC | 943 | 2021 | 2M593161XM1197837 |
| MANAC | 943 | 2021 | 2M5931611M1197838 |
| MANAC | 943 | 2021 | 2M5931613M1197839 |

# APPENDIX "E"

**Summary of Motions filed by PGL Lenders**

| Party | Relief being Sought[1] |
|---|---|
| Bank of Montreal and BMO Bank N.A. (together, "**BMO Canada**") | Pursuant to the BMO Canada motion record, dated July 29, 2024, BMO Canada is bringing a motion before the Court to request, among other things, the following relief:<br><br>(a) lifting the stay of proceedings in these CCAA proceedings (the "**Stay**") to provide, among other things, that:<br><br>  i. BMO Canada be permitted to collect and repossess for sale outside of these CCAA proceedings the BMO PGL Collateral that is not identified as a MCV in the Monitor's Database;<br><br>  ii. for the BMO PGL Collateral identified as a MCV in the Monitor's Database, that BMO Canada be permitted to enter into a collateral release and reimbursement agreement with the Monitor and the CRO upon which BMO Canada shall be entitled to, prior to the Entitlement Finding, immediately repossess and monetize the BMO PGL Collateral through its own processes. BMO Canada acknowledges that it will reimburse and pay to the Monitor the value of the BMO PGL Collateral in the event it is determined that another entity has a prior ranking claim to that of BMO Canada;<br><br>  iii. in the alternative, for the BMO PGL Collateral identified as a MCV in the Monitor's Database, that BMO Canada be permitted to collect and repossess such BMO PGL Collateral for sale outside of these proceedings immediately after it is determined, pursuant to the Entitlement Claims Process, that BMO Canada has a priority claim in such vehicle;<br><br>(b) directing the Applicants and the Monitor to cooperate with BMO Canada in its efforts to recover possession of the BMO PGL Collateral, including providing the municipal address(es) of the location of the BMO PGL Collateral, together with the contact information of the individual(s) who will facilitate compliance with the order to recover possession of the BMO PGL Collateral;<br><br>(c) if required, granting BMO Canada and/or their duly authorized bailiff(s) and agents the right to enter on any premises of the Applicants or any other person for purposes of taking possession of the BMO PGL Collateral, whether unlocked or locked, for the purposes of recovering possession of the BMO PGL Collateral; and<br><br>(d) permitting BMO Canada to sell or otherwise dispose of the BMO PGL Collateral and waiving any applicable notice requirements, including any |

---

[1] Capitalized terms used in this summary chart and not otherwise defined herein have the meanings ascribed to them in the corresponding Court materials.

| | |
|---|---|
| | requirements for Notice of Disposition of Collateral pursuant to any applicable provincial equivalent of Section 63 of the *Personal Property Security Act*, R.S.O. 1990, c. P.10 (the "**PPSA**"). |
| The Bank of Nova Scotia ("**BNS**") | Pursuant to the BNS motion record, dated July 31, 2024, BNS is bringing a motion before the Court to request, among other things, lifting the Stay for the purpose of seeking and providing for the appointment of the Receiver, without security, over the Collateral pursuant to Section 101 of the *Courts of Justice Act* (Ontario) and section 243 of the BIA (the "**Receivership Application**").<br><br>The Receivership Application was supported by Royal Bank of Canada pursuant to the Affidavit of Brian Pettit, affirmed July 31, 2024. |
| Daimler Truck Financial Services Canada Corporation ("**DTF Canada**") | Pursuant to the DTF Canada motion record, dated July 30, 2024, DTF Canada is bringing a motion before the Court to request, among other things, the following relief:<br><br>(a) lifting the Stay to permit DTF Canada to collect and repossess for sale outside of these CCAA proceedings all DTF PGL Collateral that is not identified as a MCV in the Monitor's Database;<br><br>(b) for the DTF PGL Collateral identified as a MCV in the Monitor's Database, if any, that DTF Canada be permitted to collect and repossess such DTF PGL Collateral for sale outside of these proceedings immediately after it is determined, pursuant to the Entitlement Claims Process Order, that DTF Canada has a priority claim in such vehicle;<br><br>(c) if required, granting DTF Canada and/or its duly authorized bailiff(s) access to each unit of DTF PGL Collateral, whether locked or unlocked, for the purposes of recovering possession of such units; and<br><br>(d) ordering that DTF Canada shall be at liberty to dispose of the DTF PGL Collateral and waiving any applicable notice requirements, including any requirements for Notice of Disposition of Collateral pursuant to any applicable provincial equivalent of Section 63 of the PPSA. |
| TD Equipment Finance Canada ("**TDEF**") | Pursuant to the TDEF motion record dated July 31, 2024, TDEF is bringing a motion before the Court to request, among other things, the following relief:<br><br>(a) lifting the Stay so that, among other things:<br><br>   i. for each piece of Collateral that TDEF has a security interest in, that is not identified as a MCV in the Monitor's Database following the Monitor's Database Closing Date, that TDEF be permitted forty-five days to retrieve same commencing from the date the Collateral's location is identified and available for retrieval; and<br><br>   ii. for each piece of Collateral that TDEF has a security interest in, that is identified as a MCV in the Monitor's Database following the Monitor's Database Closing Date, that TDEF be permitted forty-five days to retrieve same commencing from the date the Collateral's location is |

| | |
|---|---|
| | identified and available for retrieval, pursuant to the Entitlement Claims Process, that that TDEF has a priority claim in such MCV;<br><br>(b) providing that TDEF shall be at liberty to dispose of the Collateral and waiving any applicable notice requirements, including any notice requirements to dispose of the Collateral pursuant to any applicable provincial equivalent of section 63 of the PPSA; and<br><br>(c) that the Monitor and PGL shall cooperate in good faith with TDEF regarding the retrieval of the Collateral, including by providing possession of any ownership documents relating to the Collateral to TDEF. |
| FINLOC 2000 Inc. ("**Finloc**") | Pursuant to the Finloc motion record dated July 29, 2024, Finloc is bringing a motion before the Court to request, among other things, the following relief:<br><br>(a) lifting the Stay in respect of PGL and all of the Applicants (as necessary) for the purpose of enabling and authorizing Finloc to take any and all necessary steps to repossess the Finloc Trailers;<br><br>(b) authorizing and directing PGL and the Applicants to:<br><br>   i. provide to Finloc the known locations of all of the Finloc Trailers and access to the 'GPS' tracking systems in respect of the same, as well as the details of their Current Route;<br><br>   ii. recall all the Finloc Trailers from active service, immediately following completion of each Vehicle's Current Route, to PGL's Yard and to advise Finloc (via email to its counsel) as to the arrival of each Vehicle at the Yard;<br><br>   iii. hold each such recalled Finloc Trailer in the Yard, at no cost and free of any encumbrances, to facilitate the release of the same to Finloc;<br><br>   iv. provide Finloc with access, from time to time, to the Yard (during regular business hours) to repossess the Finloc Trailers – and to release all the Finloc Trailers to Finloc – as they become available; and<br><br>   v. provide Finloc, at Finloc's request, with access to all premises, books and record and other documents and information of PGL and the Applicants required by Finloc to locate and repossess any Finloc Trailers which PGL and the Applicants are unable to recall to the Yard. |

# APPENDIX "F"



6050 Dixie Road. Mississauga, ON L5T 1A6

**TURN-OVER MECHANICS NOTICE**

**VIA EMAIL**

August 19, 2024

**TO WHOM IT MAY CONCERN**

**Re:**     **In the Matter of a Plan of Compromise or Arrangement of Pride Group Holdings Inc., et. al. (collectively, the "Pride Entities"), Court File No. CV-24-00717340-00CL**

**And Re:**     **Facilitating the Turn-Over of Securitization Assets**

We refer to the Order regarding Turn-Over of Securitized Assets dated August 8, 2024 granted in these proceedings (the "**Turn-Over Order**"), and the Tenth Report of the Monitor dated July 21, 2024 in respect of such Turn-Over Order (together with the supplement thereto and any amendments, the "**Tenth Report**"). Any capitalized terms not defined herein have the meanings given to them in the Turn-Over Order.

This letter is addressed to all Securitization Parties in respect of the Turn-Over of Subject Assets, and sets out the principal turn-over mechanics to facilitate an orderly and organized transition and relinquishment of Subject Assets from the Pride Entities to the respective Securitization Parties in accordance with the Turn-Over Order.

In the case of any conflict between this letter and (i) the terms of the Turn-Over Order, the Turn-Over shall prevail, and (ii) any prior correspondence or communication relating to the matters herein, the terms of this letter shall prevail.

*Intended Timing of Turn-Overs*

As the Monitor's counsel confirmed by email to the Securitization Parties' counsel on August 14, 2024, the Pride Entities are targeting the following in respect of Turn-Overs:

1. an August 30, 2024 Effective Turn-Over Time for all Subject Assets that are not Repossessed Assets and were included in the Subject Asset Schedules as described and defined in the Turn-Over Order;

2.

2. Effective Turn-Over Times over the next four (4) weeks with respect to Repossessed Assets, depending on location of such Repossessed Asset;

3. with respect to Multiple Collateral Vehicles:

   a. an August 30, 2024 Effective Turn-Over Time, to the extent Securitization Parties are in a position to satisfy the MCV Turn-Over Conditions, on or before August 19, 2024 (including providing a copy of the relevant MCV Servicing Agreement to the Monitor and its counsel together with a list of the affected MCV Assets) ), or have informed the Monitor and its counsel, on or before August 19, 2024, that the relevant Subject Asset is no longer a Multiple Collateral Vehicle (including confirmation of all other parties claiming an interest in such Multiple Collateral Vehicle) and the Monitor and its counsel are in a position, to be determined on a case by case basis, to validate such Securitization Parties interest and recommend a Turn-Over; and

   b. an Effective Turn-Over Time, as soon as practicable, upon minimum two weeks advance written notice prior to any Turn-Over, to the extent such notice is provided after August 19, 2024.

Subject Assets (including trucks or trailers) will not be Turned-Over to any Securitization Parties prior to August 30, 2024 without the express written consent of the Monitor.

*Mechanics of Physical Turn-Overs*

To facilitate the Turn-Over of Repossessed Assets, the Pride Entities and the Monitor shall provide the applicable Securitization Parties with the following information on or before August 23, 2024:

1. the addresses of the Pride Entity locations where the Repossessed Assets are situated, together with a list of VINs of the Repossessed Assets situate at each such location (the "**Location-Information**"); and

2. the contact information for the site-specific supervisor responsible for each such Pride Entity lot for the purposes of facilitating a Turn-Over (each, a "**Site Supervisor**").

In order to take delivery of the Repossessed Assets, each Securitization Party must satisfy the following conditions (collectively, the "**Pick-up Conditions**"):

1. as soon as practicable after receipt of the Location-Information, contact by email, collectively, the applicable Site Supervisor, the Pride Entities' representative[1] and the Monitor's Representative[2] to schedule a mutually-agreeable "pick-up window"[3] for the collection of specified VINs (the "**Pick-up Window**"), each party acting reasonably in

---

[1] By copy email to Nim Bhangoo at nbhangoo@tpinefs.com.

[2] By copy email to Emily Masry at emily.masry@parthenon.ey.com.

[3] The "Pick-up Window" shall, in each instance, be between 10:00am and 4:00pm on a business day.

3.

scheduling a date and time that furthers the objective of an orderly and organized transition and relinquishment of the Repossessed Assets;

2. as soon as possible following 1 immediately above, deliver to the Site Supervisor and the Monitor's Representative by electronic transmission a letter from the applicable Securitzation Party (the "**Letter of Authority**")

   a. specifying the VINs to be Turned-Over;

   b. specifying the applicable Pick-Up Window; and

   c. confirming that insurance for the VINs to be Turned-Over has been obtained; and

   d. specifying and authorizing an agent or representative, with complete contact information of same, to collect the specified Repossessed Assets on behalf of the Securitization Party;

3. the Securitization Party's agent or representative must:

   a. arrive at the specified location prior to or promptly at the beginning of the Pick-up Window;

   b. present to the applicable Pride Entity representative a copy of the Letter of Authority that authorizes such agent or representative to take possession of specified Repossessed Assets, or other satisfactory confirmation that they are entitled to take possession of Repossessed Assets pursuant to a Letter of Authority that has already been delivered to the Site Supervisor and Monitor's representative;

   c. have obtained independent insurance in respect of the specified Repossessed Assets it shall take possession of; and

   d. confirm in-writing upon leaving the premises that it has taken possession of the specified Repossessed Assets, in such form as the Pride Entities reasonably determine.

In the event the Repossessed Asset is not located at a Pride Entity location, only a subset of the Pick-up Conditions may apply. Further location-specific guidance will be provided in the Pride Entities' and Monitor's further communications with the applicable Securitization Party.

Should the Pick-Up Conditions not be satisfied by the Securitization Parties, as determined by the Pride Entities' representatives acting reasonably, the Repossessed Assets may not be Turned-over the specified Pick-up Window, and the Pride Entities and the Monitor reserve the right to work with the Securitization Party to re-schedule the Turn-Over at a rescheduled date and pick-up window that is consistent with the overall purposes of an organized Turn-Over of the Repossessed Assets.

### *Storage and Other Fees*

In accordance with paragraph  20 of the Turn-Over Order, the applicable Securitization Party shall pay to the Pride Entities $35.00 per day for storage costs in respect of any Repossessed Asset that

4.

is not retrieved or removed by such Securitization Party, or its designate, by the relevant Retrieval Deadline.

The $35.00/day fee shall begin to accrue in respect of each Repossessed Asset that is not retrieved or removed during the Pick-up Window, and such aggregate fees must be paid to the Pride Entities in respect of the applicable Repossessed Assets prior to their retrieval on any re-scheduled Turn-Over date.

### *Pre-authorized Payments*

Securitization Parties may only initiate pre-authorized payments ("**PAPs**") for active leases with respect to the Subject Assets that are turned-over – i.e., the Subject Assets listed on the applicable Subject Asset Schedule for each respective Securitization Party. The Securitization Parties shall provide the respective obligors with notice of such PAP amendments in accordance with the Turn-Over Order.

### *Compliance with Ongoing Obligations*

Paragraph 12 of the Turn-Over specifies numerous ongoing obligations of the Securitization Parties, including in respect of dealing with unallocated amounts and the termination of tax elections, among other things.

The Pride Entities may make inquiries of the Securitization Parties (or their replacement servicers, as applicable) and/or enter into suitable arrangements with the Securitization Parties to ensure ongoing compliance with their such Court-ordered obligations.

To the extent that any PAP proceeds for MCVs are paid into the blocked accounts that are controlled by the Securitization Parties or the Securitization Parties are in receipt of any other amounts that are the property of the Pride Entities, or another stakeholder, any all such amounts are required to be transferred to the Monitor's trust account as soon as practicable following the Securitization Parties' receipt of same.

*[Letter follows on subsequent page]*

5.

***Certain Repossessed Assets Excluded***

Notwithstanding anything else, in the event that (1) the applicable Securitization Party has provided its consent to the sale of a specific Repossessed Asset pursuant to the Governance Protocol approved in these proceedings, and (2) a purchaser has entered into an agreement of purchase and sale and provided a deposit in respect of such Repossessed Asset, the sale of such Repossessed Asset shall be permitted to proceed to closing and the asset will be unavailable for pick-up in accordance with the terms of this letter until and unless such pending sale is not consummated for any reason.

Yours truly,

RC Benson

RC Benson Consulting Inc.,
Chief Restructuring Officer of the Pride Entities

# APPENDIX "G"

# FASKEN

| | | |
|---|---|---|
| **Fasken Martineau DuMoulin LLP** | 333 Bay Street, Suite 2400 | **T** +1 416 366 8381 |
| Barristers and Solicitors | P.O. Box 20 | +1 800 268 8424 |
| Patent and Trade-mark Agents | Toronto, Ontario  M5H 2T6 | **F** +1 416 364 7813 |
| | Canada | |
| | | **fasken.com** |

August 16, 2024
File No.:  200440.00056/16471

**Aubrey E. Kauffman**
Direct Line / Fax  +1 416 868 3538
akauffman@fasken.com

**By Email**

Kelly Bourassa
Blake, Cassels & Graydon LLP
Bankers Hall East Tower
855 - 2nd Street S.W., Suite 3500
Calgary AB   T2P 4J8

Dear Ms. Bourassa:

**Re:     Pride Securitization Issues- Initial Reporting Letters**

Further to the endorsement relating to the  Turn- Over of Securitized Assets Order, dated August 8, 2024, the flow of securitization documents from Securitization Counterparties has commenced.

We are presently in the process of developing a due diligence process in order to assess the efficacy of the various securitization programs and related priority issues. These are, of course, the very issues analyzed by the Monitor in its Tenth Report.

As set out in various court reports, the scope of such review is unprecedented. It took the Monitor and Blakes several months, and millions of dollars, to develop the analysis set out in the Tenth Report. This review was funded by the Pride Group estate through the vehicle of the increased DIP facility provided by our client.

The conclusions contained in the Tenth Report are, of course, anchored in the analysis contained in the Initial Reporting Letters. Paragraph 62 of the Tenth Report enumerates precisely the issues analyzed by Blakes. Those are the very same issues that we will have to analyze in our review.

In the interest of efficiency, cost control and common sense, we ask that the Monitor share the 8 Initial Reporting Letters with us. This cooperation will save a vast amount of expense and greatly accelerate our review process. It will avoid "reinventing the wheel".

We understand that the Monitor has taken the position that the Initial Reporting Letters are subject to privilege. Without debating the point, we would be happy to have the Initial Reporting Letters produced subject to whatever reasonable protections the Monitor and Blakes propose, including:

- Non waiver of any privilege;

# FASKEN

- Confidentiality;

- Use restricted to Fasken's due diligence related to the Determination Motion process;

- No reliance on the facts or conclusions set out in the letters and protection against claims; and

- Redaction of matters not encompassed by the issues set out in the aforesaid paragraph 62 of the Tenth Report.

In addition, we understand that a memorandum was sent by Blakes to each securitization counterparty setting out aspects of Blake's analysis. We would be interested in reviewing those memoranda as well.

We note that production of the Initial Reporting Letters and the aforesaid memoranda will not have a cost to the Monitor or Blakes either in time spent or professional fees incurred. On the other hand, the savings to our client, in both time and professional fees, will be immense.

We are available to have a discussion of this request once you have had a chance to consider it.

Best,

**FASKEN MARTINEAU DuMOULIN LLP**

Aubrey E. Kauffman

AEK/ah
Enclosure

cc    Stuart Brotman



Blake, Cassels & Graydon LLP
Barristers & Solicitors
Patent & Trademark Agents
855 - 2nd Street S.W.
Suite 3500, Bankers Hall East Tower
Calgary AB T2P 4J8 Canada
Tel: 403-260-9600 Fax: 403-260-9700

**Kelly J. Bourassa**
Partner
Dir: 403-260-9697
kelly.bourassa@blakes.com

Reference: 8431/1367

August 21, 2024

**VIA E-MAIL**
*akauffman@fasken.com*

Fasken Martineau DuMoulin LLP
First Canadian Centre
350 7th Avenue SW, Suite 3400
Calgary, AB T2P 3N9

Attn: Aubrey E. Kauffman

RE:   **Pride Securitization – Disclosure Request**

Dear Sir:

We have considered the disclosure request set out in your letter dated August 16, 2024 and as discussed on our telephone call on Monday, August 19, 2024. Capitalized terms not otherwise defined herein have the meaning given to them in the Monitor's Tenth Report to Court dated July 21, 2024 (the "Tenth Report").

The Tenth Report distills the Monitor's conclusions and recommendations in relation to Turn-Overs, and highlights substantive considerations bearing on those conclusions and recommendations. It also explains the limitations of the validation process undertaken by the Monitor and its counsel, both in terms of the limited scope and intended purpose of the legal review on which such conclusions and recommendations were based. The Tenth Report was intended to provide even-handed transparency to the Monitor's processes, including with respect to the underlying legal review, for the benefit of all potential stakeholders. In particular, paragraphs 71 through 76 set out the Monitor's Turn-Over recommendations for each of the 8 securitization programs considered, including a summary of substantive analysis from the corresponding Initial Reporting Letters.

The Initial Reporting Letters themselves are privileged communications between the Monitor and its counsel. The information contained in the Initial Reporting Letters includes content extracting from or otherwise based on documentation and other information that has been provided to the Monitor and its counsel on a confidential and "*without prejudice*" basis. The Monitor's and its counsel's undertaking to treat such information on a confidential and "*without prejudice*" basis was extended to securitization parties and others in order to accelerate and promote candour, transparency and cooperation, in order to establish an alternative to litigation and expedite Turn-Overs on the basis described in the Tenth Report. These limitations and understandings were described in the Tenth Report, including in paragraph 61, which described meetings held with counsel to securitization parties on a confidential and "*without prejudice*" basis, as well as the Supplement to the Monitor's Ninth Report dated July 15, 2024. This

*Blakes*

information, and related counsel meetings, informed the legal analysis on which the Monitor based its conclusions and recommendations to the Court.

Disclosure of the Initial Reporting Letters themselves would be inappropriate without first receiving a consent and waiver from the relevant securitization parties, their counsel and certain other persons who provided confidential information to the Monitor and/or its counsel. Alternatively, for efficiency reasons and recognizing the need for cost control, it may be more expedient to focus on specific follow-up questions that your client may identify, to elaborate on the information and analysis set out in the Tenth Report. For example, the Monitor would be prepared to respond to those follow-ups, including where appropriate by providing extracts of non-confidential discussion included in the Initial Reporting Letters, or otherwise providing supplementary background information and analysis so long as it does not compromise confidentiality and the "*without prejudice*" undertakings made to the providers of the related information.

If your client wishes to make enquiries or pursue consents and waivers, the Monitor will stand ready to help facilitate your related processes, so long as (1) your client agrees to reimburse the Monitor for its costs (both internal time and resources spent responding, on a cost recovery basis, and for out-of-pocket expenses, including external counsel fees for both the Monitor's Canadian and U.S. counsel), (2) the information and analysis provided in response to any enquiries made is also provided to any affected stakeholder, as determined by the Monitor (recognizing that the Monitor's role and processes, as an extension of the Court's processes, needs to be even-handed and fairly administered, as between the various stakeholders affected by the CCAA Proceedings), and (3) any legal analysis from counsel is acknowledged by your client for its limited purpose, including appropriate caveats, including to recognize that counsel is not acting for or advising your client in this context and your client's non-reliance.

You also requested memoranda sent by the Monitor's counsel to certain securitization parties and their counsel. We expect that you are referring to the memos provided in advance of the funder meetings referenced in the Tenth Report. We can confirm that those memos did not contain any discussion of substantive legal analysis or the basis for the Monitor's ultimate conclusions or recommendations, but rather shared with funders the preliminary findings at the time in the form of lists identifying validated assets, not validated assets and potential third party lien claims. Ultimately, those preliminary lists were further refined (including based on funder feedback received) and attached as appendices for a similar purpose in the Tenth Report. Those appendices (as revised and as may be further amended) are publicly available on the Monitor's website. Accordingly, those memos do not provide additional information or analysis that would be of assistance to your client. If useful, the Monitor can share electronic copies of the appendices to the Tenth Report.

Page 3



With respect to the Monitor's requirement to have any related costs and expenses covered by your client, absent the availability of interim funding to the Pride Entities, the Monitor must generally rely on a "user pay" model to ensure that its costs and expenses will ultimately be covered.

Yours truly,

Kelly J. Bourassa

cc      Stuart Brotman, Fasken Martineau DuMoulin LLP
        Client

1394-8279-4766.1

# APPENDIX "H"



6050 Dixie Road. Mississauga, ON L5T 1A6

**DOCUMENT PRESERVATION NOTICE**

August 19, 2024

**TO WHOM IT MAY CONCERN**             **VIA EMAIL**

Dear Sir/Madam:

**Re:     In the Matter of a Plan of Compromise or Arrangement of Pride Group Holdings Inc., et. al. (collectively, the "Pride Entities"), Ontario Superior Court of Justice, Court File No. CV-24-00717340-00CL**

As you may be aware, the Pride Entities were granted creditor protection under the *Companies' Creditors Arrangement Act* by the Ontario Superior Court of Justice (Commercial List) (the "**Court**") on March 27, 2024. These proceedings are currently ongoing. On August 8, 2024 the Court issued an Order regarding the turn-over of certain securitized assets (the "**Turn-Over Order**").

Paragraph 16 of the Turn-Over Order includes the following direction:

16.    **THIS COURT ORDERS** that each of the Pride Entities (which includes their respective employees, agents, advisors, representatives, and affiliates), at their sole cost and expense, shall, until further Order of this Court, take reasonable and good faith steps to identify and preserve all documents in their possession, control, or power (which term includes electronically-stored information, including, without limitation, within the Pride Entities' Casitron or Simplicity software) that are relevant or potentially relevant to (a) facilitating a Turn-Over, (b) any Securitization Program, (c) the Subject Assets, (d) the MCV Assets, or (e) the "Factual Inquiries" as such term is defined in paragraph 47 of the Tenth Report and further particularized in paragraph 48 thereof (collectively, the "**Relevant Documents**"). Such reasonable and good faith steps shall include, without limitation:

(a)    taking steps to prevent the partial or full destruction, alteration, testing, deletion, overwriting, shredding, incineration, wiping, relocation, migration, theft or mutation of documents, as well as to prevent any action that would make the documents unreadable, incomplete or inaccessible; and

(b)    within 10 days from the date of this Order, circulating a document preservation notice, in form and substance satisfactory to the Monitor, to all potential custodians of the Relevant Documents notifying them of this Order and their obligation to preserve the Relevant Documents.

This letter is a document preservation notice circulated pursuant to paragraph 16(b) of the Turn-Over Order. You are receiving this notice because you may have Relevant Documents, as that term is defined in the Turn-Over Order.

What constitutes a document is very broad. It includes documents that are either in hard copy (e.g. paper files) or electronic format (e.g. emails, text messages, instant messages of any form, word documents, excel spreadsheets, etc.). It includes letters, appointment books, emails, text messages, drawings, pictures, sound recordings, and any other documentary material in whatever form. It also includes drafts and documents with handwritten notations.

With respect to electronic documents, this obligation to preserve includes documents on desktop or laptop computer hard drives, networks, shared drives, usb keys, cloud, tablets, cellular phones, or any other electronic device. These documents must be preserved even if they exist on a home computer, mobile phone or tablet, or any other personal device.

Without being exhaustive, examples of Relevant Documents may include lease agreements, sub-lease agreements, estoppel letters, finance agreements, sale agreements, and documents related to those sales, etc., with respect to securitized assets.

Please preserve any Relevant Documents in accordance with the Turn-Over Order. A full copy is posted online at
https://documentcentre.ey.com/api/Document/download?docId=39916&language=EN.

**aman@pridegroupenterprises.com**

Yours truly,

Pride Entities

# APPENDIX "I"



Suite 1000 - 33 Bloor Street East
Toronto, Canada M4W 3H1

Telephone: (416) 961-4100
Fax: (416) 961-2531

Craig R. Colraine
Direct Line:  (416) 961-0042
E-Mail:  colraine@bslsc.com

Refer to file no. 45706

August 21, 2024

***BY EMAIL TO pamela.huff@blakes.com and chris.burr@blakes.com***
Pamela Huff
Chris Burr
Blake, Cassels & Graydon LLP
199 Bay Street, Suite 4000
Commerce Court West
Toronto ON  M5L 1A9

***BY EMAIL TO lwilliams@tgf.ca***

Leanne Williams
Thornton Grout Finnigan LLP
TD West Tower, Toronto-Dominion Centre
100 Wellington Street West, Suite 3200
Toronto, ON  M5K 1K7

Dear Pamela, Chris and Leanne:

**Re: *Companies' Creditors Arrangement Act* proceeding (the "CCAA Proceedings") commenced by Pride Group Holdings Inc., et al (the "Applicants" or the "Pride Group")**

This letter is being written on behalf of PACCAR, VFS Canada Inc., VFS U.S. LLC, Daimler Truck Financial Services Canada Corporation and Daimler Truck Financial Services USA LLC, each of whom is an original equipment manufacturer, or a captive financing company of an original equipment manufacturer (collectively, the "OEMs") involved in the financing of the purchase and lease of trucks by certain Pride Group entities ("OEM Vehicles").

As a preliminary matter, the OEMs note that notwithstanding the direction of Justice Osborne of the Ontario Superior Court of Justice [Commercial List] in his endorsement dated August 9, 2024, none of the OEMs have been meaningfully consulted or engaged about an orderly wind-down proposal for the Pride Group as it relates to the OEM Vehicles. The OEMs appear to be excluded from that process.

- 2 -

At the same time, as the OEMs are being excluded from this process, their idle financed and leased trucks, which could be returned at little or no expense are being held hostage so that unjustifiable and unwarranted wind-up expenses can be extracted from them for the benefit of other lenders which may require more complex and expensive wind-up procedures, and the professional fees associated with such a process.  The same concerns equally apply to those trucks that are currently leased out by members of the Pride Group to third parties that have been financed by the OEMs.

 To date, considerable expenses have been incurred as a result of the Pride Group's failure to restructure -which realistically was never going to be possible given the justifiable mistrust of

the Pride Group's stakeholders in light of the Pride Group's conduct and their failure to present a coherent and viable plan stakeholders could support.

The OEMs understand that significant costs will have to be incurred to wind up the Pride Group. However, they do not understand why arrangements cannot be made now to return easily accessible idle units and to permit the forwarding of notices of assignment to third party lessees so that they can take over servicing of those leases – leases which the OEMs understand are not presently being serviced adequately by the Pride Group. The OEMs are prepared to do that at their expense which will in turn result in cost savings and efficiencies in the overall wind-up costs and which will be in the interest of all the lenders. Space on Pride Group lots will be freed up, insurance and maintenance expenses reduced and, the administrative costs associated with operating third party leases will be reduced. The OEMs are global leaders in the trucking industry with wide networks of dealers and substantial human resources at their disposal, as well as access to unique remarketing networks, the ability to extend direct financing to end users and potential purchasers to maximize recovery, and unique product and pricing knowledge.

No third-party will be in a better position to repossess and market the idle units and to take over servicing the leases than the OEMs.

Minimal cooperation and information from Pride and the Monitor will be required to permit the recovery of idle units, trucks subject to non-performing leases and the takeover of servicing of performing leases. As a result of its extensive review of the records of the Pride Group, the Monitor should have easily accessible lists of the locations of the affected trucks and the identities and addresses of the lessees (the OEMs in fact already have much of this information in hand). In addition, Daimler has already demonstrated that the recovery of idle units can be completed quickly and efficiently, as evidenced by its orderly collection of its voluntarily surrendered units within a few weeks.

The OEMs are being substantially prejudiced by (a) not being able to deal with their assets immediately, (b) while at the same time being excluded from any discussions pertaining to a wind-up plan (notwithstanding again the clear wording in the Court's endorsement dated August 9, 2024) . Through these proceedings, collectively the value of their security has already significantly depreciated. There is simply no justifiable reason why depreciation cost

- 2 -

should continue to mount and recovery continue to be delayed, while at the same time the OEMs are excluded from any discussion around a wind-up plan.

Given the foregoing, we must insist that the Pride Group's and the Monitor's counsels make themselves available for a meeting at their earliest opportunity with counsels to the OEMs to address the issues raised in this letter.

The OEMs are attaching a draft order for consideration with respect to their proposal.  Please note that the OEMs are content that the MCV's (Schedule H) be dealt with in accordance with the existing protocol. They will, however, be working with the other MCV affected parties to efficiently recover and sell those vehicles.

Yours very truly,

**BIRENBAUM, STEINBERG, LANDAU, SAVIN & COLRAINE LLP**

Craig R. Colraine

cc:     Elaine Gray and Mark Freake - Dentons Canada LLP
        NicholaKluge and Thomas Gertner – Gowling WLG (Canada) LLP

# APPENDIX "J"

Court File No. CV-24-00717340-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**


| THE HONOURABLE | ) | TUESDAY, THE |
|---|---|---|
|  | ) |  |
| JUSTICE OSBORNE | ) | DAY OF , 2024 |


IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED


AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those Applicants listed on Schedule "A" hereto (each, an "**Applicant**", and collectively, the "**Applicants**")


**ORDER**


**THIS MOTION**, made by: (i) PACCAR Financial Ltd. ("**PFL**"), PACCAR Financial Services Ltd. ("**PFSL**"), and PACCAR Financial Corp. ("**PFC**") (collectively referred to as "**PACCAR**"); (ii) Daimler Truck Financial Services Canada Corporation and Daimler Truck Financial Services USA LLC (collectively referred to as "**Daimler**"); and (iii) VFS Canada Inc. and VFS USA LLC (collectively referred to as "**Volvo**") for an order, *inter alia*, authorizing and permitting those parties (each an "**OEM**" collectively, the "**OEMs**") to recover trucks which they financed for purchase and lease by the Applicants, was heard this day at 330 University Avenue, Toronto, Ontario.


**ON READING** the ●:

- 2 -

**SERVICE**

1.      **THIS COURT ORDERS** that the time for service of the Notice of Motion and the Motion Record herein is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

**OEM VEHICLES - REPOSSESSION**

2.      **THIS COURT ORDERS** that the Pride Entities (as defined in the Second Amended and Restated Initial Order dated May 6, 2024 (as may be amended and/or restated from time to time, the "**Initial Order**")) shall make available for possession and sale by or on behalf of PACCAR, as applicable, the vehicles listed on Schedule "**B**" hereto (collectively, the "**PACCAR Repossession Vehicles**"), in accordance with the terms of this Order. Without limiting the generality of the foregoing, the term "**PACCAR Repossession Vehicles**" includes the electric vehicle charging equipment described in Schedule "C" hereto and all related equipment financed by PACCAR to any Pride Entity For greater certainty, the stay of proceedings in respect of the Pride Entities pursuant to the Initial Order is hereby lifted with respect to the possession and sale by or on behalf of PACCAR, as may be applicable, of the PACCAR Repossession Vehicles.

3.      **THIS COURT ORDERS** that the Pride Entities shall make available for possession and sale by or on behalf of Daimler, as applicable, the vehicles and other collateral listed on Schedule "C" hereto (collectively, the "**Daimler Repossession Vehicles**"), in accordance with the terms of this Order. Without limiting the generality of the foregoing, the term "Daimler Repossession Vehicles" includes the electric vehicle charging equipment described in Schedule "C" hereto and all related equipment financed by Daimler to any Pride Entity. For greater certainty, the stay of proceedings in respect of the Pride Entities pursuant to the Initial Order is hereby lifted with respect to the possession and sale by or on behalf of Daimler, as may be applicable, of the Daimler Repossession Vehicles.

4.      **THIS COURT ORDERS** that the Pride Entities shall make available for possession and sale by or on behalf of Volvo, as applicable, the vehicles listed on Schedule "D" hereto (collectively, the "**Volvo Repossession Vehicles**"), in accordance with the terms of this Order. For greater certainty, the stay of proceedings in respect of the Pride Entities pursuant to the Initial Order is hereby lifted with respect to the possession and sale by or on behalf of Volvo, as may be

- 3 -

applicable, of the Volvo Repossession Vehicles.

5.      **THIS COURT ORDERS** that,  on the 15th day of each month (or the next business day if such date is not a business day), each OEM shall provide a detailed written accounting to the Monitor and CRO with respect to the sale of, or other transactions involving their Respective Repossession Vehicles (as defined below) in the preceding month (each a "**Repossessed Vehicle Sale**"), which accounting shall include: (i) the total amount of all proceeds and other consideration received for each Repossessed Vehicle Sale ("**Gross Repossessed Vehicle Proceeds**"),  (ii) the direct costs to such OEM associated with each Repossessed Vehicle Sale (the "**Costs of Disposition**"), (iii) the outstanding amount owing pursuant to the loan advanced by such OEM to any of the Pride Entities to finance the acquisition of the applicable Respective Repossession Vehicle subject to a Repossessed Vehicle Sale (the "**Repossessed Unit Financed Amount**"), (iv) the amount of any indebtedness owing to such OEM by any of the Pride Entities other than the Repossessed Unit Financed Amount that is secured by the applicable Respective Repossession Vehicle (the "**Cross-Collateralized Indebtedness (Repossessed)**"), (v) a reasonable description of the process by which each Repossessed Vehicle Sale was arrived at, and (vi) confirmation whether the counterparty to each Repossessed Vehicle Sale is at arm's length to such OEM. The term "**Respective Repossession Vehicle(s)**" shall mean: (i) with respect to PACCAR, the PACCAR Repossession Vehicles, (ii) with respect to Daimler, the Daimler Repossession Vehicles, and (iii) with respect to Volvo, the Volvo Repossession Vehicles.

6.      **THIS COURT ORDERS** that where an OEM claims Cross-Collateralized Indebtedness (Repossessed) in respect of any Repossessed Vehicle Sale, the reporting with respect to such Repossessed Vehicle Sale referenced in Paragraph 5 of this Order shall include such OEM's factual and legal support for its entitlement to the Cross-Collateralized Indebtedness (Repossessed), and for the Cross-Collateralized Indebtedness (Repossessed) being secured against the relevant Respective Repossession Vehicle.

7.      **THIS COURT ORDERS** that each OEM shall, with respect to their Respective Repossession Vehicles remit to the Monitor the amount (if greater than zero) equal to (i) the Gross Repossessed Vehicle Proceeds, less (ii) the Costs of Disposition, and less (iii) the Repossessed Unit Financed Amount (the "**Net Repossessed Vehicle Proceeds**") within ten (10) business days following receipt of such Gross Repossessed Vehicle Proceeds by such OEM.  To the extent that an OEM asserts a claim to any Net Repossessed Vehicle Proceeds as a result of Cross-

- 4 -

Collateralized Indebtedness (Repossessed), such OEM shall advise the Monitor and CRO of such claim upon remittance of such applicable Net Repossessed Vehicle Proceeds with respect to their Respective Repossession Vehicles.

8.      **THIS COURT ORDERS** that the entitlement of an OEM to any Net Repossessed Vehicle Proceeds shall be subject to confirmation by the Monitor (with the consent of the DIP Agent), and/or further order of the Court, and once confirmed, such Net Repossessed Vehicle Proceeds shall be distributed to such OEM by the Monitor.

9.      **THIS COURT ORDERS** that the Pride Entities shall: (i) within two (2) business days of the date of this Order, provide each OEM, in writing, with the municipal address (if one exists) and, where available, GPS coordinates of each Respective Repossession Vehicle (the "**Repossession Vehicle Location**"), together with the contact information of the individual(s) who will grant the relevant OEM access to each of their respective Repossession Vehicle Location (the "**Contact Information**"), and (ii) make each  Respective Repossession Vehicle available to the relevant OEM at the relevant Repossession Vehicle Location within fourteen (14) calendar days of the date of this Order, or such later date as may be reasonably agreed in writing by the relevant OEM with respect to any of their Respective Repossession Vehicles, the Pride Entities and the Monitor.  The Pride Entities shall give each OEM written notice as soon as each of their Respective Repossession Vehicles becomes available for possession.

10.      **THIS COURT ORDERS** that each OEM shall pay to the Monitor $500.00 per Respective Repossession Vehicle within five (5) days after a Respective Repossession Vehicle has been removed by such OEM from the relevant Repossession Vehicle Location.

**OEM – LEASED VEHICLES**

11.      **THIS COURT ORDERS** that the Pride Entities shall be deemed to have assigned, conveyed, and transferred their rights and obligations as lessor under any existing leases for the vehicles listed on Schedule "**E**" hereto (collectively, the "**PACCAR Leased Vehicles**") to PACCAR, who shall be deemed to have assumed the same. For greater certainty, the stay of proceedings in respect of the Pride Entities pursuant to the Initial Order is hereby lifted with respect to the assignment of the leases of PACCAR Leased Vehicles and the recovery, repossession, exercise of other rights available to a lessor, and/or sale by or on behalf of PACCAR as may be applicable, of the PACCAR Leased Vehicles.

- 5 -

12.     **THIS COURT ORDERS** that the Pride Entities shall be deemed to have assigned, conveyed and transferred their rights and obligations as lessor under any existing leases for the vehicles listed on Schedule "**F**" hereto (collectively, the "**Daimler Leased Vehicles**") to Daimler, who shall be deemed to have assumed the same. For greater certainty, the stay of proceedings in respect of the Pride Entities pursuant to the Initial Order is hereby lifted with respect to the assignment of the leases of Daimler Leased Vehicles and the recovery, repossession, exercise of other rights available to a lessor,  and / or sale by or on behalf of Daimler as may be applicable, of the Daimler Leased Vehicles.

13.     **THIS COURT ORDERS** that the Pride Entities shall be deemed to have assigned, conveyed, and transferred their rights and obligations as lessor under any existing leases for the vehicles listed on Schedule "**G**" hereto (collectively, the "**Volvo Leased Vehicles**") to Volvo in accordance with the terms of this Order. For greater certainty, the stay of proceedings in respect of the Pride Entities pursuant to the Initial Order is hereby lifted with respect to the assignment of the leases of Volvo Leased Vehicles and the recovery, repossession, exercise of other rights available to a lessor, and / or sale by or on behalf of Volvo as may be applicable, of the Volvo Leased Vehicles.

14.     **THIS COURT ORDERS** that, on the first business day of each month, each OEM shall provide a detailed written accounting to the Monitor and CRO, for the immediately prior month, of the respective OEMs receipt of proceeds from their Respective Leased Vehicles (as defined below), whether on account of a sale, receipt of lease revenue, or other form or transaction (each a "**Leased Vehicle Transaction**") which accounting shall include: (i) the total amount of all proceeds and other consideration received on account of such Leased Vehicle Transaction (**"Gross Leased Vehicle Proceeds**"), (ii) the direct costs incurred in connection with such Leased Vehicle Transaction (the "**Leased Vehicle Costs**"), (iii) the outstanding amount owing pursuant to the loan advanced by such OEM to any of the Pride Entities to finance the acquisition of the applicable Respective Leased Vehicle (the "**Leased Unit Financed Amount**"), (iv) the amount of any indebtedness owing to such OEM by any of the Pride Entities other than the Leased Unit Financed Amount that is secured by the applicable Respective Leased Vehicle (the "**Cross-Collateralized Indebtedness (Leased)**"), (v) a reasonable description of the process by which each Leased Vehicle Transaction was arrived at (but only if such Leased Vehicle Transaction involves

realization other than the receipt of lease proceeds pursuant to the assigned lease), and (vi) confirmation whether the counterparty to each Leased Vehicle Transaction is at arm's length to such OEM. The term "**Respective Leased Vehicle(s)**" shall mean: (i) with respect to PACCAR, the PACCAR Leased Vehicles, (ii) with respect to Daimler, the Daimler Leased Vehicles, and (iii) with respect to Volvo, the Volvo Leased Vehicles.

15.     **THIS COURT ORDERS** that where an OEM claims Cross-Collateralized Indebtedness (Leased) in respect of any Leased Vehicle Transaction, the reporting with respect to such Leased Vehicle Transaction referenced in Paragraph 14 of this Order shall include such OEM's factual and legal support for its entitlement to the Cross-Collateralized Indebtedness (Leased), and for the Cross-Collateralized Indebtedness (Leased) being secured against the relevant Respective Leased Vehicle.

16.     **THIS COURT ORDERS** that each OEM shall, with respect to each of their Respective Leased Vehicles remit to the Monitor the amount (if greater than zero) equal to (i) the Gross Leased Vehicle Proceeds for such vehicle, less (ii) the Leased Vehicle Costs for such vehicle, and less (iii) the Leased Unit Financed Amount for such vehicle (the "**Net Leased Vehicle Proceeds**") within ten (10) business days following receipt of such Gross Leased Vehicle Proceeds by the OEM for a vehicle.  To the extent that an OEM asserts a claim to any Net Leased Vehicle Proceeds as a result of Cross-Collateralized Indebtedness (Leased), such OEM shall advise the Monitor and CRO of such claim upon remittance of such applicable Net Leased Vehicle Proceeds with respect to their Respective Leased Vehicles.

17.     **THIS COURT ORDERS** that the entitlement of an OEM to any Net Leased Vehicle Proceeds shall be subject to confirmation by the Monitor (with the consent of the DIP Agent), and/or further order of the Court, and once confirmed, such Net Leased Vehicle Proceeds shall be distributed to such OEM by the Monitor.

18.     **THIS COURT ORDERS** that within two (2) business days of the date of this Order: (i) the Pride Entities shall provide each OEM, in writing, with the municipal address (if one exists) and, where available, GPS coordinates of their Respective Leased Vehicle (the "**Leased Vehicle Location**"), the full details, including contact information, of the relevant lessee and the contact information of the individual(s) who will grant the relevant OEM access to each of their respective

- 7 -

Leased Vehicle Location (the "**Lease Information**"),  together with the current status of each lease (i.e. paid as agreed or in default) and full payment histories for each lease, and (ii) with respect to each Respective Lease Vehicle, the OEMs shall provide the relevant lessee(s) with a notice of assignment of their relevant lease and related auto-debit (ACH) agreement, as applicable, in favour of the relevant OEM and provide each OEM with proof thereof.

19.    **THIS COURT ORDERS** that each OEM shall within five (5) days from the receipt of the information referred to in Paragraph 18 hereof, pay any actual, documented out-of-pocket costs incurred by the Pride Entities, after the date of this Order, associated with providing such OEM with the information referred to in Paragraph 18, provided that such costs (i) result from actions by the Pride Entities and/or the Monitor that are requested in writing by such OEM, and (ii) are in an amount that is approved in advance by such OEM, in writing.

**MISCELLANEOUS**

20.    **THIS COURT ORDERS** that unless otherwise ordered by the Court, the sale, turn-over or other treatment of the units listed on Schedule "**H**" hereto is and shall be governed by the Entitlement Claims Process Order dated June 14, 2024, including paragraph 25 thereof.

21.    **THIS COURT ORDERS** that PACCAR, Daimler, Volvo, the Monitor or Pride Entities may from time to time apply to this Court for advice and directions concerning the discharge of their respective powers and duties under this Order or the interpretation or application of this Order.

22.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body or agency having jurisdiction in Canada or in the United States of America, including the United States Bankruptcy Court for the District of Delaware, or in any other foreign jurisdiction, to give effect to this Order and to assist the Pride Entities, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies and agencies are hereby respectfully requested to make such orders and to provide such assistance to the Pride Entities and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Pride Entities and the Monitor and their respective agents in carrying out the terms of this Order.

_____

- 9 -

SCHEDULE "A"

**A. APPLICANTS**

**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*

- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*

- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*

- PERGOLA HOLDINGS, CORP.
- PRIDE GLOBAL INSURANCE COMPANY LTD.

# APPENDIX "K"

CCAA Proceedings of Pride Group Holdings Inc., other Applicants and Additional Stay Parties
Cash Flow Forecast for the period from August 12, 2024 to March 30, 2025 (the "CCAA Period")

Case 24-10632-CTG    Doc 280-3    Filed 10/29/24    Page 190 of 481

| | Notes | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Jan-25 | Feb-25 | Mar-25 | Post March | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week ending | | | | | | | | | | | |
| **Cash Sales** | | | | | | | | | | | |
| Can Sales | 1 | 3,760 | 5,541 | - | - | - | - | - | - | - | 9,301 |
| US Sales | 1 | 4,069 | 6,027 | - | - | - | - | - | - | - | 10,096 |
| Sales Payments to Financier | 2 | (6,790) | (13,414) | (2,000) | - | - | - | - | - | - | (22,204) |
| Cost Recovery | 3 | 130 | 390 | - | - | - | - | - | - | - | 520 |
| Realization Commission | 3 | 714 | 1,053 | - | - | - | - | - | - | - | 1,767 |
| **Net Cash from Sales** | | **1,883** | **(403)** | **(2,000)** | **-** | **-** | **-** | **-** | **-** | **-** | **(520)** |
| | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | |
| Lease Collections | 4 | 4,489 | 10,793 | - | - | - | - | - | - | - | 15,282 |
| Logistics Receipts | 5 | 4,400 | 6,600 | - | - | - | - | - | - | - | 11,000 |
| Net Fuel Sales | 6 | 126 | 132 | - | - | - | - | - | - | - | 258 |
| Rental Income | 7 | 289 | 829 | 413 | 621 | 798 | 315 | 357 | 397 | - | 4,019 |
| Recovery of Costs from PGL and Real Estate | 8 | 150 | 750 | 100 | 75 | 2,424 | 650 | 300 | 375 | - | 4,824 |
| **Total receipts** | | **9,454** | **19,104** | **513** | **696** | **3,222** | **965** | **657** | **772** | **-** | **35,383** |
| | | | | | | | | | | | |
| **Cash Sales & Receipts** | | **11,337** | **18,701** | **(1,487)** | **696** | **3,222** | **965** | **657** | **772** | **-** | **34,863** |
| | | | | | | | | | | | |
| **Operating disbursements** | | | | | | | | | | | |
| Payroll and Benefits | 9 | (2,467) | (6,072) | (1,168) | (792) | (1,060) | (392) | (192) | (195) | - | (12,338) |
| KERP | 10 | - | - | - | - | (1,200) | - | - | (600) | - | (1,800) |
| Sales taxes payable | 11 | - | (1,536) | (100) | (997) | - | - | - | - | - | (2,633) |
| Utilities | 12 | (78) | (195) | (116) | (76) | (95) | (76) | (76) | (95) | - | (807) |
| Operating Fuel | 13 | (974) | (2,435) | - | - | - | - | - | - | - | (3,409) |
| Repairs and maintenance | 14 | (769) | - | - | - | - | - | - | - | - | (769) |
| Brokerage costs | 15 | (326) | (815) | - | - | - | - | - | - | - | (1,141) |
| Legal Costs | 16 | (126) | (315) | (252) | (252) | (63) | - | - | - | - | (1,008) |
| Wind Down Costs | 17 | (126) | (630) | (191) | - | - | - | - | - | - | (947) |
| Occupancy Costs | 18 | (14) | (686) | (74) | (141) | (11) | (11) | (11) | (22) | - | (970) |
| Other Costs | 19 | (3,380) | (775) | (615) | (615) | 1,286 | - | - | - | - | (4,099) |
| Logistics Equipment Financing | 20 | - | - | - | - | - | - | - | - | - | - |
| Intercompany Borrowings | 21 | (164) | (246) | - | - | - | - | - | - | - | (410) |
| Di Miller Completion Costs | 22 | (724) | - | - | - | - | - | - | - | - | (724) |
| **Total operating disbursements** | | **(9,148)** | **(13,705)** | **(2,516)** | **(2,873)** | **(1,143)** | **(479)** | **(279)** | **(912)** | **-** | **(31,055)** |
| | | | | | | | | | | | |
| Professional Fees - Restructuring | 23 | (4,252) | (4,673) | (2,211) | (1,797) | (1,244) | (1,208) | (208) | (260) | (1,000) | (16,853) |
| | | | | | | | | | | | |
| **Net operating cash flow** | | **(2,063)** | **323** | **(6,214)** | **(3,974)** | **835** | **(722)** | **170** | **(400)** | **(1,000)** | **(13,045)** |
| | | | | | | | | | | | |
| **Non operating disbursements** | | | | | | | | | | | |
| Lease Repayments | 24 | - | - | - | - | - | - | - | - | - | - |
| OEM Lease Repayments | 25 | - | - | - | - | - | - | - | - | - | - |
| Lease Repayments - Other | 26 | - | - | - | - | (17,921) | - | - | - | - | (17,921) |
| **Total non-operating disbursements** | | **-** | **-** | **-** | **-** | **(17,921)** | **-** | **-** | **-** | **-** | **(17,921)** |
| | | | | | | | | | | | |
| **Available Cash Balance for the Syndicate Borrowing Group** | 27 | | | | | | | | | | |
| Opening Bank Balance | | 17,656 | 14,022 | 8,999 | 3,000 | 3,000 | 3,000 | 3,000 | 2,880 | 2,188 | 17,656 |
| PGL & PFS Bank Balance | | - | - | (1,542) | - | - | - | - | - | - | (1,542) |
| Bill and Collect | | (868) | - | - | - | - | - | - | - | - | (868) |
| Net operating cash/(disbursements) | | (2,063) | 323 | (6,214) | (3,974) | 835 | (722) | 170 | (400) | (1,000) | (13,045) |
| Non-operating cash/(disbursements) | | - | - | - | - | (17,921) | - | - | - | - | (17,921) |
| DIP Interest expense | | - | - | (281) | (283) | (286) | (288) | (290) | (292) | - | (1,720) |
| Disbursement of Di Miller Recovery | | - | - | - | - | (1,749) | - | - | - | - | (1,749) |
| Lender Allocation | | - | - | 10,597 | 445 | 19,121 | 1,010 | - | - | - | 31,173 |
| Contributions to Monitor's Payment Procedure Account (Pursuant to the Payment Procedure Agreement) | | - | - | (8,559) | - | - | - | - | - | - | (8,559) |
| Segregated Lease Payments | | - | (3,812) | - | 3,812 | - | - | - | - | - | - |
| Payments to Trust Account (MCVs) | | (703) | (1,534) | - | - | - | - | - | - | - | (2,237) |
| **Closing Bank Balance** | | **14,022** | **8,999** | **3,000** | **3,000** | **3,000** | **3,000** | **2,880** | **2,188** | **1,188** | **1,188** |
| | | | | | | | | | | | |
| **Lender Allocation** | 28 | | | | | | | | | | |
| Opening balance | | - | - | - | 10,597 | 11,042 | 30,163 | 31,173 | 31,173 | 31,173 | - |
| Lender Allocation | | - | - | 10,597 | 445 | 19,121 | 1,010 | - | - | - | 31,173 |
| **Ending Lender Allocation Balance** | | **-** | **-** | **10,597** | **11,042** | **30,163** | **31,173** | **31,173** | **31,173** | **31,173** | **31,173** |

CCAA Proceedings of Pride Group Holdings Inc., other Applicants and Additional Stay Parties
Cash Flow Forecast for the period from August 12, 2024 to March 30, 2025 (in '000s CAD)

Case 24-10632-CTG    Doc 280-3    Filed 10/29/24    Page 191 of 481

| | | 12-Aug-24 25-Aug-24 | 26-Aug-24 29-Sep-24 | 30-Sep-24 27-Oct-24 | 28-Oct-24 24-Nov-24 | 25-Nov-24 29-Dec-24 | 30-Dec-24 26-Jan-25 | 27-Jan-25 23-Feb-25 | 24-Feb-25 30-Mar-25 | Post March | 12-Aug-24 30-Mar-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week ending | | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Jan-25 | Feb-25 | Mar-25 | | TOTAL |
| **Available Cash Balance for Other Applicants** | 29 | | | | | | | | | | |
| Opening Bank Balance | | 8,293 | 8,293 | 2,227 | 1,256 | 1,256 | 1,256 | 1,256 | 1,256 | 1,256 | 8,293 |
| Less Balance of Other Applicants | | - | (6,066) | (971) | - | - | - | - | - | - | (7,037) |
| Intercompany Borrowings | | 164 | 246 | - | - | - | - | - | - | - | 410 |
| Net operating cash/(disbursements) | | (164) | (246) | - | - | - | - | - | - | - | (410) |
| **Closing Bank Balance** | | **8,293** | **2,227** | **1,256** | **1,256** | **1,256** | **1,256** | **1,256** | **1,256** | **1,256** | **1,256** |
| | | | | | | | | | | | |
| **Monitor's Trust Account** | 30 | | | | | | | | | | |
| Opening Pooling Balance | | 3,725 | 4,436 | 5,996 | 2,509 | 2,518 | 2,530 | 2,540 | 2,550 | 2,562 | 3,725 |
| Floorplan | | 606 | 1,212 | - | - | - | - | - | - | - | 1,818 |
| Leaseline | | 68 | 225 | (3,500) | - | - | - | - | - | - | (3,207) |
| OEM Financing | | 29 | 97 | - | - | - | - | - | - | - | 126 |
| Interest | | 8 | 26 | 13 | 9 | 12 | 10 | 10 | 12 | - | 100 |
| **Closing Pool Balance** | | **4,436** | **5,996** | **2,509** | **2,518** | **2,530** | **2,540** | **2,550** | **2,562** | **2,562** | **2,562** |
| | | | | | | | | | | | |
| **Segregated Lease Payment Account** | 31 | | | | | | | | | | |
| Opening Lease Payment Account | | 13,728 | 4,576 | 3,811 | 3,811 | - | - | - | - | - | 13,728 |
| Lease Collections (Bank) | | - | 12,130 | 4,657 | (3,811) | - | - | - | - | - | 12,975 |
| Lease Repayments | | (9,152) | (12,895) | (4,657) | - | - | - | - | - | - | (26,703) |
| **Closing Lease Payment Account** | | **4,576** | **3,811** | **3,811** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | | |
| **Monitor's Payment Procedure Account (Pursuant to the Payment Procedure Agreement)** | 32 | | | | | | | | | | |
| Opening Monitor's Payment Procedure Account Balance | | 10,002 | 10,002 | 10,002 | - | - | - | - | - | - | 10,002 |
| Contributions to Monitors Payment Procedure Account (Pursuant to the Payment Procedure Agreement) | | - | - | 8,559 | - | - | - | - | - | - | 8,559 |
| July 31 Accrued Equipment Payments | | - | - | (5,214) | - | - | - | - | - | - | (5,214) |
| July 31 Floor Plan Financiers Payments | | - | - | (3,811) | - | - | - | - | - | - | (3,811) |
| July 31 Lease Collections Accrual Payments | | - | - | (4,650) | - | - | - | - | - | - | (4,650) |
| July 31 HST Accrual Payments | | - | - | (4,886) | - | - | - | - | - | - | (4,886) |
| **Closing Monitor's Payment Procedure Account Balance** | | **10,002** | **10,002** | **10,002** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those
Applicants listed on **Schedule "A"** hereto

**Notes to the Unaudited Consolidated Filing Cash Flow Forecast of the
Applicants and Limited Partnerships listed on Schedule "A"
(collectively, the "Pride Entities") for the period from
August 12, 2024, to March 30, 2024 (the "Forecast Period")**

**Disclaimer:**

In preparing this cash flow forecast (the "**Cash Flow Forecast**"), the Applicants with the assistance of Ernst & Young Inc., in its capacity as Monitor of the Pride Entities (the "**Monitor**"), have relied upon unaudited financial information and have not attempted to further verify the accuracy or completeness of such information. The Cash Flow Forecast includes estimates concerning the operations of the Pride Entities and additional assumptions discussed below, including assumptions from management of the Pride Entities ("**Management**"), with respect to the requirements and financial impact of a *Companies' Creditors Arrangement Act* ("**CCAA**") filing (the "**Probable and Hypothetical Assumptions**" or the "**Assumptions**"). Since the Cash Flow Forecast is based on Assumptions about future events and conditions that are not ascertainable, the actual results achieved during the Cash Flow Forecast period will vary from the Cash Flow Forecast, even if Assumptions materialize, and such variation may be material. There is no representation, warranty, or other assurance that any of the estimates, forecasts or projections will be realized.

The Monitor's review of the Cash Flow Forecast consisted of inquiries, analytical procedures and discussions related to information supplied to it by certain key members of the Pride Entities and other employees of the Pride Entities. Since the Probable and Hypothetical Assumptions need not be supported, the Monitor's procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the Cash Flow Forecast. The Monitor also reviewed the support provided by the Pride Entities for the Probable and Hypothetical Assumptions and the preparation and presentation of the Cash Flow Forecast. Based on the Monitor's review, nothing has come to the Monitor's attention that causes the Monitor to believe, in any material respect, that:

      a)  The Probable and Hypothetical Assumptions are not consistent with the purpose of the Cash Flow Forecast;

b) As at the date of this Report, the Probable and Hypothetical Assumptions are not suitably supported and consistent with the plans of the Pride Entities or do not provide a reasonable basis for the Cash Flow Forecast; or

c) The Cash Flow Forecast does not reflect the Probable and Hypothetical Assumptions.

Receipts and disbursements are denominated in thousands of Canadian dollars. The line-by-line details are based on borrowers and guarantors to the Syndicate Agreement ("**Syndicate Borrowers**").  Receipts and disbursements of other Applicants are represented on a net basis. The Syndicate Borrowers are noted in Schedule "A" and are a subset of the Pride Entities.

This version of the Cash Flow Forecast is an estimate of the funding needs for a Wind-down Plan. The Wind-down Plan assumes the completion of a sale transaction for PGL (inclusive of PFS) on September 15th, 2024, and a wind-down of the Applicants remaining business consisting primarily of the dealership and leasing operations. The Pride Entities seek to extend the use of Deferred Payments until September 30th, 2024, and to obtain authorization to sell certain MCVs, using the sale proceeds for ordinary working capital and other general corporate purposes, subject to subsequent allocation. In addition, it has an estimated time period subsequent to the major milestones beyond March 30th, 2024, for finalizing the CCAA proceedings and extending processes relating to Real Estate and MCVs. Further details of the anticipated steps to Wind-down the remaining CCAA Proceedings and the Chapter 15 Proceedings are within the body of the Fourteenth Report. This Cash Flow Forecast sizes the needed liquidity, the potential source for which is discussed in the Fourteenth Report. Below is a Gantt chart of the assumed milestones of each of the various lines of business:

| | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr 25 – Dec 27 |
|---|---|---|---|---|---|---|---|---|---|
| Applicants' Headcount | 639 | 620 | 138 | 114 | 75 | 32 | 32 | 32 | Contract |
| **Workstream** | | | | | | | | | |
| Vehicles Cash Sales | █ | ▒ | | | | | | | |
| Securitization Turnover – Inventory | █ | ▒ | | | | | | | |
| Recourse Lender Turnover – Inventory | █ | █ | ▒ | | | | | | |
| Lease Collections | █ | █ | | | | | | | |
| Securitization Turnover – Leasing | █ | █ | | | | | | | |
| Recourse Lender Turnover - Leasing | █ | █ | | | | | | | |
| Other Assets (MCVs) | █ | █ | █ | | | | | | |
| PGL Transaction | █ | ▒ | | | | | | | |
| Factoring Transaction | █ | █ | | | | | | | |
| Other entity wind-down | █ | █ | | | | | | | |
| Real Estate | █ | █ | █ | █ | █ | █ | █ | █ | |
| Windup, Trust Account, and Monitoring of Estate Administration | █ | █ | █ | █ | █ | █ | █ | █ | █ |

▒ - Half Month

█ - Full Month

**Assumptions:**

1. **Cash Sales**

   This category includes estimates of revenues generated by the Pride Entities (through PTS, TTR, PTS LP and TTR USA) with respect to cash sales of vehicles. This would also include customers who have sought out third-party lease financing. The estimate of cash sales is based on the historical 4-week trailing average of both the sales and the deposit received, net of funds retained for Cost Recovery and Realization Commission in Note 3. It is anticipated that cash sales will continue until mid-September and the MCV sales will be continued as may be approved by the Court.

2. **Sale Payments to Financier**

   Represents the repayment to the floor plans/lease lines from net proceeds from the sale of vehicles. It is assumed that if the sale price is below the outstanding loan value, then the financier is only repaid with the funds received from the sale, net of Realization Commission and Cost Recovery (See Note 3). This does not include payments to the floor plans for vehicles that are identified as Multiple Collateral Vehicles (Leases). The net proceeds received from the sale of Multiple Collateral Vehicles (Leases) will be placed into the Monitor's Trust Account (See Note 30). This includes amounts required to repay the Agent for previous sales with no existing financier.

3. **Realization Commission on Sales**

   The Realization Commission represents the structure of the Pride Entities to recover commission from cash sales to cover a portion of the variable and overhead costs related to selling vehicles. The commission calculation reflects a weighted average of the rates agreed to by various lenders weighted against the historical sales data, which includes the number of trucks sold for each lender.

4. **Lease Collections**

   This category includes the collection of customers payments under their lease obligations and short-term rental obligations. This is based on known pre-authorized payments for the current month, and adjusted based on historical performance, including assumptions for estimated defaults and recovery of such defaults ("**Soft Collections**"). It is assumed that a funding allocation has been approved by the end of September and the servicing for these leases will transition thereafter.

5. **Logistics Receipts**

   Represents the collection from customers for the logistics business, which is through PGL, based on known contracts with customers. The projection is based on Management's assumptions. The forecast assumes there is a sale transaction of PGL that closes on September 15th, 2024.

**6. Net Fuel Sales**

Represents receipts from customers that have purchased fuel cards through PFS, net of the cost of sale. Customers purchase fuel cards to benefit from a volume discount that PFS has obtained. The net fuel sales are based on a 4-week trailing actual run rate.

**7. Rental Income**

Represents rental income collected from tenants of real estate owned by the Syndicate Borrower. This is based on actual tenant contracts of each property. This will be updated as new tenants are onboarded or revenue from tenant agreements cease on the sale of the underlying real estate. Rental income for the other Pride Entities is assumed to be collected within their own bank accounts.

**8. Recovery of Costs from PGL and Real Estate**

It is assumed that there will be a completed Transaction for both PGL and for the real estate properties.  As part of the distribution of proceeds, it is anticipated that there will be amounts paid for the professional fees related to these transactions. The amounts included are the estimated recoveries being $750,000 related to the PGL Transaction, $50,000 per Canadian real estate transaction, $75,000 per US real estate transaction, and $1.7 million in December to reflect the Di Miller construction costs paid out of the DIP Facility. The amounts allocated for professional fees on real estate transactions are from the net proceeds after commissions and direct costs of the sale. The illustrative quantum of the professional fees related to each real estate transaction is detailed in Schedule "B". Professional fees on the pursuit of real estate transactions have not been paid, but are accruing and will be paid out of the proceeds of sale.

**9. Payroll and Benefits**

Represents wages and salaries, benefits, WSIB and National Auto League insurance (WSIB alternative coverage for the trucking industry). This also includes payment to subcontractors, i.e. truck drivers under contract, mechanics, and office contractors.

It assumes the completion of a sale transaction of PGL on September 15th, 2024, with the final related payroll being paid in the subsequent two weeks.  The reduction of headcount is based on the wind-down and turnover of assets and servicing of leases. Accrued vacation pay has been included to reflect the reduction in headcount.

**10. KERP**

There is currently no key employee retention plan. However, it is typical in many CCAA proceedings for a KERP to retain the necessary staff to assist in achieving critical milestones. There was an estimate made based on milestones, such as the turnover of physical assets, support the transition to replacement service provider, provide support for reconciliation of books and records and wind-down of the Applicants.

**11. Sales Taxes Payable**

The amounts included in the Forecast Period are calculated based on amounts that would be accrued and due post-filing, and all accrued and payable amounts within the CCAA Proceedings. The timing has been updated to reflect the filing and expected payment dates from Management.

**12. Utilities**

These are the estimated utility costs for the terminal/dealership operations. PTS pays for PGL's utilities until the closing of a PGL sale, which is assumed to be on September 15th, 2024. The utilities will reduce as the leases are transferred to the purchaser (if required to pay under such lease) and as the properties are sold.

**13. Operating Fuel**

Represents the cost of fuel that is used by PGL estimated based on its 4-week trailing averages. It is assumed that the payments will be on regular credit terms. The forecast assumes there is a sale transaction of PGL that closes on September 15th, 2024. Remaining pre-closing operating expenses will be paid in the subsequent two weeks.

**14. Repairs and Maintenance**

Represents the repairs and maintenance costs incurred by the operating entities. When all the vehicles are turned over, there are no further costs anticipated to be spent on vehicles. Similarly with the vehicles for PGL as the transaction is anticipated to close on September 15th, 2024. The amounts included are related to estimated outstanding payables.

**15. Brokerage Costs**

Represents the operating cost for PGL for brokerage fees. This is based on Management's estimate and historical run rate. The forecast assumes there is a sale transaction of PGL that closes on September 15th, 2024. Remaining pre-closing operating expenses will be paid in the subsequent two weeks.

**16. Legal Costs**

These relate to fees paid to legal teams and other advisors for operations, such as enforcement and recovery of delinquent customer accounts. It is assumed that these will continue as they relate to collections and recoveries from customers, and some will be part of the turnover process. It is estimated that this will continue until the end of November. Some of their time will be utilized to assist the turnover of litigation to respective lenders as well as continue those that are commercially beneficial to the estate.

**17. Wind Down Costs**

These relate to costs such as boosting of truck batteries (which have been idle), to prepare the vehicles for movement off the Applicants lots for turnover to lenders. Turn-overs to the applicable Securitization Parties begin in August and recourse lenders in September. This cost has been estimated on a per vehicle basis.

**18. Occupancy Costs**

Represents rent for leased premises used by Syndicate Borrowers and 2076401 Ontario Inc. ("207"). The lease for 207 is then sublet to PTS. It is assumed that all occupancy costs related to PGL and PFS will be the responsibility of the purchaser in the Transaction after September 15th, 2024. As turnover of assets are occurring, leased locations will be disclaimed as they become vacant. It is assumed that all leased locations related to PTS/PTS LP will be disclaimed by November.

**19. Other Costs**

Represents the operating cost for the Pride Entities which include parking, software, tolls, insurance, and other general administrative costs. August includes payment of the annual insurance premiums for all the Applicants operating locations. December includes a credit for the annual insurance premiums, which will be applied after the completion of the inventory give back.

**20. Logistics Equipment Financing**

This represents payments to financers of equipment used for PGL operations. It is assumed in the forecast that these payments are paused until the sale of PGL. The forecast assumes there is a sale transaction of PGL that closes on September 15th, 2024.

**21. Intercompany Borrowings**

This represents intercompany borrowings from Pride Entities outside of the Syndicate Borrowers from the Syndicate Borrowers to support operations of these Pride Entities. This is related to entities that will be sold with the PGL Transaction.

**22. DI Miller Completion Costs**

The costs to complete the Di Miller Bakersfield construction project.

**23. Professional Fees - Restructuring**

This relates to fees of the Applicants' external legal counsel in Canada and US, the Monitor and its counsels in Canada and the US, the directors and officers counsel, and the Chief Restructuring Officer. This is based on the remaining workstreams to manage turnover, wind-down and the conclusion of the CCAA and Ch.15 Proceedings.

**Non-Operating Disbursements**

### 24. Lease Repayments

This represents the payments for wholesale leases to the various financiers. These lease payments only relate to performing leases and therefore excludes any payments associated with delinquent customers, vehicles returned or repossessed, vehicles in inventory, duplicate liabilities, etc. These payments are subject to the Revised Governance Protocol. The Cash Flow Forecast assumes relief is granted from the Court from making such lease payments to September 30th, 2024.

### 25. OEM Lease Repayments

This represents payments for wholesale leases to the various OEM financiers. These lease payments only relate to performing leases and therefore excludes any payments associated with delinquent customers, vehicles returned or repossessed, vehicles in inventory, duplicate liabilities, etc. These payments are subject to the Revised Governance Protocol. The Cash Flow Forecast assumes relief is granted from the Court from making such lease payments to September 30th, 2024.

### 26. Lease Repayments - Other

This represents payments to non-lease lines financiers at a two-week lag for which the vehicle has been leased out to a customer.  These lease payments only relate to performing leases and therefore excludes any payments associated with delinquent customers, duplicate liabilities, etc. These payments are subject to the Revised Governance Protocol. The Cash Flow Forecast assumes relief is granted from the Court from making such lease payments to September 30th, 2024.

It is assumed that the repayment of the Total Deferred Payments as defined in Fourteenth Report will be paid to all affected lenders in December.

### 27. Available Cash Balance for the Syndicate Borrowers

This represents the bank balances of the Syndicate Borrowers, net of the bank account balances held with respect to lease collections for Securitization Parties. In October, there is a projected outflow of $8.6 million, being the Payment Procedure Top-Up to the Monitor's Payment Procedure Account for the purpose of paying the July 31st Accruals. A minimum cash balance of $3 million tapered to $1.2 million in March is assumed to be needed for working capital and to manage cash flow timing differences. The Available Cash Balance is reduced by the PGL and PFS bank balances after their assumed sale date.

### 28. Lender Allocation

This is an estimate of the total financing need to complete the turnover, wind-down and completion of the CCAA Proceedings and Ch.15 Proceedings. This total funding includes $17.9 million related to the repayment of the Total Deferred Payments and $8.7 million related to the payment under the Payment Procedure Agreement.

**29. Available Cash Balance for the other Applicants**

This represents the bank balances of other the other Pride Entities not in the Syndicate Borrower group. The Other Applicants Balance is reduced by the bank balances of TPFS, PGL USA, PGL International, PFS USA, and Dixie Parts after their assumed sale date.

**30. Monitor's Trust Account**

This is the Trust account set up by the Monitor to hold amounts including Cash Proceeds and Lease Collections that relate to Multiple Collateral Vehicles (Leases) until the priority to such vehicles are determined pursuant to the Entitlement Claims Process. In addition, this includes the amounts held in a trust for soft collections of Securitization Parties as required under the Revised Governance Protocol. It is assumed that these amounts (estimated at $3.5 million) will be remitted to the Securitization Parties upon reconciliation by October. As a component of the Requested Relief, proceeds from the sale of MCVs, not claimed by a Securitization Party, are sought to be used for ordinary working capital needs and other corporate purposes, while the remaining proceeds are to be held in the Monitor's Trust Account.

**31. Segregated Lease Payment Account**

These lease collections are set aside in segregated accounts pursuant to the DIP Credit Agreement. They will be paid to the appropriate lenders pursuant to the Revised Governance Protocol.

**32. Monitor's Payment Procedure Account (Pursuant to the Payment Procedure Agreement)**

The Payment Procedure Agreement required the Monitor to hold the Final Advance of $10 million in a Monitor's Payment Procedure Account and use such funds in accordance with restrictions requiring that such funds be applied to pay certain disbursements specified in the DIP Budget (as defined in the Amending Agreement). To have access to the Final Advance, the Pride Entities are required to top up the Payment Procedure Account by $8.6 million to pay the July 31st Accruals in full. These accruals cover payments to PGL financiers, sales payments for the last week of July, lease payments and soft collections for the last two weeks of July, and accrued HST for February, June, and July.

Schedule "A"

**A. APPLICANTS**

**Operating Entities**

*Canadian Operating Entities*

- PRIDE TRUCK SALES LTD. ("**PTS**")*
- TPINE TRUCK RENTAL INC. ("**TTR**")*
- PRIDE GROUP LOGISTICS LTD. ("**PGL**")*
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION*
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC. ("**PFS**")*
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*

- TPINE RENTAL USA, INC. ("**TTR USA**")*
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**

*Canadian Real Estate Holding Companies*

- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.*
- 1450 MEYERSIDE HOLDING INC.*
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*

- PGED HOLDING, CORP.*
- HIGH PRAIRIE TEXAS HOLDING CORP.*
- 131 INDUSTRIAL BLVD HOLDING CORP.*
- 59TH AVE PHOENIX HOLDING CORP.*
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.*
- FRONTAGE ROAD HOLDING CORP.*
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**

*Other Canadian Holding Companies*

- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.*
- PRIDE GROUP HOLDINGS INC.*
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*

- COASTLINE HOLDINGS, CORP.*
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*

- PRIDE TRUCK SALES L.P. ("**PTS LP**")*
- TPINE LEASING CAPITAL L.P.*
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*

- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*

- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.

\* Syndicate Borrowers (borrowers or guarantors under the Syndicate Agreement)

# Schedule "B"

**BDC**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 20804 Stony Plain Rd, Edmonton, AB | CAN | March | BDC | | | | | $ 50,000.00 | |

**BMO**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 10015 NW 87th Avenue Medley, FL, 33178 | USA | November | BMO | | | | | $ 75,000.00 | |
| 235132 84 Street SE, Rocky View County, AB | CAN | December | BMO | | | | | $ 50,000.00 | |
| 3000 Pitfield Blvd., St Laurent, QC | CAN | January | BMO | | | | | $ - | |
| 335 68th Street, Saskatoon, SK | CAN | March | BMO | | | | | $ 50,000.00 | |
| 343 68th Street, Saskatoon, SK | CAN | March | BMO | | | | | $ 50,000.00 | |
| 1985 E. Crescentville Road, West Chester, OH | USA | March | BMO | | | | | $ - | |
| 3800 Mannheim Rd, Franklin Park, IL | USA | March | BMO | | | | | $ - | |
| Total | | | | $ 49,113,500.00 | $ 46,674,628.00 | $ 4,235,269.87 | $ 4,527,477.73 | $ 225,000.00 | $ 4,302,477.73 |

**NBC**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 1943 - 45, 55th Ave, Dorval, QC | CAN | January | NBC | | | | | $ - | |
| 3550-3590 Pitfield Blvd, Pierrefonds, QC | CAN | March | NBC | | | | | $ - | |
| 3600-3650 Pitfield Blvd, Pierrefonds, QC | CAN | March | NBC | | | | | $ - | |
| 10874 Steeles Ave, Halton Hills, ON | CAN | March | NBC | | | | | $ 50,000.00 | |
| Total | | | | $ 36,820,000.00 | $ 54,732,171.57 | $ 2,673,481.56 | $ 136,537.60 | $ 50,000.00 | $ 86,537.60 |

**Syndicate**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 131 Industrial Blvd, La Vergne, TN | USA | November | RBC | | | | | $ 75,000.00 | |
| 1021 N 59th Ave, Phoenix, Arizona | USA | November | RBC | | | | | $ 75,000.00 | |
| 3375 High Prairie Rd, TX | USA | November | RBC | | | | | $ 75,000.00 | |
| 34880 LBJ Freeway, Dallas, TX | USA | November | RBC | | | | | $ 75,000.00 | |
| 7548 DkMiller Drive, Bakersfield, CA | USA | December | RBC | | | | | $ 75,000.00 | |
| 1450 Meyerside Drive, Mississauga, ON | CAN | March | RBC | | | | | $ - | |
| 10862 Steeles Avenue East, Milton, ON | CAN | March | RBC | | | | | $ - | |
| Total | | | | $ 168,984,912.50 | $ 138,788,406.56 | $ 16,453,658.98 | $ 23,646,676.15 | $ 375,000.00 | $ 23,271,676.15 |

**RBC USA**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 963 Sweetwater Ln, Boca Raton, FL 33431, USA | USA | October | RBC USA | | $ 4,494,694.48 | | | $ 75,000.00 | |

**Roynat**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 1696 Bishop Road, Chehalis, WA | USA | May | Roynat | | | | | $ 75,000.00 | |
| 6253 Boundary Road, South Glengarry, ON | CAN | September | Roynat | | | | | $ 50,000.00 | |
| 30530 Matsqui Pl, Abbotsford, BC | CAN | September | Roynat | | | | | $ 50,000.00 | |
| 11670 Interstate 10 E, San Antonio, TX | USA | November | Roynat | | | | | $ 75,000.00 | |
| 6111 W Hanna Avenue, Indianapolis, Indiana | USA | November | Roynat | | | | | $ 75,000.00 | |
| 500 Torres Drive, Monroe, MI | USA | November | Roynat | | | | | $ 75,000.00 | |
| 15762 Valley Blvd, Fontana, CA | USA | December | Roynat | | | | | $ - | |
| 10202 177A Street SURREY BC | CAN | December | Roynat | | | | | $ - | |
| 31992 Highway 46, McFarland, CA | USA | December | Roynat | | | | | $ 75,000.00 | |
| Hwy 99 and Hwy 46 McFarland, CA | USA | December | Roynat | | | | | $ 75,000.00 | |
| 1501 NE Loop 820, Fort Worth, TX | USA | December | Roynat | | | | | $ 75,000.00 | |
| 4895 Old National Highway, College Park, GA | USA | December | Roynat | | | | | $ 75,000.00 | |
| 1125 E Alexis Rd, Toledo, OH | USA | January | Roynat | | | | | $ 75,000.00 | |
| NE 45th & N. Corrington Ave., Kansas City, MO | USA | January | Roynat | | | | | $ 75,000.00 | |
| 8201 State Highway 66, Tulsa, OK | USA | January | Roynat | | | | | $ 75,000.00 | |
| 4600 E Victoria Ave, Regina, SK | CAN | March | Roynat | | | | | $ 50,000.00 | |
| lot 1163711, Cadastre, QC | CAN | March | Roynat | | | | | $ 50,000.00 | |
| 401 S Meridian Avenue, OKC, OK | USA | March | Roynat | | | | | $ - | |
| 7403 52 Street NW, Edmonton, AB | CAN | March | Roynat | | | | | $ - | |
| 933 Helena St, Fort Erie, ON | CAN | March | Roynat | | | | | $ - | |
| 2929 and 2726 N. Eastgate Ave., Springfield, MO | USA | March | Roynat | | | | | $ - | |
| Total | | | | $ 149,166,572.98 | $ 93,667,134.70 | $ 11,363,624.02 | $ 49,710,137.70 | $ 1,100,000.00 | $ 48,610,137.70 |

**No Lender**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 981 SW 13 Street, Pompano, FL | USA | November | No Lender | | $ - | | | $ 75,000.00 | |
| 162 Route Road, Troy, IL 62294 | USA | January | No Lender | | $ - | | | $ 75,000.00 | |
| E. Bandage Lane APN: '177-130-03-00, County of Kern, CA 93307 | USA | March | No Lender | | $ - | | | $ 75,000.00 | |
| 2546 French Camp Road, Stockton CA | USA | December | No Lender | | $ - | | | $ 75,000.00 | |
| 225 West South Frontage Road, Bolingbrook, IL | USA | June | No Lender | | $ - | | | $ 75,000.00 | |
| 2400 Oakmont DR | USA | December | No Lender | | $ - | | | $ 75,000.00 | |
| Total | | | | $ 23,360,784.75 | $ - | $ 2,254,701.17 | $ 21,106,083.58 | $ 450,000.00 | $ 20,656,083.58 |

\* The property values, mortgage balances, disposition costs, and estimated proceeds have been redacted as the properties are being marketed for sale.

# APPENDIX "L"

| VIN | Lender |
|-----|--------|
| 4V4NC9EH8MN272888 | BMO, Royal Bank (AdminAgent) |
| 3HSDZAPR7PN492634 | Mitsubishi (US), BMO Harris Bank N.A. |
| 3HSDZAPRXPN493289 | Mitsubishi (US), BMO Harris Bank N.A. |
| 3HSDZAPR6PN493287 | Mitsubishi (US), BMO Harris Bank N.A. |
| 3HSDZAPR0PN492636 | Mitsubishi (US), BMO Harris Bank N.A. |
| 3HSDZAPR2PN439288 | Mitsubishi (US), BMO Harris Bank N.A. |
| 3HSDZAPR9PN492649 | Mitsubishi (US), BMO Harris Bank N.A. |
| 3HSDZAPR5PN439298 | Mitsubishi (US), BMO Harris Bank N.A. |
| 3HSDZAPR9PN443578 | Mitsubishi (US), BMO Harris Bank N.A. |
| 3HSDZAPR6PN492656 | Mitsubishi (US), BMO Harris Bank N.A. |
| 3HSDZAPR8PN493288 | Mitsubishi (US), BMO Harris Bank N.A. |
| 3HSDZAPRXPN493292 | Mitsubishi (US), BMO Harris Bank N.A. |
| 1XPBD49X9ND789784 | Mitsubishi (US), First American (US) |
| 527SR5325PM031734 | Mitsubishi (US), First American (US) |
| 1JJV532D1PL326303 | Mitsubishi (US), First American (US) |
| 1XKYD49X0NJ479136 | Mitsubishi (US), First American (US) |
| 3AKJHHDR8KSKD2117 | Mitsubishi (US), First American (US) |
| 1XPBD49X4ND781737 | Mitsubishi (US), First American (US) |
| 1XPXD49X2PD841300 | Mitsubishi (US), First American (US) |
| 1JJV532DXNL357191 | Mitsubishi (US), First American (US) |
| 3AKJHHDR2LSKC0465 | Mitsubishi (US), First American (US) |
| 1UYVS2535P6711717 | Mitsubishi (US), First American (US) |
| 3HSDJAPR2HN410849 | Mitsubishi (US), Flagstar |
| 4V4NC9EH2GN954444 | Mitsubishi (US), TBK Bank, SSB |
| 1XKYD49X8NJ467025 | Mitsubishi (US), TBK Bank, SSB |
| 1XKYD49X3KJ221124 | Mitsubishi (US), TBK Bank, SSB |
| 3AKJHHDR7NSMZ6227 | Mitsubishi (US), TBK Bank, SSB |
| 4V4NC9EH2PN603422 | Mitsubishi (US), Volvo (US) |
| 4V4NC9EHXNN305116 | Mitsubishi (US), Volvo (US) |
| 4V4NC9EH3NN603281 | Mitsubishi (US), Volvo (US) |
| 4V4NC9EH6PN603424 | Mitsubishi (US), Volvo (US) |
| 1GRAA0625HW110440 | Mitsubishi (US), Webster Capital Finance, Inc. |
| 1FUJHHDR2NLMV7539 | Royal Bank (AdminAgent), Mitsubishi (Canada) |
| 1FUJHHDR1MLMA7421 | Royal Bank (AdminAgent), Mitsubishi (Canada) |
| 1FUJHHDR7MLMA7424 | Royal Bank (AdminAgent), Mitsubishi (Canada) |
| 1XKYD49X8KJ242485 | Royal Bank (AdminAgent), Paccar (US) |
| 4V4NC9EH9NN310954 | Royal Bank (AdminAgent), Volvo (US) |
| 4V4NC9EH9NN603401 | Royal Bank (AdminAgent), Volvo (US) |

Court File No.:  CV-24-00717340-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC., et al.

|  |  |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding Commenced at Toronto |
| | **FOURTEENTH REPORT OF THE MONITOR**<br>**dated August 28, 2024** |
| | **BLAKE, CASSELS & GRAYDON LLP**<br>Barristers and Solicitors<br>199 Bay Street<br>Suite 4000, Commerce Court West<br>Toronto, Ontario M5L 1A9<br><br>**Pamela Huff**, LSO #27344V<br>Tel:        416-863-2958<br>Email:    pamela.huff@blakes.com<br>**Chris Burr**, LSO #55172H<br>Tel:        416-863-3261<br>Email:    chris.burr@blakes.com<br>**Kelly Bourassa**, LSO #43062R<br>Tel:        416-863-2421<br>Email:    kelly.bourassa@blakes.com<br>**Daniel Loberto**, LSO #79632Q<br>Tel:        416-863-2937<br>Email:    daniel.loberto@blakes.com<br><br>Lawyers for the Monitor |

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**SUPPLEMENT TO FOURTEENTH REPORT OF THE MONITOR**

**DATED September 2, 2024**

## TABLE OF CONTENTS

**Page**

**INTRODUCTION** .................................................................................................................1

**PURPOSE** .............................................................................................................................3

**TERMS OF REFERENCE** ....................................................................................................3

**REQUESTED RELIEF UPDATE** .........................................................................................3

**CONSULTATION WITH FINANCIERS**...............................................................................4

**PGL GOING CONCERN TRANSACTION UPDATE** ..........................................................5

**PGL RECEIVERSHIP MOTION RESPONSE** ....................................................................6

**ALLOCATION METHODOLOGY UPDATE** .......................................................................9

**OTHER STAKEHOLDER UPDATES**................................................................................10

**Appendices**                                                            **Tab**

Form of Approval and Vesting Order……………………………………………… A

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**SUPPLEMENT TO FOURTEENTH REPORT OF THE MONITOR**

**DATED September 2, 2024**

**INTRODUCTION**

1.      On March 27, 2024, Pride Group Holdings Inc. and those entities listed as "Applicants" in
**Schedule "A"** hereto (each an "**Applicant**" and, collectively, the "**Applicants**") brought
an application (the "**CCAA Application**") before the Ontario Superior Court of Justice
(Commercial List) (the "**Court**") under the *Companies' Creditors Arrangement Act*,
R.S.C. 1985, c. C-36 (the "**CCAA**") to, among other things, obtain a stay of proceedings
to allow them an opportunity to restructure their business and affairs.

2.      On the same day, the Court granted an initial order in these CCAA proceedings (the
"**CCAA Proceedings**") that, among other things, (i) appointed Ernst & Young Inc. as
Monitor (in such capacity, the "**Monitor**"), and (ii) appointed RC Benson Consulting Inc.
as Chief Restructuring Officer of the Pride Entities (in such capacity, the "**CRO**").

3.      In addition to the Applicants, the entities listed as "Limited Partnerships" and "Additional
Stay Parties" in **Schedule "A"** hereto also obtained the benefit of the stay of proceedings
until and including April 6, 2024, which stay expired the next business day, April 8, 2024
(the "**Stay Period**"). The Applicants together with the Limited Partnerships are referred to
herein as the "**Pride Entities**" (and together with the Additional Stay Parties, the "**Pride
Group**").

- 2 -

4.      The comeback hearing was heard on Friday, April 5, 2024 (the "**Comeback Hearing**"), where the Pride Entities sought and obtained an amended and restated initial order (the "**ARIO**"). The Monitor filed its First Report to Court, dated April 4, 2024 (the "**First Report**") in connection with the Comeback Hearing. The ARIO, among other things, extended the Stay Period to June 30, 2024, approved the DIP Term Sheet (as defined in the ARIO) and granted other relief as further described in the First Report. The Stay Period has been subsequently extended by the Court to and including September 30, 2024, pursuant to the Stay Extension order granted by the Court on June 27, 2024.

5.      The description of the events occurring in these CCAA Proceedings are provided at paragraphs 5 to 22 in the Fourteenth Report to Court, dated August 28, 2024 (the "**Fourteenth Report**").

6.      The Pride Entities have brought a motion returnable on September 3, 2024 seeking, among other things, an order (i) extending the Pride Entities' ability to use Lease Payments and Soft Collections received from and after September 3 until September 30, 2024 to pay their ordinary course working capital needs and for other general corporate purposes (the "**Extended Deferred Payments**" and collectively with the Deferred Payments, the "**Total Deferred Payments**"), but excluding Lease Payments and Soft Collections (a) in respect of MCVs, (b) in which a Securitization Party has claimed an interest, or (c) in respect of any Subject Asset or MCV Asset (as defined in the Turn-Over Order), provided that the Pride Entities continue to abide by the reporting and record-keeping obligations in respect of such Deferred Payments as set out in the Revised Governance Protocol, (ii) authorizing the sale of MCVs not subject to an active lease and permitting the Pride Entities to use the proceeds of sale of 38 such MCVs which are not subject to a property claim by a Securitization Party, (iii) approval of the PGL Sale Agreement, and (iv) advice and directions relating to alternate relief in respect of the PGL Entities and a wind-down of the Pride Entities. Advice and directions are also sought for an orderly wind-down process, in a collective response to the Lift-Stay Motions (defined below) returnable on September 3, 2024 (all capitalized terms as defined in the Fourteenth Report).

7.      The Monitor filed its Fourteenth Report in connection with same.

- 3 -

**PURPOSE**

8.      This supplement to the Fourteenth Report (the "**Supplemental Report**") is to provide information to the Court with respect to:

   (a)      the ongoing consultation with Financiers, including Financiers of PGL;

   (b)      the proposed form of approval and vesting order to be sought in respect of the PGL Going Concern Sale;

   (c)      an update on proposed allocation of Restructuring Costs and other costs necessary to effect an orderly wind-down of the Pride Entities, including professional costs (the "**CCAA Costs**"); and

   (d)      other updates in respect of the September 3, 2024 hearing, including in response to the motion for the appointment of the Fuller Landau Group Inc. ("**Fuller Landau**") as receiver of the PGL business and the Pre-Filing Report of Fuller Landau, dated August 31, 2024, filed in connection with same (the "**Fuller Landau Report**").

**TERMS OF REFERENCE**

9.      The Terms of Reference set out in paragraphs 25 through 27 of the Fourteenth Report are incorporated herein by reference.

10.     Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Fourteenth Report.  All references are to CDN $.

**REQUESTED RELIEF UPDATE**

11.     On August 30, 2024, counsel to the Pride Entities advised the Service List that the Pride Entities had agreed to adjourn the portion of the Requested Relief authorizing the sale of MCVs that Securitization Parties have asserted an interest in, and that such relief is now proposed to be sought at the next stay extension motion in these CCAA Proceedings.

- 4 -

## CONSULTATION WITH FINANCIERS

*Consultations with Financiers of PGL and other Financiers*

12.     As discussed in the Fourteenth Report, on August 27, 2024, the Monitor:

    (a)     provided each of BMO, CWB Maxium Financial Inc., Daimler Truck Financial Services Canada Corporation, HSBC (via Royal Bank of Canada as successor to HSBC), Royal Bank of Canada (in its capacity as bi-lateral lender), the Bank of Nova Scotia and TD Equipment Finance Canada, with an illustrative analysis of estimated recoveries of such lender, based on the Purchase Price Allocation set out in the PGL Sale Agreement; and

    (b)     offered to schedule a call with each lender referred to in subparagraph (a), above, to discuss the illustrative recovery analysis.

13.     On August 28, 2024, the Monitor provided each of Meridian OneCap Credit Corp., De Lage Landen Financial Services Canada Inc., and Concentra Bank with an illustrative analysis of estimated recoveries of such lender, based on the Purchase Price Allocation set out in the PGL Sale Agreement and offered to schedule a call with each such lender to discuss the illustrative recovery analysis.

14.     Before noon on August 28, 2024, the Monitor and the CRO had contacted each of these Financiers of PGL and had completed or scheduled calls with four such Financiers and were awaiting a response from the remaining parties. As at August 30, 2024, calls were completed or scheduled with six Financiers of PGL, and the balance of Financiers of PGL had either declined a call or not responded.

15.     Also on August 28, 2024, the Monitor's Canadian Counsel contacted counsel to certain Financiers of PGL by e-mail to follow up with respect to a meeting that had been offered to them on Friday, August 23, 2024. The Monitor's Canadian Counsel communicated concerns relating to confidentiality of information requested to be shared with Fuller Landau and also limited bandwidth, but offered to meet with the applicable Financiers and their financial advisors, including Fuller Landau, to understand the information requests and whether or how they can be accommodated.

16.     On August 29, 2024, the Monitor's Canadian Counsel and counsel to the Pride Entities met with a group of counsel to Financiers of PGL. Counsel to TD Equipment Finance Canada ("**TDEF**") advised that the Financiers of PGL would provide written interrogatories (the "**PGL Written Interrogatories**"), which were provided to the Monitor's Canadian Counsel in the afternoon of August 30, 2024. The Monitor's Canadian Counsel and counsel to the Pride Entities intend to respond to the PGL Written Interrogatories on September 2, 2024.

17.     On August 29, 2024, the Monitor and the Monitor's Canadian Counsel held a meeting with the DIP Agent's legal and financial advisors to discuss, among other things, the DIP Agent's views of the PGL Going Concern Transaction. The DIP Agent's advisors did not convey a position in respect of the PGL Going Concern Transaction which, as set out below, only became known once the BNS Supplementary Motion Record (as defined below) was served.

## PGL GOING CONCERN TRANSACTION UPDATE

*Status of Approval and Vesting Order*

18.     Since finalizing the PGL Sale Agreement on August 26, 2024, the Monitor and its Canadian Counsel have continued to engage with counsel to the Proposed Purchaser in respect of advancing the form of approval and vesting order that would be agreeable to all parties.

19.     The PGL Going Concern Transaction involves a number of moving pieces and contingencies, including for example the Real Estate Option, which cannot be exercised (and the consents required cannot be sought) until the PGL Sale Agreement has been approved. Accordingly, while the form of the corresponding approval and vesting order will generally be based on the model order, there will be a number of bespoke provisions.

20.     The Monitor and the Proposed Purchaser have agreed to the form of approval and vesting order in principle, however this form is subject to change depending on which assets are ultimately included in the PGL Going Concern Transaction. A copy of the contemplated approval and vesting order is attached hereto as **Appendix "A"**.

- 6 -

21.     The Monitor is not seeking the appended approval and vesting order on September 3, 2024 and is only seeking approval of the PGL Sale Agreement at that time. Subject to the outcome of matters on September 3, 2024, the Monitor anticipates returning on notice to the Service List to have the approval and vesting order granted.

**PGL RECEIVERSHIP MOTION RESPONSE**

22.     On August 30, 2024, the Bank of Nova Scotia ("**BNS**") served its supplementary Motion Record (the "**BNS Supplementary Motion Record**") which requested, among other things, that the stay of proceedings be lifted for the purpose of appointing Fuller Landau, as receiver, without security, over PGL (the "**PGL Receivership Relief**").  On the same date, the Royal Bank of Canada served its Aide Memoire in support of, among other things, the PGL Receivership Relief.  The BNS Supplementary Motion Record indicates that the DIP Agent and TDEF are supportive of the PGL Receivership Relief.

23.     The Monitor continues to recommend the PGL Going Concern Transaction as the best outcome for the stakeholders of PGL, including Financiers, employees, and customers. The PGL Equipment Financiers Letter dated August 26th indicated that a draft order for the appointment of Fuller Landau as receiver would be provided early last week, which would contemplate an orderly winddown plan led by Fuller Landau. The letter suggests that the Syndicate Lenders would be supportive. The BNS Supplementary Motion Record with the form of proposed order (the "**Draft Receivership Order**") was served in the evening of Friday, August 30. The Syndicate Lenders' support was confirmed in the motion materials, which had not previously been communicated to the CRO or the Monitor. The Monitor has had an opportunity to review these materials and notes the following:

(a)     The Fuller Landau Report and Draft Receivership Order proposes a Phase 1 marshalling of assets to secure locations, with the assistance of a service provider experienced in the logistics business, and a coordinated turn-over to Financiers of PGL in accordance with their entitlements to liquidate on their own. This is effectively the structure of the PGL Wind-Down Plan described by the Monitor as the alternative to a going-concern solution in the Fourteenth Report.

- 7 -

(b)    The Draft Receivership Order contemplates the granting of the Order at the September 3, 2024 hearing which would entitle Fuller Landau to seize all bank accounts and cash of PGL immediately, but not the vehicles and trailers until they are located to real property designated by it.

(c)    There is no provision for the payment of employees, drivers, operating expenses, professional fees or other necessary payments; yet paragraph 16 of the Draft Receivership Order requires that the CRO and Applicants "deliver the VINs to a location as may be specified and directed by the Receiver (the "**Specified Location**") and advise the Receiver when such applicable Property has been delivered to the Specified Location."

(d)    In discussions with the Financiers of PGL and discussions with respect to the CRO and Monitor's PGL Wind-Down Plan, the Financiers were asked to come forward with a proposal as to how they would fund a wind-down plan amongst them. It appears no consensus has been reached as to amount or allocation. Paragraph 28 of the Fuller Landau Report indicates that "if appointed and once information is accessible, the Proposed Receiver will work to develop a wind down plan and budget and will be able to propose a methodology of allocation of costs related to gathering and securing the assets, winding down operations, and professional fees among the PGL Financiers."

(e)    If PGL's cash flow is seized by Fuller Landau, as receiver, there is no availability in the Wind-Down Cash Flow Forecast to support the PGL operations. Employees and contractor drivers would have to be terminated immediately, deliveries could not continue, perishable goods would spoil and vehicles would have to be abandoned as there are currently no available parking spots on Pride lots for their orderly return. The Wind-Down Cash Flow Forecast contemplates a going concern transaction and the continuation of employees and contractors. Outstanding wages and vacation pay would have to be addressed, but that is not addressed in the Fuller Landau Report.

(f) The Fuller Landau Report asserts that limited information has been provided on the accounts receivable of PGL, including to the DIP Agent. The DIP Agent and Syndicate Agent have priority security over accounts receivable and, in fact, most of the Financiers of PGL have security that is limited to the equipment they have financed which does not extend to accounts receivable. The advisors of the DIP Agent and Syndicate Agent and the Monitor and its advisors consult regularly, and detailed accounts receivable information was made available to the DIP Agent and Syndicate Agent on July 15, 2024. No additional particulars have been requested, although the Monitor has discussed with the financial advisor to the DIP Agent and Syndicate Agent as to its views on the better outcome on the collection of accounts receivable in a going concern transaction as opposed to a wind-down.

(g) In the Fuller Landau Report, there is limited recognition of or plan to address the intercompany transactions and interconnectedness of the Pride Entities, including the shared services between PGL and the remaining Pride Entities. This includes shared systems, personnel, and resources that support the financial accounting, collections, GPS and customer service centres functions which would have to be bifurcated with additional attendant costs.

24. The Fuller Landau Report fairly discloses in paragraph 17 that for several weeks, the PGL Financier group has not been aligned:

> "Today, some of the PGL Financiers would prefer that their VINS just be left somewhere for them to be picked up or taken to one of their lots, while others wish for the VINs to be liquidated through a receiver."

25. Fuller Landau indicates that the majority but not all have aligned on a single plan for the wind-down of the business. Paragraph 21 of the Fuller Landau Report states:

> "If appointed, Fuller Landau anticipates that it would continue to work with the Company, the Monitor and the CRO to obtain information, make arrangements for drivers to complete routes, accommodate for outstanding costs (including

- 9 -

incremental professional costs of the CCAA professionals) and work to wind down PGL in an efficient manner that balances all of the various interests."

26.     This is exactly what the Monitor has proposed to do, as an alternative to the going concern transaction, under the supervision of the Monitor and CRO. The granting of the Draft Receivership Order would take the available cash of PGL without a plan for what is to happen next. Not all the Financiers of PGL are aligned and no funding mechanism has been agreed.

27.     In the Monitor's respectful view, should the Court not be inclined to approve the PGL Going Concern Transaction at this juncture, the parties would very much benefit from a mediation process with the Honourable Mr. McEwen, before the motion to appoint Fuller Landau as receiver is considered by the Court, to facilitate (i) the sharing of relevant information, (ii) the consideration of the options, and (iii) the development of consensus on the wind-down funding need and how it could be addressed if a going concern sale is not approved. The Monitor views the mediation process as the appropriate avenue to address the expectations of the parties and seek a consensus on the path forward.

**ALLOCATION METHODOLOGY UPDATE**

28.     As described in the Fourteenth Report, the Monitor and the CRO is working on an allocation proposal that would fairly and appropriately allocate CCAA Costs. The Wind-Down Cash Flow Forecast provides the sizing of the funding required for CCAA Costs, but does not set out the source of funding. Should the Court grant the Relief Requested, the Monitor proposes to circulate to affected stakeholders a proposed allocation of CCAA Costs by the end of next week. The proposed allocation will be based on the funding need as set out in the Wind-Down Cash Flow Forecast plus the allocation of the direct costs of the security review validation mandate as more fully described in the Eleventh Report and the Responses to the Written Interrogatories to the Monitor, dated August 4, 2024, plus an amount for contingencies. The allocation will be subject to reconciliation once the final CCAA Costs are known, and the approval of professional fees as required by the Second ARIO.

- 10 -

**OTHER STAKEHOLDER UPDATES**[1]

*Cornwall Property Sale*

29.     In Paragraph 49 of the Fourteenth Report, the Monitor indicated that it expected the sale of the Cornwall Property to Globocam would close on August 29, 2024.

30.     The Monitor is pleased to report that the Cornwall Property transaction closed on August 29, 2024, as expected. The Monitor has been authorized by the August 7, 2024 approval and vesting order in respect of the Cornwall Property to make a distribution of the net proceeds of sale to Roynat Inc., in full satisfaction of its mortgage.[2] The Monitor is currently finalizing the closing cost calculations and expects to make a distribution of the Cornwall Property net proceeds in the near term.

*Individual Enforcement Actions*

31.     In the Fourteenth Report, the Monitor referenced a Mistaken Retrieval by a Securitization Party following the date of the Turn-Over Order.  Since the date of the Fourteenth Report, a Financier (through its agent) has contacted the Pride Entities advising that it will be picking up certain units, which were not authorized for release, i.e. were not subject to the Turn-Over Order or other Orders of the Court that have authorized turn-over of assets to Financiers.

32.     The CRO, Monitor and the Pride Entities are concerned that these unauthorized enforcement actions may jeopardize the safety of employees or create an incident at a Pride lot.  This further illustrates the need for a coordinated and harmonious plan for the return of vehicles overseen by the CRO and the Monitor.

33.     On August 30, 2024, PACCAR served the Second Supplementary Affidavit of James Schenk ("**Supplementary Schenk Affidavit**"), which contemplates, among things, the matters discussed in the Fourteenth Report.  The Supplementary Shenk Affidavit states that

---

[1] Capitalized terms used in the section but not otherwise defined herein have the meaning given to them in the Tenth Report or Eleventh Report, as applicable.

[2] The sale price of the Cornwall Transaction is $7,500,000, with the net proceeds (less adjustments on close and the Roynat mortgage and accrued interest thereon) being $3,065,965.22, with such net amount subject to further closing costs that are in the process of being finalized.

in respect to the Monitor's concern about transferring insurance coverage noted at paragraph 120 of the Fourteenth Report, "the Security Agreements entered into between the Tpine Entities with PACCAR already provided that the applicable insurance on the PACCAR Trucks shall have PACCAR as the payee or assigned beneficiary", and therefore "a transfer of insurance would be irrelevant in PACCAR's case". The aforementioned response by PACCAR in the Supplementary Schenk Affidavit suggests a key misunderstanding. The Pride Entities will not be able to continue insurance on assets on turn-over and the applicable Financier will need to arrange for go-forward insurance coverage when retrieving their collateral. As a matter of public safety, the CRO and Monitor must be satisfied that insurance is in place when multiple parties take possession of trucks and trailers in an orderly wind-down.

34.     Since the date of the Fourteenth Report, two Financiers have filed court materials in the Chapter 15 Proceedings to request lift-stay relief, being PACCAR Financial Corp. ("**PFC**") and DTF US. [3]  The Monitor views the relief sought by PFC and DTF US as an attempt to circumvent these CCAA Proceedings to retrieve their collateral, and therefore inappropriate in the circumstances.

*BMO US*

35.     As discussed in the Fourteenth Report, since July 31, 2024, the Monitor's Canadian Counsel and U.S. Counsel have received numerous follow up questions and additional information from a multitude of Financiers.  Additionally, as noted in the Fourteenth Report, various Financiers have filed motions seeking to lift the stay of proceedings to allow them to exercise remedies in respect of the collateral to which their security attaches. In the motion filed by BMO and BMO Bank, N.A. ("**BMO US**"), they indicate that "Chapman has pointed the Monitor to the relevant documentation that establishes BMO's perfection and priority in relation to the remaining VINs being those VINs in respect of which the Monitor's Counsel had indicated in the Eleventh Report that it required

---

[3] The Monitor notes that Mitsubishi HC Capital America Inc. f/k/a Hitachi Capital America Corp. also previously filed for stay relief in the Chapter 15 Proceedings.

additional evidence; however the Monitor has elected not to undertake a further review of same."

36.     After July 31, 2024, the Monitor's Counsel received over 100 subordination or priority type documents, many of which appeared to be duplicative, from counsel to BMO US. The Monitor can advise as follows (with reference to paragraph 38(v) of the Eleventh Report) in respect of the 339 VINs where the Monitor is of the view that BMO US has not provided sufficient evidence of a perfected and priority interest:

(a)     232 VINs financed to TPine Rental USA under the wholesale agreement: The Monitor has now received a subordination agreement (which was not provided prior to July 31, 2024) whereby the Syndicate Agent (as defined in the Twelfth Report) has subordinated its interest in favour of BMO US. However, the subordination agreement is limited to vehicles expressly identified by BMO US as being financed under this facility pursuant to a funding request. To date, the Monitor has only received two funding notices relating to four VINs, leaving 228 VINs in respect of which BMO US has not provided sufficient evidence of a perfected and priority interest;

(b)     75 VINs financed to TPine Leasing Capital LP where no certificate of title was provided: Further review and analysis by the Monitor's U.S. Counsel is required;

(c)     30 VINs financed to TPine Leasing Capital LP where certificates of title were provided, but loan and security documents to support such an interest were not: No additional loan and security documents have been provided; and

(d)     2 VINs where no certificate of title or loan and security documents were provided: There is no change to this finding.

37.     The Monitor disagrees with BMO's assertion that it has provided all information to the Monitor, but the Monitor has elected not to take further action. It is for this reason (that Financiers continue to provide incomplete information and documentation well after the Monitor's completion of its review), in part, that the Monitor has advised Financiers that it is not completing further analysis at this time. The funding of continued review must also

be addressed. As set out in greater detail in the Fourteenth Report, the Monitor intends to seek advice and directions before the end of September 2024 of a Court approved process to finally determine entitlement to "PCVs", being those VINs where the Monitor was not able to conclude, based on the information available to it as at July 31, 2024, that the secured creditor asserting an interest therein had established a perfected and priority interest in priority to the DIP Agent.

*Mitsubishi*

38. In the evening of August 27, 2024, the Monitor received from counsel to Mitsubishi a secure link to documentation in support of Mitsubishi's ownership claim in certain repossessed securitization assets. As discussed in the Tenth Report, Mitsubishi is party to three Securitization Programs with the Pride Entities. Mitsubishi had not provided any documentation whatsoever to the Monitor in advance of the finalization of the Tenth Report, despite numerous requests. Based on inadequate information related to Tranches under Mitsubishi's programs, the Mitsubishi Securitization Programs were not further considered by the Monitor's Counsel, Initial Reporting Letters for these Securitization Programs were not prepared and, accordingly, these Securitization Programs were not included as reviewed programs in the Tenth Report.

39. On August 28, 2024, the Monitor's Canadian Counsel responded to Mitsubishi's counsel indicating that the Monitor completed its validation mandate in respect of Securitization Programs as at July 16, 2024 and was not at this time reviewing new information or documentation in relation to the validation mandate. The Monitor's Canadian Counsel indicated that dependent on the outcome of the September 3, 2024 hearing, the Monitor would review the materials provided. As noted above, the funding of continued review must be addressed.

*Securitization Parties*

40. Immediately after the hearing on August 9, 2024, counsel for certain Securitization Parties raised concerns with the Monitor with respect to paragraph 5 of the Order amending the Revised Governance Protocol ("**August 9 Order**") and asserted that the reference to

- 14 -

allocation should expressly exclude allocation to Securitization Parties who had the benefit of the Turn-Over Order. Paragraph 5 of the August 9 Order had been added after the conclusion of the hearing without knowledge or consent of those parties that raised concerns to the Monitor immediately after the hearing. The Monitor confirmed that it was of the view that all rights were reserved in respect of paragraph 5 and was prepared to seek an endorsement clarifying same. The language of a clarifying endorsement could not be agreed amongst the Securitization Parties and the DIP Agent, but the Monitor understands that all such parties are of the general view that all rights are reserved and will seek such clarification at the hearing on September 3, 2024. Parties may wish to make submissions as to whether the Securitization Parties should be expressly exempted from paragraph 5, rather than just a reservation of rights.

41.    The group that manages the Pride Entities leasing portfolio have been occupied since the date of the Turn-Over Order with coordinating the turn-over of approximately 4,000 active leases to various Securitization Parties with the remaining over 4,500 active leases to be turned over throughout the month of September based on availability of the replacement servicers for two of the Securitization Parties.  This work includes identifying all active and non-active securitization assets, identifying locations of repossessed assets and coordinating, orderly pick-up of physical units.  This group of employees has no additional capacity until such time as the turn-over of securitized assets in accordance with the Turn-Over Order is completed, which is anticipated to be late September. It is unfortunate that lenders complain about the lack of capacity and bandwidth of Pride employees who are working full time and overtime to assist in an orderly turn-over of assets, without any assurance of their ongoing employment.

- 15 -

All of which is respectfully submitted this 2nd day of September 2024.

**ERNST & YOUNG INC.**,
solely in its role as Court-appointed Monitor
of Pride Group Holdings Inc. and certain
affiliates and not in its personal or corporate
capacity

**per:**

**Alex Morrison, CPA, CA, LIT, CIRP**
**Senior Vice President**

**Karen Fung, CPA, CA, LIT, CIRP**
**Senior Vice President**

# SCHEDULE "A"

## A. APPLICANTS
## Operating Entities
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

## Real Estate Holding Companies
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.

**Appendix "A"**

**Form of approval and vesting order**

Please see attached

Court File No.: CV-24-00717340-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE ● | ) | ●DAY, THE ● |
| | ) | |
| JUSTICE ● | ) | DAY OF ●, 2024 |

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. AND THOSE APPLICANTS LISTED ON SCHEDULE "A" HERETO (each, an "Applicant", and collectively, the "Applicants")**

**ORDER**
**(Approval and Vesting - PGL)**

**THIS MOTION**, made by Applicants pursuant to the *Companies Creditors' Arrangement Act*, R.S.C. 1985, c. c-36, as amended (the "**CCAA**") for an order, among other things, approving the sale transaction (the "**Transaction**")[1] contemplated by a Purchase Agreement dated as of August 26, 2024 (the "**Purchase Agreement**") between Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation, as vendors (collectively, the "**Vendors**"), and 1000927605 Ontario Inc., as purchaser (the "**Purchaser**"), attached to the Fourteenth Report (as defined below) as Appendix "D", and vesting in the Purchaser all of the Vendors' right, title and interest in and to the Purchased Assets (as defined in the Purchase Agreement), was heard this day at 330 University Avenue, Toronto, Ontario.

---

[1] For greater certainty, "Transaction" shall not include any transaction(s) contemplated by the Real Property Option (as defined in the Sale Agreement) which option and the exercise of same remain open in accordance with and subject to the terms of the Sale Agreement and which transaction(s) remain subject to Court approval.

- 2 -

ON READING the affidavit of Randal Benson sworn August 27, 2024 and the Exhibits thereto (the "**Benson Affidavit**"), the Fourteenth Report of Ernst & Young Inc. dated August 28, 2024 (the "**Fourteenth Report**") and the Supplement to the Fourteenth Report of Ernst & Young Inc., dated September 2, 2024, in its capacity as court-appointed monitor (in such capacity, the "**Monitor**"), and on hearing the submissions of counsel for the Applicants and the limited partnerships listed in **Schedule "A"** hereto (collectively with the Applicants, the "**Pride Entities**"), the Monitor and the Purchaser, and such other counsel as listed on the Participant Information Form, with no one else appearing although properly served as appears from the affidavit of service, filed,

**DEFINITIONS**

1.      **THIS COURT ORDERS** that capitalized terms used but not defined in this Order shall have the meanings given to them in the Purchase Agreement or the Fourteenth Report, as the case may be.

**APPROVAL OF TRANSACTION**

2.      **THIS COURT ORDERS AND DECLARES** that the Transaction is hereby approved, and the execution of the Purchase Agreement by the Vendors is hereby authorized and approved, with such minor amendments as the Vendors and the Purchaser, with the consent of the Monitor, may deem necessary or as the Purchase Agreement may permit in accordance with its terms. The Vendors and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Purchased Assets to the Purchaser.

3.      **THIS COURT ORDERS AND DECLARES** that this Order shall constitute the only authorization required by the Monitor and Vendors to proceed with the Transaction and that no shareholder, partner, or other approvals shall be required in connection therewith.

- 3 -

4.      **THIS COURT ORDERS AND DECLARES** that upon the delivery of a certificate by the Monitor to the Vendors and the Purchaser or their respective counsel substantially in the form attached as **Schedule "B"** hereto (the "**Monitor's Certificate**"), all of the Vendors' right, title and interest in and to the Purchased Assets (which for greater certainty shall not include the Excluded Assets listed on Schedule "B" to the Purchase Agreement or the Excluded Contracts listed on Schedule "E" to the Purchase Agreement) shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts, or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, rights of distraint, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "**Claims**") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Second ARIO or any other Order made in these CCAA Proceedings, including, without limitation, the Administration Charge, Intercompany Advances Charge, DIP Lenders' Charge and the Directors' Charge (as each of those terms are defined in the Second ARIO); (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system in Canada or the United States and all Encumbrances (as defined in the Purchase Agreement) (all of which are collectively referred to as the "**Encumbrances**", which term shall not include the Permitted Encumbrances listed on Schedule "C" to the Purchase Agreement) and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

5.      **THIS COURT ORDERS** that upon the issuance of the Monitor's Certificate, any of the Vendors, the Purchaser or the Monitor, shall be authorized to take all such steps as may be necessary to effect the discharge of all Encumbrances registered against the Purchased Assets (including by filing such financing change statements in the Ontario Personal Property Registry (or any analogous legislation as may be necessary) provided that the Vendors, the Purchaser and the Monitor shall not be authorized to effect any

- 4 -

discharge that would have the effect of releasing any Encumbrances against any property other than the Purchased Assets.

6.      **THIS COURT ORDERS AND DIRECTS** that the Purchaser shall pay the LC Purchase directly to the issuers of the Purchased LCs (the "**LC Issuers**"), which amount shall be held by the LC Issuers as cash collateral for the LCs, or as cash collateral for letters of credit issued to replace the Purchased LCs (the "**Replacement LCs**"), and applied or disbursed in accordance with the terms of the documentation governing the Purchased LCs or Replacement LCs, as applicable.

7.      **THIS COURT ORDERS AND DIRECTS** that the Cash Purchase Price (as adjusted pursuant to the Purchase Agreement, and, for the avoidance of doubt, net of the LC Purchase Price) shall be paid to the Monitor on Closing, and held in trust by the Monitor pending further order of the Court.

8.      **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Purchased Assets (other than the LC Purchase Price) shall stand in the place and stead of the Purchased Assets, in accordance with and based on the allocations set out in the Allocation Statement, and that from and after the delivery of the Monitor's Certificate, all Claims and Encumbrances shall attach to the net proceeds from the sale of the Purchased Assets with the same priority as they had with respect to the Purchased Assets immediately prior to the sale, as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

9.      **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

- 5 -

10.     **THIS COURT ORDERS** that the Monitor may rely on written notice from the Vendors and the Purchaser or their respective counsel regarding fulfillment of the conditions to Closing under the Purchase Agreement and shall incur no liability with respect to the delivery of the Monitor's Certificate.

11.     **THIS COURT ORDERS** that, notwithstanding:

     (a)      the pendency of these CCAA Proceedings;

     (b)      any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "**BIA**") in respect of any of the Vendors and any bankruptcy order issued pursuant to any such applications; and

     (c)      any assignment in bankruptcy made in respect of any of the Vendors;

the vesting of the Purchased Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of the Vendors and shall not be void or voidable by creditors of the Vendors, nor shall it constitute nor be deemed to be a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

**SELLER NAME CHANGE AND TITLE OF PROCEEDINGS**

12.     **THIS COURT ORDERS AND DIRECTS** that, immediately following Closing, each of the Vendors and Purchaser are authorized and directed to take any and all steps prescribed by Section 5.4 of the Purchase Agreement (the "**Name Change**").

13.     **THIS COURT ORDERS** that following the Name Change, the name of the Vendors in the within title of proceedings shall be deleted and replaced with the new legal name of the Vendors, and any document filed in these CCAA Proceedings shall be filed using such revised title of proceedings.

- 6 -

**DISCLOSURE OF PERSONAL INFORMATION**

14.      **THIS COURT ORDERS** that, pursuant to clause 7(3)(c) of the *Personal Information Protection and Electronic Documents Act* (Canada), the Vendors and the Monitor are authorized and permitted to disclose and transfer to the Purchaser all human resources and payroll information in the Vendors' records pertaining to the Vendors' past and current employees. The Purchaser shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Vendors.

**GENERAL**

15.      **THIS COURT ORDERS AND DECLARES** that this Order shall have full force and effect in all provinces and territories in Canada.

16.      **THIS COURT ORDERS** that the Vendors, the Monitor or the Purchaser may apply to the Court as necessary to seek further orders and directions to give effect to this Order.

17.      **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States to give effect to this Order and to assist the Pride Entities, the CRO, the Monitor and their agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Pride Entities, the CRO, and the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Pride Entities, the CRO, the Monitor and their agents in carrying out the terms of this Order.

18.      **THIS COURT ORDERS** that each of the Pride Entities, the CRO, the Monitor, and the Purchaser be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

- 7 -

19.    **THIS COURT ORDERS** that this Order is effective from the date that it is made and is enforceable without any need for entry and filing.

_____

- 8 -

**SCHEDULE "A"**

## A. APPLICANTS

**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.

- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PERGOLA HOLDINGS, CORP.
- PRIDE GLOBAL INSURANCE COMPANY LTD.

**SCHEDULE "B"**

**Form of Monitor's Certificate**

Court File No.: CV-24-00717340-00CL

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. AND THOSE APPLICANTS LISTED ON SCHEDULE "A" HERETO (each, an "Applicant", and collectively, the "Applicants")**

Applicants

**MONITOR'S CERTIFICATE**

**RECITALS**

A.      Pursuant to an Order of the Court dated September 3, 2024 (the "**Approval and Vesting Order**"), the Court approved a Purchase Agreement dated as of August 26, 2024 (the "**Purchase Agreement**") between Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation, as vendors (collectively, the "**Vendors**"), and 1000927605 Ontario Inc., as purchaser (the "**Purchaser**"), and provided for the vesting in the Purchaser of the Vendor's right, title and interest in and to the Purchased Assets (the "**Transaction**"), which vesting is to be effective with respect to the Purchased Assets upon the Monitor's delivery to the Purchaser of a certificate confirming the Transaction has been completed to the satisfaction of the Monitor.

B.      Pursuant to the Approval and Vesting Order, the Monitor may rely on written notice from the Vendors and the Purchaser regarding fulfillment and/or waiver of conditions to closing under the Purchase Agreement.

C.      Capitalized terms used herein and not otherwise defined have the meanings given to such terms in the Approval and Vesting Order or the Purchase Agreement, as the case may be.

- 2 -

**THE MONITOR CERTIFIES** the following:

1.      The Purchaser has paid the Purchase Price for the Purchased Assets pursuant to the Purchase Agreement.

2.      The Vendors and the Purchaser have each delivered written notice to the Monitor that the conditions to Closing under the Purchase Agreement have been satisfied and/or waived, as applicable.

3.      The Transaction has been completed to the satisfaction of the Monitor.

4.      This Certificate was delivered by the Monitor at _____ **[TIME]** on _____ **[DATE]**.

**ERNST & YOUNG INC., soley in its capacity as Court-appointed Monitor of the Pride Entities and not in its personal capacity**

Per: _____
     Name:
     Title:

Court File No.:  CV-24-00717340-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC., et al.**

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

Proceeding Commenced at Toronto

---

**SUPPLEMENT TO FOURTEENTH REPORT
OF THE MONITOR
dated September 2, 2024**

---

**BLAKE, CASSELS & GRAYDON LLP**
Barristers and Solicitors
199 Bay Street
Suite 4000, Commerce Court West
Toronto, Ontario M5L 1A9

**Pamela Huff**, LSO #27344V
Tel:       416-863-2958
Email:     pamela.huff@blakes.com

**Kelly Bourassa**, LSO #43062R
Tel:       416-863-2421
Email:     kelly.bourassa@blakes.com

**Chris Burr**, LSO #55172H
Tel:       416-863-3261
Email:     chris.burr@blakes.com

**Daniel Loberto**, LSO #79632Q
Tel:       416-863-2937
Email:     daniel.loberto@blakes.com

Lawyers for the Monitor

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**SECOND SUPPLEMENT TO FOURTEENTH REPORT OF THE MONITOR**

**DATED September 19, 2024**

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................... **2**

**PURPOSE** ............................................................................................................... **4**

**TERMS OF REFERENCE** ...................................................................................... **5**

**MEDIATION UPDATE** .......................................................................................... **5**

**ORDERLY WIND-DOWN PLAN** ........................................................................... **6**

*Timing Of Orderly Wind-Down Plan* ....................................................................... **6**

*Monetization Of Assets Not Retrieved Prior To The Turn-Over Outside Date* ............. **8**

*Termination Of The Governance Protocol* ............................................................... **9**

**FUNDING CONTRIBUTION PROPOSAL** ............................................................ **9**

**FUNDING MECHANISM** ..................................................................................... **14**

**RECOMMENDATIONS** ........................................................................................ **14**

| **Appendices** | **Tab** |
|---|---|
| September 3 Endorsement ……………………………………………………. | A |

- 2 -

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**SECOND SUPPLEMENT TO FOURTEENTH REPORT OF THE MONITOR**

**DATED September 19, 2024**

**INTRODUCTION**

1.   On March 27, 2024, Pride Group Holdings Inc. and those entities listed as "Applicants" in
     **Schedule "A"** hereto (each an "**Applicant**" and, collectively, the "**Applicants**") brought
     an application (the "**CCAA Application**") before the Ontario Superior Court of Justice
     (Commercial List) (the "**Court**") under the *Companies' Creditors Arrangement Act*,
     R.S.C. 1985, c. C-36 (the "**CCAA**") to, among other things, obtain a stay of proceedings
     to allow them an opportunity to restructure their business and affairs.

2.   On the same day, the Court granted an initial order in these CCAA proceedings (the
     "**CCAA Proceedings**") that, among other things, (i) appointed Ernst & Young Inc. as
     Monitor (in such capacity, the "**Monitor**"), and (ii) appointed RC Benson Consulting Inc.
     as Chief Restructuring Officer of the Pride Entities (in such capacity, the "**CRO**"). The
     Monitor filed a Pre-Filing Report dated March 27, 2024, in connection with the CCAA
     Application.

3.   In addition to the Applicants, the entities listed as "Limited Partnerships" and "Additional
     Stay Parties" in **Schedule "A"** hereto also obtained the benefit of the stay of proceedings
     until and including April 6, 2024, which stay expired the next business day, April 8, 2024
     (the "**Stay Period**"). The Applicants together with the Limited Partnerships are referred to

- 3 -

herein as the "**Pride Entities**" (and together with the Additional Stay Parties, the "**Pride Group**").

4.      The comeback hearing was heard on Friday, April 5, 2024 (the "**Comeback Hearing**"), where the Pride Entities sought and obtained an amended and restated initial order (the "**ARIO**"). The Monitor filed its First Report to Court, dated April 4, 2024 (the "**First Report**") in connection with the Comeback Hearing. The ARIO, among other things, extended the Stay Period to June 30, 2024, approved the term sheet for the DIP Facility and granted other relief as further described in the First Report.

5.      The description of the events occurring in these CCAA Proceedings are provided at paragraphs 5 to 22 in the Fourteenth Report to Court, dated August 28, 2024 (the "**Fourteenth Report**").

6.      Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Fourteenth Report.

7.      The Pride Entities brought a motion returnable on September 3, 2024 seeking, among other things, (i) an order extending the Pride Entities' ability to use the Extended Deferred Payments and authorizing the sale of Multiple Collateral Vehicles (as defined in the Fifth Report) not subject to an active lease, (ii) approval of the PGL Sale Agreement, and (iii) advice and directions relating to alternate relief in respect of the PGL Entities and a wind-down of the Pride Entities. Advice and directions were also sought for an orderly wind-down process, as a collective response to the Lift-Stay Motions also returnable on September 3, 2024.

8.      The Monitor filed its Fourteenth Report and its Supplement to Fourteenth Report of the Monitor, dated September 2, 2024 (the "**Supplemental Report**") in connection with same.

9.      On September 3, 2024, the Court granted orders which, among other things, (i) amended the Order amending the Revised Governance Protocol, dated August 9, 2024 (the "**Governance Protocol Amendment Order**") to permit the Pride Entities to use the Extended Deferred Payments, in accordance with the provisions contained in such order, (ii) increased the Administration Charge to an aggregate amount of $5 million, and (iii)

expunged and discharged any liens registered against any assets owned by the Pride Entities pursuant to the *Repair and Storage Lien Act* (Ontario), or equivalent statutes, upon payment of the amount of such lien as registered in the applicable personal property registry to the Monitor in trust, pending the resolution or determination of the validity and/or quantum of such lien claims, in accordance with the terms of such order (the "**September 3 Order**").

10.     The Court issued an Endorsement on the same date (the "**September 3 Endorsement**") which directed "the secured creditors of PGL" and the "secured creditors and securitization parties (to the extent affected by the wind-down)" to attend before The Honourable Thomas McEwen, former Team Lead of the Commercial List (the "**Mediator**"), on September 9, 2024, and if and as necessary and as Mr. McEwen may direct, September 10, 2024, to mediate the issues in dispute at the September 3, 2024 hearing and attempt to resolve or at least narrow the issues (the "**Mediation Issues**", with the underlying mediation referred to herein as the "**Mediation**"). A copy of the September 3 Endorsement is attached hereto as **Appendix "A"**.

**PURPOSE**

11.     This second supplement to the Fourteenth Report (the "**Second Supplemental Report**") is to provide information and updates to the Court with respect to:

    (a)     the Mediation;

    (b)     the Orderly Wind-Down Plan;

    (c)     the Funding Contribution Proposal (as defined below);

    (d)     the Pride Entities' motion for the following relief (the "**Requested Relief**"), among other things:

        (i)     approving the implementation of the Orderly Wind-Down Plan;

        (ii)     approving the Funding Contribution Proposal;

        (iii)     terminating the Revised Governance Protocol; and

(iv) approving deadlines for monetization of Remaining Assets, and Multiple Collateral Vehicles where entitlement is not resolved on a timely basis; and

(e) the Monitor's recommendation with respect to the Requested Relief.

**TERMS OF REFERENCE**

12. The Terms of Reference set out in paragraphs 25 through 27 of the Fourteenth Report are incorporated herein by reference. All references are to CDN $.

**MEDIATION UPDATE**

13. As discussed above, the September 3 Endorsement directed "the secured creditors of PGL" and the "secured creditors and securitization parties (to the extent affected by the wind-down)" to attend the Mediation before the Mediator to resolve or at least narrow the outstanding issues in these CCAA Proceedings, including the wind-down of the Pride Entities other than the PGL Entities and the necessary funding required to implement that wind-down.

14. On September 9 and 10, 2024, the Monitor and its counsel, counsel to the Pride Entities, and the CRO attended this Mediation, including the following parties:

(a) Financier company representatives, counsel, and/or financial advisers from all but three Financiers of PGL (the "**PGL Mediation Parties**");

(b) Financier company representatives, counsel, and/or financial advisers from all but five Financiers of the non-PGL Pride Entities (the "**Non-PGL Mediation Parties**"); and

(c) Securitization Party company representatives, counsel, and/or financial advisers from all but one of the Securitization Parties (the "**Securitization Mediation Parties**", and collectively with the PGL Mediation Parties and the Non-PGL Mediation Parties, the "**Mediation Parties**").

- 6 -

15.     The Mediation was conducted in a confidential manner and involved the filing of 23 mediation briefs by the Monitor, the Pride Entities, the Mediation Parties, and the Pride Entities' directors and employees to assist the Mediator.  While no global resolution was achieved in respect of the Mediation Issues, such issues were significantly addressed and narrowed over the course of the Mediation due to the efforts of the attending parties. The Monitor views the Mediation as having been a successful and useful exercise that has informed the Monitor's recommendations herein.

## ORDERLY WIND-DOWN PLAN[1]

*Timing of Orderly Wind-Down Plan*

16.     As discussed in the Fourteenth Report, the notes to the Wind-Down Cash Flow Forecast include a Gantt Chart which provided the anticipated timing of various wind-down milestones at that time, including, without limitation, (i) the turn-over of all Subject Assets (as defined in the Order re: Turn-Over Order of Securitized Assets granted on August 8, 2024 ("**Securitized Asset Turn-Over Order**"), and in accordance with same) to Securitization Parties by mid-September, (ii) the turn-over of VINs[2] in connection with lease portfolios to those secured creditors that are not Securitization Parties (also referred to as "**Recourse Lenders**") by the end of September, and those VINs which are held in physical inventory by mid-October, and (iii) the turn-over of Multiple Collateral Vehicles to the applicable Financier by the end of October.

17.     The Monitor notes that the above-referenced timeline must be balanced with addressing control and safety issues to facilitate the completion of the Orderly Wind-Down Plan. Issues affecting the turn-over of VINs in physical inventory to Financiers include the following:

---

[1] Capitalized terms in this section that not defined herein or in the Fourteenth Report have the meanings ascribed to such terms in the proposed Funding Contribution and Turn-Over Order attached as Tab 3 to the Pride Entities' motion record, dated September 18, 2024 (the "**Funding Contribution and Turn-Over Order**").

[2] The term "VIN" used herein shall reference vehicles in both lease portfolios and in physical inventory.

- 7 -

(a)   Financiers arriving at the applicable turn-over locations outside of their scheduled time to pick-up VINs, creating a hostile environment between bailiffs and site supervisors at Pride lots;

(b)   Financiers not arriving at turn-over locations at all, creating backlog, delay, and additional cost;

(c)   Financier agents contacting the Pride Entities to pick-up VINs that are not authorized for release, as described in paragraph 31 of the Supplemental Report, and more recently, a situation involving a Securitization Party bailiff picking up a VIN without first scheduling a time with the Pride Entities in accordance with the Turn-Over Mechanics Notice;

(d)   Financier agents repossessing VINs after being originally denied by Pride employees;

(e)   employees of the Pride Entities being forced to deal with disputes arising out of the matters referenced in (a)-(d) above in real time, while concurrently being required to complete a significant workload to facilitate the orderly and efficient turn-over of VINs; and

(f)   disentangling the congestion of VINs located on certain Pride lots in a safe manner and avoiding damaging any of the VINs.

18.   Based on the experience to date with the Securitized Asset Turn-Over Order matters and the delay in the commencement of the Orderly Wind-Down Plan from what was contemplated in the Wind-Down Cash Flow Forecast, and consideration for a safe and controlled manner for the benefit of the Pride Entities' employees and all stakeholders, the timeline as outlined in the Gantt Chart included in the Fourteenth Report has been slightly amended. The amended timeline is set out in the definition of Turn-Over Outside Date in the Funding Contribution and Turn-Over Order and is provided below for ease of reference.

19.   The Pride Entities' lots are categorized in this definition from A to E, with Category A being the least complex to facilitate turn-over due to low VIN counts, Category B and C

- 8 -

being of medium complexity due to greater VIN counts, and Category D and E being the most complex due to having the largest number of VINs. The proposed deadline for the return of VINs is as follows:

(a)     October 17, in respect of Inventory or Repossessed Assets situated at Lot Category 1A lots, being 15 lots located in Canada and the U.S.;

(b)     October 24, in respect of Inventory or Repossessed Assets situated at Lot Category 1B lots, being 5 lots located in Canada and the U.S.;

(c)     October 31, in respect of all Leasebooks;

(d)     October 31, in respect of Inventory or Repossessed Assets situated at Lot Category 1C lots, being 8 lots located in Canada and the U.S.;

(e)     the earlier of October 31 and the applicable Lot Category in respect of each Multiple Collateral Vehicle;

(f)     November 21, in respect of Inventory or Repossessed Assets situated at Lot Category 1D lots, being 8 lots located in the U.S.;

(g)     December 12, in respect of Inventory or Repossessed Assets situated at Lot Category 1E lots, being the 4 lots located in Milton and Mississauga, Ontario,

or in any case, such other date agreed to by the Monitor, the CRO, and an affected Financier having regard to the spirit and intent of the Funding Contribution and Turn-Over Order to effect turn-overs as soon as commercially practicable.

*Monetization of Assets Not Retrieved Prior to the Turn-Over Outside Date*

20.     The Monitor notes in its Fourteenth Report that the significant congestion of VINs on the Pride Entities' lots makes it (i) nearly impossible to enter the premises and retrieve VINs, and (ii) increasingly difficult to maintain public safety.  This situation is exacerbated by the fact that four Securitization Parties have not booked an appointment to retrieve their Repossessed Assets (as defined in the Securitized Asset Turn-Over Order), and one Securitization Party did not attend their scheduled pick-up window to retrieve same on two

separate occasions. The Monitor understands that 3 Securitization Parties are not even in a position to pick up VINs at this time, which results in further congestion on Pride lots.

21.     Accordingly, to facilitate the efficient turn-over of VINs to Financiers, the Pride Entities are seeking relief to liquidate or sell any and all Remaining Assets if any Financier fails to take possession of the Remaining Assets, including any Repossessed Vehicles, in which they have asserted an interest by the Turn-Over Outside Date (with such applicable dates referenced above).

*Termination of the Governance Protocol*

22.     On April 5, 2024, the Court granted the Protocols Order, which included a Governance Protocol to create a process by which revenue from sales, leasing and enforcement would be distributed to the entitled Financier in these CCAA Proceedings. The purpose of the Governance Protocol was to provide short-term stability, predictability and equality-of-treatment for all Financiers, while the Pride Entities, the CRO and the Monitor developed and implemented longer-term solutions on a Financier-by-Financier basis. On May 15, 2024, the Court granted orders approving, among other things, the Amended and Restated Protocols Order, dated May 15, 2024, which revised the Governance Protocol.

23.     As noted in the Affidavit of Randall Benson, sworn September 18, 2024, the Governance Protocol has no further utility in light of the wind-down of these CCAA Proceedings, and dispensing with its requirements will permit more efficient uses of the Pride Entities' and the Monitor's time. Accordingly, the Pride Entities are seeking approval to terminate the Governance Protocol as of September 30, 2024, with the exception of reporting and remittance activities related to the Lease Payments and Soft Collections until they are transitioned to the applicable replacement service provider or paid to the entitled Financier.

## FUNDING CONTRIBUTION PROPOSAL

24.     As discussed in the Fourteenth Report, the Monitor, in consultation with the Pride Entities, the CRO, and respective counsel, prepared a Wind-Down Cash Flow Forecast from August 12, 2024, until March 30, 2025.  Based on the Wind-Down Cash Flow Forecast, with contingencies added to complete the wind down process, the funding for an Orderly Wind-

down Plan is estimated to be approximately $40 million (the "**Funding Requirement**"). The Funding Requirement was estimated on the assumption that the PGL Going Concern Transaction is approved, and includes wind-down costs, professional fees, and repayment of Total Deferred Payments.

25.    The Monitor recommends that both Securitization Parties and Recourse Lenders contribute to the Funding Requirement. As Multiple Collateral Vehicles are subject to entitlement claims of more than one Financier, they have been placed in their own category for funding contribution purposes.

26.    In the Monitor's view, the proportion of the Funding Requirement to be contributed by Securitization Parties should be less than the proportion of the Funding Requirement to be contributed by Recourse Lenders, given, among other things, the difference in timing and remaining effort to complete the Orderly Wind-Down Plan in respect of VINs and in recognition of their contractual rights and remedies as against the Pride Entities. The Monitor notes that the Monitor and the Pride Entities continue to exert significant effort in dealing with VINs subject to the Securitized Asset Turn-Over Order and associated Soft Collections and Lease Payments, including (i) the Pride Entities' site supervisors working overtime to locate and manage access to VINs subject to the Securitized Asset Turn-Over Order, as well as boosting VINs subject to the Securitized Asset Turn-Over Order and ensuring all keys are released with the VINs subject to the Securitized Asset Turn-Over Order, (ii) the Pride Entities' employees locating and providing titles for VINs subject to the Securitized Asset Turn-Over Order, (iii) the Pride Entities' employees working with replacement servicers to coordinate Lease Payment collection and turn-over matters, (iv) the Monitor completing weekly sweeps of Securitization Parties' Soft Collections, reconciling these funds, and administering disbursements back to Securitization Parties and to the Monitor's Multiple Collateral Vehicle trust accounts, and (v) the Pride Entities providing Securitization Parties with detailed leasing information, including outstanding balances in their respective lease portfolios, for which the Securitization Parties do not have adequate records of their own.

27.    Based on the above and other considerations, the Funding Contribution Proposal contemplates Recourse Lenders, and amounts to be paid in respect of Multiple Collateral

- 11 -

Vehicles, contributing 75% ($30 million) of the Funding Requirement and Securitization Parties contributing 25% ($10 million) of the Funding Requirement.[3]

28.     The Monitor had prepared a detailed proposal for a cost allocation of these CCAA Proceedings that was provided to the Mediation Parties. The Monitor recognizes that, while substantial work went into this proposed cost allocation, there would need to be extensive consultation with stakeholders and consideration of other options for allocation. The Monitor therefore determined, for expediency purposes, to bring forward its Funding Contribution Proposal and defer final allocation discussions to a later date.

29.     In an attempt to provide for a fair and equitable methodology for contribution of funding amongst Financiers, the Monitor is of the view that it is appropriate to divide the $30 million Funding Requirement for Recourse Lenders and $10 million Funding Requirement for Securitization Parties on the basis of VINs of such groups, estimated as at August 1, 2024, which are either (i) located on-site at the Pride Entities' premises, or (ii) subject to a lease being serviced by the Pride Entities (the "**Funding Contribution Proposal**").

30.     On September 12, 2024, counsel to the Pride Entities provided to each of the Mediation Parties (i) a summary of the total VINs, by Recourse Lender or Securitization Party, and (ii) a listing of the VINs applicable to each such Financier (including those VINs subject to the Securitized Asset Turn-Over Order) for their review. The information provided by counsel to the Pride Entities to the Mediation Parties does not have regard to the Monitor's findings in the Eleventh Report with respect to PCVs.  Rather, PCVs are denoted as VINs on the list of the Recourse Lender or Securitization Party who asserted an interest in such VIN which would be the basis for the calculation of payment requirements by Financier in accordance with the Funding Contribution Proposal.

31.     The following is a summary of VINs, estimated as of August 1, 2024, based on the Monitor's Database that are proposed to be dealt with as part of the Orderly Wind-Down Plan and are the basis for the Funding Contribution Proposal:

---

[3] The Monitor notes that all Recourse Lenders and Securitization Parties entitled to VINs held by the Pride Entities (other than those VINs held by the PGL Entities) will be required to contribute to the Funding Requirement.

| Parties | VINs |
|---|---|
| Recourse Lenders | 5,664 |
| Securitization Parties | 9,529 |
| Multiple Collateral Vehicles | 1,546 |
| **Total** | 16,739 |

32.   Based on the VIN summary above, this Funding Contribution Proposal will result in per VIN contributions as follows:

(a)   Recourse Lenders will contribute approximately $4,161 per VIN;

(b)   Financiers entitled to a Multiple Collateral Vehicle will contribute approximately $4,161 per Multiple Collateral Vehicle; and

(c)   Securitization Parties will contribute approximately $1,049 per VIN (each, a "**Funding Contribution**").

A summary of each Financier's total Funding Contribution based on the VINs to be turned over to it is attached as Schedule "C" of the Funding Contribution and Turn-Over Order.

33.   The Funding Contribution Proposal is not a proposed allocation of the Funding Requirement, but rather a mechanism to satisfy the immediate funding needs of the Pride Entities on an interim basis subject to a subsequent allocation in order to effect the Orderly Wind-Down Plan and facilitate the turn-over of VINs (both those held in inventory or on lease) to Financiers as soon as practicable, so that they can control the realization of their VINs outside of the CCAA Proceedings.  The rights of all Financiers will be reserved with respect to the allocation of the Funding Requirement and the costs of these CCAA Proceedings, to be determined at a later date. The Monitor and the CRO will work with the Pride Entities to provide sufficient accounting of the use of the Funding Contributions,

- 13 -

after the Orderly Wind-Down Plan is complete, to assist the discussion with Financiers with respect to the final allocation of costs.

34.     In order to move forward with the Orderly Wind-Down Plan, including the necessary funding to complete it, it is the Monitor's view that all rights of Financiers in connection with arguments as to the appropriate allocation of the Funding Requirement should be reserved.  If approved, the Funding Contribution Proposal should be without prejudice to any party's rights to argue how the Funding Requirement should be allocated to them, if at all, and that any allocation of costs of these proceedings and the Funding Requirement should be addressed at a future motion before the Court (after the turn-over of VINs has been completed).

35.     The Monitor anticipates that any future order of the Court with respect to allocation will also address (i) reimbursement to Financiers who have contributed an amount in excess of the amount that may ultimately be allocated to them, and (ii) the obligation of Financiers who have contributed an amount less than the amount that may ultimately be allocated to them, to pay those funds to the Monitor to be distributed to those parties who have over-contributed. The Monitor views this reconciliation process as necessary to ensure that the Funding Requirement is borne by affected parties in a fair and equitable manner.

36.     Pursuant to the September 3 Order, the Governance Protocol Amendment Order was amended to permit the Pride Entities to use the Extended Deferred Payments until September 30, 2024 in accordance with the provisions contained in such order. As a result of this relief concluding on September 30, 2024, the Pride Entities require certainty of funding as at September 30, 2024 to facilitate the Orderly Wind-Down Plan to its conclusion. Accordingly, the Monitor views it as imperative that the total Funding Requirement in respect of each Financier be satisfied by September 30, 2024 to provide certainty that the Pride Entities, the Monitor and the CRO will have access to the necessary funds to carry out the remaining tasks in these CCAA Proceedings.

37.     For these reasons, the Monitor recommends approval of the Orderly Wind-Down Plan as described in the Fourteenth Report and the associated Funding Contribution Proposal set out in this Second Supplemental Report.

- 14 -

## FUNDING MECHANISM

38.     The expectation is that the Financiers will make their respective Funding Contributions to
a trust fund held by the Monitor by September 30, 2024, with the following exceptions:

(a)     *Total Deferred Payments* - As the Pride Entities received relief to utilize the
Total Deferred Payments, these amounts can be used to offset the Funding
Contribution of Financiers whose respective Total Deferred Payments were used
by the Pride Entities.

(b)     *Other Lease Payments or Soft Collections held either by the Pride Entities or
the Monitor* - As the Monitor is holding certain Soft Collections and Lease
Payments that have been collected and not yet remitted to applicable Financiers
pursuant to the Governance Protocol, the Monitor proposes that it will offset
amounts it is currently holding as against the Funding Contribution of applicable
Financiers, unless otherwise agreed to by the applicable Financier.

(c)     *Multiple Collateral Vehicles* - With respect to Multiple Collateral Vehicles, the
Monitor estimates that it is holding approximately $6 million in Soft Collections
and Lease Payments in respect of Multiple Collateral Vehicles (the "**MCV
Collections**") as at September 1, 2024.  The Monitor proposes to use those funds
in respect of the Orderly Wind-Down Plan and at such time as entitlement to a
Multiple Collateral Vehicle is confirmed to the Monitor, the Monitor will credit
the MCV Collections as against the Funding Contribution in respect of such
VIN.

(d)     *Other funds* – Any other funds that are held by the Pride Entities, or the Monitor,
that have yet to be remitted to a Financier can be directed to offset the Funding
Contribution at the Financiers' direction.

## RECOMMENDATIONS

39.     The Monitor recommends that this Court authorize the Pride Entities to immediately
commence the Orderly Wind-Down Plan and allow Financiers to monetize VINs. To
accomplish this objective, the Pride Entities require funding to permit a fair, orderly and

organized turn-over of VINs to both Securitization Parties and Recourse Lenders. The Funding Contribution Proposal sufficiently balances the interests of Securitization Parties and Recourse Lenders by preserving their rights in respect of a final allocation of costs in these CCAA Proceedings once the Orderly Wind-Down Plan is complete.

40.     For the reasons set out in this Second Supplemental Report, the Monitor recommends this Court grant the Requested Relief.

All of which is respectfully submitted this 19th day of September 2024.

**ERNST & YOUNG INC.,**
solely in its role as Court-appointed Monitor
of Pride Group Holdings Inc. and certain
affiliates and not in its personal or corporate
capacity

**per:**

**Alex Morrison, CPA, CA, LIT, CIRP**
**Senior Vice President**

**Karen Fung, CPA, CA, LIT, CIRP**
**Senior Vice President**

**SCHEDULE "A"**

**A. APPLICANTS**
**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

## Other Holding Companies
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.

**Appendix "A"**

**September 3 Endorsement**

Please see attached.



## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

# <u>COUNSEL/ENDORSEMENT SLIP</u>

**COURT FILE NO.:  CV-24-00717340-00CL**              **DATE: September 3, 2024**


**NO. ON LIST: 1**


**TITLE OF PROCEEDING:  IN THE MATTER OF PRIDE GROUP HOLDINGS INC et al.**


**BEFORE:   JUSTICE OSBORNE**

---

## PARTICIPANT INFORMATION

### For Applicants:

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Leanne Williams<br>Puya Fesharaki<br>Ines Ferreira | Counsel for the Applicants | lwilliams@tgf.ca<br>pfeshraki@tgf.ca<br>iferreira@tgf.ca |
| Raj Sahni | Counsel for the Directors and Officers | sahnir@bennettjones.com |

### For Respondents:

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Craig Colraine | Counsel for PACCAR FINANCIAL Ltd | colraine@bslsc.com |
| Graham Phoenix | Counsel to Finloc 2000 Inc. | gphoenix@LN.law |

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Jeffrey Levine | Counsel for Roynat Inc and The Bank of Nova Scotia | Jeffrey.levine@mcmillan.ca |
| Stuart Brotman<br>Daniel Richer<br>Aubrey E. Kauffman | Counsel for The Lending Syndicate | sbrotman@fasken.com<br>dricher@fasken.com<br>akauffman@fasken.com |

| Shaun Parsons<br>Steven L. Graff | Counsel for TD Equipment Finance Canada | sparsons@airdberlis.com<br>sgraff@airdberlis.com |
|---|---|---|
| Pam Huff<br>Kelly Bourassa<br>Chris Burr | Counsel for the Monitor | Chris.burr@blakes.com<br>Kelly.bourassa@blakes.com<br>Pam.huff@blakes.com |
| John Salmas | Counsel for Bank of Montreal | john.salmas@dentons.com |
| Marc Wasserman<br>Harvey Chaiton | Counsel for Mitsubishi HC Capital | mwasserman@osler.com<br>harvey@chaitons.com |
| Rania Hammad<br>Ashley Taylor | Counsel for MOVETRUST and Boat Capital LP | rhammad@stikeman.com<br>ataylor@stikeman.com |
| Elaine Gray | Counsel for Daimler Truck Financial Services Canada Corporation and Daimler Truck Financial Services USA LLC | Elaine.gray@dentons.com |
| John MacDonald | Counsel for RBC as Financial Service Agent | jmacdonald@osler.com |
| Caroline Descours<br>Erik Axell | Counsel for Regions Bank Regions Equipment Finance Corporation and Regions Commercial Equipment Finance LLC | cdescours@goodmans.ca<br>eaxell@goodmans.ca |
| Heather Meredith | Counsel for National Bank of Canada | hmeredith@mccarthy.ca |
| Nicholas Kluge<br>Thomas Gertner | Counsel for VFS | nicholas.kluge@gowlingwlg.com<br>thomas.gertner@gowlingwlg.com |
| Jennifer Stam | Counsel for the Proposed Receiver | jennifer.stam@nortonrosefulbright.com |
| R. Brendan Bissell | Counsel for Versa Finance and Aviator Financial | bbissell@reconllp.com |
| Valerie Cross | Counsel for RBC – formerly HSBC Bank Canada | valerie.cross@dentons.com |
| John Russo | Counsel for Meridian OneCap Credit Corp | jrusso@pallettvalo.com |
| Trevor Courtis | Counsel for Bennington Financial Corp | tcourtis@mccarthy.ca |
| Kevin Bunt | Lawyer for Ford Credit | kevinbunt@mitchell77.com |
| Joshua Foster | Counsel to the Pride Entities' Directors and Officers | fosterj@bennettjones.com |
| Alex Fernet Brochu | Counsel for Hilco Industrial | afernetbrochu@blg.com |
| Monique Sassi | Counsel for Flagstar | msassi@cassels.com |
| Abir Shamim<br>Andrew J. Hatnay | Counsel for Anna Kazmierska and other employees | ashamim@kmlaw.ca<br>ahatnay@kmlaw.ca |

**ENDORSEMENT OF JUSTICE OSBORNE:**

1. There are several motions before the Court, some of which were scheduled to be heard today, and others of which were not scheduled but are said to be urgent.

2. In general, the parties are at a complete impasse as to the direction of this proceeding, and the path forward. The Applicants, supported by the Monitor, seek relief related to the continued development and implementation of their proposed wind-down plan for the Tpine business, and the sale of the logistics business (PGL) as a going concern.

3. Neither of those initiatives has the support of the Financiers, equipment lessors and the syndicate. They have begun developing their own version of a wind-down plan and oppose the sale of PGL as currently proposed. They seek the termination of this CCAA proceeding in respect of PGL, the termination of the mandate of each of the Monitor and CRO with respect to PGL, and the appointment of a Receiver.

4. In particular, the Applicants, supported by the Monitor, seek:

   a. a Monetization Order as described in the Motion Record to provide for funding to maintain operations through September, 2024;

   b. an order amending the terms of the Amended and Restated Protocols Order to enable the Applicants to sell certain vehicles without requiring prior consent of applicable Financiers;

   c. an order amending the terms of the Governance Protocol Amendment Order;

   d. an order increasing the quantum of the Administration Charge from $3 million to $5 million;

   e. an order approving the PGL Going Concern Transaction, or, in the alternative, advice and directions with respect to the PGL Wind-Down Plan, including a possible mediation, together with advice and directions with respect to the wind-down of the Applicants other than the PGL Entities, including necessary funding required to implement that wind-down; and

   f. an order expunging and discharging any liens registered against any assets owned by the Applicants pursuant to the *Repair and Storage Lien Act* (Ontario), or equivalent statutes, upon payment of the amount of such lien as registered in the applicable personal property registry to the Monitor in trust, pending the resolution or determination of the validity and/or quantum of such lien claims.

5. PACCAR Financial Ltd, PACCAR Financial Services Ltd., and PACCAR Financial Corp. seek:

   a. an order lifting the stay of proceedings to permit them to recover and sell, outside these proceedings, their trucks that remain unsold by the Applicants and are sitting idle on truck lots operated by the Applicants;

   b. an order permitting them to sell their trucks that are subject to non-performing leases entered into between the Applicants and third-party truck operators;

   c. an order dispensing with all notice requirements applicable on the repossession and disposal of trucks, including but not limited to any Notice of Disposition of Collateral required pursuant to any applicable state version of Section 9-611 of the *Uniform Commercial Code* and section 63 of the *Personal Property Security Act*;

d. an order permitting those parties to recover and receive the proceeds of sale of the trucks referred to above in accordance with their valid purchase money security interests with respect to trucks that are not Multiple Collateral Vehicles (MCVs); and

e. an order that those entities receive their entitlements with respect to their trucks that are MCVs in accordance with the MCV Governance Protocol.

6. VFS Canada Inc. seeks similar relief in the form of an order lifting the stay of proceedings to allow it to issue notices of assignment to the third-party lessees of the TLCC Administered Lease Units in respect of the TLCC Administered Leases other than the Excluded Units.

7. Mitsubishi Capital also seeks an order lifting the stay of proceedings in order that it can dispose of its own vehicles as described in its Motion Record.

8. The Bank of Montréal and BMO Bank N.A. seek an order lifting the stay of proceedings similarly to address their own vehicles.

9. Daimler Truck Financial Services Canada Corporation also seeks an order lifting the stay to repossess and sell the PDF Idle Collateral.

10. TD Equipment Finance Canada, together with certain other equipment Financiers of PGL, including but not limited to The Bank of Nova Scotia, oppose the approval of the PGL going-concern transaction sought by the Applicants and instead seek an order:

a. terminating the CCAA proceedings as they relate to PGL and discharging the Monitor and CRO; and

b. appointing The Fuller Landau Group Inc. as Receiver of the assets and properties of PGL.

11. Defined terms in this Endorsement have the meaning given to them in the motion materials and/or the 14th Report of the Monitor and the Supplement to the 14th Report, unless otherwise stated.

12. The various motions before the court are reflective of the fundamental differences in perspective as to how matters should proceed, and which parties should fund steps and to what extent.

13. Numerous parties, and particularly the equipment Financiers and lessors, including but certainly not limited to the syndicate, are frustrated given the limited opportunities for recovery of amounts for which they are exposed, and this frustration is exasperated by a number of the unique features of this case, well-known to all stakeholders, but worth repeating here: the logistical complexity of this business and the fact that the assets representing the overwhelming proportion of value (and therefore possible recovery) consist of tractors and trailers that are not only located in virtually every jurisdiction in Canada and the United States, but that also, at least in some cases, move around on literally a daily basis.

14. At the same time, the value of these assets needs to be maximized, and that yields significant and robust differences of view with respect to how and by whom they should be maintained, and how and by whom they should be monetized in a manner so as to minimize the effect of diluting an already saturated market.

15. There is general consensus that the Tpine business needs to be wound down. Indeed, in the circumstances where there is no new DIP financing available, and the current DIP facility is effectively fully drawn, there is little practical alternative.

16. Some Financiers including the syndicate have proposed the discharge of the Monitor and the CRO with respect to that element of the business, and the appointment of a receiver. The proposal is that the receiver would implement a wind-down plan, but the parties sponsoring that proposal submit that the proposed

receiver is not able to particularize that wind-down plan beyond the extent to which it has already done so, absent the provision of significantly more information and materials than (they submit) have been forthcoming from the Monitor to date.

17. The Applicants, supported by the Monitor, accept that a wind-down of the Tpine business will be necessary, but submit vigorously that it should be implemented in an orderly manner that is transparent, fair and does not grant, intentionally or inadvertently, a preference to any similarly ranked creditor over another.

18. The Financiers have not yet shared the particulars of their proposed wind-down plan with the Applicants and the Monitor, although it is apparently well along in its development.

19. At the same time, the Applicants, supported by the Monitor, seek a going concern sale of PGL, and that is further vigorously supported both by the directors of the Pride Entities and the employees, many of whom are here today and whose livelihoods will be directly affected by the direction taken.

20. The going concern sale is not supported by any of the Financiers or lessors, including but not limited to those lenders who in the aggregate, comprise the fulcrum creditors. Consideration of the transaction is complicated by the fact that the principals of the proposed purchaser entities are the current principals of the Pride Entities, and this adds a layer of complexion to the proposed transaction as against which the total consideration and outcome with all of its benefits for all stakeholders, must be considered.

21. There has been much discussion both at earlier court appearances in this matter, including the most recent court appearance, and indeed earlier today, about the possibility of a mediation in respect of at least some of the issues. At the same time, those parties who are seeking to have lift stay motions heard have in some cases had those motions pending for a period of time.

22. There has, regrettably, not been the level of communication and candour that would be optimal, with the result that frustration and a lack of order remain.

23. Accordingly, I am directing that all affected parties attend before The Honourable Thomas McEwen, former Team Lead of the Commercial List and an extremely experienced commercial mediator, on September 9 and if and as necessary and as he may direct, September 10, to mediate these issues and attempt to resolve or at least narrow the issues.

24. To be clear, the secured creditors of PGL should attend and participate in that aspect of the mediation, and the secured creditors and securitization parties (to the extent affected by the wind-down) should attend the balance of the mediation, all as Mr. McEwen (the Mediator) may direct.

25. I am further directing that the parties provide to Mr. McEwen, no later than 12 PM noon on Thursday, September 5, a position paper outlining their position and proposed path forward. Position papers are not to exceed five pages in length. Parties may collaborate on their position papers and file them jointly if and as appropriate.

26. The parties will participate in an introductory Zoom call before Mr. McEwen on Friday, September 6, with a view to sorting out as he may direct the sequence of events for September 9 and 10. I would ask the Monitor and the CRO to take an active role in the coordination of that to maximize efficiency.

27. With respect to the mechanics of the mediation process, the following communication and confidentiality protocol will apply:

a. the Court and the Mediator may communicate between one another directly to discuss on an ongoing basis the conduct of the Mediation in the manner in which it will be coordinated with these CCAA Proceedings;

b. the Court will not disclose to the Mediator how it will decide any matter that may come before the Court for determination, and the Mediator will not disclose to the Court the negotiating positions or confidential information of any of the parties in the mediation;

c. any notes, records, statements made, discussions had, and recollections of the Mediator in conducting the mediation shall be confidential and are without prejudice and protected from disclosure for all purposes as set out above; and

d. the Mediator shall not be liable to any party or participant for any act or omission in connection with the mediation and shall have the immunity of a judge of a Superior Court in Canada.

28. To the extent that matters are not resolved in the judicially directed mediation, I will hear such motions as may be necessary, including the lift stay motions that are pending, and the opposed motion with respect to the going concern sale of PGL. Those motions are adjourned in the interim.

29. I will speak with the Commercial List Trial Coordinator to see what judicial resources can be freed up to address those matters as may be necessary during the week of September 16.

30. In the interim, I am granting the monetization order sought by the Applicants, recommended by the Monitor and (perhaps reluctantly) not opposed by any other party, in order to ensure the continuation of operations through the use of lease payments to fund operations, such as they are, until the completion of the mediation process or further order of the Court.

31. The increase in the quantum of the Administration Charge is not opposed by any party and is also recommended by the Monitor. I am satisfied that the proposed increase is appropriate, necessary and it is approved.

32. Similarly, the lien regularization relief is not opposed by any party, it is appropriate, and it is approved.

33. The allocation of Deferred Payments will be addressed at a later date, and all parties have reserved their rights in that regard.

34. The Applicants advise that certain Financiers have brought motions in the US Proceedings, currently returnable September 12 for effectively the same relief as they seek in the motions before this Court, and which I have adjourned pending the judicial mediation, which, as noted above, I am hopeful will narrow, if not resolve, the issues. As I advised the parties at the conclusion of this hearing, it would be my expectation that those Financiers would not proceed with those motions in the US Proceedings at this time in order that the mediation proceed in good faith and this Court can address remaining issues thereafter.

35. Orders to go in the form signed by me which are effective immediately and without the necessity of issuing and entering.

_Osborne, J._

Court File No.:  CV-24-00717340-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC., et al.

| |
|---|
| ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding Commenced at Toronto |
| **SECOND SUPPLEMENT TO FOURTEENTH**<br>**REPORT OF THE MONITOR**<br>**dated September 19, 2024** |
| **BLAKE, CASSELS & GRAYDON LLP**<br>Barristers and Solicitors<br>199 Bay Street<br>Suite 4000, Commerce Court West<br>Toronto, Ontario M5L 1A9<br><br>**Pamela Huff**, LSO #27344V<br>Tel:    416-863-2958<br>Email:   pamela.huff@blakes.com<br><br>**Chris Burr**, LSO #55172H<br>Tel:    416-863-3261<br>Email:   chris.burr@blakes.com<br><br>**Kelly Bourassa**, LSO #43062R<br>Tel:    416-863-2421<br>Email:   kelly.bourassa@blakes.com<br><br>**Daniel Loberto**, LSO #79632Q<br>Tel:    416-863-2937<br>Email:   daniel.loberto@blakes.com<br><br>Lawyers for the Monitor |

Court File No. CV-24-00717340-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**THIRD SUPPLEMENT TO FOURTEENTH REPORT OF THE MONITOR**

**DATED September 23, 2024**

**TABLE OF CONTENTS**

**INTRODUCTION** ..................................................................................................... **2**

**PURPOSE** ................................................................................................................ **2**

**TERMS OF REFERENCE** ...................................................................................... **2**

**PGL REQUESTED RELIEF UPDATE** .................................................................. **3**

*ACCESS TO INFORMATION* ................................................................................. **3**

*MEDIATION UPDATE* ............................................................................................ **4**

*AMENDMENTS REFLECTED IN THE A&R PGL SALE AGREEMENT* ................................... **4**

**RECOMMENDATIONS** ........................................................................................... **14**

<u>**Appendices**</u>                                                                                                    <u>**Tab**</u>

Amended and Restated PGL Sale Agreement, dated September 22, 2024.........   A

Blackline of Amended and Restated PGL Sale Agreement, dated September 23, 2024, marked against PGL Sale Agreement dated August 26, 2024...............   B

Form of Approval and Vesting Order……………………………………………   C

Blackline of of Approval and Vesting Order marked against version attached to First Supplement to the Fourteenth Report………………………………………   D

Court File No. CV-24-00717340-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**THIRD SUPPLEMENT TO FOURTEENTH REPORT OF THE MONITOR**

**DATED September 23, 2024**

**INTRODUCTION**

1.    The background on these CCAA proceedings is summarized in paragraphs 1-24 of the Fourteenth Report, which paragraphs are hereby incorporated by reference. All capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Fourteenth Report.

**PURPOSE**

2.    This third supplement to the Fourteenth Report (the "**Third Supplemental Report**") is to provide information and updates to the Court with respect to the Pride Entities' motion for the approval of the PGL Going Concern Transaction contemplated by the PGL Sale Agreement, as amended pursuant to the amendments discussed herein the "**A&R PGL Sale Agreement**", and vesting in the Purchaser (as defined in the A&R PGL Sale Agreement) of the Purchased Assets (as defined in the A&R PGL Sale Agreement), and the Monitor's recommendation in respect to same.

**TERMS OF REFERENCE**

3.    The Terms of Reference set out in paragraphs 25 through 27 of the Fourteenth Report are incorporated herein by reference.  All references are to CDN $.

**PGL TRANSACTION UPDATE**

*Access to Information*

4.     At the September 3, 2024 hearing in these CCAA Proceedings, Financiers of PGL raised concerns regarding information provided to them in respect of the PGL Entities.

5.     Immediately following this hearing, the Monitor: (i) contacted each of the Financiers of PGL and Fuller Landau to indicate that they could have access to the dataroom created by Ernst & Young's corporate finance group in connection with the PGL Sale Process (the "**PGL Dataroom**"), which would provide them with substantially all of the relevant information pertaining to the PGL Entities to which the Monitor has access, and (ii) circulated a form of non-disclosure agreement ("**NDA**") to be reviewed and executed by each of the Financiers of PGL and Fuller Landau to gain access to the PGL Dataroom.

6.     The Monitor received two executed NDAs, from RBC (in its capacity as bilateral lender) and Daimler, and provided access to the PGL Dataroom accordingly.

7.     As discussed in the Supplement to the Fourteenth Report of the Monitor, dated September 2, 2024 (the "**First Supplemental Report**"), the Monitor's counsel previously communicated to Financiers of PGL concerns relating to confidentiality of information requested to be shared with Fuller Landau, but offered to meet with the applicable Financiers and their financial advisors, including Fuller Landau, to understand the information requests and whether or how they could be accommodated. Additionally, the Monitor has offered a meeting with Fuller Landau to respond to any reasonable information requests of Fuller Landau in respect of the PGL Entities, but the Monitor has not received a response from Fuller Landau to this offer as of the date hereof.

- 4 -

*Mediation Update*

8.     The Endorsement of Mr. Justice Osborne, dated September 3, 2024, directed, among other things, "the secured creditors of PGL" to attend at a mediation (the "**Mediation**") before retired Commercial List Team Lead Mr. Thomas McEwen (the "**Mediator**"). The intend of the Mediation was to resolve, or at least narrow, the outstanding issues in these CCAA Proceedings, including any issues in respect of the PGL Going Concern Transaction.

9.     As discussed in the Second Supplement to Fourteenth Report to Court, dated September 19, 2024, the Monitor and its counsel, counsel to the Pride Entities, and the CRO attended the Mediation on September 9 and 10, 2024, along with Financier representatives, counsel, and/or financial advisers from all but three Financiers of PGL (the "**PGL Mediation Parties**"), among other stakeholders of the Pride Entities. To facilitate further negotiation and discussion, the Monitor and its counsel, the CRO and the PGL Mediation Parties attended on a series of calls with the Mediator on September 13, 2024.

10.    The Monitor commends the PGL Mediation Parties for their participation in the Mediation, including two full days of attendance, and participation in the September 13 phone calls. In the Monitor's view, while all of the issues surrounding the PGL Going Concern Transaction could not be resolved, substantial progress was made and the terms of the PGL Going Concern Transaction have been materially improved.

11.    The Mediation resulted in a number of amendments to the PGL Sale Agreement, which were agreed to between the Purchaser and the Vendors (acting through the CRO and the Monitor) in order to address as many of the concerns raised by the Financiers of PGL as could be accommodated. These amendments resulted in the A&R PGL Sale Agreement, a copy of which is attached hereto as **Appendix "A"**. Attached hereto as **Appendix "B"** is a blackline of the A&R PGL Sale Agreement marked against the executed version of the PGL Sale Agreement that was attached to the Fourteenth Report as Appendix "D".

*Amendments Reflected in the A&R PGL Sale Agreement*

12.    As illustrated in the blackline attached as Appendix "B", the amendments to the PGL Sale Agreement that have resulted in the A&R PGL Sale Agreement are set out below.

Capitalized terms used but not defined in this section have the definitions given to them in the A&R PGL Sale Agreement.

*Purchase Price Increase*

13. The Purchase Price has been increased by $2 million, all of which has been allocated to Vehicles, which are listed in Schedule "G" of the A&R PGL Sale Agreement. As no new Purchased Assets have been added to the A&R PGL Sale Agreement, the net effect of this Purchase Price increase is that PGL's equipment Financiers will each recover more under the A&R PGL Sale Agreement than they would have recovered under the PGL Sale Agreement.

14. The Monitor is in the process of updating the lender-by-lender allocation analyses, and will be providing revised allocation analyses to each lender shortly. A number of lenders have requested the allocation analyses of other lenders, however this request has been declined by the Monitor. If the PGL Financiers wish to share their respective allocation analyses with other lenders, the Monitor has no objection to them doing so.

15. In the Monitor's view, the increased Purchase Price represents a material improvement to the PGL Sale Agreement, from the perspective of lender recoveries. As discussed in the Twelfth and Fourteenth Reports, based on the Monitor's analysis of the allocation of the Purchase Price, and the costs and logistics of a wind-down alternative to a going concern sale, PGL's Financiers would do better in the aggregate under the going concern scenario than they would under a wind-down scenario; with the addition of $2 million to the Purchase Price, that recovery is even better than it would have been under the PGL Sale Agreement.

*Real Estate Option and Approved Lease Terms*

16. Financiers with an interest in the real property that is subject to the Real Estate Option and/or the real property to be leased to the Purchaser under the terms of the PGL Sale Agreement communicated concerns to the Monitor about the ways in which the Real Estate Option and leases may prejudice their interests, in particular their desire to see the charged property sold as expeditiously as possible.

- 6 -

17. While it has not been possible to include all of the mortgagee's requested revisions into the A&R PGL Sale Agreement, the following changes have been made:

    (a)    Scope of Real Property Option

18. The Real Property Option, as drafted in the PGL Sale Agreement, provided that the Purchaser could exercise an option to buy three parcels of land owed by Pride Entities, which were historically used by PGL to store vehicles not currently on customer delivery, and mortgaged to National Bank of Canada ("**NBC**"), being property in Dorval, Quebec (the "**Dorval Property**"), Pierrefonds Quebec, and Halton, Ontario (collectively, the "**Option Properties**").[1] The Real Property Option was (and continues to be) subject to the consent of the Monitor, the applicable mortgagee on the Option Property (being NBC), and RBC as syndication agent (the "**Agent**").

19. The Real Property Option has been amended to provide that the option can be exercised in respect of any one or more of the Option Properties, rather than all of them together. This would permit the Purchaser to buy fewer than all three Option Properties, and/or permit NBC and the Agent to grant or decline to grant consent to individual Option Properties.

    (b)    Approved Lease Terms

21. The PGL Sale Agreement included a Purchaser's condition of closing that required leases to be entered into between the Purchaser, as tenant, and the relevant Pride Entity property owner, as landlord, for the Dorval Property,[2] the Milton Property[3] and the Fort Erie Property[4] (collectively, the "**Leased Pride Properties**"), as well as assignments to the Purchaser of the leases of the Dixie Road Property and the Cornwall Property, which are owned by third-parties (the "**Leased Third Party Properties**", and together with the Leased Pride Properties, the "**Lease Properties**").[5]

---

[1] The Option Properties are described in further detail in Paragraph 54 of the Fourteenth Report.
[2] Being the property municipally known as 1943 & 1945 55e Avenue, Dorval, Quebec.
[3] Being the property municipally known as 10862 Steeles Ave E., Milton, Ontario.
[4] Being the property municipally known as 933 Helena Street, Fort Erie, Ontario.
[5] The Lease Properties are discussed in further detail in Paragraphs 59-63 of the Fourteenth Report.

- 7 -

22.     In respect of the Leased Pride Properties, the PGL Sale Agreement required that the lease terms be:

> not less favourable than the terms of any existing lease agreements or other existing arrangements, as necessary to allow the Purchaser or its nominee to continue to use the real property currently owned by [the Pride Entity owner of the Leased Pride Properties] for a period of twelve (12) months at fair market value rents, with an option to extend such lease for an additional twelve months on consent of [the Pride Entity owner of the Leased Pride Properties] and the Purchaser, and an at-will termination provision in favour of the landlord of not more than 60 days notice.

23.     The mortgagee of the Lease Pride Properties raised concerns that these prescribed lease terms could interfere with the sale of the real properties, by imposing a tenant on the property that a purchaser may not want. In the Monitor's view, this is a fair concern, and the Monitor shares the mortgagee's desire to maintain the Lease Pride Properties for sale as soon as possible.

24.     In response to these concerns, the A&R PGL Sale Agreement now includes the defined term "Approved Lease Terms", which prescribes the terms on which the Leased Pride Properties must be leased by the Purchaser. These Approved Lease Terms require that the leases have the following terms:

(a)     an initial 60 day term, with a series of 60 day renewal terms, renewable with the consent of the landlord, any mortgagee with an interest registered on title to the real property, and the Royal Bank of Canada (in its capacity as administrative agent and collateral agent), which consent is not to be unreasonably withheld unless: (A) the lease is in default and any applicable cure periods have expired, (B) a binding offer is accepted by the landlord for the purchase of the applicable real property, or (C) the leased property has been vacated of substantially all trucks and trailers not owned by the Purchaser, at which point the lease or agreement may be (x) terminated by the landlord on 60 days notice to the tenant, or (y) renewed if requested by the tenant for a further term, with the consent of the landlord, any mortgagee or other secured creditor with an interest in the leased property, and the purchaser of the real property;

- 8 -

(b)      fair market value rent, as determined by the Monitor in its sole discretion;

(c)      terms that are not less favourable to the landlord than the terms of any existing lease, access or parking agreements in respect of the real property;

(d)      an at-will, without-cause, termination right, exercisable by either the landlord or the tenant on 60 days notice; and

(e)      prior to its execution, each lease for Leased Pride Properties shall be provided to any mortgagee or other secured creditor with an interest in the property to be leased, and the Monitor, CRO and Purchaser shall consult with such creditors on the terms of such lease.

25.    The amendments related to the Approved Lease Terms also include a new provision in Section 4.6 to provide that the Pride Entity owners of the Leased Pride Properties (defined as the "Related Party Landlords") shall, after Closing, be subject to the exclusive governance and control of the CRO and the Monitor, and shall not be bankrupt, dissolved or otherwise wound up without further order of the Court. This provision is to ensure that the landlord remains an extant corporation for the duration of the leases of the Leased Pride Properties. This provision is also required by the A&R PGL Sale Agreement to be included in the Approval and Vesting Order. A copy of the revised proposed Approval and Vesting Order is attached hereto as **Appendix "C"**, and a blackline of the updated proposed Approval and Vesting Order, marked against the version attached as Appendix "A" to the First Supplemental Report, is attached hereto as **Appendix "D"**.

26.    In the Monitor's view, the foregoing amendments substantially address the concerns of mortgagees that the leases contemplated by the A&R Sale Agreement could interfere with the sale of the Leased Pride Properties. Each of the Leased Pride Properties is presently listed for sale, and the Monitor and CRO are working to sell them as soon as possible, consistent with the larger wind-down plan of the Pride Entities generally. However, any sale for the Leased Pride Properties cannot close until the property has been vacated of Pride Entity vehicles. The Monitor projects that the Dorval Property and Fort Erie Property will be vacant by mid-October, and the Milton Property by the end of the year. In the

interim, offers can be solicited, terms of sale can be negotiated, sale agreements can be executed, and transactions can be brought before the Court for approval – it's only the closing that cannot occur until the properties are vacant of Pride Entity vehicles.

27.     If an offer for any of the Leased Pride Properties that was acceptable to the applicable mortgagee was received, that offer could be accepted immediately. However, in the Monitor's experience with selling other Pride Entity real property, a transaction could not be negotiated, documented, court-approved and closed in a 60 day period. Accordingly, the 60 day terms and termination rights set out in the Approved Lease Terms would allow the CRO to deliver vacant possession to any purchaser of a Leased Pride Property who did not want the Purchaser as a tenant, on a commercially reasonable timeline.

28.     In short, in the Monitor's view, the revisions to the PGL Sale Agreement represented by the Approved Lease Terms address the potential prejudice to mortgagees that has been raised. The Monitor understands and acknowledges that the mortgagees would prefer a consent right over the leases themselves, however such a consent right (a) was not acceptable to the Purchaser, and (b) would introduce a third-party consent condition to the Transaction that could jeopardize Closing (such third-party consent rights are discussed further below).

29.     The Leased Third Party Properties are discussed below, under the heading "Critical Required Contracts".

*Permit Assignment*

30.     Section 6.2(a) of the PGL Sale Agreement required that, as a Purchaser's condition of closing, all "Permits" be in good standing and transferred or assigned to the Purchaser on Closing. This closing condition created a third-party consent right that was out of the Monitor's and the Purchaser's control, and thus was a Closing risk that the Monitor understands was justifiably of concern to PGL Financiers.

31.     The Purchaser has advised the Monitor that it will agree to close without the Permits being assigned, provided the PGL entities that hold the Permits (defined as "**Permit Vendors**" in the A&R PGL Sale Agreement) remain as corporations in good standing post-Closing,

- 10 -

and enter into a transition services agreement that will allow the Purchaser to take the benefit of the Permits until they can be assigned to the Purchaser (with the consent of the issuing regulator), or new permits can be obtained by the Purchaser.

32.     The PGL Sale Agreement has accordingly been amended to (a) delete the Permit condition in Section 6.2(a), and (b) include in Sections 2.1 and 4.6 new language to ensure that the Permit Vendors remain in good standing, under the exclusive control of the Monitor and CRO, until such time as the transition services agreement is no longer required.

33.     The Monitor considers the revised treatment of Permits to be positive, as it reduces Closing risk, and does not impose any new costs or obligations on the Vendors. There is no change in the Purchase Price or other consideration to accommodate the revised treatment of Permits, because it is fundamentally an administrative change: the Purchaser is still buying the Permits, it is just agreeing to a work-around in the event that they cannot be conveyed on the Closing Date, so that the assignment of the Permits does not delay closing.

34.     The amendments to the treatment of the Permits and Permit Vendors also requires an addition to the proposed Approval and Vesting Order, to address the treatment of the Permit Vendors post-Closing, similar to that of the Related Party Landlords.

*Critical Required Contracts*

35.     The PGL Sale Agreement included five "Critical Required Contracts", the assignment of which to the Purchaser (whether on consent or pursuant to the Assignment Order) was a condition of Closing. Like the Permit condition discussed above, the condition attached to these Critical Required Contracts presented a third-party consent right that could delay Closing.

36.     In order to mitigate the Closing risk, the Purchaser has agreed to reduce the number of Critical Required Contracts from five to three, with the remaining Critical Required Contracts being: (a) the lease of the Dixie Road Property, (b) the lease of the Cornwall Property, and (c) the Finloc Leases.

37.     The Purchaser, the Monitor and the CRO have engaged in discussions with the landlord of the Dixie Road Property, which discussions have been constructive. The landlord of the Cornwall Property is subject to a lease option in favour of PGL, with prescribed terms that have already been agreed to by the Cornwall Property landlord, and the Purchaser has commenced discussions with the landlord, which likewise have been constructive. Finally, the Finloc Leases are, in the Monitor's view, "true leases", which are expected to be current as of the Closing Date.

38.     In the Monitor's view, the reduction of the Critical Required Contracts to just the two real property leases and the Finloc Leases is a positive step towards reducing Closing risk, and based on discussions to date, the Monitor is optimistic that consents to assignment of each will be obtained (obviating the need for an Assignment Order).

*Outside Date*

39.     The Monitor understands that the PGL Financiers are acutely concerned with the certainty of Closing of the Transaction, and with such Closing happening as soon as possible. The Monitor shares this concern.

40.     The A&R PGL Sale Agreement includes an "Outside Date" of "October 16, 2024, or such later date that is two Business Days after the date on which the Approval and Vesting Order and, if applicable, the Assignment Order, become Final Orders, or such later date and time as the Vendors, with the consent of the Monitor, and the Purchaser may agree in writing, or as the Court may direct."

41.     The Monitor is focussed on Closing on October 16, and the revised treatment of Permits and reduced number of Critical Required Contracts will make this timing more achievable. However, the Monitor understands that the Purchaser cannot close without the Approval and Vesting Order being a Final Order (particularly given the significant degree of opposition to the PGL Going Concern Transaction that has been raised), and given the complexity of the Transaction (and the volume of mobile Purchased Assets), the Closing Date could, without the fault of any person, slip beyond October 16.

- 12 -

42.    The revisions to the definition of "Outside Date" in the A&R PGL Sale Agreement are designed to provide some discretion to the Monitor to extend Closing if reasonable and prudent to do so under the prevailing circumstances on October 16, while also providing recourse to the Court for the Monitor and the PGL Financers in the event that Closing cannot be completed. In the Monitor's view, it would be commercially unreasonable to agree to an October 16 Outside Date that did not have any flexibility whatsoever, however this does not mean that the Monitor would support the Closing Date being extended indefinitely.

43.    It bears repeating that the Monitor is acutely aware of the importance to the PGL Financers of the October 16 Closing Date, and intends to work with the Purchaser and any necessary third parties to ensure that this Closing Date is met.

*Purchased LCs and LC Purchase Price*

44.    The PGL Sale Agreement allocated $4 million of the aggregate Purchase Price to the "Purchased LCs", being the existing letters of credit maintained by PGL entities in the course of their business. However, this "LC Purchase Price" was not payable to the Vendors or the Monitor on Closing, rather, it was payable to the issuer(s) of the Purchased LCs, to be used as cash collateral to maintain the letters of credit in good standing.

45.    In the context of amending the PGL Sale Agreement, the Monitor and the Purchaser have agreed to delete the Purchased LCs and the LC Purchase Price from the A&R PGL Sale Agreement. The Purchaser will apply the former LC Purchase Price, and deal with the necessary letters of credit, separately from the Transaction.

46.    In the Monitor's view, this change is neutral: since the LC Purchase Price was never payable to the Vendors or the Monitor, and never constituted proceeds of the sale to be distributed to creditors, its deletion does not change the mechanics or economics of the PGL Going Concern Transaction.

*Monitor's Continued Support for the PGL Going Concern Transaction*

- 13 -

47.  The Monitor supported the PGL Going Concern Transaction evidenced by the PGL Sale Agreement for the reasons set out in the Fourteenth Report, summarized in Paragraph 71 thereof. In the Monitor's view, the A&R PGL Sale Agreement includes a number of improvements to the PGL Sale Agreement, and the Monitor's support for the Transaction thereunder continues.

48.  As set out in the Fourteenth Report, the support of the Monitor for the PGL Going Concern Transaction is based on the following factors:

  (a)  it provides a higher recovery than a forced liquidation, which recoveries have been improved by the $2 million increase to the Purchase Price;

  (b)  it provides for the purchase of substantially all the PGL Entities' assets, including trucks, trailers, inventory, and accounts receivable (other than accounts receivable owing by non-acquired Pride Entities), on an as-is, where-is basis;

  (c)  the Purchase Price was the result of a thorough and comprehensive sale process, on Court-approved terms and conditions;

  (d)  the sale contemplates the assumption of substantially all employees, independent contractors and customer contracts;

  (e)  the closing and post-closing adjustments regarding assumed liabilities and other assets are limited and rational;

  (f)  the Real Estate Option appropriately balances the Purchaser's need for real property to conduct the PGL business with the mortgagee's rights to consent to a sale of such real property pursuant to existing Court orders, which mortgagee's rights and interests have been improved from prior deal by the addition of the Approved Lease Terms; and

  (g)  the alternative to the PGL Going Concern Transaction will be expensive, time consuming, destructive to value, logistically very difficult to implement, and will result in the loss of over 500 jobs.

- 14 -

**RECOMMENDATIONS**

49.     For the reasons set out in this Third Supplemental Report, the Monitor recommends this

Court approve the PGL Going Concern Transaction.


All of which is respectfully submitted this 23rd day of September 2024.

**ERNST & YOUNG INC.**,
solely in its role as Court-appointed
Monitor of Pride Group Holdings Inc. and
certain affiliates and not in its personal or
corporate capacity

**per:**

**Alex Morrison, CPA, CA, LIT, CIRP**
**Senior Vice President**

**SCHEDULE "A"**

**A. APPLICANTS**
**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*

- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*

- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*

- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.

# Appendix "A"

## <u>AMENDED & RESTATED PURCHASE AGREEMENT</u>

This Amended & Restated Purchase Agreement dated as of the 22nd day of September, 2024 among:

Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation
(collectively, the "**Vendors**")

– and –

1000927605 Ontario Inc.
(the "**Purchaser**")

**WHEREAS** pursuant to the Order of the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") granted on March 27, 2024 (the "**CCAA Filing Date**") (as amended or amended and restated from time to time, the "**Initial Order**"), the Vendors and certain of their affiliated entities/businesses (as defined collectively in the Initial Order, the "**Pride Entities**") were granted creditor protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36, as amended (the "**CCAA**"). Ernst & Young Inc. was appointed as the monitor of the Pride Entities (in such capacity, the "**Monitor**"), and RC Benson Consulting Inc. was appointed as the Pride Entities' chief restructuring officer (in such capacity, the "**CRO**");

**AND WHEREAS** the proceedings initiated by the Initial Order (the "**CCAA Proceedings**") were recognized pursuant to an Order of the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**" and together with the Canadian Court, the "**Courts**") under Chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**");

**AND WHEREAS** in connection with the CCAA Proceedings, on May 15, 2024, the Pride Entities sought and obtained approval from the Canadian Court of a sale solicitation process (as it may be amended from time to time in accordance with its terms, the "**Sale Process**"), to be conducted by the Monitor, with the assistance of its advisors, the CRO, and the Vendors, intended to solicit interest in, and opportunities for, the purchase of all or part of the business, operations and assets of all or any of the Vendors;

**AND WHEREAS** pursuant to the Sale Process, the Monitor, in consultation with the Vendors, has reviewed and evaluated all qualified bids received, and identified the Purchaser's bid for the Purchased Assets (defined herein) as a Successful Bid;

**AND WHEREAS** on the terms set out in the purchase agreement among the Vendors and the Purchaser dated August 26, 2024 (the "**Original APA**"), the Vendors agreed to sell and transfer to the Purchaser, and the Purchaser agreed to purchase from the Vendors, all of the Vendors' right, title and interest in and to the Purchased Assets, which includes substantially all of PGL's assets, subject to and in accordance with the terms and conditions set forth in this Agreement;

**AND WHEREAS** following the execution of the Original APA, certain additional transaction terms were negotiated between the Vendors and the Purchaser, which additional terms are set out in this Agreement;

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby irrevocably acknowledged, the parties hereto (collectively, the "**Parties**", and each, a "**Party**") hereby acknowledge and agree as follows:

– 2 –

# ARTICLE 1
## INTERPRETATION

**1.1     Definitions**

Unless something in the subject matter or context is inconsistent therewith, the terms defined herein shall have the following meanings:

"**129 Canada**" means 12944154 Canada Inc.

"**129 Shares**" means all of the outstanding shares of 129 Canada.

"**131 Canada**" means 13184633 Canada Inc.

"**207 Ontario**" means 2076401 Ontario Inc.

"**283 Ontario**" means 2837229 Ontario Inc.

"**933 Helena**" means 933 Helena Holdings Inc.

"**Accounts Receivable**" means, with respect to the PGL Vendors and without duplication, all accounts receivable, trade receivables, bills receivable, trade accounts, book debts, notes receivables, rebates, refunds and other receivables of the PGL Vendors whether current or overdue and determined in accordance with GAAP, arising prior to, including, and after the Closing Date, together with all interest accrued on such items, but for greater certainty, <u>excluding</u> any amounts owing by any the Pride Entity that is not a PGL Vendor or PGL Insurance.

"**Acquired AR Amount**" has the meaning ascribed thereto in section 3.2.

"**Affiliate**" has the meaning given to the term "affiliate" in the *Business Corporations Act* (Ontario).

"**Agreement**" means this amended & restated purchase agreement, as may be further amended and restated from time to time in accordance with the terms hereof, with the consent of the Monitor, and "Article" and "Section" mean and refer to the specified article, section and subsection of this Agreement.

"**Applicable Law**" means, in respect of any Person, property, transaction or event, any (i) domestic or foreign statute, law (including the common law), ordinance, rule, regulation, treaty, restriction, regulatory policy, standard, code or guideline, by-law or order, (ii) judicial, arbitral, administrative, ministerial, departmental or regulatory judgments, orders, decisions, rulings, instruments or awards of any Governmental Authority, and (iii) policies, practices, standards, guidelines and protocols having the force of law, that applies in whole or in part to such Person, property, transaction or event.

"**Approval and Vesting Order**" means an order by the Canadian Court, in form and substance satisfactory to the Purchaser, acting reasonably, among other things, approving and authorizing the Transaction and vesting in the Purchaser (or as it may direct) all the right, title and interest of the Vendors in and to the Purchased Assets, free and clear from any Encumbrances.

"**Approved Lease Terms**" mean terms in a real property lease, access agreement or parking agreement that provide for: (i) an initial 60 day term, with a series of 60 day renewal terms, renewable with the consent of the landlord, any mortgagee with an interest registered on title to the real property, and the Royal Bank of Canada (in its capacity as administrative agent and collateral

agent), which consent is not to be unreasonably withheld unless (A) the lease is in default and any applicable cure periods have expired, (B) a binding offer is accepted by the landlord for the purchase of the applicable real property, or (C) the leased property has been vacated of substantially all trucks and trailers not owned by the Purchaser, at which point the lease or agreement may be (x) terminated by the landlord on 60 days notice to the tenant, or (y) renewed if requested by the tenant for a further term, with the consent of the landlord, any mortgagee or other secured creditor with an interest in the leased property, and the purchaser of the real property; (ii) fair market value rent, as determined by the Monitor in its sole discretion; (iii) terms that are not less favourable to the landlord than the terms of any existing lease, access or parking agreements in respect of the real property; and (iv) an at-will, without-cause, termination right, exercisable by either the landlord or the tenant on 60 days notice. Without limiting any of the foregoing, the Purchaser and the Vendors agree that any lease entered into subject to the Approved Lease Terms shall be provided in draft to any mortgagee or other secured creditor with an interest in the property to be leased, prior to it being entered into, and the Monitor, CRO and Purchaser shall consult with such creditors on the terms of such lease.

"**Assignment Order**" means an order or orders of the Canadian Court pursuant to section 11.3 of the CCAA and other applicable provisions of the CCAA, in form and substance satisfactory to the Purchaser and the Monitor on behalf of the PGL Vendors, each acting reasonably, authorizing and approving (i) the assignment of any Critical Required Contract for which a consent, approval or waiver necessary for the assignment of such Critical Required Contract has not been obtained, (ii) the prevention of any counterparty to such Critical Required Contracts from exercising any right or remedy under such Critical Required Contracts by reason of any defaults arising from the CCAA Proceedings or the insolvency of the PGL Vendors and deeming any such defaults to have been cured (iii) the vesting in the Purchaser (or as directed by the Purchaser) of all right, title and interest of the PGL Vendors in such Critical Required Contracts, including without limitation any and all rights to purchase the Finloc Leased Vehicles in accordance with the Finloc Leases.

"**Assumed Liabilities**" means any of the following: (i) liabilities of PGL Insurance accruing from and after the Closing Date; (ii) any Unpaid Post CCAA Filing Accruals that remain unpaid by the Vendors on Closing; (iii) liabilities for accrued vacation pay of the Transferring Employees; (iv) liabilities of any PGL Vendor owing to any other PGL Vendor or PGL Insurance, whether incurred or owing prior or subsequent to the CCAA Filing Date; and (v) if the Real Property Option is exercised, the real property mortgages and accrued property taxes and utilities associated with the Optional Assets.

"**Authorization**" means any authorization, approval, consent, concession, exemption, license, lease, grant, permit, franchise, right, privilege or no-action letter from any Governmental Authority having jurisdiction with respect to any specified Person, property, transaction or event, or with respect to any of such Person's property or business and affairs (including any zoning approval or building permit) or from any Person in connection with any easements, contractual rights or other matters.

"**Books and Records**" means, in respect of the PGL Vendors, LeaseCo and PGL Insurance and, if applicable, the Optional Vendors: (i) all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise), including Tax and accounting books and records, and (ii) all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise), including Tax and accounting books and records used or intended for use by, or in the possession of such entities, including, without limitation, information, documents and records relating to the Purchased Contracts, customer lists, customer information and account records, sales records, computer files, data processing records, employment and personnel records, sales literature,

advertising and marketing data and records, cost and pricing information, production reports and records, equipment logs, operating guides and manuals, credit records, records relating to present and former suppliers and contractors, plans and projections and all other records, data and information stored electronically, digitally or on computer-related media.

"**Business**" means the transportation and logistics business conducted by the PGL Vendors across Canada and the United States, as applicable.

"**Business Day**" means a day on which banks are open for business in Toronto, Ontario, but does not include a Saturday, Sunday or statutory holiday in the Province of Ontario.

"**Canadian Court**" has the meaning ascribed thereto in the recitals.

"**Cash and Cash Equivalents**" means all cash on hand, cash equivalents and bank accounts of the PGL Vendors.

"**Cash Purchase Price**" has the meaning ascribed thereto in Section 3.4(b).

"**CCAA**" has the meaning ascribed thereto in the recitals.

"**CCAA Filing Date**" has the meaning ascribed thereto in the recitals.

"**CCAA Proceedings**" has the meaning ascribed thereto in the recitals.

"**Change of Control Consents**" has the meaning ascribed thereto in Section 5.2(c).

"**Claims**" means any civil, criminal, administrative, regulatory, arbitral or investigative inquiry, action, suit, investigation or proceeding and any claim of any nature or kind (including any cross-claim or counterclaim), demand, investigation, audit, chose in or cause of action, suit, default, assessment, litigation, prosecution, third party action, arbitral proceeding or proceeding, complaint or allegation, by or before any Person.

"**Closing**" means the completion of the purchase and sale of the Purchased Assets in accordance with the provisions of this Agreement.

"**Closing Date**" means, subject to the terms hereof, the date on which the Monitor's Certificate is released from escrow to the Purchaser in accordance with Section 9.15, which date shall (unless otherwise agreed to by the Purchaser and the Monitor, on behalf of the Vendors) be no later than the Outside Date.

"**Closing Time**" means 12:01 a.m. (Toronto time) on the Closing Date or such other time on the Closing Date as the Parties agree in writing that the Closing Time shall take place.

"**Contracts**" means all pending and executory contracts, agreements, leases, understandings and arrangements (whether oral or written) to which the PGL Vendors are a party or by which the PGL Vendors are bound or in which the PGL Vendors have, or will at Closing have, any rights or by which any of their property or assets are or may be affected, including any Contracts in respect of Employees.

"**Courts**" has the meaning ascribed thereto in the recitals hereto.

"**Critical Required Contract**" means the Contracts set forth in Schedule "I", which Schedule "I" may be amended by the Purchaser up until 5 calendar days prior to the hearing of the motion for

the Approval and Vesting Order, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "I" is amended.

"**Cure Costs**" means, in respect of any Purchased Contract, Critical Required Contract or Change of Control Consent, all monetary amounts, if any, required to be paid pursuant to section 11.3(4) of the CCAA in order to obtain the assignment to the Purchaser of such Purchased Contract, Critical Required Contract or in order for the Purchaser to obtain any Change of Control Consent, or such lesser amount as may be negotiated by the Purchaser or the Monitor with the applicable counterparty.

"**Deposit**" has the meaning ascribed thereto in Section 3.5 hereof.

"**Discharge**" means, in relation to any Encumbrance against any Person or upon any asset, undertaking or property, the full, final, irrevocable, complete and permanent waiver, release, discharge, cancellation, termination and extinguishment of such Encumbrance against such Person or upon such asset, undertaking or property and all proceeds thereof.

"**Effective Date**" means August 26, 2024, the "Effective Date" of the Original APA.

"**Employee**" means any individual who is employed by the PGL Vendors as of the Closing Date, whether on a full-time or a part-time basis and includes an employee on short term or long-term disability leave, but for certainty excludes any employee whose employment is terminated by the PGL Vendors prior to the Closing Date.

"**Encumbrance**" means any security interest, lien, Claim, charge, right of retention, deemed trust, judgement, writ of seizure, writ of execution, notice of seizure, notice of execution, notice of sale, hypothec, reservation of ownership, pledge, encumbrance, mortgage or right of a third party (including any contractual rights such as purchase options, rights of first refusal, rights of first offer or any other pre-emptive contractual right) or encumbrance of any nature or kind whatsoever and any agreement, option or privilege (whether by law, contract or otherwise) capable of becoming any of the foregoing, (including any conditional sale or title retention agreement, or any capital or financing lease).

"**Equipment**" means all Tangible Property and Vehicles.

"**Excluded Assets**" means the assets of the PGL Vendors listed in Schedule "B", the Excluded Contracts, and all claims by the PGL Vendors against or in respect of any Related Party other than the PGL Vendors and PGL Insurance, which Schedule "B" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "B" is amended.

"**Excluded Contracts**" means the Contracts listed in Schedule "E", which Schedule "E" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "E" is amended.

"**Excluded Liabilities**" means all Liabilities of the PGL Vendors of any kind or nature whatsoever, other than Assumed Liabilities.

"**Exercise Notice**" has the meaning ascribed in Section 2.2 hereof.

"**Final Adjustment Statement**" has the meaning ascribed thereto in Section 3.10(a)

"**Final AR Adjustment**" has the meaning ascribed thereto in Section 3.3.

"**Final Order**" means a final, non-interlocutory order issued by a court of competent jurisdiction that has not been stayed, set aside, or vacated and no application, motion or other proceeding has been commenced seeking the same, in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably, and all appeal periods in respect of such order have expired.

"**Finloc Leased Vehicles**" means such of the trailers owned by Finloc 2000 Inc. or its affiliates subject to the Finloc Leases that the Purchaser agrees to assume the leases in respect of, as are set out in Schedule "J" to this Agreement, which Schedule may be amended by the Purchaser no later than 5 calendar days prior to the hearing of the motion for the Approval and Vesting Order.

"**Finloc Leases**" means, collectively, the Master Leasing Agreement No. A900271 PRI 6055 dated November 5, 2019 between PGL and Finloc 2000 Inc., and each of the following leasing agreements entered into thereunder: A900271-10854, A900271-10885 (as amended), A900271-10891, A900271-10905, A900271-10949, A900271-10990, A900271-11125, A900271-11138.

"**Fuel Inventory Adjustment**" has the meaning ascribed thereto in Section 3.3(e).

"**GAAP**" means Canadian Accounting Standards for Private Enterprises as defined in the CPA Canada Handbook—Accounting, Part II, as applicable, from time to time applied on a consistent basis and determined in accordance with past practices of PGL Vendors.

"**Governmental Authority**" means any domestic or foreign government, whether federal, provincial, state, territorial or municipal; and any governmental agency, ministry, department, court (including the Courts), tribunal, commission, stock exchange, bureau, board or other instrumentality exercising or purporting to exercise legislative, judicial, regulatory or administrative functions of, or pertaining to, government or securities market regulation.

"**GST/HST**" has the meaning ascribed thereto in Section 7.2(i).

"**Ineligible Equipment**" means any Vehicles of any PGL Vendor or TPine that is included in Schedule "G" hereof, but that prior to the Closing Date becomes unavailable for sale or otherwise cannot be conveyed to the Purchaser, including because the Vehicles have (a) been sold to a party other than the Purchaser, (b) been delivered to a secured creditor, or (c) become Wrecked Equipment.

"**Initial AR Adjustment**" has the meaning ascribed thereto in Section 3.3.

"**Initial Order**" has the meaning ascribed thereto in the recitals hereto.

"**Intangible Property**" means all of the following which is used in connection with the Business and/or the Purchased Assets, whether or not registered, anywhere in the world: (a) all trade or brand names, business names, trademarks, service marks, copyrights to any original works of authorship, patents, licences, sublicenses, industrial designs, trade secrets, and other industrial or intellectual property of any nature in any form whatsoever recognized in any jurisdiction throughout the world; (b) inventions, discoveries, developments, concepts, ideas, improvements, processes and methods, know-how, trade secrets, confidential information, systems, procedures, computer software, source code; and (c) all goodwill, customer and supplier lists, confidential and proprietary information;

"**Intercompany Receivables**" means (i) any Accounts Receivable owing to any PGL Vendor by PGL Insurance, and (ii) if the Real Property Option is exercised by way of a share purchase transaction, any Accounts Receivable owing to any PGL Vendor by any of the Optional Vendors.

"**Interim Adjustment Statement**" has the meaning ascribed thereto in section 3.4(c).

"**Interim Period**" means the period beginning on the Effective Date and ending at the Closing Time.

"**Inventory**" means, collectively, all (i) shop supplies, including, motor oil, fluids, filters and other service supplies used in connection with the Business and/or the Purchased Assets, and (ii) diesel and fuel inventory.

"**ITA**" means the *Income Tax Act* (Canada).

"**LeaseCo**" means 2029909 Ontario Inc.

"**Lenders**" has the meaning ascribed thereto in Section 2.2.

"**Liability**" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"**Monitor**" has the meaning ascribed thereto in the recitals hereto.

"**Monitor's Certificate**" has the meaning ascribed thereto in Section 9.15.

"**Offers of Employment**" has the meaning ascribed thereto in Section 9.1(a).

"**Optional Assets**" means all rights, titles and interests in and to the real property held by the Optional Vendors.

"**Optional Vendors**" means, collectively, 129 Canada, 131 Canada and 283 Ontario.

"**Original APA**" has the meaning ascribed thereto in the recitals hereto.

"**Organizational Documents**" means any trust document, charter, certificate or articles of incorporation or amalgamation, articles of amendment, articles of association, articles of organization, articles of continuance, bylaws, as amended, partnership agreement or similar formation or governing documents of a Person (excluding individuals).

"**Outside Date**" means 11:59PM (Toronto time) on October 16, 2024, or such later date that is two Business Days after the date on which the Approval and Vesting Order and, if applicable, the Assignment Order, become Final Orders, or such later date and time as the Vendors, with the consent of the Monitor, and the Purchaser may agree in writing, or as the Court may direct.

"**Parties**" has the meaning ascribed thereto in the recitals hereto.

"**Party**" has the meaning ascribed thereto in the recitals hereto.

"**Permit Vendor**" has the meaning ascribed thereto in Section 4.6.

"**Permits**" means, in respect of the PGL Vendors, all permits, licences, certificates, licence plates, approvals, authorizations, and registrations, or any item with a similar effect, issued or granted by

any Governmental Authority that are listed in Schedule "H", which Schedule "H" may be amended no later than 5 calendar days prior to the hearing of the motion for the Approval and Vesting Order, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "H" is amended.

"**Permitted Assignee**" has the meaning ascribed thereto in Section 9.11

"**Permitted Encumbrances**" means such Encumbrances, if any, that the Purchaser agrees will continue to attach to and be enforceable against the Purchased Assets following Closing, a list of which are attached hereto as Schedule "C", which Schedule "C" may be amended by the Purchaser up until the Closing Date, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "C" is amended.

"**Person**" is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity.

"**PFS**" means Pride Fleet Solutions Inc.

"**PFS USA**" means Pride Fleet Solutions USA Inc.

"**PGL**" means Pride Group Logistics Ltd.

"**PGL Entities**" means PGL, PGL USA, PGL Insurance, PGL International, 12944154 Canada Inc. and 933 Helena Holdings Inc.

"**PGL Group**" means the PGL Vendors and their subsidiaries.

"**PGL Insurance**" means Pride Global Insurance Company Ltd.

"**PGL Insurance Financial Instruments**" means, collectively, all letters of credit, cash, cash equivalents, securities and investments held directly or indirectly by PGL Insurance.

"**PGL Insurance Shares**" means all of the outstanding shares of PGL Insurance.

"**PGL International**" means Pride Group Logistics International Ltd.

"**PGL USA**" means Pride Group Logistics USA, Co.

"**PGL Vendors**" means, collectively, PGL, PGL International, PGL USA, PFS, PFS USA, and LeaseCo**.**

"**Post-Closing Cash**" has the meaning ascribed thereto in Section 3.7.

"**Pride Entities**" has the meaning ascribed to it in the recitals.

"**Prepaid Expenses**" means all prepaid expenses of LeaseCo in respect of prepaid rents under the lease for 6050 Dixie Road, Mississauga, ON.

"**Purchase Price**" has the meaning ascribed thereto in Section 3.1.

"**Purchased Assets**" means the following tangible and intangible assets, undertakings and properties owned by the PGL Vendors, Optional Vendors and Real Property Vendor, related to the Business, wherever located, as of the Closing Date, but excluding the Excluded Assets:

    (i)     all Cash and Cash Equivalents of PGL, PGL International, and PGL USA;

    (ii)    all Accounts Receivable (including the Intercompany Receivables);

    (iii)   all Purchased Contracts;

    (iv)   all Prepaid Expenses;

    (v)    all Permits;

    (vi)   all Equipment;

    (vii)   all Inventory;

    (viii)  all PGL Insurance Shares;

    (ix)   all PGL Insurance Financial Instruments;

    (x)    the Intangible Property;

    (xi)   all Books and Records;

    (xii)   all rights under non-disclosure and confidentiality, non-compete, or non-solicitation agreements with Employees and agents of the PGL Vendors or with third parties to the extent related to the Business and/or the Purchased Assets, excluding any such agreements signed in connection with the Sale Process;

    (xiii)  all rights of the PGL Vendors under or pursuant to all warranties, representations and guarantees to the extent relating to products sold, or services provided, to the PGL Vendors or to the extent affecting any Purchased Assets;

    (xiv)  if the Real Property Option is exercised, the Optional Assets;

    (xv)   all Vehicles listed on Schedule "G" hereof;

and the following tangible assets owned by TPine:

    (xvi)  all Vehicles listed on Schedule "G" that are owned by TPine.

"**Purchased Contracts**" means all Contracts of the PGL Vendors, including the Finloc Leases, except for the Excluded Contracts.

"**QST**" has the meaning ascribed thereto in Section 7.2(i).

"**Real Property Option**" has the meaning ascribed thereto in Section 2.2.

"**Real Property Vendor**" means 2043002 Ontario Inc., being the entity that holds all outstanding shares of 283 Ontario, 129 Canada, 131 Canada and LeaseCo.

"**Related Party**" means any Person (i) that is an affiliate or associate of any of the Pride Entities; (ii) that is an officer or director of any of the Pride Entities, (iii) that is an affiliate or associate of any such responsible officer or director, or (iv) that does not deal at arm's length (within the meaning of the ITA) with any of the Pride Entities or any responsible officer or director of any of the Pride Entities.

"**Related Party Landlord**" means any Related Party that becomes a landlord under a lease, access agreement or parking agreement referred to in Section 6.2(f).

"**Sanctions**" has the meaning ascribed thereto in Section 7.2(g).

"**Sale Process**" has the meaning ascribed thereto in the recitals hereto.

"**Specific Conveyances**" means all conveyances, bills of sale, assignments, powers of attorney, transfers, registrable transfers of land and other documents or instruments that are reasonably required or desirable to convey, assign and transfer the Vendors' respective title to and/or interest in and to the Purchased Assets to the Purchaser;

"**Tangible Property**" means all tangible personal property of the PGL Vendors other than the Vehicles.

"**Taxes**" means, with respect to any Person, all national, federal, provincial, local or other taxes, including income taxes, capital gains taxes, value added taxes, severance taxes, ad valorem taxes, property taxes, capital taxes, net worth taxes, production taxes, sales taxes, use taxes, license taxes, lease excise taxes, environmental taxes, transfer taxes, withholding or similar taxes, payroll taxes, employment taxes, employer health taxes, pension plan premiums and contributions, workers' compensation premiums, employment insurance or compensation premiums, stamp taxes, occupation taxes, premium taxes, alternative or add-on minimum taxes, GST/HST, customs duties or other taxes of any kind whatsoever imposed or charged by any Governmental Authority, together with any interest, penalties, or additions with respect thereto and any interest in respect of such additions or penalties and any Liability for the payment of any amounts of the type described in this paragraph as a result any express or implied obligation to indemnify any other Person or as a result of being a transferee or successor in interest to any Person.

"**TPine**" means TPine Leasing Capital Corporation.

"**Transaction**" means all of the transactions contemplated by this Agreement, including the purchase and sale transaction whereby the Purchaser will acquire the Purchased Assets.

"**Transfer Taxes**" has the meaning ascribed in section 3.11 hereof.

"**Transferring Employees**" means the Employees who accept or are deemed to accept offers of employment from the Purchaser or an affiliate thereof in accordance with the terms hereof.

"**Transition Services Agreement**" means an agreement between the Purchaser and each Permit Vendor, in form and substance acceptable to the Purchaser, Vendors and Monitor, that provides for the Purchaser to have the use and benefit of the Permits post-Closing, to the extent that the Permits are not transferred or assigned to the Purchaser on Closing.

"**U.S. Approval Order**" means an Order of the U.S. Court approving the Transaction solely with respect to the sale to the Purchaser of the Purchased Assets and Business located within the territorial jurisdiction of the United States.

"**Vehicles**" means all of the trucks, trailers and other vehicles of the PGL Vendors and TPine listed in Schedule "G", which schedule cannot be amended except for as provided for herein, and includes all accessories, fuel, equipment and parts thereof, therein or affixed thereto.

"**Vendors**" means, collectively, the PGL Vendors, TPine the Optional Vendors and the Real Property Vendor.

"**Wrecked Equipment**" has the meaning ascribed in section 7.4 hereof.

## 1.2      Interpretation Not Affected by Headings, etc.

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

## 1.3      General Construction

The terms "this Agreement", "hereof", "herein" and "hereunder" and similar expressions refer to this Agreement and not to any particular section hereof. The expression "Section" or reference to another subdivision followed by a number mean and refer to the specified Section or other subdivision of this Agreement. The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

## 1.4      Extended Meanings

Words importing the singular include the plural and vice versa and words importing gender include all genders. The term "including" means "including, without limitation," and such terms as "includes" have similar meanings and the term "third party" means any other Person other than the Vendors or the Purchaser, or any Affiliates thereof.

## 1.5      Currency

All references in this Agreement to dollars, monetary amounts, or to $, are expressed in Canadian currency unless otherwise specifically indicated.

## 1.6      Statutes

Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules, regulations and interpretations made under it, as it or they may have been or may from time to time be modified, amended or re-enacted.

## 1.7      Schedules & Amendments to Schedules

The following exhibits and schedules are attached hereto and incorporated in and form part of this Agreement:

### **SCHEDULES**

Schedule "A"    -    Form of Approval and Vesting Order

Schedule "B"    -    Excluded Assets

Schedule "C"    -    Permitted Encumbrances

| | | |
|---|---|---|
| Schedule "D" | - | [Intentionally Omitted] |
| Schedule "E" | - | Excluded Contracts |
| Schedule "F" | - | Allocation Statement |
| Schedule "G" | - | Vehicles |
| Schedule "H" | - | Permits |
| Schedule "I" | - | Critical Required Contracts |
| Schedule "J" | - | Finloc Leased Equipment |

Unless the context otherwise requires, words and expressions defined in this Agreement will have the same meanings in the Schedules and the interpretation provisions set out in this Agreement will apply to the Schedules. Unless the context otherwise requires, or a contrary intention appears, references in the Schedules to a designated Article, Section, or other subdivision refer to the Article, Section, or other subdivision, respectively, of this Agreement.

**1.8     Interpretation if Closing Does Not Occur**

If Closing does not occur, each provision of this Agreement which presumes that the Purchaser has acquired the Purchased Assets shall be construed as having been contingent upon Closing having occurred.

**1.9     Amendment and Restatement**

The Vendors and the Purchaser agree that effective as of the date hereof, this Agreement is an amendment and restatement of the Original APA and not a novation of the Original APA. As a consequence, the obligations, liabilities, covenants, representations and warranties under the Original APA shall constitute obligations, liabilities, covenants, representations and warranties hereunder governed by the terms hereof. Such obligations, liabilities, covenants, representations and warranties shall be continuing in all respects, and this Agreement shall not be deemed to evidence or result in a novation of such obligations, liabilities, covenants, representations and warranties. The Original APA has been amended and restated solely for the purposes of reflecting amendments to the Original APA which the Vendors and Purchaser have agreed upon.

**ARTICLE 2**
**PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES**

**2.1     Purchase and Sale of the Purchased Assets**

Subject to the terms and conditions of this Agreement, effective as of the Closing Time, the Vendors shall sell, assign and transfer the Purchased Assets to the Purchaser, and the Purchaser shall purchase, accept, assume and receive from the Vendors, all of the Vendors' title to and interest in and to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to the Approval and Vesting Order. For greater certainty, the Purchased Assets do not include the Excluded Assets.

Notwithstanding the foregoing paragraph, the Permits shall only be transferred and assigned to the Purchaser by the Vendors on Closing to the extent that such transfer and assignment is consented to or approved by the applicable issuers of the Permits, and the Parties hereto acknowledge that if such transfer or assignment of the Permits cannot be accomplished on Closing, the Purchaser shall still be required to close the Transaction on the Closing Date as long as the Transition Services Agreement is delivered in

accordance with Section 5.2(e). If the Permits are not transferred and assigned to the Purchaser on Closing because the necessary consents have not been obtained, then the Permits shall transfer and assign to the Purchaser following Closing effective immediately upon the delivery of the necessary consents from the issuer of the Permit(s), without any further steps or formalities by the Vendors and the Purchaser.

Provided that Closing occurs, and subject to the terms and conditions of this Agreement, possession, risk, legal and beneficial ownership of, rights in, and responsibility for, the Purchased Assets shall transfer from the Vendors to the Purchaser effective as of the Closing Time, all subject to the Approval and Vesting Order.

## 2.2      Option to Acquire Additional Assets

From the Effective Date until the date that is no less than ten (10) Business Days prior to the Closing Date, the Purchaser shall have the option (but not the obligation) to acquire any of the Optional Assets held by any of the Optional Vendors (the "**Real Property Option**"). If the Real Property Option is exercised, in whole or in part, the acquisition by the Purchaser of any of Optional Assets shall be free and clear of any Encumbrances and Liabilities, other than the Assumed Liabilities. In the event that the Real Property Option is exercised, in whole or in part, the Optional Assets subject to the exercise of the Real Property Option shall be deemed to be included in the definition of Purchased Assets. Notwithstanding anything to the contrary provided in this Agreement, the exercise of the Real Property Option will be subject to (i) the approval of the Monitor, and (ii) the Purchaser obtaining written consent from (A) the mortgage lenders to each of the mortgaged real property owned by the applicable Optional Vendors (the "**Lenders**") to the assignment of the existing mortgages to the Purchaser, and (B) the Royal Bank of Canada (in its capacity as administrative agent and collateral agent). The Purchaser may exercise the Real Property Option at its sole discretion by delivering to the Vendors and the Monitor written notice of its intention to exercise the Real Property Option (the "**Exercise Notice**") on or before the date that is ten (10) Business Days prior to the Closing Date. Such Exercise Notice shall, among other things, specify the Optional Assets the Purchaser wishes to acquire. After receiving the Exercise Notice, the Monitor shall advise the Purchaser within five (5) Business Days as to whether or not the Monitor consents to the exercise of the Real Property Option. If the Real Property Option is exercised, the Purchase Price shall be increased by $1.00 and concordant adjustments will be made to the Allocation Statement in Schedule "F".

If the Real Property Option is exercised, the Purchaser and Vendors may elect to complete the transaction as either an asset purchase or a share purchase transaction, and shall be subject to Court approval, which may be sought at the hearing for the Approval and Vesting Order, or at a subsequent hearing in the event that the Exercise Notice is not exercised, and the required consents are not obtained, prior to the motion for the Approval and Vesting Order being served.

In the event that (a) the Purchaser declines to exercise the Real Property Option, (b) the Lenders do not consent to the sale of any of the Optional Assets, or (c) the Monitor does not provide its consent to the exercise of the Real Property Option, then in each such case there shall be no right of termination on the part of the Purchaser or the Vendors based solely upon such event, and the Purchaser's obligations, entitlements or other rights under this agreement shall not be impaired, waived or diminished, including the obligation to proceed with the Transaction, excluding the Optional Assets, in accordance with the terms of this Agreement.

– 14 –

## ARTICLE 3
## PURCHASE PRICE AND RELATED MATTERS

**3.1**    **Purchase Price**

(a)    The aggregate cash consideration payable by the Purchaser for the Purchased Assets based upon the Purchased Assets existing as at the date of this Agreement and subject to adjustment as set out below shall be as set out below (the "**Purchase Price**").

Purchase Price Allocation Summary:

| | |
|---|---|
| Vehicles (Schedule "G") | $43,098,837[1] |
| Acquired AR Amount (including Intercompany Receivables at nil consideration) | $9,000,000.00[2] |
| Tangible Property (Computers, office furniture, IT, mechanics tools, etc.) | $160,000.00 |
| Intangibles (IP, licenses, software, goodwill, Permits, license plates, Purchased Contracts, etc.) (Schedule "F") | $50,000.00 |
| PGL Insurance Shares | $1.00 |
| Inventory[3] | $100,000 |
| Prepaid Expenses | $50,000 |
| **TOTAL** | $52,458,838 |

(b)    The Purchase Price shall be satisfied in accordance with Section 3.3 and shall not be subject to any claim for set off, reduction or adjustment or any similar claim or mechanism of any kind whatsoever, other than as described herein. For the avoidance of doubt, any Cash or Cash Equivalents indirectly acquired by the Purchaser from the PGL Vendors pursuant to this Agreement will be acquired on a dollar for dollar basis and such amount of Cash or Cash Equivalents acquired hereunder shall be added to the Purchase Price after payment and deduction of any unpaid amounts owing by any of the PGL Vendors in respect of unpaid wages, source deductions, taxes and unpaid HST accruing up to the Closing Date (the "**Unpaid Post CCAA Filing Accruals**"). In the event that the Cash or Cash Equivalents are not sufficient to satisfy the Unpaid Post CCAA Filing Accruals or there are any liabilities that cannot be vested out and released as against the PGL Vendors and their directors and officers pursuant to the Approval and Vesting Order, the Purchase Price shall be reduced on a dollar for dollar basis to the extent that such Unpaid Post CCAA Filing Accruals and any such undischarged liabilities are greater than the Cash or Cash

1 Subject to further adjustment in accordance with s. 3.3(c).
2 Subject to further adjustment in accordance with s. 3.3(b).
3 Subject to further adjustment in accordance with s. 3.3(e).

– 15 –

Equivalents as at the Closing Date. For the avoidance of doubt, Unpaid Post CCAA Filing Accruals shall not be Excluded Liabilities. Subject to the filing of the elections referred to in Section 3.12 hereof, the Purchase Price shall be net of all applicable Transfer Taxes, which shall be paid in accordance with Section 3.12(a) hereof.

(c)       [Intentionally Omitted].

(d)       In addition, as set forth in Section 2.4 hereof, the Purchaser shall have the option to acquire the Optional Assets for a purchase price of $1.00 or such other amount as may be agreed to by the Monitor and Purchaser (and, for greater certainty, no other adjustment to the Purchase Price) and indirectly assume certain liabilities associated with the Optional Assets so acquired, including the mortgages and accrued property taxes and utilities associated with such Optional Assets.

## 3.2    Assumption of Liabilities

In addition to the Purchase Price, the Purchaser shall assume the Assumed Liabilities, which are estimated by the Purchaser to be equal to approximately $4 million based upon post-Closing obligations under the Purchased Contracts and the accrued vacation pay liabilities of the Employees. For the avoidance of doubt, the Purchaser shall assume all liabilities of PGL Insurance, by virtue of purchasing the shares of PGL Insurance.

## 3.3    Allocation

(a)       <u>Allocation Statement</u>. The Purchaser has delivered to the Monitor, on behalf of the Vendors, a statement (the "**Allocation Statement**"), as set out in Schedule "F", allocating, in sufficient detail, the Purchase Price and in respect thereof, (a) the allocation of the respective Purchase Price on an asset-by-asset basis, together with (b) the Purchase Price aggregated and allocated among each category of Purchased Assets of the Vendors.

(b)       <u>AR Adjustments</u>. In respect of Accounts Receivable, the Allocation Statement shall include a value to be allocated to the Accounts Receivable, which value shall be equal to 70% of the face amount of such Accounts Receivable other than Intercompany Receivables (the "**Acquired AR Amount**"), it being acknowledged and agreed by all Parties hereto that (a) the Acquired AR Amount shall remain at all times an amount equal to 70% of the full amount of the Accounts Receivable (other than Intercompany Receivables), as determined by the Monitor, and (b) the full amount of Accounts Receivable as estimated on the Allocation Statement shall be subject to adjustments based on the full amount of the Accounts Receivable, as determined by the Monitor, on (i) the Closing Date under the Interim Adjustment Statement in accordance with Section 3.4(c) (the "**Initial AR Adjustment**"), and (ii) the date that is sixty (60) days following the Closing Date, as determined in accordance with Section 3.10(a) hereof (the "**Final AR Adjustment**"). Notwithstanding the foregoing, no value shall be allocated to Intercompany Receivables, which shall be assigned to the Purchaser for no additional consideration.

(c)       <u>Vehicles Adjustment</u>. In respect of Vehicles, the Allocation Statement includes a value allocated to the Vehicles being acquired (the "**Acquired Vehicles Amount**"), it being acknowledged and agreed by all Parties hereto that (a) the Acquired Vehicles Amount shall not be amended or adjusted, other than removal of any Ineligible Equipment, and (b) the Purchase Price allocated to Equipment in the Allocation Statement shall be reduced to omit any Ineligible Equipment, in an amount equal to value attributed to such Ineligible Equipment on the Allocation Statement (such reduction, the "**Vehicle Adjustment**").

– 16 –

(d) <u>Adjustments to Allocation Statement</u>. The Parties hereto shall make appropriate adjustments to the Allocation Statement to reflect any changes in the Purchase Price as of the Closing Time.  The Parties hereto agree for all Tax reporting purposes to report the Transaction in accordance with the Allocation Statement, as adjusted pursuant to the preceding sentence, and to not take any position during the course of any audit or other action inconsistent with such schedule unless required by a determination of the applicable Governmental Authority that is final.

(e) <u>Fuel Inventory Adjustment</u>.  An amount of $50,000 of the Purchase Price has been allocated as the estimated fuel in the gas station fuel tanks as part of the "Inventory" in the Allocation Statement.  On the Closing Date, the Vendors shall provide an updated measurement of actual fuel in the gas station fuel tanks and the Purchase Price shall be adjusted by X-$50,000 where X is the cost basis of the actual fuel in the gas station fuel tanks on the Closing Date. (the "**Fuel Inventory Adjustment**").

**3.4    Satisfaction of Purchase Price**

The Purchaser shall satisfy the Purchase Price, at the Closing Time, in accordance with the following:

(a) <u>Deposit.</u> The Parties acknowledge that the Purchaser has paid a deposit in the amount of $3,000,000 being approximately 5% of the Purchase Price (the "**Deposit**"), which Deposit is being held by the Monitor, in trust, in accordance with the terms of the Sale Process and shall be credited against the Purchase Price at Closing.

(b) <u>Cash Purchase Price.</u> An amount shall be paid to the Monitor (the "**Cash Purchase Price**"), for the benefit of the Vendors, at the Closing Time, in immediately available funds equal to the Purchase Price (i) *minus* the Deposit, (ii) *plus* or *minus* the Initial AR Adjustment (if any), (iii) *plus* or *minus* the Vehicle Adjustment (if any), and (iv) *plus* or *minus* the Fuel Inventory Adjustment (if any).

(c) <u>Initial AR Adjustment.</u> The PGL Vendors, in consultation with the Monitor, shall carry out a physical accounting and adjustment and prepare and deliver to Purchaser no less than five (5) Business Days before the Closing a statement (the "**Interim Adjustment Statement**") setting out the PGL Vendors' good faith estimate of any difference between the Acquired AR Amount as set out in the Allocation Statement and the full value of the acquired accounts receivable on the Closing Date. The Interim Adjustment Statement shall be used to calculate any adjustments to the Cash Purchase Price required by Section 3.3.

(d) <u>Vehicle Adjustment.</u> The PGL Vendors and TPine, in consultation with the Monitor, shall carry out a physical accounting and adjustment and prepare and deliver to Purchaser no less than five (5) Business Days before the Closing an updated schedule of Vehicles (the "**Vehicle Adjustment Statement**") setting out any Ineligible Equipment by VIN. The Vehicle Adjustment Statement shall be used to calculate the Vehicle Adjustment required by Section 3.3.

**3.5    Deposit**

(a) If Closing occurs in accordance with the terms and conditions of this Agreement, the Deposit shall be credited against the Purchase Price, in partial satisfaction of the Purchaser's obligation to pay the Purchase Price at Closing.

(b) If this Agreement is terminated:

– 17 –

(i) due to breach by the Purchaser as a result of events or circumstances entirely under the Purchaser's control that are not cured or waived and result in this Agreement not closing, then the Monitor on behalf of the Vendors shall be entitled to retain the Deposit and the full amount of the Deposit shall be forfeited to the Vendors; or

(ii) for any other reason, including, for the avoidance of doubt, the failure of the Vendors to satisfy any of its obligations or meet any of its conditions in this Agreement or any of the Purchaser's conditions set forth under Section 6.2 not being satisfied, the Deposit shall be returned to the Purchaser within three (3) Business Days of the termination of the Agreement; and

each Party shall be released from all obligations and liabilities under or in connection with this Agreement. In the event of termination of this Agreement under Section 6.3 pursuant to which the Vendors shall be entitled to retain the Deposit, the Parties agree that the amount of the Deposit constitutes a genuine pre-estimate of liquidated damages representing the Vendors' Losses and Liabilities as a result of Closing not occurring and agree that the Vendors shall not be entitled to recover from the Purchaser any amounts that are in excess of the Deposit as a result of Closing not occurring. The Purchaser hereby waives any claim or defence that the amount of the Deposit is a penalty or is otherwise not a genuine pre-estimate of the Vendors' damages.

## 3.6    Assignment of Critical Required Contracts

In the event that there are any Critical Required Contracts which are not assignable in whole or in part without the consent, approval or waiver of another Person and such consents, approvals or waivers have not yet been obtained as of the Closing Date, then:

(a) nothing in this Agreement will be construed as an assignment of any Critical Required Contract and, without limiting the foregoing, the Purchaser does not assume and has no obligation to discharge any liability or obligation under or in respect of any such Critical Required Contract, until (i) an Assignment Order is obtained in accordance with 3.6(c), or (ii) such consent, approval or waiver is obtained in respect of such Critical Required Contract on terms satisfactory to the Purchaser, in either case following which the value of and rights of the applicable PGL Vendor under such Critical Required Contract shall enure to the applicable Purchaser;

(b) the PGL Vendors shall use their commercially reasonable efforts to obtain any such consent, approval or waiver, and the Purchaser shall provide reasonable cooperation to assist the PGL Vendors in obtaining any such consent, approval or waiver;

(c) if any consent, approval or waiver is not obtained for any Critical Required Contract prior to Closing, the Purchaser may request that the PGL Vendors bring a motion to the Court for issuance of an Assignment Order with respect to such Critical Required Contract prior to Closing;

(d) once the consent, approval or waiver to the assignment of a Critical Required Contract is obtained, or the assignment of such Contract has been ordered by the Court pursuant to an Assignment Order, such Critical Required Contract shall be deemed to be assigned to the Purchaser on Closing;

(e) the PGL Vendors shall preserve the Critical Required Contracts for the benefit of the Purchasers and shall not terminate, amend, modify, assign, convey or otherwise transfer all or any part of such Critical Required Contracts until such time as the required consent,

– 18 –

approval or waiver or an Assignment Order is obtained, to enable the Purchasers to obtain the benefit of the Critical Required Contracts; and

(f)  the PGL Vendors, with the consent of the Purchaser, shall have the right to disclaim any Critical Required Contract in accordance with the CCAA, and in the event of disclaimer, such Critical Required Contract shall be considered an Excluded Contract for all purposes under this Agreement.

With respect to each Critical Required Contract, subject to Closing and to either (i) the consent, approval or waiver of the other parties thereto to the assignment thereof, or (ii) in the absence of such consent, approval or waiver, the obtaining of an Assignment Order, in addition to its other obligations under this Agreement, the Purchaser shall pay the applicable Cure Costs related to such Critical Required Contract on Closing.

**3.7    Change of Control Consents**

(a)  The Vendors shall as promptly as practicable submit requests for the Change of Control Consents to the applicable party related to the purchase of PGL Insurance and, if applicable, the Optional Assets (provided that Change of Control Consents in respect of the Optional Assets shall not be sought until the Exercise Notice has been delivered by the Purchaser). The Vendors shall, and they shall cause the PGL Insurance and, if applicable, the Lenders associated with the Optional Assets, to obtain or cause to be obtained prior to Closing the Change of Control Consents on such terms as are acceptable to the Purchaser, acting reasonably. The Purchaser shall co-operate in obtaining the Change of Control Consents.

(b)  PGL and the Real Property Vendor shall, and PGL and the Real Property Vendor shall cause PGL Insurance and, if applicable, the Lenders associated with the Optional Assets to provide, or cause to be provided, all notices that are required to be provided in connection with the Transactions.

**3.8    Post-Closing Cash**

If, after the Closing Date, the PGL Vendors come into possession of any Cash or Cash Equivalents that are proceeds of Accounts Receivable purchased by the Purchaser (the **"Post-Closing Cash"**), the Monitor, on behalf of the PGL Vendors, shall hold all such amounts in trust for the Purchaser and shall forthwith wire or otherwise transfer any Post-Closing Cash to an account designated by the Purchaser in writing.

**3.9    Good Faith Dealings**

(a)  The Parties shall co-operate fully in good faith with each other and their respective legal advisors, accountants and other representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, including making or causing to be made, all filings and submissions, as applicable, required under any Applicable Law to effect the Closing.

(b)  The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing on or before the Outside Date.

(c)  The Parties acknowledge, agree and confirm that the Agreement was negotiated, proposed and entered into by the Vendors and the Purchaser in good faith, without collusion, and from arm's-length bargaining positions and that the Purchaser is a good faith purchaser

within the meaning of section 363(m) of the United States Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

**3.10**   **Post-Closing Adjustments**

In the event that any prorations, apportionments, computations, statements of Purchased Assets or amounts made hereunder shall require final adjustment, then the Parties shall use good faith and diligent efforts to make the appropriate adjustments promptly when accurate information becomes available and either Party shall be entitled to an adjustment to correct the same provided that, it makes written demand on the one from whom it is entitled to such adjustment within 90 days of the Closing Date (or prior to the end of any applicable tax period).

Notwithstanding the foregoing, the Parties hereto agree to work together in good faith, and in consultation with the Monitor and CRO, to make any necessary post-Closing adjustments to the Purchase Price as follows:

(a)     On the date that is sixty (60) days following the Closing Date, the Purchaser shall deliver to the Vendors and the Monitor a statement (the "**Final Adjustment Statement**"), together with any supporting accounting and other information, that sets out as as at such date (A) the full amount of the purchased Accounts Receivable compared to the value of the Acquired AR Amount set out in the Allocation Statement; (B) the Vehicles actually received by the Purchaser, compared to the listing of the purchased Vehicles on Schedule "G" (as amended prior to the Closing Date to omit any Ineligible Equipment) and (C) the actual amount of the Prepaid Expenses as at the Closing Date in respect of which the Purchaser receives the actual benefit of on Closing, compared to the value of the Prepaid Expenses set out in the Allocation Statement. The Final Adjustment Statement shall be in a form acceptable to the Vendors, in consultation with the Monitor;

(b)     On or before the date that is ninety (90) days following the Closing Date, the Vendors, in consultation with the Monitor, may provide changes and comments on the Final Adjustment Statement to the Purchaser in writing, and the Purchaser and Vendors, in consultation with the Monitor, shall negotiate in good faith to finalize the Final Adjustment Statement, failing which either Party may direct the Monitor to engage an independent third-party accountant to resolve any discrepancies regarding the Final Adjustment Statement on such terms and standards as the Parties may agree in good faith in consultation with the Monitor;

(c)     Subject to the Final Adjustment Statement being resolved pursuant to (b) above, the Parties agree to the following post-Closing adjustments to the Purchase Price, to be paid in readily available cash as the Parties may determine in good faith:

(i)     an adjustment in favour of the Purchaser or the Vendors, as the case may be, in the amount of the applicable Final AR Adjustment as between the Closing Date and the date that is sixty (60) days following the Closing Date; and

(ii)     an adjustment in favour of the Purchaser in the amount of any Purchased Assets that the Vendor was incapable of delivering unto the Purchaser for any reason despite making its best efforts to do so, provided that the aggregate value of such Purchased Assets that cannot be delivered to the Purchaser is equal to or greater than two percent (2%) of the Purchase Price, failing which there shall not be any adjustment under this subheading.

**3.11    Withholding**

The Purchaser (or any affiliate thereof) shall be permitted to deduct or withhold from any amounts payable under this Agreement any amounts required to be deducted or withheld pursuant to Applicable Law in respect of Taxes, provided that it shall remit or cause to be remitted, such withheld amounts to the appropriate Governmental Authority in accordance with Applicable Law. To the extent that a Party becomes aware that any consideration payable under this Agreement may be subject to withholding Taxes, it shall promptly notify the other Party and the Parties shall cooperate in good faith to minimize or eliminate the amount of such withholding Taxes (including seeking relief from the Court, if applicable). To the extent that any amounts are so deducted or withheld and timely paid over to the applicable Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

**3.12    Payment of Sales Taxes and Tax Elections**

(a)    <u>Transfer Taxes</u>.  The Purchaser shall be liable for and shall pay all federal and provincial sales, goods and services, harmonized sales, value added, use, transfer, property or land transfer and similar Taxes ("**Transfer Taxes**") properly payable upon and in connection with the sale, assignment and transfer of the Purchased Assets from the Vendors to the Purchaser, which for greater certainty exclude any Taxes payable on the Vendors' net income, profits or gains. Subject to Section 3.12(b), where the Transfer Taxes are collectable by the Vendors, the Purchaser shall pay such Transfer Taxes directly and promptly to the Vendors upon the delivery of such documentation as may be prescribed under applicable Laws indicating the applicable Transfer Taxes and the Vendors' relevant Transfer Tax registration number(s) and any other information required for the Purchaser to obtain any applicable input tax credits or similar amounts in respect of such Transfer Taxes (or alternatively, in the context of any property or land transfer tax or other Tax required to be paid directly by the Purchaser to a Governmental Authority, the Purchaser shall pay such tax directly to the applicable Governmental Authority). The Vendors shall remit any such Transfer Taxes received from the Purchaser directly to the relevant taxation authority.  For Transfer Taxes that are payable directly by the Purchaser to the relevant Governmental Authority (including, for greater certainty, GST/HST to be self-assessed on the acquisition of real property), the Purchaser will be responsible for, and shall indemnify and hold harmless the Vendors from, such Transfer Taxes, plus any applicable penalties and interest.  For purposes of calculating the Transfer Taxes collectable by the Vendors, the provincial place of supply for the Purchased Assets physically situated in Canada will be determined by the Vendor one (1) day prior to Closing.

(b)    <u>GST/HST Election</u>.  PGL and the Purchaser shall jointly make the election provided for under section 167 of the *Excise Tax Act* (Canada) and under section 75 of *an Act respecting the Quebec sales tax* that no tax be payable pursuant to that legislation in respect of the purchase and sale of the Purchased Assets to be sold by PGL as contemplated by this Agreement.  The Purchaser and PGL, in consultation with the Monitor, shall jointly complete the election form(s) (including more particularly the form described as form GST-44 and Form FP-2044) in respect of such election and the Purchaser shall file the said election form(s) no later than the due date for the Purchaser's GST/HST and QST returns for the first reporting period in which GST/HST, would, in the absence of such election, become payable in connection with the transactions contemplated by this Agreement (or within the timelines otherwise required under applicable provincial law), and will provide evidence of such filings to the Vendors and the Monitor. Notwithstanding the foregoing, the Purchaser shall, on demand, indemnify and hold harmless the Vendors and their

– 21 –

directors, shareholders, employees, and successors of any Taxes (including interest and penalties) resulting from (i) the Purchaser's failure to timely file any election form (including the GST-44 and F P-2044) required to be filed pursuant to this paragraph, or (ii) any assessment, reassessment or imposition of GST/HST, QST assessed or imposed by any Governmental Authority as a result of or as a consequence of a rejection or denial of the GST/HST and QST elections made by the parties pursuant to this paragraph. The Purchaser does not assume and shall not be liable for any other Taxes which may be or become payable by the Vendors other than Transfer Taxes in connection with the purchase and sale of the Purchased Assets pursuant to this Agreement.

(c)      <u>Income Tax Election – Section 22 of the ITA</u>.   The Purchaser and the Vendors, in consultation with the Monitor, agree to make and file, in a timely manner, a joint election under section 22 of the ITA and any other equivalent or corresponding provision under applicable provincial or territorial tax legislation with respect to the sale, assignment, transfer and conveyance of the Accounts Receivable and shall designate therein that portion of the Purchase Price allocated to the Accounts Receivable in accordance with the procedures set out in Section 3.2 and 3.10 of this Agreement. The Purchaser and the Vendors, in consultation with the Monitor shall each file such elections, along with any documentation necessary or desirable to give effect to such elections, within the prescribed time limitations and will also prepare and file all of their respective Tax Returns in a manner consistent with such allocation.

## ARTICLE 4
## COVENANTS

### 4.1   Closing Date

(a)      The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing.

(b)      Each of the Parties shall, as promptly as possible, make, or cause to be made, all filings and submissions, as applicable, required under any Applicable Law to effect the Closing.

### 4.2   Motion for Approval and Vesting Order and Assignment Order

As soon as practicable after the date of this Agreement, the Vendors shall serve and file with the Canadian Court a motion for the issuance of the Approval and Vesting Order, seeking relief that will, *inter alia*, approve this Agreement and the Transaction and the Assignment Order. The Vendors shall use their best efforts to seek the issuance and entry of the Approval and Vesting Order and the Purchaser shall cooperate with the Vendors in their efforts to obtain the issuance and entry of the Approval and Vesting Order and the Assignment Order.

To the extent required to give full effect to, and implement, the Transaction, Randall Benson, in his capacity as the foreign representative of the Vendors, shall seek U.S. Court approval of the Transaction solely with respect to Purchased Assets located within the territorial jurisdiction of the United States in the form and manner required by the order approving the sales procedures motion to be filed in the Chapter 15 Proceedings set forth in the Order (i) Approving the Sale Procedures and Sale Notice, (ii) Authorizing the Sale of the Debtors' U.S. Assets Free and Clear and Liens, Claims, Encumbrances and Other Interests, and (iii) Granting Related Relief.

### 4.3      Interim Period

During the Interim Period, the Vendors shall ensure that all of the Purchased Assets remain insured and the Vendors shall use commercially reasonable efforts to continue to maintain the Purchased Assets and the Business in substantially the same manner as on the Effective Date, *provided that* the Purchaser hereby acknowledges that payments to equipment financers of the Vendors have not been made during the pendency of the CCAA Proceedings to date.

### 4.4      Access During Interim Period

During the Interim Period, the Monitor, on behalf of the Vendors, shall give, or cause to be given, to the Purchaser, and its representatives, reasonable access during normal business hours to the Books and Records, to conduct such investigations, inspections, surveys or tests thereof and of the financial and legal condition of the Business and Assets as the Purchaser reasonably deems necessary or desirable to further familiarize themselves with the Business and/or Assets. Without limiting the generality of the foregoing: (a) the Purchaser and its representatives shall be permitted reasonable access during normal business hours to all documents relating to information scheduled or required to be disclosed under this Agreement and to the Employees; and (b) the Purchaser and its Representatives shall be permitted to contact and discuss the Transactions contemplated herein with Governmental Authorities and the Vendors' customers and contractual counterparties. Such investigations, inspections, surveys and tests shall be carried out at the Purchaser's sole and exclusive risk and cost, during normal business hours, and without undue interference with the Vendors' operations and the Vendors shall co-operate reasonably in facilitating such investigations, inspections, surveys and tests and shall furnish copies of all such documents and materials relating to such matters as may be reasonably requested by or on behalf of the Purchaser. For the avoidance of doubt, nothing in this section 4.4 shall constitute a due diligence condition, and nothing discovered or learned by the Purchaser during the Interim Period shall entitle the Purchaser to terminate this Agreement or adjust the Purchase Price.

### 4.5      Insurance Matters

Until Closing, the Vendors shall keep in full force and effect all existing insurance policies relating to the Purchased Assets or the Business, and give any notice or present any claim under any such insurance policies consistent with past practice of the Vendors in the ordinary course of business. Any insurance proceeds received shall be applied to repair or remedy any damage caused by fire, theft, vandalism, collision or other calamity to any Equipment or other property being purchased by the Purchaser pursuant to this Agreement. For the avoidance of any doubt, in the event that insurance proceeds are paid or payable in respect of any Wrecked Equipment that is excluded from Schedule "G" in accordance with the terms hereof, the Purchaser shall in no case be entitled to any portion of such proceeds, and such proceeds constitute Excluded Assets hereunder.

### 4.6      Post-Closing Matters

Following Closing, each Vendor that holds, or is a direct or indirect beneficiary of, any Permit (each, a "**Permit Vendor**") and each Related Party Landlord shall continue as a corporation in good standing, in the CCAA Proceedings, and the Purchaser and Vendors agree that the Approval and Vesting Order shall provide that (a) the Permit Vendors and Related Party Landlords shall be subject to the exclusive governance and control of the CRO and/or the Monitor, (b) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Permit Vendor shall be bankrupt, dissolved or otherwise wound-up prior to the earlier of (i) the date that all Permits are irrevocably transferred to the Purchaser, (ii) the date that the Purchaser advises the CRO and the Monitor in writing that it does not require the irrevocable transfer of the Permits to the Purchaser, and (iii) March 31, 2025, and (c) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Related Party Landlord

shall be bankrupt, dissolved or otherwise wound-up prior to the date that the lease, access agreement or parking agreement to which the Related Party Landlord is terminated.

**ARTICLE 5**
**CLOSING ARRANGEMENTS**

**5.1    Closing**

Closing shall take place on the Closing Date effective as of the Closing Time electronically (or as otherwise determined by mutual agreement of the Parties in writing), by the exchange of deliverables (in counterparts or otherwise) by electronic transmission in PDF format.

**5.2    Vendors' Closing Deliveries**

At or before the Closing Time, the Vendors shall deliver or cause to be delivered to the Purchaser the following:

(a)    any Specific Conveyances required in respect of the transfer of the Purchased Assets from the Vendors to the Purchaser, including, if applicable, the transfer of the Optional Assets;

(b)    a true copy of the Approval and Vesting Order, as signed by the Canadian Court;

(c)    all required consents or approval orders, in form and substance satisfactory to the Purchaser, providing for the assignment and transfer of the Critical Required Contracts;

(d)    all required consents, in form and substance satisfactory to the Purchaser, to the change of control of PGL Insurance, which shall be provided by the Purchaser to the Vendors for execution (the "**Change of Control Consents**");

(e)    consents to the assignment of the Permits effective on the Closing date, or a duly executed copy of the Transition Services Agreement;

(f)    any tax elections contemplated by Section 3.11 duly executed by the applicable Vendors;

(g)    evidence that all necessary corporate actions have been taken on or prior to the Closing to permit good title to the PGL Insurance Shares to be duly and validly transferred and assigned to the Purchaser at the Closing;

(h)    share certificates representing all issued and outstanding shares of PGL Insurance accompanied with duly executed share transfer forms in the name of the Purchaser or its nominee or evidence of cancellation of all existing outstanding shares and issuance of new share certificates to the Purchaser or its nominee, in either case, together with security registers evidencing that the Purchaser or its nominee is the sole holder of PGL Insurance;

(i)    the Books and Records of the Vendors, PGL Insurance, LeaseCo and, if applicable, any Optional Vendors;

(j)    a true copy of the U.S. Approval Order as entered by the U.S. Court;

(k)    a certificate of an officer of the Vendors dated as of the Closing Date confirming that all of the representations and warranties of the Vendors contained in this Agreement are true in all material respects as of the Closing Time, with the same effect as though made at and

as of the Closing Time, and that the Vendors have performed in all material respects the covenants to be performed by them prior to the Closing Time; and

(l)    such other agreements, documents and instruments as may be reasonably required by the Purchaser to complete the Transaction, all of which shall be in form and substance satisfactory to the Parties, acting reasonably.

**5.3    Purchaser's Closing Deliveries**

At or before the Closing, the Purchaser shall deliver or cause to be delivered to the Vendors (or to the Monitor, as applicable), the following:

(a)    the Cash Purchase Price;

(b)    all Transfer Taxes payable in accordance with Section 3.12(a);

(c)    evidence that all Offers of Employment have been provided to the Employees prior to Closing in accordance with Section 9.1(a);

(d)    duly executed assignment and assumption agreements, in form and substance satisfactory to the Vendors, evidencing the assumption by the Purchaser of the Purchased Contracts and Assumed Liabilities;

(e)    any Specific Conveyances required in respect of the transfer of the Purchased Assets from the Vendors to the Purchaser;

(f)    any tax elections contemplated by Section 3.12 duly executed by the Purchaser;

(g)    a certificate of an officer of the Purchaser dated as of the Closing Date confirming that all of the representations and warranties of the Purchaser contained in this Agreement are true in all material respects as of the Closing Time, with the same effect as though made at and as of the Closing Time, and that the Purchaser has performed in all material respects the covenants to be performed by it prior to the Closing Time; and

(h)    such other agreements, documents and instruments as may be reasonably required by the Monitor on behalf of the Vendors to complete the Transaction, all of which shall be in form and substance satisfactory to the Monitor and the Purchaser, acting reasonably.

**5.4    Post-Closing Deliveries**

(a)    Following Closing, as soon as practicable after receiving a written direction to do so by the Purchaser, PGL, PGL USA, PGL International, PFS and PFS USA shall file articles of amendment to change their name to another name or numbered company and shall deliver to the Purchaser evidence of the filing of such articles of amendment and change of name and shall consent to the Purchaser changing its name to "Pride Group Logistics Ltd.", it being acknowledged by the Vendors that the Purchaser is purchasing all goodwill and intellectual property associated with the "Pride Group Logistics" name and that the change of the name of the Purchaser to Pride Group Logistics Ltd. may facilitate the assignment and continuation of Permits currently held by the Vendors, provided however that the Purchaser may defer delivering the direction referred to herein in respect of any Permit Vendors that are required to maintain their current name in order to maintain any Permits in good standing, in which case such Permit Vendors shall maintain their current names until such time as the Purchaser advises the Monitor and the CRO, in writing, that the

– 25 –

applicable Permits are no longer required to be maintained by the Permit Vendors pursuant to Section 4.6, and the Purchaser shall contemporaneously with such advise to the Monitor and CRO delivery the direction contemplated hereby, at which point the applicable Permit Vendors shall promptly change their names in accordance with this Section 5.4.

(b)     Immediately following the receipt of the documents set out in Section 5.4(a) above, or as soon as practicable thereafter, the Purchaser and each of its Permitted Assignees shall be entitled to file articles of amendment, articles of incorporation or otherwise effect a change of name in their applicable jurisdiction of incorporation to utilize one or more of the names of the Vendors set out in Section 5.4(a) above, and shall, upon doing so, provide the Monitor with evidence of the filing of such articles of amendment, articles of incorporation or other documents evidencing such change of name.

## ARTICLE 6
## CONDITIONS OF CLOSING

### 6.1     Conditions Precedent in Favour of the Parties

The obligation of the Parties to complete the Transaction is subject to the following joint conditions being satisfied, fulfilled or performed on or prior to the Closing Date:

(a)     <u>Approval and Vesting Order and Assignment Order.</u> The Canadian Court shall have issued and entered the Approval and Vesting Order on or before September 25, 2024 (or such later date as may be agreed by the Purchaser, Vendors and Monitor) and the Assignment Order on or before October 7, 2024 (or such later date as may be agreed by the Purchaser, Vendors and Monitor) in form and substance satisfactory to the parties, or as soon thereafter subject to availability of the Canadian Court, which Approval and Vesting Order and, if applicable, Assignment Order, have become Final Orders.

(b)     <u>US Approval Order</u>.  The U.S. Approval Order shall have been entered by the U.S. Court.

(c)     <u>No Order</u>. No Applicable Law and no judgment, injunction, order or decree shall have been issued by a Governmental Authority or otherwise in effect that restrains or prohibits the completion of the Transaction;

(d)     <u>No Restraint.</u> No motion, action or proceedings shall be pending by or before a Governmental Authority to restrain or prohibit the completion of the Transaction contemplated by this Agreement; and

The foregoing conditions are for the mutual benefit of the Parties. If any condition set out in this Section 6.1 is not satisfied, performed or mutually waived on or prior to the Closing Date, any Party may elect on written notice to the other Parties to terminate this Agreement.

### 6.2     Conditions Precedent in Favour of the Purchaser

The obligation of the Purchaser to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)     <u>Change of Control Consents; Critical Required Contracts</u>: The assignment of all Critical Required Contracts to the Purchaser shall have been completed either pursuant to the Change of Control Consents or the Assignment Order, provided that this condition shall not apply to any Change of Control Consents or Critical Required Contracts that are not in

– 26 –

good standing, transferred or assigned solely as a result of the Purchaser's failure to pay the applicable Cure Costs.

(b) <u>Vendors' Deliverables.</u> The Vendors shall have executed and delivered or caused to have been executed and delivered to the Purchaser at the Closing all the documents contemplated in Section 5.2.

(c) <u>No Breach of Representations and Warranties</u>. Except as such representations and warranties may be affected by the occurrence of events or transactions specifically contemplated by this Agreement, each of the representations and warranties contained in Section 7.1 shall be true and correct in all material respects: (i) as of the Closing Date as if made on and as of such date; or (ii) if made as of a date specified therein, as of such date.

(d) <u>No Breach of Covenants.</u> The Vendors shall have performed, in all material respects, all covenants, obligations and agreements contained in this Agreement required to be performed by the Vendors on or before the Closing Date.

(e) <u>Monitor's Certificate.</u> The Monitor shall have provided an executed certificate of the Monitor substantially in the form attached to the Approval and Vesting Order (the "**Monitor's Certificate**") confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Vendors.

(f) <u>Real Property.</u>

    (i) In the event that the Purchaser (A) exercises the Real Property Option with respect to the purchase of the 129 Shares, and the Purchaser is unable to obtain the required consents and approvals from the applicable Lenders or the Monitor to acquire the real property currently owned by 129 Canada, or (B) advises the Vendors and the Monitor in writing that it does not intend to exercise the Real Property Option with respect to the 129 Shares, then the Purchaser or its nominee shall have entered into a lease agreement or such other form of arrangement, consistent with the Approved Lease Terms, for the property municipally known as 1943 & 1945 55e Avenue, Dorval, Quebec.

    (ii) The Purchaser or its nominee shall have entered into an access or parking agreement with 207 Ontario for the use by the Purchaser of the real property municipally known as 10862 Steeles Ave E., Milton, Ontario, currently held by 207 Ontario in a manner consistent with the existing use of such property by the Vendors, consistent with the Approved Lease Terms;

    (iii) The Purchaser or its nominee shall have entered into a lease with 933 Helena for the continued use of the real property municipally known as 933 Helena Street, Fort Erie, Ontario, currently held by 933 Helena, consistent with the Approved Lease Terms.

    (iv) Without limiting Section 6.2(a), the Purchaser shall be entitled to the continued use of the real property municipally known as 6050 Dixie Road, Mississauga, Ontario, currently used by the PGL Vendors, on existing lease terms for the duration of the existing lease, and the Vendors shall have obtained a Change of Control Consent from the 6050 Dixie Road landlord, or Assignment Order in respect thereof.

– 27 –

(v)     Without limiting Section 6.2(a), the Purchaser shall be entitled to the continued use of the real property municipally known as 6253 Boundary Road, Cornwall, ON, currently used by the PGL Vendors, on existing lease terms for the duration of the existing lease, and the Vendors shall have obtained a Change of Control Consent from the 6253 Boundary Road landlord, or Assignment Order in respect thereof.

The foregoing conditions are for the exclusive benefit of the Purchaser. Any condition in this Section 6.2 may be waived by the Purchaser in whole or in part, without prejudice to any of its rights of termination in the event of non-fulfillment of any other condition in whole or in part. Any such waiver shall be binding on the Purchaser only if made in writing. If any condition set out in this Section 6.2 is not satisfied or performed by the Closing Date, the Purchaser may elect on written notice to the Vendors to terminate this Agreement.

**6.3     Conditions Precedent in Favour of the Vendors**

The obligation of the Vendors to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)     <u>Purchaser's Deliverables</u>. The Purchaser shall have executed and delivered or caused to have been executed and delivered to the Vendors at the Closing all the documents and payments contemplated in Section 5.3.

(b)     <u>No Breach of Representations and Warranties</u>. Each of the representations and warranties contained in Section 7.2 shall be true and correct in all material respects (i) as of the Closing Date as if made on and as of such date, or (ii) if made as of a date specified therein, as of such date.

(c)     <u>No Breach of Covenants.</u> The Purchaser shall have performed in all material respects all covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(d)     <u>Monitor's Certificate.</u> The Monitor shall have provided an executed copy of the Monitor's Certificate confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Vendors.

The foregoing conditions are for the exclusive benefit of the Vendors. Any condition in this Section 6.3 may be waived by the Vendors in whole or in part, without prejudice to any of their rights of termination in the event of non-fulfilment of any other condition in whole or in part. Any such waiver shall be binding on the Vendors only if made in writing. If any condition set forth in this Section 6.3 is not satisfied or performed by the Closing Date, the Vendors may elect on written notice to the Purchaser to terminate the Agreement.

**ARTICLE 7**
**REPRESENTATIONS AND WARRANTIES**

**7.1     Representations and Warranties of the Vendors**

The Vendors hereby jointly and severally represent and warrant as of the Effective Date and as of the Closing Time as follows, and acknowledge that the Purchaser is relying on such representations and warranties in connection with entering into this Agreement and performing its obligations hereunder:

– 28 –

(a)     Incorporation and Status. The Vendors are corporations incorporated and existing under the *Business Corporations Act* (Ontario), are in good standing under such act and have the power and authority to enter into, deliver and perform their obligations under this Agreement.

(b)     Corporate Authorization. The execution, delivery and, subject to obtaining the Approval and Vesting Order and Assignment Order in respect of the matters to be approved therein, performance by the Vendors of this Agreement has been authorized by all necessary corporate action on the part of the Vendors.

(c)     Execution and Binding Obligation. This Agreement has been duly executed and delivered by the Vendors and constitutes a legal, valid and binding obligation of the Vendors, enforceable against them in accordance with its terms, subject only to obtaining the Approval and Vesting Order, the Assignment Order, and the U.S. Approval Order.

(d)     Proceedings. There are no proceedings pending against the Vendors, or any of them, or, to the knowledge of the Vendors, threatened, with respect to, or in any manner affecting, title to the Purchased Assets, which would reasonably be expected to enjoin, delay, restrict or prohibit the transfer of all or any part of the Purchased Assets as contemplated by this Agreement or which would reasonably be expected to delay, restrict or prevent the Vendors from fulfilling any of their obligations set forth in this Agreement, provided that the Approval and Vesting Order is granted.

(e)     No Consents or Authorizations. Subject only to obtaining the Approval and Vesting Order, the Assignment Order and, to the extent applicable, the U.S. Approval Order, the Vendors do not require any consent, approval, waiver or other Authorization from any Governmental Authority as a condition to the lawful completion of the Transaction.

(f)     Residency. None of the Vendors (other than PGL USA and PFS USA) is a non-resident of Canada for purposes of the ITA.

(g)     No Other Agreements to Purchase. Except for the Purchaser's rights under this Agreement, no Person has any contractual right, option or privilege for the purchase or acquisition from the Vendors of any of the Purchased Assets.

**7.2     Representations and Warranties of the Purchaser**

The Purchaser hereby represents and warrants to and in favour of the Vendors as of the Effective Date and as of the Closing Time, and acknowledges that, the Vendors are relying on such representations and warranties in connection with entering into this Agreement and performing their obligations hereunder:

(a)     Incorporation and Status. The Purchaser is a corporation incorporated and existing under the laws of the Province of Ontario as of the date hereof, is in good standing under such act and has the power and authority to enter into, deliver and perform their obligations under this Agreement.

(b)     Corporate Authorization. The execution, delivery and performance by the Purchaser of this Agreement has been authorized by all necessary corporate action on the part of the Purchaser.

(c)     No Conflict. The execution, delivery and performance by the Purchaser of this Agreement do not (or would not with the giving of notice, the lapse of time, or both, or the happening of any other event or condition) result in a breach or a violation of, or conflict with, or

allow any other Person to exercise any rights under, any terms or provisions of the Organizational Documents of the Purchaser.

(d)     <u>Execution and Binding Obligation.</u> This Agreement has been duly executed and delivered by the Purchaser and constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms subject only to the Approval and Vesting Order, the Assignment Order and, to the extent applicable, the U.S. Approval Order.

(e)     <u>Proceedings.</u> There are no proceedings pending, or to the knowledge of the Purchaser, threatened, against the Purchaser before any Governmental Authority, which prohibit or seek to enjoin delay, restrict or prohibit the Closing of the Transaction, as contemplated by this Agreement, or which would reasonably be expected to delay, restrict or prevent the Purchaser from fulfilling any of its obligations set forth in this Agreement.

(f)     <u>Residency.</u> The Purchaser is not a non resident of Canada within the meaning of section 116 of the ITA.

(g)     <u>Sanctions Not Applicable.</u> None of the Purchaser, any of its subsidiaries or, to the knowledge of the Purchaser, any director, officer, agent, employee, Affiliate or representative of the Purchaser or any of its subsidiaries is, or is controlled or 50% or more owned by or is acting on behalf of, an individual or entity ("**Person**") currently the subject of  applicable economic sanctions including those administered or enforced by the government of Canada, the United States of America (collectively, "**Sanctions**"). None of the Purchaser or any of its subsidiaries is located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions.  To the Purchaser's knowledge, neither it nor any of its subsidiaries has engaged in any dealings or transactions with or for the benefit of a Person subject to Sanctions. The Purchaser has procedures and policies in place designed to ensure compliance with Sanctions.

(h)     <u>Equity Financing.</u> The Purchaser has obtained not less than $5,000,000 in equity financing.

(i)     <u>GST/HST Registration.</u>  The Purchaser is registered for goods and services tax/harmonized sales tax (GST/HST) purposes under Part IX of the *Excise Tax Act* (Canada), and its registration number is 766551022. The Purchaser will be registered effective on the Closing Date for Quebec sales tax (QST) purposes under Title I of *an Act respecting the Quebec sales tax.*

## 7.3     Transfer of Title; Conveyance of Assets

Subject to the conditions relating to leases set out in Section 6.2 above, the Purchaser is responsible for transferring any physical Purchased Assets (including specifically, any Equipment owned by the Vendors) as soon as practicable following Closing situated on any real properties owned or leased by the Vendors that are not acquired by the Purchaser pursuant to the Transaction.

## 7.4     "As is, Where is"

(1)     The Purchaser acknowledges and agrees that it is purchasing the Purchased Assets on an "as is, where is" basis, and without representations or warranties of any kind, nature, or description by the Monitor, the CRO, the Vendors or any of their respective agents, advisors or estates, and on the basis that the Purchaser has conducted to its satisfaction an independent inspection, investigation and verification of the Purchased Assets (including a review of title), and all other relevant matters and has determined to proceed with the transaction contemplated herein and will accept the same at the Closing Time in their then current state, condition, location, and amounts, provided, however, that the Purchaser shall not be required to accept

– 30 –

any Equipment or other property that has been lost, damaged or destroyed due to theft, fire, collision, vandalism or other calamity and for which insurance proceeds are not available to repair or replace such Equipment (the "**Wrecked Equipment**"), in which case such Wrecked Equipment will be deemed not to have been received by the Purchaser and the Purchaser shall be entitled to a reduction of the Purchase Price in accordance with Section 3.10.

(2)    No representation, warranty or condition whether statutory (including under the *Sale of Goods Act* (Ontario), the International Sale of Goods *Contracts Convention Act* (Canada) and the *International Sale of Goods Act* (Ontario) or any international equivalent act which may be applicable to the subject matter pursuant to the provisions of this Agreement, including but not limited to the United Nations Convention on Contracts for the International Sale of Goods), or express or implied, oral or written, legal, equitable, conventional, collateral, arising by custom or usage of trade, or otherwise is or will be given by the Vendors or the Monitor including as to title, outstanding liens or encumbrances, description, fitness for purpose, merchantability, merchantable quality, quantity, condition (including physical and environmental condition), suitability, durability, assignability, or marketability thereof or any other matter or thing whatsoever, and all of the same are expressly excluded and disclaimed and any rights pursuant to such statutes have been waived by the Purchaser.  The Purchaser acknowledges and agrees that it has relied entirely and solely on its own investigations as to the matters set out above and in determining to purchase the Purchased Assets pursuant to this Agreement.

(3)    The description of the Purchased Assets contained herein is for the purpose of identification only and the inclusion of any item in such description does not confirm the existence of any such items or that any such item is owned by the Vendors.  No representation, warranty or condition has been given by the Vendors, CRO or the Monitor concerning the completeness or accuracy of such descriptions and the Purchaser acknowledges and agrees that any other representation, warranty, statements of any kind or nature, express or implied, (including any relating to the future or historical financial condition, results of operations, prospects, assets or liabilities of the Vendors or the quality, quantity or condition of the Purchased Assets) are specifically disclaimed by the Vendors.

(4)    Any documents, materials and information provided by the Vendors, CRO or Monitor to the Purchaser with respect to the Purchased Assets (including any confidential information memorandums, management presentations, or material made available in the electronic data room) have been provided to the Purchaser solely to assist the Purchaser in undertaking its own due diligence, and the Vendors, CRO and/or Monitor have not made and are not making any representations or warranties, implied or otherwise, to or for the benefit of the Purchaser as to the accuracy and completeness of any such documents, materials or information or the achievability of any valuations, estimates or projections.  The Purchaser acknowledges that it has not and will not rely upon any such documents, materials or information in any manner, whether as a substitute for or supplementary to its own due diligence, searches, inspections and evaluations.  The Vendors, CRO and/or Monitor and their respective Affiliates, directors, officers, employees, agents and advisors shall not be liable for any inaccuracy, incompleteness or subsequent changes to any such documents, materials or information. The Purchaser further acknowledges that the use of the documents may not be possible without the Purchaser obtaining reliance or other assurances from the author of such documents directly and further that the documents may be subject to copyright or other property rights which may preclude their use by the Purchaser in whole or in part.

**ARTICLE 8**
**TERMINATION**

**8.1    Grounds for Termination**

This Agreement may be terminated on or prior to the Closing Date:

(a)     by the mutual written agreement of the Vendors (with the consent of the Monitor) and the Purchaser;

(b)     pursuant to Sections 6.1, 6.2 and 6.3, as applicable; or

(c)     by the Vendors (with the consent of the Monitor) or the Purchaser upon written notice to the other Parties if: (i) the Closing has not occurred by the Outside Date; or (ii) this Agreement is not approved or the Approval and Vesting Order is not granted by the Canadian Court; provided in each case that the failure to close or obtain such order, as applicable, by such deadline is not caused by any act or omission or breach of this Agreement by the Party proposing to terminate the Agreement.

**8.2     Effect of Termination.**

If this Agreement is terminated pursuant to Section 8.1, all further obligations of the Parties under this Agreement will terminate and no Party will have any Liability or further obligations hereunder; except for the provisions of Sections 9.4 (Public Announcements) and 9.10 (Governing Law).

**ARTICLE 9**
**GENERAL**

**9.1     Employment Matters**

(a)     The Purchaser or an affiliate thereof shall offer employment, effective on the Closing Date, to all Employees on terms and conditions which are substantially similar to the terms and conditions that each Employee had with the Vendors, conditional on the Closing occurring and effective on the Closing Date. Purchaser shall have provided the Vendors with copies of all offers of employment for the Employees for the purposes of confirming that the proposed terms and conditions of such offers comply with this section (collectively, the "**Offers of Employment**"). Each Offer of Employment shall expressly provide that the Purchaser recognizes all employment service with the Vendors and if applicable, the Vendors' predecessors, for all purposes. Each Offer of Employment will be delivered by the Purchaser to each Employee such number of days prior to the Closing Date as Purchaser and Vendors may reasonably agree, and shall provide that the Offer of Employment will be deemed to have been accepted if it is not rejected in writing by the applicable employee no less than two (2) business days prior to the Closing Date. The Purchaser shall have advised the Vendors prior to the Closing Date of each Employee who has rejected an Offer of Employment. In the event an Employee rejects an Offer of Employment such Employee shall not be considered a Transferring Employee and the applicable Vendor shall provide written notice of termination to such Employee prior to the Closing Date, which notice shall be in form and substance satisfactory to the Monitor, acting reasonably. The Vendors shall not attempt to discourage Employees from accepting the Offers of Employment.

(b)     If the Purchaser satisfies its obligations under the section immediately above, it shall only assume and be liable for the Employee-related obligations of the Transferring Employees.

(c)     The Purchaser will establish replacement plans for the Transferring Employees that are substantially similar to the Employee benefit plans existing on the Closing Date. The Purchaser shall cause each replacement plan to recognize all employment service with the Vendors, as applicable, and if applicable, the Vendors' predecessors, of each Transferring Employee for purposes of eligibility for participating, vesting, benefit accrual and entitlement to benefits under such replacement plans.

**9.2**    **Access to Books and Records**

For a period of six years from the Closing Date or for such longer period as may be reasonably required for the Vendors (or any trustee in bankruptcy of the estate of any of the Vendors) to comply with Applicable Law, the Purchaser will retain all original Books and Records that are transferred to the Purchaser under this Agreement, but the Purchaser is not responsible or liable for any accidental loss or destruction of, or damage to, any such Books and Records. So long as any such Books and Records are retained by the Purchaser pursuant to this Agreement, the Vendors (and any representative, agent, former director or officer or trustee in bankruptcy of the estate of any of the Vendors, including the Monitor) has the right to inspect and to make copies (at their own expense) of them at any time upon reasonable request during normal business hours and upon reasonable notice for any proper purpose and without undue interference to the business operations of the Purchaser.

**9.3**    **Notice**

Any notice or other communication under this Agreement shall be in writing and may be delivered by read-receipted email, addressed:

(a)    in the case of the Purchaser, as follows:

**1000927605 Ontario Inc.**
100 King Street West, Suite 3400
Toronto, Ontario, M5X 1A4

Attention: Aman Johal
Email: aman@pridegroupenterprises.com

with a copy to:

**Bennett Jones LLP**
100 King Street West, Suite 3400
Toronto, Ontario, M5X 1A4

Attention: Raj Sahni and Jesse Mighton
Email: SahniR@bennettjones.com / mightonj@bennettjones.com

(b)    in the case of the Vendors, as follows to the CRO:

Attention:        Randall Benson
Email:            r.benson@rcbensonconsulting.com

with a copy to:

**Thornton Grout Finnigan LLP**
Suite 3200, 100 Wellington Street West
P. O. Box 329, Toronto-Dominion Centre
Toronto, ON  M5K 1K7

Attention:        Leanne Williams, Rachel Nicholson, Puya Fesharaki
Email:            lwilliams@tgf.ca, rnicholson@tgf.ca, pfesharaki@tgf.ca

(c)      in each case, with a further copy to the Monitor as follows:

**Ernst & Young Inc.**
EY Tower, 100 Adelaide Street West,
Toronto , ON M5H 0B3

Attention:      Alex Morrison, Simone Carvalho, Michael Hayes, Ross Johnson
Email:  alex.f.morrison@parthenon.ey.com; simone.carvalho@parthenon.ey.com;
Michael.Hayes@parthenon.ey.com;  ross.johnson@ca.ey.com

with a copy to:

**Blake, Cassels & Graydon LLP**
199 Bay Street, Suite 4000,
Toronto ON M5L 1A9

Attention:      Pam Huff, Kelly Bourassa, Chris Bur,
Email:          pam.huff@blakes.com; kelly.bourassa@blakes.com
chris.burr@blakes.com;

Any such notice or other communication, if transmitted by email before 5:00 p.m. (Toronto time) on a Business Day, will be deemed to have been given on such Business Day, and if transmitted by email after 5:00 p.m. (Toronto time) on a Business Day, will be deemed to have been given on the Business Day after the date of the transmission. In the case of a communication by email or other electronic means, if an autoreply is received indicating that the email is no longer monitored or in use, delivery must be followed by the dispatch of a copy of such communication pursuant to one of the other methods described above; provided however that any communication originally delivered by electronic means shall be deemed to have been given on the date stipulated above for electronic delivery.

Sending a copy of a notice or other communication to a Party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the notice or other communication to that Party. The failure to send a copy of a notice or other communication to legal counsel does not invalidate delivery of that notice or other communication to a Party. A Person may change its address for service by notice given in accordance with the foregoing and any subsequent communication must be sent to such Person at its changed address.

## 9.4      Public Announcements

The Vendors shall be entitled to disclose this Agreement to the Courts and parties in interest in the CCAA Proceedings, other than any information which the Purchaser advises the Vendors in writing as being confidential, acting reasonably, and this Agreement may be posted on the Monitor's website maintained in connection with the CCAA Proceedings at URL: http://www.ey.com/ca/pridegroup. Other than as provided in the preceding sentence or statements made in the Courts (or in pleadings filed therein) or where required to meet timely disclosure obligations of the Vendors or any of their Affiliates under Applicable Laws, the Vendors shall not issue (prior to or after the Closing) any press release or make any public statement or public communication with respect to this Agreement or the Transactions contemplated hereby without the prior consent of the other Parties, which shall not be unreasonably withheld or delayed.

## 9.5      Time

Time shall, in all respects, be of the essence hereof, provided that the time for doing or completing any matter provided for herein may be extended or abridged by an agreement in writing signed by the Parties.

**9.6    Survival**

The representations and warranties of the Parties contained in this Agreement shall not merge on Closing and the representations, warranties and covenants of the Parties contained herein to be performed after the Closing shall survive Closing and remain in full force and effect.

**9.7    Benefit of Agreement**

This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

**9.8    Entire Agreement**

This Agreement and the attached Schedules hereto constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior negotiations, understandings and agreements. This Agreement may not be amended or modified in any respect unless agreed to in writing by the Parties.

**9.9    Paramountcy**

In the event of any conflict or inconsistency between the provisions of this Agreement, and any other agreement, document or instrument executed or delivered in connection with this Transaction or this Agreement, the provisions of this Agreement shall prevail to the extent of such conflict or inconsistency.

**9.10    Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and each of the Parties irrevocably attorn to the exclusive jurisdiction of the Canadian Court, and any appellate courts of the Province of Ontario therefrom.

**9.11    Assignment**

The Purchaser cannot assign any of its rights or obligations under this Agreement without the prior written consent of the Vendors and the Monitor. Notwithstanding the foregoing, this Agreement may be assigned by the Purchaser prior to the issuance of the Approval and Vesting Order, in whole or in part (and, for greater certainty, the Purchaser may assign to one or more Permitted Assignees (as defined below) the right to purchase, in consideration for the allocable portion of the Consideration, all or any portion of the Purchased Assets hereunder), without the prior written consent of the Vendors or the Monitor, provided that: (i) such assignee is a Related Party or subsidiary of the Purchaser (a "**Permitted Assignee**"); (ii) the Purchaser provides prior notice of such assignment to the Vendors and the Monitor; and (iii) such assignee agrees in writing to be bound by the terms of this Agreement to the extent of the assignment and a copy of such assumption agreement is delivered to the Vendors and the Monitor forthwith after having been entered into; provided, however, that any such assignment shall not relieve the Purchaser of its obligations hereunder.

**9.12    Further Assurances**

Each of the Parties shall, at the request and expense of the requesting Party, take or cause to be taken such action and execute and deliver or cause to be executed and delivered to the other such conveyances, transfers, documents and further assurances as may be reasonably necessary or desirable to give effect to this Agreement.

– 35 –

**9.13    Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement. Transmission by e-mail of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

**9.14    Severability**

Notwithstanding any provision herein, if a condition to complete the Transaction, or a covenant or an agreement herein is prohibited or unenforceable pursuant to Applicable Law, then such condition, covenant or agreement shall be ineffective to the extent of such prohibition or unenforceability without invalidating the other provisions hereof.

**9.15    Monitor's Certificate**

The Parties acknowledge and agree that the Monitor shall be entitled to deliver to the Purchaser, and file with the Canadian Court, the executed Monitor's Certificate without independent investigation, upon receiving written confirmation from both Parties (or the applicable Party's counsel) that all conditions of Closing in favour of such Party have been satisfied or waived, and the Monitor shall have no Liability to the Parties in connection therewith. The Parties further acknowledge and agree that upon written confirmation from both Parties that all conditions of Closing in favour of such Party have been satisfied or waived, the Monitor may deliver the executed Monitor's Certificate to the Purchaser's counsel in escrow, with the sole condition of its release from escrow being the Monitor's written confirmation that all such funds have been received, the Monitor's Certificate will be released from escrow to the Purchaser, and the Closing shall be deemed to have occurred.

**9.16    Monitor's Capacity**

In addition to all of the protections granted to the Monitor under the CCAA or any order of the Court in this CCAA Proceeding, the Vendors and the Purchaser acknowledge and agree that the Monitor, acting in its capacity as Monitor and not in their personal capacity, will have no Liability, in its personal capacity or otherwise, in connection with this Agreement or the Transaction contemplated herein whatsoever as Monitor.

*[Signature Page Follows]*

IN WITNESS WHEREOF the Parties have executed this Agreement as of the day and year first above written.

**1000927605 ONTARIO INC**.

By: *Sulakhan Johal*

      Name:    Sulakhan Johal

      Title:     Director

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS LTD.**

By: *RC Benson*

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS USA, CO.**

By: *RC Benson*

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS INTERNATIONAL LTD.**

By *RC Benson*

      Name: Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE FLEET SOLUTIONS INC.**

By: 

Name:       Randy Benson

Title:        Chief Restructuring Officer

I have authority to bind the Corporation.


**PRIDE FLEET SOLUTIONS USA INC.**

By: 

Name:       Randy Benson

Title:        Chief Restructuring Officer

I have authority to bind the Corporation.


**2029909 ONTARIO INC.**

By: 

Name:       Randy Benson

Title:        Chief Restructuring Officer

I have authority to bind the Corporation.


**12944154 CANADA INC.**

By: 

Name:       Randy Benson

Title:        Chief Restructuring Officer

I have authority to bind the Corporation.

**13184633 CANADA INC.**

By 

Name:    Randy Benson

Title:    Chief Restructuring Officer

I have authority to bind the Corporation.


**2837229 ONTARIO INC.**

By: 

Name:    Randy Benson

Title:    Chief Restructuring Officer

I have authority to bind the Corporation.


**2043002 ONTARIO INC.**

By 

Name:    Randy Benson

Title:    Chief Restructuring Officer

I have authority to bind the Corporation.


**TPINE LEASING CAPITAL CORPORATION**

By 

Name:    Randy Benson

Title:    Chief Restructuring Officer

I have authority to bind the Corporation.

**SCHEDULE "A"**
**FORM OF APPROVAL AND VESTING ORDER**

**[To be finalized and appended prior to Approval and Vesting Order motion]**

**SCHEDULE "B"**
**EXCLUDED ASSETS**

1.      Non-material assets sold in the Interim Period.

2.      Excluded Contracts.

3.      Accounts Receivable owed to any PGL Vendor or its subsidiaries by any member of the Pride Entities that is not a PGL Vendor.

4.      Any Cash or Cash Equivalents of PFS and PFS USA.

5.      All truck and trailer parts inventory owned by PFS [**or PFS USA**], save and except for motor oil and other fluids and shop supplies used by PFS [**or PFS USA**] in servicing trucks and trailers and diesel exhaust fluid and diesel fuel and gasoline held in storage tanks or containers at the gas stations.

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

**SCHEDULE "C"**
**PERMITTED ENCUMBRANCES**

**[Note: Balance of schedule to be completed prior to Closing.]**

Docusign Envelope ID: 127CBCE5-42D7-4956-95CD-D633BA41DEE0

**SCHEDULE "D"**

**[INTENTIONALLY OMITTED]**

**SCHEDULE "E"**
**EXCLUDED CONTRACTS**

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

**SCHEDULE F**
**ALLOCATION STATEMENT**

| | |
|---|---|
| Vehicles (Schedule "G") | $ 43,098,837[4] |
| Acquired AR Amount (including Intercompany Receivables at nil consideration) | $9,000,000.00[5] |
| Tangible Property (Computers, office furniture, IT, mechanics tools, etc.) | $160,000.00 |
| Intangibles (IP, licenses, software, goodwill, Permits, license plates, Purchased Contracts, etc.) (Schedule "F") | $50,000.00 |
| PGL Insurance Shares | $1.00 |
| Inventory[6] | $100,000 |
| Prepaid Expenses | $50,000 |
| **TOTAL** | $52,458,838 |

**[Note: This Allocation Statement is subject to adjustment in accordance with Section 3.3 of the Purchase Agreement. The details with respect to Vehicles being purchased are set out in Schedule "G".]**

---

4 Subject to further adjustment in accordance with s. 3.3(c).

5 Subject to further adjustment in accordance with s. 3.3(b).

6 Subject to further adjustment in accordance with s. 3.3(e).

## SCHEDULE "G"

## VEHICLES

### TPine Assets

| Make | Model | Year | VIN |
|------|-------|------|-----|
| FREIGHTLINER | CSC | 2018 | 3AKJGBDV6JDJV5185 |
| FREIGHTLINER | PEI | 2019 | 1FUJHTDV1KLKA1156 |
| FREIGHTLINER | PE1 | 2019 | 1FUJHTDV3KLKA1160 |
| FREIGHTLINER | FM2 | 2019 | 1FUJHTDV6KLKA1170 |
| FREIGHTLINER | FM2 | 2019 | 1FUJHTDV5KLKA1161 |
| UTILITY | VS2 | 2020 | 1UYVS2533L7143908 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7143909 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7143912 |
| UTILITY | VS2 | 2020 | 1UYVS2530L7143915 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143917 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143921 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143925 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143926 |
| VOLVO | VVN | 2022 | 4V4NC9EHXNN305472 |
| VOLVO | VVN | 2022 | 4V4NC9EH5NN305475 |
| VOLVO | VVN | 2022 | 4V4NC9EH9NN305477 |
| VOLVO | VVN | 2022 | 4V4NC9EH8NN305499 |
| VOLVO | VVN | 2022 | 4V4NC9EH2NN305501 |
| VOLVO | VVN | 2022 | 4V4NC9EH4NN320372 |
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR2KSKM7362 |
| WABASH | ZGP | 2019 | 1DW1A5331KBA14563 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14564 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14565 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14566 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14567 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14568 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14569 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14570 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14571 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14572 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14573 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14574 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14575 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14576 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14577 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14578 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14579 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14580 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14581 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14582 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14583 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14584 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14585 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14586 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14587 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14588 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14589 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14590 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14591 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14592 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14593 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14594 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14595 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14596 |

| | | | |
|---|---|---|---|
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14597 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14598 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14599 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14600 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14602 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14603 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14604 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14605 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14606 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14607 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14608 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14609 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14610 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14611 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14612 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17904 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17905 |
| STOUGHTON | COM | 2019 | 1DW1A5330KEA17906 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17907 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17908 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17909 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17910 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17911 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17912 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17913 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17914 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17915 |
| STOUGHTON | COM | 2019 | 1DW1A5333KEA17916 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17917 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17918 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17919 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17920 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17921 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17922 |
| STOUGHTON | COM | 2019 | 1DW1A5330KEA17923 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17924 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17925 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17926 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17927 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17928 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17929 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17930 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17931 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17932 |
| STOUGHTON | COM | 2019 | 1DW1A5333KEA17933 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17934 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17935 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903018 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903020 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903021 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903022 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903023 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903024 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903025 |
| VANGUARD | VXP | 2019 | 5V8VC53B6KM903026 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903027 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903028 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903029 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903030 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903031 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903032 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903033 |

| VANGUARD | VXP | 2019 | 5V8VC53B5KM903034 |
|---|---|---|---|
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903035 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903037 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903038 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903039 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903040 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903041 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903042 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903049 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903050 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903051 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903052 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903056 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903058 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903059 |
| VANGUARD | VXP | 2019 | 5V8VC53B6KM903060 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903061 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903062 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903063 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903064 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903065 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903066 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903067 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30640 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30641 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30642 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30643 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30644 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30645 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30646 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30647 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30648 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30649 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30650 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30651 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30652 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30653 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30654 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30655 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30656 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30657 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30660 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30661 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30662 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30663 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30664 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30665 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30666 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30667 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30668 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30669 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30670 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30671 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30672 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30673 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30674 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30675 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30676 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30677 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30678 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30679 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30680 |

| | | | |
|---|---|---|---|
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30681 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30682 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30683 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30684 |
| GREAT DANE | ETL | 2015 | 1GRAA062XFB700007 |
| UTILITY | VS2 | 2018 | 1UYVS2532GM381420 |
| UTILITY | N/A | 2019 | 1UYVS2535K6740918 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14836 |
| WANC | RFA | 2014 | 1JJV532B1HL008360 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6884720 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6840805 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6840806 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6840808 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6915027 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6915028 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6915029 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6840831 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6840842 |
| UTILITY | N/A | 2020 | 1UYVS253L6914929 |
| UTILITY | N/A | 2020 | 1UYVS2537L6914943 |
| UTILITY | N/A | 2020 | 1UYVS2532L6914946 |
| UTILITY | N/A | 2020 | 1UYVS2534L6914947 |
| UTILITY | N/A | 2020 | 1UYVS2534L6914950 |
| UTILITY | VS2 | 2019 | 1UYVS253XK6538527 |
| UTILITY | UTIL | 2019 | 1UYVS2532K6538523 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6258505 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6914935 |
| UTILITY | N/A | 2019 | 1UYVS2535L7837015 |
| STRI | S75 | 2018 | 1S12E9532JE536500 |
| STRI | S75 | 2018 | 1S12E9534JE536482 |
| EAST | S75 | 2018 | 1S12E9537JE536489 |
| STRI | S75 | 2018 | 1S12E9531JE536486 |
| DIMN | FV | 2018 | 2DM421A45JB157402 |
| UTILITY | S75 | 2018 | 1S12E9536JE536483 |
| UTILITY | N/A | 2020 | 1UYVS2531L7143910 |
| UTILITY | N/A | 2020 | 1UYVS2532L7143916 |
| CIMC | N/A | 2018 | 527SR5320JM012662 |
| CIMC | N/A | 2018 | 527SR5324JM012597 |
| CIMC | N/A | 2018 | 527SR5326JM012598 |
| CIMC | N/A | 2018 | 527SR5326JM012665 |
| CIMC | N/A | 2018 | 527SR5322JM012663 |
| UTILITY | VS3 | 2020 | 1UYVS3536L6884601 |
| UTILITY | VS3 | 2020 | 1UYVS3538L6884602 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884604 |
| UTILITY | VS3 | 2020 | 1UYVS3533L6884605 |
| UTILITY | VS3 | 2020 | 1UYVS3535L6884606 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884607 |
| UTILITY | VS3 | 2020 | 1UYVS3539L6884608 |
| UTILITY | VS3 | 2020 | 1UYVS3530L6884609 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884610 |
| UTILITY | 2020 | 2020 | 1UYVS3539L6884611 |
| UTILITY | VS3 | 2020 | 1UYVS3530L6884612 |
| UTILITY | VS3 | 2020 | 1UYVS3532L6884613 |
| UTILITY | VS3 | 2020 | 1UYVS3534L6884614 |
| UTILITY | VS3 | 2020 | 1UYVS3538L6884616 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884617 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884618 |
| UTILITY | VS3 | 2020 | 1UYVS3533L6884619 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884621 |
| UTILITY | VS3 | 2020 | 1UYVS3535L6884623 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884624 |
| UTILITY | VS3 | 2020 | 1UYVS3539L6884625 |

| | | | |
|---|---|---|---|
| UTILITY | VS3 | 2020 | 1UYVS353XL6884620 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884603 |
| UTILITY | VS3 | 2020 | 1UYVS3536L6884615 |
| UTILITY | VS2 | 2014 | 1UYVS2535EM774258 |
| STOU | N/A | 2017 | 1DW1A532XHB699224 |
| STOUGHTON | STOU | 2016 | 1DW1A53246B703721 |
| WABASH | N/A | 2023 | 1JJV532D1PL328715 |
| UTILITY | VS2 | 2020 | 1UYVS2538L7143919 |
| UTILITY | VS2 | 2020 | 1UYVS2537L7143913 |
| UTILITY | N/A | 2014 | 1UYVS2531EM774533 |
| UTILITY | N/A | 2014 | 1UYVS253XEM774515 |
| UTILITY | VS2 | 2014 | 1UYVS2535EU772851 |
| UTILITY | VS2 | 2014 | 1UYVS2530EU772708 |
| UTILITY | VS2 | 2014 | 1UYVS2537EU772821 |
| UTILITY | VS2 | 2014 | 1UYVS2535EM774521 |
| GREAT DANE | TT | 2011 | 1GRAA0623BW702135 |
| GREAT DANE | TT | 2011 | 1GRAA0629BW702110 |
| UTILITY | VS2 | 2012 | 1UYVS2539CM470007 |
| UTILITY | VS2 | 2015 | 1UYVS2531FM078109 |
| UTILITY | VS2 | 2014 | 1UYVS535EM773949 |
| UTILITY | VS2 | 2011 | 1UYVS2538CU468846 |
| UTILITY | VS2 | 2014 | 1UYVS2537CM469910 |
| HYUNDAI | N/A | 2012 | 3H3V533C3CT298004 |
| UTILITY | TL | 2020 | 1UYVS2531L7143924 |
| UTILITY | VS2 | 2020 | 1UYVS2533L7143911 |
| UTILITY | N/A | 2019 | 1UYVS2538K7533319 |
| UTILITY | VS2 | 2020 | 1UYVS2536L7143904 |
| UTILITY | VS2 | 2020 | 1UYVS2539L7143914 |
| UTILITY | VS2 | 2020 | 1UYVS2536L7143918 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143920 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143922 |

## PGL Assets

| Make | Model | Year | VIN |
|---|---|---|---|
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F70RPUX9509 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F70RPUX9512 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F71RPNP1888 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F72RPUX9513 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F75RPUX9506 |
| FREIGHTLINER | ECASCADIA | 2024 | 1FUJH4F76RPUX9515 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F77RPUX9507 |
| FREIGHTLINER | ECASCADIA | 2024 | 1FUJH4F78RPUX9516 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR1LLLA0402 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR1NLMW8595 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR2LLLA0408 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR2NLMW8590 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR3NLMW8596 |
| FREIGHTLINER | FRHT | 2022 | 1FUJHHDR3NLMW8890 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR4NLMW8591 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHHDR5MLML4450 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR5NLMW8597 |

| | | | |
|---|---|---|---|
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR6NLMW8589 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR6NLMW8592 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR7LLLA0405 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR7NLMW8598 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR8LLLA0400 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR8NLMW8593 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR9LLLA0406 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDRXNLMW8594 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR0LLKU7313 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR0LLKU7375 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR2LLKU7300 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR2LLKU7314 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR2MLMM2136 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7301 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7377 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7380 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR4MLMM2137 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR5LLKU7310 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR5MLMA7585 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7302 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7378 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7381 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR7LLKU7311 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR7MLMA7586 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR8LLKU7303 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR8LLKU7379 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR9LLKU7312 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR9MLMA7587 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDRXLLKU7304 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV0MLMA7667 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV3MLML4446 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV5MLMA7664 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV5MLML4447 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV7MLMA7665 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV9MLMA7666 |
| KENWORTH | CON | 2020 | 1XKZD49X1LJ960840 |
| KENWORTH | CON | 2020 | 1XKZD49X3LJ960841 |
| KENWORTH | CON | 2020 | 1XKZD49X5LJ960839 |
| KENWORTH | CON | 2020 | 1XKZD49X5LJ960842 |
| KENWORTH | CON | 2020 | 1XKZD49X7LJ960843 |
| PETERBILT | 579 | 2023 | 1XPBAL9X0PD793437 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR0PSUP5013 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR0PSUP5027 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSUU3259 |

| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSUU3262 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR0RSVA3178 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR0RSVA3181 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSVG7513 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR1PSUP5019 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR1PSUP5022 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR1RSUU3383 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR1RSVA3240 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5000 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5014 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5028 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5031 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR2RSVA3179 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR2RSVA3182 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR2RSVG7514 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR3PSUP5006 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR3PSUP5023 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSUU3384 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSVA3238 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSVA3241 |
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR4KSKM7301 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP4995 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5001 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5015 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5029 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR4RSUU3376 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR4RSVG7515 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP4990 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR5PSUP5007 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP5010 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP5024 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSUU3385 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSVA3239 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSVA3242 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR6PSUP4996 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR6PSUP5002 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR6RSUU3220 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR6RSUU3377 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR6RSUU3380 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR6RSVG7516 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR7PSUP5008 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR7PSUP5011 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR7RSUU3257 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR7RSUU3260 |

| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR8KSKM7303 |
|---|---|---|---|
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR8PSUP4997 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR8PSUP5003 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR8PSUP5020 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3218 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3221 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3378 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3381 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR8RSVG7517 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR9PSUP4992 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5009 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5012 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5026 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSUU3258 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSUU3261 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR9RSVA3180 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSVG7512 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP4998 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5004 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5018 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5021 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3253 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3379 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3382 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDRXRSVG7518 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR0MSMA7580 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR1MSMA7605 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR2MSMA7581 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR3MSMA7606 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR4MSMA7579 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR4MSMA7582 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR5MSMA7607 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR6MSMA7583 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR7MSMA7608 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR8MSMA7584 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR8MSMA7603 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDRXMSMA7604 |
| FREIGHTLINER | CASC | 2019 | 3AKJHTDV5KSKA1178 |
| FREIGHTLINER | 116 | 2019 | 3AKJHTDV7KSKA1179 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPA1PN527730 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPA4PN527771 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR0PN526008 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR1PN557610 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN121888 |

| | | | |
|---|---|---|---|
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN443561 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN527766 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR4PN580704 |
| INTERNATIONAL | LT | 2023 | 3HSDZAPR5PN492650 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPR5PN527767 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR5PN557612 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPR5PN563622 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR6PN527731 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR6PN580705 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR7PN443580 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN121109 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN121885 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN527729 |
| INTERNATIONAL | LT6 | 2023 | 3HSDZAPR8PN580706 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN443581 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN492635 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN527769 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN527772 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN563624 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN569133 |
| VOLVO | VNL | 2022 | 4V4NC9EH0NN305476 |
| VOLVO | VVN | 2021 | 4V4NC9EH4MN272886 |
| VOLVO | VVN | 2021 | 4V4NC9EH6MN272887 |
| VOLVO | VVN | 2022 | 4V4NC9EH9NN320383 |
| VOLVO | ARO | 2021 | 4V4WC9EG0MN281824 |
| VOLVO | ARO | 2021 | 4V4WC9EG2MN281825 |
| VOLVO | ARO | 2021 | 4V4WC9EG4MN281826 |
| VOLVO | ARO | 2021 | 4V4WC9EG7MN281822 |
| VOLVO | ARO | 2021 | 4V4WC9EG9MN281823 |
| VOLVO | ARO | 2019 | 4V4WC9EH0KN192955 |
| VOLVO | ARO | 2022 | 4V4WC9EH0NN292686 |
| VOLVO | ARO | 2019 | 4V4WC9EH2KN192956 |
| VOLVO | ARO | 2022 | 4V4WC9EH2NN292673 |
| VOLVO | ARO | 2022 | 4V4WC9EH2NN292687 |
| VOLVO | ARO | 2019 | 4V4WC9EH4KN192957 |
| VOLVO | ARO | 2022 | 4V4WC9EH4NN292688 |
| VOLVO | ARO | 2022 | 4V4WC9EH6NN292689 |
| VOLVO | ARO | 2019 | 4V4WC9EH7KN192953 |
| VOLVO | ARO | 2022 | 4V4WC9EH7NN292670 |
| VOLVO | ARO | 2019 | 4V4WC9EH8KN192962 |
| VOLVO | ARO | 2022 | 4V4WC9EH9NN292671 |
| VOLVO | ARO | 2022 | 4V4WC9EH9NN292685 |
| UTILITY | N/A | 2019 | 1UYVS2539K7562215 |
| WANC | VS2 | 2020 | 1UYVS2537L7876432 |

| | | | |
|---|---|---|---|
| WANC | DVC | 2023 | 1JJV532DXPL361129 |
| WANC | WANC | 2023 | 1JJV532D6PL361130 |
| WANC | DVC | 2023 | 1JJV532D8PL361131 |
| UTILITY | VS2 | 2023 | 1JJV532DXPL361132 |
| WANC | DVC | 2023 | 1JJV532D1PL361133 |
| WANC | DVC | 2023 | 1JJV532D3PL361134 |
| WANC | DVC | 2023 | 1JJV532D5PL361135 |
| WANC | DVC | 2023 | 1JJV532D7PL361136 |
| WANC | DVC | 2023 | 1JJV532D9PL361137 |
| WANC | DVC | 2023 | 1JJV532D0PL361138 |
| WANC | DVC | 2023 | 1JJV532D2PL361139 |
| WANC | DVC | 2023 | 1JJV532D9PL361140 |
| WANC | DVC | 2023 | 1JJV532D0PL361141 |
| WANC | DVC | 2023 | 1JJV532D2PL361142 |
| WANC | DVC | 2023 | 1JJV532D4PL361143 |
| WANC | DVC | 2023 | 1JJV532D6PL361144 |
| WANC | DVC | 2023 | 1JJV532D8PL361145 |
| WANC | DVC | 2023 | 1JJV532DXPL361146 |
| WANC | DVC | 2023 | 1JJV532D1PL361147 |
| WANC | DVC | 2023 | 1JJV532D3PL361148 |
| WANC | DVC | 2023 | 1JJV532D5PL361149 |
| WANC | DVC | 2023 | 1JJV532D1PL361150 |
| WANC | DVC | 2023 | 1JJV532D3PL361151 |
| WANC | DVC | 2023 | 1JJV532D5PL361152 |
| WANC | DVC | 2023 | 1JJV532D7PL361153 |
| WANC | DVC | 2023 | 1JJV532D9PL361154 |
| WANC | DVC | 2023 | 1JJV532D0PL361155 |
| WANC | DVC | 2023 | 1JJV532D2PL361156 |
| WANC | DVC | 2023 | 1JJV532D4PL361157 |
| WANC | DVC | 2023 | 1JJV532D6PL361158 |
| WANC | DVC | 2023 | 1JJV532D8PL361159 |
| WANC | DVC | 2023 | 1JJV532D4PL361160 |
| WANC | DVC | 2023 | 1JJV532D6PL361161 |
| WANC | DVC | 2023 | 1JJV532D8PL361162 |
| WANC | DVC | 2023 | 1JJV532DXPL361163 |
| WANC | DVC | 2023 | 1JJV532D1PL361164 |
| WANC | DVC | 2023 | 1JJV532D3PL361165 |
| WANC | DVC | 2023 | 1JJV532D5PL361166 |
| WANC | DVC | 2023 | 1JJV532D7PL361167 |
| WANC | DVC | 2023 | 1JJV532D9PL361168 |
| MANAC | 942 | 2023 | 2M5921610P1215253 |
| MANAC | 942 | 2023 | 2M5921612P1215254 |
| MANAC | 942 | 2023 | 2M5921614P1215255 |
| MANAC | 942 | 2023 | 2M5921616P1215256 |

| | | | |
|---|---|---|---|
| MANAC | 942 | 2023 | 2M5921618P1215257 |
| MANAC | 942 | 2023 | 2M592161XP1215258 |
| MANAC | 942 | 2023 | 2M5921611P1215259 |
| MANAC | 942 | 2023 | 2M5921618P1215260 |
| MANAC | 942 | 2023 | 2M592161XP1215261 |
| MANAC | 942 | 2023 | 2M592161XP1215262 |
| MANAC | 942 | 2023 | 2M5921613P1215263 |
| MANAC | 942 | 2023 | 2M5921615P1215264 |
| MANAC | 942 | 2023 | 2M5921617P1215265 |
| MANAC | 942 | 2023 | 2M5921619P1215266 |
| MANAC | 942 | 2023 | 2M5921610P1215267 |
| MANAC | 942 | 2023 | 2M5921612P1215268 |
| MANAC | 942 | 2023 | 2M5921614P1215269 |
| MANAC | 942 | 2023 | 2M5921610P1215270 |
| MANAC | 942 | 2023 | 2M5921612P1215271 |
| MANAC | 942 | 2023 | 2M5921614P1215272 |
| STOUGHTON | AVW | 2017 | 1DW1A5337HS699304 |
| STOUGHTON | AVW | 2017 | 1DW1A5332HS699307 |
| STOUGHTON | AVW | 2017 | 1DW1A5330HS699306 |
| STOUGHTON | AVW | 2017 | 1DW1A5335HS699303 |
| STOUGHTON | AVW | 2017 | 1DW1A5332HS699310 |
| STOUGHTON | AVW | 2017 | 1DW1A5336HS699309 |
| STOUGHTON | AVW | 2017 | 1DW1A5334HS699311 |
| STOUGHTON | AVW | 2017 | 1DW1A5334HS699308 |
| STOUGHTON | AVW | 2017 | 1DW1A5339HS699305 |
| MANAC | 94353A321 | 2017 | 2M5931615H1163715 |
| MANAC | 94353A321 | 2017 | 2M593161XH1163712 |
| MANAC | 94353A321 | 2017 | 2M5931618H1163711 |
| MANAC | N/A | 2017 | 2M5931613H1163714 |
| STOUGHTON | AVW | 2017 | 1DW1A5333HS699302 |
| MANAC | N/A | 2017 | 2M5931611H1163713 |
| GREAT DANE | CS1 | 2016 | 1GRAA0635GB705741 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705744 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705743 |
| GREAT DANE | CS1 | 2016 | 1GRAA0637GB705742 |
| MANAC | 943 | 2017 | 2M5931614H1161812 |
| MANAC | 943 | 2017 | 2M5931612H1161811 |
| MANAC | 943 | 2017 | 2M5931618H1161814 |
| MANAC | 943 | 2017 | 2M593161XH1161815 |
| MANAC | 943 | 2017 | 2M5931611H1161816 |
| MANAC | 943 | 2017 | 2M5931616H1161813 |
| MANAC | 943 | 2017 | 2M5931613H1161817 |
| GREAT DANE | CS1 | 2016 | 1GRAA063XGB705752 |
| GREAT DANE | CS1 | 2016 | 1GRAA063XGB705749 |

| GREAT DANE | CS1 | 2016 | 1GRAA0637GB705756 |
|------------|-----|------|-------------------|
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705750 |
| GREAT DANE | CS1 | 2016 | 1GRAA0635GB705755 |
| GREAT DANE | CS1 | 2016 | 1GRAA0633GB705754 |
| GREAT DANE | CS1 | 2016 | 1GRAA0638GB705751 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705747 |
| GREAT DANE | CS1 | 2016 | 1GRAA0632GB705759 |
| GREAT DANE | CS1 | 2016 | 1GRAA0633GB705746 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705757 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705760 |
| GREAT DANE | CSE | 2016 | 1GRAA0638GB705748 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705758 |
| GREAT DANE | CS1 | 2016 | 1GRAA0631GB705753 |
| GREAT DANE | CS1 | 2016 | 1GRAA0634GB705763 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705764 |
| GREAT DANE | CS1 | 2016 | 1GRAA0638GB705765 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705761 |
| GREAT DANE | CS1 | 2016 | 1GRAA0632GB705762 |
| STOUGHTON | ZGP | 2018 | 1DW1A5338JS773108 |
| STOUGHTON | ZGP | 2018 | 1DW1A533XJS773109 |
| STOUGHTON | ZGP | 2018 | 1DW1A5337JS773102 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335JS773101 |
| GREAT DANE | CS1 | 2018 | 1GRAA0637JB700872 |
| STOUGHTON | ZGP | 2018 | 1DW1A5331JS773113 |
| STOUGHTON | ZGP | 2018 | 1DW1A533XJS773112 |
| GREAT DANE | CS1 | 2018 | 1GRAA0635JB700871 |
| STOUGHTON | ZGP | 2018 | 1DW1A5330JS773104 |
| STOUGHTON | ZGP | 2018 | 1DW1A5339JS773103 |
| STOUGHTON | ZGP | 2018 | 1DW1A5333JS773114 |
| STOUGHTON | ZGP | 2018 | 1DW1A5334JS773106 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335JS773115 |
| STOUGHTON | ZGP | 2018 | 1DW1A5336JS773110 |
| STOUGHTON | ZGP | 2018 | 1DW1A5338JS773111 |
| STOUGHTON | ZGP | 2018 | 1DW1A5336JS773107 |
| UTILITY | VS3 | 2017 | 1UYVS3534HG835611 |
| UTILITY | VS3 | 2017 | 1UYVS3531HG835601 |
| UTILITY | VS2 | 2017 | 1UYVS3533HG835602 |
| UTILITY | VS3 | 2017 | 1UYVS3536HG835612 |
| UTILITY | VS3 | 2017 | 1UYVS3538HG835613 |
| UTILITY | VS3 | 2017 | 1UYVS353XHG835614 |
| UTILITY | VS3 | 2017 | 1UYVS3531HG835615 |
| UTILITY | VS3 | 2017 | 1UYVS3535HG835603 |
| VANGUARD | VXP | 2018 | 5V8VC53B2JM806498 |
| VANGUARD | VXP | 2018 | 5V8VC53B4JM806499 |

| VANGUARD | VXP | 2018 | 5V8VC53B9JM806501 |
|----------|-----|------|-------------------|
| VANGUARD | VXP | 2018 | 5V8VC53B0JM806502 |
| VANGUARD | VXP | 2018 | 5V8VC53B2JM806503 |
| VANGUARD | VXP | 2018 | 5V8VC53B4JM806504 |
| VANGUARD | VXP | 2018 | 5V8VC53B6JM806505 |
| VANGUARD | VXP | 2018 | 5V8VC53B8JM806506 |
| VANGUARD | VXP | 2018 | 5V8VC53BXJM806507 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335KBA14601 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903019 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30635 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30636 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30637 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30638 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30639 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30658 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30659 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30809 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30811 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30812 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30813 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30814 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30816 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30817 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30820 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30821 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30823 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30824 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30825 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30826 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30827 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30828 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30829 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30830 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30831 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30832 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30833 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30834 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30835 |
| STOUGHTON | COM | 2020 | 1DW1A5330LBA30836 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30837 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30838 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30839 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30840 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30841 |

| STOUGHTON | COM | 2020 | 1DW1A5336LBA30842 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30843 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30844 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30845 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30846 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30847 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30848 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30849 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30850 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30851 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30852 |
| STOUGHTON | COM | 2020 | 1DW1A5330LBA30853 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30854 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30855 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30856 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30857 |
| STOUGHTON | COM | 2020 | 1DW1A5333LEA31171 |
| STOUGHTON | COM | 2020 | 1DW1A5335LEA31172 |
| STOUGHTON | COM | 2020 | 1DW1A5337LEA31173 |
| STOUGHTON | COM | 2020 | 1DW1A5339LEA31174 |
| STOUGHTON | COM | 2020 | 1DW1A5330LEA31175 |
| STOUGHTON | COM | 2020 | 1DW1A5332LEA31176 |
| STOUGHTON | COM | 2021 | 1DW1A5339MSA49712 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49713 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49714 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49715 |
| STOUGHTON | COM | 2021 | 1DW1A5336MSA49716 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49717 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49718 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49719 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49720 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49721 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49722 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49723 |
| STOUGHTON | COM | 2021 | 1DW1A5335MSA49724 |
| STOUGHTON | COM | 2021 | 1DW1A5337MSA49725 |
| STOUGHTON | COM | 2021 | 1DW1A5339MSA49726 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49727 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49728 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49729 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49730 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49731 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49732 |
| STOUGHTON | COM | 2021 | 1DW1A5336MSA49733 |

| | | | |
|---|---|---|---|
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49734 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49735 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49736 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49737 |
| STOUGHTON | COM | 2021 | 1DW1A5335MSA49738 |
| STOUGHTON | COM | 2021 | 1DW1A5337MSA49739 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49740 |
| MANAC | 944 | 2017 | 2M5941615H1157801 |
| MANAC | 944 | 2017 | 2M5941617H1157802 |
| MANAC | 944 | 2017 | 2M5941613H1157800 |
| MANAC | 944 | 2017 | 2M5941610H1157799 |
| MANAC | VAN | 2017 | 2M5941610H1165692 |
| MANAC | VAN | 2017 | 2M5941616H1165695 |
| MANAC | VAN | 2017 | 2M5941614H1165694 |
| MANAC | VAN | 2017 | 2M5941612H1165693 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA31360 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA31368 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA31369 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA31371 |
| STOUGHTON | N/A | 2020 | 1DW1R5328LEA31375 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA31382 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA31359 |
| STOUGHTON | N/A | 2020 | 1DW1R5320LEA31385 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA31363 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA31372 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA40962 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31364 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31378 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA31373 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA31379 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA31374 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA31383 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA31358 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA31370 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA31384 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6884737 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6914910 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914911 |
| UTILITY | N/A | 2020 | 1UYVS2539L6914913 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6914916 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914919 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6914920 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6914921 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914922 |

| | | | |
|---|---|---|---|
| UTILITY | VS2 | 2020 | 1UYVS2531L6914923 |
| UTILITY | N/A | 2020 | 1UYVS2531L6884743 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6884744 |
| UTILITY | VS2 | 2020 | 1UYVS25306L884748 |
| UTILITY | N/A | 2020 | 1UYVS2539L6884750 |
| WABASH | RFA | 2016 | 1JJV532B2GL887138 |
| WABASH | RFA | 2016 | 1JJV532B3GL920311 |
| WABASH | RFA | 2016 | 1JJV532B5GL920312 |
| GREAT DANE | ESS | 2016 | 1GRAA0620GW700575 |
| VANGUARD | COO | 2016 | 527SR5326GM006535 |
| GREAT DANE | ESS | 2016 | 1GRAA0623GW703289 |
| WABASH | RFA | 2017 | 1JJV532B1HL008326 |
| WABASH | RFA | 2017 | 1JJV532B1HL008357 |
| WABASH | RFA | 2017 | 1JJV532B1HL008410 |
| UTILITY | VS2 | 2012 | 1UYVS2533CM469922 |
| WABASH | RFA | 2017 | 1JJV532BXHL008342 |
| WABASH | RFA | 2017 | 1JJV532B7HL008220 |
| UTILITY | VS2 | 2016 | 1UYVS2536GM381422 |
| UTILITY | VS2 | 2018 | 1UYVS2539J6258502 |
| WABASH | RFA | 2017 | 1JJV52B2HL008237 |
| WABASH | RFA | 2017 | 1JJV532B4HL008367 |
| WABASH | RFA | 2017 | f31971JJV532B1HL008181 |
| UTILITY | VS2 | 2018 | 1UYVS2536J6258506 |
| UTILITY | VS2 | 2018 | 1UYVS2539J6258516 |
| UTILITY | VS2 | 2018 | 1UYVS2530J6258517 |
| UTILITY | VS2 | 2018 | 1UYVS2533J6258513 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6258512 |
| UTILITY | VS2 | 2018 | 1UYVS2532J6258518 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6258509 |
| UTILITY | VS2 | 2018 | 1UYVS2538J6258507 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6258508 |
| UTILITY | VS2 | 2018 | 1UYVS2538J6258510 |
| UTILITY | VS2 | 2018 | 1UYVS2530J6258520 |
| UTILITY | VS2 | 2018 | 1UYVS2535J6258514 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6258519 |
| UTILITY | VS3 | 2018 | 1UYVS2530J6270201 |
| UTILITY | VS3 | 2018 | 1UYVS2538J6270205 |
| UTILITY | VS2 | 2018 | 1UYVS2537J6258515 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6258511 |
| UTILITY | VS2 | 2018 | 1UYVS2532J6270202 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6270203 |
| UTILITY | VS2 | 2018 | 1UYVS2536J6270204 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6270206 |
| UTILITY | VS2 | 2018 | 1UYVS2535J6270209 |

| | | | |
|---|---|---|---|
| UTILITY | VS2 | 2018 | 1UYVS2531J6270210 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6270207 |
| UTILITY | VS2 | 2018 | 1UYVS2533J6270208 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14796 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14797 |
| STOUGHTON | REF | 2019 | 1DW1R5327KEA14811 |
| STOUGHTON | REF | 2019 | 1DW1R5329KEA14812 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14813 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14814 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14816 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14817 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14819 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14820 |
| STOUGHTON | REF | 2019 | 1DW1R532XKEA14821 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14822 |
| STOUGHTON | REF | 2019 | 1DW1R5323KEA14823 |
| STOUGHTON | REF | 2019 | 1DW1R5325KEA14824 |
| STOUGHTON | REF | 2019 | 1DW1R5327KEA14825 |
| STOUGHTON | REF | 2019 | 1DW1R5329KEA14826 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14827 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14828 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14829 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14830 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14831 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14832 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14833 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14834 |
| VANGUARD | CR8 | 2019 | 527SR5322KM017007 |
| VANGUARD | CR8 | 2019 | 527SR5324KM017008 |
| VANGUARD | CR8 | 2019 | 527SR5326KM017009 |
| VANGUARD | CR8 | 2019 | 527SR5322KM017010 |
| VANGUARD | CR8 | 2019 | 527SR5324KM017011 |
| VANGUARD | CR8 | 2019 | 527SR5328KM017013 |
| VANGUARD | CR8 | 2019 | 527SR532XKM017014 |
| VANGUARD | CR8 | 2019 | 527SR5321KM017015 |
| UTILITY | N/A | 2019 | 1UYVS2535K6740904 |
| UTILITY | N/A | 2019 | 1UYV52537K6740905 |
| UTILITY | N/A | 2019 | 1UYVS2532K6740911 |
| UTILITY | N/A | 2019 | 1UYV52534K6740912 |
| UTILITY | N/A | 2019 | 1UYVS2536K6740913 |
| UTILITY | N/A | 2019 | 1UYVS2538K6740914 |
| UTILITY | N/A | 2019 | 1UYVS253XK6740915 |
| UTILITY | N/A | 2019 | 1UYVS2531K6740916 |
| UTILITY | N/A | 2019 | 1UYVS2537K6740919 |

| | | | |
|---|---|---|---|
| UTILITY | N/A | 2019 | 1UYVS2533K6740920 |
| UTILITY | VS2 | 2019 | 1UYVS2533K6740903 |
| WABASH | N/A | 2016 | 1JJV532B3GL887147 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6114202 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6914930 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6914931 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6914932 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6914933 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914939 |
| UTILITY | VS2 | 2020 | 1UYVS2531L6914940 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6914941 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914942 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6914944 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6914945 |
| UTILITY | N/A | 2020 | 1UYVS2533L6914938 |
| UTILITY | N/A | 2020 | 1UYVS2536L6914934 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914936 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA41949 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA41950 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA41951 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA41952 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA41955 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA41956 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA41957 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA41958 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42375 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA42376 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42377 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA41945 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA42379 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42380 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA42381 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA42382 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA42384 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA42385 |
| STOUGHTON | REF | 2021 | 1DW1R5329LEA41946 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA42387 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA42388 |
| STOUGHTON | RSV | 2019 | 1DW1R5325KEA14791 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6915562 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6915563 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6915565 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6915567 |
| STOUGHTON | REF | 2021 | 1DW1R5321LEA41939 |

| STOUGHTON | REF  | 2021 | 1DW1R5325LEA42396 |
|-----------|------|------|-------------------|
| STOUGHTON | REF  | 2020 | 1DW1R5320LEA42399 |
| STOUGHTON | REF  | 2020 | 1DW1R5328LEA42389 |
| STOUGHTON | REF  | 2020 | 1DW1R532XLEA42393 |
| STOUGHTON | REF  | 2020 | 1DW1R5323LEA42395 |
| UTILITY   | VS2  | 2022 | 1UYVS2539N6712107 |
| UTILITY   | VS2  | 2022 | 1UYVS2538N6712101 |
| UTILITY   | VS2  | 2022 | 1UYVS253XN6712102 |
| UTILITY   | VS2  | 2022 | 1UYVS2531N6712103 |
| UTILITY   | VS2  | 2022 | 1UYVS2533N6712104 |
| UTILITY   | VS2  | 2022 | 1UYVS2535N6712105 |
| UTILITY   | VS2  | 2022 | 1UYVS2537N6712106 |
| UTILITY   | VS2  | 2022 | 1UYVS2530N6712108 |
| UTILITY   | VS2  | 2022 | 1UYVS2539N6712110 |
| UTILITY   | VS2  | 2022 | 1UYVS253ON6712111 |
| UTILITY   | VS2  | 2022 | 1UYVS2532N6712112 |
| UTILITY   | VS2  | 2022 | 1UYVS2534N6712113 |
| UTILITY   | VS2  | 2022 | 1UYVS2536N6712114 |
| UTILITY   | VS2  | 2022 | 1UYVS2538N6712115 |
| UTILITY   | VS2  | 2022 | 1UYVS2532N6712109 |
| CIMC      | COO  | 2023 | 527SR5328PM034319 |
| CIMC      | REE  | 2023 | 527SR532XPL033355 |
| CIMC      | REE  | 2023 | 527SR5326PL033367 |
| CIMC      | REE  | 2023 | 527SR5322PL030398 |
| CIMC      | REE  | 2023 | 527SR5327PL030400 |
| CIMC      | REE  | 2023 | 527SR5320PL030416 |
| CIMC      | REE  | 2023 | 527SR5326PL030419 |
| CIMC      | REE  | 2023 | 527SR5322PL030420 |
| VANGUARD  | REE  | 2023 | 527SR5323PL030474 |
| CIMC      | REE  | 2023 | 527SR5325PL030475 |
| CIMC      | COO  | 2023 | 527SR5326PL030422 |
| CIMC      | COO  | 2023 | 527SR5320PM034296 |
| CIMC      | COO  | 2023 | 527SR5329PM034295 |
| UTILITY   | VS2  | 2021 | 1UYVS2539M6393225 |
| CIMC      | CR8  | 2023 | 2SHSR5328PS001426 |
| VANGUARD  | CIMC | 2024 | 527SR532XRM037015 |
| CIMC      | COO  | 2024 | 527SR5321RM037016 |
| CIMC      | COO  | 2024 | 527SR5323RM037017 |
| CIMC      | COO  | 2024 | 527SR5325RM037018 |
| CIMC      | COO  | 2024 | 527SR5327RM037019 |
| CIMC      | COO  | 2024 | 527SR5323RM037020 |
| CIMC      | COO  | 2024 | 527SR5325RM037021 |
| CIMC      | COO  | 2024 | 527SR5327RM037022 |
| CIMC      | COO  | 2024 | 527SR5329RM037023 |

| CIMC | COO | 2024 | 527SR5320RM037024 |
| CIMC | COO | 2024 | 527SR5322RM037025 |
| CIMC | COO | 2024 | 527SR5324RM037026 |
| CIMC | COO | 2024 | 527SR5326RM037027 |
| CIMC | COO | 2024 | 527SR5328RM037028 |
| CIMC | COO | 2024 | 527SR532XRM037029 |
| CIMC | COO | 2024 | 527SR5326RM037030 |
| CIMC | COO | 2024 | 527SR5328RM037031 |
| CIMC | COO | 2024 | 527SR532XRM037032 |
| CIMC | COO | 2024 | 527SR5321RM037033 |
| CIMC | COO | 2024 | 527SR5323RM037034 |
| CIMC | COO | 2024 | 527SR5325RM037035 |
| CIMC | COO | 2024 | 527SR5327RM037036 |
| CIMC | COO | 2024 | 527SR5329RM037037 |
| CIMC | COO | 2024 | 527SR5320RM037038 |
| CIMC | COO | 2024 | 527SR5322RM037039 |
| CIMC | COO | 2024 | 527SR5322PL033365 |
| CIMC | REE | 2023 | 527SR5322PL033348 |
| CIMC | N/A | 2023 | 527SR532XPM031227 |
| CIMC | N/A | 2023 | 527SR5324PM033989 |
| CIMC | N/A | 2023 | 527SR5322PM033988 |
| CIMC | N/A | 2023 | 527SR5323PM034034 |
| UTILITY | VS2 | 2021 | 1UYVS2537M6393224 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6461945 |
| CIMC | COO | 2023 | 527SR5322PM034297 |
| UTILITY | RFA | 2022 | 1UYVS2536N6712128 |
| CIMC | REE | 2023 | 527SR5324PL033352 |
| CIMC | COO | 2023 | 527SR5327PM034294 |
| CIMC | REE | 2023 | 527SR5320PL030478 |
| CIMC | VS2 | 2022 | 1UYVS2533N6461925 |
| CIMC | REE | 2023 | 527SR5329PL030477 |
| CIMC | REE | 2023 | 527SR5329PL030401 |
| CIMC | REE | 2023 | 527SR5320PL033350 |
| CIMC | REE | 2023 | 527SR5327PL030431 |
| CIMC | COO | 2023 | 527SR5320PM034329 |
| HYUNDAI | N/A | 2016 | 3H3V532C2GT498007 |
| HYUNDAI | HHY | 2016 | 3H3V532CXGT498014 |
| HYUNDAI | N/A | 2016 | 3H3V532C1GT498015 |
| UTILITY | VS2 | 2015 | 1UYVS2533FG298608 |
| STRI | S75 | 2019 | 1S12E9533KE539102 |
| UTILITY | N/A | 2020 | 1UYVS2534L7143923 |
| MANAC | 942 | 2023 | 2M592161P1217644 |
| MANAC | 942 | 2023 | 2M5921615P1217645 |
| MANAC | 942 | 2023 | 2M5921617P1217646 |

| MANAC | 942 | 2023 | 2M5921619P1217647 |
| MANAC | 942 | 2023 | 2M5921610P1217648 |
| MANAC | 942 | 2023 | 2M5921612P1217649 |
| MANAC | 942 | 2023 | 2M5921619P1217650 |
| MANAC | 942 | 2023 | 2M5921617P1217016 |
| MANAC | 942 | 2023 | 2M5921619P1217017 |
| MANAC | 942 | 2023 | 2M5921610P1217018 |
| MANAC | 942 | 2023 | 2M5921612P1217019 |
| MANAC | 942 | 2023 | 2M5921619P1217020 |
| MANAC | 942 | 2023 | 2M5921610P1217021 |
| MANAC | 942 | 2023 | 2M5921612P1217022 |
| MANAC | 942 | 2023 | 2M5921614P1217023 |
| MANAC | 942 | 2023 | 2M5921616P1217024 |
| MANAC | 942 | 2023 | 2M5921618P1217025 |
| MANAC | 94253A311 | 2023 | 2M592161XP1217026 |
| MANAC | 942 | 2023 | 2M5921611P1217027 |
| MANAC | 94253A311 | 2023 | 2M5921613P1217028 |
| MANAC | 942 | 2023 | 2M5921615P1217029 |
| MANAC | 942 | 2023 | 2M5921611P1217030 |
| MANAC | 94253A311 | 2023 | 2M5921613P1217031 |
| MANAC | 942 | 2023 | 2M5921615P1217032 |
| MANAC | 942 | 2023 | 2M5921617P1217033 |
| MANAC | 942 | 2023 | 2M5921619P1217034 |
| MANAC | 942 | 2023 | 2M5921610P1217035 |
| MANAC | 942 | 2023 | 2M5921612P1217036 |
| MANAC | 942 | 2023 | 2M5921614P1217037 |
| MANAC | 942 | 2023 | 2M5921616P1217038 |
| MANAC | MANAC | 2023 | 2M5921618P1217039 |
| MANAC | 942 | 2023 | 2M5921614P1217040 |
| MANAC | 942 | 2023 | 2M5921616P1217041 |
| MANAC | 942 | 2023 | 2M5921618P1217042 |
| MANAC | 942 | 2023 | 2M592161XP1217043 |
| MANAC | 942 | 2023 | 2M5921611P1217044 |
| MANAC | 942 | 2023 | 2M5921613P1217045 |
| MANAC | 94253A311 | 2023 | 2M5921615P1217046 |
| MANAC | 94253A311 | 2023 | 2M5921617P1217047 |
| MANAC | 94253A311 | 2023 | 2M5921619P1217048 |
| MANAC | 94253A311 | 2023 | 2M5921610P1217049 |
| MANAC | 94253A311 | 2023 | 2M5921617P1217050 |
| MANAC | 94253A311 | 2023 | 2M5921619P1217051 |
| MANAC | 94253A311 | 2023 | 2M5921610P1217052 |
| MANAC | 94253A311 | 2023 | 2M5921612P1217053 |
| MANAC | 94253A311 | 2023 | 2M5921614P1217054 |
| MANAC | 94253A311 | 2023 | 2M5921616P1217055 |

| MANAC | 942 | 2023 | 2M5921618P1217641 |
| MANAC | 942 | 2023 | 2M592161XP1217642 |
| MANAC | 942 | 2023 | 2M5921611P1217643 |
| MANAC | 942 | 2022 | 2M5921614N1208884 |
| MANAC | 942 | 2022 | 2M5921616N1208885 |
| MANAC | N/A | 2022 | 2M5921618N1208886 |
| MANAC | 942 | 2022 | 2M592161XN1208887 |
| MANAC | 942 | 2022 | 2M5921611N1208888 |
| STOUGHTON | 942 | 2022 | 2M5921613N1208889 |
| MANAC | 942 | 2022 | 2M592161XN1208890 |
| MANAC | N/A | 2022 | 2M5921611N1208891 |
| MANAC | N/A | 2022 | 2M5921613N1208892 |
| MANAC | 942 | 2022 | 2M5921615N1208893 |
| MANAC | 942 | 2021 | 2M592161XM1202294 |
| MANAC | 942 | 2021 | 2M5921611M1202295 |
| MANAC | 942 | 2021 | 2M5921613M1202296 |
| MANAC | 942 | 2021 | 2M5921615M1202297 |
| MANAC | 942 | 2021 | 2M5921617M1202298 |
| MANAC | 942 | 2021 | 2M5921619M1202299 |
| MANAC | 942 | 2021 | 2M5921611M1202300 |
| MANAC | 942 | 2021 | 2M5921613M1202301 |
| MANAC | 942 | 2021 | 2M5921615M1202302 |
| MANAC | 942 | 2021 | 2M5921617M1202303 |
| MANAC | 942 | 2021 | 2M5921619M1202304 |
| MANAC | 942 | 2021 | 2M5921610M1202305 |
| MANAC | 942 | 2021 | 2M5921612M1202306 |
| MANAC | 942 | 2021 | 2M5921614M1202307 |
| MANAC | 942 | 2021 | 2M5921616M1202308 |
| MANAC | 942 | 2021 | 2M5921618M1202309 |
| MANAC | 942 | 2021 | 2M5921614M1202310 |
| MANAC | 942 | 2021 | 2M5921616M1202311 |
| MANAC | 942 | 2021 | 2M5921618M1202312 |
| MANAC | 942 | 2021 | 2M592161XM1202313 |
| CIMC | NDW136*0AF0 | 2018 | 527SR5329JM012594 |
| CIMC | VS2 | 2023 | 527SR5327PM031170 |
| CIMC | VS2 | 2022 | 527SR5329PM031171 |
| CIMC | N/A | 2023 | 527SR5320PM031172 |
| CIMC | VS2 | 2022 | 527SR5322PM031173 |
| CIMC | N/A | 2023 | 527SR5324PM031174 |
| CIMC | VS2 | 2022 | 527SR5326PM031175 |
| CIMC | N/A | 2023 | 527SR5328PM031176 |
| CIMC | VS2 | 2023 | 527SR532XPM031177 |
| CIMC | N/A | 2022 | 527SR5321PM031178 |
| CIMC | N/A | 2022 | 527SR5323PM031179 |

| CIMC | N/A | 2023 | 527SR532XPM031180 |
|------|-----|------|-------------------|
| CIMC | N/A | 2023 | 527SR5323PM031215 |
| CIMC | N/A | 2023 | 527SR5327PM031217 |
| CIMC | N/A | 2023 | 527SR5325PM031183 |
| CIMC | N/A | 2023 | 527SR5327PM031184 |
| CIMC | N/A | 2022 | 527SR5329PM031185 |
| CIMC | N/A | 2023 | 527SR5329PM031218 |
| CIMC | VS2 | 2022 | 527SR5324PM031188 |
| CIMC | VS2 | 2023 | 527SR5329PM031221 |
| CIMC | N/A | 2023 | 527SR5329PM031222 |
| CIMC | N/A | 2023 | 527SR5325PM031197 |
| CIMC | N/A | 2023 | 527SR5320PM031219 |
| CIMC | N/A | 2022 | 527SR5325PM031216 |
| CIMC | VS2 | 2023 | 527SR5321PM031200 |
| CIMC | N/A | 2023 | 527SR5327PM031220 |
| CIMC | THERMO | 2023 | 527SR5328PM031226 |
| CIMC | VS2 | 2023 | 527SR5322PM031206 |
| CIMC | N/A | 2023 | 527SR5324PM031224 |
| CIMC | REF | 2023 | 527SR5326PM031208 |
| CIMC | RFA | 2023 | 527SR5324PM031210 |
| CIMC | COO | 2023 | 527SR5328PM031212 |
| CIMC | N/A | 2023 | 527SR532XPM031213 |
| CIMC | VS2 | 2022 | 527SR5321PM031214 |
| CIMC | VS2 | 2023 | 527SR537PM031198 |
| CIMC | N/A | 2023 | 527SR5326PM034318 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31381 |
| | | | |
| UTILITY | N/A | 2020 | 1UYVS2537L6914912 |
| WANC | RFA | 2022 | 1JJV532B2NL315354 |
| WANC | RFA | 2022 | 1JJV532B2NL315355 |
| WANC | RFA | 2022 | 1JJV532B6NL315356 |
| WANC | RFA | 2022 | 1JJV532B2NL315357 |
| WANC | RFA | 2022 | 1JJV532B2NL315358 |
| WANC | RFA | 2022 | 1JJV532B2NL315359 |
| WANC | RFA | 2022 | 1JJV532B2NL315360 |
| WANC | RFA | 2022 | 1JJV532B2NL315361 |
| WANC | RFA | 2022 | 1JJV532B2NL315362 |
| WANC | RFA | 2022 | 1JJV532B3NL315363 |
| WANC | RFA | 2022 | 1JJV532B5NL315364 |
| WANC | RFA | 2022 | 1JJV532B7NL315365 |
| WANC | RFA | 2022 | 1JJV532B9NL315366 |
| WANC | RFA | 2022 | 1JJV532B0NL315367 |
| WANC | RFA | 2022 | 1JJV532B2NL315368 |
| WANC | RFA | 2022 | 1JJV532B4NL315369 |

| | | | |
|---|---|---|---|
| WANC | RFA | 2022 | 1JJV532B0NL315370 |
| WANC | RFA | 2022 | 1JJV532B2NL315371 |
| WANC | RFA | 2022 | 1JJV532B4NL315372 |
| WANC | RFA | 2022 | 1JJV532B6NL315373 |
| WANC | RFA | 2022 | 1JJV532B8NL315374 |
| WANC | RFA | 2022 | 1JJV532BXNL315375 |
| WANC | RFA | 2022 | 1JJV532B1NL315376 |
| WANC | RFA | 2022 | 1JJV532B3NL315377 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315378 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315379 |
| WABASH | 7500 | 2023 | 1JJV532BXPL315380 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315381 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315382 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315383 |
| WABASH | 7500 | 2023 | 1JJV532B7PL315384 |
| WABASH | 7500 | 2023 | 1JJV532B9PL315385 |
| WABASH | 7500 | 2023 | 1JJV532B0PL315386 |
| WABASH | 7500 | 2023 | 1JJV532B2PL315387 |
| WABASH | 7500 | 2023 | 1JJV532B4PL315388 |
| WABASH | 7500 | 2023 | 1JJV532B6PL315389 |
| WABASH | 7500 | 2023 | 1JJV532B2PL315390 |
| WABASH | 7500 | 2023 | 1JJV532B4PL315391 |
| WABASH | 7500 | 2023 | 1JJV532B8PL315393 |
| WABASH | 7500 | 2023 | 1JJV532BXPL315394 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315395 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315396 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315397 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315398 |
| WABASH | 7500 | 2023 | 1JJV532B9PL315399 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315400 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315401 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315402 |
| WABASH | 7500 | 2023 | 1JJV532B7PL315403 |
| CIMC | REE | 2022 | 2SHSR5328NS000452 |
| WABASH | 7500 | 2023 | 1JJV532B6PL315392 |
| MANAC | 943 | 2022 | 2M5931614N1204475 |
| MANAC | 943 | 2022 | 2M5931616N1204476 |
| MANAC | 943 | 2022 | 2M5931618N1204477 |
| MANAC | 943 | 2022 | 2M593161XN1204478 |
| MANAC | 943 | 2022 | 2M5931611N1204479 |
| MANAC | 943 | 2022 | 2M5931618N1204480 |
| MANAC | 943 | 2022 | 2M593161XN1204481 |
| MANAC | 943 | 2022 | 2M5931611N1204482 |

| MANAC | 943 | 2022 | 2M5931613N1204483 |
|-------|-----|------|-------------------|
| MANAC | 943 | 2022 | 2M5931615N1204484 |
| MANAC | 943 | 2022 | 2M5931617N1204485 |
| MANAC | 943 | 2022 | 2M5931619N1204486 |
| MANAC | 943 | 2022 | 2M5931610N1204487 |
| MANAC | 943 | 2022 | 2M5931612N1204488 |
| MANAC | 943 | 2022 | 2M5931614N1204489 |
| MANAC | 943 | 2022 | 2M5931610N1204490 |
| MANAC | 943 | 2022 | 2M5931612N1204491 |
| MANAC | 943 | 2022 | 2M5931614N1204492 |
| MANAC | 943 | 2022 | 2M5931616N1204493 |
| MANAC | 943 | 2022 | 2M5931618N1204494 |
| MANAC | 943 | 2022 | 2M593161XN1204495 |
| MANAC | 943 | 2022 | 2M5931611N1204496 |
| MANAC | 943 | 2022 | 2M5931613N1204497 |
| MANAC | 943 | 2022 | 2M5931615N1204498 |
| MANAC | 943 | 2022 | 2M5931617N1204499 |
| MANAC | 943 | 2022 | 2M5931615N1204517 |
| MANAC | 943 | 2022 | 2M5931617N1204518 |
| MANAC | 943 | 2022 | 2M5931619N1204519 |
| MANAC | 943 | 2022 | 2M5931615N1204520 |
| MANAC | 943 | 2022 | 2M5931617N1204521 |
| MANAC | 943 | 2022 | 2M5931619N1204522 |
| MANAC | 943 | 2022 | 2M5931610N1204523 |
| MANAC | 943 | 2022 | 2M5931612N1204524 |
| MANAC | 943 | 2022 | 2M5931614N1204525 |
| MANAC | 943 | 2022 | 2M5931616N1204526 |
| MANAC | 943 | 2022 | 2M5931618N1204527 |
| MANAC | 943 | 2022 | 2M593161XN1204528 |
| MANAC | 943 | 2022 | 2M5931611N1204529 |
| MANAC | 943 | 2022 | 2M5931618N1204530 |
| MANAC | 943 | 2022 | 2M593161XN1204531 |
| MANAC | 943 | 2022 | 2M5931611N1204532 |
| MANAC | 943 | 2022 | 2M5931613N1204533 |
| MANAC | 943 | 2022 | 2M5931615N1204534 |
| MANAC | 943 | 2022 | 2M5931617N1204535 |
| MANAC | 943 | 2022 | 2M5931619N1204536 |
| MANAC | 943 | 2022 | 2M5931610N1204537 |
| MANAC | 943 | 2022 | 2M5931612N1204538 |
| MANAC | 943 | 2022 | 2M5931614N1204539 |
| MANAC | 943 | 2022 | 2M5931610N1204540 |
| MANAC | 943 | 2022 | 2M5931612N1204541 |
| UTILITY | TRA | 2018 | 1UYVS3530J6060316 |

| | | | |
|---|---|---|---|
| GREAT DANE | ESS | 2016 | 1GRAA0636GW701027 |
| GREAT DANE | ESS | 2016 | 1GRAA0638GW701028 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6060317 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6060319 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6060318 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6060320 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6258401 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6258406 |
| UTILITY | VS3 | 2015 | 1UYVS3537J6258407 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6258402 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6258409 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6258410 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6258405 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6258408 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6258404 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6258413 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6258415 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6258414 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6258416 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6258412 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6258420 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6258417 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6258418 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6258419 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6269901 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6269902 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6269903 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6269904 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6269905 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6269906 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6269907 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6269908 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6269909 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6269910 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6269911 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6269912 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6269913 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6269914 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6269915 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6269916 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6269917 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6269919 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6270001 |

| UTILITY | VS3 | 2018 | 1UYVS3538J6270002 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6270003 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6270004 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6270005 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6270006 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6270007 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6270008 |
| WABASH | RFA | 2022 | IJJV533B7NL339891 |
| WABASH | RFA | 2022 | 1JJV533B9NL339892 |
| WABASH | RFA | 2022 | 1JJV533B0NL339893 |
| WABASH | RFA | 2022 | 1JJV533B2NL339894 |
| WABASH | RFA | 2022 | 1JJV533B4NL339895 |
| EAST | PLA | 2022 | 1E1H5Z581NR074864 |
| EAST | PLA | 2022 | 1E1H5Z583NR074865 |
| EAST | PLA | 2022 | 1E1H5Z585NR074866 |
| EAST | PLA | 2022 | 1E1H5Z682NR074869 |
| EAST | PLA | 2022 | 1E1H5Z689NR074870 |
| WABASH | RFA | 2016 | 1JJV532B7GL887149 |
| WABASH | RFA | 2016 | 1JJV532B2GL887141 |
| WABASH | RFA | 2016 | 1JJV532B7GL887145 |
| WABASH | RFA | 2016 | 1JJV532B6GL920299 |
| WABASH | RFA | 2016 | 1JJV532B1GL920310 |
| WABASH | RFA | 2016 | 1JJV532B8GL920305 |
| WABASH | RFA | 2016 | 1JJV532BXGL920306 |
| GREAT DANE | ESS | 2016 | 1GRAA0626GW700578 |
| GREAT DANE | ESS | 2016 | 1GRAA0622GW700576 |
| GREAT DANE | ESS | 2016 | 1GRAA0624GW700577 |
| WABASH | RFA | 2016 | 1JJV532B2GL920316 |
| WABASH | RFA | 2016 | 1JJV532B0GL920329 |
| HYUNDAI | VC2 | 2016 | 3H3V532C5GT498020 |
| STRI | S75 | 2018 | 1S12E953XJE536499 |
| MANAC | 712 | 2022 | 2M5720416N1208230 |
| MANAC | 712 | 2021 | 2M5720418M1202542 |
| MANAC | N/A | 2023 | 2M5720413P1212318 |
| MANAC | N/A | 2023 | 2M5720411P1212317 |
| MANAC | N/A | 2023 | 2M5720415P1212319 |
| MANAC | N/A | 2023 | 2M5720411P1212320 |
| MANAC | N/A | 2023 | 2M5720413P1212321 |
| MANAC | N/A | 2023 | 2M5720419P1212307 |
| MANAC | N/A | 2019 | 1GR5R1623PK439837 |
| GREAT DANE | N/A | 2019 | 1GR5R1625PK439838 |
| MANAC | 712 | 2023 | 2M5720419P1218916 |
| MANAC | 712 | 2023 | 2M5720412P1218918 |

| MANAC | 712 | 2023 | 2M5720410P1218920 |
|---|---|---|---|
| UTILITY | VS2 | 2020 | 1UYVS2537L6884701 |
| CIMC | VS2 | 2022 | 527SR5320PM031186 |
| CIMC | COO | 2023 | 527SR5328PM031209 |
| GREAT DANE | CCC | 2016 | 1GRAP0628GD461688 |
| STOUGHTON | COM | 2016 | 1DW1A5321GB647821 |
| STOU | COM | 2016 | 1DW1A532XGB647817 |
| STOUGHTON | 7GP | 2017 | 1DW1A532XHB753511 |
| STOUGHTON | ZGP | 2017 | 1DW1A5322HB753521 |
| STOUGHTON | ZGP | 2018 | 1DW1A5320JBA00210 |
| STOUGHTON | ZGP | 2018 | 1DW1A5320JBA00191 |
| STOUGHTON | WHI | 2017 | 1DW1A5320HB753520 |
| STOUGHTON | ZGP | 2017 | 1DW1A5327HB753532 |
| STOUGHTON | WHI | 2018 | 1DW1A5320JBA00188 |
| STOUGHTON | ZGP | 2018 | 1DW1A5328JBA00195 |
| STOUGHTON | ZGP | 2017 | 1DW1A5329HB753533 |
| STOUGHTON | ZGP | 2017 | 1DW1A5320HB753534 |
| STOUGHTON | ZGP | 2017 | 1DW1A5329HB753502 |
| STOUGHTON | ZGP | 2017 | 1DW1A5324HB753519 |
| STOUGHTON | ZGP | 2017 | 1DW1A5323HB753527 |
| STOUGHTON | ZGP | 2017 | 1DW1A5325HB753514 |
| STOUGHTON | ZGP | 2017 | 1DW1A532XHB753539 |
| WABASH | N/A | 2023 | 1JJV532D6PL328709 |
| WABASH | N/A | 2023 | 1JJV532D2PL328710 |
| WABASH | N/A | 2023 | 1JJV532D4PL328711 |
| WABASH | N/A | 2023 | 1JJV532D3PL328716 |
| WABASH | N/A | 2023 | 1JJV532D7PL328718 |
| WABASH | N/A | 2023 | 1JJV532D9PL328719 |
| WABASH | N/A | 2023 | 1JJV532D5PL328720 |
| STOUGHTON | ZGP | 2018 | 1DW1A5322JBA00189 |
| STOUGHTON | ZGP | 2017 | 1DW1A532XHB753508 |

| STOUGHTON | ZGP | 2018 | 1DW1A5321JBA00197 |
| STOUGHTON | WHI | 2018 | 1DW1A5328JBA00214 |
| STOUGHTON | ZGP | 2018 | 1DW1A5327JBA00186 |
| STOUGHTON | N/A | 2018 | 1DW1A5327JBA00205 |
| STOUGHTON | WHI | 2017 | 1DW1A5324HB753522 |
| STOUGHTON | ZGP | 2017 | 1DW1A5326HB753540 |
| STOUGHTON | ZGP | 2018 | 1DW1A5321JBA00202 |
| STOUGHTON | ZGP | 2017 | 1DW1A5320HB753503 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7876428 |
| UTILITY | VS2 | 2020 | 1UYVS2530K7760908 |
| STOUGHTON | ALU | 2020 | 1DW1R5326LEA41936 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA41944 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA42386 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA42397 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA42398 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA42390 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42392 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA42391 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42394 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA41947 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7876431 |
| GREAT DANE | N/A | 2016 | 1GRAP0626GD461687 |
| UTILITY | VS2 | 2012 | 1UYVS2535CM470005 |

**SCHEDULE "H"**

**PERMITS**

- Commercial Vehicle Operating Licences

- United States Department of Transportation Licences

- Long Combination Vehicle Licence

- New York State Heavy Haul Permit

**[Note: Balance of schedule to be completed no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order.]**

SCHEDULE "I"

CRITICAL REQUIRED CONTRACTS

1.  The lease dated as of November 24, 2015 in respect of the property located at 6050 Dixie Road, Mississauga, between 6050 Dixie Road Investments Limited as Landlord, 2029909 Ontario Inc. as Tenant and Sam Johal as Indemnifier

2.  Lease agreement in respect of 6253 Boundary Road, Cornwall, ON, with Globocam (Montreal) Inc., provided that such lease is in force on the Closing Date.

3.  The Finloc Leases


**[Note: Balance of schedule to be completed no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order.]**

## SCHEDULE "J"

## FINLOC LEASED VEHICLES

| Make | Model | Year | VIN |
|------|-------|------|-----|
| MANAC | 712 | 2020 | 2M5720419L1190805 |
| MANAC | 712 | 2020 | 2M5720410L1190806 |
| MANAC | 712 | 2020 | 2M5720417L1186817 |
| MANAC | 712 | 2020 | 2M5720417L1190804 |
| MANAC | 712 | 2020 | 2M5720415L1190803 |
| MANAC | 942 | 2021 | 2M5921613M1202282 |
| MANAC | N/A | 2019 | 2M593161XL1197805 |
| MANAC | 942 | 2021 | 2M5921611M1202264 |
| MANAC | 942 | 2021 | 2M5921613M1202265 |
| MANAC | 942 | 2021 | 2M5921615M1202266 |
| MANAC | 942 | 2021 | 2M5921617M1202267 |
| MANAC | 942 | 2021 | 2M5921619M1202268 |
| MANAC | 942 | 2021 | 2M5921610M1202269 |
| MANAC | 942 | 2021 | 2M5921617M1202270 |
| MANAC | 942 | 2021 | 2M5921619M1202271 |
| MANAC | 942 | 2021 | 2M5921610M1202272 |
| MANAC | 942 | 2021 | 2M5921612M1202273 |
| MANAC | 942 | 2021 | 2M5921614M1202274 |
| MANAC | 942 | 2021 | 2M5921616M1202275 |
| MANAC | 942 | 2021 | 2M5921618M1202276 |
| MANAC | 942 | 2021 | 2M592161XM1202277 |
| MANAC | 942 | 2021 | 2M5921611M1202278 |
| MANAC | 942 | 2021 | 2M5921613M1202279 |
| MANAC | 942 | 2021 | 2M592161XM1202280 |
| MANAC | 942 | 2021 | 2M5921611M1202281 |
| MANAC | 942 | 2021 | 2M5921615M1202283 |
| MANAC | 942 | 2021 | 2M5921617M1202284 |
| MANAC | 942 | 2021 | 2M5921619M1202285 |
| MANAC | 942 | 2021 | 2M5921610M1202286 |
| MANAC | 942 | 2021 | 2M5921612M1202287 |
| MANAC | 942 | 2021 | 2M5921614M1202288 |
| MANAC | 942 | 2021 | 2M5921616M1202289 |
| MANAC | 342 | 2021 | 2M5921612M1202290 |
| MANAC | 942 | 2021 | 2M5921614M1202291 |
| MANAC | 942 | 2021 | 2M5921616M1202292 |
| MANAC | 942 | 2021 | 2M5921618M1202293 |
| MANAC | 943 | 2020 | 2M5931611L1197790 |
| MANAC | 943 | 2020 | 2M5931613L1197791 |
| MANAC | 943 | 2020 | 2M5931615L1197792 |
| MANAC | 943 | 2020 | 2M5931617L1197793 |
| MANAC | 943 | 2020 | 2M5931619L1197794 |
| MANAC | 943 | 2020 | 2M5931610L1197795 |
| MANAC | N/A | 2020 | 2M5931612L1197796 |
| MANAC | N/A | 2020 | 2M5931614L1197797 |
| MANAC | N/A | 2020 | 2M5931618L1197799 |
| MANAC | N/A | 2020 | 2M5931610L1197800 |
| MANAC | N/A | 2020 | 2M5931612L1197801 |
| MANAC | N/A | 2020 | 2M5931614L1197802 |
| MANAC | N/A | 2020 | 2M5931616L1197803 |
| MANAC | N/A | 2020 | 2M5931618L1197804 |
| MANAC | N/A | 2020 | 2M5931611L1197806 |
| MANAC | N/A | 2020 | 2M5931613L1197807 |
| MANAC | N/A | 2020 | 2M5931615L1197808 |
| MANAC | N/A | 2020 | 2M5931617L1197809 |
| MANAC | N/A | 2020 | 2M5931613L1197810 |

| MANAC | N/A | 2020 | 2M5931615L1197811 |
| MANAC | N/A | 2020 | 2M5931617L1197812 |
| MANAC | N/A | 2020 | 2M5931619L1197813 |
| MANAC | N/A | 2020 | 2M5931610L1197814 |
| MANAC | N/A | 2020 | 2M5931612L1197815 |
| MANAC | N/A | 2020 | 2M5931614L1197816 |
| MANAC | N/A | 2020 | 2M5931616L1197817 |
| MANAC | N/A | 2020 | 2M5931618L1197818 |
| MANAC | N/A | 2020 | 2M593161XL1197819 |
| MANAC | N/A | 2020 | 2M5931614M1197820 |
| MANAC | N/A | 2020 | 2M5931616M1197821 |
| MANAC | N/A | 2020 | 2M5931618M1197822 |
| MANAC | N/A | 2020 | 2M593161XM1197823 |
| MANAC | N/A | 2020 | 2M5931611M1197824 |
| MANAC | 943 | 2020 | 2M5931613M1197825 |
| MANAC | 943 | 2020 | 2M5931615M1197826 |
| MANAC | 943 | 2021 | 2M5931617M1197827 |
| MANAC | 943 | 2021 | 2M5931619M1197828 |
| MANAC | 943 | 2021 | 2M5931610M1197829 |
| MANAC | 943 | 2021 | 2M5931617M1197830 |
| MANAC | 943 | 2021 | 2M5931619M1197831 |
| MANAC | 943 | 2021 | 2M5931610M1197832 |
| MANAC | 943 | 2021 | 2M5931612M1197833 |
| MANAC | 943 | 2021 | 2M5931614M1197834 |
| MANAC | 943 | 2021 | 2M5931616M1197835 |
| MANAC | 943 | 2021 | 2M5931618M1197836 |
| MANAC | 943 | 2021 | 2M593161XM1197837 |
| MANAC | 943 | 2021 | 2M5931611M1197838 |
| MANAC | 943 | 2021 | 2M5931613M1197839 |

# Appendix "B"

~~EXECUTION COPY~~Execution Copy

## AMENDED & RESTATED PURCHASE AGREEMENT

This Amended & Restated Purchase Agreement dated as of the ~~26th~~22nd day of ~~August~~September, 2024 ~~(the "Effective Date")~~ among:

Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd.,
Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc.,
13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital
Corporation
(collectively, the "**Vendors**")

– and –

1000927605 Ontario Inc.
(the "**Purchaser**")

**WHEREAS** pursuant to the Order of the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") granted on March 27, 2024 (the "**CCAA Filing Date**") (as amended or amended and restated from time to time, the "**Initial Order**"), the Vendors and certain of their affiliated entities/businesses (as defined collectively in the Initial Order, the "**Pride Entities**") were granted creditor protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36, as amended (the "**CCAA**"). Ernst & Young Inc. was appointed as the monitor of the Pride Entities (in such capacity, the "**Monitor**"), and RC Benson Consulting Inc. was appointed as the Pride Entities' chief restructuring officer (in such capacity, the "**CRO**");

**AND WHEREAS** the proceedings initiated by the Initial Order (the "**CCAA Proceedings**") were recognized pursuant to an Order of the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**" and together with the Canadian Court, the "**Courts**") under Chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**");

**AND WHEREAS** in connection with the CCAA Proceedings, on May 15, 2024, the Pride Entities sought and obtained approval from the Canadian Court of a sale solicitation process (as it may be amended from time to time in accordance with its terms, the "**Sale Process**"), to be conducted by the Monitor, with the assistance of its advisors, the CRO, and the Vendors, intended to solicit interest in, and opportunities for, the purchase of all or part of the business, operations and assets of all or any of the Vendors;

**AND WHEREAS** pursuant to the Sale Process, the Monitor, in consultation with the Vendors, has reviewed and evaluated all qualified bids received, and ~~has~~ identified the Purchaser's bid for the Purchased Assets (defined herein) as a Successful Bid ~~on the terms set out in this Agreement~~;

**AND WHEREAS** on the terms set out ~~herein~~in the purchase agreement among the Vendors and the Purchaser dated August 26, 2024 (the "**Original APA**"), the Vendors ~~have~~ agreed to sell and transfer to the Purchaser, and the Purchaser ~~has~~ agreed to purchase from the Vendors, all of the Vendors' right, title and interest in and to the Purchased Assets, which includes substantially all of PGL's assets, subject to and in accordance with the terms and conditions set forth in this Agreement;

**AND WHEREAS** following the execution of the Original APA, certain additional transaction terms were negotiated between the Vendors and the Purchaser, which additional terms are set out in this Agreement;

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby

– 2 –

irrevocably acknowledged, the parties hereto (collectively, the "**Parties**", and each, a "**Party**") hereby acknowledge and agree as follows:

## ARTICLE 1
## INTERPRETATION

**1.1     Definitions**

Unless something in the subject matter or context is inconsistent therewith, the terms defined herein shall have the following meanings:

"**129 Canada**" means 12944154 Canada Inc.

"**129 Shares**" means all of the outstanding shares of 129 Canada.

"**131 Canada**" means 13184633 Canada Inc.

"**207 Ontario**" means 2076401 Ontario Inc.

"**283 Ontario**" means 2837229 Ontario Inc.

"**933 Helena**" means 933 Helena Holdings Inc.

"**Accounts Receivable**" means, with respect to the PGL Vendors and without duplication, all accounts receivable, trade receivables, bills receivable, trade accounts, book debts, notes receivables, rebates, refunds and other receivables of the PGL Vendors whether current or overdue and determined in accordance with GAAP, arising prior to, including, and after the Closing Date, together with all interest accrued on such items, but for greater certainty, <u>excluding</u> any amounts owing by any the Pride Entity that is not a PGL Vendor or PGL Insurance.

"**Acquired AR Amount**" has the meaning ascribed thereto in section 3.2.

"**Affiliate**" has the meaning given to the term "affiliate" in the *Business Corporations Act* (Ontario).

"**Agreement**" means this <u>amended & restated</u> purchase agreement, as may be <u>further</u> amended and restated from time to time in accordance with the terms hereof, with the consent of the Monitor, and "Article" and "Section" mean and refer to the specified article, section and subsection of this Agreement.

"**Applicable Law**" means, in respect of any Person, property, transaction or event, any (i) domestic or foreign statute, law (including the common law), ordinance, rule, regulation, treaty, restriction, regulatory policy, standard, code or guideline, by-law or order, (ii) judicial, arbitral, administrative, ministerial, departmental or regulatory judgments, orders, decisions, rulings, instruments or awards of any Governmental Authority, and (iii) policies, practices, standards, guidelines and protocols having the force of law, that applies in whole or in part to such Person, property, transaction or event.

"**Approval and Vesting Order**" means an order by the Canadian Court, in form and substance satisfactory to the Purchaser, acting reasonably, among other things, approving and authorizing the Transaction and vesting in the Purchaser (or as it may direct) all the right, title and interest of the Vendors in and to the Purchased Assets, free and clear from any Encumbrances.

– 3 –

"**Approved Lease Terms**" mean terms in a real property lease, access agreement or parking agreement that provide for: (i) an initial 60 day term, with a series of 60 day renewal terms, renewable with the consent of the landlord, any mortgagee with an interest registered on title to the real property, and the Royal Bank of Canada (in its capacity as administrative agent and collateral agent), which consent is not to be unreasonably withheld unless (A) the lease is in default and any applicable cure periods have expired, (B) a binding offer is accepted by the landlord for the purchase of the applicable real property, or (C) the leased property has been vacated of substantially all trucks and trailers not owned by the Purchaser, at which point the lease or agreement may be (x) terminated by the landlord on 60 days notice to the tenant, or (y) renewed if requested by the tenant for a further term, with the consent of the landlord, any mortgagee or other secured creditor with an interest in the leased property, and the purchaser of the real property; (ii) fair market value rent, as determined by the Monitor in its sole discretion; (iii) terms that are not less favourable to the landlord than the terms of any existing lease, access or parking agreements in respect of the real property; and (iv) an at-will, without-cause, termination right, exercisable by either the landlord or the tenant on 60 days notice. Without limiting any of the foregoing, the Purchaser and the Vendors agree that any lease entered into subject to the Approved Lease Terms shall be provided in draft to any mortgagee or other secured creditor with an interest in the property to be leased, prior to it being entered into, and the Monitor, CRO and Purchaser shall consult with such creditors on the terms of such lease.

"**Assignment Order**" means an order or orders of the Canadian Court pursuant to section 11.3 of the CCAA and other applicable provisions of the CCAA, in form and substance satisfactory to the Purchaser and the Monitor on behalf of the PGL Vendors, each acting reasonably, authorizing and approving (i) the assignment of any Critical Required Contract for which a consent, approval or waiver necessary for the assignment of such Critical Required Contract has not been obtained, (ii) the prevention of any counterparty to such Critical Required Contracts from exercising any right or remedy under such Critical Required Contracts by reason of any defaults arising from the CCAA Proceedings or the insolvency of the PGL Vendors and deeming any such defaults to have been cured (iii) the vesting in the Purchaser (or as directed by the Purchaser) of all right, title and interest of the PGL Vendors in such Critical Required Contracts, including without limitation any and all rights to purchase the Finloc Leased Vehicles in accordance with the Finloc Leases.

"**Assumed Liabilities**" means any of the following: (i) liabilities of PGL Insurance accruing from and after the Closing Date; (ii) any Unpaid Post CCAA Filing Accruals that remain unpaid by the Vendors on Closing; (iii) liabilities for accrued vacation pay of the Transferring Employees; (iv) liabilities of any PGL Vendor owing to any other PGL Vendor or PGL Insurance, whether incurred or owing prior or subsequent to the CCAA Filing Date; and (v) if the Real Property Option is exercised, the real property mortgages and accrued property taxes and utilities associated with the Optional Assets.

"**Authorization**" means any authorization, approval, consent, concession, exemption, license, lease, grant, permit, franchise, right, privilege or no-action letter from any Governmental Authority having jurisdiction with respect to any specified Person, property, transaction or event, or with respect to any of such Person's property or business and affairs (including any zoning approval or building permit) or from any Person in connection with any easements, contractual rights or other matters.

"**Books and Records**" means, in respect of the PGL Vendors, LeaseCo and PGL Insurance and, if applicable, the Optional Vendors: (i) all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise), including Tax and accounting books and records, and (ii) all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic

format or otherwise), including Tax and accounting books and records used or intended for use by, or in the possession of such entities, including, without limitation, information, documents and records relating to the Purchased Contracts, customer lists, customer information and account records, sales records, computer files, data processing records, employment and personnel records, sales literature, advertising and marketing data and records, cost and pricing information, production reports and records, equipment logs, operating guides and manuals, credit records, records relating to present and former suppliers and contractors, plans and projections and all other records, data and information stored electronically, digitally or on computer-related media.

"**Business**" means the transportation and logistics business conducted by the PGL Vendors across Canada and the United States, as applicable.

"**Business Day**" means a day on which banks are open for business in Toronto, Ontario, but does not include a Saturday, Sunday or statutory holiday in the Province of Ontario.

"**Canadian Court**" has the meaning ascribed thereto in the recitals.

"**Cash and Cash Equivalents**" means all cash on hand, cash equivalents and bank accounts of the PGL Vendors.

"**Cash Purchase Price**" has the meaning ascribed thereto in Section 3.4(b).

"**CCAA**" has the meaning ascribed thereto in the recitals.

"**CCAA Filing Date**" has the meaning ascribed thereto in the recitals.

"**CCAA Proceedings**" has the meaning ascribed thereto in the recitals.

"**Change of Control Consents**" has the meaning ascribed thereto in Section 5.2(c).

"**Claims**" means any civil, criminal, administrative, regulatory, arbitral or investigative inquiry, action, suit, investigation or proceeding and any claim of any nature or kind (including any cross-claim or counterclaim), demand, investigation, audit, chose in or cause of action, suit, default, assessment, litigation, prosecution, third party action, arbitral proceeding or proceeding, complaint or allegation, by or before any Person.

"**Closing**" means the completion of the purchase and sale of the Purchased Assets in accordance with the provisions of this Agreement.

"**Closing Date**" means, subject to the terms hereof, the date on which the Monitor's Certificate is released from escrow to the Purchaser in accordance with Section 9.15, which date shall (unless otherwise agreed to by the Purchaser and the Monitor, on behalf of the Vendors) be no later than ~~ten (10) days after the date on which the Approval and Vesting Order is granted by the Canadian Court and, if applicable, the U.S. Approval Order is granted by the U.S. Court~~the Outside Date.

"**Closing Time**" means 12:01 a.m. (Toronto time) on the Closing Date or such other time on the Closing Date as the Parties agree in writing that the Closing Time shall take place.

"**Contracts**" means all pending and executory contracts, agreements, leases, understandings and arrangements (whether oral or written) to which the PGL Vendors are a party or by which the PGL Vendors are bound or in which the PGL Vendors have, or will at Closing have, any rights

or by which any of their property or assets are or may be affected, including any Contracts in respect of Employees.

"**Courts**" has the meaning ascribed thereto in the recitals hereto.

"**Critical Required Contract**" means the Contracts set forth in Schedule "I", which Schedule "I" may be amended by the Purchaser up until 85 calendar days prior to the hearing of the motion for the Approval and Vesting Order, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "I" is amended.

"**Cure Costs**" means, in respect of any Purchased Contract, Critical Required Contract or Change of Control Consent, all monetary amounts, if any, required to be paid pursuant to section 11.3(4) of the CCAA in order to obtain the assignment to the Purchaser of such Purchased Contract, Critical Required Contract or in order for the Purchaser to obtain any Change of Control Consent, or such lesser amount as may be negotiated by the Purchaser or the Monitor with the applicable counterparty.

"**Deposit**" has the meaning ascribed thereto in Section 3.5 hereof.

"**Discharge**" means, in relation to any Encumbrance against any Person or upon any asset, undertaking or property, the full, final, irrevocable, complete and permanent waiver, release, discharge, cancellation, termination and extinguishment of such Encumbrance against such Person or upon such asset, undertaking or property and all proceeds thereof.

"**Effective Date**" has the meaning ascribed thereto in the preamble hereto means August 26, 2024, the "Effective Date" of the Original APA.

"**Employee**" means any individual who is employed by the PGL Vendors as of the Closing Date, whether on a full-time or a part-time basis and includes an employee on short term or long-term disability leave, but for certainty excludes any employee whose employment is terminated by the PGL Vendors prior to the Closing Date.

"**Encumbrance**" means any security interest, lien, Claim, charge, right of retention, deemed trust, judgement, writ of seizure, notice of seizure, notice of seizure, writ of execution, notice of execution, notice of sale, hypothec, reservation of ownership, pledge, encumbrance, mortgage or right of a third party (including any contractual rights such as purchase options, rights of first refusal, rights of first offer or any other pre-emptive contractual right) or encumbrance of any nature or kind whatsoever and any agreement, option or privilege (whether by law, contract or otherwise) capable of becoming any of the foregoing, (including any conditional sale or title retention agreement, or any capital or financing lease).

"**Equipment**" means all Tangible Property and Vehicles.

"**Excluded Assets**" means the assets of the PGL Vendors listed in Schedule "B", the Excluded Contracts, and all claims by the PGL Vendors against or in respect of any Related Party other than the PGL Vendors and PGL Insurance, which Schedule "B" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "B" is amended.

"**Excluded Contracts**" means the Contracts listed in Schedule "E", which Schedule "E" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "E" is amended.

"**Excluded Liabilities**" means all Liabilities of the PGL Vendors of any kind or nature whatsoever, other than Assumed Liabilities.

"**Exercise Notice**" has the meaning ascribed in Section 2.2 hereof.

"**Final Adjustment Statement**" has the meaning ascribed thereto in Section 3.10(a)

"**Final AR Adjustment**" has the meaning ascribed thereto in Section 3.3.

"**Final Order**" means a final, non-interlocutory order issued by a court of competent jurisdiction that has not been stayed, set aside, or vacated and no application, motion or other proceeding has been commenced seeking the same, in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably, and all appeal periods in respect of such order have expired.

"**Finloc Leased Vehicles**" means such of the trailers owned by Finloc 2000 Inc. or its affiliates subject to the Finloc Leases that the Purchaser agrees to assume the leases in respect of, as are set out in Schedule "J" to this Agreement, which Schedule may be amended by the Purchaser no later than 85 calendar days prior to the hearing of the motion for the Approval and Vesting Order.

"**Finloc Leases**" means, collectively, the Master Leasing Agreement No. A900271 PRI 6055 dated November 5, 2019 between PGL and Finloc 2000 Inc., and each of the following leasing agreements entered into thereunder: A900271-10854, A900271-10885 (as amended), A900271-10891, A900271-10905, A900271-10949, A900271-10990, A900271-11125, A900271-11138.

"**Fuel Inventory Adjustment**" has the meaning ascribed thereto in Section 3.3(e).

"**GAAP**" means Canadian Accounting Standards for Private Enterprises as defined in the CPA Canada Handbook—Accounting, Part II, as applicable, from time to time applied on a consistent basis and determined in accordance with past practices of PGL Vendors.

"**Governmental Authority**" means any domestic or foreign government, whether federal, provincial, state, territorial or municipal; and any governmental agency, ministry, department, court (including the Courts), tribunal, commission, stock exchange, bureau, board or other instrumentality exercising or purporting to exercise legislative, judicial, regulatory or administrative functions of, or pertaining to, government or securities market regulation.

"**GST/HST**" has the meaning ascribed thereto in Section 7.2(i).

"**Ineligible Equipment**" means any Vehicles of any PGL Vendor or TPine that is included in Schedule "G" hereof, but that prior to the Closing Date becomes unavailable for sale or otherwise cannot be conveyed to the Purchaser, including because the Vehicles have (a) been sold to a party other than the Purchaser, (b) been delivered to a secured creditor, or (c) become Wrecked Equipment.

"**Initial AR Adjustment**" has the meaning ascribed thereto in Section 3.3.

"**Initial Order**" has the meaning ascribed thereto in the recitals hereto.

"**Intangible Property**" means all of the following which is used in connection with the Business and/or the Purchased Assets, whether or not registered, anywhere in the world: (a) all trade or

brand names, business names, trademarks, service marks, copyrights to any original works of authorship, patents, licences, sublicenses, industrial designs, trade secrets, and other industrial or intellectual property of any nature in any form whatsoever recognized in any jurisdiction throughout the world; (b) inventions, discoveries, developments, concepts, ideas, improvements, processes and methods, know-how, trade secrets, confidential information, systems, procedures, computer software, source code; and (c) all goodwill, customer and supplier lists, confidential and proprietary information;

"**Intercompany Receivables**" means (i) any Accounts Receivable owing to any PGL Vendor by PGL Insurance, and (ii) if the Real Property Option is exercised by way of a share purchase transaction, any Accounts Receivable owing to any PGL Vendor by any of the Optional Vendors.

"**Interim Adjustment Statement**" has the meaning ascribed thereto in section 3.4(c).

"**Interim Period**" means the period beginning on the Effective Date and ending at the Closing Time.

"**Inventory**" means, collectively, all (i) shop supplies, including, motor oil, fluids, filters and other service supplies used in connection with the Business and/or the Purchased Assets, and (ii) diesel and fuel inventory.

"**ITA**" means the *Income Tax Act* (Canada).

"**LeaseCo**" means 2029909 Ontario Inc.

~~"**LC Purchase Price**" has the meaning ascribed thereto in Section 3.1.~~

"**Lenders**" has the meaning ascribed thereto in Section 2.2.

"**Liability**" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"**Monitor**" has the meaning ascribed thereto in the recitals hereto.

"**Monitor's Certificate**" has the meaning ascribed thereto in Section 9.15.

"**Offers of Employment**" has the meaning ascribed thereto in Section 9.1(a).

"**Optional Assets**" means all rights, titles and interests in and to the real property held by the Optional Vendors.

"**Optional Vendors**" means, collectively, 129 Canada, 131 Canada and 283 Ontario.

"**Original APA**" has the meaning ascribed thereto in the recitals hereto.

"**Organizational Documents**" means any trust document, charter, certificate or articles of incorporation or amalgamation, articles of amendment, articles of association, articles of

– 8 –

organization, articles of continuance, bylaws, as amended, partnership agreement or similar formation or governing documents of a Person (excluding individuals).

"**Outside Date**" means 11:59PM (Toronto time) on ~~September 30~~October 16, 2024, or such later date that is two Business Days after the date on which the Approval and Vesting Order and, if applicable, the Assignment Order, become Final Orders, or such later date and time as the Vendors, with the consent of the Monitor, and the Purchaser may agree in writing, or as the Court may direct.

"**Parties**" has the meaning ascribed thereto in the recitals hereto.

"**Party**" has the meaning ascribed thereto in the recitals hereto.

"**Permit Vendor**" has the meaning ascribed thereto in Section 4.6.

"**Permits**" means, in respect of the PGL Vendors, all permits, licences, certificates, licence plates, approvals, authorizations, and registrations, or any item with a similar effect, issued or granted by any Governmental Authority that are listed in Schedule "H", which Schedule "H" may be amended no later than ~~8~~5 calendar days prior to the hearing of the motion for the Approval and Vesting Order, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "H" is amended.

"**Permitted Assignee**" has the meaning ascribed thereto in Section 9.11

"**Permitted Encumbrances**" means such Encumbrances, if any, that the Purchaser agrees will continue to attach to and be enforceable against the Purchased Assets following Closing, a list of which are attached hereto as Schedule "C", which Schedule "C" may be amended by the Purchaser up until the Closing Date, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "C" is amended.

"**Person**" is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity.

"**PFS**" means Pride Fleet Solutions Inc.

"**PFS USA**" means Pride Fleet Solutions USA Inc.

"**PGL**" means Pride Group Logistics Ltd.

"**PGL Entities**" means PGL, PGL USA, PGL Insurance, PGL International, 12944154 Canada Inc. and 933 Helena Holdings Inc.

"**PGL Group**" means the PGL Vendors and their subsidiaries.

"**PGL Insurance**" means Pride Global Insurance Company Ltd.

"**PGL Insurance Financial Instruments**" means, collectively, all letters of credit, cash, cash equivalents, securities and investments held directly or indirectly by PGL Insurance.

"**PGL Insurance Shares**" means all of the outstanding shares of PGL Insurance.

"**PGL International**" means Pride Group Logistics International Ltd.

"**PGL USA**" means Pride Group Logistics USA, Co.

"**PGL Vendors**" means, collectively, PGL, PGL International, PGL USA, PFS, PFS USA, and LeaseCo.

"**Post-Closing Cash**" has the meaning ascribed thereto in Section 3.7.

"**Pride Entities**" has the meaning ascribed to it in the recitals.

"**Prepaid Expenses**" means all prepaid expenses ~~(a) of the PGL Vendors in respect of Permits, and (b)~~ of LeaseCo in respect of prepaid rents under the lease for 6050 Dixie Road, Mississauga, ON.

"**Purchase Price**" has the meaning ascribed thereto in Section 3.1.

"**Purchased Assets**" means the following tangible and intangible assets, undertakings and properties owned by the PGL Vendors, Optional Vendors and Real Property Vendor, related to the Business, wherever located, as of the Closing Date, but excluding the Excluded Assets:

    (i)     all Cash and Cash Equivalents of PGL, PGL International, and PGL USA;

    (ii)     all Accounts Receivable (including the Intercompany Receivables);

    (iii)     all Purchased Contracts;

    (iv)     all Prepaid Expenses;

    (v)     all Permits;

    (vi)     all Equipment;

    (vii)     all Inventory;

    (viii)     all PGL Insurance Shares;

    (ix)     all PGL Insurance Financial Instruments;

    (x)     the Intangible Property;

    (xi)     all Books and Records;

    (xii)     all rights under non-disclosure and confidentiality, non-compete, or non-solicitation agreements with Employees and agents of the PGL Vendors or with third parties to the extent related to the Business and/or the Purchased Assets, excluding any such agreements signed in connection with the Sale Process;

    (xiii)     all rights of the PGL Vendors under or pursuant to all warranties, representations and guarantees to the extent relating to products sold, or services provided, to the PGL Vendors or to the extent affecting any Purchased Assets;

(xiv)    if the Real Property Option is exercised, the Optional Assets;

(xv)    all Vehicles listed on Schedule "G" hereof;

and the following tangible assets owned by TPine:

(xvi)    all Vehicles listed on Schedule "G" that are owned by TPine.

"**Purchased Contracts**" means all Contracts of the PGL Vendors, including ~~the Purchased LCs set out in Schedule "D" and~~ the Finloc Leases, except for the Excluded Contracts~~, which Schedule "D" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "D" is amended.~~

~~"**Purchased LCs**" means the letters of credit set out in Schedule "D", which Schedule "D" may be amended by the Purchaser up until 5 calendar days prior to Closing, provided that no adjustment to the Purchase Price shall be made in the event that Schedule "D" is amended~~.

"**QST**" has the meaning ascribed thereto in Section 7.2(i).

"**Real Property Option**" has the meaning ascribed thereto in Section 2.2.

"**Real Property Vendor**" means 2043002 Ontario Inc., being the entity that holds all outstanding shares of 283 Ontario, 129 Canada, 131 Canada and LeaseCo.

"**Related Party**" means any Person (i) that is an affiliate or associate of any of the Pride Entities; (ii) that is an officer or director of any of the Pride Entities, (iii) that is an affiliate or associate of any such responsible officer or director, or (iv) that does not deal at arm's length (within the meaning of the ITA) with any of the Pride Entities or any responsible officer or director of any of the Pride Entities.

"**Related Party Landlord**" means any Related Party that becomes a landlord under a lease, access agreement or parking agreement referred to in Section 6.2(f).

"**Sanctions**" has the meaning ascribed thereto in Section 7.2(g).

"**Sale Process**" has the meaning ascribed thereto in the recitals hereto.

"**Specific Conveyances**" means all conveyances, bills of sale, assignments, powers of attorney, transfers, registrable transfers of land and other documents or instruments that are reasonably required or desirable to convey, assign and transfer the Vendors' respective title to and/or interest in and to the Purchased Assets to the Purchaser;

"**Tangible Property**" means all tangible personal property of the PGL Vendors other than the Vehicles.

"**Taxes**" means, with respect to any Person, all national, federal, provincial, local or other taxes, including income taxes, capital gains taxes, value added taxes, severance taxes, ad valorem taxes, property taxes, capital taxes, net worth taxes, production taxes, sales taxes, use taxes, license taxes, lease excise taxes, environmental taxes, transfer taxes, withholding or similar taxes, payroll taxes, employment taxes, employer health taxes, pension plan premiums and contributions, workers' compensation premiums, employment insurance or compensation premiums, stamp taxes, occupation taxes, premium taxes, alternative or add-on minimum taxes,

– 11 –

GST/HST, customs duties or other taxes of any kind whatsoever imposed or charged by any Governmental Authority, together with any interest, penalties, or additions with respect thereto and any interest in respect of such additions or penalties and any Liability for the payment of any amounts of the type described in this paragraph as a result any express or implied obligation to indemnify any other Person or as a result of being a transferee or successor in interest to any Person.

"**TPine**" means TPine Leasing Capital Corporation.

"**Transaction**" means all of the transactions contemplated by this Agreement, including the purchase and sale transaction whereby the Purchaser will acquire the Purchased Assets.

"**Transfer Taxes**" has the meaning ascribed in section 3.11 hereof.

"**Transferring Employees**" means the Employees who accept or are deemed to accept offers of employment from the Purchaser or an affiliate thereof in accordance with the terms hereof.

"**Transaction**" means all of the transactions contemplated by this Agreement, including the purchase and sale transaction whereby the Purchaser will acquire the Purchased Assets**Transition Services Agreement**" means an agreement between the Purchaser and each Permit Vendor, in form and substance acceptable to the Purchaser, Vendors and Monitor, that provides for the Purchaser to have the use and benefit of the Permits post-Closing, to the extent that the Permits are not transferred or assigned to the Purchaser on Closing.

"**U.S. Approval Order**" means an Order of the U.S. Court approving the Transaction solely with respect to the sale to the Purchaser of the Purchased Assets and Business located within the territorial jurisdiction of the United States.

"**Vehicles**" means all of the trucks, trailers and other vehicles of the PGL Vendors and TPine listed in Schedule "G", which schedule cannot be amended except for as provided for herein, and includes all accessories, fuel, equipment and parts thereof, therein or affixed thereto.

"**Vendors**" means, collectively, the PGL Vendors, TPine the Optional Vendors and the Real Property Vendor.

"**Wrecked Equipment**" has the meaning ascribed in section 7.4 hereof.

## 1.2    Interpretation Not Affected by Headings, etc.

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

## 1.3    General Construction

The terms "this Agreement", "hereof", "herein" and "hereunder" and similar expressions refer to this Agreement and not to any particular section hereof. The expression "Section" or reference to another subdivision followed by a number mean and refer to the specified Section or other subdivision of this Agreement. The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

– 12 –

**1.4      Extended Meanings**

Words importing the singular include the plural and vice versa and words importing gender include all genders. The term "including" means "including, without limitation," and such terms as "includes" have similar meanings and the term "third party" means any other Person other than the Vendors or the Purchaser, or any Affiliates thereof.

**1.5      Currency**

All references in this Agreement to dollars, monetary amounts, or to $, are expressed in Canadian currency unless otherwise specifically indicated.

**1.6      Statutes**

Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules, regulations and interpretations made under it, as it or they may have been or may from time to time be modified, amended or re-enacted.

**1.7      Schedules & Amendments to Schedules**

The following exhibits and schedules are attached hereto and incorporated in and form part of this Agreement:

> **<u>SCHEDULES</u>**
>
> Schedule "A"    -    Form of Approval and Vesting Order
>
> Schedule "B"    -    Excluded Assets
>
> Schedule "C"    -    Permitted Encumbrances
>
> Schedule "D"    -    ~~Purchased Contracts~~[Intentionally Omitted]
>
> Schedule "E"    -    Excluded Contracts
>
> Schedule "F"    -    Allocation Statement
>
> Schedule "G"    -    Vehicles
>
> Schedule "H"    -    Permits
>
> Schedule "I"    -    Critical Required Contracts
>
> Schedule "J"    -    Finloc Leased Equipment

Unless the context otherwise requires, words and expressions defined in this Agreement will have the same meanings in the Schedules and the interpretation provisions set out in this Agreement will apply to the Schedules. Unless the context otherwise requires, or a contrary intention appears, references in the Schedules to a designated Article, Section, or other subdivision refer to the Article, Section, or other subdivision, respectively, of this Agreement.

– 13 –

**1.8     Interpretation if Closing Does Not Occur**

If Closing does not occur, each provision of this Agreement which presumes that the Purchaser has acquired the Purchased Assets shall be construed as having been contingent upon Closing having occurred.

**1.9     Amendment and Restatement**

The Vendors and the Purchaser agree that effective as of the date hereof, this Agreement is an amendment and restatement of the Original APA and not a novation of the Original APA. As a consequence, the obligations, liabilities, covenants, representations and warranties under the Original APA shall constitute obligations, liabilities, covenants, representations and warranties hereunder governed by the terms hereof. Such obligations, liabilities, covenants, representations and warranties shall be continuing in all respects, and this Agreement shall not be deemed to evidence or result in a novation of such obligations, liabilities, covenants, representations and warranties. The Original APA has been amended and restated solely for the purposes of reflecting amendments to the Original APA which the Vendors and Purchaser have agreed upon.

**ARTICLE 2**
**PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES**

**2.1     Purchase and Sale of the Purchased Assets**

Subject to the terms and conditions of this Agreement, effective as of the Closing Time, the Vendors shall sell, assign and transfer the Purchased Assets to the Purchaser, and the Purchaser shall purchase, accept, assume and receive from the Vendors, all of the Vendors' title to and interest in and to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to the Approval and Vesting Order. For greater certainty, the Purchased Assets do not include the Excluded Assets.

Notwithstanding the foregoing paragraph, the Permits shall only be transferred and assigned to the Purchaser by the Vendors on Closing to the extent that such transfer and assignment is consented to or approved by the applicable issuers of the Permits, and the Parties hereto acknowledge that if such transfer or assignment of the Permits cannot be accomplished on Closing, the Purchaser shall still be required to close the Transaction on the Closing Date as long as the Transition Services Agreement is delivered in accordance with Section 5.2(e). If the Permits are not transferred and assigned to the Purchaser on Closing because the necessary consents have not been obtained, then the Permits shall transfer and assign to the Purchaser following Closing effective immediately upon the delivery of the necessary consents from the issuer of the Permit(s), without any further steps or formalities by the Vendors and the Purchaser.

Provided that Closing occurs, and subject to the terms and conditions of this Agreement, possession, risk, legal and beneficial ownership of, rights in, and responsibility for, the Purchased Assets shall transfer from the Vendors to the Purchaser effective as of the Closing Time, all subject to the Approval and Vesting Order.

**2.2     Option to Acquire Additional Assets**

From the Effective Date until the date that is no less than ten (10) Business Days prior to the Closing Date, the Purchaser shall have the option (but not the obligation) to acquire ~~all~~any of the Optional Assets held by any of the Optional Vendors (the "**Real Property Option**"). If the Real Property Option is exercised, in whole or in part, the acquisition by the Purchaser of any of Optional Assets shall be free and clear of any Encumbrances and Liabilities, other than the Assumed Liabilities. In the event that the Real

– 14 –

Property Option is exercised, in whole or in part, the Optional Assets subject to the exercise of the Real Property Option shall be deemed to be included in the definition of Purchased Assets. Notwithstanding anything to the contrary provided in this Agreement, the exercise of the Real Property Option will be subject to (i) the approval of the Monitor, and (ii) the Purchaser obtaining written consent from (A) the mortgage lenders to each of the mortgaged real property owned by the applicable Optional Vendors (the "**Lenders**") to the assignment of the existing mortgages to the Purchaser, and (B) the Royal Bank of Canada (in its capacity as administrative agent and collateral agent). The Purchaser may exercise the Real Property Option at its sole discretion by delivering to the Vendors and the Monitor written notice of its intention to exercise the Real Property Option (the "**Exercise Notice**") on or before the date that is ten (10) Business Days prior to the Closing Date. Such Exercise Notice shall, among other things, specify the Optional Assets the Purchaser wishes to acquire. After receiving the Exercise Notice, the Monitor shall advise the Purchaser within five (5) Business Days as to whether or not the Monitor consents to the exercise of the Real Property Option. If the Real Property Option is exercised, the Purchase Price shall be increased by $1.00 and concordant adjustments will be made to the Allocation Statement in Schedule "F".

If the Real Property Option is exercised, the Purchaser and Vendors may elect to complete the transaction as either an asset purchase or a share purchase transaction, and shall be subject to Court approval, which may be sought at the hearing for the Approval and Vesting Order, or at a subsequent hearing in the event that the Exercise Notice is not exercised, and the required consents are not obtained, prior to the motion for the Approval and Vesting Order being served.

In the event that (a) the Purchaser declines to exercise the Real Property Option, (b) the Lenders do not consent to the sale of any of the Optional Assets, or (c) the Monitor does not provide its consent to the exercise of the Real Property Option, then in each such case there shall be no right of termination on the part of the Purchaser or the Vendors based solely upon such event, and the Purchaser's obligations, entitlements or other rights under this agreement shall not be impaired, waived or diminished, including the obligation to proceed with the Transaction, excluding the Optional Assets, in accordance with the terms of this Agreement.

## ARTICLE 3
## PURCHASE PRICE AND RELATED MATTERS

### 3.1    Purchase Price

(a)    The aggregate cash consideration payable by the Purchaser for the Purchased Assets based upon the Purchased Assets existing as at the date of this Agreement and subject to adjustment as set out below shall be as set out below (the "**Purchase Price**").

Purchase Price Allocation Summary:

| | |
|---|---|
| Vehicles (Schedule "G") | $ ~~41,098,837~~43,098,837[1] |
| Acquired AR Amount (including Intercompany Receivables at nil consideration) | $9,000,000.00[2] |
| ~~Purchased LCs~~ | ~~$4,000,000.00[3]~~ |

---

[1] Subject to further adjustment in accordance with s. 3.3(c).

[2] Subject to further adjustment in accordance with s. 3.3(b).

[3] ~~Subject to further adjustment in accordance with s. 3.1(c).~~

| | |
|---|---|
| Tangible Property (Computers, office furniture, IT, mechanics tools, etc.) | $160,000.00 |
| Intangibles (IP, licenses, software, goodwill, Permits, license plates, Purchased Contracts, etc.) (Schedule "F") | $50,000.00 |
| PGL Insurance Shares | $1.00 |
| Inventory[43] | $100,000 |
| Prepaid Expenses | $50,000 |
| **TOTAL** | $~~54,458,838~~52,458,838 |

(b)     The Purchase Price shall be satisfied in accordance with Section 3.3 and shall not be subject to any claim for set off, reduction or adjustment or any similar claim or mechanism of any kind whatsoever, other than as described herein. For the avoidance of doubt, any Cash or Cash Equivalents indirectly acquired by the Purchaser from the PGL Vendors pursuant to this Agreement will be acquired on a dollar for dollar basis and such amount of Cash or Cash Equivalents acquired hereunder shall be added to the Purchase Price after payment and deduction of any unpaid amounts owing by any of the PGL Vendors in respect of unpaid wages, source deductions, taxes and unpaid HST accruing up to the Closing Date (the "**Unpaid Post CCAA Filing Accruals**"). In the event that the Cash or Cash Equivalents are not sufficient to satisfy the Unpaid Post CCAA Filing Accruals or there are any liabilities that cannot be vested out and released as against the PGL Vendors and their directors and officers pursuant to the Approval and Vesting Order, the Purchase Price shall be reduced on a dollar for dollar basis to the extent that such Unpaid Post CCAA Filing Accruals and any such undischarged liabilities are greater than the Cash or Cash Equivalents as at the Closing Date. For the avoidance of doubt, Unpaid Post CCAA Filing Accruals shall not be Excluded Liabilities. Subject to the filing of the elections referred to in Section 3.12 hereof, the Purchase Price shall be net of all applicable Transfer Taxes, which shall be paid in accordance with Section 3.12(a) hereof.

(c)     ~~As the Purchased LCs are not currently cash collateralized, the Purchase Price allocated to the Purchased LCs (the "**LC Purchase Price**") shall be paid directly to the issuer or issuers of the Purchased LCs to be held by such issuers as cash collateral for the Purchased LCs, shall not be paid to the Vendors or the Monitor, and shall not form a part of the Cash Purchase Price. Further, in the event that the issuer of any Purchased LC wishes to terminate any Purchased LC prior to or concurrently with Closing, an amount of the LC Purchase Price corresponding to the terminated Purchased LC shall be used solely to secure replacement letters of credit or other security in form and substance satisfactory to the applicable insurance companies who are the beneficiaries of the terminated Purchased LC~~[Intentionally Omitted].

---

[43] Subject to further adjustment in accordance with s. 3.3(e).

– 16 –

(d)     In addition, as set forth in Section 2.4 hereof, the Purchaser shall have the option to acquire the Optional Assets for a purchase price of $1.00 or such other amount as may be agreed to by the Monitor and Purchaser (and, for greater certainty, no other adjustment to the Purchase Price) and indirectly assume certain liabilities associated with the Optional Assets so acquired, including the mortgages and accrued property taxes and utilities associated with such Optional Assets.

**3.2     Assumption of Liabilities**

In addition to the Purchase Price, the Purchaser shall assume the Assumed Liabilities, which are estimated by the Purchaser to be equal to approximately $4 million based upon post-Closing obligations under the Purchased Contracts and the accrued vacation pay liabilities of the Employees. For the avoidance of doubt, the Purchaser shall assume all liabilities of PGL Insurance, by virtue of purchasing the shares of PGL Insurance.

**3.3     Allocation**

(a)     Allocation Statement. The Purchaser has delivered to the Monitor, on behalf of the Vendors, a statement (the "**Allocation Statement**"), as set out in Schedule "F", allocating, in sufficient detail, the Purchase Price and in respect thereof, (a) the allocation of the respective Purchase Price on an asset-by-asset basis, together with (b) the Purchase Price aggregated and allocated among each category of Purchased Assets of the Vendors.

(b)     AR Adjustments. In respect of Accounts Receivable, the Allocation Statement shall include a value to be allocated to the Accounts Receivable, which value shall be equal to 70% of the face amount of such Accounts Receivable other than Intercompany Receivables (the "**Acquired AR Amount**"), it being acknowledged and agreed by all Parties hereto that (a) the Acquired AR Amount shall remain at all times an amount equal to 70% of the full amount of the Accounts Receivable (other than Intercompany Receivables), as determined by the Monitor, and (b) the full amount of Accounts Receivable as estimated on the Allocation Statement shall be subject to adjustments based on the full amount of the Accounts Receivable, as determined by the Monitor, on (i) the Closing Date under the Interim Adjustment Statement in accordance with Section 3.4(c) (the "**Initial AR Adjustment**"), and (ii) the date that is sixty (60) days following the Closing Date, as determined in accordance with Section 3.10(a) hereof (the "**Final AR Adjustment**"). Notwithstanding the foregoing, no value shall be allocated to Intercompany Receivables, which shall be assigned to the Purchaser for no additional consideration.

(c)     Vehicles Adjustment. In respect of Vehicles, the Allocation Statement includes a value allocated to the Vehicles being acquired (the "**Acquired Vehicles Amount**"), it being acknowledged and agreed by all Parties hereto that (a) the Acquired Vehicles Amount shall not be amended or adjusted, other than removal of any Ineligible Equipment, and (b) the Purchase Price allocated to Equipment in the Allocation Statement shall be reduced to omit any Ineligible Equipment, in an amount equal to value attributed to such Ineligible Equipment on the Allocation Statement (such reduction, the "**Vehicle Adjustment**").

(d)     Adjustments to Allocation Statement. The Parties hereto shall make appropriate adjustments to the Allocation Statement to reflect any changes in the Purchase Price as of the Closing Time. The Parties hereto agree for all Tax reporting purposes to report the Transaction in accordance with the Allocation Statement, as adjusted pursuant to the

– 17 –

preceding sentence, and to not take any position during the course of any audit or other action inconsistent with such schedule unless required by a determination of the applicable Governmental Authority that is final.

(e)     Fuel Inventory Adjustment.  An amount of $50,000 of the Purchase Price has been allocated as the estimated fuel in the gas station fuel tanks as part of the "Inventory" in the Allocation Statement.  On the Closing Date, the Vendors shall provide an updated measurement of actual fuel in the gas station fuel tanks and the Purchase Price shall be adjusted by X-$50,000 where X is the cost basis of the actual fuel in the gas station fuel tanks on the Closing Date. (the "**Fuel Inventory Adjustment**").

## 3.4     Satisfaction of Purchase Price

The Purchaser shall satisfy the Purchase Price, at the Closing Time, in accordance with the following:

(a)     Deposit. The Parties acknowledge that the Purchaser has paid a deposit in the amount of $3,000,000 being approximately 5% of the Purchase Price (the "**Deposit**"), which Deposit is being held by the Monitor, in trust, in accordance with the terms of the Sale Process and shall be credited against the Purchase Price at Closing.

(b)     Cash Purchase Price. An amount shall be paid to the Monitor (the "**Cash Purchase Price**"), for the benefit of the Vendors, at the Closing Time, in immediately available funds equal to the Purchase Price (i) *minus* the Deposit, (ii) *minus* the LC Purchase Price, (iii) *plus* or *minus* the Initial AR Adjustment (if any), (iviii) *plus* or *minus* the Vehicle Adjustment (if any), and (viv) *plus* or *minus* the Fuel Inventory Adjustment (if any).

(c)     Initial AR Adjustment. The PGL Vendors, in consultation with the Monitor, shall carry out a physical accounting and adjustment and prepare and deliver to Purchaser no less than five (5) Business Days before the Closing a statement (the "**Interim Adjustment Statement**") setting out the PGL Vendors' good faith estimate of any difference between the Acquired AR Amount as set out in the Allocation Statement and the full value of the acquired accounts receivable on the Closing Date. The Interim Adjustment Statement shall be used to calculate any adjustments to the Cash Purchase Price required by Section 3.3.

(d)     Vehicle Adjustment. The PGL Vendors and TPine, in consultation with the Monitor, shall carry out a physical accounting and adjustment and prepare and deliver to Purchaser no less than five (5) Business Days before the Closing an updated schedule of Vehicles (the "**Vehicle Adjustment Statement**") setting out any Ineligible Equipment by VIN. The Vehicle Adjustment Statement shall be used to calculate the Vehicle Adjustment required by Section 3.3.

## 3.5     Deposit

(a)     If Closing occurs in accordance with the terms and conditions of this Agreement, the Deposit shall be credited against the Purchase Price, in partial satisfaction of the Purchaser's obligation to pay the Purchase Price at Closing.

(b)     If this Agreement is terminated:

(i)      due to breach by the Purchaser as a result of events or circumstances entirely under the Purchaser's control that are not cured or waived and result in this Agreement not closing, then the Monitor on behalf of the Vendors shall be

– 18 –

entitled to retain the Deposit and the full amount of the Deposit shall be forfeited to the Vendors; or

(ii)    for any other reason, including, for the avoidance of doubt, the failure of the Vendors to satisfy any of its obligations or meet any of its conditions in this Agreement or any of the Purchaser's conditions set forth under Section 6.2 not being satisfied, the Deposit shall be returned to the Purchaser within three (3) Business Days of the termination of the Agreement; and

each Party shall be released from all obligations and liabilities under or in connection with this Agreement. In the event of termination of this Agreement under Section 6.3 pursuant to which the Vendors shall be entitled to retain the Deposit, the Parties agree that the amount of the Deposit constitutes a genuine pre-estimate of liquidated damages representing the Vendors' Losses and Liabilities as a result of Closing not occurring and agree that the Vendors shall not be entitled to recover from the Purchaser any amounts that are in excess of the Deposit as a result of Closing not occurring. The Purchaser hereby waives any claim or defence that the amount of the Deposit is a penalty or is otherwise not a genuine pre-estimate of the Vendors' damages.

**3.6    Assignment of Critical Required Contracts**

In the event that there are any Critical Required Contracts which are not assignable in whole or in part without the consent, approval or waiver of another Person and such consents, approvals or waivers have not yet been obtained as of the Closing Date, then:

(a)    nothing in this Agreement will be construed as an assignment of any Critical Required Contract and, without limiting the foregoing, the Purchaser does not assume and has no obligation to discharge any liability or obligation under or in respect of any such Critical Required Contract, until (i) an Assignment Order is obtained in accordance with 3.53.6(c), or (ii) such consent, approval or waiver is obtained in respect of such Critical Required Contract on terms satisfactory to the Purchaser, in either case following which the value of and rights of the applicable PGL Vendor under such Critical Required Contract shall enure to the applicable Purchaser;

(b)    the PGL Vendors shall use their commercially reasonable efforts to obtain any such consent, approval or waiver, and the ~~Purchasers~~Purchaser shall provide reasonable cooperation to assist the PGL Vendors in obtaining any such consent, approval or waiver;

(c)    if any consent, approval or waiver is not obtained for any Critical Required Contract prior to Closing, the Purchaser may request that the PGL Vendors bring a motion to the Court for issuance of an Assignment Order with respect to such Critical Required Contract prior to Closing;

(d)    once the consent, approval or waiver to the assignment of a Critical Required Contract is obtained, or the assignment of such Contract has been ordered by the Court pursuant to an Assignment Order, such Critical Required Contract shall be deemed to be assigned to the Purchaser on Closing;

(e)    the PGL Vendors shall preserve the Critical Required Contracts for the benefit of the Purchasers and shall not terminate, amend, modify, assign, convey or otherwise transfer all or any part of such Critical Required Contracts until such time as the required

consent, approval or waiver or an Assignment Order is obtained, to enable the Purchasers to obtain the benefit of the Critical Required Contracts; and

(f)     the PGL Vendors, with the consent of the Purchaser, shall have the right to disclaim any Critical Required Contract in accordance with the CCAA, and in the event of disclaimer, such Critical Required Contract shall be considered an Excluded Contract for all purposes under this Agreement.

With respect to each Critical Required Contract, subject to Closing and to either (i) the consent, approval or waiver of the other parties thereto to the assignment thereof, or (ii) in the absence of such consent, approval or waiver, the obtaining of an Assignment Order, in addition to its other obligations under this Agreement, the Purchaser shall pay the applicable Cure Costs related to such Critical Required Contract on Closing.

**3.7     Change of Control Consents**

(a)     The Vendors shall as promptly as practicable, ~~but in any event within five (5) days, after the execution of this Agreement,~~ submit requests for the Change of Control Consents to the applicable party related to the purchase of PGL Insurance and, if applicable, the Optional Assets (provided that Change of Control Consents in respect of the Optional Assets shall not be sought until the Exercise Notice has been delivered by the Purchaser). The Vendors shall, and they shall cause the PGL Insurance and, if applicable, the Lenders associated with the Optional Assets, to obtain or cause to be obtained prior to Closing the Change of Control Consents on such terms as are acceptable to the Purchaser, acting reasonably. The Purchaser shall co-operate in obtaining the Change of Control Consents.

(b)     PGL and the Real Property Vendor shall, and PGL and the Real Property Vendor shall cause PGL Insurance and, if applicable, the Lenders associated with the Optional Assets to provide, or cause to be provided, all notices that are required to be provided in connection with the Transactions.

**3.8     Post-Closing Cash**

If, after the Closing Date, the PGL Vendors come into possession of any Cash or Cash Equivalents that are proceeds of Accounts Receivable purchased by the Purchaser (the **"Post-Closing Cash"**), the Monitor, on behalf of the PGL Vendors, shall hold all such amounts in trust for the Purchaser and shall forthwith wire or otherwise transfer any Post-Closing Cash to an account designated by the Purchaser in writing.

**3.9     Good Faith Dealings**

(a)     The Parties shall co-operate fully in good faith with each other and their respective legal advisors, accountants and other representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, including making or causing to be made, all filings and submissions, as applicable, required under any Applicable Law to effect the Closing.

(b)     The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing on or before the Outside Date.

(c)     The Parties acknowledge, agree and confirm that the Agreement was negotiated, proposed and entered into by the Vendors and the Purchaser in good faith, without

– 20 –

collusion, and from arm's-length bargaining positions and that the Purchaser is a good faith purchaser within the meaning of section 363(m) of the United States Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

**3.10**   **Post-Closing Adjustments**

In the event that any prorations, apportionments, computations, statements of Purchased Assets or amounts made hereunder shall require final adjustment, then the Parties shall use good faith and diligent efforts to make the appropriate adjustments promptly when accurate information becomes available and either Party shall be entitled to an adjustment to correct the same provided that, it makes written demand on the one from whom it is entitled to such adjustment within 90 days of the Closing Date (or prior to the end of any applicable tax period).

Notwithstanding the foregoing, the Parties hereto agree to work together in good faith, and in consultation with the Monitor and CRO, to make any necessary post-Closing adjustments to the Purchase Price as follows:

(a)     On the date that is sixty (60) days following the Closing Date, the Purchaser shall deliver to the Vendors and the Monitor a statement (the "**Final Adjustment Statement**"), together with any supporting accounting and other information, that sets out as at such date (A) the full amount of the purchased Accounts Receivable compared to the value of the Acquired AR Amount set out in the Allocation Statement; (B) the Vehicles actually received by the Purchaser, compared to the listing of the purchased Vehicles on Schedule "G" (as amended prior to the Closing Date to omit any Ineligible Equipment) and (C) the actual amount of the Prepaid Expenses as at the Closing Date in respect of which the Purchaser receives the actual benefit of on Closing, compared to the value of the Prepaid Expenses set out in the Allocation Statement. The Final Adjustment Statement shall be in a form acceptable to the Vendors, in consultation with the Monitor;

(b)     On or before the date that is ninety (90) days following the Closing Date, the Vendors, in consultation with the Monitor, may provide changes and comments on the Final Adjustment Statement to the Purchaser in writing, and the Purchaser and Vendors, in consultation with the Monitor, shall negotiate in good faith to finalize the Final Adjustment Statement, failing which either Party may direct the Monitor to engage an independent third-party accountant to resolve any discrepancies regarding the Final Adjustment Statement on such terms and standards as the Parties may agree in good faith in consultation with the Monitor;

(c)     Subject to the Final Adjustment Statement being resolved pursuant to (b) above, the Parties agree to the following post-Closing adjustments to the Purchase Price, to be paid in readily available cash as the Parties may determine in good faith:

(i)     an adjustment in favour of the Purchaser or the Vendors, as the case may be, in the amount of the applicable Final AR Adjustment as between the Closing Date and the date that is sixty (60) days following the Closing Date; and

(ii)    an adjustment in favour of the Purchaser in the amount of any Purchased Assets that the Vendor was incapable of delivering unto the Purchaser for any reason despite making its best efforts to do so, provided that the aggregate value of such Purchased Assets that cannot be delivered to the Purchaser is equal to or greater than two percent (2%) of the Purchase Price, failing which there shall not be any adjustment under this subheading.

– 21 –

**3.11    Withholding**

The Purchaser (or any affiliate thereof) shall be permitted to deduct or withhold from any amounts payable under this Agreement any amounts required to be deducted or withheld pursuant to Applicable Law in respect of Taxes, provided that it shall remit or cause to be remitted, such withheld amounts to the appropriate Governmental Authority in accordance with Applicable Law. To the extent that a Party becomes aware that any consideration payable under this Agreement may be subject to withholding Taxes, it shall promptly notify the other Party and the Parties shall cooperate in good faith to minimize or eliminate the amount of such withholding Taxes (including seeking relief from the Court, if applicable). To the extent that any amounts are so deducted or withheld and timely paid over to the applicable Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

**3.12    Payment of Sales Taxes and Tax Elections**

(a)    <u>Transfer Taxes</u>.        The Purchaser shall be liable for and shall pay all federal and provincial sales, goods and services, harmonized sales, value added, use, transfer, property or land transfer and similar Taxes ("**Transfer Taxes**") properly payable upon and in connection with the sale, assignment and transfer of the Purchased Assets from the Vendors to the Purchaser, which for greater certainty exclude any Taxes payable on the Vendors' net income, profits or gains. Subject to Section 3.12(b), where the Transfer Taxes are collectable by the Vendors, the Purchaser shall pay such Transfer Taxes directly and promptly to the Vendors upon the delivery of such documentation as may be prescribed under applicable Laws indicating the applicable Transfer Taxes and the Vendors' relevant Transfer Tax registration number(s) and any other information required for the Purchaser to obtain any applicable input tax credits or similar amounts in respect of such Transfer Taxes (or alternatively, in the context of any property or land transfer tax or other Tax required to be paid directly by the Purchaser to a Governmental Authority, the Purchaser shall pay such tax directly to the applicable Governmental Authority). The Vendors shall remit any such Transfer Taxes received from the Purchaser directly to the relevant taxation authority. For Transfer Taxes that are payable directly by the Purchaser to the relevant Governmental Authority (including, for greater certainty, GST/HST to be self-assessed on the acquisition of real property), the Purchaser will be responsible for, and shall indemnify and hold harmless the Vendors from, such Transfer Taxes, plus any applicable penalties and interest. For purposes of calculating the Transfer Taxes collectable by the Vendors, the provincial place of supply for the Purchased Assets physically situated in Canada will be determined by the Vendor one (1) day prior to Closing.

(b)    <u>GST/HST Election</u>. PGL and the Purchaser shall jointly make the election provided for under section 167 of the *Excise Tax Act* (Canada) and under section 75 of *an Act respecting the Québec sales tax* that no tax be payable pursuant to that legislation in respect of the purchase and sale of the Purchased Assets to be sold by PGL as contemplated by this Agreement. The Purchaser and PGL, in consultation with the Monitor, shall jointly complete the election form(s) (including more particularly the form described as form GST-44 and Form FP-2044) in respect of such election and the Purchaser shall file the said election form(s) no later than the due date for the Purchaser's GST/HST and QST returns for the first reporting period in which GST/HST, would, in the absence of such election, become payable in connection with the transactions contemplated by this Agreement (or within the timelines otherwise required under applicable provincial law), and will provide evidence of such filings to the Vendors and the Monitor. Notwithstanding the foregoing, the Purchaser shall, on

– 22 –

demand, indemnify and hold harmless the Vendors and their directors, shareholders, employees, and successors of any Taxes (including interest and penalties) resulting from (i) the Purchaser's failure to timely file any election form (including the GST-44 and F P-2044) required to be filed pursuant to this paragraph, or (ii) any assessment, reassessment or imposition of GST/HST, QST assessed or imposed by any Governmental Authority as a result of or as a consequence of a rejection or denial of the GST/HST and QST elections made by the parties pursuant to this paragraph. The Purchaser does not assume and shall not be liable for any other Taxes which may be or become payable by the Vendors other than Transfer Taxes in connection with the purchase and sale of the Purchased Assets pursuant to this Agreement.

(c)     <u>Income Tax Election – Section 22 of the ITA</u>.    The Purchaser and the Vendors, in consultation with the Monitor, agree to make and file, in a timely manner, a joint election under section 22 of the ITA and any other equivalent or corresponding provision under applicable provincial or territorial tax legislation with respect to the sale, assignment, transfer and conveyance of the Accounts Receivable and shall designate therein that portion of the Purchase Price allocated to the Accounts Receivable in accordance with the procedures set out in Section 3.2 and 3.10 of this Agreement. The Purchaser and the Vendors, in consultation with the Monitor shall each file such elections, along with any documentation necessary or desirable to give effect to such elections, within the prescribed time limitations and will also prepare and file all of their respective Tax Returns in a manner consistent with such allocation.

## ARTICLE 4
## COVENANTS

### 4.1    Closing Date

(a)     The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing.

(b)     Each of the Parties shall, as promptly as possible, make, or cause to be made, all filings and submissions, as applicable, required under any Applicable Law to effect the Closing.

### 4.2    Motion for Approval and Vesting Order and Assignment Order

As soon as practicable after the date of this Agreement, the Vendors shall serve and file with the Canadian Court a motion for the issuance of the Approval and Vesting Order, seeking relief that will, *inter alia*, approve this Agreement and the Transaction and the Assignment Order. The Vendors shall use their best efforts to seek the issuance and entry of the Approval and Vesting Order and the Purchaser shall cooperate with the Vendors in their efforts to obtain the issuance and entry of the Approval and Vesting Order and the Assignment Order.

To the extent required to give full effect to, and implement, the Transaction, Randall Benson, in his capacity as the foreign representative of the Vendors, shall seek U.S. Court approval of the Transaction solely with respect to Purchased Assets located within the territorial jurisdiction of the United States in the form and manner required by the order approving the sales procedures motion to be filed in the Chapter 15 Proceedings set forth in the Order (i) Approving the Sale Procedures and Sale Notice, (ii) Authorizing the Sale of the Debtors' U.S. Assets Free and Clear and Liens, Claims, Encumbrances and Other Interests, and (iii) Granting Related Relief.

### 4.3    Interim Period

During the Interim Period, the Vendors shall ensure that all of the Purchased Assets remain insured and the Vendors shall use commercially reasonable efforts to continue to maintain the Purchased Assets and the Business in substantially the same manner as on the Effective Date, *provided that* the Purchaser hereby acknowledges that payments to equipment financers of the Vendors have not been made during the pendency of the CCAA Proceedings to date.

### 4.4    Access During Interim Period

During the Interim Period, the Monitor, on behalf of the Vendors, shall give, or cause to be given, to the Purchaser, and its representatives, reasonable access during normal business hours to the Books and Records, to conduct such investigations, inspections, surveys or tests thereof and of the financial and legal condition of the Business and Assets as the Purchaser reasonably deems necessary or desirable to further familiarize themselves with the Business and/or Assets. Without limiting the generality of the foregoing: (a) the Purchaser and its representatives shall be permitted reasonable access during normal business hours to all documents relating to information scheduled or required to be disclosed under this Agreement and to the Employees; and (b) the Purchaser and its Representatives shall be permitted to contact and discuss the Transactions contemplated herein with Governmental Authorities and the Vendors' customers and contractual counterparties. Such investigations, inspections, surveys and tests shall be carried out at the Purchaser's sole and exclusive risk and cost, during normal business hours, and without undue interference with the Vendors' operations and the Vendors shall co-operate reasonably in facilitating such investigations, inspections, surveys and tests and shall furnish copies of all such documents and materials relating to such matters as may be reasonably requested by or on behalf of the Purchaser. For the avoidance of doubt, nothing in this section 4.4 shall constitute a due diligence condition, and nothing discovered or learned by the Purchaser during the Interim Period shall entitle the Purchaser to terminate this Agreement or adjust the Purchase Price.

### 4.5    Insurance Matters

Until Closing, the Vendors shall keep in full force and effect all existing insurance policies relating to the Purchased Assets or the Business, and give any notice or present any claim under any such insurance policies consistent with past practice of the Vendors in the ordinary course of business. Any insurance proceeds received shall be applied to repair or remedy any damage caused by fire, theft, vandalism, collision or other calamity to any Equipment or other property being purchased by the Purchaser pursuant to this Agreement. For the avoidance of any doubt, in the event that insurance proceeds are paid or payable in respect of any Wrecked Equipment that is excluded from Schedule "G" in accordance with the terms hereof, the Purchaser shall in no case be entitled to any portion of such proceeds, and such proceeds constitute Excluded Assets hereunder.

### 4.6    Post-Closing Matters

Following Closing, each Vendor that holds, or is a direct or indirect beneficiary of, any Permit (each, a "**Permit Vendor**") and each Related Party Landlord shall continue as a corporation in good standing, in the CCAA Proceedings, and the Purchaser and Vendors agree that the Approval and Vesting Order shall provide that (a) the Permit Vendors and Related Party Landlords shall be subject to the exclusive governance and control of the CRO and/or the Monitor, (b) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Permit Vendor shall be bankrupt, dissolved or otherwise wound-up prior to the earlier of (i) the date that all Permits are irrevocably transferred to the Purchaser, (ii) the date that the Purchaser advises the CRO and the Monitor in writing that it does not require the irrevocable transfer of the Permits to the Purchaser, and (iii) March 31, 2025, and (c) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Related Party

– 24 –

Landlord shall be bankrupt, dissolved or otherwise wound-up prior to the date that the lease, access agreement or parking agreement to which the Related Party Landlord is terminated.

**ARTICLE 5**
**CLOSING ARRANGEMENTS**

**5.1     Closing**

Closing shall take place on the Closing Date effective as of the Closing Time electronically (or as otherwise determined by mutual agreement of the Parties in writing), by the exchange of deliverables (in counterparts or otherwise) by electronic transmission in PDF format.

**5.2     Vendors' Closing Deliveries**

At or before the Closing Time, the Vendors shall deliver or cause to be delivered to the Purchaser the following:

(a)     any Specific Conveyances required in respect of the transfer of the Purchased Assets from the Vendors to the Purchaser, including, if applicable, the transfer of the Optional Assets;

(b)     a true copy of the Approval and Vesting Order, as signed by the Canadian Court;

(c)     all required consents or approval orders, in form and substance satisfactory to the Purchaser, providing for the assignment and transfer of the Critical Required Contracts;

(d)     all required consents, in form and substance satisfactory to the Purchaser, to the change of control of PGL Insurance, which shall be provided by the Purchaser to the Vendors for execution (the "**Change of Control Consents**");

(e)     all required consents, in form and substance satisfactory to the Purchaser, to the assignment of the Permits effective on the Closing date, or a duly executed copy of the Transition Services Agreement;

(f)     any tax elections contemplated by Section 3.11 duly executed by the applicable Vendors;

(g)     evidence that all necessary corporate actions have been taken on or prior to the Closing to permit good title to the PGL Insurance Shares to be duly and validly transferred and assigned to the Purchaser at the Closing;

(h)     share certificates representing all issued and outstanding shares of PGL Insurance accompanied with duly executed share transfer forms in the name of the Purchaser or its nominee or evidence of cancellation of all existing outstanding shares and issuance of new share certificates to the Purchaser or its nominee, in either case, together with security registers evidencing that the Purchaser or its nominee is the sole holder of PGL Insurance;

(i)     the Books and Records of the Vendors, PGL Insurance, LeaseCo and, if applicable, any Optional Vendors;

(j)     a true copy of the U.S. Approval Order, if applicable, as entered by the U.S. Court;

– 25 –

(k)     a certificate of an officer of the Vendors dated as of the Closing Date confirming that all of the representations and warranties of the Vendors contained in this Agreement are true in all material respects as of the Closing Time, with the same effect as though made at and as of the Closing Time, and that the Vendors have performed in all material respects the covenants to be performed by them prior to the Closing Time; and

(l)     such other agreements, documents and instruments as may be reasonably required by the Purchaser to complete the Transaction, all of which shall be in form and substance satisfactory to the Parties, acting reasonably.

**5.3     Purchaser's Closing Deliveries**

At or before the Closing, the Purchaser shall deliver or cause to be delivered to the Vendors (or to the Monitor, as applicable), the following:

(a)     the Cash Purchase Price;

(b)     all Transfer Taxes payable in accordance with Section 3.12(a);

(c)     evidence that all Offers of Employment have been provided to the Employees prior to Closing in accordance with Section 9.1(a);

(d)     duly executed assignment and assumption agreements, in form and substance satisfactory to the Vendors, evidencing the assumption by the Purchaser of the Purchased Contracts and Assumed Liabilities;

(e)     any Specific Conveyances required in respect of the transfer of the Purchased Assets from the Vendors to the Purchaser;

(f)     any tax elections contemplated by Section 3.12 duly executed by the Purchaser;

(g)     a certificate of an officer of the Purchaser dated as of the Closing Date confirming that all of the representations and warranties of the Purchaser contained in this Agreement are true in all material respects as of the Closing Time, with the same effect as though made at and as of the Closing Time, and that the Purchaser has performed in all material respects the covenants to be performed by it prior to the Closing Time; and

(h)     such other agreements, documents and instruments as may be reasonably required by the Monitor on behalf of the Vendors to complete the Transaction, all of which shall be in form and substance satisfactory to the Monitor and the Purchaser, acting reasonably.

**5.4     Post-Closing Deliveries**

(a)     ~~Immediately following~~Following Closing ~~or,~~ as soon as practicable ~~thereafter~~after receiving a written direction to do so by the Purchaser, PGL, PGL USA, PGL International, PFS and PFS USA shall file articles of amendment to change their name to another name or numbered company and shall deliver to the Purchaser evidence of the filing of such articles of amendment and change of name and shall consent to the Purchaser changing its name to "Pride Group Logistics Ltd.", it being acknowledged by the Vendors that the Purchaser is purchasing all goodwill and intellectual property associated with the "Pride Group Logistics" name and that the change of the name of the Purchaser to Pride Group Logistics Ltd. may facilitate the assignment and continuation of Permits currently held by the Vendors, provided however that the Purchaser may defer

– 26 –

delivering the direction referred to herein in respect of any Permit Vendors that are required to maintain their current name in order to maintain any Permits in good standing, in which case such Permit Vendors shall maintain their current names until such time as the Purchaser advises the Monitor and the CRO, in writing, that the applicable Permits are no longer required to be maintained by the Permit Vendors pursuant to Section 4.6, and the Purchaser shall contemporaneously with such advise to the Monitor and CRO delivery the direction contemplated hereby, at which point the applicable Permit Vendors shall promptly change their names in accordance with this Section 5.4.

(b)     Immediately following the receipt of the documents set out in Section 5.4(a) above, or as soon as practicable thereafter, the Purchaser and each of its Permitted Assignees shall be entitled to file articles of amendment, articles of incorporation or otherwise effect a change of name in their applicable jurisdiction of incorporation to utilize one or more of the names of the Vendors set out in Section 5.4(a) above, and shall, upon doing so, provide the Monitor with evidence of the filing of such articles of amendment, articles of incorporation or other documents evidencing such change of name.

## ARTICLE 6
## CONDITIONS OF CLOSING

**6.1     Conditions Precedent in Favour of the Parties**

The obligation of the Parties to complete the Transaction is subject to the following joint conditions being satisfied, fulfilled or performed on or prior to the Closing Date:

(a)     <u>Approval and Vesting Order and Assignment Order.</u> The Canadian Court shall have issued and entered the Approval and Vesting Order on or before September 25, 2024 (or such later date as may be agreed by the Purchaser, Vendors and Monitor) and the Assignment Order on or before September 15October 7, 2024 (or such later date as may be agreed by the Purchaser, Vendors and Monitor) in form and substance satisfactory to the parties, or as soon thereafter subject to availability of the Canadian Court, which Approval and Vesting Order and, if applicable, Assignment Order shall not, have been stayed, set aside, or vacated and no application, motion or other proceeding shall have been commenced seeking the same, in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonablybecome Final Orders.

(b)     <u>US Approval Order</u>.  If determined to be necessary, theThe U.S. Approval Order shall have been entered by the U.S. Court.

(c)     <u>No Order</u>. No Applicable Law and no judgment, injunction, order or decree shall have been issued by a Governmental Authority or otherwise in effect that restrains or prohibits the completion of the Transaction;

(d)     <u>No Restraint.</u> No motion, action or proceedings shall be pending by or before a Governmental Authority to restrain or prohibit the completion of the Transaction contemplated by this Agreement; and

The foregoing conditions are for the mutual benefit of the Parties. If any condition set out in this Section 6.1 is not satisfied, performed or mutually waived on or prior to the Closing Date, any Party may elect on written notice to the other Parties to terminate this Agreement.

**6.2** **Conditions Precedent in Favour of the Purchaser**

The obligation of the Purchaser to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a) ~~Good Standing of Permits;~~ Change of Control Consents; Critical Required Contracts: ~~All Permits shall have been transferred to the Purchaser in good standing and the Vendors shall have obtained all consents required by regulatory authorities in order to allow for the transfer of such Permits to the Purchaser.~~ The assignment of all Critical Required Contracts to the Purchaser shall have been completed ~~and~~either pursuant to the Change of Control Consents ~~shall have been obtained~~or the Assignment Order, provided that this condition shall not apply to any ~~Permits,~~ Change of Control Consents or Critical Required Contracts that are not in good standing, transferred or assigned solely as a result of the Purchaser's failure to pay the applicable Cure Costs.

(b) Vendors' Deliverables. The Vendors shall have executed and delivered or caused to have been executed and delivered to the Purchaser at the Closing all the documents contemplated in Section 5.2.

(c) No Breach of Representations and Warranties. Except as such representations and warranties may be affected by the occurrence of events or transactions specifically contemplated by this Agreement, each of the representations and warranties contained in Section 7.1 shall be true and correct in all material respects: (i) as of the Closing Date as if made on and as of such date; or (ii) if made as of a date specified therein, as of such date.

(d) No Breach of Covenants. The Vendors shall have performed, in all material respects, all covenants, obligations and agreements contained in this Agreement required to be performed by the Vendors on or before the Closing Date.

(e) Monitor's Certificate. The Monitor shall have provided an executed certificate of the Monitor substantially in the form attached to the Approval and Vesting Order (the "**Monitor's Certificate**") confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Vendors.

(f) Real Property.

(i) In the event that the Purchaser (A) exercises the Real Property Option with respect to the purchase of the 129 Shares, and the Purchaser is unable to obtain the required consents and approvals from the applicable Lenders or the Monitor to acquire the real property currently owned by 129 Canada, or (B) advises the Vendors and the Monitor in writing that it does not intend to exercise the Real Property Option with respect to the 129 Shares, then the Purchaser or its nominee shall have entered into a lease agreement or such other form of arrangement, ~~on terms that are not less favorable than the terms of any existing lease agreements or other existing arrangements, as is necessary to allow the~~consistent with the Approved Lease Terms, for the property municipally known as 1943 & 1945 55e Avenue, Dorval, Quebec.

(ii) The Purchaser or its nominee ~~to continue to use~~shall have entered into an access or parking agreement with 207 Ontario for the use by the Purchaser of the real property municipally known as 10862 Steeles Ave E., Milton, Ontario, currently ~~owned~~held by ~~129 Canada for a period of twelve (12) months at fair market~~

Case 24-10632-CTG    Doc 280-3    Filed 10/29/24    Page 392 of 481

– 28 –

value rents, with an option to extend such lease for an additional twelve months on consent of 129 Canada and the Purchaser, and an at will termination provision in favour of the landlord of not more than 60 days notice.  In addition, the207 Ontario in a manner consistent with the existing use of such property by the Vendors, consistent with the Approved Lease Terms;

(iii)    The Purchaser or its nominee shall have entered into a lease with each of 207 Ontario and 933 Helena for the continued use of the real property municipally known as 933 Helena Street, Fort Erie, Ontario, currently held by each of them for a period of twelve (12) months at fair market value rents, with an option to extend such lease for an additional twelve months on consent of 207 Ontario and 933 Helena, respectively933 Helena, consistent with the Approved Lease Terms.

(iv)    Without limiting Section 6.2(a), and the Purchaser, and an at will termination provision in favour of shall be entitled to the continued use of the real property municipally known as 6050 Dixie Road, Mississauga, Ontario, currently used by the PGL Vendors, on existing lease terms for the duration of the existing lease, and the Vendors shall have obtained a Change of Control Consent from the 6050 Dixie Road landlord of not more than 60 days notice.  In addition, or Assignment Order in respect thereof.

(v)    Without limiting Section 6.2(a), the Purchaser shall be entitled to the continued use of the real property municipally known as 6253 Boundary Road, Cornwall, ON, currently used by the PGL Vendors at 6050 Dixie Road, Mississauga, ON, on existing lease terms for the duration of the existing lease, and the Vendors shall have obtained a Change of Control Consent from the Landlord6253 Boundary Road landlord, or Assignment Order in respect thereof.

The foregoing conditions are for the exclusive benefit of the Purchaser. Any condition in this Section 6.2 may be waived by the Purchaser in whole or in part, without prejudice to any of its rights of termination in the event of non-fulfillment of any other condition in whole or in part. Any such waiver shall be binding on the Purchaser only if made in writing. If any condition set out in this Section 6.2 is not satisfied or performed by the Closing Date, the Purchaser may elect on written notice to the Vendors to terminate this Agreement.

**6.3    Conditions Precedent in Favour of the Vendors**

The obligation of the Vendors to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)    Purchaser's Deliverables. The Purchaser shall have executed and delivered or caused to have been executed and delivered to the Vendors at the Closing all the documents and payments contemplated in Section 5.3.

(b)    No Breach of Representations and Warranties. Each of the representations and warranties contained in Section 7.2 shall be true and correct in all material respects (i) as of the Closing Date as if made on and as of such date, or (ii) if made as of a date specified therein, as of such date.

(c)    <u>No Breach of Covenants.</u> The Purchaser shall have performed in all material respects all covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(d)    <u>Monitor's Certificate.</u> The Monitor shall have provided an executed copy of the Monitor's Certificate confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Vendors.

The foregoing conditions are for the exclusive benefit of the Vendors. Any condition in this Section 6.3 may be waived by the Vendors in whole or in part, without prejudice to any of their rights of termination in the event of non-fulfilment of any other condition in whole or in part. Any such waiver shall be binding on the Vendors only if made in writing. If any condition set forth in this Section 6.3 is not satisfied or performed by the Closing Date, the Vendors may elect on written notice to the Purchaser to terminate the Agreement.

**ARTICLE 7**
**REPRESENTATIONS AND WARRANTIES**

**7.1    Representations and Warranties of the Vendors**

The Vendors hereby jointly and severally represent and warrant as of the ~~date hereof~~Effective Date and as of the Closing Time as follows, and acknowledge that the Purchaser is relying on such representations and warranties in connection with entering into this Agreement and performing its obligations hereunder:

(a)    <u>Incorporation and Status.</u> The Vendors are corporations incorporated and existing under the *Business Corporations Act* (Ontario), are in good standing under such act and have the power and authority to enter into, deliver and perform their obligations under this Agreement.

(b)    <u>Corporate Authorization.</u> The execution, delivery and, subject to obtaining the Approval and Vesting Order and Assignment Order in respect of the matters to be approved therein, performance by the Vendors of this Agreement has been authorized by all necessary corporate action on the part of the Vendors.

(c)    <u>Execution and Binding Obligation.</u> This Agreement has been duly executed and delivered by the Vendors and constitutes a legal, valid and binding obligation of the Vendors, enforceable against them in accordance with its terms, subject only to obtaining the Approval and Vesting Order, the Assignment Order, ~~[and, if applicable,~~ the U.S. Approval Order~~]~~.

(d)    <u>Proceedings.</u> There are no proceedings pending against the Vendors, or any of them, or, to the knowledge of the Vendors, threatened, with respect to, or in any manner affecting, title to the Purchased Assets, which would reasonably be expected to enjoin, delay, restrict or prohibit the transfer of all or any part of the Purchased Assets as contemplated by this Agreement or which would reasonably be expected to delay, restrict or prevent the Vendors from fulfilling any of their obligations set forth in this Agreement, provided that the Approval and Vesting Order is granted.

(e)    <u>No Consents or Authorizations.</u> Subject only to obtaining the Approval and Vesting Order, the Assignment Order and, to the extent applicable, the U.S. Approval Order, the Vendors do not require any consent, approval, waiver or other Authorization from any Governmental Authority as a condition to the lawful completion of the Transaction.

– 30 –

(f)     Residency. None of the Vendors (other than PGL USA and PFS USA) is a non-resident of Canada for purposes of the ITA.

(g)     No Other Agreements to Purchase. Except for the Purchaser's rights under this Agreement, no Person has any contractual right, option or privilege for the purchase or acquisition from the Vendors of any of the Purchased Assets.

**7.2     Representations and Warranties of the Purchaser**

The Purchaser hereby represents and warrants to and in favour of the Vendors as of the ~~date hereof~~Effective Date and as of the Closing Time, and acknowledges that, the Vendors are relying on such representations and warranties in connection with entering into this Agreement and performing their obligations hereunder:

(a)     Incorporation and Status. The Purchaser is a corporation incorporated and existing under the laws of the Province of Ontario as of the date hereof, is in good standing under such act and has the power and authority to enter into, deliver and perform their obligations under this Agreement.

(b)     Corporate Authorization. The execution, delivery and performance by the Purchaser of this Agreement has been authorized by all necessary corporate action on the part of the Purchaser.

(c)     No Conflict. The execution, delivery and performance by the Purchaser of this Agreement do not (or would not with the giving of notice, the lapse of time, or both, or the happening of any other event or condition) result in a breach or a violation of, or conflict with, or allow any other Person to exercise any rights under, any terms or provisions of the Organizational Documents of the Purchaser.

(d)     Execution and Binding Obligation. This Agreement has been duly executed and delivered by the Purchaser and constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms subject only to the Approval and Vesting Order, the Assignment Order and, to the extent applicable, the U.S. Approval Order.

(e)     Proceedings. There are no proceedings pending, or to the knowledge of the Purchaser, threatened, against the Purchaser before any Governmental Authority, which prohibit or seek to enjoin delay, restrict or prohibit the Closing of the Transaction, as contemplated by this Agreement, or which would reasonably be expected to delay, restrict or prevent the Purchaser from fulfilling any of its obligations set forth in this Agreement.

(f)     Residency. The Purchaser is not a non resident of Canada within the meaning of section 116 of the ITA.

(g)     Sanctions Not Applicable. None of the Purchaser, any of its subsidiaries or, to the knowledge of the Purchaser, any director, officer, agent, employee, Affiliate or representative of the Purchaser or any of its subsidiaries is, or is controlled or 50% or more owned by or is acting on behalf of, an individual or entity ("**Person**") currently the subject of  applicable economic sanctions including those administered or enforced by the government of Canada, the United States of America (collectively, "**Sanctions**"). None of the Purchaser or any of its subsidiaries is located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions.  To the Purchaser's knowledge, neither it nor any of its subsidiaries has engaged in any dealings

or transactions with or for the benefit of a Person subject to Sanctions. The Purchaser has procedures and policies in place designed to ensure compliance with Sanctions.

(h)    <u>Equity Financing.</u> The Purchaser has obtained not less than $5,000,000 in equity financing.

(i)    <u>GST/HST Registration</u>.    The Purchaser is registered for goods and services tax/harmonized sales tax (GST/HST) purposes under Part IX of the *Excise Tax Act* (Canada), and its registration number is 766551022. The Purchaser will be registered effective on the Closing Date for Quebec sales tax (QST) purposes under Title I of *an Act respecting the Quebec sales tax.*

## 7.3    Transfer of Title; Conveyance of Assets

Subject to the conditions relating to leases set out in Section 6.2 above, the Purchaser is responsible for transferring any physical Purchased Assets (including specifically, any Equipment owned by the Vendors) as soon as practicable following Closing situated on any real properties owned or leased by the Vendors that are not acquired by the Purchaser pursuant to the Transaction.

## 7.4    "As is, Where is"

(1)    The Purchaser acknowledges and agrees that it is purchasing the Purchased Assets on an "as is, where is" basis, and without representations or warranties of any kind, nature, or description by the Monitor, the CRO, the Vendors or any of their respective agents, advisors or estates, and on the basis that the Purchaser has conducted to its satisfaction an independent inspection, investigation and verification of the Purchased Assets (including a review of title), and all other relevant matters and has determined to proceed with the transaction contemplated herein and will accept the same at the Closing Time in their then current state, condition, location, and amounts, provided, however, that the Purchaser shall not be required to accept any Equipment or other property that has been lost, damaged or destroyed due to theft, fire, collision, vandalism or other calamity <u>and</u> for which insurance proceeds are not available to repair or replace such Equipment (the "**Wrecked Equipment**"), in which case such Wrecked Equipment will be deemed not to have been received by the Purchaser and the Purchaser shall be entitled to a reduction of the Purchase Price in accordance with Section 3.10.

(2)    No representation, warranty or condition whether statutory (including under the *Sale of Goods Act* (Ontario), the International Sale of Goods *Contracts Convention Act* (Canada) and the *International Sale of Goods Act* (Ontario) or any international equivalent act which may be applicable to the subject matter pursuant to the provisions of this Agreement, including but not limited to the United Nations Convention on Contracts for the International Sale of Goods), or express or implied, oral or written, legal, equitable, conventional, collateral, arising by custom or usage of trade, or otherwise is or will be given by the Vendors or the Monitor including as to title, outstanding liens or encumbrances, description, fitness for purpose, merchantability, merchantable quality, quantity, condition (including physical and environmental condition), suitability, durability, assignability, or marketability thereof or any other matter or thing whatsoever, and all of the same are expressly excluded and disclaimed and any rights pursuant to such statutes have been waived by the Purchaser. The Purchaser acknowledges and agrees that it has relied entirely and solely on its own investigations as to the matters set out above and in determining to purchase the Purchased Assets pursuant to this Agreement.

(3)    The description of the Purchased Assets contained herein is for the purpose of identification only and the inclusion of any item in such description does not confirm the existence of any such items or that any such item is owned by the Vendors.  No representation, warranty or condition has been given by the Vendors, CRO or the Monitor concerning the completeness or accuracy of such descriptions and the Purchaser acknowledges and agrees that any other representation, warranty, statements of any kind or

nature, express or implied, (including any relating to the future or historical financial condition, results of operations, prospects, assets or liabilities of the Vendors or the quality, quantity or condition of the Purchased Assets) are specifically disclaimed by the Vendors.

(4)     Any documents, materials and information provided by the Vendors, CRO or Monitor to the Purchaser with respect to the Purchased Assets (including any confidential information memorandums, management presentations, or material made available in the electronic data room) have been provided to the Purchaser solely to assist the Purchaser in undertaking its own due diligence, and the Vendors, CRO and/or Monitor have not made and are not making any representations or warranties, implied or otherwise, to or for the benefit of the Purchaser as to the accuracy and completeness of any such documents, materials or information or the achievability of any valuations, estimates or projections.  The Purchaser acknowledges that it has not and will not rely upon any such documents, materials or information in any manner, whether as a substitute for or supplementary to its own due diligence, searches, inspections and evaluations.  The Vendors, CRO and/or Monitor and their respective Affiliates, directors, officers, employees, agents and advisors shall not be liable for any inaccuracy, incompleteness or subsequent changes to any such documents, materials or information. The Purchaser further acknowledges that the use of the documents may not be possible without the Purchaser obtaining reliance or other assurances from the author of such documents directly and further that the documents may be subject to copyright or other property rights which may preclude their use by the Purchaser in whole or in part.

## ARTICLE 8
## TERMINATION

**8.1     Grounds for Termination**

This Agreement may be terminated on or prior to the Closing Date:

(a)     by the mutual written agreement of the Vendors (with the consent of the Monitor) and the Purchaser;

(b)     pursuant to Sections 6.1, 6.2 and 6.3, as applicable; or

(c)     by the Vendors (with the consent of the Monitor) or the Purchaser upon written notice to the other Parties if: (i) the Closing has not occurred by the Outside Date; or (ii) this Agreement is not approved or the Approval and Vesting Order is not granted by the Canadian Court; provided in each case that the failure to close or obtain such order, as applicable, by such deadline is not caused by any act or omission or breach of this Agreement by the Party proposing to terminate the Agreement.

**8.2     Effect of Termination.**

If this Agreement is terminated pursuant to Section 8.1, all further obligations of the Parties under this Agreement will terminate and no Party will have any Liability or further obligations hereunder; except for the provisions of Sections 9.4 (Public Announcements) and 9.10 (Governing Law).

## ARTICLE 9
## GENERAL

**9.1     Employment Matters**

(a)     The Purchaser or an affiliate thereof shall offer employment, effective on the Closing Date, to all Employees on terms and conditions which are substantially similar to the

terms and conditions that each Employee had with the Vendors, conditional on the Closing occurring and effective on the Closing Date. Purchaser shall have provided the Vendors with copies of all offers of employment for the Employees for the purposes of confirming that the proposed terms and conditions of such offers comply with this section (collectively, the "**Offers of Employment**"). Each Offer of Employment shall expressly provide that the Purchaser recognizes all employment service with the Vendors and if applicable, the Vendors' predecessors, for all purposes. Each Offer of Employment will be delivered by the Purchaser to each Employee such number of days prior to the Closing Date as Purchaser and Vendors may reasonably agree, and shall provide that the Offer of Employment will be deemed to have been accepted if it is not rejected in writing by the applicable employee no less than two (2) business days prior to the Closing Date. The Purchaser shall have advised the Vendors prior to the Closing Date of each Employee who has rejected an Offer of Employment. In the event an Employee rejects an Offer of Employment such Employee shall not be considered a Transferring Employee and the applicable Vendor shall provide written notice of termination to such Employee prior to the Closing Date, which notice shall be in form and substance satisfactory to the Monitor, acting reasonably. The Vendors shall not attempt to discourage Employees from accepting the Offers of Employment.

(b)     If the Purchaser satisfies its obligations under the section immediately above, it shall only assume and be liable for the Employee-related obligations of the Transferring Employees.

(c)     The Purchaser will establish replacement plans for the Transferring Employees that are substantially similar to the Employee benefit plans existing on the Closing Date. The Purchaser shall cause each replacement plan to recognize all employment service with the Vendors, as applicable, and if applicable, the Vendors' predecessors, of each Transferring Employee for purposes of eligibility for participating, vesting, benefit accrual and entitlement to benefits under such replacement plans.

## 9.2     Access to Books and Records

For a period of six years from the Closing Date or for such longer period as may be reasonably required for the Vendors (or any trustee in bankruptcy of the estate of any of the Vendors) to comply with Applicable Law, the Purchaser will retain all original Books and Records that are transferred to the Purchaser under this Agreement, but the Purchaser is not responsible or liable for any accidental loss or destruction of, or damage to, any such Books and Records. So long as any such Books and Records are retained by the Purchaser pursuant to this Agreement, the Vendors (and any representative, agent, former director or officer or trustee in bankruptcy of the estate of any of the Vendors, including the Monitor) has the right to inspect and to make copies (at their own expense) of them at any time upon reasonable request during normal business hours and upon reasonable notice for any proper purpose and without undue interference to the business operations of the Purchaser.

## 9.3     Notice

Any notice or other communication under this Agreement shall be in writing and may be delivered by read-receipted email, addressed:

(a)     in the case of the Purchaser, as follows:

| 1000927605 | | | Ontario | | | Inc. |
|---|---|---|---|---|---|---|
| 100 | King | Street | West, | | Suite | 3400 |
| Toronto, | | Ontario, | | M5X | | 1A4 |

Attention:                                    Aman                                    Johal
Email: aman@pridegroupenterprises.com

with a copy to:

**Bennett Jones LLP**
100 King Street West, Suite 3400
Toronto,                     Ontario,                     M5X                     1A4

Attention:        Raj        Sahni        and        Jesse        Mighton
Email: SahniR@bennettjones.com / mightonj@bennettjones.com

(b)        in the case of the Vendors, as follows to the CRO:

Attention:        Randall                                    Benson
Email:                r.benson@rcbensonconsulting.com

with a copy to:

**Thornton                     Grout                     Finnigan                     LLP**
Suite        3200,        100        Wellington        Street        West
P.        O.        Box        329,        Toronto-Dominion        Centre
Toronto,        ON                M5K        1K7

Attention:        Leanne        Williams,        Rachel        Nicholson,        Puya        Fesharaki
Email:        lwilliams@tgf.ca, rnicholson@tgf.ca, pfesharaki@tgf.ca

(c)        in each case, with a further copy to the Monitor as follows:

**Ernst                     &                     Young                     Inc.**
EY        Tower,        100        Adelaide        Street        West,
Toronto , ON M5H 0B3

Attention:        Alex Morrison, Simone Carvalho, Michael Hayes, Ross Johnson
Email:  alex.f.morrison@parthenon.ey.com; simone.carvalho@parthenon.ey.com;
Michael.Hayes@parthenon.ey.com;  ross.johnson@ca.ey.com

with a copy to:

**Blake,                     Cassels                     &                     Graydon                     LLP**
199        Bay        Street,        Suite        4000,
Toronto ON M5L 1A9

Attention:        Pam Huff, Kelly Bourassa, Chris Bur,
Email:                pam.huff@blakes.com; kelly.bourassa@blakes.com
chris.burr@blakes.com;

Any such notice or other communication, if transmitted by email before 5:00 p.m. (Toronto time) on a
Business Day, will be deemed to have been given on such Business Day, and if transmitted by email after
5:00 p.m. (Toronto time) on a Business Day, will be deemed to have been given on the Business Day

after the date of the transmission. In the case of a communication by email or other electronic means, if an autoreply is received indicating that the email is no longer monitored or in use, delivery must be followed by the dispatch of a copy of such communication pursuant to one of the other methods described above; provided however that any communication originally delivered by electronic means shall be deemed to have been given on the date stipulated above for electronic delivery.

Sending a copy of a notice or other communication to a Party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the notice or other communication to that Party. The failure to send a copy of a notice or other communication to legal counsel does not invalidate delivery of that notice or other communication to a Party. A Person may change its address for service by notice given in accordance with the foregoing and any subsequent communication must be sent to such Person at its changed address.

**9.4    Public Announcements**

The Vendors shall be entitled to disclose this Agreement to the Courts and parties in interest in the CCAA Proceedings, other than any information which the Purchaser advises the Vendors in writing as being confidential, acting reasonably, and this Agreement may be posted on the Monitor's website maintained in connection with the CCAA Proceedings at URL: http://www.ey.com/ca/pridegroup. Other than as provided in the preceding sentence or statements made in the Courts (or in pleadings filed therein) or where required to meet timely disclosure obligations of the Vendors or any of their Affiliates under Applicable Laws, the Vendors shall not issue (prior to or after the Closing) any press release or make any public statement or public communication with respect to this Agreement or the Transactions contemplated hereby without the prior consent of the other Parties, which shall not be unreasonably withheld or delayed.

**9.5    Time**

Time shall, in all respects, be of the essence hereof, provided that the time for doing or completing any matter provided for herein may be extended or abridged by an agreement in writing signed by the Parties.

**9.6    Survival**

The representations and warranties of the Parties contained in this Agreement shall not merge on Closing and the representations, warranties and covenants of the Parties contained herein to be performed after the Closing shall survive Closing and remain in full force and effect.

**9.7    Benefit of Agreement**

This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

**9.8    Entire Agreement**

This Agreement and the attached Schedules hereto constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior negotiations, understandings and agreements. This Agreement may not be amended or modified in any respect unless agreed to in writing by the Parties.

**9.9      Paramountcy**

In the event of any conflict or inconsistency between the provisions of this Agreement, and any other agreement, document or instrument executed or delivered in connection with this Transaction or this Agreement, the provisions of this Agreement shall prevail to the extent of such conflict or inconsistency.

**9.10    Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and each of the Parties irrevocably attorn to the exclusive jurisdiction of the Canadian Court, and any appellate courts of the Province of Ontario therefrom.

**9.11    Assignment**

The Purchaser cannot assign any of its rights or obligations under this Agreement without the prior written consent of the Vendors and the Monitor. Notwithstanding the foregoing, this Agreement may be assigned by the Purchaser prior to the issuance of the Approval and Vesting Order, in whole or in part (and, for greater certainty, the Purchaser may assign to one or more Permitted Assignees (as defined below) the right to purchase, in consideration for the allocable portion of the Consideration, all or any portion of the Purchased Assets hereunder), without the prior written consent of the Vendors or the Monitor, provided that: (i) such assignee is a Related Party or subsidiary of the Purchaser (a "**Permitted Assignee**"); (ii) the Purchaser provides prior notice of such assignment to the Vendors and the Monitor; and (iii) such assignee agrees in writing to be bound by the terms of this Agreement to the extent of the assignment and a copy of such assumption agreement is delivered to the Vendors and the Monitor forthwith after having been entered into; provided, however, that any such assignment shall not relieve the Purchaser of its obligations hereunder.

**9.12    Further Assurances**

Each of the Parties shall, at the request and expense of the requesting Party, take or cause to be taken such action and execute and deliver or cause to be executed and delivered to the other such conveyances, transfers, documents and further assurances as may be reasonably necessary or desirable to give effect to this Agreement.

**9.13    Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement. Transmission by e-mail of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

**9.14    Severability**

Notwithstanding any provision herein, if a condition to complete the Transaction, or a covenant or an agreement herein is prohibited or unenforceable pursuant to Applicable Law, then such condition, covenant or agreement shall be ineffective to the extent of such prohibition or unenforceability without invalidating the other provisions hereof.

**9.15    Monitor's Certificate**

The Parties acknowledge and agree that the Monitor shall be entitled to deliver to the Purchaser, and file with the Canadian Court, the executed Monitor's Certificate without independent investigation, upon

– 37 –

receiving written confirmation from both Parties (or the applicable Party's counsel) that all conditions of Closing in favour of such Party have been satisfied or waived, and the Monitor shall have no Liability to the Parties in connection therewith. The Parties further acknowledge and agree that upon written confirmation from both Parties that all conditions of Closing in favour of such Party have been satisfied or waived, the Monitor may deliver the executed Monitor's Certificate to the Purchaser's counsel in escrow, with the sole condition of its release from escrow being the Monitor's written confirmation that all such funds have been received, the Monitor's Certificate will be released from escrow to the Purchaser, and the Closing shall be deemed to have occurred.

**9.16    Monitor's Capacity**

In addition to all of the protections granted to the Monitor under the CCAA or any order of the Court in this CCAA Proceeding, the Vendors and the Purchaser acknowledge and agree that the Monitor, acting in its capacity as Monitor and not in their personal capacity, will have no Liability, in its personal capacity or otherwise, in connection with this Agreement or the Transaction contemplated herein whatsoever as Monitor.

*[Signature Page Follows]*

IN WITNESS WHEREOF the Parties have executed this Agreement as of the day and year first above written.

**1000927605 ONTARIO INC**.

By: _____

      Name:    Sulakhan Johal

      Title:    Director

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS LTD.**

By: _____

      Name:    Randy Benson

      Title:    Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS USA, CO.**

By: _____

      Name:    Randy Benson

      Title:    Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE GROUP LOGISTICS INTERNATIONAL LTD.**

By: _____

      Name:    Randy Benson

      Title:    Chief Restructuring Officer

I have authority to bind the Corporation.

**PRIDE FLEET SOLUTIONS INC.**

By: _____

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**PRIDE FLEET SOLUTIONS USA INC.**


By: _____

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**2029909 ONTARIO INC.**


By: _____

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**12944154 CANADA INC.**


By: _____

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**13184633 CANADA INC.**


By: _____

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**2837229 ONTARIO INC.**

By:  _____

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**2043002 ONTARIO INC.**

By:  _____

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.


**TPINE LEASING CAPITAL CORPORATION**

By:  _____

      Name:    Randy Benson

      Title:     Chief Restructuring Officer

I have authority to bind the Corporation.

**SCHEDULE "A"**
**FORM OF APPROVAL AND VESTING ORDER**

**[To be finalized and appended prior to Approval and Vesting Order motion]**

**SCHEDULE "B"**
**EXCLUDED ASSETS**

1.      Non-material assets sold in the Interim Period.

2.      Excluded Contracts.

3.      Accounts Receivable owed to any PGL Vendor or its subsidiaries by any member of the Pride Entities that is not a PGL Vendor.

4.      Any Cash or Cash Equivalents of PFS and PFS USA.

5.      All truck and trailer parts inventory owned by PFS **[or PFS USA]**, save and except for motor oil and other fluids and shop supplies used by PFS **[or PFS USA]** in servicing trucks and trailers and diesel exhaust fluid and diesel fuel and gasoline held in storage tanks or containers at the gas stations.

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

**SCHEDULE "C"**
**PERMITTED ENCUMBRANCES**

**[Note: Balance of schedule to be completed prior to Closing.]**

SCHEDULE "D"

**PURCHASED LETTERS OF CREDIT**

The following is a list of Purchased LCs:

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

**Letters of Credit**

| Applicant | Beneficiary | Issue Date | Cur | Amount |
|-----------|-------------|------------|-----|--------|
| PRIDE GROUP LOGISTICS LTD. | RBC INVESTOR SERVICES TRUST IN (ZURICH) | Feb/25/2022 | CAD | 1,400,000.00 |
| PRIDE GROUP LOGISTICS LTD. | LIQUOR CONTROL BOARD OF ONTARIO | Mar/31/2022 | CAD | 135,000.00 |
| PRIDE GROUP LOGISTICS LTD. | SOCIETE DES ALCOOLS DU QUEBEC | Jan/31/2023 | CAD | 137,410.00 |
| PRIDE GROUP LOGISTICS LTD. | RBC INVESTOR SERVICES TRUST IN (ZURICH) | Feb/14/2023 | CAD | 922,726.00 |
| PRIDE GROUP LOGISTICS LTD. | RBC INVESTOR SERVICES TRUST IN (ZURICH) | Feb/14/2023 | CAD | 1,467,245.00 |

**[INTENTIONALLY OMITTED]**

**SCHEDULE "E"**
**EXCLUDED CONTRACTS**

**[Note: Balance of schedule to be completed not later than 5 calendar days prior to Closing.]**

**SCHEDULE F**
**ALLOCATION STATEMENT**

| | |
|---|---|
| Vehicles (Schedule "G") | $ ~~41,098,837~~[5]43,098,837[4] |
| Acquired AR Amount (including Intercompany Receivables at nil consideration) | $9,000,000.00~~6~~5 |
| ~~Purchased LCs~~ | ~~$4,000,000.00[7]~~ |
| Tangible Property (Computers, office furniture, IT, mechanics tools, etc.) | $160,000.00 |
| Intangibles (IP, licenses, software, goodwill, Permits, license plates, Purchased Contracts, etc.) (Schedule "F") | $50,000.00 |
| PGL Insurance Shares | $1.00 |
| Inventory~~8~~6 | $100,000 |
| Prepaid Expenses | $50,000 |
| **TOTAL** | $~~54,458,838~~52,458,838 |

**[Note: This Allocation Statement is subject to adjustment in accordance with Section 3.3 of the Purchase Agreement.  The details with respect to Vehicles being purchased are set out in Schedule "G".]**

---

~~5 Subject to further adjustment in accordance with s. 3.3(e).~~

4 Subject to further adjustment in accordance with s. 3.3(c).

65 Subject to further adjustment in accordance with s. 3.3(b).

~~7 Subject to further adjustment in accordance with s. 3.1(e).~~

86 Subject to further adjustment in accordance with s. 3.3(e).

## SCHEDULE "G"

## VEHICLES

**TPine Assets**

| Make | Model | Year | VIN |
|------|-------|------|-----|
| FREIGHTLINER | CSC | 2018 | 3AKJGBDV6JDJV5185 |
| FREIGHTLINER | PEI | 2019 | 1FUJHTDV1KLKA1156 |
| FREIGHTLINER | PE1 | 2019 | 1FUJHTDV3KLKA1160 |
| FREIGHTLINER | FM2 | 2019 | 1FUJHTDV6KLKA1170 |
| FREIGHTLINER | FM2 | 2019 | 1FUJHTDV5KLKA1161 |
| UTILITY | VS2 | 2020 | 1UYVS2533L7143908 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7143909 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7143912 |
| UTILITY | VS2 | 2020 | 1UYVS2530L7143915 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143917 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143921 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143925 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143926 |
| VOLVO | VVN | 2022 | 4V4NC9EHXNN305472 |
| VOLVO | VVN | 2022 | 4V4NC9EH5NN305475 |
| VOLVO | VVN | 2022 | 4V4NC9EH9NN305477 |
| VOLVO | VVN | 2022 | 4V4NC9EH8NN305499 |
| VOLVO | VVN | 2022 | 4V4NC9EH2NN305501 |
| VOLVO | VVN | 2022 | 4V4NC9EH4NN320372 |
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR2KSKM7362 |
| WABASH | ZGP | 2019 | 1DW1A5331KBA14563 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14564 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14565 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14566 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14567 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14568 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14569 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14570 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14571 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14572 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14573 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14574 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14575 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14576 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14577 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14578 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14579 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14580 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14581 |
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14582 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14583 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14584 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14585 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14586 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14587 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14588 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14589 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14590 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14591 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14592 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14593 |
| STOUGHTON | ZGP | 2019 | 1DW1A5331KBA14594 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14595 |

| | | | |
|---|---|---|---|
| STOUGHTON | ZGP | 2019 | 1DW1A5335KBA14596 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14597 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14598 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14599 |
| STOUGHTON | ZGP | 2019 | 1DW1A5333KBA14600 |
| STOUGHTON | ZGP | 2019 | 1DW1A5337KBA14602 |
| STOUGHTON | ZGP | 2019 | 1DW1A5339KBA14603 |
| STOUGHTON | ZGP | 2019 | 1DW1A5330KBA14604 |
| STOUGHTON | ZGP | 2019 | 1DW1A5332KBA14605 |
| STOUGHTON | ZGP | 2019 | 1DW1A5334KBA14606 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14607 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14608 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14609 |
| STOUGHTON | ZGP | 2019 | 1DW1A5336KBA14610 |
| STOUGHTON | ZGP | 2019 | 1DW1A5338KBA14611 |
| STOUGHTON | ZGP | 2019 | 1DW1A533XKBA14612 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17904 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17905 |
| STOUGHTON | COM | 2019 | 1DW1A5330KEA17906 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17907 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17908 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17909 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17910 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17911 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17912 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17913 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17914 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17915 |
| STOUGHTON | COM | 2019 | 1DW1A5333KEA17916 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17917 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17918 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17919 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17920 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17921 |
| STOUGHTON | COM | 2019 | 1DW1A5339KEA17922 |
| STOUGHTON | COM | 2019 | 1DW1A5330KEA17923 |
| STOUGHTON | COM | 2019 | 1DW1A5332KEA17924 |
| STOUGHTON | COM | 2019 | 1DW1A5334KEA17925 |
| STOUGHTON | COM | 2019 | 1DW1A5336KEA17926 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17927 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17928 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17929 |
| STOUGHTON | COM | 2019 | 1DW1A5338KEA17930 |
| STOUGHTON | COM | 2019 | 1DW1A533XKEA17931 |
| STOUGHTON | COM | 2019 | 1DW1A5331KEA17932 |
| STOUGHTON | COM | 2019 | 1DW1A5333KEA17933 |
| STOUGHTON | COM | 2019 | 1DW1A5335KEA17934 |
| STOUGHTON | COM | 2019 | 1DW1A5337KEA17935 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903018 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903020 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903021 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903022 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903023 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903024 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903025 |
| VANGUARD | VXP | 2019 | 5V8VC53B6KM903026 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903027 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903028 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903029 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903030 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903031 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903032 |

| | | | |
|---|---|---|---|
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903033 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903034 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903035 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903037 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903038 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903039 |
| VANGUARD | VXP | 2019 | 5V8VC53B0KM903040 |
| VANGUARD | VXP | 2019 | 5V8VC53B2KM903041 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903042 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903049 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903050 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903051 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903052 |
| VANGUARD | VXP | 2019 | 5V8VC53B4KM903056 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903058 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903059 |
| VANGUARD | VXP | 2019 | 5V8VC53B6KM903060 |
| VANGUARD | VXP | 2019 | 5V8VC53B8KM903061 |
| VANGUARD | VXP | 2019 | 5V8VC53BXKM903062 |
| VANGUARD | VXP | 2019 | 5V8VC53B1KM903063 |
| VANGUARD | VXP | 2019 | 5V8VC53B3KM903064 |
| VANGUARD | VXP | 2019 | 5V8VC53B5KM903065 |
| VANGUARD | VXP | 2019 | 5V8VC53B7KM903066 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903067 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30640 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30641 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30642 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30643 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30644 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30645 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30646 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30647 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30648 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30649 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30650 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30651 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30652 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30653 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30654 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30655 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30656 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30657 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30660 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30661 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30662 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30663 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30664 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30665 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30666 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30667 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30668 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30669 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30670 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30671 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30672 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30673 |
| STOUGHTON | COM | 2019 | 1DW1A5332KBA30674 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30675 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30676 |
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30677 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30678 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30679 |

| | | | |
|---|---|---|---|
| STOUGHTON | COM | 2019 | 1DW1A5338KBA30680 |
| STOUGHTON | COM | 2019 | 1DW1A533XKBA30681 |
| STOUGHTON | COM | 2019 | 1DW1A5331KBA30682 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30683 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30684 |
| GREAT DANE | ETL | 2015 | 1GRAA062XFB700007 |
| UTILITY | VS2 | 2018 | 1UYVS2532GM381420 |
| UTILITY | N/A | 2019 | 1UYVS2535K6740918 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14836 |
| WANC | RFA | 2014 | 1JJV532B1HL008360 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6884720 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6840805 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6840806 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6840808 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6915027 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6915028 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6915029 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6840831 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6840842 |
| UTILITY | N/A | 2020 | 1UYVS253L6914929 |
| UTILITY | N/A | 2020 | 1UYVS2537L6914943 |
| UTILITY | N/A | 2020 | 1UYVS2532L6914946 |
| UTILITY | N/A | 2020 | 1UYVS2534L6914947 |
| UTILITY | N/A | 2020 | 1UYVS2534L6914950 |
| UTILITY | VS2 | 2019 | 1UYVS253XK6538527 |
| UTILITY | UTIL | 2019 | 1UYVS2532K6538523 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6258505 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6914935 |
| UTILITY | N/A | 2019 | 1UYVS2535L7837015 |
| STRI | S75 | 2018 | 1S12E9532JE536500 |
| STRI | S75 | 2018 | 1S12E9534JE536482 |
| EAST | S75 | 2018 | 1S12E9537JE536489 |
| STRI | S75 | 2018 | 1S12E9531JE536486 |
| DIMN | FV | 2018 | 2DM421A45JB157402 |
| UTILITY | S75 | 2018 | 1S12E9536JE536483 |
| UTILITY | N/A | 2020 | 1UYVS2531L7143910 |
| UTILITY | N/A | 2020 | 1UYVS2532L7143916 |
| CIMC | N/A | 2018 | 527SR5320JM012662 |
| CIMC | N/A | 2018 | 527SR5324JM012597 |
| CIMC | N/A | 2018 | 527SR5326JM012598 |
| CIMC | N/A | 2018 | 527SR5326JM012665 |
| CIMC | N/A | 2018 | 527SR5322JM012663 |
| UTILITY | VS3 | 2020 | 1UYVS3536L6884601 |
| UTILITY | VS3 | 2020 | 1UYVS3538L6884602 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884604 |
| UTILITY | VS3 | 2020 | 1UYVS3533L6884605 |
| UTILITY | VS3 | 2020 | 1UYVS3535L6884606 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884607 |
| UTILITY | VS3 | 2020 | 1UYVS3539L6884608 |
| UTILITY | VS3 | 2020 | 1UYVS3530L6884609 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884610 |
| UTILITY | 2020 | 2020 | 1UYVS3539L6884611 |
| UTILITY | VS3 | 2020 | 1UYVS3530L6884612 |
| UTILITY | VS3 | 2020 | 1UYVS3532L6884613 |
| UTILITY | VS3 | 2020 | 1UYVS3534L6884614 |
| UTILITY | VS3 | 2020 | 1UYVS3538L6884616 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884617 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884618 |
| UTILITY | VS3 | 2020 | 1UYVS3533L6884619 |
| UTILITY | VS3 | 2020 | 1UYVS3531L6884621 |
| UTILITY | VS3 | 2020 | 1UYVS3535L6884623 |
| UTILITY | VS3 | 2020 | 1UYVS3537L6884624 |

| | | | |
|---|---|---|---|
| UTILITY | VS3 | 2020 | 1UYVS3539L6884625 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884620 |
| UTILITY | VS3 | 2020 | 1UYVS353XL6884603 |
| UTILITY | VS3 | 2020 | 1UYVS3536L6884615 |
| UTILITY | VS2 | 2014 | 1UYVS2535EM774258 |
| STOU | N/A | 2017 | 1DW1A532XHB699224 |
| STOUGHTON | STOU | 2016 | 1DW1A53246B703721 |
| WABASH | N/A | 2023 | 1JJV532D1PL328715 |
| UTILITY | VS2 | 2020 | 1UYVS2538L7143919 |
| UTILITY | VS2 | 2020 | 1UYVS2537L7143913 |
| UTILITY | N/A | 2014 | 1UYVS2531EM774533 |
| UTILITY | N/A | 2014 | 1UYVS253XEM774515 |
| UTILITY | VS2 | 2014 | 1UYVS2535EU772851 |
| UTILITY | VS2 | 2014 | 1UYVS2530EU772708 |
| UTILITY | VS2 | 2014 | 1UYVS2537EU772821 |
| UTILITY | VS2 | 2014 | 1UYVS2535EM774521 |
| GREAT DANE | TT | 2011 | 1GRAA0623BW702135 |
| GREAT DANE | TT | 2011 | 1GRAA0629BW702110 |
| UTILITY | VS2 | 2012 | 1UYVS2539CM470007 |
| UTILITY | VS2 | 2015 | 1UYVS2531FM078109 |
| UTILITY | VS2 | 2014 | 1UYVS535EM773949 |
| UTILITY | VS2 | 2011 | 1UYVS2538CU468846 |
| UTILITY | VS2 | 2014 | 1UYVS2537CM469910 |
| HYUNDAI | N/A | 2012 | 3H3V533C3CT298004 |
| UTILITY | TL | 2020 | 1UYVS2531L7143924 |
| UTILITY | VS2 | 2020 | 1UYVS2533L7143911 |
| UTILITY | N/A | 2019 | 1UYVS2538K7533319 |
| UTILITY | VS2 | 2020 | 1UYVS2536L7143904 |
| UTILITY | VS2 | 2020 | 1UYVS2539L7143914 |
| UTILITY | VS2 | 2020 | 1UYVS2536L7143918 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143920 |
| UTILITY | VS2 | 2020 | 1UYVS2534L7143922 |

## PGL Assets

| Make | Model | Year | VIN |
|---|---|---|---|
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F70RPUX9509 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F70RPUX9512 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F71RPNP1888 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F72RPUX9513 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F75RPUX9506 |
| FREIGHTLINER | ECASCADIA | 2024 | 1FUJH4F76RPUX9515 |
| FREIGHTLINER | ECASC | 2024 | 1FUJH4F77RPUX9507 |
| FREIGHTLINER | ECASCADIA | 2024 | 1FUJH4F78RPUX9516 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR1LLLA0402 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR1NLMW8595 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR2LLLA0408 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR2NLMW8590 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR3NLMW8596 |
| FREIGHTLINER | FRHT | 2022 | 1FUJHHDR3NLMW8890 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR4NLMW8591 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHHDR5MLML4450 |

| | | | |
|---|---|---|---|
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR5NLMW8597 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR6NLMW8589 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR6NLMW8592 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR7LLLA0405 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR7NLMW8598 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR8LLLA0400 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDR8NLMW8593 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHHDR9LLLA0406 |
| FREIGHTLINER | FM2 | 2022 | 1FUJHHDRXNLMW8594 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR0LLKU7313 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR0LLKU7375 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR2LLKU7300 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR2LLKU7314 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR2MLMM2136 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7301 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7377 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR4LLKU7380 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR4MLMM2137 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR5LLKU7310 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR5MLMA7585 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7302 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7378 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR6LLKU7381 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR7LLKU7311 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHLDR7MLMA7586 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR8LLKU7303 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR8LLKU7379 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR9LLKU7312 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDR9MLMA7587 |
| FREIGHTLINER | FM2 | 2020 | 1FUJHLDRXLLKU7304 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV0MLMA7667 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV3MLML4446 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV5MLMA7664 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV5MLML4447 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV7MLMA7665 |
| FREIGHTLINER | FM2 | 2021 | 1FUJHTDV9MLMA7666 |
| KENWORTH | CON | 2020 | 1XKZD49X1LJ960840 |
| KENWORTH | CON | 2020 | 1XKZD49X3LJ960841 |
| KENWORTH | CON | 2020 | 1XKZD49X5LJ960839 |
| KENWORTH | CON | 2020 | 1XKZD49X5LJ960842 |
| KENWORTH | CON | 2020 | 1XKZD49X7LJ960843 |
| PETERBILT | 579 | 2023 | 1XPBAL9X0PD793437 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR0PSUP5013 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR0PSUP5027 |

| | | | |
|---|---|---|---|
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSUU3259 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSUU3262 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR0RSVA3178 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR0RSVA3181 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR0RSVG7513 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR1PSUP5019 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR1PSUP5022 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR1RSUU3383 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR1RSVA3240 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5000 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5014 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5028 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR2PSUP5031 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR2RSVA3179 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR2RSVA3182 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR2RSVG7514 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR3PSUP5006 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR3PSUP5023 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSUU3384 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSVA3238 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR3RSVA3241 |
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR4KSKM7301 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP4995 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5001 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5015 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR4PSUP5029 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR4RSUU3376 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR4RSVG7515 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP4990 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR5PSUP5007 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP5010 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR5PSUP5024 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSUU3385 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSVA3239 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR5RSVA3242 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR6PSUP4996 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR6PSUP5002 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR6RSUU3220 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR6RSUU3377 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR6RSUU3380 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR6RSVG7516 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR7PSUP5008 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR7PSUP5011 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR7RSUU3257 |

| | | | |
|---|---|---|---|
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR7RSUU3260 |
| FREIGHTLINER | FM2 | 2019 | 3AKJHHDR8KSKM7303 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR8PSUP4997 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR8PSUP5003 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR8PSUP5020 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3218 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3221 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3378 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR8RSUU3381 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR8RSVG7517 |
| FREIGHTLINER | PT1 | 2023 | 3AKJHHDR9PSUP4992 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5009 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5012 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDR9PSUP5026 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSUU3258 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSUU3261 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDR9RSVA3180 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDR9RSVG7512 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP4998 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5004 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5018 |
| FREIGHTLINER | FM2 | 2023 | 3AKJHHDRXPSUP5021 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3253 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3379 |
| FREIGHTLINER | PT1 | 2024 | 3AKJHHDRXRSUU3382 |
| FREIGHTLINER | FM2 | 2024 | 3AKJHHDRXRSVG7518 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR0MSMA7580 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR1MSMA7605 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR2MSMA7581 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR3MSMA7606 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR4MSMA7579 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR4MSMA7582 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR5MSMA7607 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR6MSMA7583 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR7MSMA7608 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR8MSMA7584 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDR8MSMA7603 |
| FREIGHTLINER | FM2 | 2021 | 3AKJHLDRXMSMA7604 |
| FREIGHTLINER | CASC | 2019 | 3AKJHTDV5KSKA1178 |
| FREIGHTLINER | 116 | 2019 | 3AKJHTDV7KSKA1179 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPA1PN527730 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPA4PN527771 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR0PN526008 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR1PN557610 |

| | | | |
|---|---|---|---|
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN121888 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN443561 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR3PN527766 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR4PN580704 |
| INTERNATIONAL | LT | 2023 | 3HSDZAPR5PN492650 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPR5PN527767 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR5PN557612 |
| INTERNATIONAL | LT 625 | 2023 | 3HSDZAPR5PN563622 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR6PN527731 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR6PN580705 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR7PN443580 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN121109 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN121885 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR8PN527729 |
| INTERNATIONAL | LT6 | 2023 | 3HSDZAPR8PN580706 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN443581 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN492635 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN527769 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN527772 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN563624 |
| INTERNATIONAL | LT625 | 2023 | 3HSDZAPR9PN569133 |
| VOLVO | VNL | 2022 | 4V4NC9EH0NN305476 |
| VOLVO | VVN | 2021 | 4V4NC9EH4MN272886 |
| VOLVO | VVN | 2021 | 4V4NC9EH6MN272887 |
| VOLVO | VVN | 2022 | 4V4NC9EH9NN320383 |
| VOLVO | ARO | 2021 | 4V4WC9EG0MN281824 |
| VOLVO | ARO | 2021 | 4V4WC9EG2MN281825 |
| VOLVO | ARO | 2021 | 4V4WC9EG4MN281826 |
| VOLVO | ARO | 2021 | 4V4WC9EG7MN281822 |
| VOLVO | ARO | 2021 | 4V4WC9EG9MN281823 |
| VOLVO | ARO | 2019 | 4V4WC9EH0KN192955 |
| VOLVO | ARO | 2022 | 4V4WC9EH0NN292686 |
| VOLVO | ARO | 2019 | 4V4WC9EH2KN192956 |
| VOLVO | ARO | 2022 | 4V4WC9EH2NN292673 |
| VOLVO | ARO | 2022 | 4V4WC9EH2NN292687 |
| VOLVO | ARO | 2019 | 4V4WC9EH4KN192957 |
| VOLVO | ARO | 2022 | 4V4WC9EH4NN292688 |
| VOLVO | ARO | 2022 | 4V4WC9EH6NN292689 |
| VOLVO | ARO | 2019 | 4V4WC9EH7KN192953 |
| VOLVO | ARO | 2022 | 4V4WC9EH7NN292670 |
| VOLVO | ARO | 2019 | 4V4WC9EH8KN192962 |
| VOLVO | ARO | 2022 | 4V4WC9EH9NN292671 |
| VOLVO | ARO | 2022 | 4V4WC9EH9NN292685 |
| UTILITY | N/A | 2019 | 1UYVS2539K7562215 |

| WANC | VS2 | 2020 | 1UYVS2537L7876432 |
|------|-----|------|-------------------|
| WANC | DVC | 2023 | 1JJV532DXPL361129 |
| WANC | WANC | 2023 | 1JJV532D6PL361130 |
| WANC | DVC | 2023 | 1JJV532D8PL361131 |
| UTILITY | VS2 | 2023 | 1JJV532DXPL361132 |
| WANC | DVC | 2023 | 1JJV532D1PL361133 |
| WANC | DVC | 2023 | 1JJV532D3PL361134 |
| WANC | DVC | 2023 | 1JJV532D5PL361135 |
| WANC | DVC | 2023 | 1JJV532D7PL361136 |
| WANC | DVC | 2023 | 1JJV532D9PL361137 |
| WANC | DVC | 2023 | 1JJV532D0PL361138 |
| WANC | DVC | 2023 | 1JJV532D2PL361139 |
| WANC | DVC | 2023 | 1JJV532D9PL361140 |
| WANC | DVC | 2023 | 1JJV532D0PL361141 |
| WANC | DVC | 2023 | 1JJV532D2PL361142 |
| WANC | DVC | 2023 | 1JJV532D4PL361143 |
| WANC | DVC | 2023 | 1JJV532D6PL361144 |
| WANC | DVC | 2023 | 1JJV532D8PL361145 |
| WANC | DVC | 2023 | 1JJV532DXPL361146 |
| WANC | DVC | 2023 | 1JJV532D1PL361147 |
| WANC | DVC | 2023 | 1JJV532D3PL361148 |
| WANC | DVC | 2023 | 1JJV532D5PL361149 |
| WANC | DVC | 2023 | 1JJV532D1PL361150 |
| WANC | DVC | 2023 | 1JJV532D3PL361151 |
| WANC | DVC | 2023 | 1JJV532D5PL361152 |
| WANC | DVC | 2023 | 1JJV532D7PL361153 |
| WANC | DVC | 2023 | 1JJV532D9PL361154 |
| WANC | DVC | 2023 | 1JJV532D0PL361155 |
| WANC | DVC | 2023 | 1JJV532D2PL361156 |
| WANC | DVC | 2023 | 1JJV532D4PL361157 |
| WANC | DVC | 2023 | 1JJV532D6PL361158 |
| WANC | DVC | 2023 | 1JJV532D8PL361159 |
| WANC | DVC | 2023 | 1JJV532D4PL361160 |
| WANC | DVC | 2023 | 1JJV532D6PL361161 |
| WANC | DVC | 2023 | 1JJV532D8PL361162 |
| WANC | DVC | 2023 | 1JJV532DXPL361163 |
| WANC | DVC | 2023 | 1JJV532D1PL361164 |
| WANC | DVC | 2023 | 1JJV532D3PL361165 |
| WANC | DVC | 2023 | 1JJV532D5PL361166 |
| WANC | DVC | 2023 | 1JJV532D7PL361167 |
| WANC | DVC | 2023 | 1JJV532D9PL361168 |
| MANAC | 942 | 2023 | 2M5921610P1215253 |
| MANAC | 942 | 2023 | 2M5921612P1215254 |
| MANAC | 942 | 2023 | 2M5921614P1215255 |

| | | | |
|---|---|---|---|
| MANAC | 942 | 2023 | 2M5921616P1215256 |
| MANAC | 942 | 2023 | 2M5921618P1215257 |
| MANAC | 942 | 2023 | 2M592161XP1215258 |
| MANAC | 942 | 2023 | 2M5921611P1215259 |
| MANAC | 942 | 2023 | 2M5921618P1215260 |
| MANAC | 942 | 2023 | 2M592161XP1215261 |
| MANAC | 942 | 2023 | 2M592161XP1215262 |
| MANAC | 942 | 2023 | 2M5921613P1215263 |
| MANAC | 942 | 2023 | 2M5921615P1215264 |
| MANAC | 942 | 2023 | 2M5921617P1215265 |
| MANAC | 942 | 2023 | 2M5921619P1215266 |
| MANAC | 942 | 2023 | 2M5921610P1215267 |
| MANAC | 942 | 2023 | 2M5921612P1215268 |
| MANAC | 942 | 2023 | 2M5921614P1215269 |
| MANAC | 942 | 2023 | 2M5921610P1215270 |
| MANAC | 942 | 2023 | 2M5921612P1215271 |
| MANAC | 942 | 2023 | 2M5921614P1215272 |
| STOUGHTON | AVW | 2017 | 1DW1A5337HS699304 |
| STOUGHTON | AVW | 2017 | 1DW1A5332HS699307 |
| STOUGHTON | AVW | 2017 | 1DW1A5330HS699306 |
| STOUGHTON | AVW | 2017 | 1DW1A5335HS699303 |
| STOUGHTON | AVW | 2017 | 1DW1A5332HS699310 |
| STOUGHTON | AVW | 2017 | 1DW1A5336HS699309 |
| STOUGHTON | AVW | 2017 | 1DW1A5334HS699311 |
| STOUGHTON | AVW | 2017 | 1DW1A5334HS699308 |
| STOUGHTON | AVW | 2017 | 1DW1A5339HS699305 |
| MANAC | 94353A321 | 2017 | 2M5931615H1163715 |
| MANAC | 94353A321 | 2017 | 2M593161XH1163712 |
| MANAC | 94353A321 | 2017 | 2M5931618H1163711 |
| MANAC | N/A | 2017 | 2M5931613H1163714 |
| STOUGHTON | AVW | 2017 | 1DW1A5333HS699302 |
| MANAC | N/A | 2017 | 2M5931611H1163713 |
| GREAT DANE | CS1 | 2016 | 1GRAA0635GB705741 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705744 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705743 |
| GREAT DANE | CS1 | 2016 | 1GRAA0637GB705742 |
| MANAC | 943 | 2017 | 2M5931614H1161812 |
| MANAC | 943 | 2017 | 2M5931612H1161811 |
| MANAC | 943 | 2017 | 2M5931618H1161814 |
| MANAC | 943 | 2017 | 2M593161XH1161815 |
| MANAC | 943 | 2017 | 2M5931611H1161816 |
| MANAC | 943 | 2017 | 2M5931616H1161813 |
| MANAC | 943 | 2017 | 2M5931613H1161817 |
| GREAT DANE | CS1 | 2016 | 1GRAA063XGB705752 |

| | | | |
|---|---|---|---|
| GREAT DANE | CS1 | 2016 | 1GRAA063XGB705749 |
| GREAT DANE | CS1 | 2016 | 1GRAA0637GB705756 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705750 |
| GREAT DANE | CS1 | 2016 | 1GRAA0635GB705755 |
| GREAT DANE | CS1 | 2016 | 1GRAA0633GB705754 |
| GREAT DANE | CS1 | 2016 | 1GRAA0638GB705751 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705747 |
| GREAT DANE | CS1 | 2016 | 1GRAA0632GB705759 |
| GREAT DANE | CS1 | 2016 | 1GRAA0633GB705746 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705757 |
| GREAT DANE | CS1 | 2016 | 1GRAA0639GB705760 |
| GREAT DANE | CSE | 2016 | 1GRAA0638GB705748 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705758 |
| GREAT DANE | CS1 | 2016 | 1GRAA0631GB705753 |
| GREAT DANE | CS1 | 2016 | 1GRAA0634GB705763 |
| GREAT DANE | CS1 | 2016 | 1GRAA0636GB705764 |
| GREAT DANE | CS1 | 2016 | 1GRAA0638GB705765 |
| GREAT DANE | CS1 | 2016 | 1GRAA0630GB705761 |
| GREAT DANE | CS1 | 2016 | 1GRAA0632GB705762 |
| STOUGHTON | ZGP | 2018 | 1DW1A5338JS773108 |
| STOUGHTON | ZGP | 2018 | 1DW1A533XJS773109 |
| STOUGHTON | ZGP | 2018 | 1DW1A5337JS773102 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335JS773101 |
| GREAT DANE | CS1 | 2018 | 1GRAA0637JB700872 |
| STOUGHTON | ZGP | 2018 | 1DW1A5331JS773113 |
| STOUGHTON | ZGP | 2018 | 1DW1A533XJS773112 |
| GREAT DANE | CS1 | 2018 | 1GRAA0635JB700871 |
| STOUGHTON | ZGP | 2018 | 1DW1A5330JS773104 |
| STOUGHTON | ZGP | 2018 | 1DW1A5339JS773103 |
| STOUGHTON | ZGP | 2018 | 1DW1A5333JS773114 |
| STOUGHTON | ZGP | 2018 | 1DW1A5334JS773106 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335JS773115 |
| STOUGHTON | ZGP | 2018 | 1DW1A5336JS773110 |
| STOUGHTON | ZGP | 2018 | 1DW1A5338JS773111 |
| STOUGHTON | ZGP | 2018 | 1DW1A5336JS773107 |
| UTILITY | VS3 | 2017 | 1UYVS3534HG835611 |
| UTILITY | VS3 | 2017 | 1UYVS3531HG835601 |
| UTILITY | VS2 | 2017 | 1UYVS3533HG835602 |
| UTILITY | VS3 | 2017 | 1UYVS3536HG835612 |
| UTILITY | VS3 | 2017 | 1UYVS3538HG835613 |
| UTILITY | VS3 | 2017 | 1UYVS353XHG835614 |
| UTILITY | VS3 | 2017 | 1UYVS3531HG835615 |
| UTILITY | VS3 | 2017 | 1UYVS3535HG835603 |
| VANGUARD | VXP | 2018 | 5V8VC53B2JM806498 |

| | | | |
|---|---|---|---|
| VANGUARD | VXP | 2018 | 5V8VC53B4JM806499 |
| VANGUARD | VXP | 2018 | 5V8VC53B9JM806501 |
| VANGUARD | VXP | 2018 | 5V8VC53B0JM806502 |
| VANGUARD | VXP | 2018 | 5V8VC53B2JM806503 |
| VANGUARD | VXP | 2018 | 5V8VC53B4JM806504 |
| VANGUARD | VXP | 2018 | 5V8VC53B6JM806505 |
| VANGUARD | VXP | 2018 | 5V8VC53B8JM806506 |
| VANGUARD | VXP | 2018 | 5V8VC53BXJM806507 |
| STOUGHTON | ZGP | 2018 | 1DW1A5335KBA14601 |
| VANGUARD | VXP | 2019 | 5V8VC53B9KM903019 |
| STOUGHTON | COM | 2019 | 1DW1A5333KBA30635 |
| STOUGHTON | COM | 2019 | 1DW1A5335KBA30636 |
| STOUGHTON | COM | 2019 | 1DW1A5337KBA30637 |
| STOUGHTON | COM | 2019 | 1DW1A5339KBA30638 |
| STOUGHTON | COM | 2019 | 1DW1A5330KBA30639 |
| STOUGHTON | COM | 2019 | 1DW1A5334KBA30658 |
| STOUGHTON | COM | 2019 | 1DW1A5336KBA30659 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30809 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30811 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30812 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30813 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30814 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30816 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30817 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30820 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30821 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30823 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30824 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30825 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30826 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30827 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30828 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30829 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30830 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30831 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30832 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30833 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30834 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30835 |
| STOUGHTON | COM | 2020 | 1DW1A5330LBA30836 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30837 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30838 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30839 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30840 |

| STOUGHTON | COM | 2020 | 1DW1A5334LBA30841 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30842 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30843 |
| STOUGHTON | COM | 2020 | 1DW1A533XLBA30844 |
| STOUGHTON | COM | 2020 | 1DW1A5331LBA30845 |
| STOUGHTON | COM | 2020 | 1DW1A5333LBA30846 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30847 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30848 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30849 |
| STOUGHTON | COM | 2020 | 1DW1A5335LBA30850 |
| STOUGHTON | COM | 2020 | 1DW1A5337LBA30851 |
| STOUGHTON | COM | 2020 | 1DW1A5339LBA30852 |
| STOUGHTON | COM | 2020 | 1DW1A5330LBA30853 |
| STOUGHTON | COM | 2020 | 1DW1A5332LBA30854 |
| STOUGHTON | COM | 2020 | 1DW1A5334LBA30855 |
| STOUGHTON | COM | 2020 | 1DW1A5336LBA30856 |
| STOUGHTON | COM | 2020 | 1DW1A5338LBA30857 |
| STOUGHTON | COM | 2020 | 1DW1A5333LEA31171 |
| STOUGHTON | COM | 2020 | 1DW1A5335LEA31172 |
| STOUGHTON | COM | 2020 | 1DW1A5337LEA31173 |
| STOUGHTON | COM | 2020 | 1DW1A5339LEA31174 |
| STOUGHTON | COM | 2020 | 1DW1A5330LEA31175 |
| STOUGHTON | COM | 2020 | 1DW1A5332LEA31176 |
| STOUGHTON | COM | 2021 | 1DW1A5339MSA49712 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49713 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49714 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49715 |
| STOUGHTON | COM | 2021 | 1DW1A5336MSA49716 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49717 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49718 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49719 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49720 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49721 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49722 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49723 |
| STOUGHTON | COM | 2021 | 1DW1A5335MSA49724 |
| STOUGHTON | COM | 2021 | 1DW1A5337MSA49725 |
| STOUGHTON | COM | 2021 | 1DW1A5339MSA49726 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49727 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49728 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49729 |
| STOUGHTON | COM | 2021 | 1DW1A5330MSA49730 |
| STOUGHTON | COM | 2021 | 1DW1A5332MSA49731 |
| STOUGHTON | COM | 2021 | 1DW1A5334MSA49732 |

| | | | |
|---|---|---|---|
| STOUGHTON | COM | 2021 | 1DW1A5336MSA49733 |
| STOUGHTON | COM | 2021 | 1DW1A5338MSA49734 |
| STOUGHTON | COM | 2021 | 1DW1A533XMSA49735 |
| STOUGHTON | COM | 2021 | 1DW1A5331MSA49736 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49737 |
| STOUGHTON | COM | 2021 | 1DW1A5335MSA49738 |
| STOUGHTON | COM | 2021 | 1DW1A5337MSA49739 |
| STOUGHTON | COM | 2021 | 1DW1A5333MSA49740 |
| MANAC | 944 | 2017 | 2M5941615H1157801 |
| MANAC | 944 | 2017 | 2M5941617H1157802 |
| MANAC | 944 | 2017 | 2M5941613H1157800 |
| MANAC | 944 | 2017 | 2M5941610H1157799 |
| MANAC | VAN | 2017 | 2M5941610H1165692 |
| MANAC | VAN | 2017 | 2M5941616H1165695 |
| MANAC | VAN | 2017 | 2M5941614H1165694 |
| MANAC | VAN | 2017 | 2M5941612H1165693 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA31360 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA31368 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA31369 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA31371 |
| STOUGHTON | N/A | 2020 | 1DW1R5328LEA31375 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA31382 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA31359 |
| STOUGHTON | N/A | 2020 | 1DW1R5320LEA31385 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA31363 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA31372 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA40962 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31364 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31378 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA31373 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA31379 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA31374 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA31383 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA31358 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA31370 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA31384 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6884737 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6914910 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914911 |
| UTILITY | N/A | 2020 | 1UYVS2539L6914913 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6914916 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914919 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6914920 |
| UTILITY | VS2 | 2020 | 1UYVS2538L6914921 |

| UTILITY | VS2 | 2020 | 1UYVS253XL6914922 |
|---------|-----|------|-------------------|
| UTILITY | VS2 | 2020 | 1UYVS2531L6914923 |
| UTILITY | N/A | 2020 | 1UYVS2531L6884743 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6884744 |
| UTILITY | VS2 | 2020 | 1UYVS25306L884748 |
| UTILITY | N/A | 2020 | 1UYVS2539L6884750 |
| WABASH | RFA | 2016 | 1JJV532B2GL887138 |
| WABASH | RFA | 2016 | 1JJV532B3GL920311 |
| WABASH | RFA | 2016 | 1JJV532B5GL920312 |
| GREAT DANE | ESS | 2016 | 1GRAA0620GW700575 |
| VANGUARD | COO | 2016 | 527SR5326GM006535 |
| GREAT DANE | ESS | 2016 | 1GRAA0623GW703289 |
| WABASH | RFA | 2017 | 1JJV532B1HL008326 |
| WABASH | RFA | 2017 | 1JJV532B1HL008357 |
| WABASH | RFA | 2017 | 1JJV532B1HL008410 |
| UTILITY | VS2 | 2012 | 1UYVS2533CM469922 |
| WABASH | RFA | 2017 | 1JJV532BXHL008342 |
| WABASH | RFA | 2017 | 1JJV532B7HL008220 |
| UTILITY | VS2 | 2016 | 1UYVS2536GM381422 |
| UTILITY | VS2 | 2018 | 1UYVS2539J6258502 |
| WABASH | RFA | 2017 | 1JJV52B2HL008237 |
| WABASH | RFA | 2017 | 1JJV532B4HL008367 |
| WABASH | RFA | 2017 | f31971JJV532B1HL008181 |
| UTILITY | VS2 | 2018 | 1UYVS2536J6258506 |
| UTILITY | VS2 | 2018 | 1UYVS2539J6258516 |
| UTILITY | VS2 | 2018 | 1UYVS2530J6258517 |
| UTILITY | VS2 | 2018 | 1UYVS2533J6258513 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6258512 |
| UTILITY | VS2 | 2018 | 1UYVS2532J6258518 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6258509 |
| UTILITY | VS2 | 2018 | 1UYVS2538J6258507 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6258508 |
| UTILITY | VS2 | 2018 | 1UYVS2538J6258510 |
| UTILITY | VS2 | 2018 | 1UYVS2530J6258520 |
| UTILITY | VS2 | 2018 | 1UYVS2535J6258514 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6258519 |
| UTILITY | VS3 | 2018 | 1UYVS2530J6270201 |
| UTILITY | VS3 | 2018 | 1UYVS2538J6270205 |
| UTILITY | VS2 | 2018 | 1UYVS2537J6258515 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6258511 |
| UTILITY | VS2 | 2018 | 1UYVS2532J6270202 |
| UTILITY | VS2 | 2018 | 1UYVS2534J6270203 |
| UTILITY | VS2 | 2018 | 1UYVS2536J6270204 |
| UTILITY | VS2 | 2018 | 1UYVS253XJ6270206 |

| UTILITY | VS2 | 2018 | 1UYVS2535J6270209 |
|---|---|---|---|
| UTILITY | VS2 | 2018 | 1UYVS2531J6270210 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6270207 |
| UTILITY | VS2 | 2018 | 1UYVS2533J6270208 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14796 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14797 |
| STOUGHTON | REF | 2019 | 1DW1R5327KEA14811 |
| STOUGHTON | REF | 2019 | 1DW1R5329KEA14812 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14813 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14814 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14816 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14817 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14819 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14820 |
| STOUGHTON | REF | 2019 | 1DW1R532XKEA14821 |
| STOUGHTON | REF | 2019 | 1DW1R5321KEA14822 |
| STOUGHTON | REF | 2019 | 1DW1R5323KEA14823 |
| STOUGHTON | REF | 2019 | 1DW1R5325KEA14824 |
| STOUGHTON | REF | 2019 | 1DW1R5327KEA14825 |
| STOUGHTON | REF | 2019 | 1DW1R5329KEA14826 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14827 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14828 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14829 |
| STOUGHTON | REF | 2019 | 1DW1R5320KEA14830 |
| STOUGHTON | REF | 2019 | 1DW1R5322KEA14831 |
| STOUGHTON | REF | 2019 | 1DW1R5324KEA14832 |
| STOUGHTON | REF | 2019 | 1DW1R5326KEA14833 |
| STOUGHTON | REF | 2019 | 1DW1R5328KEA14834 |
| VANGUARD | CR8 | 2019 | 527SR5322KM017007 |
| VANGUARD | CR8 | 2019 | 527SR5324KM017008 |
| VANGUARD | CR8 | 2019 | 527SR5326KM017009 |
| VANGUARD | CR8 | 2019 | 527SR5322KM017010 |
| VANGUARD | CR8 | 2019 | 527SR5324KM017011 |
| VANGUARD | CR8 | 2019 | 527SR5328KM017013 |
| VANGUARD | CR8 | 2019 | 527SR532XKM017014 |
| VANGUARD | CR8 | 2019 | 527SR5321KM017015 |
| UTILITY | N/A | 2019 | 1UYVS2535K6740904 |
| UTILITY | N/A | 2019 | 1UYV52537K6740905 |
| UTILITY | N/A | 2019 | 1UYVS2532K6740911 |
| UTILITY | N/A | 2019 | 1UYV52534K6740912 |
| UTILITY | N/A | 2019 | 1UYVS2536K6740913 |
| UTILITY | N/A | 2019 | 1UYVS2538K6740914 |
| UTILITY | N/A | 2019 | 1UYVS253XK6740915 |
| UTILITY | N/A | 2019 | 1UYVS2531K6740916 |

| UTILITY | N/A | 2019 | 1UYVS2537K6740919 |
|---|---|---|---|
| UTILITY | N/A | 2019 | 1UYVS2533K6740920 |
| UTILITY | VS2 | 2019 | 1UYVS2533K6740903 |
| WABASH | N/A | 2016 | 1JJV532B3GL887147 |
| UTILITY | VS2 | 2018 | 1UYVS2531J6114202 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6914930 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6914931 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6914932 |
| UTILITY | VS2 | 2020 | 1UYVS2534L6914933 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914939 |
| UTILITY | VS2 | 2020 | 1UYVS2531L6914940 |
| UTILITY | VS2 | 2020 | 1UYVS2533L6914941 |
| UTILITY | VS2 | 2020 | 1UYVS2535L6914942 |
| UTILITY | VS2 | 2020 | 1UYVS2539L6914944 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6914945 |
| UTILITY | N/A | 2020 | 1UYVS2533L6914938 |
| UTILITY | N/A | 2020 | 1UYVS2536L6914934 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6914936 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA41949 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA41950 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA41951 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA41952 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA41955 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA41956 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA41957 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA41958 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42375 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA42376 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42377 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA41945 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA42379 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42380 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA42381 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA42382 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA42384 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA42385 |
| STOUGHTON | REF | 2021 | 1DW1R5329LEA41946 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA42387 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA42388 |
| STOUGHTON | RSV | 2019 | 1DW1R5325KEA14791 |
| UTILITY | VS2 | 2020 | 1UYVS2530L6915562 |
| UTILITY | VS2 | 2020 | 1UYVS2532L6915563 |
| UTILITY | VS2 | 2020 | 1UYVS2536L6915565 |
| UTILITY | VS2 | 2020 | 1UYVS253XL6915567 |

| | | | |
|---|---|---|---|
| STOUGHTON | REF | 2021 | 1DW1R5321LEA41939 |
| STOUGHTON | REF | 2021 | 1DW1R5325LEA42396 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA42399 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42389 |
| STOUGHTON | REF | 2020 | 1DW1R532XLEA42393 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA42395 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6712107 |
| UTILITY | VS2 | 2022 | 1UYVS2538N6712101 |
| UTILITY | VS2 | 2022 | 1UYVS253XN6712102 |
| UTILITY | VS2 | 2022 | 1UYVS2531N6712103 |
| UTILITY | VS2 | 2022 | 1UYVS2533N6712104 |
| UTILITY | VS2 | 2022 | 1UYVS2535N6712105 |
| UTILITY | VS2 | 2022 | 1UYVS2537N6712106 |
| UTILITY | VS2 | 2022 | 1UYVS2530N6712108 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6712110 |
| UTILITY | VS2 | 2022 | 1UYVS253ON6712111 |
| UTILITY | VS2 | 2022 | 1UYVS2532N6712112 |
| UTILITY | VS2 | 2022 | 1UYVS2534N6712113 |
| UTILITY | VS2 | 2022 | 1UYVS2536N6712114 |
| UTILITY | VS2 | 2022 | 1UYVS2538N6712115 |
| UTILITY | VS2 | 2022 | 1UYVS2532N6712109 |
| CIMC | COO | 2023 | 527SR5328PM034319 |
| CIMC | REE | 2023 | 527SR532XPL033355 |
| CIMC | REE | 2023 | 527SR5326PL033367 |
| CIMC | REE | 2023 | 527SR5322PL030398 |
| CIMC | REE | 2023 | 527SR5327PL030400 |
| CIMC | REE | 2023 | 527SR5320PL030416 |
| CIMC | REE | 2023 | 527SR5326PL030419 |
| CIMC | REE | 2023 | 527SR5322PL030420 |
| VANGUARD | REE | 2023 | 527SR5323PL030474 |
| CIMC | REE | 2023 | 527SR5325PL030475 |
| CIMC | COO | 2023 | 527SR5326PL030422 |
| CIMC | COO | 2023 | 527SR5320PM034296 |
| CIMC | COO | 2023 | 527SR5329PM034295 |
| UTILITY | VS2 | 2021 | 1UYVS2539M6393225 |
| CIMC | CR8 | 2023 | 2SHSR5328PS001426 |
| VANGUARD | CIMC | 2024 | 527SR532XRM037015 |
| CIMC | COO | 2024 | 527SR5321RM037016 |
| CIMC | COO | 2024 | 527SR5323RM037017 |
| CIMC | COO | 2024 | 527SR5325RM037018 |
| CIMC | COO | 2024 | 527SR5327RM037019 |
| CIMC | COO | 2024 | 527SR5323RM037020 |
| CIMC | COO | 2024 | 527SR5325RM037021 |
| CIMC | COO | 2024 | 527SR5327RM037022 |

| | | | |
|---|---|---|---|
| CIMC | COO | 2024 | 527SR5329RM037023 |
| CIMC | COO | 2024 | 527SR5320RM037024 |
| CIMC | COO | 2024 | 527SR5322RM037025 |
| CIMC | COO | 2024 | 527SR5324RM037026 |
| CIMC | COO | 2024 | 527SR5326RM037027 |
| CIMC | COO | 2024 | 527SR5328RM037028 |
| CIMC | COO | 2024 | 527SR532XRM037029 |
| CIMC | COO | 2024 | 527SR5326RM037030 |
| CIMC | COO | 2024 | 527SR5328RM037031 |
| CIMC | COO | 2024 | 527SR532XRM037032 |
| CIMC | COO | 2024 | 527SR5321RM037033 |
| CIMC | COO | 2024 | 527SR5323RM037034 |
| CIMC | COO | 2024 | 527SR5325RM037035 |
| CIMC | COO | 2024 | 527SR5327RM037036 |
| CIMC | COO | 2024 | 527SR5329RM037037 |
| CIMC | COO | 2024 | 527SR5320RM037038 |
| CIMC | COO | 2024 | 527SR5322RM037039 |
| CIMC | COO | 2024 | 527SR5322PL033365 |
| CIMC | REE | 2023 | 527SR5322PL033348 |
| CIMC | N/A | 2023 | 527SR532XPM031227 |
| CIMC | N/A | 2023 | 527SR5324PM033989 |
| CIMC | N/A | 2023 | 527SR5322PM033988 |
| CIMC | N/A | 2023 | 527SR5323PM034034 |
| UTILITY | VS2 | 2021 | 1UYVS2537M6393224 |
| UTILITY | VS2 | 2022 | 1UYVS2539N6461945 |
| CIMC | COO | 2023 | 527SR5322PM034297 |
| UTILITY | RFA | 2022 | 1UYVS2536N6712128 |
| CIMC | REE | 2023 | 527SR5324PL033352 |
| CIMC | COO | 2023 | 527SR5327PM034294 |
| CIMC | REE | 2023 | 527SR5320PL030478 |
| CIMC | VS2 | 2022 | 1UYVS2533N6461925 |
| CIMC | REE | 2023 | 527SR5329PL030477 |
| CIMC | REE | 2023 | 527SR5329PL030401 |
| CIMC | REE | 2023 | 527SR5320PL033350 |
| CIMC | REE | 2023 | 527SR5327PL030431 |
| CIMC | COO | 2023 | 527SR5320PM034329 |
| HYUNDAI | N/A | 2016 | 3H3V532C2GT498007 |
| HYUNDAI | HHY | 2016 | 3H3V532CXGT498014 |
| HYUNDAI | N/A | 2016 | 3H3V532C1GT498015 |
| UTILITY | VS2 | 2015 | 1UYVS2533FG298608 |
| STRI | S75 | 2019 | 1S12E9533KE539102 |
| UTILITY | N/A | 2020 | 1UYVS2534L7143923 |
| MANAC | 942 | 2023 | 2M592161P1217644 |
| MANAC | 942 | 2023 | 2M5921615P1217645 |

| | | | |
|---|---|---|---|
| MANAC | 942 | 2023 | 2M5921617P1217646 |
| MANAC | 942 | 2023 | 2M5921619P1217647 |
| MANAC | 942 | 2023 | 2M5921610P1217648 |
| MANAC | 942 | 2023 | 2M5921612P1217649 |
| MANAC | 942 | 2023 | 2M5921619P1217650 |
| MANAC | 942 | 2023 | 2M5921617P1217016 |
| MANAC | 942 | 2023 | 2M5921619P1217017 |
| MANAC | 942 | 2023 | 2M5921610P1217018 |
| MANAC | 942 | 2023 | 2M5921612P1217019 |
| MANAC | 942 | 2023 | 2M5921619P1217020 |
| MANAC | 942 | 2023 | 2M5921610P1217021 |
| MANAC | 942 | 2023 | 2M5921612P1217022 |
| MANAC | 942 | 2023 | 2M5921614P1217023 |
| MANAC | 942 | 2023 | 2M5921616P1217024 |
| MANAC | 942 | 2023 | 2M5921618P1217025 |
| MANAC | 94253A311 | 2023 | 2M592161XP1217026 |
| MANAC | 942 | 2023 | 2M5921611P1217027 |
| MANAC | 94253A311 | 2023 | 2M5921613P1217028 |
| MANAC | 942 | 2023 | 2M5921615P1217029 |
| MANAC | 942 | 2023 | 2M5921611P1217030 |
| MANAC | 94253A311 | 2023 | 2M5921613P1217031 |
| MANAC | 942 | 2023 | 2M5921615P1217032 |
| MANAC | 942 | 2023 | 2M5921617P1217033 |
| MANAC | 942 | 2023 | 2M5921619P1217034 |
| MANAC | 942 | 2023 | 2M5921610P1217035 |
| MANAC | 942 | 2023 | 2M5921612P1217036 |
| MANAC | 942 | 2023 | 2M5921614P1217037 |
| MANAC | 942 | 2023 | 2M5921616P1217038 |
| MANAC | MANAC | 2023 | 2M5921618P1217039 |
| MANAC | 942 | 2023 | 2M5921614P1217040 |
| MANAC | 942 | 2023 | 2M5921616P1217041 |
| MANAC | 942 | 2023 | 2M5921618P1217042 |
| MANAC | 942 | 2023 | 2M592161XP1217043 |
| MANAC | 942 | 2023 | 2M5921611P1217044 |
| MANAC | 942 | 2023 | 2M5921613P1217045 |
| MANAC | 94253A311 | 2023 | 2M5921615P1217046 |
| MANAC | 94253A311 | 2023 | 2M5921617P1217047 |
| MANAC | 94253A311 | 2023 | 2M5921619P1217048 |
| MANAC | 94253A311 | 2023 | 2M5921610P1217049 |
| MANAC | 94253A311 | 2023 | 2M5921617P1217050 |
| MANAC | 94253A311 | 2023 | 2M5921619P1217051 |
| MANAC | 94253A311 | 2023 | 2M5921610P1217052 |
| MANAC | 94253A311 | 2023 | 2M5921612P1217053 |
| MANAC | 94253A311 | 2023 | 2M5921614P1217054 |

| MANAC | 94253A311 | 2023 | 2M5921616P1217055 |
|---|---|---|---|
| MANAC | 942 | 2023 | 2M5921618P1217641 |
| MANAC | 942 | 2023 | 2M592161XP1217642 |
| MANAC | 942 | 2023 | 2M5921611P1217643 |
| MANAC | 942 | 2022 | 2M5921614N1208884 |
| MANAC | 942 | 2022 | 2M5921616N1208885 |
| MANAC | N/A | 2022 | 2M5921618N1208886 |
| MANAC | 942 | 2022 | 2M592161XN1208887 |
| MANAC | 942 | 2022 | 2M5921611N1208888 |
| STOUGHTON | 942 | 2022 | 2M5921613N1208889 |
| MANAC | 942 | 2022 | 2M592161XN1208890 |
| MANAC | N/A | 2022 | 2M5921611N1208891 |
| MANAC | N/A | 2022 | 2M5921613N1208892 |
| MANAC | 942 | 2022 | 2M5921615N1208893 |
| MANAC | 942 | 2021 | 2M592161XM1202294 |
| MANAC | 942 | 2021 | 2M5921611M1202295 |
| MANAC | 942 | 2021 | 2M5921613M1202296 |
| MANAC | 942 | 2021 | 2M5921615M1202297 |
| MANAC | 942 | 2021 | 2M5921617M1202298 |
| MANAC | 942 | 2021 | 2M5921619M1202299 |
| MANAC | 942 | 2021 | 2M5921611M1202300 |
| MANAC | 942 | 2021 | 2M5921613M1202301 |
| MANAC | 942 | 2021 | 2M5921615M1202302 |
| MANAC | 942 | 2021 | 2M5921617M1202303 |
| MANAC | 942 | 2021 | 2M5921619M1202304 |
| MANAC | 942 | 2021 | 2M5921610M1202305 |
| MANAC | 942 | 2021 | 2M5921612M1202306 |
| MANAC | 942 | 2021 | 2M5921614M1202307 |
| MANAC | 942 | 2021 | 2M5921616M1202308 |
| MANAC | 942 | 2021 | 2M5921618M1202309 |
| MANAC | 942 | 2021 | 2M5921614M1202310 |
| MANAC | 942 | 2021 | 2M5921616M1202311 |
| MANAC | 942 | 2021 | 2M5921618M1202312 |
| MANAC | 942 | 2021 | 2M592161XM1202313 |
| CIMC | NDW136*0AF0 | 2018 | 527SR5329JM012594 |
| CIMC | VS2 | 2023 | 527SR5327PM031170 |
| CIMC | VS2 | 2022 | 527SR5329PM031171 |
| CIMC | N/A | 2023 | 527SR5320PM031172 |
| CIMC | VS2 | 2022 | 527SR5322PM031173 |
| CIMC | N/A | 2023 | 527SR5324PM031174 |
| CIMC | VS2 | 2022 | 527SR5326PM031175 |
| CIMC | N/A | 2023 | 527SR5328PM031176 |
| CIMC | VS2 | 2023 | 527SR532XPM031177 |
| CIMC | N/A | 2022 | 527SR5321PM031178 |

| | | | |
|---|---|---|---|
| CIMC | N/A | 2022 | 527SR5323PM031179 |
| CIMC | N/A | 2023 | 527SR532XPM031180 |
| CIMC | N/A | 2023 | 527SR5323PM031215 |
| CIMC | N/A | 2023 | 527SR5327PM031217 |
| CIMC | N/A | 2023 | 527SR5325PM031183 |
| CIMC | N/A | 2023 | 527SR5327PM031184 |
| CIMC | N/A | 2022 | 527SR5329PM031185 |
| CIMC | N/A | 2023 | 527SR5329PM031218 |
| CIMC | VS2 | 2022 | 527SR5324PM031188 |
| CIMC | VS2 | 2023 | 527SR5329PM031221 |
| CIMC | N/A | 2023 | 527SR5329PM031222 |
| CIMC | N/A | 2023 | 527SR5325PM031197 |
| CIMC | N/A | 2023 | 527SR5320PM031219 |
| CIMC | N/A | 2022 | 527SR5325PM031216 |
| CIMC | VS2 | 2023 | 527SR5321PM031200 |
| CIMC | N/A | 2023 | 527SR5327PM031220 |
| CIMC | THERMO | 2023 | 527SR5328PM031226 |
| CIMC | VS2 | 2023 | 527SR5322PM031206 |
| CIMC | N/A | 2023 | 527SR5324PM031224 |
| CIMC | REF | 2023 | 527SR5326PM031208 |
| CIMC | RFA | 2023 | 527SR5324PM031210 |
| CIMC | COO | 2023 | 527SR5328PM031212 |
| CIMC | N/A | 2023 | 527SR532XPM031213 |
| CIMC | VS2 | 2022 | 527SR5321PM031214 |
| CIMC | VS2 | 2023 | 527SR537PM031198 |
| CIMC | N/A | 2023 | 527SR5326PM034318 |
| STOUGHTON | REF | 2020 | 1DW1R5323LEA31381 |
| UTILITY | N/A | 2020 | 1UYVS2537L6914912 |
| WANC | RFA | 2022 | 1JJV532B2NL315354 |
| WANC | RFA | 2022 | 1JJV532B2NL315355 |
| WANC | RFA | 2022 | 1JJV532B6NL315356 |
| WANC | RFA | 2022 | 1JJV532B2NL315357 |
| WANC | RFA | 2022 | 1JJV532B2NL315358 |
| WANC | RFA | 2022 | 1JJV532B2NL315359 |
| WANC | RFA | 2022 | 1JJV532B2NL315360 |
| WANC | RFA | 2022 | 1JJV532B2NL315361 |
| WANC | RFA | 2022 | 1JJV532B2NL315362 |
| WANC | RFA | 2022 | 1JJV532B3NL315363 |
| WANC | RFA | 2022 | 1JJV532B5NL315364 |
| WANC | RFA | 2022 | 1JJV532B7NL315365 |
| WANC | RFA | 2022 | 1JJV532B9NL315366 |
| WANC | RFA | 2022 | 1JJV532B0NL315367 |
| WANC | RFA | 2022 | 1JJV532B2NL315368 |
| WANC | RFA | 2022 | 1JJV532B4NL315369 |

| | | | |
|---|---|---|---|
| WANC | RFA | 2022 | 1JJV532B0NL315370 |
| WANC | RFA | 2022 | 1JJV532B2NL315371 |
| WANC | RFA | 2022 | 1JJV532B4NL315372 |
| WANC | RFA | 2022 | 1JJV532B6NL315373 |
| WANC | RFA | 2022 | 1JJV532B8NL315374 |
| WANC | RFA | 2022 | 1JJV532BXNL315375 |
| WANC | RFA | 2022 | 1JJV532B1NL315376 |
| WANC | RFA | 2022 | 1JJV532B3NL315377 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315378 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315379 |
| WABASH | 7500 | 2023 | 1JJV532BXPL315380 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315381 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315382 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315383 |
| WABASH | 7500 | 2023 | 1JJV532B7PL315384 |
| WABASH | 7500 | 2023 | 1JJV532B9PL315385 |
| WABASH | 7500 | 2023 | 1JJV532B0PL315386 |
| WABASH | 7500 | 2023 | 1JJV532B2PL315387 |
| WABASH | 7500 | 2023 | 1JJV532B4PL315388 |
| WABASH | 7500 | 2023 | 1JJV532B6PL315389 |
| WABASH | 7500 | 2023 | 1JJV532B2PL315390 |
| WABASH | 7500 | 2023 | 1JJV532B4PL315391 |
| WABASH | 7500 | 2023 | 1JJV532B8PL315393 |
| WABASH | 7500 | 2023 | 1JJV532BXPL315394 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315395 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315396 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315397 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315398 |
| WABASH | 7500 | 2023 | 1JJV532B9PL315399 |
| WABASH | 7500 | 2023 | 1JJV532B1PL315400 |
| WABASH | 7500 | 2023 | 1JJV532B3PL315401 |
| WABASH | 7500 | 2023 | 1JJV532B5PL315402 |
| WABASH | 7500 | 2023 | 1JJV532B7PL315403 |
| CIMC | REE | 2022 | 2SHSR5328NS000452 |
| WABASH | 7500 | 2023 | 1JJV532B6PL315392 |
| MANAC | 943 | 2022 | 2M5931614N1204475 |
| MANAC | 943 | 2022 | 2M5931616N1204476 |
| MANAC | 943 | 2022 | 2M5931618N1204477 |
| MANAC | 943 | 2022 | 2M593161XN1204478 |
| MANAC | 943 | 2022 | 2M5931611N1204479 |
| MANAC | 943 | 2022 | 2M5931618N1204480 |
| MANAC | 943 | 2022 | 2M593161XN1204481 |
| MANAC | 943 | 2022 | 2M5931611N1204482 |
| MANAC | 943 | 2022 | 2M5931613N1204483 |

| MANAC | 943 | 2022 | 2M5931615N1204484 |
|-------|-----|------|-------------------|
| MANAC | 943 | 2022 | 2M5931617N1204485 |
| MANAC | 943 | 2022 | 2M5931619N1204486 |
| MANAC | 943 | 2022 | 2M5931610N1204487 |
| MANAC | 943 | 2022 | 2M5931612N1204488 |
| MANAC | 943 | 2022 | 2M5931614N1204489 |
| MANAC | 943 | 2022 | 2M5931610N1204490 |
| MANAC | 943 | 2022 | 2M5931612N1204491 |
| MANAC | 943 | 2022 | 2M5931614N1204492 |
| MANAC | 943 | 2022 | 2M5931616N1204493 |
| MANAC | 943 | 2022 | 2M5931618N1204494 |
| MANAC | 943 | 2022 | 2M593161XN1204495 |
| MANAC | 943 | 2022 | 2M5931611N1204496 |
| MANAC | 943 | 2022 | 2M5931613N1204497 |
| MANAC | 943 | 2022 | 2M5931615N1204498 |
| MANAC | 943 | 2022 | 2M5931617N1204499 |
| MANAC | 943 | 2022 | 2M5931615N1204517 |
| MANAC | 943 | 2022 | 2M5931617N1204518 |
| MANAC | 943 | 2022 | 2M5931619N1204519 |
| MANAC | 943 | 2022 | 2M5931615N1204520 |
| MANAC | 943 | 2022 | 2M5931617N1204521 |
| MANAC | 943 | 2022 | 2M5931619N1204522 |
| MANAC | 943 | 2022 | 2M5931610N1204523 |
| MANAC | 943 | 2022 | 2M5931612N1204524 |
| MANAC | 943 | 2022 | 2M5931614N1204525 |
| MANAC | 943 | 2022 | 2M5931616N1204526 |
| MANAC | 943 | 2022 | 2M5931618N1204527 |
| MANAC | 943 | 2022 | 2M593161XN1204528 |
| MANAC | 943 | 2022 | 2M5931611N1204529 |
| MANAC | 943 | 2022 | 2M5931618N1204530 |
| MANAC | 943 | 2022 | 2M593161XN1204531 |
| MANAC | 943 | 2022 | 2M5931611N1204532 |
| MANAC | 943 | 2022 | 2M5931613N1204533 |
| MANAC | 943 | 2022 | 2M5931615N1204534 |
| MANAC | 943 | 2022 | 2M5931617N1204535 |
| MANAC | 943 | 2022 | 2M5931619N1204536 |
| MANAC | 943 | 2022 | 2M5931610N1204537 |
| MANAC | 943 | 2022 | 2M5931612N1204538 |
| MANAC | 943 | 2022 | 2M5931614N1204539 |
| MANAC | 943 | 2022 | 2M5931610N1204540 |
| MANAC | 943 | 2022 | 2M5931612N1204541 |
| UTILITY | TRA | 2018 | 1UYVS3530J6060316 |
| GREAT DANE | ESS | 2016 | 1GRAA0636GW701027 |
| GREAT DANE | ESS | 2016 | 1GRAA0638GW701028 |

| | | | |
|---|---|---|---|
| UTILITY | VS3 | 2018 | 1UYVS3532J6060317 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6060319 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6060318 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6060320 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6258401 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6258406 |
| UTILITY | VS3 | 2015 | 1UYVS3537J6258407 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6258402 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6258409 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6258410 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6258405 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6258408 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6258404 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6258413 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6258415 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6258414 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6258416 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6258412 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6258420 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6258417 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6258418 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6258419 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6269901 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6269902 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6269903 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6269904 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6269905 |
| UTILITY | VS3 | 2018 | 1UYVS3533J6269906 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6269907 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6269908 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6269909 |
| UTILITY | VS3 | 2018 | 1UYVS3535J6269910 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6269911 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6269912 |
| UTILITY | VS3 | 2018 | 1UYVS3530J6269913 |
| UTILITY | VS3 | 2018 | 1UYVS3532J6269914 |
| UTILITY | VS3 | 2018 | 1UYVS3534J6269915 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6269916 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6269917 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6269919 |
| UTILITY | VS3 | 2018 | 1UYVS3536J6270001 |
| UTILITY | VS3 | 2018 | 1UYVS3538J6270002 |
| UTILITY | VS3 | 2018 | 1UYVS353XJ6270003 |
| UTILITY | VS3 | 2018 | 1UYVS3531J6270004 |

| UTILITY | VS3 | 2018 | 1UYVS3533J6270005 |
|---------|-----|------|-------------------|
| UTILITY | VS3 | 2018 | 1UYVS3535J6270006 |
| UTILITY | VS3 | 2018 | 1UYVS3537J6270007 |
| UTILITY | VS3 | 2018 | 1UYVS3539J6270008 |
| WABASH | RFA | 2022 | IJJV533B7NL339891 |
| WABASH | RFA | 2022 | 1JJV533B9NL339892 |
| WABASH | RFA | 2022 | 1JJV533B0NL339893 |
| WABASH | RFA | 2022 | 1JJV533B2NL339894 |
| WABASH | RFA | 2022 | 1JJV533B4NL339895 |
| EAST | PLA | 2022 | 1E1H5Z581NR074864 |
| EAST | PLA | 2022 | 1E1H5Z583NR074865 |
| EAST | PLA | 2022 | 1E1H5Z585NR074866 |
| EAST | PLA | 2022 | 1E1H5Z682NR074869 |
| EAST | PLA | 2022 | 1E1H5Z689NR074870 |
| WABASH | RFA | 2016 | 1JJV532B7GL887149 |
| WABASH | RFA | 2016 | 1JJV532B2GL887141 |
| WABASH | RFA | 2016 | 1JJV532B7GL887145 |
| WABASH | RFA | 2016 | 1JJV532B6GL920299 |
| WABASH | RFA | 2016 | 1JJV532B1GL920310 |
| WABASH | RFA | 2016 | 1JJV532B8GL920305 |
| WABASH | RFA | 2016 | 1JJV532BXGL920306 |
| GREAT DANE | ESS | 2016 | 1GRAA0626GW700578 |
| GREAT DANE | ESS | 2016 | 1GRAA0622GW700576 |
| GREAT DANE | ESS | 2016 | 1GRAA0624GW700577 |
| WABASH | RFA | 2016 | 1JJV532B2GL920316 |
| WABASH | RFA | 2016 | 1JJV532B0GL920329 |
| HYUNDAI | VC2 | 2016 | 3H3V532C5GT498020 |
| STRI | S75 | 2018 | 1S12E953XJE536499 |
| MANAC | 712 | 2022 | 2M5720416N1208230 |
| MANAC | 712 | 2021 | 2M5720418M1202542 |
| MANAC | N/A | 2023 | 2M5720413P1212318 |
| MANAC | N/A | 2023 | 2M5720411P1212317 |
| MANAC | N/A | 2023 | 2M5720415P1212319 |
| MANAC | N/A | 2023 | 2M5720411P1212320 |
| MANAC | N/A | 2023 | 2M5720413P1212321 |
| MANAC | N/A | 2023 | 2M5720419P1212307 |
| MANAC | N/A | 2019 | 1GR5R1623PK439837 |
| GREAT DANE | N/A | 2019 | 1GR5R1625PK439838 |
| MANAC | 712 | 2023 | 2M5720419P1218916 |
| MANAC | 712 | 2023 | 2M5720412P1218918 |
| MANAC | 712 | 2023 | 2M5720410P1218920 |
| UTILITY | VS2 | 2020 | 1UYVS2537L6884701 |
| CIMC | VS2 | 2022 | 527SR5320PM031186 |
| CIMC | COO | 2023 | 527SR5328PM031209 |

| | | | |
|---|---|---|---|
| GREAT DANE | CCC | 2016 | 1GRAP0628GD461688 |
| STOUGHTON | COM | 2016 | 1DW1A5321GB647821 |
| STOU | COM | 2016 | 1DW1A532XGB647817 |
| STOUGHTON | 7GP | 2017 | 1DW1A532XHB753511 |
| STOUGHTON | ZGP | 2017 | 1DW1A5322HB753521 |
| STOUGHTON | ZGP | 2018 | 1DW1A5320JBA00210 |
| STOUGHTON | ZGP | 2018 | 1DW1A5320JBA00191 |
| STOUGHTON | WHI | 2017 | 1DW1A5320HB753520 |
| STOUGHTON | ZGP | 2017 | 1DW1A5327HB753532 |
| STOUGHTON | WHI | 2018 | 1DW1A5320JBA00188 |
| STOUGHTON | ZGP | 2018 | 1DW1A5328JBA00195 |
| STOUGHTON | ZGP | 2017 | 1DW1A5329HB753533 |
| STOUGHTON | ZGP | 2017 | 1DW1A5320HB753534 |
| STOUGHTON | ZGP | 2017 | 1DW1A5329HB753502 |
| STOUGHTON | ZGP | 2017 | 1DW1A5324HB753519 |
| STOUGHTON | ZGP | 2017 | 1DW1A5323HB753527 |
| STOUGHTON | ZGP | 2017 | 1DW1A5325HB753514 |
| STOUGHTON | ZGP | 2017 | 1DW1A532XHB753539 |
| WABASH | N/A | 2023 | 1JJV532D6PL328709 |
| WABASH | N/A | 2023 | 1JJV532D2PL328710 |
| WABASH | N/A | 2023 | 1JJV532D4PL328711 |
| WABASH | N/A | 2023 | 1JJV532D3PL328716 |
| WABASH | N/A | 2023 | 1JJV532D7PL328718 |
| WABASH | N/A | 2023 | 1JJV532D9PL328719 |
| WABASH | N/A | 2023 | 1JJV532D5PL328720 |
| STOUGHTON | ZGP | 2018 | 1DW1A5322JBA00189 |
| STOUGHTON | ZGP | 2017 | 1DW1A532XHB753508 |

| | | | |
|---|---|---|---|
| STOUGHTON | ZGP | 2018 | 1DW1A5321JBA00197 |
| STOUGHTON | WHI | 2018 | 1DW1A5328JBA00214 |
| STOUGHTON | ZGP | 2018 | 1DW1A5327JBA00186 |
| STOUGHTON | N/A | 2018 | 1DW1A5327JBA00205 |
| STOUGHTON | WHI | 2017 | 1DW1A5324HB753522 |
| STOUGHTON | ZGP | 2017 | 1DW1A5326HB753540 |
| STOUGHTON | ZGP | 2018 | 1DW1A5321JBA00202 |
| STOUGHTON | ZGP | 2017 | 1DW1A5320HB753503 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7876428 |
| UTILITY | VS2 | 2020 | 1UYVS2530K7760908 |
| STOUGHTON | ALU | 2020 | 1DW1R5326LEA41936 |
| STOUGHTON | REF | 2020 | 1DW1R5325LEA41944 |
| STOUGHTON | REF | 2020 | 1DW1R5322LEA42386 |
| STOUGHTON | REF | 2020 | 1DW1R5327LEA42397 |
| STOUGHTON | REF | 2020 | 1DW1R5329LEA42398 |
| STOUGHTON | REF | 2020 | 1DW1R5324LEA42390 |
| STOUGHTON | REF | 2020 | 1DW1R5328LEA42392 |
| STOUGHTON | REF | 2020 | 1DW1R5326LEA42391 |
| STOUGHTON | REF | 2020 | 1DW1R5321LEA42394 |
| STOUGHTON | REF | 2020 | 1DW1R5320LEA41947 |
| UTILITY | VS2 | 2020 | 1UYVS2535L7876431 |
| GREAT DANE | N/A | 2016 | 1GRAP0626GD461687 |
| UTILITY | VS2 | 2012 | 1UYVS2535CM470005 |

**SCHEDULE "H"**

**PERMITS**

- Commercial Vehicle Operating Licences

- United States Department of Transportation Licences

- Long Combination Vehicle Licence

- New York State Heavy Haul Permit

**[Note: Balance of schedule to be completed no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order.]**

## SCHEDULE "I"

## CRITICAL REQUIRED CONTRACTS

1. ~~DEF contract dated as of August 29, 2023 between Shell Flying J and Pride Diesel Inc.~~

1. ~~2.~~ The lease dated as of November 24, 2015 in respect of the property located at 6050 Dixie Road, Mississauga, between 6050 Dixie Road Investments Limited as Landlord, 2029909 Ontario Inc. as Tenant and Sam Johal as Indemnifier

~~3.~~ ~~Fuel contract dated as of June 19, 2023 between Shell Flying J and Pride Diesel Inc.~~

~~4.~~ ~~Branded Dealer Agreement (Esso) dated as of October 25, 2019 between Husky Oil Marketing Company, a division of Husky Oil Operations Limited and 2076401 Ontario Inc.~~

2. ~~5.~~ Lease agreement in respect of 6253 Boundary Road, Cornwall, ON, with Globocam (Montreal) Inc., provided that such lease is in force on the Closing Date.

3. ~~6.~~ The Finloc Leases

**[Note: Balance of schedule to be completed no later than 8 calendar days prior to the hearing of the motion for the Approval and Vesting Order.]**

## SCHEDULE "J"

## FINLOC LEASED VEHICLES

| Make | Model | Year | VIN |
|------|-------|------|-----|
| MANAC | 712 | 2020 | 2M5720419L1190805 |
| MANAC | 712 | 2020 | 2M5720410L1190806 |
| MANAC | 712 | 2020 | 2M5720417L1186817 |
| MANAC | 712 | 2020 | 2M5720417L1190804 |
| MANAC | 712 | 2020 | 2M5720415L1190803 |
| MANAC | 942 | 2021 | 2M5921613M1202282 |
| MANAC | N/A | 2019 | 2M593161XL1197805 |
| MANAC | 942 | 2021 | 2M5921611M1202264 |
| MANAC | 942 | 2021 | 2M5921613M1202265 |
| MANAC | 942 | 2021 | 2M5921615M1202266 |
| MANAC | 942 | 2021 | 2M5921617M1202267 |
| MANAC | 942 | 2021 | 2M5921619M1202268 |
| MANAC | 942 | 2021 | 2M5921610M1202269 |
| MANAC | 942 | 2021 | 2M5921617M1202270 |
| MANAC | 942 | 2021 | 2M5921619M1202271 |
| MANAC | 942 | 2021 | 2M5921610M1202272 |
| MANAC | 942 | 2021 | 2M5921612M1202273 |
| MANAC | 942 | 2021 | 2M5921614M1202274 |
| MANAC | 942 | 2021 | 2M5921616M1202275 |
| MANAC | 942 | 2021 | 2M5921618M1202276 |
| MANAC | 942 | 2021 | 2M592161XM1202277 |
| MANAC | 942 | 2021 | 2M5921611M1202278 |
| MANAC | 942 | 2021 | 2M5921613M1202279 |
| MANAC | 942 | 2021 | 2M592161XM1202280 |
| MANAC | 942 | 2021 | 2M5921611M1202281 |
| MANAC | 942 | 2021 | 2M5921615M1202283 |
| MANAC | 942 | 2021 | 2M5921617M1202284 |
| MANAC | 942 | 2021 | 2M5921619M1202285 |
| MANAC | 942 | 2021 | 2M5921610M1202286 |
| MANAC | 942 | 2021 | 2M5921612M1202287 |
| MANAC | 942 | 2021 | 2M5921614M1202288 |
| MANAC | 942 | 2021 | 2M5921616M1202289 |
| MANAC | 342 | 2021 | 2M5921612M1202290 |
| MANAC | 942 | 2021 | 2M5921614M1202291 |
| MANAC | 942 | 2021 | 2M5921616M1202292 |
| MANAC | 942 | 2021 | 2M5921618M1202293 |
| MANAC | 943 | 2020 | 2M5931611L1197790 |
| MANAC | 943 | 2020 | 2M5931613L1197791 |
| MANAC | 943 | 2020 | 2M5931615L1197792 |
| MANAC | 943 | 2020 | 2M5931617L1197793 |
| MANAC | 943 | 2020 | 2M5931619L1197794 |
| MANAC | 943 | 2020 | 2M5931610L1197795 |
| MANAC | N/A | 2020 | 2M5931612L1197796 |
| MANAC | N/A | 2020 | 2M5931614L1197797 |
| MANAC | N/A | 2020 | 2M5931618L1197799 |
| MANAC | N/A | 2020 | 2M5931610L1197800 |
| MANAC | N/A | 2020 | 2M5931612L1197801 |
| MANAC | N/A | 2020 | 2M5931614L1197802 |
| MANAC | N/A | 2020 | 2M5931616L1197803 |
| MANAC | N/A | 2020 | 2M5931618L1197804 |
| MANAC | N/A | 2020 | 2M5931611L1197806 |
| MANAC | N/A | 2020 | 2M5931613L1197807 |
| MANAC | N/A | 2020 | 2M5931615L1197808 |
| MANAC | N/A | 2020 | 2M5931617L1197809 |

```
MANAC   N/A    2020   2M5931613L1197810
MANAC   N/A    2020   2M5931615L1197811
MANAC   N/A    2020   2M5931617L1197812
MANAC   N/A    2020   2M5931619L1197813
MANAC   N/A    2020   2M5931610L1197814
MANAC   N/A    2020   2M5931612L1197815
MANAC   N/A    2020   2M5931614L1197816
MANAC   N/A    2020   2M5931616L1197817
MANAC   N/A    2020   2M5931618L1197818
MANAC   N/A    2020   2M593161XL1197819
MANAC   N/A    2020   2M5931614M1197820
MANAC   N/A    2020   2M5931616M1197821
MANAC   N/A    2020   2M5931618M1197822
MANAC   N/A    2020   2M593161XM1197823
MANAC   N/A    2020   2M5931611M1197824
MANAC   943    2020   2M5931613M1197825
MANAC   943    2020   2M5931615M1197826
MANAC   943    2021   2M5931617M1197827
MANAC   943    2021   2M5931619M1197828
MANAC   943    2021   2M5931610M1197829
MANAC   943    2021   2M5931617M1197830
MANAC   943    2021   2M5931619M1197831
MANAC   943    2021   2M5931610M1197832
MANAC   943    2021   2M5931612M1197833
MANAC   943    2021   2M5931614M1197834
MANAC   943    2021   2M5931616M1197835
MANAC   943    2021   2M5931618M1197836
MANAC   943    2021   2M593161XM1197837
MANAC   943    2021   2M5931611M1197838
MANAC   943    2021   2M5931613M1197839
```

Document comparison by Workshare Compare on Monday, September 23, 2024
4:06:48 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\BUR\AppData\Local\Temp\1\Workshare\wmtemp1450\Purchase Agreement - August 26 2024 - Execution Copy73.DOCX |
| Description | Purchase Agreement - August 26 2024 - Execution Copy73 |
| Document 2 ID | netdocuments://1408-7051-1119/2 |
| Description | EY - Pride - Amended and Restated PGL Purchase Agreement (Final) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 105 |
| Deletions | 125 |
| Moved from | 4 |
| Moved to | 4 |
| Style changes | 0 |
| Format changes | 0 |

| Total changes | 238 |

# Appendix "C"

Court File No.: CV-24-00717340-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| THE HONOURABLE MR. | ) | TUESDAY, THE 24th |
|---|---|---|
| | ) | |
| JUSTICE OSBORNE | ) | DAY OF SEPTEMBER, 2024 |

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT**
**OF PRIDE GROUP HOLDINGS INC. AND THOSE APPLICANTS LISTED ON**
**SCHEDULE "A" HERETO (each, an "Applicant", and collectively, the**
**"Applicants")**

**ORDER**
**(Approval and Vesting - PGL)**

**THIS MOTION**, made by Applicants pursuant to the *Companies Creditors' Arrangement Act*, R.S.C. 1985, c. c-36, as amended (the "**CCAA**") for an order, among other things, approving the sale transaction (the "**Transaction**")[1] contemplated by an Amended and Restated Purchase Agreement dated as of September 23, 2024 (the "**Purchase Agreement**") between Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation, as vendors (collectively, the "**Vendors**"), and 1000927605 Ontario Inc., as purchaser (the "**Purchaser**"), attached to the Third Supplement to the Fourteenth Report of the Monitor, dated September 23, 2024 (the "**Third Supplementary Report**") as Appendix "D", and vesting in the Purchaser all of the Vendors' right, title

---

[1] For greater certainty, "Transaction" shall not include any transaction(s) contemplated by the Real Property Option (as defined in the Sale Agreement) which option and the exercise of same remain open in accordance with and subject to the terms of the Sale Agreement and which transaction(s) remain subject to Court approval.

- 2 -

and interest in and to the Purchased Assets (as defined in the Purchase Agreement), was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of Randal Benson sworn August 27, 2024 and the Exhibits thereto (the "**Benson Affidavit**"), the Fourteenth Report of Ernst & Young Inc. dated August 28, 2024 (the "**Fourteenth Report**"), the Supplement to the Fourteenth Report of Ernst & Young Inc., dated September 2, 2024, and the Third Supplementary Report, each issued by Ernst & Young Inc. in its capacity as court-appointed monitor (in such capacity, the "**Monitor**"), and on hearing the submissions of counsel for the Applicants and the limited partnerships listed in **Schedule "A"** hereto (collectively with the Applicants, the "**Pride Entities**"), the Monitor and the Purchaser, and such other counsel as listed on the Participant Information Form, with no one else appearing although properly served as appears from the affidavit of service, filed,

**DEFINITIONS**

1.      **THIS COURT ORDERS** that capitalized terms used but not defined in this Order shall have the meanings given to them in the Purchase Agreement or the Fourteenth Report, as the case may be.

**APPROVAL OF TRANSACTION**

2.      **THIS COURT ORDERS AND DECLARES** that the Transaction is hereby approved, and the execution of the Purchase Agreement by the Vendors is hereby authorized and approved, with such minor amendments as the Vendors and the Purchaser, with the consent of the Monitor, may deem necessary or as the Purchase Agreement may permit in accordance with its terms. The Vendors and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Purchased Assets to the Purchaser.

3.      **THIS COURT ORDERS AND DECLARES** that this Order shall constitute the only authorization required by the Monitor and Vendors to proceed with the Transaction and that no shareholder, partner, or other approvals shall be required in connection therewith.

4.      **THIS COURT ORDERS AND DECLARES** that upon the delivery of a certificate by the Monitor to the Vendors and the Purchaser or their respective counsel substantially in the form attached as **Schedule "B"** hereto (the "**Monitor's Certificate**"), all of the Vendors' right, title and interest in and to the Purchased Assets (which for greater certainty shall not include the Excluded Assets listed on Schedule "B" to the Purchase Agreement or the Excluded Contracts listed on Schedule "E" to the Purchase Agreement) shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts, or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, rights of distraint, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "**Claims**") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Second ARIO or any other Order made in these CCAA Proceedings, including, without limitation, the Administration Charge, Intercompany Advances Charge, DIP Lenders' Charge and the Directors' Charge (as each of those terms are defined in the Second ARIO); (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system in Canada or the United States and all Encumbrances (as defined in the Purchase Agreement) (all of which are collectively referred to as the "**Encumbrances**", which term shall not include the Permitted Encumbrances listed on Schedule "C" to the Purchase Agreement) and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

- 4 -

5.        **THIS COURT ORDERS** that upon the issuance of the Monitor's Certificate, any of the Vendors, the Purchaser or the Monitor, shall be authorized to take all such steps as may be necessary to effect the discharge of all Encumbrances registered against the Purchased Assets (including by filing such financing change statements in the Ontario Personal Property Registry (or any analogous legislation as may be necessary) provided that the Vendors, the Purchaser and the Monitor shall not be authorized to effect any discharge that would have the effect of releasing any Encumbrances against any property other than the Purchased Assets.

6.        **THIS COURT ORDERS AND DIRECTS** that the Cash Purchase Price (as adjusted pursuant to the Purchase Agreement) shall be paid to the Monitor on Closing, and held in trust by the Monitor pending further order of the Court.

7.        **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Purchased Assets shall stand in the place and stead of the Purchased Assets, in accordance with and based on the allocations set out in the Allocation Statement, without prejudice to a subsequent determination by the Court as to the quantum of any claims, distributions and priority in respect of proceeds, and that from and after the delivery of the Monitor's Certificate, all Claims and Encumbrances shall attach to the net proceeds from the sale of the Purchased Assets with the same priority as they had with respect to the Purchased Assets immediately prior to the sale, as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

8.        **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

9.      **THIS COURT ORDERS** that the Monitor may rely on written notice from the Vendors and the Purchaser or their respective counsel regarding fulfillment of the conditions to Closing under the Purchase Agreement and shall incur no liability with respect to the delivery of the Monitor's Certificate.

10.      **THIS COURT ORDERS** that upon the issuance of the Monitor's Certificate, (a) each Permit Vendor and each Related Party Landlord shall be subject to the exclusive governance and control of the CRO and/or the Monitor, (b) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Permit Vendor shall be bankrupt, dissolved or otherwise wound-up prior to the earlier of (i) the date that all Permits are irrevocably transferred to the Purchaser, (ii) the date that the Purchaser advises the CRO and the Monitor in writing that it does not require the irrevocable transfer of the Permits to the Purchaser, and (iii) March 31, 2025, and (c) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Related Party Landlord shall be bankrupt, dissolved or otherwise wound-up prior to the date that the lease, access agreement or parking agreement to which the Related Party Landlord is a party is terminated.

11.      **THIS COURT ORDERS** that nothing in this Order, and nothing done by the Monitor or the CRO in carrying out their control of the Permit Vendors and Related Party Landlords as prescribed in Paragraph 10 hereof, shall result in, or be deemed to result in, the Monitor or CRO being an employer, successor employer, responsible person, operator, officer, director, employee, receiver, trustee, assignee, liquidator, administrator, legal representative, receiver-manager or agent of any Permit Vendor or Related Party Landlord, in each case, within the meaning of any statute, regulation or rule of law, or equity, for any purpose whatsoever.

12.      **THIS COURT ORDERS** that, without limiting Paragraph 11 hereof, the Monitor and CRO shall not, as a result of this Order, or anything done pursuant to Paragraph 10 hereof, be deemed to occupy or to take control, care, charge, possession or management of any of the property of any Permit Vendor or Related

Party Landlord that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination; provided however, if the Monitor or CRO is nevertheless found to be in possession of any property of any Permit Vendor or Related Party Landlord, then the Monitor and CRO, as applicable, shall be deemed to be a person who has been lawfully appointed to take, or has lawfully taken, possession or control of such property for the purposes of section 14.06(1.1)(c) of the BIA, and shall be entitled to the benefits and protections in relation to the applicable Permit Vendor or Related Party Landlord and such property, as provided by section 14.06(2) of the BIA to a "trustee" in relation to an insolvent person and its property.

13.    **THIS COURT ORDERS** that, in addition to the rights and protections afforded to the Monitor and CRO under the CCAA, any order granted in these CCAA proceedings, as an officer of this Court or otherwise at law, the Monitor, CRO and their respective legal counsel shall continue to have the benefit of all of the indemnities, charges, protections and priorities as set out in the Second ARIO and any other Order of this Court and all such indemnities, charges, protections and priorities shall apply and extend to the Monitor and CRO in the fulfillment of their duties, carrying out the provisions of this Order and exercising any powers granted to them hereunder. Nothing in this Order shall derogate from the powers of the Monitor as provided in the CCAA, the Second ARIO and the other Orders of this Court in the CCAA proceedings. Without limiting the generality of the foregoing, in exercising any powers granted to it hereunder: (a) the Monitor and CRO shall be entitled to rely on the Permit Vendors' and Related Party Landlords' books and records without independent investigation; and (b) the Monitor and CRO shall incur no liability or obligation as a result of exercising the powers granted to it under Paragraph 10 hereof, save and except for any gross negligence or wilful misconduct on their part, and the Monitor and CRO shall not have any liability with respect to any losses, claims, damages or liabilities, of any nature or kind in relation to the exercise of their powers under Paragraph 10 hereof, to any person from and after the date of this Order,

save and except to the extent such losses, claims, damages or liabilities result from gross negligence or wilful misconduct on their part.

14.    **THIS COURT ORDERS** that, notwithstanding:

     (a)    the pendency of these CCAA Proceedings;

     (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "**BIA**") in respect of any of the Vendors and any bankruptcy order issued pursuant to any such applications; and

     (c)    any assignment in bankruptcy made in respect of any of the Vendors;

the vesting of the Purchased Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of the Vendors and shall not be void or voidable by creditors of the Vendors, nor shall it constitute nor be deemed to be a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

**SELLER NAME CHANGE AND TITLE OF PROCEEDINGS**

15.    **THIS COURT ORDERS AND DIRECTS** that, following the issuance of the Monitor's Certificate, each of the Vendors and Purchaser are authorized and directed to take any and all steps prescribed by Section 5.4 of the Purchase Agreement, pursuant to the terms thereof (the "**Name Change**").

16.    **THIS COURT ORDERS** that following the Name Change, the name of the Vendors in the within title of proceedings shall be deleted and replaced with the new legal name of the Vendors, and any document filed in these CCAA Proceedings shall be filed using such revised title of proceedings.

**DISCLOSURE OF PERSONAL INFORMATION**

17.     **THIS COURT ORDERS** that, pursuant to clause 7(3)(c) of the *Personal Information Protection and Electronic Documents Act* (Canada), the Vendors and the Monitor are authorized and permitted to disclose and transfer to the Purchaser all human resources and payroll information in the Vendors' records pertaining to the Vendors' past and current employees. The Purchaser shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Vendors.

**GENERAL**

18.     **THIS COURT ORDERS AND DECLARES** that this Order shall have full force and effect in all provinces and territories in Canada.

19.     **THIS COURT ORDERS** that the Vendors, the Monitor or the Purchaser may apply to the Court as necessary to seek further orders and directions to give effect to this Order.

20.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States to give effect to this Order and to assist the Pride Entities, the CRO, the Monitor and their agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Pride Entities, the CRO, and the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Pride Entities, the CRO, the Monitor and their agents in carrying out the terms of this Order.

21.     **THIS COURT ORDERS** that each of the Pride Entities, the CRO, the Monitor, and the Purchaser be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

22.    **THIS COURT ORDERS** that this Order is effective from the date that it is made and is enforceable without any need for entry and filing.

_____

## SCHEDULE "A"

**A. APPLICANTS**

**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.

- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PERGOLA HOLDINGS, CORP.
- PRIDE GLOBAL INSURANCE COMPANY LTD.

SCHEDULE "B"

**Form of Monitor's Certificate**

Court File No.: CV-24-00717340-00CL

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. AND THOSE APPLICANTS LISTED ON SCHEDULE "A" HERETO (each, an "Applicant", and collectively, the "Applicants")**

Applicants

**MONITOR'S CERTIFICATE**

**RECITALS**

A.       Pursuant to an Order of the Court dated September 24, 2024 (the "**Approval and Vesting Order**"), the Court approved an Amended and Restated Purchase Agreement dated as of September 22, 2024 (the "**Purchase Agreement**") between Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation, as vendors (collectively, the "**Vendors**"), and 1000927605 Ontario Inc., as purchaser (the "**Purchaser**"), and provided for the vesting in the Purchaser of the Vendor's right, title and interest in and to the Purchased Assets (the "**Transaction**"), which vesting is to be effective with respect to the Purchased Assets upon the Monitor's delivery to the Purchaser of a certificate confirming the Transaction has been completed to the satisfaction of the Monitor.

B.       Pursuant to the Approval and Vesting Order, the Monitor may rely on written notice from the Vendors and the Purchaser regarding fulfillment and/or waiver of conditions to closing under the Purchase Agreement.

C.       Capitalized terms used herein and not otherwise defined have the meanings given to such terms in the Approval and Vesting Order or the Purchase Agreement, as the case may be.

- 2 -

**THE MONITOR CERTIFIES** the following:

1.      The Purchaser has paid the Purchase Price for the Purchased Assets pursuant to the Purchase Agreement.

2.      The Vendors and the Purchaser have each delivered written notice to the Monitor that the conditions to Closing under the Purchase Agreement have been satisfied and/or waived, as applicable.

3.      The Transaction has been completed to the satisfaction of the Monitor.

4.      This Certificate was delivered by the Monitor at _____ **[TIME]** on _____ **[DATE]**.

**ERNST & YOUNG INC., solely in its capacity as Court-appointed Monitor of the Pride Entities and not in its personal capacity**

Per: _____
    Name:
    Title:

Court File No.: CV-24-00717340-00CL

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. ET AL. (each, an "Applicant", and collectively, the "Applicants")**

| | |
|---|---|
| | **ONTARIO**<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>PROCEEDING COMMENCED AT TORONTO |
| | **ORDER**<br>**(Approval and Vesting)** |
| | **THORNTON GROUT FINNIGAN LLP**<br>TD West Tower, Toronto-Dominion Centre<br>100 Wellington Street West, Suite 3200<br>Toronto, ON  M5K 1K7<br><br>**Leanne Williams (LSO #41877E)**<br>Tel:  (416) 304-0060 / Email:  lwilliams@tgf.ca<br><br>**Rachel Nicholson (LSO #68348V)**<br>Tel:  (416) 304-1153 / Email:  rnicholson@tgf.ca<br><br>**Puya Fesharaki (LSO #70588L)**<br>Tel:  (416) 304-7979 / Email:  pfesharaki@tgf.ca<br><br>**Ines Ferreira (LSO #81472A)**<br>Tel:  (416) 304-0461 / Email: iferreira@tgf.ca<br><br>Lawyers for the Applicants |

# Appendix "D"

Court File No.: CV-24-00717340-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE ~~ ~~ MR. | ) | ~~ DAY~~ TUESDAY, THE ~~ ~~ 24th |
| | ) | |
| JUSTICE ~~ ~~ OSBORNE | ) | DAY OF ~~ ~~ SEPTEMBER, 2024 |

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. AND THOSE APPLICANTS LISTED ON SCHEDULE "A" HERETO (each, an "Applicant", and collectively, the "Applicants")**

**ORDER**
**(Approval and Vesting - PGL)**

**THIS MOTION**, made by Applicants pursuant to the *Companies Creditors' Arrangement Act*, R.S.C. 1985, c. c-36, as amended (the "**CCAA**") for an order, among other things, approving the sale transaction (the "**Transaction**")[1] contemplated by ~~a~~ an Amended and Restated Purchase Agreement dated as of ~~August 26~~ September 22, 2024 (the "**Purchase Agreement**") between Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation, as vendors (collectively, the "**Vendors**"), and 1000927605 Ontario Inc., as purchaser (the "**Purchaser**"), attached to the Third Supplement to the Fourteenth Report ~~(as defined below~~ of the Monitor, dated September 23, 2024 (the "**Third Supplementary Report**") as Appendix "D",  and vesting in the Purchaser all of the

---

[1] For greater certainty, "Transaction" shall not include any transaction(s) contemplated by the Real Property Option (as defined in the Sale Agreement) which option and the exercise of same remain open in accordance with and subject to the terms of the Sale Agreement and which transaction(s) remain subject to Court approval.

- 2 -

Vendors' right, title and interest in and to the Purchased Assets (as defined in the Purchase Agreement), was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of Randal Benson sworn August 27, 2024 and the Exhibits thereto (the "Benson Affidavit"), the Fourteenth Report of Ernst & Young Inc. dated August 28, 2024 (the "Fourteenth Report") and ,. the Supplement to the Fourteenth Report of Ernst & Young Inc., dated August [31]September 2, 2024, and the Third Supplementary Report, each issued by Ernst & Young Inc. in its capacity as court-appointed monitor (in such capacity, the "Monitor"), and on hearing the submissions of counsel for the Applicants and the limited partnerships listed in Schedule "A" hereto (collectively with the Applicants, the "Pride Entities"), the Monitor and the Purchaser, and such other counsel as listed on the Participant Information Form, with no one else appearing although properly served as appears from the affidavit of service, filed,

**DEFINITIONS**

1.      **THIS COURT ORDERS** that capitalized terms used but not defined in this Order shall have the meanings given to them in the Purchase Agreement or the Fourteenth Report, as the case may be.

**APPROVAL OF TRANSACTION**

2.      **THIS COURT ORDERS AND DECLARES** that the Transaction is hereby approved, and the execution of the Purchase Agreement by the Vendors is hereby authorized and approved, with such minor amendments as the Vendors and the Purchaser, with the consent of the Monitor, may deem necessary or as the Purchase Agreement may permit in accordance with its terms. The Vendors and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Purchased Assets to the Purchaser.

3.    **THIS COURT ORDERS AND DECLARES** that this Order shall constitute the only authorization required by the Monitor and Vendors to proceed with the Transaction and that no shareholder, partner, or other approvals shall be required in connection therewith.

4.    **THIS COURT ORDERS AND DECLARES** that upon the delivery of a certificate by the Monitor to the Vendors and the Purchaser or their respective counsel substantially in the form attached as **Schedule "B"** hereto (the "**Monitor's Certificate**"), all of the Vendors' right, title and interest in and to the Purchased Assets (which for greater certainty shall not include the Excluded Assets listed on Schedule "B" to the Purchase Agreement or the Excluded Contracts listed on Schedule "E" to the Purchase Agreement) shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts, or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, rights of distraint, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "**Claims**") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Second ARIO or any other Order made in these CCAA Proceedings, including, without limitation, the Administration Charge, Intercompany Advances Charge, DIP Lenders' Charge and the Directors' Charge (as each of those terms are defined in the Second ARIO); (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system in Canada or the United States and all Encumbrances (as defined in the Purchase Agreement) (all of which are collectively referred to as the "**Encumbrances**", which term shall not include the Permitted Encumbrances listed on Schedule "C" to the Purchase Agreement) and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

5.    **THIS COURT ORDERS** that upon the issuance of the Monitor's Certificate, any of the Vendors, the Purchaser or the Monitor, shall be authorized to take all such steps as may be necessary to effect the discharge of all Encumbrances registered against the Purchased Assets (including by filing such financing change statements in the Ontario Personal Property Registry (or any analogous legislation as may be necessary) provided that the Vendors, the Purchaser and the Monitor shall not be authorized to effect any discharge that would have the effect of releasing any Encumbrances against any property other than the Purchased Assets.

6.    ~~**THIS COURT ORDERS AND DIRECTS** that the Purchaser shall pay the LC Purchase directly to the issuers of the Purchased LCs (the "**LC Issuers**"), which amount shall be held by the LC Issuers as cash collateral for the LCs, or as cash collateral for letters of credit issued to replace the Purchased LCs (the "**Replacement LCs**"), and applied or disbursed in accordance with the terms of the documentation governing the Purchased LCs or Replacement LCs, as applicable.~~

<u>6.</u>    ~~7.~~ **THIS COURT ORDERS AND DIRECTS** that the Cash Purchase Price (as adjusted pursuant to the Purchase Agreement~~, and, for the avoidance of doubt, net of the LC Purchase Price~~) shall be paid to the Monitor on Closing, and held in trust by the Monitor pending further order of the Court.

<u>7.</u>    ~~8.~~ **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Purchased Assets ~~(other than the LC Purchase Price)~~ shall stand in the place and stead of the Purchased Assets, in accordance with and based on the allocations set out in the Allocation Statement<u>, without prejudice to a subsequent determination by the Court as to the quantum of any claims, distributions and priority in respect of proceeds</u>, and that from and after the delivery of the Monitor's Certificate, all Claims and Encumbrances shall attach to the net proceeds from the sale of the Purchased Assets with the same priority as they had with respect to the Purchased Assets

immediately prior to the sale, as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

8.    9. **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

9.    10. **THIS COURT ORDERS** that the Monitor may rely on written notice from the Vendors and the Purchaser or their respective counsel regarding fulfillment of the conditions to Closing under the Purchase Agreement and shall incur no liability with respect to the delivery of the Monitor's Certificate.

10.    **THIS COURT ORDERS** that upon the issuance of the Monitor's Certificate, (a) each Permit Vendor and each Related Party Landlord shall be subject to the exclusive governance and control of the CRO and/or the Monitor, (b) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Permit Vendor shall be bankrupt, dissolved or otherwise wound-up prior to the earlier of (i) the date that all Permits are irrevocably transferred to the Purchaser, (ii) the date that the Purchaser advises the CRO and the Monitor in writing that it does not require the irrevocable transfer of the Permits to the Purchaser, and (iii) March 31, 2025, and (c) except by further Court order, sought on not less than 10 calendar days notice to the Purchaser, no Related Party Landlord shall be bankrupt, dissolved or otherwise wound-up prior to the date that the lease, access agreement or parking agreement to which the Related Party Landlord is a party is terminated.

11.    **THIS COURT ORDERS** that nothing in this Order, and nothing done by the Monitor or the CRO in carrying out their control of the Permit Vendors and Related Party Landlords as prescribed in Paragraph 10 hereof, shall result in, or be deemed to result in, the Monitor or CRO being an employer, successor employer, responsible person, operator, officer, director, employee, receiver, trustee, assignee, liquidator, administrator, legal representative, receiver-manager or agent of any Permit Vendor or

Related Party Landlord, in each case, within the meaning of any statute, regulation or rule of law, or equity, for any purpose whatsoever.

12.     **THIS COURT ORDERS** that, without limiting Paragraph 11 hereof, the Monitor and CRO shall not, as a result of this Order, or anything done pursuant to Paragraph 10 hereof, be deemed to occupy or to take control, care, charge, possession or management of any of the property of any Permit Vendor or Related Party Landlord that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination; provided however, if the Monitor or CRO is nevertheless found to be in possession of any property of any Permit Vendor or Related Party Landlord, then the Monitor and CRO, as applicable, shall be deemed to be a person who has been lawfully appointed to take, or has lawfully taken, possession or control of such property for the purposes of section 14.06(1.1)(c) of the BIA, and shall be entitled  to the benefits and protections in relation to the applicable Permit Vendor or Related Party Landlord and such property, as provided by section 14.06(2) of the BIA to a "trustee" in relation to an insolvent person and its property.

13.     **THIS COURT ORDERS** that, in addition to the rights and protections afforded to the Monitor and CRO under the CCAA, any order granted in these CCAA proceedings, as an officer of this Court or otherwise at law, the Monitor, CRO and their respective legal counsel shall continue to have the benefit of all of the indemnities, charges, protections and priorities as set out in the Second ARIO and any other Order of this Court and all such indemnities, charges, protections and priorities shall apply and extend to the Monitor and CRO in the fulfillment of their duties, carrying out the provisions of this Order and exercising any powers granted to them hereunder. Nothing in this Order shall derogate from the powers of the Monitor as provided in the CCAA, the Second ARIO and the other Orders of this Court in the CCAA proceedings. Without limiting the generality of the foregoing, in exercising any powers granted to

- 7 -

it hereunder: (a) the Monitor and CRO shall be entitled to rely on the Permit Vendors' and Related Party Landlords' books and records without independent investigation; and (b) the Monitor and CRO shall incur no liability or obligation as a result of exercising the powers granted to it under Paragraph 10 hereof, save and except for any gross negligence or wilful misconduct on their part, and the Monitor and CRO shall not have any liability with respect to any losses, claims, damages or liabilities, of any nature or kind in relation to the exercise of their powers under Paragraph 10 hereof, to any person from and after the date of this Order, save and except to the extent such losses, claims, damages or liabilities result from gross negligence or wilful misconduct on their part.

14.    11. **THIS COURT ORDERS** that, notwithstanding:

(a)     the pendency of these CCAA Proceedings;

(b)     any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "**BIA**") in respect of any of the Vendors and any bankruptcy order issued pursuant to any such applications; and

(c)     any assignment in bankruptcy made in respect of any of the Vendors;

the vesting of the Purchased Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of the Vendors and shall not be void or voidable by creditors of the Vendors, nor shall it constitute nor be deemed to be a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

**SELLER NAME CHANGE AND TITLE OF PROCEEDINGS**

15.    ~~12.~~ **THIS COURT ORDERS AND DIRECTS** that, ~~immediately~~ following ~~Closing~~the issuance of the Monitor's Certificate, each of the Vendors and Purchaser are authorized and directed to take any and all steps prescribed by Section 5.4 of the Purchase Agreement, pursuant to the terms thereof (the "**Name Change**").

16.    ~~13.~~ **THIS COURT ORDERS** that following the Name Change, the name of the Vendors in the within title of proceedings shall be deleted and replaced with the new legal name of the Vendors, and any document filed in these CCAA Proceedings shall be filed using such revised title of proceedings.

**DISCLOSURE OF PERSONAL INFORMATION**

17.    ~~14.~~ **THIS COURT ORDERS** that, pursuant to clause 7(3)(c) of the *Personal Information Protection and Electronic Documents Act* (Canada), the Vendors and the Monitor are authorized and permitted to disclose and transfer to the Purchaser all human resources and payroll information in the Vendors' records pertaining to the Vendors' past and current employees. The Purchaser shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Vendors.

**GENERAL**

18.    ~~15.~~ **THIS COURT ORDERS AND DECLARES** that this Order shall have full force and effect in all provinces and territories in Canada.

19.    ~~16.~~ **THIS COURT ORDERS** that the Vendors, the Monitor or the Purchaser may apply to the Court as necessary to seek further orders and directions to give effect to this Order.

20.    17. **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States to give effect to this Order and to assist the Pride Entities, the CRO, the Monitor and their agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Pride Entities, the CRO, and the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Pride Entities, the CRO, the Monitor and their agents in carrying out the terms of this Order.

21.    18. **THIS COURT ORDERS** that each of the Pride Entities, the CRO, the Monitor, and the Purchaser be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

22.    19. **THIS COURT ORDERS** that this Order is effective from the date that it is made and is enforceable without any need for entry and filing.

_____

SCHEDULE "A"

**A.  APPLICANTS**

**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*

- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

## C. ADDITIONAL STAY PARTIES

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PERGOLA HOLDINGS, CORP.
- PRIDE GLOBAL INSURANCE COMPANY LTD.

**SCHEDULE "B"**

**Form of Monitor's Certificate**

Court File No.: CV-24-00717340-00CL

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. AND THOSE APPLICANTS LISTED ON SCHEDULE "A" HERETO (each, an "Applicant", and collectively, the "Applicants")**

Applicants

**MONITOR'S CERTIFICATE**

**RECITALS**

A.       Pursuant to an Order of the Court dated September 3~~3~~24, 2024 (the "**Approval and Vesting Order**"), the Court approved ~~a~~an Amended and Restated Purchase Agreement dated as of ~~August 26~~September 22, 2024 (the "**Purchase Agreement**") between Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc. and TPine Leasing Capital Corporation, as vendors (collectively, the "**Vendors**"), and 1000927605 Ontario Inc., as purchaser (the "**Purchaser**"), and provided for the vesting in the Purchaser of the Vendor's right, title and interest in and to the Purchased Assets (the "**Transaction**"), which vesting is to be effective with respect to the Purchased Assets upon the Monitor's delivery to the Purchaser of a certificate confirming the Transaction has been completed to the satisfaction of the Monitor.

B.       Pursuant to the Approval and Vesting Order, the Monitor may rely on written notice from the Vendors and the Purchaser regarding fulfillment and/or waiver of conditions to closing under the Purchase Agreement.

- 2 -

C.      Capitalized terms used herein and not otherwise defined have the meanings given to such terms in the Approval and Vesting Order or the Purchase Agreement, as the case may be.

**THE MONITOR CERTIFIES** the following:

1.      The Purchaser has paid the Purchase Price for the Purchased Assets pursuant to the Purchase Agreement.

2.      The Vendors and the Purchaser have each delivered written notice to the Monitor that the conditions to Closing under the Purchase Agreement have been satisfied and/or waived, as applicable.

3.      The Transaction has been completed to the satisfaction of the Monitor.

4.      This Certificate was delivered by the Monitor at _____ **[TIME]** on _____ **[DATE]**.

**ERNST & YOUNG INC.,** ~~soley~~solely **in its capacity as Court-appointed Monitor of the Pride Entities and not in its personal capacity**

Per: _____

     Name:
     Title:

- 3 -

Court File No.: CV-24-00717340-00CL

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. ET AL. (each, an "Applicant", and collectively, the "Applicants")**

<table>
<tr>
<td></td>
<td>

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

PROCEEDING COMMENCED AT TORONTO

---

**ORDER**
**(Approval and Vesting)**

---

**THORNTON GROUT FINNIGAN LLP**
TD West Tower, Toronto-Dominion Centre
100 Wellington Street West, Suite 3200
Toronto, ON  M5K 1K7

**Leanne Williams (LSO #41877E)**
Tel:  (416) 304-0060 / Email:  lwilliams@tgf.ca

**Rachel Nicholson (LSO #68348V)**
Tel:  (416) 304-1153 / Email:  rnicholson@tgf.ca

**Puya Fesharaki (LSO #70588L)**
Tel:  (416) 304-7979 / Email:  pfesharaki@tgf.ca

**Ines Ferreira (LSO #81472A)**
Tel:  (416) 304-0461 / Email: iferreira@tgf.ca

Lawyers for the Applicants

</td>
</tr>
</table>

Document comparison by Workshare Compare on Monday, September 23, 2024 4:49:02 PM

| Input: | |
|---|---|
| Document 1 ID | netdocuments://1415-2696-3471/2 |
| Description | EY - Pride - PGL Approval and Vesting Order (Blakes Comments) |
| Document 2 ID | netdocuments://1415-2696-3471/4 |
| Description | EY - Pride - PGL Approval and Vesting Order (Blakes Comments) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |

|  | Count |
|---|---|
| Insertions | 41 |
| Deletions | 33 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 74 |

Court File No.:  CV-24-00717340-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC., et al.

| | |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding Commenced at Toronto |
| | **THIRD SUPPLEMENT TO FOURTEENTH**<br>**REPORT OF THE MONITOR**<br>**Dated September 23, 2024** |
| | **BLAKE, CASSELS & GRAYDON LLP**<br>Barristers and Solicitors<br>199 Bay Street<br>Suite 4000, Commerce Court West<br>Toronto, Ontario M5L 1A9<br><br>**Pamela Huff**, LSO #27344V<br>Tel:  416-863-2958<br>Email:  pamela.huff@blakes.com<br><br>**Chris Burr**, LSO #55172H<br>Tel:  416-863-3261<br>Email:  chris.burr@blakes.com<br><br>**Kelly Bourassa**, LSO #43062R<br>Tel:  416-863-2421<br>Email:  kelly.bourassa@blakes.com<br><br>**Daniel Loberto**, LSO #79632Q<br>Tel:  416-863-2937<br>Email:  daniel.loberto@blakes.com<br><br>Lawyers for the Monitor |