**Exhibit C**

Fifteenth Report

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*, **R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those Applicants listed on **Schedule "A"** hereto

**FIFTEENTH REPORT OF THE MONITOR**

**DATED September 22, 2024**

# TABLE OF CONTENTS

**INTRODUCTION**.................................................................................................................3

**PURPOSE**.........................................................................................................................11

**TERMS OF REFERENCE** ................................................................................................11

**ACTIVITIES OF THE APPLICANTS SINCE THE SEVENTH REPORT** .....................................12

*VEHICLE SALES AND REPOSSESSIONS* ...........................................................................12

***REAL ESTATE MONETIZATION, LEASES AND FACTORING TRANSACTION UPDATES*** ........14

***ORDERLY WIND-DOWN PLAN*** ......................................................................................15

**PRIDE ENTITIES RECEIPTS AND DISBURSEMENTS** ...........................................................16

**CONCLUSIONS AND RECOMMENDATIONS** ......................................................................21

**Appendices**

| **Appendix** | **Tab** |
|---|---|

Variance Analysis………………………………………………………A

Cash Flow Forecast................................................................................B

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and
those Applicants listed on **Schedule "A"** hereto

**FIFTEENTH REPORT OF THE MONITOR**

**DATED September 22, 2024**

**INTRODUCTION**

1. On March 27, 2024, Pride Group Holdings Inc. and those entities listed as "Applicants" in **Schedule "A"** hereto (each an "**Applicant**" and, collectively, the "**Applicants**") brought an application (the "**CCAA Application**") before the Ontario Superior Court of Justice (Commercial List) (the "**Court**") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") to, among other things, obtain a stay of proceedings to allow them an opportunity to restructure their business and affairs.

2. On the same day, the Court granted an initial order in these CCAA proceedings (the "**CCAA Proceedings**") that, among other things, (i) appointed Ernst & Young Inc. as Monitor (in such capacity, the "**Monitor**"), and (ii) appointed RC Benson Consulting Inc. as Chief Restructuring Officer of the Pride Entities (in such capacity, the "**CRO**"). The Monitor filed a Pre-Filing Report dated March 27, 2024, in connection with the CCAA Application.

3. In addition to the Applicants, the entities listed as "Limited Partnerships" and "Additional Stay Parties" in **Schedule "A"** hereto also obtained the benefit of the stay of proceedings until and including April 6, 2024, which stay expired the next business day, April 8, 2024 (the "**Stay Period**"). The Applicants together with the Limited Partnerships are referred to

herein as the "**Pride Entities**" (and together with the Additional Stay Parties, the "**Pride Group**").

4.      The comeback hearing was heard on Friday, April 5, 2024 (the "**Comeback Hearing**"), where the Pride Entities sought and obtained an amended and restated initial order (the "**ARIO**"). The Monitor filed its First Report to Court, dated April 4, 2024 (the "**First Report**") in connection with the Comeback Hearing. The ARIO, among other things, extended the Stay Period to June 30, 2024, approved the term sheet for the DIP Facility and granted other relief as further described in the First Report.

5.      At the Comeback Hearing, the Court also granted an order approving certain protocols, including the Governance Protocol set out in Scheduled "B" thereto (the "**Governance Protocol**"). The Governance Protocol was approved subject to parties returning to Court on a without prejudice basis on April 19, 2024, for the approval of a revised Governance Protocol (the "**Revised Governance Protocol**"). which was subsequently adjourned to April 25, 2024, on consent. The Monitor filed its Second Report to Court, dated April 24, 2024 (the "**Second Report**") in connection with this April 19, 2024 return date, which was further adjourned to May 15, 2024, on consent, to give the Monitor, the Pride Entities, and the CRO additional time to negotiate the Revised Governance Protocol with affected stakeholders.

6.      The Monitor filed its Supplement to the Second Report to Court on May 6, 2024, to provide information to the Court in respect of ongoing negotiations and terms of the Revised Governance Protocol from the date of the Second Report.

7.      On May 6, 2024, the Pride Entities brought a motion for an approval and vesting order in respect of the sale of certain real property in Bolingbrook, Illinois (the "**Bolingbrook Property**") and to amend and restate the ARIO. The Monitor filed its Third Report to Court, dated May 2, 2024, in connection with such motion. The Court granted orders approving the sale of the Bolingbrook Property and amending and restating the ARIO (the "**Second ARIO**").

8.      On May 5, 2024, the Pride Entities brought a motion, seeking, among other things, (i) an order approving a sale and marketing process for the business, operations, and assets ("**PGL Sale Process**") of Pride Group Logistics Ltd. ("**PGL**"), Pride Group Logistics USA, Co., Pride Global Insurance Company Ltd.[1] (collectively, the "**PGL Entities**"), and (ii) an approval and vesting order in respect of the sale of certain property in Chehalis, Washington (the "**Chehalis Property**"). The Monitor filed its Fourth Report to Court, dated May 10, 2024, in connection with same.

9.      On May 13, 2024, the Monitor filed its Fifth Report to Court, which provided the Court and stakeholders with an update on the status and ongoing work with respect to: (i) secured facility reviews, (ii) securitization facility reviews, and (iii) the entitlement claims process. On May 15, 2024, the Court granted orders approving, among other things, the PGL Sale Process, the sale of the Chehalis Property, and the Amended and Restated Protocols Order, dated May 15, 2024, which included the Revised Governance Protocol.

10.     On June 14, 2024, the Pride Entities brought a motion seeking approval of the entitlement claims process (the "**Entitlement Claims Process**", with such Order being the "**Entitlement Claims Process Order**"). The Monitor filed its Sixth Report to Court, dated June 13, 2024 (the "**Sixth Report**"), in connection with same. On June 14, 2024, the Court granted the Entitlement Claims Process Order.

11.     On June 27, 2024, the Pride Entities brought motions seeking (i) the extension of the Stay Period (as defined in the Second ARIO) to and including September 30, 2024, (ii) the entry of a consent order authorizing Regions Equipment Finance Corporation ("**REFCO**") and Regions Commercial Equipment Finance, LLC ("**RCEF**", and together with REFCO, "**Regions Equipment Finance**") to sell certain vehicles surrendered to Regions Equipment Finance pre-filing, and (iii) the entry of a consent order authorizing Daimler Truck Financial Services Canada Corporation ("**DTF Canada**") and Daimler Truck Financial Services USA LLC ("**DTF US**", and together with DTF Canada, "**Daimler**") to sell certain vehicles surrendered to Daimler pre-filing. The Monitor filed its Seventh Report to Court

---

[1] Pride Global Insurance Company Ltd. is not an Applicant in these proceedings and is an Additional Stay Party as listed in Schedule "A" to the Second ARIO.

dated June 26, 2024 (the "**Seventh Report**"), in connection with these motions. On June 27, 2024, the Court granted the order extending the Stay Period as well as the consent orders referred to above.

12.  On July 3, 2024, the Pride Entities brought a motion seeking (i) an order approving the amendment and extension of the Fourth Amended and Restated Credit Agreement executed on May 10, 2024, and (ii) the entry of a consent order authorizing VFS Canada Inc. ("**VFS Canada**") and VFS U.S. LLC ("**VFS US**", and together with VFS Canada, "**VFS**") to sell certain vehicles surrendered to VFS pre-filing. The Monitor filed its Eighth Report to Court, dated July 2, 2024, in connection with this motion. On July 3, 2024, the Court granted the orders referred to above.

13.  On July 16, 2024, the Pride Entities brought a motion seeking, among other things, (i) entry of an order in respect of certain unreturned collateral financed by Regions Equipment Finance, (ii) an order approving the distribution of net proceeds of sale of the Chehalis Property to Roynat Inc. ("**Roynat**"), and (iii) an order approving a transaction contemplated by a factoring portfolio purchase agreement (the "**Factoring Transaction**") between TPine Financial Services Inc., as vendor, and J D Factors Corporation / Corporation D'affacturage J D, as purchaser. The Monitor filed its Ninth Report to Court, dated July 13, 2024, in connection with same. Separately, the Monitor filed a Supplement to the Ninth Report of the Monitor on July 15, 2024, which included an update on the Monitor's review of the securitization facilities. On July 16, 2024, the Court granted the orders referred to in points (i) and (ii) above. The motion seeking the approval of the Factoring Transaction was adjourned until August 7, 2024. An order granted on that date approved the Factoring Transaction, which is expected to close in phases, with the first phase expected to close on or about September 4, 2024.

14.  On July 21, 2024, the Pride Entities brought a motion seeking, among other things, (i) an order respecting the transition and relinquishment of servicing and other duties under certain Securitization Programs where the outcome of the Monitor's proprietary interest assessment with respect to an applicable Securitization Party's ownership entitlement to such assets is favourable, and (ii) set out the terms and conditions upon which such turn-

over may occur.  The Monitor filed its Tenth Report to Court, dated July 21, 2024 (the "**Tenth Report**"), in connection with same, which Tenth Report included the Monitor's view with respect to certain of the Securitization Programs. On August 8, 2024, the Court granted an order in respect of, among other things, the turn-over of securitized assets (the "**Securitized Asset Turn-Over Order**").

15.     The Monitor filed its Supplement to the Tenth Report on August 1, 2024 (the "**Supplement to the Tenth Report**"), which provided a proposed methodology for consideration by the stakeholders and the Court for the allocation of the direct legal fees and disbursements of the Securitization Program review undertaken by the Monitor's Canadian counsel, Blake, Cassels & Graydon LLP, and U.S. counsel, McDermott, Will & Emery LLP  on a fair and equitable basis as a necessary cost of transitioning among the Subject Assets subject to the Reviewed Programs (the "**Validation Mandate Fee Proposal**") (as such terms are defined in the Supplement to the Tenth Report). No hearing date has been set to approve the Validation Mandate Fee Proposal, and the Monitor expects to engage with stakeholders prior to such hearing date.

16.     The Monitor filed its Eleventh Report to the Court on August 2, 2024, which provided the Court with information pertaining to the Monitor's review of the security interests asserted by secured creditors, including, but not limited to, the Monitor's view as to whether each secured creditor had, as at July 31, 2024, provided sufficient evidence of a perfected and priority interest in specific vehicles which are owned by the Pride Entities and identified and tracked by vehicle identification numbers (with the exception of Multiple Collateral Vehicles and each, an "**MCV**", which are subject to the Entitlement Claims Process).

