## **Exhibit D**

Sixteenth Report

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

*IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED*

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those Applicants listed on **Schedule "A"** hereto

**SIXTEENTH REPORT OF THE MONITOR**

**DATED October 9, 2024**

## TABLE OF CONTENTS

Page

INTRODUCTION..........................................................................................................................1

TERMS OF REFERENCE ...........................................................................................................9

PURPOSE...................................................................................................................................10

OVERVIEW ...............................................................................................................................11

THE NEED FOR THE WIND-DOWN PLAN...........................................................................15

BACKGROUND WITH RESPECT TO THE ASSET MONETIZATION PROPOSAL ... 17

    The Urgent Need for Funding and the Liquidity Requirement ................................. 17

    Details with respect to the Liquidity Requirement.................................................... 18

    Rationale behind the Asset Monetization Proposal and the Liquidity Contributions
    ...................................................................................................................................... 19

    Reservation of Rights................................................................................................. 20

    Consultation with the Recourse Lenders on the Liquidity Contribution................. 21

DETAILS OF THE ASSET MONETIZATION PROPOSAL ............................................. 22

    Sale of the Monetized Inventory ............................................................................... 22

    Release of the Remaining Inventory ......................................................................... 23

    Other Vehicles .......................................................................................................... 23

        Multiple Collateral Vehicles........................................................................ 23

        Priority Collateral Vehicles.......................................................................... 24

    Treatment of Leasebooks .......................................................................................... 24

    Securitization Parties................................................................................................. 25

    The Liquidity Contribution Election ......................................................................... 26

THE KERP .................................................................................................................................. 27

STAY EXTENSION ................................................................................................................... 28

NEXT STEPS ............................................................................................................................. 28

RECOMMENDATIONS............................................................................................................ 29


**Appendix**                                                                                                    **Tab**

    Liquidity Contribution Analysis……………………………………………A

**INTRODUCTION**

1.   On March 27, 2024, Pride Group Holdings Inc. and those entities listed as "Applicants" in **Schedule "A"** hereto (each an "**Applicant**" and, collectively, the "**Applicants**") brought an application (the "**CCAA Application**") before the Ontario Superior Court of Justice (Commercial List) (the "**Court**") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") to, among other things, obtain a stay of proceedings to allow them an opportunity to restructure their business and affairs.

2.   On the same day, the Court granted an initial order in these CCAA proceedings (the "**CCAA Proceedings**") that, among other things, (i) appointed Ernst & Young Inc. as Monitor (in such capacity, the "**Monitor**"), and (ii) appointed RC Benson Consulting Inc. as Chief Restructuring Officer of the Pride Entities (in such capacity, the "**CRO**"). The Monitor filed a Pre-Filing Report dated March 27, 2024, in connection with the CCAA Application.

3.   In addition to the Applicants, the entities listed as "Limited Partnerships" and "Additional Stay Parties" in **Schedule "A"** hereto also obtained the benefit of the stay of proceedings until and including April 6, 2024, which stay expired the next business day, April 8, 2024 (the "**Stay Period**"). The Applicants together with the Limited Partnerships are referred to herein as the "**Pride Entities**" (and together with the Additional Stay Parties, the "**Pride Group**").

4.   The comeback hearing was heard on Friday, April 5, 2024 (the "**Comeback Hearing**"), where the Pride Entities sought and obtained an amended and restated initial order (the "**ARIO**"). The Monitor filed its First Report to Court, dated April 4, 2024 (the "**First Report**") in connection with the Comeback Hearing. The ARIO, among other things, extended the Stay Period to June 30, 2024, approved the term sheet for the DIP Facility and granted other relief as further described in the First Report.

5.   At the Comeback Hearing, the Court also granted an order approving certain protocols (the "**Protocols Order**"), including the Governance Protocol set out in Schedule "B" thereto (the "**Governance Protocol**"). The Governance Protocol was approved subject to parties

returning to Court on a without prejudice basis on April 19, 2024, for the approval of proposed revisions to the Governance Protocol ("**Revised Governance Protocol**"), which was subsequently adjourned to April 25, 2024, on consent. The Monitor filed its Second Report to Court, dated April 24, 2024 (the "**Second Report**") in connection with this April 19, 2024 return date, which was further adjourned to May 15, 2024, on consent, to give the Monitor, the Pride Entities, and the CRO additional time to negotiate the Revised Governance Protocol with affected stakeholders.

6.      The Monitor filed its Supplement to the Second Report to Court on May 6, 2024, to provide information to the Court in respect of ongoing negotiations and terms of the Revised Governance Protocol from the date of the Second Report.

7.      On May 6, 2024, the Pride Entities brought a motion for an approval and vesting order in respect of the sale of certain real property in Bolingbrook, Illinois (the "**Bolingbrook Property**") and to amend and restate the ARIO. The Monitor filed its Third Report to Court, dated May 2, 2024, in connection with such motion. The Court granted orders approving the sale of the Bolingbrook Property and amending and restating the ARIO (the "**Second ARIO**").

8.      On May 5, 2024, the Pride Entities brought a motion, seeking, among other things, (i) an order approving a sale and marketing process for the business, operations, and assets ("**PGL Sale Process**") of Pride Group Logistics Ltd. ("**PGL**"), Pride Group Logistics USA, Co., Pride Global Insurance Company Ltd.[1] (collectively, the "**PGL Entities**"), and (ii) an approval and vesting order in respect of the sale of certain property in Chehalis, Washington (the "**Chehalis Property**"). The Monitor filed its Fourth Report to Court, dated May 10, 2024 in connection with same (the "**Fourth Report**").

9.      On May 13, 2024, the Monitor filed its Fifth Report to Court (the "**Fifth Report**"), which provided the Court and stakeholders with an update on the status and ongoing work with respect to: (i) secured facility reviews, (ii) securitization facility reviews, and (iii) the entitlement claims process. On May 15, 2024, the Court granted orders approving, among

---

[1] Pride Global Insurance Company Ltd. is not an Applicant in these proceedings and is an Additional Stay Party as listed in Schedule "A" to the Second ARIO.

- 3 -

other things, the PGL Sale Process, the sale of the Chehalis Property, and the Amended and Restated Protocols Order, dated May 15, 2024, which included the Revised Governance Protocol.

10. On June 14, 2024, the Pride Entities brought a motion seeking approval of the entitlement claims process (the "**Entitlement Claims Process**", with such Order being the "**Entitlement Claims Process Order**"). The Monitor filed its Sixth Report to Court, dated June 13, 2024 (the "**Sixth Report**"), in connection with same. On June 14, 2024, the Court granted the Entitlement Claims Process Order.

11. On June 27, 2024, the Pride Entities brought motions seeking (i) the extension of the Stay Period (as defined in the Second ARIO) to and including September 30, 2024, (ii) the entry of a consent order authorizing Regions Equipment Finance Corporation ("**REFCO**") and Regions Commercial Equipment Finance, LLC ("**RCEF**", and together with REFCO, "**Regions Equipment Finance**") to sell certain vehicles surrendered to Regions Equipment Finance pre-filing, and (iii) the entry of a consent order authorizing Daimler Truck Financial Services Canada Corporation ("**DTF Canada**") and Daimler Truck Financial Services USA LLC ("**DTF US**", and together with DTF Canada, "**Daimler**") to sell certain vehicles surrendered to Daimler pre-filing. The Monitor filed its Seventh Report to Court, dated June 26, 2024, in connection with these motions. On June 27, 2024, the Court granted the order extending the Stay Period as well as the consent orders referred to above.

12. On July 3, 2024, the Pride Entities brought a motion seeking (i) an order approving the amendment and extension of the Fourth Amended and Restated Credit Agreement executed on May 10, 2024 ("**FARCA**"), and (ii) the entry of a consent order authorizing VFS Canada Inc. ("**VFS Canada**") and VFS U.S. LLC ("**VFS US**", and together with VFS Canada, "**VFS**") to sell certain vehicles surrendered to VFS pre-filing. The Monitor filed its Eighth Report to Court, dated July 2, 2024 (the "**Eighth Report**") in connection with this motion. On July 3, 2024, the Court granted the orders referred to above.

