# Exhibit E

September 30 Endorsement



## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

# **ENDORSEMENT**

**COURT FILE NO.:** CV-24-00717340-00CL                **DATE:** September 26, 2024

**NO. ON LIST: 1**

**TITLE OF PROCEEDING:** IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC et al

**BEFORE:** JUSTICE OSBORNE

### PARTICIPANT INFORMATION

**For Plaintiff, Applicant:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Leanne Williams<br>Rachel Nicholson<br>Puya Fesharaki<br>Ines Ferreira | Counsel for the Applicants | lwilliams@tgf.ca<br>rnicholson@tgf.ca<br>pfeshraki@tgf.ca<br>iferreira@tgf.ca |
| Raj Sahni | Counsel for the Directors and Officers | sahnir@bennettjones.com |

**For Defendant, Respondent:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Matthew Cressatti | Counsel for CWB Maximum Financial Inc | mcressatti@millerthomson.com |
| Monty Dhaliwal | Counsel for Meridian OneCap Credit Corp | mdhaliwal@pallettvalo.com |
| Craig Colraine | Counsel for Paccar | mariane@bslsc.com |
| Brendan Bissell<br>Sharon Kour | Counsel for Versafinance and Aviator Financial | bbissell@reconllp.com<br>skour@reconllp.com |
| Andrew Hatnay<br>Abir Shamim | Counsel for the employees | ahatnay@kmlaw.ca<br>ashamim@kmlaw.ca |

**For Other, Self-Represented:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Stuart Brotman<br>Daniel Richer | Counsel for The Lending Syndicate | sbrotman@fasken.com<br>dricher@fasken.com |
| Pam Huff<br>Kelly Bourassa<br>Chris Burr<br>Daniel Loberto | Counsel for the Monitor | Chris.burr@blakes.com<br>Kelly.bourassa@blakes.com<br>Pam.huff@blakes.com<br>Daniel.loberto@blakes.com |
| John Salmas | Counsel for Bank of Montreal | john.salmas@dentons.com |
| Blair McRadu<br>Harvey Chaiton | Counsel for Mitsubishi HC Capital | bmcradu@osler.com<br>harvey@chaitons.com |
| Lee Nicholson<br>Ashley Taylor<br>Rania Hammad | Counsel for MOVETRUST and Boat Capital LP | leenicholson@stikeman.com<br>ashleytalor@stikeman.com<br>raniahammad@stikeman.com |
| Elaine Gray | Counsel for Daimler Truck Financial Services Canada Corporation and Daimler Truck Financial Services USA LLC | Elaine.gray@dentons.com |
| Tracy Sandler<br>Shawn Irving<br>Martino Calvaruso | Counsel for RBC as Financial Service Agent | tsandler@osler.com<br>sirving@osler.com<br>mcalvaruso@osler.com |
| Caroline Descours<br>Peter Kolla<br>Brittni Tee<br>Erik Axell | Counsel for Regions Bank Regions Equipment Finance Corporation and Regions Commercial Equipment Finance LLC | cdescours@goodmans.ca<br>pkolla@goodmans.ca<br>btee@goodmans.ca<br>eaxell@goodmans.ca |
| Geoff Hall<br>Saneea Tanvir | Counsel for National Bank of Canada | ghall@mccarthy.ca<br>stanvir@mccarthy.ca |
| Trevor Courtis | Counsel for Bennington Financial Corp. | tcourtis@mccarthy.ca |
| Stewart Thom | Counsel for M&T Capital and Leasing Corporation and Webster Capital Finance, Inc., | sthom@torkinmanes.com |
| Monique Sassi | Counsel for Flagstar | msassi@cassels.com |
| Nicholas Kluge | Counsel for Volvo Financial | nicholas.kluge@gowlingwlg.com |
| Shahrzad Hamraz | Counsel for Republic Bank of Chicago | shamraz@ln.law |

