**Exhibit F**

Wind-Down and Turn-Over Order

Court File No. CV-24-00717340-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE | ) | THURSDAY, THE 10TH |
| | ) | |
| JUSTICE OSBORNE | ) | DAY OF OCTOBER, 2024 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those Applicants listed on Schedule "A" hereto (each, an "**Applicant**", and collectively, the "**Applicants**")

**ORDER**
**(re Wind-Down, Liquidity Contribution Alternative and Turn-Over)**

**THIS MOTION**, made by the Applicants pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. c-36, as amended, for an order implementing critical components of a centralized, coordinated and controlled wind-down of the remaining assets of the Applicants and the limited partnerships listed in Schedule "A" hereto (collectively with the Applicants, the "**Pride Entities**"), other than in respect of the PGL Entities (as defined below), including, among other things, (i) authorizing the sale of Inventory (as defined below) to fund the cost of the wind-down, save and except where the applicable Recourse Lender (as defined below) with an interest in such Inventory has satisfied its Liquidity Contribution (as defined below) in accordance with the terms of this Order and in such case, authorizing the turn-over of Remaining Assets (as defined below); (ii) authorizing the Pride Entities to retain and use Leasebooks (as defined below) collections to fund the cost of the wind-down, save and except where the applicable Recourse Lender with an interest in such Leasebooks has satisfied its Liquidity Contribution in accordance with the terms of this Order; and (iii) terminating the Governance Protocol (as defined below) in respect of Remaining Assets turned over to Recourse Lenders in accordance with this Order, was heard this day at 330 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of Randall Benson sworn September 18, 2024, the supplemental affidavit of Randall Benson sworn September 23, 2024, the affidavit of Randall

Benson sworn October 8, 2024, the Fourteenth Report of Ernst & Young Inc., in its capacity as court-appointed monitor (the "**Monitor**") dated August 27, 2024, the first and second supplements thereto dated, respectively, September 2, 2024, and September 19, 2024 (collectively, the "**Fourteenth Report**"), the Fifteenth Report of the Monitor dated September 22, 2024 (the "**Fifteenth Report**"), the Sixteenth Report of the Monitor dated October 10, 2024, and on hearing the submissions of counsel for the Pride Entities, the Monitor, and such other counsel that were present, and no one else appearing although duly served as appears from the affidavits of service, filed,

**SERVICE & DEFINED TERMS**

1.      **THIS COURT ORDERS** that the time for service of the Notice of Motion and the Motion Record herein is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that any capitalized terms used and not defined herein shall have the meaning ascribed in the Second Amended and Restated Initial Order dated May 6, 2024 (including as ascribed by reference therein), as amended and/or restated from time to time (the "**Initial Order**"), as applicable.

3.      **THIS COURT ORDERS** that nothing herein shall amend, modify or vary in any way the Order re: Turn-Over of Securitized Assets dated August 8, 2024 (the "**Securitized Asset Turn-Over Order**"), the Order re: Daimler Surrendered Vehicles dated June 27, 2024, the Order re: VFS Canada & VFS U.S. Surrendered Vehicles dated July 3, 2024, the Order re: Regions Surrendered Vehicles dated June 27, 2024, or the Order re: Additional Regions Vehicles dated July 16, 2024 (all such surrendered vehicles orders, collectively, the "**Surrendered Vehicles Orders**") and, for certainty, nothing herein applies to any of the trucks, trailers or other motor vehicles subject to the Surrendered Vehicles Orders.

4.      **THIS COURT ORDERS** that, for the purposes of this Order, the following terms shall have the following meanings:

    (a)      "**CCAA Charges**" means, collectively, the Administration Charge, Intercompany Advances Charge, DIP Lenders' Charge and Directors' Charge granted in these proceedings;

(b)     **"Entitlement Claims Process Order"** means the Order granted by the Court on June 14, 2024;

(c)     **"EV Units"** means the uninstalled standalone electric vehicle charging units constituting Property of the Pride Entities;

(d)     **"Liquidity Contribution"** means the proportional amount to be contributed by each Recourse Lender to the Liquidity Requirement in the amounts set out in **Schedule "C"** hereto, the satisfaction of which proportional amount shall be reduced dollar-for-dollar by set-off in respect of (i) lease payments, Soft Collections or Deferred Payments (as defined in the Order amending the Governance Protocol dated August 9, 2024) that have been collected between August 1 and September 30, 2024 and reconciled by the Pride Entities and confirmed by the Monitor as subject to the security interest of and payable to the respective Recourse Lender; (ii) Segregated Lease Amounts, and (iii) the lease payments collected on October 1, 2024 in respect of pre-authorized payment plans and reconciled by the Pride Entities and confirmed by the Monitor as subject to the security interest of and payable to the respective Recourse Lender, all as set out on Schedule "C" hereto;

(e)     **"Liquidity Contribution Deadline"** has the meaning set out in paragraph 9 herein;

(f)     **"Liquidity Requirement"** means the projected amount of $40 million required to fund the Wind-Down Plan;

(g)     **"Governance Protocol"** means the Governance Protocol (as revised) appended to the Protocols Order;

(h)     **"Inventory"** means all trucks, trailers or other motor vehicles, identified by VIN, constituting Property of the Pride Entities (including for greater certainty, PCVs), in each case as such asset exists and in respect of which the relevant Pride Entity has possession and control as of or following the date of this Order (which, for greater certainty, does not include any vehicles subject to a performing lease), excluding any Property of the PGL Entities or any other Purchased Assets being sold pursuant to the Approval and Vesting Order granted by the Court on September

26, 2024, and for greater certainty, the Inventory does not include any truck, trailer or other motor vehicle in which a Securitization Party has asserted an interest based on the Monitor's Database;

(i) **"Leasebooks"** means any vehicle leases, financial and related assets constituting Property of the Pride Entities, including any lease amounts collected in respect thereof by the Pride Entities after October 1, 2024, which for greater certainty, does not include any vehicle leases, financial and related assets in which a Securitization Party has asserted an interest based on the Monitor's Database;

(j) **"Lot Category"** means the category attributed to specified lots, all as more fully set out in **Schedule "B"** hereto;

(k) **"MCV Contribution Amount"** means the amount of $6,984 per Multiple Collateral Vehicle to be contributed by each MCV Claimant entitled to such Multiple Collateral Vehicle to the Liquidity Requirement;

(l) **"MCV Claimant"** has the meaning given to it in paragraph 11 herein;

(m) **"MCV Resolution Outside Date"** means the earlier of (i) the applicable Turn-Over Outside Date for the applicable Lot Category upon which such Multiple Collateral Vehicle is located as of the date of this Order, and (ii) November 8, 2024;

