## **Exhibit I**

Sale Approval Order

Court File No. CV-24-00717340-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

| THE HONOURABLE | ) | THURSDAY, THE 17TH |
|---|---|---|
| | ) | |
| JUSTICE OSBORNE | ) | DAY OF OCTOBER, 2024 |

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF PRIDE GROUP HOLDINGS INC. and those Applicants listed on **Schedule "A"** hereto (each, an "**Applicant**", and collectively, the "**Applicants**")

**SALE AGREEMENT & SALE APPROVAL ORDER**

THIS MOTION made by the Royal Bank of Canada in its capacity as administrative agent (the "**Administrative Agent**") for and on behalf of itself and the other lenders (the "**Syndicate Lenders**") party to the fourth amended and restated credit agreement dated as of May 10, 2024 among, *inter alios*, the Administrative Agent, the Syndicate Lenders and the Applicants and the limited partnerships listed in Schedule "A" hereto (collectively, the "**Pride Entities**" and, each, a "**Pride Entity**") for an Order (i) approving the Servicing Agreement between Integrated Financial Technologies Inc. (the "**Leasebook Servicer**") and Alvarez & Marsal Canada Inc. in its capacity as manager (in such capacity, the "**Manager**") dated August 16, 2024 (the "**Leasebook Servicer Agreement**") and the transactions contemplated thereby; (ii) approving the form of dealer and auctioneer agreements attached at Schedule "B" hereto (each, a "**Sale Agreement**") between the Manager and the dealer or auctioneer counterparties identified by the Manager from time to time (each, a "**Dealer**") and the transactions contemplated thereby; (iii) authorizing the Manager to enter into the Sale Agreements with such minor amendments as may be required by the Dealers identified by the Manager from time to time; (iv) confirming the Manager's authority to transfer

Sold Vehicles (as defined below) free and clear of any claims and (v) providing related relief, was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavits of Brad D. Newton sworn August 2, 2024 and October 16, 2024 and the Exhibits thereto and on hearing the submissions of counsel for the Syndicate Lenders, the Pride Entities, the Monitor and such other parties listed on the Participant Information Form, no one else appearing although duly served as appears from the affidavit of service of Julia Chung sworn October 16, 2024,

**SERVICE**

1.     THIS COURT ORDERS that the time for service of the Notice of Motion and the Motion is hereby abridged and validated so that this motion is properly returnable today and hereby dispenses with further service thereof

2.     THIS COURT ORDERS that capitalized terms used and not defined in this Order shall have the meaning given to them in the Second Amended and Restated Initial Order of this Court issued May 6, 2024 in these proceedings (the "**Initial Order**"), the Order (re Wind-Down, Liquidity Contribution Alternative and Turn-Over) of this Court issued October 10, 2024 in these proceedings (the "**Recourse Lender Turn-Over Order**"), or the Syndicate Collateral Management Order of this Court issued October 17, 2024 (the "**Syndicate Collateral Management Order**"), as applicable.

**LEASEBOOK SERVICER AND SALE AGREEMENTS**

3.     THIS COURT ORDERS that the Leasebook Servicer Agreement and the transactions contemplated thereunder are hereby approved, authorized and ratified *nunc pro tunc* with such minor amendments as the Manager and the Leasebook Servicer may agree to in writing. Subject to the provisions of the Recourse Lender Turn-Over Order and the Syndicate Collateral Management Order, the Manager is hereby authorized and directed to take any and all actions as may be necessary or desirable to implement the Leasebook Servicer Agreement and each of the transactions contemplated therein. Without limiting the forgoing, the Manager is authorized to execute any other agreement, contract, deed or any other document, or take any other action, that

- 3 -

could be required or be useful to give full and complete effect to the Leasebook Servicer Agreement.

4.        THIS COURT ORDERS that the Manager be and is hereby authorized to enter into one or more consignment or auction agreements with any Dealer or Dealers identified by the Manager, on substantively the same terms as those in the forms contained in Schedule "B" and in any case subject to such amendments, including amendments to the economic terms, as the Manager and any applicable Dealer may agree to in writing. Subject to the provisions of the Recourse Lender Turn-Over Order and the Syndicate Collateral Management Order, the Manager is hereby authorized and directed to take any and all actions as may be necessary or desirable to implement the Sale Agreements and each of the transactions contemplated therein. Without limiting the forgoing, the Manager is authorized to execute any other agreement, contract, deed or any other document, or take any other action, that could be required or be useful to give full and complete effect to the Sale Agreements.

5.        THIS COURT ORDERS that if required by a Dealer, the Manager is authorized to sign a bill of sale in the form attached hereto as Schedule "C" for any Management Property, notwithstanding that title documentation for such Management Property may not be available to the Manager or the Pride Entities.

**APPROVAL AND VESTING**

6.        THIS COURT ORDERS that, consistent with the Recourse Lender Turn-Over Order, upon the closing of any sale pursuant to a Sale Agreement, all of the Pride Entities' right, title and interest in and to the Sold Vehicle shall vest absolutely to the purchaser, free and clear of and from any and all Claims including, without limiting the generality of the foregoing, all Encumbrances including the charges created by any Order of this Court in the Pride Entities' CCAA proceedings, and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Sold Vehicle are hereby expunged and discharged as against such Sold Vehicle, provided however, for greater certainty, that the CCAA Charges shall continue to apply to any Recourse Lender's Net Proceeds remitted to the Monitor in accordance with the Recourse Lender Turn-Over Order, pending further Court order.

- 4 -

7.    THIS COURT ORDERS that for the purposes of determining the nature and priority of Encumbrances, the net proceeds from the sale of any Management Property (each a "**Sold Vehicle**", the proceeds of such sale being the "**Net Proceeds**") shall stand in the place and stead of the Sold Vehicle to which it related. All Encumbrances shall attach to the relevant Net Proceeds from such Sold Vehicle with the same priority as they had with respect to the Sold Vehicle immediately prior to the sale as if the Sold Vehicle had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

8.    THIS COURT ORDERS that, notwithstanding:

(a)    the pendency of these CCAA Proceedings;

(b)    any applications for a bankruptcy or receivership order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "**BIA**") in respect of the Pride Entities of the Management Property and any bankruptcy or receivership order issued pursuant to any such applications;

(c)    any assignment in bankruptcy made in respect of the Pride Entities; and

(d)    any provisions of any federal or provincial legislation;

the transactions contemplated by any Sale Agreement and the vesting of any Sold Vehicle in a purchaser pursuant to this Order (the "**Transactions**") shall be binding on any trustee in bankruptcy or receiver that may be appointed in respect of any Pride Entity and shall not be void or voidable by creditors of any Pride Entity, nor shall any of the Transactions constitute nor be deemed to be a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall any of the Transactions constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

**CANCELLATION OF SECURITY REGISTRATIONS**

9.     THIS COURT ORDERS that, upon the completion of the sale of any Sold Vehicles, the Manager and the relevant Dealer shall each be authorized to take all steps necessary to effect the discharge of all Encumbrances registered against such Sold Vehicle.

**PAYMENT OF PROCEEDS**

10.     THIS COURT ORDERS that, upon the completion of the sale of any Sold Vehicle, the relevant Dealer shall pay the Net Proceeds of such sale to the Manager in accordance with the applicable Sale Agreement.

11.     THIS COURT ORDERS that all Net Proceeds received by the Manager shall be dealt with in accordance with the Syndicate Collateral Management Order.

**GENERAL**

12.     THIS COURT ORDERS, without limiting the foregoing, that the CRO shall, as Foreign Representative, seek an order in form and substance satisfactory to the Manager in the proceedings pending in the United States under Chapter 15 of Title 11 of the United States Code in respect of the Pride Entities (the "**Chapter 15 Proceedings**") recognizing and giving effect to this Order, and such further relief in the Chapter 15 Proceedings as the Manager may reasonably request from time to time; provided the costs of seeking and obtaining an order in the Chapter 15 Proceedings as aforesaid shall be paid by the Manager.

13.     THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States to give effect to this Order and to assist the Manager and its agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Manager or the CRO, as foreign representative of the Pride Entities and an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Manager and its agents in carrying out the terms of this Order.

- 6 -

14.    THIS COURT ORDERS that the Manager be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Manager is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

15.    THIS COURT ORDERS that any interested party may apply to this Court to vary or amend this Order on not less than seven (7) days' notice to the Manager and to any other party likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

Digitally signed by Osborne J. Date: 2024.10.19 10:21:39 -04'00'

## SCHEDULE "A"

**A. APPLICANTS**

**Operating Entities**

*Canadian Operating Entities*

- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*

- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**

*Canadian Real Estate Holding Companies*

- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.

- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*

- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**

*Other Canadian Holding Companies*

- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.

- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*

- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

## B. LIMITED PARTNERSHIPS

*U.S. Limited Partnerships*

- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

## C. ADDITIONAL STAY PARTIES

*Canadian Additional Stay Parties*

- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*

- PERGOLA HOLDINGS, CORP.
- PRIDE GLOBAL INSURANCE COMPANY LTD.

**SCHEDULE "B"**
**FORM OF SALE AND AUCTIONEER AGREEMENTS**

## REMARKETING PROGRAM - DEALER AGREEMENT

**THIS AGREEMENT** made as of the [●] day of October, 2024.

**BETWEEN:**

[●] (the "**Dealer**")

- and -

**ALVAREZ & MARSAL CANADA INC.**, ("**A&M**") in its capacity as Court-appointed manager of certain of the assets, undertakings and properties of the Pride Entities (as defined below) acquired for, or used in relation to a business carried on by the Pride Entities, and not in its personal or corporate capacity (in such capacity, the "**Manager**").

