**EXHIBIT 4**

<u>Program Agreement</u>

(See attached)

## SECOND AMENDED AND RESTATED
## PROGRAM AGREEMENT

THIS SECOND AMENDED AND RESTATED PROGRAM AGREEMENT (this "**Agreement**") is made and entered into as of May 31, 2023 (the "**Effective Date**"), by and between MITSUBISHI HC CAPITAL AMERICA, INC., a Delaware corporation, as successor by merger and in interest to ENGS COMMERCIAL FINANCE CO., a California corporation, with offices at One Pierce Place, Suite 1100 West, Itasca, IL 60143, and its successors and/or assigns (individually or collectively, "**Buyer**" or "**Mitsubishi**"), and TPINE LEASING CAPITAL, L.P., a Delaware limited partnership, on behalf of itself, its Principal(s) and its Affiliates, with its principal place of business at 1125 East Alexis Road, Toledo, Ohio 43612 (individually or collectively, "**Seller**" or "**TPINE**") (Buyer and Seller are hereinafter sometimes collectively referred to as, the "**parties**" or "**parties hereto**", and sometimes hereinafter individually referred to as, a "**party**"). This Agreement amends and restates in its entirety that certain Program Agreement dated and effective as of March 18, 2020, and thereafter amended and restated by that certain Amended and Restated Program Agreement dated and effective as of November 30, 2021 (collectively, the "**Old Agreement**"), which established the terms and conditions regarding and controlling, among other things, Contracts (as hereinafter defined) purchased and to be purchased by Buyer from Seller, and the relationship and obligations of the Buyer and Seller, as more fully set forth herein. Buyer and Seller have agreed to amend and restate the Old Agreement to, among other things, revise and re-establish the terms and conditions regarding and controlling, among other things, Contracts (as hereinafter defined) purchased by, or to be purchased by, Buyer from Seller, and the relationship and obligations of the Buyer and Seller, and for this Agreement to control all such Contracts (as hereinafter defined) and other transactions, relationships, and obligations of the parties hereto dating back to the execution of the original Old Agreement on March 18, 2020, and thereafter, for as long as this Agreement shall remain in effect, or terms and obligations under this Agreement shall survive. This Agreement is an amendment and restatement in its entirety of the Old Agreement. This Agreement is executed, delivered and accepted as an amendment and restatement in full, and replacement of the Old Agreement and not an acknowledgment of any termination of the relationship between Buyer and Seller. Nothing herein shall be construed to be a novation of the Old Agreement, or the documents executed in connection therewith, or Contracts (as hereinafter defined) sold or assigned pursuant to the Old Agreement. This Agreement shall not release or otherwise discharge the obligations of Seller under the Old Agreement. This Agreement, the Old Agreement, and other documents executed or delivered in connection with the Old Agreement, and as may be modified and/or amended contemporaneous herewith, are hereby ratified and confirmed in all respects by Seller, and its/their rights, responsibilities, obligations, warranties, and representations under all such document(s) shall continue in full force and effect and are hereby renewed and extended, as the same may be modified and/or amended hereby or contemporaneous herewith. To the extent that any provisions of this Agreement are inconsistent with or contrary to the provisions of the Old Agreement, the provisions of this Agreement shall control. This Agreement may be enforced independent of and without reference to the Old Agreement. Capitalized terms and defined terms shall have the meanings ascribed to them in this Agreement.

## WITNESSETH

WHEREAS, Seller in its ordinary course of business enters into lease and financing contracts with various Obligors (as hereinafter defined) pursuant to which Seller leases or finances various types of equipment to or for its Obligors; and

WHEREAS, Seller desires to originate lease or financing contracts with Obligors and then, from time to time, sell and/or assign to Buyer such Contracts (as hereinafter defined) and all of Seller's rights, title and interest

in and to the Equipment (as hereinafter defined), and other collateral for the Contracts (as hereinafter defined), subject to such Contracts (as hereinafter defined);

WHEREAS, Buyer may from time to time desire to purchase and accept Seller's interest in such Contracts and Equipment, subject to the terms and conditions of this Agreement; and

WHEREAS, Buyer and Seller are parties to the Old Agreement, and desire to refine and amend the terms and conditions of their relationship and the Old Agreement as provided herein, by, among other things, execution of this Agreement as of the Effective Date, and such Agreement being applicable to all Contracts (as hereinafter defined) purchased by Buyer under the Old Agreement as well as all future Contracts purchased, or to be purchased, by Buyer.

WHEREAS, ENGS COMMERCIAL FINANCE CO., a California corporation has merged with and into MITSUBISHI HC CAPITAL AMERICA, INC., a Delaware corporation.  From and after the date hereof, and including any and all references in this Agreement, the Old Agreement, or any other documents or agreements executed by or between Buyer and Seller in connection therewith, or on or after March 18, 2020, Buyer shall refer to and mean MITSUBISHI HC CAPITAL AMERICA, INC., a Delaware corporation, as successor by merger and in interest to ENGS COMMERCIAL FINANCE CO., a California corporation, as Buyer.  All such documents and agreements are hereby automatically amended to reference the correct and updated Buyer by its new and correct name, and Seller agrees to execute any and all documents and take any and all action necessary to effectuate this change and to update the applicable party name, addresses, or any other matter that may require amendment or change, or that may reasonably be requested by Buyer.

WHEREAS, in addition to the terms and conditions related to the sale and assignment of Contracts (as defined herein), Seller and Buyer wish to establish terms and conditions by which Seller will act as fiscal agent and servicer in relation to Contracts (as defined herein), payments, and other matters associated with the Contracts (as defined herein), all as more fully set forth in this Agreement.

NOW, THEREFORE, in consideration of the agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as of the Effective Date as follows:

I.  DEFINITIONS

As used herein, all capitalized terms shall have the meanings set forth below:

"**Advance**" has the meaning assigned to such term in Section 4.6(l).

"**Affiliate**" means Seller's Guarantor(s) (Sulakhan Singh Johal a/k/a Sam Johal, Jasvir Johal), Seller's parent, or any entity of which Sulakhan Singh Johal, Jasvir Johal directly or indirectly has control or that is directly or indirectly controlled by, in control of or under common control with Seller, including, without limitation, the entities listed in **Exhibit B** hereto. For purposes of this definition, "control" means the power to direct or cause the direction of the management and policies of such person or entity, whether through the ownership of voting securities, by contract, or otherwise.

"**Aggregate Loss Pool Amount**" means an aggregate amount, calculated with respect to all Contracts that have not been paid in full and satisfied, determined by multiplying (i) the Loss Pool Percentage (as hereinafter

defined) for each such Contract by (ii) the sum of all due and unpaid and future rent or other periodic payments on such Contract, discounted to present value at the Discount Rate (as hereinafter defined) for such Contract.

"**Agreement**" means this Second Amended and Restated Program Agreement, all Assignments, and all Exhibits annexed hereto and made a part hereof, as may be amended, supplemented and/or modified from time to time by the parties hereto.

"**Approval Letter**" means a letter, email, or some other written communication to Seller from Buyer setting forth the terms and conditions of Buyer's approval of a Contract.

"**Assignment**", "**Specification**" or "**Assignment Specification**" means the assignment, (i) prior to the date hereof, executed by Seller and Buyer and (ii) after the date hereof, substantially in the form of **Exhibit A** hereto, in each case along with an Assignment exhibit specifying all information relevant to the assigned Contract.

"**Business Day**" means a day when federal and state banks in Chicago, Illinois are required to be open for business.

"**Contract**" means a lease, conditional sale agreement, or other evidence or form of payment obligation and/or security interest including all Obligor and guarantor credit applications, invoices, schedules, riders, addenda or supplements thereto and all guaranties and credit enhancements related thereto and all other related documents provided by Seller to Buyer. Assigned lease Contracts shall be substantially identical to the form of **Exhibit D-1** or **Exhibit D-2** attached hereto. Assigned finance Contracts shall be substantially identical to the form of **Exhibit D-3**. **Exhibit D-1**, **Exhibit D-2**, and **Exhibit D-3** collectively referred to as **Exhibit D**.

"**Contract Receivables**" of a Contract means all contract, installment, and other payments related thereto by Obligor due or to become due under such Contract for the period specified as the "**Contract Receivables Period**" for such Contract in the Contract and related documents and/or agreements, excluding (i) any late payment charges thereon or otherwise payable under the Contract to the extent that Seller has paid to Buyer the delinquent or defaulted payment(s) that gave rise to such late payment charges.

"**Contract Receivables Period**" has the meaning specified in the Contract, supplement or attachment thereof that designates any Equipment, or payments therefor, leased or financed under such Contract.

"**Delivery and Acceptance Certificate**" means a certificate executed by an authorized representative of an Obligor, which confirms that the Equipment has been delivered to and unconditionally accepted by the Obligor and the obligation to make payments under the Contract has commenced.

"**Deposit Account Control Agreement**" shall mean that certain Deposit Account Control Agreement in form and substance set forth on **Exhibit G** hereto, and incorporated by this reference, by and among, Seller, Purchaser and Bank (as defined in the Deposit Account Control Agreement), as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Distribution Date**" means the 6th calendar day of each month (where payments or Contract Receivables are due from an Obligor on the 1st calendar day of such month) and the 20th calendar day of each month (where payments and Contract Receivables are due from an Obligor on the 15th calendar day of such month), unless such day is a weekend or US business holiday, in which case it shall mean the first Business Day following such date.

"**Equipment**" means certain equipment described in a Contract together with all components and parts incorporated therein, and other acquisitions, replacements, substitutions and accessories incorporated therein, and software licensed in connection therewith, sold or leased by Seller to an Obligor under a Contract.

"**Guarantor**" means Sulakhan Singh Johal a/k/a Sam Johal, Jasvir Johal and any parent company, affiliate or other entity or person who has furnished a guaranty of Seller's or an Affiliate's obligations under this Agreement or an Assignment."

"**Loss Pool**" means the loss pool created under Section 2.8(a) hereof.

"**Loss Pool Deduction**" means, with respect to each Contract, the Loss Pool Percentage, multiplied by the Purchase Price.

"**Loss Pool Percentage**" means, with respect to each Contract, the Loss Pool Percentage listed in the Assignment Specification for such Contract; provided that if the Assignment Specification for any Contract does not list a Loss Pool Percentage, and the Loss Pool Deduction cannot be calculated to Buyer's satisfaction by other means or documentation, then the Loss Pool Percentage for such Contract shall be 9.9%; and further provided that the Loss Pool Percentages for the Contracts listed on **<u>Exhibit A-1</u>** shall be the corresponding percentages shown on **<u>Exhibit A-1</u>**.

"**Monthly Reports**" means written or electronic reports furnished by Seller within 15 Business Days after the end of each month, containing at least the following information with respect to each Contract: (a) the name of the lessee or other primary Obligor, (b) payment histories of the amounts and dates of (i) each Advance made by Seller with respect to such Contract, (ii) each Contract Receivable or other payment received by Seller with respect to such Contract, (iii) each reimbursement made by Buyer to Seller for any unpaid Advance, and (c) a list and description of any delinquent Contract Receivable with respect to such Contract.

"**Nondisclosure Agreement**" means the Nondisclosure Agreement dated as of August 12, 2019 between Seller and Buyer.

"**Obligor**" means a lessee under a lease, a buyer under a conditional sales agreement, debtor under a security agreement or any other party to a Contract with a payment obligation thereunder.  The term "Obligor" shall include any and all guarantors of Contract obligations or other obligations of any Obligor with respect to a Contract (an "**Obligor Guarantor**").

"**Perfect Pay Basis**" means that all such Contract Receivables are due from Obligors on the dates specified in the applicable Contracts, but that payments and/or distributions from Seller to Buyer on the date specified herein or in a separate agreement between Buyer and Seller, are due in full on the designated dates and times herein or therein, irrespective of actual collection by Seller from Obligor(s).

"**Purchase Price**" means for any Contract purchased hereunder the amount agreed on between Buyer and Seller as the amount to be paid to Seller for such Contract.

"**Servicing Trigger Event**" means, with respect to any Contract: (A) any failure by Seller to deliver to Buyer any Contract Receivable or other amount received by Seller within fifteen (15) days after receipt of written notice of such non-delivery from Buyer; or (B) failure on the part of Seller to observe or to perform in any material respect any other covenants or agreements of Seller set forth herein in respect of such Contract, Contract

Receivables or the Equipment, which failure continues without cure (a) in the case of any payment due under such Contract for a period of fifteen (15) days, or (b) in the case of any other failure for a period of thirty (30) days after Seller's receipt of written notice from Buyer requesting the failure to be remedied.

## II. OFFER AND ACCEPTANCE

2.1 <u>Program Scope</u>.

