**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>Pride Group Holdings Inc., *et al.*[1]<br><br>Debtors[2] in Foreign Proceedings. | Chapter 15<br><br>Case No. 24-10632 (CTG)<br><br>(Jointly Administered)<br>**Hearing Date: TBD**<br>**Obj. Deadline: Dec. 16, 2024 at 4:00 p.m. (ET)** |

**OBJECTION OF MITSUBISHI HC CAPITAL AMERICA INC. F/K/A HITACHI CAPITAL AMERICA CORP. TO THE FOREIGN REPRESENTATIVE'S NOTICE OF SALE AND ORDER AUTHORIZING AND APPROVING SALE OF AVAILABLE U.S. ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS IN ACCORDANCE WITH THE SALE PROCEDURES ORDER**

Mitsubishi HC Capital America Inc. f/k/a Hitachi Capital America Corp. ("MHCA"), through its undersigned counsel, respectfully submits this opposition (this "Objection") to the *Notice of Sale of U.S. Assets* (the "Sale Notice") and the *Order Authorizing and Approving Sale of Available U.S. Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests in Accordance with the Sale Procedures Order* (the "Sale Order") filed by Randall Benson (the "Foreign Representative") on December 9, 2024 [D.I. 303] in the above-captioned chapter 15 cases (these "Chapter 15 Cases"). In support of this Objection, MHCA respectfully states as follows:

[1] The last four digits of Debtor Pride Group Holdings Inc.'s Canadian business number are 6399. Due to the large number of debtors in these chapter 15 cases, a complete list of the debtor entities and the last four digits of their unique identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing agent at https://dm.epiq11.com/pridegroup. The Debtors' service address for the purposes of these chapter 15 cases is 1450 Meyerside, Suite 401, Mississauga, Ontario, L5T 2N5, Canada.

[2] The Debtors are also debtors in the Canadian proceedings (the "CCAA Proceedings") commenced under the Companies' Creditors Arrangement Act (the "CCAA"), pending before the Ontario Superior Court of Justice (Commercial List) in Ontario, Canada, Court File No. CV-24-00717340-00CL (the "Canadian Court"), commenced on March 26, 2024, by the Debtors' filing of the *Application Record* (the "CCAA Application"). Unless otherwise noted, capitalized terms used but not otherwise defined in this Objection have the meanings ascribed to them in the U.S. Financing Agreements or the Personal Guaranties, as the context requires.

**PRELIMINARY STATEMENT**[3]

1. By all measures, these Chapter 15 Cases and CCAA Proceedings are unmitigated disasters being overseen and managed by the Foreign Representative (who also serves as the Chief Restructuring Officer). What started as a potential reorganization quickly turned into a fire sale of the lenders' collateral (including that of MHCA). Further, the lenders are now forced to pay millions of dollars to fund the Debtors' insolvency proceedings and for the option to liquidate their collateral, only to recover a mere fraction of the portion paid. At the core of the lenders' plight is the fraud and malfeasance perpetrated by Sulakhan (Sam) Johal and Jasvir Johal (together, the "Personal Guarantors"). They are liable to MHCA for tens of millions of dollars for breaching personal guaranties that supported MHCA's financing arrangements with entities they controlled.

2. Notwithstanding the fact that the Foreign Representative has been leading the Debtors during the Chapter 15 Cases and CCAA Proceedings and further deepening the losses suffered by all creditors (especially the lenders), the Foreign Representative now seeks this Court's permission to sell the shares in chapter 15 debtor 963 Sweetwater Holding Corp—which owns a multimillion-dollar property in Boca Raton, Florida—to Sam Johal's wife. Restated, the person charged with leading the Debtors (who committed fraud upon their lenders at the direction of Sam Johal) through these insolvency proceedings now seeks to further insulate the bad actors by selling one of their properties back to them. The Foreign Representative's lack of judgment cannot be overstated, and a reasonable person may question whether he is seeking to help creditors maximize their recovery or placate the Johals. Indeed, the Foreign Representative vehemently opposed MHCA's dual motions seeking relief to pursue claims against Sam and Jasvir Johal because they

[3] Capitalized terms not otherwise defined in this *Preliminary Statement* have the meaning given to such terms in the body of the Objection.

allegedly are aiding in the winddown process (a process that is uncoordinated and rife with misinformation), and on the same day the Foreign Representative asks this Court to approve the sale of the Florida property to Sam Johal's wife.

