**Exhibit A**

APA

# PURCHASE AND SALE AGREEMENT

by and between

## 87TH AVENUE MEDLEY FL HOLDING CORP, Seller

and

## JMC TRUCKING INC., Purchaser

dated as of

## January 29, 2025

This PURCHASE AND SALE AGREEMENT (this "**Agreement**"), dated as of the 29th day of January, 2025 (the "**Effective Date**"), is entered into between 87TH AVENUE MEDLEY FL HOLDING CORP ("**Seller**"), and JMC TRUCKING INC., ("**Purchaser**"). The terms "**Party**" and "**Parties**" include Seller, Purchaser, their respective constituent entities and their respective successors, assigns, and legal representatives. In the event either Seller or Purchaser is an individual, a "Party" or "Parties" includes that individual's heirs.

## RECITALS

WHEREAS, Seller is the owner of the Property (as defined below);

WHEREAS on March 27, 2024, Seller was granted creditor protection pursuant to an Order granted by the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") (as amended and restated from time to time, the "**Initial Order**") under the *Companies' Creditors Arrangement Act*, RSC 1985, c. C-36, as amended (the "**CCAA Proceedings**");

WHEREAS pursuant to the Initial Order, Ernst & Young Inc. was appointed as Monitor of Seller (in such capacity, the "**Monitor**") under the CCAA Proceedings and R.C. Benson Consulting Inc., was appointed as Chief Restructuring Officer (in such capacity, the "**CRO**");

WHEREAS on April 5, 2024, the Court granted the Protocols Order which approved a real estate monetization plan (as amended and restated from time to time, the "**Protocols Order**");

WHEREAS the Initial Order and the Protocols Order were recognized by the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") under Chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**");

WHEREAS pursuant to the Initial Order and the Protocols Order, Seller, in consultation with the Monitor and CRO, is authorized to market and sell any or all of the real property of Seller, and negotiate such terms and conditions of sale as they may deem appropriate;

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser the Property and Purchaser desires to purchase the Property from Seller; and

WHEREAS capitalized terms used but not otherwise defined herein shall have the meanings given to them in Schedule "A" attached hereto.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01   The Property.** Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller in accordance with the terms and conditions of this Agreement, all of Seller's

right, title and interest in and to the following described property (collectively referred to as the "**Property**"):

(a)     The real property, including all right, title, and interest therein, located at 10015 NW 87th Avenue, Medley, FL 33166 more particularly described on <u>Schedule "B"</u> attached hereto and incorporated herein by this reference (the "**Real Property**").

(b)     All rights, privileges, easements, and rights-of-way appurtenant to said Real Property, including without limitation, all mineral, oil and gas and other subsurface rights, development rights, air rights, and water rights (collectively, the "**Appurtenances**").

(c)     All improvements and fixtures located on the Real Property, including, without limitation: (i) all structures affixed to the Real Property; (ii) all apparatus, equipment, and appliances used in connection with the operation or occupancy of the Real Property; and (iii) all facilities used to provide any services to the Real Property and/or the structures affixed thereto (collectively, the "**Improvements**"), excluding those fixtures owned by Tenants or other occupants of the Property or vendors of the Improvements, if any.

(d)     All tangible personal property owned by Seller and located on the Real Property or the Improvements and used solely in connection therewith (provided that it is expressly agreed by the parties hereto that none of the tangible personal property in, on, around or affixed on or about the Real Property and the Improvements owned by any party other than Seller (including, without limitation, any Tenant or other occupants of the Real Property shall be or be deemed included in the Property (and shall not be sold pursuant hereto)) (collectively, the "**Personal Property**"). Notwithstanding the foregoing, the Personal Property described on Schedule A to the Bill of Sale (collectively the "**Excluded Property**") shall not be included in the sale of the Property as described herein.

(e)     All rights, title, and interest of Seller in and to any and all written agreements including, without limitation, personal property leases and contracts (other than the Leases) to which Seller is a party and which affect the Property to the extent assignable without the consent of third parties (collectively, the "**Assumed Contracts**").

(f)     All rights, warranties, guarantees, utility contracts, approvals (governmental or otherwise), permits, certificates of occupancy, surveys, plans and specifications, trademarks or tradenames, copyrights, and any agreements, covenants, or indemnifications that Seller received from a third party, including any prior owner, and relating to the Real Property, Appurtenances, or Improvements (collectively, the "**Intangible Property**").

(g)     All rights, title, and interest of Seller in and to all Tenant leases, lease amendments, guarantees, exhibits, addenda, and riders thereto and any other documents creating a possessory interest in the Real Property or Improvements with any Persons leasing, using, or occupying the Real Property or Improvements or any part of either (collectively, the "**Leases**").

Notwithstanding anything herein to the contrary, "**Property**" does not include any tenant fixtures or other property belonging to Tenants of the Property, or any item leased from third parties.

**Section 1.02   Assumed Liabilities.**  Subject to the terms and conditions set forth herein, and provided Seller shall ten (10) days prior to the expiration of the Due Diligence period submit to Purchaser a list of the liabilities to be assumed by Purchaser. Such list will include a description of the Leases and the Assumed Contracts, with copies of same. Purchaser (or any person designated by Purchaser) shall assume and agree to pay, perform and discharge when due the following liabilities and obligations of Seller arising out of or relating to the Property on or after the Closing, which for the avoidance of doubt shall not include any other liabilities and obligations that relate to any failure to perform, improper performance, warranty, or other breach or default by the Seller (collectively the "**Assumed Liabilities**"):

(a)    All liabilities and obligations arising under or relating to the Assumed Contracts, but solely to the extent such liabilities and obligations are to be performed on or after the Closing;

(b)    All liabilities and obligations arising under or relating to the Assumed Contracts (as distinct from curing all defaults or failures to comply with provisions thereunder that may not be cured by the mere payment of money): (i) accruing or arising at any time prior to or after the Petition Date or (ii) arising from or relating to any act, event, or occurrence prior to the Petition Date that are required to be paid pursuant to § 365 of the Bankruptcy Code in order to assume and assign the Assumed Contracts to Purchaser;

(c)    All other liabilities and obligations arising out of or relating to Purchaser's ownership or operation of the Property on or after the Closing;

(d)    Liabilities and obligations apportioned to Purchaser under this Agreement;

(e)    Permitted Exceptions and Permitted Encumbrances.

## ARTICLE II
## PURCHASE PRICE AND DEPOSIT

**Section 2.01   Purchase Price.** Purchaser shall pay First American Title Insurance Company, 200 West Madison Street, Suite 800, Chicago, Illinois 60606, Attention: James McIntosh and April Muiser, Telephone No. (312) 917-7220, Email: jmcintosh@firstam.com and amuiser@firstam.com (the "**Escrow Agent**")), the sum of Three Million One Hundred Thousand and 00/100 United States Dollars ($3,100,000.00 USD) (the "**Purchase Price**"), subject to such apportionments, adjustments, and credits as are provided for in this Agreement.

**Section 2.02   Payment of Purchase Price.** Purchaser shall pay the Purchase Price as follows:

4

(a)    The sum of Seventy-Seven Thousand Five Hundred and 00/100 United States Dollars ($77,500.00 USD) within seven (7) days of the Parties' mutual execution of this Agreement (together with any interest earned thereon, collectively, the "**Initial Deposit**"), and an additional Seventy-Seven Thousand Five Hundred and 00/100 United States Dollars ($77,500.00 USD) before the expiration of the Due Diligence Period (as defined herein) (together with any interest earned thereon, collectively, the "**Additional Deposit**" and together with the Initial Deposit, the "**Earnest Money Deposit**"). The Earnest Money Deposit shall be paid by wire transfer, payable to the Escrow Agent, in trust, which shall be applied against the Purchase Price on the Closing Date.

(b)    The balance of the Purchase Price shall be paid to the Escrow Agent on the Closing Date simultaneously with the delivery of the Conveyance Deed, by federal funds wire transfer of immediately available funds.

**Section 2.03    Earnest Money Deposit.**

(a)    The Earnest Money Deposit shall be held, pending Closing, by the Escrow Agent in an interest-bearing account with a third-party financial institution.

(b)    In the event Purchaser fails to deposit the Earnest Money Deposit with the Escrow Agent in accordance with this Agreement, this Agreement shall automatically terminate, without the need for further notice or instruction.

(c)    If the Closing does not occur by reason of a uncured default of Purchaser (including if any of the representations and/or warranties of Purchaser as set forth in this Agreement are found to be false at Closing), the full amount of the Earnest Money Deposit (plus accrued interest) held by Escrow Agent, less any applicable withholding Taxes, shall be forfeited by the Purchaser and become the property of Seller, and shall be released by the Escrow Agent to Seller as liquidated damages and not as a penalty.  This shall be the Seller's sole and exclusive remedy.

(d)    If the Closing does not occur for any reason other than that expressed in Section 2.03(c) above, the full amount of the Earnest Money Deposit (plus accrued interest), shall be returned by the Escrow Agent to Purchaser.

(e)    Purchaser hereby acknowledges and agrees that the Earnest Money Deposit held by the Escrow Agent does not and shall not constitute property of the estate of Purchaser within the meaning of Section 541 of title 11 of the United States Code, or substantially similar provisions of state law (the "**Bankruptcy Code**"), and Purchaser's interest in such Earnest Money Deposit is limited to the right to have the Earnest Money Deposit returned if and when the conditions for the return of the Earnest Money Deposit to Purchaser are satisfied as set forth herein, or paid to the Seller at the time of Closing as part of and applied to the Purchase Price. Purchaser hereby acknowledges and agrees that the proper release of the Earnest Money Deposit to Seller as provided hereunder shall not be a violation of any provision of the Bankruptcy Code, including, without limitation, Section 362 of the Bankruptcy Code, or require the approval of any court with jurisdiction over

5

any case in which Purchaser or any affiliate of Purchaser is a debtor. Purchaser hereby waives any provision of the Bankruptcy Code necessary to invoke the foregoing, including, without limitation, Sections 105 and 362, and waives any right to defend against any motion for relief from the automatic stay that may be filed by Seller.

(f)    The Earnest Money Deposit shall be held and disbursed by Escrow Agent in accordance with the provisions set forth in <u>Schedule "D"</u> attached hereto.

(g)    This section shall survive termination of this Agreement.

**Section 2.04    No Financing Contingency.** Purchaser expressly agrees and acknowledges that Purchaser's obligations to pay the Purchase Price and otherwise consummate the Transaction are not in any way conditioned upon Purchaser's ability to obtain financing of any type or nature whatsoever, whether by way of debt financing or equity investment, or otherwise.

**ARTICLE III**
**ACCESS**

**Section 3.01    Property Investigation Period.** Purchaser shall have a period, commencing on the Effective Date through the date which is thirty (30) days thereafter (the "**Due Diligence Period**"), to review the Property (including conducting such tests, studies, surveys, and/or other physical inspections of the Property as Purchaser deems necessary or appropriate) and all information relating thereto (the "**Inspections**"). Subject to Section 3.03 below, Purchaser's Inspections may encompass such matters as, without limitation, title and survey, environmental conditions, soil conditions, siting, access, traffic patterns, competition, financing, economic feasibility, platting, zoning, leasing status, and matters involving governmental cooperation. If Purchaser is dissatisfied with the Property for any reason or no reason whatsoever, then Purchaser shall have the right to terminate this Agreement upon written notice to Seller, the Monitor and Escrow Agent delivered at any time prior to 11:59 p.m. Prevailing Time Zone Time on the last day of the Due Diligence Period, in which event the Initial Deposit shall be returned to Purchaser, this Agreement shall terminate, and the parties shall have no further liability hereunder (except with respect to those obligations hereunder which survive the termination of this Agreement). In the event Purchaser does not so notify Seller, the Monitor and Escrow Agent of its election to terminate this Agreement prior to 11:59 p.m. Prevailing Time Zone Time on the last day of the Due Diligence Period, Purchaser shall be deemed to have elected to proceed to Closing, subject to the terms and conditions of this Agreement. If Purchaser elects to terminate this Agreement as provided in this section, the Escrow Agent shall return the Initial Deposit to Purchaser, upon such refund being made this Agreement shall terminate, and the parties shall have no further liability hereunder (except with respect to those obligations hereunder which survive the termination of this Agreement).

