## Exhibit A

APA

**PURCHASE AND SALE AGREEMENT**

by and between

**59TH AVE PHOENIX HOLDING CORP, Seller**

and

**JC IOS ACQUISITIONS, LLC, Purchaser**

dated as of

**December 10, 2024**

This **PURCHASE AND SALE AGREEMENT** (this "**Agreement**"), dated as of the 10th day of December 2024 (the "**Effective Date**"), is entered into between **59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation ("**Seller**"), and **JC IOS ACQUISITIONS, LLC**, a Delaware limited liability company ("**Purchaser**") The terms "**Party**" and "**Parties**" include Seller, Purchaser, their respective constituent entities and their respective successors, assigns, and legal representatives. In the event either Seller or Purchaser is an individual, a "Party" or "Parties" includes that individual's heirs.

## RECITALS

WHEREAS, Seller is the owner of the Property (as defined below);

WHEREAS on March 27, 2024, Seller was granted creditor protection pursuant to an Order granted by the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") (as amended and restated from time to time, the "**Initial Order**") under the *Companies' Creditors Arrangement Act*, RSC 1985, c. C-36, as amended (the "**CCAA Proceedings**");

WHEREAS pursuant to the Initial Order, Ernst & Young Inc. was appointed as Monitor of Seller (in such capacity, the "**Monitor**") under the CCAA Proceedings and R.C. Benson Consulting Inc., was appointed as Chief Restructuring Officer (in such capacity, the "**CRO**");

WHEREAS on April 5, 2024, the Court granted the Protocols Order which approved a real estate monetization plan (as amended and restated from time to time, the "**Protocols Order**");

WHEREAS the Initial Order and the Protocols Order were recognized by the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") under Chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**");

WHEREAS pursuant to the Initial Order and the Protocols Order, Seller, in consultation with the Monitor and CRO, is authorized to market and sell any or all of the real property of Seller, and negotiate such terms and conditions of sale as they may deem appropriate;

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser the Property (defined below) and Purchaser desires to purchase the Property from Seller; and

WHEREAS capitalized terms used but not otherwise defined herein shall have the meanings given to them in Schedule "A" attached hereto.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I  PURCHASE AND SALE

**Section 1.01  The Property.** Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller in accordance with the terms and conditions of this Agreement, all of Seller's right, title and interest in and to the following described property (collectively referred to as the "**Property**"):

(a)     The real property, including all right, title, and interest therein, located at 1021 N 59th Ave, Phoenix, Arizona 85043, more particularly described on Schedule "B" attached hereto and incorporated herein by this reference (the "**Real Property**").

(b)     All rights, privileges, easements, and rights-of-way appurtenant to said Real Property, including without limitation, all mineral, oil and gas and other subsurface rights, development rights, air rights, and water rights (collectively, the "**Appurtenances**").

(c)     All improvements and fixtures located on the Real Property, including, without limitation: (i) all structures affixed to the Real Property; (ii) all apparatus, equipment, and appliances used in connection with the operation or occupancy of the Real Property; and (iii) all facilities used to provide any services to the Real Property and/or the structures affixed thereto (collectively, the "**Improvements**").

(d)     All tangible personal property owned by Seller and located on the Real Property or the Improvements and used solely in connection therewith (provided that it is expressly agreed by the parties hereto that none of the tangible personal property in, on, around or affixed on or about the Real Property and the Improvements owned by any party other than Seller shall be or be deemed included in the Property (and shall not be sold pursuant hereto)) (collectively, the "**Personal Property**"). Notwithstanding the foregoing, the Personal Property described on Schedule A to the Bill of Sale (collectively, the "**Excluded Property**") shall not be included in the sale of the Property as described herein.

(e)     All rights, warranties, guarantees, utility contracts, approvals (governmental or otherwise), permits, certificates of occupancy, surveys, plans and specifications, trademarks or tradenames, copyrights, and any agreements, covenants, and indemnifications that Seller received from a third party, including any prior owner, and relating to the Real Property, Appurtenances, or Improvements (collectively, the "**Intangible Property**").

Notwithstanding anything herein to the contrary, "**Property**" does not include any item leased from third parties.

**Section 1.02    Assumed Liabilities.**  Subject to the terms and conditions set forth herein, Purchaser (or any person designated by Purchaser) shall assume and agree to pay, perform and discharge when due the following liabilities and obligations of Seller arising out of or relating to the Property on or after the Closing (collectively the "**Assumed Liabilities**"):

(a)     All liabilities and obligations arising out of or relating to Purchaser's ownership or operation of the Property on or after the Closing; and

(b)     Permitted Encumbrances.

## ARTICLE II
## PURCHASE PRICE AND DEPOSIT

**Section 2.01    Purchase Price.** Purchaser shall pay First American Title Insurance Company, 200 West Madison Street, Suite 800, Chicago, Illinois 60606, Attention: James W. McIntosh and April Muiser, Phone No. (312) 917-7220 (the "**Escrow Agent**"), the sum of Four Million Three Hundred Thousand and 00/100 United States Dollars ($4,300,000.00 USD) (the "**Purchase Price**"), subject to such apportionments, adjustments, and credits as are provided for in this Agreement.

**Section 2.02    Payment of Purchase Price.** Purchaser shall pay the Purchase Price as follows:

(a)    The sum of One Hundred Seventy-Five Thousand and 00/100 United States Dollars ($175,000.00 USD) (together with any interest earned thereon, collectively, the "**Earnest Money Deposit**"), within five (5) days of the date this Agreement is fully-executed, by wire transfer, payable to the Escrow Agent, in trust, to an account specified in writing by the Escrow Agent, which shall be applied against the Purchase Price on the Closing Date.

(b)    The balance of the Purchase Price shall be paid to the Escrow Agent on the Closing Date, simultaneously with the delivery of the Conveyance Deed, by federal funds wire transfer of immediately available funds to an account at such bank or banks as shall be designated by the Escrow Agent in writing.

**Section 2.03    Earnest Money Deposit.**

(a)    The Earnest Money Deposit shall be held, pending Closing, by the Escrow Agent in an interest-bearing account with a third-party financial institution.

(b)    In the event Purchaser fails to deposit the Earnest Money Deposit with the Escrow Agent in accordance with this Agreement, this Agreement shall automatically terminate, without the need for further notice or instruction.

(c)    If the Closing does not occur by reason of a uncured default of Purchaser (including if any of the representations and/or warranties of Purchaser as set forth in this Agreement are found to be false in any material respect at Closing, which has a material adverse effect on Purchaser's ability to perform its obligations under this Agreement), the full amount of the Earnest Money Deposit (plus accrued interest), less any applicable withholding Taxes, shall be forfeited by the Purchaser and become the property of Seller, and shall be released by the Escrow Agent to Seller as liquidated damages and not as a penalty, in full satisfaction of claims against Purchaser in accordance with Section 16.01 of this Agreement.

(d)    If the Closing does not occur for any reason other than that expressed in Section 2.03(c) above, the full amount of the Earnest Money Deposit (plus accrued

interest), less any applicable withholding Taxes, shall be returned by the Escrow Agent to Purchaser.

(e)     Purchaser hereby acknowledges and agrees that the Earnest Money Deposit held by the Monitor (or Escrow Agent) does not and shall not constitute property of the estate of Purchaser within the meaning of Section 541 of title 11 of the United States Code, or substantially similar provisions of state law (the "**Bankruptcy Code**"), and Purchaser's interest in such Earnest Money Deposit is limited to the right to have the Earnest Money Deposit returned if and when the conditions for the return of the Earnest Money Deposit to Purchaser are satisfied as set forth herein. Purchaser hereby acknowledges and agrees that the proper release of the Earnest Money Deposit to Seller as provided hereunder shall not be a violation of any provision of the Bankruptcy Code, including, without limitation, Section 362 of the Bankruptcy Code, or require the approval of any court with jurisdiction over any case in which Purchaser or any affiliate of Purchaser is a debtor. Purchaser hereby waives any provision of the Bankruptcy Code necessary to invoke the foregoing, including, without limitation, Sections 105 and 362, and waives any right to defend against any motion for relief from the automatic stay that may be filed by Seller.

(f)     The Earnest Money Deposit shall be held and disbursed by Escrow Agent in accordance with the provisions set forth in Schedule "D" attached hereto.

(g)     This section shall survive termination of this Agreement.

**Section 2.04   No Financing Contingency.** Purchaser expressly agrees and acknowledges that Purchaser's obligations to pay the Purchase Price and otherwise consummate the Transaction at Closing are not in any way conditioned upon Purchaser's ability to obtain financing of any type or nature whatsoever, whether by way of debt financing or equity investment, or otherwise.

## ARTICLE III
## ACCESS

**Section 3.01   Property Investigation Period.** Purchaser shall have a period, commencing on the Effective Date until 11:59 p.m. Prevailing Time Zone Time on the date which is thirty (30) days thereafter (the "**Due Diligence Period**"), to review the Property (including conducting such tests, studies, surveys, and/or other physical inspections of the Property as Purchaser deems necessary or appropriate) and all information relating thereto (the "**Inspections**"). Subject to Section 3.03 below, Purchaser's Inspections may encompass such matters as, without limitation, title and survey, environmental conditions, soil conditions, siting, access, traffic patterns, competition, financing, economic feasibility, platting, zoning, leasing status, and matters involving governmental cooperation. If Purchaser is dissatisfied with the Property for any reason or no reason whatsoever, in Purchaser's sole discretion, then Purchaser shall have the right to terminate this Agreement upon written notice to Seller and Escrow Agent (the "**Termination Notice**") delivered at any time prior to 11:59 p.m. Prevailing Time Zone Time on the last day of the Due Diligence Period (the "**Due Diligence Approval Deadline**"), in which event the Earnest Money Deposit shall be returned to Purchaser, this Agreement shall terminate, and the parties shall have no further liability hereunder (except with respect to those obligations

hereunder which survive the termination of this Agreement). If Purchaser elects in its sole discretion to proceed to Closing, then Purchaser shall, by no later than the Due Diligence Approval Deadline, deliver written notice to Seller of such election to proceed (an "**Approval Notice**"), whereupon Purchaser shall be deemed to have elected to waive its right to terminate this Agreement pursuant to this <u>Section 3.01</u>. In the event Purchaser does not so deliver a Termination Notice or an Approval Notice prior to the Due Diligence Approval Deadline, Purchaser shall be deemed to have timely delivered a Termination Notice, whereupon (a) this Agreement shall automatically terminate and be of no further force or effect upon the Due Diligence Approval Deadline, (b) the Earnest Money Deposit shall be promptly returned to Purchaser, and (c) except as expressly provided for in this Agreement, neither Seller nor Purchaser shall have any further liability or obligation to the other under this Agreement.

**Section 3.02    Purchaser's Access.** At any time prior to the Closing (including during the Due Diligence Period), Purchaser and its agents, employees, consultants, inspectors, appraisers, engineers, and contractors (collectively, "**Purchaser's Representatives**") shall have the right to enter upon and pass through the Property during normal business hours to examine and inspect the same, as well as conduct reasonable tests, studies, investigations, and surveys to assess utility availability, soil conditions, environmental conditions, physical condition, and the like of the Property.

**Section 3.03    Purchaser's Right to Inspect.**

(a)    In conducting any inspection of the Property or otherwise accessing the Property, Purchaser shall at all times: (i) comply with all laws and regulations of all applicable governmental authorities; and (ii) maintain commercial general liability insurance in the amount of Two Million Dollars ($2,000,000.00 USD), shall name Seller as an additional insured under all such applicable polices, shall provide evidence of all such insurance to Seller within seven (7) days prior to Purchaser's or Purchaser's Representatives first entry onto the Property to conduct any inspection. In addition, while conducting any inspection of the Property or otherwise accessing the Property, neither Purchaser nor any of Purchaser's Representatives shall: (A) contact or have any discussions with any of Seller's or Seller's affiliates, employees, agents, or representatives (other than Seller's Broker and Seller's attorneys), or with any occupants at, or contractors providing services to, the Property, unless, in each case, Purchaser obtains the prior written consent of Seller, which consent may be withheld or conditioned in Seller's sole discretion; (B) interfere with the business of Seller conducted at the Property or disturb the use or occupancy of any occupant of the Property other than, in each case, to a *de minimis* extent; or (C) subject to the provisions set forth below in <u>Section 3.04</u>, damage the Property. Seller may from time to time establish reasonable rules of conduct for Purchaser and Purchaser's Representatives in furtherance of the foregoing.

(b)    Purchaser shall schedule and coordinate all inspections of the Property or other access thereto with Seller and shall give Seller at least two (2) Business Days' prior notice thereof. Seller and/or the Monitor shall be entitled to have a representative present at all times during each such inspection or other access; provided, however, should Seller or Monitor fail to attend a previously scheduled inspection then Purchaser shall be entitled to continue with such inspection or access. Purchaser agrees to pay to Seller promptly upon

6

demand the cost of repairing and restoring any damage or disturbance that Purchaser or Purchaser's Representatives shall cause to the Property; provided, however, such obligation shall not apply to any pre-existing liabilities for matters merely discovered by Purchaser or resulting from Seller's gross negligence, illegal acts, or willful misconduct. All inspection fees, appraisal fees, engineering fees, and other costs and expenses of any kind incurred by Purchaser or Purchaser's Representatives relating to such inspection and its other access shall be at the sole expense of Purchaser.

(c)    In the event that the Closing hereunder shall not occur for any reason whatsoever, Purchaser shall promptly return to Seller copies of all due diligence materials delivered by Seller to Purchaser and shall destroy all copies and abstracts thereof. Purchaser and Purchaser's Representatives shall not be permitted to conduct borings of the Property or drilling in or on the Property, or any other invasive testing, in connection with the preparation of an environmental audit or in connection with any other inspection of the Property without the prior written consent of Seller, which consent may not be unreasonably delayed or withheld (and, if such consent is given, Purchaser shall be obligated to pay to Seller promptly upon demand the cost of repairing and restoring any damage in accordance with <u>Section 3.04</u>, below). The provisions of this <u>Section 3.03(c)</u> shall survive the Closing or any termination of this Agreement.

**Section 3.04    Seller Indemnification.** Purchaser agrees to indemnify and hold Seller and its disclosed or undisclosed, direct and indirect shareholders, officers, directors, trustees, partners, principals, members, employees, agents, affiliates, representatives, consultants, accountants, contractors, and attorneys or other advisors, and any successors or assigns of the foregoing (collectively with Seller, the "**Seller Related Parties**"), harmless from and against any and all actual losses, costs, damages, liens, Claims, liabilities, or expenses (including, but not limited to, reasonable attorneys' fees, court costs, and disbursements) actually incurred by any Seller Related Parties arising from or by reason of Purchaser's and/or Purchaser's Representatives' access to, or inspection of, the Property, or any tests, inspections, or other due diligence conducted by or on behalf of Purchaser, except to the extent such losses, costs, damages, liens, Claims, liabilities, or expenses are caused by the mere discovery of a pre-existing condition at the Property or are caused by the illegal acts, gross negligence, or willful misconduct of any of the Seller Related Parties. The provisions of this <u>Section 3.04</u> shall survive the Closing or any termination of this Agreement, in each case for a period of twelve (12) months.