17.     On August 2, 2024, the DIP Agent (as defined below) brought a motion, on a date to be set by the Court, for the appointment of Alvarez & Marsal Canada Inc. (the "**Proposed Collateral Manager**") as manager, an officer of the Court (in such capacity, the "**Collateral Manager**"), of those assets, undertakings and properties of the Pride Entities/Syndicate Lenders, including all proceeds thereof, included in the definition of "Management Property" in the proposed Syndicate Collateral Management Order and lifting the stay of proceedings granted in these CCAA Proceedings to the extent necessary

to give effect to the appointment of the Proposed Collateral Manager as Collateral Manager and the other relief set out in the Syndicate Collateral Management Order.

18.    On August 7, 2024, the Pride Entities brought a motion seeking, among other things, (i) an approval and vesting order in respect of the sale of certain property in Abbotsford, British Columbia and approving the distribution of net proceeds of sale to Roynat, and (ii) an approval and vesting order in respect of the sale of certain property in Cornwall, Ontario and approving the distribution of net proceeds of sale to Roynat.  The Monitor filed its Twelfth Report to the Court on August 6, 2024, in respect of this motion and to provide updates to the Court in respect of the PGL Sale Process and the Factoring Transaction. On August 7, 2024, the Court granted orders approving both real property sales referred to above.

19.    On August 9, 2024, the Pride Entities brought a motion, seeking, among other things, an order (i) authorizing and entitling the Pride Entities to apply any Lease Payments and Soft Collections (each as defined in the Affidavit of Randall Benson, sworn August 7, 2024) received from and after July 15, 2024 until September 3, 2024 to pay their ordinary course working capital needs and for other general corporate purposes (the "**Deferred Payments**"), but excluding Lease Payments and Soft Collections (a) in respect of MCVs, (b) in which a Securitization Party has claimed an interest, or (c) in respect of any Subject Asset or MCV Asset (as defined in the Securitized Asset Turn-Over Order), provided that the Pride Entities continue to abide by the reporting and record-keeping obligations in respect of such Deferred Payments as set out in the Revised Governance Protocol, and (ii) approving the Pride Entities' execution of a non-binding indicative term sheet (the "**Indicative Term Sheet**") between Nations Capital, LLC, as Agent, 1903P Loan Agent, LLC or is affiliates and Pride Group Holdings, Inc, as borrower, to facilitate a proposed interim financing facility (the "**New Interim Financing Facility**"), and seeking the limited approval of the payment of due diligence fees and negotiations of the New Interim Financing Facility and wind-down plan, subject to Court approval.

20.     The Monitor filed its Thirteenth Report to the Court on August 8, 2024 (the "**Thirteenth Report**") in respect of the foregoing motion and to provide updates to the Court in respect of the Validation Mandate, the DIP Facility, and the status of the Pride Entities' liquidity.

21.     On August 9, 2024, the Court granted an Order (i) amending the Revised Governance Protocol to permit the Pride Entities to use the Deferred Payments subject to the Monitor's review and oversight, provided that (a) the aggregate amount of the Deferred Payments do not exceed the aggregate amount contemplated in the cash flow forecast (subject to a 10% positive variance), (b) the Pride Entities continue to abide by the reporting and record-keeping obligations in respect of such Deferred Payments, among other things, and (c) the amount of the Deferred Payments will be allocated by further order of the Court; and (ii) adjourning the Pride Entities' motion to approve certain provisions of the Indicative Term Sheet *sine die.*

22.     On August 9, 2024, the Court issued an endorsement which provided that, among other things, the CRO and the Pride Entities, in consultation with the Monitor, shall immediately engage with the Pride Entities' significant Financiers to develop an orderly wind-down proposal in respect of the Pride Entities, including the funding required in respect of such proposal and completion of the CCAA proceedings.

23.     The Pride Entities brought a motion returnable on September 3, 2024 seeking, among other things, (i) an order extending the Pride Entities' ability to use  Deferred Payments from September 3, 2024 to September 30, 2024the (the "**Extended Deferred Payments**", collectively with the Deferred Payments, the "**Total Deferred Payments**") and authorizing the sale of MCVs not subject to an active lease, (ii) approval of the PGL Sale Agreement, and (iii) advice and directions relating to alternate relief in respect of the PGL Entities and a wind-down of the Pride Entities. Advice and directions were also sought for an orderly wind-down process, as a collective response to the Lift-Stay Motions also returnable on September 3, 2024.

24.     The Monitor filed its Fourteenth Report to Court on August 28, 2024 (the "**Fourteenth Report**") and its Supplement to Fourteenth Report on September 2, 2024, in connection with same.

25.  On September 3, 2024, the Court granted orders which, among other things, (i) amended the Order amending the Revised Governance Protocol, dated August 9, 2024 to permit use of the Extended Deferred Payments, in accordance with the provisions contained in such order, (ii) increased the Administration Charge to an aggregate amount of $5 million, and (iii) expunged and discharged any liens registered against any assets owned by the Pride Entities pursuant to the *Repair and Storage Lien Act* (Ontario), or equivalent statutes, upon payment of the amount of such lien as registered in the applicable personal property registry to the Monitor in trust, pending the resolution or determination of the validity and/or quantum of such lien claims, in accordance with the terms of such order.

26.  The Court issued an Endorsement on the same date (the "**September 3 Endorsement**") which directed affected parties to attend before The Honourable Thomas McEwen, former Team Lead of the Commercial List, on September 9, 2024, and if and as necessary and as Mr. McEwen may direct, September 10, 2024, to mediate the issues in dispute at the September 3, 2024 hearing and attempt to resolve or at least narrow the issues (the "**Mediation Issues**", with the underlying mediation referred to herein as the "**Mediation**").

27.  The Monitor filed its Second Supplement to the Fourteenth Report on September 19, 2024 (the "**Second Supplemental Report**") to provide the Court with information pertaining to the Mediation, the Orderly Wind-Down Plan, the Funding Contribution Proposal, and the Pride Entities' motion for, among other things, (i) approval of the implementation of the Orderly Wind-Down Plan, (ii) approval of the Funding Contribution Proposal (all as defined in the Second Supplemental Report), (iii) termination of the Governance Protocol (as revised), and (iv) approval of deadlines for monetization of Remaining Assets, and MCVs where entitlement is not resolved on a timely basis.

28.  This report (the "**Fifteenth Report**") should be read in conjunction with the prior reports of the Monitor and the Affidavit of Randall Benson, sworn September 18, 2024 (the "**Benson Affidavit**").

**PURPOSE**

29.     The purpose of this Fifteenth Report is to provide information to the Court with respect to:

   (a)     the Applicants' receipts and disbursements from July 29, 2024, to September 6, 2024, compared to the cash flow forecast appended as Appendix "C" (the "**July 29 Cash Flow Forecast**") to the Thirteenth Report;

   (b)     the updated cash flow forecast from September 7, 2024, to March 30, 2025, on a consolidated basis for the Pride Entities;

   (c)     the Pride Entities' motions for an order that includes the following relief (the "**Requested Relief**"):

      (i)     extending the Stay Period to March 31, 2025.

      (ii)    approving the key employee retention plan (the "**KERP**"), and sealing the KERP Summary (defined below); and

   (d)     the Monitor's views on the Requested Relief.

**TERMS OF REFERENCE**

30.     In preparing this Fifteenth Report and making the comments herein, the Monitor has been provided with, and has relied upon, unaudited financial information, books and records prepared by the Applicants, discussions with management of the Applicants ("**Management**"), and information from other third-party sources (collectively, the "**Information**").  In its preparation of this Fifteenth Report:

   (a)     the Monitor has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Monitor has not audited or otherwise attempted to verify the accuracy or completeness of such Information in a manner that would wholly or partially comply with Canadian Auditing Standards ("**CAS**") pursuant to the Chartered Professional Accountants

Canada Handbook and, accordingly, the Monitor expresses no opinion or other form of assurance contemplated under CAS in respect of the Information; and

(b)     some of the information referred to in this Fifteenth Report may consist of forecasts and projections. An examination or review of the financial forecast and projections, as outlined in the Chartered Professional Accountants Canada Handbook, has not been performed.

31.     Any future-oriented financial information referred to in this Fifteenth Report was prepared based on Management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that are not ascertainable, the actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

32.     Unless otherwise indicated, the Monitor's understanding of factual matters expressed in this Fifteenth Report concerning the Pride Entities, and their business is based on the Information, and not independent factual determinations made by the Monitor.

33.     Capitalized terms not otherwise defined herein have the meaning given to them in the Fourteenth Report, the supplements thereto, the Securitized Asset Turn-Over Order, or the Second ARIO, as applicable.  Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## ACTIVITIES OF THE APPLICANTS SINCE THE SEVENTH REPORT

### *Vehicle Sales and Repossessions*

34.     Since the date of the Seventh Report and the Order extending the Stay Period dated June 27, 2024, the Pride Entities have continued to sell trucks and trailers in the ordinary course. Since the commencement of the CCAA Proceedings through to September 15, 2024, the Pride Entities had completed 1,234 vehicle sales and 115 early buyouts with lease customers, which generated total gross sale proceeds in the amount of approximately $84.8 million and $5.8 million, respectively.   Since the commencement of the CCAA Proceedings through to September 15, 2024, the Pride Entities made distributions to

Financiers from sale proceeds in the amount of approximately $75.7 million. This has resulted in an average net recovery rate of 75% on debt balances on a VIN-by-VIN basis for the applicable Financiers. Financiers have been provided with weekly vehicle sale and buyout reports for the periods from March 27, 2024 to September 8, 2024, in accordance with the Revised Governance Protocol.

35.     In accordance with the Revised Governance Protocol, Financiers have also received monthly "Vehicle Repossession Reports".

36.     As further detailed in the Fourteenth Report and the supplements to the Fourteenth Report, the Pride Entities have been working with the Monitor and the CRO to coordinate and logistically prepare for an orderly transition and relinquishment of the Subject Assets following the issuance of the Securitized Asset Turn-Over Order. This process has involved validating the location of Repossessed Assets that are on the premises of the Pride Entities, ensuring they are not MCVs, preparing for safe and efficient retrievals of the approximately 630 Repossessed Assets (that are not MCVs) across over 30 locations, coordinating with site supervisors to schedule pick-up windows for each Securitization Party, and cooperating with requests for information and documentation in accordance with the Securitized Asset Turn-Over Order.