13. On July 16, 2024, the Pride Entities brought a motion seeking, among other things, (i) entry of an order in respect of certain unreturned collateral financed by Regions Equipment Finance, (ii) an order approving the distribution of net proceeds of sale of the Chehalis

- 4 -

Property to Roynat Inc. ("**Roynat**"), and (iii) an order approving a transaction contemplated by a factoring portfolio purchase agreement (the "**Factoring Transaction**") between TPine Financial Services Inc., as vendor, and J D Factors Corporation / Corporation D'affacturage J D, as purchaser. The Monitor filed its Ninth Report to Court, dated July 13, 2024, in connection with same. Separately, the Monitor filed a Supplement to the Ninth Report of the Monitor on July 15, 2024 (the "**Supplement to the Ninth Report**"), which Supplement to the Ninth Report included an update on the Monitor's review of the securitization facilities. On July 16, 2024, the Court granted the orders referred to in points (i) and (ii) above. The motion seeking the approval of the Factoring Transaction was adjourned until August 7, 2024. An order granted on that date approved the Factoring Transaction, which closed on September 6, 2024.

14.    On July 21, 2024, the Pride Entities brought a motion seeking, among other things, (i) an order respecting the transition and relinquishment of servicing and other duties under certain Securitization Programs where the outcome of the Monitor's proprietary interest assessment with respect to an applicable Securitization Party's ownership entitlement to such assets is favourable, and (ii) set out the terms and conditions upon which such turn-over may occur. The Monitor filed its Tenth Report to Court, dated July 21, 2024 (the "**Tenth Report**"), in connection with same, which Tenth Report included the Monitor's view with respect to certain of the Securitization Programs. On August 8, 2024, the Court granted an order in respect of, among other things, the turn-over of securitized assets (the "**Securitized Assets Turn-Over Order**").

15.    The Monitor filed its Supplement to the Tenth Report on August 1, 2024 (the "**Supplement to the Tenth Report**"), which provided a proposed methodology for consideration by the stakeholders and the Court for the allocation of the direct legal fees and disbursements of the Securitization Program review undertaken by the Monitor's Canadian counsel, Blake, Cassels & Graydon LLP ("**Canadian Counsel**"), and U.S. counsel, McDermott, Will & Emery LLP ("**U.S. Counsel**") on a fair and equitable basis as a necessary cost of transitioning among the Subject Assets subject to the Reviewed Programs (the "**Validation Mandate Fee Proposal**") (as such terms are defined in the Supplement to the Tenth

Report). No hearing date has been set to approve the Validation Mandate Fee Proposal, and the Monitor expects to engage with stakeholders prior to such hearing date.

16.     The Monitor filed its Eleventh Report to the Court on August 2, 2024 (the "**Eleventh Report**"), which provided the Court with information pertaining to the Monitor's review of the security interests asserted by Secured Creditors (as defined therein), including, but not limited to, the Monitor's view as to whether each Secured Creditor had, as at July 31, 2024, provided sufficient evidence of a perfected and priority interest in specific vehicles which are owned by the Pride Entities and identified and tracked by vehicle identification numbers (with the exception of Multiple Collateral Vehicles and each, an "**MCV**", which are subject to the Entitlement Claims Process).

17.     On August 2, 2024, the DIP Agent brought a motion, on a date to be set by the Court, for the appointment of Alvarez & Marsal Canada Inc. (the "**Proposed Collateral Manager**") as manager, an officer of the Court (in such capacity, the "**Collateral Manager**"), of those assets, undertakings and properties of the Pride Entities/Syndicate Lenders, including all proceeds thereof, included in the definition of "Management Property" in the proposed Syndicate Collateral Management Order and lifting the stay of proceedings granted in these CCAA Proceedings to the extent necessary to give effect to the appointment of the Proposed Collateral Manager as Collateral Manager and the other relief set out in the Syndicate Collateral Management Order.

18.     On August 7, 2024, the Pride Entities brought a motion seeking, among other things, (i) an approval and vesting order in respect of the sale of certain property in Abbotsford, British Columbia and approving the distribution of net proceeds of sale to Roynat, and (ii) an approval and vesting order in respect of the sale of certain property in Cornwall, Ontario and approving the distribution of net proceeds of sale to Roynat. The Monitor filed its Twelfth Report to the Court on August 6, 2024 (the "**Twelfth Report**") in respect of this motion and to provide updates to the Court in respect of the PGL Sale Process and the Factoring Transaction. On August 7, 2024, the Court granted orders approving both real property sales referred to above.

19.     On August 9, 2024, the Pride Entities brought a motion, seeking, among other things, an order (i) authorizing and entitling the Pride Entities to apply any Lease Payments and Soft Collections (each as defined in the Affidavit of Randall Benson, sworn August 7, 2024) received from and after July 15, 2024 until September 3, 2024 to pay their ordinary course working capital needs and for other general corporate purposes (the "**Deferred Payments**"), but excluding Lease Payments and Soft Collections (a) in respect of MCVs, (b) in which a Securitization Party has claimed an interest, or (c) in respect of any Subject Asset or MCV Asset (as defined in the Turn-Over Order), provided that the Pride Entities continue to abide by the reporting and record-keeping obligations in respect of such Deferred Payments as set out in the Revised Governance Protocol, and (ii) approving the Pride Entities' execution of a non-binding indicative term sheet (the "**Indicative Term Sheet**") between Nations Capital, LLC, as Agent, 1903P Loan Agent, LLC or is affiliates (the "**Gordon Brothers**") and Pride Group Holdings, Inc, as borrower, to facilitate a proposed interim financing facility (the "**New Interim Financing Facility**"), and seeking the limited approval of the payment of due diligence fees and negotiations of the New Interim Financing Facility and wind-down plan, subject to Court approval.

20.     The Monitor filed its Thirteenth Report to the Court on August 8, 2024 (the "**Thirteenth Report**") in respect of the foregoing motion and to provide updates to the Court in respect of the Validation Mandate, the DIP Facility, and the status of the Pride Entities' liquidity.

21.     On August 9, 2024, the Court granted an Order (i) amending the Revised Governance Protocol to permit the Pride Entities to use the Deferred Payments subject to the Monitor's review and oversight, provided that (a) the aggregate amount of the Deferred Payments do not exceed the aggregate amount contemplated in the cash flow forecast (subject to a 10% positive variance), (b) the Pride Entities continue to abide by the reporting and record-keeping obligations in respect of such Deferred Payments, among other things, and (c) the amount of the Deferred Payments will be allocated by further order of the Court; and (ii) adjourning the Pride Entities' motion to approve certain provisions of the Indicative Term Sheet *sine die.*

22.     On August 9, 2024, the Court issued an endorsement which provided that, among other things, the CRO and the Pride Entities, in consultation with the Monitor, shall immediately

engage with the Pride Entities' significant Financiers in an effort to develop an orderly wind-down proposal in respect of the Pride Entities, including the funding required in respect of such proposal and completion of the CCAA proceedings.

23.    The Pride Entities brought a motion returnable on September 3, 2024 seeking, among other things, (i) an order extending the Pride Entities' ability to use Lease Payments and Soft Collections received from and after September 3 until September 30, 2024 to pay their ordinary course working capital needs and for other general corporate purposes (the "**Extended Deferred Payments**" and collectively with the Deferred Payments, the "**Total Deferred Payments**") and authorizing the sale of MCVs not subject to an active lease, (ii) approval of the PGL Sale Agreement, and (iii) advice and directions relating to alternate relief in respect of the PGL Entities and a wind-down of the Pride Entities. Advice and directions were sought for an orderly wind-down process, in a collective response to the lift stay motions also returnable on September 3, 2024.

24.    The Monitor filed its Fourteenth Report to the Court on August 28, 2024 (the "**Fourteenth Report**"), as well as a First Supplement to the Fourteenth Report dated September 2, 2024 (the "**First Supplement to the Fourteenth Report**") in respect of the foregoing motion.