**ENDORSEMENT OF JUSTICE OSBORNE:**

[1] The Applicants seek on this motion:

    a. a Funding Contribution and Turn-Over Order (the "Funding Order") approving the implementation of a centralized, coordinated and controlled wind-down of the Pride Entities' remaining assets other than in respect of the PGL Entities, including, among other things:

        i. the funding of the cost of the wind-down by the non-PGL Entities' Financiers and reserving their rights in respect of the future allocation of such amounts;

        ii. terminating the Governance Protocol;

        iii. establishing a procedure for including reasonable deadlines in respect of the timely transfer of the Pride Entities' leasing portfolios and the trucks, trailers and other motor vehicles in the possession of those entities to entitled Financiers; and

        iv. establishing deadlines for the monetization of Multiple Collateral Vehicles ("MCVs") in the event an entitlement resolution is not achieved on a timely basis;

    b. an order extending the Stay Period to and including March 31, 2025; and

    c. an order approving a key employee retention plan ("KERP") and granting a related sealing order.

[2] This motion was originally returnable on September 24, 2024, but given the objections of the Financiers to both the substantive relief sought by way of the Funding Order and to the short service of the motion, I adjourned it at their request to be heard on September 26, 2024.

[3] The Applicants rely on the Affidavit of Randall Benson, the Chief Restructuring Officer, sworn September 18, 2024, the Supplemental Affidavit of Mr. Benson sworn September 23, 2024, the 14th Report of the Monitor together with the First and Second Supplements thereto, the 15th Report of the Monitor, and the Monitor's Responses to Written Interrogatories.

[4] The motion is supported, if reluctantly in some cases, by the Syndicate and DIP Lender (who is also the Pre-filing Lender), Mitsubishi, Daimler, PACCAR, and is recommended by the Monitor.

[5] As stated above, various Financiers oppose the Funding Order. A number of them have filed responding materials (including Regions Bank, Versafinance US Corp., National Bank, RBC in its capacity as Financial Services Agent, and MOVE Trust and BOAT Capital LP).

[6] Defined terms in this Endorsement have the meaning given to them in earlier Endorsements I have made in this proceeding, and/or in the motion materials, unless otherwise stated.

[7] The background to and context of this motion is fully set out in earlier Endorsements and in the Reports of the Monitor. Relevant milestones include these:

    a. on July 31, 2024, the DIP Facility matured, and was effectively fully drawn;

  b. on August 8, 2024, the Court granted the Turn-Over Order authorizing the turn-over of Securitized Assets to the Securitization Parties;

  c. on August 9, 2024, the Court granted a Governance Protocol Amendment Order to permit the Pride Entities to apply any Deferred Payments (including Lease Payments and Collections received by them from and after July 15, 2024 until September 3, 2024) to fund ordinary course working capital requirements, subject to the terms provided;

  d. on September 3, 2024, the Court granted an order extending this Deferred Payment relief until September 30, 2024 and directing the affected parties to immediately engage in a mediation;

  e. the mediation was held on September 9 and 10, 2024. While certain issues were narrowed, all issues were not resolved. In particular, stakeholders were not in agreement with the Applicants' proposed Wind-down Plan and Wind-Down Forecast appended to the 14th Report and supplements thereto; and

  f. on September 25, 2024, the Court approved the PGL Going Concern Transaction.

[8] The use of the Deferred Payments as described above have been the only source of working capital and operational funding for the Pride Entities since the maturation of the DIP Facility on July 31, 2024, as the parties work toward an orderly wind-down.

[9] All parties are in agreement that the operations of the Pride Entities (excluding the PGL Entities)[1] are to be wound down. There is also general consensus that the Funding Requirement necessary for that wind-down, as determined by the Monitor and CRO, is approximately $40 million.

[10] The relief sought on this motion is intended as a mechanism to meet that Funding Requirement. The proposed Funding Order contemplates that the Financiers of the Pride Entities contribute to the Funding Requirement by September 30, 2024, since after that date, the Pride Entities will have no further recourse to use the Deferred Payments to fund operations.

[11] The Applicants are proposing that the Funding Requirement be divided on a 25% / 75% basis, as to the Securitization Parties and the secured lenders that are not Securitization Parties respectively. The Applicants also propose that the rights of all parties be specifically and expressly reserved as to the future allocation of any Funding Requirement contributions, including in respect of the prior use of the Deferred Payments.