(n) **"MCV Turn-Over Resolution"** has the meaning given to it in paragraph 11 herein;

(o) **"Monitor's Database"** has the meaning given to it in the Entitlement Claims Process Order;

(p) **"Multiple Collateral Vehicles"** has the meaning given to it in the Entitlement Claims Process Order and are limited to those Multiple Collateral Vehicles where no Securitization Party has asserted an interest based on the Monitor's Database;

(q) **"NCI"** means Nations Capital, LLC;

(r) **"PCV"** means the Inventory and/or Leasebooks, identified by VIN, where the Monitor is of the view, as indicated in the Eleventh Report, that a Recourse Lender

has not established a perfected and priority security interest over the DIP Lenders' Charge and the Lenders' pre-filing security interest in such VIN;

(s)    **"PCV Claimant"** means a Recourse Lender in respect of which the Monitor is of the view, as indicated in the Eleventh Report, that such Recourse Lender has not established a perfected and priority security interest over the DIP Lenders' Charge and the Lenders' pre-filing security interest in such VIN;

(t)    **"PGL Entities"** means Pride Group Logistics Ltd., Pride Group Logistics USA, Co., Pride Group Logistics International Ltd., Pride Fleet Solutions Inc., Pride Fleet Solutions USA Inc., 2029909 Ontario Inc., 12944154 Canada Inc., 13184633 Canada Inc., 2837229 Ontario Inc., 2043002 Ontario Inc., and Pride Global Insurance Company Ltd.;

(u)    **"Protocols Order"** means the Amended and Restated Protocols Order dated May 15, 2024, as amended by Orders dated August 9, 2024, and September 3, 2024;

(v)    **"Recourse Lender"** means any secured party in its capacity as such and not in its capacity as a Securitization Party, provided that for the purposes of this Order, references to "Recourse Lender" shall include Bennington Financial Corp.;

(w)    **"Remaining Assets"** means the Inventory and Leasebooks, and excludes any Property of the PGL Entities;

(x)    **"Segregated Lease Amounts"** means the amounts held in segregated lease accounts and confirmed by the Monitor as subject to the security interest of and payable to the respective Recourse Lender, all as set out on **Schedule "C"** hereto;

(y)    **"Soft Collections"** has the meaning given to it in the Governance Protocol;

(z)    **"Turn-Over Outside Date"** means:

    (i)    October 31, 2024, in respect of Inventory situated at Lot Category A lots;

    (ii)    November 7, 2024, in respect of Inventory situated at Lot Category B lots;

(iii)    November 14, 2024, in respect of Inventory situated at Lot Category C lots;

(iv)    November 15, 2024, in respect of all Leasebooks;

(v)    November 26, 2024, in respect of Inventory situated at Lot Category D lots;

(vi)    December 17, 2024, in respect of Inventory situated at Lot Category E lots,

and in each case, only where the Pride Entities have made the applicable Remaining Assets identified above available for turn-over, and in any case, such other date agreed to by the CRO, Monitor and an affected Recourse Lender having regard to the spirit and intent of this Order to effect turn-overs as soon as commercially practicable;

(aa)    **"Wind-Down Cash Flow Forecast"** has the meaning given to it in the Fifteenth Report and includes the cash flow forecast included as Appendix "B" thereto; and

(bb)    **"Wind-Down Plan"** means the wind-down plan of the non-PGL Entities described in the Fourteenth Report under the heading, "Pride Entities' Wind-Down Plan", as amended by the Sixteenth Report.

**TERMINATION OF THE GOVERNANCE PROTOCOL**

5.    **THIS COURT ORDERS** that the Governance Protocol be and is hereby terminated and of no further force and effect in respect of the Remaining Assets as of the date such Remaining Assets are turned-over to the applicable Recourse Lender hereunder, and the Pride Entities, the CRO and the Monitor shall have no further obligations thereunder with respect to such Remaining Assets after that date, save and except for any reporting and remittance obligations under the Governance Protocol in respect of the Leasebooks which shall continue until the earlier of the Turn-Over Outside Date and the turn-over of such Leasebooks, unless otherwise stated in this Order.

**SALE OF INVENTORY**

6.    **THIS COURT ORDERS** that the Pride Entities, at the direction of the CRO and through their agent NCI, shall be authorized and empowered to: (i) sell any Inventory subject to a security

interest of a Recourse Lender that has not paid its Liquidity Contribution by the Liquidity Contribution Deadline, (ii) apply the net proceeds of any such sale to the applicable Recourse Lender's Liquidity Contribution (or any unpaid balance thereof), and (iii) following full satisfaction of such Recourse Lender's Liquidity Contribution, distribute any remaining net sale proceeds to such Recourse Lender or in the case of PCVs, pay the remaining net sale proceeds to the Monitor to hold in trust pending final determination of the entitlement to such PCV, a written agreement among the DIP Agent and applicable PCV Claimant as to entitlement to the PCV, or such other Order that may be granted by the Court.

7.    **THIS COURT ORDERS** that the Pride Entities, at the direction of the CRO and through their agent NCI, shall be authorized and empowered to: (i) sell any Inventory subject to a security interest of a Recourse Lender (and in the case of PCVs, a PCV Claimant) that has failed to take possession of same in accordance with paragraph 13 herein by the Turn-Over Outside Date applicable to such Inventory, and (ii) provided that such Recourse Lender's (and in the case of PCVs, such PCV Claimant's) Liquidity Contribution has been satisfied in full, distribute any remaining balance of net sale proceeds thereof to such Recourse Lender or in the case of PCVs, pay the remaining net sale proceeds to the Monitor to hold in trust pending final determination of the entitlement to such PCV, a written agreement among the DIP Agent and applicable PCV Claimant as to entitlement to the PCV, or such other Order that may be granted by the Court.

**RETENTION OF LEASEBOOKS & SEGREGATED LEASE AMOUNTS**

8.    **THIS COURT ORDERS** that the Pride Entities, at the direction of the CRO and in consultation with the Monitor, shall be authorized and empowered (i) to retain and use the Leasebooks subject to a security interest of a Recourse Lender (and in the case of PCVs, a PCV Claimant) that has not paid its Liquidity Contribution by the Liquidity Contribution Deadline, (ii) apply the Leasebooks and Segregated Lease Amounts to the applicable Recourse Lender's (and in the case of PCVs, a PCV Claimant's) Liquidity Contribution (or any balance thereof), and (iii) turn-over the remaining Leasebooks and any remaining balance thereof to such Recourse Lender (and in the case of PCVs, such PCV Claimant), following full satisfaction of such Recourse Lender's (and in the case of PCVs, such PCV Claimant's) Liquidity Contribution.