**RECITALS:**

A.  **WHEREAS** on March 27, 2024, Pride Group Holdings Inc. and those entities listed in Schedule 1 hereto (collectively, the "**Applicants**") brought an application before the Ontario Superior Court of Justice (Commercial List) (the "**Court**") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") to, among other things, obtain a stay of proceedings to allow them an opportunity to restructure their business and affairs;

B.  **AND WHEREAS** the Royal Bank of Canada, in its capacity as administrative agent (the "**Administrative Agent**") for and on behalf of itself and the other lenders (the "**Syndicate Lenders**"), is a party to the Fourth Amended and Restated Credit Agreement dated as of May 10, 2024 among, *inter alia*, the Administrative Agent, the Syndicate Lenders and the Applicants and the limited partnerships listed in Schedule 1 hereto (collectively, the "**Pride Entities**");

C.  **AND WHEREAS** the Administrative Agent has a valid and enforceable security interest in, among other collateral, vehicles, trailers and equipment and related certificates of title owned by one or more Pride Entities (the "**Vehicles**");

D.  **AND WHEREAS** the Administrative Agent has brought a motion in the Pride Entities' CCAA proceeding for the Court to appoint A&M as Manager over certain assets, undertakings and properties of the Pride Entities, including all proceeds thereof, which includes, without limitation, the Vehicles, in accordance with the terms of a syndicate collateral management order (the "**Syndicate Collateral Management Order**");

E.    **AND WHEREAS** the Syndicate Collateral Management Order authorizes the Manager, to, among other things: (i) take possession of and exercise control over, among other collateral, the Vehicles, and any and all proceeds, receipts and disbursements arising out of or from the Vehicles; (ii) engage, among others, consignees to assist with the exercise of the Manager's powers and duties in respect of, among other collateral, the Vehicles; and (iii) market any or all of the Vehicles, including advertising and soliciting offers in respect of the Vehicles or any part or parts thereof and negotiating such terms and conditions of sale as the Manager in its discretion may deem appropriate;

F.    **AND WHEREAS** this Agreement outlines the terms and conditions under which the Dealer shall participate in the remarketing of Vehicles on behalf of the Manager in accordance with the terms of the Syndicate Collateral Management Order and an order approving this agreement (the "**Sale Approval Order**") to be sought following the issuance of the Syndicate Collateral Management Order.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

**ARTICLE 1**
**CONSIGNMENT**

1.1    Subject only to the issuance of the Sale Approval Order, the Manager will notify the Dealer from time to time that it has selected the Dealer to sell, on a consignment basis, one or more Vehicles designated by the Manager, in its sole discretion, to the Dealer's customers in accordance with the terms of this Agreement. During the term of this Agreement, the Manager will designate such quantities of Vehicles as it determines appropriate, in its sole discretion, for remarketing by the Dealer in accordance with the terms of this Agreement by providing one or more notices to the Dealer at such times as the Manager determines appropriate, which notices shall identify the Vehicle(s) to be remarketed. Within a reasonable period of time, and in any event not less than five (5) business days from receiving the aforementioned notice(s), the Dealer will attend at a location designated by the Manager to retrieve the Vehicle(s) and to transport the Vehicle(s) to the Dealer's premises (the "**Premises**").

1.2    The Dealer agrees that title to the Vehicles shall remain with the Pride Entities, subject to the terms of the Syndicate Collateral Management Order and Sale Approval Order, and that the Pride Entities will remain the owners of the Vehicles until a sale to the Dealer in accordance with the terms hereof.

1.3    Notwithstanding anything elsewhere in this Agreement, express or implied, the Dealer agrees with the Manager that (a) the Vehicles being stored at the Premises are not and will not comprise inventory or other property of the Dealer, (b) until the execution of the Manager Sale Agreement contemplated in Section 9.2(g) (if any), the Dealer has no ownership right, title, benefit or interest in the Vehicles, and (c) the only rights that the

Dealer has in and to the Vehicles is the right derived hereunder to transfer ownership of the Vehicles to its customers, subject to and upon the terms and conditions hereof.

1.4     The Dealer shall protect the Vehicles stored on the Premises from loss or damage using the same degree of care that the Dealer uses to protect its own products and inventory, but in no event less than a commercially reasonable degree of care.

1.5     The Dealer shall keep the Vehicles free and clear of all Encumbrances (as defined in the Syndicate Collateral Management Order), including but not limited to Encumbrances by landlords or secured creditors, *provided, however,* that any Encumbrances that exist prior to the delivery of the Vehicle to the Dealer shall be discharged as against such Vehicle, immediately prior to the closing of any sale of such Vehicle pursuant to the Sale Approval Order. The Dealer shall indemnify and hold harmless the Manager from and against any loss or damage caused by acts of the Dealer which result in any such Encumbrances being placed upon any Vehicles, including all costs, fees, and expenses incurred by the Manager in commencing or participating in such action or proceedings as are necessary for the Manager to defend its interest in the Vehicles.

1.6     The Dealer agrees that the Manager or the Administrative Agent, as applicable, may file any financing statement or other security filing against the Dealer to give notice to third parties of the existence of this Agreement.

1.7     The Manager acknowledges and agrees that, upon notifying the Dealer that it has been selected to sell, on a consignment basis, one or more Vehicles designated by the Manager in accordance with the terms of this Agreement, the Dealer shall have the exclusive right to remarket the Vehicle until the earlier of: (i) the expiry of the Remarketing Period; or (ii) termination of this Agreement in accordance with Article 12.

1.8     If the Manager wishes to withdraw and retake possession of a Vehicle, for any reason, prior to the expiry of the Remarketing Period, the Manager shall deliver a written request for withdrawal of the Vehicle to the Dealer (the "**Withdrawal Request**"). Upon receipt of a Withdrawal Request, Dealer shall promptly cease all repair work on the Vehicle and shall provide the Manager with an invoice stating any amount owing to Dealer by the Manager in respect of the Vehicle which includes, without limitation, repair costs (if any), and all other costs owed by the Manager to the Dealer under this Agreement. The Manager acknowledges and agrees that Dealer shall maintain possession of the Vehicle until any and all amounts owing to Dealer under this Agreement are paid in full by the Manager. Upon full payment of all such amounts owing to Dealer, and shall release possession of the Vehicle to the Manager. Transport costs incurred by the Dealer to return a Vehicle to the Manager pursuant to a Withdrawal Request shall be borne by the Manager.  A Withdrawal Request shall not be binding upon Dealer, and shall be of no force and effect, if at the date and time Dealer receives the Withdrawal Request, Dealer

has already agreed to sell the Vehicle to a third party purchaser, regardless of whether title has yet to transfer.

## ARTICLE 2
## "AS IS, WHERE IS"

2.1     The Dealer acknowledges that the Manager is delivering the Vehicles on an "as is, where is" basis as they will exist on the date of delivery. No representation, warranty or condition is expressed or can be implied as to title, Encumbrances, description, fitness for purpose, merchantability, condition, quantity or quality or in respect of any other matter or thing whatsoever concerning the Vehicles or the right of the Manager to sell or assign same.

2.2     Without limiting the generality of the foregoing, any and all conditions, warranties or representations expressed or implied pursuant to the *Sale of Goods Act* (Ontario), *Consumer Protection Act* (Ontario) or similar legislation do not apply hereto and have been waived by the Dealer. Any description of the Vehicles contained herein or that may otherwise be provided to the Dealer is for the purpose of identification only. No representation, warranty or condition has or will be given by the Manager concerning the completeness or accuracy of such descriptions.

## ARTICLE 3
## VEHICLE TRANSPORTATION & STORAGE

3.1.1     Upon receiving a notice described above at Section 1.1, the Dealer will attend at a location designated by the Manager to retrieve the Vehicles(s) and transport them to the Premises.

3.1.2     The Dealer agrees to store the Vehicles at no cost to the Manager.

3.1.3     The cost of pick-up of the Vehicles shall be borne by the Dealer (the "**Transport Fees**").

3.1.4     The Dealer shall designate an employee to act as the primary liaison/coordinator between the Dealer and the Manager and shall notify the Manager promptly if the designated employee is replaced.

3.1.5     The Manager shall have the right, at reasonable times and after reasonable notice to the Dealer, to enter the Premises to inspect or otherwise protect the Manager's interest in the Vehicles and its rights hereunder.

## ARTICLE 4
## CONDITION REPORT

4.1     Within four (4) business days following the arrival date of the applicable Vehicle at the Dealer's Premises, the Dealer shall: a) conduct an initial inspection of each Vehicle's condition and specifications; b) create a condition report (including pictures) that includes a recommendation as to whether the particular vehicle should be: i) sold through

retail channels, or ii) sold through wholesale channels (the "**Condition Report**"), and c) forward the Condition Report to the Manager by email.

## ARTICLE 5
## RECONDITIONING PROPOSAL

5.1.1   The Dealer will prepare an estimate within 15 days of the arrival of a Vehicle to the Dealer's Premises of the cost, effort and time required to repair and recondition the Vehicle ("**Reconditioning Proposal**"), which shall include:

(a)   a recommendation to the Manager with respect to reconditioning a Vehicle which could reasonably be anticipated to increase the value of the Vehicle, thereby maximizing net sales proceeds of the Vehicle (which typically includes only reconditioning which either substantially enhances the Vehicle's physical appearance/visual appeal or is otherwise necessary to meet provincial safety standards or other legal requirements);

(b)   the estimated value of the Vehicle upon completion of the proposed reconditioning (which shall be the proposed Minimum Selling Price (as defined below)), which may take into account a reasonable amount of time to complete a sale at such price; and

(c)   any applicable supporting documents if requested by the Manager.