(a)    The parties agree that the types of Equipment for the Contracts to be purchased under this Agreement are trucks and trailers of makes and models that Buyer informs Seller which are acceptable to Buyer. Buyer will not be purchasing the title or the residual interest in any Equipment related to a Contract, unless otherwise set forth in the applicable Assignment.  Buyer will use commercially reasonable efforts to communicate the Discount Rates and maximum advance in effect on the date of Assignment of any Contract.  For purposes of clarity, the Discount Rate or pricing set forth in the Assignment is the approved Discount Rate or pricing from Buyer, notwithstanding anything the contrary in this Agreement or any Approval Letter.  The documentation of the Contract will be subject to Buyer's approval which can be given or withheld at its sole discretion. Notwithstanding anything to contrary in this Agreement is the parties understand and acknowledge that this Agreement is not intended to be a firm commitment to fund Contracts or for this Agreement to be a line of credit for the funding of Contracts. To support its obligations under this Agreement, Seller shall fund a loss reserve and Loss Pool with Buyer as set forth in Section 2.8.

(b)    Any Affiliate may enter into an Assignment, and Seller will be jointly and severally responsible with the Affiliate for the obligations thereunder, whether or not Seller executes such Assignment and both shall be bound to all terms and conditions, obligations, warranties, representations and covenants under this Agreement and the applicable Assignment which will include but not be limited to the payments of amounts set forth in Section 2.8, and Article V, VI or VII.  Such Affiliate will be considered an additional Seller for the purposes of such Assignment.  At Buyer's sole discretion, Buyer shall have full recourse against Seller and/or any Affiliate without having to seek or exhaust any, some or all remedies against an Affiliate or the Seller, as the case may be. Seller and its Affiliates agree that any authorized signature of either Seller or Affiliate is authorized to bind the Seller and the Affiliates with respect to this Agreement, an Assignment, and any associated documents.  Any notice required under this Agreement or an Assignment which is received by Buyer from either the Seller or an Affiliate will be deemed to have been given by both Seller and all Affiliates.  Any references herein to Seller shall include any Affiliates for purposes of this Agreement and any Assignment.

2.2    <u>Assets to be Sold</u>.  The parties hereby agree that unless otherwise agreed in writing, each transaction purchased and sold pursuant to this Agreement shall include the sale and/or assignment of all of Seller's right, title and interest, but not its obligations or responsibilities, in, to and under the relevant Contract and all related guaranties, insurance proceeds, vendor warranties and other amounts receivable with respect to the Equipment or the Contract, and all rent and other payments due under the Contract.  Seller also grants to Buyer, or assigns to Buyer, its first priority security interest in the Equipment, free and clear of any liens or encumbrances covered by each Contract and all proceeds thereof.  In the event that, contrary to the mutual intent of Buyer and Seller, any purchase hereunder is not characterized as a sale, Seller shall, effective as of the date hereof, be deemed to have granted (and Seller hereby does grant) to Buyer a first priority security interest in and to any and all Contracts, guaranties, all payments thereunder and described above, and the Equipment leased or financed under each Contract, whether now or in the future owned by Seller, and all proceeds thereof to secure the repayment of all amounts owed under such Contract and hereunder, with accrued interest thereon, and this Agreement shall be deemed to be a security agreement.  Seller hereby authorizes and empowers Buyer to file and amend, as Buyer

may deem necessary or desirable, financing statements regarding such collateral. Notwithstanding the assignment of Seller's right, title and interest in any titled Equipment, such Equipment will remain titled in Seller's name, as collateral agent for Buyer, subject to Section 4.5 and/or Section 4.6 of this Agreement.

2.3    Credit Submission.  In each instance in which Seller proposes to sell or assign a Contract hereunder, Seller will furnish Buyer with the information reasonably requested by Buyer in order to make a credit determination, which may include the following:

(i)    a fully completed credit application from the potential Obligor satisfactory to Buyer in form and substance;

(ii)    a complete description of the Equipment;

(iii)    payment terms requested;

(iv)    estimated Equipment delivery date or actual delivery date, if known;

(v)    a copy of the proposed Obligor's most recent three-year end audited financial statements (or if unaudited, accompanied by Obligor's tax returns for each fiscal year) and if requested by Buyer, the most recent interim financial statement and comparable interim statement from the prior year;

(vi)    a copy of any written lease proposal presented to the potential Obligor by Seller;

(vii)    any requested modifications to Seller's standard form contracts; and

(viii)    such other documentation and information as Buyer may reasonably request.

In connection with all credit submissions, Seller shall secure from all potential Obligors written consent for Seller and its assigns to conduct all necessary credit reviews of potential Obligors, whether entities or individuals, and to share such credit information with third parties, as may be required under any applicable federal or state law or regulation applicable thereto.

2.4    Confidentiality of Submissions.  All information and materials furnished to Buyer by Seller shall be used by Buyer solely for the purpose of making a decision whether or not to accept the offered Contract for assignment and the terms of such acceptance and in connection with any subsequent administration by Buyer of the Contract after the purchase thereof from Buyer, and all such information and materials will be subject to the Nondisclosure Agreement.

2.5    Credit Decision.  The decision to accept or reject any proposed transaction shall be at the sole discretion of Buyer.  Buyer will notify Seller of its decision to approve or reject a proposed transaction.  Unless a proposed transaction is accepted by Buyer by the issuance of an Approval Letter, the transaction shall be deemed rejected by Buyer within a reasonable time after receipt of all requested information.  Seller will not offer a Contract to any other party while Buyer is considering the Contract.

2.6    Credit Rejection.  If Buyer rejects a proposed transaction, upon Seller's request, Buyer promptly shall return to Seller all credit information and other materials furnished by Seller.  Buyer is not a credit reporting agency and consequently Seller agrees that any details provided to substantiate Buyer's reason(s) for rejection of a specific proposed transaction represent strictly Buyer's opinion of the credit and financial risk(s) involved in the proposed transaction, and not statements of fact.  Seller agrees to keep all such details and statements of opinion strictly confidential.  To the extent required by applicable law, Seller agrees to provide to any such proposed Obligor any notice required by the Federal Equal Credit Opportunity Act, Fair Credit Reporting Act, or any other applicable federal, state or local law, regulation or rule.

2.7   <u>Credit Approval</u>.  In the event of a decision to accept a Contract, Buyer shall confirm such acceptance to Seller by means of an Approval Letter.  The Approval Letter shall give summary details regarding the terms and conditions of the approval.  A credit approval shall be valid for the period set forth in the Approval Letter, or if no such period is specified, the approval shall be valid for a period of forty-five (45) days from the date of such Approval Letter; provided, however, that Buyer's credit approval may be revoked prior to the sale and/or assignment of a Contract to Buyer should the Contract be or become in default, Buyer determines that any representation or warranty made by an Obligor in any credit application and/or credit-underwriting package was false or misleading when made, Seller, Guarantor or any Obligor thereunder (including any Obligor Guarantor) suffers an adverse change in its financial condition, any Obligor has not complied with the credit approval requirements set forth in the Approval Letter, the cost of the Equipment changes by more than 10%, or Seller shall be in breach or default under this Agreement.  Any Approval Letter may be amended by Buyer at any time for any reason by communicating such change to Seller.

2.8. <u>Net Loss Pool.</u>

(a)   Buyer and Seller shall establish, and Seller shall fund on or about the date of the original Old Agreement, or March 18, 2020, an ultimate loss pool (the "**Loss Pool**") in an amount of five hundred thousand dollars ($500,000.00). Thereafter, the Loss Pool shall be funded by Buyer's deducting from Purchase Price paid for each Contract, the Loss Pool Deduction for such Contract and depositing such deducted amount into the Loss Pool. The Loss Pool shall at all times be the higher of five hundred thousand dollars ($500,000.00) or the Aggregate Loss Pool Amount. The Loss Pool may be commingled by Buyer with any other amounts or accounts of Buyer. The Loss Pool will not bear interest for the benefit of Seller. The Loss Pool shall be the property of Seller, subject to a first priority, possessory security interest in favor of Buyer, which Seller hereby grants. Seller shall not permit any lien or security interest to attach to the Loss Pool other than Buyer's interest as provided herein. Nothing herein shall require Buyer to refund or remit to Seller any portion of the Loss Pool at any time when (i) Seller is in default hereunder or under any other agreement between Seller and Buyer, (ii) any amount due from Seller under Section 2.8(b) or 2.8(c) is unpaid, or (iii) due to a material adverse change in Seller's business or financial condition, Buyer reasonably deems itself insecure or under secured with respect to any obligation of Seller hereunder.

(b)   If, with respect to any Contract (a "**Defaulted Financing**") the Obligor (i) shall fail to make any payment for a period of ninety (90) consecutive days, (ii) the Obligor ceases to do business as a going concern, becomes bankrupt, insolvent, unable to pay its debts as they become due, or makes an assignment for the benefit of creditors or otherwise takes advantage of the bankruptcy laws or other laws for the relief of debtors, or a trustee or receiver is appointed, or the filing by or against the Obligor or Obligor Guarantor of such Contract of any petition under any provision of the Bankruptcy Act, as amended, and such petition, if filed by or against Obligor, is not dismissed, withdrawn, or otherwise eliminated within sixty (60) days after the filing thereof, or (iii) any of the first three (3) payments (excluding any advance payment or deposit) are past due for a period of sixty (60) days, then Buyer shall apply funds from the Loss Pool equal to the rents, principal and interest and other receivables as of the date such Contract becomes a Defaulted Financing, discounted to present value by application of the Discount Rate and as otherwise provided herein, on no less than ten (10) days prior written notice to Seller. Seller's liability under this Section 2.8(b) shall not exceed the amount of the higher of $500,000.00 or the Aggregate Loss Pool Amount, provided, however, that nothing contained herein shall relieve Seller from maintaining the Required Amount (as hereinafter defined) and nothing herein shall limit or affect Seller's obligations under Article III, IV, V, VI or VII, or affect Seller's other obligations hereunder.

(c)        On the tenth (10th) day of each calendar quarter, commencing August of 2020, or such other frequency as is determined by Buyer, but in any event no less frequent than once every calendar quarter, Buyer shall calculate the amount required to be on deposit in the Loss Pool ("**Required Amount**")." Prior to such date, there shall be no adjustment pursuant to this Section 2.8(c). If the amount in the Loss Pool available for payment as provided herein is greater than the Required Amount, Buyer shall cause such excess to be paid to Seller. If the Required Amount shall be greater than the amount in the Loss Pool available for payment as provided herein, Buyer shall notify Seller and Seller shall, within three (3) Business Days of its receipt of such notice, deposit into the Loss Pool the amount of such shortfall so that the Loss Pool is fully funded as required by Section 2.8(a).

(d)        Amounts added to the Loss Pool with respect to any Contract shall remain in the Loss Pool upon a sale of such Contract by Buyer; the Loss Pool shall not be decreased due to any sale of a Contract by Buyer. Buyer may, at its option, elect not to assign its rights under the Loss Pool to such assignee. All Contracts (whether owned by Buyer or an assignee of Buyer) shall be included for purposes of the calculations set forth in Section 2.8(a). If this Agreement shall be terminated while any Contract is owned by Buyer, the Loss Pool shall remain subject to the above terms and Buyer's security interest, to be increased or reduced over time as provided in Section 2.8(c), above.

(e)        The Loss Pool is established to provide additional security for Buyer. Nothing in this Section 2.8 shall reduce Seller's liability under Article III, IV, V, VI or VII, or affect its other obligations hereunder. Anything herein to the contrary notwithstanding, Buyer shall have recourse, in Buyer's sole discretion, to any and all amounts in the Loss Pool to satisfy any of Seller's obligations under this Agreement or any Assignment.

(f)        In the event that this Agreement is terminated, this Section 2.8 of the Agreement shall survive so long as there are active Contracts. Once all the Contracts purchased or funded under this Agreement have been fully paid off by either Seller or Obligor, Buyer will release any remaining amounts, if any, in the Loss Pool.

## III.  PREPARATION, ASSIGNMENT AND PURCHASE OF CONTRACTS

3.1        Preparation of Contracts.  All Contracts, including all schedules, riders, addenda or supplements thereto, shall be prepared by Seller using standard documents in the form of the documents attached hereto as **Exhibit D**. Seller will not make any changes to the documents reviewed and approved by Buyer, including any negotiated changes requested by an Obligor, without prior written notification to Buyer.

3.2        Purchase Price.  The Purchase Price for Contracts and the related Equipment purchased hereunder shall be determined by Buyer based on the applicable Discount Rate for each such Contract as set by Buyer and provided by Buyer to Seller in the Approval Letter (the "**Discount Rate**").  With respect to each Contract and Seller's interest in the related Equipment purchased hereunder, the Purchase Price shall be set forth in the Assignment.