3. Beyond the negative appearances, the Foreign Representative fails to provide basic information in the Sale Notice that would allow parties to assess whether he (and Mrs. Johal) are complying with their obligations under the Bankruptcy Code.[4] The Sale Notice does not disclose the terms and conditions of the competing bid, the source of Mrs. Johal's funds, the details of the negotiations with Mrs. Johal, or how and why the Foreign Representative determined that Mrs. Johal's offer was the best available offer. And because Mrs. Johal is an insider, as disclosed by the Foreign Representative, there is a heightened standard that the Court must enforce.

4. The Court should not approve the sale to Mrs. Johal or, alternatively, the Court should provide 90 days for discovery followed by an evidentiary hearing so that MHCA (and other creditors) have sufficient time to discover critical facts that the Foreign Representative has chosen to hide.

**JURISDICTION AND VENUE**

5. The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over these Chapter 15 Cases under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is and other proceedings under chapter 15 of the Bankruptcy Code are core matters within the meaning of 28 U.S.C. § 157(b)(2)(P). Venue of these Chapter 15 Cases is proper in the Court pursuant to 28 U.S.C. § 1410.

[4] 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

6. Pursuant to Local Rule 9013-1(f), MHCA consents to the entry of a final judgment or order with respect to the Sale Notice if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

### A. U.S. Financing Agreements and Personal Guaranties

7. MHCA provides customized financing solutions to businesses to help meet their capital needs. MHCA offers vehicles, trading, structure, and commercial vehicle finance services. Prior to the commencement of the CCAA Proceedings and these Chapter 15 Cases, MHCA provided such financing to non-debtor Pride Truck and non-debtor Tpine Leasing Capital, L.P. ("Tpine") under three (3) agreements (collectively the "U.S. Financing Agreements"), each of which was personally guaranteed by the Personal Guarantors.

#### (i) *Norwalk U.S. Floorplan Agreement and Norwalk Guaranty*

8. On or around November 21, 2018, MHCA entered into a *Floorplan and Security Agreement* (the "Norwalk U.S. Floorplan Agreement") with Pride Truck (of which each Sam and Jasvir Johal are partners). Under the Norwalk U.S. Floorplan Agreement, MHCA agreed to "extend credit to or on behalf of [Pride Truck] to purchase inventory." The agreement also granted MHCA "an absolute and cross-collateralized security interest in" the "Collateral".

9. The Personal Guarantors each "severally request[ed] [MHCA] to extend credit to or to purchase security agreements, leases, notes, accounts and/or other obligations." To induce MHCA "to extend such credit or to make such purchase, and in consideration thereof," each Personal Guarantor, "as a primary obligor, irrevocably and unconditionally, jointly and severally

guarantee[d] to [MHCA] that [Personal Guarantors' company] will fully and promptly pay and perform all of its present and *future* obligations."

(ii) ***The Program Agreement and Program Guaranties***

10. On or around May 31, 2023, MHCA entered into the *Second Amended and Restated Program Agreement* (the "Program Agreement") with Tpine. Under the Program Agreement, Tpine agreed to sell MHCA all of its right, title, and interest in certain Contracts (defined as leases, conditional sale agreements, or other evidence or form of payment obligation and/or security interest), along with all related guaranties, insurance proceeds, vendor warranties, and any other amounts due under the Contracts.

11. To further induce MHCA to enter into the Program Agreement, the Personal Guarantors executed an unconditional personal guaranty of Tpine's obligations under the Program Agreement (the "Program Guaranties"). The Program Guaranties guaranty Tpine's obligations under the Program Agreement (including, without limitation, the payment of all principal and interest and all other sums then and thereafter incurred by Tpine).

(iii) ***The Norwalk Master Receivables Purchase Agreement and Norwalk Receivables Guaranties***

12. On or around May 25, 2021, MHCA entered into a *Master Lease Receivables Sale and Assignment Agreement* ("Norwalk Master Receivables Purchase Agreement" ) with Tpine.

13. Under the Norwalk Master Receivables Purchase Agreement, the Personal Guarantors' company, Tpine, which "[i]n its normal course of business . . . provides equipment lease financing for commercial vehicles," agreed to sell MHCA "the rentals payable under certain of those leases, on the terms and conditions set forth" in the agreement.

**B. Defaults under the U.S. Financing Agreements and Personal Guaranties**

14. By mid-December 2023, Pride Truck, Tpine, and the Personal Guarantors had defaulted on the U.S. Financing Agreements and Personal Guaranties. As of March 25, 2024, the outstanding amount owed to MHCA under the U.S. Financing Agreements and Personal Guaranties was at least $88,920,679.27.