**Section 3.02    Purchaser's Access.** At any time prior to the Closing (including during the Due Diligence Period), Purchaser and its agents, employees, consultants, inspectors, appraisers, engineers, and contractors (collectively, "**Purchaser's Representatives**") shall have the right to enter upon and pass through the Property during normal business hours to examine and inspect the same, as well as conduct reasonable tests, studies, investigations, and surveys to assess utility

6

availability, soil conditions, environmental conditions, physical condition, and the like of the Property. However, any and all reasonable tests, studies, investigations, and surveys Purchaser wishes to complete and/or undertake must be completed during, and before the expiration of, the Due Diligence Period. Seller is not obligated to permit, nor is Purchaser permitted to conduct, any tests, studies, investigations, and/or surveys on the Property after the expiration of the Due Diligence Period. Once the Due Diligence Period has expired, Purchaser shall be limited to a total of three (3) inspections of and/or visits to the Property until Closing, and all such inspections/visits shall be during regular business hours with at least forty-eight (48) hour's advanced notice to Seller.

**Section 3.03    Purchaser's Right to Inspect.**

(a)       In conducting any inspection of the Property or otherwise accessing the Property, Purchaser shall at all times: (i) comply with all laws and regulations of all applicable governmental authorities; and (ii) maintain commercial general liability insurance in the amount of One Million Dollars ($1,000,000.00 USD), shall name Seller as an additional insured under all such applicable polices, shall provide evidence of all such insurance to Seller within two (2) business days prior to Purchaser's or Purchaser's Representatives first entry onto the Property to conduct any inspection. In addition, while conducting any inspection of the Property or otherwise accessing the Property, neither Purchaser nor any of Purchaser's Representatives shall: (A) interfere with the business of Seller (or any of its Tenants) conducted at the Property or disturb the use or occupancy of any occupant of the Property other than, in each case, to a *de minimis* extent; or (B) subject to the provisions set forth below in Section 3.04, damage the Property. In conducting the foregoing inspection or otherwise accessing the Property, Purchaser and Purchaser's Representatives shall at all times comply with, and shall be subject to, the rights of the Tenants under the Leases (and any Persons claiming under or through such Tenants). Seller may from time to time establish reasonable rules of conduct for Purchaser and Purchaser's Representatives in furtherance of the foregoing.

(b)       Purchaser shall schedule and coordinate all inspections of the Property or other access thereto with Seller and shall give Seller at least two (2) Business Days' prior notice thereof. Seller and/or the Monitor shall be entitled to have a representative present at all times during each such inspection or other access. Purchaser agrees to pay to Seller promptly upon demand the cost of repairing and restoring any damage or disturbance that Purchaser or Purchaser's Representatives shall cause to the Property. All inspection fees, appraisal fees, engineering fees, and other costs and expenses of any kind incurred by Purchaser or Purchaser's Representatives relating to such inspection and its other access shall be at the sole expense of Purchaser.

(c)       In the event that the Closing hereunder shall not occur for any reason whatsoever, Purchaser shall promptly return to Seller copies of all due diligence materials delivered by Seller to Purchaser and shall destroy all copies and abstracts thereof. Purchaser and Purchaser's Representatives shall not be permitted to conduct borings of the Property or drilling in or on the Property, or any other invasive testing, in connection with the preparation of an environmental audit or in connection with any other inspection of the

7

Property without the prior written consent of Seller, which consent may be withheld in the sole discretion of the Seller (and, if such consent is given, Purchaser shall be obligated to pay to Seller promptly upon demand the reasonable and actual cost of repairing and restoring any damage as aforesaid). The provisions of this Section 3.03(c) shall survive the Closing or any termination of this Agreement.

**Section 3.04    Seller Indemnification.** Purchaser agrees to indemnify and hold Seller and its disclosed or undisclosed, direct and indirect shareholders, officers, directors, trustees, partners, principals, members, employees, agents, affiliates, representatives, consultants, accountants, contractors, and attorneys or other advisors, and any successors or assigns of the foregoing (collectively with Seller, the "**Seller Related Parties**"), harmless from and against any and all losses, costs, damages, liens, Claims, liabilities, or expenses (including, but not limited to, reasonable attorneys' fees, court costs, and disbursements) incurred by any Seller Related Parties arising from or by reason of Purchaser's and/or Purchaser's Representatives' access to, or inspection of, the Property, or any tests, inspections, or other due diligence conducted by or on behalf of Purchaser, except to the extent such losses, costs, damages, liens, Claims, liabilities, or expenses are caused by the mere discovery of a pre-existing condition at the Property or are caused by the negligence or willful misconduct of any of the Seller Related Parties. The provisions of this Section 3.04 shall survive the Closing or any termination of this Agreement.

**Section 3.05    Tenants and Service Providers.**  Purchaser is authorized to contact both (a) the tenants under the Leases; and (b) the vendors and service providers under the Assumed Contracts.  Purchaser at its discretion may request estoppel certificates and other information from these parties.

# ARTICLE IV
# CLOSING

**Section 4.01    Closing; Closing Date.** The closing of the Transaction (the "**Closing**") shall occur remotely at 2:00 p.m. Prevailing Time Zone Time on the seventieth (70th) day following the expiration of the Due Diligence Period (the "**Closing Date**") in accordance with the terms and conditions of this Agreement. Purchaser and Seller agree to provide the Monitor (or Escrow Agent) with all documents, payments, and other items needed for the Closing on or before the Closing Date. Purchaser acknowledges and agrees that **TIME SHALL BE OF THE ESSENCE** with respect to the performance by Purchaser of its obligations to purchase the Property, pay the Purchase Price, and otherwise consummate the Transaction on the Closing Date.

# ARTICLE V
# TITLE MATTERS

**Section 5.01    "As Is, Where Is".** The Property shall be sold, assigned and conveyed by Seller to Purchaser on an "as is, where is" basis, and Purchaser shall accept and assume same subject only to the Permitted Encumbrances.

**Section 5.02    Title.**

8

(a)    Title to the Property shall be conveyed in fee simple, subject to the terms of the Approval and Vesting Order(s), subject only to the Permitted Encumbrances.

(b)    Purchaser shall promptly order from First American Title Insurance Company, 200 West Madison Street, Suite 800, Chicago, Illinois 60606, Attention: James W. McIntosh and April Muiser, Phone No. (312) 917-7220, Email: jmcintosh@firstam.com; amuiser@firstam.com (the "**Title Company**"), a title commitment for an ALTA title insurance policy (the "**Title Report**") and survey update and shall cause a copy of the Title Report and updated survey to be delivered to Seller no later than 30 days after the Effective Date(the "**Title Report Objection Date**"). Purchaser shall furnish to Seller written notice (the "**Title Report Objection Notice**") specifying any exceptions to title to the Property set forth in the Title Report which are not Permitted Exceptions (each, a "**Title Objection**"). Purchaser's failure to timely deliver the Title Report Objection Notice on or prior to 9:00 a.m. (Prevailing Time Zone Time) on the Title Report Objection Date shall constitute Purchaser's irrevocable acceptance of the Title Report and Purchaser shall be deemed to have unconditionally waived any right to object to any matters set forth therein (and all of the exceptions to title in the Title Report shall be deemed Permitted Exceptions). If, after giving the Title Report Objection Notice to Seller, Purchaser receives a continuation report showing any new exceptions to title to the Property which are not Permitted Exceptions, Purchaser shall give written notice thereof to Seller no later than 9:00 a.m. (Prevailing Time Zone Time) on the date that is seven (7) Business Days after the date Purchaser receives such continuation report. If Purchaser fails to give Seller such notice, Purchaser shall be deemed to have unconditionally waived any additional matters as to which it fails to give such notice to Seller (and all of the exceptions to title in the Title Report shall be deemed Permitted Exceptions). Purchaser hereby acknowledges and agrees that **TIME IS OF THE ESSENCE** with respect to all time periods relating to Purchaser's obligations as set forth in this Article [V].

(c)    Any exceptions in the Title Report or any continuation title report not timely objected to by Purchaser with a Title Report Objection Notice shall be deemed to have been approved by Purchaser, other than those items Seller is obligated to remove pursuant to Section 5.05 hereof. Upon Purchaser's delivery of a Title Report Objection Notice, Seller may elect, in its sole discretion, to remove (or otherwise modify or cure in a manner reasonably satisfactory to Purchaser) said disapproved item or items at or prior to the Close Date, by delivering written notice of such election to Purchaser not later than five (5) days following the date Seller receives a Title Report Objection Notice. If Seller does not notify Purchaser in writing that Seller will eliminate (or otherwise cure) such disapproved exceptions or matters by the expiration of the Due Diligence Period, Seller shall be deemed to have elected not to remove (or otherwise cure) such exception and Purchaser shall have until the expiration of the Due Diligence Period to terminate this Agreement by written notice to Seller and the Monitor (and Escrow Agent) delivered on or before the expiration of the Due Diligence Period, in which event Purchaser shall be entitled to a return of the Earnest Money Deposit, and this Agreement shall thereupon be deemed terminated and of no further effect, and neither party hereto shall have any obligations to the other hereunder or by reason hereof, except for the provisions hereof that expressly survive termination of this Agreement. Subject to the immediately following sentence, if Purchaser fails to so

9

terminate this Agreement on or before the expiration of the Due Diligence Period, Purchaser shall be deemed to have withdrawn its disapproval and approved such exceptions, and such exceptions shall be deemed Permitted Exceptions. However, if Purchaser receives the continuation report after the expiration of the Due Diligence Period, and same reflects exceptions which are not Permitted Exceptions, and which were not included in the initial Title Report, and Seller elects not to cure same prior to Closing, then Purchaser may elect to terminate this Agreement by written notice to Seller, Monitor and Escrow Agent delivered on or before the Closing Date, in which event Purchaser shall be entitled to a return of the Earnest Money Deposit and this agreement shall thereupon be deemed terminated and of no further effect, and neither party hereto shall have any obligations to the other hereunder or by reason hereof, except for the provisions hereof that expressly survive termination of this Agreement.

(d)    For the avoidance of doubt, Purchaser and Seller hereby acknowledge and agree that Purchaser shall only have the right to object to those exceptions to title disclosed on Schedule B of the Title Report that are not Permitted Exceptions. As used herein, "**Permitted Exceptions**" shall be deemed to include, without limitation, any Permitted Encumbrances, and any liens, encumbrances, or other title exceptions: (i) which the Title Company is willing to omit as exceptions to title (without additional cost to Purchaser or where Seller pays such cost for Purchaser); (ii) which shall be extinguished upon the transfer of the Property; (iii) which comprise financing statements for the benefit of a vendor or supplier of any tenant's equipment or personal property; (iv) which comprise liens that encumber the leasehold estate of any tenant; [and] (v) which are the responsibility of any tenant under the Leases to cure, correct, and remove of record; provided, that Seller shall use commercially reasonable efforts to enforce its rights, as landlord, under such tenant's Lease to cause such tenant to cure, correct, and remove of record the subject lien, encumbrance, or other title exception promptly after Seller's becoming apprised of the existence thereof; and (vi) the Existing Violations (collectively, the "**Non-Objectionable Encumbrances**").