**ARTICLE IV**
**CLOSING**

**Section 4.01    Closing; Closing Date.** The closing of the Transaction (the "**Closing**") shall occur remotely before 5:00 p.m. Prevailing Time Zone Time on the forty-fifth (45th) day following the expiration of the Due Diligence Period (the "**Closing Date**") in accordance with the terms and conditions of this Agreement. Purchaser and Seller agree to provide the Escrow Agent with all documents, payments, and other items needed for the Closing on or before the Closing Date. Purchaser acknowledges and agrees that **TIME SHALL BE OF THE ESSENCE** with respect to the performance by Purchaser of its obligations to purchase the Property, pay the Purchase Price, and otherwise consummate the Transaction on the Closing Date.

# ARTICLE V
# TITLE MATTERS

**Section 5.01   "As Is, Where Is"**. The Property shall be sold, assigned and conveyed by Seller to Purchaser on an "as is, where is" basis, and Purchaser shall accept and assume same subject only to the Permitted Encumbrances.

**Section 5.02   Title.**

(a)     Title to the Property shall be conveyed in fee simple, subject to the terms of the Approval and Vesting Order(s), subject only to the Permitted Encumbrances.

(b)     Purchaser shall promptly order from First American Title Insurance Company, 200 West Madison Street, Suite 800, Chicago, Illinois 60606, Attention: James W. McIntosh and April Muiser, Phone No. (312) 917-7220 (the "**Title Company**"), a title commitment for an ALTA title insurance policy (the "**Title Report**") and survey update and shall cause a copy of the Title Report and updated survey to be delivered to Seller concurrently with the delivery thereof to Purchaser.  If any aspect of the Title Report or Survey is objectionable to Purchaser (each, an "**Objection**" and collectively, the "**Objections**"), in Purchaser's sole discretion, Purchaser shall notify Seller of such fact in writing on or prior to the expiration of the Due Diligence Period (the "**Objection Notice**"). If Purchaser delivers an Objection Notice, Seller shall have until such date that is five (5) Business Days after the delivery of Purchaser's Objection Notice (the "**Response Period**") to notify Purchaser in writing ("**Cure Notice**") of any Objections that Seller will either agree to cure or not cure. If Seller does not timely deliver a Cure Notice on or prior to the expiration of the Response Period as to any particular Objection, then Seller shall be deemed to have made the election to not cure such Objection. Seller shall not have the right to cure any Objections by causing Title Company to endorse or "insure over" the same without Purchaser's prior written consent. If Seller makes (or is deemed to have made) the election to not cure an Objection as set forth above, then Purchaser shall have five (5) Business Days after the expiration of the Response Period to either (x) waive such Objection(s) and proceed to Closing in accordance with the terms and conditions of this Agreement (provided however that Mandatory Cure Items shall be deemed objected to by Purchaser for all purposes and Seller shall cure same on or prior to Closing), whereupon such Objections shall be deemed Permitted Encumbrances under this Agreement, or (y) terminate this Agreement and be entitled to a prompt return of the Earnest Money Deposit. If Purchaser does not notify Seller in writing of its election within such five (5) Business Day period, then Purchaser shall be deemed to have made the election in clause (x) above, whereupon Purchaser shall be deemed to have waived those Objections that Seller has refused or is deemed to have refused to cure, which shall be Permitted Encumbrances under this Agreement, and shall proceed to Closing in accordance with the terms and conditions of this Agreement (provided however that Mandatory Cure Items shall be deemed objected to by Purchaser for all purposes and Seller shall cure same on or prior to Closing). All exceptions appearing in the Title Commitment and matters appearing on the Survey that Purchaser does not object in the Objection Notice (other than the Mandatory Cure Items, which shall be satisfied by Seller on or before the Closing) or that are deemed waived and accepted by Purchaser as set forth in this Agreement shall constitute "**Permitted**

**Encumbrances**." Following the expiration of the Due Diligence Period, Purchaser shall have until the Closing Date in which to re-examine title and survey to the Real Property and in which to give Seller an additional Objection Notice with respect to any Objections first disclosed by such re-examination and/or any updates to the Title Commitment or Survey (each, an "**Additional Objection**"). The Parties shall follow the same time periods and methods for responding to each Additional Objection as set forth above in this Section 5.02(b) (and if applicable, the Closing Date shall be adjourned to allow for each party to have the full benefit of such time periods). Seller shall obtain, at or prior to Closing, a satisfaction and release of (i) all monetary liens, including, without limitation, any and all mortgages, deeds of trust, mechanics liens, financing statements, and judgment liens, in each case, created by, under or through Seller, encumbering the Land and/or the Improvements, and (ii) any exceptions or encumbrances to title that are created by Seller or Monitor after the Effective Date without Purchaser's written consent (collectively, "**Mandatory Cure Items**"), and Purchaser shall not be required to include any Mandatory Cure Items in any Objection Notice. If Seller fails to cure any Mandatory Cure Items, Objection(s), Additional Objections that it is required to cure or has agreed to cure in Seller's Cure Notice and/or Seller's Cure Notice with respect to any Additional Objections prior to Closing, then Purchaser shall be entitled to exercise its remedies under Section 16.01 of this Agreement. Purchaser hereby acknowledges and agrees that **TIME IS OF THE ESSENCE** with respect to all time periods relating to Purchaser's obligations as set forth in this Article V.

**Section 5.03    Seller Unable to Convey.**

(a)    If, on the Closing Date, Seller fails or is unable to convey title to the Property to Purchaser subject to and in accordance with the provisions of this Agreement, Seller and Purchaser shall have the following rights and obligations:

(i)    Seller shall be entitled to reasonable adjournments of the Closing Date one or more times for a period not to extend beyond the Outside Date (as defined below) to enable Seller to convey such title to the Property, upon written notice delivered to Purchaser on or prior to the extended Closing Date;

(ii)    If Seller does not so elect to adjourn the Closing Date, and on the Closing Date, fails or is unable to convey title subject to and in accordance with the provisions of this Agreement, Purchaser shall be entitled, in its sole discretion, to elect by written notice to Seller, to either in accordance with the provisions of this Agreement: (A) terminate this Agreement by written notice to Seller and the Monitor (and Escrow Agent) delivered on or before the Closing Date, in which event Purchaser shall be entitled to a prompt return of the Earnest Money Deposit, and this Agreement shall thereupon be deemed terminated and of no further effect, and neither party hereto shall have any obligations to the other hereunder or by reason hereof, except for the provisions hereof that expressly survive termination of this Agreement; or (B) subject to Seller's receipt of the Approval and Vesting Order, complete the purchase (with no reduction in the Purchase Price) with such title as Seller is able to convey on the Closing Date. If Purchaser shall fail to give

such notice as aforesaid, Purchaser shall be deemed to have elected clause (B) above and the Closing shall take place on the Closing Date;

        (iii)    If Seller elects to adjourn the Closing Date as provided in <u>Section 5.03(a)(i)</u> above, this Agreement shall remain in effect for the period or periods of adjournment, in accordance with its terms. If, on the Closing Date, Seller fails or is unable to convey title to the Property subject to and in accordance with the provisions of this Agreement, Purchaser shall make its election between clauses (A) and (B) of <u>Section 5.03(a)(ii)</u> above, by written notice to Seller given not later than the Closing Date. If Purchaser shall fail to give such notice as aforesaid, Purchaser shall be deemed to have elected clause (A) of <u>Section 5.03(a)(ii)</u> above.

        (b)    Notwithstanding anything to the contrary contained in this Agreement, Seller shall not be required to take or bring any action or proceeding or any other steps to remove any defect in or objection to title or to fulfill any condition precedent to Purchaser's obligations under this Agreement or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller therefor, at law or in equity, except that Seller shall, on or prior to the Closing, pay, discharge, or remove of record, or cause any Mandatory Cure Items to be paid, discharged, or removed of record, at Seller's sole cost and expense.

    **Section 5.04   Title As Seller Can Convey.** Notwithstanding anything in <u>Section 5.03</u> above to the contrary, Purchaser may, in its sole and absolute discretion, at any time elect by written notice to Seller to accept such title as Seller can convey, without reduction of the Purchase Price or any credit or allowance on account thereof or any claim against Seller. The acceptance of the Conveyance Deed by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement, except for such matters which are expressly stated to survive the Closing hereunder.

    **Section 5.05   Liens and Other Encumbrances.** If the Property shall, at the time of the Closing, be subject to any liens (such as for judgments or transfer, inheritance, estate, franchise, license, or other similar taxes), encumbrances, or other title exceptions which would be grounds for Purchaser to object to title hereunder, the same shall not be deemed an objection to title provided that, at the time of the Closing, Seller, at Seller's discretion, delivers immediately available funds or other security at or before the Closing in the amount required to satisfy the same and delivers to Purchaser and/or the Title Company at the Closing, instruments in recordable form (and otherwise in form reasonably satisfactory to the Title Company in order to omit same as an exception to its title policy) sufficient to satisfy and discharge of record such liens and encumbrances together with the cost of recording or filing such instruments.

    **Section 5.06   Certificate of Occupancy.** Notwithstanding anything to the contrary contained in this Agreement, the fact that the Property does not have a certificate or certificates of occupancy (or, if there be such certificate or certificates, that there exist any variances between such certificate or certificates and the actual state or use of the Property) shall not be deemed an objection to title or a reason for Purchaser not to close hereunder.

## ARTICLE VI
## CLOSING DELIVERIES

**Section 6.01   Seller's Closing Deliveries.** Seller shall deliver or cause to be delivered to the Escrow Agent the following at the Closing Date, except as otherwise specified below:

(a)     one (1) original warranty deed (the "**Conveyance Deed**"), executed by Seller and acknowledged, and in recordable form, conveying to Purchaser the Real Property, Improvements, and Appurtenances, subject only to the Permitted Encumbrances;

(b)     one (1) original bill of sale executed by Seller with respect to the Personal Property, Permits, Licenses and any Intangible Property, if any, in substantially the form attached hereto as Exhibit A (the "**Bill of Sale**").

(c)     Intentionally Omitted.

(d)     Intentionally omitted.

(e)     a copy of the Approval and Vesting Order(s);

(f)     a certificate in the form attached hereto as Exhibit B with respect to compliance with the Foreign Investment in Real Property Tax Act (Internal Revenue Code Sec. 1445, as amended, and the regulations issued thereunder).

(g)     a closing statement;

(h)     an undertaking to re-adjust any item on or omitted from the closing statement for a period of not longer than 45 days after the Closing Date;

(i)     a bring down certificate dated as of the Closing Date, confirming that all of the representations and warranties of Seller contained in this Agreement are true and correct in all material respects as of the Closing Date, with the same effect as though made on and as of the Closing Date;

(j)     the Monitor's Certificate, which shall be delivered and held in escrow until all other closing conditions have been satisfied or waived and the Monitor confirms same in writing to Purchaser;

(k)     all other documents reasonably necessary or otherwise required by the Monitor, or the Title Company, to consummate the Transaction, including any required transfer tax forms.

**Section 6.02   Purchaser's Closing Deliveries.** Purchaser shall deliver or cause to be delivered to Escrow Agent, on or before the Closing Date, the following:

(a)     The balance of the Purchase Price as set forth in Section 2.02(b).

(b)     Intentionally Omitted.

11

(c)      Intentionally Omitted.

(d)      an undertaking to re-adjust any item on or omitted from the statement of adjustments for a period of not longer than 45 days after the Closing Date;

(e)      a bring down certificate dated as of the Closing Date, confirming that all of the representations and warranties of Purchaser contained in this Agreement are true and correct in all material respects as of the Closing Date, with the same effect as though made on and as of the Closing Date;

(f)      Any required transfer tax forms.

(g)      All other documents reasonably necessary or otherwise required by the Title Company to consummate the Transaction.

**Section 6.03   Delivery of the Monitor's Certificate**. When the conditions set out in Article XII below have been satisfied or waived, the Monitor will deliver an executed copy of the Monitor's Certificate to Purchaser. Upon such delivery, the Closing will be deemed to have occurred. The Monitor will thereafter promptly file a copy of the Monitor's Certificate with the Canadian Court. For the purposes of delivering the Monitor's Certificate, the Monitor shall be entitled to rely exclusively and without independent verification on written confirmation from counsel to Purchaser and Seller (email being sufficient) regarding the satisfaction or waiver of the conditions set out in Article XII.

## ARTICLE VII
## CLOSING COSTS

**Section 7.01   Seller's Closing Costs.** Seller shall pay the following costs and expenses in connection with the transaction contemplated by this Agreement:

(a)      One-half of Escrow Agent's fees.

(b)      Seller's Broker's fees.

(c)      Recording fees and expenses for the recording of the Conveyance Deed.

(d)      Any and all costs incurred by Seller in connection with the preparation, review, and negotiation of this Agreement and the transactions and the Closing contemplated by this Agreement, including any attorneys' or consultancy fees.

**Section 7.02   Purchaser's Closing Costs.** Purchaser shall pay the following costs and expenses in connection with the transaction contemplated by this Agreement:

(a)      One-half of Escrow Agent's fees.

(b)      Any and all stated and/or local real property transfer fees that are payable in connection with the transaction contemplated by this Agreement.

(c)     The cost of the survey.

(d)     Any and all costs associated with any financing Purchaser may obtain to consummate the acquisition of the Property.

(e)     Any transfer fees charged by the issuer of any letters of credit.

(f)     The cost of the Title Report and Title Insurance Policy

(g)     Any and all costs incurred by Purchaser in connection with the preparation, review, and negotiation of this Agreement and the transactions and the Closing contemplated by this Agreement, including any expenses associated with Purchaser's investigation of the Property, and any attorneys' or consultancy fees.

## ARTICLE VIII
## APPORTIONMENTS

**Section 8.01    Apportionments at Closing.** The Parties shall prorate the following as of 11:59 p.m. Prevailing Time Zone Time on the day immediately preceding the Closing Date (the "**Apportionment Date**") on the basis of the actual number of days of the month which shall have elapsed as of the Closing Date and based upon the actual number of days in the month and a 365 day year.

**Section 8.02    Property Taxes.** Property taxes shall be apportioned on the basis of the fiscal period for which assessed. If the Closing Date shall occur before an assessment is made or a tax rate is fixed for the tax period in which the Closing Date occurs, the apportionment of such Property Taxes based thereon shall be made at the Closing Date by applying the tax rate for the preceding year to the latest assessed valuation, but, promptly after the assessment and/or tax rate for the current year are fixed, the apportionment thereof shall be recalculated and Seller or Purchaser, as the case may be, shall make an appropriate payment to the other within seven (7) Business Days based on such recalculation. If, as of the Closing Date, the Real Property or any portion thereof shall be affected by any special or general assessments which are or may become payable in installments of which the first installment is then a lien and has become payable, Seller shall pay the unpaid installments of such assessments which are due prior to the Closing Date and Purchaser shall pay the installments which are due on or after the Closing Date.

**Section 8.03    Utility Charges.** All water, sewer, gas, electric, telephone, fuel, and other utility charges that were prorated as of the Closing Date based on the last ascertainable bill shall be adjusted and prorated as of the Closing Date upon receipt of the actual statements for said utilities.

**Section 8.04    Operating Costs and Expenses.** All operating costs and expenses accrued before the Closing Date shall be paid by Seller on or before the Closing Date or promptly upon receipt of applicable statements. All operating costs and expenses accruing on or after the Closing Date shall be paid by Purchaser.