37.     As of September 13, 2024, 452 of the 630 Repossessed Assets have not been retrieved by the applicable Securitization Parties. Two Securitization Parties have not retrieved any Repossessed Assets or had their Subject Assets turned over to a Replacement Servicer as contemplated in the Securitized Asset Turn-Over Order.

*Lease Payments and Soft Collections*

38.     In accordance with the Revised Governance Protocol, Financiers have received reports on Lease Payments and Soft Collections for the period from March 27, 2024 to July 14, 2024. The Pride Entities have provided additional reports on Lease Payments and Soft Collections for the period from July 15 to August 30, 2024 to the Monitor, which additional reports are subject to ongoing review and reconciliation. Such reports are expected to be made available to the applicable Financiers by September 27, 2024.

39. Commencing on March 27, 2024, the Pride Entities have transferred Soft Collections received on account of Securitization Parties into a Monitor's trust account. The Monitor has remitted Soft Collections and provided reporting to the applicable Securitization Parties, net of amounts collected with respect to MCVs up to and including June 30, 2024. For the reporting period ending July 14, 2024, some Securitization Parties had MCVs greater than the Soft Collections received on their behalf; therefore, there were no funds to remit to such Securitization Party. The remaining Soft Collections (net of MCVs) are still pending payment to Securitization Parties.

40. As part of the Securitized Asset Turn-Over Order, the Pride Entities have been working the Securitization Parties and their respective replacement servicers to transition the servicing of its Subject Assets. The Pride Entities continue to support the Securitization Parties and the replacement servicers with transition related matters and requests.

***Real Estate Monetization, Leases and Factoring Transaction Updates***

41. As further discussed in the Benson Affidavit and the Fourteenth Report, the Pride Entities continue to sell real estate. To date, the Pride Entities have sold four properties with the fifth property located in Abbotsford, British Columbia set to close on September 23, 2024. Eleven of the Pride Entities' other real properties are in either the letter of intent or executed purchase agreement phase of the associated sale process. Of these 11 properties, one is in Canada and 10 are in the United States, with total estimated gross proceeds of approximately $139,000,000 (being the sale price, less agent/legal fees and other closing costs) and estimated at approximately $45,700,000 after payout of mortgages.

42. The remaining owned real estate properties are being actively marketed. The CRO and Monitor have been co-ordinating regular meetings with the mortgage holders of each of the properties, and the Agent and its advisors, to provide updates on the marketing process and offers received.

43. In particular, with respect to two of the higher valued properties located in Milton, Ontario, one for which National Bank holds the first mortgage and the other for which the Syndicate holds the first mortgage, the Monitor and the CRO have facilitated several

specific meetings with the mortgage holders to discuss issues such as zoning, valuation, best use for the properties, contractual requirements, environmental matters, broker renewal proposals and recommended marketing strategies. The Monitor and the CRO have also organized third party real estate brokerage firms to present material to these mortgage holders and to answer any questions they may have. This consultation was initiated by the CRO and Monitor, to help explain the necessary information with respect to complex issues involving these two properties to agree on a path forward, which will both maximize value and minimize the time to completion of a successful transaction. The CRO and the Monitor will continue to consult and inform the affected mortgage holders and the Agent throughout the sales process.

44.    The Pride Entities are currently operating from 27 leased properties, which include 13 leased properties in Canada and 14 leased properties in the United States.  Fourteen leased properties have vehicles on the premises.  As part of the Orderly Wind-Down Plan, these 14 leased properties will be disclaimed in line with the closure of these properties (as reflected by the Turn-Over Outside Date in the proposed Funding Contribution and Turn-Over Order).  The remaining 13 leased properties will be disclaimed in due course.

45.    As further discussed in the Benson Affidavit, the Pride Entities successfully closed the Factoring Transaction on September 6, 2024.  The net proceeds from the sale of the Pride Entities' factoring receivables book are presently held in trust by the Monitor pending determination of secured creditors' entitlement to same.

### *Orderly Wind-Down Plan*

46.    As described in the Fourteenth Report, the Monitor no longer views a going concern restructuring plan for the Pride Entities as a feasible option, other than the PGL Going Concern Sale, given the lack of stakeholder support. Accordingly, the CRO and the Monitor have directed their efforts towards developing a centralized, coordinated, and controlled wind-down of the Pride Entities' remaining assets (the "**Orderly Wind-Down Plan**"), other than in respect of the PGL Entities.

47.     The Orderly Wind-Down Plan is imperative, given the vast number of vehicles in the Pride
        Entities' fleet across North America, in addition to the thousands of leased vehicles (most
        of which are constantly in transit).

48.     The Monitor, in consultation with the Pride Entities and the CRO, developed the Orderly
        Wind-Down Plan which considered the timing and staff necessary to assist with (i) the
        turn-over of the remaining Subject Assets, (ii) the turn-over VINs to secured creditors' (the
        "**Recourse Lenders**") and the transitioning of lease books to replacement servicers, and
        (iii) other necessary tasks as detailed in the Completion Task List in the Fourteenth Report.

**PRIDE ENTITIES RECEIPTS AND DISBURSEMENTS**

49.     A summary of the Pride Entities' actual receipts and disbursements during the period from
        July 29, 2024, to September 6, 2024 (the "**Reporting Period**"), as compared to the July 29
        Cash Flow Forecast (the "**Variance Analysis**") is attached hereto as **Appendix "A"**.

50.     During the Reporting Period, the Pride Entities generated a net operating cash inflow of
        approximately $4.7 million.  This consists of approximately $14.4 million in Lease
        Payments and Soft Collections received by the Pride Entities during the Reporting Period,
        including Total Deferred Payments. As of September 6, 2024, the Syndicate Borrowers (as
        defined in the Cash Flow Forecast) had access to cash on hand in the amount of
        approximately $22.5 million.  Of this amount, approximately $13.0 million was reserved
        or restricted for specific uses. The available cash balance for the general operations of the
        Syndicate Borrowers as of September 6, 2024, was approximately $9.5 million. As of
        September 6, 2024, the other Pride Entities had access to cash on hand in the amount of
        approximately $3.4 million.

51.     The favourable operating cash variance for the Reporting Period of approximately $5.7
        million is primarily a result of:

        (a)     the continued operations of PGL, as the July 29 Cash Flow Forecast estimated the
                closing of the PGL Going Concern Sale to occur in mid-August, and such closing
                (should it be approved by this Court) has now been extended to October 16, 2024;

(b)   some favourable permanent differences in operating disbursements from restructuring efforts; and

(c)   favourable timing differences in respect of the payment of professional fees.

52.   The Cash Flow Forecast has been amended during the Cash Flow Period (defined below) to include the timing difference in the subsequent weeks, where applicable.

**OVERVIEW OF PRIDE ENTITIES' CASH FLOW FORECAST**

53.   The Pride Entities, with the assistance of the Monitor, have prepared a Cash Flow Forecast which includes forecast receipts and disbursements for the period from September 7, 2024 to March 30, 2025 (the "**Cash Flow Period**") for the purpose of estimating the Pride Entities' liquidity needs during the Cash Flow Period. The Cash Flow Forecast covers the majority of the period required for the Orderly Wind-Down Plan and is presented on a monthly basis.  A copy of the Cash Flow Forecast is attached hereto as **Appendix "B"**.

54.   The Cash Flow Forecast shows that the Pride Entities project total combined net receipts of approximately $21.8 million and project total combined disbursements of approximately $41.3 million. The disbursements include operating disbursements and restructuring fees.

55.   The Total Deferred Payments received up to September 30, 2024, are forecast to be used as working capital for the Pride Entities. The Total Deferred Payments, estimated to be approximately $16.5 million, will be repaid to the applicable Financiers during the Cash Flow Period.

56.   As further set out in the Second Supplemental Report, the Pride Entities are expected to require approximately $40.0 million (the "**Funding Requirement**") to fund the Orderly Wind-Down Plan (including contingencies).  The Funding Requirement and the Orderly Wind-Down Plan assume the PGL Going Concern Sale closes on or before October 16, 2024.  If the PGL Going Concern Sale is not approved or does not close, the Funding Requirement is not sufficient to complete an orderly wind-down of PGL. Similarly, any delays to the start and end dates identified in the Orderly Wind-Down Plan to key workstreams, such as turn-over of vehicles or transitioning of the leasebooks to the

replacement servicers, might increase the overall costs and could require additional funding beyond the current Funding Requirement.

57.    If the relief requested in the proposed Funding Contribution and Turn-over Order is approved by the Court, the Funding Requirement would provide the necessary liquidity needed during the extended Stay Period. This assumes that the Applicants can implement the Orderly Wind-Down Plan immediately and achieve the milestone dates set out in the Second Supplemental Report.  Any significant deviations beyond these dates will likely result in further costs and funding requirements.

**EXTENSION OF THE STAY PERIOD**

58.    The Monitor has considered the Pride Entities' request to extend the Stay Period up to and including March 31, 2025, and is of the view that: (a) there will be no material prejudice to the Pride Entities' creditors and stakeholders as a result of the proposed extension of the Stay Period; (b) the Cash Flow Forecast shows sufficient liquidity with use of the Total Deferred Payments and the Funding Requirement, based on the Assumptions (as defined and contained in Appendix "B"); (c) the extension of the Stay Period will allow the Pride Entities to continue and complete the Orderly Wind-Down Plan; and (d) the Pride Entities have acted, and are acting,  in good faith and with due diligence during the Stay Period.

**PROPOSED KERP**

59.    Under the terms of the key employee retention plan ("**KERP**"), the Pride Entities propose to make retention payments to specific individuals that are critical to the execution and success of the Orderly Wind-Down Plan (with such employees, the "**Key Personnel**"). The Key Personnel include both senior management and employees but does not include immediate Johal family members.

60.    The purpose of the KERP is to retain Key Personnel until the end of the Orderly Wind-Down Plan. Therefore, the KERP has only one milestone which is based on the Key Personnel's continued employment for the duration of the Orderly Wind-Down Plan, or until such time as the CRO has determined, in consultation with the Monitor that such Key

Personnel's continued employment and support is no longer necessary (the "**Milestone Date**").