25.    On September 3, 2024, the Court granted orders which, among other things, (i) amended the Order amending the Revised Governance Protocol, dated August 9, 2024 to permit use of the Extended Deferred Payments, in accordance with the provisions contained in such order, (ii) increased the Administration Charge to an aggregate amount of $5 million, and (iii) expunged and discharged any liens registered against any assets owned by the Pride Entities pursuant to the *Repair and Storage Lien Act* (Ontario), or equivalent statutes, upon payment of the amount of such lien as registered in the applicable personal property registry to the Monitor in trust, pending the resolution or determination of the validity and/or quantum of such lien claims, in accordance with the terms of such order.

26.    The Court issued an Endorsement on the same date (the "**September 3 Endorsement**") which directed affected parties to attend before The Honourable Thomas McEwen, former Team Lead of the Commercial List, on September 9, 2024, and if and as necessary and as Mr. McEwen may direct, September 10, 2024, to mediate the issues in dispute at the

September 3, 2024 hearing and attempt to resolve or at least narrow the issues (the "**Mediation Issues**", with the underlying mediation referred to herein as the "**Mediation**").

27.    The Monitor filed its Second Supplement to the Fourteenth Report on September 19, 2024 (the "**Second Supplemental Report**") to provide the Court with information pertaining to the Mediation, the Orderly Wind-Down Plan, the Funding Contribution Proposal, and the Pride Entities' motion for, among other things, (i) approval of the implementation of the Orderly Wind-Down Plan, (ii) approval of the Funding Contribution Proposal (all as defined in the Second Supplement to the Fourteenth Report), (iii) termination of the Governance Protocol (as revised), (iv) approval of deadlines for monetization of Remaining Assets, and MCVs where entitlement is not resolved on a timely basis, and (v) the Wind-Down Funding Contribution and Turn-Over Order (the "**Funding Order**"). Such motion was returnable before the Court on September 26, 2024.

28.    The Monitor filed its Fifteenth Report of the Monitor on September 22, 2024 (the "**Fifteenth Report**") to provide the Court with information pertaining to, among other things, the Pride Entities' updated cash flow forecast from September 7, 2024 to March 30, 2025 on a consolidated basis, and the Pride Entities' motion for, among other things, (i) extending the Stay Period to March 31, 2025, and (ii) approving a key employee retention plan (the "**KERP**"). This motion was also returnable before the Court on September 26, 2024.

29.    The Monitor filed its Third Supplement to the Fourteenth Report dated September 23, 2024 (the "**Third Supplemental Report**") to provide information and updates to the Court with respect to the motion for the approval of the PGL Going Concern Transaction contemplated by the PGL Sale Agreement, as amended pursuant to the amendments discussed therein (the "**A&R PGL Sale Agreement**"), and vesting the Purchased Assets in the Purchaser (each as defined in the A&R PGL Sale Agreement), and the Monitor's recommendation in respect to same.

30.    On September 26, 2024, the Court issued an Endorsement (the "**PGL Endorsement**") approving the PGL Going Concern Transaction contemplated by the A&R PGL Sale

Agreement and on September 26, 2024, the Court granted an Approval and Vesting Order with respect to the PGL Going Concern Transaction.

31.   On September 30, 2024, the Court issued an Endorsement (the "**September 26 Endorsement**") which, among other things, set out its reasons for declining to grant the Funding Order and extended the Stay Period to and including November 29, 2024. Since the proposed KERP was dependent upon the Funding Order being granted, the approval of the KERP was also declined without prejudice to the ability of the Pride Entities to seek such relief at a later date.

32.   The Pride Entities have brought a motion returnable on October 10, 2024 seeking approval of a Wind-Down, Liquidity Contribution Alternative and Turn-Over Order attached in draft to the Notice of Motion ("**Wind-Down Order**") that, among other things: (a) approves the Wind-Down Plan (as defined therein); (b) approves the Asset Monetization Proposal (as defined below); and (c) approves a term sheet between the Pride Entities and Nations Capital, LLC ("**NCI**") setting out the principal terms of the engagement of NCI as the Pride Entities' agent to sell certain assets of the Pride Entities, as is described in more detail below. At the same time, the Pride Entities will be bringing forward a motion for approval of the proposed KERP and an extension of the Stay Period to and including March 31, 2025.

33.   This report (the "**Sixteenth Report**") should be read in conjunction with the Eleventh Report, Fourteenth Report, First and Second Supplements to the Fourteenth Report, the Fifteenth Report (collectively, the "**Prior Reports**"), the Affidavit of Randall Benson, sworn August September 18, 2024, the Supplemental Affidavit of Randall Benson sworn September 23, 2024 (the "**Supplemental Benson Affidavit**"), and the Affidavit of Randall Benson sworn October 8, 2024 (the "**Benson Affidavit**").

**TERMS OF REFERENCE**

34.   In preparing this Sixteenth Report and making the comments herein, the Monitor has been provided with, and has relied upon, unaudited financial information, books and records prepared by the Applicants, discussions with management of the Applicants

("**Management**"), and information from other third-party sources, including Financiers and personal property security registries (collectively, the "**Information**"). In its preparation of this Sixteenth Report, the Monitor has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Monitor has not audited or otherwise attempted to verify the accuracy or completeness of such Information in a manner that would wholly or partially comply with Canadian Auditing Standards ("**CAS**") pursuant to the Chartered Professional Accountants Canada Handbook and, accordingly, the Monitor expresses no opinion or other form of assurance contemplated under CAS in respect of the Information. Some of the information referred to in this Sixteenth Report may consist of forecasts and projections. An examination or review of the financial forecast and projections, as outlined in the Chartered Professional Accountants Canada Handbook, has not been performed.

35.     Any future-oriented financial information referred to in this Sixteenth Report was prepared based on Management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that are not ascertainable, the actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

36.     Unless otherwise indicated, the Monitor's understanding of factual matters expressed in this Sixteenth Report concerning the Pride Entities and their business is based on the Information, and not independent factual determinations made by the Monitor.

37.     Capitalized terms not otherwise defined herein have the meaning given to them in the Fourteenth Report and the First and Second Supplements to the Fourteenth Report, as applicable.

**PURPOSE**

38.     The purpose of this Sixteenth Report is to provide the Court and stakeholders of the Pride Entities with, among other things, the Monitor's recommendations with respect to:

(a)      the Wind-Down Plan; and

(b)      the Liquidity Requirement, the Liquidity Contribution and the Asset Monetization Proposal (all as defined herein) to fund the Wind-Down Plan.

39.     When reference is made herein to the secured entitlement of or the turn-over of Inventory and/or Leasebooks (as such terms are defined in the Wind-Down Order) to a Recourse Lender, it is in respect of or to such Recourse Lender for which the Monitor has determined, as set out in the Eleventh Report, that said Recourse Lender has provided sufficient evidence of a perfected and priority interest in such collateral, or with respect to PCVs (as defined in the Wind-Down Order), such Recourse Lender that has asserted an interest in such Inventory or Leasebooks and the potential priority claim of the Syndicate Lenders has not yet been determined.

**OVERVIEW**

40.     Following the issuance of the September 30 Endorsement, the Pride Entities, the CRO, and the Monitor diligently pursued an alternative model to provide for the liquidity urgently needed to implement a centralized, coordinated and controlled wind-down of the Pride Entities' remaining assets. As discussed below, they have also engaged with certain of the Pride Entities' most significant secured lenders with respect to the same.

41.     The Pride Entities, the CRO, and the Monitor have concluded that the only viable option is to immediately begin monetizing certain assets of the Pride Entities and/or retaining proceeds from the Leasebooks, being pre-authorized payments received by the Pride Entities on October 1, 2024 (the "**October 1 Leasebook Collections**")[2] and the pre-authorized payments and/or Soft Collections received by the Pride Entities after October 1, 2024 (the "**Post-October 1 Leasebook Collections**"), to generate the $40 million liquidity requirement (the "**Liquidity Requirement**") needed to fund the Wind-Down Plan (the "**Asset Monetization Proposal**").