[12] Accordingly, the proposed relief would compel the Securitization Parties in the aggregate to contribute $10 million in funding to the Pride Entities, while all other secured lenders that are not Securitization Parties would contribute in the aggregate $30 million. The Applicants submit, and the Monitor Agrees, that this interim funding apportionment is fair and equitable.

[13] The Funding Requirement is proposed to be further divided among each Financier according to the number of VINs in which each Financier has an interest (the "Funding Contribution").

[14] For the reasons that follow, I decline to grant the Funding Order.

---

[1] References to the Pride Entities for the purposes of this motion exclude the PGL Entities, unless otherwise specified.

[15] The Applicants submit that the Court has the jurisdiction to grant the order under section 11 of the *CCAA* which gives this Court broad discretion to make "any order that it considers appropriate in the circumstances".

[16] They submit that the exercise of this discretion is broad and flexible and allows Courts to make orders responsive to the circumstances of each case, informed by safeguards including the requirement that any such order must further the remedial objectives of the *CCAA* and be guided by the baseline considerations of appropriateness, good faith and due diligence: *269354-9186 Québec Inc. v Callidus Capital Corp,* 2020 SCC 10 at para 48 ("*Callidus*").

[17] The Applicants further submit that while the proposed Funding Order does not impose a final cost allocation of the Funding Requirement (and indeed all rights of all parties in respect of that are proposed to be expressly reserved), the principles established by the relevant jurisprudence governing allocation among debtors and other stakeholders within insolvency proceedings provide useful guidance in considering the proposed funding contribution mechanism: *Arrangement relatif à FormerXBC inc. (Xebec Adsorption inc.)*, 2023 QCCS 2417 at para 45, which cited the principles applicable to funding contributions set out in *Royal Bank of Canada v Atlas Block Co Limited*, 2014 ONSC 1531 (Commercial List) at para. 43 as being helpful in CCAA proceedings; *Re Hickman Equipment (1985) Ltd., Re*, 2004 NLSCTD 164 at para 17; and *Winnipeg Motor Express Inc., et al*, 2009 MBQB 204 ("*Winnipeg Motor*") at para 42, quoting *Hickman* at para 17.

[18] The position of the Applicants is effectively that while the Securitization Parties object to being compelled to contribute to the Funding Requirement, they continue to receive significant benefits in and as a result of these proceedings, including not limited to the turnover of significant pools of assets from the Pride Entities to the Securitization Parties, and that they are in no way strangers to these proceedings. The Applicants submit that it would work an unfairness on other stakeholders if the Securitization Parties were not required to contribute to wind-down costs.

[19] They submit that cases such as *Winnipeg Motor* support the proposition that the Court will exercise its jurisdiction in appropriate cases to direct stakeholders other than secured creditors (such as equipment lessors and trust beneficiaries) to contribute to the cost of such proceedings where they benefit from them. They point to *Ontario (Securities Commission) v. Consortium Construction Inc.*, 1992 CarswellOnt 176 where the Court of Appeal for Ontario found that the Court has the authority to impose the fees and disbursements of a receiver on trust assets that did not belong to the party against whom the receivership order was made, and *Eron Mortgage Corp., Re,* 2 C.B.R. (4th) 184 (B.C.S.C.) at para. 36 where the British Columbia Supreme Court reached essentially the same conclusion.

[20] Fundamentally, the Applicants submit that the fundamental underlying principle in the allocation of costs is well established in the jurisprudence: parties that derive a benefit from a proceeding, and in particular the preservation of property within and as a result of a proceeding, should pay their share, *quid pro quo*: *Winnipeg Motor* at para. 51.