**ELECTION TO CONTRIBUTE TO LIQUIDITY REQUIREMENT**

9. **THIS COURT ORDERS** that, each Recourse Lender shall be entitled to elect to pay its Liquidity Contribution to the Monitor (the "**Liquidity Contribution Election**") in accordance with paragraph 10 below and upon receipt of such payment, shall be entitled to receive all of the Remaining Assets in respect of which it asserts an interest. For greater certainty, where a Recourse Lender has made a Liquidity Contribution Election, neither the Pride Entities nor NCI shall be authorized to sell any Inventory in which a Recourse Lender that has made a Liquidity Contribution Election asserts an interest until the Turn-Over Outside Date applicable to such Inventory.

10. **THIS COURT ORDERS** that a Recourse Lender shall be deemed to have made a Liquidity Contribution Election if it pays its Liquidity Contribution as set out in Schedule "C" in full to the Monitor in immediately available funds to an account specified by the Monitor by no later than three (3) business days from the date of this Order or such later date agreed among the applicable Recourse Lender, the CRO and the Monitor (the "**Liquidity Contribution Deadline**"), failing which it shall be deemed not to have made a Liquidity Contribution Election.

**MULTIPLE COLLATERAL VEHICLES**

11. **THIS COURT ORDERS** that every Recourse Lender who is identified pursuant to the Monitor's Database as potentially having an interest in a Multiple Collateral Vehicle (each, an "**MCV Claimant**") shall have until the MCV Resolution Outside Date to reach an agreement with the other MCV Claimant potentially having an interest in such Multiple Collateral Vehicle as to which MCV Claimant (or its representative, agent or nominee) shall be entitled to turn-over of the Multiple Collateral Vehicle and provide written notice of such agreement to the CRO and the Monitor (the "**MCV Turn-Over Resolution**"), which such MCV Turn-Over Resolution shall indicate whether it is subject to final determination of entitlement to such Multiple Collateral Vehicle pursuant to the Entitlement Claims Process Order or agreement by the relevant MCV Claimants, in which case, such MCV Claimants shall advise the Monitor as to the final resolution of such entitlement to the Multiple Collateral Vehicle (or its proceeds).

12. **THIS COURT ORDERS** that where a MCV Turn-Over Resolution is received by the CRO and the Monitor by the MCV Resolution Outside Date, the MCV Claimant entitled to turn-

over of each Multiple Collateral Vehicle will have three (3) business days from the date of delivery of such notice to pay its applicable MCV Contribution Amount. Failing either (i) receipt of the MCV Turn-Over Resolution by the MCV Resolution Outside Date and/or (ii) receipt of the applicable MCV Contribution Amount by the deadline specified herein, the Pride Entities are hereby authorized and empowered (i) to retain any lease collections in respect of such Multiple Collateral Vehicle (if applicable), and/or (ii) through NCI, to sell such Multiple Collateral Vehicle (if applicable) and, in each case, (a) apply any applicable lease collections and/or net proceeds of sale towards the MCV Contribution Amount in respect of such Multiple Collateral Vehicle, and (b) hold the balance of any remaining lease collections (if applicable) or net sale proceeds (if applicable) in trust, to be dealt with pursuant to a MCV Turn-Over Resolution, by the Entitlement Claims Process or such other Order that may be granted by the Court.

**TURN-OVER OF REMAINING ASSETS**

13.     **THIS COURT ORDERS** that, where the Monitor has received the total Liquidity Contribution from a Recourse Lender (whether through the sale of Inventory, retention of Leasebooks or payment from a Recourse Lender), such Recourse Lender (or its agents or designees, as it may direct), by no later than the Turn-Over Outside Date, shall have the right to take possession and control of (i) in the case of Remaining Assets, all Remaining Assets that the Monitor has determined, as set out in the Eleventh Report, such Recourse Lender has provided sufficient evidence of a perfected and priority interest in such Remaining Assets, (ii) in the case of Multiple Collateral Vehicles, all such Multiple Collateral Vehicles where the entitlement to turn-over of such Recourse Lender is specified in a MCV Turn-Over Resolution, and (iii) in the case of a PCV, all PCVs that such Recourse Lender has asserted an interest in, subject to the future determination of entitlement to the PCV, with all such Remaining Assets that are turned over to Recourse Lenders being the "**Transferred Assets**".

**APPROVAL OF WIND-DOWN PLAN**

14.     **THIS COURT ORDERS** that each of the Wind-Down Cash Flow Forecast and the Wind-Down Plan be and is hereby approved, subject to such amendments as the Pride Entities, as directed by the CRO in consultation with the Monitor may deem necessary, and that the Pride Entities, as directed by the CRO and in consultation with the Monitor are hereby directed to abide by the terms and conditions of same. The Recourse Lenders shall be provided with not less than three (3)

business day's prior written notice of all substantive amendments to the Wind-Down Plan or Wind-Down Cash Flow Forecast.

15.     **THIS COURT ORDERS** that the Liquidity Contribution (whether funded by payment from a Recourse Lender or by application of net proceeds of sale of Inventory or of Leasebooks and Segregated Lease Amounts) shall be used solely for the purpose of funding the Wind-Down Plan in accordance with the Wind-Down Cash Flow Forecast.

**MECHANICS OF WIND-DOWN PLAN**

16.     **THIS COURT ORDERS** that the CRO, with the assistance of the Pride Entities, the Monitor and NCI (as applicable) shall develop and implement the process and mechanics of the sale or turn-over of the Remaining Assets, where applicable, in a manner that (i) is controlled and coordinated; (ii) maximizes the economics and efficiencies of the limited resources of the Pride Entities to facilitate sales or turn-overs of Remaining Assets; (iii) provides affected Recourse Lenders that have satisfied their Liquidity Contribution with "windows" prior to the Turn-Over Outside Date to take possession of the Remaining Assets on reasonable notice; and (iv) endeavours to permit all Remaining Assets to be turned-over to respective Recourse Lenders that have satisfied their Liquidity Contribution by the applicable Turn-Over Outside Date.

17.     **THIS COURT ORDERS** that the Pride Entities shall, as soon as reasonably practicable and in any event no later than October 16, 2024 in respect of Lot Categories A, B, C, D and E, provide a list of locations of Inventory (including the complete address and, where available, GPS coordinates) to each relevant Recourse Lender that has satisfied its Liquidity Contribution (whether by sale of Inventory, retention of Leasebooks or payment from a Recourse Lender).

18.     **THIS COURT ORDERS** that, in accordance with paragraph 16 herein, the Pride Entities shall make the Remaining Assets available for turn-over, where applicable in accordance with the terms of this Order, on an "as is" condition to each Recourse Lender that has satisfied its Liquidity Contribution, commencing on October 17, 2024 in respect of Lot Categories A, B, C, D and E, and shall advise the applicable Recourse Lender of any amendment to such dates, if any, as soon as reasonably possible.