5.1.2   The Dealer will not proceed with any work to the Vehicle unless such work was specifically pre-authorized by the Manager.

## ARTICLE 6
## REMARKETING AUTHORIZATION

6.1   The Manager may, in its sole discretion, limit the amount of reconditioning to be performed on a Vehicle and determine a minimum selling price (the "**Minimum Selling Price**") for the Vehicle. For greater certainty, the Minimum Selling Price shall be exclusive of any applicable goods and services, harmonized sales, provincial sales, retail sales, use, consumption, personal property, customs, excise, stamp, transfer, value added, registration, and other such similar taxes, duties or charges in connection with this Agreement, including, for greater certainty, the goods and services tax/harmonized sales tax ("**GST/HST**") exigible pursuant to Part IX of the *Excise Tax Act* (Canada) (collectively, "**Sales Taxes**").

6.2     The Manager will provide to the Dealer a remarketing authorization (the "**Remarketing Authorization**") including (a) approved reconditioning expense budget, and (b) Minimum Selling Price.

6.3     Notwithstanding the Minimum Selling Price, the Dealer agrees to attempt to obtain the best possible selling price in accordance with prevailing market conditions.

## ARTICLE 7
## REPAIRS AND RECONDITIONING

7.1     Upon receiving the Remarketing Authorization, the Dealer will then facilitate and perform the repair and reconditioning of the Vehicle as specified in the Remarketing Authorization. The Manager will pay all approved reconditioning expenses on a contra basis (i.e. against the proceeds of sale) wherever possible.

7.2     The Dealer agrees that the reconditioning costs associated with any Vehicle shall not exceed the amount authorized in the Remarketing Authorization by more than 10%. If additional or unexpected issues arise, the Dealer agrees to contact the Manager for review and approval of any such costs. Any additional expenses incurred by the Dealer that were not authorized in the Remarketing Authorization will be the responsibility of the Dealer unless such expenses were pre-approved in writing by the Manager

7.3     In the event the Manager has approved reconditioning expenses in respect of a Vehicle and such Vehicle is not sold by the Dealer hereunder, upon the earlier of the return of the Vehicle or the termination of this Agreement, the Dealer shall be entitled to invoice the Manager for such repairs.

## ARTICLE 8
## MARKETING AND OFFER CONSIDERATION

8.1     Following receipt of the Remarketing Authorization and repairs being underway or complete, the Dealer shall begin to remarket the Vehicle in the same manner as their own used truck inventory (e.g. online classifieds, website, etc.). Unless the Agreement is terminated in accordance with Article 12 or a Vehicle is withdrawn pursuant to Section 1.8, the Dealer is entitled to remarket each Vehicle exclusively for a period of one hundred and eighty (180) days from the date the Manager issued the Remarketing Authorization, with the option to extend for additional sixty (60) day periods, in the Manager's sole discretion (the "**Remarketing Period**").

8.2     At the end of the Remarketing Period, the Manager may, in its sole discretion, determine whether or not to change the remarketing strategy which could result in the relocation of the Vehicle to another dealer, jurisdiction, remarketing centre or auction. On the Manager's demand for the return of any Vehicles delivered under this Agreement and not sold by the Dealer, the Dealer shall promptly return such Vehicle in accordance with the

Manager's reasonable instructions, at the Manager's cost. In addition, the Dealer may return any Vehicles that are not sold to customers at the end of the Remarketing Period.

8.3    The Dealer is permitted to finalize and accept, in their sole discretion, any offer to purchase a Vehicle which meets all of the following criteria:

(a)    the selling price meets or exceeds the Minimum Selling Price;

(b)    the reconditioning expenses do not exceed the values authorized by the Manager; and

(c)    the Dealer believes in good faith that the offer and its conditions reasonably reflects the prevailing market value of the Vehicle.

If, however, any of the above criteria have not been met and the Dealer still feels the offer should be considered by the Manager, the Dealer shall present the offer to the Manager via email. The Manager agrees to respond to such requests via e-mail within two business days.

8.4    The Dealer agrees:

(a)    that Vehicles will only be sold to arm's-length purchasers, unless otherwise agreed to in writing by the Manager; and

(b)    that the Manager may, without notice, and from time to time, complete an audit of its inventory of Vehicles and review during these audits any documents related to the Vehicle and/or reconditioning work, including without limitation vehicle purchase agreements/bills of sale and invoices for completed work. Furthermore, the Dealer agrees to provide the Manager with all information regarding the Vehicles upon reasonable request by the Manager.

## ARTICLE 9
## PRE-DELIVERY RECONCILIATION AND COMMISSION

9.1    No less than two (2) business days prior to the closing of a sale to the Dealer's customer, or such other period as the parties may agree upon, the Dealer must submit the following documents to the Manager for review:

(a)    Customer Agreement - True copy of the final vehicle purchase agreement/bill of sale to be signed by the purchaser;

(b)    Repair Invoice – Invoice billed to the Manager for the authorized reconditioning and repairs, to the extent it has not already been delivered;

(c)    Commission Invoice – Invoice billed to the Manager for the Dealer's commission contemplated below in Section 9.2;

(d)     Backup - supporting documentation of the authorized reconditioning and repairs to verify work completed;

(e)     Copy of the applicable jurisdictional safety certificate; and

(f)     Manager Agreement – copy of the vehicle purchase agreement/bill of sale to be signed by the Manager to transfer title of the Vehicle to the Dealer, in the form attached hereto as Schedule 2. The purchase price in the Vehicle purchase agreement will show the final selling price to the Dealer (which will paid in accordance Section 10.3) (the "**Manager Sale Agreement**").

(collectively, the "**Reconciliation Documents**").

9.2     The Dealer's commission with respect to the sale of a Vehicle through retail channels is calculated at 7 percent of the sale price of the Vehicle (exclusive of Sales Taxes), less approved reconditioning expenses. For example, if the Vehicle was sold through retail channels for $120,000 after incurring $10,000 in authorized reconditioning expenses, then the Dealer's commission would be 7% x (120,000 - $10,000) = 7,700.

9.3     The Dealer's commission with respect to the sale of a Vehicle through wholesale channels shall be $500 per Vehicle.

9.4     The Manager shall pay the Dealer's commission from the Proceeds pursuant to Section 10.3 below.

9.5     The Manager shall be entitled to deduct and withhold from any consideration or other amount payable or otherwise deliverable to the Dealer such amounts as the Manager may be required to deduct and withhold therefrom under any provision of applicable laws in respect of taxes. To the extent that such amounts are so deducted, withheld and remitted to the appropriate governmental entity, such amounts shall be treated for all purposes under this Agreement as having been paid to the person to whom such amounts would otherwise have been paid.

9.6     Except as provided in this Agreement, the Dealer shall be responsible for all costs expenses necessary with respect to the remarketing of the Vehicle unless otherwise agreed by the Manager.

9.7     The Dealer shall conduct all of its business relating to the processing of the Vehicles in the Dealer's name and at the Dealer's cost and expense, and nothing herein shall authorize or empower the Dealer to assume or create any obligation or responsibility whatsoever, express or implied, on behalf or in the name of the Manager, or to bind the Manager in any manner, or to make any representation, warranty, or commitment on

behalf of the Manager, this Agreement being limited solely to the consignment of the Vehicles.

## ARTICLE 10
## PAYMENT AND CLOSURE OF SALE

10.1    Upon receipt of the Reconciliation Documents, in form and substance satisfactory to the Manager, in its sole discretion, the Manager shall execute the Manager Sale Agreement and return it to the Dealer.

10.2    Upon receipt of the Manager Sale Agreement from the Manager, the Dealer shall close the sale of the Vehicle to its customer and deliver to the Manager: (a) a copy of the fully executed Customer Agreement; and (b) the Manager Proceeds (as defined below) in accordance with Section 10.3.

10.3    Notwithstanding anything else in this Agreement, express or implied, upon the sale of a Vehicle from the Dealer to its customer, the Dealer shall wire the sale proceeds from the sale of the Vehicle, including any applicable Sales Taxes payable on such sale proceeds (the "**Proceeds**"), directly to a bank account designated by the Manager and provided to the Dealer, provided that the Dealer shall be entitled to deduct from the Proceeds and retain, any amount owing to the Dealer pursuant to Sections 9.1(b) and 9.1(c), including applicable Sales Taxes payable thereon (the amount wired to the Manager net of such deduction, the "**Manager Proceeds**").

10.4    Upon receipt of the Manager Proceeds, the Manager shall deliver title to the Vehicle to the Dealer and the Dealer shall deliver title to the Vehicle to its customer. The closing of the sale of the Vehicle from the Manager to the Dealer, and from the Dealer to its customer, shall occur concurrently.