3.3        Documents Required.

(a)        As soon as practicable after Buyer's issuance of an Approval Letter, the following original (unless otherwise noted) documents shall be delivered by Seller to the office designated by Buyer within fifteen (15) Business Days after funding:

(i)        an Assignment executed by an authorized representative of Seller;

(ii)    the approved Contract executed by the appropriate Obligor and Seller and any other party where appropriate;

(iii)    a Delivery and Acceptance Certificate executed by the Obligor;

(iv)    the invoice and, if Seller has paid for the Equipment, proof of payment in the form of a cancelled check or a bill of sale (copy), and if requested by Buyer, a bill of lading;

(v)    a notification of assignment letter from Seller to Obligor, in the form of **Exhibit E** hereto (each a "**Notice of Assignment**") and properly executed by Seller, to be held by Buyer and not disclosed to any Obligor until such time (if any) as Buyer is permitted by Article IV of this Agreement to disclose its ownership of the Contract;

(vi)    a copy of the UCC-1 financing statement designating the Obligor as debtor and Seller as secured party, and Buyer as assignee of the secured party, duly filed in accordance with Article 9 of the Uniform Commercial Code as in effect in the jurisdiction applicable to the Obligor, such UCC-1 to have been filed within the legal time requirement for perfection of a first priority purchase money security interest, if applicable;

(vii)    Motor vehicle certificate(s) of title, if applicable, conforming to the requirements of this Agreement.

(viii)    evidence of insurance on the Equipment satisfactory to Buyer and listing Seller and its assigns as additional insured and lenders loss payee;

(ix)    a power of attorney in the form of the attached **Exhibit C**;

(x)    a release of lien, subordination or no interest letter from any other creditors that may have a lien or other interest in the Contract and the Equipment leased or financed thereunder in the form of the attached **Exhibit F** (or another form acceptable to Buyer).

(xi)    any other documents or information reasonably requested by Buyer or anticipated by this Agreement or an Assignment.

(b)    Upon receipt of the above documentation, Buyer shall promptly examine all documents submitted and shall promptly advise Seller of any deficiencies. The failure of Buyer to discover any deficiencies shall not limit any warranty or representation of Seller hereunder.

(c)    Unless otherwise stated by Buyer to Seller in writing, the obligation to obtain documents required in Section 3.3(a) above are exclusively and solely an obligation of Seller.

3.4    <u>Filing Fees</u>. Seller shall immediately pay to and/or reimburse Buyer for all UCC search and filing fees (other than UCC termination filing fees) incurred by Buyer, and it shall be the responsibility of Seller to insure that any UCC search and filing fees (other than UCC termination filing fees) incurred by Buyer are reimbursed to Buyer.

3.5    <u>Payment of Purchase Price</u>. As soon as possible after receipt of all documents properly completed and executed as required by this Agreement and unconditional acceptance of the Equipment by Obligor, subject to satisfaction of all Buyer's conditions precedent to purchase, Buyer shall pay or cause to be paid the Purchase Price therefor to Seller by wire transfer or check to Seller; provided, however, that if Seller has not previously paid the Equipment purchase price to the vendor of the Equipment, Buyer shall pay such vendor directly on behalf of Seller. For Contracts where the total transaction size is less than $150,000.00, fax and email delivery of Contracts is acceptable; provided original executed Contract documents are delivered to Buyer within five (5) business days of Buyer's payment of the Purchase Price for such Contract. At Buyer's discretion, exceptions may be made for Contracts where the total transaction size is less than $50,000.00. Buyer's policy with respect to accepting fax and email delivery of Contracts is subject to change at Buyer's sole discretion.

3.6    [Intentionally Omitted]

3.7    Limitation on Acceptance of Contract.  The purchase by Buyer of any Contract hereunder shall not constitute or be deemed an assumption or acceptance by Buyer or an imposition on Buyer of any representation, warranty, obligation, covenant, liability or duty of Seller, or of any manufacturer or supplier of the Equipment, under the Contract or any other agreement relating to the Contract or the Equipment.

## IV.  COLLECTION, ADMINISTRATION, AND SERVICING

4.1    Private Label Billing and Collection.

(a)    With respect to each Contract transferred by Seller to Buyer hereunder, Buyer may, at Buyer's election (and subject to Buyer's right to appoint Seller as Servicer in this Agreement for the same), at Buyer's sole cost and expense, perform all billing and collecting in the name of Seller and in compliance with the Contract, applicable law, and this Agreement.  If Buyer elects to bill and collect directly from an Obligor in Seller's name, Buyer may invoice the applicable Obligor in Seller's name for amounts due under the Contract and will direct the Obligor to make payments to a post office box or other address specified by Buyer.  Buyer may perform collection activities with respect to past due amounts under the Contract in the name of Seller.  If amounts due under the Contract or any other contract on Buyer's books with the same Obligor, become more than 60 days past due, unless otherwise agreed between Seller and Buyer, if any Obligor under the Contract becomes a debtor in any bankruptcy proceeding, if any other default occurs under the Contract, or if the event of a default by Seller as described in 7.1, Buyer may disclose to the Obligor its ownership of the Contract and thereafter deal with the Obligor(s) and the Contract in its own name.  Otherwise, Buyer may, at its election, use reasonable efforts to ensure that its identity remains undisclosed, and Buyer may direct its employees and agents who communicate with Obligors not to identify themselves as Buyer representatives.  Buyer will at all times maintain a telephone number that Obligors or Seller may call to obtain information or assistance regarding any Contract transferred to Buyer for which Buyer has elected to collect directly from Obligor(s).  Seller grants to Buyer such rights and license in Seller's tradenames, trademarks, logos and marks sufficient to allow Buyer to service the Contracts purchased hereunder in Seller's name.  Notwithstanding the foregoing, unless specifically revoked in writing by Buyer, Buyer hereby appoints Seller as servicer and agent pursuant to the terms and conditions more fully set forth in Section 4.5 and/or Section 4.6 herein, and in any event, subject to Buyer's right to terminate such appointment at any time, and from time to time, in accordance with the terms and conditions of this Agreement.

4.2    Limited Power of Attorney. For any Contract(s) assigned hereunder, and subject to the terms and conditions of this Agreement, Seller hereby constitutes Buyer, its officers, directors, employees and agents as Seller's true and lawful attorney-in-fact with full power and authority in the name of Seller or otherwise to file UCC financing statements and execute Contracts (as applicable); to lawfully ask, require, demand, receive, compound and give acquittance for any and all payments and claims for rent or other sums due or to become due under any Contract or any related guaranty; to endorse, negotiate or process, electronically or otherwise, any checks or other instruments delivered to a lockbox or otherwise received by Buyer and constituting payments of rent or other sums legally due Buyer under the Contract or this Agreement; to bill and collect from Obligor rent or other payments, installments or otherwise, applicable sales, use and property taxes; to execute and deliver any agreements, instruments and documents, including without limitation sale and lease agreements and a Notice of Assignment letter notifying Obligor of the assignment of the Contract to Buyer; file any claims or take any action or institute any proceedings that Buyer may deem to be necessary or desirable for the enforcement and collection of any Contracts; and to take such other action as necessary to effectuate the intent of this Agreement.  The power

of attorney granted hereby shall be coupled with an interest, shall be irrevocable, and shall survive any dissolution, liquidation, insolvency or winding-up of Seller. The limited power given to Buyer under this Section shall be exercised by Buyer's employees, in Seller's name.

4.3    Tax Reporting Requirements.  Prior to and after the assignment of a Contract to Buyer, Seller shall be responsible for the administration, filing and reporting of all sales, use, personal property and other taxes (collectively, "**Taxes**") that are due for the Contract and Equipment, including the remittance of all Taxes to the appropriate authorities and the filing of all tax returns and reports with respect thereto.  Anything herein to the contrary notwithstanding:

Seller, as owner of the Equipment, on its behalf and for the benefit of Buyer, will promptly and, to the extent required by law in accordance with such law:

(a)     report, file, register and take all other actions required by law with respect to all property, sales, use, ad valorem, rental and other taxes, and related penalties and interest, that are or may be levied, assessed, collected or otherwise payable with respect to the Equipment, the Contracts, rents or other payments under or with respect to the Contracts, or any transaction contemplated by the Contracts (excluding state and federal income taxes of Seller or Buyer, "**Taxes**");

(b)     remit, or cause the applicable Obligor to remit, to the appropriate governmental authority (a "**Tax Authority**") all Taxes due and payable;

(c)     bill and collect from the appropriate Obligor all amounts it is obligated to pay under the Contracts with respect to Taxes, and

(d)     if advanced by Seller or Buyer, reimburse Seller or Buyer as applicable, for all Taxes.

Seller will notify Buyer promptly if any Obligor does not pay any amounts with respect to any of the Taxes promptly and as provided in the applicable Contract.

In satisfying its obligations as fiscal agent and/or as Servicer hereunder, Seller will act in good faith and in a commercially reasonable manner at least as diligently as it performs with respect to transactions retained for its own account, and will use its reasonable best efforts to avoid incurring penalties or interest.

Seller will promptly deliver to Buyer all notices or other communications Seller receives from any Tax Authority with respect to any Taxes.  Except as herein provided, without the prior written consent of Buyer, Seller will not have authority to take any of the following actions, directly, indirectly or by inaction: (i) negotiate, compromise, settle, approve, admit liability for, or waive any rights regarding any Taxes, (ii) approve, confirm, admit, or accept any assessment, valuation or assertion of liability resulting in or affecting the amount of any Taxes, or (iii) enter into any agreement with any Tax Authority regarding Taxes. Seller will indemnify and hold Buyer harmless from and against any additional Taxes, penalties and interest, and any lawsuit or claim by or any liability to any Tax Authority or other governmental or private entity or person arising by reason of Seller's breach of any of the terms of this Addendum.

4.4    No Modification After Assignment.  Seller shall have no right or authority to, and will not, without the prior written consent of Buyer, repossess or consent to the return of any Equipment, modify the terms of any Contract, or consent to a termination of any Contract.

4.5    Collateral Agency:  Each item of Equipment constituting tractors, trailers, motor vehicles, or other equipment ("**Titled Vehicles**") which are subject to requirements of applicable laws requiring the recordation or

other indication of ownership thereof or security interests thereon to be noted on certificates of title or other similar documentation shall be registered under the laws of each state under which such item is the subject of a titling law; and for each of item of Titled Vehicle subject to an Assignment, within 120 days after the purchase of a Contract, Seller shall obtain and deliver to Buyer (or cause to be obtained and delivered to Buyer) any certificates of title, or ELT record or lien receipt (if state utilizes Electronic Lien and Title Program) issued therefor (sometimes herein called a "**Certificate of Title**"), it being understood that, unless otherwise stated in the applicable specification or agreed in writing, Buyer shall be listed as first lienholder or, at its election, owner. If and to the extent Seller is  indicated on any Certificate of Title as owner or first lienholder, or is in possession of any Certificate of Title Seller is acting solely as collateral agent for Buyer until such time as Buyer shall administer the Contract in its own name pursuant to the terms of this Agreement  and the applicable Assignment, and change the owner or first lienholder, as applicable, to the name of Buyer pursuant to a power of attorney substantially in the form attached hereto as **Exhibit C** to be delivered to Buyer concurrently with execution of an Assignment.

In furtherance of and subject to the immediately-preceding paragraph:

(a)     Buyer hereby appoints Seller as Buyer's collateral agent for the following limited purposes:  (1) to be named as the owner, as trustee or agent, or the lienholder, as trustee or agent, as applicable, on Certificates of Title relating to Titled Vehicles on behalf of Buyer; (2) to hold the ownership or security interest in the Titled Vehicles solely for the benefit of Buyer, its successors and assigns; and (3) to take any lawful actions requested in writing by Buyer, including, but not limited to, assigning the ownership or security interest to Buyer or any designee of Buyer.

(b)     Seller hereby agrees to conduct its agency as Buyer shall direct in writing and shall not take any action with respect to any Certificate of Title except as expressly directed by Buyer in writing.  Buyer hereby confers on Seller such powers as it possesses as are reasonably necessary for Seller to act as Buyer's agent for the purpose of being listed as owner or lienholder on Certificates of Title for the Titled Vehicles as described above. Seller undertakes to perform as collateral agent on behalf of Buyer such duties and only such duties as are specifically set forth herein and no implied covenants or obligations shall be read into this Agreement against Seller.  Seller has no legal or beneficial title to, ownership of, or interest in, any of the Titled Vehicles.

(c)     Acceptance of Appointment.  Seller hereby accepts its appointment as collateral agent and agrees that if and to the extent it is named as owner, as agent, or as lienholder, collateral agent or in any other capacity on a Certificate of Title only for the benefit of Buyer and that it has no beneficial title, ownership, or interest in the Vehicles.