**C. The Personal Guarantor Actions**

15. On March 25, 2024, with defaults continuing, MHCA filed three (3) actions against the Personal Guarantors for breach of the Personal Guaranties (collectively, the "Personal Guarantor Actions" and each, a "Personal Guarantor Action"). Each Personal Guarantor Action corresponded to one of the three (3) U.S. Financing Agreements and the applicable Personal Guaranty and was filed in accordance with the agreement-specific jurisdictional and venue provisions.[5] MHCA filed complaints asserting breach of the Personal Guaranties as follows:

- **Norwalk U.S. Floorplan Agreement:** United States District Court for the District of Connecticut (Case No. 24-cv-433).
- **Program Agreement:** United States District Court for the Northern District of Illinois, Eastern Division (Case No. 24-cv-2393).
- **Norwalk Master Receivables Purchase Agreement:** United States District Court for the Southern District of New York (Case No. 24-cv-2205).

16. The Personal Guarantor Actions were stayed immediately after filing due to the Debtors' initiation of the CCAA Proceedings and these Chapter 15 Cases.

[5] The jurisdictional and venue provisions of the Norwalk Guaranty provide for the state and federal courts of Connecticut. *See* Ex. 2, § 8. The jurisdictional and venue provisions of the Program Guaranties provide for the exclusive jurisdiction for the state and federal courts of Illinois. *See* Ex. 5, § 8. The jurisdictional and venue provisions of the Norwalk Receivables Guaranties provide for the exclusive jurisdiction for the state and federal courts located in the Borough of Manhattan, New York County, New York. *See* Ex. 8, § 6.02.

**D. Pride Group's CCAA Proceedings and Chapter 15 Cases**

17. On March 27, 2024, the Debtors commenced the CCAA Proceedings in the Canadian Court, which thereafter issued an initial order (the "Initial Order") (a) authorizing (among other things) the Foreign Representative to act as the foreign representative for the Debtors and file these Chapter 15 Cases and (b) appointing Ernst & Young Inc. as the monitor (the "Monitor") and RC Benson Consulting Inc. as Chief Restructuring Officer of the Debtors (the "CRO").

18. On April 1, 2024, the Foreign Representative filed petitions for relief under chapter 15 of the Bankruptcy Code for 26 Canadian and U.S. operating companies and non-real estate holding companies and sought recognition of the CCAA Proceedings as "foreign main proceedings" under Bankruptcy Code section 1517. *See Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 2] (the "Verified Petition").

19. On April 5, 2024, the Canadian Court issued an amended and restated version of the Initial Order (the "A&R Initial Order") and an order regarding protocols for real estate sale transactions (the "Canadian Protocols Order"), which imposed a stay as to the Debtors, the Personal Guarantors, and certain other parties initially through April 6, 2024. The Foreign Representative thereafter sought and obtained enforcement of the orders in the United States on a provisional basis. *See Order Granting Provisional Relief in Connection with Debtors-In-Possession Financing and Certain Protocols Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code* [D.I. 110].

20. On April 15, 2024, the Foreign Representative filed petitions for relief under chapter 15 of the Bankruptcy Code for 45 Canadian and U.S. single-asset real estate holding

companies. On May 2, 2024, the Court granted recognition of the CCAA Proceedings, enforcement of the A&R Initial Order and Canadian Protocols Order in the United States on a final basis, and related relief. *See* D.I. 152.

21. On August 9, 2024, the Canadian Court authorized the Debtors to develop an orderly wind-down proposal, including soliciting bidders for the sale of substantially all of the Debtors' assets (the "PGL Assets", as more fully defined in the Fourteenth Report and Supplemental Report (each as defined below)). After engaging in a sale process seeking qualified bids for the PGL Assets, the CRO and Monitor identified a sole bidder—1000927605 Ontario[6]—an entity created by the Personal Guarantors for the sole purpose of purchasing the Debtors' assets. *See Fourteenth Report of the Monitor* (the "Fourteenth Report") and *Supplemental Fourteenth Report of the Monitor* (the "Supplemental Report").