**Section 5.03    Seller Unable to Convey.**

(a)    If, on the Closing Date, Seller fails or is unable to convey title to the Property to Purchaser subject to and in accordance with the provisions of this Agreement, Seller and Purchaser shall have the following rights and obligations:

(i)    Seller shall be entitled to reasonable adjournments of the Closing one or more times for a period not to exceed ten (10) Business Days in the aggregate to enable Seller to convey such title to the Property, upon written notice delivered to Purchaser on or prior to the Closing Date;

(ii)    If Seller does not so elect to adjourn the Closing, and on the Closing Date, fails or is unable to convey title subject to and in accordance with the provisions of this Agreement, Purchaser shall be entitled, to either: (A) terminate this Agreement by written notice to Seller and the Monitor (and Escrow Agent) delivered on or before the Closing Date, in which event Purchaser shall be entitled

10

to a return of the Earnest Money Deposit, and this Agreement shall thereupon be deemed terminated and of no further effect, and neither party hereto shall have any obligations to the other hereunder or by reason hereof, except for the provisions hereof that expressly survive termination of this Agreement; or (B) subject to Seller's receipt of the Approval and Vesting Order, complete the purchase (with no reduction in the Purchase Price) with such title as Seller is able to convey on the Closing Date. If Purchaser shall fail to give such notice as aforesaid, Purchaser shall be deemed to have elected clause (B) above and the Closing shall take place on the Closing Date;

(iii)    If Seller elects to adjourn the Closing as provided in Section 5.03(a)(i) above, this Agreement shall remain in effect for the period or periods of adjournment, in accordance with its terms. If, on the Closing Date, Seller fails or is unable to convey title to the Property subject to and in accordance with the provisions of this Agreement, Purchaser shall make its election between clauses (A) and (B) of Section 5.03(a)(ii) above, by written notice to Seller given not later than five (5) days after the Closing Date. If Purchaser shall fail to give such notice as aforesaid, Purchaser shall be deemed to have elected clause (B) of Section 5.03(a)(ii) above and the Closing shall take place on the day which is ten (10) days after the originally scheduled Closing Date; and

(b)    Notwithstanding anything to the contrary contained in this Agreement, Seller shall not be required to take or bring any action or proceeding or any other steps to remove any defect in or objection to title or to fulfill any condition precedent to Purchaser's obligations under this Agreement or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller therefor, at law or in equity, except that Seller shall, on or prior to the Closing, pay, discharge, or remove of record, or cause any Voluntary Lien to be paid, discharged, or removed of record, at Seller's sole cost and expense. The term **"Voluntary Lien"** as used herein shall mean any lien and other encumbrances (other than Permitted Exceptions and Permitted Encumbrances) which: (i) Seller has knowingly and intentionally placed (or allowed to be placed) on the Property, including, without limitation, mortgages and construction liens; (ii) are in a liquidated amount; and (iii) may be satisfied solely by the payment of money. For all Voluntary Liens, including without limitation, mortgages and construction liens, Seller shall have the obligation to pay, discharge, or remove of record Voluntary Liens at or prior to the Closing Date.

**Section 5.04    Title As Seller Can Convey.** Notwithstanding anything in Section 5.03 above to the contrary, Purchaser may at any time accept such title as Seller can convey, without reduction of the Purchase Price or any credit or allowance on account thereof or any claim against Seller. The acceptance of the Conveyance Deed by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement, except for such matters which are expressly stated to survive the Closing hereunder.

**Section 5.05    Liens and Other Encumbrances.** If the Property shall, at the time of the Closing, be subject to any liens (such as for judgments or transfer, inheritance, estate, franchise,

11

license, or other similar taxes), encumbrances, or other title exceptions which would be grounds for Purchaser to object to title hereunder, the same shall not be deemed an objection to title provided that, at the time of the Closing, either: (a) Seller, at Seller's discretion, delivers clear and collected funds to the Escrow Agent at or before the Closing in the amount required to satisfy the same and delivers to Purchaser and/or the Title Company at the Closing, instruments in recordable form (and otherwise in form reasonably satisfactory to the Title Company in order to omit same as an exception to its title policy) sufficient to satisfy and discharge of record such liens and encumbrances together with the cost of recording or filing such instruments; or (b) the Title Company shall otherwise issue or bind itself to issue a policy which shall insure Purchaser against collection thereof from or enforcement thereof against the Property.

**Section 5.06   Certificate of Occupancy.** Notwithstanding anything to the contrary contained in this Agreement, the fact that the Property does not have a certificate or certificates of occupancy (or, if there be such certificate or certificates, that there exist any variances between such certificate or certificates and the actual state or use of the Property) shall not be deemed an objection to title or a reason for Purchaser not to close hereunder after the expiration of the Due Diligence Period.

## ARTICLE VI
## CLOSING DELIVERIES

**Section 6.01   Seller's Closing Deliveries.** Seller shall deliver or cause to be delivered to Purchaser or to the Title Company the following at the Closing, except as otherwise specified below:

(a)      one (1) original special warranty deed (the "**Conveyance Deed**"), executed by Seller and acknowledged, and in recordable form, conveying to Purchaser the Real Property, Improvements, and Appurtenances, subject only to the Permitted Encumbrances;

(b)      one (1) original bill of sale executed by Seller with respect to the Personal Property, Permits, Licenses and any Intangible Property, if any, in substantially the form attached hereto as Exhibit A (the "**Bill of Sale**").

(c)      one (1) original assignment and assumption agreement executed by Seller with respect to the Leases in the form attached hereto as Exhibit B (the "**Assignment and Assumption of Leases**").

(d)      one (1) original assignment and assumption agreement executed by Seller with respect to the Assumed Contracts in the form attached hereto as Exhibit C (the "**Assignment and Assumption of Contracts**").

(e)      a copy of the Approval and Vesting Order(s);

(f)      a certificate in the form attached hereto as Exhibit D with respect to compliance with the Foreign Investment in Real Property Tax Act (Internal Revenue Code Sec. 1445, as amended, and the regulations issued thereunder).

12

(g)    a closing statement;

(h)    an undertaking to re-adjust any item on or omitted from the closing statement for a period of not longer than 45 days after the Closing Date;

(i)    a bring down certificate dated as of the Closing Date, confirming that all of the representations and warranties of Seller contained in this Agreement are true and correct in all material respects as of the Closing Date, with the same effect as though made on and as of the Closing Date;

(j)    the Monitor's Certificate, which shall be delivered and held in escrow until all other closing conditions have been satisfied or waived and the Monitor confirms same in writing to Purchaser; and

(k)    all other documents reasonably necessary or otherwise required by the Monitor, or the Title Company, to consummate the Transaction.

**Section 6.02    Purchaser's Closing Deliveries.** Purchaser shall deliver or cause to be delivered to Seller and/or the Monitor and/or Escrow Agent or Title Agent, on or before the Closing Date, the following:

(a)    The balance of the Purchase Price as set forth in Section 2.02(b).

(b)    one (1) original Assignment and Assumption of Leases countersigned by Purchaser.

(c)    one (1) original Assignment and Assumption of Contracts countersigned by Purchaser.

(d)    an undertaking to re-adjust any item on or omitted from the statement of adjustments for a period of not longer than 45 days after the Closing Date;

(e)    a bring down certificate dated as of the Closing Date, confirming that all of the representations and warranties of Purchaser contained in this Agreement are true and correct in all material respects as of the Closing Date, with the same effect as though made on and as of the Closing Date;

(f)    Any required transfer tax forms.

(g)    All other documents reasonably necessary or otherwise required by the Monitor, or the Title Company, to consummate the Transaction.

**Section 6.03    Delivery of the Monitor's Certificate**. When the conditions set out in Article XII below have been satisfied or waived, the Monitor will deliver an executed copy of the Monitor's Certificate to Purchaser. Upon such delivery, together with the other Seller's Closing Deliveries referenced in Section 6.01 above, the Closing will be deemed to have occurred. The Monitor will thereafter promptly file a copy of the Monitor's Certificate with the Canadian Court.

13

For the purposes of delivering the Monitor's Certificate, the Monitor shall be entitled to rely exclusively and without independent verification on written confirmation from counsel to Purchaser and Seller (email being sufficient) regarding the satisfaction or waiver of the conditions set out in Article XII.

## ARTICLE VII
## CLOSING COSTS

**Section 7.01    Seller's Closing Costs.** Seller shall pay the following costs and expenses in connection with the transaction contemplated by this Agreement:

(a)    Seller's Broker's fees.

(b)    Any and all costs incurred by Seller in connection with the preparation, review, and negotiation of this Agreement and the transactions and the Closing contemplated by this Agreement, including any attorneys' or consultancy fees.

(c)    Fifty (50%) percent of the Escrow Agent's escrow and closing fees.

**Section 7.02    Purchaser's Closing Costs.** Purchaser shall pay the following costs and expenses in connection with the transaction contemplated by this Agreement:

(a)    Fifty (50%) percent of the Escrow Agent's escrow and closing fees.

(b)    All documentary stamp taxes and surtax payable upon the recording of the deed to Purchaser.

(c)    Recording fees for the recording of the Conveyance Deed and any mortgage.

(d)    Intentionally omitted.

(e)    The cost of the Title Report (not to exceed $500).

(f)    The cost of the Title Insurance Policy.

(g)    The cost of the survey.

(h)    Any and all costs associated with any financing Purchaser may obtain to consummate the acquisition of the Property.

(i)    Intentionally omitted.

(j)    Any and all costs incurred by Purchaser in connection with the preparation, review, and negotiation of this Agreement and the transactions and the Closing contemplated by this Agreement, including any expenses associated with Purchaser's investigation of the Property, and any attorneys' or consultancy fees.

14

## ARTICLE VIII
## APPORTIONMENTS

**Section 8.01    Apportionments at Closing.** The Parties shall prorate the following as of 11:59 p.m. Prevailing Time Zone Time on the day immediately preceding the Closing Date (the "**Apportionment Date**") on the basis of the actual number of days of the month which shall have elapsed as of the Closing Date and based upon the actual number of days in the month and a 365 day year.

**Section 8.02    Property Taxes.** Property taxes shall be apportioned on the basis of the fiscal period for which assessed. If the Closing Date shall occur before an assessment is made or a tax rate is fixed for the tax period in which the Closing Date occurs, the apportionment of such Property Taxes based thereon shall be made at the Closing Date by applying the tax rate for the preceding year to the latest assessed valuation, but, promptly after the assessment and/or tax rate for the current year are fixed, the apportionment thereof shall be recalculated and Seller or Purchaser, as the case may be, shall make an appropriate payment to the other within seven (7) Business Days based on such recalculation. If, as of the Closing Date, the Real Property or any portion thereof shall be affected by any special or general assessments which are or may become payable in installments of which the first installment is then a lien and has become payable, Seller shall pay the unpaid installments of such assessments which are due prior to the Closing Date and Purchaser shall pay the installments which are due on or after the Closing Date.

**Section 8.03    Utility Charges.** All water, sewer, gas, electric, telephone, fuel, and other utility charges that were prorated as of the Closing Date based on the last ascertainable bill shall be adjusted and prorated as of the Closing Date upon receipt of the actual statements for said utilities.

**Section 8.04    Operating Costs and Expenses.** All operating costs and expenses accrued before the Closing Date shall be paid by Seller on or before the Closing Date or promptly upon receipt of applicable statements. All operating costs and expenses accruing on or after the Closing Date shall be paid by Purchaser.

**Section 8.05    Rents**. All rent and other charges (including reimbursement payments) payable under the Leases shall be apportioned as of the Closing Date as and when collected; provided, however, that if any rents under any of the Leases shall be accrued and unpaid at the Closing Date, the rents collected by Purchaser on or after the Closing Date shall first be applied to all rents due and payable for the calendar month in which the Closing occurs; next to all rent due Seller and payable for the month immediately preceding the calendar month in which the Closing occurs, so long as all rents payable to Purchaser are then current; next to all rents due and payable at the time of such collection with respect to the period after the calendar month in which the Closing occurs; and the balance shall be payable to the extent of delinquent rents for the period prior to the month immediately preceding the calendar month in which the Closing occurs, so long as all rents payable to Purchaser are then current.  Any sums received by Purchaser to which Seller is entitled shall be held in trust for Seller on account of said past due rents payable to Seller, and Purchaser shall remit any such sums to Seller within ten (10) days after receipt thereof.  Seller agrees that if Seller receives any amounts after the Closing Date which are attributable, in whole

15

or in part, to any period after the Closing Date, Seller shall remit to Purchaser that portion of the monies so received by Seller to which Purchaser is entitled within ten (10) days after receipt thereof.  Purchaser agrees to use good faith commercially reasonable efforts following the Closing to collect delinquent rents due to Seller pursuant to the terms hereof.

Section 8.06   **Security Deposits**. At Closing, Seller will grant Purchaser a credit against the Purchase Price in an amount equal to all tenant security deposits held by Seller pursuant to any Leases being assigned to Purchaser at Closing.

Section 8.07   **Seller's Insurance.** Seller shall not be required to assign any policies of insurance in respect of the Property to Purchaser and Purchaser shall be responsible for obtaining its own insurance as of the Closing Date.

Section 8.08   **Other Items**. Such other items as are customarily prorated in transactions similar to the transaction contemplated by this Agreement.

Section 8.09   **Survival.** The provisions of this Article shall survive the Closing of this Agreement for a period of forty-five (45) days.