**Section 8.05   Seller's Insurance.** Seller shall not be required to assign any policies of insurance in respect of the Property to Purchaser and Purchaser shall be responsible for obtaining its own insurance as of the Closing Date.

**Section 8.06   Other Items.** Such other items as are customarily prorated in transactions similar to the transaction contemplated by this Agreement.

**Section 8.07   Survival.** The provisions of this Article shall survive the Closing of this Agreement for a period of forty-five (45) days.

**ARTICLE IX**
**RESERVED**

**ARTICLE X**
**SELLER'S COVENANTS**

**Section 10.01 Seller's Covenants.** Seller covenants that:

(a)      From the Effective Date until the Closing, Seller shall, subject in all cases to any orders made in the CCAA Proceedings and Chapter 15 Proceedings that are applicable to Seller:

(i)      Maintain the Property in the ordinary course of business and deliver the Property to Purchaser at the Closing in substantially the same condition it was in as of the Effective Date, ordinary wear and tear excepted; provided, however, that Seller shall have no obligation to make any capital expenditures;

(ii)      Continue its customary practices with respect to leasing and contracts affecting the Property;

(iii)      Maintain general liability and property damage insurance in amounts that it customarily maintains;

(iv)      Without Purchaser's prior written consent, which may be withheld or granted in Purchaser's reasonable discretion, Seller shall not enter into, modify, amend, or terminate any Leases, Contracts, or any other agreements that affect the Property or would be binding upon Purchaser after the Closing; provided, however, that Seller shall have the right to enforce its rights under any such Leases, Contracts, or other agreements, including, without limitation, exercising any right to terminate such Leases, Contracts or other agreements in the event of a default of the other party thereto. If Purchaser fails to respond to any request for approval of any such matters as provided in this clause (iv) within five (5) business days after receipt thereof, Purchaser shall be deemed to have approved such request.

(v)      Not modify the use or zoning of the Property prior to Closing and Seller shall provide to Purchaser copies of all written material notices received or

14

given by Seller with respect to the Property other than in connection with the CCAA Proceedings and Chapter 15 Proceedings; and

(vi)    Comply with all laws applicable to the Property, use, or occupancy thereof.

**Section 10.02  Reserved**.

# ARTICLE XI
# REPRESENTATIONS AND WARRANTIES

**Section 11.01  Seller's Representations and Warranties.**

(a)    Except as expressly set forth in this <u>Section 11.01</u>, and without limiting anything in <u>Article XIV</u>, Seller has not made and does not make any representations or warranties, including any representations or warranties as to the physical and environmental condition, layout, leases, footage, rents, income, expenses, zoning, or other matters with respect to the Property.

(b)    Seller represents and warrants to Purchaser, as of the Effective Date and as of the Closing Date, that:

(i)    Seller has all necessary power and authority to enter into this Agreement and to carry out its obligations hereunder. The execution and delivery of this Agreement and the consummation of the Transaction have been duly authorized by all necessary action on the part of Seller, subject to the Approval and Vesting Orders. This Agreement is a valid and binding obligation of Seller enforceable in accordance with its terms;

(ii)    the Monitor has been duly appointed as the monitor of Seller by the Initial Order and such Initial Order is in full force and effect and has not been stayed, and subject to obtaining the Approval and Vesting Order(s), Seller has the full right, power and authority to enter into this Agreement, perform its obligations hereunder and convey all of its right, title and interest in and to the Property;

(iii)    subject to any charges created by the Initial Order, Seller has done no act itself to encumber or dispose of the Property and is not aware of any action or process pending or threatened against Seller that may affect its ability to convey the Property as contemplated herein;

(iv)    Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the "**Code**");

(v)    Seller is not, and shall not become, a Person or entity with whom United States Persons or entities are restricted or prohibited from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the

Department of the Treasury (including those named on OFAC's specially designated and blocked Persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or be otherwise associated with such Persons;

(vi)     There are no currently active leases, oral or written, or service contracts in place affecting the Property which will survive the Closing or which will be binding upon Purchaser or the Property after the Closing Date; and

(vii)     All representations and warranties made by knowledge in this Agreement are made based on the actual knowledge of the CRO, without any duty to review or investigate the matters to which such knowledge, or the absence thereof, pertains and with no imputed knowledge whatsoever, whether from any partner, officer, director, member, shareholder, or employee of Seller. The CRO shall have no personal liability arising out of any representations or warranties made herein.

## Section 11.02 Purchaser's Representations and Warranties.

(a)     Purchaser represents and warrants that:

(i)     Purchaser has full power and authority to enter into and perform this Agreement in accordance with its terms. Purchaser is a limited liability company validly formed and in good standing under the laws of the State of Delaware. Prior to the Closing Date, Purchaser intends to assign this Agreement to a wholly-owned single purpose entity who shall be duly qualified to do business and be in good standing in the State of Arizona. All requisite action (corporate, trust, partnership, or otherwise) has been taken by Purchaser in connection with this Agreement or shall have been taken on or prior to the Closing Date. Purchaser's execution, delivery, and performance of this Agreement have been duly authorized and all required consents or approvals have been obtained. The individuals executing this Agreement on behalf of Purchaser have the power and authority to bind Purchaser to the terms and conditions of this Agreement;

(ii)     This Agreement is a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, or other similar laws affecting the enforcement of creditors' rights generally;

(iii)     To Purchaser's actual knowledge, Purchaser has not violated any contract, agreement, or other instrument to which Purchaser is a party, nor any judicial order, judgment, or decree to which Purchaser is bound, by: (A) entering into this Agreement; (B) executing any of the documents Purchaser is obligated to execute and deliver on the Closing Date; or (C) performing any of its duties or

16

obligations under this Agreement or otherwise necessary to consummate the Transaction;

(iv)    There are no actions, lawsuits, litigation, or proceedings pending or, to Purchaser's actual knowledge, threatened in any court or before any governmental or regulatory agency that affect Purchaser's power or authority to enter into or perform this Agreement;

(v)    Except for the express representations and warranties of Seller found in <u>Section 11.01</u> and subject to <u>Article XIV</u>, and except for any representations made by Seller in any of the documents executed by Seller and delivered at Closing (collectively, the "**<u>Closing Documents</u>**"), Purchaser is acquiring the Property on an "AS IS, WHERE IS" basis, without any representation or warranty of any kind or nature whatsoever, express or implied, and Purchaser acknowledges that no such representations or warranties have been made except as set forth in writing herein. In deciding whether to acquire the Property, Purchaser is relying solely on Purchaser's investigation of the Property and the representations, warranties, and covenants in this Agreement and in any of the Closing Documents;

(vi)    Purchaser is not, and shall not become, a Person or entity with whom United States Persons are restricted or prohibited from doing business under regulations OFAC (including those named on OFAC's specially designated and blocked Persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or be otherwise associated with such Persons; and

(vii)    There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, nor any actions, suits, or other legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, threatened against Purchaser, which would have any material adverse effect on the business or assets or the condition, financial or otherwise, of Purchaser or the ability of Purchaser to consummate the Transaction.

**Section 11.03 No Representations.** PURCHASER HEREBY ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY OF THE CLOSING DOCUMENTS, NEITHER SELLER, CRO, MONITOR, NOR ANY PERSON ACTING ON BEHALF OF SELLER, CRO, MONITOR, NOR ANY PERSON OR ENTITY WHICH PREPARED OR PROVIDED ANY OF THE MATERIALS REVIEWED BY PURCHASER IN CONDUCTING ITS DUE DILIGENCE, NOR ANY DIRECT OR INDIRECT OFFICER, DIRECTOR, PARTNER, MEMBER, SHAREHOLDER, EMPLOYEE, AGENT, REPRESENTATIVE, ACCOUNTANT, ADVISOR, ATTORNEY, PRINCIPAL, AFFILIATE, CONSULTANT, CONTRACTOR, SUCCESSOR, OR ASSIGN OF ANY OF THE FOREGOING PARTIES (SELLER, CRO, MONITOR, SELLER RELATED PARTIES, AND ALL THE OTHER PARTIES DESCRIBED IN THE PRECEDING PORTIONS OF THIS

SENTENCE (OTHER THAN PURCHASER) SHALL BE REFERRED TO HEREIN COLLECTIVELY AS THE "**EXCULPATED PARTIES**") HAS MADE OR SHALL BE DEEMED TO HAVE MADE ANY ORAL OR WRITTEN REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESSED OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE (INCLUDING WITHOUT LIMITATION WARRANTIES OF HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE), WITH RESPECT TO THE PROPERTY, THE PERMITTED USE OF THE PROPERTY, OR THE ZONING AND OTHER LAWS, REGULATIONS, AND RULES APPLICABLE THERETO OR THE COMPLIANCE BY THE PROPERTY THEREWITH, THE REVENUES AND EXPENSES GENERATED BY OR ASSOCIATED WITH THE PROPERTY, OR OTHERWISE RELATING TO THE PROPERTY OR THE TRANSACTIONS CONTEMPLATED HEREIN. PURCHASER FURTHER ACKNOWLEDGES THAT EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY OF THE CLOSING DOCUMENTS, ALL MATERIALS WHICH HAVE BEEN PROVIDED BY ANY OF THE EXCULPATED PARTIES HAVE BEEN PROVIDED WITHOUT ANY WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED, AS TO THEIR CONTENT, SUITABILITY FOR ANY PURPOSE, ACCURACY, TRUTHFULNESS, OR COMPLETENESS AND, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY OF THE CLOSING DOCUMENTS, PURCHASER SHALL NOT HAVE ANY RECOURSE AGAINST SELLER, CRO, MONITOR OR ANY OF THE OTHER EXCULPATED PARTIES IN THE EVENT OF ANY ERRORS THEREIN OR OMISSIONS THEREFROM. PURCHASER IS ACQUIRING THE PROPERTY BASED SOLELY ON ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT IN RELIANCE ON ANY INFORMATION PROVIDED BY SELLER, CRO, MONITOR OR ANY OF THE OTHER EXCULPATED PARTIES, EXCEPT FOR THE REPRESENTATIONS, WARRANTIES, AND COVENANTS EXPRESSLY SET FORTH HEREIN AND THE CLOSING DOCUMENTS. EXCEPT AS EXPRESSLY SET FORTH HEREIN, PURCHASER EXPRESSLY DISCLAIMS ANY INTENT TO RELY ON ANY SUCH MATERIALS PROVIDED TO IT BY SELLER, CRO OR MONITOR IN CONNECTION WITH ITS DUE DILIGENCE AND AGREES THAT IT SHALL RELY SOLELY ON ITS OWN INDEPENDENTLY DEVELOPED OR VERIFIED INFORMATION.

## ARTICLE XII
## CONDITIONS TO CLOSING

**Section 12.01 Conditions Precedent to Obligations of Seller.** Notwithstanding anything to the contrary contained herein, the obligation of Seller to close in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the time of the Closing of each of the conditions listed below, provided that Seller, at its election, evidenced by written notice delivered to Purchaser at or prior to the Closing, may waive any of such conditions:

(a)    Purchaser shall have: (i) executed and delivered to Seller all the documents required to be executed and delivered under this Agreement; (ii) paid the full balance of the Purchase Price in accordance with <u>Section 2.02(b)</u> above; (iii) paid all other sums of money required under this Agreement; and (iv) taken or caused to be taken all the other action required of Purchaser pursuant to this Agreement.

18

(b)    Purchaser shall not be in default of any covenant or agreement to be performed by Purchaser under this Agreement, and shall have performed all other obligations required to be performed by it under this Agreement on or prior to the Closing Date.

(c)    the Royal Bank of Canada (in its capacity as administrative agent, collateral agent, and as mortgagee on the Real Property) shall have consented in writing to the Transaction.

(d)    the Canadian Court and the U.S. Court shall have issued the Approval and Vesting Orders, and such Approval and Vesting Orders shall not have been stayed, vacated, reversed, or modified.

(e)    On the Closing Date all representations and warranties made by Purchaser in Section 11.02 shall be true and correct in all material respects as if made on the Closing Date.

**Section 12.02 Conditions Precedent to Obligations of Purchaser.** Notwithstanding anything to the contrary contained herein, in addition to all other conditions set forth in this Agreement, the obligation of Purchaser to consummate the Transaction and pay the Purchase Price in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the time of the Closing of each of the conditions listed below, provided that Purchaser, at its election, evidenced by written notice delivered to Seller at or prior to the Closing, may waive all or any of such conditions:

(a)    Seller shall have executed and delivered to Purchaser all the documents required to be executed and delivered under this Agreement and required to be delivered by Seller at the Closing and shall have taken all other action required of Seller at the Closing.

(b)    Seller shall not be in default of any covenant or agreement to be performed by Seller under this Agreement, and shall have performed all other obligations required to be performed by it under this Agreement on or prior to the Closing Date.

(c)    All representations and warranties made by Seller in this Agreement shall be true and correct in all material respects as if made on the Closing Date.

(d)    the Royal Bank of Canada (in its capacity as administrative agent, collateral agent, and as mortgagee on the Real Property) shall have consented in writing to the Transaction.

(e)    the Canadian Court and the U.S. Court shall have issued the Approval and Vesting Orders, and such Approval and Vesting Orders shall not have been stayed, vacated, reversed, or modified.

(f)    (i) a final examination of the title to the Property shall disclose no title exceptions except for the Permitted Encumbrances; and (ii) the Title Company shall be

irrevocably committed to issue to Purchaser, at standard rates, an ALTA owner's title insurance policy in the amount of the Purchase Price, insuring that the fee simple estate to the Real Property is vested in Purchaser, subject only to the Permitted Encumbrances (the "**Title Insurance Policy**").

**Section 12.03  Failure of Conditions to Closing.**

(a)    If all of the conditions precedent to Seller's obligation to effect the Closing in Section 12.01 have not been satisfied (and Seller has not waived the same in writing), then Seller shall give notice in accordance with this Agreement to Purchaser of the condition or conditions that the Seller asserts are not satisfied, then Purchaser may, if it so elects, adjourn the Closing Dates until such date that is thirty (30) days after the originally scheduled Closing Date (the "**Outside Date**"); and (ii) if, after such extension, the conditions precedent to Seller's obligation to effect the Closing continue not to be satisfied (and Seller has not waived the same in writing) or Purchaser does not elect such extension, and, in either case, such failure of condition precedent is not the result of Purchaser's default hereunder, then Seller shall have the right to terminate this Agreement by notice thereof to Purchaser in accordance with the terms of this Agreement, and thereafter, neither party shall have any further obligations hereunder, except those expressly stated to survive the termination hereof; provided that, if such failure of a closing condition is due to a default by Purchaser, Seller shall have those rights and remedies set forth in Section 16.01 and the disposition of the Earnest Money shall be governed by Section 16.01 and not this Section 12.03.

(b)    Subject to Section 5.03 and Section 16.02 of this Agreement, if all of the conditions precedent to Purchaser's obligation to effect the Closing in Section 12.02 have not been satisfied (and Purchaser has not waived the same in writing), then Seller may, if it so elects and without any abatement in the Purchase Price: (i) adjourn the Closing Date to the Outside Date; and (ii) if, after any such extension, the conditions precedent to Purchaser's obligation to effect the Closing continue not to be satisfied (and Purchaser has not waived the same in writing) or Seller does not elect such extension and, in either case, such failure of condition precedent is not the result of Seller's default hereunder, then Purchaser shall be entitled to terminate this Agreement by notice thereof to the other party in accordance with the terms of this Agreement. If this Agreement is so terminated, then Purchaser shall be entitled to receive the Earnest Money Deposit and thereafter neither party shall have any further obligations hereunder, except those expressly stated to survive the termination hereof; provided that if such failure is due to Seller's default hereunder, Purchaser shall have all rights and remedies set forth in Section 16.02 and the disposition of the Earnest Money shall be governed by 16.02 and not this Section 12.03.