61.   Other major terms and conditions of the proposed KERP include: (a) total KERP payments in the maximum amount of $1,800,000 (inclusive of a discretionary fund of $567,301, the "**Discretionary Fund**"); (b) payments from the Discretionary Fund to essential employees (who are not Key Personnel and are not immediate Johal family members) subject to the approval of the CRO and the Monitor and to be paid on the same timeline as payments to Key Personnel; (c) entitlement to KERP payments conditional on continued employment until the Milestone Date, unless terminated without cause.

62.   The retention of Key Personnel and their ongoing commitment to the Pride Entities are essential for an efficient and successful Orderly Wind-Down Plan which is beneficial for all stakeholders.   In particular: (a) the Key Personnel provide critical leadership and execution required to coordinate and complete the turn-over of in excess of 3,700 VINs from almost 35 different lots, to assist with the transition of servicing in respect of 13,500 leased assets to replacement servicers, and to provide the administrative and reporting support to Financiers as part of  implementing such transitions (b) none of the Key Personnel could be readily or easily replaced internally as there have already been terminations and significant attrition over the past several months, and the process to find qualified replacements for the Key Personnel externally would extend the timeline of the Orderly Wind-Down Plan resulting in increased costs, and (c) the knowledge transfer would be lost and any replacements for the Key Personnel would face a steep learning curve.

63.   The Monitor is of the view that the KERP will provide the necessary incentive to the Key Personnel to remain committed to assisting in a successful Orderly Wind-Down Plan. In addition, the Pride Entities have indicated that some of the Key Personnel have started considering other employment opportunities as they are aware of the wind-down of the non-PGL entities.

64.   The Applicants are not seeking approval of a charge with respect to the KERP.  Instead, the Applicants are seeking that the entire amount of the KERP be paid to the Monitor and

held in trust. The Monitor will release sufficient funds to the relevant Pride Entity so that payments can be made to the applicable Key Personnel at the Milestone Date, net of applicable withholding taxes.

65.    A copy of the KERP is attached as a Confidential Exhibit "A" to the Benson Affidavit. The KERP contains confidential and commercially sensitive information regarding the compensation of the Key Personnel and as such the Pride Entities will be seeking a sealing order in respect of Confidential Exhibit "A".  Such information is not normally made publicly available and disclosure by the Pride Entities may cause significant harm or prejudice to the Key Personnel and the Pride Entities.

66.    The Monitor is of the view that the KERP is reasonable and appropriate in the circumstances.

**CONCLUSIONS AND RECOMMENDATIONS**

67.    For the reasons set out in this Fifteenth Report, the Monitor recommends this Court grant
the Requested Relief.

All of which is respectfully submitted this 22nd day of September 2024.

**ERNST & YOUNG INC.,**

solely in its role as Court-appointed Monitor of

Pride Group Holdings Inc. and certain affiliates

and not in its personal or corporate capacity


**per:**

**Alex Morrison, CPA, CA, LIT, CIRP**
**Senior Vice President**


**Karen Fung, CPA, CA, LIT, CIRP**
**Senior Vice President**

# SCHEDULE "A"

## A. APPLICANTS

### Operating Entities

*Canadian Operating Entities*

- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*

- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

### Real Estate Holding Companies

*Canadian Real Estate Holding Companies*

- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.

- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*

- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.

- EASTGATE MISSOURI HOLDING CORP.

- FRENCH CAMP HOLDING CORP.

- 87TH AVENUE MEDLEY FL HOLDING CORP.

- LOOP 820 FORT WORTH HOLDING CORP.

- 162 ROUTE ROAD TROY HOLDING CORP.

- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.

- MANHEIM ROAD HOLDING CORP.

- 13TH STREET POMPANO BEACH FL HOLDING CORP.

- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.

- CORRINGTON MISSOURI HOLDING CORP.

- 963 SWEETWATER HOLDING CORP.

- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**

*Other Canadian Holding Companies*

- 2692293 ONTARIO LTD.

- 2043002 ONTARIO INC.

- PRIDE GROUP HOLDINGS INC.

- 2554193 ONTARIO INC.

- 2554194 ONTARIO INC.

- PRIDE GROUP REAL ESTATE HOLDINGS INC.

- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*

- COASTLINE HOLDINGS, CORP.

- PARKER GLOBAL ENTERPRISES, INC.

- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*

- PRIDE TRUCK SALES L.P.

- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

## C. ADDITIONAL STAY PARTIES

*Canadian Additional Stay Parties*

- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*

- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.

**Appendix "A"**

**Variance Analysis**

| CCAA Proceedings of Pride Group Holdings Inc., other Applicants and Additional Stay Parties Variance for the period from Jul-29 to Sep-06 (In $000 CAD) | | Actuals | Forecast | Variance $ |
|---|---|---|---|---|

**Cash Sales** — Notes

| | Notes | Actuals | Forecast | Variance $ |
|---|---|---|---|---|
| Can Sales | 1 | 14,269 | 14,710 | (441) |
| US Sales | 1 | 12,538 | 9,690 | 2,848 |
| Sales Payments to Financier | 2 | (24,627) | (21,458) | (3,169) |
| Downpayments and Deposits | 3 | 630 | - | 630 |
| Cost Recovery | 4 | - | - | - |
| Realization Commission | 4 | 2,450 | 2,136 | 314 |
| **Net Cash from Sales** | | **5,261** | **5,078** | **183** |

**Receipts**

| | | Actuals | Forecast | Variance $ |
|---|---|---|---|---|
| Lease Collections | 5 | 14,446 | 16,101 | (1,655) |
| Lease Buyout | 6 | 118 | - | 118 |
| Lease Buyout - Payments to Funder | 7 | - | - | - |
| Logistics Receipts | 8 | 11,427 | 8,800 | 2,627 |
| Net Fuel Sales | 9 | 82 | 400 | (318) |
| Securitization Portfolio Fees | | - | - | - |
| Rental Income | | 899 | 953 | (54) |
| **Total receipts** | | **26,972** | **26,254** | **718** |
| **Cash Sales & Receipts** | | **32,232** | **31,332** | **900** |

**Operating disbursements**

| | | Actuals | Forecast | Variance $ |
|---|---|---|---|---|
| Payroll and Benefits | 10 | (9,635) | (8,918) | (717) |
| Income taxes payable | | - | - | - |
| Sales taxes payable | 11 | (915) | (200) | (715) |
| Utilities | 12 | (322) | (196) | (126) |
| Operating Fuel | 13 | (2,252) | (2,922) | 670 |
| Repairs and maintenance | 14 | (2,626) | (2,336) | (290) |
| Brokerage costs | | (1,132) | (1,200) | 68 |
| Legal Costs | 15 | (449) | (248) | (201) |
| Recovery Costs | | - | (6) | 6 |
| Wind Down Costs | | - | - | - |
| Occupancy Costs | | (979) | (768) | (211) |
| Other Costs | 16 | (2,629) | (5,082) | 2,453 |
| Logistics Equipment Financing | | - | - | - |
| Intercompany Borrowings | 17 | (143) | (472) | 329 |
| **Total operating disbursements** | | **(21,083)** | **(22,348)** | **1,347** |
| Professional Fees - Restructuring | 18 | (6,452) | (9,861) | 3,409 |
| **Net operating cash flow** | A | **4,698** | **(877)** | **5,657** |

**Non operating disbursements**

| | | Actuals | Forecast | Variance $ |
|---|---|---|---|---|
| Lease Repayments | | (2,040) | - | (2,040) |
| Floor Plan Repayments | | - | - | - |
| Floor Plan Interest | | - | - | - |
| Term Loan Repayments (Mortgages) | | - | - | - |
| OEM Lease Repayments | | (948) | - | (948) |
| OEM Interest | | - | - | - |
| Lease Repayments - Other | | - | - | - |
| **Total non-operating disbursements** | B | **(2,988)** | **-** | **(2,988)** |
| **Net operating and non-operating cash flow** | | **1,709** | **(877)** | **2,668** |

**CCAA Proceedings of Pride Group Holdings Inc.,**
**other Applicants and Additional Stay Parties**
**Variance for the period from Jul-29 to Sep-06 (in $000 CAD)**

| | | | Actuals | Forecast | Variance $ |
|---|---|---|---:|---:|---:|
| **Available Cash Balance for the Syndicate Borrowers** | | | | | |
| Opening Bank Balance | | | 26,853 | 26,853 | - |
| Bill and Collect | 19 | | (1,775) | (788) | (987) |
| Net operating cash/(disbursements) | | A | 4,698 | (877) | 5,575 |
| Non-operating cash/(disbursements) | | B | (2,988) | - | (2,988) |
| DIP Draws/(repayments) | | | - | - | - |
| Segregated Lease Payments | | | - | - | - |
| Payments to Trust Account | | | (4,133) | (1,650) | (2,483) |
| Reconciling items & Fx adjustment | | | (101) | - | (101) |
| **Closing Bank Balance** | | C | **22,554** | **23,538** | **(983)** |
| | | | | | |
| **Available Cash Balance for Other Applicants** | 20 | | | | |
| Opening Bank Balance | | | 9,335 | 9,335 | - |
| Intercompany Borrowings | | | 143 | 164 | (21) |
| Net operating cash/(disbursements) | | | (6,098) | (164) | (5,934) |
| **Closing Bank Balance** | | | **3,380** | **9,335** | **(5,955)** |
| | | | | | |
| **Closing Available Cash Balance for Operations** | 21 | | | | |
| Closing Bank Balance | | C | 22,554 | | |
| Closing Segregated Lease Payment Account Balance | | | (5,773) | | |
| Closing Restricted Cash Balance (PGL, PFS, and Real Estate) | | | (4,205) | | |
| Accrued Sales Payments to Financier | | | (3,072) | | |
| **Closing Available Cash Balance for Operations** | | | **9,504** | | |

**CCAA Proceedings of Pride Group Holdings Inc., other Applicants and Additional Stay Parties (the "Pride Entities")**

**Notes to the Comparison of the Unaudited Cash Flow Forecast to Actual Receipts and Disbursements of the Company for the period from July 29, 2024, to September 6, 2024 (the "Variance Period")**

**Disclaimer:**

In preparing this variance analysis, the Pride Entities have relied upon unaudited financial information and have not attempted to verify the accuracy or completeness of such information that would wholly or partially comply with CAS pursuant to the Chartered Professional Accountants Canada Handbook.