---

[2] There were many pre-authorized payments due on October 1, 2024 that were not received on October 1, 2024 and, therefore, are included in the Post-October 1 Leasebook Collections.

42.     The basic structure of the Asset Monetization Proposal is the following:

(a)     **Appendix "A"** hereto (the "**Liquidity Contribution Analysis**") contains a *pro rata* calculation of each Recourse Lenders'[3] proportionate share of the Liquidity Requirement (each, a "**Liquidity Contribution**"), based on the number of inventory and leasesbook assets (identified by VIN) in the possession of the Pride Entities as at August 1, 2024;

(b)     the Liquidity Contribution Analysis also sets out the net amount of each Recourse Lender's Liquidity Contribution, which is their "**Gross Liquidity Contribution Amount**" net of (i) certain Deferred Payments, Segregated Lease Amounts (as defined in the Wind-Down Order) and October 1 Leasebook Collections payable to such Recourse Lender, resulting in a "**Net Liquidity Contribution Amount**";

(c)     the Asset Monetization Proposal provides for (i) the monetization of certain of the Inventory by NCI (the "**Monetized Inventory**") in three scenarios: (a) where a Recourse Lender has not made a Liquidity Contribution Election (as described and defined below), (b) where a Recourse Lender has not retrieved its Inventory by the Turn-Over Outside Date (as defined in the Wind-Down Order) for such Inventory, and (c) where parties claiming an interest in MCVs have not agreed among themselves as to who is entitled to such MCV by the MCV Resolution Outside Date (as defined in the Wind-Down Order); and (ii) the retention of certain Post-October 1 Leasebook Collections and other amounts to fund each Recourse Lender's Net Liquidity Contribution Amount if the Recourse Lenders do not make the Liquidity Contribution Election;

(d)     the Pride Entities, the CRO and the Monitor understand the need for an orderly sales process that will utilize NCI's existing sale channels and relationships through private treaty sales to maximize value. For this reason, it is not presently expected that NCI will sell any Monetized Inventory through auction;

---

[3] For the purposes of this Report, the Recourse Lenders include Bennington Financial Corp.

(e)    to meet immediate liquidity needs and provide the Pride Entities with sufficient liquidity runway to pursue a robust strategy for the Monetized Inventory, the Pride Entities will use funds generated from the Liquidity Contribution Election, Segregated Lease Amounts, October 1 Leasebook Collections and Post-October 1 Leasebook Collections to fund the immediate liquidity needs of the Wind-Down Plan pending the sale of the Monetized Inventory (if applicable) to fund longer term liquidity needs;

(f)    where a Recourse Lender has not made a Liquidity Contribution Election, the specific Monetized Inventory to be sold and Post-October 1 Leasebook Collections to be retained to fund the Liquidity Requirement will be determined by the CRO and the Monitor in a number and quantum sufficient to satisfy such Recourse Lender's Net Liquidity Contribution Amount;

(g)    while the need for liquidity is urgent, as discussed in the Prior Reports and below, with the exception of the Monetized Inventory, the Recourse Lenders will be permitted to retrieve all other VINs constituting Inventory (the "**Remaining Inventory**");

(h)    with respect to the MCVs:

(i)    MCVs to which a Securitization Party has claimed an interest that have not yet been returned to the Securitization Parties will be returned to the Securitization Parties pursuant to the terms of the Securitized Assets Turn-Over Order (or where Securitization Parties claiming an interest in an MCV reach agreement with the other parties claiming an interest in such MCV, as they have been doing on an *ad hoc* basis since the date of the Securitized Assets Turn-Over Order). To date, Securitization Parties have not been charged for and, accordingly, have not contributed to the costs of such turn-over (the majority of which costs have already been incurred by the Pride Entities). However, the remaining direct costs of returning MCVs and securitized assets to the Securitization Parties are not proposed to be funded

through the Asset Monetization Proposal and will, instead, be charged on a case-by-case basis (as further discussed below);

(ii) MCVs over which only Recourse Lenders claim an entitlement will be available to be retrieved by the applicable Recourse Lender if there is a MCV Turn-Over Resolution (as defined in the Wind-Down Order) between these Recourse Lenders prior to the MCV Resolution Outside Date. Any remaining Multiple Collateral Vehicles will be sold by NCI, with the net proceeds (which, for greater certainty, will be net of NCI's commission) thereof to be held in trust by the Monitor, pending a determination as to entitlement thereto; and

(i) while Post-October 1 Leasebook Collections may be retained pursuant to the Asset Monetization Proposal, the Asset Monetization Proposal does not contemplate the actual sale of Leasebooks (i.e. performing leases).

43. As an alternative to the proposal summarized in paragraph 42 above, each Recourse Lender will also have the option (the "**Liquidity Contribution Election**") to pay its Net Liquidity Contribution Amount to the Monitor within 3 business days of the granting of the Wind-Down Order or such later date that may be agreed upon by the applicable Recourse Lender, the CRO and the Monitor.

44. Each Recourse Lender that makes the Liquidity Contribution Election will be permitted to retrieve all of its Inventory and its Leasebooks, with the exception of its Segregated Lease Amounts, Deferred Payments from August 1, 2024 and October 1 Leasebook Collections (which will be retained by the Pride Entities to reduce such Recourse Lender's Gross Liquidity Contribution Amount).

45. The Asset Monetization Proposal is not intended to be a definitive allocation of the Liquidity Requirement, but rather a mechanism to satisfy the immediate liquidity needs of the Pride Entities on an interim and *without prejudice* basis in a manner which ensures that no single Recourse Lender is disproportionately impacted. The rights of all affected parties

will be reserved with respect to the allocation of the Liquidity Requirement and the costs of the Wind-Down Plan and these CCAA Proceedings, to be determined at a later date.

**THE NEED FOR THE WIND-DOWN PLAN**

46.     As set out in the Fourteenth Report, a going concern restructuring plan for the Pride Entities is not a feasible option. Accordingly, the CRO and the Monitor have directed their efforts towards developing the Wind-Down Plan, which will effect a centralized, coordinated, and controlled wind-down of the Pride Entities' remaining assets.

47.     The Wind-Down Plan will be implemented at the direction of the CRO, in consultation with the Monitor. Since the granting of the Second ARIO, which empowered the CRO to, among other things, enter into and execute agreements on behalf of the Pride Entities, the CRO, in consultation with the Monitor, has been largely responsible for administering the Pride Entities' business and restructuring efforts and is authorized and well placed to effect the Wind-Down Plan, in consultation with the Monitor.

48.     The Monitor views the Wind-Down Plan as imperative, given the vast number of vehicles in the Pride Entities' fleet across North America, in addition to the thousands of leased vehicles (most of which are constantly in transit). Any form of wind-down will require liquidity to fund the necessary payroll, transition costs, transfer of assets to the Recourse Lenders, administration costs of the Pride Entities and the costs of these CCAA Proceedings. Without this funding, employees would be immediately terminated, leases would not be serviced, insurance would not be maintained, delinquency rates would increase, and many vehicles would be abandoned without the critical infrastructure needed to support their retrieval or to determine competing claims against the assets of the Pride Entities. This would make it challenging if not impossible to turn-over Inventory and Leasebooks in an orderly fashion.

49.     The Monitor advised in its Thirteenth Report that due to the DIP Facility being effectively fully drawn and matured, and given the restrictions on the manner in which the Final Advance could be used by the Pride Entities pursuant to the Payment Procedure Agreement, the Pride Entities would have limited liquidity during the interim period from

July 29, 2024 up to and including September 8, 2024 by which point the Pride Entities intended on seeking Court approval of the New Interim Financing Facility. However, the New Interim Financing Facility was not pursued due to lack of stakeholder support.

50.     Both prior to and following the hearing on September 26, 2024, and the release of the September 30 Endorsement, the CRO and the Monitor have engaged with certain of the Pride Entities' most significant secured lenders in respect of the Wind-Down Plan for the entirety of the Pride Entities' estate, except for those assets included in the PGL Going Concern Transaction.