[21] The Applicants further submit that the relief sought on this motion is effectively no more than an advance payment mechanism to provide these costs, necessary since there is no other source of funding for the proposed wind-down, which all parties agree is inevitable. They submit that the Court's discretion to grant the Funding Order should be exercised here, particularly since:

   a. the funding of approximately $40 million is required;

    b. all allocation rights are reserved to be determined at a later date, and that there should be an evaluation, allocation and, where necessary, a reconciliation of such costs, such that the proposed relief on this motion is purely temporary and interim in nature, and no final allocation is being determined;

    c. the proposed 25% / 75% interim split is fair and equitable given, among other things, the difference in timing and remaining effort to complete the wind-down in respect of VINs, but respecting the contractual rights of the Securitization Parties, and further given that the Funding Requirement is proposed to be funded on a "per-VIN" basis, and while the proportion differs between and among the Financier groups, such an approach is objective and *pro rata*;

    d. the alternative result, if the relief is not granted, will be a certain degree of chaos and instability as the proposed orderly wind-down will be incapable of implementation since it is unfunded; and

    e. the proposed arrangement is supported by the Monitor.

[22] I accept that:

    a. the proposal is made in good faith;

    b. there is no dispute, or at least none seriously pursued, that the inevitable and imminent wind-down will have significant costs in the order of magnitude estimated by the Applicants, the Monitor and the CRO approximately $40 million;

    c. the proposal contemplates a contribution "per-VIN" that may well be reasonable;

    d. the prejudice to the Securitization Parties is or would be mitigated by the reservation of rights as to a final allocation and the requirement and mechanism to reconcile and readjust if and as necessary to achieve and implement a fair and equitable final allocation;

    e. the proposal represents an expedient mechanism to address a funding deficiency in circumstances where, at least at present, there is no other funding available;

    f. all stakeholders would benefit (to varying degrees) from an orderly wind-down; and

    g. the Applicants are largely indifferent to the 25% / 75% proposed split if stakeholders prefer a different interim split, but the Applicants submit that it is fair and equitable.

[23] However, and notwithstanding those factors, I find I am unable to grant the requested relief for a number of reasons.

[24] First, I am not persuaded that section 11 of the *CCAA* and the broad discretion given to this Court thereunder includes the discretion in circumstances such as are before the Court on this motion to compel the Securitization Parties to advance new money to the Applicants to fund the wind-down.

[25] Clearly, the discretion granted in section 11 is subject to the "restrictions set out in this Act". Section 11.01(b) states that "[n]o order made under section 11 … has the effect of … requiring the further advance of money or credit".

[26] The Applicants submit that the funding requirement here is not "credit" and that no credit is sought to be required from the Financiers. Rather, what is required is simply a prepayment of allocated costs, and *CCAA* courts routinely order those parties who have benefited from the proceedings to contribute to such allocations.

[27] I accept that what is being sought is not "credit" in the usual sense of that term. It is, however, inescapably a requirement that the Securitization Parties advance new money to fund the proposed wind-down. The fact that if the wind-down were funded (by other parties or by recourse to available DIP financing, for example) and the costs had already been incurred, this Court would have jurisdiction to impose an allocation where appropriate, does not address the challenge faced by the Applicants here. Today, the Applicants ask that the Securitization Parties be compelled to contribute new funds. Moreover, it cannot be said that the proposed Funding Order is an allocation, since that very exercise is expressly reserved to a later date.

[28] It was submitted that the heading above section 11.01, "Rights of suppliers", as well as the text of section 11.01(a), supports the conclusion that section 11.01(b) is principally directed towards suppliers and the payment for goods and services provided after the order is made. To the extent that the heading or the prior subsection are relevant at all, the plain language of section 11.01(b) is clear that no order made under section 11 (or 11.02) has the effect of requiring the further advance of money. In the particular circumstances of this case, that is the effect of the proposed Funding Order.

[29] I draw some comfort in that conclusion from the absence of any decision to which the Applicants could direct my attention where a Court has relied on section 11.01(b) to order stakeholders to contribute new money to fund a wind-down.

[30] I draw further comfort from the fact that the relevant jurisprudence under both the *CCAA* and the *BIA* is to the effect that a creditor should not be forced to advance additional sums to an insolvent party, even if the advancing of additional sums or the granting of additional credit might seem expedient to ensure the survival of the debtor's business. See, for example: *Callidus v. Carcap*, 2012 ONSC 163; *HSBC Bank Canada c. Aliments Infiniti inc.*, 2010 QCCA 717, (Certified Translation found in the Book of Authorities of Regions Bank, Tab 1); *Canadian Imperial Bank of Commerce v. Sahtu Contractors Ltd.*, 1992 CanLII 14363 (NWTCA) at para. 13; and *New Skeena Fourth Products Inc., Re*, 2005 BCCA 192 at paras. 3 and 26-27.