19.     **THIS COURT ORDERS** that the Pride Entities and the CRO, with the assistance of the Monitor, shall provide the Recourse Lenders with the assistance and information necessary to give

effect to the turn-over of the Remaining Assets to the Recourse Lenders (together with their respective agents and designees) contemplated hereunder, including, without limitation, executing such documentation reasonably required to give effect to such turn-overs, and providing to the Recourse Lenders such necessary information, including the information contained on the Pride Entities' portfolio management software in respect of the Leasebooks.

20.     **THIS COURT ORDERS** that the turn-overs permitted hereby do not in any way confirm or validate any ownership, proprietary or security interests in any Remaining Asset or its proceeds or any priority right or interests of an applicable Recourse Lender in any Remaining Asset or its proceeds, and this Order is without prejudice to any rights, interests, claims and entitlements of the Pride Entities, the CRO, the Monitor or any other affected person, including each Recourse Lender, may have in respect of any Remaining Asset or its proceeds.

**STAY OF PROCEEDINGS**

21.     **THIS COURT ORDERS** that the stay of proceedings provided for in the Initial Order in respect of the Pride Entities be and is hereby lifted in respect of each Remaining Asset contemplated to be turned-over hereunder, along with the EV Units, effective as at the date of the turn-over of such Remaining Asset or its proceeds, where applicable, solely to permit the turn-over of such Remaining Asset, its proceeds or the EV Units and for no other purpose.

**ENGAGEMENT OF NATIONS CAPITAL, LLC**

22.     **THIS COURT ORDERS** that the term sheet between the CRO, on behalf of the Pride Entities, and NCI dated September 21, 2024 (the "**NCI Term Sheet**"), setting out the principal terms of the Pride Entities' engagement of NCI as their agent to sell the Inventory in accordance with the terms of this Order be and is hereby approved.

23.     **THIS COURT ORDERS** that the CRO, on behalf of the Pride Entities, is hereby authorized and empowered to enter into a definitive agreement with NCI on the principal terms of the NCI Term Sheet (together with the NCI Term Sheet, the "**Definitive Documents**"), with such minor amendments as the CRO and NCI decide may be reasonably required, in consultation with the Monitor, and the Pride Entities and CRO are hereby authorized and directed to perform their obligations under the NCI Term Sheet and the Definitive Documents.

24.    **THIS COURT ORDERS** that NCI is hereby authorized and empowered to market for sale and sell, on behalf of the Pride Entities, the Inventory in accordance with the terms of this Order and the Definitive Documents, and that upon the closing of any sale by NCI to a purchaser of any Inventory (each, a "**Sold Inventory**"), all of the Pride Entities' rights, title and interest in and to the Sold Inventory shall vest absolutely to the purchaser, free and clear of and from any and all legal, beneficial or other ownership interests, security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "**Claims**") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Initial Order or any other Order of this Court in these proceedings (including the CCAA Charges); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system (all of which are collectively referred to as the "**Encumbrances**"), and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Sold Inventory are hereby expunged and discharged as against such Sold Inventory, and the Pride Entities are hereby authorized to file such discharges with the applicable personal property registry to give effect to this paragraph, if necessary.

25.    **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Sold Inventory pursuant to the immediately preceding paragraph shall be held in trust and distributed by the Monitor in accordance with the terms of this Order and stand in the place and stead of the Sold Inventory to which they pertain, and that from and after the date of receipt by the Monitor of such net proceeds, all Claims and Encumbrances shall attach to those net proceeds with the same priority as they had with respect to the Sold Inventory immediately prior to the sale.

**TURN-OVER OF REMAINING ASSETS TO RECOURSE LENDERS**

26.    **THIS COURT ORDERS** that (a) upon completion of the turn-over of the Remaining Assets to the applicable Recourse Lender, where applicable in accordance with this Order, (including in respect of any net sale proceeds of any Sold Inventory, where applicable), the CCAA Charges shall be and are hereby released, and discharged as against such Remaining Asset, and

the applicable Recourse Lender (directly or through its agent or designee) shall be at liberty to market for sale and sell such Remaining Assets (or any one of them); and (b) upon the closing of any sale by such Recourse Lender, or its agent or designee, to a purchaser of such Remaining Asset, all of the Pride Entities' right, title and interest in and to the Remaining Asset shall vest absolutely to the purchaser, free and clear of and from any and all Claims including, without limiting the generality of the foregoing, all Encumbrances, and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Remaining Asset sold are hereby expunged and discharged as against such Remaining Asset, provided however, for greater certainty, that (i) the CCAA Charges shall continue to apply to any Recourse Lender's Net Proceeds remitted to the Monitor in accordance with paragraph 29 herein, pending further Court order; and (ii) any claims of the DIP Agent to a PCV that is turned-over to a PCV Claimant hereunder shall continue to attach to such PCV until entitlement to such PCV has been determined.

**REPORTING OBLIGATIONS OF RECOURSE LENDERS**

27.     **THIS COURT ORDERS** that each Recourse Lender having taken possession and control of Transferred Assets, on a monthly basis after taking control of any such Transferred Assets, shall provide a detailed written accounting to the Monitor and the CRO on the receipt of proceeds from the sale or other disposition of Inventory, the collection, sale or other disposition of Leasebooks and/or other transaction involving such Transferred Assets (the "**Transferred Asset Monetization**"), which accounting shall include: (i) the total amount of all proceeds and other consideration received on account of such Transferred Asset Monetization ("**Gross Transferred Asset Proceeds**"); (ii) direct costs to the Recourse Lender associated with such Transferred Asset Monetization (the "**Costs of Monetization**"); (iii) the outstanding amount owing pursuant to the loan advanced by the Recourse Lender to any of the Pride Entities to finance the acquisition of the applicable Transferred Asset (the "**Unit Financed Amount**"); (iv) a reasonable description of the process by which each Transferred Asset Monetization was arrived at; and (v) confirmation whether the counterparty to each Transferred Asset Monetization is at arm's length to the Recourse Lender.

28.     **THIS COURT ORDERS** that where the Recourse Lender claims indebtedness owing to the Recourse Lender by any of the Pride Entities other than the Unit Financed Amount that is secured by the applicable Transferred Vehicle ("**Cross-Collateralized Indebtedness**"), the

reporting with respect to such Transferred Asset Monetization referenced in the preceding paragraph of this Order shall include the Recourse Lender's factual and legal support for its entitlement to the Cross-Collateralized Indebtedness, and for the Cross-Collateralized Indebtedness being secured against the applicable Transferred Asset.