10.5    Notwithstanding anything to the contrary in this Agreement:

(a)    all amounts payable by a Party under this Agreement are exclusive of any applicable Sales Taxes which shall be paid by that Party in addition to such amounts;

(b)    all Sales Taxes payable by any Party under this Agreement shall be collected by the relevant Party, who shall remit such Sales Tax directly to the applicable governmental authority in accordance with applicable law;

(c)    notwithstanding any other provision of this Agreement, in the event that, as a result of a breach, modification or termination of this Agreement at any time, an amount is to be paid or forfeited (otherwise than as consideration for a supply under this Agreement) by a particular Party, or a debt or other obligation is to be reduced or extinguished without payment by the Party on account of the debt or obligation and section 182 of the *Excise Tax Act* (Canada), or any Sales Tax legislation applies to the amount to be paid, forfeited, reduced or extinguished, as the case may be, the amount shall be increased to equal the quotient of the amount otherwise paid, forfeited or extinguished, or the amount by which the debt or

obligation was reduced, as the case may be, divided by the difference between 100% and the aggregate percentage rate of the GST/HST and any other applicable Sales Tax;

(d)     the Parties agree that, as between the Dealer and the Manager, the Dealer shall be solely liable for, and as a separate and independent covenant, the Dealer shall indemnify, defend and save harmless the Manager from any Sales tax, or any penalty, interest or other amounts with respect thereto, which may be payable by or assessed against the Manager under the *Excise Tax Act* (Canada) or other Sales Tax legislation in respect of any supplies made by the Manager to the Dealer hereunder (including any costs incurred by the Manager in collecting such amount from the Dealer). The indemnity in this Article 10.5(d) shall not apply to Sales Tax that is paid by the Dealer to the Manager in accordance with invoices delivered by the Manager to the Dealer under this Agreement but is not remitted by the Manager to the applicable governmental authority in accordance with applicable law, or to any penalty, interest or other amounts with respect thereto;

(e)     the Dealer shall be responsible for, and shall, collect, report and remit any Sales Taxes payable in respect of the supply of the Vehicle from the Dealer to the customer, if applicable; and

(f)     to the extent that a Sales Tax exemption, election or other relief is available to either party with respect to a transaction or payment contemplated in this Agreement that relieves one party from the payment of Sales Taxes (a "**Sales Tax Exemption**"), the party claiming the Sales Tax Exemption shall deliver to the other party a certificate of exemption or such other document as required under applicable laws and take such steps as may be provided for under applicable laws to obtain the Sales Tax Exemption.

10.6    Pursuant to the Sale Approval Order, the Dealer will take the Vehicle free and clear of Encumbrances of any and every kind whatsoever; provided that all Encumbrances of which the Vehicle is sold free and clear shall attach to the Manager Proceeds of the applicable sale.   For the avoidance of doubt, the Manager and the Administrative Agent, as applicable, agree to discharge any Encumbrances in favour of the Manager or the Administrative Agent that are registered against such Vehicle; provided further, however, that prior to entry of the Sale Approval Order, the Manager may transfer Vehicles to the Dealer pursuant to the Syndicate Collateral Management Order and subject to any limitations set out therein.

10.7    The Dealer is responsible for all credit risks regarding, and for collecting payment for, all Vehicles sold by the Dealer to each customer. After execution of the Manager Sale Agreement, the inability of the Dealer to close the sale of a Vehicle with a customer or to collect payment from a customer, for any reason, shall not affect the Dealer's obligation to pay the Manager for any Vehicles sold by the Manager to the Dealer, unless the

Dealer's inability to close the sale results from a breach of this Agreement by the Manager.

10.8    Notwithstanding anything herein to the contrary, the Manager agrees that the Dealer may rescind a sale of a Vehicle for any reason subsequent to notifying the Manager of the sale but prior to completion of the sale.

## ARTICLE 11
## PERMITTED USE AND INSURANCE

11.1    Except for the display of the Vehicles for sale at the Dealer's Premises, temporarily relocating the Vehicles to external vendors for approved reconditioning, and for the temporary test driving of the Vehicles by prospective purchasers, the Vehicles may not be used, rented, or lent for any purpose whatsoever. In addition, an employee of the Dealer must accompany any prospective purchaser during the temporary test driving of any Vehicle.

11.2    Subject to Section 1.4, the Manager shall bear all risk of loss to the Vehicles at all times, including, without limitation, while the Vehicles are in the care, custody or control of Dealer, or in transit to and from Dealer's premises. The Manager shall maintain, at its sole expense, insurance on the Vehicles for the full replacement value against any and all loss, damage, theft, injury, disappearance or destruction by any cause whatsoever, which insurance shall cover a waiver of subrogation in favour of Dealer.

## ARTICLE 12
## TERMINATION

12.1    This Agreement may be terminated by either party for any reason upon sixty (60) days' notice in writing to the other party, *provided however*, that if the Sale Approval Order is sought by the Manager and not granted by the Court, or the Manager determines, in its sole discretion, not to seek Court approval of the Sale Approval Order, either party may terminate this Agreement effective upon written notice to the other party.

12.2    This Agreement shall automatically terminate forthwith and without prior notice to the Dealer if the Dealer: (i) becomes insolvent, fails to pay its debts generally as they become due or otherwise acknowledges its insolvency, seeks creditor protection under any insolvency laws or corporate arrangement statutes, or upon the appointment of a trustee, receiver or receiver/manager of the business or assets of the Dealer, or the seizure of any of the assets of the Dealer by or on behalf of any creditor of the Dealer; or (ii) the Dealer is in breach of any terms of this Agreement and has failed to rectify the breach within 15 days notice from the Manager.

12.3    This Agreement shall automatically terminate forthwith and without prior notice to the Manager if: (i) the Manager is in breach of any terms of this Agreement, and has failed to

rectify the breach within 15 days notice from the Dealer; or (ii) a court orders cancellation of this Agreement.

12.4    The Vehicles remaining unsold at the termination of the Agreement shall be returned to the Manager within a reasonable period of time to a reasonable location designated by the Manager. In the case of termination under Section 12.1, the cost of returning the Vehicles to the Manager shall be borne by the party that terminated the Agreement. In the case of termination under Section 12.2, the cost of returning the Vehicles to the Manager shall be borne by the Dealer and the Dealer shall not be entitled to charge Transport Fees. In the case of termination under Section 12.3, the cost of returning the Vehicles to the Manager shall be borne by the Manager and the Dealer shall be entitled to charge the Manager the Transport Fees.

### ARTICLE 13
### REPRESENTATIONS AND WARRANTIES

13.1    Dealer represents and warrants to the Manager that:

(a)    it is a corporation duly incorporated and validly existing in the jurisdiction of its incorporation;

(b)    it is duly licensed or registered to carry on business in every jurisdiction in which such license or registration is required for purposes of this Agreement;

(c)    it has the right, corporate power, and capacity to enter into this Agreement, and to perform its obligations under this Agreement;

(d)    the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action of the Dealer;

(e)    this Agreement will constitute a legal, valid, and binding obligation of the Dealer, enforceable against the Dealer in accordance with its terms, except as may be limited by any applicable bankruptcy, insolvency, reorganization, arrangement, moratorium, or similar laws related to or affecting creditors' rights generally or the effect of general principles of equity;

(f)    it is in compliance with all applicable laws relating to this Agreement and the operation of its business;

(g)    it is not insolvent and is paying all of its debts as they become due;

(h)    all financial information that it has provided to the Manager is true and accurate and fairly represents the Dealer's financial condition;

(i)    it is and will continue to be registered for GST/HST purposes under Subdivision (d) of Division V of Part IX of the *Excise Tax Act* (Canada), as amended from time to time, and its GST/HST registration number is [●]; and

(j)    it is not a non-resident of Canada for purposes of the *Income Tax Act* (Canada).

## ARTICLE 14
## LIMITATION OF LIABILITY OF MANAGER

14.1    Except to the extent finally determined by a court of competent jurisdiction to have resulted from its own wilful misconduct, negligence or fraudulent behaviour or a breach of this Agreement, including the obligations to deliver title upon a sale or pay any sums to Dealer owing hereunder, in no event shall A&M have any liability relating to this Agreement to the Dealer, and its respective successors and assigns. In no event shall A&M's affiliates and A&M's and its affiliates' respective members, managers, shareholders, representatives, agents, independent contractors or employees, be liable to the Dealer, or any other party as a result of the execution and delivery of this Agreement or the provision of any services hereunder, or other matters relating to or arising from this Agreement, whether a claim be in tort, contract or otherwise, unless caused by wilful misconduct, negligence or fraudulent behaviour.

## ARTICLE 15
## GENERAL

15.1    This Agreement shall be governed by and construed in accordance with the laws of the province of Ontario and the laws of Canada as applicable therein.

15.2    All statements and references to "$" or "dollars" are references to the lawful money of Canada, unless specifically stated otherwise.

15.3    The Dealer is obliged to adhere to all laws and regulations applicable to both the Dealer and the Dealer's commercial relationship with the Manager. For further clarity, within the framework of Dealer's commercial dealings with the Manager, the Dealer is obliged to desist from all practices which may lead to penal liability due to fraud or embezzlement, insolvency crimes, crimes in violation of competition, guaranteeing advantages, bribery, acceptance of bribes or other corruption crimes on the part of the Dealer, persons employed by the Dealer or other third parties. In the event of violation of the above specifically cited breaches, the Manager has the right to immediately terminate this Agreement.

15.4    This Agreement contains the entire understanding of, and supersedes all prior or contemporaneous agreements not specifically referred to herein among, the parties with respect to the subject matter hereof. No modification, amendment, or waiver of any provision of, or consent required by, this Agreement, nor any consent to any departure herefrom, shall be effective unless it is in writing and signed by authorized officers of the parties hereto. Such modification, amendment, waiver, or consent shall be effective only in the specific instance and for the purpose for which given.

15.5    All notices, requests, demands, or other communications given hereunder shall be in writing and shall be deemed to have been duly given when delivered personally or when delivered by email or courier to the parties at their addresses set forth below or to such other addresses as the parties may designate by written notice to the other parties in

accordance with this section. If such notice, demand, or other communication is served personally or by email, it shall be conclusively deemed made at the time of such service. If such notice, demand, or other communication is given by courier, it shall be conclusively deemed given seventy-two (72) hours after the date such notice was sent to the parties to whom such notice, demand, or other communication is to be given.