(d)     Notices.  Seller hereby agrees promptly, upon receipt, to deliver to Buyer all notices and other communications received by Seller with respect to the Titled Vehicles.

(e)     Negative Covenant.  Seller hereby agrees not to take any action which would encumber the Titled Vehicles or convey legal or equitable title thereto without the prior written consent or written direction of Buyer.

(f)     Fee.  Seller serves hereunder as collateral agent without any fee.  Buyer shall reimburse Seller for any reasonable out-of-pocket costs and expenses incurred by Seller in performing its obligations hereunder (expressly excluding any out-of-pocket costs and expenses incurred as a result of the negligent or willful act or failure to act of Seller); provided, however, that Seller shall not incur any single expense in excess of $1,000.00

without the prior written consent of Buyer.  If Seller does incur any such expense without prior written consent of Buyer, then Buyer shall be under no obligation to reimburse Seller for such expense.

(g)    Terms of Appointment.  Unless sooner terminated by Buyer, Seller's appointment hereunder shall extend until the Agreement has expired or otherwise been terminated (including any extension thereof).  Buyer may terminate Seller's appointment as collateral agent hereunder at any time, with or without cause, and for any reason or no reason, upon thirty (30) days' prior written notice to Seller.  Upon any termination of Seller's appointment as agent hereunder, Buyer shall promptly take all actions necessary to obtain new Certificates of Title for such Titled Vehicles, indicating Buyer as owner or lienholder, as the case may be, pursuant to the power of attorney to be delivered to Buyer concurrently with the execution of each Assignment (see **Exhibit C**).

4.6    Servicing, Collection, Administration, Reporting, Duties of Servicer, and Termination of Servicer:

(a)    Appointment of Seller as Servicer.  In consideration of, and as a necessary condition to, the consummation of the transactions contemplated in this Agreement, Buyer and Seller desire to appoint the Seller as servicer and agent (Seller, in such capacity, shall sometimes also be referred to herein as, "**Servicer**") of Buyer with respect to the Contract Receivables and Equipment to perform certain servicing responsibilities for the benefit of Buyer and, with respect to defaulted Contracts, certain remarketing responsibilities with respect to the Equipment, and Seller is willing to perform such servicing and remarketing responsibilities on the terms and conditions provided in this Agreement.

(b)    Termination of Seller as Servicer, Contract Default, and Servicing Trigger Event(s).  Notwithstanding any to the contrary in this Agreement or in any agreement between the parties other than an express amendment of this Agreement:

(i)    In the event of a Contract default, Buyer shall have the right to terminate Seller's designation and rights as Servicer under this Agreement, or terminate this Agreement, or both, with respect to the affected Contract, and Buyer may assume the servicing responsibilities under this Agreement (or attempt to locate a successor servicer).

(ii)    Upon the occurrence of a Servicing Trigger Event or any Event of Default by Seller under this Agreement, Buyer may, at its option, by notice to Seller within ten (10) days after expiry of any applicable grace or cure period, terminate Seller's designation and rights as Servicer under this Agreement, or terminate this Agreement, or both, and Buyer assume the related servicing responsibilities (or attempt to locate a successor servicer); provided that upon any Event of Default under Section 7.1(c) hereof, the termination of Seller's designation and rights as Servicer under this Agreement shall be automatic and immediate without any action, election or notice on Buyer's part.

(iii)    In Buyer's sole and absolute discretion, with or without cause, at any time, and from time to time, and irrespective of the occurrence or non-occurrence of any Event of Default by Seller under this Agreement or any Servicing Trigger Event, Buyer shall have the right, at its election, by not less than ninety (90) days' notice to Seller, to terminate Seller's designation and rights as Servicer and agent under this Agreement, with respect to any Contract or all Contracts, and Buyer may assume the servicing responsibilities under this Agreement (or attempt to locate a successor servicer).

(c)    <u>Title to the Contract Receivables</u>. Seller agrees that Seller will not at any time have or in any way attempt to assert any interest in any Contract Receivables; provided, however, that Seller shall have rights in, and be entitled to retain amounts payable to Seller with respect to any Contract or the Equipment solely to the extent explicitly set forth in this Agreement and any related agreement pursuant to which Buyer acquired such Contract and the related Equipment.  Seller shall deliver to Buyer, at closing, and in accordance with the notice provisions set forth in the Contract, a copy of the fully executed Notice of Assignment, which shall be held by Buyer until the occurrence of a Servicing Triggering Event and/or a default under an applicable Contract or under this Agreement. Seller shall maintain proof of such delivery of the Notice of Assignment to Obligor in the Contract File.

(d)    <u>Duties of Seller as Servicer</u>.

(i)    Seller as agent for Buyer shall manage, service, administer and make collections on each Contract with reasonable care, using that degree of skill and attention that the Seller exercises with respect to all comparable contracts, leases, and similar agreements that it services for itself; provided, however, in no event shall such care fall below standards of commercial reasonableness. Seller's duties shall include, without limitation, billing, collection, receiving and posting of all payments (including, without limitation, Contract Receivables and any taxes pertaining to the Contract and/or the Equipment), and providing all required tax information for all sales, use and personal property taxes required to be paid in connection with the Contract or the Equipment, responding to the Obligor inquiries, investigating delinquencies, sending payment invoices to Obligor(s), accounting for collections, providing and receiving notices due under the Contract, and executing all documents required under the Contract; provided, however, except as expressly permitted with respect to Permitted Actions (as defined herein), Seller shall not execute any document in connection with the Contract without the prior written consent of Buyer, except in the event of a repurchase of a Contract by Seller from Buyer pursuant to a separate agreement or pursuant to any required of Seller to do the same contained in this Agreement (a "**Repurchase**").  For the avoidance of doubt, Seller shall (a) bill for, collect and receive all sums payable under each Contract, including sales, use and personal property taxes, and (b) remit to the appropriate agencies, all sale, use and personal property taxes required to be paid in connection with each Contract (the amounts of which shall be withdrawn, paid or transferred from the Contract Receivables Deposit Account by Seller), or, in the event no sales tax is due under a Contract, then Seller shall obtain a tax exemption certificate from the Obligor.  Seller shall follow its customary standards, policies and procedures for transactions it holds for its own account in performing all of its duties as the Servicer.  Buyer may, at its election, furnish Seller with any powers of attorney and other documents reasonably necessary or appropriate to enable Seller to carry out its servicing and administrative duties under this Agreement.

(ii)    Notwithstanding anything in this Agreement to the contrary, in the event of a Contract Default under a Contract by the related Obligor, Buyer shall have the sole right, at Buyer election, to independently exercise any and all remedies available to Buyer in connection with such Contract Receivables that are the subject of such Contract default.  If specifically requested by Buyer in writing, however, and subject to the following subsection of this Agreement, Seller shall continue to serve as agent and Servicer hereunder and/or shall take all such actions as may be requested by Buyer to enforce Buyer's rights with respect to the Contract Receivables due and owing under such Contract upon the occurrence of a Contract default.  For the avoidance of doubt, nothing in this

14

subsection shall limit or restrain any obligation of Seller under this Agreement, including with respect to the Loss Pool.

(iii)    Upon the written direction or with the prior written consent of Buyer, Seller shall enforce rights or take action on Buyer's behalf with respect to any Contract Receivable that is the subject of a Contract default, including, without limitation, by repossessing the related Equipment. Upon the written request of Buyer, Seller shall provide Buyer with all information and documents relating to any actions taken by Seller on Buyer's behalf with respect to such Contract Receivables. In addition, Seller agrees to reasonably cooperate and assist Buyer with respect to any actions taken by Buyer with respect to any Contract Receivable that is the subject of a Contract default. Buyer hereby (a) acknowledges that Seller may also be enforcing rights or may be a party to such action in its capacity as owner or servicer of other contracts, leases, or other agreements with the same Obligor, and (b) should a conflict of interest arise, such conflict must either be waived in writing by all parties, if capable of being waived, and/or may require Seller and Buyer to retain separate counsel. If there is an unresolvable conflict of interest between Buyer and Seller with respect to enforcement actions involving the same Obligor, and Seller can no longer act as Servicer on behalf of Buyer for such Contract Receivables, or if Buyer elects to terminate Seller's rights to act as Servicer for such Contract Receivable, Seller may be terminated, or may resign upon written consent of Buyer, as Servicer for such Contract and related Contract Receivables. Notwithstanding the foregoing, Seller shall not be under any obligation to initiate, appear in, prosecute or defend any legal or enforcement action that will result in Seller's legal liability.

(iv)    Seller shall (a) continue to conduct "Know your Customer" and due diligence screening of each Obligor under any Contract in accordance with Seller's normal operating procedures for transactions held for its own account, and (b) promptly notify Buyer in writing of any alerts or other notices that any Obligor provides to Seller advising Buyer of risk pertaining to "Know your Customer" obligations. In the event any Obligor or any person that owns or controls any Obligor is subject to one of the foregoing events, the parties hereto shall cooperate and take any appropriate actions required to be taken by applicable law. Within five (5) days of Seller's receipt of prior written request of Buyer, Seller agrees to deliver to Buyer any information reasonably requested by Buyer in order for Buyer to conduct any screening of any Obligor and confirming whether any Obligor is subject to one of the foregoing events.

(e)     <u>Collection of Contract Receivables and Other Actions</u>.

(i)     Seller shall make reasonable efforts to collect all Contract Receivables as and when the same shall become due in accordance with the customary procedures Seller follows with respect to all comparable contracts, leases, or similar agreements that it services for itself.

(ii)    Unless such action is a Permitted Action (as defined herein), Seller shall not enter into any agreement or take, or fail to take, any action that: (a) permits amendment, modification or waiver of any of the terms of any Contract; (b) releases, substitutes, exchanges or otherwise conveys any Equipment (or any interest therein) under, any guaranty of or any security for the Contract in whole or in part except in the event of payment in full by the Obligor, the Seller under a Repurchase or otherwise, or in connection with the substitution of Equipment, as expressly permitted under such Contract and this Agreement; (c) materially impairs or jeopardizes the right, title and interest of Buyer in any Contract Receivables, Contract, or related Equipment; (d) accelerates or otherwise changes any of the payment

terms of any Contract; (e) settles any insurance claim resulting from insurance maintained by Obligor with respect to any casualty to, theft of, or other loss of any Equipment; (f) agrees to any prepayment or early termination of any Contract, except as otherwise expressly permitted hereunder; (g) agrees to any renewal term or renewal rent amount not expressly permitted by the Contract; or (h) agrees that any Obligor has met its/his/her obligations under any Contract.  For purposes of this Section, a "**Permitted Action**" means, with respect to any Contract or Contract Receivables, entry into any agreement, or the taking, or failure to take, any action: (a) expressly permitted under this Agreement, (b) required by law or court order, (c) expressly required by, or prohibited by, as applicable, the terms of such Contract, (4) for which Buyer has provided its prior written consent; and/or (5) extending the term of such Contract with a corresponding deferment of rent or other periodic payments for one additional period of up to three (3) calendar months, provided (A) Seller shall confirm to Buyer as part of its monthly reporting process that the term has been extended, (B) Seller shall, upon granting such extension, furnish Buyer with the calculation of additional Contract Receivables due by reason of such extension, which shall not be less than additional interest at the rate implicit in calculation of rent or other periodic payments under such Contract and which shall be payable to Buyer upon receipt by Seller, and (C) Seller shall be responsible for and guaranty Buyer's receipt of any and all such additional Contract Receivables.

(iii)      Seller will promptly provide to Buyer copies of any amendments, modifications, waivers or other documents executed and delivered by Seller with respect to any Contract or Equipment, the Monthly Reports, and other reports reasonably requested in writing by Buyer.