**E. Extension of the Stay to Non-Debtor Personal Guarantors**

22. The A&R Orders stayed the commencement or continuation of all proceedings or enforcement actions against (among others) Pride Group, the Personal Guarantors, and their respective property initially through April 6, 2024, later extended to June 30, 2024, and then to September 30, 2024. *See* A&R Initial Order ¶ 14; Second A&R Initial Order at ¶ 13; Extension Order at ¶ 3. Most recently, the Canadian Court extended the stay for actions against the Personal Guarantors through March 31, 2025, with this Court granting parallel relief in deference to the Canadian Court and based on the Debtors' representations. [D.I. 152 at ¶ 6].

23. This Court and the Canadian Court found extending the stay appropriate based upon the Debtors' representation that allowing proceedings to continue against the Personal Guarantors, in their capacities as directors and officers of the Pride Group, would be "distracting to

[6] Sam Johal and his wife are purchasing the PGL assets through the sale process approved by the Canadian Court.

management which is operating the Pride Group and pursuing the CCAA Proceedings and these Chapter 15 Cases." *See* D.I. 6 at ¶ 5; CCAA Application at ¶ 156.

**F. Stay Relief Sought in the CCAA Proceedings and These Chapter 15 Cases**

24. On November 11, 2024, MHCA filed its *Motion to Lift the Stay of Proceedings* in the CCAA Proceedings. The parties had a preliminary hearing on December 9, 2024, and are awaiting a subsequent hearing date in the CCAA Proceedings.

25. On November 25, 2024, MHCA filed its *Motion to Lift the Automatic Stay* in these Chapter 15 Cases. The CRO objected in the CCAA Proceedings to MHCA seeking relief from the automatic stay in these Chapter 15 Cases to pursue the pending guarantor suits. MHCA has adjourned its stay relief hearing in these Chapter 15 Cases without setting a new hearing date.

**OBJECTION**

26. MHCA respectfully requests entry of an order: (i) denying the relief sought by the Foreign Representative in the Sale Order, or (ii) granting a 90-day period for parties to undertake discovery so that the Foreign Representative can attempt to substantiate his burden of proof under section 363 of the Bankruptcy Code.

**I. LEGAL STANDARD**

27. Bankruptcy Code section 363(m) provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m).

28. The proponent of good faith carries the burden to show good faith. *In re Borders Grp., Inc.*, 453 B.R. 477, 484-85 (Bankr. S.D.N.Y. 2011) ("The burden of proof to show good faith is on the proponent of good faith, usually the party seeking dismissal of the appeal; it may not be assumed.") (quotation omitted). In considering whether a sale is in 'good faith' under section 363(m), courts may consider whether a potential purchaser is an insider of the debtor. *See In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993).

## II. THE PURCHASER IS NOT ENTITLED TO ANY PROTECTIONS UNDER 11 U.S.C. § 363(M).

29. The Third Circuit "requires the bankruptcy court to 'make a finding with respect to the 'good faith' of the purchaser' when approving a sale outside the ordinary course of business." *In re Primel,* 629 B.R. 790, 799 (Bankr. W.D. Pa. 2021). *Abbotts Dairies* requires the bankruptcy court to make *a finding* as to good faith *when* it approves a sale, *not* find good faith as a condition to it. *See In re Abbotts Dairies,* 788 F.2d 143, 149-50 (3d Cir. 1986). This point is further emphasized in the Third Circuit's definition of good faith under section 363(m) as encompassing "one who purchases in 'good faith' for 'value'" in accordance with traditional equitable concepts. The approach inherently distinguishes between the conduct of the purchaser (good faith) and the integrity of the process (value). *Id.*

30. Accordingly, this Court cannot approve a Section 363 sale without a finding of good faith. *In re Abbotts Dairies,* 788 F.2d at 149-50. This good faith finding is the crucial element of this sale motion, and much of the testimony heard to date (together with the Examiner's Report) establish the basis on which this Court must make its finding. A good faith finding establishes the "integrity of [a purchaser's] conduct in the course of the sale proceedings." *Id.* at 147. A court may not find good faith if fraud, collusion, or unfair advantages are found to be present. *Id.*

31. The Foreign Representative seeks the following finding in the Sale Order:

> The Purchaser is a good faith purchaser for value, is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code and has otherwise acted in good faith in connection with the Sale. Specifically, (a) the Sale was negotiated at arm's-length and in good faith; (b) the Purchaser did not in any way induce or cause the filing of these Chapter 15 Cases; (c) the consideration provided by the Purchaser under the Sale is fair and reasonable; and (d) the Sale is not the result of fraud or collusion. Neither the Foreign Representative nor the Purchaser has engaged in any conduct that would cause or permit the Sale to be avoided or result in the imposition of any costs or damages under section 363(n) of the Bankruptcy Code.