**ARTICLE IX**
**RESERVED**


**ARTICLE X**
**SELLER'S COVENANTS**

Section 10.01  **Seller's Covenants.** Seller covenants that:

(a)   From the Effective Date until the Closing, Seller shall, subject in all cases to any orders made in the CCAA Proceedings and Chapter 15 Proceedings that are applicable to Seller:

(i)   Maintain the Property in the ordinary course of business and deliver the Property to Purchaser at the Closing in substantially the same condition it was in as of the Effective Date, ordinary wear and tear excepted; provided, however, that Seller shall have no obligation to make any capital expenditures;

(ii)   Continue its customary practices with respect to leasing and contracts affecting the Property, provided that any lease or contract not disclosed to Purchaser during the Due Diligence Period may not be entered into or modified after the Due Diligence Period without first obtaining the written consent of Purchaser;

(iii)   Maintain general liability and property damage insurance in amounts that it customarily maintains; and

16

(iv)    Comply with all laws applicable to the Property, use, or occupancy thereof.

## ARTICLE XI
## REPRESENTATIONS AND WARRANTIES

**Section 11.01  Seller's Representations and Warranties.**

(a)    Except as expressly set forth in this Section 11.01, and without limiting anything in Article XIV, Seller has not made and does not make any representations or warranties, including any representations or warranties as to the physical and environmental condition, layout, leases, footage, rents, income, expenses, zoning, or other matters with respect to the Property.

(b)    Seller represents and warrants that:

(i)    Seller has all necessary power and authority to enter into this Agreement and to carry out its obligations hereunder. The execution and delivery of this Agreement and the consummation of the Transaction have been duly authorized by all necessary action on the part of Seller, subject to the Approval and Vesting Orders. This Agreement is a valid and binding obligation of Seller enforceable in accordance with its terms;

(ii)    the Monitor has been duly appointed as the monitor of Seller by the Initial Order and such Initial Order is in full force and effect and has not been stayed, and subject to obtaining the Approval and Vesting Order(s), Seller has the full right, power and authority to enter into this Agreement, perform its obligations hereunder and convey all of its right, title and interest in and to the Property;

(iii)    subject to any charges created by the Initial Order, Seller has done no act itself to encumber or dispose of the Property and is not aware of any action or process pending or threatened against Seller other than the Existing Violations that may affect its ability to convey the Property as contemplated herein;

(iv)    Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the "**Code**");

(v)    Seller is not, and shall not become, a Person or entity with whom United States Persons or entities are restricted or prohibited from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's specially designated and blocked Persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or

17

Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or be otherwise associated with such Persons;

(vi)    To Seller's knowledge, the only leases in place affecting the Property which will survive the Closing or which will be binding upon Purchaser or the Property after the Closing Date are those listed on <u>Exhibit E</u> attached hereto;

(vii)    To Seller's knowledge, the only service contracts which as of the Effective Date affect the Property are those listed on <u>Exhibit E</u> attached hereto; and

(viii)    All representations and warranties made by knowledge in this Agreement are made based on the actual knowledge of the CRO, without any duty to review or investigate the matters to which such knowledge, or the absence thereof, pertains and with no imputed knowledge whatsoever, whether from any partner, officer, director, member, shareholder, or employee of Seller. The CRO shall have no personal liability arising out of any representations or warranties made herein.

**Section 11.02  Purchaser's Representations and Warranties.**

(a)    Purchaser represents and warrants that:

(i)    Purchaser has full power and authority to enter into and perform this Agreement in accordance with its terms. Purchaser is a corporation validly formed and in good standing under the laws of the State of Florida. Purchaser is duly qualified to do business and is in good standing in the State of Florida. All requisite action (corporate, trust, partnership, or otherwise) has been taken by Purchaser in connection with this Agreement or shall have been taken on or prior to the Closing Date. Purchaser's execution, delivery, and performance of this Agreement have been duly authorized and all required consents or approvals have been obtained. The individuals executing this Agreement on behalf of Purchaser have the power and authority to bind Purchaser to the terms and conditions of this Agreement;

(ii)    This Agreement is a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, or other similar laws affecting the enforcement of creditors' rights generally;

(iii)    Purchaser has not violated any contract, agreement, or other instrument to which Purchaser is a party, nor any judicial order, judgment, or decree to which Purchaser is bound, by: (A) entering into this Agreement; (B) executing any of the documents Purchaser is obligated to execute and deliver on the Closing Date; or (C) performing any of its duties or obligations under this Agreement or otherwise necessary to consummate the Transaction;

18

(iv)    There are no actions, lawsuits, litigation, or proceedings pending or threatened in any court or before any governmental or regulatory agency that affect Purchaser's power or authority to enter into or perform this Agreement;

(v)    Purchaser shall defend and indemnify Seller against, and hold Seller harmless from, all Claims, demands, liabilities, losses, damages, costs, and expenses, including reasonable attorneys' fees, asserted by third parties for any breach, default, or violation of any Lease, or covenant thereof, occurring after the Closing Date;

(vi)    Except for the express representations and warranties of Seller found in Section 11.01 and subject to Article XIV, Purchaser is acquiring the Property on an "AS IS, WHERE IS" basis, without any representation or warranty of any kind or nature whatsoever, express or implied, and Purchaser acknowledges that no such representations or warranties have been made except as set forth in writing herein. In deciding whether to acquire the Property, Purchaser is relying solely on Purchaser's investigation of the Property;

(vii)    Purchaser is not, and shall not become, a Person or entity with whom United States Persons are restricted or prohibited from doing business under regulations OFAC (including those named on OFAC's specially designated and blocked Persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or be otherwise associated with such Persons; and

(viii)    There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, nor any actions, suits, or other legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, threatened against Purchaser, which would have any material adverse effect on the business or assets or the condition, financial or otherwise, of Purchaser or the ability of Purchaser to consummate the Transaction.

**Section 11.03 No Representations.** PURCHASER HEREBY ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER SELLER, CRO, MONITOR, NOR ANY PERSON ACTING ON BEHALF OF SELLER, CRO, MONITOR, NOR ANY PERSON OR ENTITY WHICH PREPARED OR PROVIDED ANY OF THE MATERIALS REVIEWED BY PURCHASER IN CONDUCTING ITS DUE DILIGENCE, NOR ANY DIRECT OR INDIRECT OFFICER, DIRECTOR, PARTNER, MEMBER, SHAREHOLDER, EMPLOYEE, AGENT, REPRESENTATIVE, ACCOUNTANT, ADVISOR, ATTORNEY, PRINCIPAL, AFFILIATE, CONSULTANT, CONTRACTOR, SUCCESSOR, OR ASSIGN OF ANY OF THE FOREGOING PARTIES (SELLER, CRO, MONITOR, SELLER RELATED PARTIES, AND ALL THE OTHER PARTIES DESCRIBED IN THE PRECEDING PORTIONS OF THIS SENTENCE (OTHER THAN PURCHASER) SHALL BE REFERRED TO HEREIN COLLECTIVELY AS THE "**EXCULPATED PARTIES**") HAS MADE OR

SHALL BE DEEMED TO HAVE MADE ANY ORAL OR WRITTEN REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESSED OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE (INCLUDING WITHOUT LIMITATION WARRANTIES OF HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE), WITH RESPECT TO THE PROPERTY, THE PERMITTED USE OF THE PROPERTY, OR THE ZONING AND OTHER LAWS, REGULATIONS, AND RULES APPLICABLE THERETO OR THE COMPLIANCE BY THE PROPERTY THEREWITH, THE REVENUES AND EXPENSES GENERATED BY OR ASSOCIATED WITH THE PROPERTY, OR OTHERWISE RELATING TO THE PROPERTY OR THE TRANSACTIONS CONTEMPLATED HEREIN. PURCHASER FURTHER ACKNOWLEDGES THAT EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, ALL MATERIALS WHICH HAVE BEEN PROVIDED BY ANY OF THE EXCULPATED PARTIES HAVE BEEN PROVIDED WITHOUT ANY WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED, AS TO THEIR CONTENT, SUITABILITY FOR ANY PURPOSE, ACCURACY, TRUTHFULNESS, OR COMPLETENESS AND, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, PURCHASER SHALL NOT HAVE ANY RECOURSE AGAINST SELLER, CRO, MONITOR OR ANY OF THE OTHER EXCULPATED PARTIES IN THE EVENT OF ANY ERRORS THEREIN OR OMISSIONS THEREFROM. PURCHASER IS ACQUIRING THE PROPERTY BASED SOLELY ON ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT IN RELIANCE ON ANY INFORMATION PROVIDED BY SELLER, CRO, MONITOR OR ANY OF THE OTHER EXCULPATED PARTIES, EXCEPT FOR THE REPRESENTATIONS, WARRANTIES, AND COVENANTS EXPRESSLY SET FORTH HEREIN. EXCEPT AS EXPRESSLY SET FORTH HEREIN, PURCHASER EXPRESSLY DISCLAIMS ANY INTENT TO RELY ON ANY SUCH MATERIALS PROVIDED TO IT BY SELLER, CRO OR MONITOR IN CONNECTION WITH ITS DUE DILIGENCE AND AGREES THAT IT SHALL RELY SOLELY ON ITS OWN INDEPENDENTLY DEVELOPED OR VERIFIED INFORMATION.

     **Section 11.04  Existing Violations.** The parties hereto acknowledge and agree that Seller has disclosed to Purchaser the existence of the Existing Violations relating to the Property which are described on Schedule "E" attached hereto. Purchaser acknowledges and agrees that Purchaser has retained legal counsel to fully, completely, and exhaustively search all public records to determine the totality of any and all court actions and/or federal, state, local, and/or municipal zoning and/or code violations related to the Property, and in doing so, Purchaser agrees that Seller has fully and completely complied with its disclosure requirements under the terms of this Agreement and under any and all applicable state and federal laws. Notwithstanding these disclosures, Purchaser wishes to proceed with the transaction contemplated in this Agreement, and Purchaser wishes to purchase the Property from Seller. After Closing has occurred and Purchaser has taken possession of the Property, Purchaser further agrees to perform any and all repairs and/or work, and undertake all actions, at Purchaser's sole cost and expense, necessary to bring the Property into compliance with all applicable federal, state, local, and municipal laws, regulations, and ordinances.

## ARTICLE XII
## CONDITIONS TO CLOSING

**Section 12.01 Conditions Precedent to Obligations of Seller.** Notwithstanding anything to the contrary herein, the obligation of Seller to close in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the time of the Closing of each of the conditions listed below, provided that Seller, at its election, evidenced by written notice delivered to Purchaser at or prior to the Closing, may waive any of such conditions:

(a)     Purchaser shall have: (i) executed and delivered to Seller all the documents required to be executed and delivered under this Agreement; (ii) paid the full balance of the Purchase Price in accordance with Section 2.02(b) above; (iii) paid all other sums of money required under this Agreement; and (iv) taken or caused to be taken all the other action required of Purchaser pursuant to this Agreement.

(b)     Purchaser shall not be in default of any covenant or agreement to be performed by Purchaser under this Agreement and shall have performed all other obligations required to be performed by it under this Agreement on or prior to the Closing Date.

(c)     the Royal Bank of Canada (in its capacity as administrative agent and collateral agent) and BMO Bank, N.A. (in its capacity as mortgagee on the Real Property) shall have consented in writing to the Transaction.

(d)     the Canadian Court and the U.S. Court shall have issued the Approval and Vesting Orders, and such Approval and Vesting Orders shall not have been stayed, vacated, reversed, or modified.

(e)     On the Closing Date all representations and warranties made by Purchaser in Section 11.02 shall be true and correct as if made on the Closing Date.

**Section 12.02 Conditions Precedent to Obligations of Purchaser.** Notwithstanding anything to the contrary contained herein, the obligation of Purchaser to close title and pay the Purchase Price in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the time of the Closing of each of the conditions listed below, provided that Purchaser, at its election, evidenced by written notice delivered to Seller at or prior to the Closing, may waive all or any of such conditions:

(a)     Seller shall have executed and delivered to Purchaser all the documents required to be executed and delivered under this Agreement and required to be delivered by Seller at the Closing and shall have taken all other action required of Seller at the Closing.

(b)     All representations and warranties made by Seller in Section 11.01 shall be true and correct in all material respects as if made on the Closing Date, provided, however, to the extent the facts and circumstances underlying such representations and warranties may have changed as of the Closing Date, Seller shall have the right to update its

21

representations and warranties as of the Closing Date and Purchaser shall be obligated to consummate the Transaction on the Closing Date.