## ARTICLE XIII
## BROKERAGE COMMISSIONS

**Section 13.01 Purchaser Representation.** Purchaser represents and warrants to Seller that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, either directly or indirectly, any broker, finder, consultant, advisor, or professional in the capacity of a broker or

finder (each a "**Broker**") in connection with this Agreement or the Transaction other than Chris Wong with Bradford Commercial Real Estate Service (the "**Purchaser's Broker**"). Except for Seller's Broker's failure to pay Purchaser's Broker, Purchaser hereby agrees to indemnify, defend, and hold Seller and its disclosed and undisclosed direct and indirect shareholders, officers, directors, partners, principals, members, employees, agents, contractors, and any successors or assigns of the foregoing, harmless from and against any and all Claims, demands, causes of action, losses, costs, and expenses (including reasonable attorneys' fees, court costs, and disbursements) arising from any Claim for commission, fees, or other compensation or reimbursement for expenses made by any Broker (including Purchaser's Broker) engaged by or claiming to have dealt with Purchaser in connection with this Agreement or the Transaction.

**Section 13.02 Seller Representation.** Seller represents and warrants to Purchaser that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, either directly or indirectly, any Broker in connection with this Agreement or the Transaction other than CBRE (the "**Seller's Broker**"). Seller's Broker agrees to pay Purchaser's Broker in accordance with the terms of a separate agreement between Seller's Broker and Purchaser's Broker. Seller hereby agrees to indemnify, defend, and hold Purchaser and its disclosed and undisclosed direct and indirect shareholders, officers, directors, partners, principals, members, employees, agents, contractors, and any successors or assigns of the foregoing, harmless from and against any and all Claims, demands, causes of action, losses, costs, and expenses (including reasonable attorneys' fees, court costs, and disbursements) arising from any Claim for commission, fees, or other compensation or reimbursement for expenses made by any Broker (including Seller's Broker) engaged by or claiming to have dealt with Seller in connection with this Agreement or the Transaction.. Seller agrees to pay Seller's Broker in accordance with the terms of a separate agreement between Seller and Seller's Broker.

**Section 13.03 Survival.** The provisions of this Article XIII shall survive the termination of this Agreement or the Closing.

**ARTICLE XIV**
**AS-IS, WHERE-IS**

**Section 14.01 AS-IS, WHERE-IS.** Except as expressly set forth in this Agreement or in any of the Closing Documents to the contrary, Purchaser is expressly purchasing the Property in its existing condition "AS-IS, WHERE-IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions, and defects, and Seller has no obligation to determine or correct any such facts, circumstances, conditions, or defects or to compensate Purchaser for same. Seller has specifically bargained for the assumption by Purchaser of all responsibility to investigate, prior to the Closing, the Property, Laws, and Regulations, Rights, Facts, Leases, Service Contracts, Violations, Employees, and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof. As of the Closing, Purchaser shall have undertaken all such investigations of the Property, Laws, and Regulations, Rights, Facts, Leases, Service Contracts, Employees, and Violations, as Purchaser deems necessary or appropriate under the circumstances as to the status of the Property and, based upon same, Purchaser is and shall be relying strictly and solely upon such inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel, and officers. As of the Closing, Purchaser is and shall

be fully satisfied that the Purchase Price is fair and adequate consideration for the Property and, by reason of all the foregoing, Purchaser assumes the full risk of any loss or damage (subject to Section 15.01 below) occasioned by any fact, circumstance, condition, or defect pertaining to the Property.

**Section 14.02 No Warranty or Other Representation.** Except as expressly set forth in this Agreement or in any of the Closing Documents to the contrary, Seller hereby disclaims all warranties of any kind or nature whatsoever (including, without limitation, warranties of habitability and fitness for particular purposes), whether expressed or implied, including, without limitation, warranties with respect to the Property. Except as is expressly set forth in this Agreement or in any of the Closing Documents to the contrary, Purchaser acknowledges that it is not relying upon any representation of any kind or nature made by Seller, CRO, Monitor or Seller's Broker, or any of their respective direct or indirect members, partners, shareholders, officers, directors, employees, or agents (collectively, the "**Seller Related Parties**") with respect to the Property, and that, in fact, except as expressly set forth in this Agreement to the contrary, no such representations were made. To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation, or order. The information contained in any data room accessed by Purchaser in respect of the Property and description of the Property in any marketing material, listing information, and any like material delivered or made available by Seller Related Parties to Purchaser or its representatives are believed to be correct, but if any misstatement, error, inaccuracy or omission (collectively the "**Inaccuracies**") is found in them, Purchaser shall not be entitled to any abatement, damages, reimbursement, costs or termination of this Agreement as a result of them and Purchaser releases Seller and the Seller Related Parties from any Claims the Purchaser had, has or may have as a result of such Inaccuracies. Purchaser hereby waives to the fullest extent permitted by law any rights, remedies and benefits under any consumer protection law, whether federal, state or local. Purchaser covenants not to sue Seller under any such consumer protection law.

**Section 14.03 Environmental Laws; Hazardous Materials.** Seller makes no warranty with respect to the presence of Hazardous Materials on, above, or beneath the Property (or any parcel in proximity thereto) or in any water on or under the Property. The Closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws. As used herein, the term "**Hazardous Materials**" shall mean: (a) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them; (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof; (c) natural gas, synthetic gas, and any mixtures thereof; (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophyllite, and/or actinolite, whether friable or non-friable; (e) polychlorinated biphenyl ("**PCBs**") or PCB-containing materials or fluids; (f) radon; (g) any other hazardous or radioactive substance, material, pollutant, contaminant, or waste; and (h) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring, or remediation. As used herein, the term "**Environmental Laws**" shall mean all federal, state, and local laws, statutes, ordinances, and

regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees, and binding judgments relating to the regulation and protection of human health, safety, the environment, and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species, and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 *et seq.*), the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§ 5101 *et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 *et seq.*), the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901 *et seq.*), the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601 *et seq.*), the Clean Air Act, as amended (42 U.S.C. §§ 7401 *et seq.*), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 *et seq.*), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f *et seq.*), and any other state or local counterpart or equivalent of any of the foregoing, and any federal, state, or local transfer of ownership notification or approval statutes.

**Section 14.04  Seller Release.** Purchaser shall rely solely upon Purchaser's own knowledge of the Property based on its investigation of the Property and its own inspection of the Property in determining the Property's physical condition, and Purchaser agrees that it shall, subject to the express warranties, representations, and conditions contained in this Agreement and in any of the Closing Documents, assume the risk that adverse matters, including, but not limited to, construction defects and adverse physical and environmental conditions may not have been revealed by Purchaser's investigations. Except as expressly set forth in this Agreement or in any of the Closing Documents to the contrary, as of the Closing, Purchaser releases Seller, the Seller Related Parties, and their respective successors and assigns from and against any and all Claims which Purchaser or any party related to or affiliated with Purchaser (each, a "**Purchaser Related Party**") has or may have arising from or related to any matter or thing related to or in connection with the Property except as expressly set forth in this Agreement or in any of the Closing Documents to the contrary, including the documents and information referred to herein, any construction defects, errors or omissions in the design or construction, and any environmental conditions, and except as expressly set forth in this Agreement or in any of the Closing Documents to the contrary, neither Purchaser nor any Purchaser Related Party shall look to Seller, the Seller Related Parties, or their respective successors and assigns in connection with the foregoing for any redress or relief. This release shall, as of the Closing, be given full force and effect according to each of its express terms and provisions, including those relating to unknown and unsuspected Claims, damages, and causes of action. To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation, or order. Notwithstanding anything contained in this Agreement, it is understood and agreed that this Article XIV does not cover or release or limit Seller, the Seller Related Parties, and their respective successors and assigns from (i) any claims arising from or related to (directly or indirectly) a breach by Seller of any of Seller's representations or warranties, (ii) any other breach by Seller of any obligation of Seller under this Agreement or any of the documents delivered at Closing, (iii) any claims related to Seller or any Seller Parties' (as defined below) fraud, gross negligence, and/or willful, reckless and/or intentional misconduct, or illegal conduct, (iv) any pre-existing tort or personal injury claim related to the Property accruing prior to the Closing Date that are made by third parties, and/or (v) any right of Purchaser to implead or join

23

Seller or any of the Seller Parties' in any personal injury or tort claim or action brought by any third party person or entity against Purchaser for matters arising prior to the Closing Date. For purposes of this Agreement, "**Seller Parties**" shall mean Seller, Seller's Affiliates and subsidiaries and affiliated predecessors-in-title, and their respective partners, members, officers, directors, shareholders, employee, affiliates and agents, "**Sellers' Affiliates**" means any entity that directly or indirectly controls, is controlled by or is under common control with the Seller, and the term "**control**" means the power to direct the management of such entity through voting rights, ownership or contractual obligations.

**Section 14.05 Survival.** The provisions of this Article XIV shall survive the Closing or the earlier termination of this Agreement and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

## ARTICLE XV
## RISK OF LOSS

**Section 15.01 Risk of Loss.** The risk of loss or damage to any portion of the Property, by fire, condemnation, or otherwise, until the Closing Date, shall be borne by Seller. In the event that any condemnation loss, casualty loss, or any damage to any portion of the Property shall occur before the Closing Date, the party first learning of the loss or damage shall, in writing, immediately inform the other party of such loss or damage and, if such loss is less than five percent (5%) of the Purchase Price, in the aggregate, Purchaser shall be given a credit at Closing for the amount necessary to repair or replace the damage, and Seller and Purchaser shall close the Transaction as otherwise provided. If such loss exceeds five percent (5%) of the Purchase Price, in the aggregate, Purchaser shall have the option (which option shall be exercised within twenty (20) days in writing upon the determination of the replacement and/or repair costs) to either (a) rescind the Agreement, in which event the Earnest Money Deposit shall be returned to Purchaser, whereupon this Agreement shall be null and void and neither party shall have any rights against the other; or (b) proceed to Closing and, in such event, Seller's right to all insurance proceeds resulting from such damage or destruction or to any condemnation proceeds resulting from a condemnation shall be assigned by Seller to Purchaser, and Seller shall pay to Purchaser the amount of any deductibles and co-payments required to be paid along with certification that the policy is in full force and effect and unimpaired and the loss is covered by the policy. Seller shall have no obligation to make repairs. All time periods under this Section 15.01 that have not expired shall toll during the pendency of any determination of the amount of loss, with time of tolling being measured from the date of notice through any final determination or agreement on the amount of loss. Seller shall assist Purchaser in the ascertainment of the amount and details of disbursement of insurance proceeds.

## ARTICLE XVI
## REMEDIES

**Section 16.01 Seller's Remedies in the Event of Purchaser's Breach or Default.** In the event of Purchaser's default or breach in its obligations under this Agreement, after written notice and ten (10) days to cure, the Seller, as its sole and exclusive remedy, may retain the Earnest Money Deposit and all interest earned thereon as liquidated damages and seek reimbursement for

any legal fees and costs incurred in the enforcement of any dispute arising from this Agreement related to such default or breach. Thereafter, upon payment of the Earnest Money Deposit and all interest earned thereon to Seller, this Agreement shall be terminated, and the parties shall be released from further liability to each other hereunder, except for those obligations and liabilities that are expressly stated to survive termination of this Agreement. SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE EARNEST MONEY DEPOSIT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT. SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED. SELLER EXPRESSLY WAIVES ALL RIGHTS TO SEEK ANY OTHER DAMAGES, INCLUDING WITHOUT LIMITATION, ACTUAL OR CONSEQUENTIAL DAMAGES IT MAY HAVE ON ACCOUNT OF ANY DEFAULT BY PURCHASER HEREUNDER.

**Section 16.02  Purchaser's Remedies in the Event of Seller's Breach or Default.** In the event Seller should default in its obligations under this Agreement, after written notice and ten (10) days to cure, the Purchaser shall have the right as its sole and exclusive remedy to choose to: (a) terminate this Agreement by delivery of written notice to Seller and the Monitor and the Escrow Agent, and the Escrow Agent shall promptly return the Earnest Money Deposit to Purchaser, with the interest earned thereon, if any; or (b) enforce specific performance to consummate the sale of the Property in accordance with the terms of this Agreement and to execute and deliver the documents required to convey the Property to Purchaser in accordance with this Agreement; or (c) waive said failure, default or breach and proceed to Closing in accordance with this Agreement. If Purchaser fails to bring an action of specific performance within sixty (60) days following the Closing Date, Purchaser shall be deemed to have elected to terminate this Agreement and receive a refund of the Earnest Money Deposit with the interest earned thereon, if any. PURCHASER EXPRESSLY WAIVES ALL RIGHTS TO SEEK OTHER DAMAGES, INCLUDING WITHOUT LIMITATION, ACTUAL OR CONSEQUENTIAL DAMAGES IT MAY HAVE ON ACCOUNT OF ANY DEFAULT BY SELLER HEREUNDER.

**Section 16.03  Exculpation.** Purchaser and Seller each agree, that each party does not have and will not have any Claims or causes of action against any disclosed or undisclosed officer, director, employee, trustee, shareholder, partner, principal, parent, subsidiary, retirant, beneficiary, internal investment contractor, agent, or other affiliate of Seller or Purchaser, as appliable, or any other Seller Related Parties or Purchaser Related Party, including, without limitation, any officer, director, employee, trustee, shareholder, partner, principal, retirant, beneficiary, internal investment contractor, agent, or other affiliate of Seller or any such parent, subsidiary, or other affiliate, or any other Seller Related Parties (collectively, "**Seller's Affiliates**") or any officer, director, employee, trustee, shareholder, partner, principal, retirant, beneficiary, internal investment contractor, agent, or other affiliate of Purchaser or any such parent, subsidiary, or other affiliate, or any other Purchaser Related Party (collectively, "**Purchaser's Affiliates**"), arising out of or in connection with this Agreement or the Transaction. Subject at all times to any stay of proceedings in effect in the CCAA Proceedings and/or Chapter 15 Proceedings, Purchaser and

Seller agree to look solely to the other party and such other party's assets for the satisfaction of any liability or obligation arising under this Agreement (expressly subject to <u>Section 16.01</u> hereof) or the Transaction, or for the performance of any of the covenants, warranties, or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Seller's Affiliates or Purchaser's Affiliates, as applicable, with respect to any matters arising out of or in connection with this Agreement or the Transaction. Without limiting the generality of the foregoing provisions of this <u>Section 16.03</u>, Purchaser and Seller each hereby unconditionally and irrevocably waives any and all Claims and causes of action of any nature whatsoever it may now or hereafter have against Seller's Affiliates and Purchaser's Affiliates, as applicable, and hereby unconditionally and irrevocably releases and discharges Seller's Affiliates and Purchaser's Affiliates from any and all liability whatsoever which may now or hereafter accrue in favor of Purchaser or Seller against Seller's Affiliates or Purchaser's Affiliates, as applicable, in connection with or arising out of this Agreement or the Transaction.