This comparison of actual receipts and disbursements is with respect to the Cash Flow Forecast in the Thirteenth Report of the Monitor.

**Notes:**

1. **Cash Sales**
   Represents cash sales to customers and include customers who obtain their own third-party financing. This includes all sale receipts, except for initial deposits. If the lenders do not approve the sale transaction and another vehicle is not available for these customers, the funds will be returned to the customer. The positive variance is due to higher than anticipated sales.

2. **Sale Payments to Financier**
   The Pride Entities paid these amounts towards the outstanding balances of the relevant financiers for the release of vehicles that were sold for cash. There is a timing difference from when the funds are received from the customer to the payments to the financiers.

3. **Downpayments and Deposits**
   Down payments/deposits are received from customers for cash sales or those who obtain third party lease financing. These amounts are offset by deposit returns if the sale is not completed. Any interim payments for vehicle sales are included in cash sales. The amount received for deposits in the Variance Period was $0.6 million.

4. **Cost Recovery, Realization Commission and Securitization Portfolio Fee**
   There were no costs allocated to cash sales in this Variance Period and therefore no cost recovery. The realization commission calculation reflects a weighted average of the rates anticipated to be agreed to by various lenders weighted against the historical sales data, which includes the count of trucks sold for each lender.

5. **Lease Collections**
   This unfavourable variance of approximately $1.7 million is with respect to an increase in NSFs on the lease collections due to the CCAA filing.

**6. Lease Buyout**

This favourable variance represents cash payments received from customers who opted to buy out the remaining lease term. These receipts were not included in the forecast due to unpredictability as to when a customer decides to buy out their leases. These amounts also include the receipt of insurance claims for the loss portion of the lease buyouts.

**7. Lease Buyout – Payment to Funder**

This represents amounts that are paid to the respective funder with respect to the customer lease buyout. There is typically a timing difference between the receipt from customers and the buyout payment to the lender as such payments are made after the lender provides payout letters.

**8. Logistics Receipts**

This favourable variance of approximately $3.0 million is due to the previous forecast assuming an end-of-August sale of the PGL business. Logistics receipts are now forecast to continue until October 16th, the assumed date for the closing of the sale of the PGL business.

**9. Net Fuel Sales**

This unfavourable variance of $0.3 million is permanent and is due to lower than anticipated receipts due to a decrease in sales.

**10. Payroll and Benefits**

There is an unfavourable variance of $0.7 million, with most of the balance attributable to higher-than-projected payroll costs in PTS and PTS LP.

**11. Sales Tax Payable**

There is an unfavourable variance of $0.7 million due to higher-than-forecast U.S. sales taxes and the payment of TPL's Q2 2024 QST.

**12. Utilities**

This unfavourable variance of approximately $0.1 million is due to a timing difference in the payment of such costs.

**13. Operating Fuel**

There is a permanent favourable variance of $0.7 million attributed to lower sales.

**14. Repairs and Maintenance**

There is an unfavourable variance of $0.3 million, with most of the amount attributable to a timing difference in the payment of completion costs for the Di Miller construction project.

### 15. Legal Costs

There is an unfavourable variance of $0.2 million due to higher-than-forecast legal fees associated with the work the Applicants' in-house counsels are doing with respect to litigation claims.

### 16. Other Costs

There is a favourable variance of $2.2 million, mainly attributed to lower-than-forecast credit card payments (i.e., office expenses), travel, advertising, and miscellaneous expenses, as well as timing differences in the payment of forecast insurance costs.

### 17. Intercompany Borrowings

There is an outflow of $0.1 million, with the main transactions set out below:
- Outflow of $0.4 million to PGL USA.
- Inflow of $0.7 million due to the interbank movement of funds between PFS and PFS USA.
- Outflow of $0.4 million to 2029909 Ontario Inc for the rent payment of 6050 Dixie Road, Mississauga.

### 18. Professional Fees – Restructuring

The favourable variance is a timing difference for outstanding fees. The Cash Flow Forecast has been updated accordingly.

## Other Items

### 19. Bill and Collect

This is the amount received and remitted to the securitization lenders from bill and collection activities. These payments are shown as a reconciling item to the bank balance.

### 20. Available Cash Balance for Other Applicants

This represents the opening bank balance of Applicants that are not part of the Borrowing Group.

### 21. Closing Available Cash Balance for Operations

This represents the cash balance available for operations. It is the closing bank balance net of segregated lease collections that must be repaid to lenders, and it excludes PGL, PFS, and real estate entity bank balances. The balance is also net of the accrued amount due to financiers for sales that occurred in the Variance Period, as identified in Note 2.

**Appendix "B"**

**Cash Flow Forecast**

**CCAA Proceedings of Pride Group Holdings Inc., other Applicants and Additional Stay Parties**
**Cash Flow Forecast for the period from September 07, 2024 to March 30, 2025 (in $000 CAD)**

| | Notes | 07-Sep-24 29-Sep-24 Sep-24 | 30-Sep-24 27-Oct-24 Oct-24 | 28-Oct-24 24-Nov-24 Nov-24 | 25-Nov-24 29-Dec-24 Dec-24 | 30-Dec-24 26-Jan-25 Jan-25 | 27-Jan-25 23-Feb-25 Feb-25 | 24-Feb-25 30-Mar-25 Mar-25 | Post March | 07-Sep-24 30-Mar-25 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Sales** | | | | | | | | | | |
| Can Sales | 1 | 5,382 | - | - | - | - | - | - | - | 5,382 |
| US Sales | 1 | 3,852 | - | - | - | - | - | - | - | 3,852 |
| Sales Payments to Financier | 2 | (11,688) | (2,000) | - | - | - | - | - | - | (13,688) |
| Realization Commission | 3 | 844 | - | - | - | - | - | - | - | 844 |
| **Net Cash from Sales** | | **(1,610)** | **(2,000)** | **-** | **-** | **-** | **-** | **-** | **-** | **(3,610)** |
| | | | | | | | | | | |
| **Receipts** | | | | | | | | | | |
| Lease Collections | 4 | 4,987 | - | - | - | - | - | - | - | 4,987 |
| Logistics Receipts | 5 | 6,200 | 6,000 | - | - | - | - | - | - | 12,200 |
| Net Fuel Sales | 6 | - | - | - | - | - | - | - | - | - |
| Rental Income | 7 | 497 | 413 | 621 | 798 | 315 | 357 | 397 | - | 3,398 |
| Recovery of Costs from PGL and Real Estate | 8 | 150 | 100 | 825 | 2,424 | 650 | 300 | 375 | - | 4,824 |
| **Total receipts** | | **11,834** | **6,513** | **1,446** | **3,222** | **965** | **657** | **772** | **-** | **25,409** |
| | | | | | | | | | | |
| **Cash Sales & Receipts** | | **10,224** | **4,513** | **1,446** | **3,222** | **965** | **657** | **772** | **-** | **21,799** |
| | | | | | | | | | | |
| **Operating disbursements** | | | | | | | | | | |
| Payroll and Benefits | 9 | (2,997) | (3,692) | (1,184) | (1,060) | (392) | (192) | (195) | - | (9,712) |
| KERP | 10 | - | - | - | (1,200) | - | - | (600) | - | (1,800) |
| Sales taxes payable | 11 | (1,436) | (100) | (997) | - | - | - | - | - | (2,533) |
| Utilities | 12 | (117) | (156) | (76) | (95) | (76) | (76) | (95) | - | (691) |
| Operating Fuel | 13 | (1,363) | (1,752) | (438) | - | - | - | - | - | (3,553) |
| Repairs and maintenance | 14 | (266) | - | - | - | - | - | - | - | (266) |
| Brokerage costs | 15 | (585) | (752) | (188) | - | - | - | - | - | (1,525) |
| Legal Costs | 16 | (189) | (252) | (252) | (63) | - | - | - | - | (756) |
| Wind Down Costs | 17 | - | (378) | (504) | (65) | - | - | - | - | (947) |
| Occupancy Costs | 18 | (211) | (293) | (270) | (115) | (11) | (11) | (22) | - | (933) |
| Other Costs | 19 | (3,349) | (615) | (615) | 1,286 | - | - | - | - | (3,293) |
| Logistics Equipment Financing | 20 | - | - | - | - | - | - | - | - | - |
| Intercompany Borrowings | 21 | (244) | (243) | - | - | - | - | - | - | (487) |
| **Total operating disbursements** | | **(10,757)** | **(8,233)** | **(4,524)** | **(1,312)** | **(479)** | **(279)** | **(912)** | **-** | **(26,496)** |
| | | | | | | | | | | |
| Professional Fees - Restructuring | 22 | (6,864) | (2,211) | (1,797) | (1,244) | (1,208) | (208) | (260) | (1,000) | (14,792) |
| | | | | | | | | | | |
| **Net operating cash flow** | | **(7,397)** | **(5,931)** | **(4,875)** | **666** | **(722)** | **170** | **(400)** | **(1,000)** | **(19,489)** |
| | | | | | | | | | | |
| **Non operating disbursements** | | | | | | | | | | |
| Lease Repayments | 23 | - | (2,755) | - | - | - | - | - | - | (2,755) |
| OEM Lease Repayments | 24 | - | (2,799) | - | - | - | - | - | - | (2,799) |
| Lease Repayments - Other | 25 | - | (219) | - | (16,514) | - | - | - | - | (16,733) |
| **Total non-operating disbursements** | | **-** | **(5,773)** | **-** | **(16,514)** | **-** | **-** | **-** | **-** | **(22,287)** |
| | | | | | | | | | | |
| **Available Cash Balance for the Syndicate Borrowing Group** | 26 | | | | | | | | | |
| Opening Bank Balance | | 22,554 | 13,201 | 3,000 | 3,000 | 3,000 | 3,359 | 3,239 | 2,547 | 22,554 |
| PGL & PFS Bank Balance | | - | - | (2,447) | - | - | - | - | - | (2,447) |
| Bill and Collect | | (940) | - | - | - | - | - | - | - | (940) |
| Net operating cash/(disbursements) | | (7,397) | (5,931) | (4,875) | 666 | (722) | 170 | (400) | (1,000) | (19,489) |
| Non-operating cash/(disbursements) | | - | (5,773) | - | (16,514) | - | - | - | - | (22,287) |
| DIP Interest expense | | - | (281) | (283) | (286) | (288) | (290) | (292) | - | (1,720) |
| Disbursement of Di Miller Recovery | | - | - | - | (1,749) | - | - | - | - | (1,749) |
| Funding Contribution | | - | 4,570 | 7,605 | 17,883 | 1,369 | - | - | - | 31,427 |
| Contributions to Monitor's Payment Procedure Account (Pursuant to the Payment Procedure Agreement) | | - | (8,559) | - | - | - | - | - | - | (8,559) |
| Segregated Lease Payments | | - | 5,773 | - | - | - | - | - | - | 5,773 |
| Payments to Trust Account (MCVs) | | (1,016) | - | - | - | - | - | - | - | (1,016) |
| **Closing Bank Balance** | | **13,201** | **3,000** | **3,000** | **3,000** | **3,359** | **3,239** | **2,547** | **1,547** | **1,547** |
| | | | | | | | | | | |
| **Funding Contribution** | 27 | | | | | | | | | |
| Opening balance | | - | - | 4,570 | 12,175 | 30,058 | 31,427 | 31,427 | 31,427 | - |
| Funding Contribution | | - | 4,570 | 7,605 | 17,883 | 1,369 | - | - | - | 31,427 |
| **Ending Funding Contribution Balance** | | **-** | **4,570** | **12,175** | **30,058** | **31,427** | **31,427** | **31,427** | **31,427** | **31,427** |