51.     The Wind-Down Plan, funded by the Asset Monetization Proposal, in summary:

(a)     obviates the need for multiple lift-stay motions, or the appointment of multiple Court officers, except on a consent basis to the extent Recourse Lenders require a Court officer to take possession of the Inventory or Leasebooks being released to them;

(b)     seamlessly transfers the Remaining Inventory to the Recourse Lenders (or all Inventory with respect to those Recourse Lenders who elect the Liquidity Contribution Election);

(c)     facilitates the turn-over of Leasebooks (other than October 1 Leasebook Collections) to applicable Recourse Lenders or PCV claimants;

(d)     monetizes certain MCVs, with the net proceeds to be held in trust pending determination of entitlement thereto; and

(e)     winds down the remainder of the Pride Entities' estate, including, but not limited to, matters involving employees, customers, and real estate.

52.     A detailed summary of the terms of the Wind-Down Plan is set out in the Fourteenth Report.

53.     The timelines for the Wind-Down Plan as set out in the Gantt Chart included in the Wind-Down Cash Flow Forecast (as defined in the Wind-Down Order) will remain substantially

similar, although the start times of turning over Inventory and transitioning Leasebooks have been revised.

54.    The proposed Turn-Over Outside Dates, as set out in the Wind-Down Order, are as follows:

(a)    October 31, 2024, in respect of Inventory situated at Lot Category A lots;

(b)    November 7, 2024, in respect of Inventory situated at Lot Category B lots;

(c)    November 14, 2024, in respect of Inventory situated at Lot Category C lots;

(d)    November 15, 2024, in respect of all Leasebooks;

(e)    November 26, 2024, in respect of Inventory situated at Lot Category D lots; and

(f)    December 17, 2024, in respect of Inventory situated at Lot Category E lots;

with each of the "Lot Categories" shown in Schedule "B" to the Wind-Down Order.

55.    These timelines are intended to ensure maximum efficiencies for the benefit of all stakeholders. As discussed in the Second Supplement to the Fourteenth Report, the timelines for the Wind-Down Plan must be balanced with addressing control and safety issues so that the Wind-Down Plan can be implemented in a safe and controlled manner to the benefit of the Pride Entities' employees and all stakeholders.

**BACKGROUND WITH RESPECT TO THE ASSET MONETIZATION PROPOSAL**

*The Urgent Need for Funding and the Liquidity Requirement*

56.    As noted in the September 30 Endorsement, there is general consensus that the Pride Entities need to be wound-down and that the $40 million Liquidity Requirement is necessary to fund the wind-down. The need for the Liquidity Requirement is largely because the DIP Facility has now been fully drawn and the Pride Entities do not have the liquidity to fund the wind-down of its operations.

57.    The Wind-Down Cash Flow Forecast sets out the immediate, short-term and medium-term liquidity needs of the Pride Entities. The current projections are generally the same as those

in the Wind-Down Cash Flow Forecast, although the delay in the commencement of the wind down is estimated to result in approximately $1.5 million in additional liquidity needs for each week of the delay. Despite these increased costs, the $40 million Liquidity Requirement is still considered sufficient, though the contingency portion of the Liquidity Requirement will decrease given the commensurate increase in hard costs due to the delayed start.

58.    Based on their discussions with various Recourse Lenders, the CRO and the Monitor expect that a significant proportion of the Recourse Lenders will make the Liquidity Contribution Election and pay their respective Net Liquidity Contribution Amount in order to retrieve all of their respective Inventory and Leasebooks. As discussed below, the Monitor anticipates this will (in most part) fund the immediate liquidity needs of the Pride Entities.

*Details with respect to the Liquidity Requirement*

59.    The Monitor remains of the view that the Liquidity Requirement of $40 million is needed to fund the Wind-Down Plan.

60.    Some of the major components of the Liquidity Requirement (totalling approximately $30.6 million) are further set out in the Fifteenth Report and can be broken down as follows:

(a)    the repayment of certain Deferred Payments to Recourse Lenders in the estimated amount of approximately $16.5 million;

(b)    Payment Procedure Top-Up in the amount of approximately $8.6 million;

(c)    interest under the DIP Facility in the amount of approximately $1.7 million;

(d)    credit to the Syndicate Lenders with respect to VINs that have previously been monetized where no other Recourse Lenders have asserted a priority interest, in the amount of approximately $2.0 million; and

(e)    amounts required to fund the proposed KERP of $1.8 million.

61.    Further details of the $40 million Liquidity Requirement are described in the Fifteenth Report, Second Supplement to the Fourteenth Report and the Benson Affidavit.

***Rationale behind the Asset Monetization Proposal and the Liquidity Contributions***

62.    Based on the guidance provided by this Court in the September 30 Endorsement, the CRO and the Monitor have developed an alternative model which does not extend to Securitization Parties, does not compel any further advances, and permits the Pride Entities to utilize their assets to meet the Liquidity Requirement in a manner which is fair among the Recourse Lenders and does not disproportionately impact any single Recourse Lender.

63.    Each Recourse Lender's Liquidity Contribution is calculated on a *pro rata* basis and is based on the number of inventory and leasebook assets (identified by VIN) each Recourse Lender claims an entitlement to as at August 1, 2024. Based on the $40 million Liquidity Requirement and 5,729 total VINs as set out in **Appendix "A"**, the Liquidity Contribution of each Recourse Lender works out to $6,982 per VIN (inventory and leasebook assets).

64.    The amount actually required to satisfy each Recourse Lenders' Liquidity Contribution, i.e. the Net Liquidity Contribution Amount, is the Gross Liquidity Contribution Amount net of (i) certain Deferred Payments (being pre-authorized payments and Soft Collections for the period of August 1, 2024 to September 30, 2024, that have been reconciled by the Pride Entities and confirmed by the Monitor as subject to the security interest of and payable to the respective Recourse Lenders), (ii) Segregated Lease Payments; and (iii) October 1 Leasebook Collections.

65.    Further, to the extent a Recourse Lender does not choose the Liquidity Contribution Election, certain other amounts will also be retained and set-off against that Recourse Lender's Net Liquidity Contribution Amount, such as Post-October 1 Leasebook Collections, as well as any proceeds from the Monetized Inventory.

66.    The Monitor notes the following with respect to the Liquidity Contribution Analysis:

    (a)    the number of VINs assigned to each Recourse Lender removes any non-vehicle assets, including the EV Units (as defined and discussed below), reducing the total number of

Inventory assets available and increasing the per VIN amount by $100 (as compared to what was previously provided to the Recourse Lenders on October 3, 2024);

(b)      the set-off amounts include Lease Payments and Soft Collections collected from August 1, 2024 until September 30, 2024. Although the Revised Governance Protocol authorized the retention of Lease Payments and Soft Collections from July 15, 2024 onwards, amounts received between July 15 and July 31, 2024, and not remitted will be paid to the applicable Recourse Lender once the Monitor's Payment Procedure Account has been topped-up (as defined and discussed in the Thirteenth and Fourteenth Reports) and not deducted from that Recourse Lender's Net Liquidity Contribution Amount; and

(c)      the October 1 Leasebook Collections are derived from pre-authorized payments and have been included as a set-off towards each Recourse Lenders' Gross Liquidity Contribution Amount. As Soft Collections require time and significant effort to be reconciled by the Pride Entities and the Monitor, Soft Collections received on or after October 1, 2024 will be retained as part of Post-October 1 Leasebook Collections to fund the Liquidity Requirement and set-off against each Recourse Lender's Net Liquidity Contribution Amount (if a Recourse Lender does not make the Liquidity Contribution Election).

### *Reservation of Rights*

67.      The Asset Monetization Proposal is not an allocation of the Liquidity Requirement or the costs of these CCAA Proceedings, but rather a mechanism to satisfy the immediate funding needs of the Pride Entities on an interim basis in order to fund the Wind-Down Plan, subject to a subsequent allocation. While certain of the Recourse Lenders' Inventory may have to be monetized, all Remaining Inventory will be turned over as soon as practicable, so Recourse Lenders can control the realization of Remaining Inventory outside of these CCAA Proceedings.