[31] Second, I accept that the Securitization Parties are stakeholders just as are the secured creditors of the Pride Entities, but they are differently situated. While the agreements pursuant to which the Securitization Parties assert rights are not identical in each case, they generally implement a structure pursuant to which the relevant Securitization Party holds a proprietary interest in portfolio assets, but those portfolio assets are expressly removed from the "Property" of the Applicants.

[32] While the intention of the parties to such structures and related agreements may not be entirely determinative of the outcome, such intention is a relevant factor. The intention of the securitization structures was clearly to provide that the portfolio assets could not be charged by a bankruptcy court or used without the consent of the Securitization Parties: *Metropolitan Toronto Police Widows and Orphans Fund v. Telus Communications Inc.*, 2003 CanLII 25909 (ONSC), at paras. 16 and 18.

[33] Third, previous orders made in this proceeding have recognized the fact that parties to the securitization structures are in a different position than are the secured lenders to the Pride Entities. The Initial Order expressly provided (without objection from the Applicants) that the "Securitization Party Assets" were excluded from the "Property" of the Pride Entities.

[34] It follows that the Securitization Party Assets were not (and are not) subject to the Court-ordered Charges, including the Administration Charge and the DIP Charge. When the DIP Facility matured at the end of July 2024, the Securitization Parties were entitled to a specific carveout from the use by the Applicants of lease payments arising from the collateral of the secured lenders. I am of the view that to grant the Funding Order now in the particular circumstances of this case would be contrary to the "building block" approach described by Chief Justice Morawetz in *Target Canada Co., Re*, 2016 ONSC 316 at para. 81.

## Result and Disposition

[35] For all of these reasons, I decline to grant the Funding Order. To be clear, in doing so, I am making no determination about the fairness or reasonableness of the proposed 25% / 75% split or any other terms of what may be a future allocation of wind-down costs, including the requirement of any stakeholder to contribute thereto.

[36] The Applicants conceded that the relief sought in respect of the proposed KERP was dependent upon funding being available, and therefore also dependent on the Funding Order being granted. In the circumstances, I therefore decline to approve the proposed KERP at this time, without prejudice to the ability of the Applicants to seek that relief in the event there is funding available.

[37] The Applicants had filed in support of the proposed KERP the Confidential Exhibit to the Affidavit of the CRO containing the details of the proposed KERP and requested a sealing order. In the circumstances, I am satisfied that the sealing relief should be granted pursuant to section 137(2) of the *Courts of Justice Act*. In my view, the factors set out by the Supreme Court of Canada in *Sierra Club* and refined in *Sherman Estate* have been met here. The Confidential Exhibit shall be sealed on a temporary basis pending further order of the Court.

[38] Finally, the Applicants sought an extension of the stay of proceedings which expires at the end of the day today. In the circumstances, I am satisfied that the stay should be extended pursuant to section 11.02(2) of the *CCAA*. An extension is clearly required to permit the implementation and completion of the PGL Going Concern Transaction already approved. It will also be required if any version of the proposed wind-down plan is to be implemented, or other avenues are pursued. The Applicants have acted and continue to act in good faith and with due diligence and the proposed extension is supported by the Monitor.

[39] In the circumstances, however, and particularly given that I have declined to grant the Funding Order, I am not persuaded that it is appropriate today to extend the stay through to the proposed date of March 31, 2025. That is based on the Wind-Down Plan and accompanying Forecast which may or may not be relevant and accurate going forward.

[40] Having considered all of the circumstances and factors, in my view it is appropriate to extend the stay today to and including November 29, 2024, and I so order. This is without prejudice to the ability of the Applicants to seek a further stay extension if and as may be necessary. It is also without prejudice to the ability of other parties to seek relief as may be appropriate.

[41] Order to go in accordance with these reasons.

*Sloane, J.*