29.    **THIS COURT ORDERS** that, except to the extent that a Recourse Lender asserts Cross-Collateralized Indebtedness, the Recourse Lender shall remit to the Monitor the aggregate amount (if greater than zero) equal to (i) the Gross Transferred Asset Proceeds, less (ii) the Costs of Monetization, and less (iii) the Unit Financed Amount (the "**Recourse Lender's Net Proceeds**") for the immediately preceding month by the tenth (10) business day of each month hereafter.

30.    **THIS COURT ORDERS** that the Monitor shall provide to the Service List on October 24, 2024, and every second Thursday thereafter, a report that includes the actual receipts and disbursements of the Pride Entities for the immediately preceding two-week period and a variance report to the Wind-Down Cash Flow Forecast for the same period.

**FUTURE ALLOCATION AND ACCOUNTING**

31.    **THIS COURT ORDERS** that the costs of the Wind-Down Plan and Liquidity Contributions (which are a prepayment of such costs subject to such future allocation), shall be decided at a future date upon further Order of the Court, with all rights reserved by all affected parties.

**DIRECTION TO ANY OTHER PERSONS HOLDING PROPERTY**

32.    **THIS COURT ORDERS** that any Person in possession or control of Inventory identified by VIN or other assets that constitute Property of the Pride Entities (other than Property subject to a performing lease) be and is hereby directed to transfer such Property forthwith following written notice from the CRO or Monitor, on such terms and conditions as the CRO or Monitor may direct.

**DISCHARGE OF LIENS WITH RESPECT TO SOLD VEHICLES**

33.    **THIS COURT ORDERS** that where, prior to the date of this Order, the sale by the Pride Entities of any Inventory has closed in accordance with the Governance Protocol, and the Pride Entities' rights, title and interest in such Inventory has vested in the purchaser of such Inventory, and the Pride Entities have received in full the consideration for such sale, the Pride Entities, with

the consent of the Monitor, and on notice to the affected Recourse Lender, shall be entitled to file a discharge of any Encumbrances with the applicable personal property registry, if necessary.

**GENERAL**

34.    **THIS COURT ORDERS** that any Recourse Lender, the Monitor, CRO or the Pride Entities may from time to time apply to this Court for advice and directions concerning the discharge of their respective powers and duties under this Order or the interpretation or application of this Order.

35.    **THIS COURT ORDERS** that in the event of any conflict between the terms of this Order and any prior Order (excluding the Securitized Asset Turn-Over Order and the Surrendered Vehicles Orders) the terms of this Order shall prevail.

36.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States, to give effect to this Order and to assist the Pride Entities, the CRO, the Monitor and their respective agents in carrying out the terms of this Order, as may be applicable. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Pride Entities, the CRO and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the CRO or Monitor in any foreign proceeding, or to assist the Pride Entities, the CRO and the Monitor and their respective agents in carrying out the terms of this Order.

Digitally signed by Osborne J. Date: 2024.10.11 11:05:15 -04'00'

- 16 -

## SCHEDULE "A"

### A. APPLICANTS

**Operating Entities**

*Canadian Operating Entities*

- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*

- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**

*Canadian Real Estate Holding Companies*

- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.

- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*

- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.

- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**

*Other Canadian Holding Companies*

- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*

- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**B. LIMITED PARTNERSHIPS**

*U.S. Limited Partnerships*

- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

**C. ADDITIONAL STAY PARTIES**

*Canadian Additional Stay Parties*

- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*

- PERGOLA HOLDINGS, CORP.
- PRIDE GLOBAL INSURANCE COMPANY LTD.

- 20 -

**SCHEDULE "B"**

| Location | Lot Category |
| --- | --- |
| 30530 Matsqui Pl, Abbotsford, BC | A |
| 933 Helena St, Fort Erie, ON | A |
| 1945 55th Ave, Dorval, QC | A |
| 11670 I-10 Converse, TX, USA | A |
| 345 Grand Island Blvd, Tonawanda, NY, USA | A |
| 1021 N 59th Ave Phoenix, AZ, USA | A |
| 2382 US-130 Dayton, NJ, USA | A |
| 10015 NW 87th Ave Medley, FL, USA | A |
| 3375 High Prairie Rd Grand Prairie, TX, USA | A |
| 8022 East Fwy Houston, TX, USA | A |
| 8201 OK-66 Tulsa, OK, USA | A |
| 1696 Bishop Rd Chehalis, WA, USA | A |
| 131 Industrial Blvd La Vergne, TN 37086, USA | A |
| 225 W S Frontage Rd, Bolingbrook, IL, USA | A |
| 401 S Meridian Ave, Oklahoma City, OK, USA | A |
| 335 68 St Saskatoon, SK | B |
| 4895 Old National Hwy, College Park, GA, USA | B |
| 500 Ternes Dr Monroe, MI, USA | B |
| 1900 NE Loop 820 Fort Worth, TX, USA | B |
| 7200 NE 45th St Kansas City, MO, USA | B |
| 7403 52 ST NW, Edmonton, AB | C |
| 5720 84 Street SE, Rocky View County No. 14, Calgary, AB | C |
| 10202 177A Street, Surrey BC | C |
| 12090 104 AVE, Surrey BC | C |
| 8504 Winston Churchill Blvd, Brampton, ON | C |
| 500 Oak Point Hwy, Winnipeg, MB | C |
| 4440 Eastgate Dr, Regina, SK | C |
| 1125 W Alexis Rd, Toledo, OH, USA | C |
| 34880 Lyndon B Johnson Fwy, Dallas, TX, USA | D |
| 3032 E Central Ave Fresno, CA, USA | D |
| 6111 W Hanna Ave Indianapolis, IN, USA | D |
| 2546 French Camp Turnpike, Stockton, CA,USA | D |
| 15666 Slover Ave Fontana, CA, USA | D |
| 15662 Valley Blvd Fontana, CA, USA | D |
| 31992 Famoso Rd McFarland, CA, USA | D |
| 3140 Irving Blvd Dallas, TX, USA | D |
| 5850 Dixie Road, Mississauga, ON | E |
| 6050 Dixie Road, Mississauga, ON | E |
| 5868 Dixie Road, Mississauga, ON | E |
| 10862 Steeles Ave E, Milton, ON | E |

Schedule "C"