> If such notice is delivered to Manager:
>
> Alvarez & Marsal Canada Inc.
> Royal Bank Plaza, South Tower
> Suite 3501, P.O. Box 22
> Toronto, Ontario
> M5J 1K8
> Attention: Douglas R. McIntosh, Managing Director
> Email: dmcintosh@alvarezandmarsal.com
>
> If such notice is delivered to the Dealer:
>
> 

15.6 The Dealer shall not assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the Manager, which consent shall not be unreasonably withheld. Any purported assignment or delegation in violation of this Section 15.6 is null and void. No permitted assignment or delegation relieves the Dealer of any of its obligations under this Agreement. The Manager may assign any of its rights or delegate any of its obligations without the consent of the Dealer.

15.7 Notwithstanding anything to the contrary contained in this Agreement, if either Party is bona fide delayed or hindered in or prevented from the performance of an obligation under this Agreement by reason of Force Majeure, then performance of the obligation is excused for the period of the delay and the party so delayed shall be entitled to perform such obligation within the appropriate time period after the expiration of the period of such delay.  For the purposes of this section, "Force Majeure" means any event beyond the reasonable control, and without the fault or negligence, of the Party claiming inability to perform its obligations and which such Party is unable to prevent by the exercise of reasonable diligence, including, without limitation, the combined action of workers, strikes, labour difficulty (whether or not involving employees of the party concerned), embargoes, fire, acts of terrorism, explosions and other catastrophes, casualties, a moratorium on construction, delays in transportation, governmental delays in granting permits or approvals, changes in laws, expropriation or condemnation of property, governmental actions, unavailability or shortages of materials, national emergency, war, pandemic declaration, civil disturbance, floods, unusually severe weather conditions or other acts of God or public enemy.  Inability to pay or financial hardship, however, shall not constitute Force Majeure regardless of the cause thereof and whether the reason is

outside a Party's control. Nothing herein shall excuse the Dealer or Manager from the prompt payment of any sum due hereunder.

15.8    This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original agreement and all of which shall constitute one agreement. All counterparts shall be construed together and shall constitute one and the same agreement. This Agreement, to the extent signed and delivered by means of electronic transmission (including, without limitation, facsimile and PDF transmissions), shall be treated in all manner and respects as an original agreement and should be considered to have the same binding legal effect as if it were the original signed version thereof personally delivered.

15.9    Each of the parties hereto shall, upon the reasonable written request of any other party, execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of its duties and obligations hereunder and to carry out the intent of the parties hereto.

15.10    The parties to this Agreement confirm that it is their express wish that this Agreement be drawn up in the English language only. Les parties aux presentes confirment que c'est leur volonte expresse que le present contrat soient rediges en anglais seulement.

*(Signature page to follow)*

By execution hereof, the Dealer signifies its agreement to be bound by the terms and conditions outlined above.

**ALVAREZ & MARSAL CANADA INC.,** solely in its capacity as Court-appointed manager of certain of the assets, undertakings and properties of the Pride Entities, and not in its personal or corporate capacity

Per:_____
Name:
Title:

Per:_____
Name:
Title:

**[●]**

Per:_____
Name:
Title:

*I have authority to bind the corporation*

**SCHEDULE 1**
**PRIDE ENTITIES**

### A. APPLICANTS

**Operating Entities**

*Canadian Operating Entities*

- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*

- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**

*Canadian Real Estate Holding Companies*

- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.

- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*

- PGED HOLDING, CORP.
- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**

*Other Canadian Holding Companies*

- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.

- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*

- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

## B. LIMITED PARTNERSHIPS

*U.S. Limited Partnerships*

- PRIDE TRUCK SALES L.P.
- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

## C. ADDITIONAL STAY PARTIES

*Canadian Additional Stay Parties*

- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*

- PERGOLA HOLDINGS, CORP.
- PRIDE GLOBAL INSURANCE COMPANY LTD.

**SCHEDULE 2**
**FORM OF BILL OF SALE**

**THIS BILL OF SALE** is made as of [●], 202[●].

|  |  |
|---|---|
| **AMONG:** | **ALVAREZ & MARSAL CANADA INC.,** solely in its capacity as Court-appointed manager of certain of the assets, undertakings and properties of the Pride Entities, and not in its personal or corporate capacity (the "**Transferor**") |
| **AND:** | [●](the "**Transferee**") |

**WHEREAS** the Transferor and Transferee entered into a remarketing program – dealer agreement dated October [●], 2024 (the "**Remarketing Agreement**"), pursuant to which the Transferee agreed to remarket the vehicle or vehicles identified on Schedule "A" hereto (the "**Vehicles**") with effect as of the date set out above;

**WHEREAS** the Transferee has entered into a binding agreement of purchase and sale with a third party purchaser (the "**Purchaser**") with respect to the Vehicles;

**WHEREAS** in order for title to the Vehicles to be transferred to the Purchaser, the Transferor wishes to sell, assign, transfer, convey and deliver the Vehicles to the Transferee, and the Transferee wishes to purchase, acquire and accept the transfer and conveyance of the Vehicles;

**NOW THEREFORE THIS BILL OF SALE WITNESSES THAT**, in consideration of the premises and mutual agreements contained herein, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each party):

1. This Bill of Sale is made pursuant to and subject to the provisions of the Remarketing Agreement and, in the event of any conflict or inconsistency between the terms and conditions of the Remarketing Agreement and the terms and conditions hereof, the terms and conditions of the Remarketing Agreement shall prevail.

2. The representations, warranties, terms, conditions, covenants, limitations and indemnities relating to the Vehicles in the Remarketing Agreement apply to this Bill of Sale, *mutatis mutandis*.

3. The Transferor hereby sells, assigns, transfers, conveys and delivers to the Transferee, and the Transferee purchases, acquires and accepts from the Transferor, all of the Transferor's rights, titles and interests in and to each of the Vehicles, free and clear of all encumbrances.

4. Each of the parties shall, from time to time, execute and deliver such further documents, transfers, assignments, assurances and instruments and do such further acts and things as may be reasonably required for the better carrying out of the provisions and intent of this Bill of Sale, including, without limitation, executing and delivering separate assignments and/or transfer documents (including vehicle transfer/tax forms, if applicable) of the Vehicles which are required as a condition of consent or approval in connection with the sale, conveyance or assignment of any of the Vehicles to the Transferee.

5.  This Bill of Sale will enure to the benefit of and be binding upon the heirs, executors, administrators, successors and permitted assigns, as the case may be, of each of the Parties hereto.

6.  This Bill of Sale shall be governed by and interpreted and enforced in accordance with the Laws of the Province of Ontario and the federal Laws of Canada applicable therein.

7.  This Bill of Sale may be executed in counterparts, each of which so executed shall be deemed to be an original and such counterparts together shall constitute one and the same agreement. An executed copy of this Bill of Sale by email (in "pdf" format) shall be considered valid, binding and effective upon the undersigned.

*[Signature page follows]*

**IN WITNESS WHEREOF,** the Parties hereto have executed this Bill of Sale with effect as of the date first above written.

**TRANSFEROR**                **ALVAREZ & MARSAL CANADA INC.,** solely in its capacity as Court-appointed manager of certain of the assets, undertakings and properties of the Pride Entities, and not in its personal or corporate capacity

By: _____

Name: [●]

Title: Authorized Signatory

**TRANSFEREE**                [●]

By: _____

Name: [●]

Title: Authorized Signatory

SCHEDULE A

| Year | Make | Model | VIN | Licence Plate Number |
|------|------|-------|-----|----------------------|
|      |      |       |     |                      |
|      |      |       |     |                      |
|      |      |       |     |                      |
|      |      |       |     |                      |
|      |      |       |     |                      |

Draft 10/15/2024

## SALE & AUCTION AGREEMENT

This Sale and Auction Agreement, dated as of _____, 2024 (together with any Schedules, Exhibits and attachments hereto, collectively, the "**Agreement**"), is made by and between [●] (the "**Consultant**") and Alvarez & Marsal Canada Inc. solely in its capacity as collateral manager (the "**Collateral Manager**") appointed by the Ontario Superior Court of Justice (Ontario) (the "**CCAA Court**") in the *Companies' Creditors Arrangement Act* proceedings (the "**CCAA Proceedings**") of Pride Group Holdings Inc. and those entities and limited partnerships listed in **Exhibit A** hereto (collectively the "**Pride Entities**").

### WITNESSETH:

**WHEREAS**, the Pride Entities formerly operated a truck and trailer dealership and is in the process of winding-down its dealership operations in the CCAA Proceedings;

**WHEREAS**, the Collateral Manager was appointed by the CCAA Court with the power to realize upon certain of the Pride Entities' property in which a syndicate of lenders represented by Royal Bank of Canada as administrative agent hold or assert a security interest, which collateral includes those trucks, trailers and other property identified in **Exhibit B** (such trucks, trailers and other property are hereinafter referred to as the "**Assets**") pursuant to an order of the CCAA Court dated October [●], 2024 (the "**Collateral Management Order**");

**WHEREAS**, the Collateral Management Order was recognized and given force and effect in the United States by an order of the United States Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**") dated October [●], 2024;

**WHEREAS**, the Collateral Manager desires to retain Consultant to provide consulting services to the Collateral Manager with respect to the disposition of the Assets; and

**WHEREAS**, Consultant is willing to serve as the Collateral Manager's consultant, for the purpose of providing such consulting services, upon the terms and conditions and in the manner set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1.    DEFINITIONS

For the purposes of this Agreement, the terms listed below shall have the respective meanings indicated:

1.1    "**Approval Order**" shall mean one or more orders of the Court in form and substance reasonably acceptable to Collateral Manager and Consultant (1) authorizing Collateral Manager to (a) retain Consultant on the terms set forth herein, (b) pay Consultant its compensation and reimburse its Sale Expenses on the terms set forth herein without further order of the Court, (c) enter into and consummate the

transactions set forth herein, (2) directing that the Assets shall vest in the name of the purchaser/s of the Assets, free and clear of all claims against the Assets, (3) authorizing the Manager to execute a bill of sale where no title documents are available and (4) otherwise giving effect to the provisions of this Agreement.