(f)      <u>Insurance</u>. In accordance with Seller's customary standards, policies and procedures for transactions it holds for its own account, Seller shall require that each Obligor shall, at all times, (i) have obtained and maintain in full force and effect physical damage insurance as provided in the Contract covering the Equipment, and (i) have obtained and maintain liability insurance in such amounts and for such risks as set forth in the Contract, including, but not limited to, fire, extended coverage, vandalism and theft insurance. All such insurance coverage shall be provided by insurance companies that have an A.M. Best Co. Financial Strength Rating of "A-" or better.  Seller or Buyer, as applicable, and its successors and/or assigns shall be named as loss payee and/or additional insured under any such insurance policies.  In addition, Seller or its designee shall track Obligor's insurance coverage and the renewals thereof and deliver to Buyer a monthly report showing: (1) the status of any Obligor's insurance coverage, (2) whether such insurance coverage has expired or been cancelled, (3) physical damage insurance as required under the Contract covering the Equipment, (4) liability insurance in such amounts and for such risks as set forth in the Contract, and (5) actions taken by Seller or its designee to cause any Obligor to deliver to Seller or its designee evidence of such insurance coverage where evidence of such coverage had not been delivered to Seller or its designee. In the event Seller receives notice or otherwise becomes aware that any physical damage insurance or liability insurance has expired, is not in compliance with the terms and conditions of the Contract, or has been cancelled, Seller shall, within thirty (30) days after receipt of such notice, deliver a letter to the applicable Obligor demanding that Obligor deliver to Seller a new certificate of insurance evidencing that such Obligor has physical damage and liability insurance in effect in accordance with the terms and conditions of the Contract.  Notwithstanding anything in this Agreement to the contrary, in the event Seller breaches any of its obligations under this Article IV, and Buyer is unable to recover any insurance proceeds in an amount that would have been received if the Obligor had maintained insurance in accordance with the terms of the Contract that is the subject of such breach, then Buyer may, at Buyer's election, and without delay, withdraw from the Loss Pool an amount equal to the amount of insurance proceeds that Buyer would have received if the Obligor had maintained insurance in accordance with the terms of the Contract.

(g)     Covenants of Seller and Servicer. Except as otherwise provided in this Agreement or agreed by Buyer in writing, Seller shall not take any action that has an adverse effect on the rights of Buyer in the Contract Receivables, the Contract or the related Equipment.

(h)     Periodic Information and Reporting.  Seller shall provide Buyer, within five (5) Business Days after receipt of a written request from Buyer, a copy of any reports, financial statements, notices, and other information provided or required to be provided by any Obligor pursuant to a Contract, or that may be reasonably requested by Buyer.

(i)     Expenses and Liabilities; Seller and Servicer Indemnity. Except as expressly set forth in this Agreement, all liabilities, obligations, losses, penalties, expenses, disbursements, costs and damages incurred by Seller, or for which the Seller is responsible, directly or indirectly, in connection with or arising as a result of the Contract or the Equipment (including, without limitation, those arising due to suit, claims, or counterclaims by any Obligor or any other person against the Seller or by the Seller to enforce rights and remedies under any Contract) which are not paid by the applicable Obligor(s) (or others, on behalf of such Obligor(s)) shall be the responsibility of Seller.  Seller shall indemnify Buyer for all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees, and disbursements and other costs of investigation and/or defense, including those incurred upon any appeal, and with or without the need for any lawsuit to have been filed) (collectively, "**Indemnified Amounts**") which may be imposed on, incurred by or asserted against Buyer in any way arising out of or relating to (i) Seller's actions or inactions under any Contract, except when at the explicit written direction of Buyer, (ii) any material breach by Seller of any of its obligations under this Agreement or related agreements; or (iii) Seller's gross negligence or willful misconduct in the performance of its duties hereunder. Seller shall not be entitled to any compensation from Buyer for the performance of its obligations under this Agreement.

(j)     Prepayment.

    (i)     Seller shall remit to Buyer all payments made by or on behalf of any Obligor in accordance with the applicable Contract, with respect to such Equipment, such event of loss (including any stipulated loss value related to such item or items of Equipment), any proceeds from insurance policies covering the Equipment and any Contract Receivables, in each case on a Perfect Pay Basis.

    (ii)     Except as otherwise provided in the following subsection herein, or otherwise in this Agreement, Seller and Buyer hereby agree that if any Obligor requests early termination or payment of a Contract expressly permitted under the Contract, Buyer hereby authorizes Seller to quote to the Obligor an early termination or payment amount in an amount in accordance with the relevant Contract.  Seller shall immediately provide written notice to Buyer of the amount and terms of any such early termination or payment.  If the Obligor and Seller agree to an early payment amount in accordance with the preceding sentence, upon Seller's receipt of such payment amount, Seller shall promptly remit such payment amount to Buyer.

    (iii)     For the avoidance of doubt, a voluntary prepayment of a Contract as described in the above subsection herein shall not include, (1) any prepayment resulting from the exercise of remedies following an Event of Default, or (2) in connection with a prepayment that arises as a result of a casualty loss, or (3) if Seller or one of its Affiliates refinances the Equipment for the Obligor or finances the Obligor's acquisition of Equipment as an upgrade of or replacement for the Equipment.

(k)    <u>Audits</u>.  Seller covenants and agrees that Buyer shall have the right, but not the obligation, to perform audits of Seller, at the sole cost and expense of Seller, and as may be requested or required by Buyer in Buyer's discretion, and Seller shall promptly comply with all such audit requests and demands from Seller.

(l)    <u>Collections</u>. Seller shall deposit upon receipt, and hold in trust as agent for Buyer, all amounts received in connection with each Contract for which it is acting as Servicer, and the related Equipment, in a segregated deposit account (the "**Contract Receivables Deposit Account**") and shall withdraw from such Contract Receivables Deposit Account only such amounts required to be disbursed on each Distribution Date in accordance with Article IV hereof.  The Contract Receivables Deposit Account shall be maintained at a bank acceptable to Buyer in Buyer's sole discretion, shall be subject to the Deposit Account Control Agreement in favor of Buyer, and Seller shall not deposit any Contract Receivables, insurance proceeds related to the Equipment, or any other proceeds of the Equipment into an account other than the Contract Receivables Deposit Account without the express written consent of Buyer.  Buyer shall be permitted to monitor all deposits and disbursements from the Contract Receivables Deposit Account, and to make certain withdrawals as permitted by this Agreement or the Deposit Account Control Agreement.

(m)    <u>Distributions</u>. On each Distribution Date, Seller hereby expressly authorizes Buyer, and Buyer shall have the right, but not the obligation, to cause to be withdrawn, by automated clearing house ("**ACH**") transfer, the aggregate scheduled Contract Receivables pursuant to all Contracts purchased by Buyer and due during the entire calendar month preceding the month in which such Distribution Date occurs, including any Advance, as that term is defined herein, and each scheduled Advance shall be made, and can be ACH withdrawn by Buyer, on each Distribution Date, irrespective of actual collection by Seller, on a Perfect Pay Basis.  In addition, Seller shall remit to Buyer by wire transfer any prepayments and other payments, including insurance proceeds, made under any applicable Contract on or prior to the Distribution Date following the receipt of such payment.  The amount of any Contract Receivables advanced by Seller to Buyer prior to receipt thereof is referred to herein as an "**Advance,**" and Seller shall have the duty to maintain a sufficient balance in the Contract Receivables Deposit Account to make each Advance required hereunder.  Seller shall be obligated to make an Advance whether or not Seller determines, in good faith, that such Advance will be recoverable from each applicable Obligor.  Seller shall notify Buyer in writing if Seller has not received all or any portion of any Contract Receivables for which Seller has made an Advance within thirty (30) days after the applicable Distribution Date, but notwithstanding such notice requirement, each scheduled Advance shall be made on time irrespective of actual collection on a Perfect Pay Basis.  Buyer acknowledges and agrees that an Obligor may have additional schedules or related contracts and/or agreements with a Contract serviced by Seller that are not owned (beneficially or otherwise) by Buyer, and in the event payments received from an Obligor are not designated by Obligor, or if no schedule, related contract, or other agreement is specified, then such payments shall be applied without prejudice to or discrimination against Buyer or any Contract Receivables assigned to Buyer in accordance with its customary procedures.  Upon the written request of Buyer, Seller shall provide Buyer with an accounting of any payments that were distributed by Seller pursuant to the preceding sentence.  Seller shall be entitled to retain as servicing compensation any late charges relating to any Contract Receivable with respect to which Seller has made an Advance.

## V.  <u>REPRESENTATIONS, WARRANTIES AND COVENANTS</u>

5.1   <u>Representations, Warranties, and Covenants with Respect to Contracts</u>.  Seller hereby warrants, represents and covenants with respect to each Contract sold hereunder that as of the effective date of the Contract:

(a)    it has not entered into any agreement, amendment or modification that purports to change any terms of Seller's agreement with the Obligor;

(b)    Seller is properly licensed and qualified in all appropriate jurisdictions; and

(c)    Seller shall not make any payment due under such Contract on behalf of the Obligor in question and to the extent Seller receives a payment from an Obligor intended for Buyer, Seller agrees to hold such amounts in trust for Buyer, and promptly forward such payment to Buyer, in the form received by Seller;

(d)    (i) Seller has neither provided the Obligor with, nor paid on behalf of the Obligor, any part of the advance payments required to be paid by the Obligor pursuant to the Contract  or received any rent or other payment by the Obligor not delivered to Buyer (ii) there has been no material adverse change in the financial condition or prospects of the Obligor or any Obligor's obligations subsequent to Buyer's credit approval and prior to Buyer's payment of the related invoice; (iii) the Obligor's signature(s) on any application, Contract and any other ancillary document is genuine, valid and binding;

(e)    Immediately prior to such sale, ownership of the Contract was vested in Seller, the Contract and the Equipment are free of liens or encumbrances in favor of third parties created by, through or under Seller, and such free and clear ownership of the Contract (and the Equipment, if a true lease) passes to Buyer at the sale;

(f)    Seller has not received any prepaid rent or other installment payment amounts due for periods after the sale of the Contract which Seller has not disclosed and turned over to Buyer, except amounts previously disclosed to Buyer and taken into account in connection with the calculation of the Purchase Price;

(g)    The Contract complies with all applicable laws and regulations (including, without limitation, interest or usury laws); the Contract has been duly executed and delivered on behalf of Seller and Obligor (including any Obligor Guarantor) and is enforceable against Seller, Obligor and any and all Obligor Guarantors in accordance with its terms; and the Contract accurately describes the related Equipment and the payments due under the Contract;

(h)    The Contract provided to Buyer is in the form attached hereto as **Exhibit D** without any modification thereto, constitutes the sole original counterpart thereof, and constitutes the entire agreement of the parties thereto with respect to the subject matter of the Contract; and there are no side agreements, verbal or written, between Seller and Obligor with respect to the Contract or the Equipment.

(i)    The amount of rent or other obligation, the amount of remaining rent or other installment payments, the commencement date, the remaining term, the Equipment description set forth in the Contract and all information on the exhibit to the Assignment are accurate, true and correct;

(j)    No default or event of default under the Contract has occurred and is continuing as of the date of the assignment of such Contract;

(k)    The Equipment is in all respects in conformity with the requirements of the Contract and has been delivered to and unconditionally accepted by the Obligor thereunder; as of the date of delivery to the applicable Obligor, the Equipment was owned either by Seller (if the Contract is a true lease) or by the Obligor specified in the Contract (if the Contract is not a true lease); the Equipment is in good operating order (reasonable wear and tear excepted);  the Equipment is physically located at the street address specified in the Contract; and the Equipment is new unless clearly identified as used;

(l)      Seller has not assigned or pledged, and hereby covenants that it will not assign or pledge, so long as the Assignment of such Contract shall remain in effect, the whole or any part of the rights hereby assigned, to anyone other than Buyer, its designee, its successors or assigns;

(m)      The Assignment for such Contract has been duly executed by an authorized representative of Seller, and such Assignment is enforceable against Seller in accordance with its terms;

(n)      If applicable, Seller has filed a UCC-1 financing statement designating the Obligor as debtor and Seller as secured party, in accordance with Article 9 of the Uniform Commercial Code as in effect as in the jurisdiction applicable to the Obligor, and such UCC-1 was filed within the legal time requirement for perfection of a first priority purchase money security interest in the Equipment described therein;

(o)      Seller is not aware of any material inaccuracies, omissions or misrepresentations in the credit information provided by Seller to Buyer concerning the Obligor and such information is true and accurate to the best knowledge of Seller, and Seller has not received any adverse credit information concerning any Obligor, including any Obligor Guarantor, with respect thereto;

(p)      The Contract was originated by Seller and was not sub-brokered or re-brokered by Seller, as such terms are customarily used or defined in the leasing industry;

(q)      Seller has complied (and will continue to comply) with the Equal Credit Opportunity Act and Fair Credit Reporting Act and all other applicable federal or state statutes.

5.2      <u>Representations and Warranties with Respect to Seller and Buyer</u>.

(a)      Seller and Buyer each represents and warrants to the other party that:

(i)      it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and is duly qualified to do business and is in good standing in every jurisdiction where the nature of its business requires it to be qualified, except where the failure to so qualify would not have a material adverse effect on its condition (financial or otherwise);

(ii)      it has the power, authority and legal right to execute, deliver and perform this Agreement and the execution, delivery and performance hereof have been duly authorized by all necessary corporate action;

(iii)      this Agreement has been duly executed and delivered by such party and constitutes a legal, valid and binding obligation of such party enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy or similar laws affecting the rights of creditors generally and except as such enforceability may be subject to equitable principles; and

(iv)      the execution, delivery and performance of this Agreement (1) are not in contravention of any agreement or indenture by which such party is bound, (2) do not require any approval or consent of, or filing or registration with, any governmental body or regulatory authority or agency, or any approval or consent of any trustees or holders of any indebtedness or obligations of such party, or

such approval or consent has been obtained and (3) do not contravene any law, regulation, judgment or decree applicable to such party.