*See* Sale Order ¶ H.[7]

32. Under the present circumstances, the Court simply cannot make a finding of good faith in favor of Mrs. Johal. In support of the Sale Notice, the Foreign Representative offers limited (and boilerplate) evidence in the *Declaration of Foreign Representative In Support of the Sale of Available U.S. Assets Free and Clear of Any Lines, Claims, Encumbrances and Other Interests* (the "Benson Declaration").

33. Without any supporting evidence, the Foreign Representative merely concludes that "the Sale was negotiated at arm's-length and in good faith." *See* Benson Declaration ¶ 18. Nothing in the Sale Notice discusses the nature of the other bid, including the amount and terms, and the various negotiations conducted by the Foreign Representative with Mrs. Johal. The Foreign Representative is selling the property to the wife of the bad actor that caused the downfall of the Debtors and inflicted hundreds of millions of dollars of loss on the Debtors' creditors. A reasonable person would expect the Foreign Representative to offer more than simple, conclusory

[7] The Sale Order also includes the following ordered paragraph: "The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the full protections of section 363(m) of the Bankruptcy Code. The reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of the Sale is duly and properly stayed pending such appeal." *See* Sale Order ¶ 3.

statements in support of the sale. Moreover, the Sale Notice lacks any discussion of Mrs. Johal's source of funds—which is critical because she may be using ill-gotten funds to repurchase her husband's assets. These are funds that could be used to satisfy lawsuits against the Personal Guarantors (or at least Sam Johal).

34. The Foreign Representative also states—again without support—that the "Purchaser did not in any way induce or cause the filing of these Chapter 15 Cases." *Id.* Mrs. Johal is married to the principal bad actor, and the Foreign Representative does not support his conclusions (which are presumably based upon some knowledge that he has). Further, parties cannot determine if the "consideration provided by the Purchaser under the Sale is fair and reasonable" because there is no baseline. The Foreign Representative omits details of the competing bid, a crucial detail that may help parties determine if the consideration is "fair and reasonable." Quite simply, MHCA (and other parties in interest) must be given time to take discovery on, and test the veracity of, the Foreign Representative's statements.

## III. THE FOREIGN REPRESENTATIVE MUST SATISFY A HEIGHTENED BURDEN TO COMPLETE A SALE TO AN INSIDER.

35. Because "the proposed transaction is outside the ordinary course . . . the Debtor must also prove that there is a sound business justification for the transaction . . . allowing a bankruptcy court to make findings of fact as to the sale." *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, *27-28 (Bankr. D.N.J. 2008); *see also In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Exaeris, Inc.,* 380 B.R 741, 744 (Bankr. D. Del. Jan. 15, 2008) (articulating that substantial sale of assets outside of a chapter 11 plan is not unusual but requires careful bankruptcy court scrutiny as to business judgment).

36. Critically, the Foreign Representative must meet a heightened standard because he is selling the shares to Mrs. Johal, an insider. *See In re Summit Global Logistics, Inc.*,

2008 Bankr. LEXIS 896 at *27-28 ("The Debtors have clearly recognized their burden to prove with heightened scrutiny the propriety of the proposed insider transaction to TriDec. The Debtors were required to meet the requirements of applicable Delaware non-bankruptcy law in the instant motion as SGL is a Delaware corporation."); *see also In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) ("[S]ales to fiduciaries in chapter 11 cases are not *per se* prohibited, 'but [they] are necessarily subject to heightened scrutiny because they are rife with the possibility of abuse.'").[8]

37. Here, the Benson Declaration provides that "[t]he Seller received several indications of interest and offers from two parties over the course of the Sweetwater Property's listing, including (i) the Purchaser, who is the spouse of Sulakhan Johal, the founder of the Pride Group and (ii) an unrelated non-insider. As a result of the multiple offers, the Monitor requested that the bidders submit their best and final offers to ensure a competitive process and directed that all final offers be delivered directly to the Monitor to ensure strict confidentiality given the insider offer." *See* Benson Declaration ¶ 9.