(c)      the Canadian Court and the U.S. Court  shall have issued the Approval and Vesting Orders, and such Approval and Vesting Orders shall not have been stayed, vacated, reversed, or modified. Seller to provide evidence of such approvals at least fifteen (15) days prior to the Closing.

(d)      The Title Company shall be willing to insure title to the Property pursuant to a standard coverage title insurance policy in the amount of the Purchase Price, subject only to the Permitted Exceptions and as otherwise provided in this Agreement (the "**Title Insurance Policy**").

**Section 12.03  Failure of Conditions to Closing.**

(a)      If Purchaser is unable to timely satisfy (and Seller has not waived in writing) the conditions precedent to Seller's obligation listed in Section 12.01 (a), (b) and (e) to effect the Closing, then such failure shall constitute a default hereunder, in which case, Seller shall have the right to terminate this Agreement by notice thereof to Purchaser in accordance with the terms of this Agreement. If this Agreement is so terminated, then Seller shall be entitled to receive the Earnest Money Deposit and thereafter, neither party shall have any further obligations hereunder, except those expressly stated to survive the termination hereof.

(b)      If Seller is unable to timely satisfy the conditions precedent to Purchaser's obligation to effect the Closing (and Purchaser has not waived the same in writing), then Seller may, if it so elects and without any abatement in the Purchase Price: (i) adjourn the Closing Date for a period or periods not to exceed ten (10) Business Days in the aggregate after the Closing Date; and (ii) if, after any such extension, the conditions precedent to Purchaser's obligation to effect the Closing continue not to be satisfied (and Purchaser has not waived the same in writing) or Seller does not elect such extension and, in either case, such failure of condition precedent is not the result of Seller's default hereunder, then Purchaser or Seller shall be entitled to terminate this Agreement by notice thereof to the other party in accordance with the terms of this Agreement. If this Agreement is so terminated, then Purchaser shall be entitled to receive the Earnest Money Deposit and thereafter neither party shall have any further obligations hereunder, except those expressly stated to survive the termination hereof.

## ARTICLE XIII
## BROKERAGE COMMISSIONS

**Section 13.01 Purchaser Representation.** Purchaser represents and warrants to Seller that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, either directly or indirectly, any broker, finder, consultant, advisor, or professional in the capacity of a broker or finder (each a "**Broker**") in connection with this Agreement or the Transaction other than Premier Realty Services Corp. (the "**Purchaser's Broker**") and the Seller's Broker. Purchaser hereby

22

agrees to indemnify, defend, and hold Seller and its disclosed and undisclosed direct and indirect shareholders, officers, directors, partners, principals, members, employees, agents, contractors, and any successors or assigns of the foregoing, harmless from and against any and all Claims, demands, causes of action, losses, costs, and expenses (including reasonable attorneys' fees, court costs, and disbursements) arising from any Claim for commission, fees, or other compensation or reimbursement for expenses made by any Broker other than the Purchaser's Broker engaged by or claiming to have dealt with Purchaser in connection with this Agreement or the Transaction.

**Section 13.02  Seller Representation.** Seller represents and warrants to Purchaser that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, either directly or indirectly, any Broker in connection with this Agreement or the Transaction other than Lee & Associates (the **"Seller's Broker"**). Seller hereby agrees to indemnify, defend, and hold Purchaser and its disclosed and undisclosed direct and indirect shareholders, officers, directors, partners, principals, members, employees, agents, contractors, and any successors or assigns of the foregoing, harmless from and against any and all Claims, demands, causes of action, losses, costs, and expenses (including reasonable attorneys' fees, court costs, and disbursements) arising from any Claim for commission, fees, or other compensation or reimbursement for expenses made by any Broker (including the Seller's Broker) engaged by or claiming to have dealt with Seller in connection with this Agreement or the Transaction. Seller agrees to pay the Seller's Broker in accordance with the terms of a separate agreement between Seller and the Seller's Broker[1].

**Section 13.03  Survival.** The provisions of this Article XIII shall survive the termination of this Agreement or the Closing.

## ARTICLE XIV
## AS-IS, WHERE-IS

**Section 14.01  AS-IS, WHERE-IS.** Except as expressly set forth in this Agreement to the contrary, Purchaser is expressly purchasing the Property in its existing condition "AS-IS, WHERE-IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions, and defects, and Seller has no obligation to determine or correct any such facts, circumstances, conditions, or defects or to compensate Purchaser for same. Seller has specifically bargained for the assumption by Purchaser of all responsibility to investigate the Property, Laws, and Regulations, Rights, Facts, Service Contracts, Violations, Employees, and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof. Purchaser has undertaken all such investigations of the Property, Laws, and Regulations, Rights, Facts, Service Contracts, Employees, and Violations, as Purchaser deems necessary or appropriate under the circumstances as to the status of the Property and, based upon same, Purchaser is and shall be relying strictly and solely upon such inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel, and officers. Purchaser is and shall be fully satisfied that the Purchase Price is fair and adequate consideration for the Property and, by reason of all the

---

[1] Note that Seller's Broker agrees to pay Purchaser's broker by separate agreement, not the seller.

foregoing, Purchaser assumes the full risk of any loss or damage (subject to Section 15.01 below) occasioned by any fact, circumstance, condition, or defect pertaining to the Property.

**Section 14.02 No Warranty or Other Representation.** Except as expressly set forth in this Agreement to the contrary, Seller hereby disclaims all warranties of any kind or nature whatsoever (including, without limitation, warranties of habitability and fitness for particular purposes), whether expressed or implied, including, without limitation, warranties with respect to the Property. Except as is expressly set forth in this Agreement to the contrary, Purchaser acknowledges that it is not relying upon any representation of any kind or nature made by Seller, CRO, Monitor or Seller's Broker, or any of their respective direct or indirect members, partners, shareholders, officers, directors, employees, or agents (collectively, the "**Seller Related Parties**") with respect to the Property, and that, in fact, except as expressly set forth in this Agreement to the contrary, no such representations were made. To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation, or order. The information contained in any data room accessed by Purchaser in respect of the Property and description of the Property in any marketing material, listing information, and any like material delivered or made available by Seller Related Parties to Purchaser or its representatives are believed to be correct, but if any misstatement, error, inaccuracy or omission (collectively the "**Inaccuracies**") is found in them, Purchaser shall not be entitled to any abatement, damages, reimbursement, costs or termination of this Agreement as a result of them and Purchaser releases Seller and the Seller Related Parties from any Claims the Purchaser had, has or may have as a result of such Inaccuracies. Purchaser covenants and agrees that it shall accept title to the Property subject to any Work Orders and Seller shall not be required to rectify any Work Orders as a condition of Closing. Purchaser hereby waives to the fullest extent permitted by law any rights, remedies and benefits under any consumer protection law, whether federal, state or local. Purchaser covenants not to sue Seller under any such consumer protection law.

**Section 14.03 Environmental Laws; Hazardous Materials.** Seller makes no warranty with respect to the presence of Hazardous Materials on, above, or beneath the Property (or any parcel in proximity thereto) or in any water on or under the Property. The Closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws. As used herein, the term "**Hazardous Materials**" shall mean: (a) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them; (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof; (c) natural gas, synthetic gas, and any mixtures thereof; (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophyllite, and/or actinolite, whether friable or non-friable; (e) polychlorinated biphenyl ("**PCBs**") or PCB-containing materials or fluids; (f) radon; (g) any other hazardous or radioactive substance, material, pollutant, contaminant, or waste; and (h) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring, or remediation. As used herein, the term "**Environmental Laws**" shall mean all federal, state, and local laws, statutes, ordinances, and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time,

24

including, without limitation, all applicable judicial or administrative orders, applicable consent decrees, and binding judgments relating to the regulation and protection of human health, safety, the environment, and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species, and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 *et seq*.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§ 5101 *et seq*.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 *et seq*.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901 *et seq*.), the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601 *et seq*.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 *et seq*.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 *et seq*.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f *et seq*.), and any other state or local counterpart or equivalent of any of the foregoing, and any federal, state, or local transfer of ownership notification or approval statutes.

**Section 14.04  Seller Release.** Purchaser shall rely solely upon Purchaser's own knowledge of the Property based on its investigation of the Property and its own inspection of the Property in determining the Property's physical condition, and Purchaser agrees that it shall, subject to the express warranties, representations, and conditions contained in this Agreement, assume the risk that adverse matters, including, but not limited to, construction defects and adverse physical and environmental conditions may not have been revealed by Purchaser's investigations. Except as expressly set forth in this Agreement to the contrary, Purchaser releases Seller, the Seller Related Parties, and their respective successors and assigns from and against any and all Claims which Purchaser or any party related to or affiliated with Purchaser (each, a "**Purchaser Related Party**") has or may have arising from or related to any matter or thing related to or in connection with the Property except as expressly set forth in this Agreement to the contrary, including the documents and information referred to herein, any construction defects, errors or omissions in the design or construction, and any environmental conditions and, except as expressly set forth in this Agreement to the contrary, neither Purchaser nor any Purchaser Related Party shall look to Seller, the Seller Related Parties, or their respective successors and assigns in connection with the foregoing for any redress or relief. This release shall be given full force and effect according to each of its express terms and provisions, including those relating to unknown and unsuspected Claims, damages, and causes of action. To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation, or order.

**Section 14.05  Survival.** The provisions of this Article XIV shall survive the Closing or the earlier termination of this Agreement and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

**ARTICLE XV**
**RISK OF LOSS**

**Section 15.01  Risk of Loss.** The risk of loss or damage to any portion of the Property, by fire, condemnation, or otherwise, until the Closing Date, shall be borne by Seller. In the event that

any condemnation loss, casualty loss, or any damage to any portion of the Property shall occur before the Closing Date, the party first learning of the loss or damage shall, in writing, immediately inform the other party of such loss or damage and, if such loss is less than fifteen percent (15%) of the Purchase Price, in the aggregate, Purchaser shall be given a credit at Closing for the amount necessary to repair or replace the damage, and Seller and Purchaser shall close the Transaction as otherwise provided. If such loss exceeds fifteen percent (15%) of the Purchase Price, in the aggregate, Purchaser shall have the option (which option shall be exercised within 20 days in writing upon the determination of the replacement and/or repair costs) to either: (a) rescind the Agreement, in which event the Earnest Money Deposit shall be returned to Purchaser, whereupon this Agreement shall be null and void and neither party shall have any rights against the other; or (b) proceed to Closing and, in such event, Seller's right to all insurance proceeds resulting from such damage or destruction or to any condemnation proceeds resulting from a condemnation shall be assigned by Seller to Purchaser, and Seller shall pay to Purchaser the amount of any deductibles and co-payments required to be paid along with certification that the policy is in full force and effect and unimpaired and the loss is covered by the policy. Seller shall have no obligation to make repairs. All time periods under this Section 15.01 that have not expired shall toll during the pendency of any determination of the amount of loss, with time of tolling being measured from the date of notice through any final determination or agreement on the amount of loss. Seller shall assist Purchaser in the ascertainment of the amount and details of disbursement of insurance proceeds.

## ARTICLE XVI
## REMEDIES

**Section 16.01  Seller's Remedies in the Event of Purchaser's Breach or Default.** In the event of Purchaser's default or breach in its obligations under this Agreement, after written notice and ten (10) days to cure, the Seller, as its sole and exclusive remedy, may retain the Earnest Money Deposit and all interest earned thereon as liquidated damages. Thereafter, upon payment of the Earnest Money Deposit and all interest earned thereon to Seller, this Agreement shall be terminated, and the parties shall be released from further liability to each other hereunder, except for those obligations and liabilities that are expressly stated to survive termination of this Agreement. SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE EARNEST MONEY DEPOSIT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT. SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.

**Section 16.02  Purchaser's Remedies in the Event of Seller's Breach or Default.** In the event Seller should default in its obligations under this Agreement, after written notice and ten (10) days to cure, the Purchaser shall have the right as its sole and exclusive remedy to choose to either: (a) terminate this Agreement by delivery of written notice to Seller and the Escrow Agent, and the Escrow Agent shall return the Earnest Money Deposit to Purchaser, with the interest earned

thereon, if any; or (b) seek the remedy of specific performance[2], provided, that any such action for specific performance must be commenced within thirty (30) days after such default. PURCHASER EXPRESSLY WAIVES ALL RIGHTS TO SEEK OTHER DAMAGES, INCLUDING WITHOUT LIMITATION, ACTUAL OR CONSEQUENTIAL DAMAGES IT MAY HAVE ON ACCOUNT OF ANY DEFAULT BY SELLER HEREUNDER.