**Section 16.04  Survival.** The provisions of this <u>Article XVI</u> shall survive the termination of this Agreement and the Closing.

## ARTICLE XVII
## CONFIDENTIALITY AND PRESS RELEASE

**Section 17.01  Confidentiality.** The Parties agree that the terms and conditions of this Agreement are confidential and shall not be disclosed to any Person prior to Closing, except: (a) to such Parties' solicitors, advisors, agents or representatives acting in connection herewith and, then, only on the basis that such Persons are also required to keep such information confidential as aforesaid; and (b) to the Canadian Court and/or U.S. Court in furtherance of obtaining the Approval and Vesting Order(s).

**Section 17.02  Limited Disclosure.** Notwithstanding the foregoing, the obligation to maintain the confidentiality of such information will not apply to the extent that disclosure of such information is required by, or desirable to be made to, the Canadian Court and/or U.S. Court, by law or otherwise in connection with governmental or other applicable filings relating to the Transaction, provided that, in such case, unless the Purchaser otherwise agrees, Seller may, if possible in its sole discretion, request confidentiality in respect of such legal proceedings or governmental or other filings.

**Section 17.03  Survival.** The provisions of this <u>Article XVII</u> shall survive the termination of this Agreement.

## ARTICLE XVIII
## GENERAL PROVISIONS

**Section 18.01  Notices.** Unless specifically stated otherwise in this Agreement, all notices, waivers, and demands required under this Agreement shall be in writing and delivered to all other Parties, and the Monitor, at the addresses below, by one of the following methods:

(a)     Hand delivery, whereby delivery is deemed to have occurred at the time of delivery;

(b)     A nationally recognized overnight courier company, whereby delivery is deemed to have occurred the Business Day following deposit with the courier;

(c)     Registered U.S. Mail, signature required and postage-prepaid, whereby delivery is deemed to have occurred on the third Business Day following deposit with the United States Postal Service; or

(d)     Electronic transmission (email) provided that the transmission is completed no later than 4:00 p.m. on a Business Day and the original also is sent via overnight courier or U.S. Mail, whereby delivery is deemed to have occurred at the end of the Business Day on which electronic transmission is completed.

|  |  |
|---|---|
| To Purchaser: | c/o Jadian IOS<br>4 Star Point, Suite 204<br>Stamford, CT  06902<br>Attn: Alex Stahl<br>Email: astahl@jadianios.com and<br>legal@jadiancapital.com |
| with a copy to: | King & Spalding LLP<br>1700 Pennsylvania Avenue, NW<br>Washington, DC 20006<br>Attn: Brian E. Ashin, Esq.<br>Telephone: (202) 626-2380<br>Email: bashin@kslaw.com |
| To Seller: | **Pride Group Enterprises**<br>400 Spectrum Center Dr., Suite 280<br>Irvine, CA 92618<br><br>Attention: Amtoj Randhawa, Esq.<br>Tel: (949) 749-2185<br>E-mail: Amtoj.Randhawa@PrideGroupEnterprises.com |
| with a copy to: | Thornton Grout Finnigan LLP<br>100 Wellington Street West, Suite 3200<br>Toronto, ON M5K 1K7<br>Attention: Leanne Williams / Rachel Nicholson / Puya Fesharaki<br>Tel: (416) 304-0060 / (416) 304-1153 / (416) 304-7979<br>Email: lwilliams@tgf.ca / rnicholson@tgf.ca / pfesharaki@tgf.ca |

| To Monitor: | Ernst & Young Inc.<br>100 Adelaide Street West<br>Toronto, ON M5H 0B3<br>Attention: Alex Morrison / Emily Masry<br>Tel: (416) 941-7743 / (437) 518-2646<br>Email: alex.f.morrison@parthenon.ey.com /<br>emily.masry@parthenon.ey.com |
|---|---|
| with a copy to: | Blake, Cassels & Graydon LLP<br>199 Bay Street, Suite 4000, Commerce Court West<br>Toronto, ON M5L 1A9<br>Attention: Chris Burr<br>Tel: (416) 863-3261<br>Email: chris.burr@blakes.com |
| To Escrow Agent: | First American Title Insurance Company<br>200 West Madison Street, Suite 800<br>Chicago, IL 60606<br>Attention: James W. McIntosh and April Muiser<br>Tel: (312) 917-7220<br>Email: jmcintosh@firstam.com ; amuiser@firstam.com |

Any Party shall change its address for purposes of Section 18.01 by giving written notice as provided in this Section 18.01.

All notices and demands delivered by a Party's attorney on a Party's behalf shall be deemed to have been delivered by said Party. Notices shall be valid only if served in the manner provided in this Section 18.01.

**Section 18.02 Complete Agreement; Amendments and Modifications; Partial Invalidity; Waivers.**

(a)    This Agreement may be executed in counterparts, and when executed by all Parties shall become one (1) integrated agreement enforceable on its terms. This Agreement supersedes all prior agreements between the Parties with respect to the Property and all discussions, understandings, offers, and negotiations with respect thereto, whether oral or written. This Agreement shall not be amended or modified, except in a writing signed by each Party hereto. If amended or modified as permitted by this Section 18.02(a), the term "**Agreement**" shall thereafter be read as including all said amendments and modifications. All exhibits that are referenced in this Agreement or attached to it are incorporated herein and made a part hereof as if fully set forth in the body of the document.

(b)    Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity

or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

(c)    Any waiver of any provision or of any breach of this Agreement shall be in writing and signed by the Party waiving said provision or breach. No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts. Effective as of the Closing, any breaches or conditions not waived previously in accordance with this Section 18.02(c) are deemed waived.

**Section 18.03 Parties; Assignment of Interests in This Agreement; Successors and Assigns.**

(a)    Purchaser may not assign or otherwise transfer this Agreement or any of its rights or obligations hereunder or any of the direct or indirect ownership interests in Purchaser, without first obtaining Seller's prior consent and approval thereto, which may be given or withheld in Seller's sole and absolute discretion; provided, however, that, Purchaser shall have the right to assign its interest in this Agreement to any entity controlled by, controlling, or under common control with Purchaser without Seller's consent.

(b)    All references to Seller in this Agreement shall include Seller's assignee.

(c)    This Agreement and all its covenants, terms, and provisions shall be binding on and inure to the benefit of each Party and its successors and assigns.

**Section 18.04 Reserved**.

**Section 18.05 Further Assurances.** After the Closing Date, Seller and Purchaser each agrees to do such things, perform such acts, and make, execute, acknowledge, and deliver such documents as may be reasonably necessary and customary to complete the Transaction. In particular, Seller and Purchaser each agree to do such things as may be reasonably necessary with respect to the transfer of the operation of the Property, including with respect to the any items to be assumed by Purchaser under this Agreement, to complete the transfer of the operation of the Property.

**Section 18.06 Interpretation and Construction.**

(a)    The Parties acknowledge that, in connection with negotiating and executing this Agreement, each has had its own counsel and advisors and that each has reviewed and participated in the drafting of this Agreement. The fact that this Agreement was prepared by Seller's counsel as a matter of convenience shall have no import or significance to the

construction of this Agreement. Any uncertainty or ambiguity in this Agreement shall not be construed against Seller because Seller's counsel prepared this Agreement in its final form. Any rule of construction that requires any ambiguities to be interpreted against the drafter shall not be employed in the interpretation of: (i) this Agreement; (ii) any exhibits to this Agreement; or (iii) any document drafted or delivered in connection with the Transaction.

(b)    Any captions or headings used in this Agreement are for convenience only and do not define or limit the scope of this Agreement.

(c)    The singular of any term, including any defined term, shall include the plural, and the plural of any term shall include the singular. The use of any pronoun with respect to gender shall include the neutral, masculine, feminine, and plural.

**Section 18.07 Days; Performance on a Saturday, Sunday, or Holiday.** Whenever the term "day" is used in this Agreement, it shall refer to a calendar day unless otherwise specified. A "**Business Day**" shall mean any weekday except for those weekdays that a banking institution within the State in which the Property is located is required by said state to be closed (a "**Holiday**"). Should this Agreement require an act to be performed or a notice to be given on a Saturday, Sunday, or Holiday, the act shall be performed or notice given on the following Business Day.

**Section 18.08 Time Is of the Essence.** The parties hereto acknowledge and agree that, except as otherwise expressly provided in this Agreement, TIME IS OF THE ESSENCE for the performance of all actions (including, without limitation, the giving of notices, the delivery of documents, and the funding of money) required or permitted to be taken under this Agreement. Whenever action must be taken (including, without limitation, the giving of notice, the delivery of documents, or the funding of money) under this Agreement, prior to the expiration of, by no later than, or on a particular date, unless otherwise expressly provided in this Agreement, such action must be completed by 11:59 p.m. Prevailing Time Zone Time on such date. However, notwithstanding anything to the contrary herein, whenever action must be taken (including, without limitation, the giving of Notice, the delivery of documents, or the funding of money) under this Agreement prior to the expiration of, by no later than, or on a particular date that is not a Business Day, then such date shall be extended until the immediately following Business Day.

**Section 18.09 Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the State of Arizona. EACH PARTY HERETO AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE INSTITUTED IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, AND, TO THE EXTENT SUCH COURT DOES NOT HAVE OR DOES NOT ACCEPT JURISDICTION TO ADJUDICATE SUCH MATTER, MAY BE INSTITUTED IN THE STATE OR FEDERAL COURTS OF THE UNITED STATES OF AMERICA IN THE STATE OF ARIZONA. TO THE EXTENT PERMITTED BY LAW, EACH PARTY HERETO IRREVOCABLY WAIVES ANY RIGHT ANY PARTY HERETO MAY HAVE TO ASSERT THE DOCTRINE OF *FORUM NON CONVENIENS*, TO ASSERT THAT ANY PARTY HERETO IS NOT SUBJECT TO THE JURISDICTION OF THE AFORESAID COURTS, OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS ARTICLE

XVIII. SERVICE OF PROCESS, SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST ANY PARTY HERETO, MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ANY SUCH PARTY'S ADDRESS INDICATED IN SECTION 18.01 HEREOF.

**Section 18.10 No Offer.** This Agreement shall not be deemed an offer or binding upon Seller or Purchaser until this Agreement is fully executed and delivered by Seller and Purchaser.

**Section 18.11 No Survival.** Except as otherwise provided in this Agreement, no representations, warranties, covenants, or other obligations of Seller set forth in this Agreement shall survive the Closing hereunder and no action based thereon shall be commenced after the Closing.

**Section 18.12 Attorneys' Fees; Income and Capital Gains Taxes.**

(a)      Seller and Purchaser each acknowledge that: (i) they have been represented by independent counsel in connection with this Agreement; (ii) they have executed this Agreement with the advice of such counsel; (iii) this Agreement is the result of negotiations between the parties hereto and the advice and assistance of their respective counsel; and (iv) because Seller and Purchaser have been represented by independent counsel in connection with this Agreement, this Agreement shall not be construed against Seller.

(b)      Each Party to this Agreement shall be responsible for all costs it incurs in connection with the preparation, review, and negotiation of this Agreement and the Transaction and the Closing contemplated by this Agreement, including any attorneys' or consultants fees. In addition, each Party is responsible for its own income taxes and capital gains taxes resulting from its operation of the Property and such taxes shall not be a proration at the Closing.

(c)      If any action is brought by either Party against the other in connection with or arising out of this Agreement, or any of the documents and instruments delivered in connection herewith or in connection with the Transaction, the prevailing party shall be entitled to recover from the other party its reasonable out-of-pocket costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection with the prosecution or defense of such action. The provisions of this Section 18.12 shall survive the Closing.

**Section 18.13 Reserved**.

**Section 18.14 Waiver of Jury Trial.** Except as otherwise expressly stated in this Agreement, to survive the Closing hereunder, all obligations the Parties have to each other under this Agreement shall survive neither the Closing nor the earlier termination of this Agreement. In the unlikely event that a dispute survives the Closing or termination, EACH OF SELLER AND PURCHASER HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION, OR PROCEEDING BROUGHT BY THE OTHER PARTY HERETO UNDER THIS AGREEMENT OR IN CONNECTION WITH ANY TRANSACTION CONTEMPLATED HEREBY, ANY AND EVERY RIGHT EACH OF

SELLER AND PURCHASER MAY HAVE TO: (A) INJUNCTIVE RELIEF (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT TO THE CONTRARY); (B) A TRIAL BY JURY; (C) INTERPOSE ANY COUNTERCLAIM THEREIN (EXCEPT FOR ANY COMPULSORY COUNTERCLAIM WHICH, IF NOT ASSERTED IN SUCH SUIT, ACTION, OR PROCEEDING, WOULD BE WAIVED); AND (D) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION, OR PROCEEDING.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the date first written above.

<u>**PURCHASER:**</u>

**JC IOS ACQUISITIONS, LLC**,
a Delaware limited liability company

By: *Daniel Schuchinsky*
Name: Daniel Schuchinsky
Title:   Authorized Signatory

<u>**SELLER:**</u>

59TH AVE PHOENIX HOLDING CORP,
an Arizona corporation

By:_____
Name: Randall Benson
Title: Court-Appointed Chief Restructuring Officer

The undersigned has executed this Agreement solely to confirm its acceptance of the duties of Escrow Agent as set forth in this Agreement:

**ESCROW AGENT:**

FIRST AMERICAN TITLE INSURANCE COMPANY

By:_____
    Name:
    Title:

[Signature Page to Purchase and Sale Agreement]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the date first written above.

<u>**PURCHASER**</u>:

**JC IOS ACQUISITIONS, LLC**,
a Delaware limited liability company

By: _____
Name: Daniel Schuchinsky
Title:   Authorized Signatory

<u>**SELLER**</u>:

59TH AVE PHOENIX HOLDING CORP,
an Arizona corporation

By: _____
Signed by:
*RC Benson*
ED7DE051644941D...
Name: Randall Benson
Title: Court-Appointed Chief Restructuring Officer

The undersigned has executed this Agreement solely to confirm its acceptance of the duties of Escrow Agent as set forth in this Agreement:

**ESCROW AGENT:**

FIRST AMERICAN TITLE INSURANCE COMPANY

By:_____
   Name:
   Title:

[Signature Page to Purchase and Sale Agreement]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the date first written above.