CCAA Proceedings of Pride Group Holdings Inc., other Applicants and Additional Stay Parties
Cash Flow Forecast for the period from September 07, 2024 to March 30, 2025 (in $000 CAD)

| | | 07-Sep-24 29-Sep-24 | 30-Sep-24 27-Oct-24 | 28-Oct-24 24-Nov-24 | 25-Nov-24 29-Dec-24 | 30-Dec-24 26-Jan-25 | 27-Jan-25 23-Feb-25 | 24-Feb-25 30-Mar-25 | Post March | 07-Sep-24 30-Mar-25 |
|---|---|---|---|---|---|---|---|---|---|---|
| Week ending | | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Jan-25 | Feb-25 | Mar-25 | | TOTAL |
| **Available Cash Balance for Other Applicants** | 28 | | | | | | | | | |
| Opening Bank Balance | | 8,293 | 8,293 | 8,293 | 5,951 | 5,951 | 5,951 | 5,951 | 5,951 | 8,293 |
| Less Balance of Other Applicants | | - | - | (2,342) | - | - | - | - | - | (2,342) |
| Intercompany Borrowings | | 244 | 243 | - | - | - | - | - | - | 487 |
| Net operating cash/(disbursements) | | (244) | (243) | - | - | - | - | - | - | (487) |
| **Closing Bank Balance** | | **8,293** | **8,293** | **5,951** | **5,951** | **5,951** | **5,951** | **5,951** | **5,951** | **5,951** |
| | | | | | | | | | | |
| **Monitor's Trust Account** | 29 | | | | | | | | | |
| Opening Pooling Balance | | 10,480 | 11,528 | 6,859 | 6,885 | 6,918 | 6,945 | 6,972 | 7,005 | 10,480 |
| Floorplan | | 909 | - | - | - | - | - | - | - | 909 |
| Leaseline | | 74 | (4,700) | - | - | - | - | - | - | (4,626) |
| OEM Financing | | 32 | - | - | - | - | - | - | - | 32 |
| Interest | | 33 | 31 | 26 | 33 | 27 | 27 | 33 | - | 210 |
| **Closing Pool Balance** | | **11,528** | **6,859** | **6,885** | **6,918** | **6,945** | **6,972** | **7,005** | **7,005** | **7,005** |
| | | | | | | | | | | |
| **Segregated Lease Payment Account** | 30 | | | | | | | | | |
| Opening Lease Payment Account | | 5,773 | 5,773 | - | - | - | - | - | - | 5,773 |
| Lease Collections (Bank) | | - | - | - | - | - | - | - | - | - |
| Lease Repayments | | - | (5,773) | - | - | - | - | - | - | (5,773) |
| **Closing Lease Payment Account** | | **5,773** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | |
| **Monitor's Payment Procedure Account (Pursuant to the Payment Procedure Agreement)** | 31 | | | | | | | | | |
| Opening Monitor's Payment Procedure Account Balance | | 10,002 | 10,002 | - | - | - | - | - | - | 10,002 |
| Contributions to Monitors Payment Procedure Account (Pursuant to the Payment Procedure Agreement) | | - | 8,559 | - | - | - | - | - | - | 8,559 |
| July 31 Accrued Equipment Payments | | - | (5,214) | - | - | - | - | - | - | (5,214) |
| July 31 Floor Plan Financiers Payments | | - | (3,811) | - | - | - | - | - | - | (3,811) |
| July 31 Lease Collections Accrual Payments | | - | (4,650) | - | - | - | - | - | - | (4,650) |
| July 31 HST Accrual Payments | | - | (4,886) | - | - | - | - | - | - | (4,886) |
| **Closing Monitor's Payment Procedure Account Balance** | | **10,002** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those
Applicants listed on **Schedule "A"** hereto

**Notes to the Unaudited Consolidated Filing Cash Flow Forecast of the
Applicants and Limited Partnerships listed on Schedule "A"
(collectively, the "Pride Entities") for the period from
September 7, 2024, to March 30, 2025 (the "Forecast Period")**

**Disclaimer:**

In preparing this cash flow forecast (the "**Cash Flow Forecast**"), the Applicants with the assistance of Ernst & Young Inc., in its capacity as Monitor of the Pride Entities (the "**Monitor**"), have relied upon unaudited financial information and have not attempted to further verify the accuracy or completeness of such information. The Cash Flow Forecast includes estimates concerning the operations of the Pride Entities and additional assumptions discussed below, including assumptions from management of the Pride Entities ("**Management**"), with respect to the requirements and financial impact of a *Companies' Creditors Arrangement Act* ("**CCAA**") filing (the "**Probable and Hypothetical Assumptions**" or the "**Assumptions**"). Since the Cash Flow Forecast is based on Assumptions about future events and conditions that are not ascertainable, the actual results achieved during the Cash Flow Forecast period will vary from the Cash Flow Forecast, even if Assumptions materialize, and such variation may be material. There is no representation, warranty, or other assurance that any of the estimates, forecasts or projections will be realized.

The Monitor's review of the Cash Flow Forecast consisted of inquiries, analytical procedures and discussions related to information supplied to it by certain key members of the Pride Entities and other employees of the Pride Entities. Since the Probable and Hypothetical Assumptions need not be supported, the Monitor's procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the Cash Flow Forecast. The Monitor also reviewed the support provided by the Pride Entities for the Probable and Hypothetical Assumptions and the preparation and presentation of the Cash Flow Forecast. Based on the Monitor's review, nothing has come to the Monitor's attention that causes the Monitor to believe, in any material respect, that:

      a)  The Probable and Hypothetical Assumptions are not consistent with the purpose of the Cash Flow Forecast;

    b) As at the date of this Report, the Probable and Hypothetical Assumptions are not suitably supported and consistent with the plans of the Pride Entities or do not provide a reasonable basis for the Cash Flow Forecast; or

    c) The Cash Flow Forecast does not reflect the Probable and Hypothetical Assumptions.

Receipts and disbursements are denominated in thousands of Canadian dollars. The line-by-line details are based on borrowers and guarantors to the Syndicate Agreement ("**Syndicate Borrowers**").  Receipts and disbursements of other Applicants are represented on a net basis. The Syndicate Borrowers are noted in Schedule "A" and are a subset of the Pride Entities.

This version of the Cash Flow Forecast is an estimate of the funding needs for an Orderly Wind-Down Plan. The Orderly Wind-Down Plan assumes the completion of a sale transaction for PGL (inclusive of PFS) on October 16th, 2024, and a wind-down of the Applicants' remaining business consisting primarily of the dealership and leasing operations. In addition, it has an estimated time period subsequent to the major milestones beyond March 30th, 2025, for finalizing the CCAA proceedings and extending processes relating to Real Estate and MCVs. Further details of the anticipated steps to wind-down the remaining CCAA Proceedings and the Chapter 15 Proceedings are included in the Fourteenth Report to Court of the Monitor dated August 28, 2024 (the "**Fourteenth Report**"), including the Completion Task List at Appendix "A" thereto. This Cash Flow Forecast sizes the needed liquidity, the potential source for which is discussed in the Fourteenth Report. Below is a Gantt chart of the assumed milestones of each of the various lines of business:

| | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr 25 – Dec 27 |
|---|---|---|---|---|---|---|---|---|---|
| Applicants' Headcount | 639 | 620 | 138 | 114 | 75 | 32 | 32 | 32 | Contract |
| Workstream | | | | | | | | | |
| Vehicles Cash Sales | | | | | | | | | |
| Securitization Turnover – Inventory | | | | | | | | | |
| Recourse Lender Turnover – Inventory | | | | | | | | | |
| Lease Collections | | | | | | | | | |
| Securitization Turnover – Leasing | | | | | | | | | |
| Recourse Lender Turnover - Leasing | | | | | | | | | |
| Other Assets (MCVs) | | | | | | | | | |
| PGL Transaction | | | | | | | | | |
| Factoring Transaction | | | | | | | | | |
| Other entity wind-down | | | | | | | | | |
| Real Estate | | | | | | | | | |
| Windup, Trust Account, and Monitoring of Estate Administration | | | | | | | | | |

     - Half Month

     - Full Month

**Assumptions:**

1. **Cash Sales**

   This category includes estimates of revenues generated by the Pride Entities (through PTS, TTR, PTS LP and TTR USA) with respect to cash sales of vehicles. This would also include customers who have sought out third-party lease financing. The estimate of cash sales is based on the historical 4-week trailing average of both the sales and the deposit received, net of funds retained for Cost Recovery and Realization Commission in Note 3. It is anticipated that cash sales will continue until September 25th and Multiple Collateral Vehicle sales will be continued as may be approved by the Court.