68.     The CRO and the Monitor will work with the Pride Entities to provide an accounting of the use of the Liquidity Contributions after the Wind-Down Plan is complete, to assist the consultation with the Recourse Lenders with respect to the final allocation of costs.

69.     The Monitor anticipates that any future order of the Court with respect to allocation of costs will also address (i) reimbursement to Recourse Lenders who have contributed an amount in excess of the amount that may ultimately be allocated to them, (ii) the obligation of Recourse Lenders who have contributed an amount less than the amount that may ultimately be allocated to them, to pay those funds to the Monitor to be distributed to those parties who have over-contributed, and (iii) whether any costs of these proceedings ought to be borne by Securitization Parties. The Monitor views this reconciliation process as necessary to ensure that the Liquidity Requirement is borne by affected parties in a fair and equitable manner.

### *Consultation with the Recourse Lenders on the Liquidity Contribution*

70.     The formulation of the Asset Monetization Proposal has involved consultation with the Recourse Lenders. Prior to the date of this Sixteenth Report, the CRO and the Monitor engaged with numerous Recourse Lenders, in order to further consider the interests of such stakeholders and refine the Liquidity Contribution Election.

71.     On October 2, 2024, counsel to the Pride Entities sent a letter (the "**October 2 Letter**") to the Recourse Lenders reiterating the Pride Entities' liquidity crisis and the need for $40 million to fund the Wind-Down Plan. The October 2 Letter advised the Recourse Lenders that in the circumstances, the only available option was to immediately begin monetizing certain assets of the Pride Entities which are subject to the security of Recourse Lenders, to generate the $40 million of required liquidity. The October 2 Letter also advised the Recourse Lenders that the Pride Entities, the CRO and the Monitor intended on providing the Liquidity Contribution Election as an alternative option to prepay their proportionate share of the required liquidity and secure the retrieval of all their collateral without any portion of their respective collateral being monetized. On October 3, 2024, an updated version of the October 2 Letter was provided to Recourse Lenders which included updates

to the VIN schedule. A copy of the October 2 Letter, as circulated on October 3, 2024, with the updated schedule, is attached as Exhibit "B" to the Benson Affidavit.

72. Since October 2, 2024, counsel to the Pride Entities and counsel to the Monitor have continued to have correspondence with stakeholders, including Recourse Lenders, some *without prejudice*, which have been taken into account.

## DETAILS OF THE ASSET MONETIZATION PROPOSAL

### *Sale of the Monetized Inventory*

73. As set out above, in order to meet the Liquidity Requirement and fund the Wind-Down Plan, the Pride Entities are seeking the authority to: (i) retain and use October 1 Leasebook Collections and Segregated Lease Amounts, (ii) through NCI as agent, liquidate the Monetized Inventory, and/or (iii) retain Post-October 1 Leasebook Collections, as necessary, until each Recourse Lender's Net Liquidity Contribution Amount has been fully satisfied.

74. The Monetized Inventory will be selected by the CRO, in consultation with the Monitor, by determining which of the Inventory will be sufficient to satisfy the remaining amount of each Recourse Lender's Net Liquidity Contribution Amount and considering operational factors including the logistics of removing Inventory from lots, the location of such Inventory and the prospects for sale of same.

75. The sale of the Monetized Inventory will be conducted by NCI. The Wind-Down Order provides for the approval of the NCI Term Sheet, which sets out the principal terms of the Pride Entities' engagement of NCI as their agent to sell the Monetized Inventory, if any, in accordance with the terms thereof. The Supplemental Benson Affidavit provides a high-level summary of the NCI Term Sheet, and a copy is attached to the Supplemental Benson Affidavit at Exhibit "A".

76. The Monitor supports the approval of the NCI Term Sheet to allow the CRO, in consultation with the Monitor, to efficiently carry-out the terms of the Wind-Down Order and the Wind-Down Plan in a controlled manner for the benefit of the Pride Entities and

all of its stakeholders. As described above, to the extent any Recourse Lenders object to having any of the Inventory in which they assert an interest liquidated by NCI, such Recourse Lenders can make an election under the Liquidity Contribution Election. To the extent Recourse Lenders object to having any MCVs in which they assert an interest liquidated by NCI, then they can agree among themselves to a MCV Turn-Over Resolution. Alternatively, to the extent any Recourse Lender desires for NCI to liquidate its Inventory or MCVs, the CRO and the Monitor are prepared to facilitate the same.

77.    All net proceeds from the sale of the Monetized Inventory shall first be applied to the applicable Recourse Lender's Net Liquidity Contribution Amount and any remaining balance shall be distributed to the applicable Recourse Lender in the case of the sale of non-PCVs and to the Recourse Lender that has asserted an interest in PCVs.

*Release of the Remaining Inventory*

78.    Except for Monetized Inventory and Leasebooks retained by the Pride Entities to satisfy Net Liquidity Contribution Amounts, the Remaining Inventory and Leasebooks will be made available to the Recourse Lenders for retrieval prior to the respective Turn-Over Outside Dates.

79.    The turn-over of the Remaining Inventory will be conducted in a safe and controlled manner pursuant to the timelines set out in the Wind-Down Plan (with such updated timelines as set out herein).

80.    In the Monitor's view, permitting the entitled Recourse Lenders to retrieve the Inventory subject only to the sale of the Monetized Inventory which is required to fund the Wind-Down Plan, balances the urgent need for funding and the Recourse Lenders' ability to monetize these assets outside of these CCAA Proceedings.

*Other Vehicles*

Multiple Collateral Vehicles

81.    The treatment of MVCs under the Asset Monetization Proposal will differ based on the parties claiming an interest in such Multiple Collateral Vehicles.

82.     With respect to MCVs over which only Recourse Lenders claim an entitlement, these Recourse Lenders shall have until the MCV Resolution Outside Date to reach a collective determination with the other Recourse Lender asserting an interest in such MCVs as to which Recourse Lender (or its representative, agent or nominee) shall receive a transfer of the MCV and provide the Monitor with an MCV Turn-Over Resolution.

83.     If a MCV Turn-Over Resolution is not made by the MCV Resolution Outside Date with respect to an MCV, the CRO, through NCI, will be authorized to sell such MCV and hold the net proceeds (net of NCI's fees and any other applicable fees and expenses) in trust for the Recourse Lender who is ultimately determined to have a priority interest in such MCV. Sale proceeds for these MCVs will not be credited against the Liquidity Contribution of the Recourse Lenders.

<u>Priority Collateral Vehicles</u>

84.     PCVs are included in the definition of "Inventory" to be monetized or returned to the Recourse Lenders.

85.     If a Recourse Lender chooses the Liquidity Contribution Election, PCVs (or any proceeds of sale thereof) will be returned to that Recourse Lender (and not to the Syndicate Lenders). If a Recourse Lender does not choose the Liquidity Contribution Election, then the PCVs will be monetized and the proceeds used to fund that Recourse Lender's Net Liquidity Contribution Amount.

**_Treatment of Leasebooks_**

86.     The Asset Monetization Proposal does not contemplate the sale of Leasebooks or vehicles subject to a performing lease.

87.     The October 1 Leasebook Collections will be retained by the Pride Entities to fund immediate liquidity needs with respect to the Wind-Down Plan.

88.     Should a Recourse Lender elect the Liquidity Contribution Election, Leasebooks (and any Post-October 1 Leasebook Collections) will be turned over to the applicable Recourse Lender.

89.    Should a Recourse Lender not elect the Liquidity Contribution Election, the Post-October 1 Leasebook Collections will be retained by the Pride Entities to fund the Liquidity Requirement. Following satisfaction of each applicable Recourse Lender's Net Liquidity Contribution Amount (whether by retention of Leasebooks and Soft Collections or sale of Monetized Inventory, or a combination), the remaining Leasebooks will be turned over to the applicable Recourse Lender.