## Liquidity Contribution Schedule

$ Canadian

| | Total VINs (E) | Per VIN Cost (Note 1) (F) | Gross Liquidity Contribution G = (E * F) | Deferred Payments, October 1 Lease Book Collections, and Amount Payable to the Syndicate for No Back Funder VINs (Note 2,3) (H) | Held in Segregated Lease Account (July 1 - July 14) (I) | Net Liquidity Contribution (J = G - H - I) |
|---|---|---|---|---|---|---|
| **Recourse** | | | | | | |
| BMO | 6 | $6,984 | $41,907 | $17,970 | $8,143 | $15,793 |
| Bennington | 149 | 6,984 | 1,040,684 | 18,227 | 8,900 | 1,013,558 |
| CWB Maxium | 19 | 6,984 | 132,705 | - | - | 132,705 |
| Daimler (CAN) | 770 | 6,984 | 5,378,034 | 4,054,677 | 817,069 | 506,288 |
| Daimler (US) | 517 | 6,984 | 3,610,966 | 2,710,079 | 703,320 | 197,567 |
| Mitsubishi (Canada) | 98 | 6,984 | 684,477 | 54,537 | 9,394 | 620,546 |
| Mitsubishi (US) | 563 | 6,984 | 3,932,251 | (14,507) | 8,580 | 3,938,178 |
| TBK Bank SSB | 135 | 6,984 | 942,902 | 78,630 | - | 864,272 |
| VFS | 12 | 6,984 | 83,814 | 59,883 | 22,318 | 1,612 |
| Paccar (US) | 242 | 6,984 | 1,690,239 | 410,708 | 125,028 | 1,154,503 |
| Paccar | 59 | 6,984 | 412,083 | 58,423 | 9,475 | 344,186 |
| BMO Harris Bank N.A. | 196 | 6,984 | 1,368,954 | - | - | 1,368,954 |
| Royal Bank (AdminAgent) | 2,276 | 6,984 | 15,896,630 | 6,057,980 | 4,434,571 | 5,404,079 |
| Webster Capital Finance Inc. | 12 | 6,984 | 83,814 | - | - | 83,814 |
| M&T | 5 | 6,984 | 34,922 | 4,830 | 1,872 | 28,221 |
| Flagstar | 53 | 6,984 | 370,176 | 84,264 | 21,161 | 264,752 |
| First American (US) | 63 | 6,984 | 440,021 | 179,497 | 32,645 | 227,879 |
| No Back Funder - Syndicate | 405 | 6,984 | 2,828,706 | 2,000,000 | - | 828,706 |
| Republic Bank of Chicago | 20 | 6,984 | 139,689 | (10,649) | 7,326 | 143,012 |
| Meridian | 8 | 6,984 | 55,876 | - | 33,743 | 22,133 |
| **Total Recourse** | 5,608 | 6,984 | 39,168,849 | 15,764,550 | 6,243,544 | 17,160,756 |
| | | | | | | |
| **MCVs** | 119 | 6,984 | 831,151 | - | - | 831,151 |
| | | | | | | |
| **Grand Total** | **5,727** | **$ 6,984** | **$40,000,000** | **$15,764,550** | **$6,243,544** | **$17,991,907** |

Notes:

1. Per VIN Cost is calculated as $40,000,000 divided by 5,727 VINs.

2. The $2,000,000 for the 'No Back Funder - Syndicate' represents the estimated amount payable to the Syndicate for the sale of vehicles without a back funder. The Deferred Payments are based on August and September lease and soft collections and only PAPs received on October 1st less HST where applicable. Deferred Payments for September and October 1 has been reconciled by the Pride Entities, however are subject to review and reconciliation (including offsetting NSFs for October 1 Collections) by the Monitor.

3. The Pride Entities and the Monitor have reviewed and reconciled the amounts payable and paid to Recourse Lenders since Filing and have added any differences to the Deferred Payments. In certain situations, Recourse Lenders have been paid more than what was owed. In these situations, the net amount will appear as negative.

## Liquidity Contribution Schedule

$ Canadian

| Recourse | Inventory (A) | PCV Inventory (B) | Lease Book (C) | PCV Lease Book (D) | Total VINs (E = A + B + C + D) | Per VIN Cost (Note 1) (F) | Gross Liquidity Contribution G = (E * F) |
|---|---|---|---|---|---|---|---|
| BMO | - | - | 6 | - | 6 | $6,984 | $41,907 |
| Bennington | 91 | 58 | - | - | 149 | 6,984 | 1,040,684 |
| CWB Maxium | 19 | - | - | - | 19 | 6,984 | 132,705 |
| Daimler (CAN) | 94 | 2 | 674 | - | 770 | 6,984 | 5,378,034 |
| Daimler (US) | 37 | - | 480 | - | 517 | 6,984 | 3,610,966 |
| Mitsubishi (Canada) | 79 | - | 19 | - | 98 | 6,984 | 684,477 |
| Mitsubishi (US) | 468 | 12 | 83 | - | 563 | 6,984 | 3,932,251 |
| TBK Bank SSB | - | 10 | - | 125 | 135 | 6,984 | 942,902 |
| VFS | - | - | 10 | 2 | 12 | 6,984 | 83,814 |
| Paccar (US) | 98 | 8 | 129 | 7 | 242 | 6,984 | 1,690,239 |
| Paccar | 51 | - | 8 | - | 59 | 6,984 | 412,083 |
| BMO Harris Bank N.A. | - | 196 | - | - | 196 | 6,984 | 1,368,954 |
| Royal Bank (AdminAgent) | 564 | - | 1,712 | - | 2,276 | 6,984 | 15,896,630 |
| Webster Capital Finance Inc. | - | 9 | 1 | 2 | 12 | 6,984 | 83,814 |
| M&T | 1 | 2 | 2 | - | 5 | 6,984 | 34,922 |
| Flagstar | 5 | 1 | 42 | 5 | 53 | 6,984 | 370,176 |
| First American (US) | - | 14 | 3 | 46 | 63 | 6,984 | 440,021 |
| No Back Funder - Syndicate | 162 | - | 243 | - | 405 | 6,984 | 2,828,706 |
| Republic Bank of Chicago | 6 | - | 12 | 2 | 20 | 6,984 | 139,689 |
| Meridian | - | - | 5 | 3 | 8 | 6,984 | 55,876 |
| **Total Recourse** | 1,675 | 312 | 3,429 | 192 | 5,608 | 6,984 | 39,168,849 |
| **MCVs** | 94 | 1 | 24 | - | 119 | 6,984 | 831,151 |
| **Grand Total** | **1,769** | **313** | **3,453** | **192** | **5,727** | **$6,984** | **$40,000,000** |

Notes:

1. Per VIN Cost is calculated as $40,000,000 divided by 5,727 VINs.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** et al (each, an "Applicant", and collectively, the "**Applicants**")