1.2  **"Approval Recognition Order"** means an order of the U.S. Bankruptcy Court giving full force and effect to the Approval Order in the United States and granting such other relief as may be required to effect the transactions described in the Approval Order.

1.3  **"Auction"** shall mean an auction of the Assets to occur online and which the Consultant anticipates will occur on or about _____, 2024;

1.4  **"Auctioneer"** shall mean any auctioneer of said auction.

1.5  **"Completion Date"** shall be a date no later than [●] unless extended pursuant to mutual agreement between Consultant and Collateral Manager.

1.6  **"Event of Default"** shall have the meaning given to it in section 11.1 of this Agreement.

1.7  **"Facility"** means a commercially suitable location owned or procured by the Consultant capable of storing the Assets between their collection by the Consultant from the Pride Entities until their eventual Sale.

1.8  **"Sale"** shall mean a liquidation sale of all the Assets to be conducted by Consultant on behalf of the Collateral Manager, which may include any combination of a liquidation sale of the Assets prior to the Auction, a sale of substantially all of the Assets, and/or the Auction of the Assets at the Facility or on the internet.

1.9  **"Sale Expenses"** shall mean, with respect to the Sale, all direct operating expenses reasonably incurred in connection with the Sale but does not include the Transportation Costs.

1.10  **"Sale Term"** shall mean the period of time beginning with the execution of this Agreement and ending on the Completion Date.

1.11  **"Sales Taxes"** shall mean goods and services, harmonized sales, sales, retail sales, use, consumption, personal property, customs, excise, stamp, transfer, value added, registration, and other such similar taxes, duties or charges, including, for greater certainty, the goods and services tax/harmonized sales tax (**"GST/HST"**) exigible pursuant to Part IX of the *Excise Tax Act* (to the extent Canadian law is applicable).

1.12  **"Services"** shall mean the services to be performed by Consultant pursuant to Section 2.2 of this Agreement.

1.13  **"Supervisors"** shall mean the individual(s) that will provide Services at the Facility as set forth in Sections 2.2 and 2.3 of this Agreement.

2

1.14    **"Transportation Cost"** shall mean an estimated US$450 to US$550 per Asset (but in any case, shall not exceed US$550 without prior written approval from the Collateral Manager) for all work, expenses or disbursements of the Consultant necessary for each Asset's retrieval from the Pride Entities' possession, the Asset's transportation, and the Asset's storage by the Consultant from collection until Sale.

## 2.    RETENTION

2.1    Subject to issuance and entry by the CCAA Court of the Approval Order and entry by the U.S. Bankruptcy Court of the Approval Recognition Order, Collateral Manager hereby retains Consultant, and Consultant hereby agrees to serve, as an independent consultant to Collateral Manager in connection with the conduct of the Sale as set forth herein. With respect to the Sale, Consultant shall serve as Collateral Manager's sole and exclusive consultant relative thereto throughout the Sale Term.

2.2    On the terms and conditions set forth herein, commencing after execution of this Agreement and satisfaction of the conditions precedent hereunder, Consultant shall provide Collateral Manager with the following Services with respect to the conduct of the Sale:

    (a)    coordinate and effect the retrieval of the Assets from the facilities of the Pride Entities and delivery of same to the Facility upon two business days' notice by the Collateral Manager to the Consultant provided that notice is to be given at different times for different locations;

    (b)    oversee the liquidation and disposal of the Assets from the Facility as further described below;

    (c)    determine and implement commercially reasonable advertising (including brochures, web site listings and email notices) to sell the Assets during the Sale Term;

    (d)    prepare for the Sale of the Assets, including gathering specifications and photographs for brochures and arranging the Assets in a manner, which in Consultant's judgment is designed to enhance the net recovery on the Assets;

    (e)    provide and supervise fully qualified and experienced personnel who will prepare for and sell the Assets in accordance with the terms of this Agreement;

    (f)    sell the Assets for cash or other immediately available funds on an "AS IS," "WHERE IS" and "all Sales are final" basis and in accordance with the terms of this Agreement, provided that, (A) when sold during the Sale Term but not by way of Auction, the Consultant will first seek the consent of the Collateral Manager prior to finalizing any Sales, and (B) when sold under an Auction, the Consultant will sell to the highest bidder(s);

3

(g)     charge and collect on behalf of Collateral Manager from all purchasers any purchase price together with all applicable Sales Taxes in connection therewith;

(h)     provide such other related service deemed necessary or prudent by Collateral Manager and Consultant under the circumstances presented;

(i)     provide and process all reporting forms, certificates, reports and other documentation arising in connection with the payment of applicable Sales Taxes and as specified in section 7.6 of this Agreement; and

(j)     provide Collateral Manager with reporting and reconciliation of accounting information in form reasonably acceptable to Collateral Manager as set forth herein.

2.3     In connection with the Sale, Consultant shall directly retain and engage one or more Supervisors.  The Supervisors may be employees of Consultant or independent contractors engaged as agents of Consultant, and are not and shall not be deemed to be employees of Pride Entities or Collateral Manager in any manner whatsoever.  In consideration of Consultant's engagement of the Supervisors, Sale Expenses shall include the Supervisors' compensation and expenses.

2.4     All Sales of Assets shall be made by Consultant as agent in fact for Collateral Manager.  Title to the Assets shall remain with the Pride Entities or the Collateral Manager, as applicable, throughout the Sale Term. Title will only be transferred to a purchaser upon receipt by the Collateral Manager of the Sale proceeds in the Sale Proceeds Account.

2.5     Subject to this Agreement, Consultant shall be the sole party authorized to sell the Assets.  The Assets will be sold in such lots as Consultant may determine.

2.6     Consultant is authorized to accept any reasonable means as payment for the Assets sold provided it is in immediately available funds.

2.7     Consultant shall sell the Assets "as is", without any representations of any kind or nature whatsoever, including as to merchantability or fitness, and without warranty or agreement as to the condition of such Assets.   The Collateral Manager acknowledges that Consultant is acting solely in the capacity of Consultant for the Collateral Manager and has no knowledge with respect to the fitness or usability of any of the Assets.  Consultant will not use, alter or repair any of the Assets for any particular purpose or otherwise.

**3.     EXPENSES**

3.1     Sale Expenses and Transportation Costs shall be subtracted from the proceeds of Sale as set forth in Section 4 hereof.  To the extent that Sale Expenses or Transportation Costs must be paid in advance of receipt of proceeds of the Sale, subject to satisfaction of the conditions precedent hereunder, Consultant shall be responsible

4

for the payment of such Sale Expenses or Transportation Costs subject to recovery as provided in Section 4.3 below.

## 4.    CONSULTANT'S FEES

4.1    Consultant shall take no commission from any disposal of the Assets.

4.2    Consultant shall be entitled to reimbursement of Sale Expenses incurred, not to exceed US$48,000.

4.3    All proceeds of the Sale shall be deposited in a segregated Sale proceeds account (the "**Sale Proceeds Account**").  Consultant will provide Collateral Manager with a written weekly report outlining an itemized summary of all of that week's incoming funds, including receipts from Sales of the Assets and outgoing funds, including drawings for Sale Expenses and Transportation Costs.

4.4    Consultant shall be entitled to charge, and retain for its own account, a buyer's premium to all purchasers of 10% until the aggregate value of Assets sold by Consultant reaches US$3,000,000 and thereafter, Consultant shall charge a buyer's premium to all purchasers of 10%, to be allocated between Consultant and the Collateral Manager on a 70:30 basis.  In the event Assets are sold at Auction, the Consultant shall be entitled to charge and retain for its own account up to 2% of the value of any Sale for the provider of the online auction software in addition to the 10% buyer's premium.  Any such buyer's premium or online auction software amount collected shall not be considered proceeds of any Sale made hereunder.

4.5    The Collateral Manager shall be entitled to deduct and withhold from any consideration or other amount payable or otherwise deliverable to any person hereunder such amounts as the Collateral Manager may be required to deduct and withhold therefrom under any provision of applicable laws in respect of taxes. To the extent that such amounts are so deducted, withheld and remitted to the appropriate governmental entity, such amounts shall be treated for all purposes under this Agreement as having been paid to the person to whom such amounts would otherwise have been paid.