(b)     Upon the execution of this Agreement, Seller will furnish Buyer with evidence of the authority of, and a specimen signature(s) by, the person(s) who will sign this Agreement on behalf of Seller and who will represent Seller in related transactions contemplated hereby.

5.3     <u>Affirmative Covenants of Seller</u>.

(a)     From the date hereof, until the date on which all obligations of Obligors under all Contracts have been fully paid and otherwise discharged, Seller shall deliver to Buyer as soon as available but no later than one hundred twenty (120) days after the close of each fiscal year, a complete copy of Seller's balance sheet as of the close of such year, Seller's statement of income and retained earnings and changes in financial position for such year, which shall be prepared in accordance with generally accepted accounting principles and practices, consistently applied, and such other information as Buyer shall reasonably request.

(b)     Seller will promptly fulfill and perform all obligations, covenants, liabilities, warranties and duties, if any, on its part to be fulfilled and performed in connection with each Contract and any other agreements or instruments executed by Seller with respect to the sale, installation, maintenance or servicing by Seller of the Equipment covered by the Contract.  Buyer or any subsequent assignee shall not be obligated to perform any of Seller's obligations thereunder; Seller's obligations under the Contract may be performed by Buyer or any subsequent assignee, however, without releasing Seller therefrom.

(c)     Seller will notify Buyer promptly upon Seller's learning of (i) any change in the name of the Obligor under any Contract; (ii) the default or violation of any provision of a Contract or other related documents by the Obligor thereunder or any other Obligor thereof; (iii) any adverse credit information, which Seller may acquire or have knowledge of, with respect to any Obligor; (iv) the movement of the location of any Equipment subject to a Contract; or (v) any change in the principal address, form of organization or state of organization of any Obligor.

(d)     Seller shall not modify any Contract, including any guaranty delivered with respect thereto or any other document pertaining thereto, or waive any provision thereof.

(e)     Seller shall execute and deliver to Buyer, at Seller's sole cost and expense, such security agreements, UCC financing statements, certificates of title, amendments and other documents and instruments (in form and substance satisfactory to Buyer) as Buyer may reasonably request from time to time to evidence, perfect, maintain, or enforce Buyer's rights in the Contracts and its ownership and/or security interest in the Equipment subject to such Contracts; and Buyer may, and is hereby granted a power of attorney to, execute such UCC financing statements in the name of Seller as Buyer shall reasonably deem necessary and/or authorizes Buyer to file on behalf of Seller such UCC financing statements and/or Amendments and Addenda thereto as Buyer shall reasonably deem necessary.

(f)     Sulakhan Singh Johal, Jasvir Johal, or such other principals or individuals that Buyer may identify from time to time shall be a Guarantor of Seller's payment obligations and other obligations under this Agreement and any Assignment.  The form of guaranty will be in the form and content acceptable to Buyer in its sole discretion.  Guarantors will also be responsible for the representations, warranties, and obligations of Seller, including, without limitation, the obligation to maintain loss reserve amounts.

(g)     This Agreement will be cross-guaranteed with all other Affiliate and Seller accounts.  In the event of default by Seller (or Seller's affiliate) under its agreement with Pride, will be deemed an event of default under this Agreement, and Buyer shall have the right to offset amounts under this Agreement with the agreement between Pride and Seller (or Seller's Affiliate).

(h)     In the event a Contract is prepaid as the result of (i) a casualty loss to the Equipment, (ii) pursuant to the express terms of the Contract or (iii) the result of the acceleration of the balance of a Contract as a result of an event of default, and the amount due from Obligor pursuant to the terms of the Contract is less than the Repurchase Price, Seller shall, upon demand, pay to Buyer an amount equal to the difference between the Repurchase Price and the amount due from the Obligor pursuant to the terms of the Contract (the "**Shortfall**").   Repurchase Price is equal to the sum of the remaining payments and obligations due and owing under such Contract.  The Shortfall shall be paid from the Loss Pool.  For the avoidance of doubt, the Buyer shall not have recourse to the Seller for the Shortfall.

(i)     Seller shall be responsible for the recovery and repair of all repossessed or off lease Equipment. Such repairs and recovery will be performed in an ordinary and workman like manner in accordance with industry practices for such Equipment.

## VI.  INDEMNIFICATION

6.1     <u>Indemnification</u>.  Seller agrees to indemnify and save Buyer harmless from and against any losses, damages, costs, and expenses (including reasonable attorneys' fees) incurred by Buyer as a result of (i) Seller's infringement of any patent, copyright, or other intellectual property right with respect to any Equipment or any Contract, (ii) any injury to persons or property caused by the equipment including under, strict liability or other product liability principles, (iii) any breach by Seller of any of its representations, warranties, covenants or other obligations or agreements contained in this Agreement, in any Contract or in any agreement related hereto or thereto, (iv) for the net book value of a Contract for which the applicable Obligor is 90 days past due for any of such Obligor's payment Obligations under the applicable Contract, (v) any conflict between the terms and conditions of any Contract and any related document, to the extent such conflict adversely affects Buyer's ability to enforce its rights or otherwise protect its interests under the Contract, (vi) any offset, deduction, reduction, abatement, defense, claim or counterclaim made or asserted by an Obligor arising from or relating to the acts, omissions, representation or misrepresentations of Seller, or (vii) which, for all Contracts delivered to Buyer by fax or email for which Buyer has not received all original executed Contract documents following payment of the Purchase Price, arise out of or in connection with Seller's inability to deliver to Buyer the original executed Contract, including but not limited to any claim by a third party of any right or interest under or with respect to ownership of, or any lien, security interest or other encumbrance on, against or with respect to any of the original executed Contract, in whole or in part.

## VII.  DEFAULT AND REMEDIES

7.1     <u>Events of Default</u>.  The following shall be events of default hereunder:

(a)  The breach by Seller or any Guarantor of any representation or warranty made by Seller in connection with this Agreement or in any agreement of Seller or any Guarantor made in connection herewith; or

(b)  The breach by Seller or any Guarantor of any covenant, agreement or obligation made by Seller in this Agreement or in any agreement of Seller made in connection herewith; or

(c) Seller or any Guarantor ceases to do business as a going concern, becomes bankrupt, insolvent, unable to pay its debts as they become due, or makes an assignment for the benefit of creditors or otherwise takes advantage of the bankruptcy laws or other laws for the relief of debtors, or a trustee or receiver is appointed, or the filing by or against Seller or any Guarantor of any petition under any provision of the Bankruptcy Act, as amended; provided however that Seller and/or Guarantor, as applicable, may cure this immediate Event of Default if the bankruptcy petition is dismissed, withdrawn, or otherwise eliminated within sixty (60) days after the filing thereof.

(d) An event of default by Seller (or an Affiliate) under an agreement between Pride and Seller (or an Affiliate)

7.2   <u>Remedies</u>.  In the event of a default hereunder, the following remedies shall be available to Buyer:

(a) In the event of a default described in Section 7.1(a) above, with respect to any Contract purchased hereunder, Seller agrees, upon receipt of a written request from Buyer specifying the claimed breach by Seller, to repurchase the affected Contract within five (5) business days after Buyer's receipt of such request, for an amount equal to the sum of:  (i) any payments or other amounts then due under the Contract; plus (ii) the sum of the balance of all payments then remaining under the Contract plus if applicable Buyer's anticipated residual, as indicated by Buyer's books and records, such sum discounted to present value using the simple interest method at the Discount Rate (as defined in Section 3.2) applicable to such Contract; plus (iii) unamortized initial direct costs; plus (iv) recapture of any tax benefits; minus (v) any unearned finance charges; plus (vi) any outstanding taxes and fees; minus (vii) any security deposits; plus (viii) any reasonable costs and expenses incurred by Buyer to collect the repurchase amount from Seller, including reasonable attorneys' fees, with all the foregoing amounts being determined as of the date Buyer receives payment for such repurchase.  The amount set forth in this subsection (a) constitutes the full amount due to Buyer with respect to any repurchase of a Contract.

(b) In the event of any breach or default by Seller described in Section 7.1(b) and 7.1(c) above or by either Buyer or Seller of any terms and conditions contained herein (other than an event of default described in Section 7.1(a) above), the aggrieved party shall provide the other party with written notice thereof setting forth in reasonable detail the basis of such breach or default, whereupon the defaulting party shall have ten (10) days to cure, and absent such cure, the aggrieved party may, in addition to exercising any and all other remedies available herein, enforce its rights at law or in equity, and/or by written notice to the other party terminate this Agreement, effective upon notice of termination, provided, however, that the rights and obligations of the parties under this Agreement in respect of then-outstanding Contracts Assignments shall remain in full force and effect.

(c) As and when provided in Section 4.1, Buyer may disclose to the Obligor(s) that Buyer is the owner of the Contract and may deal with the Obligor(s) and the Contract in its own name.

(d) Buyer has the right to self-help, without due process, without notice to Seller or any Guarantor, and without the requirement of any judicial proceeding or order to tap the loss reserves and/or Loss Pool established under Section 2.8 under this Agreement and offset any amounts held by Buyer to satisfy Seller's payment obligations (whether due to breach or event of default) to Buyer under this Agreement or any Assignment.

7.3   <u>Rights Cumulative; Waivers</u>.  All rights, remedies and powers granted to Buyer hereunder are cumulative, and not alternative or exclusive, and shall be in addition to all other rights, remedies and powers given hereunder, or in or by any other instrument, or available in law or equity.  Buyer's knowledge at any time of any breach of, or non-compliance with, any representations, warranties, covenants or agreements hereunder shall not constitute

or be deemed a waiver of any of such rights or remedies hereunder, and any waiver of any default shall not constitute a waiver of any other default.

VIII.  <u>MISCELLANEOUS</u>

8.1    <u>Inspection of Records</u>.  Seller shall permit authorized representatives of Buyer to examine, audit and photocopy Seller's records with respect to any Contract, at the expense of Buyer, such examinations to take place at Seller's principal place of business during Seller's normal business hours and at reasonable intervals, upon not less than five (5) business days' notice to Seller, or immediately with or without notice upon any Seller Event of Default.

8.2    <u>Power of Attorney</u>.  Seller hereby appoints Buyer as Seller's attorney-in-fact to do, at Buyer's option and at Seller's expense, all lawful acts and things which Buyer may deem necessary to perfect and continue the perfection of any security interest created hereunder and to endorse checks on behalf of Seller for proceeds due Buyer pursuant to Contracts purchased by Buyer, and as otherwise authorized in this Agreement.

8.3    <u>Assignments</u>.  Buyer may assign any or all of its rights or obligations hereunder, and Seller agrees that any such assignee of Buyer may assert or enforce any such assigned rights as if such assignee were an original party to this Agreement.  Notwithstanding any assignment by Buyer of rights or obligations hereunder, any rights or obligations not expressly assigned to any assignee shall remain the rights and obligations of Buyer.  Seller may not assign any of its rights hereunder without the prior written consent of Buyer.

8.4    <u>Term and Termination</u>.  This Agreement shall be effective until terminated by either party upon no less than ninety (90) days written notice to the other party of such party's intent to terminate except as provided in Section 7.2(b).  Termination will not affect the parties' rights and duties as to sold or assigned Contracts.

8.5    <u>Survival</u>.  All covenants, agreements, representations, warranties, and indemnities (including any obligation to repurchase associated therewith) contained in this Agreement (and any and each other agreement or instrument delivered pursuant hereto) shall survive (i) the execution and delivery of this Agreement, (ii) the consummation of the transactions contemplated hereby, (iii) repurchase of any Contract by Seller, and (iv) termination or cancellation of this Agreement (but only with respect to Assignments or credit approvals executed or outstanding prior to the date of any such termination or cancellation).  Except in the event of a termination as a result of Seller's default, Buyer's obligations to accept Assignments of any Contracts for which the commitment to accept has been made prior to termination of this Agreement shall survive such termination.