38. The Foreign Representative proffers that Mrs. Johal's offer for the "Sweetwater Property in the amount of US $4,425,000 . . . was the highest and best offer based on (i) total value offered, (ii) the terms and conditions of the offer and (iii) Purchaser's assurances that the Sale would close, which culminated in the SPA between the Seller and Purchaser." *See* Benson

[8] Additionally, the Foreign Representative must provide evidence supporting his decision to sell the shares to an insider. *See In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 641 n. 4 (Bankr. W.D. Pa. 2021) ("In the sale context, some courts examine (1) whether there is a sound business purpose for the sale; (2) whether the proposed sale price is fair; (3) whether the debtor has provided adequate and reasonable notice of the transaction; and (4) whether the buyer has acted in good faith."); *In re Grand Prix Assocs. Inc.*, 2009 Bankr. LEXIS 1779 at *4 (Bankr. D.N.J. June 26, 2009) ("Debtors must prove the following: (1) a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith"); *In re Stroud Ford, Inc.*, 163 B.R. 730, 734 (Bankr. M.D. Pa. 1993) (purchaser's lack of good faith obviated the need "to determine whether the consideration offered was fair and valuable or whether sound business reasons exist").

Declaration ¶ 10. Noticeably absent from the Benson Declaration is a discussion on the source of Mrs. Johal's funds—a fact of great importance to the Debtors' creditors that are suffering extreme losses from Mr. Johal's likely fraud—and the details of the third-party bid, including the final price, payment terms, and closing conditions.

39. Quite simply, the Foreign Representative falls woefully short of his burden to establish that the sale to Mrs. Johal is anything other than an engineered attempt by Sam Johal to keep a $5 plus million property in his family while his creditors pay for (literally) his bad acts. One may reasonably question the Foreign Representative's loyalty given that he has staked his professional representation to the Johal family (and helping them recover their property out of these Chapter 15 Cases and the CCAA Proceedings) rather than work with creditors to mitigate their losses.

40. Finally, the Foreign Representative's insistence on selling the shares to Ms. Johal is even more egregious following the CRO's sale to the Personal Guarantors of assets out of the CCAA Proceedings while leaving their creditors suffering tens of millions of dollars (if not hundreds of millions of dollars) of losses. The approximately $56 million bid by the Proposed Buyer—again, an entity controlled by the Personal Guarantors—was finalized on August 26, 2024, and the Monitor believes that the Johal purchasers are working to obtain an unconditional bid for the PGL Assets. *Fourteenth Report of the Monitor*, at ¶ 47. The Personal Guarantors think so little of their creditors and the deliberate financial pain they have caused them through a massive, and orchestrated fraud that they are using the CCAA Proceedings and these Chapter 15 Cases to obtain a broad stay of proceedings against them while purchasing estate assets, including the PGL assets and the Sweetwater shares (likely at a discount).

## NOTICE

41. Notice of this Objection has been provided pursuant to the terms of the Sale Notice. MHCA submits that no other or further notice is necessary or required.

## RESERVATION OF RIGHTS

42. MHCA reserves all of its rights to amend, modify, or supplement this Objection in any manner, at any time, and for any purpose, and to assert and file any and all additional claims of whatever kind or nature that it has or may hereafter have against the Debtors, which may be based on the respective rights and obligations arising under the relationship and agreements discussed in this Motion or the same events and circumstances described in this Objection. MHCA further reserves the right to bring forth additional documentation supporting all of its claims including, without limitation, any documents that may become available after further investigation and discovery.

## CONCLUSION

WHEREFORE, MHCA respectfully requests that the Court (i) deny the Sale Order, or (ii) order discovery followed by an evidentiary hearing, and (iii) grant such further relief as is appropriate.

[*Remainder of Page Intentionally Left Blank*.]

Dated: December 16, 2024
Wilmington, Delaware

Respectfully submitted,

**REED SMITH LLP**

By: */s/ Jason D. Angelo*

Jason D. Angelo (No. 6009)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: +1 302.778.7500
Facsimile: +1 302.778.7575
Email: jangelo@reedsmith.com

- and -

Aaron G. Javian, Esq. (admitted *pro hac vice*)
**REED SMITH LLP**
599 Lexington Avenue, 22nd Floor
New York, NY 10022
Telephone: +1.212.521.5400
Facsimile: +1.212.521.5450
Email: ajavian@reedsmith.com

- and -

Jared S. Roach, Esq. (admitted *pro hac vice*)
**REED SMITH LLP**
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Telephone: +1 412.288.3131
Facsimile: +1 412.288.3063
Email: jroach@reedsmith.com

*Counsel to Mitsubishi HC Capital America Inc. f/k/a Hitachi Capital America Corp*.