**Section 16.03  Exculpation.** Purchaser agrees that it does not have and will not have any Claims or causes of action against any disclosed or undisclosed officer, director, employee, trustee, shareholder, partner, principal, parent, subsidiary, retirant, beneficiary, internal investment contractor, agent, or other affiliate of Seller, or any other Seller Related Parties, including, without limitation, any officer, director, employee, trustee, shareholder, partner, principal, retirant, beneficiary, internal investment contractor, agent, or other affiliate of Seller or any such parent, subsidiary, or other affiliate, or any other Seller Related Parties (collectively, "**Seller's Affiliates**"), arising out of or in connection with this Agreement or the Transaction. Subject at all times to any stay of proceedings in effect in the CCAA Proceedings and/or Chapter 15 Proceedings, Purchaser agrees to look solely to Seller and its assets for the satisfaction of any liability or obligation arising under this Agreement or the Transaction, or for the performance of any of the covenants, warranties, or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Seller's Affiliates with respect to any matters arising out of or in connection with this Agreement or the Transaction. Without limiting the generality of the foregoing provisions of this Section 16.03, Purchaser hereby unconditionally and irrevocably waives any and all Claims and causes of action of any nature whatsoever it may now or hereafter have against Seller's Affiliates and hereby unconditionally and irrevocably releases and discharges Seller's Affiliates from any and all liability whatsoever which may now or hereafter accrue in favor of Purchaser against Seller's Affiliates in connection with or arising out of this Agreement or the Transaction.

**Section 16.04  Survival.** The provisions of this Article XVI shall survive the termination of this Agreement and the Closing.

## ARTICLE XVII
## CONFIDENTIALITY AND PRESS RELEASE

**Section 17.01  Confidentiality.** The Parties agree that the terms and conditions of this Agreement are confidential and shall not be disclosed to any Person, except: (a) to such Parties' solicitors, advisors, agents or representatives acting in connection herewith and, then, only on the basis that such Persons are also required to keep such information confidential as aforesaid; (b) to the Canadian Court and/or U.S. Court in furtherance of obtaining the Approval and Vesting Order(s); and (c) to the tenants and service providers pursuant to Section 3.05 above..

**Section 17.02  Limited Disclosure.** Notwithstanding the foregoing, the obligation to maintain the confidentiality of such information will not apply to the extent that disclosure of such information is required by, or desirable to be made to, the Canadian Court and/or U.S. Court, by

---

[2] NTD: Attorneys fees are covered in Section 18.12.

law or otherwise in connection with governmental or other applicable filings relating to the Transaction.

**Section 17.03  Survival.** The provisions of this Article XVII shall survive the termination of this Agreement.

**ARTICLE XVIII**
**GENERAL PROVISIONS**

**Section 18.01  Notices.** Unless specifically stated otherwise in this Agreement, all notices, waivers, and demands required under this Agreement shall be in writing and delivered to all other Parties, and the Monitor, at the addresses below, by one of the following methods:

(a)     Hand delivery, whereby delivery is deemed to have occurred at the time of delivery;

(b)     A nationally recognized overnight courier company, whereby delivery is deemed to have occurred the Business Day following deposit with the courier;

(c)     Registered U.S. Mail, signature required and postage-prepaid, whereby delivery is deemed to have occurred on the third Business Day following deposit with the United States Postal Service; or

(d)     Electronic transmission (email) provided that the transmission is completed no later than 5:00 p.m. on a Business Day and the original also is sent via overnight courier or U.S. Mail, whereby delivery is deemed to have occurred at the end of the Business Day on which electronic transmission is completed.

| To Purchaser: | **JMC Trucking, Inc.**<br>11093 N.W. 138 Street, Unit 111<br>Hialeah Gardens, FL 33018<br>Attention:  Juan M. Cruz, President<br>Telephone:  _____<br>Facsimile:  _____<br>Email:  _____ |
|---|---|
| with a copy to: | **Robert J. Julia**<br>15205 N.W. 60th Avenue<br>Miami Lakes, FL 33014<br>Telephone:  (786) 485-4211<br>Email:  robertj@premierservicesfl.com |
| with a copy to: | **Gregory T. Martini, P.A.**<br>2334 Ponce de Leon Boulevard, Suite 250<br>Coral Gables, FL 33134 |

28

Attention:  Gregory T. Martini
Telephone:  (786) 673-3650
Facsimile:  (305) 489-8046
Email:  greg@gregmartinilaw.com

To Seller

**Pride Group Enterprises**
400 Spectrum Center Dr., Suite 280
Irvine, CA 92618

Attention: Amtoj Randhawa, Esq.
Tel: (949) 749-2185
E-mail: Amtoj.Randhawa@PrideGroupEnterprises.com

with a
copy to:

**Thornton Grout Finnigan LLP**
100 Wellington Street West, Suite 3200
Toronto, ON M5K 1K7

Attention:  Leanne Williams / Rachel Nicholson / Puya Fesharaki
Tel:        (416) 304-0060 / (416) 304-1153 / (416) 304-7979
Email:      lwilliams@tgf.ca / rnicholson@tgf.ca / pfesharaki@tgf.ca

To
Monitor:

**Ernst & Young Inc.**
100 Adelaide Street West
Toronto, ON M5H 0B3

Attention:  Alex Morrison / Emily Masry
Tel:        (416) 941-7743 / (437) 518-2646
Email:      alex.f.morrison@parthenon.ey.com / emily.masry@parthenon.ey.com

with a
copy to:

**Blake, Cassels & Graydon LLP**
199 Bay Street, Suite 4000, Commerce Court West
Toronto, ON M5L 1A9

Attention:  Chris Burr
Tel:        416) 863-3261
Email:      chris.burr@blakes.com

To Escrow
Agent:

**First American Title Insurance Company**
200 West Madison Street, Suite 800
Chicago, Illinois 60606

29

Attention: James W. McIntosh and April Muiser
Tel: (312) 917-7220
Email: jmcintosh@firstam.com; amuiser@firstam.com

Any Party shall change its address for purposes of Section 18.01 by giving written notice as provided in this Section 18.01.

All notices and demands delivered by a Party's attorney on a Party's behalf shall be deemed to have been delivered by said Party. Notices shall be valid only if served in the manner provided in this Section 18.01.

**Section 18.02 Complete Agreement; Amendments and Modifications; Partial Invalidity; Waivers.**

(a)    This Agreement may be executed in counterparts, and when executed by all Parties shall become one (1) integrated agreement enforceable on its terms. This Agreement supersedes all prior agreements between the Parties with respect to the Property and all discussions, understandings, offers, and negotiations with respect thereto, whether oral or written. This Agreement shall not be amended or modified, except in a writing signed by each Party hereto. If amended or modified as permitted by this Section 18.02(a), the term **"Agreement"** shall thereafter be read as including all said amendments and modifications. All exhibits that are referenced in this Agreement or attached to it are incorporated herein and made a part hereof as if fully set forth in the body of the document.

(b)    Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

(c)    Any waiver of any provision or of any breach of this Agreement shall be in writing and signed by the Party waiving said provision or breach. No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts. Effective as of the Closing, any breaches or conditions not waived previously in accordance with this Section 18.02(c) are deemed waived.

**Section 18.03 Parties; Assignment of Interests in This Agreement; Successors and Assigns.**

(a)    Purchaser may not assign or otherwise transfer this Agreement or any of its rights or obligations hereunder or any of the direct or indirect ownership interests in

30

Purchaser, without first obtaining Seller's prior consent and approval thereto, which may be given or withheld in Seller's sole and absolute discretion; provided, however, Purchaser may assign this Agreement to any person or entity that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control Purchaser. For purposes of the preceding sentence, the terms "controlled", "control" and "common control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.

(b)      All references to Seller in this Agreement shall include Seller's assignee.

(c)      This Agreement and all its covenants, terms, and provisions shall be binding on and inure to the benefit of each Party and its successors and assigns.

**Section 18.04 Reserved**.

**Section 18.05 Further Assurances.** From the Effective Date, Seller and Purchaser each agrees to do such things, perform such acts, and make, execute, acknowledge, and deliver such documents as may be reasonably necessary and customary to complete the Transaction. In particular, Seller and Purchaser each agree to do such things as may be reasonably necessary with respect to the transfer of the operation of the Property, including with respect to the Assumed Contracts, and any other items to be assumed by Purchaser under this Agreement, to complete the transfer of the operation of the Property.

**Section 18.06 Interpretation and Construction.**

(a)      The Parties acknowledge that, in connection with negotiating and executing this Agreement, each has had its own counsel and advisors and that each has reviewed and participated in the drafting of this Agreement. The fact that this Agreement was prepared by Seller's counsel as a matter of convenience shall have no import or significance to the construction of this Agreement. Any uncertainty or ambiguity in this Agreement shall not be construed against Seller because Seller's counsel prepared this Agreement in its final form. Any rule of construction that requires any ambiguities to be interpreted against the drafter shall not be employed in the interpretation of: (i) this Agreement; (ii) any exhibits to this Agreement; or (iii) any document drafted or delivered in connection with the Transaction.

(b)      Any captions or headings used in this Agreement are for convenience only and do not define or limit the scope of this Agreement.

(c)      The singular of any term, including any defined term, shall include the plural, and the plural of any term shall include the singular. The use of any pronoun with respect to gender shall include the neutral, masculine, feminine, and plural.

**Section 18.07 Days; Performance on a Saturday, Sunday, or Holiday.** Whenever the term "day" is used in this Agreement, it shall refer to a calendar day unless otherwise specified. A **"Business Day"** shall mean any weekday except for those weekdays that a banking institution

31

within the State in which the Property is located is required by said state to be closed (a **"Holiday"**). Should this Agreement require an act to be performed or a notice to be given on a Saturday, Sunday, or Holiday, the act shall be performed or notice given on the following Business Day.

Section 18.08 **Time Is of the Essence.** The parties hereto acknowledge and agree that, except as otherwise expressly provided in this Agreement, TIME IS OF THE ESSENCE for the performance of all actions (including, without limitation, the giving of notices, the delivery of documents, and the funding of money) required or permitted to be taken under this Agreement. Whenever action must be taken (including, without limitation, the giving of notice, the delivery of documents, or the funding of money) under this Agreement, prior to the expiration of, by no later than, or on a particular date, unless otherwise expressly provided in this Agreement, such action must be completed by 11:59 p.m. Prevailing Time Zone Time on such date. However, notwithstanding anything to the contrary herein, whenever action must be taken (including, without limitation, the giving of Notice, the delivery of documents, or the funding of money) under this Agreement prior to the expiration of, by no later than, or on a particular date that is not a Business Day, then such date shall be extended until the immediately following Business Day.

Section 18.09 **Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the State of Florida. EACH PARTY HERETO AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE INSTITUTED IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, AND, TO THE EXTENT SUCH COURT DOES NOT HAVE OR DOES NOT ACCEPT JURISDICTION TO ADJUDICATE SUCH MATTER, MAY BE INSTITUTED IN THE STATE OR FEDERAL COURTS OF THE UNITED STATES OF AMERICA IN THE STATE OF FLORIDA.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY HERETO IRREVOCABLY WAIVES ANY RIGHT ANY PARTY HERETO MAY HAVE TO ASSERT THE DOCTRINE OF *FORUM NON CONVENIENS*, TO ASSERT THAT ANY PARTY HERETO IS NOT SUBJECT TO THE JURISDICTION OF THE AFORESAID COURTS, OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS ARTICLE XVIII. SERVICE OF PROCESS, SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST ANY PARTY HERETO, MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ANY SUCH PARTY'S ADDRESS INDICATED IN SECTION 18.01 HEREOF.

Section 18.10 **No Offer.** This Agreement shall not be deemed an offer or binding upon Seller or Purchaser until this Agreement is fully executed and delivered by Seller and Purchaser.