**PURCHASER:**

**JC IOS ACQUISITIONS, LLC**,
a Delaware limited liability company


By:   _____
Name: Daniel Schuchinsky
Title:   Authorized Signatory



**SELLER:**

59TH AVE PHOENIX HOLDING CORP,
an Arizona corporation


By:_____
Name: Randall Benson
Title: Court-Appointed Chief Restructuring Officer

The undersigned has executed this Agreement solely to confirm its acceptance of the duties of Escrow Agent as set forth in this Agreement:

**ESCROW AGENT:**

FIRST AMERICAN TITLE INSURANCE COMPANY


By: *April Muiser*_____
    Name: April Muiser
    Title:  Commercial Escrow Assistant

**SCHEDULE "A"**

**Defined Terms**

(a)    "**Approval and Vesting Orders**" means the Canadian Approval and Vesting Ordre and the U.S. Approval and Vesting Order, and "**Approval and Vesting Order**" means either one of them;

(b)    "**Business Day**" means a day on which banks are open for business in the State in which the Property is located, but does not include a Saturday, Sunday or statutory holiday recognized in the State in which the Property is located;

(c)    "**Canadian Approval and Vesting Order**" means the approval and vesting order issued by the Canadian Court in the CCAA Proceedings, in form and substance acceptable to Seller, Purchaser and the Monitor (acting reasonably) approving this Agreement and the Transaction, and (i) authorizing and directing Seller to complete the Transaction and conveying to Purchaser all of Seller's right, title and interest, if any, in and to the Property; and (ii) vesting title in the Property into the name of the Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances;

(d)    "**Claims**" means any and all claims, demands, complaints, actions, applications, suits, causes of action, orders, or other similar processes, and "**Claim**" means any one of them;

(e)    "**Governmental Authority**" means any nation, government, province, state, or any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of any government or any political subdivision thereof, court, tribunal, arbitrator, the governing body of any securities exchange, and self-regulatory organization, in each case having competent jurisdiction, and "**Governmental Authority**" means any one of them;

(f)    "**Monitor's Certificate**" means the certificate referred to as such in the Canadian Approval and Vesting Order;

(g)    "**Permitted Encumbrances**" means those encumbrances listed on **Schedule "C",** which the Purchaser acknowledges and agrees will continue to attach to and be enforceable against the Property following Closing.

(h)    "**Person**" is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity;

(i)    "**Prevailing Time Zone Time**" shall mean the time zone of the city in which the Property is located;

(j)    "**Taxes**" means any and all federal, state, local and foreign taxes, land transfer taxes, charges, fees, levies, imposts and other assessments, including all income, sales, use, goods and services, harmonized, value added, capital, capital gains, alternative, net worth, transfer, profits, withholding, payroll, employer health, excise, franchise, real property and personal property taxes, and any other taxes, customs duties, fees, assessments or similar charges in the nature of a tax, together with any interest, fines and penalties, imposed by any Governmental Authority, and whether disputed or not that arise in respect of the Property in the jurisdiction in which it is located;

(k)    "**Transaction**" means the transaction of purchase and sale of the Property as contemplated by this Agreement;

(l)    "**U.S. Approval and Vesting Order**" means the recognition order issued by the U.S. Court in the Chapter 15 Proceedings, in form and substance acceptable to Seller, Purchaser and the Monitor (acting reasonably), (i) recognizing and giving effect to the Canadian Approval and Vesting Order in the United States, (ii) approving the sale of the Property free and clear of liens, claims, and encumbrances, and (iii) granting any related relief;

(m)    "**Work Orders**" means any work orders, deficiency notices, orders to comply, inspector's orders, notices of non-compliance, notices of violation or similar orders or directives issued with respect to the Property, including any outstanding, open, pending or active building permits and/or permit applications or the like, in each case issued by any Governmental Authority having jurisdiction with respect to the Property or any part thereof pursuant to Applicable Law; and "**Work Order**" has a corresponding meaning.

### SCHEDULE "B"

THAT PORTION OF LOT 1, INLAND KENWORTH PLAT, ACCORDING TO
BOOK 417 OF MAPS, PAGE 46, RECORDS OF MARICOPA COUNTY, ARIZONA,
AND THAT PORTION OF LOT 48, I-10 INDUSTRIAL PARK WEST UNIT II,
ACCORDING TO BOOK 234 OF MAPS, PAGE 48, RECORDS OF MARICOPA
COUNTY, ARIZONA, AND THAT PORTION OF LATHAM STREET, ALL
LOCATED IN THE NORTHWEST QUARTER (NW%) OF SECTION 5, TOWNSHIP
1 NORTH, RANGE 2 EAST, GILA AND SALT RIVER MERIDIAN, MARICOPA
COUNTY, ARIZONA, DESCRIBED AS FOLLOWS:

COMMENCING AT A 3 INCH BRASS CAP IN HANDHOLE IN CONCRETE
MARKING THE WEST QUARTER CORNER OF SAID SECTION 5, BEING
NORTH 89°01'49" WEST 2649.12 FEET FROM A 3 INCH CITY OF PHOENIX
BRASS CAP IN HANDHOLE IN CONCRETE MARKING THE CENTER
QUARTER CORNER OF SAID SECTION 5;

THENCE ALONG THE EAST - WEST MID SECTION LINE OF SAID SECTION 5
SOUTH 89°01'49" EAST 60.55 FEET;

THENCE NORTH 00°58'11" EAST 78.50 FEET TO THE POINT OF BEGINNING
ON THE EXISTING NORTHERLY RIGHT OF WAY LINE OF ROOSEVELT
STREET;

THENCE ALONG SAID EXISTING NORTHERLY RIGHT OF WAY LINE OF
ROOSEVELT STREET NORTH 89°01'49" WEST 6.11 FEET TO THE EXISTING
EASTERLY RIGHT OF WAY LINE OF 59TH AVENUE;

THENCE ALONG SAID EXISTING EASTERLY RIGHT OF WAY LINE NORTH
12°35'09" WEST
22.20 FEET;

THENCE CONTINUING ALONG SAID EXISTING EASTERLY RIGHT OF WAY

LINE NORTH 89°28'17" WEST 10.00 FEET;

THENCE CONTINUING ALONG SAID EXISTING EASTERLY RIGHT OF WAY LINE NORTH 00°31'43" EAST 193.70 FEET TO POINT "A" FOR LATER IDENTIFICATION;

THENCE CONTINUING ALONG SAID EXISTING EASTERLY RIGHT OF WAY LINE NORTH 04°36'51" EAST 390.02 FEET TO THE EXISTING WESTERLY RIGHT OF WAY LINE OF STATE ROUTE 202L (SOUTH MOUNTAIN FREEWAY);
ALONG SAID EXISTING WESTERLY RIGHT OF WAY LINE NORTH 90°00'00" EAST 95.23 FEET;

THENCE CONTINUING ALONG SAID EXISTING WESTERLY RIGHT OF WAY LINE FROM A LOCAL TANGENT BEARING OF SOUTH 24°05'57" EAST ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 968.03 FEET, A LENGTH OF 351.86 FEET;

THENCE CONTINUING ALONG SAID EXISTING WESTERLY RIGHT OF WAY LINE SOUTH 03°16'24" EAST 98.49 FEET;

THENCE CONTINUING ALONG SAID EXISTING WESTERLY RIGHT OF WAY LINE SOUTH 04°48'58" WEST 150.10 FEET;

THENCE CONTINUING ALONG SAID EXISTING WESTERLY RIGHT OF WAY LINE SOUTH
16°54'57" WEST 20.30 FEET TO SAID EXISTING NORTHERLY RIGHT OF WAY LINE OF
ROOSEVELT STREET;

THENCE ALONG SAID EXISTING NORTHERLY RIGHT OF WAY LINE OF ROOSEVELT STREET NORTH 89°01'49" WEST 177.38 FEET TO THE POINT OF BEGINNING.

[Schedule A]

A.P.N. 103-27-055

Commonly known as: 1021 N 59th Ave, Phoenix, Arizona 85043

## SCHEDULE "C"

### (Permitted Encumbrances)

(a)     All presently existing and future liens for unpaid real estate taxes and water and sewer charges not due and payable as of the Closing Date, subject to adjustment as hereinafter provided.

(b)     All present and future zoning, building, environmental, and other laws, ordinances, codes, restrictions, and regulations of all governmental authorities having jurisdiction with respect to the Property, including, without limitation, landmark designations and all zoning variances and special exceptions, if any (collectively, "**Laws and Regulations**").

(c)     All covenants, restrictions, and rights of record and all easements and agreements of record for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer, or other utility pipelines, poles, wires, conduits, or other like facilities, and appurtenances thereto, over, across, and under the Property (collectively, "**Rights**"), provided as to any such exceptions that are not set forth in the Title Report, such exceptions do not interfere with the present use of the Property, do not prohibit the maintenance and operation of the Property, and do not impose any financial or other obligations on the Purchaser.

(d)     Any state of facts which would be shown on or by an accurate current survey of the Property, together with any additional state of facts that a subsequent accurate survey of the Property would show (collectively, "**Facts**").

(e)     Rights of tenants of the Property pursuant to leases and any and all amendments, assignments, and subleases, with Seller, or any predecessor fee owner of the Property or other statutory tenants, and others claiming by, through, or under any such tenants (collectively, the "**Tenants**").

(f)     All violations of building, fire, zoning, sanitary, environmental, housing, and similar Laws and Regulations whether or not noted or issued  at the date hereof or at the Closing Date or Work Orders (collectively, "**Violations**").

(g)     Any lien or encumbrance (including, without limitation, any construction liens) the removal of which is the obligation of a tenant.

(h)     Any lien or encumbrance arising out of the acts or omissions of Purchaser.

(i)     Any special assessments including but not limited to any and all special assessments that are presently assessed, a lien against or imposed on the Property, not yet due and payable and payable in installments or in a lump sum.

## SCHEDULE "D"

### ESCROW PROVISIONS

The Earnest Money Deposit shall be held by Escrow Agent, in trust, on the terms hereinafter set forth:

A.  Escrow Agent shall deposit the Earnest Money Deposit in an interest bearing account, with a Federally insured financial institution.

B.  Escrow Agent shall not commingle the Earnest Money Deposit with any other funds of Escrow Agent or others and shall promptly advise Purchaser and Seller of the number of any bank account in which the Earnest Money Deposit has been deposited.

C.  If the Closing takes place under this Agreement, then Escrow Agent shall disburse the Earnest Money Deposit on the Closing Date to Seller and Purchaser shall receive a credit against the Purchase Price in an amount equal to the Earnest Money Deposit.

D.  Except for the return of the Earnest Money Deposit to Purchaser as a result of Purchaser exercising its termination right (or having been deemed to terminate) under Section 2.03 of this Agreement (in which event Escrow Agent shall promptly release the Earnest Money Deposit to Purchaser on demand without deduction and notwithstanding any contrary instructions received from Seller), if this Agreement is terminated in accordance with the terms hereof or if the Closing does not take place under this Agreement by reason of the failure of Purchaser or Seller to comply with its obligations hereunder, then Escrow Agent shall pay the Earnest Money Deposit as required by the terms of this Agreement, provided, however, that notwithstanding the foregoing, Escrow Agent shall not pay over the Earnest Money Deposit to any party hereunder unless and until the following procedure is complied with:  The party requesting disbursement of the Earnest Money Deposit (the "Requesting Party") shall deliver notice to Escrow Agent and all other parties hereto requesting such disbursement.  Within five (5) days after receipt of such notice of request, Escrow Agent shall deliver notice to all other parties hereto stating that the Requesting Party has requested such disbursement (and including a copy of the Requesting Party's notice).  Within ten (10) days after receipt of Escrow Agent's notice, the non-requesting party shall either: (a) agree to permit such disbursement by Escrow Agent or (b) inform Escrow Agent that the non-requesting party does not agree to permit such disbursement.  If the non-requesting party acts under clause (a), then Escrow Agent shall make the disbursement as requested by the Requesting Party.  If the non-requesting party acts under clause (b), then Escrow Agent shall not make any disbursement except as provided in paragraph F below.  If the non-requesting party fails to respond during the foregoing ten (10) day period, same shall be deemed to be the response of the non-requesting party under clause (a) on the last day of such ten (10) day period.

[Schedule D]

E.  It is agreed that the duties of Escrow Agent are only as herein specifically provided, and, subject to the provisions of paragraph F hereof, are purely ministerial in nature, and that Escrow Agent shall incur no liability whatsoever except for willful misconduct or gross negligence, as long as Escrow Agent has acted in good faith.  Seller and Purchaser each release Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in the performance of its duties hereunder.

F.  Escrow Agent is acting as a stakeholder only with respect to the Earnest Money Deposit. If there is any dispute as to whom the Earnest Money Deposit is to be delivered, Escrow Agent shall not make any delivery, but in such event Escrow Agent shall hold same until receipt by Escrow Agent of an authorization in writing, signed by all the parties having interest in such dispute, directing the disposition of same, or, in the absence of such authorization Escrow Agent shall hold the Earnest Money Deposit until the final determination of the rights of the parties in an appropriate proceeding.  If such written authorization is not given, or proceedings for such determination are not begun within thirty (30) days after the Closing Date and diligently continued, Escrow Agent may bring an appropriate action or proceeding for leave to deposit the Earnest Money Deposit in court pending such determination.  Escrow Agent shall be reimbursed for all costs and expenses of such action or proceeding including, without limitation, reasonable attorneys' fees and disbursements, by the party determined not to be entitled to the Earnest Money Deposit. Upon making delivery of the Earnest Money Deposit in the manner herein provided, Escrow Agent shall have no further liability hereunder.

G.  Escrow Agent has executed this Agreement in order to confirm that Escrow Agent has received the Earnest Money Deposit, and that Escrow Agent will hold the Earnest Money Deposit in escrow, pursuant to the provisions hereof.

H.  Purchaser and Seller shall each pay one-half (1/2) of any and all costs and expenses incurred by Escrow Agent as a result of this transaction.

[Schedule D]

# EXHIBIT A

Form of Bill of Sale and General Assignment


_____, a _____ ("Seller"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid to Seller by [_____], a [_____] ("Purchaser"), the receipt and sufficiency of which are hereby acknowledged, hereby sells, conveys, assigns, transfers, delivers and sets over to Purchaser all Personal Property, Licenses, Permits and Intangible Property, if any, owned by Seller and which are located at and used solely in connection with the Real Property and/or the Improvements but specifically excluding the property listed on Schedule A annexed hereto. Any term with its initial letter capitalized and not otherwise defined herein shall have the meaning set forth in the Purchase Agreement (as defined below).

TO HAVE AND TO HOLD unto Purchaser and its successors and assigns to its and their own use and benefit forever.

Purchaser hereby acknowledges and agrees that the Personal Property, Licenses, Permits and Intangible Property are being conveyed "AS IS, WHERE IS, WITH ALL FAULTS", and the provisions of Article [XIV] of the Purchase and Sale Agreement dated [_____ \_\_, 20\_\_] between Purchaser and Seller with respect thereto, are incorporated herein by this reference (the "Purchase Agreement").

This Bill of Sale is made by Seller without recourse and without any express or implied representation or warranty whatsoever.

## [SIGNATURE PAGE TO FOLLOW]

[Exhibit A]

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed as of this _____ day of _____, 20__.

_____, a

_____

By: _____

    Name:

    Title:

Docusign Envelope ID: 9ABEF5F9-16EG-4208-965F-80834DA3C28C

Schedule A to Exhibit A

<u>Excluded Property</u>

Any and all tractors, trailers, motor vehicles, movable equipment, EV chargers and/or personal property not permanently fixed to the Property.

## **EXHIBIT B**

Form FIRPTA

SELLER'S FIRPTA CERTIFICATE

_____, a _____ ("Transferor"), hereby certifies as follows:

Section 1445 of the Internal Revenue Code (the "Code") provides that a transferee (buyer) of a United States real property interest must withhold tax if the transferor (seller) is a foreign person.

Transferor     is     transferring     certain     real     property     in     the     City     of _____,     County     of     _____     and [State/Commonwealth     of     _____     to     _____,     a _____ ("Transferee") pursuant to a deed of even date herewith.

Transferor is not a foreign corporation, foreign partnership, foreign trust, foreign estate or foreign person, as those terms are defined in the Code.  The office address of Transferor is c/o _____.

The United States taxpayer identification number of Transferor is:  _____.