2. **Sale Payments to Financier**

   Represents the repayment to the floor plans/lease lines from net proceeds from the sale of vehicles. It is assumed that if the sale price is below the outstanding loan value, then the financier is only repaid with the funds received from the sale, net of Realization Commission and Cost Recovery (See Note 3). This does not include payments to the floor plans for vehicles that are identified as Multiple Collateral Vehicles (Leases). The net proceeds received from the sale of Multiple Collateral Vehicles (Leases) will be placed into the Monitor's Trust Account (See Note 29). This includes amounts required to repay the Agent for previous sales with no existing financier.

3. **Realization Commission on Sales**

   The Realization Commission represents the structure of the Pride Entities to recover commissions from cash sales to cover a portion of the variable and overhead costs related to selling vehicles. The commission calculation reflects a weighted average of the rates agreed to by various lenders weighted against the historical sales data, which includes the number of trucks sold for each financier.

4. **Lease Collections**

   This category includes the collection of customers' payments under their lease obligations and short-term rental obligations. This is based on known pre-authorized payments for the current month, and adjusted based on historical performance, including assumptions for estimated defaults and recovery of such defaults ("**Soft Collections**"). It is assumed that a funding contribution has been approved by the end of September and the servicing for these leases will transition thereafter.

5. **Logistics Receipts**

   Represents the collection from customers for the logistics business, which is through PGL, based on known contracts with customers. The projection is based on Management's assumptions. The forecast assumes there is a going concern sale transaction of PGL that closes on October 16th, 2024.

**6. Net Fuel Sales**

Represents receipts from customers that have purchased fuel cards through PFS, net of the cost of sale. Customers purchase fuel cards to benefit from a volume discount that PFS has obtained. The net fuel sales are based on a 4-week trailing actual run rate.

**7. Rental Income**

Represents rental income collected from tenants of real estate owned by the Syndicate Borrowers. This is based on actual tenant contracts of each property. This will be updated as new tenants are onboarded or revenue from tenant agreements cease on the sale of the underlying real estate. Rental income for the other Pride Entities is assumed to be collected within their own bank accounts.

**8. Recovery of Costs from PGL and Real Estate**

It is assumed that there will be a completed transaction for PGL and for the real estate properties. As part of the distribution of proceeds, it is anticipated that there will be amounts paid for the professional fees related to these transactions. The amounts included are the estimated recoveries being $750,000 related to the PGL transaction, $50,000 per Canadian real estate transaction, $75,000 per US real estate transaction, and $1.7 million in December to reflect the Di Miller construction costs paid out of the DIP Facility. The amounts allocated for professional fees on real estate transactions are from the net proceeds after commissions and direct costs of the sale. The illustrative quantum of the professional fees related to each real estate transaction is detailed in Schedule "B". Professional fees on the pursuit of real estate transactions have not been paid, but are accruing and will be paid out of the proceeds of sale.

**9. Payroll and Benefits**

Represents wages and salaries, benefits, WSIB and National Auto League insurance (WSIB alternative coverage for the trucking industry). This also includes payment to subcontractors, i.e. truck drivers under contract, mechanics, and office contractors.

It assumes the completion of a going concern sale transaction of PGL on October 16th, 2024, with the final related payroll being paid in the subsequent two weeks. The reduction of headcount is based on the wind-down and turnover of assets and servicing of leases. Accrued vacation pay has been included to reflect the reduction in headcount.

**10. KERP**

This amount represents the total maximum size of the KERP set out in the Fifteenth Report, if approved by the Court.

**11. Sales Taxes Payable**

The amounts included in the Forecast Period are calculated based on amounts that would be accrued and due post-filing, and all accrued and payable amounts within the CCAA Proceedings. The timing has been updated to reflect the filing and expected payment dates from Management.

**12. Utilities**

These are the estimated utility costs for the terminal/dealership operations. PTS pays for PGL's utilities until the closing of a PGL sale, which is assumed to be on October 16th, 2024. The utilities will reduce as the leases are transferred to the purchaser (if required to pay under such lease) and as the properties are sold.

**13. Operating Fuel**

Represents the cost of fuel that is used by PGL estimated based on its 4-week trailing averages. It is assumed that the payments will be on regular credit terms. The forecast assumes there is a going concern sale transaction of PGL that closes on October 16th, 2024. Remaining pre-closing operating expenses will be paid in the subsequent two weeks.

**14. Repairs and Maintenance**

Represents the repair and maintenance costs incurred by the operating entities. When all the vehicles are turned over, there are no further costs anticipated to be spent on vehicles; similarly with the vehicles for PGL, there are no further costs anticipated post- October 16th, 2024 when the going concern transaction of PGL is anticipated to close. The amounts included are related to estimated outstanding payables.

**15. Brokerage Costs**

Represents the operating cost for PGL for brokerage fees. This is based on Management's estimate and historical run rate. The forecast assumes there is a going concern sale transaction of PGL that closes on October 16th, 2024. Remaining pre-closing operating expenses will be paid in the subsequent two weeks.

**16. Legal Costs**

These relate to fees paid to legal teams and other advisors for operations, such as enforcement and recovery of delinquent customer accounts. It is assumed that these will continue as they relate to collections and recoveries from customers, and some will be part of the turnover process. It is estimated that this will continue until the end of November. Some of their time will be utilized to assist the turnover of litigation to respective lenders as well as continue those that are commercially beneficial to the estate.

### 17. Wind Down Costs

These relate to costs such as boosting of truck batteries (which have been idle), to prepare the vehicles for movement off the Applicants' lots for turnover to lenders. Turn-overs to the applicable Securitization Parties began in August and turn-overs to recourse lenders are anticipated to begin in October. This cost has been estimated on a per vehicle basis.

### 18. Occupancy Costs

Represents rent for leased premises used by Syndicate Borrowers and 2076401 Ontario Inc. ("**207**"). The lease for 207 is then sublet to PTS. It is assumed that all occupancy costs related to PGL and PFS will be the responsibility of the purchaser in the PGL transaction after October 16th, 2024. As turnover of assets are occurring, leased locations will be disclaimed as they become vacant. It is assumed that all leased locations related to PTS/PTS LP will be disclaimed by November.

### 19. Other Costs

Represents the operating cost for the Pride Entities which include parking, software, tolls, insurance, and other general administrative costs. August includes payment of the annual insurance premiums for all the Applicants operating locations. December includes a credit for the annual insurance premiums, which will be applied after the completion of the inventory give back.

### 20. Logistics Equipment Financing

This represents payments to financers of equipment used for PGL operations. It is assumed in the forecast that these payments are paused until the sale of PGL. The forecast assumes there is a going concern sale transaction of PGL that closes on October 16th, 2024.

### 21. Intercompany Borrowings

This represents intercompany borrowings from Pride Entities outside of the Syndicate Borrowers from the Syndicate Borrowers to support operations of these Pride Entities. This is related to entities that will be sold with the PGL transaction.

### 22. Professional Fees - Restructuring

This relates to fees of the Applicants' external legal counsel in Canada and U.S., the Monitor and its counsels in Canada and the U.S., the directors and officers counsel, and the Chief Restructuring Officer. This is based on the remaining workstreams to manage turnover, wind-down and the conclusion of the CCAA and Chapter15 Proceedings.

## Non-Operating Disbursements

### 23. Lease Repayments

This represents the payments for wholesale leases to the various financiers. These lease payments only relate to performing leases and therefore exclude any payments associated with delinquent customers, vehicles returned or repossessed, vehicles in inventory, duplicate liabilities, etc. These

payments are subject to the Revised Governance Protocol. The Cash Flow Forecast assumes relief from making such lease payments to September 30th, 2024. It is anticipated that there will be some lease payments collected in October as servicing for these leases is transitioned. We do not anticipate any lease payments after October.

### 24. OEM Lease Repayments

This represents payments for wholesale leases to the various OEM financiers. These lease payments only relate to performing leases and therefore exclude any payments associated with delinquent customers, vehicles returned or repossessed, vehicles in inventory, duplicate liabilities, etc. These payments are subject to the Revised Governance Protocol. The Cash Flow Forecast assumes relief from making such lease payments to September 30th, 2024. It is anticipated that there will be some lease payments collected in October as servicing for these leases is transitioned. We do not anticipate any lease payments after October.

### 25. Lease Repayments - Other

This represents payments to non-lease lines financiers at a two-week lag for which the vehicle has been leased out to a customer. These lease payments only relate to performing leases and therefore exclude any payments associated with delinquent customers, duplicate liabilities, etc. These payments are subject to the Revised Governance Protocol. The Cash Flow Forecast assumes, in most cases, relief from making such lease payments to September 30th, 2024 where such payments constitute Deferred Lease Payments. It is anticipated that there will be some lease payments collected in October as servicing for these leases is transitioned. We do not anticipate any lease payments after October.

It is assumed that the repayment of the Total Deferred Payments as defined in Fourteenth Report will be paid to all affected lenders in December.

### 26. Available Cash Balance for the Syndicate Borrowers

This represents the bank balances of the Syndicate Borrowers, net of the bank account balances held with respect to lease collections for Securitization Parties. In October, there is a projected outflow of $8.6 million, being the Payment Procedure Top-Up to the Monitor's Payment Procedure Account for the purpose of paying the July 31st Accruals. A minimum cash balance of $3 million tapered to $1.5 million in March is assumed to be needed for working capital and to manage cash flow timing differences. The Available Cash Balance is reduced by the PGL and PFS bank balances after their assumed sale date.

### 27. Funding Contribution

This is an estimate of the total financing need to complete the turnover, wind-down and completion of the CCAA Proceedings and Chapter 15 Proceedings. This total funding includes $16.5 million related to the repayment of the Total Deferred Payments and $8.6 million related to the payment under the Payment Procedure Agreement.

**28. Available Cash Balance for the other Applicants**

This represents the bank balances of other the other Pride Entities who are not Syndicate Borrowers. The Other Applicants Balance is reduced by the bank balances of TPFS, PGL USA, PGL International, PFS USA, and Dixie Parts after their assumed sale date.

**29. Monitor's Trust Account**

This is the Trust account set up by the Monitor to hold amounts including Cash Proceeds and Lease Collections that relate to Multiple Collateral Vehicles (Leases) until the entitlement to such vehicles is determined pursuant to the Entitlement Claims Process, or by consent of the affected parties. In addition, this includes the amounts held in a trust for soft collections of Securitization Parties as required under the Revised Governance Protocol. It is assumed that these amounts (estimated at $4.7 million) will be remitted to the Securitization Parties, upon reconciliation, in October.