### *Securitization Parties*

90.    The turnover of assets to the Securitization Parties is already well advanced. Most of the performing leases have already been turned over to the Securitization Parties and a significant number of vehicles have also been returned, in accordance with the terms of the Securitized Assets Turn-Over Order.

91.    The Securitization Parties have been advised that performance of the remaining obligations under the Securitized Assets Turn-Over Order is dependent upon (1) the agreement as to any out-of-pocket costs pursuant to Paragraph 21 of the Order and (2) payment of same in advance by such Securitization Party. The proposed closure of lots and efficiencies will govern the schedule and timing of the turn-over of any remaining securitized assets.

92.    The Pride Entities, the Monitor, and the CRO are working to calculate any further direct costs involved in continuing to turn over the securitized assets to Securitization Parties on a case-by-case basis as requests for assistance continue to be received from Securitization Parties. These direct costs are not contemplated to be significant or to have an impact on the Wind-Down Cash Flow Forecast, as it is the intention of the Pride Entities to seek payment from the Securitization Parties with respect to any direct costs related to completion of the turn-over contemplated in the Securitized Assets Turn-Over Order.

93.    Further, as noted above, there will be a full reservation of rights to seek an allocation of costs at a future date, including those with respect to the Securitization Parties.

*The Liquidity Contribution Election*

94.   Recourse Lenders who chose the Liquidity Contribution Election will, prior to the Turn-Over Outside Date, have the right to take possession and control of:

    (a)   all Inventory to such Recourse Lender; and

    (b)   all MCVs where the entitlement of such Recourse Lender is specified in a MCV Turn-Over Resolution.

95.   With respect to the Leasebooks, where a Recourse Lender has made the Liquidity Contribution Election the Leasebooks will be turned-over to the applicable Recourse Lender by no later than the applicable Turn-Over Outside Date. Post-October 1 Leasebook Collections will also be paid to Recourse Lenders who elect the Liquidity Contribution Election.

96.   As mentioned above, each Recourse Lender must elect whether to pursue the Liquidity Contribution Election within 3 business days of the granting of the Wind-Down Order or such later date that may be agreed upon by the applicable Recourse Lender, the CRO and the Monitor. With respect to the timing of this election, the Monitor notes that the Recourse Lenders were provided with an outline of the Asset Monetization Proposal in the October 2 Letter, including the proposed amount of each Recourse Lender's Gross and Net Liquidity Contribution Amount. These figures have been updated as reflected in **Appendix "A"** to provide actual amounts for September and the October 1 Leasebook Collections available to be netted off each Recourse Lender's Gross Liquidity Contribution Amount.

97.   As noted above, based on discussions to date with the various Recourse Lenders, the CRO and the Monitor expect that a significant proportion of the Recourse Lenders will elect to pay the Liquidity Contribution Election.

98.   Should a Recourse Lender elect the Liquidity Contribution Election but fail to collect the Inventory attributable to it by the Turn-Over Outside Date (which dates range from October 31, 2024 to December 17, 2024), NCI shall be authorized to sell any remaining Inventory and distribute the net proceeds to such Recourse Lender as set out above.

*EV Units*

99.    The Monitor also wishes to provide an update with respect to certain uninstalled standalone EV charging stations (the "**EV Units**") over which Mitsubishi and Daimler claim secured interests.

100.    Based on the Monitor's review of documentation provided in connection with the Eleventh Report, Daimler has established a perfected and priority claim with respect to 43 of the EV Units and Mitsubishi has established a perfected and priority claim with respect to 133 of the EV Units.

101.    There are also 4 EV Units over which both Mitsubishi and Daimler have asserted a priority interest in (the "**MCV EV Units**"). The Monitor has not yet formed a view on the priority of Mitsubishi's claim as compared to Daimler's claim with respect to these MCV EV Units.

102.    Given that, among other considerations, the majority of EV Units are sitting in the Pride Entities' lots in crates and are not required for ongoing operations, and there is sufficient Inventory and Leasebooks to satisfy Daimler's and Mitsubishi's Net Liquidity Contribution Amount, the Pride Entities have confirmed to Daimler and Mitsubishi that they may retrieve the EV Units at their expense, with the exception of the MCV EV Units. The MCV EV Units will be retained by the Pride Entities at this time.

**THE KERP**

103.    The Monitor remains of the view (as set out in paragraphs 59-66 of the Fifteenth Report) that the KERP will provide the necessary incentive to Key Personnel to remain committed to assisting in a successful Wind-Down Plan. The Monitor notes that the Key Personnel include both senior management and employees but do not include immediate Johal family members. Further, the Pride Entities are not seeking approval of a charge with respect to the KERP. Instead, the Pride Entities are seeking that the entire amount of the KERP be paid to the Monitor and held in trust, pending release to the relevant Pride Entity so that the payments can be made to the applicable Key Personnel at the Milestone Date (net of applicable withholding taxes).

104.    The Monitor remains of the view that the KERP is reasonable and appropriate in the circumstances.

**STAY EXTENSION**

105.    The Stay Extension Order and the September 30 Endorsement extended the Stay Period to and including November 29, 2024, without prejudice to the ability of the Pride Entities to seek a further stay extension if and as may be necessary.

106.    The Monitor has considered the Pride Entities' request to extend the Stay Period up to and including March 31, 2025, and provided the Wind-Down Order is granted, remains of the view (as set out at paragraph 58 of the Fifteenth Report) that: (a) there will be no material prejudice to the Pride Entities' creditors and stakeholders as a result of the proposed extension of the Stay Period; (b) the Cash Flow Forecast shows sufficient liquidity with use of the Total Deferred Payments (including October 1 Leasebook Collections) and the Liquidity Requirement, based on the Assumptions (as defined and contained in Appendix "B" to the Fifteenth Report); (c) the extension of the Stay Period will allow the Pride Entities to continue and complete the Wind-Down Plan; and (d) the Pride Entities have acted, and are acting, in good faith and with due diligence during the Stay Period.

**NEXT STEPS**

107.    If the Wind-Down Order is granted, the Monitor understands that a number of the Recourse Lenders will require the appointment of Court officers to take possession and/or control of the Inventory and the Leasebooks when entitled. In this regard, a form of Order has already been granted by this Court in respect of a receiver for the RBC Securitization Program. On October 7, 2024, counsel for the Syndicate Lenders provided a revised form of its proposed Collateral Management Order which will require further engagement before it can be settled. The Monitor is proposing that a date be arranged with the Court in the near future for the Syndicate Lenders' proposed Collateral Management motion, and recommends that those other parties requiring a similar order to facilitate turn-over of Inventory and Leasebooks, proceed at the same time on a consensual basis or with unresolved issues to be addressed by this Court.

## RECOMMENDATIONS

108.    The Monitor recommends that this Court authorize the Pride Entities to immediately commence the Wind-Down Plan. To accomplish this objective, the Pride Entities require funding. The Asset Monetization Proposal will provide the liquidity urgently required to complete the Wind-Down Plan and sufficiently balances the interests of the Recourse Lenders by preserving their rights in respect of a final allocation of costs in these CCAA Proceedings once the Wind-Down Plan is complete.

109.    For the reasons set out in this Sixteenth Report, the Monitor recommends this Court grant the relief sought in the Wind-Down Order including the extension of the Stay Period to and including March 31, 2025.

All of which is respectfully submitted this 9th day of October, 2024.

**ERNST & YOUNG INC.**,
solely in its role as Court-appointed Monitor of Pride Group Holdings Inc. and certain affiliates and not in its personal or corporate capacity

**per:**

**Alex Morrison, CPA, CA, LIT, CIRP**
**Senior Vice President**

**per:**

**Karen Fung, CPA, CA, LIT, CIRP**
**Senior Vice President**

## SCHEDULE "A"

**A. APPLICANTS**
**Operating Entities**
*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**
*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

## B. LIMITED PARTNERSHIPS
*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

## C. ADDITIONAL STAY PARTIES
*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PRIDE GLOBAL INSURANCE COMPANY LTD.
- PERGOLA HOLDINGS, CORP.