Court File No.: CV-24-00717340-00CL

| | |
|---|---|
| | *ONTARIO*<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br>Proceedings commenced at Toronto, Ontario |
| | **ORDER**<br>**(Wind-Down, Liquidity Contribution Alternative and Turn-Over)** |
| | **THORNTON GROUT FINNIGAN LLP**<br>TD West Tower, Toronto-Dominion Centre<br>100 Wellington Street West, Suite 3200<br>Toronto, ON  M5K 1K7<br><br>**Leanne Williams (LSO #41877E)**<br>Tel: (416) 304-0060 / Email:<br><br>**Rachel Nicholson (LSO #68348Y)**<br>Tel: (416) 304-1153 / Email: rnicholson@tgf.ca<br><br>**Puya Fesharaki (LSO #70588L)**<br>Tel: (416) 304-7979 / Email: pfesharaki@tgf.ca<br><br>**Ines Ferreira (LSO #81472A)**<br>Tel: (416) 304-0461 / Email: iferreira@tgf.ca<br><br>Lawyers for the Applicants |



ONTARIO SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

# COUNSEL/ENDORSEMENT SLIP

**COURT FILE NO.: CV-24-00717340-00CL**             **DATE: OCTOBER 19, 2024**

                                                    **NO. ON LIST: 1**

**TITLE OF PROCEEDING: PRIDE GROUP HOLDINGS INC. V CWB MAXIMUM FINANCIAL INC.**

**BEFORE:   JUSTICE OSBORNE**

---

**PARTICIPANT INFORMATION**

**For Plaintiff, Applicant, Moving Party:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Rachel Nicholson | CSL for the Applicant Pride Group Holdings Inc. | rnicholson@tgf.ca |
| Abir Shamim | CSL for employees of Pride Group Logistics Ltd | ashamim@kmlaw.ca |
| Ines Ferreira | CSL for the Applicants | iferreira@tgf.ca |
| Puya Fesharaki | CSL for the Applicants | pfesharaki@tgf.ca |
| James Harnum | CSL for the Applicants | jharnum@kmlaw.ca |

**For Defendant, Respondent, Responding Party:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Raj Sahni | CSL for the Directors | SahniR@bennettjones.com |
|  |  |  |

| Aubrey Kauffman | CSL to Royal Bank of Canada, in its capacity as the Financial Services Agent | akauffman@fasken.com |
|---|---|---|
| Ben Muller | CSL to Royal Bank of Canada, in its capacity as the Financial Services Agent | bmuller@osler.com |
| Caroline Descours | CSL to Regions Bank and Regions Equipment Finance Corporation | Cdescours@goodmans.ca |
| Trevor Courtis | CSL for Bennington Financial Corp | tcourtis@mccarthy.ca |
| John Salmas | CSL to Bank of Montreal | John.salmas@dentons.com |
| Lee Nicholson | CSL to Move Trust | leenicholson@stikeman.com |
| Daniel Richer and Aubrey Kauffman | CSL for the DIP/Syndicate Lenders | dricher@fasken.com akauffman@fasken.com |
| Kelly Bourassa | CSL for the Monitor | kelly.bourassa@blakes.com |
| Shayne Kukulowicz | CSL for A&M | skukulowicz@cassels.com |
| Mark Freake | CSL for Daimler Truck | mark.freake@dentons.com |
| Esther Mann | CSL for Alvarez & Marsal | |
| Chris Burr | CSL for the Monitors | chris.burr@blakes.com |
| Heather Meredith | CSL for National Bank | hmeredith@mccarthy.ca |

## <u>ENDORSEMENT OF JUSTICE OSBORNE:</u>

[1]   RBC, in its capacity as administrative agent for the Syndicate Lenders, moves for two orders:

a. a Syndicate Collateral Management Order appointing Alvarez & Marsal Canada Inc. as an officer of this Court in the capacity of Manager of those assets of the Syndicate/DIP Borrowers including proceeds thereof, and lifting the stay of proceedings in these *CCAA* Proceedings to give effect thereto; and

b. a Sale Agreement and Sale Approval Order, as fully described in the motion materials, and which effectively would give the Manager, if appointed, necessary powers to sell the Management Property, vest title thereto in any purchaser, account for the Net Proceeds, and provide for other ancillary relief.

[2]     The Syndicate relies upon the affidavits of Brad D. Newton sworn August 2, 2024, together with exhibits thereto, and the affidavit of Mr. Newton sworn October 16, 2024, together with exhibits thereto.

[3]     Defined terms in this Endorsement have the meaning given to them in the motion materials, the Reports of the Monitor, and/or earlier Endorsements made in this *CCAA* Proceeding, unless otherwise stated.

[4]     The relief sought on this motion in principle was unopposed, but certain parties, and in particular the Applicants, counsel to certain employees and the Court-appointed Monitor, objected to the scope of the powers for the proposed Manager as contemplated in the draft orders.

[5]     At the conclusion of the hearing of the motion, I granted the two orders with certain amendments, additions and deletions for reasons to follow. These are those reasons.

[6]     The context within which this motion is brought is fully set out in the materials and need not be restated here. There is no issue that the Syndicate/DIP Borrowers are indebted to the Syndicate Lenders on a secured basis in an aggregate principal amount that exceeds CAD $391,200,000 and USD $105,800,000 plus accrued interest and costs, all of which Indebtedness is due and payable. The DIP Indebtedness matured on July 31, 2024 and was not extended or renewed. The DIP Facility of CAD $36,300,000 is virtually fully drawn.

[7]     On October 10, 2024, I granted a Wind-down, Liquidity Contribution Alternative and Turnover Order (the "Turnover Order"). That Turnover Order provides a comprehensive mechanism for the turnover of Remaining Assets and imposes certain obligations related thereto on the Pride Entities, the CRO and the Monitor, all with a view to treating equitably and fairly the Recourse Lenders through the fair and equitable turnover of Remaining Assets with the oversight of the CRO and Monitor.

[8]     The proposed relief sought on this motion is intended to facilitate and operationalize the relief granted in the Turnover Order and is expressly subject to the terms thereof. Effectively, the orders now sought would appoint A&M as Manager of the Remaining Assets that would be turned over to that firm. The proposed order is based on the model Receivership Order of the Commercial List, and in some but not all respects is similar to the order granted in this *CCAA* Proceeding on September 24, 2024 appointing BDO Canada Limited as manager over certain assets.

[9]     The Syndicate Lenders have selected A&M as its proposed Manager, and submit that, in their view, the vehicle sales channel of the Pride Group is not maximizing the value of the vehicles included in the Management Property as they believe that the proposed Manager will be able to achieve. Accordingly, the proposed Syndicate Collateral Management Order allows for the proposed Manager to manage and realize on that Management Property within this *CCAA* Proceeding, and transfer to the Syndicate Lenders the cost of such management and realization.