4.6    Notwithstanding anything to the contrary in this Agreement:

(a)    all amounts payable by the Collateral Manager to the Consultant under this Agreement are exclusive of any applicable Sales Taxes which shall be payable in addition to such amounts;

(b)    all Sales Taxes payable by the Collateral Manager to the Consultant under this Agreement shall be collected by the Consultant, who shall remit such Sales Tax directly to the applicable governmental authority in accordance with applicable law;

(c)    any applicable Sales Tax shall be set forth in the relevant invoice or other document prepared by the Party responsible for charging such Sales Tax;

5

(d)    notwithstanding any other provision of this Agreement, in the event that, as a result of a breach, modification or termination of this Agreement at any time, an amount is to be paid or forfeited (otherwise than as consideration for a supply under this Agreement) by a particular Party, or a debt or other obligation is to be reduced or extinguished without payment by the Party on account of the debt or obligation and section 182 of the *Excise Tax Act* (Canada, if applicable), or any Sales Tax legislation applies to the amount to be paid, forfeited, reduced or extinguished, as the case may be, the amount shall be increased to equal the quotient of the amount otherwise paid, forfeited or extinguished, or the amount by which the debt or obligation was reduced, as the case may be, divided by the difference between 100% and the aggregate percentage rate of the GST/HST and any other applicable Sales Tax;

(e)    the Parties agree that, as between the Consultant and the Collateral Manager, the Consultant shall be solely liable for, and as a separate and independent covenant, the Consultant shall indemnify, defend and save harmless the Collateral Manager from any Sales Tax, or any penalty, interest or other amounts with respect thereto, which may be payable by or assessed against the Collateral Manager under the *Excise Tax Act* (Canada, if applicable) or other Sales Tax legislation in respect of any supplies made by the Collateral Manager hereunder (including any costs incurred by the Collateral Manager in collecting such amount from the Consultant). The indemnity in this Article 4.6(e) shall not apply to Sales Tax that is paid by the Consultant or buyer to the Collateral Manager in accordance with invoices delivered under this Agreement but is not remitted by the Collateral Manager to the applicable governmental authority in accordance with applicable law, or to any penalty, interest or other amounts with respect thereto;

(f)    the Parties agree to cooperate in good faith with respect to Sales Tax matters, addressing any queries or audit activity by the Canada Revenue Agency or other governmental authority, and the recovery of any Sales Tax paid in error;

(g)    the Consultant shall be responsible for, and shall, collect, report and remit any Sales Taxes payable in respect of any charges payable by the buyer to the Consultant, if applicable;

(h)    to the extent that a Sales Tax exemption or other relief is available to either party with respect to a transaction or payment contemplated in this Agreement that relieves one party from the payment of Sales Taxes (a "**Sales Tax Exemption**"), the party claiming the Sales Tax Exemption shall deliver to the other party a certificate of exemption or such other document as required under applicable laws and take such steps as may be provided for under applicable laws to obtain the Sales Tax Exemption.

5.    **REPRESENTATIONS AND WARRANTIES OF CONSULTANT**

5.1    Consultant hereby represents, warrants and covenants in favor of Collateral Manager as follows:

(a)    Consultant has taken all necessary action required to authorize the execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby;

(b)    This Agreement is a valid binding obligation of Consultant enforceable in accordance with its terms;

(c)    Consultant holds all permits and licenses required to perform its obligations under this Agreement; and

(d)    To the best of Consultant's knowledge, no action or proceeding has been instituted or threatened affecting the consummation of this Agreement or the transactions contemplated herein.

The representations, warranties and covenants of Consultant set forth in this Agreement will survive termination of this Agreement and completion of the transactions (including Sales) contemplated herein.

6.    **REPRESENTATIONS AND WARRANTIES OF COLLATERAL MANAGER**

6.1    Collateral Manager hereby represents, warrants and covenants in favor of Consultant that, subject to the issuance and entry by the CCAA Court of the Approval Order and the entry by the U.S. Bankruptcy Court of the Approval Recognition Order, Collateral Manager has good and sufficient power and authority to enter into this Agreement and to complete the transactions contemplated by this Agreement.

7.    **AFFIRMATIVE DUTIES OF CONSULTANT**

7.1    Consultant shall reimburse, indemnify, defend and hold the Collateral Manager and its officers, directors, agents, and employees, harmless from and against any damage, loss, expense (including reasonable attorneys' fees) or penalty, or any claim or action therefore, by or on behalf of any person, arising out of Consultant's breach of this Agreement, as well as any claims asserted by the Consultant's employees or agents, including the Consultant's employees' or agents' payroll claims (wage claims, claims for taxes required to be withheld from wages, social security, etc.), or unemployment compensation claims.

7.2    On retrieval of the Assets, Consultant shall document the state and condition of the Assets as they were prior to transportation of the Assets to the Facility. and provide the Collateral Manager (within five business days) with a report summarizing the initial inspection. The initial inspection will, amongst other things, (a) verify the existence of the Asset and note any Asset identifiers; (b) detail any defects of the Asset and specify whether the defects may have a minimal or material effect on the

7

Consultant's expected realization value of the Asset; and (c) give any other information as the Consultant believes may be relevant for the Collateral Manager to know.

7.3    Consultant shall be responsible for obtaining, in the name of and with the assistance of the Collateral Manager, any permits or licenses necessary to conduct the Sale.

7.4    Consultant shall provide sufficient labor and Supervisors for the set up and conduct of the Auction, including auctioneers, accounting support, and personnel to register bidders.

7.5    Consultant shall provide Collateral Manager with an accounting of the Auction within twenty-one days after its completion. With such accounting, Consultant shall also deliver any funds due and payable to the Collateral Manager by wire or check in immediately available funds to _____.

7.6    Consultant shall prepare all reporting forms, certificates, reports and other documentation required in connection with the payment of applicable Sales Taxes to the appropriate taxing authorities and Consultant shall process all of the foregoing. The Consultant shall pay the same to the appropriate taxing authorities in accordance with applicable law.

## 8.    AFFIRMATIVE DUTIES OF COLLATERAL MANAGER

8.1    The Collateral Manager's liability to the Consultant for any expenses incurred in the collection of the Assets, their transportation from the collection point to the Facility, and their storage at the Facility until Sale will be capped at the Transportation Cost.

8.2    Subject to the terms of the Approval Order and the Approval Recognition Order, the Collateral Manager shall and hereby agrees to defend, indemnify, and hold harmless Consultant and its agents, employees, principals and Supervisors from any and all known or unknown losses, damages (including without limitation, any personal injury, death or property damage), liabilities, claims, actions (including removal of toxic waste), judgments, penalties and fines, court costs and legal or other expenses which the Consultant may incur as a direct or indirect consequence in whole or in part of: (a) grossly negligent or intentional acts or omissions of Collateral Manager or its agents, employees, representatives and principals in connection with the Sale; and/or (b) the breach by Collateral Manager of any of its representations, warranties or other obligations under this Agreement.

8.3    Subject to the terms of the Approval Order and the Approval Recognition Order, and to the extent applicable and available to the Collateral Manager, the Collateral Manager will take all reasonable steps to ensure that the Pride Entities deliver to the Consultant all corresponding certificates of title (clean and ready for endorsement) either upon retrieval by the Consultant or no later than 7 business days before the Auction. The Consultant acknowledges that where the Approval Order entitles the Consultant (acting under the terms of this Agreement) to dispose of the Assets to third parties free and clear of claims, such certificates of title may not be available or

8

required. If a title is not available, Collateral Manager will provide a notarized bill of sale and lien release document in the form appended to the Approval Order.

## 9.   CONDITIONS PRECEDENT

9.1   The willingness of Consultant and Collateral Manager to enter into the transactions contemplated under this Agreement, are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)   All representations and warranties of Consultant and Collateral Manager hereunder shall be true and correct in all material respects, and no Event of Default (as defined below) shall have occurred as of the date hereof and as of the date of this Agreement;

(b)   The specific Assets set forth on Exhibit B shall be available for Sale by Consultant and shall, at the time of the Sale, be in the same condition as inspected by Consultant on or after retrieval (as summarized in the report prepared by Consultant in accordance with section 7.2 above);  and

(c)   The Approval Order shall have been issued and entered by the CCAA Court and shall not have been stayed, subject to appealed or subject to a pending motion for leave to appeal and the Approval Recognition Order shall have been entered by the U.S. Bankruptcy Court and shall not have been stayed or subject to appeal.

## 10.   INSURANCE

10.1   Consultant will maintain insurance, and will provide to the Collateral Manager proof of insurance, with respect to any public liability which could flow from the Auctioneer's activities, naming the Collateral Manager as beneficiary of such insurance, providing for coverage of not less than US$2,000,000 per occurrence and otherwise in a form satisfactory to the Collateral Manager acting reasonably. Proceeds received on any insurance claim in respect of any insured Assets that otherwise would have been sold during the Auction shall be deposited into the Sale Proceeds Account.

## 11.   DEFAULTS

11.1   The following shall constitute an "Event of Default" hereunder:

(a)   The failure by Consultant or Collateral Manager to perform any of the respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)     Any representation or warranty made by Collateral Manager or Consultant proves untrue in any material respect as of the date made and throughout the Sale Term.

## 12.    MISCELLANEOUS

12.1    Any notice or other communication under this Agreement shall be in writing and may be delivered personally, sent by prepaid registered or certified mail, or by electronic mail, addressed as follows:

(a)     in the case of Consultant:

[●]

(b)     in the case of Collateral Manager:

Alvarez & Marsal Canada Inc. solely in its capacity as Collateral Manager appointed by the CCAA Court in the CCAA Proceedings
Royal Bank Plaza, South Tower
200 Bay Street Suite 3501
Toronto
Ontario M5J 2J1
Canada
Attn: Esther Mann
Email: Esther.mann@alvarezandmarsal.com

12.2    This Agreement shall be governed by and interpreted in accordance with the internal laws of the Province of Ontario and the federal laws of Canada applicable therein, without reference to any conflict of laws provisions.

12.3    Consultant's Services involve the orchestration of a sales and marketing effort of the Assets on behalf of Collateral Manager.  Consultant is not guaranteeing any result from the Sale, and nothing contained in this Agreement shall be construed as a warranty on the part of Consultant that any result will be achieved as part of the Sale, unless explicitly stated otherwise, herein.