8.6    <u>Notices</u>.  All notices, consents, requests, instructions, approvals and communications provided herein shall be validly given, made or served, effective only if in writing, except as otherwise provided herein, and sent by U.S. mail, postage prepaid, overnight courier or by electronic facsimile, and shall be deemed received four (4) business days after the date of posting, to each party at the address set forth below for such party, or to such other address as such party may designate in writing:

| If to Buyer: | MITSUBISHI HC CAPITAL AMERICA, INC., as successor by merger and in interest to ENGS COMMERCIAL FINANCE CO.<br>One Pierce Place, 11th Floor<br>Itasca, Illinois 60143<br>Attention: [Office of the General Counsel **CONFIRM**] |
|---|---|
| If to Seller: | TPINE Leasing Capital, L.P.<br>1125 East Alexis Road<br>Toledo, Ohio 43612 |

8.7    <u>Governing Law</u>.  This Agreement shall be subject to and governed by the laws of the State of Illinois, without regard to conflict of laws principles, but giving effect to federal laws applicable to national banks.  Each party consents to the jurisdiction of the federal and state courts sitting in the State of Illinois for resolving disputes arising under this Agreement, and each party waives any objection it may now or hereafter have to the laying of jurisdiction and venue in such courts.  The parties agree that the jurisdiction of the federal and state courts in Illinois is non-exclusive, and either party may bring an action in any other state or federal court permitted by law.  **SELLER AND BUYER EACH IRREVOCABLY WAIVES TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND ANY AND ALL RIGHT TO CLAIM OR RECOVER ANY PUNITIVE, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN (OR IN ADDITION TO) ACTUAL, DIRECT DAMAGES.**

8.8    <u>Other Documents</u>.  Seller shall execute such other documents and shall otherwise cooperate with Buyer as Buyer reasonably may request to effectuate the transactions contemplated hereby.

8.9    <u>Severability</u>.  If any part of this Agreement shall be contrary to any law which either party might seek to apply or enforce or should otherwise be defective, the other provisions hereof shall not be affected thereby but shall continue in full force and effect, to which end they are hereby declared severable.

8.10    <u>Headings</u>.  The headings of the sections of this Agreement are for convenience only and shall not be used to interpret or construe this Agreement.

8.11    <u>Entirety; Amendments</u>.  This Agreement, together with the Exhibits referred to herein, constitute the entire agreement between Buyer and Seller as to the subject matter of this Agreement, and supersedes all prior agreements and understandings (written or oral) relating thereto.  No agreement will be effective to change, modify or terminate this Agreement in whole or in part unless such agreement is in writing, expressly refers to this Agreement, and is duly executed by both parties.

8.12    <u>Remarketing Assistance</u>.  Following the early termination, expiration or other cancellation of a Contract and when Equipment is made legally available, Seller shall have, subject to any limitations set forth in Article IV, the exclusive right to remarket the Equipment for 90 days following the recovery or repossession of such Equipment.  This period may be extended by Buyer in its sole discretion.  The proceeds of the remarketing will be deposited in the loss reserve and/or Loss Pool established under this Agreement.  If the remarketing is as a result of a repossession or early termination of a Contract, Buyer may, at Buyer's sole election, defer tapping the loss reserve and/or Loss Pool, and wait until the remarketing of Equipment has been completed.  All such

remarketing of Equipment by Seller shall be in compliance with all applicable laws and be performed and conducted with a degree of skill and competence of a typical merchant in Seller's industry.

8.13    Use of Seller's Trademarks.  Subject to prior review and prior written approval of Seller in each instance, Buyer is authorized to use the trademarks and logos of Seller solely for the purpose of Buyer performing the billing, collecting and other services contemplated hereunder.  Buyer hereby expressly disclaims any proprietary interest in the trademarks and logos of Seller.

8.14    Agency.  In entering into, and performing its duties under, this Agreement, Buyer does not hold itself out as the agent or partner of the Seller, but Seller has agreed to perform certain servicing and agency duties in relation to Buyer.  Except as expressly set forth in this Agreement, neither party shall have the authority to make any agreement, warranty, representation, or promise for the other party or to bind the other party in any respect, either express or implied, without the prior written consent of such other party.  Buyer owes no fiduciary duties to Seller, but Seller owes such duties to Buyer, as more fully set forth in the terms and conditions of this Agreement.

8.15    No Waiver.  Any delay in requiring or the failure to require performance of any provision hereof shall neither impair nor affect the right of such party to require full performance thereof at any time thereafter, and the waiver by either party of a breach of any such provision shall not constitute a waiver of any subsequent breach thereof or nullify the effectiveness of such provision.  To be effective, any waiver must be in writing setting forth the waiver and be duly executed by the party against which enforcement of such waiver is sought.

8.16    Counterparts.  This Agreement may be executed in one or more counterparts, including by facsimile, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  In addition, this Agreement may be executed or accepted using electronic, stamped or facsimile signatures, and such a signature shall be legally binding to the same extent as a written signature by a party's authorized representative. Each party waives any legal requirement that this Agreement be embodied, stored or reproduced in tangible media, and agrees that an electronic reproduction shall be given the same legal force and effect as a signed writing

8.17    Compliance with Anti-Corruption Laws; Sanctions; Anti-Terrorism Laws.  Seller and any other person who owns a controlling interest in or otherwise controls Seller in any manner ("**Seller Representatives**") are and will remain in full compliance with all laws, regulations and government guidance concerning foreign asset control, trade sanctions, embargoes, and the prevention and detection of money laundering, bribery, corruption, and terrorism, and neither Seller nor any Seller Representative is or will be listed in any Sanctions-related list of designated persons maintained by the U.S. Department of Treasury's Office of Foreign Assets Control or successor or the U.S. Department of State.

8.18    Patriot Act Notice.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Obligor who opens an account.  Before Seller assigns another transaction to us, Buyer may ask for Seller's business' name, address and other information that will allow us to identify Seller.  Buyer may also ask to see other documents that substantiate Seller's business' identity.

8.19    Additional Agreements.  Notwithstanding anything to the contrary contained in this Agreement or the Specifications, the parties agree as follows:

Buyer may, in its sole and absolute discretion, elect to purchase any Contract prior to completing Buyer's review of documentation submitted by Seller as required by this Agreement, including without limitation the documents

listed in Section 3.3. Buyer shall not be required to notify Seller that Buyer has made such election, and the terms of this Section B of this Addendum shall apply to all Contracts purchased by Buyer. No acceptance of documentation, advance of funds, purchase, approval, acknowledgement or other communication (oral or written), or action by Buyer or any other person shall constitute a waiver by Buyer of its right to strict compliance with the conditions to closing, including without limitation Sections 3.3 and 3.5 or its rights under this Section B. As an inducement to Buyer to consider expeditious closings and other good and valuable consideration, the adequacy, sufficiency and receipt of which Seller acknowledges, as to all purchases under this Agreement, Seller agrees that Buyer shall have a period of ninety (90) days after its payment to Seller or the vendor of the applicable Equipment of any portion of the Purchase Price for any Contract, to rescind such purchase by written notice to Seller, such right to be exercised by Buyer in its sole and absolute discretion. If Buyer so notifies Seller, Seller shall have three (3) Business Days after its receipt of such notice to purchase such Contract and any rights sold to Buyer in the related Equipment AS-IS, WHERE-IS, without recourse or warranty (except as to Buyer's ownership of and right to sell such assets) for a price equal to the sum of (a) the amount of the Purchase Price or such of it as has been paid by Buyer to Seller and/or the vendor, plus (b) interest on such amount from the date of payment by Buyer to the date of repurchase at the interest rate used by the parties to calculate the Purchase Price of such Contract, plus (c) any expenses paid or incurred by Buyer on account of the purchase of such Contract, less (d) the amount of any rent or other payments received by Buyer from the Obligor as required by such Contract, together with interest on such payments at the interest rate used by the parties to calculate the Purchase Price of such Contract. In addition, Buyer and Seller shall take any action reasonably requested by Buyer to reduce the Loss Pool by the amount deemed contributed to the Loss Pool with respect to such Contract under Section 2.8.

If Buyer determines reasonably and in good faith that it better represents the actual amount paid or costs incurred with respect to any Contract to be repurchased as provided in this Section B, Buyer may instead declare such Contract to be a Defaulted Financing under and for purposes of Section 2.8.

IN WITNESS WHEREOF, the undersigned parties, intending to be legally bound hereby, have duly executed this Agreement as of the Effective Date first written above.

**SELLER/SERVICER/TPINE:**

TPINE LEASING CAPITAL L.P.,
a Delaware limited partnership

E-SIGNED by Chris Petersen
By: _on 2023-05-23 21:02:30 GMT_____

Name:_____

Title:_____

**BUYER/MITSUBISHI:**

MITSUBISHI HC CAPITAL AMERICA, INC., a
Delaware corporation, as successor by merger and in
interest to ENGS COMMERCIAL FINANCE CO., a
California corporation,

By: _____E-SIGNED by Scott Franklin_____
         on 2023-05-23 20:38:22 GMT

Name: _____

Title: _____


## GUARANTORS' ACKNOWLEDGEMENTS AND CONSENTS TO THE SECOND AMENDED AND RESTATED PROGRAM AGREEMENT

Buyer's agreements in this Second Amended and Restated Program Agreement (the "**Agreement**") constitute new, good and valuable consideration for the guaranties executed by the following individuals, who hereby remake and republish such guaranties and acknowledge that their obligations under such guaranties are in no way diminished by the amendments contained herein.

**Sulakhan Singh Johal a/k/a Sam Johal**

By: _____E-SIGNED by Sam Johal_____
        on 2023-05-23 21:30:21 GMT

Name: _____

Title: _____

Date: _____


**Jasvir Johal**

By: _____E-SIGNED by Jas Johal_____
        on 2023-05-23 20:42:06 GMT

Name: _____

Title: _____

Date: _____

**AFFILIATE SIGNATORIES:**

**PRIDE GROUP LOGISTICS LTD. (CANADA)**

By:_____
E-SIGNED by Sam Johal
on 2023-05-23 21:33:36 GMT

Name:_____

Title:_____

Date:_____


**PRIDE TRUCK SALES LTD. (CANADA)**

By:_____
E-SIGNED by Sam Johal
on 2023-05-23 21:33:37 GMT

Name:_____

Title:_____

Date:_____


**PRIDE GROUP ENTERPRISES (CANADA)**

By:_____
E-SIGNED by Sam Johal
on 2023-05-23 21:33:42 GMT

Name:_____

Title:_____

Date:_____


**TPINE LEASING CAPITAL CORP. (CANADA)**

By:_____
E-SIGNED by Sam Johal
on 2023-05-23 21:33:44 GMT

Name:_____

Title:_____

Date:_____

**TPINE TRUCK RENTAL INC. (CANADA)**

By: _E-SIGNED by Sam Johal_
_on 2023-05-23 21:33:49 GMT_

Name: _____

Title: _____

Date: _____

**PRIDE TRUCK SALES LP (USA)**

By: _E-SIGNED by Sam Johal_
_on 2023-05-23 21:33:52 GMT_

Name: _____

Title: _____

Date: _____

**PRIDE HOSPITALITY LP (USA)**

By: _E-SIGNED by Sam Johal_
_on 2023-05-23 21:33:21 GMT_

Name: _____

Title: _____

Date: _____

**COASTLINE HOLDINGS CORP. (USA)**

By: _E-SIGNED by Sam Johal_
_on 2023-05-23 21:33:24 GMT_

Name: _____

Title: _____

Date: _____

**PERGOLA HOLDINGS CORP. (USA)**

By: _E-SIGNED by Sam Johal_
_on 2023-05-23 21:33:27 GMT_

Name: _____

Title: _____

Date: _____

**EXHIBIT A**

**SPECIFICATION OF ASSIGNED INTEREST** (PORTFOLIO)

This Specification of Assigned Interest is executed pursuant to, and incorporates by reference the terms and conditions of, that certain Second Amended and Restated Program Agreement dated as of the _____ day of_____, 20__ (the "Program Agreement"), by and between _____ ("Seller") and _____ ("Buyer"). All of the terms and conditions of the Program Agreement apply to this Specification of Assigned Interest and the transaction contemplated herein as though fully set forth herein. In the event of a conflict between the terms of this Specification and the terms of the Program Agreement, the terms of this Specification shall control, and to the extent this Specification is silent on any item or matter, or does not specifically contradict the terms and conditions set forth in the Program Agreement, the terms and conditions of the Program Agreement shall control.  Except as expressly provided in Article VI of the Program Agreement, the assignment contemplated by this Specification is without recourse.

1. Purchase Price: $_____          Closing Date: _____, 20____

2. See attached spreadsheet for information regarding the Purchased Assets covered by this Specification. The spreadsheet is incorporated herein by this reference and made a part hereof. Information included is shown below:

| Customer Name | Address | Contract ID | Contract Date | Rem Pmts (#) | Monthly Payment: | Next Invoice Due Date | Final Pmt Date | Loan/Lease | True Lease (Y/N) | Seller to Retain Title (Y/N) | Guarantors | Equipment Description | Buy Rate | Purchase Price | Loss Pool Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |

3. Notwithstanding anything to contrary in the Program Agreement, Buyer and Seller agree that this Specification can govern more than a singular Loan or Lease, and that the terms of the Program Agreement and this Specification shall apply to each and every Loan or Lease listed in Section 2 immediately hereinabove.