Section 18.11 **No Survival.** Except as otherwise provided in this Agreement, no representations, warranties, covenants, or other obligations of Seller set forth in this Agreement shall survive the Closing hereunder and no action based thereon shall be commenced after the Closing.

Section 18.12  **Attorneys' Fees; Income and Capital Gains Taxes.**

(a)     Seller and Purchaser each acknowledge that: (i) they have been represented by independent counsel in connection with this Agreement; (ii) they have executed this Agreement with the advice of such counsel; (iii) this Agreement is the result of negotiations between the parties hereto and the advice and assistance of their respective counsel; and (iv) because Seller and Purchaser have been represented by independent counsel in connection with this Agreement, this Agreement shall not be construed against Seller.

(b)     Each Party to this Agreement shall be responsible for all costs it incurs in connection with the preparation, review, and negotiation of this Agreement and the Transaction and the Closing contemplated by this Agreement, including any attorneys' or consultants fees. In addition, each Party is responsible for its own income taxes and capital gains taxes resulting from its operation of the Property and such taxes shall not be a proration at the Closing.

(c)     If any action is brought by either Party against the other in connection with or arising out of this Agreement, or any of the documents and instruments delivered in connection herewith or in connection with the Transaction, the prevailing party shall be entitled to recover from the other party its reasonable out-of-pocket costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection with the prosecution or defense of such action.

**Section 18.13  Reserved**.

**Section 18.14 Waiver of Jury Trial.** Except as otherwise expressly stated in this Agreement, to survive the Closing hereunder, all obligations the Parties have to each other under this Agreement shall survive the Closing nor the earlier termination of this Agreement. In the unlikely event that a dispute survives the Closing or termination, EACH OF SELLER AND PURCHASER HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION, OR PROCEEDING BROUGHT BY THE OTHER PARTY HERETO UNDER THIS AGREEMENT OR IN CONNECTION WITH ANY TRANSACTION CONTEMPLATED HEREBY, ANY AND EVERY RIGHT EACH OF SELLER AND PURCHASER MAY HAVE TO: (A) INJUNCTIVE RELIEF (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT TO THE CONTRARY); (B) A TRIAL BY JURY; (C) INTERPOSE ANY COUNTERCLAIM THEREIN (EXCEPT FOR ANY COMPULSORY COUNTERCLAIM WHICH, IF NOT ASSERTED IN SUCH SUIT, ACTION, OR PROCEEDING, WOULD BE WAIVED); AND (D) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION, OR PROCEEDING.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

**PURCHASER:**

JMC TRUCKING, INC., a Florida corporation

By: _____

Name:    Juan M. Cruz

Title:    President

**SELLER:**

87TH AVENUE MEDLEY FL HOLDING CORP

By: _____

Name:    Randall

Title:    Court-Appointed Chief Restructuring Officer

The undersigned has executed this Agreement solely to confirm its acceptance of the duties of Escrow Agent as set forth in this Agreement:

**ESCROW AGENT:**

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _April Muiser_____

Name: James McIntosh

Title: Vice President & Senior Account Representative

# SCHEDULE "A"

## Defined Terms

(a)      "**Approval and Vesting Order**s" means the Canadian Approval and Vesting Ordre and the U.S. Approval and Vesting Order, and "**Approval and Vesting Order**" means either one of them;

(b)      "**Business Day**" means a day on which banks are open for business in the City, but does not include a Saturday, Sunday or statutory holiday recognized in the State in which the Property is located;

(c)      "**Canadian Approval and Vesting Order**" means the approval and vesting order issued by the Canadian Court in the CCAA Proceedings, in form and substance acceptable to Seller, Purchaser and the Monitor (acting reasonably) approving this Agreement and the Transaction, and (i) authorizing and directing Seller to complete the Transaction and conveying to Purchaser all of Seller's right, title and interest, if any, in and to the Property; and (ii) vesting title in the Property into the name of the Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances;

(d)      "**Claims**" means any and all claims, demands, complaints, actions, applications, suits, causes of action, orders, or other similar processes, and "**Claim**" means any one of them;

(e)      "**Existing Violations**" means those violations affecting the Property as disclosed on Schedule "E" attached hereto.

(f)      "**Governmental Authority**" means any nation, government, province, state, or any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of any government or any political subdivision thereof, court, tribunal, arbitrator, the governing body of any securities exchange, and self-regulatory organization, in each case having competent jurisdiction, and "**Governmental Authority**" means any one of them;

(g)      "**Monitor's Certificate**" means the certificate referred to as such in the Canadian Approval and Vesting Order;

(h)      "**Permitted Encumbrances**" means those Encumbrances listed on **Schedule "C"**, which the Purchaser acknowledges and agrees will continue to attach to and be enforceable against the Property following Closing;

(i)      "**Person**" is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity;

(j)      "**Prevailing Time Zone Time**" shall mean the time zone of the City in which the Property is located;

(k)      "**Taxes**" means any and all federal, state, local and foreign taxes, land transfer taxes, charges, fees, levies, imposts and other assessments, including all income, sales, use, goods and services, harmonized, value added, capital, capital gains, alternative, net worth, transfer, profits, withholding, payroll, employer health, excise, franchise, real property and personal property taxes, and any other taxes, customs duties, fees, assessments or similar charges in the nature of a tax, together with any interest, fines and penalties, imposed by any Governmental Authority, and whether disputed or not that arise in respect of the Property in the jurisdiction in which it is located;

(l)      "**Transaction**" means the transaction of purchase and sale of the Property as contemplated by this Agreement;

(m)      "**U.S. Approval and Vesting Order**" means the recognition order issued by the U.S. Court in the Chapter 15 Proceedings, in form and substance acceptable to Seller, Purchaser and the Monitor (acting reasonably), (i) recognizing and giving effect to the Canadian Approval and Vesting Order in the United States, (ii) approving the sale of the Property free and clear of liens, claims, and encumbrances, and (iii) granting any related relief;

(n)      "**Work Orders**" means any work orders, deficiency notices, orders to comply, inspector's orders, notices of non-compliance, notices of violation or similar orders or directives issued with respect to the Property, including the Existing Violations, any outstanding, open, pending or active building permits and/or permit applications or the like, in each case issued by any Governmental Authority having jurisdiction with respect to the Property or any part thereof pursuant to Applicable Law; and "**Work Order**" has a corresponding meaning.

## SCHEDULE "B"

### (Legal Description of the Property)

Tract B of BELLMAR LAND PLAT, according to the plat thereof recorded in Plat Book 150, Page 9, of the Public Records of Miami-Dade County, Florida.

LESS AND EXCEPT THE FOLLOWING:

A portion of the Tract "B" of BELLMAR LAND PLAT, according to the plat thereof, as recorded in Plat Book 150, Page 9, of the Public Records of Miami-Dade County, Florida, lying and being in the Northwest (NW) 1/4 of Section 3, Township 53 South, Range 40 East, Miami-Dade County, Florida, more particularly described as follows:

Commence at the Southwest comer of the Northwest (NW) 1/4 of Section 3; Thence North 01 °48'01" West along the West line of said Northwest (NW) 1/4 of Section 3 for a distance of 658.67 feet; Thence North 88°11'59" East at a Right angle from the previously described line for a distance of 40.00 feet to a point of intersection of the Existing Right-of-Way line of NW 87th Avenue, said point also being the SW comer of Tract "B" of said BELLMAR LAND PLAT, Plat Book 150, Page 9 and the POINT OF BEGINNING of the hereinafter described parcel; Thence North 01 °48'01" West along said Existing East R/W line of NW 87th Avenue for a distance of 84.50 feet to a point of intersection of the North line of said Tract "B", Thence North 89°10'34" East along the North line of said Tract "B" for a distance of 65.97 feet to a point of a non-tangent circular curve concave to the West, said point bears North 86°39'31" East from the center of said curve; thence Southeasterly along the arc of said curve to the Right, having a radius of 3,552.00 feet and a central angle of 0l 022'14" for a distance of 84.96 feet to a Point of the South line of said Tract "B"; thence South 89°32'35" West along said South line of said Tract "B" for a distance of 67.25 feet to the POINT OF BEGINNING.

## SCHEDULE "C"

### (Permitted Encumbrances)

(a)     All presently existing and future liens for unpaid real estate taxes and water and sewer charges not due and payable as of the Closing Date, subject to adjustment as hereinafter provided.

(b)     All present and future zoning, building, environmental, and other laws, ordinances, codes, restrictions, and regulations of all governmental authorities having jurisdiction with respect to the Property, including, without limitation, landmark designations and all zoning variances and special exceptions, if any (collectively, "**Laws and Regulations**").

(c)     All covenants, restrictions, and rights of record and all easements and agreements of record for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer, or other utility pipelines, poles, wires, conduits, or other like facilities, and appurtenances thereto, over, across, and under the Property (collectively, "**Rights**"), provided as to any such exceptions that are not set forth in the Title Report, such exceptions do not interfere with the present use of the Property, do not prohibit the maintenance and operation of the Property, and do not impose any financial or other obligations on the Purchaser.

(d)     Any state of facts which would be shown on or by an accurate current survey of the Property, together with any additional state of facts that a subsequent accurate survey of the Property would show (collectively, "**Facts**").

(e)     Rights of tenants of the Property pursuant to leases and any and all amendments, assignments, and subleases, with Seller, or any predecessor fee owner of the Property or other statutory tenants, and others claiming by, through, or under any such tenants (collectively, the "**Tenants**").

(f)     All violations of building, fire, zoning, sanitary, environmental, housing, and similar Laws and Regulations whether or not noted or issued at the date hereof or at the Closing Date or Work Orders (collectively, "**Violations**").

(g)     Consents by Seller or any former owner of the Property for the erection of any structure or structures on, under, or above any street or streets on which the Property may abut.

(h)     Possible encroachments and/or projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, windowsills, fire escapes, satellite dishes, protective netting; sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air-conditioners and the like, if any, on, under, or above any street or highway, the Property, or any adjoining property.

(i)     Variations between tax lot lines and lines of record title.

(j)      The standard conditions and exceptions to title contained in the form of title policy or "marked-up" title commitment issued to Purchaser by the Title Company, which were not objected to by Purchaser.

(k)      All service, maintenance, management, commission, union, and other contracts in connection with the Property and all renewals, replacements, extensions of same, or additional service contracts that may hereafter be entered into in the ordinary course of business, which are assumed by Purchaser (collectively, "**Service Contracts**").

(l)      The Non-Objectionable Encumbrances and any liens, encumbrances, or other title exceptions approved or waived by Purchaser as provided in this Agreement.

(m)      Any other matter which the Title Company may raise as an exception to title, and which were not objected to by Purchaser, provided the Title Company will insure against collection or enforcement of same out of the Property and/or that no prohibition of present use or maintenance of the Property will result therefrom, as may be applicable.

(n)      Any lien or encumbrance arising out of the acts or omissions of Purchaser.

(o)      Any special assessments including but not limited to any and all special assessments that are presently assessed, a lien against or imposed on the Property, not yet due and payable and payable in installments or in a lump sum.

## SCHEDULE "D"

### ESCROW PROVISIONS

The Earnest Money Deposit shall be held by Escrow Agent, in trust, on the terms hereinafter set forth:

A. Escrow Agent shall deposit the Earnest Money Deposit in an interest bearing account, with a Federally insured financial institution.

B. Escrow Agent shall not commingle the Earnest Money Deposit with any other funds of Escrow Agent or others and shall promptly advise Purchaser and Seller of the number of any bank account in which the Earnest Money Deposit has been deposited.

C. If the Closing takes place under this Agreement, then Escrow Agent shall disburse the Earnest Money Deposit on the Closing Date to Seller and Purchaser shall receive a credit against the Purchase Price in an amount equal to the Earnest Money Deposit.