This certification is being given pursuant to Section 1445 of the Code to inform Transferee that withholding of tax is not required upon this disposition of United States real property interests.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Dated:  _____ __, 20___

[_____]

By:     _____
Name:
Title:

*Execution Version*

## AMENDMENT NO. 1 TO PURCHASE AND SALE AGREEMENT
*(1021 N 59th Avenue, Phoenix, Arizona 85043)*

This **AMENDMENT NO. 1 TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made effective as of January 9, 2025, by and between **59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation ("**Seller**") and **JC IOS ACQUISITIONS, LLC**, a Delaware limited liability company ("**Purchaser**")

## RECITALS

This Amendment is made with reference to the following facts:

A.      Seller and Purchaser entered into that certain Purchase and Sale Agreement dated December 10, 2024 (the "**Agreement**"), with respect to the purchase and sale of certain Property (as defined in the Agreement). Capitalized terms used and not otherwise defined in this Amendment have the meanings ascribed to such terms in the Agreement.

B.      Seller and Purchaser desire to amend the Agreement on the terms and conditions set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as well as the mutual covenants and agreements herein contained, Seller and Purchaser, intending to be legal bound, agree as follows:

1.      **Extension of the Due Diligence Period**. Section 3.01 of the Agreement is hereby amended to provide that the Due Diligence Period shall expire at 11:50 pm (Mountain Standard time) on March 10, 2025 (the "**Due Diligence Period**"). Seller and Purchaser acknowledge and agree that the purpose of the foregoing extension to the Due Diligence Period is for ServPro and/or its authorized agents and/or contractors to perform certain repair work on the Property, as described in an e-mail correspondence transmitted by Chris Butas of ServPro to all Parties on or about December 31, 2024 (the "**Repair Work**").

2.      **Extension of the Closing Date**. The first sentence of Section 4.01 of the Agreement is hereby amended as follows:

> "The closing of the Transaction (the "**Closing**") shall occur remotely at 5:00 p.m. Prevailing Time Zone Time on or before the seventieth (70th) day following the expiration of the Due Diligence Period (the "**Closing Date**") in accordance with the terms and conditions of the Agreement."

3.      **Miscellaneous**.  In the event of any conflict between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall control. The Recitals herein contained are true and correct and made a part hereof. This Amendment may be executed in one or more counterparts and may be signed by facsimile or by an electronic PDF version. All counterparts so executed shall constitute one Amendment, binding on all parties, even though all parties are not signatory to the same counterpart, or the signatures are not original signatures to the same Amendment. As amended by this Amendment, the Agreement is ratified and confirmed in all respects.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

<u>**SELLER:**</u>                                     <u>**PURCHASER:**</u>

**59TH AVE PHOENIX HOLDING CORP**, an      **JC IOS ACQUISITIONS, LLC,**
Arizona corporation                          a Delaware limited liability company

Signed by:

By: _RC Benson_____           By: _____
    ED7DE051A449410...                           Daniel Schuchinsky, Authorized Signatory
Name:  Randall Benson
Title:  Court-Appointed Chief Restructuring
        Officer

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

**SELLER:**                                    **PURCHASER:**

**59TH AVE PHOENIX HOLDING CORP**, an          **JC IOS ACQUISITIONS, LLC,**
Arizona corporation                            a Delaware limited liability company

By: _____            By: *Daniel Schuchinsky*
Name:  Randall Benson                              _____
Title:   Court-Appointed Chief Restructuring       Daniel Schuchinsky, Authorized Signatory
         Officer

*Execution Version*

## AMENDMENT NO. 2 TO PURCHASE AND SALE AGREEMENT
*(1021 N 59th Avenue, Phoenix, Arizona 85043)*

This **AMENDMENT NO. 2 TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made effective as of February 24, 2025, by and between **59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation ("**Seller**") and **JC IOS ACQUISITIONS, LLC**, a Delaware limited liability company ("**Purchaser**")

## RECITALS

This Amendment is made with reference to the following facts:

A.      Seller and Purchaser entered into that certain Purchase and Sale Agreement dated December 10, 2024, as amended by that certain Amendment No. 1 to Purchase and Sale Agreement dated January 9, 2025 (the "**Agreement**"), with respect to the purchase and sale of certain Property (as defined in the Agreement). Capitalized terms used and not otherwise defined in this Amendment have the meanings ascribed to such terms in the Agreement.

B.      Seller and Purchaser desire to amend the Agreement on the terms and conditions set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as well as the mutual covenants and agreements herein contained, Seller and Purchaser, intending to be legal bound, agree as follows:

1.      **Extension of the Due Diligence Period**. Section 3.01 of the Agreement is hereby amended to provide that the Due Diligence Period shall expire at 11:50 pm (Mountain Standard time) on May 9, 2025 (the "**Due Diligence Period**").

2.      **Miscellaneous**.  In the event of any conflict between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall control. The Recitals herein contained are true and correct and made a part hereof. This Amendment may be executed in one or more counterparts and may be signed by facsimile or by an electronic PDF version. All counterparts so executed shall constitute one Amendment, binding on all parties, even though all parties are not signatory to the same counterpart, or the signatures are not original signatures to the same Amendment. As amended by this Amendment, the Agreement is ratified and confirmed in all respects.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

| | |
|---|---|
| <u>**SELLER:**</u> | <u>**PURCHASER:**</u> |
| **59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation | **JC IOS ACQUISITIONS, LLC,** a Delaware limited liability company |

<u>**SELLER:**</u>

**59ᵀᴴ AVE PHOENIX HOLDING CORP**, an
Arizona corporation

By: _RC Benson_ _____
Name:  Randall Benson
Title:    Court-Appointed Chief Restructuring
Officer

<u>**PURCHASER:**</u>

**JC IOS ACQUISITIONS, LLC,**
a Delaware limited liability company

By: _____
Daniel Schuchinsky, Authorized Signatory

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

<u>**SELLER:**</u>

**59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation

By: _____
Name:  Randall Benson
Title:   Court-Appointed Chief Restructuring
           Officer

<u>**PURCHASER:**</u>

**JC IOS ACQUISITIONS, LLC,**
a Delaware limited liability company

By: _Daniel Schuchinsky_____
       Daniel Schuchinsky, Authorized Signatory

*Execution Version*

## AMENDMENT NO. 3 TO PURCHASE AND SALE AGREEMENT

*(1021 N 59th Avenue, Phoenix, Arizona 85043)*

This **AMENDMENT NO. 3 TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made effective as of May 9, 2025, by and between **59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation ("**Seller**") and **JC IOS ACQUISITIONS, LLC**, a Delaware limited liability company ("**Purchaser**")

## RECITALS

This Amendment is made with reference to the following facts:

A.      Seller and Purchaser entered into that certain Purchase and Sale Agreement dated December 10, 2024, as amended by that certain Amendment No. 1 to Purchase and Sale Agreement dated January 9, 2025, and as further amended by that certain Amendment No. 2 to Purchase and Sale Agreement dated February 24, 2025  (the "**Agreement**"), with respect to the purchase and sale of certain Property (as defined in the Agreement). Capitalized terms used and not otherwise defined in this Amendment have the meanings ascribed to such terms in the Agreement.

B.      Seller and Purchaser desire to amend the Agreement on the terms and conditions set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as well as the mutual covenants and agreements herein contained, Seller and Purchaser, intending to be legal bound, agree as follows:

1.      **Extension of the Due Diligence Period**. Section 3.01 of the Agreement is hereby amended to provide that the Due Diligence Period shall expire at 11:50 pm (Mountain Standard time) on May 14, 2025 (the "**Due Diligence Period**").

2.      **Miscellaneous**.  In the event of any conflict between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall control. The Recitals herein contained are true and correct and made a part hereof. This Amendment may be executed in one or more counterparts and may be signed by facsimile or by an electronic PDF version. All counterparts so executed shall constitute one Amendment, binding on all parties, even though all parties are not signatory to the same counterpart, or the signatures are not original signatures to the same Amendment. As amended by this Amendment, the Agreement is ratified and confirmed in all respects.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

<u>**SELLER:**</u>

**59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation

By: _____

    *RC Benson*

Name:  Randall Benson

Title:   Court-Appointed Chief Restructuring
        Officer

<u>**PURCHASER:**</u>

**JC IOS ACQUISITIONS, LLC,**
a Delaware limited liability company


By: _____

    Daniel Schuchinsky, Authorized Signatory

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

<u>**SELLER:**</u>

**59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation


By: _____
Name:  Randall Benson
Title:   Court-Appointed Chief Restructuring
           Officer

<u>**PURCHASER:**</u>

**JC IOS ACQUISITIONS, LLC,**
a Delaware limited liability company


By: _____
       Daniel Schuchinsky, Authorized Signatory

*Execution Version*

## AMENDMENT NO. 4 TO PURCHASE AND SALE AGREEMENT
*(1021 N 59th Avenue, Phoenix, Arizona 85043)*

This **AMENDMENT NO. 4 TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made effective as of May 14, 2025, by and between **59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation ("**Seller**") and **JC IOS ACQUISITIONS, LLC**, a Delaware limited liability company ("**Purchaser**")

## RECITALS

This Amendment is made with reference to the following facts:

A.    Seller and Purchaser entered into that certain Purchase and Sale Agreement dated December 10, 2024, as amended by that certain Amendment No. 1 to Purchase and Sale Agreement dated January 9, 2025, as further amended by that certain Amendment No. 2 to Purchase and Sale Agreement dated February 24, 2025 and as further amended by that certain Amendment No. 3 to Purchase and Sale Agreement dated May 9, 2025  (the "**Agreement**"), with respect to the purchase and sale of certain Property (as defined in the Agreement). Capitalized terms used and not otherwise defined in this Amendment have the meanings ascribed to such terms in the Agreement.

B.    Seller and Purchaser desire to amend the Agreement on the terms and conditions set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as well as the mutual covenants and agreements herein contained, Seller and Purchaser, intending to be legal bound, agree as follows:

1.    **Extension of the Due Diligence Period**. Section 3.01 of the Agreement is hereby amended to provide that the Due Diligence Period shall expire at 11:50 pm (Mountain Standard time) on May 16, 2025 (the "**Due Diligence Period**").

2.    **Miscellaneous**.  In the event of any conflict between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall control. The Recitals herein contained are true and correct and made a part hereof. This Amendment may be executed in one or more counterparts and may be signed by facsimile or by an electronic PDF version. All counterparts so executed shall constitute one Amendment, binding on all parties, even though all parties are not signatory to the same counterpart, or the signatures are not original signatures to the same Amendment. As amended by this Amendment, the Agreement is ratified and confirmed in all respects.

*[Signature page follows]*

51270414v3

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

<u>**SELLER:**</u>

**59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation

By: _Randall Benson_____
    ED7DE6618449410
Name:    Randall Benson
Title:    Court-Appointed Chief Restructuring
         Officer

<u>**PURCHASER:**</u>

**JC IOS ACQUISITIONS, LLC,**
a Delaware limited liability company

By: _____
      Daniel Schuchinsky, Authorized Signatory

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

<table>
<tr><td><u>**SELLER:**</u></td><td><u>**PURCHASER:**</u></td></tr>
<tr><td>**59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation</td><td>**JC IOS ACQUISITIONS, LLC,**<br>a Delaware limited liability company</td></tr>
</table>

SELLER:

**59TH AVE PHOENIX HOLDING CORP**, an
Arizona corporation


By: _____
Name:  Randall Benson
Title:   Court-Appointed Chief Restructuring
           Officer

PURCHASER:

**JC IOS ACQUISITIONS, LLC,**
a Delaware limited liability company

*Daniel Schuchinsky*
By: _____
      Daniel Schuchinsky, Authorized Signatory

## AMENDMENT NO.5 TO PURCHASE AND SALE AGREEMENT
### *(1021 N 59TH Avenue, Phoenix, Arizona 85043)*

This **AMENDMENT NO.5 TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made effective as of May 16, 2025, by and between **59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation ("**Seller**") and **JC IOS ACQUISITIONS, LLC**, a Delaware limited liability company ("**Purchaser**").

## RECITALS

This Amendment is made with reference to the following facts:

A.  Seller and Purchaser entered into that certain Purchase and Sale Agreement dated December 10, 2024, as amended by that certain Amendment No. 1 to Purchase and Sale Agreement dated January 9, 2025, as further amended by that certain Amendment No. 2 to Purchase and Sale Agreement dated February 24, 2025, as further amended by that certain Amendment No. 3 to Purchase and Sale Agreement dated May 9, 2025, and as further amended by that certain Amendment No. 4 to Purchase and Sale Agreement dated May 14, 2025 (the "**Agreement**"), with respect to the purchase and sale of certain Property (as defined in the Agreement). Capitalized terms used and not otherwise defined in this Amendment have the meanings ascribed to such terms in the Agreement.

B.  Seller and Purchaser desire to amend the Agreement on the terms and conditions set forth in this Amendment.

NOW THEREFORE for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as well as the mutual covenants and agreements herein contained, Seller and Purchaser, intending to be legal bound, agree as follows:

1.  **Extension of the Due Diligence Period**: Section 3.01 of the Agreement is hereby amended to provide that the Due Diligence Period shall expire at 11:50 pm (Mountain Standard time) on May 21, 2025 (the "**Due Diligence Period**").

2.  **Miscellaneous**: In the event of any conflict between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall control. The Recitals herein contained are true and correct and made a part hereof. This Amendment may be executed in one or more counterparts and may be signed by facsimile or by an electronic PDF version. All counterparts so executed shall constitute one Amendment, binding on all parties, even though all parties are not signatory to the same counterpart, or the signatures are not original signatures to the same Amendment. As amended by this Amendment, the Agreement is ratified and confirmed in all respects.

*[remainder of page left intentionally blank; signature pages follow]*

AMENDMENT NO.5

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the date first written above.

SELLER:
**59TH AVE PHOENIX HOLDING CORP,** an
Arizona corporation

By: _____
Name: Randall Benson
Title: Chief Restructuring Officer

PURCHASER:
**JC IOS ACQUISITIONS, LLC,** a Delaware
limited liability company

By: _____
Name: Daniel Schuchinsky, Authorized Signatory

AMENDMENT NO.5

## AMENDMENT NO.6 TO PURCHASE AND SALE AGREEMENT
### *(1021 N 59TH Avenue, Phoenix, Arizona 85043)*

This **AMENDMENT NO.6 TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made effective as of May 21, 2025, by and between **59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation ("**Seller**") and **JC IOS ACQUISITIONS, LLC**, a Delaware limited liability company ("**Purchaser**").

### RECITALS

This Amendment is made with reference to the following facts:

A.  Seller and Purchaser entered into that certain Purchase and Sale Agreement dated December 10, 2024, as amended by that certain Amendment No. 1 to Purchase and Sale Agreement dated January 9, 2025, as further amended by that certain Amendment No. 2 to Purchase and Sale Agreement dated February 24, 2025, as further amended by that certain Amendment No. 3 to Purchase and Sale Agreement dated May 9, 2025, as further amended by that certain Amendment No. 4 to Purchase and Sale Agreement dated May 14, 2025, and as further amended by that certain Amendment No. 5 to Purchase and Sale Agreement dated May 16, 2025 (the "**Agreement**"), with respect to the purchase and sale of certain Property (as defined in the Agreement). Capitalized terms used and not otherwise defined in this Amendment have the meanings ascribed to such terms in the Agreement.