**30. Segregated Lease Payment Account**

These lease collections are set aside in segregated accounts pursuant to the DIP Credit Agreement. They will be paid to the appropriate lenders pursuant to the Revised Governance Protocol.

**31. Monitor's Payment Procedure Account (Pursuant to the Payment Procedure Agreement)**

The Payment Procedure Agreement required the Monitor to hold the Final Advance of $10.0 million in a Monitor's Payment Procedure Account and use such funds in accordance with restrictions requiring that such funds be applied to pay certain disbursements specified in the DIP Budget (as defined in the Amending Agreement). To have access to the Final Advance, the Pride Entities are required to top up the Payment Procedure Account by $8.6 million to pay the July 31st Accruals in full. These accruals cover payments to PGL financiers, sales payments for the last week of July, lease payments and soft collections for the last two weeks of July, and accrued HST for February, June, and July.

**Schedule "A"**

**A. APPLICANTS**

**Operating Entities**

*Canadian Operating Entities*

- PRIDE TRUCK SALES LTD. ("**PTS**")*
- TPINE TRUCK RENTAL INC. ("**TTR**")*
- PRIDE GROUP LOGISTICS LTD. ("**PGL**")*
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION*
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC. ("**PFS**")*
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*

- TPINE RENTAL USA, INC. ("**TTR USA**")*
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**

*Canadian Real Estate Holding Companies*

- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.*
- 1450 MEYERSIDE HOLDING INC.*
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*

- PGED HOLDING, CORP.*
- HIGH PRAIRIE TEXAS HOLDING CORP.*
- 131 INDUSTRIAL BLVD HOLDING CORP.*
- 59TH AVE PHOENIX HOLDING CORP.*
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.*
- FRONTAGE ROAD HOLDING CORP.*
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**

*Other Canadian Holding Companies*

- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.*
- PRIDE GROUP HOLDINGS INC.*
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*

- COASTLINE HOLDINGS, CORP.*
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*

- PRIDE TRUCK SALES L.P. ("**PTS LP**")*
- TPINE LEASING CAPITAL L.P.*
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*

- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*

- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.

* Syndicate Borrowers (borrowers or guarantors under the Syndicate Agreement)

## Schedule "B"

**BDC**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 20804 Stony Plain Rd, Edmonton, AB | CAN | March | BDC | | | | | $ 50,000.00 | |

**BMO**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 10015 NW 87th Avenue Medley, FL, 33178 | USA | November | BMO | | | | | $ 75,000.00 | |
| 235132 84 Street SE, Rocky View County, AB | CAN | December | BMO | | | | | $ 50,000.00 | |
| 3000 Pitfield Blvd., St Laurent, QC | CAN | January | BMO | | | | | $ - | |
| 335 68th Street, Saskatoon, SK | CAN | March | BMO | | | | | $ 50,000.00 | |
| 343 68th Street, Saskatoon, SK | CAN | March | BMO | | | | | $ 50,000.00 | |
| 1985 E. Crescentville Road, West Chester, OH | USA | March | BMO | | | | | $ - | |
| 3800 Mannheim Rd, Franklin Park, IL | USA | March | BMO | | | | | $ - | |
| Total | | | | $ 49,113,500.00 | $ 46,674,628.00 | $ 4,235,269.87 | $ 4,527,477.73 | $ 225,000.00 | $ 4,302,477.73 |

**NBC**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 1943 - 45, 55th Ave, Dorval, QC | CAN | January | NBC | | | | | $ - | |
| 3550-3590 Pitfield Blvd, Pierrefonds, QC | CAN | March | NBC | | | | | $ - | |
| 3600-3650 Pitfield Blvd, Pierrefonds, QC | CAN | March | NBC | | | | | $ - | |
| 10874 Steeles Ave, Halton Hills, ON | CAN | March | NBC | | | | | $ 50,000.00 | |
| Total | | | | $ 36,820,000.00 | $ 54,732,171.57 | $ 2,673,481.56 | $ 136,537.60 | $ 50,000.00 | $ 86,537.60 |

**Syndicate**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 131 Industrial Blvd, La Vergne, TN | USA | November | RBC | | | | | $ 75,000.00 | |
| 1021 N 59th Ave, Phoenix, Arizona | USA | November | RBC | | | | | $ 75,000.00 | |
| 3375 High Prairie Rd, TX | USA | November | RBC | | | | | $ 75,000.00 | |
| 34880 LBJ Freeway, Dallas, TX | USA | November | RBC | | | | | $ 75,000.00 | |
| 7548 DkMiller Drive, Bakersfield, CA | USA | December | RBC | | | | | $ 75,000.00 | |
| 1450 Meyerside Drive, Mississauga, ON | CAN | March | RBC | | | | | $ - | |
| 10862 Steeles Avenue East, Milton, ON | CAN | March | RBC | | | | | $ - | |
| Total | | | | $ 168,984,912.50 | $ 138,788,406.56 | $ 16,453,658.98 | $ 23,646,676.15 | $ 375,000.00 | $ 23,271,676.15 |

**RBC USA**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 963 Sweetwater Ln, Boca Raton, FL 33431, USA | USA | October | RBC USA | | $ 4,494,694.48 | | | $ 75,000.00 | |

**Roynat**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 1696 Bishop Road, Chehalis, WA | USA | May | Roynat | | | | | $ 75,000.00 | |
| 6253 Boundary Road, South Glengarry, ON | CAN | September | Roynat | | | | | $ 50,000.00 | |
| 30530 Matsqui Pl, Abbotsford, BC | CAN | September | Roynat | | | | | $ 50,000.00 | |
| 11670 Interstate 10 E, San Antonio, TX | USA | November | Roynat | | | | | $ 75,000.00 | |
| 6111 W Hanna Avenue, Indianapolis, Indiana | USA | November | Roynat | | | | | $ 75,000.00 | |
| 500 Ternes Drive, Monroe, MI | USA | November | Roynat | | | | | $ 75,000.00 | |
| 15762 Valley Blvd, Fontana, CA | USA | December | Roynat | | | | | $ 75,000.00 | |
| 10202 177A Street SURREY BC | CAN | December | Roynat | | | | | $ - | |
| 31992 Highway 46, McFarland, CA | USA | December | Roynat | | | | | $ 75,000.00 | |
| Hwy 99 and Hwy 46 McFarland, CA | USA | December | Roynat | | | | | $ 75,000.00 | |
| 1501 NE Loop 820, Fort Worth, TX | USA | December | Roynat | | | | | $ 75,000.00 | |
| 4895 Old National Highway, College Park, GA | USA | December | Roynat | | | | | $ 75,000.00 | |
| 1125 E Alexis Rd, Toledo, OH | USA | January | Roynat | | | | | $ 75,000.00 | |
| NE 45th & N. Corrington Ave., Kansas City, MO | USA | January | Roynat | | | | | $ 75,000.00 | |
| 8201 State Highway 66, Tulsa, OK | USA | January | Roynat | | | | | $ 75,000.00 | |
| 4600 E Victoria Ave, Regina, SK | CAN | March | Roynat | | | | | $ 50,000.00 | |
| lot 1163711, Cadastre, QC | CAN | March | Roynat | | | | | $ 50,000.00 | |
| 401 S Meridian Avenue, OKC, OK | USA | March | Roynat | | | | | $ - | |
| 7403 52 Street NW, Edmonton, AB | CAN | March | Roynat | | | | | $ - | |
| 933 Helena St, Fort Erie, ON | CAN | March | Roynat | | | | | $ - | |
| 2929 and 2726 N. Eastgate Ave., Springfield, MO | USA | March | Roynat | | | | | $ - | |
| Total | | | | $ 149,166,572.98 | $ 93,667,134.70 | $ 11,363,624.02 | $ 49,710,137.70 | $ 1,100,000.00 | $ 48,610,137.70 |

**No Lender**

| Location | Country | Expected Close Date | Lender | Estimated Sale Price (CAD)* | Mortgage Balance (CAD)* | Disposition Costs (CAD)* | Estimated Proceeds (CAD)* | Recovery of Real Estate Professional Fees (CAD) | Estimated Disbursement (CAD)* |
|---|---|---|---|---|---|---|---|---|---|
| 981 SW 13 Street, Pompano, FL | USA | November | No Lender | | $ - | | | $ 75,000.00 | |
| 162 Route Road, Troy, IL 62294 | USA | January | No Lender | | $ - | | | $ 75,000.00 | |
| E. Bundage Lane APN: '177.-130-03-00, County of Kern, CA 93307 | USA | March | No Lender | | $ - | | | $ 75,000.00 | |
| 2546 French Camp Road, Stockton CA | USA | December | No Lender | | $ - | | | $ 75,000.00 | |
| 225 West South Frontage Road, Bolingbrook, IL | USA | June | No Lender | | $ - | | | $ 75,000.00 | |
| 2400 Oakmont DR | USA | December | No Lender | | $ - | | | $ 75,000.00 | |
| Total | | | | $ 23,360,784.75 | $ - | $ 2,254,701.17 | $ 21,106,083.58 | $ 450,000.00 | $ 20,656,083.58 |

* The property values, mortgage balances, disposition costs, and estimated proceeds have been redacted as the properties are being marketed for sale.

12

Court File No.:  CV-24-00717340-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC., et al.

| | |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)** |
| | Proceeding Commenced at Toronto |
| | **FIFTEENTH REPORT OF THE MONITOR**<br>dated September 22, 2024 |
| | **BLAKE, CASSELS & GRAYDON LLP**<br>Barristers and Solicitors<br>199 Bay Street<br>Suite 4000, Commerce Court West<br>Toronto, Ontario M5L 1A9<br><br>**Pamela Huff**, LSO #27344V<br>Tel:      416-863-2958<br>Email:    pamela.huff@blakes.com<br>**Chris Burr**, LSO #55172H<br>Tel:      416-863-3261<br>Email:    chris.burr@blakes.com<br>**Kelly Bourassa**, LSO #43062R<br>Tel:      416-863-2421<br>Email:    kelly.bourassa@blakes.com<br>**Daniel Loberto**, LSO #79632Q<br>Tel:      416-863-2937<br>Email:    daniel.loberto@blakes.com<br><br>Lawyers for the Monitor |