**Appendix "A"**

**Liquidity Contribution Analysis**

# Liquidity Contribution Schedule

$ Canadian

| | Total VINs (E) | Per VIN Cost (Note 1) (F) | Gross Liquidity Contribution G = (E * F) | Deferred Payments, October 1 Lease Book Collections, and Amount Payable to the Syndicate for No Back Funder VINs (Note 2,3) (H) | Held in Segregated Lease Account (July 1 - July 14) (I) | Net Liquidity Contribution (J = G - H - I) |
|---|---|---|---|---|---|---|
| **Recourse** | | | | | | |
| BMO | 6 | $ 6,982 | $41,892 | $17,970 | $8,143 | $15,779 |
| Bennington | 149 | 6,982 | 1,040,321 | 18,227 | 8,900 | 1,013,194 |
| CWB Maxium | 19 | 6,982 | 132,658 | - | - | 132,658 |
| Daimler (CAN) | 770 | 6,982 | 5,376,156 | 4,054,677 | 817,069 | 504,410 |
| Daimler (US) | 517 | 6,982 | 3,609,705 | 2,710,079 | 703,320 | 196,307 |
| Mitsubishi (Canada) | 98 | 6,982 | 684,238 | 54,537 | 9,394 | 620,307 |
| Mitsubishi (US) | 563 | 6,982 | 3,930,878 | (14,507) | 8,580 | 3,936,805 |
| TBK Bank SSB | 135 | 6,982 | 942,573 | 592,403 | - | 350,170 |
| VFS | 12 | 6,982 | 83,784 | 59,883 | 22,318 | 1,583 |
| Paccar (US) | 242 | 6,982 | 1,689,649 | 410,708 | 125,028 | 1,153,913 |
| Paccar | 39 | 6,982 | 272,299 | 58,423 | 9,475 | 204,402 |
| BMO Harris Bank N.A. | 196 | 6,982 | 1,368,476 | - | - | 1,368,476 |
| Royal Bank (AdminAgent) | 2,264 | 6,982 | 15,807,296 | 6,057,980 | 4,434,571 | 5,314,745 |
| Webster Capital Finance Inc. | 12 | 6,982 | 83,784 | - | - | 83,784 |
| M&T | 5 | 6,982 | 34,910 | 4,830 | 1,872 | 28,208 |
| Flagstar | 53 | 6,982 | 370,047 | 84,264 | 21,161 | 264,623 |
| First American (US) | 63 | 6,982 | 439,867 | 179,497 | 32,645 | 227,725 |
| No Back Funder - Syndicate | 439 | 6,982 | 3,065,107 | 2,000,000 | - | 1,065,107 |
| Republic Bank of Chicago | 20 | 6,982 | 139,640 | (10,649) | 7,326 | 142,963 |
| Meridian | 8 | 6,982 | 55,856 | - | 33,743 | 22,114 |
| **Total Recourse** | 5,610 | 6,982 | 39,169,139 | 16,278,323 | 6,243,544 | 16,647,273 |
| | | | | | | |
| **MCVs** | 119 | 6,982 | 830,861 | - | - | 830,861 |
| | | | | | | |
| **Grand Total** | **5,729** | **$ 6,982** | **$40,000,000** | $ **$16,278,323** | **$6,243,544** | **$17,478,133** |

Notes:

1. Per VIN Cost is calculated as $40,000,000 divided by 5,729 VINs.

2. The $2,000,000 for the 'No Back Funder - Syndicate' represents the estimated amount payable to the Syndicate for the sale of vehicles without a back funder. The Deferred Payments are based on August and September lease and soft collections and only PAPs received on October 1st less HST where applicable. Deferred Payments for September and October 1 has been reconciled by the Pride Entities , however are subject to review and reconciliation (including offsetting NSFs for October 1 Collections) by the Monitor.

3. The Pride Entities and the Monitor have reviewed and reconciled the amounts payable and paid to Recourse Lenders since Filing and have added any differences to the Deferred Payments. In certain situations, Recourse Lenders have been paid more than what was owed. In these situations, the net amount will appear as negative.

# Liquidity Contribution Schedule

$ Canadian

| | Inventory (A) | PCV Inventory (B) | Lease Book (C) | PCV Lease Book (D) | Total VINs (E = A + B + C + D) | Per VIN Cost (Note 1) (F) | Gross Liquidity Contribution G = (E * F) |
|---|---|---|---|---|---|---|---|
| **Recourse** | | | | | | | |
| BMO | - | - | 6 | - | 6 | $6,982 | $41,892 |
| Bennington | 91 | 58 | - | - | 149 | 6,982 | 1,040,321 |
| CWB Maxium | 19 | - | - | - | 19 | 6,982 | 132,658 |
| Daimler (CAN) | 94 | 2 | 674 | - | 770 | 6,982 | 5,376,156 |
| Daimler (US) | 37 | - | 480 | - | 517 | 6,982 | 3,609,705 |
| Mitsubishi (Canada) | 79 | - | 19 | - | 98 | 6,982 | 684,238 |
| Mitsubishi (US) | 468 | 12 | 83 | - | 563 | 6,982 | 3,930,878 |
| TBK Bank SSB | - | 10 | - | 125 | 135 | 6,982 | 942,573 |
| VFS | - | - | 10 | 2 | 12 | 6,982 | 83,784 |
| Paccar (US) | 98 | 8 | 129 | 7 | 242 | 6,982 | 1,689,649 |
| Paccar | 31 | - | 8 | - | 39 | 6,982 | 272,299 |
| BMO Harris Bank N.A. | - | 196 | - | - | 196 | 6,982 | 1,368,476 |
| Royal Bank (AdminAgent) | 564 | - | 1,700 | - | 2,264 | 6,982 | 15,807,296 |
| Webster Capital Finance Inc. | - | 9 | 1 | 2 | 12 | 6,982 | 83,784 |
| M&T | 1 | 2 | 2 | - | 5 | 6,982 | 34,910 |
| Flagstar | 5 | 1 | 42 | 5 | 53 | 6,982 | 370,047 |
| First American (US) | - | 14 | 3 | 46 | 63 | 6,982 | 439,867 |
| No Back Funder - Syndicate | 183 | - | 256 | - | 439 | 6,982 | 3,065,107 |
| Republic Bank of Chicago | 6 | - | 12 | 2 | 20 | 6,982 | 139,640 |
| Meridian | - | - | 5 | 3 | 8 | 6,982 | 55,856 |
| **Total Recourse** | 1,676 | 312 | 3,430 | 192 | 5,610 | 6,982 | **39,169,139** |
| **MCVs** | 94 | 1 | 24 | - | 119 | 6,982 | **830,861** |
| **Grand Total** | **1,770** | **313** | **3,454** | **192** | **5,729** | **$6,982** | **$40,000,000** |

**Notes:**

1. Per VIN Cost is calculated as $40,000,000 divided by 5,729 VINs.

Court File No.:  CV-24-00717340-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC., et al.

|  | *ONTARIO*<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding Commenced at Toronto |
|---|---|
|  | **SIXTEENTH REPORT OF THE MONITOR**<br>**dated October 9, 2024** |
|  | **BLAKE, CASSELS & GRAYDON LLP**<br>Barristers and Solicitors<br>199 Bay Street<br>Suite 4000, Commerce Court West<br>Toronto, Ontario M5L 1A9<br><br>**Pamela Huff**, LSO #27344V<br>Tel:      416-863-2958<br>Email:    pamela.huff@blakes.com<br>**Chris Burr**, LSO #55172H<br>Tel:      416-863-3261<br>Email:    chris.burr@blakes.com<br>**Kelly Bourassa**, LSO #43062R<br>Tel:      416-863-2421<br>Email:    kelly.bourassa@blakes.com<br>**Claire Hildebrand**<br>Tel:      604-631-3331<br>Email:    claire.hildebrand@blakes.com<br><br>Lawyers for the Monitor |