[10]    The Syndicate Agent and the Proposed Manager have entered into some agreements and are negotiating others, all subject to the relief being granted on this motion, pursuant to which the Manager will place Management Vehicles with various third-party vehicle dealers on a consignment basis, transition Management Leases to replacement servicer and address other mechanical matters.

[11]    I am satisfied that this Court has the jurisdiction to grant the order sought pursuant to the broad discretion given in section 11 of the *CCAA*. A&M is well qualified to act in the Court officer capacity of Manager and has consented to do so.

[12]    I am further satisfied that, as amended, the orders are consistent with the Turnover Order and the objectives of that Turnover Order as set out above of providing for the turnover of Remaining Assets, as all of the Recourse Lenders desire, but to do so in a manner that is fair and equitable and will not give any creditor or group of creditors an unfair advantage over another.

[13]    This is achieved both through the terms of the proposed orders and in particular through the fact that they are, as confirmed by counsel to the Syndicate Agent in submissions, expressly subject to the paramountcy of the Turnover Order and other earlier orders. Simply put, the Syndicate Collateral Management Order would allow the Syndicate Lenders, through their selected Manager, to sell their vehicles, free and clear of encumbrances and at their cost, with attendant obligations to maintain Net Proceeds and report back to the CRO and the Court appointed Monitor with respect thereto. I am satisfied that that approach is appropriate and will give further practical effect to the Turnover Order.

[14]    I am further satisfied that the proposed draft orders are generally consistent with the Model Receivership Order of the Commercial List. That, however, is not the end of the matter, as the Manager here is not acting in the capacity of a straightforward receiver in the usual sense. The circumstances of the appointment of this Court officer are unique and require some refinement and nuance to the scope of powers in order to ensure fairness and consistency in the treatment of all stakeholders, balanced against the necessity to give the Manager the powers it does require to fulfil the obligations that it has agreed to undertake as an officer of the Court.

[15]    Submissions were made with respect to certain provisions of the draft order. In particular, the Applicants objected to paragraph 12, 13 and 14, and subparagraph 5(o), which would effectively impose a duty on Persons (as defined in the draft order, and including but not limited to the Monitor and the CRO) to provide access and cooperation to the Manager with respect to any Management Property, including Records of the Pride Entities and other potentially very significant assistance. They would also allow the Manager or its agents to take certain steps in the name of the Pride Entities, such as with respect to vehicle permits and licenses.

[16]    In my view, these paragraphs are not necessary or appropriate at this time, and I directed that they be deleted. They are not included in the BDO appointment order. The objective of the relief being sought and granted is to provide for the mechanical turnover of vehicles comprising the Remaining Assets, while avoiding duplicative or overlapping processes being undertaken by

multiple professional teams. I am not persuaded at this time that these powers are necessary for the Manager to fulfil its core functions. If there are issues and disputes that cannot be resolved between and among the affected parties on a consensual basis, any affected party may seek further advice and directions from the Court as may be required.

[17]    Further extensive submissions were made about paragraph 21 of the draft order which would confirm that all employees of the Pride Entities shall remain such, and paragraph 22 which deals with the Canada *Personal Information Protection and Electronic Documents Act* (*PIPEDA*) issues.

[18]    The Applicants submitted that these paragraphs were not necessary and should be deleted. I am satisfied that they are appropriate and can remain in the order. They are consistent with the Turnover Order and the basis upon which all parties have been proceeding (i.e., there is no dispute that employees remain employees of the Pride Entities until that employment may be terminated).

[19]    With respect to *PIPEDA*, I am satisfied that personal information of employees will be protected. What the Manager needs is information such as by way of example, counterparty information where vehicles forming part of the inventory being turned over are subject to continuing leases. That is going to be necessary to effect the sale of such vehicles. The parties and the proposed Manager are well aware of their statutory obligations under *PIPEDA*.

[20]    Finally, extensive submissions were made about Schedule "B" to the Syndicate Collateral Management Order which is a list of vehicles covered by the scope of the order identified by, among other things, VIN. Issues have arisen because the parties, and in particular, the Syndicate Agent on the one hand and the Pride Entities, the CRO and the Monitor on the other hand, are not in agreement with respect to which specific vehicles should be included or excluded.

[21]    This is a function, in part, of the disarray of the books and records of the Pride Entities as described in previous Endorsements. There are issues arising what have been described as multiple collateral vehicles, or MCVs, in respect of which the same collateral appears to have been pledged to different lenders with the same or overlapping purported priority.

[22]    I am now advised that there are further issues where certain vehicles said by various Recourse Lenders to have been pledged to them as collateral for financing either cannot be located at all and do not appear as assets on the books and records of the Pride Entities, or were sold by the Pride Entities prior to the commencement of this *CCAA* Proceeding without the consent of the relevant Recourse Lender(s), and without any accounting for proceeds thereof. There are still other vehicles in respect of which investigations remain ongoing. No party yet has complete certainty with respect to the status or location of such vehicles. I make no determination today about what has occurred with respect to these issues, or what flows therefrom.

[23]    I pause to observe that various other Recourse Lenders advised the Court that they are facing the same issues as is the Syndicate Agent with respect to vehicles pledged to them.

[24]    Accordingly, I directed the parties, and particularly the Syndicate Agent on the one hand and the Pride Entities, the CRO and the Monitor on the other hand, who are already in discussions about finalizing Schedule "B", to attempt to reach agreement on the VINs to be included and provide me with a revised version of the draft order within two days. That has now been done, and the parties are in agreement that the order can issue with the current version of the Schedule "B".

[25]    However, and to be clear, investigations and therefore discussions with respect to various vehicles, remain ongoing. Accordingly, and as I advised the parties at the conclusion of the hearing of this motion, that Schedule "B" may be updated or amended by agreement among the Manager, the Monitor and the CRO, or by further order of the Court. Again, my objective is to ensure fairness and transparency, but to do so in a manner that minimizes transaction costs, professional fees, and the necessity to bring formal motions to this Court to deal with issues that can and should be sorted out among the Court officers.

[26]    In the same way, submissions were made by counsel for BMO about paragraph 11 of the proposed order. To be clear, if there are errors, and/or inadvertent inclusions or omissions of vehicles, the parties will sort those out and reconcile them, and if they are unable to do so, advice and directions can be sought from this Court.

[27]    The Applicants, with the support of the Monitor, proposed that an additional paragraph 7B added to deal with tax liability and CRA issues. This paragraph is appropriate and is to be added. The objective is to ensure that where the Manager or its agents sells a vehicle, reporting and remittance obligations to the CRA are fulfilled and accounted for.

[28]    For all of these reasons, I am satisfied that the proposed relief is appropriate and should be granted.

[29]    Orders to go in the form signed by me today which are effective immediately and without the necessity of issuing and entering.