12.4    While Consultant takes steps to obtain each buyer's acknowledgment of Collateral Manager's rights to pursue buyers for their failure to fulfill purchase obligations as part of the terms of Sale, Consultant does not guarantee any buyer's performance of its obligations or payment of its purchase price.

12.5    Consultant does not warrant that the functions, features or content contained in Consultant's website (including any third party software, products or other materials used in connection with such website) or any third party website used by Consultant, will be timely, secure, uninterrupted or error-free, or that defects will be corrected.

12.6    Notwithstanding any of the terms of this Agreement to the contrary, Consultant's maximum liability for (a) any breach of covenants, agreements and/or indemnifications set forth herein, and (b) any and all damages of any type or nature

10

whatsoever, whether in contract, tort or otherwise, that may be sustained by the Collateral Manager or any other person or entity that arises from or is otherwise related to this Agreement or the Sale shall be limited to the aggregate amounts actually received by Consultant (including amounts received as Sale proceeds) under this Agreement.

12.7 The Collateral Manager has entered into and signed this Agreement solely in its capacity as Collateral Manager and neither the Collateral Manager nor its advisors, representatives or agents shall incur any personal liability whatsoever in respect of any of the obligations undertaken by the Consultant, or in respect of any failure on the part of the Consultant to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any documents or assurances made pursuant to or in connection with this Agreement. The Collateral Manager is party to this Agreement solely in its capacity as Collateral Manager for the purpose of engaging the Consultant to sell the Assets. Notwithstanding any of the terms of this Agreement to the contrary, Collateral Manager's maximum liability for (a) any breach of covenants, agreements and/or indemnifications set forth herein, and (b) any and all damages of any type or nature whatsoever, whether in contract, tort or otherwise, that may be sustained by the Consultant or any other person or entity that arises from or is otherwise related to this Agreement or the Sale shall be limited to the aggregate amounts that would be payable to the Consultant under this Agreement.

12.8 Consultant has no obligation whatsoever to store, handle, treat, dispose, transport or remove any hazardous substance that may be associated with the Assets and shall have no liability to any party with regard to the removal or remediation of any such hazardous substances.

12.9 In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

12.10 This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations and understandings and can only be modified by a writing signed by Collateral Manager and Consultant.

12.11 Neither Collateral Manager nor Consultant shall assign this Agreement without the express written consent of the other. This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

12.12 This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument. Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

12.13   Nothing contained herein shall be deemed to create any relationship between Consultant and Collateral Manager other than an agency relationship.  It is stipulated that the parties are not partners or joint venturers.

*[The remainder of this page is left intentionally blank]*

**[●]**

By:_____

Its:_____

**ALVAREZ & MARSAL CANADA INC. SOLELY IN ITS CAPACITY AS COLLATERAL MANAGER APPOINTED BY THE CCAA COURT IN THE CCAA PROCEEDINGS**

By: _____

Its:_____

<u>List of Exhibits</u>

| | | |
|---|---|---|
| **Exhibit A** | — | **Pride Entities** |
| **Exhibit B** | — | **List of Assets** |

**EXHIBIT A**

**1. APPLICANTS**

**Operating Entities**

*Canadian Operating Entities*
- PRIDE TRUCK SALES LTD.
- TPINE TRUCK RENTAL INC.
- PRIDE GROUP LOGISTICS LTD.
- PRIDE GROUP LOGISTICS INTERNATIONAL LTD.
- TPINE LEASING CAPITAL CORPORATION
- DIXIE TRUCK PARTS INC.
- PRIDE FLEET SOLUTIONS INC.
- TPINE FINANCIAL SERVICES INC.
- PRIDE GROUP EV SALES LTD.

*U.S. Operating Entities*
- TPINE RENTAL USA, INC.
- PRIDE GROUP LOGISTICS USA, CO.
- ARNOLD TRANSPORTATION SERVICES, INC.
- DIXIE TRUCK PARTS INC.
- TPINE FINANCIAL SERVICES CORP.
- PARKER TRANSPORT CO.
- PRIDE FLEET SOLUTIONS USA INC.

**Real Estate Holding Companies**

*Canadian Real Estate Holding Companies*
- 2029909 ONTARIO INC.
- 2076401 ONTARIO INC.
- 1450 MEYERSIDE HOLDING INC.
- 933 HELENA HOLDINGS INC.
- 30530 MATSQUI ABBOTSFORD HOLDING INC.
- 2863283 ONTARIO INC.
- 2837229 ONTARIO INC.
- 2108184 ALBERTA LTD.
- 12944154 CANADA INC.
- 13184633 CANADA INC.
- 13761983 CANADA INC.
- 102098416 SASKATCHEWAN LTD.
- 177A STREET SURREY HOLDING INC.
- 52 STREET EDMONTON HOLDING INC.
- 84 ST SE CALGARY HOLDINGS INC.
- 68TH STREET SASKATOON HOLDING INC.
- 3000 PITFIELD HOLDING INC.

*U.S. Real Estate Holding Companies*
- PGED HOLDING, CORP.

- HIGH PRAIRIE TEXAS HOLDING CORP.
- 131 INDUSTRIAL BLVD HOLDING CORP.
- 59TH AVE PHOENIX HOLDING CORP.
- DI MILLER DRIVE BAKERSFIELD HOLDING CORP.
- FRONTAGE ROAD HOLDING CORP.
- ALEXIS INVESTMENTS, LLC
- TERNES DRIVE HOLDING CORP.
- VALLEY BOULEVARD FONTANA HOLDING CORP.
- HIGHWAY 46 MCFARLAND HOLDING CORP.
- TERMINAL ROAD HOLDING, CORP.
- BISHOP ROAD HOLDING CORP.
- OLD NATIONAL HIGHWAY HOLDING CORP.
- 11670 INTERSTATE HOLDING, CORP.
- 401 SOUTH MERIDIAN OKC HOLDING CORP.
- 8201 HWY 66 TULSA HOLDING CORP.
- EASTGATE MISSOURI HOLDING CORP.
- FRENCH CAMP HOLDING CORP.
- 87TH AVENUE MEDLEY FL HOLDING CORP.
- LOOP 820 FORT WORTH HOLDING CORP.
- 162 ROUTE ROAD TROY HOLDING CORP.
- CRESCENTVILLE ROAD CINCINNATI HOLDING CORP.
- MANHEIM ROAD HOLDING CORP.
- 13TH STREET POMPANO BEACH FL HOLDING CORP.
- EAST BRUNDAGE LANE BAKERSFIELD HOLDING CORP.
- CORRINGTON MISSOURI HOLDING CORP.
- 963 SWEETWATER HOLDING CORP.
- OAKMONT DRIVE IN HOLDING CORP.

**Other Holding Companies**
*Other Canadian Holding Companies*
- 2692293 ONTARIO LTD.
- 2043002 ONTARIO INC.
- PRIDE GROUP HOLDINGS INC.
- 2554193 ONTARIO INC.
- 2554194 ONTARIO INC.
- PRIDE GROUP REAL ESTATE HOLDINGS INC.
- 1000089137 ONTARIO INC.

*Other U.S. Holding Companies*
- COASTLINE HOLDINGS, CORP.
- PARKER GLOBAL ENTERPRISES, INC.
- DVP HOLDINGS, CORP.

**2. LIMITED PARTNERSHIPS**
*U.S. Limited Partnerships*
- PRIDE TRUCK SALES L.P.

16

- TPINE LEASING CAPITAL L.P.
- SWEET HOME HOSPITALITY L.P.

## 3. ADDITIONAL STAY PARTIES

*Canadian Additional Stay Parties*
- BLOCK 6 HOLDING INC.
- 2500819 ONTARIO INC.

*U.S. and Other Additional Stay Parties*
- PERGOLA HOLDINGS, CORP.
- PRIDE GLOBAL INSURANCE COMPANY LTD.

**SCHEDULE "C"**
**FORM OF BILL OF SALE**

## Motor Vehicle Bill of Sale

I, _____ (seller), in consideration of $_____, do hereby sell, transfer and convey to _____ (buyer), the following vehicle:

Make:

Model:

Year:

VIN:

Seller warrants to Buyer that Seller has good and marketable title to said property, full authority to sell and transfer said property, and that said property is sold free of all liens, encumbrances, liabilities, and adverse claims of every nature and description whatsoever.

I, the undersigned seller, do sell the above-described vehicle to the buyer for the amount shown and certify that all of the information provided in this Bill of Sale is true and accurate to the best of my knowledge.

I, the undersigned buyer, acknowledge receipt of this Bill of Sale and understand there is no guarantee or warranty, expressed or implied, with respect to the above-described property. It is also understood that the above-stated vehicle is sold in "as is" condition.

Seller: _____

Signature: _____

Printed Name: _____

SWORN TO AND SUBSCRIBED BEFOREME, this the _____ day of ____, 2024.

_____
NOTARY PUBLIC

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **PRIDE GROUP HOLDINGS INC.** and those Applicants listed on Schedule "A" hereto (each, an "**Applicant**", and collectively, the "**Applicants**")

Court File No.: CV-24-00717340-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
Proceedings commenced at Toronto, Ontario

**SALE AGREEMENT & SALE APPROVAL ORDER**

**FASKEN MARTINEAU DuMOULIN LLP**
Bay Adelaide Centre, Suite 2400
333 Bay Street, Box 20
Toronto, Ontario  M5H 2T6

**Stuart Brotman**
Tel: 416 865 5419
Email:  sbrotman@fasken.com

**Aubrey Kauffman**
Tel: 416 868 3538
Email:  akauffman@fasken.com

**Daniel Richer**
Tel: 416 865 4445
Email:  dricher@fasken.com

Lawyers for Royal Bank of Canada,
as administrative and DIP agent