4. With reference to the information contained in the attached spreadsheet:

   Re: Purchased Assets that constitute True Leases only:

      As to all Purchased Assets with respect to which Seller <u>does not</u> retain title to the Equipment, Seller hereby sells the Equipment to Buyer

      As to all Purchased Assets with respect to which Seller <u>does</u> retain title to the Equipment, Seller hereby grants to Buyer a first priority security interest in the Equipment (except that no security interest may have been perfected with respect to Qualified Accessions)

5. Descriptions of all Equipment\Collateral and copies of all Purchased Assets and other Lease Documents, Loan Documents, or Contract Documents have been provided via a SharePoint or similar secure web portal link and any required originals will be delivered within fifteen (15) days after closing. References in the Program Agreement to descriptions or copies of documents or information concerning the Equipment\Collateral shall be deemed to refer to such SharePoint or similar secure web portal link.

6. The sale and assignment effected by this Specification is without notice to Obligor; and Buyer acknowledges and agrees that it will not contact Obligor with respect to the Lease Documents or Loan Documents or Equipment\Collateral so long as the fiscal agency created hereunder, and the Servicing by Seller, as Servicer, under the Program Agreement, both remain in effect.  In furtherance of the foregoing, upon Buyer's written request

from time to time, Seller shall request financial statements and evidence of insurance required under the Lease Documents or Loan Documents from Obligor and, upon receipt, promptly shall forward such information to Buyer. Seller shall continue all UCC financing statements within the time period required by applicable law.

7.  Additional disclosures and terms (e.g., Seller retained rights; any waivers; taxes included in monthly payments; unusual servicing terms, broker or third-party fees section):

_____

_____


IN WITNESS WHEREOF, the parties have executed this Specification of Assigned Interest as of this _____ day of _____, 20__.

Buyer: _____          Seller: _____

E-SIGNED by Scott Franklin
on 2023-05-23 20:38:38 GMT

By _____

E-SIGNED by Chris Petersen
on 2023-05-23 21:02:39 GMT

By _____


_____          _____
Name                                                              Name


_____          _____
Title                                                               Title

# **EXHIBIT A-1**
## **LOSS POOL PERCENTAGES**

(See Attached PDF)

## EXHIBIT B

Pride Logistics (Canada)

Pride Truck Sales (Canada)

Pride group Enterprises (Canada)

TPine Leasing Capital Corp. (Canada)

TPine Rental (Canada)

Pride Truck Sales LP (USA)

Pride Hospitality LP (USA)

Coastline Holdings Corp. (USA)

Pergola Holdings Corp. (USA)

## EXHIBIT C
### SPECIAL POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS THAT, TPINE LEASING CAPITAL, L.P. on behalf of itself, its Principal(s) and all of its Affiliates, (hereinafter referred to as the "**Principal**"), with its principal place of business at with its principal place of business at 1125 East Alexis Road, Toledo, Ohio 43612, irrevocably constitutes and appoints MITSUBISHI HC CAPITAL AMERICA, INC., a Delaware corporation, as successor by merger and in interest to ENGS COMMERCIAL FINANCE CO., a California corporation, with offices located at One Pierce Place, Suite 1100 West, Itasca, IL 60143, and/or its authorized agents, successors and/or assigns, with full power of substitution (collectively, the "**Attorney**"), as Principal's attorney-in-fact for it and in its name, place and stead, and at Principal's sole cost and expense, to prepare, execute, record and file in the Principal's name any and all title applications, registrations, title conveyances, lien releases, lien additions, and other such titled vehicle forms (hereinafter referred to collectively as "**Titled Vehicle Forms**") as the Attorney may deem necessary and appropriate with respect to the following vehicles:

Vehicles

1.
2.
3.
4.

GIVING AND GRANTING to Attorney full power and authority to do and perform every act requisite and necessary to the powers granted above, as fully and to all intents and purposes as Principal might or could do if personally present, hereby ratifying and confirming all that Attorney shall lawfully do or cause to be done by virtue of this power.

The Principal agrees that the Attorney will not be responsible for any error, negligence, or for any sort of act or omission not amounting to willful misconduct and the Principal will indemnify, defend and hold the Attorney harmless from any and all actions, claims, demands or liabilities of any nature whatsoever which the Principal may have or will have against the Attorney arising out of the performance of its functions for and on behalf of the Principal pursuant to this Power of Attorney, except for any actions, claims, demands or liabilities caused by the willful misconduct of the Attorney.  This Power of Attorney will remain in full force and effect until due notice of its revocation is given by the Principal to the Attorney by registered mail.

IN WITNESS WHEREOF, the Principal has caused this instrument to be executed by a duly authorized representative as of the date set forth below.

**Principal:**
TPINE LEASING CAPITAL L.P.,
a Delaware limited partnership

By:_____
Name:_____
Title:_____

ACKNOWLEDGMENT

STATE OF: _____ County of: _____

I certify that I know or have satisfactory evidence that _____ signed this Special Power of Attorney and acknowledged it to be his/her free and voluntary act and deed on behalf of Principal for the uses and purposes herein above mentioned.

Dated this _____ day of _____, 20__

_____
(Notary Public)

## **<u>EXHIBIT D</u>**
## **(FORM OF CONTRACT)**

D-1 (FORM OF LEASE Version A)

D-2 (FORM OF LEASE Version B)

D-3 (FORM OF LOAN AND SECURITY AGREEMENT)

**EXHIBIT E**
**NOTICE OF ASSIGNMENT**

**[INSERT SELLER'S LETTERHEAD]**
**[INSERT DATE]**


**[INSERT OBLIGOR'S NAME]**
**[INSERT OBLIGOR'S ADDRESS]**


**Dear: [INSERT OBLIGOR'S NAME]**

Reference is made to the [INSERT COMMERCIAL FINANCE AGREEMENT OR LEASE AGREEMENT NAME, CONTRACT # AND DATE] (the "**Agreement**"), originally between TPINE LEASING CAPITAL, L.P. ("**Seller**" or "**TPINE**"), and [INSERT OBLIGOR'S NAME] ("**Borrower**").

Seller hereby notifies Borrower that Seller has assigned all of its right, title and interest in and to the [INSERT NAME OF COMMERCIAL FINANCE OF LEASE AGREEMENT] (the "**Agreement**"), including, but not limited to, the Equipment and any other collateral subject thereto (individually or collectively, the "**Equipment**"), and all other riders, amendments and other attachments thereto, and all guaranties thereof, if any, to MITSUBISHI HC CAPITAL AMERICA, INC., a Delaware corporation, as successor by merger and in interest to ENGS COMMERCIAL FINANCE CO., a California corporation, and its successors and/or assigns (individually or collectively, "**Buyer**") effective as of [INSERT DATE OF SALE AND ASSIGNMENT].  [SELECT AND INSERT THE FOLLOWING IF SELLER WILL NOT ACT AS SERVICER You are hereby directed to make and continue to make all future payments of rent and other amounts due under the Agreement to Buyer, unless and until otherwise directed in writing by Buyer OR SELECT AND INSERT THE FOLLOWING IF SELLER WILL ACT AS SERVICE – THE DEFAULT CHOICE You are hereby directed to make and continue to make all future payments of rent and other amounts due under the Agreement to Seller, acting solely in Seller's capacity as agent and servicer for and on behalf of Buyer (in such capacity, "**Servicer**"), pursuant to the terms and conditions of that certain Second Amended and Restated Program Agreement, executed by and between Buyer and Seller, unless and until otherwise directed in writing by Buyer (the "**Program Agreement**").]

Please direct your insurance carrier to change the additional insured and loss payee with respect to all insurance required by the Agreement to Buyer, and have a copy of your updated certificate of insurance confirming liability and property coverage forwarded to Buyer,  [INSERT BUYER EMAIL ADDRESS][INSERT BUYER MAILING ADDRESS][INSERT BUYER FAX NUMBER][INSERT ADDITIONAL BUYER CONTACT INFORMATION AS REQUIRED].  If you have questions regarding this notification, please contact [INSERT BUYER CONTACT NAME AND TITLE] of Buyer, at [INSERT BUYER CONTACT EMAIL ADDRESS AND PHONE NUMBER].

**SELLER/SERVICER/TPINE:**
TPINE LEASING CAPITAL L.P.,
a Delaware limited partnership


By:_____
Name:_____
Title:_____

**EXHIBIT F**
**RELEASE AGREEMENT**

1.     Borrower (as hereinafter defined) has informed Agent and Secured Party (as hereinafter defined) that it intends to sell to MITSUBISHI HC CAPITAL AMERICA, INC., a Delaware corporation, as successor by merger and in interest to ENGS COMMERCIAL FINANCE CO., a California corporation, with offices at One Pierce Place, Suite 1100 West, Itasca, IL 60143, and its successors and/or assigns (individually or collectively, "**Buyer**" or "**Mitsubishi**"), and Buyer intends to purchase the Released Collateral (as hereinafter defined)

2.     [INSERT NAME] as Agent and secured party ("**Secured Party**") under the [INSERT NAME OF AGREEMENT OR LOAN], dated as of [INSERT AGREEMENT OR LOAN DATE], by and between TPINE LEASING CAPITAL, L.P., on behalf of itself, its Principal(s) Sulakhan Singh Johal, Jasvir Johal, and its Affiliates: Pride Logistics (Canada), Pride Truck Sales (Canada), Pride group Enterprises (Canada), TPine Leasing Capital Corp. (Canada), TPine Rental (Canada),Pride Truck Sales LP (USA), Pride Hospitality LP (USA), Coastline Holdings Corp. (USA), Pergola Holdings Corp. (USA) ("**Borrower**"), and the Lender party(ies) thereto (as it may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), surrenders, relinquishes and extinguishes any and all of its right, title and interest in and to the following collateral:  (a) each Contract identified on **Schedule 1** hereto; (b) Borrower's direct or beneficial interest in the equipment or vehicle financed or leased thereunder; (c) all scheduled or other payments due under such Contract; (d) all ancillary documents to the Contracts; (e) all rights and remedies of Borrower, as lessor/creditor under the Contracts; and (f) all income, payments and proceeds of any of the foregoing (collectively, the "**Released Collateral**"), effective as described below.

3.     This release will be effective automatically and without any further action by any party upon payment to the account set forth below, in immediately available funds, the amount of [INSERT DOLLAR AMOUNT] (the "**Payoff Amount**") on or before [INSERT TIME][INSERT TIME ZONE] on [INSERT PAYOFF DATE].This release shall be ineffective if the Payoff Amount is not received in such account on or before [INSERT PAYOFF DATE]. The Payoff Amount shall be paid in accordance with the following wire instructions:

Wire Instructions:

Bank:

Account Name:

4.      Secured Party releases any and all claims that it may have against Borrower regarding the Released Collateral and acknowledges that there are no obligations of any kind due from Borrower to the Secured Party regarding the Released Collateral; provided, however, that Borrower shall remain liable for any Indemnified Liabilities (as defined in the Loan Agreement) due or becoming due thereunder, and Borrower shall remain obligated and liable to Buyer and other parties pursuant to the terms and conditions of that certain Second Amended and Restated Program Agreement, executed by Borrower and Buyer (as it may be amended, restated, supplemented or otherwise modified from time to time, the "**Program Agreement**"), including, but not limited to, any servicing, fiscal agency, and other rights and obligations, as may be more fully set forth in the Program Agreement, or the documents executed in connection therewith or with the sale and/or assignment of the Released Collateral;

5.      Upon the effectiveness of this release, Secured Party hereby authorizes Borrower and/or Buyer, and/or any of Buyers agents or assigns, to prepare, execute and file on Secured Party's or Borrower's behalf, or both, an amendment to the filings made under the Uniform Commercial Code in favor of Secured Party and against Borrower describing the Released Collateral referred to in the above Sections herein, and as may be referenced in any attachment(s) hereto, and noting of record the amendment of the description of collateral covered by Agent's liens to delete such specifically identified Released Collateral.

6.      This release may be relied upon by the Buyer, Borrower, and each of their respective successors and/or assigns with respect to the Released Collateral, and any allocations thereof (if applicable) to be made under the Loan Agreement.

        IN WITNESS WHEREOF, Secured Party has caused this Release Agreement to be duly executed by its officer thereunto duly authorized as of [INSERT DATE EXECUTED].

                                        **SECURED PARTY:**

                                        [INSERT SECURED PARTY NAME],
                                        a _____

                                        By:_____
                                        Name:_____
                                        Title:_____

## **EXHIBIT G**
## **Deposit Account Control Agreement**

(See Attached)