D. If this Agreement is terminated in accordance with the terms hereof or if the Closing does not take place under this Agreement by reason of the failure of Purchaser or Seller to comply with its obligations hereunder, then Escrow Agent shall pay the Earnest Money Deposit as required by the terms of this Agreement, provided, however, that notwithstanding the foregoing, Escrow Agent shall not pay over the Earnest Money Deposit to any party hereunder unless and until the following procedure is complied with: The party requesting disbursement of the Earnest Money Deposit (the "Requesting Party") shall deliver notice to Escrow Agent and all other parties hereto requesting such disbursement. Within five (5) days after receipt of such notice of request, Escrow Agent shall deliver notice to all other parties hereto stating that the Requesting Party has requested such disbursement (and including a copy of the Requesting Party's notice). Within ten (10) days after receipt of Escrow Agent's notice, the non-requesting party shall either: (a) agree to permit such disbursement by Escrow Agent or (b) inform Escrow Agent that the non-requesting party does not agree to permit such disbursement. If the non-requesting party acts under clause (a), then Escrow Agent shall make the disbursement as requested by the Requesting Party. If the non-requesting party acts under clause (b), then Escrow Agent shall not make any disbursement except as provided in paragraph F below. If the non-requesting party fails to respond during the foregoing ten (10) day period, same shall be deemed to be the response of the non-requesting party under clause (a) on the last day of such ten (10) day period.

E. It is agreed that the duties of Escrow Agent are only as herein specifically provided, and, subject to the provisions of paragraph F hereof, are purely ministerial in nature, and that Escrow Agent shall incur no liability whatsoever except for willful misconduct or gross negligence, as long as Escrow Agent has acted in good faith. Seller and Purchaser each

release Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in the performance of its duties hereunder.

F.  Escrow Agent is acting as a stakeholder only with respect to the Earnest Money Deposit. If there is any dispute as to whom the Earnest Money Deposit is to be delivered, Escrow Agent shall not make any delivery, but in such event Escrow Agent shall hold same until receipt by Escrow Agent of an authorization in writing, signed by all the parties having interest in such dispute, directing the disposition of same, or, in the absence of such authorization Escrow Agent shall hold the Earnest Money Deposit until the final determination of the rights of the parties in an appropriate proceeding. If such written authorization is not given, or proceedings for such determination are not begun within thirty (30) days after the Closing Date and diligently continued, Escrow Agent may bring an appropriate action or proceeding for leave to deposit the Earnest Money Deposit in court pending such determination. Escrow Agent shall be reimbursed for all costs and expenses of such action or proceeding including, without limitation, reasonable attorneys' fees and disbursements, by the party determined not to be entitled to the Earnest Money Deposit. Upon making delivery of the Earnest Money Deposit in the manner herein provided, Escrow Agent shall have no further liability hereunder.

G.  Escrow Agent has executed this Agreement in order to confirm that Escrow Agent has received the Earnest Money Deposit, and that Escrow Agent will hold the Earnest Money Deposit in escrow, pursuant to the provisions hereof.

H.  Seller and Purchaser agree to equally share and pay any and all costs and expenses incurred by Escrow Agent as a result of this transaction.

==MUST BE APPROVED BY ESCROW AGENT==

[Schedule D]

## <u>SCHEDULE "E"</u>

EXISTING VIOLATIONS

1. Case No. ECC2024-0076, dated September 24, 2024, Folio No. 22-3003-027-0020
2. Case No. ECC2023-0115, dated July 7, 2024, Folio No. 22-3003-027-0020
3. Case No. ECC2023-0114, dated July 7, 2024, Folio No. 22-3003-027-0020

## EXHIBIT A

Form of Bill of Sale and General Assignment

_____, a _____ ("Seller"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid to Seller by [_____], a [_____] ("Purchaser"), the receipt and sufficiency of which are hereby acknowledged, hereby sells, conveys, assigns, transfers, delivers and sets over to Purchaser all Personal Property, Licenses, Permits and Intangible Property, if any, owned by Seller and which are located at and used solely in connection with the Real Property and/or the Improvements but specifically excluding the property listed on Schedule A annexed hereto. Any term with its initial letter capitalized and not otherwise defined herein shall have the meaning set forth in the Purchase Agreement (as defined below).

TO HAVE AND TO HOLD unto Purchaser and its successors and assigns to its and their own use and benefit forever.

Purchaser hereby acknowledges and agrees that the Personal Property, Licenses, Permits and Intangible Property are being conveyed "AS IS, WHERE IS, WITH ALL FAULTS", and the provisions of Article [XIV] of the Purchase and Sale Agreement dated [_____ __, 20__] between Purchaser and Seller with respect thereto, are incorporated herein by this reference (the "Purchase Agreement").

This Bill of Sale is made by Seller without recourse and without any express or implied representation or warranty whatsoever.

### [SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed as of this _____ day of _____, 20__.

<br>

_____, a

_____

By:_____

    Name:

    Title:

Schedule A to Exhibit A

<u>Excluded Property</u>

Any and all tractors, trailers, motor vehicles, movable equipment, EV charges and/or personal property not permanently fixed to the Property.

## <u>EXHIBIT B</u>

Assignment and Assumption of Leases

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (this "Assignment"), is made and entered into this _____ day of _____, 20__, between _____, a _____, having an office at _____, ("Assignor"), and _____, a _____, having an office at [_____] ("Assignee").

W I T N E S S E T H :

Assignor, for Ten Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby assigns to Assignee, all of Assignor's right, title and interest in, to and under the leases, license agreements and other occupancy agreements described on Schedule A annexed hereto and all guaranties thereof and security deposits related hereto (collectively, the "Leases").

Assignee hereby expressly assumes all of the obligations imposed upon Assignor under the Leases which accrue from and after the date hereof, including, without limitation, the Assignor's obligation to return any security deposits. Assignee agrees to indemnify, protect, defend and hold Assignor harmless from any and all liabilities, obligations, claims, actions, damages or expenses (including reasonable attorneys' fees) arising out of the Leases and relating to the period on or after the date hereof.

Assignee acknowledges that, simultaneously with the execution hereof, Assignee has received all security deposits deposited by tenants under their Leases, from Assignor.

Notwithstanding the foregoing assignment, the parties agree that Assignor shall have the limited right to receive all rent and other payments due under the Leases on account of periods prior to the Closing (as set forth in Section 8.05 of the Purchase and Sale Agreement (the "Purchase Agreement") between Assignor and Assignee, dated as of _____, 20__).

By its execution hereof, Assignee hereby acknowledges the application of Article [XIV] of the Purchase Agreement.

This Assignment is made by Assignor without recourse to Assignor and without any express or implied representation or warranty by Assignor whatsoever.

This Assignment inures to the benefit of the parties hereto and their respective successors and assigns.

This Assignment may be executed in any number of counterparts, each of which shall constitute an original, but all of which, taken together, shall constitute but one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the date first above written.

ASSIGNOR:

_____, a

_____

By:
    Name:
    Title:

ASSIGNEE:

_____, a

_____

By:
    Name:
    Title:

Docusign Envelope ID: E4D6E882-9A17-4BD2-B487-A838FB08C9C5

Schedule A to Exhibit B

Leases

## **EXHIBIT C**

### Assignment and Assumption of Contracts

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS (this "Assignment"), is made and entered into this _____ day of _____, 20__, between _____, a _____, having an office at _____ ("Assignor"), and _____, a _____, having an office at _____ ("Assignee").

W I T N E S S E T H:

Assignor, for Ten Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby assigns to Assignee, all of Assignor's right, title and interest in, to and under all of the Assumed Contracts. Any term with its initial letter capitalized and not otherwise defined herein shall have the meaning set forth in the Purchase Agreement (as defined below).

Assignee hereby expressly assumes all of the obligations imposed upon Assignor under the Assumed Contracts which accrue from and after the date hereof. Assignee agrees to indemnify, protect, defend and hold Assignor harmless from any and all liabilities, obligations, claims, actions, damages or expenses (including reasonable attorneys' fees) arising out of the Assumed Contracts and relating to the period on or after the date hereof.

By its execution hereof, Assignee hereby acknowledges the application of Article [XIV] of the Purchase and Sale Agreement between Assignor and Assignee, dated as of _____, 20_ (the "Purchase Agreement").

This Assignment is made by Assignor without recourse and without any express or implied representation or warranty whatsoever.

This Assignment inures to the benefit of the parties hereto and their respective successors and assigns.

This Assignment may be executed in any number of counterparts, each of which shall constitute an original, but all of which, taken together, shall constitute but one and the same instrument.

[Exhibit C]

       IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the date first above written.

                            **ASSIGNOR:**

                            _____, a

                            _____

                      By: _____

                            Name:

                            Title:

                            **ASSIGNEE:**

                            _____, a

                            _____

                      By: _____

                            Name:

                            Title:

[Exhibit C]

Docusign Envelope ID: E4D6E882-9A17-4BD2-6487-A838FB08C9C5

Schedule A to Exhibit C


Contracts

[Exhibit C]

## <u>EXHIBIT D</u>

Form FIRPTA

SELLER'S FIRPTA CERTIFICATE

_____, a _____ ("Transferor"), hereby certifies as follows:

Section 1445 of the Internal Revenue Code (the "Code") provides that a transferee (buyer) of a United States real property interest must withhold tax if the transferor (seller) is a foreign person.

Transferor is transferring certain real property in the City of _____, County of _____ and [State/Commonwealth of _____ to _____, a _____ ("Transferee") pursuant to a deed of even date herewith.

Transferor is not a foreign corporation, foreign partnership, foreign trust, foreign estate or foreign person, as those terms are defined in the Code. The office address of Transferor is c/o _____.

The United States taxpayer identification number of Transferor is: _____.

Transferor is not a disregarded entity as defined in §1.1445-2(b)(2)(iii).

This certification is being given pursuant to Section 1445 of the Code to inform Transferee that withholding of tax is not required upon this disposition of United States real property interests.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Dated: _____ __, 20____

[_____]

By:    _____
Name:
Title:

Docusign Envelope ID: E4D6E882-9A17-4BD2-6487-A638EB08C9C5

## <u>EXHIBIT E</u>

All existing Leases and Service Contracts

## AMENDMENT TO PURCHASE AND SALE AGREEMENT

THIS AMENDMENT is attached to and made a part of that certain Purchase and Sale Agreement made by between 87TH AVENUE MEDLEY FL HOLDING CORP., a Florida corporation (hereinafter referred to as the "Seller"), and JMC TRUCKING, INC., a Florida corporation (hereinafter referred to as the "Purchaser").

W I T N E S S E T H :

WHEREAS, Seller and Purchaser have executed a certain Purchase and Sale Agreement dated January 29, 2025 (hereinafter referred to as the "Purchase Agreement") certain property located in Miami-Dade County, Florida, legally described therein (hereinafter referred to as the "Property"):

WHEREAS, Seller and Purchaser desire to supplement, amend and modify certain terms and conditions of the Purchase Agreement.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, the parties hereto mutually agree as follows:

1. <u>RECITALS AND DEFINITIONS</u>.  The foregoing recitals are true and correct and incorporated herein by this reference.  All capitalized terms not defined herein will have the same meaning ascribed to them in the Purchase Agreement.

2. <u>EXTENSION OF DUE DILIGENCE PERIOD</u>.  The expiration of the Due Diligence Period is hereby extended to March 7, 2025 at 5PM of the Prevailing Time Zone.

3. <u>CONFIRMATION OF ASSUMED LIABILITIES</u>.  The Assumed Liabilities referenced in Section 1.02 of the Purchase Agreement are limited solely to the Seller's obligations under that certain Sign Location lease dated June 6, 2016 with Outfront Media LLC.

3. <u>COUNTERPARTS</u>.  This Amendment may be signed in several counterparts, each of which shall be deemed an original and all of which, taken together, shall be deemed to constitute a single agreement. It is agreed that a facsimile copy or Adobe Portable Document (PDF) copy of the signed Amendment shall be binding on the parties to the same extent as an original signed Amendment.

4. <u>CONFLICT</u>.  In the event that any of the terms and conditions of this Amendment shall conflict with or in any way contradict and provisions as contained in the Purchase Agreement, it is agreed between the parties that the terms of this Amendment shall supersede and control as between the provision of the Purchase Agreement and this Amendment.

5. <u>RATIFICATION</u>. Other than as amended and modified herein, the terms of the Purchase Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment on the _28_ day of _February_, 2025 as to the Purchaser and on the _____ day of _____, 2025 as to Seller.

**PURCHASER:**

JMC TRUCKING, INC., a Florida corporation

By: _____
Name: Juan M. Cruz
Title:   President

**SELLER:**

87TH AVENUE MEDLEY FL HOLDING CORP., a Florida corporation

By: _____
Name: Randall Benson
Title:   Court-Appointed Restructuring Officer

W:\GML Work\1124\wp\Amendment to Purchase and Sale Agreement (Rev).docx