B.  Seller and Purchaser desire to amend the Agreement on the terms and conditions set forth in this Amendment.

NOW THEREFORE for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as well as the mutual covenants and agreements herein contained, Seller and Purchaser, intending to be legal bound, agree as follows:

1.  **Extension of the Due Diligence Period**: Section 3.01 of the Agreement is hereby amended to provide that the Due Diligence Period shall expire at 11:50 pm (Mountain Standard time) on May 23, 2025 (the "**Due Diligence Period**").

2.  **Miscellaneous**: In the event of any conflict between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall control. The Recitals herein contained are true and correct and made a part hereof. This Amendment may be executed in one or more counterparts and may be signed by facsimile or by an electronic PDF version. All counterparts so executed shall constitute one Amendment, binding on all parties, even though all parties are not signatory to the same counterpart, or the signatures are not original signatures to the same Amendment. As amended by this Amendment, the Agreement is ratified and confirmed in all respects.

*[remainder of page left intentionally blank; signature pages follow]*

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the date first written above.

**SELLER:**
**59TH AVE PHOENIX HOLDING CORP,** an Arizona corporation

By: _____

Signed by:

*RC Benson*

ED7DE0516449410...

Name: Randall Benson
Title: Chief Restructuring Officer

**PURCHASER:**
**JC IOS ACQUISITIONS, LLC,** a Delaware limited liability company

By: _____

Name: Daniel Schuchinsky, Authorized Signatory

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the date first written above.

**SELLER:**
**59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation

By: _____
Name:  Randall Benson
Title:    Chief Restructuring Officer

**PURCHASER:**
**JC IOS ACQUISITIONS, LLC,** a Delaware limited liability company

By: *Daniel Schuchinsky*
_____
Name: Daniel Schuchinsky, Authorized Signatory

## AMENDMENT NO. 7 TO PURCHASE AND SALE AGREEMENT
*(1021 N 59th Avenue, Phoenix, Arizona 85043)*

This **AMENDMENT NO. 7 TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made effective as of May 23, 2025 (the "**Effective Date**"), by and between **59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation ("**Seller**") and **JC IOS ACQUISITIONS, LLC**, a Delaware limited liability company ("**Purchaser**")

## RECITALS

This Amendment is made with reference to the following facts:

A.        Seller and Purchaser entered into that certain Purchase and Sale Agreement dated December 10, 2024, as amended by that certain Amendment No. 1 to Purchase and Sale Agreement dated January 9, 2025, as further amended by that certain Amendment No. 2 to Purchase and Sale Agreement dated February 24, 2025, as further amended by that certain Amendment No. 3 to Purchase and Sale Agreement dated May 9, 2025, as further amended by that certain Amendment No. 4 to Purchase and Sale Agreement dated May 14, 2025, as further amended by that certain Amendment No. 5 to Purchase and Sale Agreement dated May 16, 2025, and as further amended by that certain Amendment No. 6 to Purchase and Sale Agreement dated May 21, 2025 (the "**Agreement**"), with respect to the purchase and sale of certain Property (as defined in the Agreement). Capitalized terms used and not otherwise defined in this Amendment have the meanings ascribed to such terms in the Agreement.

B.        Seller and Purchaser desire to amend the Agreement on the terms and conditions set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as well as the mutual covenants and agreements herein contained, Seller and Purchaser, intending to be legal bound, agree as follows:

1.        **Extension of the Due Diligence Period**. Section 3.01 of the Agreement is hereby amended to provide that the Due Diligence Period shall expire at 11:50 pm (Mountain Standard time) on May 28, 2025 (the "**Due Diligence Period**").

2.        **Miscellaneous**.  In the event of any conflict between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall control. The Recitals herein contained are true and correct and made a part hereof. This Amendment may be executed in one or more counterparts and may be signed by facsimile or by an electronic PDF version. All counterparts so executed shall constitute one Amendment, binding on all parties, even though all parties are not signatory to the same counterpart, or the signatures are not original signatures to the same Amendment. As amended by this Amendment, the Agreement is ratified and confirmed in all respects.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

<u>**SELLER:**</u>

**59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation

By: _____
Name:  Randall Benson
Title:  Court-Appointed Chief Restructuring
      Officer

<u>**PURCHASER:**</u>

**JC IOS ACQUISITIONS, LLC,**
a Delaware limited liability company

By: _*Daniel Schuchinsky*_____
    Daniel Schuchinsky, Authorized Signatory

## AMENDMENT NO. 8 TO PURCHASE AND SALE AGREEMENT
*(1021 N 59th Avenue, Phoenix, Arizona 85043)*

This **AMENDMENT NO. 8 TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made effective as of May 28, 2025 (the "**Effective Date**"), by and between **59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation ("**Seller**") and **JC IOS ACQUISITIONS, LLC**, a Delaware limited liability company ("**Purchaser**")

## RECITALS

This Amendment is made with reference to the following facts:

A.      Seller and Purchaser entered into that certain Purchase and Sale Agreement dated December 10, 2024, as amended by that certain Amendment No. 1 to Purchase and Sale Agreement dated January 9, 2025, as further amended by that certain Amendment No. 2 to Purchase and Sale Agreement dated February 24, 2025, as further amended by that certain Amendment No. 3 to Purchase and Sale Agreement dated May 9, 2025, as further amended by that certain Amendment No. 4 to Purchase and Sale Agreement dated May 14, 2025, as further amended by that certain Amendment No. 5 to Purchase and Sale Agreement dated May 16, 2025, as further amended by that certain Amendment No. 6 to Purchase and Sale Agreement dated May 21, 2025, and as further amended by that certain Amendment No. 7 to Purchase and Sale Agreement dated May 23, 2025 (the "**Agreement**"), with respect to the purchase and sale of certain Property (as defined in the Agreement). Capitalized terms used and not otherwise defined in this Amendment have the meanings ascribed to such terms in the Agreement.

B.      Seller and Purchaser desire to amend the Agreement on the terms and conditions set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as well as the mutual covenants and agreements herein contained, Seller and Purchaser, intending to be legal bound, agree as follows:

1.      **Extension of the Due Diligence Period**. Section 3.01 of the Agreement is hereby amended to provide that the Due Diligence Period shall expire at 11:50 pm (Mountain Standard time) on May 29, 2025 (the "**Due Diligence Period**").

2.      **Miscellaneous**.  In the event of any conflict between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall control. The Recitals herein contained are true and correct and made a part hereof. This Amendment may be executed in one or more counterparts and may be signed by facsimile or by an electronic PDF version. All counterparts so executed shall constitute one Amendment, binding on all parties, even though all parties are not signatory to the same counterpart, or the signatures are not original signatures to the same Amendment. As amended by this Amendment, the Agreement is ratified and confirmed in all respects.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

<u>**SELLER:**</u>

**59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation

By: _RL Benson_____
Name: Randall Benson
Title:  Court-Appointed Chief Restructuring
        Officer

<u>**PURCHASER:**</u>

**JC IOS ACQUISITIONS, LLC,**
a Delaware limited liability company


By: _Daniel Schuchinsky_____
        Daniel Schuchinsky, Authorized Signatory

## AMENDMENT NO. 9 TO PURCHASE AND SALE AGREEMENT
*(1021 N 59th Avenue, Phoenix, Arizona 85043)*

This **AMENDMENT NO. 9 TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made effective as of May 29, 2025 (the "**Effective Date**"), by and between **59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation ("**Seller**") and **JC IOS ACQUISITIONS, LLC**, a Delaware limited liability company ("**Purchaser**")

## RECITALS

This Amendment is made with reference to the following facts:

A.    Seller and Purchaser entered into that certain Purchase and Sale Agreement dated December 10, 2024, as amended by that certain Amendment No. 1 to Purchase and Sale Agreement dated January 9, 2025, as further amended by that certain Amendment No. 2 to Purchase and Sale Agreement dated February 24, 2025, as further amended by that certain Amendment No. 3 to Purchase and Sale Agreement dated May 9, 2025, as further amended by that certain Amendment No. 4 to Purchase and Sale Agreement dated May 14, 2025, as further amended by that certain Amendment No. 5 to Purchase and Sale Agreement dated May 16, 2025, as further amended by that certain Amendment No. 6 to Purchase and Sale Agreement dated May 21, 2025, as further amended by that certain Amendment No. 7 to Purchase and Sale Agreement dated May 23, 2025, as further amended by that certain Amendment No. 8 to Purchase and Sale Agreement dated May 28, 2025 (the "**Agreement**"), with respect to the purchase and sale of certain Property (as defined in the Agreement). Capitalized terms used and not otherwise defined in this Amendment have the meanings ascribed to such terms in the Agreement.

B.    Seller and Purchaser desire to amend the Agreement on the terms and conditions set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as well as the mutual covenants and agreements herein contained, Seller and Purchaser, intending to be legal bound, agree as follows:

1.    **Approval Notice**. Upon mutual execution and delivery of this Amendment by Seller and Purchaser, this Amendment shall constitute Purchaser's Approval Notice, which shall be deemed timely delivered in accordance with Section 3.01 of the Agreement. Purchaser and Seller also expressly acknowledge and agree that the Due Diligence Period shall expire immediately upon the mutual execution of this Amendment; provided that, notwithstanding the foregoing, Purchaser expressly reserves its rights under Section 5.02 of the Agreement.

2.    **Purchase Price Reduction**. Section 2.02 of the Agreement is hereby amended to provide that the Purchase Price shall be reduced to Four Million Fifty-One Thousand Five Hundred Fifty-Nine Cents and 00/100 Dollars ($4,051,559.09) (the "**Purchase Price**"). Purchaser and Seller acknowledge the existence of the one or more ongoing insurance claims, remediation, and repairs affecting the Property, and the aforementioned reduction in the Purchase Price is intended to compensate Purchaser for any and all repairs that Purchaser may or may not have to make to the Property immediately at or after Closing, including, without limitation, any repairs associated with current and future damage on the Property. Purchaser acknowledges and agrees that Seller shall not be responsible for any repairs to the Property— either before or after Closing—upon the Effective Date of this Amendment.

3.    **Purchaser Credit at Closing**. Purchaser and Seller hereby agree that upon Purchaser's delivery to Seller of evidence of Purchaser's costs and expenses for two (2) 24/7 armed security guards at

the Property for the period of time commencing as of the Effective Date and ending on the Closing Date (the "**Security Service**"). Seller shall reimburse Purchaser for all amounts actually paid by Purchaser for the Security Service (the "**Security Service Reimbursement**"). However, in no instance, and under no circumstance, shall the Security Service Reimbursement exceed a total aggregate amount of $60,000.00. Seller agrees to pay the Security Service Reimbursement in the form of a credit on the settlement statement at Closing.

4.    **Closing Date**. Section 4.01 of the Agreement is hereby amended to provide that the Closing Date shall occur on the later of (i) June 23, 2025; or (ii) the first Business Day which is twenty-five (25) days following the date on which Seller receives a court order authorizing the sale of the Property in the Chapter 15 Proceedings in the U.S. Court (the "**Court Order**"), provided that Seller shall submit the request for the Court Order no later than three (3) Business Days following the date of Purchaser's response to Seller's Cure Notice.

5.    **Miscellaneous**.  In the event of any conflict between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall control. The Recitals herein contained are true and correct and made a part hereof. This Amendment may be executed in one or more counterparts and may be signed by facsimile or by an electronic PDF version. All counterparts so executed shall constitute one Amendment, binding on all parties, even though all parties are not signatory to the same counterpart, or the signatures are not original signatures to the same Amendment. As amended by this Amendment, the Agreement is ratified and confirmed in all respects.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

| SELLER: | PURCHASER: |
|---|---|

**59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation

By: _RC Benson_ (Signed by)
_____
E07DE0516449410...
Name:  Randall Benson
Title:   Court-Appointed Chief Restructuring Officer

**JC IOS ACQUISITIONS, LLC,**
a Delaware limited liability company

By: _____
       Daniel Schuchinsky, Authorized Signatory

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the day and year first written above.

<table>
<tr><td><u>**SELLER:**</u></td><td><u>**PURCHASER:**</u></td></tr>
<tr><td>**59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation</td><td>**JC IOS ACQUISITIONS, LLC,**<br>a Delaware limited liability company</td></tr>
</table>

SELLER: _____

**59TH AVE PHOENIX HOLDING CORP**, an Arizona corporation

By: _____
Name:  Randall Benson
Title:   Court-Appointed Chief Restructuring
           Officer

PURCHASER: _____

**JC IOS ACQUISITIONS, LLC,**
a Delaware limited liability company

By: _____
     Daniel Schuchinsky, Authorized Signatory

## ASSIGNMENT AND ASSUMPTION OF PURCHASE AND SALE AGREEMENT

This **ASSIGNMENT AND ASSUMPTION OF PURCHASE AND SALE AGREEMENT** (this "**Agreement**") is made and entered into as of May 29, 2025 (the "**Effective Date**"), by and between **JC IOS ACQUISITIONS LLC**, a Delaware limited liability company ("**Assignor**"), and **1021 N 59TH LLC**, a Delaware limited liability company ("**Assignee**").

### RECITALS

This Agreement is made with reference to the following facts:

A.     Assignor is a party to that certain Purchase and Sale Agreement dated as of December 10, 2025, by and between Assignor, as Purchaser thereunder, and 59TH AVE PHOENIX HOLDING CORP, an Arizona corporation, as Seller thereunder (as amended, the "**Purchase Agreement**"), pursuant to which Assignor agreed to purchase certain real property located at 1021 N 59th Avenue, Phoenix, Arizona 85043 and the improvements located thereon (collectively, the "**Property**"). Capitalized terms used but not otherwise defined in this Agreement shall, have the meanings ascribed to such terms in the Purchase Agreement.

B.     Pursuant to <u>Section 19.03(a)</u> of the Purchase Agreement, Assignor desires to assign and transfer to Assignee all of Assignor's right, title, and interest in and to the Purchase Agreement, and Assignee desires to assume from Assignor all of Assignor's right, title, and interest in and to the Purchase Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants and conditions herein contained, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.     Assignor does hereby sell, assign, convey, transfer, set over and deliver unto Assignee, and Assignee does hereby assume, all of Assignor's right, title and interest in and to the Purchase Agreement (including, without limitation, the Deposit).

2.     The Recitals herein contained are true and correct and made a part hereof. The parties hereto agree to execute such further documents and agreements as may be necessary to effectuate the purposes of this Agreement. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the state where the Property is located (without reference to conflicts of laws principles). This Agreement may be executed in one or more counterparts and may be signed by facsimile or by an electronic PDF version. All counterparts so executed shall constitute one Agreement, binding on all parties, even though all parties are not signatory to the same counterpart, or the signatures are not original signatures to the same Agreement.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date first written above.

<u>**ASSIGNOR**</u>**:**

**JC IOS ACQUISITIONS LLC**,
a Delaware limited liability company

By: _Daniel Schuchinsky_ _____
　　　Daniel Schuchinsky, Authorized Signatory

<u>**ASSIGNEE**</u>**:**

**1021 N 59TH LLC**,
a Delaware limited liability company

By: _Daniel Schuchinsky_ _____
　　　Daniel Schuchinsky, Authorized Signatory

*Signature page to Assignment and Assumption of Purchase and Sale Agreement (SPE)*